**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GLENDA JOHNSON ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:11-cv-05782-PD |
| v. | ) | And All Related Cases |
| | ) | |
| SMITHKLINE BEECHAM CORPORATION ET AL., | ) | This Document Relates to: |
| | ) | |
| | ) | *Alexander, et al. v. Avantor* |
| Defendants. | ) | *Performance Materials, et al.* |
| | ) | No. 2:13-cv-04591 |
| | ) | |

**ORDER**

Upon consideration of Defendants' Motion for Summary Judgment as to Plaintiff Roel Garza and the accompanying Memorandum of Law in Support thereof, and any response thereto, it is hereby **ORDERED** that Defendants' Motion is **GRANTED** and the action of Plaintiff Roel Garza is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiff's counsel are assessed fees and costs in connection with the maintenance of this action. Defendants shall submit documentation concerning the fees and costs associated with the defense of Plaintiff Garza's claims within 20 days of the date of this Order.

**IT IS SO ORDERED** this __ day of _____, 2014.

BY THE COURT:

_____
Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| GLENDA JOHNSON ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:11-cv-05782-PD |
| v. | ) | And All Related Cases |
| | ) | |
| SMITHKLINE BEECHAM CORPORATION ET AL., | ) | This Document Relates to: |
| | ) | |
| | ) | *Alexander, et al. v. Avantor* |
| Defendants. | ) | *Performance Materials, et al.* |
| | ) | No. 2:13-cv-04591 |
| | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO
PLAINTIFF ROEL GARZA**

Pursuant to Federal Rule of Civil Procedure 56, for the reasons set forth in the accompanying memorandum in support of this motion, Defendants respectfully move for summary judgment as to Plaintiff Roel Garza as his action is time barred under the applicable statute of limitations and statute of repose and he has no admissible evidence that his mother took thalidomide.

Dated:  July 28, 2014

Respectfully submitted,

*/s/ Michael T. Scott*
Michael T. Scott
Sandra M. Di Iorio
Cassandra Lee Matos
REED SMITH LLP
Three Logan Square, Suite 3100
1717 Arch Street
Philadelphia, Pennsylvania 19103
Telephone:  (215) 851-8100
Facsimile:   (215) 851-1420

Sonja S. Weissman (*admitted pro hac vice*)
REED SMITH LLP
101 Second Street
San Francisco, California 94105
Telephone: (415) 543-8700
Facsimile:  (415) 391-8269

Eric L. Alexander (*admitted pro hac vice*)
REED SMITH LLP
1301 K Street, NW—East Tower
Washington, DC 20005
Telephone:  (202) 414-9403
Facsimile:  (202) 414-9299

*Attorneys for Defendants GlaxoSmithKline LLC and
GlaxoSmithKline Holdings (Americas) Inc.*


*/s/ Craig A. Knot*
Sara J. Gourley (*admitted pro hac vice*)
Eugene A. Schoon (*admitted pro hac vice*)
Craig A. Knot (*admitted pro hac vice*)
Elizabeth C. Curtin (*admitted pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:   (312) 853-7036

Albert G. Bixler
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania 19102
Telephone:   (215) 851-8400
Facsimile:   (215) 851-8383

*Attorneys for Grünenthal GmbH*

2

*/s/ Daniel S. Pariser*

Anand Agneshwar (*admitted pro hac vice*)
Daniel S. Pariser (*admitted pro hac vice*)
Paige H. Sharpe (*admitted pro hac vice*)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999


Kenneth A. Murphy
DRINKER BIDDLE & REATH LLP
One Logan Square
Suite 2000
Philadelphia, Pennsylvania  19103
Telephone: (215) 988-2700
Facsimile: (215) 988-2757

*Counsel for Sanofi-Aventis U.S. LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GLENDA JOHNSON ET AL., ) | |
| ) | |
| Plaintiffs, ) | Case No. 2:11-cv-05782-PD |
| ) | And All Related Cases |
| v. ) | |
| ) | This Document Relates to: |
| SMITHKLINE BEECHAM CORPORATION ) ET AL., ) | |
| ) | *Alexander, et al. v. Avantor* |
| Defendants. ) | *Performance Materials, et al.* |
| ) | No. 2:13-cv-04591 |
| ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF ROEL GARZA**

Michael T. Scott
Sandra M. Di Iorio
Cassandra Lee Matos
REED SMITH LLP
Three Logan Square, Suite 3100
1717 Arch Street
Philadelphia, Pennsylvania 19103
Telephone:  (215) 851-8100
Facsimile:   (215) 851-1420

Sonja S. Weissman (*admitted pro hac vice*)
REED SMITH LLP
101 Second Street
San Francisco, California 94105
Telephone: (415) 543-8700
Facsimile:  (415) 391-8269

Eric L. Alexander (*admitted pro hac vice*)
REED SMITH LLP
1301 K Street, NW—East Tower
Washington, DC 20005
Telephone:  (202) 414-9403
Facsimile:  (202) 414-9299

*Attorneys for Defendants GlaxoSmithKline LLC and GlaxoSmithKline Holdings (Americas) Inc.*

[[Additional Counsel on Signature Page]]

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     UNDISPUTED FACTS ..........................................................................................2

        A.      Thalidomide, Publicity, And Previous Litigation .....................................2

        B.      Plaintiff And His Mother ...........................................................................7

III.    PROCEDURAL HISTORY...................................................................................10

IV.     STANDARD OF LAW.........................................................................................12

V.      ARGUMENT ........................................................................................................13

        A.      Plaintiff's Claims Are Barred By The Statute Of Limitations And Statute Of
                Repose.......................................................................................................13

                1.      Plaintiff's Claims Are Time Barred Under Pennsylvania Law ........14

                        (A)     Plaintiff Has Had Constructive Notice Of His Claim His Entire
                                Adult Life...................................................................................14

                        (B)     The Doctrine Of Fraudulent Concealment Does Not Save
                                Plaintiff's Claims .......................................................................18

                2.      Although The Court Need Not Reach The Issue, Plaintiff's Claims Are
                        Also Time Barred Under Texas Law ........................................................20

                3.      Plaintiff's Claims Are Barred By The Texas Statute Of Repose.............23

        B.      Plaintiff Cannot Prove That His Mother Ingested Thalidomide ...........................25

VI.     AN AWARD OF COSTS AND FEES AGAINST PLAINTIFF'S COUNSEL AND
        IN FAVOR OF DEFENDANTS IS WARRANTED .........................................28

VII.    CONCLUSION.....................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) ................................................................................ 3

*Abuan v. Gen. Elec. Co.*,
  3 F.3d 329 (9th Cir. 1993) .................................................................................... 26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .............................................................................................. 13

*Baselice v. Franciscan Friars Assumption BVM Province, Inc.*,
  879 A.2d 270 (Pa. Super. Ct. 2005) ................................................................ 18, 19

*Bell v. Showa Denko K.K.*,
  899 S.W.2d 749 (Tex. Ct. App. 1995) .................................................................. 22

*Bradford v. City of Philadelphia*,
  No. 06-cv-5121, 2007 WL 2345278 (E.D. Pa. Aug. 16, 2007) ............................. 15

*Brown v. Pennsylvania Hosp.*,
  No. 1432, 1992 WL 1071390 (Pa. Ct. Com. Pl. May 5, 1992) .............................. 14

*Burlington Northern & Santa Fe Ry. Co. v. Poole Chem. Co.*,
  419 F.3d 355 (5th Cir. 2005) ........................................................................... 23, 24

*Burnside v. Abbot Laboratories*,
  505 A.2d 973 (Pa. Super. Ct. 1985) ...................................................................... 17

*Burton v. Richardson-Merrell*,
  No. 77-738-028 (Mich. Cir. Ct. Wayne Co.) .......................................................... 5

*Byrnes v. DeBolt Transfer, Inc.*,
  741 F.2d 620 (3d Cir. 1984) .................................................................................. 11

*C.J.M. v. Archdiocese of Phila.*,
  67 Pa. D. & C.4th 474 (Pa. Ct. Com. Pl. 2004) ..................................................... 18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................... 1, 12, 27

*Cetel v. Kirwan Financial Group, Inc.*,
  460 F.3d 494 (3d Cir. 2006) .................................................................................. 11

*Cochran v. GAF*,
  666 A.2d 245 (Pa. 1995) ....................................................................................... 17

*Combs v. Int'l Ins. Co.*,
  354 F.3d 568 (6th Cir. 2004) ................................................................................ 14

*Crofton v. Amoco Chem. Co.*,
  No. 14-98-01412, 1999 WL 1122999 (Tex. Ct. App. Dec. 9, 1999) ....................... 22

*Danysh v. Eli Lilly & Co.*,
No. 1:10-cv-2116, 2011 WL 4344601 (M.D. Pa. July 13, 2011) ............................................ 15

*DeMayo v. Schmitt*,
1990 WL 902397, 20 Phila Co. Rptr. 269 (Pa. Com. Pl. Feb. 16, 1990) .................................. 26

*Diamond v. Richardson-Merrell, Inc.*,
No. CV 62-0032132 (E.D. Pa. 1962) (Mar. 10, 1969) .......................................................... 4, 5

*Dick v. Am. Home Prods. Corp.*,
No. 1:05-cv-22384, 2009 WL 1542773 (M.D. Pa. June 2, 2009) .......................................... 25

*D'Orazio v. McGraw Edison Power System Div.*,
802 F. Supp. 1297 (W.D. Pa 1992) ...................................................................................... 12, 13

*Eckenrod v. GAF Corp.*,
375 Pa. Super. 187, 544 A.2d 50 (Pa. Super. Ct. 1988) ...................................................... 25

*Fine v. Checcio*,
870 A.2d 850 (Pa. 2005) .................................................................................................... 14, 18

*Florang v. Merrell Dow Pharmaceuticals, Inc.*,
No. 582-829 (Cal. Super. Ct. Santa Clara Co.) .................................................................. 5

*Gaulding v. Celotex Corp.*,
772 S.W.2d 66 (Tex. 1989) ................................................................................................ 25

