**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GLENDA JOHNSON, et al.,** | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **Civ. No. 11-5782** |
| | : | **and all related cases** |
| **SMITHKLINE BEECHAM** | : | |
| **CORPORATION, et al.,** | : | |
| **Defendants.** | : | |

**Diamond, J.**                                                    **October 16, 2014**

## <u>MEMORANDUM</u>

Edmund Andre is one of fifty-two Plaintiffs who allege that they have severe birth defects caused over 50 years ago by thalidomide—a drug manufactured and distributed by Defendants—then prescribed to pregnant women for morning sickness.  Because Pennsylvania's two-year limitations period has long expired, I will grant summary judgment and dismiss Plaintiff's claims as time-barred.

## I.      PROCEDURAL BACKGROUND

Mr. Andre is one of thirteen Plaintiffs who together filed a single personal injury Complaint on October 25, 2011 in the Philadelphia Common Pleas Court against SmithKline Beecham Corp., GlaxoSmithKline LLC, GlaxoSmithKline Holdings, LLC, Sanofi-Aventis, U.S., LLC, Avantor Performance Materials, and Grünenthal GmbH.  (Compl., Docket No. 11-6711, Doc. No. 1, Ex. A.)  Plaintiff brings negligence and negligent design claims against Grünenthal and the GSK Defendants.  (<u>Id.</u> ¶¶ 343-65.)  He brings fraud, negligent misrepresentation, negligent hiring, concert of action, civil conspiracy, and *alter ego* liability claims against Grünenthal only.  (<u>Id.</u> ¶¶ 367-375, 399-436.)  Thirty-six additional Plaintiffs filed substantially similar complaints in the Philadelphia Common Pleas Court from 2010 to 2013.  (Case ID Nos. 110503100,   110803830,   111003316,   120800665,   120902711,   121101057,   121102810,

121202937, 130200838, 130800419.)  All forty-nine Plaintiffs are represented by the same lead counsel: the law firm of Hagens Berman Sobol Shapiro LLP.  The Complaint verifications for all forty-nine Plaintiffs were signed by Counsel, not by Plaintiffs themselves.

Invoking diversity jurisdiction, Defendants removed the all the cases to this Court. (Docket Nos. 11-3510, 11-5782, 11-6711, 12-4542, 12-5455, 12-6431, 12-6657, 12-7125, 13-758, 13-4591.)  Plaintiffs—some of whom are Pennsylvania citizens—vigorously contested removal, arguing that the "nerve center" of the GSK Defendants is also in Pennsylvania, thus defeating complete diversity.  See Hertz Corp. v. Friend, 559 U.S. 77, 93 (2010) (for purposes of diversity jurisdiction, a corporation's citizenship is determined by the location of its "nerve center").  Members of this Court were split on this jurisdictional issue, which I certified for interlocutory appeal.  Compare Yeatts v. SmithKline Beecham Corp., No. 11-6711, 2012 WL 5488907 (E.D. Pa. Mar. 29, 2012) (Pennsylvania nerve center), Murray v. SmithKline Beecham Corp., No. 11-3510, 2012 WL 5488905 (E.D. Pa. Mar. 29, 2012) (same), Brewer v. SmithKline Beecham Corp., 774 F. Supp. 2d 720 (E.D. Pa. 2011) (same), and Monroe v. SmithKline Beecham Corp., No. 10-2140, 2010 WL 2606682 (E.D. Pa. June 25, 2010) (same), with Johnson v. SmithKline Beecham Corp., 853 F. Supp. 2d 487 (E.D. Pa. 2012) (Delaware nerve center), and White v. SmithKline Beecham Corp., No. 10-2141, 2010 WL 3119926 (E.D. Pa. Aug. 6, 2010) (same).  The Third Circuit agreed to hear the matter, and ruled that there was complete diversity.  Johnson v. SmithKline Beecham Corp., 724 F.3d 337, 358 (3d Cir. 2013).

All the thalidomide cases in this Court were then consolidated before me for pretrial purposes.  (Doc. No. 94.)  During discovery, three additional Plaintiffs filed suit in this Court on April 15, 2014.  (Docket No. 14-2186.)

Defendants moved to dismiss as time-barred the claims of only five Plaintiffs: Glenda Johnson, Debra Johnson, Steven Lucier, Robert Murray, and Diane Kessler.  (Doc. Nos. 74, 86; Docket No. 12-5455, Doc. No. 36.)  All fifty-two Plaintiffs alleged primarily that Defendants' "fraudulent concealment" had equitably tolled the applicable two-year limitations clock.  Each Plaintiff made separate fraudulent concealment allegations that may be divided into two categories: (1) those Plaintiffs who, as a result of Defendants' misrepresentations respecting domestic distribution of thalidomide, did not know their mothers had ingested thalidomide during pregnancy; and (2) those Plaintiffs who knew their mothers had ingested the drug, but, as a result of Defendants' misrepresentations, mistakenly believed thalidomide was a safe drug.  All Plaintiffs alleged that they

> suffer from severe birth defects caused by thalidomide . . . .  Until less than two years ago, Plaintiffs did not discover (and could not reasonably have discovered) that thalidomide caused their injuries. . . .  But evidence that only recently came to light based on extraordinary investigative efforts, reveals that [Defendants' statements] that thalidomide did not cause thalidomide injuries in the United States was not the truth. . . .  Now armed with the truth for the first time, [Plaintiffs] seek damages resulting from Defendants' negligence, fraud, negligent misrepresentation, negligent hiring, conspiracy and alter ego . . . .

