**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GLENDA JOHNSON ET AL., )<br><br>Plaintiffs, )<br><br>v. )<br><br>SMITHKLINE BEECHAM CORPORATION<br>ET AL., )<br><br>Defendants. ) | Case No. 2:11-cv-005782-PD<br>and all related cases |

**REPORT AND RECOMMENDATIONS OF THE SPECIAL DISCOVERY MASTER ON
MOTIONS FOR SANCTIONS AGAINST PLAINTIFFS' COUNSEL**

These are motions for sanctions in consolidated actions brought by 52 individual

plaintiffs. The three motions addressed in this Report are brought by one or more of the

defendants[1] against the firm of Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), which

represents or has represented all of the plaintiffs,[2] based on Hagens Berman's conduct in

pursuing claims on behalf of three of the plaintiffs in these cases, Jack Merica, Lawrence

Boiardi, and Roel Garza. No sanctions are sought against those plaintiffs themselves, or against

---

[1] Three companies or groups of companies are defendants: GlaxoSmithKline LLC and
GlaxoSmithKline Holdings (Americas) Inc. (collectively, with predecessors, referred to as
"GSK"), Sanofi-Aventis U.S. LLC (with predecessors, referred to as "Sanofi"), and Grünenthal
GmbH ("Grünenthal"). Only GSK and Grünenthal moved for sanctions. However, GSK
recently informed the Court that it has committed to withdraw its claims for sanctions contingent
upon the occurrence of certain other events, as discussed more fully in § V of this Report. Since
the conditions precedent have not yet occurred, and conceivably might not occur, this Report will
proceed as if GSK's prayers for sanctions were still before the Special Master.

[2] Hagens Berman represented all 52 plaintiffs, but has obtained or is seeking leave to
withdraw its appearances for several of them. Some other plaintiffs' claims have been
withdrawn or dismissed with prejudice or disposed of by summary judgment.

plaintiffs' local Pennsylvania counsel.  I have been appointed Special Discovery Master in these

cases pursuant to Fed. R. Civ. P. 53 with the duty, *inter alia,* to make reports and

recommendations to District Judge Paul Diamond on sanctions matters.  Dkt. 256, 316, 396.

After considering the briefs and evidence, and upon hearing in open court, I

recommend that the motions be granted and that sanctions be imposed for the reasons more fully

discussed below.

## I.    Applicable Standards

The sanctions motions are based on both 28 U.S.C. § 1927[3] and the inherent

authority of courts to police their own proceedings and uphold the integrity of the civil justice

system.  Those sources of the sanction power differ in certain respects.  Before sanctions can be

assessed under Section 1927, the court must find that the attorney has "(1) multiplied proceedings;

(2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings," and

that the attorney "d[id] so in bad faith or by intentional misconduct."  *In re Prudential Ins. Co. Am.*

*Sales Practice Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002).   To assess attorneys' fees

pursuant to the court's inherent power, the court must likewise make a finding of bad faith.

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (explaining that a court may assess attorneys'

fees pursuant to its inherent authority "when a party has 'acted in bad faith, vexatiously, wantonly, or

for oppressive reasons'"); *see also Prudential Ins. Co.*, 278 F.3d at 181.   Courts have a bit more

---

[3]      Any attorney or other person admitted to conduct cases in any court
of the United States or any Territory thereof who so multiplies the
proceedings in any case unreasonably and vexatiously may be
required by the court to satisfy personally the excess costs, expenses,
and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

flexibility when assessing sanctions pursuant to their inherent power. *See, e.g., Ferguson v. Valero Energy Corp.*, 454 F. App'x 109, 114 (3d Cir. 2011) (when conduct is egregious and statutory remedies would not adequately compensate the party moving for sanctions, courts are not bound by the statutory limitations imposed on fees awarded under Section 1927).

Bad faith can be inferred when the claims pursued are clearly frivolous.  *See Prudential Ins. Co.*, 278 F.3d at 188 ("[F]indings that the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment" have been recognized as "[i]ndications of this bad faith."); *see also Loftus v. S.E. Pa. Transp. Auth.,* 8 F. Supp. 2d 458, 461 (E.D. Pa. 1998), *aff'd*, 187 F.3d 626 (3d Cir. 1999) ("When a claim is advocated despite the fact that it is patently frivolous or where a litigant continues to pursue a claim in the face of an irrebuttable defense, bad faith can be implied.").  Thus, for example, in *Matthews v. Freedman*, 128 F.R.D. 194, 206-07 (E.D. Pa. 1989), *aff'd*, 919 F.2d 135 (3d Cir. 1990), the court found that plaintiff's counsel acted in bad faith when he continued to pursue claims after being notified by defendants in a letter that the claims were barred by the statute of limitations. *See also Alphonso v. Pitney Bowes, Inc.*, 356 F. Supp. 2d 442, 454 (D.N.J. 2005) ("[r]elentless pursuit of [inflated claims for lost earnings] after the evidence demonstrated, at most, a comparatively trivial amount of loss shows bad faith"); *McCandless v. Great Atl. & Pac. Tea Co.*, 529 F. Supp. 476, 478 (N.D. Ill. 1982), *aff'd*, 697 F.2d 198 (7th Cir. 1983) (sanctions because "[t]his lawsuit could have been avoided had [plaintiff's] counsel done the minimum amount of research required of a responsible member of the bar").

## II.    Background of All Cases:  Events Before April 12, 2014

The background of these and related cases, consolidated for discovery purposes and assigned to Judge Paul S. Diamond, is set forth in the District Court's recent opinion

granting summary judgment against another plaintiff, Edmund Andre.  *Johnson v. SmithKline Beecham Corp.,* ___ F. Supp. 3d _____, 2014 WL 5285943 (E.D. Pa. Oct. 16, 2014) ("*Andre Opinion*"); *see also* Dkt. 265 (July 14, 2014) (ordering summary judgment against Plaintiff Merica) ("*Merica Opinion*").  For convenience, I will summarize it here.

Between 2011 and 2013, the 52 plaintiffs, all of whom were born in the late 1950s or early 1960s, brought claims against pharmaceutical companies that had manufactured or distributed the compound thalidomide.  All the plaintiffs alleged that they suffered from grievous birth defects caused by their mothers' ingestion of the drug thalidomide while plaintiffs were *in utero.*[4]

With lawsuits coming 50 years or more after the claimed prenatal torts at issue, it must have been obvious that defendants were likely to assert that statutes of limitations had run.  Under Pennsylvania law, plaintiffs were free to ignore that likelihood and leave it to defendants to invoke that affirmative defense if they chose to do so.  *See, e.g., Kyle v. McNamara & Criste,* 506 Pa. 631, 635 (1985).  Instead, plaintiffs' counsel, Hagens Berman, met the anticipated defense head-on with claims of fraudulent concealment that had tolled the statute:

> [E]vidence that only recently came to light based on extraordinary investigative efforts, reveals that the story authored by the Defendants that thalidomide did not cause injuries in the United States was not the truth.  Instead, it was a carefully constructed

---

[4] Most of these cases were initially brought in the Court of Common Pleas of Philadelphia County, Pennsylvania, and removed to this Court, and it was not until after the Third Circuit Court of Appeals upheld the District Court's removal jurisdiction in June 2013, *see Johnson v. SmithKline Beecham Corp.,* 724 F.3d 337 (3d Cir. 2013), that these cases, back in the District Court, were consolidated for discovery purposes.  *See Andre* Opinion at *1-*2.

story sold to the public to protect Defendants from having to accept responsibility for what they had done.[5]

\* \* \*

> D.      Defendants fraudulently convinced Congress and the public that thalidomide could not have caused injuries in the United States, falsely claiming that it was almost entirely unavailable in the United States and failing to disclose that testing on pregnant women here had resulted in the births of at least two malformed babies by 1958 . . . ."[6]

As noted by the Court in the *Andre* Opinion*,* "Plaintiffs alleged twenty specific false statements or fraudulent omissions that Defendants made respecting the safety and availability of thalidomide in the United States."   *Andre* Opinion at \*2.

