**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| GLENDA JOHNSON and STEVEN LUCIER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:11-cv-05782-PD |
| v. | ) | And All Related Cases |
| | ) | |
| SMITHKLINE BEECHAM CORPORATION | ) | This Document Relates to: |
| d/b/a GLAXOSMITHKLINE; | ) | |
| GLAXOSMITHKLINE, LLC; | ) | *Yeatts, et al. v. SmithKline Beecham* |
| GLAXOSMITHKLINE HOLDINGS, LLC; | ) | *Corp., et al.*, No. 2:11-cv-06711 |
| SANOFI-AVENTIS, U.S., L.L.C.; and | ) | |
| GRÜNENTHAL GMBH | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AS TO PLAINTIFF PHILIP YEATTS AND FOR SANCTIONS UNDER 28 U.S.C. § 1927
AND THE COURT'S INHERENT AUTHORITY**

Albert G. Bixler
Email: abixler@eckertseamans.com
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
Telephone: (215) 851-8100
Facsimile: (215) 851-1420

Sara J. Gourley (*admitted pro hac vice*)
Email:  sgourley@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Counsel for Grünenthal GmbH
(additional counsel on signature page)*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ......................................................................................iv

INTRODUCTION ..................................................................................................1

UNDISPUTED FACTS ...........................................................................................1

I.    For Decades Plaintiff And His Parents Have Blamed
      Thalidomide for Plaintiff's Birth Defects........................................................1

      A.  Since No Later Than 1988, Plaintiff Has Blamed Thalidomide for
          His Birth Defects But Did Nothing to Investigate Until 2011 ..................1

      B.  Plaintiff's Mother and Father Have Blamed Thalidomide for
          Philip's Birth Defects Since His Infancy....................................................2

II.   There is No Admissible Evidence That Plaintiff Was Exposed to
      Thalidomide ..................................................................................................3

      A.  Mrs. Yeatts Received Multiple Medications for Morning
          Sickness and Cannot Identify Any of Them ..............................................3

      B.  Friends and Family Speculate About Thalidomide and Relay
          Fourth-Level Hearsay About An Alleged List Somewhere in
          Oklahoma....................................................................................................4

III.  Publicity and Lawsuits Concerning Thalidomide in the United States...........5

SUMMARY JUDGMENT STANDARD ..................................................................7

APPLICABLE LAW ..............................................................................................7

ARGUMENT .........................................................................................................7

I.    Plaintiff's Claims Are Time-Barred Because He, His Mother
      And His Father Have Believed for Decades That Thalidomide Caused
      Plaintiff's Birth Defects..................................................................................8

II.     Plaintiff's Claims Are Barred Under Texas' Statute of Repose....................14

III.    Plaintiff Has No Admissible Evidence of Exposure to Thalidomide............16

IV.     Defendants are Entitled to an Award of Fees and Costs ...............................18

CONCLUSION ......................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Baselice, III v. Franciscan Friars Assumption BVM Province, Inc.*,
    879 A.2d 270 (Pa. Super. Ct. 2005)............................................................................12

*Bickford v. Joson*,
    533 A.2d 1029 (Pa. Super. 1987)...............................................................................11

*Burlington N. & Santa Fe Railway Co. v. Poole Chemical Co., Inc.*,
    419 F.3d 355 (5th Cir. 2005) ..............................................................................14, 15

*Vaughn v. Fedders Corp.*,
    239 F. App'x 27 (5th Cir. 2007).................................................................................17

*C.J.M. v. Archdiocese of Philadelphia*,
    67 Pa. D. & C. 4th 474 (Pa. C. P. 2004) ...................................................................12

*Ciccarelli v. Carey Canadian Mines, Ltd.*,
    757 F.2d 548 (3d Cir. 1985)......................................................................................13

*Combs v. International Ins. Co.*,
    354 F.3d 568 (6th Cir. 2004) .......................................................................................8

*DeMayo v. Schmitt*,
    Case No. 625, 1990 WL 902397 (Pa. Com. Pl. Feb. 16, 1990)................................17

*Dick v. Am. Home Prods. Corp.*,
    No. 1:05-cv-2384, 2009 WL 1542773 (M.D. Pa. June 2, 2009) ...............................17

*Giest v. Sequoia Ventures, Inc.*,
    83 Cal.App. 4th 300, 99 Cal.Rptr.2d 476 (Cal.App.Ct., 1st Dist. 2000) ...................8

*Gilcrease v. Tesoro Petroleum Corp.*,
    70 S.W.3d 265 (Tex. App. 2001)................................................................................8

*Glenda Johnson et al. v. SmithKline Beecham Corp. et al.*,
    ____F. Supp. 3d ____, 2014 WL 5285943 (E.D. Pa. Oct. 16, 2014) ............................ passim

*Gray v. United States*,
    445 F. Supp. 337 (S.D. Tex. 1978) ...........................................................................17

*Holubec v. Brandenberger*,
    111 S.W.3d 32 (Tex. 2003)........................................................................................16

*Huber v. McElwee-Courbis Constr. Co.*,
  392 F. Supp. 1379 (E.D. Pa. 1974) ..................................................................10

*Hyde v. Hoffman-La Rouche Inc.*,
  No. 3:04-cv-1473, 2008 WL 4191529 (N.D. Tex. Sept. 10, 2008) ...................15, 17

*In re Prudential Ins. Co. Am. Sales Prac. Litig.*,
  278 F.3d 175 (3d Cir. 2002)...........................................................................21

*Ingenito v. AC & S, Inc.*,
  633 A.2d 1172 (Pa. Super. Ct. 1993) .............................................................11

*Koehn v. Ayers*,
  26 F. Supp. 2d 953 (S.D. Tex. 1998) *aff'd*, 194 F.3d 1309 (5th Cir. 1999) ...........17

*Ledwith v. Sears Roebuck & Co.*,
  231 A.D.2d 17, 660 N.Y.S.2d 402 (1st Dep't 1997) .........................................8

*Martz v. Weyerhaeuser Co.*,
  965 S.W.2d 584 (Tex. App. 1998) .................................................................7

*May v. Remington Arms Co., Inc.*,
  No. Civ.A. 94C-08-270FSS, 2005 WL 2155229 (Del. Super. Aug. 31, 2005) .......8

*Mest v. Cabot Corp.*,
  449 F.3d 502 (3d Cir. 2006).........................................................................13

*Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin*,
  307 S.W.3d 283 (Tex. 2010).....................................................................16, 22

*Mitchell Energy Corp. v. Barlett*,
  958 S.W.2d 430 (Tex. App. 1997)..................................................................7

*Salgado v. Great Dane Trailers*,
  No. 10-82, 2012 WL 401484 (S.D. Tex. Feb. 6, 2012) ......................................16

*Speicher v. Dalkon Shield Claimants Trust*,
  943 F. Supp. 554 (E.D. Pa. 1996) .................................................................13

*Stuart v. American Cyanamid Co.*,
  158 F.3d 622 (2d Cir. 1998)...........................................................................8

*Thomas v. SmithKline Beecham Corp.*,
  No. J-A15019-13, slip op. at 10 (Pa. Super. Ct. Nov. 27, 2013) ...........................13

