**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GLENDA JOHNSON, et al.** | : | |
| | : | |
| **v.** | : | **Civ. No. 11-5782** |
| | : | **and all related cases** |
| **SMITHKLINE BEECHAM** | : | |
| **CORPORATION, et al.** | : | |

---

**Diamond, J.**                                                                                          **March 9, 2015**

## MEMORANDUM

    Special Master William T. Hangley has recommended that I impose sanctions on Hagens Berman Sobol Shapiro LLP for the firm's bad faith and dishonesty in litigating three products liability actions it brought against the manufacturers and distributors of thalidomide.   Mr. Hangley found that Hagens Berman continued to prosecute the actions well after it knew they were baseless, time-barred, or both.   Unfortunately, the firm's dishonesty in resisting sanctions and its Objections to Mr. Hangley's Report and Recommendation only confirm his findings. Accordingly, I will overrule the Objections and approve and adopt the Report.   Pursuant to 28 U.S.C. § 1927 and the Court's inherent authority, I impose sanctions on the law firm of Hagens Berman Sobol Shapiro LLP.

## I.      PROCEDURAL HISTORY

    I have previously set out the tortuous background of this litigation.   See Johnson v. SmithKline Beecham Corp., __ F. Supp. 3d __, 2014 WL 5285943, at *1-4 (E.D. Pa. Oct. 16, 2014).   Briefly, from 2011 to 2013, forty-nine Plaintiffs filed suit in Pennsylvania state court, alleging that some 50 years before, thalidomide caused them to suffer severe birth defects. Invoking diversity jurisdiction, Defendants removed all the cases, which were assigned to me and other Judges of this Court.   The Third Circuit, upholding my refusal to remand, ruled that this Court had diversity jurisdiction.   Johnson v. SmithKline Beecham Corp., 724 F.3d 337 (3d

1

Cir. 2013).  All thalidomide cases were then consolidated before me for pretrial purposes.  (Case No. 11-5782, Doc. No. 94.)  During discovery, three additional Plaintiffs filed suit in this Court.  All fifty-two Plaintiffs are represented by Hagens Berman and local counsel.

Given that Plaintiffs' injuries occurred in the late 1950s or early 1960s, Hagens Berman anticipated a statute of limitations affirmative defense, pleading with specificity that Defendants' fraudulent concealment respecting thalidomide's dangerousness had tolled the running of the limitations clock.  Some Plaintiffs also invoked equitable tolling, alleging that they could not reasonably have discovered until very recently that thalidomide had caused their injuries.  (See, e.g., Case No. 12-4542, Compl. ¶¶ 16, 19; Case No. 13-4591, Compl. ¶¶ 18, 21, 24.)

Plaintiffs' claims were subject to a one- or two-year limitations period.  See 42 Pa. Cons. Stat. § 5524(2), (7) (two-year limitations period for personal injury claims); id. § 5521(b) (court must apply the limitations period of "the law of the place where the claim accrued or . . . the law of [Pennsylvania], whichever first bars the claim").  Defendants thus argued vigorously that they should not be compelled to defend against claims that were so obviously time-barred.  Because I was obligated to accept Plaintiffs' allegations as true, however, I denied Defendants' dismissal motions, noting that "I cannot determine, at this early stage in the litigation, the viability of Plaintiffs'" tolling allegations.  (Case No. 11-5782, Doc. No. 92.)

Defendants then made repeated attempts to discover when each Plaintiff knew or reasonably should have known that thalidomide had caused his or her birth defects.  See generally Mest v. Cabot Corp., 449 F.3d 502, 510 (3d Cir. 2006) (under Pennsylvania law, the limitations clock is tolled until "the plaintiff knows, or reasonably should know (1) that he has been injured, and (2) that his injury has been caused by another party's conduct" (internal quotation marks omitted)); Fine v. Checcio, 870 A.2d 850, 859 (Pa. 2005) (Pennsylvania's

fraudulent concealment doctrine tolls the limitations clock until the "injured party knows or reasonably should know of his injury and its cause").  Defendants would likely have had greater success trying to nail butter to a tree.  As I have described, Plaintiffs provided no responses, misleading "collective" responses, or absurd responses to these discovery efforts.  See Johnson, 2014 WL 5285943, at *3-4.

After Defendants demonstrated that contrary to my Orders, several Plaintiffs had failed to produce highly probative evidence—including online posts that they have known for decades that thalidomide caused their birth defects—Defendants urged me to dismiss all Plaintiffs' Complaints with prejudice.  (Doc. No. 232.)  Once again, I declined to do so.  Instead, on June 17, 2014, I proposed appointing Mr. Hangley to serve as Special Discovery Master pursuant to Rule 53.  (Doc. No. 239); Fed. R. Civ. P. 53(b)(1).  On June 26—after all Parties stated that they had no objection—I appointed Mr. Hangley.  (Doc. No. 256.)

Plaintiffs' obstructive efforts notwithstanding, Defendants had obtained compelling evidence that the claims of several Plaintiffs were not viable.  As Mr. Hangley described:

> Less than two months after the Court's denial of the Rule 12(b)(6) motions, [D]efendants learned that several of the [P]laintiffs could not sue for the simple reason that they had already done that once; indeed, in at least one instance, a [P]laintiff was continuing to receive monthly settlement payments from a [D]efendant it was suing a second time for the same alleged tort.

(Report, Doc. No. 414, at 6, available at Johnson v. SmithKline Beecham Corp., No. 11-5782, 2014 WL 6851277 (E.D. Pa. Dec. 4, 2014).)  To avoid the considerable expense of conducting discovery on meritless or time-barred claims, on March 26, 2014, GSK and Grünenthal urged Hagens Berman "to undertake a careful review of the claims it made in all these cases."  (Doc. No. 310, Exs. 10-11.)  For cases Plaintiffs agreed to dismiss before April 11, GSK and Grünenthal offered to bear their own costs.  (Id.)  For cases "which remain pending after that

3

date," however, GSK and Grünenthal would "not agree to bear [their] own costs and . . . reserved [their] right[s] to seek both costs and attorneys' fees under all applicable rules and statutes." (Id.)

Hagens Berman did not agree to dismiss any case before April 11.  On the contrary, as Mr. Hangley has described, the Parties engaged in "[m]assive" discovery, with over 130 depositions being taken.  (Report at 8-9.)  The evidence then produced—to which Hagens Berman had access before April 11—belied the claims of almost all Plaintiffs and often contradicted critical allegations in their Complaints.  This was certainly true respecting the three Plaintiffs whose claims are the focus of Defendants' Sanctions Motions: Jack Merica, Lawrence Boiardi, and Roel Garza.

*Jack Merica*

Mr. Merica alleged that Defendants' fraudulent concealment precluded him from learning until 2012 that thalidomide caused his birth defects.  (Case No. 12-4542, Compl. ¶ 22.) Discovery revealed, however, that:

> (1) Plaintiff's mother told him in in the 1960s that thalidomide caused his injuries; (2) Plaintiff's mother told Plaintiff's doctors in the 1960s that thalidomide caused his injuries; (3) in the 1970s, Plaintiff asked his mother why she had not sued the doctor who prescribed thalidomide or the drug's manufacturer; (4) in 1983, Plaintiff filed a Social Security Disability application seeking benefits for thalidomide-caused injuries; (5) in 1990 or 1991, Plaintiff's mother gave him the bottle of thalidomide pills that she had taken while she was pregnant with him; (6) in 1992—"thirty seconds" into their first date— Plaintiff told his now-wife that thalidomide caused his birth defects; and (7) in 2000, Plaintiff gave an interview to WeMedia Magazine during which he stated that he had injuries caused by thalidomide.

(Case No. 11-5782, Doc. No. 265 at 1-2 (internal citations omitted).)  Remarkably, although he pled that Defendants' misrepresentations precluded him from filing suit for some 50 years, at

deposition, Mr. Merica testified that he had never been misled by Defendants.  (Doc. No. 245 at 12-13.)

Hagens Berman did not oppose Defendants' Motion for Summary Judgment.  (Doc. Nos. 245, 263.)  In dismissing Mr. Merica's Complaint on July 14, 2014, I ruled that "his claims are time barred under both the laws of Pennsylvania (where Plaintiff brought suit) and Virginia (where Plaintiff's mother was prescribed the thalidomide)."  (Doc. No. 265 at 2.)

*Lawrence Boiardi*

Like the other Plaintiffs, Mr. Boiardi alleged that his mother had ingested thalidomide during the critical period *in utero*.  (Case No. 13-4591, Compl. ¶ 19.)  Discovery revealed that this was not true.  Mr. Boiardi, who is adopted, admitted that his birth mother's medical records do not show that she took thalidomide.  (Case No. 11-5782, Doc. No. 258 at 2-3 & Ex. 5.)  Moreover, his birth mother—whom Hagens Berman did not contact before filing suit—denied taking *any* medicine during her pregnancy.  (Id. at Ex. 2.)  Once again, Hagens Berman did not oppose summary judgment.  Rather, the firm voluntarily dismissed his claims on July 25, 2014.  (Doc. Nos. 277, 285.)

*Roel Garza*

Mr. Garza acknowledged at his June 18, 2014 deposition that he knew of nothing to support the allegation in his Complaint that his mother took thalidomide during her pregnancy with him.  (Doc. No. 281 at 7-8.)  Contrary to his equitable tolling allegations, he also acknowledged that he had suspected since his youth that his birth defects were caused by medication his mother took during pregnancy, but never investigated those suspicions.  (Id. at 9-10.)  After Defendants moved for summary judgment, Hagens Berman voluntarily dismissed Mr. Garza's claims with prejudice on August 14, 2014.  (Doc. Nos. 317, 318.)

*Defendants Seek Sanctions*

In July and August, 2014, the GSK Defendants and Grünenthal filed the instant Motions (in which Defendant Sanofi has not joined).  (Doc. Nos. 258 (Boiardi), 281 (Garza), 310 (Merica).)  Moving pursuant to 28 U.S.C. § 1927 and the Court's inherent authority, they asked me to sanction Hagens Berman—not its local counsel or Plaintiffs themselves—for the firm's bad faith prosecution of the Merica, Boiardi, and Garza matters after April 11, 2014.  With the Parties' agreement, I referred these Motions to Mr. Hangley.  (Doc. No. 316.)  The Parties abundantly briefed the sanctions question, and, on October, 1, 2014, Mr. Hangley held a hearing on the Motions.  (Doc. Nos. 338, 364, 383, 411-13.)

On October 28—before Mr. Hangley issued his Report and Recommendation—the GSK Defendants agreed to withdraw their Sanctions Motions in exchange for Plaintiffs dismissing with prejudice all pending thalidomide cases (save one) against GSK.  (Doc. No. 394.)  This agreement capped a "disturbing course of events"—including Hagens Berman's discovery misconduct.  (Doc. No. 420.)  It appeared that only Hagens Berman (not its clients) benefited from this agreement with GSK.  Moreover, as I discussed in my October 31, 2014 Order, Hagens Berman and GSK entered into the October 28th agreement *just days* after: (1) Plaintiff Terrie Bolton, a Hagens Berman client (whom the firm avers it is no longer able to represent), wrote me a letter describing her herculean efforts to secure replacement counsel so that she would not have to suffer "the [great] consequences of losing this matter;" and (2) the firm unsuccessfully sought a stay of "all [thalidomide] actions in their entirety" pending resolution of six outstanding summary judgment motions.  (Doc. No. 396.)

In light of my concerns, I referred to Mr. Hangley the question of whether these twenty-eight Plaintiffs had knowingly, voluntarily, and intelligently agreed to dismiss their claims against the GSK Defendants.  (Doc. No. 420.)  Those matters are pending before Mr. Hangley.

## II.     REPORT AND RECOMMENDATION

On December 4, 2014, Mr. Hangley issued his Report and Recommendation.  (Report, available at Johnson v. SmithKline Beecham Corp., No. 11-5782, 2014 WL 6851277 (E.D. Pa. Dec. 4, 2014).)  I have attached the Report as Appendix A to this Memorandum, and so I will not repeat at length Mr. Hangley's findings and analysis.  Although Hagens Berman eventually agreed to the dismissal of the Merica, Bioardi, and Garza matters at summary judgment, Mr. Hangley found that the firm acted in bad faith when it refused to dismiss months earlier and resisted sanctions on frivolous grounds.  The Special Master thus recommended the imposition of sanctions on Hagens Berman for unnecessarily multiplying these proceedings and increasing their cost.

*Jack Merica*

Mr. Merica alleged only fraudulent concealment, not equitable tolling.  He pled that even though he knew his mother took thalidomide during her 1959 pregnancy with him, he did not bring suit until August 2012 because:

> Neither [Mr. Merica] nor his family knew the names of any companies responsible for the distribution of thalidomide in the USA.  With no clues to follow, [Mr. Merica] was left with no understanding of what it meant to be a thalidomider and no idea who was responsible for developing and distributing the drug . . . in part due to acts of concealment [by Defendants].

(Case No. 12-4542, Compl. ¶ 22.)  As I have discussed, the facts produced in discovery directly contradict these allegations.  Indeed, in granting Defendants' unopposed Motion for Summary Judgment against Mr. Merica, I asked how

> in light of Plaintiff's decades-long knowledge that his birth defects were caused
> by thalidomide, he could have alleged that [D]efendants fraudulently concealed
> that information from him. The Special Discovery Master I have appointed in this
> matter will presumably answer this question.

