IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GLENDA JOHNSON, et al.,               : | |
|         Plaintiffs,               : | |
| : | |
| v.                                    : | Civ. No. 11-5782 |
| : | and all related cases |
| SMITHKLINE BEECHAM                    : | |
| CORPORATION, et al.,                  : | |
|         Defendants.             : | |

**Diamond, J.**                                                                            **April 1, 2015**

## MEMORANDUM

In this products liability action, Debra Johnson alleges that over 50 years ago, thalidomide—a morning sickness medication manufactured and distributed by Defendants—caused her to suffer severe birth defects. Because the governing one-year limitations period has long expired, I will grant summary judgment and dismiss Plaintiff's claims as time-barred.

### I.     PROCEDURAL BACKGROUND

Ms. Johnson is one of fifty-two Plaintiffs born in the late 1950s or early 1960s who have brought thalidomide actions in this Court. I have recently set forth the lengthy history of this litigation. See Johnson v. Smithkline Beecham Corp., No. 11-5782, 2015 WL 1004308 (E.D. Pa. Mar. 9, 2015); Johnson v. SmithKline Beecham Corp., __ F. Supp. 3d __, 2014 WL 5285943 (E.D. Pa. Oct. 16, 2014). Briefly, Ms. Johnson initiated the instant action on September 24, 2012 in the Philadelphia Common Pleas Court against GlaxoSmithKline LLC, GlaxoSmithKline Holdings, Inc., and Grünenthal GmbH. (Case No. 12-5455, Doc. No. 1.) Plaintiff alleged negligence, negligent design, fraud, negligent misrepresentation, concert of action, and civil conspiracy against all Defendants, and negligent hiring and *alter ego* liability against Grünenthal only. (Id.)

1

Invoking diversity jurisdiction, Defendants removed to this Court, where the case was assigned to Judge Yohn.  Plaintiff (a Louisiana citizen) moved to remand, arguing that because the GSK Defendants' "nerve center" was in Pennsylvania, they could not remove the case under the "forum-defendant" rule.  (Doc. No. 20); see 28 U.S.C. § 1441(b) ("A civil action otherwise removable solely on the basis of [diversity] jurisdiction . . . may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."); Hertz Corp. v. Friend, 559 U.S. 77, 93 (2010) (for diversity purposes, a corporation's citizenship is determined by the location of its "nerve center").

On October 15, 2012, Judge Yohn placed the case in suspense pending the Third Circuit's review of my determination in a companion thalidomide case that GSK's "nerve-center" was in Delaware.  (Doc. No. 18.)  After the Third Circuit upheld my ruling, Judge Yohn denied Plaintiff's remand motion.  (Doc. No. 31); Johnson v. SmithKline Beecham Corp., 724 F.3d 337 (3d Cir. 2013).

On August 26, 2013, Defendants moved to dismiss Plaintiff's claims as time-barred under Pennsylvania and Louisiana law.  (Doc. No. 36.)  On September 9, Plaintiff filed the instant, Amended Complaint, in which she proceeds against only the GSK Defendants, alleging negligence, fraud, and negligent misrepresentation.  (Am. Compl., Doc. No. 41.)  Accordingly, on September 17, Judge Yohn denied Defendants' dismissal motion as moot.  (Doc. No. 43.)

On September 24, all thalidomide cases filed in this Court (including the instant case) were consolidated before me for pretrial purposes.  (Case No. 11-5782, Doc. No. 94.) Although the GSK Defendants did not move to dismiss the instant case, they did so in companion actions, arguing strenuously that because these Plaintiffs sustained their birth injuries half a century earlier, their claims were long time-barred.  (Doc. Nos. 74, 86.)  I denied their Motions because I

could not determine at the Rule 12 stage "the viability of Plaintiffs' equitable tolling arguments." (Doc. No. 92 ¶ 4.)

The Parties have now completed discovery in all but a few cases. As I have discussed, when it became apparent that Counsel for all Plaintiffs, Hagens Berman Sobol Shapiro LLP, was obstructing discovery, on June 17, 2014, I appointed William T. Hangley as Special Master. Johnson, 2014 WL 5285943, at *3-4. On December 4, 2014, Mr. Hangley found that Hagens Berman's bad faith and dishonesty in prosecuting the claims of three thalidomide Plaintiffs warranted the imposition of sanctions pursuant to 28 U.S.C. § 1927 and the Court's inherent authority. Johnson v. SmithKline Beecham Corp., No. 11-5782, 2014 WL 6851277 (E.D. Pa. Dec. 4, 2014) (Hangley, Special Master). On March 9, 2015, I overruled Hagens Berman's objections to Mr. Hangley's Report and Recommendation and agreed that sanctions should be imposed. Johnson, 2015 WL 1004308. Mr. Hangley is presently preparing a Report that will include his calculation of recommended sanctions.

