**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GLENDA JOHNSON, et al.** | : | |
| | : | |
| v. | : | **Civ. No. 11-5782** |
| | : | |
| **SMITHKLINE BEECHAM** | : | |
| **CORPORATION, et al.** | : | |

<u>**MEMORANDUM**</u>

**Diamond, J.**                                                                    **May 19, 2015**

Between 2011 and 2014, fifty-two Plaintiffs brought suit alleging that thalidomide—a morning sickness drug manufactured and distributed by Defendants—caused them to suffer severe birth defects in the 1950s and 1960s.  Special Master William Hangley seeks to interview thirty-two of the Plaintiffs to determine whether they consent to the proposed termination of their claims.  Although Mr. Hangley has not yet asked a single question—indeed, no interviews have even been scheduled—Plaintiffs' counsel, Hagens Berman Sobol Shapiro LLP, objects, threatening to seek mandamus relief unless, by May 18, I either prohibit the interviews altogether or limit the questions Mr. Hangley may ask to those Hagens Berman has authorized.  (Doc. No. 502.)  Hagens Berman raises this objection only after Mr. Hangley has recommended the imposition of sanctions because of the firm's dishonesty and bad faith—a recommendation I have accepted.  (Doc. No. 414); <u>Johnson v. SmithKline Beecham Corp.</u>, 2015 WL 1004308 (E.D. Pa. Mar. 9, 2015).  Because Hagens Berman's objections to Mr. Hangley's proposed interviews are premature or otherwise meritless, I will overrule them.

## I.      BACKGROUND

I have previously described the extensive procedural history of this litigation.  <u>Johnson v. SmithKline Beecham Corp.</u>, 2014 WL 5285943, at *1-5 (E.D. Pa. 2014 Oct. 16, 2014); <u>Johnson</u>

1

v. SmithKline Beecham Corp., 2015 WL 1476386, at *1-2 (E.D. Pa. Apr. 1, 2015).  I will set out

here the events germane to Hagens Berman's objections to Mr. Hangley's Orders.

***Plaintiffs Invoke Equitable Tolling***

In ten separate state court actions, Plaintiffs brought negligence, negligent design, and

related claims.  Defendants removed to this Court, where the cases were assigned to several

judges, including me.  After the Third Circuit upheld my refusal to remand, all the cases were

consolidated before me for pretrial purposes.  (Doc. No. 81); Johnson v. SmithKline Beecham

Corp., 724 F.3d 337, 340 (3d Cir. 2013).

Anticipating Defendants' motions to dismiss, Plaintiffs pled with particularity that

Defendants' fraudulent concealment and, in some cases, the discovery rule tolled the two-year

limitations clock.  Accordingly, I denied Defendants' dismissal motions in September 2013,

noting that "I cannot determine, at this early stage in the litigation, the viability of Plaintiffs'"

tolling allegations.  (Doc. No. 92.)

***Discovery Misconduct***

Defendants then repeatedly and unsuccessfully sought to learn when each Plaintiff knew

or reasonably should have known that thalidomide had caused his or her birth defects.  As I have

described, Plaintiffs provided no responses, misleading "collective" responses, or absurd

responses to Defendants' discovery requests.  See Johnson, 2014 WL 5285943, at *3-4; Johnson,

2015 WL 1004308, at *1-2.  By June 2014, it was apparent that Plaintiffs had violated my

discovery orders and had failed to produce highly probative evidence—including online posts

that some Plaintiffs have known for decades that thalidomide caused their birth defects.  (Doc.

No. 232.)  Accordingly, with the Parties' agreement and in accordance with Rule 53, on June 26,

2014, I appointed William Hangley as Special Discovery Master.  (Doc. No. 256); Fed. R. Civ.

P. 53(b)(1).

### *Defendants Threaten Sanctions*

As discovery proceeded, it became apparent that many of Plaintiffs' cases were badly

flawed.  As Mr. Hangley explained,

> [D]efendants learned that several of the [P]laintiffs could not sue for the simple
> reason that they had already done that once; indeed, in at least one instance, a
> [P]laintiff was continuing to receive monthly settlement payments from a
> [D]efendant it was suing a second time for the same alleged tort.

(Doc. No. 414 at 6.)

