**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GLENDA JOHNSON ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:11-cv-005782-PD |
| v. | ) | and all related cases |
| | ) | |
| SMITHKLINE BEECHAM | ) | |
| CORPORATION | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPORT AND RECOMMENDATIONS**
**OF THE SPECIAL DISCOVERY MASTER**

I.    **Introduction:**

The District Court has ordered me, as Special Discovery Master in these consolidated

actions, to investigate the question whether 27 Plaintiffs[1] made voluntary and informed decisions

to dismiss with prejudice their claims against Defendants GlaxoSmithKline LLC and

GlaxoSmithKline Holdings (Americas) Inc. (collectively, "GSK"), while continuing to pursue

their claims against GSK's codefendants Grünenthal GmbH ("Grünenthal") and Sanofi-Aventis

---

[1] They are Edmund Andre, Kim Branscum, Doris Brust, Craig Charleston, Mark Endres, Yvonne English-Monroe, Darren Griggs, Carolyn Jean Grover, John Grover, Kathleen Gunn, Mark Harrelson, Alan Horridge, Tammy Jackson, Glenda Johnson, Diane Kessler, Gearold Ledsome, Steven Lucier, Mary McPartlan-Hurson, Robert Murray, Carmela Norcross, Yolanda Perez, Carolyn Sampson, Christopher Simeone, William Tyler III, Colleen Van Vleet, Edward Worthan, and Phillip Yeatts.  A 28th member of this original group, Rebecca Alexander, has decided to dismiss her claims against all Defendants, and her situation is discussed elsewhere in this Report.

U.S. LLC ("Sanofi").   In addition to addressing the Motion to Dismiss with Prejudice pursuant to Rule 41(a)(2), Fed. R. Civ. P., brought in the names of the 27, I have been given the same assignment with respect to a separate Joint Motion under Rule 41(a)(2) to Dismiss three Plaintiffs' claims against all Defendants with prejudice,[2] and to consider what purports to be (but actually appears not to be) a Rule 41(a)(1)(ii) Stipulation of All Parties to dismiss all claims of one Plaintiff,[3] again with prejudice, against all Defendants.

As discussed below, I have deputized jurisdiction to address all 31 of the proposed dismissals although none of the proposed dismissals is opposed.

Courts rarely delve into the particulars of unopposed Rule 41(a)(2) dismissals.  As I understand it, though, at least three factors contributed to the District Court's decision that I should look more closely at these particular proposals.  For one thing, the last-minute, casual manner in which the first group of proposed dismissals was presented to the Court – so that the Court could not figure out exactly whose claims were to be dismissed with prejudice and whose were not – raised doubts as to whether the lawyers themselves had thought the arrangements and consequences through, much less informed and consulted with each of the affected client Plaintiffs, before pulling the trigger.  Second, the deal was suspiciously out of balance: Defendant GSK would be relieved of claims brought by sympathetic Plaintiffs whose injuries and suffering could not be questioned.  The 27 Plaintiffs themselves, on the other hand, would gain no discernible benefit from the partial dismissals of their claims; they would continue litigating with one less "pocket" to litigate against.  But their lawyers, Hagens Berman Sobol

---

[2] Plaintiffs Sharon Anderson, Theodore Mann, and Annette Manning.

[3] The aforementioned Rebecca Alexander.

Shapiro LLP ("Hagens Berman"),[4] would fare much better. The firm was already the subject of three well-supported sanctions motions, had even raised the white flag as to one of those motions, and faced a near certainty that several more such motions were on GSK's drawing board. If the 27 Plaintiffs surrendered, the lawyers' sanctions problems with GSK would go away.

But the dominant consideration for the District Judge, I believe, was that he had lost confidence in the Hagens Berman lawyers' ability and willingness to tell the truth about critical facts when addressing the Court. Time after time, Judge Diamond had been confronted with antipodal differences between "facts" pled or asserted by the Hagens Berman lawyers and the actual facts stated under oath by their client Plaintiffs. In a proposed claims-dispositive transaction as facially out of balance as this one, Judge Diamond wanted to be very sure that Hagens Berman had it right this time, and that the clients knew what was about to happen to them.

## II.    Recommendation

After interviewing all 31 of these Plaintiffs under oath with an eye to the two-element standard – voluntariness and informedness – I recommend that the complete or partial dismissals with prejudice they seek be permitted. It is clear to me that the first element of a proper inquiry has been satisfied, *i.e.,* that each of these 31 Plaintiffs *wants* to dismiss her claims against GSK or against all Defendants, as the case may be. It is less clear that the decisions, when initially announced, were informed. After the interviews and the events ramping up to the interviews, however, it is certain that the moving Plaintiffs have now been given the facts necessary to a reasoned decision. Further, almost all the moving Plaintiffs have stated cogent reasons – reasons

---

[4]Hagens Berman is a Seattle, Washington law firm; Hagens Berman lawyers were admitted pro hac vice in these cases.

that make sense, whether one might agree with the decisions or not – for deciding to drop their claims.  The Hagens Berman lawyers' obstructive conduct in connection with my interviews has made me doubt whether the lawyers "told it like it was" to their clients, but I conclude that the Plaintiffs' present knowledge of the facts, coupled with their present intention to go forward with the dismissals, has to suffice in the circumstances of these motions, particularly since probing for further information would risk something I have worked scrupulously to avoid in these proceedings, infringing on the 31 Plaintiffs' attorney-client privilege or on attorney opinion work product.

## III.    Report

This Report discusses the events that led to my present assignment, my activities in carrying it out, and the reasons for my less than complete satisfaction regarding the "informedness" prong of my investigation; I err on the side of detail for a number of reasons: Hagens Berman has repeatedly warned that the Court and I have no jurisdiction, or have exceeded what little jurisdiction we have.  Hagens Berman also maintains that, by conducting the interviews of the 31 Plaintiffs in the presence of counsel for Defendants, I may unintentionally have disqualified those attorneys from continuing to represent their own clients.  More directly, the Hagens Berman attorneys have stated on the record – importantly, this was in the presence of their clients – that the Court and I are covertly engaged in a scheme to invade the attorney-client privilege and violate work product protection, and that my voluntariness/informedness inquiries are a "sham" and a "pretext."  For all I know, that issue, or Hagens Berman's assertion that it *is* an issue, may become pertinent to proceedings entirely separate from my investigation.

More to the immediate point, I have worried that Hagens Berman's announced antipathy toward the Court, the Discovery Master, and this inquiry itself might have skewed the "informedness" of the individual Plaintiffs in making their decisions, or those Plaintiffs'

willingness to be forthright or cooperative with a Special Master whose mission had been tarred as a sham before they even spoke to me over the telephone. I found insufficient basis to conclude that the decisions were not informed, or to justify further inquiry on my part, but I present the details for the Court's own consideration.

### A.    Truth in Pleading

Lawyers who file pleadings and papers in Pennsylvania lawsuits, whether in the state or federal courts, cannot misstate the facts they learn from their clients in their zeal to craft a complaint that gets them past the pleadings stage. We do not just make things up. We conduct "an inquiry reasonable under the circumstances" and, in handing a pleading up to the court, we promise that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(2); Pa. R. Civ. P. 1023.1; Pa. R.P.C. 3.1, 3.3.  Without that fundamental tenet of the attorney-court relationship – the promise that the lawyer's pleadings will never misstate facts learned from the clients and others – it would be impossible for the public to pursue justice through the surrogacy of attorneys.

That fundamental precept is the anchor of this discussion.

### B.    The Complaints and the Verifications:  Avoiding Early Dismissal

Between 2011 and 2014, Hagens Berman filed this series of lawsuits in Pennsylvania, claiming that 52 individual Plaintiffs, born in the late 1950s or early 1960s, suffered from birth defects attributable to in-utero exposure to thalidomide. The actions were a long time coming, filed a half century after the thalidomide scandal of the 1960s was front-page news in the United States and, of course, decades after most United States thalidomide-related litigation had been resolved. But Hagens Berman's Complaints addressed the obvious statute of limitations questions head-on by unambiguous assertions (a) that Defendants, one-time manufacturers or

purveyors of thalidomide, had fraudulently concealed relevant information from Plaintiffs or the public, so that these particular Plaintiffs were unaware of the source of their injuries or who might be responsible, (b) that a likely connection between thalidomide and the particular types of birth defects from which these Plaintiffs suffered was not discoverable until recent advances in the pertinent science made that connection possible; or (c) both.

