IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

GLENDA JOHNSON, et al., :    Case No.
                  :    2:11-cv-05782-PD

        Plaintiffs  :

     vs.           :
                  :

SMITHKLINE BEECHAM   :
CORPORATION, et al.,   :
                  :

        Defendants  :

- - -

Friday, June 26, 2015

- - -

Telephonic Interview Under Oath
conducted by SPECIAL DISCOVERY MASTER
WILLIAM T. HANGLEY, ESQUIRE, of Plaintiff,
GLENDA JOHNSON, taken pursuant to notice,
held at the law offices of HANGLEY ARONCHICK
SEGAL PUDLIN & SCHILLER, P.C., One Logan
Square, 27th Floor, Philadelphia,
Pennsylvania 19103, beginning at 2:30 p.m.,
on the above date, before MARIA NOELLE
DAMIANI, Registered Merit Reporter,
Certified Realtime Reporter, Certified
Licensed iCVnet Reporter, Certified LiveNote
Reporter, Certified Shorthand Reporter (NJ
License No. 30XI00224100; DE License No.
RPR-117; PA; NY; DC) and a Notary Public.

- - -

ELITE LITIGATION SOLUTIONS, LLC
1518 Walnut Street, Suite 300
Philadelphia, Pennsylvania 19102
www.elitelsllc.com ~ (215) 563-3703

1
    INTERVIEW OF PLAINTIFFS HELD BEFORE THE
2
    SPECIAL DISCOVERY MASTER:
3
    HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER, PC
    BY:  WILLIAM T. HANGLEY, ESQUIRE
4
    BY:  ALLISON R. BUCCOLA, ESQUIRE
    One Logan Square, 27th Floor
5
    Philadelphia, Pennsylvania 19103
    Telephone: 215.496.7001
6
    E-mail:  Whangley@hangley.com
    Abuccola@hangley.com
7
8
    A P P E A R A N C E S :
9
    HAGENS BERMAN SOBOL SHAPIRO LLC
    BY: NICK STYANT-BROWNE, ESQUIRE
10
    BY: SHELBY SMITH, ESQUIRE
    BY: TYLER S. WEAVER, ESQUIRE
11
    1918 8th Avenue, Suite 3300
    Seattle, Washington 98101
12
    Telephone:  206.623.7292
    E-mail:  Ari@hbsslaw.com
13
    -Representing the Plaintiffs
14
15
    REED SMITH, LLP
    BY: FARAH TABIBKHOEI, ESQUIRE
16
    Three Logan Square
    1717 Arch Street, Suite 3100
17
    Philadelphia, Pennsylvania 19103
    Telephone: 215.851-8223
18
    E-mail: Sdiiorio@reedsmith.com
    Ftabibkhoei@reedsmith.com
19
    -Representing the Defendant, GlaxoSmithKline
20
21
    ARNOLD & PORTER LLP
    BY: SEAN HENNESSY, ESQUIRE
22
    555 - 12th Street NW
    Washington, DC 20004
23
    Telephone: 202.942.5999
    E-mail: Daniel_pariser@aporter.com
24
    Sean.hennessy@aporter.com
    -Representing the Defendant, Sanofi-Aventis

1

2

                    C O N T E N T S
3                    -   -   -   -   -

4    Testimony of:            GLENDA JACKSON

5                                  Page Number

6    By Mr. Hangley. . . . . . . . . . .6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                      SUPPORT INDEX
2
                          -   -   -
3
4    Direction to Witness Not to Answer
     Page
5
     None
6
7
8    Request for Production of Documents
     Page
9
     None
10
11
12   Stipulations
     Page
13
     6
14
15
16   Question Marked
     Page
17
     None
18
19
20   Confidential Portions
     Page
21
     None
22
23
24

1          SPECIAL MASTER HANGLEY:  Hello,
2     this is Bill Hangley.  Allison
3     Buccola is with me.
4          Do we have anyone from Hagens
5     Berman?
6          MR. STYANT-BROWNE:  Yes, Master
7     Hangley.  This is Nick Styant-Browne.
8     And with me is Shelby Smith, Master.
9          SPECIAL MASTER HANGLEY:  Hello.
10    How about GSK?
11          MS. TABIBKHOEI:  Yes, this is
12    Farah Tabibkhoei on behalf of GSK.
13          SPECIAL MASTER HANGLEY:  Okay.
14    And Grunenthal?
15          (No response.)
16          SPECIAL MASTER HANGLEY:  And
17    Sanofi?
18          MR. HENNESSY:  Yes, good
19    afternoon.  This is Sean Hennessy
20    from Arnold and Porter on behalf of
21    Sanofi.
22          SPECIAL MASTER HANGLEY:  I will
23    assume that a Grunenthal
24    representative will be joining us.

