## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GLENDA JOHNSON ET AL.,<br><br>   Plaintiffs,<br><br>   v.<br><br>SMITHKLINE BEECHAM CORPORATION<br>ET AL.,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 2:11-cv-05782-PD
and all related cases

**Filed Under Seal**

## ORDER AND
## REPORT AND RECOMMENDATIONS
## OF THE SPECIAL DISCOVERY MASTER

### ORDER

  It is hereby ORDERED that any response or objection to the below Report and Recommendations of the Special Discovery Master shall be filed and served on or before Thursday, March 8, 2018.

## REPORT AND RECOMMENDATIONS
## OF THE SPECIAL DISCOVERY MASTER

I.   **Introduction**

  A law firm has submitted documented evidence suggesting that one of its attorneys testified falsely as a witness and placed a counterfeit document in evidence. The evidence suggests that: The attorney, Tyler S. Weaver, falsified two expert reports. He palmed one of them off on his client as genuine in an unsuccessful effort to persuade her to drop tort claims that the firm, Hagens Berman Sobel Shapiro LLC ("Hagens Berman"), no longer wished to pursue on

her behalf. Years later, he swore in court that the fraudulent document was genuine, and it was received in evidence.

At this point, we know very little about the second sham expert report, except that the subject of the altered report, a different client of Hagens Berman, agreed to the dismissal of her claims.[1]

Hagens Berman seeks under-seal treatment of two motions relating to these events, a *Motion to Reopen and Correct the Record with Respect to Hagens Berman's Motion to Withdraw as Counsel for Plaintiff Terrie Bolton* (the "Motion to Reopen," Doc. No. 583), and a *Motion for the Appointment of Independent Counsel for Diana Cabcabin* (the "Motion to Appoint Independent Counsel"), filed under cover of a Motion to File Under Seal (Doc. No. 585). I have been asked by the Court to report and recommend with respect to the requests to seal and the underlying motions and, if the hearings are reopened, to continue conducting them.

II. **Recommendation**

A. **The Interim Sealing and Recommended Unsealing of this Report**

For the moment, this Report and Recommendation ("Report") is being filed under seal and distributed only to counsel for Hagens Berman, counsel for Mr. Weaver, and *pro bono* counsel for Plaintiff Terrie Bolton. Ms. Bolton was the recipient of the first manufactured expert report, sent under cover of a Weaver email claiming it was legitimate.

But I recommend that the District Court unseal this report, and that it be available to all parties and the public once the above-named recipients have had an opportunity to object. If the Report is unsealed, I intend also to distribute copies to the following people:

---

[1] Hagens Berman believes the fake report was not provided to the client but has engaged a forensic consultant to examine its electronic and paper files to confirm this.

- Plaintiffs Richard Anderson, John Marshall, Jose Navamuel and (care of her *pro bono* counsel) Mary Sells.  Like Plaintiff Bolton, these plaintiffs are opposing Hagens Berman's motions to withdraw from their representation (the "Motions to Withdraw," Doc. Nos. 207, 301, 342, 375, 382).

- Diana Cabcabin, a one-time plaintiff in these consolidated cases, who is the subject of the second bogus expert report and may have been misled into surrendering her claims; and

- Laurence F. Pulgram, the San Francisco attorney I recommend the Court appoint to represent Ms. Cabcabin at Hagens Berman's expense, should she choose to engage him.

The events described in this Report may have implications for other former Hagens Berman client-plaintiffs who consented to the dismissal of all their claims with prejudice, presumably on Hagens Berman's advice.  However, I do not presently recommend that those non-parties be sent the Report.  I may revisit that issue once I have completed my review of documents, or during or after a reopened hearing.  I assume that Hagens Berman will make whatever distribution decisions it considers appropriate with respect to its other clients.

B.    **The Motion to Reopen**

I recommend that the Court grant under-seal treatment to the Motion to Reopen. Although that motion centers on words, deeds and documents that are decidedly unprivileged, it also discloses opinion work product and communications as to which the client, Ms. Bolton, holds the privilege, and she has not waived it.  I discuss these considerations in Section IV of this Report.

Of course, I recommend that the Motion to Reopen be granted.  I discuss the scope of the continuing inquiry in Section V.