*Gehring v. Showa Denko, K.K., No. Civ. A.*,
91-6855, 1994 WL 597584 (E.D. Pa. Nov. 2, 1994) .......................................................... 25

*Giest v. Sequoia Ventures, Inc.*,
83 Cal.App. 4th 300, 99 Cal.Rptr.2d 476 (Cal.App.Ct., 1st Dist. 2000) .............................. 14

*Gilcrease v. Tesoro Petroleum Corp.*,
70 S.W.3d 265 (Tex. App. 2001) ........................................................................................ 14

*Gray v. U.S.*,
445 F. Supp. 337 (S.D. Tex. 1978) .......................................................................... 25, 26, 27

*Henry v. Richardson-Merrell, Inc.*,
508 F.2d 28 (3d Cir. 1975) ................................................................................................ 5

*Holt v. Hedberg*,
316 S.W.2d 955 (Tex. Civ. App. 1958) .............................................................................. 21

*Holubec v. Brandenberger*,
111 S.W.3d 32 (Tex. 2003) ................................................................................................ 24

*Huber v. McElwee-Courbis Const. Co.*,
392 F. Supp. 1379 (E.D. Pa. 1974) .................................................................................... 15

*Hues v. Warren Petroleum Co.*,
814 S.W.2d 528 ................................................................................................................ 22, 23

*Hyde v. Hoffman-La Rouche Inc.*,
No. 3:04-cv-1473, 2008 WL 4191529 (N.D. Tex. Sept. 10, 2008) ...................................... 24

*In re Allied Chem. Corp.*,
227 S.W.3d 652 (Tex. 2007) ............................................................................ 25

*In re Avandia Marketing, Sales Practices & Prods. Liab. Litig.*,
No. 1871, 2012 WL 3205620 (E.D. Pa. Aug. 7, 2012) ...................................... 16

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.*,
982 F. Supp. 388 (E.D. La. 1997) ..................................................................... 16

*In re Mirena IUD Prods. Liab. Litig.*,
— F. Supp. 2d —, 2014 WL 2971179 (S.D.N.Y. July 2, 2014) ............................ 23

*In re Prudential Ins. Co. Am. Sales Prac. Litig.*,
278 F.3d 175 (3d Cir. 2002) .............................................................................. 30

*In re Trasylol Prods. Liab. Litig.*,
No. 08-MD-01928, 2010 WL 6098571 (S.D. Fla. Mar. 16, 2010) ...................... 16

*In re Vioxx Prods. Liab. Litig.*,
522 F. Supp. 2d 799 (E.D. La. 2007) ................................................................ 16

*Insurance Co. of North America v. Carnahon*,
284 A.2d 728 (Pa. 1971) .................................................................................... 30

*Larthey v. Bland*,
532 A.2d 456 (Pa. Super. Ct. 1987) .................................................................. 14

*Ledwith v. Sears Roebuck & Co.*,
231 A.D.2d 17, 660 N.Y.S.2d 402 (N.Y. App. Div, 1st Dep't 1997) ..................... 14

*Marino v. Usher*,
No. CIV. 11-6811, 2014 WL 2116114 (E.D. Pa. May 21, 2014) .......................... 29

*Martz v. Weyerhaeuser Co.*,
965 S.W.2d 584 (Tex. Ct. App. 1998) ........................................................ 21, 22

*May v. Remington Arms Co., Inc.*,
No. Civ.A. 94C-08-270FSS, 2005 WL 2155229 (Del. Super. Ct. Aug. 31, 2005) ................. 14

*McCarrick v. Richardson-Merrell*,
Inc., No. 882426, 1971 WL 39622 (Cal. Super. Ct. 1971) ................................... 5

*McKenna v. Ortho Pharm. Corp.*,
622 F.2d 657 (3d Cir. 1980) .............................................................................. 13

*Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P., v. Rankin*,
307 S.W.3d 283 (Tex. 2010) ................................................................... 24, 27, 30

*Mitchell Energy Corp. v. Bartlett*,
958 S.W.2d 430 (Tex. Ct. App. 1997) ............................................................... 22

*Moreno v. Sterling Drug, Inc.*,
787 S.W.2d 348 (Tex. 1990) ....................................................................... 21, 22

*Murray v. SmithKline Beecham Corporation, et al.*,
No. 11-cv-3510 .................................................................................................. 20

*Orozco v. Children's Hosp. of Phila.*,
  638 F. Supp. 280 (E.D. Pa. 1986) , *aff'd* 813 F.2d 398 (3d Cir. 1987) ................................... 14

*Pocono Intern. Raceway, Inc. v. Pocono Produce, Inc.*,
  468 A.2d 468 (Pa. 1983) ........................................................................................................ 17

*Riggs v. AHP Settlement Trust*,
  421 F. App'x 136 (3d Cir. 2011) ............................................................................................ 19

*Robertson v. Allied Signal, Inc.*,
  914 F.2d 360 (3d Cir. 1990) ................................................................................................... 26

*Robinson v. Weaver*,
  550 S.W.2d 18 (Tex. 1977) ..................................................................................................... 21

*Russell v. Ingersoll-Rand Co.*,
  841 S.W.2d 343 (Tex. 1992) ................................................................................................... 21

*Salgado v. Great Dane Trailers*,
  No. 10-82, 2012 WL 401484 (S.D. Tex. Feb. 6, 2012) .......................................................... 24

*Schmucher v. Naugle*,
  231 A.2d 121 (Pa. 1967) ........................................................................................................ 30

*Sherk v. Daisy-Heddon*,
  498 Pa. 594, 450 A.2d 615 (Pa. 1982) ................................................................................... 25

*Speicher v. Dalkon Shield Claimants Trust*,
  943 F. Supp. 554 (E.D. Pa. 1996) .......................................................................................... 18

*Stanton by Brooks v. Astra Pharm. Prods., Inc.*,
  718 F.2d 553 (3d Cir. 1983) ..................................................................................................... 3

*Stuart v. American Cyanamid Co.*,
  158 F.3d 622 (2d Cir. 1998) ................................................................................................... 14

*Thomas v. Smith Kline Beecham Corp.*,
  J-A15019-13, slip op. (Pa. Super. Ct. Nov. 27, 2013)...................................................... 18, 19

*Thompson v. Johns-Manville Sales Corp.*,
  714 F.2d 581 (5th Cir. 1983) ................................................................................................. 27

*United States v. Kubrick*,
  444 U.S. 111 (1979).......................................................................................................... 27, 30

*Urland v. Merrell-Dow Pharm., Inc.*,
  822 F. 2d 1268 (3d Cir. 1987) ............................................................................................... 14

*Vaught v. Showa Denko K.K.*,
  107 F.3d 1137 (5th Cir. 1997) ............................................................................................... 22

*Wagner & Brown, Ltd. v. Horwood*,
  58 S.W.3d 732 (Tex. 2001).................................................................................................... 21

*Weaver v. Witt*,
  561 S.W.2d 792 (Tex. 1977)................................................................................................... 21

*Wenke v. Gehl Co.*,
   274 Wis.2d 220, 682 N.W.2d 405 (Wis. 2004) ...................................................... 14

*Willis v. Maverick*,
   760 S.W.2d 642 (Tex. 1988)........................................................................... 21

*Winters v. Diamond Shamrock Chem. Co.*,
   149 F.3d 387 (5th Cir. 1998) .......................................................... 21, 22, 23

*Woods v. Adams Run Assoc., No. Civ. A.*,
   96-6111, 1997 WL 256966 (E.D. Pa. May 13, 1997), *aff'd*, 151 F.3d 1027 (3d Cir. 1998) .... 30

## Statutes

28 U.S.C. § 1927 ............................................................................... 29

42 Pa. Cons. Stat. § 5521(b) ............................................................... 13

42 Pa. Cons. Stat. Ann § 5524(2) .......................................................... 14

42 Pa. Cons. Stat. Ann § 5524(7) .......................................................... 14

42 Pa. Cons. Stat. Ann. § 5533(b)(1) ...................................................... 14

Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) ............................................. 21

Tex. Civ. Prac. & Rem. Code Ann. § 16.012(b) ............................................. 24

## Rules

Fed. R. Civ. P. 56(c) ....................................................................... 12

Fed. R. Civ. P. 56(e) ....................................................................... 13

Fed. R. Civ. P. 9(b) ........................................................................ 11

I.     <u>**INTRODUCTION**</u>

Plaintiff Roel Garza was born in 1959 with birth defects that he attributes to pills his mother allegedly took during pregnancy.  Plaintiff has no evidence that such pills were thalidomide, or that his mother took any pills at all.  Defendants are entitled to summary judgment on two independent grounds.

First, this birth defect case – filed 54 years after Plaintiff was born – has long been time barred.  Plaintiff testified that he has long understood that drugs taken by a woman during pregnancy may affect the unborn child.  Further, he long suspected that this may have caused his own birth defects, but failed to investigate his injuries for decades.  There is no evidence which could conceivably allow Plaintiff to invoke the "discovery rule" or the doctrine of fraudulent concealment to excuse the extraordinary delay in the filing of this action.  His claims are therefore time barred under the applicable statute of limitations and statute of repose.

Second, while Plaintiff's Complaint alleged that his injuries resulted from his mother's use of thalidomide, there is no admissible evidence that his mother used thalidomide, much less that it was provided by Defendants.  Far from it, Plaintiff testified in deposition that he has no basis for believing that his mother, who is now deceased, took thalidomide or any other pills during her pregnancy with him.  Because Plaintiff has no evidence that his mother took thalidomide, this case is controlled by *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), in which the Supreme Court held that a product liability defendant is entitled to summary judgment where, as here, Plaintiff has no evidence that he was exposed to the defendant's product.

Defendants are entitled to the entry of summary judgment in their favor.[1]

---

[1] Defendants reserve the right to raise other defenses, by motion or at trial, should this motion not be granted.