(Compl. ¶¶ 1, 3, 8; see also e.g., Compl. ¶¶ 4, 8, 10, 15, Docket No. 12-5455, Doc. No. 1, Ex. A.; Compl. Introduction, Docket No. 11-3510, Doc. No. 1, Ex. A.)

Explicitly recognizing their obligation to plead fraud "with particularity," Plaintiffs alleged twenty specific false statements or fraudulent omissions that Defendants made respecting the safety and availability of thalidomide in the United States.  (Compl. ¶¶ 369(1-20), 375.) Plaintiffs also alleged that Defendants knew their misrepresentations were false at the time they made them, and intended that "the public, including Plaintiffs and their mothers" would rely on those misrepresentations.  (Id. ¶ 373.)  As alleged, "Plaintiffs did rely on those

3

misrepresentations and concealments, to their detriment"—the misrepresentations caused Plaintiffs to refrain from suing Defendants for over five decades.  (Id.)

Plaintiffs thus pled all the elements of fraud required by Rule 9 and Pennsylvania law. Byrnes v. DeBolt Transfer, Inc., 741 F.2d 620, 626 (3d Cir. 1984) (fraudulent concealment must be pled with particularity (citing Fed. R. Civ. P. 9(b))); Fine v. Checcio, 870 A.2d 850, 860 (Pa. 2005) (plaintiff must prove fraudulent concealment "by clear, precise, and convincing evidence").  Accepting Plaintiffs' allegations as true, I denied the motions to dismiss without prejudice, noting that "I cannot determine, at this early stage in the litigation, the viability of Plaintiffs' equitable tolling arguments."  (Doc. No. 92 ¶ 4.)

Mr. Andre, who suffers from severe birth defects, alleged that while his mother was pregnant with him, she took thalidomide to treat her "serious morning sickness."  (Compl. ¶ 16.) He also alleged that "[w]hen he was about 10 to 12 years old, [Plaintiff] and his father discussed the cause of his birth defects, and [Plaintiff's] father told him that his mother had taken thalidomide while pregnant with him."  (Id. ¶ 18.)  Plaintiff alleged that because he "could not find the doctor" who prescribed the drug, and could not obtain his mother's medical records, he had "no clues to follow" and thus could not determine "who was responsible for developing and distributing the drug."  (Id.)  These allegations appear to contradict other allegations that Plaintiff knew Defendants had manufactured and distributed thalidomide, but detrimentally relied upon Defendants' false representations and omissions respecting the drug.  Defendants did not move to dismiss.

Having put front and center the question of when Plaintiffs knew thalidomide may have caused their injuries, once discovery began, Plaintiffs repeatedly refused to provide an answer. For instance, on October 22, 2013, Defendants propounded interrogatories asking each Plaintiff

4

to "[i]dentify the date on which you contend you were first on notice of a thalidomide-related claim." (Doc. No. 137, Ex. A.) Defendants also asked each Plaintiff to "[i]dentify . . . each alleged fact or document set forth in your Complaint which you contend was fraudulently concealed [and] identify how and when you first learned about each allegedly concealed fact or document." (Id.) All Plaintiffs collectively filed a single objection to these interrogatories, contending that because the inquiries were "premature and unduly burdensome," they would provide no substantive responses. (Id., Ex. B.)

After I ordered Plaintiffs to provide full and complete responses, each Plaintiff provided the identical response, purporting to rely on the "cumulative effect" of Defendants' "misrepresentations." (See, e.g., Doc. No. 164, Ex. C.) Because, as Plaintiffs themselves acknowledged in their Complaints, fraud must be pled with particularity, I ruled that because "[e]ach Plaintiff's claim of fraudulent concealment turns on her own knowledge," "each Plaintiff must provide verified individual responses disclosing each fact or document that was fraudulently concealed, and when Plaintiffs learned of these facts." (Doc. No. 166.)

On May 9, 2014, Defendants asked me to order Plaintiffs to comply with discovery requests respecting Plaintiffs' thalidomide-related online and social media communications and research. (Doc. No. 200.) I granted the Motion and ordered Plaintiffs to provide individual responses by May 18. (Doc. Nos. 206, 222.) On June 12, Defendants presented compelling evidence that, contrary to my Orders (and Plaintiffs' discovery obligations), several Plaintiffs had failed to produce highly probative, relevant evidence, including online and social media posts revealing that some Plaintiffs have known for decades that thalidomide caused their birth defects. (Doc. No. 232.) Plaintiffs responded that they failed to produce these materials because, *inter alia*: (1) some Plaintiffs could not remember making the posts; (2) some Plaintiffs

suffer from short-term memory loss; (3) in light of the volume of responsive documents, Plaintiffs' Counsel could not ensure accurate and complete discovery responses; and (4) the withheld posts were not responsive to Defendants' discovery requests.  (Doc. No. 238.)