All 52 plaintiffs alleged fraudulent concealment as a basis for tolling the statute. And a subset of the plaintiffs (including Messrs. Boiardi and Garza, but not Mr. Merica) also

---

[5] Complaint, *Valerie  Spence, et al. v. Avantor Performance Materials,* No. 665 August Term 2012 (C.P. Philadelphia Aug. 9, 2012), removed and docketed at No. 12-cv-4542 (E.D. Pa. Aug. 9, 2012) (*"Merica* Complaint"), ¶ 4; Complaint, *Rebecca Alexander, et al. v. Avantor Performance Materials, et al.,* No. 419 August Term 2013 (C.P. Philadelphia Aug. 7, 2013), removed and docketed at 13-cv-4591 (E.D. Pa. Aug. 7, 2013) ("*Boiardi-Garza* Complaint"), ¶ 4.

[6] *Merica* Complaint Statement of Facts, § D; *Boiardi-Garza* Complaint Statement of Facts, § D.  *See also* Complaint, *Philip Yeatts, et al. v. SmithKline Beecham Corporation, et al.*, No. 3316 October Term 2011 (C.P. Philadelphia Oct. 27, 2011, removed and docketed at No. 11-cv-6711 (E.D. Pa. Oct. 27, 2011) ("*Andre* Complaint"), ¶ 1:

> Plaintiffs suffer from severe birth defects caused by thalidomide, a drug given to their mothers in early pregnancy as a treatment for morning sickness. Until less than two years ago, Plaintiffs did not discover (and could not reasonably have discovered) that thalidomide caused their injuries.  Defendants' fraudulent concealment of their wrongdoing in the development of thalidomide – and its marketing, testing and distribution in the United States – tolled the limitations period for Plaintiffs' claims until the truth about Defendants' wrongful acts became known within the last year.

alleged a non-fraud theory for tolling. They asserted that medical science had evolved, just lately, to the point where some of the plaintiffs could discover and conscientiously allege that thalidomide was the cause of their particular birth defects. *See, e.g.*, *Boiardi-Garza* Complaint ¶¶ 21, 24.

Defendants did file Rule 12(b)(6) motions to dismiss, but Judge Diamond, obligated to accept the complaints' allegations as true for purposes of the motions, denied them without prejudice: "I cannot determine, at this early stage in the litigation, the viability of Plaintiffs' equitable tolling arguments." Dkt. 92; *see Andre* Opinion at *2.

As discovery lurched forward, it quickly became apparent that Hagens Berman's pretrial investigation of its 52 clients' claims was decidedly less than perfect. Less than two months after the Court's denial of the Rule 12(b)(6) motions, defendants learned that several of the plaintiffs could not sue for the simple reason that they had already done that once; indeed, in at least one instance, a plaintiff was continuing to receive monthly settlement payments from a defendant it was suing a second time for the same alleged tort. *See* Dkt. 168 and exhibits. For reasons that are not entirely clear, obtaining voluntary dismissals of those plaintiffs' claims took about four months and several angry demands from defendants' counsel. *Id.*; Dkt 182.

Defendants' written discovery was aimed, in significant part, at the fraudulent concealment allegations and sought to learn which plaintiff claimed to have relied on which alleged fraudulent statement or conduct, and when that plaintiff had sufficient knowledge to start the clock running on his or her duty to bring an action or at least investigate. Defendants argued that plaintiffs were sidestepping discovery into those subjects, and defendants were right. The history of the discovery dispute is best summarized in the *Andre* Opinion:

Having put front and center the question of when Plaintiffs knew thalidomide may have caused their injuries, once discovery began, Plaintiffs repeatedly refused to provide an answer. For instance, on October 22, 2013, Defendants propounded interrogatories asking each Plaintiff to "[i]dentify the date on which you contend you were first on notice of a thalidomide-related claim." (Doc. No. 137, Ex. A.)  Defendants also asked each Plaintiff to "[i]dentify . . . each alleged fact or document set forth in your Complaint which you contend was fraudulently concealed [and] identify how and when you first learned about each allegedly concealed fact or document."  (*Id.*)  All Plaintiffs collectively filed a single objection to these interrogatories, contending that because the inquiries were "premature and unduly burdensome," they would provide no substantive responses.  (*Id.*, Ex. B.)

After I ordered Plaintiffs to provide full and complete responses, each Plaintiff provided the identical response, purporting to rely on the "cumulative effect" of Defendants' "misrepresentations." (*See, e.g.*, Doc. No. 164, Ex. C.)  Because, as Plaintiffs themselves acknowledged in their Complaints, fraud must be pled with particularity, I ruled that because "[e]ach Plaintiff's claim of fraudulent concealment turns on her own knowledge," "each Plaintiff must provide verified individual responses disclosing each fact or document that was fraudulently concealed, and when Plaintiffs learned of these facts." (Doc. No. 166.)

On May 9, 2014, Defendants asked me to order Plaintiffs to comply with discovery requests respecting Plaintiffs' thalidomide-related online and social media communications and research. (Doc. No. 200.)  I granted the Motion and ordered Plaintiffs to provide individual responses by May 18.  (Doc. Nos. 206, 222.) On June 12, Defendants presented compelling evidence that, contrary to my Orders (and Plaintiffs' discovery obligations), several Plaintiffs had failed to produce highly probative, relevant evidence, including online and social media posts revealing that some Plaintiffs have known for decades that thalidomide caused their birth defects. (Doc. No. 232.)  Plaintiffs responded that they failed to produce these materials because, *inter alia:* (1) some Plaintiffs could not remember making the posts; (2) some Plaintiffs suffer from short-term memory loss; (3) in light of the volume of responsive documents, Plaintiffs' Counsel could not ensure accurate and complete discovery responses; and (4) the withheld posts were not responsive to Defendants' discovery requests. (Doc. No. 238.)

*Id.* at *3.  In their discovery motions, defendants had asked that all plaintiffs' cases be dismissed with prejudice as a sanction.   The Court declined to allow that extreme remedy, but appointed me as the Special Discovery Master with authority to oversee discovery and, if appropriate, make recommendations on sanctions requests by either side.  *Id.*

Earlier, as it became apparent that at least some plaintiffs' claims were deeply flawed, defense counsel had written to plaintiffs' counsel on March 26, 2014, and asked Hagens Berman to review the outstanding cases before the parties spent more time and money on continuing written and oral discovery.   Pressing the view that Hagens Berman's pre-suit investigation had been inadequate, and that none of the plaintiffs was able to "articulate any legitimate grounds for invoking fraudulent concealment," counsel – holding out both the carrot and the stick – went on to demand that Hagens Berman do an appropriate investigation immediately, before litigation expenses spun out of control:

> I would hope that plaintiffs' counsel would promptly proceed now, before additional expense is incurred, to undertake a careful review of the claims made in all these cases.  If there are others that you decide to dismiss, GSK will agree in any such case dismissed by April 11 to again bear its own costs.  However, for any cases which remain pending after that date, GSK will not agree to bear its own costs and is reserving its right to seek both costs and attorneys fees under all applicable rules and statutes.

Dkt. 310, Defendants' Motion for Sanctions as to Plaintiff Jack Merica, Ex. 10 (email).  As of the date of that letter, March 26, the battle over written discovery was at full boil, but only a handful of depositions had been taken.

The April 11 deadline came and went.   No cases were dismissed.   Massive deposition discovery went forward.   According to counsel for both sides, some 130 depositions

were taken between March 26 and my October 1 hearing (*see* Dkt. 364, Transcript of Hearing, Oct. 1, 2014 ("Tr."), at 65-66, 134), and more depositions were taken after that date.

### III.    The Present Sanctions Motions

As deposition discovery was taken, defendants jointly filed motions for summary judgment against plaintiffs Merica, Boiardi and Garza.   Dkt. 245, 258, 281.   Each of the motions is a detailed and meticulously documented collection of facts learned by defendants in their investigation and discovery.   In each case, after the motion was filed and briefed, Hagens Berman stipulated on behalf of its client to the entry of the requested summary judgment and the District Court entered judgment.   Defendants GSK and Grünenthal also moved for sanctions, which motions were referred to me.   I have entertained briefs and heard oral argument.   In each case, defendants seek sanctions only for conduct during the period after the April 11, 2014 deadline (the "Sanctions Period") announced in the March 26 letter.