*United States v. Kubrick*,
  444 U.S. 111 (1979)....................................................................................22

*Urland v. Merrell Dow Pharms., Inc.*,
    822 F.2d 1268 (3d Cir. 1987)...............................................................14

*Vaughn v. Fedders Corp.*,
    239 F. App'x 27 (5th Cir. 2007)..........................................................17

*Wenke v. Gehl Co.*,
    274 Wis.2d 220, 682 N.W.2d 405 (Wis. 2004) .....................................8

*Winters v. Diamond Shamrock Chem. Co.*,
    149 F.3d 387 (5th Cir. 1998) ................................................................7

*Woods v. Adams Run Assoc.*,
    No. Civ. A. 96-6111, 1997 WL 256966 (E.D. Pa. May 13, 1997), *aff'd* 151 F.3d 1027
    (3d Cir. 1998)......................................................................................21

STATUTES

28 U.S.C. §1927.................................................................................1, 18, 20

Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) ..........................................7

Tex. Civ. Prac. & Rem. Code Ann. § 16.012 .........................................14, 15, 16, 17

Tex. Civ. Prac. & Rem. Code. Ann. § 82.001 ...........................................15

**INTRODUCTION**

This Court granted defendants' summary judgment motions in the *Merica* and *Andre*
cases because plaintiffs' claims were time-barred.   Summary judgment should be granted in the
Philip Yeatts case for the same reason.  Mr. Yeatts – just like Mr. Merica and Mr. Andre –
believed for decades that thalidomide caused his birth defects, but he failed to investigate his
claims or file suit until 2011, long after the statute of limitations had run.  And Mr. Yeatts, just
like Mr. Andre, has no admissible evidence of exposure.  Finally, Mr. Yeatts' claims also are
barred by Texas' statute of repose.

Accordingly, defendants respectfully request the entry of summary judgment in their
favor.  Because plaintiff's counsel needlessly maintained this meritless suit when even a cursory
investigation would have revealed these dispositive flaws, defendants also request an order that
plaintiff's counsel pay defendants' fees and costs under 28 U.S.C. §1927 and this Court's
inherent authority.

**UNDISPUTED FACTS**

**I.     For Decades Plaintiff And His Parents Have Blamed Thalidomide For Plaintiff's
        Birth Defects**

  **A.     Since No Later Than 1988, Plaintiff Has Blamed Thalidomide for His Birth
          Defects But Did Nothing To Investigate Until 2011**

Philip Yeatts was born on September 18, 1962 in Brownfield, Texas with visible defects
to his right arm and without a right leg.  (Compl. ¶ 9)  He also complains of a cleft palate,
deformed tongue, curved spine, and an undescended testicle that required surgical repair when he
was young.  (*Id.*)  Mr. Yeatts no longer remembers the exact date, but he has believed since
sometime before the year 2000 that his mother took thalidomide while pregnant with him and
that it caused his birth defects.  (June 27, 2014 Deposition of Philip Yeatts ("P. Yeatts Dep.")
(Ex. 1) at 10:6-11:3; 12:10-14; 15:11-17)  Plaintiff's belief goes back at least to 1988 when his

then wife was pregnant with plaintiff's son. Mr. Yeatts did not worry about his unborn son inheriting his birth defects because he believed they had been caused by thalidomide and were not genetic. (*Id.* at 94:5-19)

Over the years, Mr. Yeatts has told his doctors that thalidomide caused his birth defects. (*Id.* at 54:17-55:15) Plaintiff testified that a number of these discussions took place in 2007 – four years before plaintiff filed suit – when he was being treated at Denton (Texas) Regional Medical Center and Baylor (Grapevine, Texas) for abdominal pain. (*Id.* at 58:24-59:12) One of those physicians, Dr. Robert Connaughton, testified that in October 2007 Mr. Yeatts attributed his birth defects to thalidomide. (June 17, 2014 Deposition of Dr. Connaughton ("Connaughton Dep.") (Ex. 2) at 10:10-13:6; 22:10-15) Another of Mr. Yeatts' doctors, Dr. Galen Howard, testified that plaintiff "volunteered" in October 2007 that thalidomide had caused his birth defects. (June 18, 2014 Deposition of Dr. Howard ("Howard Dep.") (Ex. 3) at 11:15-14:4; 17:3-18:21)

Despite his decades-long belief that thalidomide caused his birth defects, Mr. Yeatts never investigated his potential claim. (P. Yeatts Dep. (Ex. 1) at 12:10-14; 47:7-48:7; 74:22-75:25) He did not conduct any research related to thalidomide until after he had filed suit in October 2011. (*Id.* at 100:17-101:7) He first considered bringing a lawsuit after his father told him that another man had told him that Attorney Kay Reeves was filing thalidomide-related lawsuits. (*Id.* at 71:16-74:25)

### B. Plaintiff's Mother and Father Have Blamed Thalidomide for Philip's Birth Defects Since His Infancy

Jerry Sue Yeatts, Philip Yeatts' mother, has believed since Philip was a baby that thalidomide caused his birth defects. (June 27, 2014 Deposition of Jerry Sue Yeatts ("J.S. Yeatts Dep.") (Ex. 4) at 5:10-13; 58:5-12; 58:23-14)

Plaintiff's father, William Clinton Yeatts, testified that he and Jerry Sue heard rumors of thalidomide being present in Brownfield, Texas within a year of Philip's birth. (September 16, 2014 Deposition of William Clinton Yeatts ("W.C. Yeatts Dep.") (Ex. 5) at 27:20-30:21) Plaintiff's father "made the connection" between thalidomide and plaintiff's birth defects when plaintiff was less than 18 months old.  (*Id.* at 37:21-39:22)

## II.     There Is No Admissible Evidence That Plaintiff Was Exposed To Thalidomide

No doctor ever has diagnosed Mr. Yeatts as having injuries caused by thalidomide.  (P. Yeatts Dep. (Ex. 1) at 54:1-11) and plaintiff's only "evidence" of exposure is, as explained below, his mother's speculation.  This speculation is derived from multiple levels of hearsay.

### A.     Mrs. Yeatts Received Multiple Medications For Morning Sickness and Cannot Identify Any of Them

When Jerry Sue was pregnant with plaintiff, she suffered from morning sickness and sought treatment from Dr. Noah Stone.  (J.S. Yeatts Dep. (Ex. 4) at 16:20-17:8)  Mrs. Yeatts thinks Dr. Stone gave her "more than one medication."  (*Id.* at 34:9-10)  In fact, Dr. Stone may have given her as many as three:

> Q.     And I believe you told me that between that first visit [to Dr. Stone] and your hospitalization, that he gave you some medicine, but it's just as likely that he gave you one or two or three medicines.  Is that fair?
>
> A.     That's fair, because I cannot remember in detail.  I'm sorry.