(Case No. 11-5782, Doc. No. 265 at 2.) Mr. Hangley found that "Mr. Merica's allegations—all verified by a Hagens Berman lawyer rather than Merica himself—simply [could not] be squared with the uncontested facts," respecting Mr. Merica's knowledge that thalidomide caused his injuries. (Report at 11.) Mr. Hangley found that as a result of the firm's "failure to acknowledge the obvious flaws in Mr. Merica's case" by April 11, Defendants "were put to the expense" of, *inter alia*, deposing Mr. Merica and wife, preparing their summary judgment motion, and prosecuting the instant Sanctions Motion. (Id. at 12.)

"And then," wrote Mr. Hangley, "Hagens Berman made it worse." (Id.) In opposing sanctions, the firm contended that until Defendants urged at summary judgment the application of Virginia law—which purportedly does not include a discovery rule—the firm had a good faith basis to prosecute the Merica matter because Pennsylvania's discovery rule would have tolled the limitations clock. Mr. Hangley observed that this argument was dishonest for several reasons. (Id. at 12-20.) For one, when the firm made this argument, I had already ruled that Mr. Merica's claims were time-barred under Virginia *and* Pennsylvania law. (Doc. No. 265.)

The Special Master also found that it was "particularly distressing" that Hagens Berman sought to resist sanctions on the basis of the discovery rule—"a tolling theory it did not employ [in the Merica Complaint] and could not have employed in Mr. Merica's case." (Report at 15.) Rather, as Mr. Merica acknowledged in his Complaint and at deposition, he long knew or reasonably should have known thalidomide caused his birth defects. Mr. Hangley thus found that the firm's attempt "to leave the Special Master and the Court with the false impression that Mr. Merica *was* claiming non-fraud tolling" was "bad faith" advocacy. (Id. at 16.)

8

*Lawrence Boiardi*

Although Hagens Berman indicated that it could not locate Mr. Boiardi's birth mother, Defendants did so without apparent difficulty.  Consistent with her medical records, she averred that she did not take *any* medication during her pregnancy with Mr. Boiardi.  Moreover, Mr. Boiardi—who was born in 1959—pled that he did not bring suit until 2013 because, according to his expert witness, "[o]nly recently available studies" show that thalidomide could cause the birth defects from which Mr. Boiardi suffers.  (Case No. 13-4591, Compl. ¶ 21.)  Yet, Mr. Hangley found that Plaintiff's expert—hired four months *after* Mr. Boiardi filed his Complaint—based this revelation on two studies from the 1960s.  (Report at 21-24); Johnson, 2014 WL 5285943, at *9.

Mr. Hangley found that although Hagens Berman was aware of these glaring defects, it nonetheless refused to dismiss Mr. Boiardi's case before April 11, thus vexatiously multiplying these proceedings.

*Roel Garza*

At the October 1st hearing, Hagens Berman conceded the imposition of sanctions, acknowledging that it should have dismissed Mr. Garza's case "prior to the depositions" because: (1) Mr. Garza had no evidence that his mother ever took thalidomide; (2) after he had reason to believe thalidomide had caused his injuries, he never investigated any potential claim he might have; and (3) Mr. Garza's failure to investigate was not based on any of Defendants' alleged misrepresentations.  (Oct. 1 Hrg. Trans., Doc. No. 383, at 133-34.)

Two days later, Hagens Berman appeared to withdraw this concession.   During an October 1, 2014 written deposition, Dr. Gordon Forrer, who conducted thalidomide clinical trials in 1957 and 1958, testified that, contrary to contemporaneous FDA and GSK records, he had

handled far fewer thalidomide pills than those records reflect.  (Doc. No. 411.)  Hagens Berman posited on October 3 that these "unaccounted for" thalidomide doses "may mean that GSK was distributing the drugs someplace else," thus making it more likely that Mr. Boiardi's mother ingested thalidomide during the critical period *in utero*.  (Id. at 4; Report at 26.)  Yet, this dubious suggestion did nothing to change the sworn statement of Mr. Boiardi's birth mother— confirmed by her medical records—that she took no medicine during her pregnancy. Accordingly, Mr. Hangley concluded that because the Forrer deposition did not make the Boiardi claim viable, he would not permit Hagens Berman to withdraw its October 1st agreement that sanctions should be imposed on the firm.

*Sanctions Calculations*

Mr. Hangley concluded that: (1) Sanofi, which did not join in the instant Motions, may not recover sanctions; (2) GSK's Motions should be held in abeyance in light of GSK's October 28th agreement with Hagens Berman; and (3) Grünenthal, which brought and prosecuted each Motion, may recover sanctions.  (Report at 30-32.)

Mr. Hangley recommended that the Court, pursuant to § 1927 and its inherent authority, should award Grünenthal: the post-April 11, 2014 fees and costs incurred prosecuting the Merica, Boiardi, and Garza matters and Sanctions Motions; and 3/49ths of the post-April 11, 2014 litigation expenses "devoted to matters that involved these three [P]laintiffs' claims and, also, the claims of as many as [forty-six] other [P]laintiffs" (such as conducting discovery and responding to discovery requests in connection with all Plaintiffs, and research relating to the claims of all Plaintiffs).  (Id. at 32-34.)

*Responses to the Report and Recommendation*

The Parties had fourteen days to object to the Report and ten days to respond to any objections.  (Doc. No. 316.)  In its sixty-seven-page brief, Hagens Berman objects to thirty-five of Mr. Hangley's statements.  (Objections, Doc. No. 427.)  Grünenthal contends that Hagens Berman's Objections are without merit.  (Doc. No. 434.)  The GSK Defendants state that because of the October 28th voluntary dismissal agreement, they are not presently seeking sanctions against Hagens Berman, but have reserved their right to do should that agreement fall through.  (Doc. No. 433.)

## III.   LEGAL STANDARDS

Under 28 U.S.C. § 1927, I may impose sanctions if I find that Hagens Berman:

(1) [M]ultiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct.

In re Prudential Ins. Co. Am. Sales Practice Litig., 278 F.3d 175, 188 (3d Cir. 2002); see also Baker Indus. v. Cerberus Ltd., 764 F.2d 204, 209 (3d Cir. 1985).  Similarly, I may impose sanctions pursuant to the Court's inherent authority "where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  In re Prudential, 278 F.3d at 189 (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)).

Although not raised by Grünenthal or Hagens Berman, the party seeking the imposition of sanctions must show by clear and convincing evidence that they are warranted.  See Ali v. Tolbert, 636 F.3d 622, 627 (D.C. Cir. 2011); Magnetar Tech. Corp. v. Six Flags Theme Park Inc., 886 F. Supp. 2d 466, 481 (D. Del. 2012) E.E.O.C. v. U.S. Steel Corp., 877 F. Supp. 2d 278, 292 (W.D. Pa. 2012).

As Mr. Hangley observed, "bad faith can be inferred" where a party pursues claims that are clearly frivolous.  (Report at 3); see e.g., In re Prudential, 278 F.3d at 188 ("Indications of . . . bad faith are findings that the claims advanced were meritless [and] that counsel knew or should have known this . . . ."); Matthews v. Freedman, 128 F.R.D. 194, 206-07 (E.D. Pa. 1989), aff'd, 919 F.2d 135 (3d Cir. 1990) (plaintiff's counsel acted in bad faith by litigating time-barred claims).

I must review *de novo* all Objections to Mr. Hangley's findings and conclusions.  Fed. R. Civ. P. 53(f)(3-4).  I then may "adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Id. (f)(1); see Sandvik Intellectual Prop. AB v. Kennametal, Inc., No. 10-654, 2012 WL 3028028, at *4 (W.D. Pa. July 24, 2012); cf. Curay-Cramer v. Ursuline Acad., Inc., 450 F.3d 130, 133 (3d Cir. 2006) (court decision may be upheld on "any basis appearing in the record").

## IV.     OBJECTIONS

Hagens Berman's sixty-seven-page brief appears to do little more than confuse and exhaust the reader.  I have attempted to organize the firm's Objections into three broad areas.  As argued by the firm, Mr. Hangley: (1) violated its due process rights; (2) made other factual and legal errors; and (3) improperly calculated the sanctions award.

### 1.  Due Process

### Matters Purportedly First Raised in Mr. Hangley's Report and Recommendation

Hagens Berman argues that the Special Master based his imposition of sanctions on arguments and facts that Defendants did not raise in their Motions or at the October 1, 2014 hearing.  The firm thus contends that it was denied due process notice and the opportunity to be heard.  This is absurd.  The Third Circuit has held that the "Due Process Clause of the Fifth

Amendment requires a federal court to provide notice and an opportunity to be heard before sanctions are imposed on a litigant or attorney." Martin v. Brown, 63 F.3d 1252, 1262 (3d Cir. 1995). No sanctions have yet been imposed on Hagens Berman. As I have discussed, the firm had fourteen days to respond to the Report, and has filed a lengthy brief in support of its Objections. (Doc. No. 316.) The firm does not contend that this process is inadequate. Accordingly, insofar as Mr. Hangley based his recommendation on "new" grounds or facts—and plainly he did not—any such "error" has been cured by my consideration of the firm's voluminous Objections to Mr. Hangley's Report.

Given the adequacy of process afforded the firm, in more usual circumstances I would not discuss the "new" grounds on which Hagens Berman bases its due process claim. I will do so here, however, because the firm's contentions so typify its bad faith actions.

### Mr. Hangley "Improperly" Referred to a Sentence from an Interrogatory Response that Defendants Did Not Quote in Their Sanctions Motions

In finding that the record evidence conclusively refuted Mr. Merica's belated discovery rule tolling argument, Mr. Hangley cited an interrogatory response in which Mr. Merica stated that in the 1980s "a doctor from [H]ealth and [H]uman [S]ervices examined him and agreed" that he was entitled to disability benefits because of his thalidomide-related injuries. (Report at 16.) Hagens Berman argues that even though Defendants cited this interrogatory response in their Sanctions Motion, Mr. Hangley violated the firm's process rights because Defendants did not quote *this exact sentence*. (Objections at 38.)

Hagens Berman does not argue that the sentence is inaccurately quoted or dispute that the response is properly in the record. Indeed, the firm itself cited the quoted language in its brief opposing sanctions. (See Doc. No. 338, Spiegel Decl., Ex. 1, Interrog. 5.) In these circumstances, the suggestion that Mr. Hangley could not quote Plaintiff's own interrogatory

response gives new meaning to "frivolous."  In light of Mr. Merica's tolling arguments, the firm

knew that Mr. Hangley necessarily would determine if, more than two years before bringing suit,

Mr. Merica knew or reasonably should have known thalidomide had caused his birth injuries.  In

quoting the "offending" sentence, Mr. Hangley properly did just that.

### Mr. Hangley "Improperly" Noted That Hagens Berman Argued Equitable Tolling

Mr. Hangley found that, in resisting sanctions, Hagens Berman fraudulently and

dishonestly invoked the discovery rule—a tolling theory that the firm "did not employ and could

not have employed in Mr. Merica's case because not even his pleaded facts—much less the

actual facts gleaned in discovery—would have supported that theory."  (Report at 15.)  Hagens

Berman contends that because Defendants did not make this argument, Mr. Hangley's finding

violates due process.  (Objections at 34, 36.)  The firm thus argues that the Special Master could

not, consistent with due process, cite the firm's dishonesty in resisting sanctions as an example

of the firm's bad faith tactics.  Surely, to state this contention is to refute it.

### Mr. Hangley "Improperly" Rejected Plaintiffs' Expert Opinion

In resisting sanctions, Hagens Berman argued that it pursued apparently time-barred

claims in good faith because Trent Stephens, Ph.D.—a witness hired well *after* Messrs. Merica,

Boiardi, and Garza brought suit—opined that, until very recently, no expert believed that

thalidomide caused the types of birth injuries they had suffered.  (See Doc. No. 338 at 14

("Defendants' argument [in seeking sanctions in Mr. Merica's case] conveniently ignores the

expert opinion Plaintiffs have submitted in opposition to several other summary judgment

motions, to the effect that until very recently, it would have been highly unlikely that any

[P]laintiff would have been able to find an expert who could have confirmed that his injuries

were consistent with thalidomide."); Oct. 1 Hrg. Trans. at 114-16 (with respect to Messrs.

Boiardi and Garza, "Dr. Stephens will say [that] there is a growing consensus that thalidomide can cause a unilateral limb defect").)

Having thus offered Dr. Stephens's belated opinion as a basis to deny sanctions, Hagens Berman now argues that Mr. Hangley violated its due process rights when he evaluated (and properly rejected) that opinion.  (Objections at 39, 41, 50.)  Once again, Hagens Berman cannot make this argument seriously.