The GSK Defendants filed the instant Motion for Summary Judgment on July 3, 2014. (Doc. No. 260.) Plaintiff responded, GSK replied, and Plaintiff submitted supplemental responses. (Doc. Nos. 283, 315, 367, 376.)

On October 28, 2014, the GSK Defendants informed me that "[a]ll [P]laintiffs currently represented by Hagens Berman—with the sole exception of Debra Johnson—will dismiss with prejudice all claims against the GSK [D]efendants" (leaving their claims against the other Defendants in litigation). (Doc. No. 394.) In exchange, the GSK Defendants agreed to withdraw their discovery requests and not to seek sanctions against Hagens Berman. (Id.) GSK and the firm formalized this agreement on November 14 in a joint Motion for Voluntary Dismissal. (Doc. No. 409.)

3

In light of my concerns as to whether these Plaintiffs had actually agreed to dismiss their claims against GSK (or whether Hagens Berman had prevailed upon them to agree so that the firm could avoid further sanctions), I ordered Mr. Hangley to determine "whether each of the twenty-eight Plaintiffs referenced in the November 14th Motion for Voluntary Dismissal knowingly, voluntarily, and intelligently consented to dismissing with prejudice his or her claims against the GSK Defendants—or any other Defendants." (Doc. No. 420 (internal citations omitted).) Those matters are pending before Mr. Hangley.

With respect to Ms. Johnson, however, GSK's summary judgment motion "remains pending . . . with both sides retaining all rights, including the right to appeal and the right to seek sanctions." (Doc. No. 394.) Accordingly, I now consider the GSK Defendants' summary judgment motion and all related submissions. (Doc. Nos. 260, 283, 315, 367, 376.)

## II. FACTUAL BACKGROUND

I have resolved all disputed facts and made all reasonable inferences in Plaintiff's favor.

Plaintiff was born on February 23, 1959 on England Air Force Base in Alexandria, Louisiana. (Am. Compl. ¶ 16.) Her birth injuries are extensive and grievous. She has bilateral radial clubbed hands. (Id.) She is missing her right thumb. (Stephens Decl. ¶ 7, Doc. No. 283.) Although she has a left thumb, "there [is] no bony attachment to the rest of her hand." (Id.) Because she has no radius in her right arm, her right forearm is four inches long. (Am. Compl. ¶ 16.) She has a shortened left radius. (Stephens Decl. ¶ 7.) She has worn braces to straighten her arms, and has had multiple surgeries, including 1966 procedures to remove an inguinal hernia and to create "two thumbs out of her index fingers." (Id.; Am. Compl. ¶ 16.) She also has a "scoliotic curvature of the spine and pectus excavatum of the anterior chest." (Stephens Decl. ¶ 7.)

4

Although Plaintiff was "ashamed" of her birth defects, she never discussed her condition with her family, her friends, or any of her doctors. (Johnson Dep. at 66-71.) After overhearing her mother, Doris Williams, tell others that "this is how God made [Plaintiff]," "that became [Plaintiff's] answer to anyone" who would ask about her injuries. (Id. at 66.)

Since Plaintiff was a "young child," Ms. Williams believed she knew what had caused her daughter's birth defects. (Williams Dep. at 13-15, 19-24.) During her pregnancy, Ms. Williams's doctor prescribed her "experimental . . . pills . . . from Germany" to treat her morning sickness. (Id. at 22-24.) Because Ms. Williams had not taken these pills during her pregnancies with her three older children—who had no birth defects—she believed the "pills were responsible for [Plaintiff's] condition." (Id. at 13-15.) Ms. Williams became even "more confident" that the pills caused Plaintiff's injuries after the doctor who performed Plaintiff's corrective surgeries in the 1960s told Ms. Williams some time before 1968 that other women who "had taken pills from Germany" gave birth to children with similar injuries. (Id. at 29-30.) Ms. Williams and her husband (who died in 1978) never investigated further and took no legal action because they "usually don't sue people." (Id. at 20-21; Johnson Dep. at 34.)