On March 26, 2014, Defendants GlaxoSmithKline and Grünenthal urged Hagens Berman

"to undertake a careful review of the claims it made in all these cases."  (Doc. No. 310, Exs. 10-

11.)  GSK and Grünenthal offered to bear their own costs for cases Plaintiffs agreed to dismiss

before April 11.  (Id.)  For cases "which remain pending after that date," however, GSK and

Grünenthal "reserved [their] right[s] to seek both costs and attorneys' fees under all applicable

rules and statutes."  (Id.)  Hagens Berman did not agree to dismiss any case before April 11,

2014, and the Parties proceeded with "massive" deposition discovery.  (Doc. No. 414 at 8.)

In July and August, 2014, GSK and Grünenthal filed Motions for Summary Judgment

against three Plaintiffs.  (Doc. Nos. 258, 281, 310.)  Invoking 28 U.S.C. § 1927 and the Court's

inherent authority, they also asked me to sanction Hagens Berman for the firm's bad faith

prosecution of these obviously time-barred matters.  With the Parties' agreement, I referred these

Motions to Mr. Hangley.  (Doc. No. 316.)

### *Hagens Berman Takes Its Leave*

With Mr. Hangley's appointment, it became apparent that Plaintiffs were going to be

compelled to produce evidence to support their equitable tolling and fraudulent concealment

allegations.  In fact, no such evidence exists.  Around this time, Hagens Berman began seeking to dismiss cases or to withdraw as counsel.  On July 25, 2014, Hagens Berman submitted stipulations of voluntary dismissal in two cases.  (Doc. Nos. 284, 285.)  On August 1, 2014, the firm asked to dismiss a third case and moved to withdraw from representing another Plaintiff.  (Doc. Nos. 301, 302.)  On August 14 and 15, 2014, Hagens Berman sought to dismiss four more cases.  (Doc. Nos. 317, 319, 320, 321.)  Between August 21 and 29, 2014, Hagens Berman moved to withdraw from two cases and asked me to dismiss one.  (Doc. Nos. 331, 342, 343.)  Two more voluntary dismissals came on September 26, 2014 and October 14, 2014.  (Doc. Nos. 360, 368.)  In sum, between the time I appointed Mr. Hangley to oversee discovery—when it became apparent that each Plaintiff would have to disclose when he or she knew or should have known that thalidomide caused his or her injuries—and October 14, 2014, Hagens Berman sought to dismiss ten cases and moved to withdraw from three others.  In asking to withdraw, Hagens Berman informed me that it could not, consistent with its obligations under the Rules of Professional Conduct, continue to prosecute these actions.  (See, e.g., Doc. No. 342 ("Plaintiffs' counsel seek[s] to withdraw solely because professional considerations require that they withdraw.").)

On October 16, 2014, I granted Defendants' Motion for Summary Judgment against Plaintiff Edmund Andre.  Johnson, 2014 WL 5285943.  At his deposition, Mr. Andre admitted that, contrary to the allegations in his Complaint, he had not relied on any alleged misrepresentation made by any Defendant.  Id. at *11.  Accordingly, he could not show fraudulent concealment.  Again directly contradicting his own pleadings, Mr. Andre also admitted that he had known for some forty years before commencing suit that thalidomide had

caused his birth defects.  Id. at *5, 10.  Accordingly, I ruled on October 16, 2014 that Mr. Andre had not exercised reasonable diligence as required by the discovery rule.

Several days later, Hagens Berman sought to withdraw from representing two more Plaintiffs.  (Doc. Nos. 375, 382.)

***Plaintiffs "Settle" with GSK***

On October 22, 2014, I received a letter from Terrie Bolton in which she asked me, *inter alia*, to deny the firm's pending Motion to Withdraw from her case.  (Doc. No. 390.)  She stated: "If counsel is permitted to withdraw, my claims will likely find no representation and would not be allowed the same justice that the remaining Plaintiffs are receiving [in these cases]."  (Id.) She concluded she could not represent herself because, *inter alia*, "the consequences of losing this matter are so great."  (Id.)  On October 23, 2014—one day later—Hagens Berman asked me to stay "all [thalidomide] actions in their entirety—with the exception of [the six] pending summary judgment motions and [the three] pending sanctions motions" until twenty-one days after I decided all pending summary judgment motions.  (Doc. No. 388.)  I denied the request that same day.  (Doc. No. 389.)