All but three of the Plaintiffs' cases were originally filed in the Philadelphia Court of Common Pleas[5] and, hence, initially governed by the Pennsylvania Rules of Civil Procedure. And it may be significant that Pennsylvania Rule 1024 takes things a step beyond federal practice by requiring the party herself – or her informed proxy – to verify under oath or its equivalent that the pleaded facts are, in fact, *the* facts. The Rule also tells us who can sign a verification, and in what circumstances:

> The verification shall be made by one or more of the parties filing the pleading unless all the parties (1) lack sufficient knowledge or information, or (2) are outside the jurisdiction of the court and the verification of none of them can be obtained within the time allowed for filing the pleading. In such cases, the verification may be made by any person having sufficient knowledge or information and belief and shall set forth the source of the person's information as to matters not stated upon his or her own knowledge and the reason why the verification is not made by a party.

Pa. R. Civ. P. 1024(c).

In these consolidated cases, not one of the 52 Plaintiffs verified a single word of a single Complaint; instead, the attorneys signed all the verifications. That in itself is not prohibited; the Rule, quoted above, permits execution by a non-party if he has "sufficient knowledge or

---

[5] The Complaint in *Darren Griggs, et al. v. GlaxoSmithKline LLC, et al.,* No. 14-CV-2186 (E.D. Pa.), was initially filed in this Court. *Griggs* was brought after the Third Circuit had ruled that all the Pennsylvania state court cases brought against GSK were properly removed to the federal court. *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337 (3d Cir. 2013). All three *Griggs* plaintiffs are among the 27.

information and belief" to do so.  Of course, an attorney will not usually have "knowledge"; he will not know first-hand what color the traffic light was, or what the seller said to the buyer in the negotiations, or when the plaintiff first suspected that her birth defects might be related to thalidomide.  If the attorney is going to sign the verification, he must rely on the facts told to him by his client in the course of the lawyers' "reasonable in the circumstances" inquiry.  Just as in the pleading itself, the things he is told by his client are the "information" on which he properly relies, and the drafters of the Pennsylvania Rule were careful to draw a distinction between first-hand "knowledge" and second-hand "information."  The non-party verifier is required to "set forth the source of [his] information as to matters not stated upon his or her own knowledge," and "the reason why the verification is not made by a party."

The Hagens Berman attorneys did not include any of this in any of their verifications with regard to any Plaintiff's claims; they just swore to them.[6]   Thus, the verification executed by Hagens Berman attorney Nick Styant-Browne to the Complaint in one of the consolidated cases says only the following:

> Nick Styant-Browne hereby states that he is counsel for plaintiffs Valerie Spence, Kim Branscum, Jack Merica, Mark Harrelson, Jose Navamuel, Tawanna Williams, Terrie Bolton, Michael Morgan, Barbara Murray, Yolanda Perez, and Kevin Randall in this action and verifies that the statements made in the foregoing Plaintiffs' Complaint are true and correct to the best of his knowledge, information and belief.  The undersigned understands that the statements therein [sic] are made subject to the penalties of 18 Pa.C.C. [sic] Section 4904 relating to unsworn falsification to authorities.

---

[6] I use "swore" as shorthand for "swore or affirmed," because the governing statutes treat unsworn falsification to authorities as the equivalent of false swearing, with identical penalties (18 Pa. C.S.A. §§ 4902-4904), and Pennsylvania Rule 76 permits such un-notarized statements only if they are expressly made subject to those penalties.

Complaint Verification, *Valerie Spence, et al. v. Aventor Perf. Mat'ls, et al.*[7]  The *Spence*
Complaint told eleven separate stories on behalf of eleven different Plaintiffs, telling the reader
who each of those Plaintiffs was, what injuries she had sustained and, importantly, how it came
to pass that she was unable to know that her injuries could be thalidomide-related until less than
two years before filing the *Spence* Complaint.  In the Complaint and the verification, Mr. Styant-
Browne represented to the courts that he had made "inquiry reasonable under the circumstances"
(Pennsylvania Rule 1024, Federal Rule 11), before telling each of these eleven stories.

 The state cases were removed to this Court and, ultimately, all the cases were
consolidated before Judge Diamond.  Predictably, the Defendants brought limitations-based
motions to dismiss.

 Judge Diamond denied the motions and let slip the dogs of discovery[8] based on the
explicit and verified allegations of fraudulent concealment in each of the several Complaints,
allegations the District Judge had to accept as true in addressing the Rule 12(b)(6) motions.  Dkt.
92.

---

[7] No. 665 August Term 2012 (C.P. Philadelphia), on removal, No. 12-CV-4542 (E.D.
Pa.).  Mr. Styant-Browne made identical verifications (with identical misquotation and
miscitation) in other of these consolidated cases, as did Hagens Berman's Managing Partner,
Steve Berman.

[8] Discovery was bound to be grueling:  The Complaints' allegations of unawareness and
fraudulent concealment put in play, *e.g.,* the conduct, knowledge and states of mind of 52
different plaintiffs and those around them over half a century or more, as well as the conduct,
knowledge and collective states of mind of several institutional defendants on both sides of the
Atlantic, their predecessors, affiliates, and past and present agents of all of them, covering an
even longer timespan.

### C.    Discovery and Dispositive Motions Practice:  Evasion and Falsehood

1.    *Evasion*

Defendants apparently had a terrible time eliciting the basic and critical facts about the alleged fraudulent nondisclosures and other events that had gotten the cases past the Rule 12(b)(6) motions.  After the Court repeatedly ordered Plaintiffs to provide straightforward responses[9] – and after Plaintiffs repeatedly failed to do so – Defendants moved for dismissal as a discovery sanction.  In its Order of June 17, 2014 (Dkt. 239), the District Judge recited the litany of sidestepped discovery and held that Plaintiffs were not acting in good faith: "*When* each Plaintiff learned that his or her injuries might have been caused by Thalidomide (the "Thalidomide discovery issue") is . . . critical in this case.  Disturbingly, Plaintiffs have repeatedly sought to evade the issue."  Dkt. 239 at 1.  The Court stopped just short of dismissing any Plaintiff's case:

> Defendants argue that Plaintiffs' misconduct warrants dismissal of their Complaints with prejudice.  Although I am not yet prepared to dismiss, I am greatly concerned that Plaintiffs have not honored their discovery obligations with respect to this critical issue.  Rather, I believe that I am compelled to appoint a special discovery master.

Dkt. 239 at 3 (internal citations omitted).  My initial appointment became final on June 27, 2014. Dkt. 256.

---

[9] *See generally* Dkt. 127, 139, 147 (Order), 151,152, 153 (Order), 154, 164, 165, 166 (Order), 196, 197, 198, 199 (Order), 200, 203, 206 (Order), 220, 221, 222 (Order), 232, 233 (Order).  The events are summarized in Dkt. 239 and in *Johnson v. SmithKline Beecham Corp.*, 55 F. Supp. 3d 603, 607-08 (E.D. Pa. 2014)("*Andre* Opinion"), a decision discussed elsewhere in this Report.

2.    *False Pleading*

Evasiveness is bad but false pleading is worse.  Even before my appointment, startling disagreements between what the Plaintiffs said and what their lawyers said they said were coming to light.  Critical assertions in the verified Complaints were being directly contradicted by the Plaintiffs themselves.

Returning to the *Spence* Complaint, mentioned earlier:  Among the "facts" verified by Mr. Styant-Browne in that particular Complaint were specific allegations that three of the Plaintiffs, Tawanna Williams, Michael Morgan, and Barbara Murray, did not know of the Defendants' roles in the thalidomide tragedy, "and could not have reasonably discovered [Defendants'] roles" before 2010.  *Spence* Complaint ¶¶ 31 (Williams), 37 (Morgan), 40 (Murray).