1    We'll go forward whether they do or

2    not.

3         SPECIAL MASTER HANGLEY:  And do

4    we have a court reporter today?

5         THE COURT REPORTER:  Yes,

6    Master Hangley, this is Maria.

7         SPECIAL MASTER HANGLEY:  Okay.

8    Do we have the consent of all to

9    swear in the witness by telephone?

10        MR. STYANT-BROWNE:  Yes,

11   Master.

12        MS. TABIBKHOEI:  Yes.

13        -  -  -

14        GLENDA JOHNSON, after having

15   been duly sworn, was examined and

16   testified as follows:

17        -  -  -

18        THE COURT REPORTER:  Thank you.

19        -  -  -

20   E X A M I N A T I O N

21        -  -  -

22   BY SPECIAL MASTER HANGLEY:

23   Q.   Good afternoon, Ms. Johnson.  My name

24   is Bill Hangley.  I'm a lawyer in

1   Philadelphia, and I'm in private practice,

2   but I have been appointed by the Court to act

3   in the place of the Court on certain matters,

4   either to decide matters or to take evidence

5   and report and make recommendations to the

6   judge so that, in effect, I'm a pretend judge

7   for the purposes of this afternoon's

8   interview.  I don't think we'll be taking a

9   lot of your time and I thank you for your

10  cooperation.

11              SPECIAL MASTER HANGLEY:  Mr.

12          Styant-Browne, would you like to

13          either make or refer to on the record

14          your opening statement?

15              MR. STYANT-BROWNE:  Yes, I

16          would be grateful, Master, if you

17          would dispose to stipulating my usual

18          opening statement for the purpose of

19          the record.

20              SPECIAL MASTER HANGLEY:  Glad

21          to do so.

22              MR. STYANT-BROWNE:  Thank you.

23  BY SPECIAL MASTER HANGLEY:

24      Q.   Ms. Johnson, first, can you hear me

1  okay?

2      A.      Yes, sir.  Yes, I can.

3      Q.      Very good.  And are you in Louisiana

4  today?

5      A.      I'm not.

6      Q.      Oh.  Where are you?

7      A.      Seattle, Washington.

8      Q.      Oh, good.  Are you at the offices of

9  Hagens Berman?

10     A.      I am.

11     Q.      And you're with Mr. Styant-Browne?

12     A.      I am.

13     Q.      Good, good.  Okay.

14             Mr. Styant-Browne didn't make an

15  opening statement that is familiar to all of

16  the lawyers at this point, but his statement

17  raises a -- if you had heard it, you would

18  have heard him talking about something called

19  the attorney/client and the Work Product

20  Doctrine.  I want to talk to you a little bit

21  about those doctrines of law and they may be

22  important to you and they may be important in

23  this conversation.

24             As you probably understand, our

1  justice system depends on the ability of

2  courts and people in lawsuits to gather

3  relevant information, evidence concerning the

4  thing that's in dispute.  And, generally

5  speaking, courts and parties to litigation

6  are entitled to find out from anybody

7  anything relevant that they know about a

8  particular case.  There's a big exception.

9  The big exception is that we want people to

10  engage lawyers to represent them in their

11  disagreements so that they resolve their

12  disagreements legally rather than by

13  resorting to extralegal or even illegal

14  measures.  To advance that policy, we have a

15  doctrine called the attorney/client privilege

16  that says that your conversations with your

17  attorneys, written communications, oral

18  conversations, what have you, are protected

19  from being looked into by outsiders if the

20  conversations were held with the expectation

21  of privacy, which normally means outside of

22  the presence of third parties, and if the

23  conversation had to do with the litigation or

24  the other matter on which the person has

1    represented the lawyer.

2            There's a related doctrine called the

3    Work Product Doctrine to seek to protect

4    outsiders from being told what it is in the

5    mind, what the mental processes of the

6    attorney are when he is working or she is

7    working in the representation of the client.