### C.     The Motion to Appoint Independent Counsel

The Motion to Seal the Motion to Appoint Independent Counsel should be denied.  It would not merit under-seal protection if it disclosed Weaver's second forgery, but it doesn't even do that; it simply seeks to have independent counsel appointed for Ms. Cabcabin based on events Hagens Berman has disclosed to me as Discovery Master, and that I have passed on to Judge Diamond.

I recommend that the Court defer granting the Motion to Appoint Independent Counsel until Ms. Cabcabin and Mr. Pulgram have seen this Report and had an opportunity to confer.  I will almost certainly require Ms. Cabcabin's testimony at a reopened hearing (assuming the Court grants the Motion to Reopen),  and I believe she should be represented in connection with this inquiry, but it is possible that she will decline the offer of independent counsel and moot the motion.

### D.     Timing of Objections

Rule 53(f) provides that objections to a master's report and recommendations shall be filed "no later than 21 days after a copy is served, unless the court sets a different time."  As discussed below, I have had a lengthy telephone conference with counsel for Bolton, Weaver and Hagens Berman in which, for the most part, I informed them of the same views that are expressed in this Report.  At my request, counsel have submitted a Joint Memorandum in response to those views.  In the circumstances, I think a ten-day response period to this Report is adequate, and I have so ordered.

4

III.    **Facts**

This consolidated litigation involved, at one point, as many as 52 plaintiffs, all claiming that their mothers had ingested thalidomide about 50 years earlier and that they, the plaintiffs, suffered injuries as a result.  Hagens Berman represented all the plaintiffs.

By August 2014, Hagens Berman had lost or capitulated on several clients' claims, and two of the defendants were seeking sanctions against the firm under 28 U.S.C. § 1927 and the Court's inherent authority.  Faced with the threat of more sanctions litigation, Hagens Berman had consented to an Order requiring it to "investigate each of the remaining active cases in these consolidated actions with a view to making a decision whether it should continue to be prosecuted or dismissed with prejudice by consent."  Doc. No. 268 ¶ 1.  The deadline for completion of this process was September 16, 2014.

A number of plaintiffs' cases were terminated under this arrangement, Diana Cabcabin's among them.  But five of the plaintiffs refused to give their informed consent to their suggested dismissals, and insisted that Hagens Berman continue its representation and finish what it had started.

Hagens Berman filed its Motions to Withdraw.  On September 26-28, 2017, I presided over *in camera* evidentiary hearings respecting the contested motions of Hagens Berman to withdraw from its representation of Richard Anderson, Terrie Bolton, John Marshall, Jose Navamuel, and Mary Sells.  The hearings were held *in camera* to preserve the five plaintiffs' attorney-client and attorney work product protection.[2]  The purpose of the hearings is to flesh out

---

[2] The defendants in these consolidated cases (GlaxoSmithKline LLC; GlaxoSmithKline Holdings (Americas) Inc.; Grünenthal GmbH; and Sanofi-Aventis U.S. LLC) "waive[d] participation in and discovery into the in camera review and proceedings."  Doc. No. 546.

the "professional considerations" cryptically referred to in Hagens Berman's motions and assist the District Court in determining whether Hagens Berman can justify leaving client litigants without counsel. I am instructed to learn, among other things, whether Hagens Berman knew or should have known, before bringing claims on behalf of a particular plaintiff, the facts that now are said to justify a "professional considerations" withdrawal. Doc. No. 532.

Because there are five different plaintiffs and five separate motions, five separate *in camera* hearings were held;[3] thus, the hearing on Hagens Berman's motion regarding Plaintiff Bolton (the "Motion re Bolton") was participated in only by Hagens Berman and Ms. Bolton and their attorneys.

Tyler Weaver testified that he was the primary Hagens Berman lawyer dealing with Ms. Bolton in the August 2014 timeframe, when Ms. Bolton traveled to the Pocatello, Idaho home of Trent Stephens, Ph.D., a professor emeritus of anatomy and embryology at Idaho State University. Weaver said that, after interviewing and examining Ms. Bolton, Stephens prepared a report for Hagens Berman. Weaver testified that he forwarded the report to Ms. Bolton in attempting to persuade her to drop her case. The report was offered and received in evidence, along with email exchanges between Bolton and Weaver and between Stephens and Weaver. Stephens' report and conclusions were at the heart of the "professional considerations" case presented by Hagens Berman to justify terminating its representation of Ms. Bolton.