## II.        UNDISPUTED FACTS

### A.        Thalidomide, Publicity, And Previous Litigation

In the 1950s, Grünenthal GmbH developed thalidomide. Ex. 1 (Compl. ¶¶ 47, 51).[2]  In

1956, Grünenthal and Smith Kline & French ("SKF") entered into a preliminary licensing

agreement, and SKF conducted animal tests, then a limited clinical trial in 1956 and 1957

involving 875 patients. Ex. 1 (*Id.* ¶¶ 54, 80-81, 98).  In 1957, SKF decided not to market

the drug and never sought Food and Drug Administration ("FDA") approval to do so.  *See* Ex. 1

(*Id.* ¶ 109).  In October 1958, Grünenthal entered into a licensing agreement with Richardson-

Merrell, Inc. and its subsidiaries (together, "Merrell"), who thereafter conducted a clinical trial

and submitted a New Drug Application ("NDA") to the FDA.  Ex. 1 (*Id.* ¶ 70).

In November 1961, a German publication ran a story linking thalidomide and birth

defects.  Ex. 1 (*Id.* ¶ 286).  The drug was soon withdrawn from all worldwide markets, and the

still pending United States NDA was halted.  Ex. 1 (*Id.* ¶ 65-66).  What followed was one of the

most intensely and widely publicized pharmaceutical-related stories in United States history.

Plaintiff's Complaint itself notes the unprecedented extent of the world-wide media blitz, stating

the thalidomide story "unfolded before a world aghast with horror" in 1962.  Ex. 1 (*Id.* ¶ 69).

Hundreds of media reports including books, national newspapers, and magazine articles

discussing thalidomide and its link to birth defects were written in the early 1960s.  Ex. 2 (partial

bibliography).  In August 1962, President John F. Kennedy gave a press conference dealing with

thalidomide and noted that "[e]very citizen … should be aware of the hazards [of thalidomide],

and I am sure they are" and urged American women to empty their medicine cabinets of

---

[2] Although many of the allegations of the Complaint are disputed and such allegations cannot create a genuine issue of material fact, for simplicity's sake, Defendants point to certain facts referenced in the Complaint that Plaintiff cannot dispute.

thalidomide: "Every woman in this country … must be aware that it is most important that they check their medicine cabinet, that they do not take this drug, that they turn it in."  Ex. 3 (Official White House Tr. at 3).

That same month, public hearings began before Congress.  Ex. 4 (cover page, table of contents, and statement of Senator Hubert Humphrey).  The public record from those hearings included the fact that on August 27, 1962, SKF's President Walter Munns wrote a letter to Senator Hubert Humphrey in response to a series of questions posed by Senator Humphrey about the SKF clinical trial.  Ex. 5 (Hearings Before the Subcomm. on Reorganization and Int'l Org. of the S. Comm. On Gov't Operations, 87th Cong. 275-276 (Letter from W. A. Munns to Senator Hubert Humphrey, Aug. 21, 1962)).  Mr. Munns' letter was reprinted in the Senate Committee Report in 1963, which has been publicly available for over fifty years.  It states:

> Our clinical testing involved approximately 875 patients and a total of 67 investigators throughout the United States.

Ex. 5 (*Id.*).  Those hearings led to major changes in the law and regulations governing pharmaceuticals in this country.  *See Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 725 (D.C. Cir. 2007) (noting that the 1962 Kefauver-Harris Amendments were enacted in response to thalidomide and "transformed drug regulation" in the United States); *Stanton by Brooks v. Astra Pharm. Prods., Inc.*, 718 F.2d 553, 559 (3d Cir. 1983).

The media publicized the clinical trials conducted by SKF and Merrell.  On September 9, 1962, the *Washington Post* ran a front-page story reporting that 1,267 physicians had received 2.5 million thalidomide tablets during Merrell's clinical trial and that SKF's clinical trial resulted in the distribution of 344,270 thalidomide tablets to 67 doctors.  Ex. 6 (Morton Mintz, "Drug

Firm Said to Lag on Warning," *The Washington Post Times Herald* (Sept. 9, 1962) at A1).

Other stories reported the same information, including:

- In August 1962, *LIFE* published a story on thalidomide referencing German and U.S. drug manufacturers, and included a picture of Grünenthal's manufacturing plant and a statement from Merrell's director of medical research.  Ex. 7 (*Life Magazine* (Aug. 10, 1962) pp. 26-27).

- In September 1962, the *Saturday Review* wrote an article outlining the chronology of Merrell's NDA and the subsequent withdrawal of thalidomide from Germany and England; the next month the *Saturday Review* reported:  "[T]he hearing record of U.S. Senator Hubert Humphrey's committee on intergovernmental agency communications shows that in 1956 and 1957 Smith, Kline and French gave thalidomide to sixty-seven doctors, who gave it to 875 patients in an experiment encompassing eleven states."  Ex. 8 (John Lear, "The Unfinished Story of Thalidomide," *Saturday Review* (Sept. 1, 1962)); Ex. 9 (John Lear, *Saturday Review* (Oct. 6, 1962)).

- In March 1963, *The Reporter* stated:  "Smith, Kline & French Laboratories of Philadelphia tested thalidomide in 1956-1957" and "Merrell and three other subsidiaries of Richardson-Merrell, Inc., ultimately distributed 2.5 million thalidomide tablets to 1,267 physicians for 'experimental' use."  Ex. 10 (Morton Mintz, "New Drugs:  Is Government Supervision Adequate?" *The Reporter* (Mar. 28, 1963)).

Throughout the 1960s various popular magazines continued to publish stories about the victims of thalidomide.  *See, e.g.*, Ex. 11 ("The Thalidomide Generation," *Life Magazine* (July 26, 1968)); Ex. 12 ("The Untold Story of the Thalidomide Babies," *Saturday Evening Post* (Oct. 20, 1962)).  A reference to "children of thalidomide" was even included in Billy Joel's catalogue of the big stories of the second half of the 20th Century in his popular 1989 song "We Didn't Start The Fire."  *See* Ex. 13 (Lyrics from Billy Joel's song "We Didn't Start The Fire.").

Thalidomide was also the subject of extensive and widely reported litigation decades ago.  Between 1962 and the early 1990s, dozens of lawsuits claiming thalidomide injuries were filed across the United States, including in this Court.  *See Diamond v. Richardson-Merrell, Inc.*, No. CV 62-0032132 (E.D. Pa. 1962) (settled pre-verdict); Ex. 14 (list of prior U.S. thalidomide litigation); Ex. 2 at Nos. 102, 105, 107, 139, 142, 166-69, 195-96, 209-11 (identifying

widespread media coverage of U.S. lawsuits).  Publicity was so widespread that during the

*Diamond* trial in this Court, Judge Troutman admonished the jury "not to be guided by anything

which might be placed in the newspapers or anything which you might hear over the radio or

anything you might see by way of television."  Ex. 15 (Trial Tr., *Diamond v. Richardson-*

*Merrell, Inc.*, No. CV 62-0032132 (E.D. Pa. 1962), pp. 803-04, Mar. 10, 1969).

These lawsuits included claims against all the Defendants here.  In 1977, plaintiff Rose

Ann Burton filed suit against SKF, Richardson-Merrell, Grünenthal, and others in Michigan state

court.  Ex. 16 (Compl., *Burton v. Richardson-Merrell*, No. 77-738-028 (Mich. Cir. Ct. Wayne

Co.)).  In addition, SKF was added as a defendant to a lawsuit filed by plaintiff Claudia Florang

in California state court in 1985.  Ex. 17 (Amendment to Compl., *Florang* v. *Merrell Dow*

*Pharmaceuticals, Inc.*, No. 582-829 (Cal. Super. Ct. Santa Clara Co.)).  In both cases, the

plaintiffs alleged they suffered from birth defects caused by their mother's ingestion of

thalidomide.  *See* Ex. 16 (*Burton* Compl. ¶ 4); Ex. 18 (*Florang* Second Am. Compl. ¶ 13).

Other stories further publicized results from these lawsuits.  For example, in 1971, a

thalidomide case resulted in a $2.75 million verdict for the plaintiff—a remarkable and

newsworthy amount in those days.  *See McCarrick v. Richardson-Merrell, Inc.*, No. 882426,

1971 WL 39622 (Cal. Super. Ct. 1971); Ex. 19 ("Thalidomide:  The American Experience," *New*

*York Times* (Apr. 29, 1973) at p. 334 (reporting on 13 U.S. lawsuits, including *McCarrick*)); Ex.

20 ("Decades Later, Peggy Yearns 'to Be Tall'," *Los Angeles Times* (June 22, 1972) (discussing

*McCarrick* and potential statute of limitations problems for other thalidomide plaintiffs)).

In 1975, the Third Circuit affirmed the dismissal based on the statute of limitations of a

thalidomide case.  *Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28 (3d Cir. 1975).

Plaintiff's Complaint itself relies on multiple sources that have been publicly available

for decades.  For example, portions of Plaintiff's Statement of Facts crib verbatim or nearly

verbatim, without citation, from three books on thalidomide that were published decades before

Plaintiff filed his lawsuit:  (1) Henning Sjostrom & Robert Nilsson, *Thalidomide and the Power*

*of the Drug Companies* (1972), (2) Phillip Knightley, et al., The *Sunday Times* Insight Team,

*Suffer the Children: The Story of Thalidomide* (1979), and (3) Trent Stephens & Rock Brynner,

*Dark Remedy: the Impact of Thalidomide and its Revival as a Vital Medicine* (2001).  *See* Ex. 21

(comparing Compl. ¶¶ 51-52 with *Thalidomide and the Power of the Drug Companies* at 37,

187); Ex. 22 (comparing Compl. ¶¶ 72, 75 with *Suffer the Children* at 115, 117); Ex. 23

(comparing Compl. ¶¶ 47-54, 69-73, 75 with *Dark Remedy* at 6, 7, 10, 14-15, 16-17, 61-64).

These publications also discussed each Defendant ultimately sued here.  For example, *Suffer the*

*Children* stated:  "Grünenthal's first step towards marketing thalidomide was to arrange for

clinical trials" (p. 25); "During 1956, the SKF research organization in Philadelphia made both

animal and human tests" (p. 18); and "On February 11, 1959 . . . Richardson-Merrell began

testing the drug on human beings . . ." (p. 69).  Ex. 24 (cover page and excerpts from *Suffer the*

*Children: The Story of Thalidomide*).