Defendants argued that after unsuccessfully seeking to obstruct these highly material discovery requests, Plaintiffs did not provide truthful or complete responses.  Defendants urged that this misconduct warranted dismissal of all Complaints with prejudice.  (Doc. No. 232.) Although I declined to dismiss, on June 17, I proposed, pursuant to Federal Rule of Civil Procedure 53(b)(1), appointing William T. Hangley to serve as Special Master to supervise discovery respecting Plaintiffs' knowledge of when they learned that thalidomide might have caused their injuries.  (Doc. No. 239); Fed. R. Civ. P. 53(b)(1).  On June 26, after all Parties stated that they had no objection, I appointed Mr. Hangley.  (Doc. No. 256.)

Since then, Defendants have filed ten summary judgment motions against Plaintiffs, asking me, *inter alia*, to dismiss the claims as time-barred.  (Doc. Nos. 245, 246, 258, 259, 260, 272, 274, 281, 291, 312.)  Three Plaintiffs have conceded that their claims should be dismissed.  (Doc. Nos. 263, 277, 318.)  Ten other Plaintiffs have voluntarily dismissed their claims with prejudice.  (Doc Nos. 182; 284, 305, 325, 326, 328, 332, 360.)  Three of these Plaintiffs had either filed suit or made a thalidomide-related administrative claim decades ago.  (Doc. No. 364 at 63-64.)  Hagens Berman has asked to withdraw from representing four other Plaintiffs, stating that it cannot contest Defendants' limitations motions without contravening the Code of Professional Conduct.  (Doc. Nos. 207, 301, 342, 343.)  Finally, Defendants have sought sanctions against Hagens Berman with respect to the claims of three of those Plaintiffs who voluntarily dismissed their actions: Lawrence Boiardi, Jack Merica, and Roel Garza.  (Doc. Nos. 258, 281, 310.)  Defendants argue, *inter alia*, that had Hagens Berman acted in conformance

with its professional obligations, the firm would not have initiated these actions.  With the Parties' agreement, I have referred the Sanctions Motions to Mr. Hangley for his Report and Recommendation.  (Doc. No. 316.)

During a sanctions hearing before Mr. Hangley on October 1, 2014, Hagens Berman conceded that sanctions should be imposed on the firm for its continued prosecution of Plaintiff Roel Garza's case well after Defendants put the firm on notice that Mr. Garza did not know and could not show that his mother had ingested thalidomide or any other medicine during her pregnancy.  (Doc. No. 364 at 133-35.)  When Defendants' Counsel suggested during that hearing that so many obviously time-barred cases were filed because Hagens Berman had not spoken with its clients before commencing suit, the firm responded that "all Plaintiffs were spoken to by their lawyers prior to the institution of these proceedings."  (Id. at 105.)  As I describe below, however, during Plaintiff's deposition, Counsel directed him not to disclose the substance of these discussions, invoking the attorney-client privilege.  (Andre Dep. at 52-54.)  Whether Counsel's alleged misconduct has abrogated the privilege is an issue that I have not yet addressed.  But see In re Chevron Corp., 633 F.3d 153, 166 (3d Cir. 2011) (crime-fraud exception to the privilege allows for the disclosure of communications made in furtherance of malfeasance).

Defendants filed the instant Motion for Summary Judgment on June 20, 2014.  (Doc. No. 246.)  Plaintiff submitted a response in opposition, Defendants submitted a reply, and both Parties submitted supplemental responses.  (Doc. Nos. 262, 271, 367, 369, 370.)

## II.     FACTUAL BACKGROUND

Plaintiff Edmund Andre was born in West Virginia in 1957.  (Compl. ¶ 15.)  Because he is "abnormally short," "his legs were very twisted at birth," eventually causing amputation of his

left leg.  (Id.)  He has a curved spine, "two clubbed feet, very knocked knees, [and] very short legs."  (Id.)  His "left hip lacks a ball and socket, so his femur is in direct contact with his hip bone."  (Id.)  He has a malformed skeleton.

When Plaintiff was 10 or 12 years old, his parents told him that his mother took thalidomide while she was pregnant with him.  (Andre Dep. 11-13.)  In the 1980s, Plaintiff's father attempted to sue the doctor who had prescribed the thalidomide, but could not locate him.  (Id. at 77-80.)  Around the same time, Plaintiff told a lawyer who represented Plaintiff in an unrelated personal injury matter that his injuries were the "result of the thalidomide," but never asked the lawyer to investigate possible thalidomide-based litigation.  (Id. at 84-87.)  Plaintiff also testified that for 35 to 40 years, he would tell doctors that to the "best of [his] knowledge" thalidomide caused his injuries.  (Id. at 58, 65.)  In 2005, Plaintiff submitted to a doctor a form identifying "thalidomide" as an illness from which Plaintiff was suffering.  (Doc. No. 246, Ex. E.)

Plaintiff brought the instant claims on October 25, 2011, after responding to an advertisement his mother (who has since passed away) saw in a newspaper.  (Andre Dep. 26-28.)  The advertisement was "very short and sweet," and asked individuals to call a phone number "if you or someone you know have taken thalidomide."  (Id. at 26.)  When Plaintiff's mother called the number, she "learned that there was possibly some action that the family could take to participate in getting more information and possibly uncovering specifics and doing something about it."  (Id. at 27.)  A short time later, Plaintiff called the number and spoke with "attorneys," whose names he could not recall at deposition.  (Id. at 28-29.)  Plaintiff testified that he decided to bring this case after receiving an "education about thalidomide."  (Id. at 52-53.)  When questioned about this "education," he was instructed not to answer on the grounds of attorney-

client privilege.  (Id. at 52-54.)  This discussion was the only contact Plaintiff had with his lawyers before filing the instant Complaint.  (Id. at 28-29.)