It is important to note that each of the three present motions stands on its own, and seeks sanctions only for Hagens Berman's conduct with respect to the prosecution of a particular plaintiff's claims.   The Court has not been asked to impose sanctions based on Hagen Berman's conduct with respect to the claims of the other plaintiffs or conduct that related to all plaintiffs.   This will present some nice questions of apportionment discussed elsewhere in this Report and Recommendations.   *See infra.* § VI.

A.    **Jack Merica's Claim**

Mr. Merica's Complaint, like some but not all of the plaintiffs' complaints, acknowledged that he had notice outside the statutory two-year period that he might be, in his own words, a "thalidomider," but asserted that he was powerless to follow up on that suggestion, and did not actually understand what it meant, until recently:

> 21.    Jack was told his mother took thalidomide for morning sickness during her pregnancy with Jack.
>
> 22.    Neither Jack nor his family knew the names of any companies responsible for the distribution of thalidomide in the USA. With no clues to follow, Jack was left with no understanding of what it meant to be a thalidomider and no idea who was responsible for developing and distributing the drug, and the exact role of each defendant was not reasonably ascertainable in part due to acts of concealment set forth below.

*Merica* Complaint.[7]

But the actual facts unearthed in discovery were stunningly different. As observed by the District Judge:

> It is undisputed that: (1) Plaintiff's mother told him in the 1960s that thalidomide caused his injuries; (2) Plaintiff's mother told Plaintiff's doctors in the 1960s that thalidomide caused his injuries; (3) in the 1970s, Plaintiff asked his mother why she had not sued the doctor who prescribed thalidomide or the drug's manufacturer; (4) in 1983, Plaintiff filed a Social Security Disability application seeking benefits for thalidomide-caused injuries; (5) in 1990 or 1991, Plaintiff's mother gave him the bottle of thalidomide pills that she had taken while she was pregnant with him; (6) in 1992 – "thirty seconds" into their first date – Plaintiff told his now-wife that thalidomide caused his birth defects (May 9, 2014 Dep. of Yvonne Merica at 17); and (7) in 2000, Plaintiff gave

---

[7] The identical assertion is made on behalf of numerous plaintiffs in their complaints. Mr. Merica's Complaint, like the others, identified the twenty acts of alleged cover-up or outright mendacity mentioned in the *Andre* Opinion and quoted *supra*.

> an interview to WeMedia Magazine during which he stated that he
> had injuries caused by thalidomide.

*Merica* Opinion, Dkt. 265 at 1-2. (internal quotes omitted).[8]  The Court observed that "[t]he

record does not presently disclose how, in light of Plaintiff's decades-long knowledge that his

birth defects were caused by thalidomide, he could have alleged that defendants fraudulently

concealed that information from him.  The Special Discovery Master I have appointed in this

matter will presumably address this question." *Id.* at 2.

I address it now: Mr. Merica's allegations – all verified by a Hagens Berman lawyer

rather than Mr. Merica himself – simply cannot be squared with the uncontested facts.  The

assertions that Mr. Merica had "no clues to follow" and "no understanding of what it meant to be

a thalidomider" are simply impossible to reconcile with the fact that his mother told him she had

taken thalidomide pills for her morning sickness, showed him the pills, and claimed that

thalidomide had caused his injuries.   They cannot be squared with his conversation with his

mother, some forty years ago, about suing the supposed prescribing physician or the supposed

manufacturer.   They cannot be squared with the fact that Mr. Merica had the opportunity to have

the pills tested to learn if they were in fact thalidomide, but failed to do so.   Nor could Mr.

Merica or his lawyers ever hope to persuade a reasonable juror that it was never possible, at any

point before 2011 (two years before he sued) for him to find out "who was responsible for

developing and distributing the drug."  In moving for summary judgment, defendants presented

extensive public information – magazine articles and the like from the 1960's, 1970's, and later,

---

[8] The Court also noted that Mr. Merica had lost track of the pills at some point, so they
are no longer in his possession. *Id.*

in which the involvement of these defendants in the creation and distribution of the compound was widely and noisily publicized.[9]

To be clear, if this were a motion under Rule 11, Hagens Berman's apparent failure to conduct adequate investigation before filing a suit on Mr. Merica's behalf might be an appropriate basis for a sanctions order. That is not so under Section 1927. But it does establish a context for examining the post-April 12, 2014 conduct that is in question on this motion. By April 12, Hagens Berman knew or certainly should have known that the Mr. Merica's claim could not survive; the Hagens Berman lawyers knew or should have known they could not conscientiously embrace a theory of fraudulent concealment on Mr. Merica's behalf and so (as they would ultimately concede) he could not sue successfully. As a result of Hagens Berman's failure to acknowledge the obvious flaws in Mr. Merica's case, defendants were put to the expense, after April 11, of deposing Mr. Merica, deposing his wife, and generally pursuing discovery into his story, as well as the expense of preparing and prosecuting their motion for summary judgment and their later motion for sanctions.

And then Hagens Berman made it worse. After throwing in the towel on Mr. Merica's claims, and after receiving a detailed and thoughtful review of the facts and law from the District Judge, Hagens Berman prolonged the proceedings and drove up their cost by opposing the imposition of sanctions on theories that mischaracterized the District Court's summary judgment opinion, mischaracterized the law, and even mischaracterized the Complaint Hagens Berman had written on Mr. Merica's behalf.

---

[9] The exhibits to the Merica summary judgment motion included copies of stories in the *Washington Post* (1962), *Life* (1962, 1968), *Saturday Review* (1962), The Reporter (1963), the *Los Angeles Times* (1972), the *New York Times* (1973) and others. Dkt. 245, Exh. 11-16.

In resisting sanctions, counsel argued that Mr. Merica's case was winnable until, in their summary judgment motion, defendants suddenly interposed the Virginia statute of limitations, Va. Code § 8.01–230, as an alternative to the Pennsylvania statute 42 Pa. C.S. §§ 5524(2), 5542(7):  "Plaintiff Merica and his counsel filed a statement of non-opposition to the summary judgment motion solely because the discovery rule does not apply as to whether Mr. Merica's claims are untimely under Virginia law, which Defendants invoked for the first time in their summary judgment motion . . . ."  Dkt. 338 at p. 6.  Hagens Berman argued that Virginia law – unlike Pennsylvania law – does not provide a non-fraud "discovery rule" exception to the operation of the limitations clock, whereas Pennsylvania law does.  This is true, but in making this argument, Hagens Berman asserted three incorrect propositions:  First, that the "surprise" invocation of the Virginia statute of limitations violated a Pennsylvania statute;[10] second, that the loss of the case became inevitable (and therefore Merica surrendered) only because the Virginia statute took away his supposed non-fraud argument for tolling the statute; and third, that if the Pennsylvania statute and case law had been applied, Mr. Merica's evidence *would* have tolled the Pennsylvania statute.  Every one of those assertions is wrong.

First, the invocation of Virginia law as an alternative statute of limitations cannot have come as a surprise to attorneys as sophisticated as the Hagens Berman attorneys.[11]  The harms alleged by the 52 plaintiffs occurred in a number of different jurisdictions – the places

---

[10] Citing 42 Pa. C.S. § 5327(a):  "A party who intends to raise an issue concerning the law of any jurisdiction or governmental unit thereof outside this Commonwealth shall give notice *in his pleadings or other reasonable written notice*." (Emphasis added.)

[11] Hagens Berman describes itself on its web site as a "national plaintiff-focused law firm" boasting a cadre of highly respected and accomplished lawyers.  *See* Hagens Berman website, http://www.hbsslaw.com (last visited 12/3/14).

where thalidomide was prescribed or ingested – and the plaintiffs lived in a number of different jurisdictions at the times of their complaints; hence, the applicability of this, that or the other statute of limitations to a particular plaintiff's case has at all times been a relevant consideration. Mr. Merica and the nine other plaintiffs named in the *Merica* Complaint said they were born in several different jurisdictions and resided in still others.[12]  Defendants raised such statutes generally in their answers to the several complaints and plaintiffs were on fair notice that other states' statutes might be relied upon.[13]  Learned counsel also were obligated to understand, having chosen Pennsylvania as their forum, that a court applying Pennsylvania law must adopt the most restrictive limitations standard, *i.e.,* the law of the relevant jurisdiction that would be least amenable to extending the time for suit.  Pennsylvania has a "borrowing statute" that says "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, *whichever first bars the claim.*"  42 Pa. C.S. § 5521(b) (emphasis added).