(*Id.* at 30:10-15)  Mrs. Yeatts further testified that Dr. Stone might have changed these medicines "along the way, you know, if what he gave me at first didn't work."  (*Id.* at 25:16-21) One of plaintiff's medical records, dated October 19, 1962, confirms that Mrs. Yeatts was "on many different drugs" for her morning sickness.  (YEAP000001-2 (Ex. 6) at 1)

Mrs. Yeatts recalls nothing about whether these medicines were pills, liquids, injections, or something else.  (J.S. Yeatts Dep. (Ex. 4) at 24:8-25; 33:21-25)  She does not remember

whether they came in a bottle, envelope, or some other container.  (*Id.* at 25:1-7)  She does not remember anything Dr. Stone said to her about these medicines (*id.* at 33:6-17), but they were not identified as thalidomide.  (*Id.* at 16:20-25)  When Mrs. Yeatts was pregnant with plaintiff in 1962, there were more than 100 drugs on the market in the United States for the treatment of "hyperemesis gravidarium," that is, morning sickness.  (1962 Physicians' Desk Reference to Pharmaceutical Specialties and Biologicals (Ex. 7))[1]

### B.  Friends and Family Speculate About Thalidomide and Relay Fourth-Level Hearsay About an Alleged List Somewhere in Oklahoma

When Philip was an infant, friends called on Mrs. Yeatts "and they would start telling me things.  And that's when I began to hear about thalidomide."  (J.S. Yeatts Dep. (Ex. 4) at 32:2-10)  "[T]he most significant thing" for Mrs. Yeatts was when she "found out that [her] father-in-law [Cecil Yeatts] had had it investigated."  (*Id.* at 38:4-6)

Mrs. Yeatts "never talked to [her] father-in-law," but "family members and … friends and people … advised me of what he was doing."  (*Id.* at 38:8-16)  "It basically went through Betty … Timmons, his daughter" and other, unnamed persons from whom Mrs. Yeatts would hear "bits and pieces about [her father-in-law's] investigation."  (*Id.* at 38:17-21; 40:1-14)  Over time and in unidentified conversations, these unnamed people discussed "what they believed they knew about [her] father-in-law Cecil's research…."  (*Id.* at 63:21-64:6)

These unnamed people communicated that Mrs. Yeatts' father-in-law had hired an unnamed lawyer who had found a list at an Oklahoma distribution center that said Dr. Stone

---

[1] Plaintiff's father has "no idea what the treatment" for Jerry Sue's morning sickness was.  (W.C. Yeatts Dep. (Ex. 5) at 15:23-16:14))  He does not know if she received any medication, does not recall Jerry Sue's telling him anything about any medicines that Dr. Stone gave her for morning sickness, does not recall seeing her take any medication for her morning sickness, does not recall seeing any morning sickness-related medication containers, and does not recall Dr. Stone ever describing any medications that he was giving Jerry Sue for morning sickness while she was pregnant with Philip.  (*Id.* at 16:11-17:17)

received thalidomide and listed Mrs. Yeatts as one of Dr. Stone's patients.  (*Id.* at 45:5-47:6)

Mrs. Yeatts never saw this list and does not know whether the list indicated from whom Dr.

Stone purportedly received thalidomide, when he had received it, how much he had received, the

form in which he received it, or anything about whether or how Dr. Stone had dispensed the drug

to his patients.  (*Id.* at 47:9-48:3)  She does not know whether the list indicated that Dr. Stone

had given thalidomide to her (*id.* at 48:4-6), and she has made no effort to find this list or any

other records relating to her pregnancy.  (*Id.* at 48:7-16)  Mrs. Yeatts never talked to her father-

in-law about his investigation.  (*Id.* at 38:11-13)  Instead, she talked to unnamed friends who

purportedly told her what her father-in-law had told them.  (*Id.* at 38:14-16) And what her father-

in-law told these friends was what the unnamed attorney purportedly had told him.  (*Id.* at 38:17-

21)

Based on these conversations, Mrs. Yeatts has believed since Philip was an infant that

thalidomide caused his birth defects.  (*Id.* at 58:5-12; 58:23-59:6)  Mrs. Yeatts has blamed

thalidomide since "long before" the year 2000.  (*Id.* at 59:7-14)

### III.    Publicity and Lawsuits Concerning Thalidomide in the United States

In addition to plaintiff's, his mother's, and his father's decades-long belief that

thalidomide caused his birth defects, countless books, national newspapers, and magazine

articles and other media have discussed thalidomide's presence in the United States and its link

to birth defects since the early 1960s.  (*See* Bibliography (Ex. 8))  From earlier filings, this Court

is familiar with the wave of thalidomide-related media coverage and litigation that swept the

country in the 1960s and 1970s and continued into the 1980s and 1990s.[2]  Indeed – as with every

---

[2] *See Glenda Johnson et al. v. SmithKline Beecham Corp. et al.*, ____F. Supp. 3d ____, 2014
WL 5285943 (E.D. Pa. Oct. 16, 2014) (Memorandum Opinion granting motion for summary
judgment as to Edmund Andre) ("*Andre* Mem.") (noting the "overwhelming public record

other thalidomide complaint filed in this Court – entire sections of Mr. Yeatts' complaint have been copied from books published in 1972, 1979, and 2001.  (Ex. 9(A)-(C))  The rest of that story and its supporting exhibits are attached as Exhibit 10 and will not be repeated here.

Because plaintiff has actually blamed thalidomide for decades, this Court need not consider what plaintiff should have known, but the facts of this case illustrate just how widely known thalidomide's presence in the United States really was, penetrating even to the small towns and rural routes of Southwestern Texas where the Yeatts family lived.

That part of the story begins with Morton Mintz's September 9, 1962 front-page story in the *Washington Post.*  (Morton Mintz, "Drug Firm Said to Lag on Warning," *The Washington Post Times Herald* (Sept. 9, 1962) at A1 (Ex. 11))  Mr. Mintz's article – published nine days before Philip Yeatts was born – reported on the scope of Merrell's clinical trial, Merrell's efforts to notify investigators of the drug's withdrawal in Germany, and SKF's clinical trial.  (*Id.*)

About two weeks after Philip Yeatts was born, plaintiff's aunt Betty Timmons wrote Mr. Mintz a letter.  (Compl. ¶ 13)  The letter discussed her nephew's injuries and concluded that Merrell "should be made to pay."  (Exs. 12 and 13)[3]

Mr. Mintz responded on October 12, 1962.  (Ex. 15)  Among other things, he explained that Merrell had provided thalidomide to American doctors via a clinical trial, discussed the possibility of the Yeatts's filing suit, and noted that he had forwarded Mrs. Timmons' letter to

---

evidence that the American public has known since the early 1960s that thalidomide causes serious birth defects" and the ensuing 50 years of thalidomide litigation against the defendants).