### Mr. Hangley's Reliance on a Record Exhibit

As I have discussed, Mr. Hangley rejected Hagens Berman's argument that until quite recently, there was no expert opinion available to support any thalidomide claims.   The Special Master found that this "could not have been a good faith position" because, as Defendants have demonstrated, many thalidomide victims successfully prosecuted claims against these same Defendants in the 1960s and 1970s.  (Report at 18.)  These cases were listed in an exhibit appended to Defendants' summary judgment motions.  Having thus argued that Plaintiffs could not have successfully sued Defendants until 2012, Hagens Berman claims that Mr. Hangley violated due process when he relied on a public record document that refutes the argument. (Objections at 43.)  Again, I do not believe that Hagens Berman is serious in urging this "due process violation."

### Discussion of Background Facts

Hagens Berman has contended throughout this litigation that it has acted only to benefit its clients by "zealously and ethically" pursuing their claims.  (See e.g., Doc. No. 338 at 5; Objections at 32.)  In his "General Findings," Mr. Hangley responded that the firm's actions were not entirely beneficial to its clients.  As an example, Mr. Hangley referred to the letter from Plaintiff Terrie Bolton, asking me not to allow the firm to abandon her claims.  (Id. at 29 (citing

Doc. No. 390).)  Similarly, he stated that Hagens Berman "never [had] any good excuse" for leading Plaintiffs Merica, Boiardi, and Garza to believe they had viable claims.  (Id.)

The firm believes that these observations violated due process, apparently because Defendants did not make them in their Sanctions Motions.  (Objections at 9-10, 60-63.)  I do not agree.  Mr. Hangley's effort to "establish a context" for Hagens Berman's conduct was appropriate.  (Report at 12.)

### 2.  Other Factual and Legal Errors

**Jack Merica**

Hagens Berman objects to Mr. Hangley's statement that "the actual facts unearthed in discovery were stunningly different" than the allegations pled in Mr. Merica's Complaint. (Objections at 10-11.)  Once again, the Objection is frivolous.  Mr. Merica pled that Defendants' fraudulent concealment prevented him from suing until 2012.  Yet, as I have discussed, Mr. Merica admitted during discovery that he never relied on any of purported Defendants' misrepresentations.  (Doc. No. 245 at 12-13.)  On the contrary, because he has known for decades that thalidomide caused his injuries, he failed to bring suit solely because of his lack of diligence.  Mr. Hangley's acknowledgement of this stunning difference is thus amply supported.

Hagens Berman again argues that it prosecuted Mr. Merica's case in good faith because, until Defendants invoked Virginia law at summary judgment, the firm "had the ethical obligation to pursue [Mr. Merica's claims] based on the contention that his claims were not time barred under Pennsylvania's discovery rule."  (Objections at 11-20, 32; Report at 12-20 (rejecting this argument).)  Once again, Hagens Berman ignores that in granting summary judgment against Mr. Merica, I ruled that his claims were time-barred under Virginia *and* Pennsylvania law.  (Doc. No. 265.)  Although Hagens Berman argues that Pennsylvania's "discovery rule does not apply to

individuals [like Mr. Merica] who merely suspect that their injuries were caused by a particular medication," this is contrary to the undisputed facts and Pennsylvania law.  (Objections at 11; Oct. 1 Hrg. Trans. at 77-95; Doc. No. 338 at 13-22.)  As I have described, Mr. Merica has known for decades that thalidomide caused his injuries.  Presumably, that is why Hagens Berman did not oppose Defendants' request for summary judgment: because to toll the limitations clock under Pennsylvania law, a plaintiff must exercise "*reasonable diligence* in ascertaining the existence of [his] injury and its cause."  <u>Mest</u>, 449 F.3d at 511 (citations omitted); <u>see also</u> <u>Brawner v. Educ. Mgmt. Corp.</u>, 513 F. App'x 148, 150 (3d Cir. 2013) (per curiam) (collecting cases); <u>Cochran v. GAF Corp.</u>, 666 A.2d 245, 250 (Pa. 1995) ("Our cases firmly establish that the 'reasonable diligence' standard has some teeth.").

Finally, like Mr. Hangley, I am distressed by Hagens Berman's contradictory allegations. The firm initially pled only that Defendants' fraudulent concealment made it impossible for Mr. Merica to know until 2012 that thalidomide caused his birth defects.  After discovery revealed, however, this was false—that Mr. Merica never relied on any Defendant misrepresentations—the firm disingenuously argued for the first time the limitations clock was equitably tolled because Mr. Merica did not know to a certainty that thalidomide had caused his injuries until 2012.  I thus agree with Mr. Hangley: unfortunate as the firm's initial allegation was, in dishonestly resisting sanctions, "Hagens Berman made it worse."  (Report at 12.)

**Lawrence Boiardi**

Hagens Berman repeats the argument it made to Mr. Hangley in resisting sanctions: until Mr. Boiardi's birth mother averred that she did not take any medication during her pregnancy, the firm pursued Mr. Boiardi claims in good faith because Dr. Stephens would testify that

thalidomide caused the unilateral birth defects from which Mr. Boiardi suffers.  (Objections at 48-58.)

I have ruled that Dr. Stephens's opinion is inadmissible.  See Johnson, 2014 WL 5285943, at *8-9.  I will nonetheless assume, arguendo, that Hagens Berman knew about Dr. Stephens's opinion before Defendants sought sanctions, and that his opinion would be admissible.  That does not, however, impugn Mr. Hangley's determination that Mr. Boiardi had an insuperable statute of limitations problem: as I have described, Dr. Stephens' recent revelation that thalidomide causes certain birth defects is not in the least recent.  (Report at 21-24 (citing Johnson, 2014 WL 5285943, at *9) (noting that Dr. Stephens bases this conclusion on studies from the 1960s).)

**Roel Garza**

Hagens Berman twice conceded that this case should have been dismissed before any depositions had taken place.  (Objections at 58-59 (noting that firm did not seek to withdraw the concession).)  The firm nonetheless contests the imposition of sanctions for expenses incurred "prior to" depositions, contending it had a good faith basis to proceed to discovery based on Dr. Stephens's "recently available studies" opinion.  (Id. at 59.)  Once again, Dr. Stephens's belated opinion does not save an otherwise time-barred claim—like that of Mr. Garza.

### 3.  Sanctions Calculations

**Awarding Expenses Associated with Dr. Forrer's Testimony**

Hagens Berman contends that Grünenthal should not recover any expenses associated with Dr. Forrer's deposition because his testimony was "aimed at many or all of the cases." (Objections at 64.)  Mr. Hangley did not award Grünenthal deposition expenses, however. Rather, the Special Master proposed awarding Grünenthal the expenses associated with

*responding* to Hagens Berman's attempt to relitigate the Boiardi and Garza Motions based on Dr. Forrer's deposition.  (Report at 33; Doc. No. 411 (October 3, 2014 Hagens Berman letter re: Dr. Forrer's testimony); Doc. No. 412 (October 9, 2014 Defendants' letter response).)   Because these expenses were "entirely focused" on the Boiardi and Garza Motions—and thus recoverable under § 1927—I will overrule this Objection.  See Murphy v. Atlantic City Hous. Auth. & Urban Redevelopment Agency, 158 F. Supp. 2d 438, 451 (D.N.J. 2001) ("Under § 1927, only those fees and costs associated with the persistent prosecution of a meritless claim may be awarded." (quoting Browning v. Kramer, 931 F.2d 340, 344 (5th Cir. 1991))).

### Awarding 3/49ths of General Defense Costs – § 1927

Hagens Berman also objects to awarding Grünenthal 3/49ths of litigation expenses it incurred after April 11, 2014.  (Objections at 64-66.)  The firm contends that these expenses are not "excess" costs because, even if the Merica, Garza, and Boiardi matters had been dismissed by April 11, 2014, Grünenthal still would have conducted discovery and responded to discovery requests in connection with all the remaining Plaintiffs.  See 28 U.S.C. § 1927 (allowing for recovery of "excess" costs, expenses, and attorneys' fees incurred as a result of an attorney's unreasonable and vexatious conduct).

Hagens Berman thus assumes that Grünenthal would have incurred the same fees and expenses, regardless of the number of Plaintiffs.  I do not agree: Grünenthal's general defense costs undoubtedly increased as a result of defending against the claims of these three additional Plaintiffs.

The Special Master was not required to calculate these "excess" defense costs with "mathematical precision."  Salstrom v. Citicorp Credit Servs., 74 F.3d 183, 185 (9th Cir. 1996); see also Lee v. First Lenders Ins. Servs., 236 F.3d 443, 446 (8th Cir. 2001) ("[A]

sanctioning court must make an effort to isolate the additional costs and fees incurred by reason of conduct that violated § 1927.  But the task is inherently difficult, and precision is not required."); cf. Fox v. Vice, 131 S. Ct. 2205, 2215-16 (2011) (when assessing the fees recoverable under 42 U.S.C. § 1988 for defending against a frivolous civil rights claim, the "essential goal . . . is to do rough justice, not to achieve auditing perfection").  Rather, Mr. Hangley was required to be "[m]indful that sanctions must be measured and imposed with caution."  (Report at 35.)

In requiring Hagens Berman to pay 3/49ths of the defense costs, the Special Master chose as the denominator the largest credible number, including all Plaintiffs against whom Grünenthal defended in the post-April 11 period—thus reducing the costs he would tax to Hagens Berman.  (Report at 35 n. 22.)  In these circumstances, 3/49ths of the fees and costs Grünenthal expended on matters affecting all thalidomide Plaintiffs is a fair calculation of the "excess" expenses recoverable under § 1927.  See In re Silica Prods. Liab. Litig., 398 F. Supp. 2d 563, 673-80 (S.D. Tex. 2005) (in a 10,000-plaintiff MDL, court awards one-percent of defense costs incurred in prosecuting a Daubert hearing, where plaintiff's counsel had "no reasonable basis to believe that the expert [could] pass muster under Daubert" as to one-hundred plaintiffs).  Accordingly, I will overrule Hagens Berman's Objection.

**Awarding 3/49ths of General Defense Costs – Court's Inherent Authority**

If the 3/49ths formula is not available under § 1927, I may consider its availability under the Court's inherent authority:

> Even though inherent-authority sanctions are generally disfavored where another provision—such as § 1927—authorizes sanctions, our decision in Prudential allows a district court to depart from this preference when the conduct is egregious or where the statutory provision is not adequate to sanction the conduct.

Ferguson v. Valero Energy Corp., 454 F. App'x 109, 114 (3d Cir. 2011) (citing In re Prudential, 278 F.3d at 189); see also Chambers, 501 U.S. at 50 (district court may rely on its inherent authority when, in its "informed discretion, . . . neither the statute nor the Rules are up to the task"). Accordingly, if § 1927 is not "adequate" to address Hagens Berman's egregious conduct—and it would not be if 3/49ths of Grünenthal's defense costs were unrecoverable under that statute—I may consider imposing "inherent-authority sanctions." In so doing, I must:

> ensure that there is an adequate factual predicate for flexing [the Court's] substantial muscle under its inherent powers, . . . ensure that the sanction is tailored to address the harm identified, [and] consider the conduct at issue and explain why the conduct warrants sanction.

In re Cendant Corp., 260 F.3d 183, 200 (3d Cir. 2001) (citations omitted).

As Mr. Hangley and I have discussed at length, Hagens Berman's discovery misconduct—compounded by its dishonest and frivolous Objections to the Special Master's Report—is outrageous. The firm has caused Defendants and the Court to expend considerable resources on claims the firm should have agreed to dismiss months earlier than it eventually did.

Moreover, awarding 3/49ths of Grünenthal's general defense costs is properly tailored to address the harm inflicted by the firm's continued prosecution of the baseless Merica, Boiardi, and Garza matters. This is true especially because Hagens Berman insisted on providing discovery in a "collective" manner on behalf of all thalidomide Plaintiffs. See e.g., Johnson, 2014 WL 5285943, at *3-4 (discussing the firm's collective or identical interrogatory responses submitted on behalf of all Plaintiffs).

Courts have greater flexibility in formulating inherent authority sanctions. See, e.g., First Bank of Marietta v. Hartford Underwriters Ins. Co., 307 F.3d 501, 515 (6th Cir. 2002) ("[T]he district court needs the discretion and flexibility to exercise its inherent authority to address various impermissible litigation practices . . . ."); Fellheimer, Eichen & Braverman, P.C. v.

Charter Tech., Inc., 57 F.3d 1215, 1228 (3d Cir. 1995) (upholding inherent authority sanctions imposed on a law firm, which was "primarily responsible for the sanctionable conduct," because Rule 11 and Bankruptcy Rule 9011 sanctions could be imposed only on a single attorney). Exercising that flexibility, I conclude in the alternative that Hagens Berman was properly taxed for 3/49ths of Grünenthal's defense costs.

## V.   REVIEW OF REPORT AND RECOMMENDATION

I have reviewed *de novo* all the Objections to Mr. Hangley's Report.  See Fed. R. Civ. P. 53(f)(3-4).   Grünenthal has demonstrated with clear and convincing evidence that Hagens Berman multiplied proceedings unreasonably and in a vexatious manner by litigating the claims of Messrs. Merica, Boiardi, and Garza well after Defendants put the firm on notice that these claims were baseless, time-barred, or both.   I also agree with the Special Master's sanctions calculations.   Having carefully reviewed those portions of Mr. Hangley's Report to which no Objection has been made, I am satisfied with the correctness of his findings and conclusions. Accordingly, I adopt Mr. Hangley's Report and Recommendation, and, pursuant to 28 U.S.C. § 1927 and, in the alternative, pursuant to the Court's inherent authority, impose sanctions the law firm of Hagens Berman Sobol Shapiro LLP.