On February 13, 2012, when Ms. Williams was eighty and Plaintiff was fifty-two, Ms. Williams first explained to Plaintiff what had caused her birth injuries. (Williams Dep. 11-12.) Plaintiff testified that she had not previously spoken with anyone about the cause of her injuries. (Johnson Dep. at 67-71.) After Ms. Williams told Plaintiff that she had taken a drug from Germany to treat her morning sickness, Ms. Williams apologized to Plaintiff, saying that "I believe it was the medicine that affected you." (Id. at 73-77.)

In the late 1970s, Plaintiff took her medical records from England Air Force Base (where she was born and underwent corrective surgeries), after she learned that those records would be

5

removed to "a cave somewhere" if she did not retrieve them. (Id. at 10-11.) Yet, she did not look at the records—in which her injuries were described as, *inter alia*, "congenital" (i.e., present at birth) and "bilateral"—until after she spoke with her mother in February 2012. (Id. at 85-93; Doc. No. 402, passim.) Upon reviewing the records, speaking with her son (a medical student at the time), and doing Internet research, Plaintiff initiated this action on September 24, 2012. (Johnson Dep. at 85-93.)

A mother herself, Plaintiff was aware before February 2012 that the ingestion of medicine during pregnancy can cause birth defects, but "never . . . thought about" whether such medicine might have caused her birth injuries. (Id. at 60-62.) Although Plaintiff feels "misled" by her parents regarding the cause of her injuries, she does not blame anyone for failing to bring suit sooner. (Id. at 82-83.)

**III.   STANDARDS**

I may grant summary judgment "if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must initially show the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). An issue is material only if it could affect the result of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). I "must view the facts in the light most favorable to the nonmoving party," and make every reasonable inference in that party's favor. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). If I then determine that there is no genuine issue of material fact, summary judgment is appropriate. Celotex, 477 U.S. at 322.

Summary judgment is appropriate where the moving party shows that there is an absence of evidence to support the nonmoving party's case. Id. at 325. Where a moving party identifies

6

an absence of necessary evidence, the nonmoving party "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). I may consider only record evidence that would be admissible at trial. Celotex, 477 U.S. at 324; Gonzalez v. Sec'y of Dep't of Homeland Sec., 678 F.3d 254, 262 (3d Cir. 2012).

## IV.   DISCUSSION

At summary judgment I am obligated to credit Plaintiff's testimony that for over 50 years after her birth in 1959, she never inquired as to the cause of her injuries, nor discussed their possible cause with her parents, her doctors, or anyone else. It is nonetheless apparent that the record, no matter how favorably construed to Plaintiff, confirms that her claims are time-barred.

### A.   Relation-Back

For limitations purposes, I must deem Plaintiff's September 9, 2013 Amended Complaint as having been filed on September 24, 2012, when Plaintiff filed her Original Complaint. See Fed. R. Civ. P. 15(c)(1)(B) ("An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading."); Garvin v. City of Phila., 354 F.3d 215, 220 (3d Cir. 2003) ("If the amendment relates back to the date of the filing of the original complaint, the amended complaint is treated, for statute of limitations purposes, as if it had been filed at that time.").

### B.   Governing Law

The Parties agree that Louisiana's one-year statute of limitations applies here. (Doc. No. 260 at 15; Doc. No. 283 at 5.) I will nonetheless conduct a choice of law analysis.

7

Because Plaintiff's claims arose in Louisiana but were filed in Pennsylvania, the Pennsylvania borrowing statute applies. See Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am., 693 F.3d 417, 432 (3d Cir. 2012) (court sitting in diversity applies the forum state's choice of law rules). That statute requires me to apply the "the law of the place where the claim accrued or . . . the law of [Pennsylvania], whichever first bars the claim." 42 Pa. Cons. Stat. § 5521(b). I must consider each state's statute of limitations and rules governing accrual and tolling. Frankentek Residential Sys., LLC v. Buerger, No. 12-767, 2014 WL 1623775, at *4 (E.D. Pa. Apr. 24, 2014).

Although Pennsylvania and Louisiana have analogous accrual and tolling doctrines, Louisiana's one-year limitations period would bar Plaintiff's claims before Pennsylvania's two-year period. Compare 42 Pa. Cons. Stat. § 5524(2), (7) (two-year statute of limitations), Wilson v. El-Daief, 964 A.2d 354, 361 (Pa. 2009) (claim accrues when injury is inflicted), and Fine v. Checcio, 870 A.2d 850, 858-61 (Pa. 2005) (describing Pennsylvania tolling doctrines), with La. Rev. Stat. Ann. § 3492 (one-year limitations period), Titus v. IHOP Rest., Inc., 25 So. 3d 761, 763 (La. 2009) (claim accrues on "the day of injury or when the damage is sustained"), and Marin v. Exxon Mobil Corp., 48 So. 3d 234, 245-53 (La. 2010) (describing Louisiana's tolling doctrines). Accordingly, I will apply Louisiana law. Frankentek, 2014 WL 1623775, at *4 ("Pennsylvania's limitations period applies . . . unless the foreign jurisdiction's laws, including laws on tolling and the date of accrual, bar the claim first.").