On October 28, 2014, I received a letter from the GSK Defendants, stating that "[a]ll [P]laintiffs currently represented by Hagens Berman—with the sole exception of Debra Johnson—will dismiss with prejudice all claims against the GSK [D]efendants." (Doc. No. 394.) In exchange, GSK would withdraw all their discovery requests and sanctions motions and forgo any current or future sanctions payments.  (Id.)  GSK further stated that "[t]his agreement shall not be characterized as a settlement of [P]laintiffs' claims" because "no payments are being made by GSK."  (Id.)

These events were disturbing, to say the least.  As Mr. Hangley's orders issued and Defendants sought sanctions, Hagens Berman went from vigorously litigating Plaintiffs' claims, to withdrawing some cases on a piecemeal basis, to proposing wholesale dismissal of the claims of all remaining Plaintiffs.  The proposed dismissal came five days after Hagens Berman requested a stay of these cases.  (Doc. No. 388.)  The proposed dismissal came six days after Plaintiff Terrie Bolton (who, I was subsequently informed, apparently was not subject to the October 28th Agreement) emphasized her desire to continue with her litigation.  (Doc. No. 390.) Under the proposed Agreement, Plaintiffs would dismiss their claims only against GSK; their litigation against the other Defendants would continue.  The only benefit GSK conferred was its commitment not to seek sanctions against Hagens Berman.

### The "Settlement" Is Referred to Mr. Hangley

On December 4, 2014, Mr. Hangley found that Hagens Berman's bad faith and dishonesty in prosecuting the claims of three thalidomide Plaintiffs warranted the imposition of sanctions.  (Doc. No. 414.)  Mr. Hangley made this recommendation—which I have accepted— after conducting a hearing at which Hagens Berman acknowledged that its misconduct warranted the imposition of sanctions in one of these cases.  (Doc. No. 383, Tr. 10/1/14 at 133-34); Johnson, 2015 WL 1004308.  Mr. Hangley is presently calculating the amount of sanctions to be imposed.

Four days later, on December 8, 2014, over Hagens Berman's objection, I referred to Mr. Hangley the question whether the twenty-eight Plaintiffs subject to the GSK-Hagens Berman October 28th Agreement had knowingly, intelligently, and voluntarily consented to dismissing their claims against GSK.  (Doc. No. 420.)

To help him resolve the consent question, on December 10, 2014, Mr. Hangley suggested that he provide each Plaintiff with a questionnaire.  (Doc. No. 430 at 3.)  Hagens Berman objected to *any* inquiry, stating that the firm could "assure [Mr. Hangley] that Plaintiffs' counsel would never have sought to dismiss anyone's claim if counsel did not know that the Plaintiffs had consented willingly after being fully informed."  (Doc. No. 425 at 2.)  Mr. Hangley explained that he could not place his "entire reliance" on "Hagens Berman's expressed confidence in the sufficiency of its undescribed disclosures to its clients or its assurances that the [twenty-eight] plaintiffs have all knowingly agreed to an arrangement that is so facially disadvantageous to them."  (Doc. No. 430 at 6.)  Accordingly, Mr. Hangley concluded that he "must make plaintiff-by-plaintiff inquiries," and invited the Parties to assist in crafting appropriate procedures.  (Id. at 7.)  Noting that the October 28th Agreement appeared to confer a benefit only on Hagens Berman—and not its clients—Mr. Hangley also asked for briefing on whether Hagens Berman has a conflict under Rule 1.7(a)(2) of the Pennsylvania Rules of Professional Conduct.  (Id.)

The Parties subsequently moved to dismiss the claims of four additional Plaintiffs against all Defendants (not just GSK).  (Doc. Nos. 440, 468.)  Again, over Hagens Berman's objection, I referred these matters to Mr. Hangley to evaluate Plaintiffs' consent.  (Doc. Nos. 471, 485.)

On April 1, 2015, I granted Defendants' Motion for Summary Judgment as to Plaintiff Debra Johnson, whose claims were not covered by the October 28th Agreement.  Johnson, 2015 WL 1476386.  Once again, the evidence eventually produced in discovery contradicted Ms. Johnson's pleadings and demonstrated that her claims (which accrued in the 1960s) were time-barred.  Hagens Berman filed a Notice of Appeal on April 28, 2015.  (Doc. No. 494.)