But a very different picture emerged when these actual Plaintiffs, rather than their attorneys, were heard from:

> Plaintiffs' interrogatory responses . . . establish that each of these plaintiffs - by his or her own admission - previously filed a legal claim against a defendant in this case for alleged thalidomide injuries. Indeed, at least one of them is collecting settlement checks to this day.

Dkt. 168, Motion for Dismissal or in the Alternative to Compel Discovery, at 2 (Mar. 24, 2014) and supporting exhibits. Hagens Berman did not oppose the motion; it withdrew the three Plaintiffs' claims with prejudice. Dkt. 182.

It is just not possible to conclude that Mr. Styant-Browne could have made the required "inquiry reasonable under the circumstances" as to Morgan, Murray and Williams' histories, and still have been acting in good faith when he sat down and swore to dramatically different "facts" in the *Spence* Complaint and the *Spence* verification on behalf of Morgan, Murray and Williams.

In the wake of these debacles, GSK's counsel wrote to Hagens Berman, pressing the position that Hagens Berman's pre-suit investigation had been inadequate, and asking Hagens Berman to review the outstanding cases before the parties spent more time and money on continuing written and oral discovery regarding claimants whose cases must ultimately fail:

> It is obvious that in all or most of [the 52 claims] no reasonable presuit investigation was conducted. I would hope that plaintiffs' counsel would promptly proceed now, before additional expense is incurred, to undertake a careful review of the claims made in all these cases. If there are others that you decide to dismiss, GSK will agree in any such case dismissed by April 11 to again bear its own costs. However, for any cases which remain pending after that date, GSK will not agree to bear its own costs and is reserving its right to seek both costs and attorneys fees under all applicable rules and statutes.

Dkt. 310, Defendants' Motion for Sanctions as to Plaintiff Jack Merica, Ex. 10 (email of March 26, 2014). As of the date of that email, March 26, only a handful of depositions had been taken.

The April 11 deadline came and went. No cases were dismissed. Massive deposition discovery went forward. According to counsel for both sides, some 130 depositions were taken between late March and late September (*See* Dkt. 364, Hearing Tr., Oct. 1, 2014 at 65-66, 134), and more depositions were taken after that date.

Shortly after my appointment, counsel did agree to conduct the case review Defendants had requested and I entered an appropriate Order with the consent of all parties. Dkt. 268. This was a positive development. The review process would fairly be expected to cull those claims that were inarguably time-barred, sparing the Court and all concerned (those Plaintiffs included) the burden of discovery and other pretrial processes that would serve no ultimate purpose. But it was more than that: As to the Plaintiffs whose claims Hagens Berman was *refusing* to dismiss, Hagens Berman would be doing what it should have done in the first place, satisfying itself that it had evidentiary support for the sworn allegations of the pleadings.

Over the following months, that review process did result in Hagens Berman's announcement that several Plaintiffs' cases would be dismissed, but the great majority would not. Meanwhile, discovery was proceeding, with motion practice ongoing both before Judge Diamond and before me.

Jack Merica was the next Plaintiff whose claims came under concentrated scrutiny by Judge Diamond. As it happened, Mr. Merica was also a *Spence* Complaint Plaintiff and, thus, another Plaintiff whose "facts" were vouched by Nick Styant-Browne, of Hagens Berman. And, once again, Styant-Browne and Hagens Berman proved unreliable as bringers of truth. According to the *Spence* Complaint, Merica's mother had told him she had taken thalidomide for morning sickness (*Spence* Complaint ¶ 21), but Merica had no idea what that isolated fact might mean, and had no reason to pursue an inquiry: "With no clues to follow, Jack [Merica] was left with no understanding of what it meant to be a thalidomider . . . ." *Id.* ¶ 22.

At their depositions, Mr. Merica and his wife told an entirely different story, and Defendants brought another summary judgment motion. Dkt. 245. Hagens Berman once again announced that it would not oppose dismissal (Dkt. 263), but Judge Diamond issued an Opinion after seeing what had happened. *Johnson v. SmithKline Beecham Corp.,* Civ. No. 11-5782, 2014 WL 7087959 (E.D. Pa. July 14, 2014) (*"Merica* Opinion"). First, the Court pointed out that it was only on the basis of the explicit, verified representations of fraudulent concealment that Mr. Merica's claims had survived Defendants' motions to dismiss. Next, the Court, citing Mr. and Mrs. Merica's sworn deposition testimony, spelled out the crucial differences between Merica's real-world story and the fictitious account in the *Spence* Complaint:

> (1) Plaintiff's mother told him in in the 1960s that thalidomide
> caused his injuries; (2) Plaintiff's mother told Plaintiff's doctors in
> the 1960s that thalidomide caused his injuries ; (3) in the 1970s,
> Plaintiff asked his mother why she had not sued the doctor who

> prescribed thalidomide or the drug's manufacturer; (4) in 1983, Plaintiff filed a Social Security Disability application seeking benefits for thalidomide-caused injuries ; (5) in 1990 or 1991, Plaintiff's mother gave him the bottle of thalidomide pills that she had taken while she was pregnant with him; (6) in 1992—"thirty seconds" into their first date— Plaintiff told his now-wife that thalidomide caused his birth defects; and (7) in 2000, Plaintiff gave an interview to WeMedia Magazine during which he stated that he had injuries caused by thalidomide.

*Merica* Opinion, 2014 WL 7087959 (record citations omitted). Plainly, Mr. Merica had a very clear "understanding of what it meant to be a thalidomider" many years before suing.

Around the same time, all three Defendants had obtained additional "surrenders" from two more Plaintiffs, Lawrence Boiardi and Roel Garza (Dkts. 277, 318), but only after detailed motions for summary judgments were filed, demonstrating a significant difference between the allegations in the Complaint and Boiardi and Garza's actual experience. Dkts. 258, 281. GSK and Grünenthal now moved for sanctions against Hagens Berman – but not against the individual plaintiffs – with respect to Hagens Berman's conduct in pursuing the Merica, Boiardi and Garza claims.[10] With the consent of all parties, Judge Diamond assigned the sanctions motions to me for a report and recommendations. Dkts. 297, 318.

After briefing, the three sanctions motions were argued before me on October 1, 2014. At argument, Hagens Berman argued vocally against any sanctions with respect to its conduct in pursuing Messrs. Merica and Boiardi's claims but, remarkably, conceded that sanctions should be awarded with respect to its continued prosecution of Plaintiff Garza's claims.[11]

---

[10] GSK and Grünenthal filed a stand-alone motion for sanctions with respect to Merica, Dkt. 310. They had sought the Boiardi and Garza sanctions in their motions for summary judgment.

[11] Tr. Oct. 1, 2014 at 133-34, 141-42.

Later in October, Judge Diamond finally had occasion to address a summary judgment motion that was actually opposed by Hagens Berman and the Plaintiff.  In its *Andre* Opinion (*Johnson v. SmithKline Beecham Corp.*, 55 F. Supp. 3d 603), the Court discussed, again, the major discrepancies between the facts gleaned in discovery and the factual assertions in Mr. Andre's Complaint.[12]  The District Judge mentioned the process by which Mr. Andre and his mother's response to a newspaper advertisement eventuated in the filing of a verified Complaint in Andre's name (*Andre* Opinion, 55 F. Supp. 3d at 609-10):

> When Plaintiff's mother called the number, she "learned that there was possibly some action that the family could take to participate in getting more information and possibly uncovering specifics and doing something about it."  A short time later, Plaintiff called the number and spoke with "attorneys," whose names he could not recall at deposition.  Plaintiff testified that he decided to bring this case after receiving an "education about thalidomide."  When questioned about this "education," he was instructed not to answer on the grounds of attorney-client privilege.   This discussion was the only contact Plaintiff had with his lawyers before filing the instant Complaint.