8            Those, as I say, are important

9    policies.  We do not want to violate those

10   policies, and so in this conversation I'm

11   going to ask you not to tell me about

12   conversations or contents of written

13   communications that you received from or gave

14   to the Hagens Berman lawyers when they were

15   representing you if you expected those things

16   to be confidential between you, but this

17   policy doesn't stop me from asking you about

18   facts you know, about things that you believe

19   to be true, about opinions you have or about

20   decisions that you personally made.  And that

21   means since all the questions are going to be

22   about the lawsuit --

23   A.    Yes.

24   Q.    -- that we are going to have to be

1    careful not to disclose the communications,

2    while at the same time giving me access to

3    the information that I am entitled to so that

4    I can do my job and report back to the Judge

5    Diamond.

6           Before asking you whether you

7    understand that, I'm going to ask Mr.

8    Styant-Browne whether he has an objection to

9    what I have just said?

10                   MR. STYANT-BROWNE:  No, Master.

11                   SPECIAL MASTER HANGLEY:  Okay.

12   BY SPECIAL MASTER HANGLEY:

13   Q.    Do you understand what I said, Ms.

14   Jackson?

15   A.    I do.  It's Johnson.  Yes, sir.

16   Q.    Oh.  I apologize.

17   A.    That's okay.  That's okay.

18   Q.    Well, it's not okay to me and I

19   apologize, Ms. Johnson.

20   A.    No, that's fine.

21   Q.    Okay.  Now, what this conversation

22   today is about, ma'am, is the decisions that

23   you made.

24           First, just some busy work.  You are

1   Glenda Johnson, and that's the same Glenda
2   Johnson who as a plaintiff brought a lawsuit
3   against defendant groups GlaxoSmithKline,
4   Grunenthal and Sanofi-Aventis; is that
5   correct?
6       A.    Correct.
7       Q.    And is it also correct that you have
8   now asked the Court to allow you to dismiss
9   your claims against GlaxoSmithKline with
10  prejudice while you continue to litigate
11  against Grunenthal and Sanofi?
12      A.    Correct.
13      Q.    Okay.  My first question is, why did
14  you do that?
15      A.    Well, actually I did feel that my
16  case against Richardson-Merrell and
17  Grunenthal was stronger.  I didn't see any
18  need to go forward against GlaxoSmithKline
19  because when my mom took the drug, it was in
20  the '60s.
21      Q.    And why is that important to you?
22      A.    Well, I wouldn't make it against
23  someone that didn't distribute the drug and I
24  feel that I have a stronger case with

1    Richardson-Merrell and Grunenthal.

2        Q.    Are you telling me, I suppose, that

3    your understanding is that SmithKline stopped

4    distributing this drug --

5        A.    Correct.

6        Q.    -- before your mother --

7        A.    Correct, that's my belief.

8        Q.    Okay.  Okay.  Now, I am not asking

9    you how you learned that fact, but your

10   understanding, just to confirm it, is that

11   they stopped distributing before 1960?

12       A.    Correct.

13       Q.    Okay.  Now, do you know of any

14   defenses that the other defendants have to

15   your claims against them?

16       A.    Could you repeat it?

17       Q.    Sure.  Do you know of any defenses

18   that the other defendants have for your

19   claims against them?

20       A.    The statute of limitations.

21       Q.    Any others?

22       A.    Uhm, no, sir.

23       Q.    Okay.  Now, do you understand that --

24             SPECIAL MASTER HANGLEY:  I'm

1          sorry, did someone say something?  I
2          guess not.
3    BY SPECIAL MASTER HANGLEY:
4      Q.     Ms. Johnson, do you understand that
5    the dismissal you are asking for is a
6    dismissal with prejudice?
7      A.     Yes, sir.
8      Q.     And what do you think that means?
9      A.     Can you repeat it one more time?
10     Q.     Sure.  You say that you ask for a
11   dismissal of the GSK defendants be with
12   prejudice and I asked you if you had a sense
13   as a layperson, I know you're not a lawyer,
14   but as a layperson, do you have an
15   understanding of what a dismissal with
16   prejudice means?
17     A.     To dismiss.
18     Q.     Okay.
19     A.     Forever.
20     Q.     Forever, okay.
21     A.     Right.  I couldn't hear you at first.
22     Q.     Okay.  And when you say "forever,"
23   you understand that even if Hagens Berman or
24   other attorneys came up with some powerfully

1    strong evidence against GlaxoSmithKline, that

2    if you had dismissed the case with prejudice,

3    there would be almost no chance that you

4    could ever revive that case?  Do you

5    understand that?