I break off from my narrative here to commend two outstanding trial lawyers, working *pro bono*, who are doing a great service to the Court and the law in really challenging circumstances. Cindy Albracht-Crogan of Phoenix, Arizona represents Terrie Bolton, and David

---

[3] For convenience, we began with an omnibus hearing that all five plaintiffs and their counsel were entitled to attend, at which witnesses for Movant Hagens Berman testified to facts common to all five motions.

C. Weiner of Cleveland, Ohio, represents another of the five plaintiffs, Mary Sells.[4]  But for the skill and persistence of these two lawyers, I don't believe Mr. Weaver's apparent misconduct would have outed.  Crogan and Weiner were brand new to this litigation as the *in camera* hearings neared, and presumably knew only what was in the public record and what their lay clients could tell them.  But their cross-examinations of Hagens Berman witnesses (conducted by video and telephone) and their demands for documentary backup of Hagens Berman testimony were what led to Hagens Berman's agreement to search for and produce information that had not previously been produced in Bolton's and Sells' cases.  And it was that search that unearthed the document-tampering.

After the hearings, Crogan and Weiner worked with Hagens Berman's outside counsel, Gaetan Alfano and Douglas Roberts, on the nuts and bolts business of document production. Then, on November 28, 2017, I was asked to join an urgent telephone conference with Ms. Crogan and Messrs. Alfano and Roberts.  I expected a garden variety discovery dispute.

It was not that.  In the conference, Mr. Alfano explained that a consultant's report he had placed in evidence was a fake, that Weaver had received a legitimate report, altered it, and passed it on to his client, Ms. Bolton, telling her it was the genuine article.  Without going into specifics, it is fair to say that the altered document presents a more discouraging prospect for Ms. Bolton's case than the unredacted document, and surely made it easier for Weaver to argue that Bolton should drop her claims.

---

[4] Knowing the difficulties lay plaintiffs would face in the hearings, with their attorneys suddenly across the aisle, I offered (if asked), to recommend attorneys who might accept limited engagements to advise and represent them solely with respect to the Motions to Withdraw alone. *See* Procedural Memorandum of the Special Discovery Master, Doc. No. 562 at 4.  Mses. Bolton and Sells accepted the offer, and Crogan and Weiner stepped up to the plate.

No sooner had Hagens Berman filed its Motion to Reopen (on December 7, 2017), than Mr. Alfano had to come back with more bad news. On December 8, he informed us that Mr. Weaver had now admitted to altering another Stephens report, this one relating to Ms. Cabcabin.[5] At this point, according to counsel, Hagens Berman believes the altered document was never communicated to Ms. Cabcabin. We know only that she did agree to dismiss her claims with prejudice.

On December 12, I conferred with Ms. Crogan, Messrs. Alfano and Roberts, and Mr. Weaver's attorney, Robert Welsh, in a transcribed call. We discussed collegially a number of questions: whether the Motion to Reopen was entitled to under-seal treatment; what documents should be supplied to the Discovery Master in advance of any reopened hearing; who, other than the Discovery Master and the Court, should have access to such documents; what privileges or other constraints on disclosure might obtain, and who might testify at a reopened hearing. At my request, Ms. Bolton, Mr. Weaver and Hagens Berman conferred on these questions and stated their positions on these questions in a Joint Memorandum of December 20. In that Joint Memorandum, Hagens Berman confirmed that it is having a forensic review conducted by an independent third-party consultant to identify any other instances of document tampering. The participants requested that any adjourned hearing be postponed until after discovery issues have been resolved and Hagens Berman has completed its document production.

## IV. Sorting Through the Privilege Issues

Breaking up is hard to do. When a lawyer attempts to cut a client loose in a pending case and the client nasty questions of privilege, work product, case management and just plain fairness lie in the shadows, waiting to pounce. The issues are even more touchy if unspecified

---

[5] The Bolton switch was on August 21, 2014; the Cabcabin switch, the next day, although all the documents (Exhibits A-D, attached) are dated August 14.