      More recently, in 1998-1999, following a clinical trial in which thalidomide was found to

slow growth of a deadly bone cancer, Celgene Corporation applied for and received FDA

approval to market the drug for that treatment and to treat leprosy.  Ex. 25 ("Thalidomide

Approved to Treat Leprosy, With Other Uses Seen," New York Times (July 17, 1998)); Ex. 26

("Thalidomide Helps With Some Disease," New York Times (Nov. 18, 1999)).  The clinical trial

findings, ensuing FDA review, and other aspects of the return of thalidomide received further

publicity, much of which recounted the problems with the drug in the late 1950s and 1960s.  *See*

Exs. 25-26.

**B.**     **Plaintiff And His Mother**

Plaintiff is the oldest of six children born to Emma Garza ("Mrs. Garza") and Baldomero

Garza, both of whom are deceased.  *See* Ex. 27 (June 18, 2014 Deposition of Plaintiff Roel

Garza ("Pl.'s Dep.") at 48:6-15); *see also* Ex. 28 (Plaintiff Roel Garza's Supplemental Responses

to Defendant GlaxoSmithKline LLC's First Set of Interrogatories to All Plaintiffs, No. 3).

Plaintiff believes that his mother was living in Corpus Christi, Texas, during her pregnancy with

him.  Ex. 29 (Plaintiff Roel Garza's Responses to Defendants GlaxoSmithKline LLC and

GlaxoSmithKline Holdings (Americas) Inc.'s First Set of Interrogatories, No. 2).  Plaintiff does

not know where his mother received care during her pregnancy with him, or whether she

received any prenatal care at all.  Ex. 27 (Pl.'s Dep. at 10:25-11:13).  In fact, Plaintiff testified

that he did not know even the most basic facts about his mother's pregnancy.  S*ee* Ex. 27 (Pl.'s

Dep. at 10:7-14:2).  Plaintiff testified that he did not know whether his mother had any problems

during her pregnancy with him or whether she even suffered from morning sickness:

> Q. Do you know how often your mother saw a doctor, if at all, while she was pregnant with you?
> A. While she was pregnant with me?  I don't know.
> * * *
> Q. Do you know whether your mother had any health problems at all while pregnant with you?
> A. Not that I know of, but I'm not sure.
> * * *
> Q. Do you know whether your mother fell or had any accidents while pregnant with you?
> A. Don't know.
> * * *
> Q. Do you know whether your mother took any drugs while she was pregnant with you?
> A. I don't know.
> Q. All these questions I've asked you, have you ever had any discussions – did you ever have any discussions with your mother about any of those topics?
> A. No.
> Q. Did you ever have any discussion with your father about any of those topics?

- 7 -

A.    No.
Q.    All right.  So your mother never told you that she had morning
      sickness when she was pregnant with you; right?
A.    No.
Q.    And no one else ever told you that; right?
A.    Right.
Q.    And you have no basis, as you sit here today, for saying one way
      or the other that she had morning sickness or didn't have morning
      sickness; right?
A.    Right.

Ex. 27 (Pl.'s Dep. at 10:25-11:3; 11:14-16; 12:4-6; 13:10-14:7).  Plaintiff admitted that his

mother never told him she took thalidomide and he has no factual basis for saying that his

mother took *any pills* at all during her pregnancy with him:

Q.    And no one ever told you that she took pills for morning sickness;
      right?
A.    Right.
Q:    And you have no basis for claiming that she took pills for morning
      sickness; right?
A.    Right.
Q.    And your mother never told you that she took pills while pregnant
      with you for any other purpose, other than morning sickness; right?
A.    Right.
Q.    And no one else ever told you that; right?
A.    Right.
* * *
Q.    . . . I'm asking you whether you have any factual basis for saying
      that your mother took any pills while she was pregnant with you?
A.    I don't know what she took when she was pregnant with me, so I
      have no idea.
Q.    Right.  She died when you were how old?
A.    I was 18.
Q.    And your mother never told you she took [t]halidomide; right?
A.    No.
Q.    Is that – she never did; correct?
A.    She never told me she did, right.
Q.    All right.  And no one else ever told you that; right?
A.    Right.

Ex. 27 (Pl.'s Dep. at 14:8-20; 15:6-22).

Plaintiff testified that he has been aware, throughout his whole adult life, that drugs or any other substances taken by a pregnant woman could have an effect on her unborn child.  Ex. 27 (Pl.'s Dep. at 29:3-11).  When Plaintiff was a teenager, it occurred to him that something his mother took during her pregnancy may have caused his birth defects, yet he failed to do even the most rudimentary investigation and never asked his mother if she had taken any drugs while pregnant with him:

> Q.    Okay.  So did it ever occur to you that, gee, maybe my mother took something while she was pregnant and that's why I have this condition?
>
> A.    Yes.
>
> Q.    That did occur to you?
>
> A.    Yes.
>
> Q.    And when did that first occur to you?
>
> A.    I was a teenager back then.
>
> Q.    So your mother was still alive?
>
> A.    Yeah.
>
> Q.    So did you ask her about it?
>
> A.    No.  Not about taking any kind of drug.
>
> Q.    But you were there and you were thinking, gee, maybe my mother took something and that's what caused my condition, and you didn't ask your mother whether that was the case?
>
> A.    No.
>
> Q.    And how about after your mother died, did you ask your father, "Gee, did my mother take something that made me this way?"
>
> A.    No.
>
> Q.    Did you do anything to follow up on your concern that maybe that's what had happened?
>
> A.    No.
>
> Q.    Did you do any research in your 20's or 30's or 40's to look into that possibility?
>
> A.    No.

Ex. 27 (Pl.'s Dep. at 29:12-30:14).

When asked why Plaintiff never investigated his suspicion about the cause of his injuries, he testified that he "didn't have time" to think about it.  Ex. 27 (Pl.'s Dep. at 30:15-20).  Put simply, Plaintiff did absolutely no investigation to determine whether his suspicion that his

mother may have taken a drug during her pregnancy that caused his birth defects was correct. Ex. 27 (Pl.'s Dep. at 29:12-30:14).  Further, Plaintiff admits that there is not a single person who might know whether or not his mother took any drugs during her pregnancy with Plaintiff.  Ex. 27 (Pl.'s Dep. at 16:8-12).  Not until a random pulmonologist saw him in the hallway of a hospital and told him about thalidomide did Plaintiff proceed to search the internet.  Ex. 27 (Pl.'s Dep. at 16:13-18:10; 18:22-19:2).  Plaintiff, who has owned a computer since 2001 or 2002, conceded that once he did an online search for information about thalidomide, "a lot" of information was readily available to him.  Ex. 27 (Pl.'s Dep. at 19:3-12; 33:3-5).

As of his deposition, Plaintiff had never consulted any physician for a professional opinion regarding the cause of his birth defects.  Ex. 27 (Pl.'s Dep. at 18:11-21).

## III.      PROCEDURAL HISTORY

In August 2013, Plaintiff and others filed suit alleging thalidomide caused their birth defects.  Ex. 1 (Compl. ¶¶ 1-15).  Despite Plaintiff's suspicion that a drug his mother took during pregnancy may have caused his birth defects, which he held throughout his entire adulthood, the Complaint was filled with false allegations that sought to evade the statute of limitations by inaccurately representing what Plaintiff knew and when he knew it.  The Complaint broadly alleges, for instance:

> Plaintiffs bring this action now because they could not have reasonably known until recently, due to advances in science, that their injuries were caused by thalidomide or because defendants concealed their role in the thalidomide tragedy and the truth in that regard was recently uncovered due to extraordinary investigative activities.

Ex. 1 (Compl. ¶ 15).

As for Plaintiff Garza in particular, the Complaint alleges:

> Plaintiff Roel Garza was born in Corpus Christi, Texas on April 21, 1959.  He is a resident of Corpus Christi, Texas.  He believes his mother was given thalidomide by her doctor for morning sickness.

Ex. 1 (*Id.* ¶ 22).  The Complaint offered no detail about the basis for Plaintiff's belief that his mother took thalidomide, and his deposition revealed the Complaint's allegation to be pure unfounded speculation.

In its February 2014 order compelling Plaintiffs to provide information underlying their fraudulent concealment allegations, this Court explained that fraudulent concealment requires proof that the defendants actively misled each particular plaintiff.  This Court stated:

> Fraudulent concealment requires that (1) the defendant actively misled the plaintiff; (2) the defendant prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) the plaintiff's ignorance is not attributable to her lack of reasonable diligence in attempting to uncover relevant facts.  *Cetel v. Kirwan Financial Group, Inc.*, 460 F.3d 494, 509 (3d Cir. 2006).  Like all fraud, it must be pled and proven with particularity.  *Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir. 1984) ("We agree, of course, that fraud, and thus fraudulent concealment, must be pleaded with particularity." (citing Fed. R. Civ. P. 9(b)).  In opposing Defendants' request, Plaintiffs state that "[t]hey do not allege each individual Plaintiff heard or saw each individual communication. They rather rely on the cumulative effect of the communications which caused Plaintiffs to refrain from investigating their claim." (Feb. 20, 2014 Letter.) Plaintiffs cite no supporting authority for this suggestion and I am aware of none. Accordingly, *each Plaintiff* must provide a verified response to Interrogatory 4 detailing *which communications she relied upon that misled her into refraining from investigating her claim* or otherwise proceeding against Defendants.

(*G. Johnson v. SmithKline Beecham Corp. et al.*, No. 11-5782 [Doc. 166] (emphasis added)).