## III.   STANDARD

I may grant summary judgment "if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  An issue is material only if it could affect the result of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  I "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If I then determine that there is no genuine issue of material fact, summary judgment is appropriate. Celotex, 477 U.S. at 322.

Summary judgment is appropriate where the moving party shows that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  Where a moving party identifies an absence of necessary evidence, the non-moving party "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).  I may only consider record evidence that is admissible at trial or capable of being reduced to admissible evidence.  Celotex, 477 U.S. at 324; Gonzalez v. Sec'y of Dep't of Homeland Sec., 678 F.3d 254, 262 (3d Cir. 2012).

## IV.   DISCUSSION

It is apparent that the record, no matter how favorably construed to Plaintiff, demonstrates that his claims are time-barred.

### A.  Governing Law

The Parties agree on choice of law and the controlling limitations period.  (See Doc. No. 246 at 8-15; Doc. No. 262 at 5-14.)  Because Plaintiff's claims arose in West Virginia but were filed in Pennsylvania, the Pennsylvania borrowing statute applies.  See Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am., 693 F.3d 417, 432 (3d Cir. 2012) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)) (federal court sitting in diversity applies the forum state's choice of law rules).  That statute requires me to apply the "the law of the place where the claim [arose] or . . . the law of [Pennsylvania], whichever first bars the claim."  42 Pa. Cons. Stat. § 5521(b).  I make this determination by considering each state's statute of limitations and rules governing accrual and tolling.  Frankentek Residential Sys., LLC v. Buerger, No. 12-767, 2014 WL 1623775, at *4 (E.D. Pa. Apr. 24, 2014).

Because Pennsylvania and West Virginia provide a two-year limitations period for personal injury actions and analogous accrual and tolling rules, both states would bar Plaintiff's claims at the same time.  Compare 42 Pa. Cons. Stat. § 5524(2), (7) (two-year statute of limitations), Wilson v. El-Daief, 964 A.2d 354, 361 (Pa. 2009) (claim accrues when injury is inflicted), and Fine, 870 A.2d at 858-61 (describing Pennsylvania tolling doctrines), with W. Va. Code § 55-2-12 (two-year limitations period), McCoy v. Miller, 578 S.E.2d 355, 358 (W. Va. 2003) ("[A] cause of action accrues . . . when a tort occurs." (citations omitted)), Goodwin v. Bayer Corp., 624 S.E.2d 562, 567 (W. Va. 2005) (describing West Virginia's discovery rule in products liability cases), and Merrill v. W. Va. Dep't of Health & Human Res., 632 S.E.2d 307, 318 (W. Va. 2006) (describing West Virginia's fraudulent concealment doctrine).

In these circumstances, I will apply Pennsylvania law.  Frankentek, 2014 WL 1623775, at *4 ("Pennsylvania's limitations period applies . . . unless the foreign jurisdiction's laws,

including laws on tolling and the date of accrual, bar the claim first."); see also Ross v. Johns-Manville Corp., 766 F.2d 823, 827 (3d Cir. 1985) ("Both the statutory scheme and the case law in this area suggest that the limitations period for a foreign cause of action brought in Pennsylvania courts should never be construed to be longer than would be the case if the same events had occurred in Pennsylvania to a Pennsylvania plaintiff.").

### B. Accrual

Pennsylvania's two-year limitations period for personal injury actions starts to run when "an injury is inflicted." Wilson, 964 A.2d at 361; see also 42 Pa. Cons. Stat. § 5524(2), (7); Mest v. Cabot Corp., 449 F.3d 502, 510 (3d Cir. 2006). Because Plaintiff sustained his injuries at birth, the statute began to run in February 1957. See Urland v. Merrell-Dow Pharms., Inc., 822 F.2d 1268, 1276 (3d Cir. 1987) (Pennsylvania's minor tolling statute, which tolls the limitations clock until an individual reaches 18, does not apply retroactively to claims barred at the time of its enactment in 1984); Walter v. Ditzler, 227 A.2d 833, 835 (Pa. 1967) (before enactment of the minor tolling statute, Pennsylvania minors were subject to the adult statute of limitations). The statute of limitations thus bars the instant claims unless Plaintiff can equitably toll the limitations clock until at least October 25, 2009 (two years before he initiated this action).

### C. Discovery Rule

*Plaintiff's New Argument*

As I have discussed, the gravamen of Plaintiff's Complaint is that Defendants' fraudulent concealment of both thalidomide's extensive distribution in the United States and the drug's dangerousness tolled the running of the two-year limitations clock. As I explain below, however, Plaintiff has not remotely made out fraudulent concealment. Perhaps realizing this, in opposing summary judgment, Plaintiff raises a new contention: that until October 2009, he could

not, in the exercise of reasonable diligence, have known that thalidomide caused his birth defects. He thus argues that his October 2011 Complaint is not time-barred.