Second – and bearing in mind that Mr. Merica's argument for tolling the statute was based entirely on a theory of fraudulent concealment – Virginia law *would* have recognized a tolling based on an actual 51-year fraudulent concealment, had there been one. *See* Va. Code Stat. Ann. § 8.01-249; *Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 887, 891 (E.D. Va. 2010).

---

[12] The eleven plaintiffs on the *Merica* Complaint, for example, gave places of birth as being Louisiana, Ohio (two plaintiffs), California, North Carolina (two plaintiffs), Cuba, Mississippi, Germany, Texas and Maryland.  Hagens Berman mistakenly alleged that Mr. Merica was born in "Norfolk, California", hence, the omission of Virginia from the list.

[13] *See, e.g.,* GSK's Answer to the *Merica* Complaint, Dkt. 130, Affirmative defenses 2, 3, and 9, asserting that the eleven plaintiffs' claims were barred by "the applicable" statutes of limitations and repose, and that "Plaintiffs' claims are controlled by state or other applicable law other than the Commonwealth of Pennsylvania, and Plaintiffs fail to state any claim upon which relief may be granted under applicable state or other law."

Third, a court applying Pennsylvania's law instead of Virginia's would never have tolled the statute in Mr. Merica's case; indeed, the District Court has already made that clear. By the time Hagens Berman responded to the Merica sanctions motion, it had long since received the *Merica* Opinion, in which Judge Diamond reviewed the facts discussed earlier and held that Merica's claims were "time barred under both the laws of Pennsylvania (where Plaintiff brought suit) and Virginia (where Plaintiff's mother was prescribed the thalidomide)." *Merica* Opinion at 2.

A particularly distressing aspect of Hagens Berman's argument regarding the claimed differences in consequences between application of the Virginia and Pennsylvania statutes comes from Hagens Berman's after-the-fact attempt – and it simply cannot have been inadvertent – to argue that the opinion of its expert, submitted in cases other than Mr. Merica's and involving facts not relevant to Mr. Merica's case, should be taken into account. This can only be viewed as an attempt to divert the tribunal rather than assisting it. In resisting sanctions, Hagens Berman invokes a tolling theory that it did not employ and could not have employed in Mr. Merica's case because not even his pleaded facts – much less the actual facts gleaned in discovery – would have supported that theory. That is bad faith. Some background on Mr. Merica's claim in the context of all claims may be helpful:

As stated earlier, all 52 plaintiffs made claims of fraudulent concealment. But some of them (plaintiffs Boiardi, Garza and others) also claimed that there was a non-fraud-based reason why the statute should be tolled. The theory of that subset of plaintiffs' claims was that, until very recently, their birth defects would not have been viewed as thalidomide-related, but that the science had recently changed to include their developmental deficits. (Briefly, these deficits are said in the pleadings to be "unilateral" or "asymmetrical" rather than "bilateral." *See*

discussion of Mr. Boiardi's claim, *infra*).  In summary, all of the plaintiffs claimed "fraud tolling" while only some of them also claimed "non-fraud tolling."

Mr. Merica did not claim non-fraud tolling in his complaint.  Of the eleven plaintiffs who joined in the *Merica* Complaint, only three plaintiffs asserted that "the predominant medical view has for decades held that thalidomide did not cause the types of unilateral and asymmetrical limb reduction" from which they suffered, but that the science had changed.  *Merica* Complaint ¶¶ 16 (Valerie Spence), 19 (Kim Branscum), 45 (Kevin Randall).  The other eight plaintiffs on this particular complaint tellingly omitted that allegation; their claims were based on "fraud tolling" alone.

And this was not just a matter of pleading; Mr. Merica plainly did not have the facts to support a non-fraud tolling claim.  He could not have made the "non-fraud tolling" assertion that his injuries would have been "excluded from the diagnosis" of thalidomide injury.  As he acknowledged in answering interrogatories, "[i]n the 1980's, Plaintiff applied for social security disability.  He represented that he was disabled as a result of thalidomide exposure because that is what his mother told him. *A doctor from health and human services examined Plaintiff and agreed*."  Dkt. 338, Plaintiff's Counsel's Opposition to Motion for Sanctions (Merica), Ex. 2, Merica Answers to Interrogatories, No. 5 (emphasis added).

In resisting sanctions, however, Hagens Berman has attempted – and again this is bad-faith advocacy – to leave the Special Master and the Court with the false impression that Mr. Merica *was* claiming non-fraud tolling, and *was* asserting claims that he simply had not made in his complaint or elsewhere:

> Defendants have made their argument for sanctions despite
> knowing full well the opinion that *Mr. Merica's expert* would have

provided on statute of limitations issue if Mr. Merica had not had
to dismiss his claims due to the application of Virginia law.

Dkt. 338, Plaintiff's Counsel's Opposition to Motion for Sanctions (Merica) at 13 (emphasis
added).  Hagens Berman goes on:

> Plaintiffs' expert has repeatedly opined in *cases similar to Mr.
> Merica's* that it is highly unlikely that a *person in Mr. Merica's
> position* would have been able to find supporting expert testimony
> until very recently

*Id.* at 17 (emphasis added).  These statements are just false.  The expert was not "Mr. Merica's

expert" and was not addressing cases "similar to Mr. Merica's," so far as the pleadings show.

The expert Hagens Berman is talking about, Dr. Stephens, had absolutely nothing to say about

the fraudulent concealment theory on which the Merica claim relied as the sole basis for tolling

the statute.  But somehow, Hagens Berman has now convinced itself that the non-fraud tolling

theory applies to *all* thalidomide plaintiffs, and that no alleged thalidomide victim, anywhere,

could have brought a suit until very recently:

> Defendants' argument conveniently ignores the expert opinion
> Plaintiffs have submitted in opposition to several other summary
> judgment motions, to the effect that until very recently, it would
> have been highly unlikely that *any plaintiff* would have been able
> to find an expert who could have confirmed that his injuries were
> consistent with thalidomide.

*Id.* at 14 (emphasis added).  Remarkably, Hagens Berman was willing to argue that, until very

recently, nobody could have sued for thalidomide injury because no expert could ever opine that

any injury was even consistent with thalidomide, much less caused by it.  But we know, of

course, that many, many thalidomide victims did sue and recover.  This, again, could not have been a good faith position.[14]

And this leads to the second troubling aspect of the opposition to the sanctions motions.  Hagens Berman argues that the statute could not run because Mr. Merica did not *know* he was a "thalidomider" (although he told so many people that he was) and did not *know* who was responsible for his mother's receiving it.  In other words, they argue that a person who has a reasonable, informed belief that falls short of categorical certainty can insulate himself from the statute of limitations by carefully doing nothing about his belief.  That logic, of course, would make a shambles of the Pennsylvania discovery rule's requirement that a person who has reason to believe she is a victim of a tort has a duty to investigate; it would say – exactly opposite to the intention of the rule – that one can toll the statute indefinitely by *not* investigating.  The case most prominently relied upon by Hagens Berman in their briefs and at hearing, *Urland v. Merrell-Dow Pharm., Inc.*, contradicts this assertion that absolute knowledge is required before the duty to investigate kicks in:

> In Pennsylvania, the relevant inquiry for purposes of the statute of limitations is whether plaintiffs knew or reasonably should have known of the causal relationship between the injury and conduct causing that injury.  However, plaintiffs need not know that they have a cause of action or that the injury was caused by another party's wrongful conduct. Once a plaintiff possesses the salient facts concerning the occurrence of his injury and *who* or *what* caused it, he has the ability to investigate and pursue his claim.  In this case, plaintiffs were clearly aware of Merrell-Dow's

---

[14] In their Summary Judgment Motions, Dkt. 245, Exh. 16, defendants submitted a multi-page schedule of the thalidomide cases, some of which went to verdict, in which they were sued over the years beginning in 1962, including a case in which the Third Circuit affirmed this Court's dismissal on statute of limitations grounds.  That dismissal was 40 years ago.  *Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28 (3d Cir. 1975).

identity and its connection with the drug, and thus the court's
charge was not error.