[3]  The United States Library of Congress has an unredacted copy of Mrs. Timmons letter.  (Ex. 12)  The FDA produced a redacted copy in response to the parties' Freedom of Information Act requests.  The FDA's copy is easier to read.  (Ex. 13)  In her deposition, Mrs. Timmons denied writing the letter to Mr. Mintz and does not recall receiving Mr. Mintz's response.  (June 14, 2014 Deposition of Betty Timmons ("B. Timmons Dep.")  (Ex. 14) at 17:1-9; 38:16-18)

the FDA.  (*Id.*)  Plaintiff alleges that the FDA did not investigate further (Compl. ¶ 13), but public record documents in the National Archives indicate that Dr. Kelsey ordered further investigation (Ex. 16) and that this investigation concluded sometime on November 27 or 28, 1962 that there was not "any association of the use of thalidomide with these deformities."  (Ex. 17)[4]  Neither Mrs. Timmons nor Mrs. Yeatts had any recollection of an FDA investigation.  (B. Timmons Dep. (Ex. 14) at 39:22-40:5;  J.S. Yeatts Dep. (Ex. 4) at 95:10-96:6)

## SUMMARY JUDGMENT STANDARD

This Court set forth the summary judgment standard applicable to this case in the *Andre* decision.  (*Andre* Mem. at 9)

## APPLICABLE LAW

Plaintiff's claims arose in Texas.  Because Texas' statute of limitations law is similar to Pennsylvania's, this Court, as stated in the *Andre* decision, should apply Pennsylvania law.[5]

"Pennsylvania's limitations periods applies … unless the foreign jurisdiction's laws including

---

[4] Defense counsel has not been able to locate a copy of the November 27, 1962 or November 28, 1962 memos.  The FDA's conclusion regarding Mr. Yeatts' alleged thalidomide injuries is recorded in its December 3, 1962 memo.  (Ex. 17)

[5] Like Pennsylvania, Texas has a two-year statute of limitations for personal injury claims.  Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a).  As in Pennsylvania, inquiry under Texas' discovery rule is directed "toward the time when one discovers or should have discovered the **nature** of the injury, not the time when one discovers the parties allegedly at fault."  *Martz v. Weyerhaeuser Co.*, 965 S.W.2d 584, 588 (Tex. App. 1998) (emphasis in original).  A plaintiff will be found to have discovered his injury when he has "knowledge of facts which would cause a reasonable person to diligently make inquiry to determine his or her legal rights."  *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 404 (5th Cir. 1998).  Texas and Pennsylvania also apply the fraudulent concealment doctrine the same way.  "[A] defendant is estopped from relying on the defense of limitations until the party learns of the right of action or should have learned thereof through the exercise of reasonable diligence."  *Martz*, 965 S.W.2d at 588 (Tex. App. 1998).  To show fraudulent concealment, the plaintiff must show that the defendant knew about and concealed the plaintiff's cause of action and that plaintiff reasonably relied upon that deception. *See Mitchell Energy Corp. v. Barlett*, 958 S.W.2d 430, 439 (Tex. App. 1997).

laws on tolling and the date of accrual, bar the claim first." *Andre* Mem. at 10 (quoting

*Frankentek Residential Sys., LLC v. Buerger,* No. 12-767, 2014 WL 1623775 at *4 (E.D. Pa.

Apr. 24, 2014) (citing *Gwaltney v. Stone,* 564 A.2d 498, 503 (Pa. Super. Ct. 1989))  Regardless

of which state's law is applied, plaintiff's claims have been time-barred for decades, and neither

the discovery rule nor plaintiff's fraudulent concealment allegations toll the statute of

limitations.[6]  Mr. Yeatts' claims also are barred by Texas' 15-year statute of repose.[7]

---

[6] As this Court recently recognized, "Pennsylvania's minor tolling statute, which tolls the limitations clock until an individual reaches 18, does not apply retroactively to claims barred at the time of its enactment in 1984." *Andre* Mem. at 11 (citing *Urland v. Merrell Dow Pharms., Inc.*, 822 F.2d 1268, 1276 (3d Cir. 1987)).  Because Plaintiff's claims were time-barred as of 1984, the minor tolling statute does not apply here.  Even if the minor tolling statute applied – and it does not – Plaintiff's claims still would be time-barred because she has believed for more than thirty years of adulthood that thalidomide exposure caused her birth defects.

[7]Although no published Pennsylvania decision has addressed the precise issue, many courts have held that borrowing statutes apply whether the limitations period is called a statute of repose or a statute of limitation.  *See, e.g., Stuart v. American Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998) ("the purpose of the borrowing statute – preventing forum shopping by plaintiffs seeking the holy grail of the longer period – is best served by applying the period of the foreign state, regardless of how it is denominated"); *Combs v. International Ins. Co.*, 354 F.3d 568, 589 n.11 (6th Cir. 2004) ("[Borrowing statutes apply to both foreign statutes of limitation and statutes of repose."); *May v. Remington Arms Co., Inc.*, No. Civ.A. 94C-08-270FSS, 2005 WL 2155229, *2 (Del. Super. Aug. 31, 2005) ("For borrowing purposes, there is no helpful distinction between statutes of repose and limitation.  If there were a distinction, taking into account the borrowing statute's thrust the borrowing statute is even more applicable where a foreign statute of repose is concerned"); *Wenke v. Gehl Co.*, 274 Wis.2d 220, 682 N.W.2d 405 (Wis. 2004) (Wisconsin's borrowing statute borrows statues of repose); *Ledwith v. Sears Roebuck & Co.*, 231 A.D.2d 17, 660 N.Y.S.2d 402 (1st Dep't 1997) (New York's borrowing statute borrows statutes of repose); *Giest v. Sequoia Ventures, Inc.*, 83 Cal.App. 4th 300, 99 Cal.Rptr.2d 476 (Cal.App.Ct., 1st Dist. 2000) (California borrowing statute applied Montana 10-year statute of repose); *Gilcrease v. Tesoro Petroleum Corp.*, 70 S.W.3d 265, 269 (Tex. App.-San Antonio 2001) ("we hold a nonresident plaintiff … must satisfy not only the statute of limitations, but also the statute of repose").

**ARGUMENT**

**I.    Plaintiff's Claims Are Time-Barred Because He, His Mother, and His Father Have Believed for Decades That Thalidomide Caused Plaintiff's Birth Defects**

The undisputed facts show that plaintiff, his mother, and his father have blamed

thalidomide for his birth defects since no later than 1988:

(1)    Plaintiff has believed since sometime before the year 2000 that his mother took thalidomide while pregnant with him and that it caused his birth defects.  (P. Yeatts Dep. (Ex. 1) at 10:16-19; 12:10-14; 15:11-17)

(2)    Plaintiff has blamed thalidomide for his birth defects since no later than 1988 when his then-wife was pregnant with plaintiff's son. (*Id.* at 94:5-19)

(3)    In October 2007, four years before plaintiff's suit, Mr. Yeatts told doctors treating him for abdominal pain that thalidomide caused his birth defects.  (*Id.* at 54:17-55:15; 58:24-59:12)

(4)    One of those physicians, Dr. Robert Connaughton, testified that Mr. Yeatts attributed his birth defects to thalidomide in October 2007.  (Connaughton Dep. (Ex. 2) at 10:10-13:6; 22:10-15)

(5)    Another doctor, Dr. Galen Howard, testified that plaintiff  "volunteered" in October 2007 that thalidomide caused his birth defects.    (Howard Dep. (Ex. 3) at 11:15-14:4; 17:3-18:21)