## VI.   CONCLUSION

I am well aware that courts should not impose sanctions in a manner that would discourage zealous advocacy.  See In re Orthopedic Bone Screw Products Liab. Litig., 193 F.3d 781, 795-96 (3d Cir. 1999).  Nor should sanctions be imposed on counsel who urge the Court to change the law.  See id.  The advocacy condemned by Mr. Hangley was not zealous, however.  It was dishonest.  Nor has Hagens Berman ever suggested that its repeated misstatements were an effort to change the law.  On the contrary, Hagens Berman initiated these time-barred cases

apparently intending to evade providing an honest answer to the dispositive question of when its clients knew or reasonably should have known that thalidomide could have caused their birth defects.  Mr. Hangley correctly found that in prosecuting the Merica, Boiardi, and Garza claims and in resisting sanctions, Hagens Berman felt no obligation to remain tethered to the truth. Clear and convincing evidence shows that the firm's bad faith and intentional misconduct undoubtedly and unnecessarily increased the cost of litigating the claims of Messrs. Merica, Boiardi, and Garza.   In these circumstances, I agree with Mr. Hangley, overrule Hagens Berman's Objections, and impose sanctions on the firm.

An appropriate Order follows.

*/s/ Paul S. Diamond*
_____

March 9, 2015                                                    Paul S. Diamond, J.

**APPENDIX A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GLENDA JOHNSON ET AL.,        ) | |
|        ) | |
|     Plaintiffs,        ) | |
|        ) | Case No. 2:11-cv-005782-PD |
|     v.        ) | and all related cases |
|        ) | |
| SMITHKLINE BEECHAM CORPORATION | |
| ET AL.,        ) | |
|        ) | |
|     Defendants.        ) | |

**REPORT AND RECOMMENDATIONS OF THE SPECIAL DISCOVERY MASTER ON**
**MOTIONS FOR SANCTIONS AGAINST PLAINTIFFS' COUNSEL**

These are motions for sanctions in consolidated actions brought by 52 individual plaintiffs.  The three motions addressed in this Report are brought by one or more of the defendants[1] against the firm of Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), which represents or has represented all of the plaintiffs,[2] based on Hagens Berman's conduct in pursuing claims on behalf of three of the plaintiffs in these cases, Jack Merica, Lawrence Boiardi, and Roel Garza.   No sanctions are sought against those plaintiffs themselves, or against

---

[1] Three companies or groups of companies are defendants: GlaxoSmithKline LLC and GlaxoSmithKline Holdings (Americas) Inc. (collectively, with predecessors, referred to as "GSK"), Sanofi-Aventis U.S. LLC (with predecessors, referred to as "Sanofi"), and Grünenthal GmbH ("Grünenthal").  Only GSK and Grünenthal moved for sanctions.  However, GSK recently informed the Court that it has committed to withdraw its claims for sanctions contingent upon the occurrence of certain other events, as discussed more fully in § V of this Report.  Since the conditions precedent have not yet occurred, and conceivably might not occur, this Report will proceed as if GSK's prayers for sanctions were still before the Special Master.

[2] Hagens Berman represented all 52 plaintiffs, but has obtained or is seeking leave to withdraw its appearances for several of them.  Some other plaintiffs' claims have been withdrawn or dismissed with prejudice or disposed of by summary judgment.

plaintiffs' local Pennsylvania counsel.  I have been appointed Special Discovery Master in these cases pursuant to Fed. R. Civ. P. 53 with the duty, *inter alia,* to make reports and recommendations to District Judge Paul Diamond on sanctions matters.  Dkt. 256, 316, 396.

   After considering the briefs and evidence, and upon hearing in open court, I recommend that the motions be granted and that sanctions be imposed for the reasons more fully discussed below.

## I. Applicable Standards

   The sanctions motions are based on both 28 U.S.C. § 1927[3] and the inherent authority of courts to police their own proceedings and uphold the integrity of the civil justice system.  Those sources of the sanction power differ in certain respects.   Before sanctions can be assessed under Section 1927, the court must find that the attorney has "(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings," and that the attorney "d[id] so in bad faith or by intentional misconduct."  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002).   To assess attorneys' fees pursuant to the court's inherent power, the court must likewise make a finding of bad faith. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (explaining that a court may assess attorneys' fees pursuant to its inherent authority "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'"); *see also Prudential Ins. Co.*, 278 F.3d at 181.   Courts have a bit more

---

[3] Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

flexibility when assessing sanctions pursuant to their inherent power.  *See, e.g.*, *Ferguson v. Valero Energy Corp.*, 454 F. App'x 109, 114 (3d Cir. 2011) (when conduct is egregious and statutory remedies would not adequately compensate the party moving for sanctions, courts are not bound by the statutory limitations imposed on fees awarded under Section 1927).

Bad faith can be inferred when the claims pursued are clearly frivolous.  *See Prudential Ins. Co.*, 278 F.3d at 188 ("[F]indings that the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment" have been recognized as "[i]ndications of this bad faith."); *see also Loftus v. S.E. Pa. Transp. Auth.,* 8 F. Supp. 2d 458, 461 (E.D. Pa. 1998), *aff'd*, 187 F.3d 626 (3d Cir. 1999) ("When a claim is advocated despite the fact that it is patently frivolous or where a litigant continues to pursue a claim in the face of an irrebuttable defense, bad faith can be implied.").  Thus, for example, in *Matthews v. Freedman*, 128 F.R.D. 194, 206-07 (E.D. Pa. 1989), *aff'd*, 919 F.2d 135 (3d Cir. 1990), the court found that plaintiff's counsel acted in bad faith when he continued to pursue claims after being notified by defendants in a letter that the claims were barred by the statute of limitations.  *See also Alphonso v. Pitney Bowes, Inc.*, 356 F. Supp. 2d 442, 454 (D.N.J. 2005) ("[r]elentless pursuit of [inflated claims for lost earnings] after the evidence demonstrated, at most, a comparatively trivial amount of loss shows bad faith"); *McCandless v. Great Atl. & Pac. Tea Co.*, 529 F. Supp. 476, 478 (N.D. Ill. 1982), *aff'd*, 697 F.2d 198 (7th Cir. 1983) (sanctions because "[t]his lawsuit could have been avoided had [plaintiff's] counsel done the minimum amount of research required of a responsible member of the bar").

## II.    Background of All Cases:  Events Before April 12, 2014

The background of these and related cases, consolidated for discovery purposes and assigned to Judge Paul S. Diamond, is set forth in the District Court's recent opinion

granting summary judgment against another plaintiff, Edmund Andre.  *Johnson v. SmithKline Beecham Corp.,* ___ F. Supp. 3d _____, 2014 WL 5285943 (E.D. Pa. Oct. 16, 2014) ("*Andre* Opinion"); *see also* Dkt. 265 (July 14, 2014) (ordering summary judgment against Plaintiff Merica) ("*Merica* Opinion").  For convenience, I will summarize it here.

       Between 2011 and 2013, the 52 plaintiffs, all of whom were born in the late 1950s or early 1960s, brought claims against pharmaceutical companies that had manufactured or distributed the compound thalidomide.  All the plaintiffs alleged that they suffered from grievous birth defects caused by their mothers' ingestion of the drug thalidomide while plaintiffs were *in utero.*[4]

       With lawsuits coming 50 years or more after the claimed prenatal torts at issue, it must have been obvious that defendants were likely to assert that statutes of limitations had run.  Under Pennsylvania law, plaintiffs were free to ignore that likelihood and leave it to defendants to invoke that affirmative defense if they chose to do so.  *See, e.g.*, *Kyle v. McNamara & Criste*, 506 Pa. 631, 635 (1985).  Instead, plaintiffs' counsel, Hagens Berman, met the anticipated defense head-on with claims of fraudulent concealment that had tolled the statute:

> [E]vidence that only recently came to light based on extraordinary investigative efforts, reveals that the story authored by the Defendants that thalidomide did not cause injuries in the United States was not the truth.  Instead, it was a carefully constructed

---

[4] Most of these cases were initially brought in the Court of Common Pleas of Philadelphia County, Pennsylvania, and removed to this Court, and it was not until after the Third Circuit Court of Appeals upheld the District Court's removal jurisdiction in June 2013, *see Johnson v. SmithKline Beecham Corp.,* 724 F.3d 337 (3d Cir. 2013), that these cases, back in the District Court, were consolidated for discovery purposes.  *See Andre* Opinion at *1-*2.

story sold to the public to protect Defendants from having to accept responsibility for what they had done.[5]

* * *

D.    Defendants fraudulently convinced Congress and the public that thalidomide could not have caused injuries in the United States, falsely claiming that it was almost entirely unavailable in the United States and failing to disclose that testing on pregnant women here had resulted in the births of at least two malformed babies by 1958 . . . ."[6]

As noted by the Court in the *Andre* Opinion, "Plaintiffs alleged twenty specific false statements or fraudulent omissions that Defendants made respecting the safety and availability of thalidomide in the United States."   *Andre* Opinion at *2.

All 52 plaintiffs alleged fraudulent concealment as a basis for tolling the statute. And a subset of the plaintiffs (including Messrs. Boiardi and Garza, but not Mr. Merica) also

---

[5] Complaint, *Valerie  Spence, et al. v. Avantor Performance Materials*, No. 665 August Term 2012 (C.P. Philadelphia Aug. 9, 2012), removed and docketed at No. 12-cv-4542 (E.D. Pa. Aug. 9, 2012) (*"Merica* Complaint"), ¶ 4; Complaint, *Rebecca Alexander, et al. v. Avantor Performance Materials, et al.,* No. 419 August Term 2013 (C.P. Philadelphia Aug. 7, 2013), removed and docketed at 13-cv-4591 (E.D. Pa. Aug. 7, 2013) ("*Boiardi-Garza* Complaint"), ¶ 4.

[6] *Merica* Complaint Statement of Facts, § D; *Boiardi-Garza* Complaint Statement of Facts, § D.  *See also* Complaint, *Philip Yeatts, et al. v. SmithKline Beecham Corporation, et al.*, No. 3316 October Term 2011 (C.P. Philadelphia Oct. 27, 2011, removed and docketed at No. 11-cv-6711 (E.D. Pa. Oct. 27, 2011) ("*Andre* Complaint"), ¶ 1:

Plaintiffs suffer from severe birth defects caused by thalidomide, a drug given to their mothers in early pregnancy as a treatment for morning sickness. Until less than two years ago, Plaintiffs did not discover (and could not reasonably have discovered) that thalidomide caused their injuries.  Defendants' fraudulent concealment of their wrongdoing in the development of thalidomide – and its marketing, testing and distribution in the United States – tolled the limitations period for Plaintiffs' claims until the truth about Defendants' wrongful acts became known within the last year.

alleged a non-fraud theory for tolling.  They asserted that medical science had evolved, just lately, to the point where some of the plaintiffs could discover and conscientiously allege that thalidomide was the cause of their particular birth defects.  *See, e.g.*, *Boiardi-Garza* Complaint ¶¶ 21, 24.

Defendants did file Rule 12(b)(6) motions to dismiss, but Judge Diamond, obligated to accept the complaints' allegations as true for purposes of the motions, denied them without prejudice: "I cannot determine, at this early stage in the litigation, the viability of Plaintiffs' equitable tolling arguments."  Dkt. 92; *see Andre* Opinion at *2.

As discovery lurched forward, it quickly became apparent that Hagens Berman's pretrial investigation of its 52 clients' claims was decidedly less than perfect.  Less than two months after the Court's denial of the Rule 12(b)(6) motions, defendants learned that several of the plaintiffs could not sue for the simple reason that they had already done that once; indeed, in at least one instance, a plaintiff was continuing to receive monthly settlement payments from a defendant it was suing a second time for the same alleged tort.  *See* Dkt. 168 and exhibits.  For reasons that are not entirely clear, obtaining voluntary dismissals of those plaintiffs' claims took about four months and several angry demands from defendants' counsel.  *Id.*; Dkt 182.

Defendants' written discovery was aimed, in significant part, at the fraudulent concealment allegations and sought to learn which plaintiff claimed to have relied on which alleged fraudulent statement or conduct, and when that plaintiff  had sufficient knowledge to start the clock running on his or her duty to bring an action or at least investigate.  Defendants argued that plaintiffs were sidestepping discovery into those subjects, and defendants were right. The history of the discovery dispute is best summarized in the *Andre* Opinion:

Having put front and center the question of when Plaintiffs knew thalidomide may have caused their injuries, once discovery began, Plaintiffs repeatedly refused to provide an answer.  For instance, on October 22, 2013, Defendants propounded interrogatories asking each Plaintiff to "[i]dentify the date on which you contend you were first on notice of a thalidomide-related claim." (Doc. No. 137, Ex. A.)  Defendants also asked each Plaintiff to "[i]dentify . . . each alleged fact or document set forth in your Complaint which you contend was fraudulently concealed [and] identify how and when you first learned about each allegedly concealed fact or document."  (*Id.*)  All Plaintiffs collectively filed a single objection to these interrogatories, contending that because the inquiries were "premature and unduly burdensome," they would provide no substantive responses.  (*Id.*, Ex. B.)