**C. Accrual**

Louisiana's one-year personal injury limitations clock begins to run on "the day of injury or when the damage is sustained." Titus, 25 So. 3d at 763 (citing La. Rev. Stat. Ann. § 3492). The state's minor tolling statute, which stops the limitations clock until the minor plaintiff

8

reaches eighteen, does not apply retroactively to revive claims, like Plaintiff's, that were time-barred before its enactment in 1992. Chance v. Am. Honda Motor Co., 635 So. 2d 177, 178-79 (La. 1994); see also Urland v. Merrell-Dow Pharms., Inc., 822 F.2d 1268, 1276 (3d Cir. 1987) (Pennsylvania's minor tolling statute, enacted in 1984, does not apply retroactively). Because Plaintiff sustained her injuries at birth, the statute began to run in 1959. Accordingly, the Louisiana statute of limitations bars Plaintiff's claims unless she can toll the limitations clock until September 24, 2011—one year before she initiated this lawsuit. See Specialized Loan Servicing, LLC v. January, 119 So. 3d 582, 585 (La. 2013).

### D. Burden of Persuasion

Under Louisiana law, the statute of limitations is an affirmative defense that usually must be proven by its proponent with clear and convincing evidence or by an evidentiary preponderance. See Terrebonne Parish Sch. Bd. v. Mobil Oil Corp., 310 F.3d 870, 877 (5th Cir. 2002); Wells v. Zadeck, 89 So. 3d 1145, 1149 (La. 2012); Netherland v. Ethicon, Inc., 813 So. 2d 1254 (La. Ct. App. 2002). Louisiana courts have also held, however, that when it is evident from the face of a complaint that a claim is time-barred, it is the plaintiff's burden to prove the action is timely. See Wells, 89 So. 3d at 1149-50 (plaintiff's burden where his contract law claim, which was subject to a ten-year limitations period, was brought fifteen years after the claim accrued); Whitnell v. Menville, 540 So. 2d 304, 307-08 (La. 1989) (plaintiff's burden in medical malpractice action that was filed outside the applicable limitations period), cited with approval Campo v. Correa, 828 So. 2d 502, 509 n. 10 (La. 2002); see also Frank v. Shell Oil Co., 828 F. Supp. 2d 835, 842 (E.D. La. 2011) (plaintiff's burden where wrongful death claim was filed eight years after decedent's death).

9

Because it is evident from the face of the Amended Complaint that Plaintiff's claims are time-barred, she must prove that they are not. Even if I assume, however, that the GSK Defendants must prove with clear and convincing evidence that Plaintiff's claims are untimely, Defendants have met that burden.

### E. Discovery Rule

Plaintiff contends that she first learned the cause of her injuries on February 13, 2012, and that neither she nor her mother had any reason to suspect before this date that thalidomide was the cause. Accordingly, she believes the "discovery rule" tolled the limitations clock until February 13, 2012—less than one year before she filed suit on September 24, 2012. See Davis v. Johnson, 36 So. 3d 439, 441-42 (La. Ct. App. 2011) (under Louisiana law, the limitations clock starts when a plaintiff, in the exercise of reasonable diligence, "discovers or should have discovered the facts upon which his cause of action is based" (citing Wimberly v. Gatch, 635 So. 2d 206, 211 (La. 1994)); Renfroe v. State ex rel. Dep't. of Transp. & Dev., 809 So. 2d 947, 953 (La. 2002) (in making this determination, "a plaintiff [is] deemed to know what he could by reasonable diligence have learned"). For the following reasons, I do not agree.

#### 1. Imputation of Mother's Knowledge

Ms. Williams has long believed that the German morning sickness drug she took while pregnant with Plaintiff caused Plaintiff's birth defects. (Williams Dep. at 12-30.) The GSK Defendants argue that the discovery rule does not toll the Louisiana limitations clock because Ms. Williams's knowledge is imputed to Plaintiff. (Doc. No. 260 at 16-17; Doc. No. 315 at 2-5.) Plaintiff disagrees, contending that in determining whether the limitations period is tolled, I should consider only whether Plaintiff—not her mother—knew or reasonably should have known thalidomide caused her birth injuries. (Doc. No. 283 at 9.)