*Hagens Berman Seeks to Preclude Interviews*

On May 6, 2015, Mr. Hangley ordered Hagens Berman to submit by May 19, 2015 a proposed schedule of Plaintiffs' phone interviews that could be completed by June 30, 2015. (Doc. No. 498.)   On May 8, 2015, Hagens Berman asked Mr. Hangley to stay this Order, indicating that it would be filing objections with me, "and seeking interlocutory review or petitioning for a writ of mandamus, if necessary."  (Doc. No. 499.)  The firm argued that there is no basis for Mr. Hangley's inquiry, which would abrogate the attorney-client privilege.  If Mr. Hangley insisted on the interviews, Hagens Berman proposed a list of six permissible questions that "could be asked without invading the privilege."  (Id.)  For the four Plaintiffs dismissing their claims against all Defendants, Hagens Berman proposed three different questions.  (Id.)

After denying the stay request, Mr. Hangley issued a Procedural Memorandum describing how he expected to conduct the interviews.  (Doc. Nos. 500, 501.)  He emphasized that he would take special care not to ask about privileged communications:

> I will advise each of the testifying plaintiffs that I do not want to know—and she must not tell me—what her attorney said to her, but that I am interested in learning the facts she knows (regardless of where or how she learned those facts), her own appreciation of her claims, and her reasons for deciding to drop those claims.

(Doc. No. 501 at 2.)  Accordingly, the interviews would cover the Plaintiffs': (1) "understanding of their claims"; (2) "understanding of the consequences of dropping their claims"; and (3) "the facts and circumstances that they, the plaintiffs, took into account in deciding to drop their claims."  (Id.)  Mr. Hangley refused to limit his questions to those proposed by Hagens Berman. Mr. Hangley stated that although he expects to rule on counsel's objections, in his discretion, he might ask me to consider an objection.  (Id.)

To date, Hagens Berman has not made any of the thirty-two Plaintiffs available, and not a single interview has taken place.

On May 11, 2015, Hagens Berman filed the instant objections to Mr. Hangley's Procedural and Scheduling Orders respecting the interviews.  (Doc. No. 502.)  The firm admonishes that if I do not rule on the objections within a week or if I overrule the objections, Hagens Berman "will petition for a writ of mandamus from the Third Circuit."  (Id. at 2.)  Alternatively, Hagens Berman asks me to stay the interviews and certify an interlocutory appeal on the question of whether Mr. Hangley may "inquire into attorney-client communications."  (Id. at 26); 28 U.S.C. § 1292(b).

On May 15, 2015, Hagens Berman asked me to "stay the planned interviews until [its] objections are resolved."  (Doc. No. 504 at 1.)  The GSK Defendants take "no position on any of the relief sought by Hagens Berman."  (Doc. No. 503.)

## II.   DISCUSSION

Hagens Berman raises four objections to Mr. Hangley's Orders.  All are either premature, meritless, or both.

### Objection #1: Mr. Hangley's Inquiry Is Without Legal Basis

I have repeatedly set out the legal basis for Mr. Hangley's inquiry, and will do so again here.  (Doc. Nos. 396, 420, 471, 485.)

Under Rule 41, a plaintiff may voluntarily dismiss a case without court approval by, *inter alia*, filing "a stipulation of dismissal signed by all parties who have appeared."  Fed. R. Civ. P. 41(a)(1)(A)(ii).  Defendants Sanofi and Grünenthal have not joined the October 28th Agreement.  Accordingly, these twenty-eight Plaintiffs may dismiss their claims against the GSK Defendants "only by court order."  Fed. R. Civ. P. 41 (a)(2).  In more usual circumstances, I have approved

innumerable stipulations of dismissal.  These are not usual circumstances, however.  It appears that in return for terminating twenty-eight cases against GSK, the October 28th Agreement confers a benefit only on Hagens Berman, not its clients.  Moreover, I have accepted Mr. Hangley's recommendation to impose sanctions on the firm for its bad faith and dishonesty.

In these highly unusual circumstances, I feel compelled to ensure that the Plaintiffs have actually consented to the Agreement.  See Kabbaj v. Am. Sch. of Tanger, 445 F. App'x 541, 544-45 (3d Cir. 2011) (per curiam) (requiring "clear and unambiguous evidence that the parties have entered into" a Rule 41 dismissal); Kramer v. Tribe, 156 F.R.D. 96, 101 (D.N.J. 1994) ("The Court also has inherent disciplinary authority to supervise and monitor the conduct of attorneys admitted to practice." (citing Chambers v. Nasco, Inc., 501 U.S. 32, 43-46 (1991))).