And that, apparently, was the sum and substance of Hagens Berman's pre-verification investigation of Mr. Andre's claim.

The *Andre* Opinion also addressed an attempt by Hagens Berman to fend summary judgment off with a new argument that – however apposite it might have been to some other Plaintiff's case – was not and could not have been made on behalf of Mr. Andre.  This was the contention that "[t]he predominant medical view has for decades held that thalidomide did not cause the types of *unilateral and asymmetrical limb reduction* from which [Plaintiff *n*] suffers," and that "[o]nly recently available studies published in medical and scientific journals reveal the

---

[12] Mr. Andre was one of the Plaintiffs in *Philip Yeatts, et al. v. SmithKline Beecham Corp., et al.,* No. 3316 October Term 2011 (C.P. Philadelphia), on removal, No. 11-CV-6711 (E.D. Pa.) ("*Yeatts* Complaint").

flaws in the orthodox medical opinion."[13]  Judge Diamond rejected the evidence of Hagens

Berman's last-minute expert testimony on that theory for a number of reasons, including (i) that

the "new science" theory had never been pled on Andre's behalf, and was inconsistent with what

*was* pled, and (ii) that the expert's own evidence demonstrated that the "new" scholarly theory

the expert was trumpeting had been in the public theater for generations:  "It . . . appears that Dr.

Stephens himself acknowledges that any 'sea change' in medical thought on thalidomide

occurred some 45 years before the date Dr. Stephens came to appreciate its significance."  *Andre*

Opinion, 55 F. Supp. 3d at 613-14 (internal citations and quotations omitted).

### D.    The GSK Dismissal Announcement and the Court's Concern

Still Hagens Berman was vigorously pursuing its clients' claims, seeking further

discovery, and resisting dispositive motions as they were filed by Defendants.  As late as

October 22, I was receiving briefing from Hagens Berman in support of a discovery sanctions

motion *against* GSK.

But a few days later, GSK's attorneys informed the Court and me that all but one of the

"plaintiffs currently represented by Hagens Berman Sobol Shapiro LLP" had agreed to dismiss

their claims against GSK (alone) with prejudice.[14]   GSK also informed us that "GSK, in turn,

agrees to withdraw its pending sanctions motions and to forego [sic] any sanction payments

---

[13] *Compare Yeatts* Complaint ¶¶ 5, 19 (Edmund Andre) *with Yeatts* Complaint ¶¶ 14 (Philip Yeatts), 25 (Annette Manning), 32 (Mary McPartlan-Hurson), 43 (John Grover), 47 (Sharon Anderson), 52 (Diana Cabcabin), 59 (Tammy Jackson), 70 (Ted Mann), 76 (Richard Anderson).

[14] Letter, Michael T. Scott to the Court; Oct. 28, 2014 (Dkt. 394); email, Sandra Di Iorio to the Special Master, Oct. 27, 2014.  The one exception was plaintiff Debra Johnson, who would continue opposing GSK's outstanding motion for summary judgment.  That summary judgment motion was later granted and affirmed on appeal.  *Johnson v. SmithKline Beecham Corp.*, 95 F. Supp. 3d 819 (E.D. Pa. 2015), *aff'd sub nom. Johnson v. GlaxoSmithKline, LLC*, 636 F. App'x 87 (3d Cir. Jan. 5, 2016).

which may be awarded or which have already been agreed to," and that "[c]ontingent on the dismissals with prejudice, all discovery by all plaintiffs with respect to GSK, former SKF employees, and former SKF investigators will be deemed withdrawn; plaintiffs' motion for sanctions and to compel the 30(b)(6) deposition of GSK will be deemed withdrawn; and no further discovery will be initiated by plaintiffs in any case." *Id.*[15]

As discussed in the Court's Order of October 31, 2014, preliminarily assigning the present task to me (Dkt. 396), the Court was "disturbed" by the sudden about-face on the part of 28 parties who had been aggressively asserting their claims against GSK, particularly when these same Plaintiffs were continuing to assert the claims with unflagging gusto against the remaining Defendants.   Worse yet, the GSK letter seemed to say that Hagens Berman was simultaneously (i) offering to bind all but one of its record clients to with-prejudice dismissals while (ii) seeking leave to withdraw from representing six of those same clients. *Id.*[16]  By a later letter to the Court, GSK's counsel clarified that those six Plaintiffs were not intended to be included in the "dismissing" group, but the jumbled course of correspondence cannot have been comforting to a Court that was being asked to take dispositive action regarding the claims of so large but haphazardly identified a cohort of litigants. [17]  By this time, too (after its *Murray*, *Morgan*,

---

[15]  No actual Rule 41(a)(2) motion in the names of the Plaintiffs was filed until November 14, 2014.  Dkt. 409.

[16]  "It is difficult to understand how '[a]ll [P]laintiffs represented by Hagens Berman' could agree to dismiss *with prejudice* their claims against the GSK Defendants, when [Plaintiff Terrie]. Bolton (who presently remains a Hagens Berman client) described only six days earlier her herculean efforts to secure counsel so that she would not have to suffer 'the [great] consequences of losing this matter.'" *Id.* at 3-4 (emphasis added, quoting Dkt. 390, Letter from Terrie Bolton to the Court (Oct. 22, 2014)).

[17]  It was never made clear how the sweeping undertaking that "no further discovery will be initiated by plaintiffs in any case" was to be reconciled with the interests of the six plaintiffs, mentioned above, from whose representation Hagens Berman was seeking to withdraw but who

*Williams, Merica*, and *Andre* experiences), the Court was surely dubious about almost *any* non-first hand statement about what one of the Plaintiffs knew, thought, or wanted, whether communicated by the hearsay of Hagens Berman or the double hearsay of opposing attorneys who had heard it from Hagens Berman. The Court concluded that "[i]n these circumstances, I must ensure that Hagens Berman obtained the knowing, voluntary consent of each Plaintiff before agreeing to dismiss his or her case against the GSK Defendants with prejudice." Dkt. 396 at 4. The Court entered a proposed Order assigning me my present task. *Id.*

That was on October 31, 2014, but another seven months would pass before any interviews were actually held.

### E.    Getting to the Interviews

First, Hagens Berman objected (as was its right under Rule 53) to the amendment of my appointment order (Dkt. 400), asserting for the first of what would be many times that "the Court has no power to approve or disapprove the terms of dismissal." *Id.* at 3-5. As discussed later in this Report, Hagens Berman misunderstood the law. Further, the Court had never expressed an intention to approve or disapprove the terms of any Plaintiff's dismissal; Judge Diamond wanted only to be satisfied that the Plaintiffs themselves knew what was going on and assented to it. Hagens Berman also argued at some length that my investigation might invade the attorney-client privilege. *Id.* at 5-7.

On December 8, 2014, the Court issued its final Rule 53 Order instructing me to proceed. (Dkt. 420). Just a few days before that, I had filed my detailed Report and Recommendations on the sanctions motions, recommending that sanctions be awarded in favor of Defendant Grünenthal with respect to Hagens Berman's prosecution of the Merica, Boiardi and Garza

---

could not be presumed to be interested in surrendering their discovery rights. The discovery deadline passed on November 30, 2014.

claims. *Johnson v. SmithKline Beecham Corp.*, 2014 WL 6851277 (E.D. Pa. Dec. 4, 2014)

("Master's Sanctions Report"), *approved and adopted,* 2015 WL 1004308 (E.D. Pa. Mar. 9,

2015) ("Court Sanctions Opinion").[18]  I had concluded not only that Hagens Berman acted in bad

faith in its pursuit of those three Plaintiffs' claims but also, remarkably, that Hagens Berman had

made and pursued new and additional misrepresentations in the very course of opposing the

sanctions motions.  (Master's Sanctions Report, 2014 WL 6851277 at *6-*8), and Judge

Diamond noted this more recent evidence of Hagens Berman's shortcomings as annalist in his