6        A.    Absolutely.

7        Q.    You understand that?

8        A.    Absolutely.

9        Q.    Good.  And now when did you become

10   aware of this evidence or belief,

11   intention -- I'm trying to find the right

12   word -- that GlaxoSmithKline had stopped

13   distributing Thalidomide before your mother

14   became pregnant?

15       A.    I believe it was back in the fall

16   sometime.

17       Q.    Fall of 2014?

18       A.    Yes, sir.

19       Q.    Now, ma'am, did you ever become aware

20   that with respect to other cases also

21   involving Thalidomide or with respect to

22   other claims of other plaintiffs that

23   GlaxoSmithKline had sought sanctions against

24   Hagens Berman?

1    A.    I did.

2    Q.    And when did you become aware of

3  that?

4    A.    I'm not sure about the date, but I

5  think maybe back in the fall.

6    Q.    Okay.  Did you find out about those

7  two things at the same time?

8    A.    Around the same time, yes, sir.

9    Q.    Okay.  The sanctions motions and the

10  evidence of no distribution before your

11  mother was pregnant?

12    A.    Right.

13    Q.    Right.  Okay.

14        I asked you earlier about what

15  prejudice meant in your mind.  Now I'm going

16  to ask you again as a layperson, knowing

17  you're not a lawyer, you say that there were

18  sanctions -- that there was a sanctions

19  motion against GlaxoSmithKline -- I'm sorry,

20  by GlaxoSmithKline against Hagens Berman.

21  What was GlaxoSmithKline attempting to do

22  with Hagens Berman?  What kind of relief were

23  they asking for, do you know?

24    A.    Uhm, I think for us to dismiss the

GLENDA JOHNSON

1  case and it would go away.

2     Q.    I'm sorry, I wonder if you could say

3  that again.

4     A.    I'm sorry, I didn't -- I don't think

5  I heard you correctly.

6     Q.    I -- I -- I just -- this may be a --

7  I'm having a hard time figuring out the last

8  thing you said.  What was that, ma'am?

9     A.    Uhm, the legal stage.

10    Q.    GlaxoSmithKline was attempting to

11 recover money from Hagens Berman?

12    A.    Correct.  Correct.

13    Q.    Now, did you have an understanding as

14 to whether GlaxoSmithKline was trying to

15 recover money from any of the individual

16 plaintiffs, including yourself?

17    A.    No, I don't believe they were.

18    Q.    Okay.  Okay.  Now, in this

19 transaction that you are proposing, tell me

20 if I have the parts right, you will lose

21 whatever benefit or value there may be or may

22 have been in claims against GlaxoSmithKline;

23 is that right?

24    A.    Correct.

1    Q.    And GlaxoSmithKline will get whatever
2    benefit or value there is in being relieved
3    of your claims against it, right?
4    A.    Correct.
5    Q.    And GlaxoSmithKline will give up the
6    benefit of whatever value there is in their
7    sanctions claims against Hagens Berman; is
8    that correct?
9    A.    Correct.
10   Q.    And Hagens Berman will get the
11   benefit of being relieved of whatever threat
12   there is that they'll have to pay money to
13   GlaxoSmithKline?
14   A.    Right.
15   Q.    Okay.  So GlaxoSmithKline and Hagens
16   Berman both get something of value, whatever
17   value that may be; correct?
18   A.    I guess, correct.
19   Q.    And you give up something for
20   whatever value it may have.  What benefit do
21   you get out of dismissing the claim against
22   GlaxoSmithKline?
23   A.    Well, like I said, I just believe we
24   should pursue the case against Grunenthal and

1 Merrell because it's much stronger than guess
2 GlaxoSmithKline.
3     Q.    Okay.  Can you tell me what makes it
4 stronger?
5     A.    Well, I firmly believe that they --
6 that Glaxo distributed the drug to my mother
7 because it was in the '60s.  And I truly
8 believe that.
9     Q.    Somebody could argue that because of
10 its interest in avoiding those motions for
11 sanctions that there will be a temptation to
12 Hagens Berman, and I am not saying that they
13 yielded to that temptation, but that somebody
14 could argue that there would be a temptation
15 to Hagens Berman to let that concern get in
16 the way of giving you independent advice.  Do
17 you understand that argument?  I'm not saying
18 if you agree with it, but do you understand
19 it?
20     A.    Yes.
21     Q.    Okay.  Did it occur to you to talk to
22 a lawyer other than a Hagens Berman lawyer
23 with respect to whether you ought to give up
24 these claims against GlaxoSmithKline?