"professional considerations" are involved.  And the going gets still tougher if the "professional considerations" implicate the work of an expert and the testifying/non-testifying expert issue (*see* Fed. R. Civ. P. 26(b)(4)) has to be addressed.  Now, to make things even more complicated, throw in the fact that these particular lawyers are seeking to jettison not just one but five plaintiff clients.  Each of these five has her own injuries, her own family history, and her own medical history, and each of them may or may not have looked to Mr. Weaver as "my lawyer," and may or may not have been the subject of a Stephens diagnosis that Hagens Berman relies upon to support its "professional considerations" motion.  Messy indeed.

But oh, what a tangled web Weaver wove when he threw issues of mendacity and fraudulent misconduct into the mix.  Now he has brought into play the Court's obligation to police its own proceedings and the conduct of the attorneys who appear before it, and his conduct appears to go beyond these five plaintiffs and call into question every plaintiff who was asked to drop her case against all defendants.  He has given every Hagens Berman client or former client – every Bolton or Cabcabin – reason to worry about her lawyers' honesty, competency and fidelity.

Asked to inform me on the question whether documents surrounding these stunning events could be kept secret from (a) the other four Plaintiffs, (b) the Defendants, and (c) the public, the three authors of the Joint Memorandum — Hagens Berman, Bolton and Weaver — tended to speak in broad terms, with references to the "confidentiality of [former clients'] personal, medical, and legal information."  I am afraid we have to tease the doctrinal threads out a bit more.

First, a litigant's medical history may be a sensitive matter to her, but it is simply not entitled to protection here.  By putting her physical condition at issue, she waived any physician-

patient privilege. *Williams v. Rene*, 72 F.3d 1096, 1103 (3d Cir. 1995*); In re Asbestos Prod. Liab. Litig. (No. VI)*, 256 F.R.D. 151, 155 (E.D. Pa. 2009)("By bringing suit based on diagnoses of asbestosis, Plaintiffs have essentially released to the world their own medical information").

On the other hand (and as Hagens Berman has noted) Ms. Bolton did not forfeit her attorney-client privilege simply by opposing Hagens Berman's attempt to stop representing her. *Cf.*, e.g., *Knopick v. Downey*, No. 1: 09-CV-1287, 2014 WL 12731991 (M.D. Pa. Apr. 3, 2014); *Thompson v. Wyrks Tool & Mach. Ltd.*, No. CIV.A.09-581, 2010 WL 2574072, at *2 (W.D. Pa. June 22, 2010). Dr. Stephens' reasoning regarding the etiology of a Ms. Bolton's harm is just one of the several elements that she and Hagens Berman will have to address if her claim is to reach a jury – whether the mother ingested thalidomide, who manufactured and provided it, and why Ms. Bolton waited a half-century to sue, for example. Obviously, Weaver's alleged tampering was not privileged. Artifice is not advice. Fundamentally, he was not acting in the service of his if he was trying to trick the client or bilk the Discovery Master. But his firm's communications with his client and others relating to the other facets of Ms. Bolton's case, and its work product in those areas, should continue to be protected in the absence of a waiver by the client.

The next question is whether there is anything in the nature of Dr. Stephens' work as an expert in Bolton's case (or Cabcabin's, or others') that would shield it from disclosure. Fed. R. Civ. P. 26(b)(4), generally permits discovery from an "expert who may testify" (Rule 26(b)(4)(A)-(C)) but not from an "expert employed only for trial preparation."(Rule26(b)(4)(D)). Here, when Hagens Berman commenced this litigation on behalf of its 52 then clients, it is fair to say that Dr. Stephens was expected to testify in all 52 cases. That is because, in Hagens Berman's

view, Stephens was the only game in town. A Hagens Berman lawyer, Nick Styant-Browne,

made this clear:

> [O]ur understanding of the available experts in the United States
> was that there were no medical experts available who could make
> the diagnosis which we ultimately obtained from Dr. Stephens.

Bolton Transcript 9/26/2017 at 140:9-140:12.  Mr. Weaver's testimony was to the same effect:

> Q [Ms. Crogan:]  Okay.  So your testimony is that the physicians
> who treated Ms. Bolton for her birth injuries and other physical
> conditions were not qualified to opine that she was a thalidomider?
>
> A [Mr. Weaver:]   My understanding of the science and the
> number of people available to testify about thalidomide injuries is
> a very limited field.  We have had extensive discussions with Dr.
> Stephens about this, not necessarily related to Bolton's -- Ms.
> Bolton's case but to everyone's case.  And we had gone around
> looking for other experts in the United States who could testify
> about how thalidomide worked and what sort of injuries it causes.
> And that universe is extremely limited. . . .