In March 2014—a month after the Court issued the first of the above orders in *Johnson*—Plaintiff's counsel served supplemental discovery responses addressing Plaintiff's concealment allegations, a topic the Court has characterized as "critical in these cases."  (Order Appointing Special Master [Doc. 239]).  Although the response conceded "Plaintiff did not have any direct communications with Defendants," it continued to urge the theory of "public misimpression" the Court had rejected in *Johnson*.  Ex. 30 (Plaintiff Roel Garza's Second Supplemental Response to Sanofi-Aventis' Fourth Interrogatory (listing purported general concealment that supposedly created "a public misimpression (upon which Plaintiff relied in refraining from filing this

action)").  In support of this legally unfounded "public misimpression" theory, Plaintiff's response identified statements Defendants made to Congress, in the public record, and in magazine articles during the early 1960s that, according to the response, "Defendants did not commit any wrongs in connection with the testing and distribution of thalidomide in the United States and that Defendants did not cause Plaintiff to suffer thalidomide injuries." *Id.*

During deposition, however, Plaintiff told a different story than the lawyer-written response.  As Plaintiff admitted, by the time he was a teenager, he suspected that his injuries may have been the result of something his mother took during pregnancy.  Plaintiff's delay in bringing suit was due to his own failure to conduct even the most rudimentary investigation regarding this suspicion.  Plaintiff admitted that as soon as he researched thalidomide, all the information he needed to file suit was readily available to him.  Plaintiff attributed his delay to a lack of time to investigate his claim, not to any statements allegedly made by Defendants.  As such, not only is there no evidence supporting fraudulent concealment, but there was no basis for the supplemental discovery responses that were served under Court order.

## IV.    STANDARD OF LAW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  When the moving party provides such material, the "non-moving party must produce more than a mere scintilla of evidence to avoid summary judgment."  *D'Orazio v. McGraw Edison Power System Div.*, 802 F. Supp. 1297, 1301-02 (W.D. Pa 1992).

After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule [ ] set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Although the evidence is to be viewed in a light favorable to the non-moving party, the "mere existence of *some* factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that it be a *genuine issue of material* fact."   *D'Orazio*, 802 F. Supp. at 1302 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).

V.   **ARGUMENT**

A.   **Plaintiff's Claims Are Barred By The Statute Of Limitations And Statute Of Repose**

Pennsylvania has a "borrowing statute," which provides that "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, *whichever first bars the claim*."  42 Pa. Cons. Stat. § 5521(b) (emphasis added).  This statute "requires [courts] to look to the law of the state where the cause of action arose to determine not only the prescribed period of limitations but also the point at which the statute begins to run."  *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 660 (3d Cir. 1980).  Pennsylvania federal courts sitting in diversity must apply Pennsylvania's borrowing statute.  *See id.* at 659-60.

Here, Plaintiff was born with obvious birth defects in Texas, where his parents resided at the time, in 1959.  Ex. 1 (Compl. ¶¶ 22-23).  Thus, under the borrowing statute, this Court must select the statute of limitations—Pennsylvania's or Texas's—that results in an earlier bar of Plaintiff's claims.  As explained next, however, whether the Court applies Pennsylvania or Texas

law, the result is the same:  the statute of limitations ran long ago and Plaintiff's claims are time

barred.  Further, Plaintiff's claims are also barred by Texas's statute of repose.[3]

### 1.   Plaintiff's Claims Are Time Barred Under Pennsylvania Law

#### (A)   Plaintiff Has Had Constructive Notice Of His Claim His Entire Adult Life

Pennsylvania has a two-year statute of limitations for personal injury, products liability,

and fraud.  42 Pa. Cons. Stat. Ann § 5524(2), (7).  The period "does not begin to run until the

injured party *discovers or reasonably should discover* that he has been injured and that his injury

is caused by another party's conduct."  *Fine v. Checcio*, 870 A.2d 850, 859 (Pa. 2005) (emphasis

added).[4]

---

[3] Although no published Pennsylvania decision has addressed the precise issue, many courts have held that borrowing statutes apply whether the limitations period is called a statute of repose or a statute of limitation.  *See, e.g.*, *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998) ("the purpose of the borrowing statute— preventing forum shopping by plaintiffs seeking the holy grail of the longer period—is best served by applying the period of the foreign state, regardless of how it is denominated"); *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 589 n.11 (6th Cir. 2004) ("[B]orrowing statutes apply to both foreign statutes of limitation and statutes of repose, because both kinds of laws serve to limit the period in which a plaintiff may initiate an action."); *May v. Remington Arms Co., Inc.*, No. Civ.A. 94C-08-270FSS, 2005 WL 2155229, *2 (Del. Super. Ct. Aug. 31, 2005) ("For borrowing purposes, there is no helpful distinction between statutes of repose and limitation.  If there were a distinction, taking into account the borrowing statute's thrust the borrowing statute is even more applicable where a foreign statute of repose is concerned"); *Wenke v. Gehl Co.*, 274 Wis.2d 220, 682 N.W.2d 405, 431 (Wis. 2004) (finding that Wisconsin's borrowing statute borrows statutes of repose); *Ledwith v. Sears Roebuck & Co.*, 231 A.D.2d 17, 660 N.Y.S.2d 402, 405-06 (N.Y. App. Div, 1st Dep't 1997) (holding that New York's borrowing statute borrows statutes of repose); *Giest v. Sequoia Ventures, Inc.*, 83 Cal.App. 4th 300, 99 Cal.Rptr.2d 476 (Cal.App.Ct., 1st Dist. 2000) (noting that California borrowing statute applied Montana 10-year statute of repose); *Gilcrease v. Tesoro Petroleum Corp.*, 70 S.W.3d 265, 269 (Tex. App. 2001) ("we hold a nonresident plaintiff . . .  must satisfy not only the statute of limitations, but also the statute of repose").

[4] Pennsylvania's minor tolling statute, 42 Pa. Cons. Stat. Ann. § 5533(b)(1)(i), was enacted in 1984 and is not retroactive.  *See Urland v. Merrell-Dow Pharm., Inc.*, 822 F. 2d 1268, 1275 (3d Cir. 1987) (collecting cases).  In cases where the minor tolling statute does not apply, the discovery rule focuses instead on the child's parents or guardians.  *See Orozco v. Children's Hosp. of* Phila., 638 F. Supp. 280, n.1 (E.D. Pa. 1986) (finding that the statute of limitations expired where parents had knowledge of the potential cause of action resulting from their child's injuries, noting the mother's knowledge "must be imputed to all plaintiffs"), *aff'd* 813 F.2d 398 (3d Cir. 1987); *Larthey v. Bland*, 532 A.2d 456, 460 (Pa. Super. Ct. 1987) (affirming judgment for defendants because "there is no factual dispute as to the time when the [parents] knew the nature of their son's injuries and that those injuries were caused by problems during the delivery"); *Brown v. Pennsylvania Hosp.*, No. 1432, 1992 WL 1071390 (Pa. Ct. Com. Pl. May 5, 1992) (holding that the limitations period for claims resulting from the baby's birth defects began running as soon as the parents discovered the baby's injuries and the action).  The Court need not reach the minor tolling issue here, however, since Plaintiff has admitted that all through his adulthood he has suspected that his injuries may have been caused by a drug his mother took during her pregnancy.

"Pennsylvania takes a 'narrow approach' to the discovery rule and places a 'greater burden' on plaintiffs than do most other jurisdictions." *Danysh v. Eli Lilly & Co.*, No. 1:10-cv-2116, 2011 WL 4344601, at *7 (M.D. Pa. July 13, 2011).  When "the plaintiff knew of the cause of his injuries . . . [t]he requirements of the statute were met and the statute began to run" regardless of whether the plaintiff knew who was responsible because the "burden has been and should remain on the injured party once he discovers the cause of his injuries to determine within the statutory period whose negligence or breach of duty, if any, was behind the cause in the absence of fraud or concealment." *Huber v. McElwee-Courbis Const. Co.*, 392 F. Supp. 1379, 1383-84 (E.D. Pa. 1974).  Inquiry into whether a suit is timely is for the Court where "undisputed facts lead unerringly to the conclusion that the time it took to discover an injury was unreasonable as a matter of law." *Bradford v. City of Philadelphia*, No. 06-cv-5121, 2007 WL 2345278, at *2 (E.D. Pa. Aug. 16, 2007).

*Bradford* is instructive.  There, the plaintiff alleged he was injured as a result of improper medical tests performed on him while he was imprisoned at Holmesburg Correctional Facility in Philadelphia in 1957.  *Id.* at *1.  He did not file suit until some fifty years later, claiming he did not learn of the dangers of the medical testing until decades later.  *Id.*  The Court concluded that the plaintiff could not invoke the discovery rule to toll the statute of limitations in light of the extensive public record surrounding the Holmesburg medical testing, which consisted of articles in the media, public hearings before Congress, and six other lawsuits by other prisoners.  *Id.* at *3 n.2.  As the Court put it:  "[G]iven 'the extraordinary media attention paid to the medical experiments conducted on prisoners at Holmesburg, as well as the six other lawsuits filed by former Holmesburg prisoners, a reasonable person in the plaintiff's position would have been aware of the salient facts years before the current action was filed.'"  *Id.* (quoted case omitted).

Here, the undisputed evidence makes the time bar even more clear.  Plaintiff has long been on constructive notice regarding his injuries and claims.  The massive publicity about thalidomide and thalidomide lawsuits put any reasonable person on notice of potential thalidomide claim decades ago.  Plaintiff admitted that he suspected his injuries may have been caused by a drug his mother took during her pregnancy.  Ex. 27 (Pl.'s Dep. at 29:12-19).  Plaintiff testified that he did absolutely no research to investigate this suspicion.  Ex. 27 (Pl.'s Dep. at 29:12-30:14).  He further admitted that as soon as he did investigate his claims, he found a large amount of information on thalidomide readily available to him.  Ex. 27 (Pl.'s Dep. at 19:9-12).  So not only did Plaintiff *actually* suspect that a drug his mother took during her pregnancy caused his birth defects, but any reasonable person would have started investigating the facts giving rise to a lawsuit decades ago.  *See In re Avandia Marketing, Sales Practices & Prods. Liab. Litig.*, No. 1871, 2012 WL 3205620, at *4 (E.D. Pa. Aug. 7, 2012) (noting that the "extensive media reports" regarding Avandia reflected "what was in the public realm at the time" and were sufficient to put a reasonable person on notice of the need to investigate a claim); *In re Vioxx Prods. Liab. Litig.*, 522 F. Supp. 2d 799, 808 (E.D. La. 2007) ("Both the national and local media coverage of the withdrawal of Vioxx from the market were sufficient to put the plaintiffs on notice of a potential link between their alleged injuries and the use of Vioxx." (citation omitted)); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 982 F. Supp. 388, 396 (E.D. La. 1997) (rejecting plaintiffs' "bald[] assert[ion] that even in the face of … extensive media attention in widely circulated publications … their ignorance" of the [alleged defect] was reasonable); *see also In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 6098571, at *12 (S.D. Fla. Mar. 16, 2010) ("The Court finds that *at the latest*, Plaintiffs had a reason to discover (and a reasonable investigation would have led them to discover) their claims against

- 16 -

Bayer in January 2006, when the Mangano article, which asserted in part, that the administration of Trasylol doubled the risk of post-operative renal failure, was published in the *New England Journal of Medicine* and discussed in national and local newspapers.").