Once again, it is undisputed that Plaintiff has known since at least 1969 that his mother took thalidomide while she was pregnant with him; that in the 1980s, his father tried to sue the prescribing doctor; that at this time Plaintiff acknowledged to his then-personal injury lawyer that his birth defects were "the result of thalidomide"; that for the last 40 years, Plaintiff's "best knowledge" was that thalidomide caused his injuries; and that he so informed his doctor in 2005.

In arguing that the two-year limitations clock was stopped for some 50 years, Plaintiff offers the expert affidavit of Trent Stephens, Ph.D., who examined Plaintiff in July 2014 (after Plaintiffs were accused of discovery misconduct and I appointed Mr. Hangley). (Stephens Decl. ¶ 8, Doc. No. 262, Ex. 7.)

Plaintiff argues that his "[s]ubjective belief [that thalidomide caused his injuries] isn't enough to start the statute of limitations running." (Doc. No. 364 at 83; see also Doc. No. 262 at 16 ("[M]ere suspicision that thalidomide caused his injuries [does not] mean that his claims are time-barred as a matter of law.").) In support, Dr. Stephens avers that before October 25, 2009 (exactly two years before the instant Complaint was filed) medical science mistakenly understood that thalidomide caused only "bilateral" limb defects, not the "unilateral" defects from which Plaintiff suffers. (Stephens Decl. ¶¶ 17-19, 22-24.) Dr. Stephens believes that before this date, no "legitimate expert" would have opined that the unilateral injuries to Plaintiff's limbs and hip were caused by thalidomide, assuming Plaintiff's mother took the drug early in her pregnancy. (Doc. No. 262 at 3.) Plaintiff thus argues that the limitations clock was tolled until October 25, 2009, because Plaintiff could not, in the exercise of reasonable diligence,

have known with certainty that thalidomide caused his injuries: "medical expert testimony did not exist before that time" to support such a claim.  (Id. at 5, 7.)

Assuming *arguendo* that Dr. Stephens's expert opinion passes muster under Daubert, his declaration and the arguments Plaintiff bases on the declaration are nonetheless deficient. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

*The Expert Did Not Address All Plaintiff's Injuries*

Once again, Dr. Stephens opines on how thalidomide caused the injuries only to Plaintiff's limbs and hip.  (Stephens Decl. ¶ 12 (hip), ¶ 13 (hip and ankle), ¶ 14 (limbs), ¶ 15 (left leg), ¶ 16 (left hand), ¶ 17-24 (limbs).)  As I have discussed, however, Plaintiff has additional birth defects: he is "abnormally short," has a curved spine, and has a malformed skeleton. (Compl. ¶ 15.)  Dr. Stephens thus has not addressed whether thalidomide caused *all* Plaintiff's injuries.  The record abounds with uncontradicted evidence that medical science has known for decades that thalidomide caused these spinal and skeletal injuries.  (See Doc. No. 246, Exs. F-M.)  In these circumstances, even Dr. Stephens would be compelled to agree that Plaintiff could have learned well before October 25, 2009 that thalidomide caused at least some of his injuries.

*Absence of Causation Evidence*

There is no record evidence as to *when* in her pregnancy Plaintiff's mother took thalidomide.  (Andre Dep. 10-11 (Question: "During what part of her pregnancy [did Plaintiff's mother take thalidomide]?"  Answer: "I don't know."  Question: "Middle, beginning, end?  Do you have any idea?" Answer: "No."); Deborah Andre Dep. at 20-21; Bruscher Dep. at 28-29; Dein Dep. at 23 (Plaintiff's wife and two sisters did not know when Plaintiff's mother took the drug.)  Rather, Dr. Stephens avers that Hagens Berman "asked [him] to assume that Mr. Andre was exposed to thalidomide during the critical period in utero."  (Stephens Decl. ¶ 6.)  Dr.

Stephens's assumption is not evidence that Plaintiff's mother took thalidomide early in her pregnancy.  See Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002) ("It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record."); Elcock v. Kmart Corp., 233 F.3d 734, 755 (3d Cir. 2000) (same).  Without this evidence of causation, the Stephens declaration is inapplicable here.

      *I May Not Consider the Expert Declaration*

      An expert affidavit can defeat summary judgment only if the expert opinion would be admissible at trial.  See Heller v. Shaw Indus., 167 F.3d 146, 150 (3d Cir. 1999) (upholding grant of summary judgment where district court refused to consider expert opinion that would have been inadmissible at trial).  Dr. Stephens's opinion on the cause of Plaintiff's defects would not be admitted at trial unless it was to "a reasonable degree of medical certainty."  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 750-51 (3d Cir. 1994) (under Pennsylvania law, which applies in diversity cases, expert opinion on causation is not admissible unless it is to a reasonable degree of medical certainty that defendant caused plaintiff's injuries); Heller, 167 F.3d at 153 n.4 (same).  Because Dr. Stephens avers that his opinion on causation is "more likely than not," his declaration would not be admissible at trial.  (Stephens Decl. ¶ 23); see, e.g., Kollar v. Pa. Dep't of Transp., 7 A.3d 336, 342 (Pa. Commw. Ct. 2010) (excluding a medical expert's opinion that defendant "more likely than not" caused plaintiff's injuries); Griffin v. Univ. of Pittsburgh Med. Ctr.-Braddock Hosp., 950 A.2d 996, 1003 (Pa. Super. Ct. 2008) (a "more likely than not" degree of certainty is insufficient); Corrado v. Thomas Jefferson Univ. Hosp., 790 A.2d 1022, 1031 (Pa. Super. Ct. 2001) (finding inadmissible expert testimony that defendant "more likely than not . . . deviated from the standard of care"); cf. Bell v. Arvin Meritor, Inc., MDL 875, 2013 WL 5549540, at *1 n.1 (E.D. Pa. Oct. 4, 2013) (expert's testimony that plaintiff was "more likely

than not" exposed to asbestos was "impermissibly speculative" and inadmissible under Federal Rule of Evidence 702(b)).