822 F.2d 1268, 1275 (3d Cir. 1987) (internal citations and quotation marks omitted).  As the

Court of Appeals has explained, the law does not require certainty, but it does require common

sense and reasonable attention to one's affairs:

> [T]he discovery rule focuses not on "the plaintiff's actual
> knowledge, but rather on 'whether the knowledge was known, or
> through the exercise of diligence, knowable'" to the plaintiff.  A
> plaintiff therefore is obligated "to exercise reasonable diligence in
> ascertaining the existence of the injury and its cause."  As soon as
> the plaintiff either has discovered or, exercising reasonable
> diligence, should have discovered the injury and its cause, the
> statute of limitations begins to run.  Moreover, the plaintiff
> attempting to apply the discovery rule bears the burden of
> demonstrating that he exercised reasonable diligence in
> determining the existence and cause of his injury.  To demonstrate
> reasonable diligence, a plaintiff must "establish[ ] that he pursued
> the cause of his injury with those qualities of attention, knowledge,
> intelligence and judgment which society requires of its members
> for the protection of their own interests and the interests of others."

*Mest v. Cabot Corp.,* 449 F.3d 502, 511 (3d Cir. 2006) (internal citations omitted); *see Szpynda*

*v. Pyles,* 639 A.2d 1181, 1184 (Pa. Super. 1994) ("The discovery rule tolls the statute of

limitations until such time as a reasonably intelligent person (not an expert), exercising due

diligence, *should have some reason to suspect* that his injury might have been caused by [the

third party]." (emphasis added)).

And if ever there was a plaintiff who had, at the very least, *some reason to suspect*

that his injury might have been caused by a third party, Mr. Merica is that plaintiff.  Mr. Merica

and his mother understood that she had taken some pills, and they were subjectively certain that

those pills – those tiny, white, round pills in their orange-khaki bottle with a white top, and her

name on the label – were thalidomide. Dkt. 245,  Exh. 1, Merica Deposition Tr. at 151-53.

Investigating the question whether the pills were or were not thalidomide and, if so, which manufacturer's or distributor's thalidomide, might have inculpated one or more of the defendants or, just as important in a fair system of civil justice, it might have *exculpated* one or more of them; instead, Mr. Merica (or his mother) let the opportunity slip away. Today, of course, there is no way to answer that baseline question. That Hagens Berman either failed in its duty of pre-suit investigation or disregarded its results is not a basis for the present sanctions motion, but Hagens Berman certainly protracted this litigation by failing – before or within a reasonable time after it realized that at least some of its client plaintiffs had no case – to learn the facts pertinent to Mr. Merica's situation, to recognize the shortcomings of his claim, to spare him and his spouse the burden of depositions and to spare defendants the cost of multiple attempts at written discovery, of those depositions, and of multiple rounds of motion practice. Instead, Hagens Berman persisted in its insistence that Mr. Merica had "no clues to follow, . . . no understanding of what it meant to be a thalidomider and no idea who was responsible for developing and distributing the drug."

### B. Lawrence Boiardi's Claim

If Mr. Merica's problem was that he did not follow up on the facts in his possession, Mr. Boiardi's problem was that he never had any facts to begin with and never tried to get them, and they have not turned up on their own. He never had a scrap of information to suggest that his mother ingested thalidomide; the only evidence is to the contrary. Even his injuries, according to his own Complaint, are inconsistent with the accepted scientific understanding of the mechanism of thalidomide injury.

Mr. Boiardi was an adopted child who never knew his birth mother. Hagens Berman was unable to locate the mother before filing Mr. Boiardi's Complaint, but defendants

say they had no difficulty in finding her.  Defendants contacted Mr. Boiardi's mother, and she told them she had not taken any medications during her pregnancy.  Dkt. 258.  When Plaintiffs' counsel, Hagens Berman, then spoke with her, she told them she had no recollection of even being pregnant or having a child.  What she has never said, so far as the record shows, is that she did actually take thalidomide or any other medication during her pregnancy so many years ago.  Thus, the first critical link in the chain of possible culpability was never forged.  *Celotex v. Catrett*, 477 U.S. 317, 320-23 (1986).

That a child comes into the world with birth defects does not always mean that thalidomide or any other artificial agent was the cause.  Neither the particular infirmities from which Mr. Boiardi suffers nor any recent change in the state of scientific knowledge regarding those infirmities provides any basis – or, more accurately, any better basis than might have been at hand 20, 30 or 40 years ago – for an inference that he is a thalidomide victim.  Mr. Boiardi's claims were based in part on the supposed fact that, because of recent advances in science, a diagnosis of thalidomide causation for his particular birth defects became possible only within the last couple of years.  Like several of the plaintiffs in his multi-plaintiff complaint, he alleged as follows:

> That no doctor ever told him that his injury was thalidomide-related is not surprising – the predominant medical view has for decades held that thalidomide did not cause the types of unilateral and asymmetrical limb reduction from which Lawrence suffers.

*Boiardi-Garza* Complaint ¶ 21.  To excuse Mr. Boiardi's failure to sue earlier, the Complaint, verified by a Hagens Berman lawyer, goes on to explain that

> [u]ntil recently, a universe of thalidomide related injuries has been . . . excluded from diagnosis, including plaintiff's injuries. Only recently available studies published in medical and scientific journals, not customarily read by internists, reveal the flaws in the

orthodox medical opinion.  Armed with this knowledge, Lawrence can now allege that his injuries were caused by thalidomide.

*Id.*[15]

If the mainstream scientific thinking had undergone a significant recent change, such that a claim of causation that would have been dismissed two years earlier was now a viable claim, Mr. Boiardi and others like might have an argument to avoid the statute of limitations. *See Coleman v. Wyeth Pharm., Inc.*, 6 A.3d 502 (Pa. Super. 2010).  But the problem here is that Mr. Boiardi has no more basis for bringing a claim of thalidomide injury now than he had two years or fifty years ago.  As the District Court would later conclude in the *Andre* Opinion, Hagens Berman and its expert have not been able to identify any such "recently available studies."  At argument on the sanctions motions on October 1, this "new discoveries" theory was pressed on the Discovery Master as good science.  Tr. Oct. 1 at 93-94.  By that point, however, if not long before, it simply must have been obvious to Hagens Berman that there was nothing to support it.  By October 1, the parties had fully briefed their positions in the then-pending summary judgment motion that was before the District Judge in *Andre* .  Dkt. 245, 246, 258, and 281.  Hagens Berman's expert's opinion – championing the "recently available studies" theory – had undoubtedly been reviewed and vetted by the lawyers before it was submitted to the District

---

[15] For purposes of Mr. Boiardi's claim (and Mr. Garza's, discussed *infra*), it may be noted that these "only recently available studies" would have to have become available in a very narrow time band of less than three months in order for Mr. Boiardi's claim to have benefited from the discovery rule.  If these revelations had swept onto the stage of scientific knowledge at all, they must have surfaced before the initiation of another of the consolidated cases, because nearly identical "only recently available studies" language is found in that verified complaint, *see Andre* Complaint ¶¶ 14, 25, 32, 43, 47, 52, 59, filed just shy of two years before Mr. Boiardi's case was filed.  To be consistent with both sets of verified allegations, that would mean that this unspecified new science surfaced sometime between August 8, 2011 (two years before Mr. Boiardi sued) and October 27, 2011 (the day Mr. Yeatts and his co-plaintiffs sued).  If it came earlier, Mr. Boiardi's claim is time-barred.  If it came later, Mr. Yeatts was clairvoyant.

court on June 20, 2014, Dkt. 246. Hagens Berman knew or should have known that the expert

would provide absolutely no support for the "recently available studies" theory.