(6)    Jerry Sue Yeatts (plaintiff's mother) has believed that thalidomide caused her son's birth defects "long before" 2000.  Indeed, her belief extends back to when family and friends visiting Philip as an infant and young boy identified thalidomide as the cause and shared their hearsay stories about the purported list from Oklahoma. (J.S. Yeatts Dep. (Ex. 4) at 58:9-12; 59:2-14)

(7)    William Clinton Yeatts (plaintiff's father) "made the connection" between thalidomide and his son's birth defects about the same time.  (W.C. Yeatts Dep. (Ex. 5) at 37:21-39:22)

In light of these facts, this case is indistinguishable from *Merica* and *Andre*.  In granting

summary judgment on plaintiff Jack Merica's claims, this Court held that "Plaintiff's decades-

long knowledge that his birth defects were caused by thalidomide" forecloses tolling the statute

of limitations.  (Order granting Mot. for Summ. J. as to Jack Merica (July 14, 2014) [D.E. 265]

("*Merica* Order") at 2).  This Court concluded that plaintiff Edmund Andre's claims were time-barred because "it is undisputed that Plaintiff has known since at least 1969 that his mother took thalidomide while she was pregnant with him; . . . that for the last 40 years, Plaintiff's 'best knowledge' was that thalidomide caused his injuries; and that he so informed his doctor in 2005." *Andre* Mem. at 12.  The Court should reach the same result here, and plaintiff cannot point to anything in the decades between the time he actually blamed thalidomide and the October 2011 filing of his lawsuit that tolled the statute of limitations.

  ***First***, the discovery rule does not toll plaintiff's claims.  As this Court stated in *Andre*, "[t]o toll the running of the limitations clock, Plaintiff was obligated to exercise 'reasonable diligence in ascertaining the existence of [his] injury and its cause.'" *Andre* Mem. at 16 (quoting *Mest v. Cabot Corp.*, 449 F.3d 502, 511 (3d Cir. 2006)).  Plaintiff, however, did nothing to investigate his claim.  (P. Yeatts Dep. (Ex. 1) at 12:10-14; 74:22-75:25; 100:10-101:7)  For this reason alone, defendants should be granted summary judgment, and Mr. Yeatts' claims, like those of Mr. Andre, should be dismissed.

  What is more, where, as here, a plaintiff actually believes a particular drug caused his alleged injuries, the discovery rule does not toll the statute of limitations.[8]  *See Merica* Order at 2 ("Because Plaintiff knew of his injuries substantially more than two years before he filed suit in 2012, his claims are time barred . . . .").  Pennsylvania courts routinely dismiss actions as untimely when plaintiffs believe they know the cause of their injuries, but fail to act in a timely fashion.  *See, also*, *Huber v. McElwee-Courbis Constr. Co.*, 392 F. Supp. 1379, 1383-84 (E.D. Pa. 1974) (when "the plaintiff knew of the cause of his injuries . . . [t]he requirements of the

---

[8] Defendants do not concede that thalidomide caused plaintiff's injuries.  For purposes of this argument, however, plaintiff's belief triggered the commencement and expiration of the limitations period, as did the constructive knowledge imputed to him from the information publically available about thalidomide.

statute were met and the statute began to run" regardless of whether the plaintiff knew who was responsible); *Ingenito v. AC & S, Inc.*, 633 A.2d 1172, 1175 (Pa. Super. Ct. 1993) (plaintiff's claims were time-barred when he failed to exercise reasonable diligence to investigate after being diagnosed with cancer); *Bickford v. Joson*, 533 A.2d 1029, 1031 (Pa. Super. 1987) (affirming dismissal where it was "clear that the injury – failure to alleviate or reverse a paralysis – was obvious to [plaintiff] who had knowledge of the continued gravity of his paralysis with only slight improvement from the time he left the hospital").

Contrary to plaintiff's allegations, moreover, there is no evidence of any recent development in the medical literature regarding a link between thalidomide and "unilateral" birth defects such as plaintiff's. *See* Compl. ¶ 14 (alleging that "[o]nly recently available studies published in medical and scientific journals reveals [sic] the flaws in the orthodox medical opinion" that "thalidomide did not cause the types of unilateral and asymmetrical limb reduction from which [plaintiff] suffers") To the contrary, plaintiff's own supposed expert in several thalidomide cases, Trent Stephens, "bases his recent revelation that thalidomide causes unilateral birth defects . . . on a 1964 study" and a 1969 study. *Andre* Mem. at 15. "It thus appears that Dr. Stephens himself acknowledges that any 'sea change' in medical thought on thalidomide occurred some 45 years before the date Dr. Stephens came to 'appreciate[]' its significance." *Id.* (citation omitted). There is accordingly no support for plaintiff's allegation about "new science" tolling the limitations period.

Because plaintiff has believed since at least 1988 that thalidomide caused his injuries, the discovery rule does not toll the statute of limitations, his claims are untimely, and defendants should be granted summary judgment.

***Second***, plaintiff's claims are not saved by the doctrine of fraudulent concealment. Plaintiff testified that he did nothing to investigate his claims until he first considered bringing a lawsuit (P. Yeatts Dep. (Ex. 1) at 12:10-14; 47:7-48:7; 74:22-75:25; 100:10-101:7), and that it was learning that Attorney Kay Reeves was pursuing litigation for alleged thalidomide victims that prompted him to consider bringing a lawsuit.  (*Id.* at 71:23-73:2)  Mr. Yeatts never identified any anything that prevented him from considering a lawsuit prior to learning about Kay Reeves' activities.  Thus, Mr. Yeatts, just like Mr. Andre, has failed to identify "a single misrepresentation on which *he* relied to *his* detriment."  *Andre* Mem. at 19 (emphasis in original).

In addition, plaintiff admitted in his responses to written discovery that he never has had any direct communications with defendants.  (Pl. Philip Yeatts' Second Suppl. Resp. To Sanofi-Aventis U.S. LLC's Fourth Interrog. (March 3, 2014) (Ex. 18))  In the absence of any direct communication, plaintiff claims that defendants worked a fraud on the public, concealing that thalidomide was available in the United States.  (*Id.*)  Such allegations, even if true, are insufficient to toll the statute of limitations.[9]  *Baselice, III v. Franciscan Friars Assumption BVM Province, Inc.*, 879 A.2d 270, 278-79 (Pa. Super. Ct. 2005) ("general and systematic conduct" is not fraudulent concealment; "affirmative independent" statements directed to the plaintiff are required); *C.J.M. v. Archdiocese of Philadelphia*, 67 Pa. D. & C. 4th 474, 490-91 (Pa. C. P.

---

[9] There is no truth to plaintiff's allegations, as information about the U.S. availability of thalidomide in the 1950s and 1960s has been available from numerous sources since the 1960s and 1970s, including in the very sources that form the basis of plaintiff's complaint.  *See, e.g., supra* at 5-7 and Exs. 8-10.  Indeed, plaintiff himself alleges that his aunt, Betty Timmons, was corresponding with *Washington Post* reporter Morton Mintz about thalidomide, plaintiff's injuries, Dr. Kelsey, and Merrell's clinical trial shortly after plaintiff was born.  (Compl. ¶ 13)  Plaintiff relies on these publicly available documents to support his exposure claim.  (Philip Yeatts' Suppl. Resp. to Sanofi's First Set of RFAs, First Set of Interrogs., and First Set of Req. for Produc. (June 9, 2014) (Ex. 19), Interrog. No. 1, RFA No. 2.