After I ordered Plaintiffs to provide full and complete responses, each Plaintiff provided the identical response, purporting to rely on the "cumulative effect" of Defendants' "misrepresentations." (*See, e.g.*, Doc. No. 164, Ex. C.)  Because, as Plaintiffs themselves acknowledged in their Complaints, fraud must be pled with particularity, I ruled that because "[e]ach Plaintiff's claim of fraudulent concealment turns on her own knowledge," "each Plaintiff must provide verified individual responses disclosing each fact or document that was fraudulently concealed, and when Plaintiffs learned of these facts." (Doc. No. 166.)

On May 9, 2014, Defendants asked me to order Plaintiffs to comply with discovery requests respecting Plaintiffs' thalidomide-related online and social media communications and research. (Doc. No. 200.)  I granted the Motion and ordered Plaintiffs to provide individual responses by May 18.  (Doc. Nos. 206, 222.)  On June 12, Defendants presented compelling evidence that, contrary to my Orders (and Plaintiffs' discovery obligations), several Plaintiffs had failed to produce highly probative, relevant evidence, including online and social media posts revealing that some Plaintiffs have known for decades that thalidomide caused their birth defects.  (Doc. No. 232.)  Plaintiffs responded that they failed to produce these materials because, *inter alia:* (1) some Plaintiffs could not remember making the posts; (2) some Plaintiffs suffer from short-term memory loss; (3) in light of the volume of responsive documents, Plaintiffs' Counsel could not ensure accurate and complete discovery responses; and (4) the withheld posts were not responsive to Defendants' discovery requests. (Doc. No. 238.)

*Id*. at *3.  In their discovery motions, defendants had asked that all plaintiffs' cases be dismissed with prejudice as a sanction.   The Court declined to allow that extreme remedy, but appointed me as the Special Discovery Master with authority to oversee discovery and, if appropriate, make recommendations on sanctions requests by either side.  *Id*.

Earlier, as it became apparent that at least some plaintiffs' claims were deeply flawed, defense counsel had written to plaintiffs' counsel on March 26, 2014, and asked Hagens Berman to review the outstanding cases before the parties spent more time and money on continuing written and oral discovery.   Pressing the view that Hagens Berman's pre-suit investigation had been inadequate, and that none of the plaintiffs was able to "articulate any legitimate grounds for invoking fraudulent concealment," counsel – holding out both the carrot and the stick – went on to demand that Hagens Berman do an appropriate investigation immediately, before litigation expenses spun out of control:

> I would hope that plaintiffs' counsel would promptly proceed now, before additional expense is incurred, to undertake a careful review of the claims made in all these cases.  If there are others that you decide to dismiss, GSK will agree in any such case dismissed by April 11 to again bear its own costs.  However, for any cases which remain pending after that date, GSK will not agree to bear its own costs and is reserving its right to seek both costs and attorneys fees under all applicable rules and statutes.

Dkt. 310, Defendants' Motion for Sanctions as to Plaintiff Jack Merica, Ex. 10 (email).  As of the date of that letter, March 26, the battle over written discovery was at full boil, but only a handful of depositions had been taken.

The April 11 deadline came and went.   No cases were dismissed.   Massive deposition discovery went forward.   According to counsel for both sides, some 130 depositions

were taken between March 26 and my October 1 hearing (*see* Dkt. 364, Transcript of Hearing, Oct. 1, 2014 ("Tr."), at 65-66, 134), and more depositions were taken after that date.

### III.     The Present Sanctions Motions

As deposition discovery was taken, defendants jointly filed motions for summary judgment against plaintiffs Merica, Boiardi and Garza.   Dkt. 245, 258, 281.   Each of the motions is a detailed and meticulously documented collection of facts learned by defendants in their investigation and discovery.   In each case, after the motion was filed and briefed, Hagens Berman stipulated on behalf of its client to the entry of the requested summary judgment and the District Court entered judgment.   Defendants GSK and Grünenthal also moved for sanctions, which motions were referred to me.   I have entertained briefs and heard oral argument.   In each case, defendants seek sanctions only for conduct during the period after the April 11, 2014 deadline (the "Sanctions Period") announced in the March 26 letter.

It is important to note that each of the three present motions stands on its own, and seeks sanctions only for Hagens Berman's conduct with respect to the prosecution of a particular plaintiff's claims.   The Court has not been asked to impose sanctions based on Hagen Berman's conduct with respect to the claims of the other plaintiffs or conduct that related to all plaintiffs.  This will present some nice questions of apportionment discussed elsewhere in this Report and Recommendations.   *See infra.* § VI.

A.      **Jack Merica's Claim**

Mr. Merica's Complaint, like some but not all of the plaintiffs' complaints,

acknowledged that he had notice outside the statutory two-year period that he might be, in his

own words, a "thalidomider," but asserted that he was powerless to follow up on that suggestion,

and did not actually understand what it meant, until recently:

> 21.     Jack was told his mother took thalidomide for morning
> sickness  during  her pregnancy with Jack.
>
> 22.     Neither Jack nor his family knew the names of any
> companies responsible for the distribution of thalidomide in the
> USA.  With no clues to follow, Jack was left with no
> understanding of what it meant to be a thalidomider and no
> idea who was responsible for developing and distributing the
> drug, and the exact role of each defendant was not reasonably
> ascertainable in part due to acts of concealment set forth below.

*Merica* Complaint.[7]

But the actual facts unearthed in discovery were stunningly different.  As

observed by the District Judge:

> It is undisputed that: (1) Plaintiff's mother told him in the 1960s
> that thalidomide caused his injuries; (2) Plaintiff's mother told
> Plaintiff's doctors in the 1960s that thalidomide caused his
> injuries; (3) in the 1970s, Plaintiff asked his mother why she had
> not sued the doctor who prescribed thalidomide or the drug's
> manufacturer; (4) in 1983, Plaintiff filed a Social Security
> Disability application seeking benefits for thalidomide-caused
> injuries; (5) in 1990 or 1991, Plaintiff's mother gave him the bottle
> of thalidomide pills that she had taken while she was pregnant with
> him; (6) in 1992 – " thirty seconds" into their first date – Plaintiff
> told his now-wife that thalidomide caused his birth defects (May 9,
> 2014 Dep. of Yvonne Merica at 17); and (7) in 2000, Plaintiff gave

---

[7] The identical assertion is made on behalf of numerous plaintiffs in their complaints.
Mr. Merica's Complaint, like the others, identified the twenty acts of alleged cover-up or outright
mendacity mentioned in the *Andre* Opinion and quoted *supra.*

> an interview to WeMedia Magazine during which he stated that he
> had injuries caused by thalidomide.

*Merica* Opinion, Dkt. 265 at 1-2. (internal quotes omitted).[8]  The Court observed that "[t]he

record does not presently disclose how, in light of Plaintiff's decades-long knowledge that his

birth defects were caused by thalidomide, he could have alleged that defendants fraudulently

concealed that information from him.  The Special Discovery Master I have appointed in this

matter will presumably address this question."  *Id.* at 2.

      I address it now:  Mr. Merica's allegations – all verified by a Hagens Berman lawyer

rather than Mr. Merica himself – simply cannot be squared with the uncontested facts.  The

assertions that Mr. Merica had "no clues to follow" and "no understanding of what it meant to be

a thalidomider" are simply impossible to reconcile with the fact that his mother told him she had

taken thalidomide pills for her morning sickness, showed him the pills, and claimed that

thalidomide had caused his injuries.   They cannot be squared with his conversation with his

mother, some forty years ago, about suing the supposed prescribing physician or the supposed

manufacturer.   They cannot be squared with the fact that Mr. Merica had the opportunity to have

the pills tested to learn if they were in fact thalidomide, but failed to do so.   Nor could Mr.

Merica or his lawyers ever hope to persuade a reasonable juror that it was never possible, at any

point before 2011 (two years before he sued) for him to find out "who was responsible for

developing and distributing the drug."  In moving for summary judgment, defendants presented

extensive public information – magazine articles and the like from the 1960's, 1970's, and later,

---

[8] The Court also noted that Mr. Merica had lost track of the pills at some point, so they
are no longer in his possession.  *Id.*

in which the involvement of these defendants in the creation and distribution of the compound was widely and noisily publicized.[9]

   To be clear, if this were a motion under Rule 11, Hagens Berman's apparent failure to conduct adequate investigation before filing a suit on Mr. Merica's behalf might be an appropriate basis for a sanctions order.  That is not so under Section 1927.  But it does establish a context for examining the post-April 12, 2014 conduct that is in question on this motion.   By April 12, Hagens Berman knew or certainly should have known that the Mr. Merica's claim could not survive; the Hagens Berman lawyers knew or should have known they could not conscientiously embrace a theory of fraudulent concealment on Mr. Merica's behalf and so (as they would ultimately concede) he could not sue successfully.  As a result of Hagens Berman's failure to acknowledge the obvious flaws in Mr. Merica's case, defendants were put to the expense, after April 11, of deposing Mr. Merica, deposing his wife, and generally pursuing discovery into his story, as well as the expense of preparing and prosecuting their motion for summary judgment and their later motion for sanctions.

   And then Hagens Berman made it worse.  After throwing in the towel on Mr. Merica's claims, and after receiving a detailed and thoughtful review of the facts and law from the District Judge, Hagens Berman prolonged the proceedings and drove up their cost by opposing the imposition of sanctions on theories that mischaracterized the District Court's summary judgment opinion, mischaracterized the law, and even mischaracterized the Complaint Hagens Berman had written on Mr. Merica's behalf.

---

[9] The exhibits to the Merica summary judgment motion included copies of stories in the *Washington Post* (1962), *Life* (1962, 1968), *Saturday Review* (1962), The Reporter (1963), the *Los Angeles Times* (1972), the *New York Times* (1973) and others.  Dkt. 245, Exh. 11-16.

In resisting sanctions, counsel argued that Mr. Merica's case was winnable until, in their summary judgment motion, defendants suddenly interposed the Virginia statute of limitations, Va. Code § 8.01–230, as an alternative to the Pennsylvania statute 42 Pa. C.S. §§ 5524(2), 5542(7):  "Plaintiff Merica and his counsel filed a statement of non-opposition to the summary judgment motion solely because the discovery rule does not apply as to whether Mr. Merica's claims are untimely under Virginia law, which Defendants invoked for the first time in their summary judgment motion . . . ."  Dkt. 338 at p. 6.  Hagens Berman argued that Virginia law – unlike Pennsylvania law – does not provide a non-fraud "discovery rule" exception to the operation of the limitations clock, whereas Pennsylvania law does.  This is true, but in making this argument, Hagens Berman asserted three incorrect propositions:  First, that the "surprise" invocation of the Virginia statute of limitations violated a Pennsylvania statute;[10] second, that the loss of the case became inevitable (and therefore Merica surrendered) only because the Virginia statute took away his supposed non-fraud argument for tolling the statute; and third, that if the Pennsylvania statute and case law had been applied, Mr. Merica's evidence *would* have tolled the Pennsylvania statute.  Every one of those assertions is wrong.

First, the invocation of Virginia law as an alternative statute of limitations cannot have come as a surprise to attorneys as sophisticated as the Hagens Berman attorneys.[11]  The harms alleged by the 52 plaintiffs occurred in a number of different jurisdictions – the places

---

[10] Citing 42 Pa. C.S. § 5327(a):  "A party who intends to raise an issue concerning the law of any jurisdiction or governmental unit thereof outside this Commonwealth shall give notice *in his pleadings or other reasonable written notice*." (Emphasis added.)

[11] Hagens Berman describes itself on its web site as a "national plaintiff-focused law firm" boasting a cadre of highly respected and accomplished lawyers.  *See* Hagens Berman website, http://www.hbsslaw.com (last visited 12/3/14).

where thalidomide was prescribed or ingested – and the plaintiffs lived in a number of different jurisdictions at the times of their complaints; hence, the applicability of this, that or the other statute of limitations to a particular plaintiff's case has at all times been a relevant consideration. Mr. Merica and the nine other plaintiffs named in the *Merica* Complaint said they were born in several different jurisdictions and resided in still others.[12]   Defendants raised such statutes generally in their answers to the several complaints and plaintiffs were on fair notice that other states' statutes might be relied upon.[13]   Learned counsel also were obligated to understand, having chosen Pennsylvania as their forum, that a court applying Pennsylvania law must adopt the most restrictive limitations standard, *i.e.,* the law of the relevant jurisdiction that would be least amenable to extending the time for suit.  Pennsylvania has a "borrowing statute" that says "[t]he period of limitation applicable to a claim accruing outside this Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, *whichever first bars the claim*."  42 Pa. C.S. § 5521(b) (emphasis added).

Second – and bearing in mind that Mr. Merica's argument for tolling the statute was based entirely on a theory of fraudulent concealment – Virginia law *would* have recognized a tolling based on an actual 51-year fraudulent concealment, had there been one.  *See* Va. Code Stat. Ann. § 8.01-249; *Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 887, 891 (E.D. Va. 2010).