10

Plaintiff is incorrect. As the GSK Defendants observe, Plaintiff effectively asks me to apply the Louisiana minor tolling statute retroactively to 1959. (Doc. No. 315 at 2-5.) Once again, Louisiana law does not permit retroactive application. See Chance, 635 So. 2d at 178-79; Urland, 822 F.2d at 1276 (same under Pennsylvania law).

Minor tolling statutes preclude the imputation of a parent's knowledge to his or her minor child for limitations purposes. Upon application of such a statute, the governing limitations period is tolled until the plaintiff reaches the age of majority and can then decide whether to bring suit. Not surprisingly, Plaintiff bases her non-imputation argument entirely on decisions in which a minor tolling statute applied. See Duncan v. Leeds, 742 F.2d 989, 991-93 (6th Cir. 1984); Squires ex rel. Squires v. Goodwin, 829 F. Supp. 2d 1041, 1058 (D. Colo. 2011); Tanaka v. First Hawaiian Bank, 104 F. Supp. 2d 1243, 1247 & n.1 (D. Haw. 2000); Ohler v. Tacoma Gen. Hosp., 598 P.2d 1358, 1360-61 (Wash. 1979) (en banc), superseded by statute on other ground as recognized in Sahlie v. Johns-Manville Sales Corp., 663 P.2d 473, 475 (Wash. 1983). Because Louisiana's minor tolling statute does not apply here, however, these decisions are inapposite.

Absent retroactive application of Louisiana's minor tolling statute, Ms. Williams's knowledge is imputed to Plaintiff. See Griffin v. Kinberger, 507 So. 2d 821, 823-24 (La. 1987) (limitations clock started when plaintiff's mother read a newspaper article suggesting defendants caused plaintiff's birth defects); Sharkey v. Sterling Drug, Inc., 600 So. 2d 701, 713-715 (La. Ct. App. 1992) (whether discovery rule tolls the limitations clock turns on grandparents' knowledge respecting their grandchild's illness). Accordingly, I must determine whether that knowledge was sufficient to start the running of Louisiana's one-year limitations clock.

As I have discussed, once a plaintiff "discovers or should have discovered the facts upon which his cause of action is based," the limitations clock begins to run. Davis, 36 So. 3d at 441-42. "A plaintiff is deemed to know what he could have learned by *reasonable diligence*." Renfroe, 809 So. 2d 947 at 953 (emphasis added); see also Chevron USA, Inc. v. Aker Mar., Inc., 604 F.3d 888, 894 (5th Cir. 2010) ("[W]hen a plaintiff suspects something is wrong, he must seek out those whom he believes may be responsible for the specific injury."). Under Pennsylvania and Louisiana law, the exercise of reasonable diligence "may require one to seek further medical examination as well as competent legal representation." Cochran v. GAF Corp., 666 A.2d 245, 249 (Pa. 1995); see also Marin, 48 So. 3d at 251 (no tolling where plaintiffs would have learned about their cause of action within the limitations period had they, *inter alia*, "hired an expert" sooner); Touchet v. Baker Hughes Inc., 737 So. 2d 821, 825 (La. Ct. App. 1999) (where information "is available to plaintiff through inquiry or professional medical or legal advice, . . . the facts and cause of action are reasonably knowable") (citations omitted).

Ms. Williams herself refutes Plaintiff's allegation that her mother did not have any reason to suspect that thalidomide caused Plaintiff's birth injuries. As I have discussed, Ms. Williams testified that since her daughter was a "young child," she suspected that "experimental . . . pills . . . from Germany" caused her daughter's birth injuries. (Williams Dep. at 13-15, 22-24). Her suspicions were confirmed by her daughter's doctor, who told Ms. Williams in the 1960s that other women who "had taken pills from Germany" gave birth to children who had injuries similar to Plaintiff's. (Id. at 29-30.)