All Parties have joined the dismissal in the four remaining cases.  Fed. R. Civ. P. 41(a)(1)(A)(ii).  This is a distinction without a difference, however.  Pursuant to the Court's inherent authority, I may look behind the dismissal to determine whether it is the result of "collusion or improper conduct."  United States v. Mercedes-Benz of N. Am., Inc., 547 F. Supp. 399, 400 (N.D. Cal. 1982); see also Green v. Nevers, 111 F.3d 1295, 1301 (6th Cir. 1997) (same); Moeller v. Weber, No. 04-4200, 2012 WL 5289331, at *1 (D.S.D. Oct. 23, 2012) (court may look behind dismissal to "make certain that the stipulation of dismissal was voluntary"). Again, the circumstances presented compel me to act on this inherent authority.

***Objection #2: Mr. Hangley's Inquiry Is Without Factual Basis***

Hagens Berman next repeatedly argues that because "everything" it "has done in this case demonstrates that it is dedicated to representing its clients zealously," there is no "factual basis for the speculation of the Special Master and the Court that Hagens Berman sought dismissal before fully informing their clients and obtaining consent."  (Doc. No. 502 at 5, 8, 10, 12, 13.)

10

Further, Hagens Berman suggests that Mr. Hangley is "on a fishing expedition."   (Id. at 14.)   Once again, I do not agree.

The October 28th Agreement capped a disturbing course of conduct.  From the outset, Plaintiffs sought to obstruct Defendants' legitimate, and indeed, critical discovery requests as to when Plaintiffs knew or reasonably should have known that their injuries were caused by thalidomide.  It became apparent after Mr. Hangley's appointment that Plaintiffs would have to disclose this information.  Only then did Hagens Berman apparently begin investigating its clients' claims and then seek to dismiss them.  In the span of a few weeks, however, Hagens Berman went from actively litigating claims to dismissing them en masse.  Plainly, there is a more than sufficient factual basis for Mr. Hangley to conduct limited interviews of each Plaintiff to ensure that he or she actually consented to these dismissals.

### Objection #3: Mr. Hangley's Proposed Inquiry Is Overbroad

Hagens Berman next argues that Mr. Hangley's proposed inquiry exceeds the task I assigned him.  (Doc. No. 502 at 14.)  This is simply incorrect.  As Mr. Hangley has set out, the interviews will cover Plaintiffs': (1) "understanding of their claims"; (2) "understanding of the consequences of dropping their claims"; and (3) "the facts and circumstances that they, the plaintiffs, took into account in deciding to drop their claims." (Doc. No. 501 at 2.)  Mr. Hangley thus proposes to do exactly what I ordered: determine whether each Plaintiff knowingly, voluntarily, and intelligently agreed to dismiss his or her claims.

### Objection #4: Protection of Attorney-Client and Work-Product Privileges

Hagens Berman argues that Mr. Hangley's inquiry will abrogate the attorney-client and work-product privileges because there are "no protections" in Mr. Hangley's proposed questioning.  This concern is curious for several reasons.  The attorney-client privilege is the

client's, not the lawyer's, who may invoke the privilege for the client's protection.  See <u>Haines v. Liggett Grp. Inc.</u>, 975 F.2d 81, 90 (3d Cir. 1992) ("Although the privilege belongs to the client, and only the client may waive it, an attorney may assert the privilege on the client's behalf."); <u>United States v. Fisher</u>, 692 F. Supp. 488, 494 (E.D. Pa. 1988) ("It is well established that the attorney-client privilege belongs to the client.").  Yet, as the objections themselves provide, they are the "Objections of Plaintiffs' Counsel," not Plaintiffs themselves.  (Doc. No. 502.)  It is difficult to see how Plaintiffs benefit when Hagens Berman invokes the privilege to obstruct an inquiry intended to protect Plaintiffs.  In any event, the privilege objection is obviously premature.  The interviews have not been scheduled; Mr. Hangley has not asked a single question.

Moreover, because Hagens Berman overstates the scope of these privileges, the firm's hypothetical objections are meritless.  The attorney-client privilege protects communications between the client and attorney made for the purpose of "obtaining or providing legal advice." <u>Gillard v. AIG Ins. Co.</u>, 15 A.3d 44, 59 (Pa. 2011); <u>see also</u> <u>Keating v. McCahill</u>, 2012 WL 2527024, at *2 (E.D. Pa. July 2, 2012) ("Federal courts sitting in diversity . . . apply the law of the host state in determining privilege.").  The work-product privilege similarly protects "documents and tangible things . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative."  Fed. R. Civ. P. 26(b)(3).