Memorandum.   Dkt. 420 at 4.  The Judge also explained his rejection of Hagens Berman's

jurisdictional objections and its attorney-client privilege objections (noting that I had yet to ask

my first question). *Id.*

      On the heels of the December 8 Order, I convened a December 10, 2014 informal

telephone conference of counsel to discuss protocols for my investigation, and offered some

suggested next steps.  At Mr. Styant-Browne's request, I held off on issuing an actual order

pending receipt of a Hagens Berman written proposal on the subject, but the Hagens Berman

submission (Dkt. 425, received the next day) did not provide any information regarding the facts

any Plaintiff knew, the reasons why any Plaintiff had decided to drop some but not all her

claims, or the fundamental fact that dismissal was what she actually wanted.   I was asked to

accept Hagens Berman's statement that "[w]e can assure you that Plaintiffs' counsel would never

have sought to dismiss anyone's claim if counsel did not know that the Plaintiffs had consented

---

[18] In light of the unresolved GSK deal, I held GSK's sanctions motions in abeyance. But
there was nothing to distinguish GSK's entitlement to sanctions from Grünenthal's, and I would
have recommended awarding sanctions in GSK's favor, measured by the same formula
recommended in my Report and later adopted by the Court, if I had considered the GSK motions.
If the Court accepts my recommendation that the dismissals be permitted, I presume GSK will
withdraw its motions as it agreed with Hagens Berman to do.

willingly after being fully informed." The Court, I think, would not have accepted this proposal even if I had done so, and I did not do so.

On December 23, 2014, I filed my Memorandum and Order announcing that I would go forward with the interviews on voluntariness and informedness, and explaining my reasoning. Dkt. 430. I discussed the apparent incongruity of the proposed GSK deal, in which Hagens Berman and GSK would receive valuable consideration but the dismissing Plaintiffs would not. I ordered Hagens Berman and GSK's attorneys to share that Memorandum and Order with their respective clients, and to confirm to me that they had done so.[19] The Memorandum and Order solicited counsel's views on the details of conducting the interviews. *Id.* Hagens Berman's response, Dkt. 453, was not terribly helpful; after repeating the objection to the Court's jurisdiction and power, Hagens Berman proposed that it provide declarations signed by each of the 27 Plaintiffs, and that this should be the end of it.

Soon after that, the Court entered Orders expanding my duties to include the proposed dismissals of Plaintiffs Manning, Anderson and Mann (Dkt. 472, Feb. 24, 2015) and Plaintiff Alexander (Dkt. 485, Mar. 11, 2015). Just as it had with the initial group of 27, Hagens Berman had objected to the Court's preliminary Rule 53 Orders in both cases, telling the Court two more times that it had no power to pursue its investigation (Dkt. 451 at 3-4; Dkt. 480 at 1-3) and that I might violate privilege if I asked questions (Dkt. 451 at 4-6; Dkt. 480 at 4-5). The firm had reiterated its objections to the Court's or my conducting the inquiries at all and, as a fallback position, contended that Plaintiffs should respond in writing to a questionnaire instead of being interviewed. Judge Diamond had rejected the objections in his appointment Orders.

---

[19] To state the obvious, the fact that each plaintiff received my discussion of my concerns bolsters my present conclusion that the plaintiffs were informed with respect to those concerns.

On May 6, after first conducting an untranscribed telephone conference with lawyers from Hagens Berman and Defendants' counsel to begin arranging for the actual interviews I intended to conduct, I ordered Hagens Berman to submit a proposed schedule for phone interviews with each of the 31 Plaintiffs. Dkt. 498. On May 8, Mr. Styant-Browne sent a letter asking that I delay the interviews even longer and repeating the familiar assertion that Judge Diamond and I had "no jurisdiction, no factual or legal basis for the inquiry, and no precedent of any sort." He informed me that "[w]e will be objecting to Judge Diamond, and seeking interlocutory review or petitioning for a writ of mandamus, if necessary." Dkt. 499. I denied the request in a formal Order that treated Styant-Browne's letter as a motion for stay, to clear the way for Hagens Berman to seek the intervention of the Courts. Dkt. 500. Simultaneously, I issued a procedural memorandum (discussed below) setting the format of the interviews, Dkt. 501. Hagens Berman filed objections and a motion to cancel or modify my proceedings, or to stay them and certify an immediate appeal. Dkts. 502, 504. By Opinion and Order entered May 19, 2015, Judge Diamond overruled the objections, denied the requested stay, and refused to certify the matter for interlocutory appeal. That same day, May 19, Hagens Berman petitioned the Third Circuit Court of Appeals for Writ of Mandamus and moved to stay proceedings in the District Court. *In re Rebecca Alexander, et al.,* No. 15-2245 (3d Cir.). Ten days later, the Circuit Court denied both. *Alexander,* Doc. 003111976848 (May 29, 2015). The interviews followed.

### F.      The Interview Process

#### 1.      *Scope of the Interviews*

In my procedural memorandum of May 8, Dkt. 501, I took care to cabin the scope of the interviews narrowly, and to underscore what I perceived to be the importance of preserving the interviewed Plaintiffs' attorney-client privilege:

3.    **Scope and Topics:** I intend to learn from the testifying plaintiffs the following:

    a.    Their understanding of their claims.

    b.    Their understanding of the consequences of dropping the claims.

    c.    The facts and circumstances that they, the plaintiffs, took into account in deciding to drop their claims.

I am grateful to Mr. Styant-Browne for the suggested questions that he submitted in his letter of May 8, 2015 [Dkt 499]; they will be useful for me in this process. If other counsel have suggestions for additional or substituted questions, they are encouraged to submit them for my attention.

I caution all counsel that this is a limited-purpose proceeding. Accordingly, I will not permit questioning on topics removed from this scope.

4.    **Protecting Privilege:** It is important that the testifying plaintiffs [sic] attorney-client privilege and the attorney opinion work product protection not be invaded. I will advise each of the testifying plaintiffs that I do not want to know - and she must not tell me - what her attorney said to her, but that I am interested in learning the facts she knows (regardless of where or how she learned those facts), her own appreciation of her claims, and her reasons for deciding to drop those claims. I hope the Hagens Berman attorneys will communicate with their clients to explain these subtle distinctions in advance of the clients' testimony. I will also instruct the testifying plaintiffs that if one of the lawyers objects to a question - including a question that I ask – the witness should not answer the question until the objection has been ruled upon. Similarly, I will instruct each testifying plaintiff that if I say "stop" she must stop, even if she is in the middle of her answer to a question, and that my rudeness will be the product of a sincere desire not to impinge on privileged matters.

Dkt. 501. As discussed below, it appears that my announced intention to inquire about the "facts and circumstances that they, the plaintiffs, took into account in deciding to drop their claims"

was a particularly sore point for the Hagens Berman lawyers.[20]  But it is important to note that

Judge Diamond, after briefing by Hagens Berman, had expressly approved that aspect of my

limited inquiries:

> As Mr. Hangley has set out, the interviews will cover Plaintiffs':
> (1) "understanding of their claims"; (2) "understanding of the
> consequences of dropping their claims"; and (3) "the facts and
> circumstances that they, the plaintiffs, took into account in
> deciding to drop their claims."  Mr. Hangley thus proposes to do
> exactly what I ordered: determine whether each Plaintiff
> knowingly, voluntarily, and intelligently agreed to dismiss his or
> her claims.

*  *  *

> Mr. Hangley . . . has set forth detailed procedures by which he will
> determine whether each Plaintiff understands her claims and her
> reasons for withdrawing those claims. Mr. Hangley will instruct
> each Plaintiff not to disclose attorney communications and not to
> answer a question before any objection is resolved. . . . Although
> Hagens Berman suggests that Mr. Hangley's proposal would
> violate due process, it is difficult to see how the proposed process
> materially differs from that employed during the depositions in this
> litigation.