1    A.    I don't feel the need.  I trust my

2    lawyers and I have faith in them.

3    Q.    Okay.  Did you consider that

4    possibility at the time that you found out

5    about these two things, the --

6    A.    No, sir, I don't feel the need to.  I

7    don't, no.

8    Q.    Okay.  I asked you a little

9    differently, and that's whether you thought

10   about it.

11   A.    No, I didn't think of it.

12   Q.    Okay.

13   A.    I didn't feel the need to at all.

14   Q.    Okay.

15               SPECIAL MASTER HANGLEY:  Okay.

16          Ms. Johnson, I thank you very much

17          for your time and for your obvious

18          cooperativeness, and unless others

19          have questions, I think we are done

20          with this interview.

21               THE WITNESS:  You're quite

22          welcome.

23               MR. STYANT-BROWNE:  Thank you,

24          Master.  No questions from the

1    plaintiffs.

2              MS. TABIBKHOEI:  No questions

3    from GSK.  Thank you.

4              MR. HENNESSY:  No questions

5    from Sanofi.  Thank you very much for

6    your time.

7              SPECIAL MASTER HANGLEY:  Okay.

8    All right.  We are off the record.

9    We're adjourned.

10             -  -  -

11             (Witness excused.)

12             -  -  -

13             (Deposition concluded at

14   approximately 2:52 p.m.)

15

16

17

18

19

20

21

22

23

24

1          C E R T I F I C A T E
2
3                    I, Maria N Damiani, a
    Registered Merit Reporter, Certified Real
4   Time Reporter, Certified Live Note Reporter,
    Certified Court Reporter, certify that prior
5   to the commencement of the examination,
    GLENDA JOHNSON, duly sworn by me to testify
6   to the truth, the whole truth and nothing but
    the truth.
7
                     I do further certify that the
8   foregoing is a verbatim transcript of the
    testimony as taken stenographically by and
9   before me at the time, place and on the date
    hereinbefore set forth, to the best of my
10  ability.
11                   I do further certify that I am
    neither a relative nor employee nor attorney
12  nor counsel of any of the parties to this
    action, and that I am neither a relative nor
13  employee of such attorney or counsel, and
    that I am not financially interested in the
14  action.
15

    _____
16  Maria N Damiani, RMR, CRR, CLR, CCR
17  Notary number: 1034904
    Notary expiration:  12/3/2016
18  CSR Number Delaware:  RPR-117
    CSR Number New Jersey:  30XI00224100
19
    Dated: June 26, 2015
20
21                   (The foregoing certification of this
    transcript does not apply to any reproduction
22  of the same by any means, unless under the
    direct control and/or supervision of the
23  certifying reporter.)
24

1          INSTRUCTIONS TO WITNESS

2                    Please read your deposition

3    over carefully and make any necessary

4    corrections.  You should state the reason in

5    the appropriate space on the errata sheet for

6    any corrections that are made.

7                    After doing so, please sign the

8    errata sheet and date it.

9                    You are signing same subject to

10   the changes you have noted on the errata

11   sheet, which will be attached to your

12   deposition.

13                   It is imperative that you

14   return the original errata sheet to the

15   deposing attorney and all counsel within

16   thirty (30) days of receipt of the deposition

17   transcript by you.  If you fail to do so, the

18   deposition transcript may be deemed to be

19   accurate and may be used in Court.

20

21

22

23

24

1                          –  –  –  –  –  –
                        E R R A T A
2                          –  –  –  –  –  –

3   PAGE   LINE   CHANGE

4   _____  _____  _____

5   _____  _____  _____

6   _____  _____  _____

7   _____  _____  _____

8   _____  _____  _____

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24  _____  _____  _____

1      ACKNOWLEDGMENT OF DEPONENT

2

3           I,_____, do

4   hereby certify that I have read the foregoing

5   pages,  1 - 22, and that the same is a

6   correct transcription of the answers given by

7   me to the questions therein propounded,

8   except for the corrections or changes in form

9   or substance, if any, noted in the attached

10  Errata Sheet.

11

12

13  _____

14   GLENDA JOHNSON                DATE

15

16

17

18  Subscribed and sworn
    to before me this
19  _____ day of _____, 20_____.

20  My commission expires:_____

21

22  _____
    Notary Public

23

24