*Id.* At 35:1-35:12.

> A       [W]e were relying on Dr. Stephens as the preliminary --
> primary expert in the United States and perhaps the only expert in
> the United States who would give opinions on this based on their
> qualifications. . . .

*Id.* at 68:10-68:13.  Even Stephens himself seems to agree:

> The UK Thalidomide Trust and the World Health Organization
> jointly sponsored a meeting 24-25 February 2014 in Geneva,
> Switzerland to address the issue of the range of thalidomide defects
> and invited those who they apparently consider to be the twenty
> five world's experts on the subject to attend. I was the only
> attendee from the United States. My singular invitation by the
> WHO suggests that in their minds I am the only thalidomide expert
> in the US.

Doc. 429-2, Declaration of Trent Stephens, Ph.D. Regarding Phillip Yeatts ¶ 16(k).  A

thalidomide case could never *get* to trial without an expert diagnosis fingering thalidomide as the

engine of the injury.  And, in Hagens Berman's world, only Dr. Stephens could provide that

diagnosis.[6]   Thus, it would be unrealistic to argue that, in the terms of Rule 26(b)(4)(D),

Stephens was "not expected to be called as a witness at trial." *See In re Asbestos Prod. Liab.*

*Litig (No. VI)*, 256 F.R.D. at 156, *citing In re Silica Prod. Liab. Litig.,* 398 F. Supp. 2d 563, 584

(S.D. Tex. 2005).   Accordingly, Dr. Stephens' diagnostic report – the authentic pre-tampering

report – need not be placed under seal or considered *in camera.*

At present, the four documents of most urgent interest to my inquiry are publicly

unavailable because they are in the record as exhibits from an *in camera* hearing (the altered

Bolton report) or as exhibits to the sealed Motion to Reopen (the authentic and altered Bolton

reports), or because they are completely absent from the record (the authentic and altered

Cabcabin reports).   I am attaching them as exhibits to this Report, so that they will be publicly

accessible if the Report is unsealed.

I also conclude that drafts of the reports, internal Hagens Berman communications and

discussions between the lawyers and Dr. Stephens with respect to Bolton or Cabcabin should

also be made available, as needed in my investigation, and not placed under seal, in the absence

of another privilege.   I am aware that Rules 26(b)(3), 26(b)(4)(B) and 26(b)(4)(C) place

restrictions on discovery of expert's drafts and communications with counsel, but I cannot

believe those constraints were intended to provide work product or privilege protection to a

course of conduct in which the lawyer was attempting to mislead a client or misrepresent the

expert's actual work product.   (Not surprisingly, I have found no case law on the question.)

V.     **Scope of the Hearing**

Although Hagens Berman has asked for a reopened hearing, I am a little worried that the

firm may be thinking about something narrower than I contemplate.   The Motion to Reopen

---

[6] By my quick count, Stephens has filed some 16 declarations addressing dispositive
motions in these consolidated cases.   No other expert has surfaced for plaintiffs, so far as I know.

appears to paint a scenario in which Nick Styant-Browne walks me through the history of Dr. Stephens' Bolton drafts and the discovery of the fiddled report, moves to substitute the genuine for the fake, and leaves me to decide the Motion to Withdraw from the Bolton representation, as though Weaver had never done the things he did. I hope Hagens Berman appreciates the enormity of the insult to the civil justice system, the courts, and office of attorney that apparently has occurred. I believe that Weaver's conduct obliges the Court to examine closely the events that transpired, and to impose sanctions if and as warranted, and that the Court expects me to report and recommend on those subjects as well as on the grant or denial of the Motions to Withdraw.[7]

*In re Theokary*, 592 Fed. App'x 102 (3d Cir. Dec 11, 2014)(non-precedential) another case involving counterfeit expert reports, is persuasive on the point. In an adversary action in the Bankruptcy Court, Theokary sued the people who had cared for his standardbred horses. Acting under color of their stablemen's liens, they sold the horses to satisfy their delinquent accounts, even though they had notice that he had filed for bankruptcy. In the liability stage of a bifurcated trial, the court found that defendants had knowingly violated the automatic stay and held that Theokary was entitled to recover his actual damages and his attorney's fees. But then, in the damages trial, Theokary did what Weaver is accused of doing here; he placed a phony expert report in evidence. Bankruptcy Judge Frank dismissed Theokary's case as a sanction within the court's inherent power, Judge Restrepo affirmed, and Theokary appealed.