Further, it is well established that a party who seeks to use the discovery rule to excuse an otherwise late filing must bear the burden of showing that it applies:

> [T]he discovery rule is an exception to the general rule that the statute of limitations begins to run as soon as the right to institute and maintain a suit arises. Therefore, one claiming the benefit of the exception bears the burden of establishing that [he] falls within it.

*Cochran v. GAF*, 666 A.2d 245, 248-49 (Pa. 1995) (citation omitted); *see also Pocono Intern. Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983).

Pennsylvania cases "firmly establish that the 'reasonable diligence' standard has some teeth."  *Cochran*, 666 A.2d at 250.  A plaintiff invoking the discovery rule has the burden of establishing that he pursued his cause of action with "those qualities of attention, knowledge, intelligence and judgment which society requires of its members" and "a party may not rely on mistake or misunderstanding to toll the limitations period"  *Id.* (quoting *Burnside v. Abbott Labs.*, 505 A.2d 973, 988 (Pa. Super. Ct. 1985)).

Plaintiff cannot carry his burden.  With any diligence, a person in Plaintiff's position could have discovered long ago that his injuries were potentially thalidomide-related.  Dozens of thalidomide lawsuits were filed decades ago.  Moreover, as the Court knows, three of the other plaintiffs in the thalidomide cases consolidated before the Court were themselves among the dozens of people who had filed thalidomide lawsuits decades ago.  (*G. Johnson v. SmithKline Beecham Corp. et al*, No. 11-5782 [Doc. Entries 168 and 182]).  While the cases of Michael Morgan, Barbara Murray and Tawana Williams have been voluntarily (albeit belatedly) dismissed, the fact that Roel Garza's co-plaintiffs (and others) knew enough to sue decades ago

is strong evidence that he too could have known the same and done the same long ago.  As such,

Plaintiff's claims are time barred and Defendants are entitled to summary judgment.

**(B)     The Doctrine Of Fraudulent Concealment Does Not Save
Plaintiff's Claims**

Regardless of whether there has been a fraudulent concealment, the statute of limitations

starts to run once the plaintiff has constructive notice of his or her injury and its cause.  *Fine*, 870

A.2d at 861 ("Thus, we conclude that a statute of limitations that is tolled by virtue of fraudulent

concealment begins to run when the injured party knows or reasonably should know of his injury

and its cause.").

Moreover, as this Court noted in this litigation [*G. Johnson*, No. 11-5782 (Doc. 166)],

allegations of general concealment are insufficient and Plaintiff must show an affirmative

misstatement by a defendant to the plaintiff that induces actual and justifiable reliance.  *See also*

*Baselice v. Franciscan Friars Assumption BVM Province, Inc*., 879 A.2d 270, 278 (Pa. Super.

Ct. 2005) (observing that "general and systematic conduct" is not concealment; rather

"affirmative and independent" statements directed to the plaintiff are required); *C.J.M. v.*

*Archdiocese of Phila.*, 67 Pa. D. & C.4th 474, 490-91 (Pa. Ct. Com. Pl. 2004) (finding that no

concealment where plaintiff claimed reliance on "systematic" acts or "general statements"

instead of an "independent act of concealment ... applicable to an individual plaintiff"); *Speicher*

*v. Dalkon Shield Claimants Trust*, 943 F. Supp. 554, 558-59 (E.D. Pa. 1996) ("hid[ing]

information from the public" was not sufficient under Pennsylvania law "to support a claim of

fraud that would cause plaintiff to deviate from her duty to inquire").

The Pennsylvania Superior Court, likewise, recently confirmed that a "fraud on the

public" does not constitute fraudulent concealment, but that an affirmative act directed at the

specific plaintiff is required.  *Thomas v. Smith Kline Beecham Corp.*, J-A15019-13, slip op. 10,

- 18 -

(Pa. Super. Ct. Nov. 27, 2013) (upholding summary judgment on statute of limitations because "general systemic public conduct … is not an affirmative act directed at this specific plaintiff.") (Ex. 31).

Without proof the alleged concealment thwarted Plaintiff's inquiries, there is no justifiable reliance and no tolling.  *See Baselice*, 879 A.2d at 278-79; *Riggs v. AHP Settlement Trust*, 421 F. App'x 136, 139 (3d Cir. 2011) ("'[I]n order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiff [ ] justifiably relied.'") (citation omitted).

Plaintiff's attempt to rely on fraudulent concealment to escape the statute of limitations fails across the board.   Again, Plaintiff testified point blank at deposition that he has suspected since he was a teenager—and all throughout his adult life—that a drug his mother may have taken during her pregnancy had caused his injuries.  Ex. 27 (Pl.'s Dep. at 29:12-30:14).

Moreover Plaintiff admitted that the reason he waited decades to file his suit was because he did not have time to investigate his claims, **not** because of anything Defendants did or did not do.  Ex. 27 (Pl.'s Dep. at 30:12-20).  Plaintiff testified that he failed to investigate his claims because "didn't have time" and it was "the last thing on his mind."  Ex. 27 (Pl.'s Dep. at 30:15-20).  Although Plaintiff's Complaint and discovery responses offered allegations regarding Defendants' alleged fraudulent concealment, Plaintiff's discovery responses concede that he has had no contact with Defendants.  Ex. 30. Thus, Plaintiff's fraudulent concealment theory patently fails for lack of reliance.

Lastly, Plaintiff's "public misimpression" theory not only is legally irrelevant but is at odds with the massive publicity surrounding thalidomide for five decades, including the references to the Defendants.  (*See* discussion *supra* at II.A).  The relationship between

thalidomide and birth defects was so publicized that even the slightest diligence would have awoken inquiry in a reasonable person long before 2011.  Plaintiff has long been on constructive notice of his injury and its alleged cause, and his fraudulent concealment theory fails for this reason, too.

Even if Plaintiff's allegations of fraudulent concealment were true – which they are not – he still cannot avail himself of this tolling doctrine because the information he claims to have "recently" uncovered was available to him no later than May 2011, more than two years before he filed suit in August 2013.  The first of the thalidomide complaints pending in this Court, *Murray v. SmithKline Beecham Corporation, et al.*, No. 11-cv-3510, was filed in May 2011.  The plaintiffs in the *Murray* Complaint, who are represented by the same attorneys as Plaintiff Garza, alleged that "[t]oday, for the first time, evidence gathered from around the world … makes it clear that [plaintiffs] have not only been the victims of a medical tragedy, they have been duped by a cover-up that stretches back 60 years."  Ex. 32 (*Murray* Complaint p. 1).  The fact that Plaintiff Garza's co-plaintiffs claim to have uncovered the truth of the alleged cover-up by May 2011 establishes that Plaintiff Garza too could have uncovered the same information by that time.  His claims are time barred.

> **2.      Although The Court Need Not Reach The Issue, Plaintiff's Claims Are Also Time Barred Under Texas Law**

Since Pennsylvania law bars Plaintiff's claims, it is unnecessary to consider Texas law in light of the borrowing statute's rule that a bar under either potentially applicable law controls. For completeness' sake, we note that Texas law also bars the claim.

In Texas, "a person must bring suit for … personal injury … not later than two years after the day the cause of action accrues." Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a).[5]  The primary purpose of the statute of limitations is to "compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend while witnesses are available." *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990) (citing *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex. 1988)).  Under Texas law, a cause of action generally accrues "when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury." *Moreno*, 787 S.W.2d at 351 (citing *Robinson v. Weaver*, 550 S.W.2d 18, 19 (Tex. 1977)).

As an exception to this general rule, Texas courts have adopted a "discovery rule," which tolls the statute of limitations until after the plaintiff discovers, or through the exercise of reasonable care and diligence should have discovered, the nature of his injury.  *Moreno*, 787 S.W.2d at 351 (citing *Weaver v. Witt*, 561 S.W.2d 792, 793-94 (Tex. 1977)).  In applying the discovery rule, the inquiry is directed "toward the time when one discovers or should have discovered the *nature* of the injury, not the time when one discovers the parties allegedly at fault." *Martz v. Weyerhaeuser Co.*, 965 S.W.2d 584, 588 (Tex. App. 1998) (citing *Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 344 n.3 (Tex. 1992)) (emphasis in original).  The discovery rule applies only where the nature of the injury is "inherently undiscoverable." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001).  Therefore, under Texas common law, the statute of limitations is **not** tolled until "a plaintiff discovers a specific cause of action against a specific defendant." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 404 (5th Cir.

[5] Tolling for minors existed in Texas at least as early as 1958.  *See Holt v. Hedberg*, 316 S.W.2d 955, 956 (Tex. Civ. App. 1958).  But again, this Court need not reach the issue of minor tolling here because Plaintiff has had constructive notice of his claims his entire adult life.