Because the expert opinion that Dr. Stephens expressed in his declaration would be inadmissible at trial, it cannot defeat summary judgment.  Heller, 167 F.3d at 150; In re Paoli, 35 F.3d at 751-52 (upholding grant of summary judgment for defendants where plaintiffs' expert could not testify on causation "with a reasonable degree of certainty").

*The Expert Himself Contradicts His Opinion, as Does Undisputed Record Evidence*

Plaintiff's claims would still be time-barred, even assuming, *arguendo*: that Plaintiff's mother took thalidomide early in her pregnancy; that before October 25, 2009 no "legitimate expert" would state that thalidomide caused *any* of Plaintiff's injuries; and that Dr. Stephens's expert opinion would be admissible at trial.

Defendants vigorously argue that there was no material change in medical knowledge in October 2009 respecting the connection between thalidomide and birth defects.  (Doc. No. 271 at 4-5.)   This is confirmed by Dr. Stephens himself, who bases his recent revelation that thalidomide causes unilateral birth defects (from which Plaintiff suffers) on a 1964 study. (Stephens Decl. ¶ 17.)  Dr. Stephens also avers that data from a 1969 study shows thalidomide resulted in "significant unilateral defects."  (Id. ¶ 19.)  It thus appears that Dr. Stephens himself acknowledges that any "sea change" in medical thought on thalidomide occurred some 45 years before the date Dr. Stephens came to "appreciate[]" its significance.  (Id. ¶ 22.)

This is further confirmed by overwhelming record evidence that the American public has known since the early 1960s that thalidomide causes serious birth defects.  (Doc. No. 246, Exs. F-M.)   Accordingly, personal injury litigation against Defendants and their corporate predecessors has been ongoing for over 50 years.  (Id., Ex. Q.)  Indeed—*in 1975*—the Third

Circuit ruled that a thalidomide personal injury case against Defendants "will be dismissed as time-barred." Henry v. Richardson-Merrell, Inc., 508 F.2d 28, 31 (3d Cir. 1975). Yet if Dr. Stephens is correct, at least some of these numerous plaintiffs could not have known that their injuries were caused by thalidomide, and thus brought personal injury actions that were supported by "illegitimate experts."

In these circumstances, Dr. Stephens's "expert" opinion is insufficient to defeat summary judgment. See Elec. Ins. Co. v. Estate of Marcantonis, 755 F. Supp. 2d 632, 636 (D.N.J. 2010) (expert witness report unsupported by the record was insufficient to defeat summary judgment); Stein v. Foamex Int'l, Inc., No. 2356, 2001 WL 936566, at *7-8 (E.D. Pa. Aug. 15, 2001) (striking from the summary judgment record an expert witness's affidavit that contradicted his expert report and deposition testimony); cf. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 290 (3d Cir. 2012) ("When an expert opinion is not supported by sufficient facts . . . , or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." (quoting Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993))).

*No Reasonable Diligence*

To toll the running of the limitations clock, Plaintiff was obligated to exercise "reasonable diligence in ascertaining the existence of [his] injury and its cause." Mest, 449 F.3d at 511 (citations omitted). "[A] diligent investigation may require one to seek further medical examination as well as competent legal representation." Cochran v. GAF Corp., 666 A.2d 245, 249 (Pa. 1995). Here, it is undisputed that Plaintiff undertook no investigation, even though for some 40 years he told doctors that "to the best of his knowledge" thalidomide—a drug he knew "came from Germany"—caused his birth defects. (Andre Dep. at 58, 65, 104-05.)

Notwithstanding this knowledge, when Plaintiff could not find his mother's medical records, he simply gave up: "with no clues to follow, [Plaintiff] was left with no understanding of what it meant to be a thalidomider and no idea who was responsible for developing and distributing the drug." (Compl. ¶ 18.)  This is no diligence at all, especially compared with that demonstrated by the numerous plaintiffs who brought thalidomide personal injury actions against Defendants decades before October 25, 2009.  (Doc. No. 246, Ex. Q.)