As the District Judge subsequently held in *Andre,* however, there simply is no

evidence of such "recently available studies" – that is, no evidence of a recent tectonic shift in

science's appreciation of thalidomide injury that would have served to save recent actions

brought under the discovery rule. In the *Andre* Opinion, the District Court pointed out that the

Hagens Berman expert

> bases his recent revelation that thalidomide causes unilateral birth
> defects (from which Plaintiff suffers) on a 1964 study. Dr.
> Stephens also avers that data from a 1969 study shows thalidomide
> resulted in "significant unilateral defects." It thus appears that Dr.
> Stephens himself acknowledges that any "sea change" in medical
> thought on thalidomide occurred some 45 years before the date Dr.
> Stephens came to "appreciate[]" its significance. (Id. ¶ 22.)

*Andre* Opinion at *9 (internal citations omitted). I am, of course, bound by the District Court's

finding with respect to the flagrant inadequacy of Dr. Stephens' opinion to the task of identifying

the "sea change," but any objective review of the evidence, even without such constraints, would

yield the same conclusion. It is useful to compare the present facts with those of a case heavily

relied upon by Hagens Berman, *Coleman v. Wyeth Pharm.* In *Coleman,* the Pennsylvania

Superior Court reversed statute-of-limitations-based summary judgments entered against women

who claimed that various hormone replacement therapy drugs ("HRT") had caused breast cancer.

In *Coleman,* unlike the present case, there had been a "sea change" in the scientific community's

perception of the link between HRT and breast cancer, triggered by a widely anticipated and

highly publicized Women's Health Initiative ("WHI") study, and the court concluded that it was

for the jury to decide whether, before the WHI study, the plaintiffs had sufficient "reason to

suspect that the injury was caused by a third party to impose a duty to investigate further."

*Coleman,* 6 A.3d at 511.  But the Superior Court was careful to distinguish a case that did not involve a dramatic new development in the scientific thought and as to which, as with thalidomide, the links between the product and the injury were well recognized:

> Nor do we find *Love v. Raymark Indus., Inc.,* 430 Pa. Super. 155, 633 A.2d 1185 (1993), relied upon by the trial court, applicable to the facts herein.  Mr. Love, unlike Ms. Coleman, *suspected* that his lung cancer was related to his occupational exposure to asbestos. Furthermore, the causal connection between lung cancer and occupational exposure to asbestos was "neither obscure nor unascertainable." *Love,* at 1187.  On those facts we held that Love's failure to inquire of his physicians as to the results of his lung biopsy was unreasonable as a matter of law where the presence of asbestos would have confirmed the cause of his cancer.

*Coleman,* 6 A.3d at 520 (emphasis by the court).  In the present case, regardless of the state of Mr. Boiardi's thinking on whether thalidomide had anything to do with his injuries, the fact is that, in general, the causal connection between thalidomide and birth defects was "neither obscure nor ascertainable."  Turning to the question whether someone whose injuries were not symmetrical or bilateral could ultimately sue successfully, Hagens Berman and its expert, Dr. Stephens, presented absolutely nothing to indicate that the answer to that question has changed in the last two years or so.  If a plaintiff would have been successful in bringing such a suit in, say, 1970, he could be equally successful today (except that the statute has run).  If the state of scientific knowledge were such that he would have lost his case in 1970, he would still lose it today on the merits (except, again, that the statute has run and he would not get to the merits). While the parties were being subjected to their long march of discovery and motion practice, there never was a point at which Hagens Berman had any basis for its "recently available studies" theory, based on the evidence it has brought to the Court's or my attention.

### C.    Roel Garza's Claim

As with the Merica and Boiardi cases, Hagens Berman consented to a final judgment only after putting the defendants through their paces – depositions, interrogatories, motion practice, and the like.

Mr. Garza suspected, beginning in his youth, that his birth defects might be traceable to medications his mother took during her pregnancy, but he simply never took the trouble to investigate further. He never even asked his parents or other relatives about it. He did nothing. Like Mr. Boiardi, Mr. Garza claims that his developmental abnormalities are non-bilateral and asymmetrical, and points, with identical language, to the "recently available studies" theory that would be debunked by the District Court in dealing with Mr. Andre's case.

In open court at hearing on October 1, Hagens Berman agreed that, indeed, it should fairly reimburse defendants for at least some of their expenses attributable to his case:

> [I]n relation to Garza, let me make a concession so that there's at least one less thing you need to decide. And that is without conceding any bad faith, with the benefit of hindsight, it is plaintiff's view that they should have sought to dismiss this case prior to the depositions.

Tr. at 133-34. Then, two days after the hearing and the agreement, Hagens Berman turned on a dime and argued against the *Garza*-based (and *Boiardi*-based) sanctions.

While counsel were in court at the October 1 hearing, a deposition on written questions of Gordon Forrer, M.D., was being conducted in Northville, Michigan. Dkt. 410. Dr. Forrer, now 92, had been an investigator when GSK was looking into the possibility of developing the drug for purposes other than morning sickness treatment, and his recollection of his and his institution's experimental use of thalidomide differs markedly from the detailed and substantially documented records that were reviewed by the FDA, fifty years ago, in its own

investigation of GSK's involvement with thalidomide. By Dr. Forrer's present account, his institution accounted for a dramatically smaller percentage of the thalidomide pills distributed by GSK than GSK's and the FDA's records would reflect. Hagens Berman immediately argued that sanctions should not be awarded in *Garza* or *Boiardi.* The argument is that Dr. Forrer's testimony about the supposedly unaccounted-for thalidomide may mean that GSK was distributing the drugs someplace else, that there were pills not accounted for. Hagens Berman further suggests that this information gets plaintiffs closer to establishing GSK's liability (in cases other than these cases, in which it has already surrendered).[16]

For several reasons, I decline Hagens Berman's invitation to reopen the question of whether sanctions should be imposed with respect to Mr. Garza or Mr. Boiardi. First, agreements reached in open court should be honored. More importantly, however, the inconclusive evidence now proffered by Hagens Berman is unequal to the task of showing good faith prosecution of the case on its part. To be sure, Hagens Berman has identified a witness whose recollection is squarely at odds with GSK's evidence, and evidence undermining an adversary's credibility is usually a good thing to have. But the essential reasons for the summary judgments in these three cases were that these three plaintiffs began their investigations several decades too late and, in the Boiardi and Garza cases, that they had no evidence that their mothers were ever exposed to thalidomide, and the essential reason why I recommend granting the sanctions motion is that the plaintiffs' lawyers behaved unreasonably in their efforts to avoid the consequences of the profound flaws in their clients' cases. Messrs. Boiardi and Garza have

---

[16] *See* October 3 letter brief from Nick Styant-Browne (Hagens Berman) to Hangley, with exhibits (Dkt. 411); *see also* October 9 responsive letter brief from Michael Scott (GSK counsel) to Hangley, with exhibits (Dkt. 412); October 10 reply letter brief from Styant-Browne to Hangley (Dkt. 413).

conceded that they did not rely on any specific fraudulent conduct on defendants' part in delaying their investigations for half a century, and their alternative "new science" theory of tolling has been debunked by the District Court's findings in the *Andre* Opinion. In other words, the evidence that Hagens Berman now wants to chase would not merely be useless to Messrs. Boiardi and Garza – their lawyers have already folded their tents – it also would not help Hagens Berman avoid sanctions for their improper conduct in prolonging these plaintiffs' cases. If we speculate (we certainly cannot decide) that Dr. Forrer's present recollection matches what he would have remembered if he had been deposed several decades closer to the actual events, there appears no good reason why plaintiffs should not have obtained his testimony then, instead of now. And, without for a moment casting doubt on Dr. Forrer's mental acuity or good faith, this most recent event demonstrates a reason why we have statutes of limitations. Undoubtedly, GSK would have wanted to counter his fifty-year old memories with the testimony of other percipient witnesses, but virtually all of the once-available evidence relevant to Dr. Forrer's points is long gone or denatured by the passage of time. One good reason for having statutes of limitations is to avoid such imprecision in our system of investigation, evidence-marshaling and adjudication. The GSK representatives who dealt with Dr. Forrer are not here to defend their own recollections; we do not even know what those recollections might be. The FDA investigators who examined GSK's handling of thalidomide are also unavailable.[17] All of that might have

---

[17] The Rule 31 deposition on written interrogatories, Dkt. 410, also points up the reasons why Rule 31 is rarely used. From the record it appears that the only persons present were the court reporter, the witness, and his attorney; no representatives of the parties were in the room. There were no follow-up questions and, of course, no cross-examination. A Rule 30 deposition is often the next best thing to live testimony. This was not that.

been different if Messrs. Garza and Boiardi, or their families, had investigated their situations in a reasonable time frame.