2696a35be4611d22

2004) (finding no fraudulent concealment where plaintiff claimed reliance on "systematic" acts or "general statements" instead of an "independent act of concealment . . . applicable to an individual plaintiff").

The Pennsylvania Superior Court has confirmed that a "fraud on the public" does not constitute fraudulent concealment for purposes of tolling the statute of limitations; rather, a specific affirmative act directed to the specific plaintiff is required. *Thomas v. SmithKline Beecham Corp.*, No. J-A15019-13, slip op. at 10 (Pa. Super. Ct. Nov. 27, 2013) (Ex. 20) (upholding summary judgment in favor of defendants on grounds of the statute of limitations because "general systematic public conduct . . . is not an affirmative act directed at this specific plaintiff"). In *Thomas*, the Pennsylvania court cited multiple decisions of the Third Circuit and the Eastern District of Pennsylvania, all of which further support rejection of plaintiff's claim of fraudulent concealment. *Mest*, 449 F.3d at 517 (finding no fraudulent concealment in the absence of communications between defendant and plaintiff); *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 557 (3d Cir. 1985) (holding allegations of decades-long fraud on the public regarding asbestos "insufficient to create an issue of fraud under Pennsylvania law"); *Speicher v. Dalkon Shield Claimants Trust*, 943 F. Supp. 554, 558-59 (E.D. Pa. 1996) ("hid[ing] information from the public . . . [is] not sufficient to support a claim of fraud that would cause plaintiff to deviate from her duty to inquire" under Pennsylvania law).[10]  Without evidence that any alleged concealment thwarted plaintiff's investigation of his potential claim, there is no justifiable reliance and no tolling of the statute of limitations.

---

[10] Without deciding whether direct communications were necessary to sustain a claim for fraudulent concealment, this Court took notice of the substantial authority requiring direct communication. *Andre* Mem. at 20-22.

Finally, just as in *Andre* and *Merica*, plaintiff's actual belief that thalidomide caused his birth defects precludes him from invoking fraudulent concealment for the same reasons that it prevents application of the discovery rule.  This is because the Pennsylvania Supreme Court "views tolling of the statute of limitations in terms of the same 'knew or should have known' standard whether the statute is tolled because of the discovery rule or because of fraudulent concealment."  *Urland*, 822 F.2d at 1273 (cited and quoted in *Andre* Mem. at 21).  In other words, "the fraudulent concealment doctrine tolls the statute of limitations only until the 'injured party knows or reasonably should know of his injury and its cause.'"  *Andre* Mem. at 21 (quoting *Fine*, 870 A.2d at 861).  This Court held in granting summary judgment on the claims of Jack Merica that "Plaintiff's decades-long knowledge that his birth defects were caused by thalidomide" conclusively refutes any allegation of fraudulent concealment.  *Merica* Order at 2. The same is true here.

Accordingly, and for the same reasons this Court granted summary judgment in the *Merica* and *Andre* cases, plaintiff's claims are time-barred and summary judgment should be entered in defendants' favor.

## II.      Plaintiff's Claims Are Barred Under Texas' Statute of Repose

Because Pennsylvania law bars plaintiff's claims, it is unnecessary to consider Texas law, but for the sake of completeness, defendants note that, in addition to being barred by Texas' statute of limitations (*see* fn. 5 *supra*), they are barred by Texas' statute of repose as well.

Tex. Civ. Prac. & Rem. Code Ann. § 16.012 "establishes a 15-year statute of repose for products liability cases."  *Burlington N. & Santa Fe Railway Co. v. Poole Chemical Co., Inc.*, 419 F.3d 355, 358 (5th Cir. 2005).  It provides that "a claimant must commence a products liability action against a manufacturer or seller of a product before the end of 15 years after the

date of the sale of the product by the defendant."  Tex. Civ. Prac. & Rem. Code Ann. §

16.012(b).  The statute "applies to actions filed on or after July 1, 2003" and has retroactive

application "[b]ecause the 15-year repose period affects claims that arose from events that

occurred before the law came into effect."  *Burlington*, 419 F.3d at 359, 361 (holding that

"retroactive application of § 16.012(b) does not violate the open courts provision of the Texas

constitution"); *Hyde v. Hoffman-La Rouche Inc.*, No. 3:04-cv-1473, 2008 WL 4191529, at *1

(N.D. Tex. Sept. 10, 2008) (noting that "Section 16.012 applies to actions filed on or after July 1,

2003 and has retroactive application").

      Contrary to other thalidomide plaintiffs' contentions, Section 16.012(b) applies in the

present circumstances because thalidomide was "sold" via the licensing agreements with Merrell

and SKF.  Plaintiff's own complaint alleges that the drug was sold.  *See, e.g.*, Compl. ¶¶ 223,

351, 364.  Moreover, the statute of repose defines a "seller" as anyone "engaged in the business

of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for

use or consumption a product or any component part thereof."  Tex. Civ. Prac. & Rem. Code.

Ann. § 82.001; *see* Tex. Civ. Prac. Rem. Code Ann.  § 16.012(a)(1) ("'Claimant,' 'seller,' and

'manufacturer' have the meanings assigned by Section 82.001.").  Since the definition of a

"seller" includes anyone engaged in the "distrib[ution]" of a product for any commercial

purpose, it logically follows that the date of "sale" would be interpreted to include the date of

"distrib[ution]" for a commercial purpose, even where no money changes hands.  *See* Tex. Civ.

Prac. & Rem. Code Ann. § 82.001(3); *see also* Tex. Civ. Prac. & Rem. Code

Ann. § 16.012(a)(1).  Here, plaintiff clearly contends that defendants had a "commercial

purpose" in "distributing" thalidomide into the stream of commerce, even as part of clinical trials

to support possible regulatory approval and marketing of the drug.

Statutes of repose such as § 16.012(b) serve to "give absolute protection to certain parties from the burden of indefinite potential liability." *See Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003). As the Texas Supreme Court has explained, "statutes of repose not only cut off rights of action within a specified time after they accrue, but also they may even cut off rights of action before they accrue at all." *Id.* Indeed, "[t]he whole point of layering a statute of repose over the statute of limitations is to 'fix an outer limit beyond which no action can be maintained.' One practical upside of curbing open-ended exposure is to prevent defendants from answering claims where evidence may prove elusive due to unavailable witnesses (perhaps deceased), faded memories, lost or destroyed records, and institutions that no longer exist." *Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin*, 307 S.W.3d 283, 287 (Tex. 2010).

There is no discovery rule or other tolling exception under § 16.012. *Methodist Healthcare*, 307 S.W.3d at 287 ("[T]he key purpose of a repose statute is to eliminate uncertainties under the related statute of limitations and to create a final deadline for filing suit that is not subject to any exceptions. . . ."); *see also Salgado v. Great Dane Trailers*, No. 10-82, 2012 WL 401484, at *2-3 & n.3 (S.D. Tex. Feb. 6, 2012) (granting defendant's motion for summary judgment based on § 16.012(b)).