---

[12] The eleven plaintiffs on the *Merica* Complaint, for example, gave places of birth as being Louisiana, Ohio (two plaintiffs), California, North Carolina (two plaintiffs), Cuba, Mississippi, Germany, Texas and Maryland.  Hagens Berman mistakenly alleged that Mr. Merica was born in "Norfolk, California", hence, the omission of Virginia from the list.

[13] *See, e.g.*, GSK's Answer to the *Merica* Complaint, Dkt. 130, Affirmative defenses 2, 3, and 9, asserting that the eleven plaintiffs' claims were barred by "the applicable" statutes of limitations and repose, and that "Plaintiffs' claims are controlled by state or other applicable law other than the Commonwealth of Pennsylvania, and Plaintiffs fail to state any claim upon which relief may be granted under applicable state or other law."

Third, a court applying Pennsylvania's law instead of Virginia's would never have tolled the statute in Mr. Merica's case; indeed, the District Court has already made that clear. By the time Hagens Berman responded to the Merica sanctions motion, it had long since received the *Merica* Opinion, in which Judge Diamond reviewed the facts discussed earlier and held that Merica's claims were "time barred under both the laws of Pennsylvania (where Plaintiff brought suit) and Virginia (where Plaintiff's mother was prescribed the thalidomide)." *Merica* Opinion at 2.

A particularly distressing aspect of Hagens Berman's argument regarding the claimed differences in consequences between application of the Virginia and Pennsylvania statutes comes from Hagens Berman's after-the-fact attempt – and it simply cannot have been inadvertent – to argue that the opinion of its expert, submitted in cases other than Mr. Merica's and involving facts not relevant to Mr. Merica's case, should be taken into account. This can only be viewed as an attempt to divert the tribunal rather than assisting it. In resisting sanctions, Hagens Berman invokes a tolling theory that it did not employ and could not have employed in Mr. Merica's case because not even his pleaded facts – much less the actual facts gleaned in discovery – would have supported that theory. That is bad faith. Some background on Mr. Merica's claim in the context of all claims may be helpful:

As stated earlier, all 52 plaintiffs made claims of fraudulent concealment. But some of them (plaintiffs Boiardi, Garza and others) also claimed that there was a non-fraud-based reason why the statute should be tolled. The theory of that subset of plaintiffs' claims was that, until very recently, their birth defects would not have been viewed as thalidomide-related, but that the science had recently changed to include their developmental deficits. (Briefly, these deficits are said in the pleadings to be "unilateral" or "asymmetrical" rather than "bilateral." *See*

15

discussion of Mr. Boiardi's claim, *infra*).  In summary, all of the plaintiffs claimed "fraud tolling" while only some of them also claimed "non-fraud tolling."

Mr. Merica did not claim non-fraud tolling in his complaint.  Of the eleven plaintiffs who joined in the *Merica* Complaint, only three plaintiffs asserted that "the predominant medical view has for decades held that thalidomide did not cause the types of unilateral and asymmetrical limb reduction" from which they suffered, but that the science had changed.  *Merica* Complaint ¶¶ 16 (Valerie Spence), 19 (Kim Branscum), 45 (Kevin Randall). The other eight plaintiffs on this particular complaint tellingly omitted that allegation; their claims were based on "fraud tolling" alone.

And this was not just a matter of pleading; Mr. Merica plainly did not have the facts to support a non-fraud tolling claim.  He could not have made the "non-fraud tolling" assertion that his injuries would have been "excluded from the diagnosis" of thalidomide injury.  As he acknowledged in answering interrogatories, "[i]n the 1980's, Plaintiff applied for social security disability.  He represented that he was disabled as a result of thalidomide exposure because that is what his mother told him. *A doctor from health and human services examined Plaintiff and agreed*."  Dkt. 338, Plaintiff's Counsel's Opposition to Motion for Sanctions (Merica), Ex. 2, Merica Answers to Interrogatories, No. 5 (emphasis added).

In resisting sanctions, however, Hagens Berman has attempted – and again this is bad-faith advocacy – to leave the Special Master and the Court with the false impression that Mr. Merica *was* claiming non-fraud tolling, and *was* asserting claims that he simply had not made in his complaint or elsewhere:

> Defendants have made their argument for sanctions despite
> knowing full well the opinion that *Mr. Merica's expert* would have

16

> provided on statute of limitations issue if Mr. Merica had not had
> to dismiss his claims due to the application of Virginia law.

Dkt. 338, Plaintiff's Counsel's Opposition to Motion for Sanctions (Merica) at 13 (emphasis

added).  Hagens Berman goes on:

> Plaintiffs' expert has repeatedly opined in *cases similar to Mr.*
> *Merica's* that it is highly unlikely that a *person in Mr. Merica's*
> *position* would have been able to find supporting expert testimony
> until very recently

*Id*. at 17 (emphasis added).  These statements are just false.  The expert was not "Mr. Merica's

expert" and was not addressing cases "similar to Mr. Merica's," so far as the pleadings show.

The expert Hagens Berman is talking about, Dr. Stephens, had absolutely nothing to say about

the fraudulent concealment theory on which the Merica claim relied as the sole basis for tolling

the statute.  But somehow, Hagens Berman has now convinced itself that the non-fraud tolling

theory applies to *all* thalidomide plaintiffs, and that no alleged thalidomide victim, anywhere,

could have brought a suit until very recently:

> Defendants' argument conveniently ignores the expert opinion
> Plaintiffs have submitted in opposition to several other summary
> judgment motions, to the effect that until very recently, it would
> have been highly unlikely that *any plaintiff* would have been able
> to find an expert who could have confirmed that his injuries were
> consistent with thalidomide.

*Id*. at 14 (emphasis added).  Remarkably, Hagens Berman was willing to argue that, until very

recently, nobody could have sued for thalidomide injury because no expert could ever opine that

any injury was even consistent with thalidomide, much less caused by it.  But we know, of

17

course, that many, many thalidomide victims did sue and recover.  This, again, could not have been a good faith position.[14]

   And this leads to the second troubling aspect of the opposition to the sanctions motions.  Hagens Berman argues that the statute could not run because Mr. Merica did not *know* he was a "thalidomider" (although he told so many people that he was) and did not *know* who was responsible for his mother's receiving it.  In other words, they argue that a person who has a reasonable, informed belief that falls short of categorical certainty can insulate himself from the statute of limitations by carefully doing nothing about his belief.  That logic, of course, would make a shambles of the Pennsylvania discovery rule's requirement that a person who has reason to believe she is a victim of a tort has a duty to investigate; it would say – exactly opposite to the intention of the rule – that one can toll the statute indefinitely by *not* investigating.  The case most prominently relied upon by Hagens Berman in their briefs and at hearing, *Urland v. Merrell-Dow Pharm., Inc.*, contradicts this assertion that absolute knowledge is required before the duty to investigate kicks in:

> In Pennsylvania, the relevant inquiry for purposes of the statute of limitations is whether plaintiffs knew or reasonably should have known of the causal relationship between the injury and conduct causing that injury.  However, plaintiffs need not know that they have a cause of action or that the injury was caused by another party's wrongful conduct. Once a plaintiff possesses the salient facts concerning the occurrence of his injury and *who* or *what* caused it, he has the ability to investigate and pursue his claim.  In this case, plaintiffs were clearly aware of Merrell-Dow's

---

[14] In their Summary Judgment Motions, Dkt. 245, Exh. 16, defendants submitted a multi-page schedule of the thalidomide cases, some of which went to verdict, in which they were sued over the years beginning in 1962, including a case in which the Third Circuit affirmed this Court's dismissal on statute of limitations grounds.  That dismissal was 40 years ago.  *Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28 (3d Cir. 1975).

> identity and its connection with the drug, and thus the court's
> charge was not error.

822 F.2d 1268, 1275 (3d Cir. 1987) (internal citations and quotation marks omitted).  As the

Court of Appeals has explained, the law does not require certainty, but it does require common

sense and reasonable attention to one's affairs:

> [T]he discovery rule focuses not on "the plaintiff's actual
> knowledge, but rather on 'whether the knowledge was known, or
> through the exercise of diligence, knowable'" to the plaintiff.  A
> plaintiff therefore is obligated "to exercise reasonable diligence in
> ascertaining the existence of the injury and its cause."  As soon as
> the plaintiff either has discovered or, exercising reasonable
> diligence, should have discovered the injury and its cause, the
> statute of limitations begins to run.  Moreover, the plaintiff
> attempting to apply the discovery rule bears the burden of
> demonstrating that he exercised reasonable diligence in
> determining the existence and cause of his injury.  To demonstrate
> reasonable diligence, a plaintiff must "establish[ ] that he pursued
> the cause of his injury with those qualities of attention, knowledge,
> intelligence and judgment which society requires of its members
> for the protection of their own interests and the interests of others."

*Mest v. Cabot Corp.,* 449 F.3d 502, 511 (3d Cir. 2006) (internal citations omitted); *see Szpynda*

*v. Pyles,*  639 A.2d 1181, 1184 (Pa. Super. 1994) ("The discovery rule tolls the statute of

limitations until such time as a reasonably intelligent person (not an expert), exercising due

diligence, *should have some reason to suspect* that his injury might have been caused by [the

third party]." (emphasis added)).

And if ever there was a plaintiff who had, at the very least, *some reason to suspect*

that his injury might have been caused by a third party, Mr. Merica is that plaintiff.  Mr. Merica

and his mother understood that she had taken some pills, and they were subjectively certain that

those pills – those tiny, white, round pills in their orange-khaki bottle with a white top, and her

name on the label – were thalidomide.  Dkt. 245,  Exh. 1, Merica Deposition Tr. at 151-53.

19

Investigating the question whether the pills were or were not thalidomide and, if so, which manufacturer's or distributor's thalidomide, might have inculpated one or more of the defendants or, just as important in a fair system of civil justice, it might have *exculpated* one or more of them; instead, Mr. Merica (or his mother) let the opportunity slip away.  Today, of course, there is no way to answer that baseline question.  That Hagens Berman either failed in its duty of pre-suit investigation or disregarded its results is not a basis for the present sanctions motion, but Hagens Berman certainly protracted this litigation by failing – before or within a reasonable time after it realized that at least some of its client plaintiffs had no case – to learn the facts pertinent to Mr. Merica's situation, to recognize the shortcomings of his claim, to spare him and his spouse the burden of depositions and to spare defendants the cost of multiple attempts at written discovery, of those depositions, and of multiple rounds of motion practice.  Instead, Hagens Berman persisted in its insistence that Mr. Merica had "no clues to follow, . . . no understanding of what it meant to be a thalidomider and no idea who was responsible for developing and distributing the drug."

### B.      Lawrence Boiardi's Claim

If Mr. Merica's problem was that he did not follow up on the facts in his possession, Mr. Boiardi's problem was that he never had any facts to begin with and never tried to get them, and they have not turned up on their own.  He never had a scrap of information to suggest that his mother ingested thalidomide; the only evidence is to the contrary.  Even his injuries, according to his own Complaint, are inconsistent with the accepted scientific understanding of the mechanism of thalidomide injury.

Mr. Boiardi was an adopted child who never knew his birth mother.  Hagens Berman was unable to locate the mother before filing Mr. Boiardi's Complaint, but defendants

say they had no difficulty in finding her.  Defendants contacted Mr. Boiardi's mother, and she

told them she had not taken any medications during her pregnancy.  Dkt. 258.  When Plaintiffs'

counsel, Hagens Berman, then spoke with her, she told them she had no recollection of even

being pregnant or having a child.  What she has never said, so far as the record shows, is that she

did actually take thalidomide or any other medication during her pregnancy so many years ago.

Thus, the first critical link in the chain of possible culpability was never forged.  *Celotex v.

Catrett*, 477 U.S. 317, 320-23 (1986).

   That a child comes into the world with birth defects does not always mean that

thalidomide or any other artificial agent was the cause.  Neither the particular infirmities from

which Mr. Boiardi suffers nor any recent change in the state of scientific knowledge regarding

those infirmities provides any basis – or, more accurately, any better basis than might have been

at hand 20, 30 or 40 years ago – for an inference that he is a thalidomide victim.   Mr. Boiardi's

claims were based in part on the supposed fact that, because of recent advances in science, a

diagnosis of thalidomide causation for his particular birth defects became possible only within

the last couple of years.  Like several of the plaintiffs in his multi-plaintiff complaint, he alleged

as follows:

> That no doctor ever told him that his injury was thalidomide-
> related is not surprising – the predominant medical view has for
> decades held that thalidomide did not cause the types of unilateral
> and asymmetrical limb reduction from which Lawrence suffers.

*Boiardi-Garza* Complaint ¶ 21.  To excuse Mr. Boiardi's failure to sue earlier, the Complaint,

verified by a Hagens Berman lawyer, goes on to explain that

> [u]ntil recently, a universe of thalidomide related injuries has been
> . . .  excluded from diagnosis, including plaintiff's injuries. Only
> recently available studies published in medical and scientific
> journals, not customarily read by internists, reveal the flaws in the

orthodox medical opinion.  Armed with this knowledge, Lawrence
can now allege that his injuries were caused by thalidomide.