At the very least, these suspicions obligated Ms. Williams to exercise reasonable diligence in ascertaining the cause of her daughter's injuries. See Chevron, 604 F.3d at 894 ("[W]hen a plaintiff suspects something is wrong, he must seek out those whom he believes may

12

be responsible for the specific injury."). Plaintiff testified that once her mother told her that German morning sickness medicine likely caused her birth defects, it took her weeks to determine that the medicine was thalidomide and several months bring this lawsuit. (Johnson Dep. at 72-90.) The record well demonstrates that, given the widespread knowledge concerning thalidomide and birth defects, even a cursory investigation by Ms. Williams would similarly have revealed that the "experimental" German medicine prescribed to treat her morning sickness was thalidomide. (Doc. No. 260, Exs. 2-10, 14-16.) A lawyer would have advised Ms. Williams as to potential avenues of relief. Ms. Williams and her husband chose not to take any further action, however, because they "usually don't sue people." (Id. at 20-21.) As I observed in Mr. Andre's case, "[t]his is no diligence at all, especially compared with that demonstrated by the numerous plaintiffs who brought thalidomide personal injury actions against Defendants decades before" September 24, 2011. See Johnson, 2014 WL 5285943, at *10.

**2. Plaintiff's Failure to Exercise Reasonable Diligence**

Even if I do not impute Ms. Williams' knowledge to her daughter, Plaintiff's claims remain time-barred. As I have discussed, Plaintiff undertook some investigation in the late 1970s when she retrieved her medical files—which include her birth records—from England Air Force Base. Yet, she did not look at those records for over 30 years—until 2012. Had she done so earlier, she would have discovered her injuries were "congenital" and "bilateral"—conditions that Plaintiff's expert witness opines have long been associated with thalidomide exposure. See Johnson, 2014 WL 5285943, at *7; Stephens Decl. ¶ 13. Moreover, she did not even attempt to learn the cause of her injuries: she did not speak with family members, friends, doctors, nurses, lawyers, or anyone else about her condition. She testified that as a mother herself, she knew birth defects could result from a mother's ingestion of drugs during pregnancy, yet she never

investigated whether this might have caused her injuries. Once again, even a cursory inquiry would have provided Plaintiff with abundant information concerning the connection between thalidomide and her birth defects. (Doc. No. 260, Exs. 2-10, 14-16.) According to Plaintiff, however, only after her mother's February 13, 2012 disclosure did she inquire as to the cause of her injuries. Because that diligence came decades too late, it did not toll Louisiana's limitations clock from 1959 until September 24, 2011. See Renfroe, 809 So. 2d at 953 (the discovery rule does not toll the limitations clock if a plaintiff's "ignorance is attributable to [her] own . . . neglect" (citations omitted)).

### 3. Plaintiff's Expert

Plaintiff also argues that the limitations clock was tolled for some five decades because before September 24, 2011, "medical expert testimony did not exist . . . to support her claim that thalidomide caused her particular injuries." (Doc. No. 283 at 32.) In support, she offers the expert affidavit of Trent Stephens, Ph.D., who examined her on an undisclosed date. (Stephens Decl. ¶ 8.) I have previously ruled that even if Dr. Stephens's opinion passed muster under Daubert (which it may well not), it is nevertheless inadmissible, contradictory, and otherwise incompetent. See Johnson, 2014 WL 5285943, at *9; cf. Johnson, 2014 WL 6851277, at *12-13, approved and adopted, 2015 WL 1004308 (Mr. Hangley's rejection of Dr. Stephens's testimony). For the following reasons, Dr. Stephens's declaration and the arguments Plaintiff bases on the declaration are deficient.

*The Limitations Clock is not Adequately Tolled*

Dr. Stephens avers that Plaintiff could not have brought suit until September 4, 2011 because, before that date, she could not have found an expert to testify that thalidomide caused her birth defects. (Stephens Decl. ¶ 16.) To preserve her claims, however, the Louisiana

limitations clock must have been tolled until *September 24, 2011*—one year before she filed her Original Complaint.  Dr. Stephens does not address whether Plaintiff could have brought suit before that date.  If the one-year limitations clock had started to run on September 4, 2011 (when Dr. Stephens suggested Plaintiff could have found an expert), Plaintiff's claims would nonetheless have been untimely when she filed them more than one year later, on September 24, 2012.

*The Expert Opinion is Contradictory and Refuted by Undisputed Record Evidence*

Although Dr. Stephens opines that expert testimony would not have been available to Plaintiff before September 2011, he also avers that medical science has for decades associated Plaintiff's arm and hand injuries, scoliosis, and inguinal hernia with thalidomide exposure:

- "Thenar hypoplasia/aplasia and radial hypoplasia are common defects seen with thalidomide," citing a 1962 study;

- "Scoliosis was among the first defects identified as being associated with thalidomide embryopathy," citing another 1962 study; and

- "Ignuinal hernia [is] one of many congenital defects associated with thalidomide exposure," citing a 1992 study.