Hagens Berman argues that Mr. Hangley cannot inquire into a Plaintiff's decision to dismiss her own claims because "those 'understandings' have their direct roots in the extensive communications [Plaintiffs] have had with counsel on those topics."  (Doc. No. 502 at 16.)  This is incorrect.  The attorney-client privilege protects against the disclosure of *communications*.  It does not protect from disclosure any fact that maybe based, however loosely, on something

Hagens Berman lawyers told Plaintiffs.  See Upjohn Co. v. United States, 449 U.S. 383, 395 (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."); Gillard, 15 A.3d at 52 n.8 (privilege protects communications made "for the purpose of securing or providing professional legal services" and thus "does not . . . protect clients from factual investigations"). Similarly, a client's disclosure of a fact that may also be mentioned in a document prepared by her lawyer does not abrogate the work-product privilege.  In re Grand Jury (Impounded), 138 F.3d 978, 981 (3d Cir. 1998) (privilege "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case").

Mr. Hangley, an attorney of considerable skill and experience, has set forth detailed procedures by which he will determine whether each Plaintiff understands her claims and her reasons for withdrawing those claims.  Mr. Hangley will instruct each Plaintiff not to disclose attorney communications and not to answer a question before any objection is resolved.  Hagens Berman fears that Plaintiffs may be compelled to respond to Mr. Hangley's questions by the "apparent threat" that Mr. Hangley will hold them in "contempt."  (Doc. No. 502 at 22.)  Yet, the contempt power resides with the Court, not the Special Master.  18 U.S.C. § 401.  Although Hagens Berman suggests that Mr. Hangley's proposal would violate due process, it is difficult to see how the proposed process materially differs from that employed during the depositions in this litigation.

### Hagens Berman's Pre-Approved Declaration and Questions

Finally, if I overrule the firm's objections, Hagens Berman asks me to allow the firm to script Mr. Hangley's inquiry.  The firm proposes that I order Mr. Hangley to have each Plaintiff sign a declaration (written by Hagens Berman) or limit the interviews to a list of four to six

questions (again, written by Hagens Berman).  (Doc. No. 502 at 23, 25.)  These declarations and proposed questions are not materially different from Mr. Hangley's proposed inquiry: all would necessarily require Plaintiffs to disclose their "understandings" of their claims and the October 28th Agreement.  Accordingly, I do not understand why Hagens Berman believes that its own proposed questions or declarations preserve the attorney-client and work-product privileges.  In any event, I cannot expect Mr. Hangley to perform an adequate inquiry if he cannot ask his own follow-up questions.

***Alternative Request for Interlocutory Appeal or a Stay***

An order compelling the disclosure of arguably privileged information is no longer an appealable collateral order.  <u>Mohawk Industries, Inc. v. Carpenter</u>, 558 U.S. 100, 110 (2009).  Accordingly, Hagens Berman asks me to stay the proceedings and certify for interlocutory appeal the question of whether "the Special Master" may "inquire into attorney-client communications regarding Plaintiffs' dismissals."  (Doc. No. 502 at 26); 28 U.S.C. § 1292(b).  I will not do so.

I may certify for interlocutory review an otherwise non-appealable order if I find that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and that "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  Yet, certification will not help inform me or Mr. Hangley if he may "inquire into attorney-client communications."  He may not, and he does not propose to do so.  Because there is no "ground for difference of opinion" as to this question, certification would be pointless.  <u>See, e.g.</u>, <u>Johnson</u>, 724 F.3d at 344 (finding "substantial ground for difference of opinion" on question of citizenship of defendant when disagreement among District Courts would continue absent a decision from the Third Circuit).

14

Finally, I will not "stay the planned interviews" of Plaintiffs.  (Doc. No. 504 at 1.) Because Hagens Berman has refused to produce its clients for interviews, none is "planned."

## III.    CONCLUSION

If a Plaintiff has freely and intelligently decided that she no longer wishes to proceed with her case against GSK or the other Defendants, I will likely allow her to withdraw her claims.  Because the record suggests that Hagens Berman may have made this decision for Plaintiffs, Mr. Hangley's inquiry is critically important.

An appropriate Order follows.

*/s/ Paul S. Diamond*
_____

May 19, 2015                                                  Paul S. Diamond, J.

15