Dkt. 505 at 11, 13.  I think all the lawyers involved understood that, although my interviews

would attempt to steer clear of privilege, there might be some close brushes.  When lay witnesses

are being asked about conduct that occurred and decisions that were made in the course of a

relationship with attorneys, it is easy for witnesses to slip into a "my lawyer said" or "my lawyer

thought" mode.  I did not want privilege to be waived unintentionally, nor did I want to be

accused at some future point of having permitted a Plaintiff to stumble into an unintended

waiver.  In the event, I navigated the 31 interviews successfully without invading privilege.  It

---

[20] Questions on that topic triggered the most vocal objections and related behavior during
the interviews themselves, as discussed below.

was not easy.  And, of course, it left many a relevant potential question unasked, because that is how privilege works.

### 2.    *The Interviews*

Between June 8 and July 1, 2015, I conducted individual telephone interviews of the 31 Plaintiffs. Counsel for all parties were invited to attend.  The plaintiff-witnesses were under oath, and their testimony was transcribed by a court reporter.  Upon the completion of each examination, I would invite all counsel to ask questions (within a very limited scope), but none ever did so.  As private sector court reporters typically do, the reporter distributed the transcripts and solicited corrections to them.

At the beginning of each interview I provided a brief summary – comparable to what was said in my procedural memorandum – of how the interview would be conducted.  I also discussed the attorney-client privilege and work product protection and their limitations, and counseled the Plaintiff-witnesses against inadvertent disclosures of such communications.  At each interview, too, I afforded the lead Hagens Berman attorney an opportunity to make a preliminary statement.  I will discuss the content of those statements in some detail elsewhere in this Report.

### G.    **The Court's Role under Rule 41(a)**

As discussed earlier, the Court has repeatedly rejected Hagens Berman's argument that it cannot look into the voluntariness or informedness of the 27 Plaintiffs' acceptance of the GSK deal, that the District Court (not to mention the Discovery Master) is "without jurisdiction," and "has no power" to conduct these interviews.  But, Hagens Berman reiterated the position in every one of the 31 interviews.  At risk of presumptuousness, in telling the Court what it already knows and has already decided, I will discuss the law one more time.

There are two ways for a plaintiff to dismiss her claim voluntarily after her complaint has been answered. First, she can file a stipulation "signed by all parties who have appeared." Rule 41(a)(1)(A)(ii). No court action is required. If she cannot obtain those signatures, she can move for a court order dismissing the case. Rule 41(a)(2).

1.    *Jurisdiction and Rule 41(a)(1)(A)(ii): The Rebecca Alexander Stipulation*

A written stipulation executed by counsel for all the parties ends a case (usually) without any action by the court, and ends the court's jurisdiction (almost). I insert the qualifying parentheticals because courts always have jurisdiction to determine their own jurisdiction. *Chicot Cty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371 (1940); *Marshall v. Board of Educ.*, 575 F.2d 417, 423 (3d Cir. 1978). As the District Court pointed out many months ago (Dkt. 485, Order, Mar. 11, 2015), a district court has plenary power to "'look behind' a facially sufficient stipulation to determine whether the document truly reflects an agreement. *United States v. Mercedes-Benz of N. Am., Inc.*, 547 F. Supp. 399, 400 (N.D. Cal. 1982); *see also Green* v. *Nevers*, 111 F.3d 1295, 1301 (6th Cir. 1997) (same); *Moeller v. Weber*, No. 04-4200, 2012 WL 5289331, at *1 (D.S.D. Oct. 23, 2012) (court may look behind dismissal to "make certain that the stipulation of dismissal was voluntary").

Here, it should have been obvious to Hagens Berman (indeed, to all counsel signing the purported 41(a)(1)(A)(ii) stipulation, Dkt. 468) that there was, to say the very least, a question whether *all* the Plaintiffs in the case had authorized Hagens Berman to execute the stipulation on their behalves, as the sheet of paper represents. On the date of its filing, February 19, 2015, Hagens Berman was still in the unenviable position of being record counsel for Plaintiffs, but having unresolved motions pending for leave to withdraw from several Plaintiffs' representations. When that problem had reared its head in connection with the GSK deal, both GSK's lawyers and Hagens Berman had rushed to make the point that Hagens Berman was not

purporting to represent those particular plaintiffs.  And, presumably, that is one reason why

Hagens Berman chose to file a Rule 41(a)(2) motion rather than attempting to piece a Rule

41(a)(1)(A)(ii) stipulation together when it followed up on GSK's October correspondence.

With respect to the proposed Alexander dismissal, however, it is not clear from the face of the

signed document whether Hagens Berman was or was not purporting to speak on behalf of those

six Plaintiffs, or whether those Plaintiffs had agreed to anything.  The stipulation is at best

ambiguous and, accordingly, cannot have ended the Court's jurisdiction:  "Because the notice of

dismissal did not comply with the requirements of Rule 41 and the evidence of a joint stipulation

is not clear and unambiguous, the filing of the invalid notice did not end the case." *Kabbaj v. Am.

Sch. of Tangier*, 445 F. App'x 541, 545 (3d Cir. 2011).

      The 41(a)(1)(A)(ii) decision primarily relied on by Hagens Berman for its "no

jurisdiction" position, *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828 (3d Cir.

1995), *reversing* 888 F. Supp. 498 (E.D. Pa.), actually demonstrates the appropriateness of the

present inquiry.  In *Caplan,* a Rule 41(a)(1)(A)(ii) stipulation executed by plaintiff and

defendant's insurer (that is, by the plaintiff's attorney and the attorney engaged by the insurer to

represent the defendants as per the policy) was filed.  The defendant insured, a law firm, then

tried to set the settlement aside, and the district judge "looked behind" the settlement, concluded

that the insured should have a voice in deciding whether to settle the case because a settlement

would bar a separate action that the defendant insured hoped to bring against the plaintiff.  The

district court undid the settlement and enjoined the plaintiff from settling with the insurer without

defendant's consent.  The Third Circuit then took its own "look behind" and reversed the lower

court, concluding that the insured firm had bargained away any right to participate in the

settlement decision and that there was no supportable "bad faith" exception available to the

defendant law firm.  At both levels, procedurally, the courts did exactly what Hagens Berman thinks Judge Diamond could not do.

This, of course, does not mean that Plaintiff Alexander's request to dismiss her case is doomed, only that I must address it the same way I must examine the Rule 41(a)(2) motions to dismiss the other 30 Plaintiffs' claims in whole or in part.

> 2.    *Jurisdiction and Rule 41(a)(2):*

While courts rarely insert themselves into unopposed Rule 41(a)(2) dismissal proceedings, the Rule does provide that a 41(a)(2) dismissal can occur "only by court order, on terms that the court considers proper."  Hagens Berman contends that, if no non-moving party opposes the 41(a)(2) motion, the Court must robotically enter the order and dismiss the case.  To the contrary, district courts always have the discretion but usually not the duty to review a proposed Rule 41(a)(2) dismissal.  *See IPSCO Steel (Alabama), Inc. v. Blaine Constr. Corp.,* 371 F.3d 150, 155 (3d Cir. 2004); *Disabled in Action of Pennsylvania v. S.E. Pennsylvania Transp. Auth.*, 224 F.R.D. 601, 607 (E.D. Pa. 2004 ("A district court has discretion to review a proposed settlement agreement to ensure that the agreement is fair and reasonable. . . .  [I]n an appropriate circumstance, when considering whether to review a settlement agreement for fairness, a district court must focus on the individuals whose rights would be affected by the agreement's terms." (citation omitted)).  At times (only occasionally, to be sure), courts have denied unopposed Rule 41(a)(2) motions or modified the requested relief to impose limitations the courts considered proper in circumstances where, as here, the courts' concern was that the action or acquiescence of the record parties' counsel might put someone in harm's way.  *See Beaver Associates v. Cannon,* 59 F.R.D. 508 (S.D.N.Y. 1973) (plaintiff's unopposed motion to dismiss with prejudice denied, and derivative claims continued, pending developments in related litigation that might result in the loss of the only available forum for adjudication of those claims); *Williams v.*

*Trombley*, No. CIV. 04-75041-DT, 2005 WL 1861930, at *2 (E.D. Mich. Aug. 2, 2005) (unopposed motion to withdraw habeas petition held in abeyance to assure that statute would not run while state court post-conviction remedy proceedings were being pursued); *cf.*, *e.g.*, *Beer v. John Hancock Life Ins. Co.*, 211 F.R.D. 67, 68 (N.D.N.Y. 2002) (dismissal ordered where "there is no evidence of prejudice to defendants by such a dismissal and *no other interests are at stake*") (emphasis added).