---

[7] All the Hagens Berman lawyers were admitted *pro hac vice* in these cases, and are "deemed thereby to have conferred disciplinary jurisdiction upon this court for any alleged misconduct . . . in the course of or in the preparation for such proceeding." Local Rule 83.6.VIII (E.D. Pa.)

Theokary argued that, even though his damages evidence was bogus, the defendant's

expert had placed *some* value on the horses, and the statute (11 U.S.C. *S* 362(K)(1)) *did* entitle

him to his counsel fees.  The Circuit was having none of it:

> To use an analogy, Theokary essentially asserts that the
> Bankruptcy Court should have been more akin to a skilled surgeon
> using a scalpel, extracting *only* those portions of the evidence and
> proceedings actually touched by disease. This argument fails to
> recognize that his fraudulent conduct did not simply impact the
> tainted evidence, the damages trial, or the adversarial proceedings
> as a whole—it represented a direct and brazen affront to the
> judicial process. As the Supreme Court aptly noted over seventy
> years ago:
>
> > [T]ampering with the administration of justice in
> > the manner indisputably shown here involves far
> > more than an injury to a single litigant. It is a
> > wrong against the institutions set up to protect and
> > safeguard the public, institutions in which fraud
> > cannot complacently be tolerated consistently
> > with the good order of society.
>
> *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246,
> (1944). This norm still holds true today. Dismissal was properly
> imposed in this case "not merely to penalize those whose conduct
> may be deemed to warrant such a sanction, but to deter those who
> might be tempted to such conduct in the absence of such a
> deterrent." *Nat'l Hockey League [v. Metropolitan Hockey Club,
> Inc.]*, 427 U.S. 639, 643 (1976).

*In re Theokary*, 592 F. App'x at 107.

VI.     **Preliminary Observations Regarding Witnesses, Document Production and Privilege Issues**

The matters discussed in the remainder of this Report should not affect the Court's rulings on the motions before it.  I am mentioning them in keeping with my "report" function and, also, to give the parties the benefit of my thoughts on the proceedings that lie ahead.

A.     **Witnesses**

Although we have agreed to consider precise hearing arrangements after document production has taken place, I have advised counsel that I expect to require the testimony of witnesses other than Mr. Styant-Browne.  The list is likely to include Mr. Weaver, Dr. Stephens, Nicolle Grueneich (a paralegal at Hagens Berman), Steve Berman, Terrie Bolton, Diana Cabcabin and, possibly, a witness to speak for the outside e-discovery consultant.

B.     **Document Production**

Hagens Berman has already agreed to produce the report of that consultant to me and Ms. Bolton's counsel; I do not believe that document will be entitled to confidential treatment.  In our December 12 telephone conference, I also spelled out (inelegantly, to be sure) the documents I will have to examine in light of Weaver's apparent misdeeds:

> I think I have to look at the range of, quote, documents, correspondence, memoranda, drafts, et cetera, between or relating to Hagens Berman and Dr. Ste[ph]ens or any other consultant, including metadata, relating to their work in all cases where voluntary dismissal against all defendants . . . was either [e]ffected or requested and is still pending as well as these five motions.
>
> And I'm also going to want to see every report that was submitted to the court[,] provided to the Plaintiff[s], the client[s], or provided to the defendants.  At the present, I'm only going to ask for those reports, not any of the related correspondence, drafts, blah, blah, blah. Of course they should be preserved.

15

Transcript of telephone conference, Dec. 12, 2017 at 23:4-24:2.[8]   Hagens Berman's response, in the Joint Memorandum, seemed generally in agreement.  I am making it clear, however, that I do not expect just correspondence between Hagens Berman and Stephens regarding the five plaintiffs and other plaintiffs as to whom voluntary dismissal was sought or obtained, I also request Hagens Berman's correspondence with the clients themselves, and Hagens Berman's internal correspondence, notes and memoranda regarding those clients' conditions, or the possible dismissal of their claims.  With the exception of documents relating to Bolton or Cabcabin, the documents other than Dr. Stephens' last reports will be reviewed *in camera*  unless Hagens Berman chooses to make them available more broadly.