1998) (quoting *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1142 (5th Cir. 1997) (citing

*Moreno*, 787 S.W.2d at 357 n.9)).  Nor does the discovery rule require a plaintiff to have actual

knowledge of all the "particulars of a cause of action."  *Winters*, 149 F.3d at 404 (citing *Vaught*,

107 F.3d at 1141-42 (quoting *Bell v. Showa Denko K.K.*, 899 S.W.2d 749, 754 (Tex. App.

1995))).  Rather, a plaintiff will be found to have discovered his injury when he has "knowledge

of facts which would cause a reasonable person to diligently make inquiry to determine his or her

legal rights."  *Winters*, 149 F.3d at 404 (citing *Vaught*, 107 F.3d at 1141-42 (quoting *Bell*, 899

S.W.2d at 754)).  Further, Texas law provides that the discovery rule is inapplicable where a

plaintiff is on constructive notice of his potential claims due to widespread publicity.  *See*

*Crofton v. Amoco Chem. Co.*, No. 14-98-01412, 1999 WL 1122999, at *5 (Tex. App. Dec. 9,

1999) (citing  *Hues v. Warren Petroleum Co.*, 814 S.W.2d 526, 529 (Tex. App. 1991).

    Like the Pennsylvania rule, the Texas statute of limitations also may be tolled based on

specific evidence of fraudulent concealment.  *Martz*, 965 S.W.2d at 588 ("Where a defendant is

under a duty to make disclosure but fraudulently conceals the existence of a cause of action from

the party to whom it belongs, the defendant is estopped from relying on the defense of

limitations until the party learns of the right of action or should have learned thereof through the

exercise of reasonable diligence.").  To show fraudulent concealment, the plaintiff must show

that the defendant knew about and concealed the plaintiff's cause of action and that he

reasonably relied upon that deception.  *See Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430,

439 (Tex. App. 1997) (plaintiffs failed to establish fraudulent concealment where there was no

evidence that they believed or relied on any alleged fraudulent statements made by defendant).

However, as in Pennsylvania, constructive knowledge of a cause of action will trigger the statute

of limitations under Texas law—regardless of whether the defendant allegedly engaged in

fraudulent concealment.  *See In re Mirena IUD Prods. Liab. Litig.*, — F. Supp. 2d —, 2014 WL 2971179, at *5 (S.D.N.Y. July 2, 2014) ("Like the discovery rule, however, fraudulent concealment ceases to toll the statute of limitations once the plaintiff obtains information that would lead to the discovery of the cause of action through ordinary diligence.") (applying Texas law) (internal quotations and citations omitted).

Plaintiff's claims are barred under Texas' statute of limitations for the same reasons they are barred under Pennsylvania's.  Given the massive publicity surrounding thalidomide as well as the existence of publicized lawsuits, Plaintiff had constructive notice of his claims his entire adult life.  Plaintiff's allegations of fraudulent concealment are meaningless in light of Plaintiff's constructive notice regarding his injuries and their alleged cause.  Moreover, Plaintiff admits his delay in bringing this lawsuit was because it was "the last thing on his mind," negating the requirement of reliance.  Ex. 27 (Pl.'s Dep. at 30:15-20).

Viewed from any angle, summary judgment should be granted on statute of limitations grounds.  *See, e.g.*, *Winter*s, 49 F.3d at 403-404 (plaintiff's claims were barred by the statute of limitations where she had knowledge of her potential exposure to defendants' product, had been diagnosed with cancer, and there had been extensive media coverage linking defendants' product to cancer); *see also Hues*, 814 S.W.2d at 528 (plaintiffs' claims were barred by the statute of limitations where widespread publicity put them on constructive notice of their claims, irrespective of whether or not they had actually seen such publicity).

### 3.   Plaintiff's Claims Are Barred By The Texas Statute Of Repose

Section 16.012 of the Texas Civil Practice & Remedies Code "establishes a 15-year statute of repose for products liability cases."  *Burlington Northern & Santa Fe Ry. Co. v. Poole Chem. Co.*, 419 F.3d 355, 358 (5th Cir. 2005).  It provides that "a claimant must commence a products liability action against a manufacturer or seller of a product before the end of 15 years

after the date of the sale of the product by the defendant." Tex. Civ. Prac. & Rem. Code Ann. § 16.012(b). The statute "applies to actions filed on or after July 1, 2003" and has retroactive application "[b]ecause the 15-year repose period affects claims that arose from events that occurred before the law came into effect." *Burlington Northern & Santa Fe Ry. Co.*, 419 F.3d at 359, 361 (holding that "retroactive application of § 16.012 does not violate the open courts provision of the Texas constitution"); *Hyde v. Hoffman-La Rouche Inc.*, No. 3:04-cv-1473, 2008 WL 4191529, at *1 (N.D. Tex. Sept. 10, 2008) (noting that "Section 16.012 applies to actions filed on or after July 1, 2003 and has retroactive application").

Statutes of repose such as § 16.012(b) serve to "give absolute protection to certain parties from the burden of indefinite potential liability." *See Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003). As the Texas Supreme Court has explained, "statutes of repose not only cut off rights of action within a specified time after they accrue, but also they may even cut off rights of action before they accrue at all." *Id.* Indeed, "[t]he whole point of layering a statute of repose over the statute of limitations is to 'fix an outer limit beyond which no action can be maintained.' One practical upside of curbing open-ended exposure is to prevent defendants from answering claims where evidence may prove elusive due to unavailable witnesses (perhaps deceased), faded memories, lost or destroyed records, and institutions that no longer exist." *Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P. v. Rankin*, 307 S.W.3d 283, 287 (Tex. 2010).

There is no discovery rule or other tolling exception under § 16.012. *See Salgado v. Great Dane Trailers*, No. 10-82, 2012 WL 401484, at *2-3 & n.3 (S.D. Tex. Feb. 6, 2012) (granting defendant's motion for summary judgment based on application of § 16.012(b)); *Methodist Healthcare Sys.*, 307 S.W.3d at 286 (noting that "the key purpose of a repose statute is

to eliminate uncertainties under the related statute of limitations and to create a final deadline for filing suit that is not subject to any exceptions").

The application of the statute of repose is straightforward. Here, Plaintiff alleges that he was born in Texas in 1959 with defects allegedly caused by his mothers' ingestion of thalidomide during pregnancy. Ex. 1 (Compl. ¶¶ 22-24). The 15-year period under § 16.012 began to run, at the very latest, when Plaintiff was born. Since Plaintiff filed suit decades after the 15-year period had long expired, Plaintiff's product liability claims are untimely under § 16.012. He could not have brought timely product liability claims against these defendants in Texas court after July 1, 2003, and he should not be permitted to do so in this Court more than ten years later.

### B.      Plaintiff Cannot Prove That His Mother Ingested Thalidomide

"It has long been the rule in Texas that plaintiffs bear the burden of pleading and proving how they were injured and by whom. They cannot simply file suit against everyone in the vicinity and demand that the defendants prove otherwise." *In re Allied Chem. Corp.*, 227 S.W.3d 652, 659 (Tex. 2007). Thus, "[a] fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product which caused the injury." *Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex. 1989); *see also Gray v. U.S.*, 445 F. Supp. 337, 338 (S.D. Tex. 1978) ("It is a fundamental principle of products liability law that a plaintiff must prove, as an essential element of his case, that a defendant manufacturer actually made the particular product which caused injury.").

Pennsylvania law requires similar proof of exposure to a particular defendant's product. *Sherk v. Daisy-Heddon,* 498 Pa. 594, 450 A.2d 615, 617 (Pa. 1982); *Eckenrod v. GAF Corp.*, 375 Pa. Super. 187, 544 A.2d 50, 52 (Pa. Super. Ct. 1988); *Gehring v. Showa Denko, K.K.*, No. Civ. A. 91-6855, 1994 WL 597584, at *3 (E.D. Pa. Nov. 2, 1994); *Dick v. Am. Home Prods. Corp.*,

No. 1:05-cv-22384, 2009 WL 1542773, at *3 (M.D. Pa. June 2, 2009); *see also Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 366 (3d Cir. 1990) ("Under Pennsylvania law, the plaintiff in a products liability action bears the burden of demonstrating that a specific defendant is responsible for the harm alleged."); *Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 333 (9th Cir. 1993) ("In cases claiming personal injury from exposure to toxic substances, it is essential that the plaintiff demonstrate that she was, in fact, exposed to harmful levels of such substances." (quotations omitted)).

*DeMayo v. Schmitt*, 1990 WL 902397, 20 Phila Co. Rptr. 269 (Pa. Com. Pl. Feb. 16, 1990), is telling.  There, a plaintiff sued to recover for injuries allegedly caused by the plaintiff's grandmother's ingestion of DES while pregnant.  The plaintiff had no physician or pharmacist records confirming exposure, and the grandmother who had allegedly ingested DES was deceased.  *Id.* at 279-80.  The plaintiff's only evidence of exposure was physician testimony that her injuries were "consistent with DES exposure," medical records in which the grandmother "said she ingested DES while pregnant," and plaintiff's testimony that her grandmother had told her she ingested DES.  *Id.* at 272-73, 280.  The court found "no competent evidence of ingestion of DES," and dismissed plaintiffs' claims because she failed to establish exposure (among other reasons).  *Id.* at 272.

In *Gray,* another case alleging injuries from exposure to DES, the plaintiff could not identify which defendant's product caused her injuries.  445 F. Supp. at 338.  Her mother testified "that she cannot identify what brand of DES she took, nor can she remember the shape, color or dosage of the DES ingested."  *Id.*  Neither could her mother's doctor, her father, or her mother's pharmacist.  *Id.*  And the pharmacy had destroyed the prescription records because they were 20 years old.  *Id.*  Because the plaintiff "failed to provide any proof on this essential

element of her case … [the defendant's] motion for summary judgment must be granted." *Id.*;

*see also Celotex*, 477 U.S. at 319, 327-28 (reversing and remanding order denying petitioner's

motion for summary judgment where allegations of decedent's general exposure to asbestos was

insufficient to establish liability of specific manufacturer); *Thompson v. Johns-Manville Sales*

*Corp.*, 714 F.2d 581, 582 (5th Cir. 1983) (even where plaintiff alleged asbestos exposure,

summary judgment for defendant-manufacturers was affirmed because plaintiff was unable to

recall names of the products or point to other evidence connecting products to purported

injuries).