Plaintiff did not need an expert opinion to investigate the cause of his birth defects, especially when he had already heard from his parents that thalidomide had caused his injuries. (Andre Dep. at 104-05); see Brawner v. Educ. Mgmt. Corp., 513 F. App'x 148, 151 (3d Cir. 2013) ("[K]nowledge of every fact necessary to prevail on the claim is not required to . . . trigger the accrual period." (emphasis and internal citation omitted)); Mest, 449 F.3d at 510-11 (discovery rule does not toll the statute until a plaintiff "know[s] the exact nature of his injury"); Ingenito v. AC & S, Inc., 633 A.2d 1172, 1174 (Pa. Super. Ct. 1993) ("A plaintiff does not need to know that he has a cause of action, or that he has suffered an injury due to another party's wrongful conduct [if the plaintiff] possesses the salient facts concerning the occurrence of his injury and who or what caused it . . . .").  Through the exercise of diligence, Plaintiff would have discovered an expert to confirm that thalidomide caused at least some of his injuries.  See Cochran, 666 A.2d at 249 ("[A] diligent investigation may require one to seek further medical examination as well as competent legal representation."); Mest, 449 F.3d at 513 (discovery rule applied where plaintiffs "noticed their injury[,] suspected that the defendants' actions were to blame [and] sought the advice of medical experts"); Love v. Raymark Indus., 633 A.2d 1185, 1186-87 (Pa. Super. Ct. 1993) (discovery rule did not apply where plaintiff "suspected that [his lung] cancer was related to his occupational exposure to asbestos" and the "causal connection

between lung cancer and occupational exposure to asbestos was neither obscure nor unascertainable").

Moreover, had Plaintiff been told by a "legitimate expert" that thalidomide did not cause *any of* his injuries—thus giving some support to Dr. Stephens's dubious opinion—that alone would not have tolled the limitations clock.  Almost 20 years ago, the Pennsylvania Supreme Court held that "[i]t is well settled that the statute of limitations is not tolled by mistake or misunderstanding." Cochran, 666 A.2d at 249.  The Third Circuit has cautioned that "[t]here is indeed some point in time when a patient's own 'common sense' should lead her to conclude that it is no longer reasonable to rely on the assurances of her doctor." Bohus v. Beloff, 950 F.2d 919, 930 (3d Cir. 1991).  Here, where Plaintiff "knew" thalidomide caused his injuries (and no doctor or scientist told him anything to the contrary), and that a German company had manufactured the drug, "common sense" compelled him, at the very least, to obtain counsel to investigate.  Yet, Plaintiff testified that even though he had retained a personal injury lawyer decades ago in connection with an unrelated injury, he never asked the lawyer to investigate the cause of his birth defects.  (Andre Dep. 84-87.)  Plainly Plaintiff did not exercise reasonable diligence.  See Cochran, 666 A.2d at 249 ("[A] diligent investigation may require one to seek further medical examination as well as competent legal representation.")

In sum, the discovery rule does not save Plaintiff's 2011 claims, which were time-barred decades before.

### D.  Fraudulent Concealment

*Plaintiff's Arguments*

Once again, Plaintiff alleges that Defendants fraudulently concealed the extent of thalidomide's distribution in the United States and the drug's dangerousness.  (Compl. ¶¶ 369(1-

20), 375.)   Purportedly relying on those misrepresentations—whose falsity "became known within the last year" as a result of "extraordinary investigative efforts"—Plaintiff refrained from suing Defendants.   (Compl. ¶¶ 1, 3.)   Plaintiff argues that these misrepresentations tolled the running of Pennsylvania's two-year limitations clock for over 50 years.   (Doc. No. 262 at 32-35.)

   *Traditional Fraudulent Concealment*

   The doctrine of fraudulent concealment tolls the limitations clock where "through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry."   <u>Ciccarelli v. Carey Canadian Mines, Ltd.</u>, 757 F.2d 548, 556 (3d Cir. 1985).   As I have discussed—and Plaintiff acknowledges in his Complaint—a plaintiff must plead fraudulent concealment with particularity and, at summary judgment, the plaintiff has the burden of "proving fraudulent concealment by clear, precise, and convincing evidence."   <u>Fine</u>, 870 A.2d at 860; <u>Byrnes</u>, 741 F.2d at 626.

   Here, Plaintiff has not, in his Complaint or deposition, identified a single misrepresentation on which *he* relied to *his* detriment.   Plaintiff does not allege that he relied on any of the twenty "fraudulent acts" alleged in his Complaint.   (Compl. ¶ 369(1-20).)   Plaintiff testified that he did not know of—and thus could not have relied upon—any of Defendants' misrepresentations respecting the distribution and dangerousness of thalidomide.   When asked what he knew about thalidomide, Plaintiff responded only that he knew the drug caused "90 to 99 percent" of his birth defects, that it had been removed from the market, and that it had come from Germany.   (Andre Dep. at 33-35, 104-05.)   In these circumstances, Plaintiff has failed to carry his burden of proving a reasonable juror could find fraudulent concealment "by clear, precise, and convincing evidence."   <u>Fine</u>, 870 A.2d at 860.

Moreover, Defendants' alleged misrepresentations never lulled Plaintiff into an incorrect understanding that he had no reason to proceed against Defendants.  As pled, Plaintiff's parents told him thalidomide caused his birth defects.  Indeed, Plaintiff's father tried to sue the doctor who prescribed the drug.  As I have explained, Plaintiff failed to pursue claims against Defendants because of a lack of diligence, not because of Defendants' purported fraud.

*Expanding the Fraudulent Concealment Doctrine*

Because Plaintiff cannot prevail under the traditional fraudulent concealment rule, he has argued for a different rule, which has scant legal support and, more importantly, no evidentiary support.