And, at bottom, the simple fact is that taking Dr. Forrer's contested testimony as gospel would not get Hagens Berman all that much closer to actually having a case, with or without a statute of limitations problem. If we assume for argument's sake that GSK failed to account for hundreds of thousands of thalidomide tablets, and that it did so to cover up its misdeeds, that would not allow a reasonable juror to conclude that any of those tablets found their way into the regimens of the two plaintiffs' mothers. That is, of course, a critical element of the claims in these cases, *Celotex Corp. v. Catrett*, and the connection would still be far too speculative.

## IV.    General Findings Regarding Sanctions

I do find that, in each of these plaintiffs' cases, Hagens Berman's conduct has multiplied the proceedings in an unreasonable and vexatious manner, and that the conduct was both intentional and in bad faith.

Obviously, too, the conduct has taxed the defendants and the Court's resources enormously and without good reason. But it should be noted that Hagens Berman's clients, the plaintiffs in these ill-starred cases, have also suffered from the firm's conduct.

In the District Court's Order of October 31, Judge Diamond discussed his correspondence from one of the plaintiffs, Ms. Bolton.[18] Ms. Bolton's birth injuries, like those of all these plaintiffs, have undoubtedly been sources of all manner of pain over these past five decades and more. Yet, judging by her conduct over the years, she was never led to believe, until recently, that she could blame a third party for her hurt, bring a claim, and recover some form of recompense. That

---

[18] I voice no opinion on the merits of Ms. Bolton's still-pending case, or on the reasons why Hagens Berman moved to withdraw from its representation of her.

has changed; someone led her to believe passionately that she has a good and viable claim and that these defendants should make amends. Knowing that Hagens Berman wants to withdraw from her case, she has worked tirelessly to find a new lawyer to carry the litigation forward. She names sixty law firms that have turned her down, and still she believes she has a case worth bringing all these years after the event. She tells the Court that "[i]f counsel is permitted to withdraw, my claims will likely find no representation and would not be allowed the same justice that the remaining Plaintiffs are receiving," and says she could not represent herself *pro se* because "the consequences of losing this matter are so great." Dkt. 390.

False hope is a cruelty. Persuading a Merica, Boiardi or Garza to sue, without telling him that he has long since missed his main chance in litigation (if he ever had one), is not a kindness. And plunging forward in the face of overwhelming evidence that the claim cannot succeed, thereby subjecting the clients to the mortification of sitting for depositions and having the most painful threads of their personal lives picked at and teased out, is not what lawyers should do unless there is a genuine claim to pursue. Mr. Merica, Mr. Boiardi and Mr. Garza have had their hopes raised irresponsibly and then dashed, and there was never any good excuse for Hagens Berman's doing that. I will not consider those elements as Section 1927 "costs" or "expenses," but they certainly play a part in the bad faith calculus. *Cf. Macheska v. Thomson Learning,* 347 F. Supp. 2d 169, 182 (M.D. Pa. 2004) ("Because we believe that Jennings had a larger obligation than he fulfilled to Macheska, this Court, and most of all to Thomson, we will consider an award comprising at least part, if not all of the fees and costs incurred by Thomson.").

## V.   Defendants Entitled to the Benefit of Sanctions

Grünenthal is entitled to recover an award of sanctions.  Grünenthal brought and has continued to pursue its motion for sanctions with respect to Hagens Berman's conduct respecting all three plaintiffs, Messrs Merica, Boiardi and Garza.  Dkt. 281, 310.

Equally clearly, Sanofi cannot recover sanctions with respect to Hagens Berman's conduct regarding these three plaintiffs.[19]  Sanofi joined in all three motions for summary judgment, but did not join with Grünenthal and GSK in moving for sanctions.  Indeed, in connection with the dismissal of Mr. Garza's claims, Sanofi stipulated that it would bear its own costs.  Dkt. 317.

The situation is more complicated with regard to GSK, which joined with Grünenthal in the sanctions motions and played a leading role in pursuing them.  GSK's lead counsel, Mr. Scott, carried the laboring oar in oral argument at the October 1 hearing and in resisting the Hagens Berman's post-hearing efforts described above.  But on October 28, 2014 (Dkt 394), GSK informed the District Judge as follows:

> All plaintiffs currently represented by Hagens Berman Sobol
> Shapiro LLP – with the sole exception of Debra Johnson – will
> dismiss with prejudice all claims against the GSK defendants.
> Contingent on the dismissals with prejudice, all discovery by all
> plaintiffs with respect to GSK, former SKF employees, and former
> SKF investigators will be deemed withdrawn; plaintiffs' motion
> for sanctions and to compel the 30(b)(6) deposition of GSK will be
> deemed withdrawn; and no further discovery will be initiated by
> plaintiffs in any case.  GSK, in turn, agrees to withdraw its pending
> sanctions motions and to forego any sanction payments which may
> be awarded or which have already been agreed to. This agreement
> shall not be characterized as a settlement of plaintiffs' claims; no

---

[19] This is not to suggest that Sanofi would not be entitled to pursue sanctions motions respecting the prosecution of other plaintiffs' claims by Hagens Berman; that issue is not before me.

> payments are being made by GSK. With respect to Debra Johnson,
> GSK's motion for summary judgment remains pending (Doc. No.
> 260), with both sides retaining all rights, including the right to
> appeal and the right to seek sanctions.

Dkt. 394, Letter from Michael Scott to Judge Diamond.  A motion pursuant to Rule 41(a)(2) for

voluntary dismissal of the case was later filed on behalf of 28 plaintiffs currently represented by

Hagens Berman. Dkt. 409.

As reflected in an Order entered on October 31 (Dkt. 396) the District Court was,

in its own words, "disturbed by what has occurred" in light of a number of other recent events,

including the fact that there are several plaintiffs (not, apparently, included in the group of 28

identified in the Rule 41(a)(2) motion) with respect to whom Hagens Berman has moved for

leave to withdraw, and at least one has objected to Hagens Berman's withdrawal.  *Id.*[20]  The

Court, acting pursuant to Rule 53, has proposed a modification of my "task list" as Special

Master as follows:

> The Special Master, William T. Hangley, Esq. shall issue a Report
> and Recommendation on whether each Plaintiff (except Debra
> Johnson) knowingly, intelligently, and voluntarily consented to
> dismissing with prejudice his or her claims against the GSK
> Defendants – or any other Defendants.

*Id.*  Hagens Berman (speaking on behalf of "certain plaintiffs") has objected to the modification;

defendants have not objected. Dkt. 397, 398 and 400.

Given that GSK's undertaking to drop its sanction claims is, according to GSK,

contingent on dismissals with prejudice on behalf of "all plaintiffs currently represented by

---

[20] Another of these "withdrawal plaintiffs" has more recently complained to the Court,
but it is difficult to determine whether he is objecting to Hagens Berman's proposed withdrawal,
to the GSK proposed settlement, or the proposed modification of the Special Discovery Master's
assignment described in the accompanying text. Dkt. 408.

Hagens Berman . . . with the sole exception of Debra Johnson," it is impossible to determine, at this point, whether GSK will or will not be entitled to recover sanctions.

## VI.    Measure of Sanctions for Grünenthal

In multiparty or other complicated cases, a challenge is to make sure that a respondent is sanctioned for his conduct in the particular matter. Section 1927 is designed to "address[] the impact conduct has on the proceedings," and so "sanctions that are imposed under § 1927 must only impose costs and expenses that result from the particular misconduct." *In re Prudential Ins. Co.*, 278 F.3d at 188.