Here, plaintiff alleges that he was born in 1962 with birth defects caused by his mother's ingestion of thalidomide during pregnancy. Thus, under Texas law, the 15-year repose period began to run, at the very latest, when plaintiff was born. Because plaintiff did not file suit until decades after the 15-year period had expired, his claims are untimely. He could not have brought

a timely product liability claim against these defendants in a Texas court after July 1, 2003, and he should not be permitted to do so in this Court more than eight years later.[11]

### III.    Plaintiff Has No Admissible Evidence of Exposure to Thalidomide

In *Andre*, this Court described defendants' argument that plaintiff had no admissible evidence of exposure as "persuasive[]", but did not render a decision on that basis because of its statute of limitations decision. *Andre* Mem. at 22.  As noted above, the untimeliness of Mr. Yeatts' claims alone warrants their dismissal, but his lack of any admissible evidence of exposure provides another, independent reason for granting defendants summary judgment.

Texas law requires plaintiffs to prove they were exposed to the substance that allegedly harmed them.  *Koehn v. Ayers*, 26 F. Supp. 2d 953, 955 (S.D. Tex. 1998) *aff'd*, 194 F.3d 1309 (5th Cir. 1999) (granting summary judgment where plaintiffs failed to come forward with credible evidence they were exposed to allegedly toxic materials); *see also Gray v. United States*, 445 F. Supp. 337, 338 (S.D. Tex. 1978) (granting summary judgment where plaintiff failed to identify the drug allegedly ingested, including failing to provide evidence of the shape, size, color, manufacturer, or dosage because despite "ample time for discovery, [plaintiff] has failed to provide any proof of this essential element of her case").  Mr. Yeatts is unable to sustain this burden and this inability mandates dismissal of his claim.[12]

---

[11] *See also Hyde*, 2008 WL 4191529, at *3 (holding Texas' statute of repose barred plaintiff's claim because he had "a reasonable time and a fair opportunity to file his action" where his injury occurred in 1991, and the retroactive application of § 16.012 required him to file his lawsuit by 1999); *c.f. Vaughn v. Fedders Corp.*, 239 F. App'x 27, 31 (5th Cir. 2007) (per curium) (finding the retroactive application of § 16.012 unconstitutional as applied to plaintiffs because they were not afforded a "reasonable time" in which to bring a lawsuit where, unlike here, the statute of repose would have barred the plaintiffs' claim *before* the plaintiffs were even injured).

[12] Pennsylvania also requires proof of exposure.  *Dick v. Am. Home Prods. Corp.*, No. 1:05-cv-2384, 2009 WL 1542773, at *3 (M.D. Pa. June 2, 2009); *DeMayo v. Schmitt*, Case No. 625, 1990 WL 902397 (Pa. Com. Pl. Feb. 16, 1990).

Mr. Yeatts believes he was exposed to thalidomide only because of what his mother told him.  (P. Yeatts Dep. (Ex. 1) at 8:20-23)  Plaintiff's mother, however, testified that she was given multiple medications for her morning sickness (J.S. Yeatts Dep. at 30:10-15 and 34:9-10), none of which was identified as thalidomide.  (*Id.* at 16:20-25)  Mrs. Yeatts does not remember anything Dr. Stone said to her about these medicines (*id.* at 33:6-17), recalls nothing about the form these medicines took (*id.* at 24:8-25; 33:21-25), and does not remember anything about their packaging.  (*Id.* at 25:1-7)  The reason plaintiff's mother believes she was given thalidomide is hearsay from Betty Timmons or other persons who allegedly told Mrs. Yeatts what her father-in-law purportedly told them about what an unnamed investigator allegedly saw on some list from Oklahoma.  This fourth-level, speculative hearsay is insufficient to carry plaintiff's burden of proving exposure.  This is particularly true when, as here, there were more than 100 drugs on the U.S. market for the treatment of morning sickness when plaintiff's mother was pregnant (Ex. 7), and the purported list from Oklahoma did not even state that Dr. Stone gave thalidomide to plaintiff's mother.  (J.S. Yeatts Dep. (Ex. 4) at 47:9-48:6)  Accordingly, this Court also should grant summary judgment to defendants because plaintiff cannot establish that he was exposed to thalidomide.

## IV.  Defendants are Entitled to an Award of Fees and Costs

Defendants respectfully request that plaintiff's counsel be ordered to pay defendants' fees and costs under 28 U.S.C. §1927 and the Court's inherent authority.  Such sanctions are warranted because plaintiff's counsel unreasonably and vexatiously multiplied these proceedings long after it was obvious that the premises on which this case was built were false.

The *Yeatts'* complaint opened with the claim that until less than two years prior to filing Mr. Yeatts "did not discover (and could not reasonably have discovered) that thalidomide caused

their injuries." (Compl. ¶ 1)  Minutes into plaintiff's deposition, however, it was obvious that, in truth, plaintiff believed for decades that thalidomide caused his injuries.  (P. Yeatts Dep. (Ex. 1) at 15:11-17)  Indeed, plaintiff testified that he has believed since at least 1988 that thalidomide caused his injuries.  (*Id.* at 94:5-19)  And one week before plaintiff's deposition, two of plaintiff's doctors testified that Mr. Yeatts told them in October 2007 – four full years before he filed the complaint – that his birth defects were caused by thalidomide.  (Connaughton Dep. (Ex. 2) at 10:10-13:6; 22:10-15; Howard Dep. (Ex. 3) at 11:15-14:4; 17:3-18:21)  In his deposition, plaintiff  confirmed that he had made statements like these to his doctors.  (P. Yeatts Dep. (Ex. 1) at 54:17-55:15; 58:24-59:12)

Despite the testimony at Mr. Yeatts' June deposition that he had blamed thalidomide for decades and despite the testimony on the same day that his mother's belief she took thalidomide was hearsay-derived speculation, plaintiff's counsel persisted in pursuing this case.  Instead of recognizing that this case's first and core allegation had no factual support, they informed defendants on August 29, 2014 – two months after plaintiff's deposition – that Philip Yeatts' claim was among those they had reviewed and which they planned to pursue.  (August 29, 2014 e-mail from Nick Styant-Browne (Ex. 21))

Plaintiff's counsels' prosecution of the suit despite plaintiff's longstanding belief that thalidomide caused his injuries was built on two premises that discovery revealed to be entirely baseless.  The first is that plaintiff and his mother relied to their detriment on the public misimpression that thalidomide was not present in the United States.  (Compl. ¶¶ 369, 373)  As in *Andre*, there is *no* evidence that plaintiff relied on any supposed misrepresentation by any defendant in waiting until October 2011 to file suit.  *See Andre* Mem. at 19 ("Plaintiff has not, in his Complaint or deposition, identified a single misrepresentation on which *he* relied to *his*