*Id.*[15]

If the mainstream scientific thinking had undergone a significant recent change,

such that a claim of causation that would have been dismissed two years earlier was now a viable

claim, Mr. Boiardi and others like might have an argument to avoid the statute of limitations.

*See Coleman v. Wyeth Pharm., Inc.*, 6 A.3d 502 (Pa. Super. 2010).  But the problem here is that

Mr. Boiardi has no more basis for bringing a claim of thalidomide injury now than he had two

years or fifty years ago.  As the District Court would later conclude in the *Andre* Opinion,

Hagens Berman and its expert have not been able to identify any such "recently available

studies."  At argument on the sanctions motions on October 1, this "new discoveries" theory was

pressed on the Discovery Master as good science.  Tr. Oct. 1 at 93-94.  By that point, however, if

not long before, it simply must have been obvious to Hagens Berman that there was nothing to

support it.  By October 1, the parties had fully briefed their positions in the then-pending

summary judgment motion that was before the District Judge in *Andre* .  Dkt. 245, 246, 258, and

281.  Hagens Berman's expert's opinion – championing the "recently available studies" theory –

had undoubtedly been reviewed and vetted by the lawyers before it was submitted to the District

_____

[15] For purposes of Mr. Boiardi's claim (and Mr. Garza's, discussed *infra*), it may be
noted that these "only recently available studies" would have to have become available in a very
narrow time band of less than three months in order for Mr. Boiardi's claim to have benefited
from the discovery rule.  If these revelations had swept onto the stage of scientific knowledge at
all, they must have surfaced before the initiation of another of the consolidated cases, because
nearly identical "only recently available studies" language is found in that verified complaint,
s*ee Andre* Complaint ¶¶ 14, 25, 32, 43, 47, 52, 59, filed just shy of two years before Mr.
Boiardi's case was filed.  To be consistent with both sets of verified allegations, that would mean
that this unspecified new science surfaced sometime between August 8, 2011 (two years before
Mr. Boiardi sued) and October 27, 2011 (the day Mr. Yeatts and his co-plaintiffs sued).  If it
came earlier, Mr. Boiardi's claim is time-barred.  If it came later, Mr. Yeatts was clairvoyant.

court on June 20, 2014, Dkt. 246.  Hagens Berman knew or should have known that the expert

would provide absolutely no support for the "recently available studies" theory.

   As the District Judge subsequently held in *Andre,* however, there simply is no

evidence of such "recently available studies" – that is, no evidence of a recent tectonic shift in

science's appreciation of thalidomide injury that would have served to save recent actions

brought under the discovery rule.  In the *Andre* Opinion, the District Court pointed out that the

Hagens Berman expert

> bases his recent revelation that thalidomide causes unilateral birth
> defects (from which Plaintiff suffers) on a 1964 study.  Dr.
> Stephens also avers that data from a 1969 study shows thalidomide
> resulted in "significant unilateral defects."  It thus appears that Dr.
> Stephens himself acknowledges that any "sea change" in medical
> thought on thalidomide occurred some 45 years before the date Dr.
> Stephens came to "appreciate[]" its significance. (Id. ¶ 22.)

*Andre* Opinion at *9 (internal citations omitted).  I am, of course, bound by the District Court's

finding with respect to the flagrant inadequacy of Dr. Stephens' opinion to the task of identifying

the "sea change," but any objective review of the evidence, even without such constraints, would

yield the same conclusion.  It is useful to compare the present facts with those of a case heavily

relied upon by Hagens Berman, *Coleman v. Wyeth Pharm.*  In *Coleman*, the Pennsylvania

Superior Court reversed statute-of-limitations-based summary judgments entered against women

who claimed that various hormone replacement therapy drugs ("HRT") had caused breast cancer.

In *Coleman,* unlike the present case, there had been a "sea change" in the scientific community's

perception of the link between HRT and breast cancer, triggered by a widely anticipated and

highly publicized Women's Health Initiative ("WHI") study, and the court concluded that it was

for the jury to decide whether, before the WHI study, the plaintiffs had sufficient "reason to

suspect that the injury was caused by a third party to impose a duty to investigate further."

*Coleman,* 6 A.3d at 511.  But the Superior Court was careful to distinguish a case that did not involve a dramatic new development in the scientific thought and as to which, as with thalidomide, the links between the product and the injury were well recognized:

> Nor do we find *Love v. Raymark Indus., Inc.,* 430 Pa. Super. 155, 633 A.2d 1185 (1993), relied upon by the trial court, applicable to the facts herein.  Mr. Love, unlike Ms. Coleman, *suspected* that his lung cancer was related to his occupational exposure to asbestos. Furthermore, the causal connection between lung cancer and occupational exposure to asbestos was "neither obscure nor unascertainable."  *Love,* at 1187.  On those facts we held that Love's failure to inquire of his physicians as to the results of his lung biopsy was unreasonable as a matter of law where the presence of asbestos would have confirmed the cause of his cancer.

*Coleman,* 6 A.3d at 520 (emphasis by the court).  In the present case, regardless of the state of Mr. Boiardi's thinking on whether thalidomide had anything to do with his injuries, the fact is that, in general, the causal connection between thalidomide and birth defects was "neither obscure or ascertainable."  Turning to the question whether someone whose injuries were not symmetrical or bilateral could ultimately sue successfully, Hagens Berman and its expert, Dr. Stephens, presented absolutely nothing to indicate that the answer to that question has changed in the last two years or so.  If a plaintiff would have been successful in bringing such a suit in, say, 1970, he could be equally successful today (except that the statute has run).  If the state of scientific knowledge were such that he would have lost his case in 1970, he would still lose it today on the merits (except, again, that the statute has run and he would not get to the merits). While the parties were being subjected to their long march of discovery and motion practice, there never was a point at which Hagens Berman had any basis for its "recently available studies" theory, based on the evidence it has brought to the Court's or my attention.

### C.      Roel Garza's Claim

As with the Merica and Boiardi cases, Hagens Berman consented to a final judgment only after putting the defendants through their paces – depositions, interrogatories, motion practice, and the like.

Mr. Garza suspected, beginning in his youth, that his birth defects might be traceable to medications his mother took during her pregnancy, but he simply never took the trouble to investigate further.  He never even asked his parents or other relatives about it.  He did nothing.  Like Mr. Boiardi, Mr. Garza claims that his developmental abnormalities are non-bilateral and asymmetrical, and points, with identical language, to the "recently available studies" theory that would be debunked by the District Court in dealing with Mr. Andre's case.

In open court at hearing on October 1, Hagens Berman agreed that, indeed, it should fairly reimburse defendants for at least some of their expenses attributable to his case:

> [I]n relation to Garza, let me make a concession so that there's at least one less thing you need to decide. And that is without conceding any bad faith, with the benefit of hindsight, it is plaintiff's view that they should have sought to dismiss this case prior to the depositions.

Tr. at 133-34.  Then, two days after the hearing and the agreement, Hagens Berman turned on a dime and argued against the *Garza*-based (and *Boiardi*-based) sanctions.

While counsel were in court at the October 1 hearing, a deposition on written questions of Gordon Forrer, M.D., was being conducted in Northville, Michigan.  Dkt. 410.  Dr. Forrer, now 92, had been an investigator when GSK was looking into the possibility of developing the drug for purposes other than morning sickness treatment, and his recollection of his and his institution's experimental use of thalidomide differs markedly from the detailed and substantially documented records that were reviewed by the FDA, fifty years ago, in its own

investigation of GSK's involvement with thalidomide.  By Dr. Forrer's present account, his institution accounted for a dramatically smaller percentage of the thalidomide pills distributed by GSK than GSK's and the FDA's records would reflect.  Hagens Berman immediately argued that sanctions should not be awarded in *Garza* or *Boiardi.*  The argument is that Dr. Forrer's testimony about the supposedly unaccounted-for thalidomide may mean that GSK was distributing the drugs someplace else, that there were pills not accounted for.  Hagens Berman further suggests that this information gets plaintiffs closer to establishing GSK's liability (in cases other than these cases, in which it has already surrendered).[16]

For several reasons, I decline Hagens Berman's invitation to reopen the question of whether sanctions should be imposed with respect to Mr. Garza or Mr. Boiardi.  First, agreements reached in open court should be honored.  More importantly, however, the inconclusive evidence now proffered by Hagens Berman is unequal to the task of showing good faith prosecution of the case on its part.  To be sure, Hagens Berman has identified a witness whose recollection is squarely at odds with GSK's evidence, and evidence undermining an adversary's credibility is usually a good thing to have.  But the essential reasons for the summary judgments in these three cases were that these three plaintiffs began their investigations several decades too late and, in the Boiardi and Garza cases, that they had no evidence that their mothers were ever exposed to thalidomide, and the essential reason why I recommend granting the sanctions motion is that the plaintiffs' lawyers behaved unreasonably in their efforts to avoid the consequences of the profound flaws in their clients' cases.  Messrs. Boiardi and Garza have

---

[16] *See* October 3 letter brief from Nick Styant-Browne (Hagens Berman) to Hangley, with exhibits (Dkt. 411); *see also* October 9 responsive letter brief from Michael Scott (GSK counsel) to Hangley, with exhibits (Dkt. 412); October 10 reply letter brief from Styant-Browne to Hangley (Dkt. 413).

conceded that they did not rely on any specific fraudulent conduct on defendants' part in delaying their investigations for half a century, and their alternative "new science" theory of tolling has been debunked by the District Court's findings in the *Andre* Opinion.  In other words, the evidence that Hagens Berman now wants to chase would not merely be useless to Messrs. Boiardi and Garza – their lawyers have already folded their tents – it also would not help Hagens Berman avoid sanctions for their improper conduct in prolonging these plaintiffs' cases.  If we speculate (we certainly cannot decide) that Dr. Forrer's present recollection matches what he would have remembered if he had been deposed several decades closer to the actual events, there appears no good reason why plaintiffs should not have obtained his testimony then, instead of now.  And, without for a moment casting doubt on Dr. Forrer's mental acuity or good faith, this most recent event demonstrates a reason why we have statutes of limitations.  Undoubtedly, GSK would have wanted to counter his fifty-year old memories with the testimony of other percipient witnesses, but virtually all of the once-available evidence relevant to Dr. Forrer's points is long gone or denatured by the passage of time.  One good reason for having statutes of limitations is to avoid such imprecision in our system of investigation, evidence-marshaling and adjudication. The GSK representatives who dealt with Dr. Forrer are not here to defend their own recollections; we do not even know what those recollections might be.  The FDA investigators who examined GSK's handling of thalidomide are also unavailable.[17]  All of that might have

---

[17] The Rule 31 deposition on written interrogatories, Dkt. 410, also points up the reasons why Rule 31 is rarely used.  From the record it appears that the only persons present were the court reporter, the witness, and his attorney; no representatives of the parties were in the room. There were no follow-up questions and, of course, no cross-examination.  A Rule 30 deposition is often the next best thing to live testimony.  This was not that.

been different if Messrs. Garza and Boiardi, or their families, had investigated their situations in a reasonable time frame.

And, at bottom, the simple fact is that taking Dr. Forrer's contested testimony as gospel would not get Hagens Berman all that much closer to actually having a case, with or without a statute of limitations problem.  If we assume for argument's sake that GSK failed to account for hundreds of thousands of thalidomide tablets, and that it did so to cover up its misdeeds, that would not allow a reasonable juror to conclude that any of those tablets found their way into the regimens of the two plaintiffs' mothers.  That is, of course, a critical element of the claims in these cases, *Celotex Corp. v. Catrett*, and the connection would still be far too speculative.

## IV.    General Findings Regarding Sanctions

I do find that, in each of these plaintiffs' cases, Hagens Berman's conduct has multiplied the proceedings in an unreasonable and vexatious manner, and that the conduct was both intentional and in bad faith.

Obviously, too, the conduct has taxed the defendants and the Court's resources enormously and without good reason.  But it should be noted that Hagens Berman's clients, the plaintiffs in these ill-starred cases, have also suffered from the firm's conduct.

In the District Court's Order of October 31, Judge Diamond discussed his correspondence from one of the plaintiffs, Ms. Bolton.[18]  Ms. Bolton's birth injuries, like those of all these plaintiffs, have undoubtedly been sources of all manner of pain over these past five decades and more.  Yet, judging by her conduct over the years, she was never led to believe, until recently, that she could blame a third party for her hurt, bring a claim, and recover some form of recompense.  That

---

[18] I voice no opinion on the merits of Ms. Bolton's still-pending case, or on the reasons why Hagens Berman moved to withdraw from its representation of her.

has changed; someone led her to believe passionately that she has a good and viable claim and that these defendants should make amends. Knowing that Hagens Berman wants to withdraw from her case, she has worked tirelessly to find a new lawyer to carry the litigation forward. She names sixty law firms that have turned her down, and still she believes she has a case worth bringing all these years after the event. She tells the Court that "[i]f counsel is permitted to withdraw, my claims will likely find no representation and would not be allowed the same justice that the remaining Plaintiffs are receiving," and says she could not represent herself *pro se* because "the consequences of losing this matter are so great." Dkt. 390.