(Stephens Decl. ¶¶ 11-13, 16.)  In thus contradicting himself, Dr. Stephens confirms that medical knowledge has undergone no recent change respecting the connection between thalidomide and the birth defects from which Plaintiff suffers.  As I observed in Mr. Andre's case, "[i]t thus appears that Dr. Stephens himself acknowledges that any sea change in medical thought on thalidomide occurred some 45 years [ago]."  Johnson, 2014 WL 5285943, at *9 (internal quotation marks omitted).

The long-known causal relationship between thalidomide exposure and Plaintiff's birth injuries is further confirmed by overwhelming record evidence that since the early 1960s the

American public has known that thalidomide causes serious birth defects.  (See Doc. No. 260, Exs. 2-10, 14-16); see also Johnson, 2014 WL 5285943, at *9.

In these circumstances, Dr. Stephens's "expert" opinion is insufficient to defeat summary judgment.  See Elec. Ins. Co. v. Estate of Marcantonis, 755 F. Supp. 2d 632, 636 (D.N.J. 2010) (expert witness report unsupported by the record was insufficient to defeat summary judgment); Stein v. Foamex Int'l, Inc., No. 00-2356, 2001 WL 936566, at *7-8 (E.D. Pa. Aug. 15, 2001) (striking from the summary judgment record an expert witness's affidavit that contradicted his expert report and deposition testimony); cf. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 290 (3d Cir. 2012) ("When an expert opinion is not supported by sufficient facts . . . , or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." (quoting Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993))).

In sum, the record refutes Plaintiff's contention that the discovery rule tolled the limitations clock for over 50 years.

### F.  Fraudulent Concealment

Plaintiff pled that the GSK Defendants fraudulently concealed both the extent of thalidomide's distribution in the United States and its dangerousness.  (Am. Compl. ¶¶ 4, 8-10, 132(1-8).)  Purportedly relying on those misrepresentations—whose falsity "was recently uncovered due to extraordinary investigative efforts"—Plaintiff refrained from suing Defendants.  (Id. ¶ 15.)  Plaintiff argues that this detrimental reliance tolled Louisiana's one-year limitations clock until at least September 24, 2011.  (Doc. No. 283 at 39-42.)  Yet, the record—including Plaintiff's own testimony—refutes these allegations.

*The Fraudulent Concealment Doctrine*

The limitations clock is tolled where "(1) the defendant engages in conduct which rises to the level of concealment, misrepresentation, fraud or ill practice, . . . (2) the defendant's actions effectually prevented the plaintiff from pursuing a cause of action, . . . and (3) the plaintiff [was] reasonable in his or her inaction."  Marin, 48 So. 3d at 252.

As Defendants have shown, Plaintiff has not identified a single misrepresentation on which she relied to her detriment.  On the contrary, she explicitly denied that Defendants misled her:

> [GSK Counsel]: Is there anyone [other than your parents] who you feel has misled you in causing you not to file your lawsuit until 2012?
> [Plaintiff]: No.

(Johnson Dep. 83.)  This is not surprising: she also testified that until she filed suit in September 2012, she did not know of—and thus could not have relied upon—any of Defendants' purported misrepresentations respecting the distribution and dangerousness of thalidomide.  (Id. at 85.)  Indeed, she testified that it is not anyone's fault she did not bring suit sooner.  (Id. at 82-83.)

Because Plaintiff's failure to proceed for over five decades had nothing to do with the GSK Defendants' purported misrepresentations, the fraudulent concealment doctrine does not toll the limitations clock.

*Changing Louisiana Law*

Like Mr. Andre, Plaintiff urges a theory of fraudulent concealment that has scant legal support, no evidentiary support, and would not revive her time-barred claims.  (Doc. No. 283 at 39-42); see Johnson, 2014 WL 5285943, at *11-12.  Although Plaintiff acknowledges that Louisiana law applies, she cites only Pennsylvania case law in support of this dubious argument.  (Doc. No. 283 at 5, 39-42.)