Here, the Court has not even asked me to consider whether the 31 pending settlement agreements are "fair and reasonable." The Court seeks only to determine, with my help, whether there were 31 separate meetings of the minds between GSK (or all Defendants) and one adequately informed Plaintiff. Judge Diamond does not question the Plaintiffs' prerogatives to dismiss their claims on any terms they see fit; the Court's particular concern is satisfying itself that the lay Plaintiffs were armed with the appropriate information when they were asked to bless a deal that was good for their lawyers but not for them. In that sense, the present situation is quite similar to *Kabbaj*, 445 F. App'x 541, where the issue was not whether a claimed settlement underlying the proposed dismissal was fair and reasonable but whether (fair or not) it had actually been agreed upon and consummated.

## H.     Summary and conclusions on Voluntariness and Informedness

### 1.     *The 27 Plaintiffs*

Each of the 27 Plaintiffs who will be bound by the GSK dismissals plainly intends to dismiss the GSK claims. In response to my questioning, each of them made clear that she understands what she is doing, and that she understands that her attorneys will receive a benefit for themselves in exchange for her surrender of rights that she does not have to surrender without a Court decision on the merits. Each understands the gravity and finality of a voluntary dismissal with prejudice. Each also understands that she will, after the GSK dismissals,

continue to have the burden of litigating against some Defendants while losing any possibility of a recovery against GSK. Similarly, each understands that Hagens Berman and its lawyers will realize a benefit – being relieved of pending sanctions motions – that will have no value to the Plaintiff.

For the most part, too, the 27 Plaintiffs articulated a cogent rationale for a decision to dismiss their claims against GSK alone while soldiering on with claims against Grünenthal and Sanofi.[21] They stated that, as they understood the facts gleaned in discovery, they had no evidence to support claims that GSK had been involved with thalidomide at the times when these Plaintiffs were in utero. That is a rational basis for dropping claims against this particular Defendant, GSK, independent of whatever other unstated reasons any of these Plaintiffs might have for continuing or not continuing the pursuit of their claims against GSK or the others.

2.    *The Four Plaintiffs*

These Plaintiffs, too, want to drop their claims and have cogent reasons for doing so. One said an important fact witness had changed positions on an important evidentiary point. Another saw the Court's (and presumably my own) past opinions as "bullying" and "almost mocking," and decided that she would rather "get on with my life" than continue litigating. With these four Plaintiffs, of course, there is no concern that the lawyers' advice or judgment might be colored by self interest, because relief from sanctions for Hagens Berman is not a quid pro quo of these dismissals as it is in the GSK deal. Indeed, three of the four proposed dismissals came out

---

[21] A conspicuous exception is Plaintiff Mary McPartlan-Hurson, who (encouraged by her Hagens Berman attorneys) was so truculent and argumentative that I was never able to determine whether or about what she was informed. Ms. McPartlan-Hurson, ironically enough, seemed quite proud of herself for biting the hand. I declined to close the record of Ms. McPartlan-Hurson's telephone interview. I imagine she would be more cooperative in a courtroom before an actual judge, but I cannot think this would be a justifiable expenditure of scarce judicial resources and I do not recommend calling her back. Plainly, Ms. McPartlan-Hurson wants to surrender her claims against GSK. The Court and I have done our duty.

of the Discovery Master-ordered protocol of July 17, 2014 (Dkt. 268), by which Hagens Berman had agreed to review each Plaintiff's case for merit.  Unfortunately, months had passed between Hagens Berman's announcement to me that these Plaintiffs' claims would be withdrawn and the actual filing of a Rule 41(a)(2) motion.

## I.        My Misgivings:  Hagens Berman's Message to the Plaintiffs

My only opportunities to observe the Hagens Berman's lawyers' unprivileged interactions with their clients in these cases came in the telephone interviews themselves. There, the Hagens Berman lawyers (two of them, at least) were eager to tell their clients (and me, and "the record") that the entire process that began with the Court's October 31, 2014 Order has been a thinly disguised mission aimed at invading privilege and punishing (not protecting) the Plaintiffs, that the process was a "sham" and Judge Diamond's stated reasons initiating it were "pretextual."  Reading the interview transcripts, one cannot help concluding that the Hagens Berman lawyers were furious with the Court and probably with the Discovery Master. The behavior of Hagens Berman attorneys Nick Styant-Browne and Ari Brown was unacceptable. But the question, for purposes of this Report and Recommendation, is whether I can infer from that behavior that the Plaintiffs were so insufficiently informed – or, for that matter, so badly misinformed – about the terms and consequences of the proffered GSK deal that Hagens Berman fails the "voluntary/informed" test.   As stated, it remains my decision that there is simply not enough evidence to justify blocking or refusing the dismissals.  Nor do I think I could have justified crossing the border of privilege – given the narrow scope of my inquiry – based on what I witnessed in the interviews.  But I will spell these events out in some detail to facilitate the District Court's consideration of my conclusion:

In the initial interviews, before I asked any questions, the Hagens Berman lawyers read into the record an introductory statement that restated the objections on which Judge Diamond had already ruled:

> [P]laintiff intends to comply with all of the applicable orders concerning these interviews; however, plaintiffs maintain their objections to these interviews. Plaintiffs reserve the right to argue that the process is unwarranted, it is without jurisdiction, and will violate the privilege. And plaintiffs have repeatedly asserted they believe that the grave risk that the attorney/client and/or the work product privilege will be violated in these interviews which are being conducted in the presence of defense counsel.
>
> Plaintiffs expressly reserve the right to disqualify all defense counsel from these cases in the event that it's ultimately held that any privilege has been violated.
>
> Plaintiffs intend this preliminary statement to apply to all plaintiffs' interviews.

Tr., Rebecca Alexander, June 8, 2015, at 9-10. I had no issue with their doing this if they thought it necessary to preserve their position.

Within just two days, however, Mr. Brown's personal rendition of the speech had curdled. Instead of flagging a perceived risk that privilege might be violated, he was now telling his clients that I was deliberately seeking to violate the attorney-client privilege:

> [M]any of these interviews have already shown the extent to which they are without justification and we believe *seek to violate privilege.*
>
> There's not only a grave risk, but *there seems to be deliberate attempts that the attorney/client and work product privileges are being violated with these interviews* which are being conducted in the presence of defense counsel.

Tr., Carolyn Sampson, June 10, 2015, at 9-10 (emphasis added).

That same day, Mr. Brown's colleague, Nick Styant-Browne, took it a step further, proclaiming in the presence of his client and opposing counsel that the entire process was, in

effect, a fraud by the Court. During the interview of Plaintiff Ted Mann, I made the unfortunate

mistake of suggesting that Mann was one of the 27 (*i.e.*, that his motion was to dismiss only his

claims against GSK), when, as well I knew, he is actually one of the four who seek to dismiss all

their claims.[22] I cannot exactly track Mr. Styant-Browne's logic in thinking my slip proved that

a federal judge and I were engaged in a "sham," but this is what he said:

> So as of September 16th, 2014, you were advised that this
> plaintiff, Ted Mann, was dismissing all of his claims against all of
> the defendants. Despite that fact, this inquiry comports to arise out
> of a deal which was struck to which Mr. Mann was not a party in
> the second half of October, one month or more after you were
> advised that this plaintiff had dismissed all of his claims against all
> of the defendants.
>
> *And I want to make the record quite clear for everyone who
> comes after this that this reflects the sham that these interviews
> represent* in that you have just questioned him on a false premise;
> namely, that he had determined to dismiss his claim against GSK,
> and I quote, and not the other defendants. *And we object
> strenuously to the sham inquiry* and to the improper question
> which entirely misstates the record.