Hagens Berman has agreed also to provide copies of every report drafted by Dr. Stephens or any other consulting expert and either provided to any Plaintiff, provided to any Defendant, or submitted to the Court in these actions.

I will receive documents in native form, so as to include metadata.  Hagens Berman proposes to provide them to Ms. Crogan (and implicitly, to make them available to other interested parties) with privileged information redacted; hence, they will necessarily be in PDF or some other non-native format.  In the Joint Memorandum, Hagens Berman has undertaken to prepare a privilege log of documents that are being withheld from Ms. Crogan and Mr. Weiner on grounds of privilege, pointing out that I will have copies of all the documents and will be in a position to rule promptly on privilege issues

C.     **Potential Privilege Issue**

In the Joint Memorandum, Hagens Berman and Ms. Bolton disagree on one other privilege issue, and I wanted to mention it before document production begins.  Ms. Crogan has

---

[8] The transcript has not been filed with the Clerk of Court, but Judge Diamond and all participants in the December 12 call have copies.  That is also true of the Joint Memorandum.

suggested that, by reason of the co-client privilege articulated in The Restatement of the Law

Governing Lawyers § 75, none of the plaintiffs in these consolidated cases can invoke privilege

against any of the other plaintiffs, although all of them can invoke it against others.  The

provision is as follows:

> (1) If two or more persons are jointly represented by the same
> lawyer in a matter, a communication of either co-client that
> otherwise qualifies as privileged under §§ 68- 72 and relates to
> matters of common interest is privileged as against third persons,
> and any co-client may invoke the privilege, unless it has been
> waived by the client who made the communication.

> (2) Unless the co-clients have agreed otherwise, a communication
> described in Subsection (1) is not privileged as between the co-
> clients in a subsequent adverse proceeding between them.

Restatement (Third) of the Law Governing Lawyers § 75.[9]  Briefing on this point has been only

preliminary, but so far I doubt that this is a co-client situation as contemplated by the

Restatement.  *See* Comment c: "[C]lients of the same lawyer who share a common interest are

not necessarily co-clients. Whether individuals have jointly consulted a lawyer or have merely

entered concurrent but separate representations is determined by the understanding of the parties

and the lawyer in light of the circumstances."  I worry that two plaintiffs' exchange of privileged

information – whether voluntary or under court compulsion – could operate as a global waiver of

privilege.  *See id,* and  Comment e.   At this point, there is no motion before me, though, so I will

not prejudge the question.

---

[9] Pennsylvania law recognizes the co-client privilege.  *Tracy v. Tracy,* 377 Pa. 420, 424,
105 A.2d 122, 125 (1954); *Mine Safety Appliances Co. v. North River Ins. Co.,* 73 F. Supp. 3d
544, 573-74 (W.D. Pa. 2014); *CAMICO Mut. Ins. Co. v. Heffler, Radetich & Saitta, LLP*, No.
CIV.A. 11-4753, 2013 WL 315716, at *1 (E.D. Pa. Jan. 28, 2013).

VII.   **Conclusion**

To summarize, I respectfully recommend that the Court

- GRANT SEALED TREATMENT to the Motion to Reopen and Correct the Record with Respect to Hagens Berman's Motion to Withdraw as Counsel for Plaintiff Terrie Bolton;

- GRANT the Motion to Reopen and Correct the Record with Respect to Hagens Berman's Motion to Withdraw as Counsel for Plaintiff Terrie Bolton;

- DENY the Motion to File Under Seal the Motion for the Appointment of Independent Counsel for Diana Cabcabin; and

- DEFER RULING on Hagens Berman's Motion for the Appointment of Independent Counsel for Diana Cabcabin.

Copies of this Order and Report and Recommendations of the Special Discovery Master are being served on only Hagens Berman, Terrie Bolton, and Tyler Weaver, by their respective attorneys.

February 26, 2018                         /s/ William T. Hangley
                                          WILLIAM T. HANGLEY
                                          SPECIAL DISCOVERY MASTER

18