These authorities make clear that to prove causation, a plaintiff must establish not only

exposure to a product, but exposure to a specific defendant's product.  Here, Plaintiff can

establish neither.  There is absolutely no evidence that Plaintiff's mother took any drugs at all

during her pregnancy, and certainly no evidence that she took thalidomide.  Plaintiff admits he

never asked his mother or anyone else if she took thalidomide or any other drugs during her

pregnancy. Ex. 27 (Pl.'s Dep. at 13:10-14:20).  Plaintiff testified that he did not even know

whether his mother received prenatal care.  Ex. 27 (Pl.'s Dep. at 10:25-11:13).  Now that both his

parents are deceased, Plaintiff claims that his injuries are caused by thalidomide, yet admits that

there is not a single person alive who can testify whether or not his mother took any drugs during

her pregnancy with him.[6]  Ex. 27 (Pl.'s Dep. at 16:8-12).  Nor is there a shred of documentary

evidence that Plaintiff's mother took thalidomide while pregnant with him.

---

[6] The absence of evidence due to Plaintiff's delay in filing does not excuse his inability to carry his burden; rather, it reinforces why statutes of limitation and statutes of repose exist.  *See United States v. Kubrick*, 444 U.S. 111, 117 (1979); *see also Methodist Healthcare Sys.*, 307 S.W.3d at 287.

Put simply, Plaintiff has no evidence and therefore could not possibly raise a triable issue regarding exposure to thalidomide generally or to thalidomide supplied by any particular defendant.  Consequently, Defendants are entitled to summary judgment.

## VI.   AN AWARD OF COSTS AND FEES AGAINST PLAINTIFF'S COUNSEL AND IN FAVOR OF DEFENDANTS IS WARRANTED

Defendants should be awarded costs and fees against Plaintiff's counsel for the time and resources they have expended defending against a lawsuit filed many years too late and with no proof of use of the product at issue.  As the Court knows, the cases of three other plaintiffs in the thalidomide cases consolidated before the Court – Michael Morgan, Tawana Williams, and Barbara Murray – were dismissed in March 2014 because those three plaintiffs had filed thalidomide claims decades ago, which Defendants came to learn only after taking discovery of those plaintiffs.  At that time, counsel for the GSK Companies wrote to Plaintiffs' counsel and urged them to take a careful look at the remaining cases before the parties spent more time and money in discovery:

> [I]t is becoming increasingly clear beyond any doubt that all these cases -- for a variety of reasons, including the inability of a single plaintiff to articulate any legitimate grounds for invoking fraudulent concealment -- are just as clearly time barred as are these 3.  It is obvious that in all or most of them no reasonable pre-suit investigation was conducted.  I would hope that plaintiffs' counsel would promptly proceed now, before additional expense is incurred, to undertake a careful review of the claims made in all these cases.   If there are others that you decide to dismiss, GSK will agree in any such case dismissed by April 11 to again bear its own costs.   However, for any cases which remain pending after that date, GSK will not agree to bear its own costs and is reserving its right to seek both costs and attorneys fees under all applicable rules and statutes.

Ex. 33 (Mar. 26, 2014 email from Michael Scott, counsel for the GSK Companies); Ex. 34 (Mar. 26, 2014 email from Craig Knot, Esq., counsel for Grünenthal GmbH, joining in the GSK Companies' position).  Plaintiffs' counsel did not dismiss any cases.  As a result, Defendants have been put to the task of taking more than 70 depositions in the past four months.

On June 18, 2014, counsel for Defendants traveled to Corpus Christi, Texas to take Plaintiff Garza's deposition.  The deposition not only further manifested the weaknesses of his case, but also demonstrated Plaintiff's counsel's failure to ensure the accuracy of discovery responses or the allegations in the Complaint.   For example, the Complaint states that Plaintiff Garza "believes his mother was given thalidomide by her doctor for morning sickness."  Ex. 1 (Compl. ¶ 22).  However, Plaintiff's deposition revealed this allegation to be patently false, as Plaintiff testified that he had no basis for the claim that his mother took any drugs at all during her pregnancy, nor did he have any basis for the claim that his mother experienced morning sickness. Ex. 27 (Pl.'s Dep. at 13:10-14:7).  Further, the Complaint alleges that "extraordinary investigative activities" were required to discover that Plaintiff's injuries may have been caused by thalidomide (Ex. 1 (Compl. ¶ 15)), yet at his deposition, Plaintiff testified that he did absolutely no investigation of his claims prior to filing suit.  Ex. 27 (Pl.'s Dep. at 29:12-30:14).

Plaintiff's counsel failed to reasonably investigate Plaintiff's claim to ensure that there was *any* proof of use of thalidomide and that the suit could be filed in 2013 given applicable the statute of limitations and statute of repose.  Plaintiff's counsel compounded this failure by making unfounded allegations in the Complaint, serving incomplete and misleading discovery responses, and maintaining the suit even after it became obvious that it was not meritorious. Accordingly, Defendants request costs and fees in an amount this Court deems appropriate pursuant to 28 U.S.C. § 1927 and its own inherent authority.  *See* 28 U.S.C. § 1927 ("Any attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."); *Marino v. Usher*, No. CIV. 11-6811, 2014 WL 2116114, at *7 (E.D. Pa. May 21, 2014) (Diamond, J.) ("The Court may also impose sanctions

pursuant to its inherent power to discipline attorneys who appear before it. . . ." including "'cases

where a party has acted in bad faith  . . . .'") (citing *In re Prudential Ins. Co. Am. Sales Prac.

Litig.*, 278 F.3d 175, 189 (3d Cir. 2002)); *Woods v. Adams Run Assoc.*, No. Civ. A. 96-6111,

1997 WL 256966, at *5-6 (E.D. Pa. May 13, 1997) (awarding fees and costs upon finding that

plaintiff and his counsel proceeded to litigate claims that clearly were not meritorious), *aff'd*, 151

F.3d 1027 (3d Cir. 1998).

## VII.    <u>CONCLUSION</u>

Although the statute of limitations and the statute of repose apply irrespective of a

showing of prejudice, such statutes are intended to "protect defendants and the courts from

having to deal with cases in which the search for truth may be seriously impaired by the loss of

evidence, whether by death or disappearance of witnesses, fading memories, disappearance of

documents, or otherwise."  *Kubrick*, 444 U.S. at 117; *see also Methodist Healthcare Sys.*, 307

S.W.3d at 287 ("One practical upside of curbing open-ended exposure is to prevent defendants

from answering claims where evidence may prove elusive due to unavailable witnesses (perhaps

deceased), faded memories, lost or destroyed records, and institutions that no longer exist.").

"The purpose of any statute of limitations is to expedite litigation and thus discourage delay and

the presentation of stale claims which may greatly prejudice the defense of such claims."

*Insurance Co. of North America v. Carnahon*, 284 A.2d 728, 729 (Pa. 1971).  Statutes of

limitations are "vital to the welfare of society and are favored in the law."  *Id.* (quoting

*Schmucher v. Naugle*, 231 A.2d 121, 123 (Pa. 1967)).  This case is a glaring example of why

enforcement of statutes of limitations and statutes of repose is necessary.  With the passage of

time, key defense witnesses have died and cannot respond to the serious charges Plaintiff has

made against them.[7]  Defendants are severely prejudiced in defending against Plaintiff's claims.

If the statute of limitations or the statute of repose did not bar claims such as this, no tort

litigation would ever achieve finality and the limitations period and repose period would be

rendered meaningless.  Similarly, a plaintiff claiming injury from a drug must have proof that

such drug was actually used or that it came from the defendant or defendants in the case.

Plaintiff has no such proof and the requirement cannot be avoided simply because Plaintiff

claims belatedly that he was injured.

 For all the reasons set forth above, Defendants are entitled to summary judgment.


Dated: July 28, 2014       Respectfully submitted,

             */s/ Michael T. Scott*
             Michael T. Scott
             Sandra M. Di Iorio
             Cassandra Lee Matos
             REED SMITH LLP
             Three Logan Square
             Suite 3100
             1717 Arch Street
             Philadelphia, Pennsylvania 19103
             Telephone:  (215) 851-8100
             Facsimile:  (215) 851-1420

             Sonja S. Weissman (*admitted pro hac vice*)
             REED SMITH LLP
             101 Second Street
             San Francisco, California 94105
             Telephone: (415) 543-8700
             Facsimile:  (415) 391-8269

---

[7] *See, e.g.*, Ex. 35 (Soc. Security Admin. Death Index Record for SKF President Walter Munns). Plaintiff's mother and father are also deceased.  Ex. 27 (Pl.'s Dep. at 15:13-14; 38:4-9).

Eric L. Alexander (*admitted pro hac vice*)
REED SMITH LLP
1301 K Street, NW—East Tower
Washington, DC 20005
Telephone:  (202) 414-9403
Facsimile:  (202) 414-9299

*Attorneys for Defendants GlaxoSmithKline LLC
and GlaxoSmithKline Holdings (Americas) Inc.*


/s/ Craig A. Knot
Sara J. Gourley (*admitted pro hac vice*)
Eugene A. Schoon (*admitted pro hac vice*)
Craig A. Knot (*admitted pro hac vice*)
Elizabeth C. Curtin (*admitted pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

Albert G. Bixler
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania 19102
Telephone:  (215) 851-8400
Facsimile:  (215) 851-8383

*Attorneys for Grünenthal GmbH*


*/s/ Daniel S. Pariser*
Anand Agneshwar (*admitted pro hac vice*)
Daniel S. Pariser (*admitted pro hac vice*)
Paige H. Sharpe (*admitted pro hac vice*)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999

Kenneth A. Murphy
DRINKER BIDDLE & REATH LLP
One Logan Square
Suite 2000
Philadelphia, Pennsylvania  19103
Telephone: (215) 988-2700
Facsimile: (215) 988-2757

*Counsel for Sanofi-Aventis U.S. LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 28, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy of the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


*/s/ Michael T. Scott*
Michael T. Scott