At the October 1 sanctions hearing before Mr. Hangley, Plaintiff's Counsel confirmed that Defendants had made no representations of any kind directly to Plaintiff.  (Doc. No. 364 at 74; see also Pl.'s Second Supp. Resp. to Sanofi-Aventis U.S. LLC's Fourth Interrog., Doc. No. 262, Ex. 7.)  Counsel suggested that I have ruled that in the absence of such direct communications, there could be no fraudulent concealment.  (Doc. No. 364 at 74.)  This is incorrect.

In granting Defendants' unopposed motion for summary judgment against Plaintiff Jack Merica, I ruled that "in Pennsylvania, fraudulent concealment requires [an] 'affirmative act of concealment upon which Plaintiff justifiably relied.'"  (Doc. No. 265 at 2 (quoting Riggs v. AHP Settlement Trust, 421 F. App'x 136, 139 (3d Cir. 2011) (per curiam)).)  I have never ruled on whether that "act of concealment" must be communicated *directly* to the plaintiff.  But see Mest, 449 F.3d at 517 (no fraudulent concealment in the absence of communications between the parties); Urland, 822 F.2d at 1271-72 (fraudulent concealment doctrine applied where a drug manufacturer wrote a letter to the plaintiff containing misleading information); Ciccarelli, 757

F.2d at 556-57 (no fraudulent concealment where plaintiffs submitted "a detailed offer of proof, including evidence spanning several decades, which sought to implicate the manufacturers in an industry-wide conspiracy to conceal the hazards of asbestos exposure"); <u>Speicher v. Dalkon Shield Claimants Trust.</u>, 943 F. Supp. 554, 558-59 (E.D. Pa. 1996) (no fraudulent concealment where defendants allegedly "hid information from the public," because "allegations of a manufacturer's conspiracy are not sufficient to support a claim of fraud that would cause plaintiff to deviate from her duty to inquire"); <u>Baselice v. Franciscan Friars Assumption BVM Province, Inc.</u>, 879 A.2d 270, 278-79 (Pa. Super. Ct. 2005) (no fraudulent concealment based on "general and systematic conduct exhibited by the Archdiocese with regard to its offending priests").

Nevertheless, for purposes of summary judgment, I will assume *arguendo* that Plaintiff could make out fraudulent concealment with evidence of Defendants' public misrepresentations, that Plaintiff indirectly learned of these misrepresentations, and that he relied on the misrepresentations to his detriment.   Once again, Plaintiff has not identified any misrepresentation on which *he* relied in refraining from suing Defendants.   On the contrary, Plaintiff has both pled and testified to the opposite of detrimental reliance on Defendants' alleged misrepresentations: his "best knowledge" has long been that thalidomide caused his injuries.

As Plaintiff acknowledges, the fraudulent concealment doctrine tolls the statute only until the "injured party knows or reasonably should know of his injury and its cause."  (Doc. No. 262 at 33-34 (quoting <u>Fine</u>, 870 A.2d at 861)); <u>see also</u> <u>Urland</u>, 822 F.2d at 1273 ("[T]he [Pennsylvania] Supreme Court . . . views tolling of the statute of limitations in terms of the same 'knew or should have known' standard whether the statute is tolled because of the discovery rule or because of fraudulent concealment.").   As I have discussed at length, Plaintiff knew or

reasonably should have known decades before October 2009 that thalidomide caused some or all his birth defects.

In sum, because the record does not make out fraudulent concealment under any theory, Plaintiff's claims are time-barred.

### E. Causation

Defendants argue persuasively that Plaintiff has produced no admissible evidence showing that his mother ingested thalidomide at any point during her pregnancy.  (Doc. No. 246 at 15-18.)  In light of my decision that Plaintiff's claims are time-barred, however, I need not address this argument.

### F. Additional Discovery

On October 13, Plaintiff asked me to defer ruling on summary judgment until he can explore the details and accuracy of Defendants' stated distribution of thalidomide in the United States decades ago.  (Doc. No. 367 at 12-13); Fed. R. Civ. P. 56(d).  Even if Plaintiff could obtain additional evidence of Defendants' "misrepresentations" respecting thalidomide's distribution in the United States, there is no record evidence that Plaintiff relied on *any* of Defendants' representations at any time.  Granting Plaintiff's request would thus serve no valid purpose, because the proposed discovery has nothing to do with Plaintiff, his knowledge of his injuries, or the "misrepresentations" from Defendants that Plaintiff purportedly relied upon.  As I have discussed at length, Plaintiff has long been on notice that thalidomide caused his injuries, but chose not to obtain counsel until 2011 or otherwise explore avenues of relief.  Accordingly, whether additional discovery would reveal that thalidomide was somehow more or less available domestically would not affect my analysis of Plaintiff's discovery rule or fraudulent concealment contentions.

22

**V.      CONCLUSION**

After some three years of litigation, it is plain that critical allegations made by Edmund Andre—allegations that I was compelled to accept as true at the Rule 12 stage—have no evidentiary support.  Plaintiff offers no valid basis to conclude that the two-year limitations clock was tolled after February 1957, when Plaintiff was born with horrific injuries.  I am now compelled to conclude that the clock expired decades ago and that this 2011 personal injury action is time-barred.

An appropriate Order follows.

*/s/ Paul S. Diamond*

_____

October 16, 2014                                         Paul S. Diamond, J.

23