Here, Hagens Berman should be sanctioned for its foot-dragging and evasiveness in connection with written discovery after the dawn of the Sanctions Period. By April 12, Hagens Berman's belated investigation of its own clients' claims should have persuaded it to do what it would later do, surrender for lack of a plausible claim on behalf of Messrs. Merica, Boiardi or Garza, and the defendants were forced to incur enormous expense and inconvenience as a result.

In large part, I am sure, the expenses incurred by Grünenthal can be tied exclusively to its defense of one or more of the Merica, Boiardi and Garza claims, and should be recovered in full by Grünenthal. They would include defendants' discovery of these three plaintiffs and of witnesses related solely to one of those plaintiffs' claims, the summary judgment motions, and the sanctions motions. The case law makes clear that defendants are entitled to be reimbursed for their expenses of pursuing the present sanctions awards, including expenses incurred by counsel in briefing the motions and preparing for and participating in the October 1 hearing. In *In re Tutu Wells Contamination Litigation,*120 F.3d 368 (3d Cir. 1997), *overruled on other grounds by Comuso v. Nat'l R.R. Passenger Corp.*, 267 F.3d 331 (3d Cir.

2001), the Third Circuit rejected the sanctioned party's argument that costs and expenses associated with the sanctions hearings themselves should not be recoverable. *Id.* at 387. The court explained:

> The time, effort, and resources expended in bringing sanctionable conduct to light would have been unnecessary had the sanctionable conduct never occurred. These costs are as much a harm to a party in the litigation as is the delay in the litigation or the substantive prejudice caused by the conduct. If we exclude from a possible award the costs of sanctions proceedings, we would undermine the compensatory goal of a sanctions award.

*Id.* at 388.[21]

A closer question arises out of Hagens Berman's post-hearing attempt to relitigate the sanctions issues in *Boiardi* and *Garza* after the October 1 hearing based on the Forrer deposition testimony, but I conclude that Grünenthal's expenses in connection with that attempt should be reimbursed in full. Although Hagens Berman's activities in conducting the Forrer discovery were surely part of a strategy aimed at many or all of the cases, the particular use of that discovery as a tool to pry open the Garza settlement and continue litigating Boiardi was entirely focused on those two motions.

Conversely, a good deal of Grünenthal's counsel's activities during the Sanctions Period that had nothing to do with these three plaintiffs' cases – depositions of plaintiffs other than Merica, Boiardi and Garza, for example – cannot fairly be considered at all in the context of these motions, and Grünenthal cannot be reimbursed for those expenses in connection with these motions.

---

[21] That *Tutu Wells* involved the Court's inherent powers to sanction rather than Section 1927 does not seem a significant distinction here.

But a large part of Grünenthal's lawyers' work during the Sanctions Period was undoubtedly devoted to matters that involved these three plaintiffs' claims and, also, the claims of as many as 46 other plaintiffs.   Examples include the defendants' continuing pursuit, after April 11, 2014, of responsive answers to written discovery; preparing for, attending and participating in and reviewing plaintiffs' depositions of defense witnesses; responding to plaintiffs' written discovery; and research that related to more claimants than just these three plaintiffs.  I have struggled to find dispositive authority on whether and how a court should go about apportioning such expenditures in the unique circumstances of these case, *i.e.*, cases in which there was a number of plaintiffs represented by the same attorneys, and in which the charged misconduct related to all or many of those plaintiffs and their claims, but defendants sought sanctions with respect to that misconduct only insofar as it involved a handful of those plaintiffs and their claims.

There is precedent, in a situation like this, for allocating a sanctions recovery to award petitioning counsel a percentage of their overall expenses.  *In re Silica Products Liab. Litig.*, 398 F. Supp. 2d 563 (S.D. Tex. 2005), was an MDL in which virtually all 10,000 plaintiffs' cases were remanded to the Mississippi state courts, and only one action (100 cases) remained in the district court.  The court awarded sanctions equal to 1% of defendants' total expenses.  *Silica Products,* 398 F. Supp. 2d at 677-80.  And in a Rule 11 case where the liability claims were not found to pursued in bad faith, but the prayers for relief were frivolous and sanction-worthy, the Ninth Circuit approved the apportionment of expenses that appeared to relate to both subjects:

> The district court found that the damages prayer and the legal
> claims were so closely connected that it was appropriate to allocate
> 25% of the time spent investigating the claims to the sanction

award.  It is reasonable to conclude that much of the time spent investigating the legal claims were interrelated with the frivolous prayers for relief, given the complexity of the legal claims. The district court acted well within its discretion in making this determination.

*Hudson v. Moore Bus. Forms, Inc.*, 898 F.2d 684, 687 (9th Cir. 1990); *accord Salstrom v. Citicorp Credit Servs., Inc.,* 74 F.3d 183, 185 (9th Cir. 1996), *cert. denied, Webb v. Citicorp Credit Servs., Inc.,* 519 U.S. 813 (1996) (upholding sanction apportionment where "the court did evaluate the costs and fees, concluding that 'at least 30% of the total defense costs can be attributed to [counsel's] reckless litigation of this matter'"); *see also In re Tutu Water Wells Contamination Litig,* 166 F.R.D. 331, 344 (D.V.I. 1996), *aff'd in relevant part,* 120 F.3d 368 (3d Cir. 1997) (dividing sanctions approximately equally between two sanctioned attorney groups); *In re Evergreen Sec., Ltd.*, 2008 WL 4716777, at *5 (Bankr. M.D. Fla. Feb. 8, 2008), *aff'd,* 391 B.R. 184 (M.D. Fla. 2008), *aff'd,* 570 F.3d 1257 (11th Cir. 2009) (same).

I recommend reimbursing Grünenthal for a small percentage, 3/49, of its fees and expenses on all its post-April 11, 2014 litigation expenses that were addressed to the litigation with one or more of plaintiffs other than Messrs. Merica, Boiardi and Garza, but also to these plaintiffs' claims.  Mindful that sanctions must be measured and imposed with caution, I have chosen as the denominator of this fraction the largest number of plaintiffs whose cases were pending at the beginning of the Sanctions Period,[22] divided by the number of plaintiffs whose claims are the subject of these motions.

I will submit a suggested form of order

---

[22] This reflects the dismissal of claims of the three plaintiffs who turned out to be repeat claimants.  As the litigation moved on, more plaintiffs dropped their cases or suffered summary judgment.  Those changes will not affect the 3/49 fraction.

1.  Awarding Grünenthal sanctions equal to

    a)  100% of its reasonable fees and expenses incurred solely in the Merica, Boiardi and Garza matters and

    b)  3/49 of its reasonable fees and expenses incurred on work that addressed the Merica, Boiardi and Garza matters as well as other plaintiffs' matters.

2.  Permitting Grünenthal to submit detailed calculations of its fees and expenses in both separate categories within 21 days of the Court's approval or approval with modification of this Report and Recommendation and giving Hagens Berman 21 days in which to respond, after which I will make further recommended decisions.

3.  Holding in abeyance GSK's motions for sanctions.

The recommended determination will surely be a disappointment to Hagens

Berman, and probably affords Grünenthal less monetary relief than it might have hoped for.

Here, the observations of the *Silica Products* court are apt:

> It is worth noting that the amount of the sanction this Court ultimately orders, . . . while not insignificant, will be substantially less than the total amount of damages – some calculable and some not – Plaintiffs' counsel have caused by their filing of thousands of claims without a reliable basis for believing that every Plaintiff has been injured. However, the Court must confine itself to "the least severe sanction adequate to achieve the purpose of the rule under which it was imposed." *See Topalian v. Ehrman*, 3 F.3d 931, 937 (5th Cir. 1993). The Court trusts that this relatively minor sanction will nonetheless be sufficient to serve notice to counsel that truth matters in a courtroom no less than in a doctor's office.

*Silica Products*, 398 F. Supp. 2d at 679 (S.D. Tex. 2005).

Respectfully submitted,

December 4, 2014

WILLIAM T. HANGLEY
SPECIAL DISCOVERY MASTER