19

detriment.") (emphasis in original).  After initially serving evasive discovery responses seeking to avoid the question of what statements he supposedly relied upon (*see id.* at 4-5), plaintiff admitted that he never has communicated with any of the defendants.  (Philip Yeatts' Second Suppl. Resp. to Sanofi-Aventis U.S. LLC's Fourth Interrog. (Ex. 18))  The truth is that, despite believing for decades that thalidomide caused his injuries, plaintiff simply took no steps to pursue his claim until long after the statute of limitations had expired.  (P. Yeatts Dep. (Ex. 1) at 12:10-14; 74:22-75:25; 100:10-101:7)

The second false premise is the allegation that "[u]ntil recently, a universe of thalidomide related injuries has been … excluded from diagnosis, including Philip's injury.  Only ***recently available studies published in medical and scientific journals*** reveal the flaws in the orthodox medical opinion," allowing him to file suit.  (Compl. ¶ 14 (emphasis added)).  This, too, proved unfounded.  When asked during fact discovery to indentify the medical studies in question, plaintiff's counsel refused to answer.  (All Pls.' Resps. and Objections to Defendant Sanofi-Aventis U.S. LLC's First Set of Interrogs. to All Pls. (November 25, 2013) (Ex. 22), Interrog. No. 3).  Only after defendants began filing summary judgment motions did they learn that plaintiffs' expert relied on no such "new science," but instead cited studies ***published in 1964 and 1969*** for the proposition that thalidomide can cause unilateral birth defects.  *See Andre* Mem. at 15.  There accordingly was no factual basis for plaintiff's "new science" allegation.

Because plaintiff's counsel maintained this lawsuit when it should have been clear that it was without merit and engaged in discovery gamesmanship to obscure defendants' valid statute of limitations defense, defendants request payment of costs and fees from plaintiff's counsel in an amount this Court deems appropriate pursuant to 28 U.S.C. § 1927 and its own inherent authority to impose sanctions for "bad faith" conduct in litigation.  *See* 28 U.S.C. § 1927 ("Any

attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."); *In re Prudential Ins. Co. Am. Sales Prac. Litig.*, 278 F.3d 175, 189 (3d Cir. 2002)); *Woods v. Adams Run Assoc.*, No. Civ. A. 96-6111, 1997 WL 256966, at *5 (E.D. Pa. May 13, 1997) (awarding fees and costs upon finding that plaintiff and his counsel proceeded to litigate claims that clearly were not meritorious), *aff'd* 151 F.3d 1027 (3d Cir. 1998).

Finally, the award of fees and costs here would be consistent with the Special Master's recommendation to award sanctions in the Merica, Boiardi, and Garza cases. (Report and Recommendations of the Special Discovery Master on Motions for Sanctions on Plaintiffs' Counsel (December 4, 2014) [D.E. 414] ("Report")) The Special Master's Report, for example, found that Plaintiff Jack Merica's fraudulent concealment claims could not be reconciled with undisputed evidence that he actually believed he was a thalidomider many years before filing suit. (*Id.* at 11 and 18). The Report also undermined the "new science" theory, concluding that there is "no evidence of a recent tectonic shift in science's appreciation of thalidomide injury that would have served to save recent actions brought under the discovery rule." (*Id.* at 23) The same reasoning underlying the Special Master's recommendation in Merica, Boiardi, and Garza therefore applies to this case.[13]

## CONCLUSION

Although the statute of limitations and the statute of repose apply irrespective of a showing of prejudice, such statutes are intended to "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of

---

[13] Sanofi did not seek sanctions in the *Merica*, *Boiardi*, and *Garza* cases, but because plaintiff's counsel has persisted in litigating this baseless claim to this day, Sanofi accordingly joins in this request for fees and costs.

evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick*, 444 U.S. 111, 117 (1979); *see also Methodist Healthcare*, 307 S.W.3d at 287 ("One practical upside of curbing open-ended exposure is to prevent defendants from answering claims where evidence may prove elusive due to unavailable witnesses (perhaps deceased), faded memories, lost or destroyed records, and institutions that no longer exist.")  This case is yet another glaring example of why enforcement of statutes of limitations and statutes of repose is necessary.  With the passage of time, key defense witnesses have died and cannot respond to the serious charges plaintiff has made against them,[14] and plaintiff's aunt Betty Timmons cannot recall the letter she wrote to the *Washington Post* immediately after plaintiff was born even as plaintiff's discovery responses rely on it and on Mr. Mintz's response to claim exposure.  Defendants are severely prejudiced in defending against plaintiff's claims.  If the statute of limitations or the statute of repose did not bar claims such as these, no tort litigation would ever achieve finality and the limitations period would be rendered meaningless.

For the reasons set forth above, defendants respectfully request that this Court enter summary judgment in their favor and award fees and costs for plaintiff's counsels' maintenance of this groundless action.

---

[14] *See, e.g.*, Ex. 23 (Soc. Security Admin. Death Index Record for SKF President Walter Munns).

Dated:  December 5, 2014                    Respectfully submitted,


                                            */s/ Craig A. Knot*
                                            Craig A. Knot (*admitted pro hac vice*)
                                            Email:  sgourley@sidley.com
                                            Eugene A. Schoon (*admitted pro hac vice*)
                                            Email:  eschoon@sidley.com
                                            Craig A. Knot (*admitted pro hac vice*)
                                            Email:  cknot@sidley.com
                                            Elizabeth C. Curtin (*admitted pro hac vice*)
                                            Email:  ecurtin@sidley.com
                                            SIDLEY AUSTIN LLP
                                            One South Dearborn Street
                                            Chicago, Illinois 60603
                                            Telephone:  (312) 853-7000
                                            Facsimile:  (312) 853-7036

                                            Albert G. Bixler
                                            Email:  abixler@eckertseamans.com
                                            ECKERT SEAMANS CHERIN & MELLOTT, LLC
                                            Two Liberty Place
                                            50 South 16th Street, 22nd Floor
                                            Philadelphia, Pennsylvania 19102
                                            Telephone:  (215) 851-8400
                                            Facsimile:  (215) 851-8383

                                            *Attorneys for Grünenthal GmbH*

                                            */s/ Daniel S. Pariser*
                                            Anand Agneshwar (*admitted pro hac vice*)
                                            Daniel S. Pariser (*admitted pro hac vice*)
                                            Paige H. Sharpe (*admitted pro hac vice*)
                                            ARNOLD & PORTER LLP
                                            555 Twelfth Street, NW
                                            Washington, DC 20004
                                            Telephone:  (202) 942-5000
                                            Facsimile:  (202) 942-5999

                                            Anand Agneshwar (*admitted pro hac vice*)
                                            Bruce R. Kelly (*admitted pro hac vice*)
                                            ARNOLD &PORTER LLP
                                            399 Park Avenue
                                            New York, NY 10022
                                            Telephone: (212) 715-1000
                                            Facsimile: (212) 715-1399

Kenneth A. Murphy
DRINKER BIDDLE & REATH LLP
One Logan Square
Suite 2000
Philadelphia, Pennsylvania  19103
Telephone:  (215) 988-2837
Facsimile: (215) 988-2757

*Counsel for Sanofi-Aventis U.S. LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 5, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy of the foregoing document is being served this day on all counsel of record via the Court's electronic filing system.

<u>  /s/ Craig A. Knot          </u>
Craig A. Knot