False hope is a cruelty. Persuading a Merica, Boiardi or Garza to sue, without telling him that he has long since missed his main chance in litigation (if he ever had one), is not a kindness. And plunging forward in the face of overwhelming evidence that the claim cannot succeed, thereby subjecting the clients to the mortification of sitting for depositions and having the most painful threads of their personal lives picked at and teased out, is not what lawyers should do unless there is a genuine claim to pursue. Mr. Merica, Mr. Boiardi and Mr. Garza have had their hopes raised irresponsibly and then dashed, and there was never any good excuse for Hagens Berman's doing that. I will not consider those elements as Section 1927 "costs" or "expenses," but they certainly play a part in the bad faith calculus. *Cf. Macheska v. Thomson Learning,* 347 F. Supp. 2d 169, 182 (M.D. Pa. 2004) ("Because we believe that Jennings had a larger obligation than he fulfilled to Macheska, this Court, and most of all to Thomson, we will consider an award comprising at least part, if not all of the fees and costs incurred by Thomson.").

**V.      Defendants Entitled to the Benefit of Sanctions**

Grünenthal is entitled to recover an award of sanctions.  Grünenthal brought and has continued to pursue its motion for sanctions with respect to Hagens Berman's conduct respecting all three plaintiffs, Messrs Merica, Boiardi and Garza.  Dkt. 281, 310.

Equally clearly, Sanofi cannot recover sanctions with respect to Hagens Berman's conduct regarding these three plaintiffs.[19]  Sanofi joined in all three motions for summary judgment, but did not join with Grünenthal and GSK in moving for sanctions.  Indeed, in connection with the dismissal of Mr. Garza's claims, Sanofi stipulated that it would bear its own costs.  Dkt. 317.

The situation is more complicated with regard to GSK, which joined with Grünenthal in the sanctions motions and played a leading role in pursuing them.  GSK's lead counsel, Mr. Scott, carried the laboring oar in oral argument at the October 1 hearing and in resisting the Hagens Berman's post-hearing efforts described above.  But on October 28, 2014 (Dkt 394), GSK informed the District Judge as follows:

> All plaintiffs currently represented by Hagens Berman Sobol Shapiro LLP – with the sole exception of Debra Johnson – will dismiss with prejudice all claims against the GSK defendants. Contingent on the dismissals with prejudice, all discovery by all plaintiffs with respect to GSK, former SKF employees, and former SKF investigators will be deemed withdrawn; plaintiffs' motion for sanctions and to compel the 30(b)(6) deposition of GSK will be deemed withdrawn; and no further discovery will be initiated by plaintiffs in any case.  GSK, in turn, agrees to withdraw its pending sanctions motions and to forego any sanction payments which may be awarded or which have already been agreed to. This agreement shall not be characterized as a settlement of plaintiffs' claims; no

---

[19] This is not to suggest that Sanofi would not be entitled to pursue sanctions motions respecting the prosecution of other plaintiffs' claims by Hagens Berman; that issue is not before me.

> payments are being made by GSK. With respect to Debra Johnson,
> GSK's motion for summary judgment remains pending (Doc. No.
> 260), with both sides retaining all rights, including the right to
> appeal and the right to seek sanctions.

Dkt. 394, Letter from Michael Scott to Judge Diamond.  A motion pursuant to Rule 41(a)(2) for

voluntary dismissal of the case was later filed on behalf of 28 plaintiffs currently represented by

Hagens Berman.  Dkt. 409.

As reflected in an Order entered on October 31 (Dkt. 396) the District Court was,

in its own words, "disturbed by what has occurred" in light of a number of other recent events,

including the fact that there are several plaintiffs (not, apparently, included in the group of 28

identified in the Rule 41(a)(2) motion) with respect to whom Hagens Berman has moved for

leave to withdraw, and at least one has objected to Hagens Berman's withdrawal.  *Id*.[20]  The

Court, acting pursuant to Rule 53, has proposed a modification of my "task list" as Special

Master as follows:

> The Special Master, William T. Hangley, Esq. shall issue a Report
> and Recommendation on whether each Plaintiff (except Debra
> Johnson) knowingly, intelligently, and voluntarily consented to
> dismissing with prejudice his or her claims against the GSK
> Defendants – or any other Defendants.

*Id.*  Hagens Berman (speaking on behalf of "certain plaintiffs") has objected to the modification;

defendants have not objected.  Dkt. 397, 398 and 400.

Given that GSK's undertaking to drop its sanction claims is, according to GSK,

contingent on dismissals with prejudice on behalf of "all plaintiffs currently represented by

---

[20] Another of these "withdrawal plaintiffs" has more recently complained to the Court, but it is difficult to determine whether he is objecting to Hagens Berman's proposed withdrawal, to the GSK proposed settlement, or the proposed modification of the Special Discovery Master's assignment described in the accompanying text.  Dkt. 408.

Hagens Berman . . . with the sole exception of Debra Johnson," it is impossible to determine, at this point, whether GSK will or will not be entitled to recover sanctions.

## VI.        Measure of Sanctions for Grünenthal

In multiparty or other complicated cases, a challenge is to make sure that a respondent is sanctioned for his conduct in the particular matter.  Section 1927 is designed to "address[] the impact conduct has on the proceedings," and so "sanctions that are imposed under § 1927 must only impose costs and expenses that result from the particular misconduct."  *In re Prudential Ins. Co.*, 278 F.3d at 188.

Here, Hagens Berman should be sanctioned for its foot-dragging and evasiveness in connection with written discovery after the dawn of the Sanctions Period.  By April 12, Hagens Berman's belated investigation of its own clients' claims should have persuaded it to do what it would later do, surrender for lack of a plausible claim on behalf of Messrs. Merica, Boiardi or Garza, and the defendants were forced to incur enormous expense and inconvenience as a result.

In large part, I am sure, the expenses incurred by Grünenthal can be tied exclusively to its defense of one or more of the Merica, Boiardi and Garza claims, and should be recovered in full by Grünenthal.  They would include defendants' discovery of these three plaintiffs and of witnesses related solely to one of those plaintiffs' claims, the summary judgment motions, and the sanctions motions.  The case law makes clear that defendants are entitled to be reimbursed for their expenses of pursuing the present sanctions awards, including expenses incurred by counsel in briefing the motions and preparing for and participating in the October 1 hearing.  In *In re Tutu Wells Contamination Litigation*, 120 F.3d 368 (3d Cir. 1997), *overruled on other grounds by Comuso v. Nat'l R.R. Passenger Corp.*, 267 F.3d 331 (3d Cir.

32

2001), the Third Circuit rejected the sanctioned party's argument that costs and expenses associated with the sanctions hearings themselves should not be recoverable.  *Id.* at 387.  The court explained:

> The time, effort, and resources expended in bringing sanctionable conduct to light would have been unnecessary had the sanctionable conduct never occurred. These costs are as much a harm to a party in the litigation as is the delay in the litigation or the substantive prejudice caused by the conduct. If we exclude from a possible award the costs of sanctions proceedings, we would undermine the compensatory goal of a sanctions award.

*Id.* at 388.[21]

A closer question arises out of Hagens Berman's post-hearing attempt to relitigate the sanctions issues in *Boiardi* and *Garza* after the October 1 hearing based on the Forrer deposition testimony, but I conclude that Grünenthal's expenses in connection with that attempt should be reimbursed in full.  Although Hagens Berman's activities in conducting the Forrer discovery were surely part of a strategy aimed at many or all of the cases, the particular use of that discovery as a tool to pry open the Garza settlement and continue litigating Boiardi was entirely focused on those two motions.

Conversely, a good deal of Grünenthal's counsel's activities during the Sanctions Period that had nothing to do with these three plaintiffs' cases – depositions of plaintiffs other than Merica, Boiardi and Garza, for example – cannot fairly be considered at all in the context of these motions, and Grünenthal cannot be reimbursed for those expenses in connection with these motions.

---

[21] That *Tutu Wells* involved the Court's inherent powers to sanction rather than Section 1927 does not seem a significant distinction here.

But a large part of Grünenthal's lawyers' work during the Sanctions Period was undoubtedly devoted to matters that involved these three plaintiffs' claims and, also, the claims of as many as 46 other plaintiffs.   Examples include the defendants' continuing pursuit, after April 11, 2014, of responsive answers to written discovery; preparing for, attending and participating in and reviewing plaintiffs' depositions of defense witnesses; responding to plaintiffs' written discovery; and research that related to more claimants than just these three plaintiffs.  I have struggled to find dispositive authority on whether and how a court should go about apportioning such expenditures in the unique circumstances of these case, *i.e.*, cases in which there was a number of plaintiffs represented by the same attorneys, and in which the charged misconduct related to all or many of those plaintiffs and their claims, but defendants sought sanctions with respect to that misconduct only insofar as it involved a handful of those plaintiffs and their claims.

There is precedent, in a situation like this, for allocating a sanctions recovery to award petitioning counsel a percentage of their overall expenses.  *In re Silica Products Liab. Litig*., 398 F. Supp. 2d 563 (S.D. Tex. 2005), was an MDL in which virtually all 10,000 plaintiffs' cases were remanded to the Mississippi state courts, and only one action (100 cases) remained in the district court.  The court awarded sanctions equal to 1% of defendants' total expenses.  *Silica Products,* 398 F. Supp. 2d at 677-80.  And in a Rule 11 case where the liability claims were not found to pursued in bad faith, but the prayers for relief were frivolous and sanction-worthy, the Ninth Circuit approved the apportionment of expenses that appeared to relate to both subjects:

> The district court found that the damages prayer and the legal
> claims were so closely connected that it was appropriate to allocate
> 25% of the time spent investigating the claims to the sanction

> award.  It is reasonable to conclude that much of the time spent
> investigating the legal claims were interrelated with the frivolous
> prayers for relief, given the complexity of the legal claims. The
> district court acted well within its discretion in making this
> determination.

*Hudson v. Moore Bus. Forms, Inc.*, 898 F.2d 684, 687 (9th Cir. 1990); *accord Salstrom v. Citicorp Credit Servs., Inc.,* 74 F.3d 183, 185 (9th Cir. 1996), *cert. denied, Webb v. Citicorp Credit Servs., Inc.,* 519 U.S. 813 (1996) (upholding sanction apportionment where "the court did evaluate the costs and fees, concluding that 'at least 30% of the total defense costs can be attributed to [counsel's] reckless litigation of this matter'"); *see also In re Tutu Water Wells Contamination Litig*, 166 F.R.D. 331, 344 (D.V.I. 1996), *aff'd in relevant part*, 120 F.3d 368 (3d Cir. 1997) (dividing sanctions approximately equally between two sanctioned attorney groups); *In re Evergreen Sec., Ltd.*, 2008 WL 4716777, at *5 (Bankr. M.D. Fla. Feb. 8, 2008), *aff'd,* 391 B.R. 184 (M.D. Fla. 2008), *aff'd,* 570 F.3d 1257 (11th Cir. 2009) (same).

I recommend reimbursing Grünenthal for a small percentage, 3/49, of its fees and expenses on all its post-April 11, 2014 litigation expenses that were addressed to the litigation with one or more of plaintiffs other than Messrs. Merica, Boiardi and Garza, but also to these plaintiffs' claims.  Mindful that sanctions must be measured and imposed with caution, I have chosen as the denominator of this fraction the largest number of plaintiffs whose cases were pending at the beginning of the Sanctions Period,[22] divided by the number of plaintiffs whose claims are the subject of these motions.

I will submit a suggested form of order

---

[22] This reflects the dismissal of claims of the three plaintiffs who turned out to be repeat claimants.  As the litigation moved on, more plaintiffs dropped their cases or suffered summary judgment.  Those changes will not affect the 3/49 fraction.

1.    Awarding Grünenthal sanctions equal to

    a)    100% of its reasonable fees and expenses incurred solely in the Merica, Boiardi and Garza matters and

    b)    3/49 of its reasonable fees and expenses incurred on work that addressed the Merica, Boiardi and Garza matters as well as other plaintiffs' matters.

2.    Permitting Grünenthal  to submit detailed calculations of its fees and expenses in both separate categories within 21 days of the Court's approval or approval with modification of this Report and Recommendation and giving Hagens Berman 21 days in which to respond, after which I will make further recommended decisions.

3.    Holding in abeyance GSK's motions for sanctions.

The recommended determination will surely be a disappointment to Hagens

Berman, and probably affords Grünenthal less monetary relief than it might have hoped for.

Here, the observations of the *Silica Products* court are apt:

> It is worth noting that the amount of the sanction this Court ultimately orders, . . . while not insignificant, will be substantially less than the total amount of damages – some calculable and some not – Plaintiffs' counsel have caused by their filing of thousands of claims without a reliable basis for believing that every Plaintiff has been injured. However, the Court must confine itself to "the least severe sanction adequate to achieve the purpose of the rule under which it was imposed." *See Topalian v. Ehrman,* 3 F.3d 931, 937 (5th Cir. 1993). The Court trusts that this relatively minor sanction will nonetheless be sufficient to serve notice to counsel that truth matters in a courtroom no less than in a doctor's office.

*Silica Products*, 398 F. Supp. 2d at 679 (S.D. Tex. 2005).

             Respectfully submitted,


December 4, 2014           /s/ William T. Hangley
                  WILLIAM T. HANGLEY
                  SPECIAL DISCOVERY MASTER