17

I am obligated to apply substantive state law, not change it.  Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).  Louisiana and Pennsylvania courts have uniformly held that the fraudulent concealment doctrine applies only if the defendant communicates its misrepresentations directly to the plaintiff.  See, e.g., Nathan v. Carter, 372 So. 2d 560, 563 (La. 1979) (fraudulent concealment where "defendants threatened [plaintiff] with termination of her compensation benefits if she ever contacted an attorney"); Doskey v. Hebert, 645 So. 2d 674, 680 (La. Ct. App. 1994) (fraudulent concealment where defendant "repeatedly assured" plaintiffs that their termite problem was "nothing to be concerned about"); Baselice v. Franciscan Friars Assumption BVM Province, Inc., 879 A.2d 270, 278-79 (Pa. Super. Ct. 2005) (no fraudulent concealment based on "general and systematic conduct exhibited by the Archdiocese with regard to its offending priests").  Accordingly, federal courts applying Louisiana and Pennsylvania law have held the same.  See, e.g., Cross v. Alpha Therapeutic Corp., No. 94-382, 2000 WL 1140491, at *5 (E.D. La. Aug. 11, 2000) (no fraudulent concealment because defendant did not "definitely" and "directly" communicate its misrepresentations to plaintiff); see also Mest v. Cabot Corp., 449 F.3d 502, 517 (3d Cir. 2006) (no fraudulent concealment under Pennsylvania law in the absence of communications between the parties); Ciccarelli v. Carey Canadian Mines, Ltd., 757 F.2d 548, 556-57 (3d Cir. 1985) (no fraudulent concealment where plaintiffs produced evidence of only "an industry-wide conspiracy to conceal the hazards of asbestos exposure"); Speicher v. Dalkon Shield Claimants Trust., 943 F. Supp. 554, 558-59 (E.D. Pa. 1996) (same).

Plaintiff concedes that the GSK Defendants never communicated their misrepresentations directly to her.  (Doc. No. 283 at 39-42.)  She nonetheless argues that the doctrine should apply if she relied on any of Defendants' misrepresentations that reached her indirectly.  Even though state courts have never so held, I am prepared, as I was in Mr. Andre's case, to assume here that

Plaintiff's detrimental reliance on Defendants' indirect representations respecting thalidomide would toll the limitations clock. See Johnson, 2014 WL 5285943, at *11-12. Yet even this unprecedented alteration of the fraudulent concealment doctrine would not save her claims. The allegations in her Complaint notwithstanding, there is no record evidence that she refrained from investigating her injuries or from suing Defendants because of their purported misrepresentations, whether direct or indirect. See Marin, 48 So. 3d at 252 (defendant's action must, *inter alia*, "effectually prevent[ ] the plaintiff from pursuing a cause of action"). Indeed, as I have discussed, she testified that she was unaware of *any* misrepresentations made by Defendants. (Johnson Dep. at 85.) Once again, she also testified that she did not blame anyone for her failure to investigate or commence litigation sooner. (Id. at 82-83.)

During the October 1, 2014 sanctions hearing before Mr. Hangley, Hagens Berman vigorously denied Defendants' suggestion that the firm did not speak with its clients before filing suit on their behalf. (Doc. No. 383 at 105, 107.) If Hagens Berman spoke with Plaintiff before initiating the instant suit, however, I am at a loss to understand how, consistent with the Code of Professional Conduct, the firm could have included allegations of fraudulent concealment in her Complaint. See Pa. R. Prof'l. Cond. 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."). In any event, because the record does not make out Defendants' fraudulent concealment under any formulation of the doctrine, Plaintiff's claims remain time-barred.

### G. Causation

Defendants persuasively argue that Plaintiff has produced no admissible evidence showing that her mother ingested thalidomide provided by SmithKline Beecham. (Doc. No. 260

at 24-33.) In light of my determination that Plaintiff's claims are time-barred, however, I need not address this argument.

### H. Additional Discovery

Like Mr. Andre, Plaintiff asks me to defer ruling on summary judgment until she can take further discovery respecting thalidomide's domestic distribution. (Doc. No. 283 at 47-49; Doc. No. 367); Fed. R. Civ. P. 56(d). This additional discovery (once again) "has nothing to do" with Plaintiff's equitable tolling contentions. See Johnson, 2014 WL 5285943, at *13. Assuming, *arguendo*, thalidomide was "somehow more or less available domestically," it would not alter her mother's long-held belief that "experimental . . . pills . . . from Germany" caused her birth injuries; it would not cure Plaintiff's lack of diligence; it would not create "misrepresentations" from Defendants that Plaintiff relied upon to her detriment. Id. Accordingly, I will deny Plaintiff's request.

### V. CONCLUSION

Because Defendants have demonstrated with clear and convincing evidence that Plaintiff's claims are time-barred, I will dismiss her Complaint. An appropriate Order entering Judgment on all claims in favor of Defendants and against Plaintiff follows.

*/s/ Paul S. Diamond*

April 1, 2015                                                    Paul S. Diamond, J.