Tr., Ted Mann, June 10, 2015 at 15-16 (emphasis added). After apologizing to Mr. Mann for my

error, I reminded Mr. Styant-Browne that the "sham inquiry" had been ordered by the District

Court and that the Court's concern about the proposed GSK dismissals was very real. *Id.* at 16-

17.

Two days later, it was Mr. Brown's turn again. He accused the Court and me of

"pretext," editing his opening remarks yet again:

> We believe that the interviews to date have shown the extent that
> this is unwarranted and that *any claim that this is done for the
> protection of Mr. Simeone or any other plaintiff is pretextual at*

---

[22] In September 2014, Mr. Styant-Browne had informed opposing counsel and me that
Mr. Mann would be dismissing his claims against all Defendants. For reasons that do not appear
of record, no Rule 41(a)(2) motion was filed until January 2015 (Dkt. 440), some time after the
proposed GSK dismissals were announced, and I was then ordered to interview him.

> *best*. We think this is a deliberate effort to get behind the
> attorney/client privilege in an effort *to punish or perhaps*
> *embarrass plaintiffs and their counsel.*

Tr., Christopher Simeone, June 12, 2015 at 8 (emphasis added). Then, after I had made my usual

introductory remarks about the attorney-client privilege and how I intended to respect and

protect it, Mr. Brown made the following statement:

> MR. BROWN: Objection. We'd like to – we object to the
> soliloquy and the lecture that you just gave. We claim – we note
> that it was in many cases inaccurate as to the record; it was giving
> legal advice, which in many cases was inaccurate as well. And we
> believe that for all of the claims that you do not want to get into
> privilege and [into] the attorney's mental processes, we believe the
> interviews to date have shown that that is exactly what the
> intention here is, and that *this is a deliberate effort to delve into*
> *privileged information and to embarrass as part of a – and we*
> *believe it is pretextual.*
>
> We further object to the characterization of what you call
> extraordinary circumstances as to the need for this and to the
> giving of legal advice that has not been requested.
>
> [to the witness:] Please answer if you can after that.

*Id.* at 16-17 (emphasis added).[23] Mr. Brown didn't stop there; he went on to hint at the

possibility of improper contacts between "defendants" or "someone else" and the Court, to

question "if the defendants are driving this," *Id.* at 18, and to question the very legitimacy of the

tribunal. *Id.* at 25.

　　Plainly, Brown was attempting to obstruct my interview. I will never know what it was

that he didn't want me to find out, because of the very respect for the attorney-client privilege

---

[23] I became ever less confident that Mr. Brown and Mr. Styant-Browne understand how a
hearing is supposed to work. Lecturing opposing counsel at a deposition about "the giving of
legal advice that has not been requested" is one thing, but judges and (I think) those presiding
over judicial or quasi-judicial proceedings are *expected* to announce the law; that is part of their
job, and they need not await an invitation from counsel before doing it. Similarly, the witness
did not require Mr. Brown's permission to answer the question I had asked, and I certainly did
not need to be told what to do by Mr. Brown as, repeatedly, I was.

that Brown claimed was being violated.  That is a limitation on the reach of the search for truth that we consciously accept.

Mr. Brown's continued accusations, and his refusal to answer my questions aimed at fleshing out those accusations, came to such a pass on June 15, 2015 that I suspended the interview of Plaintiff Annette Manning.  *See* Tr., Annette Manning, June 15, 2015 at 9-14.  After conferring with the Court, I had an on-the-record conversation with all counsel that afternoon, outside the presence of any parties, in which I warned the Hagens Berman lawyers of the potential consequences of their ongoing conduct.[24]  Thereafter, the behavior improved.

But right to the very last, the Hagens Berman lawyers could not seem to grasp the fact that my appointed task was to serve as a proxy for Judge Diamond, performing a judicial function in conducting these interviews.  On Tuesday, July 14, 2015, after all the interviews had been completed, Heather Hunter, an employee of the court reporter, sent an email to all counsel as well as to me and my associate, Allison Buccola, who has assisted me in this engagement:

> Attention All Counsel:
>
>  At the instruction of Allison Buccola, Esquire, from Hangley Aronchick Segal Pudlin & Schiller, we were asked to go back into our audio files and/or recheck our steno notes on certain witness's respective transcripts.   As these were conducted via telephone conference call, some of the connections were fuzzy and spoken words may have been misheard by the respective stenographer.
>
> We agreed with some but not all of the changes, and made them accordingly.  Therefore, attached are all new transcripts reflecting minor changes as requested by Attorney Buccola.
>
> We apologize for any inconvenience.
>
> Thank you.

---

[24] The colloquy is included in the interview transcript of Alan Horridge, June 15, 2015, at 22-31.

Mr. Styant-Browne replied:

> Thank you for your email, and the attached "corrected" transcripts.
>
> Please provide us with the record of changes requested by Ms.
> Buccola, together with those changes you agreed to make in the
> "corrected" transcripts.

When I told Ms. Hunter to do no such thing without my approval, Styant-Brown shot back

another demand:

> Ms. Hunter,
>
> We request you preserve all records of any communications
> concerning the transcripts.

Before embarking on a chain of correspondence like this, Mr. Styant-Browne should have

reflected that what he was doing was seeking discovery into the internal workings of an office of

the Court, and that this is simply not permitted absent a very strong showing of wrongful conduct

on the part of the judicial officer or his agents.  By simply comparing his new transcripts with his

old transcripts – simple enough with today's office technology – he could have learned what

changes had been made.  But what Styant-Browne was demanding here was discovery into the

changes that my associate – my law clerk, if you will – had suggested, but that the reporter had

declined to make.  Then, Styant-Browne demanded that the reporter "preserve all records of any

communications concerning the transcripts," presumably for purposes of discovery into the

details of the Special Master's behind-the-scenes activities.[25]   It is hard to imagine trial counsel

behaving this way with respect to a judge, his law clerk or an official court reporter, and I cannot

think the rules are very different when a discovery master is the target.  Conduct like Mr. Styant-

---

[25] This was not the first time that the Hagens Berman lawyers had signaled an intention to
conduct discovery into the Court's business.  At the about-to-be suspended interview of Ms.
Manning, Ari Brown suggested that Hagens Berman might conduct discovery in support of his
"pretext" theory.  Tr., Annette Manning, June 15, 2015 at 11.

Browne's with respect to a special master was excoriated in *Alford v. Aaron Rents, Inc.,* No. 08-CV-683, 2010 WL 3522804 (S.D. Ill. Sept. 2, 2010).  There, a litigant sent a letter that "seeks discovery regarding [the special master's] work in preparing his report and recommendations."  The magistrate judge quashed the request, and ordered the special master not to produce the information.  *Id.* at *3.  Pointing out that a special master is a judicial officer, the court observed (*Id.* at *2) that

> Professor Dorothy as Special Master is not subject to discovery of his mental processes. Further, the Court notes that Alford asks for Westlaw receipts, charts and a broad request of "any other documents ... that might be helpful." To the Court, this is evidence of the same obstructive behavior that required the appointment of the Special Master.

*See also Gary W. v. State of La., Dep't of Health & Human Res.,* 861 F.2d 1366, 1369 (5th Cir. 1988) (no discovery of special master absent extreme and extraordinary circumstances); *cf. Terrazas v. Slagle*, 142 F.R.D. 136, 140 (W.D. Tex. 1992) (depositions of law clerks not permitted).

It is easy to wonder whether, in presenting the lopsided GSK deal to its clients, Hagens Berman painted a picture of a judiciary so hostile, so malevolent, that the Plaintiffs were incapable of making a reasonably informed decision.  But, particularly given the constraints of the attorney-client privilege, I cannot do more than speculate on that topic.  Accordingly, again, I respectfully recommend that dismissals should be ordered, as requested.

                    Respectfully submitted,

August 10, 2016           /s/ William T. Hangley
                               WILLIAM T. HANGLEY
                               SPECIAL DISCOVERY MASTER