**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GLENDA JOHNSON ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 2:11-cv-05782-PD |
| v. ) | and all related cases |
| ) | |
| SMITHKLINE BEECHAM CORPORATION ) | |
| ET AL., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**REPORT AND RECOMMENDATIONS OF THE SPECIAL DISCOVERY MASTER**

I will report and recommend on several matters, and act on others.

**I.   ISSUES RAISED BY PLAINTIFF CAROLYN SAMPSON**

By a series of unsolicited emails, Carolyn Sampson, a *pro se* plaintiff, has asked several questions and introduced several issues. The process reminds me that drawing the line between giving unrepresented litigants the courtesy, patience and assistance that befits a fair tribunal and inadvertently becoming counselor to those litigants is not as effortless as our judges manage to make it look.

I have concluded that I should respond on the record to Ms. Sampson's inquiries.[1] Her emails will be docketed.

**A.   Background**

These are 21st Century lawsuits alleging mid-20th Century injuries. Ms. Sampson was one of thirteen Plaintiffs in a state-court suit brought against several pharmaceutical companies

---

[1] Without awaiting this memorandum, my paralegal colleague, Kim Ferrari, has sent Ms. Sampson links to or copies of this Court's guidelines for *pro se* litigants and Local Rule 7.1, governing motion practice.

in October 2011.  Plaintiffs were represented by the Seattle law firm, Hagens Berman Sobel Shapiro LLP ("Hagens Berman"), and a Texas attorney, Kay Gunderson Reeves, among others.  The action was removed to this Court and, after District Court and Court of Appeals remand litigation, was consolidated with other suits brought by those attorneys.  *Yeatts v. SmithKline Beecham,* No. 3316 October Term 2011 (C.P. Phila.), *removed at* 11-cv-6711 (E.D. Pa.), *consolidated with Johnson v. SmithKline Beecham Corp.*, No. 11-cv-5782 (E.D. Pa.).  All told, 52 Plaintiffs claimed injuries *in utero* from their mothers' alleged ingestion, in the late '50s or early 60's, of thalidomide made or distributed by Defendants GlaxoSmithKline LLC and GlaxoSmithKline Holdings (Americas) Inc. (collectively "GSK"), Grünenthal GmbH ("Grünenthal"), and Sanofi-Aventis U.S. LLC ("Sanofi").

By October 2014, the cases had encountered problems.  In an opinion granting summary judgment against one of the 52, Edmund Andre, Judge Diamond summarized the history as follows:

> Defendants have filed ten summary judgment motions against Plaintiffs, asking me, inter alia, to dismiss the claims as time-barred. (Doc. Nos. 245, 246, 258, 259, 260, 272, 274, 281, 291, 312.) Three Plaintiffs have conceded that their claims should be dismissed. (Doc. Nos. 263, 277, 318.) Ten other Plaintiffs have voluntarily dismissed their claims with prejudice. (Doc Nos. 182; 284, 305, 325, 326, 328, 332, 360.) Three of these Plaintiffs had either filed suit or made a thalidomide-related administrative claim decades ago. (Doc. No. 364 at 63–64.) Hagens Berman has asked to withdraw from representing four other Plaintiffs, stating that it cannot contest Defendants' limitations motions without contravening the Code of Professional Conduct. (Doc. Nos. 207, 301, 342, 343.) Finally, Defendants have sought sanctions against Hagens Berman with respect to the claims of three of those Plaintiffs who voluntarily dismissed their actions: Lawrence Boiardi, Jack Merica, and Roel Garza. (Doc. Nos. 258, 281, 310.) Defendants argue, inter alia, that had Hagens Berman acted in conformance with its professional obligations, the firm would not have initiated these actions.

*Johnson v. SmithKline Beecham Corp.*, 55 F. Supp. 3d 603, 608 (E.D. Pa. 2014) ("*Andre* Opinion").

Two weeks after the issuance of the *Andre* Opinion, GSK informed the Court that all but a few of the remaining Plaintiffs had agreed to drop their claims against GSK (the "GSK dismissals").[2] In consideration of these dismissals, GSK would forgo pursuit of sanctions claims against Hagens Berman. The arrangement looked suspicious – calling for benefits to a Defendant and to the Plaintiffs' lawyers, with no readily apparent benefit for the actual Plaintiffs whose claims were being compromised, so Judge Diamond ordered me to investigate the voluntariness and informedness of the 28 proposed partial dismissals. Doc. 396.

I interviewed each of the affected Plaintiffs under oath, on the record; Ms. Sampson's telephone interview was held on June 10, 2016 (Doc. 536-7). At that point, she was quite assertive in confirming that she did indeed want to withdraw the claims against GSK Defendants, that she thought herself fully informed concerning the dispute and the case against GSK, and that she understood fully the consequences of a with-prejudice voluntary dismissal. *Id.* at 15-19. She stressed, at that time, that "I trust my attorneys and their . . . advice, and I just . . . I don't understand why my judgment is being questioned." *Id.* at 19. After these interviews, I recommended (not without misgivings) that all the Plaintiffs' expressed desire to dismiss claims

---

[2] Doc. 394. As mentioned above, Hagens Berman had moved for leave to withdraw from its representation of several Plaintiffs; and they would not be part of the proposed GSK dismissals. One other Plaintiff, Debra Johnson, was held out of the GSK dismissals so that her claims against GSK and others could be pursued on the merits. *Id.* Finally, I was ordered to conduct similar investigations with respect to four Plaintiffs who chose to dismiss their claims against all Defendants with prejudice. Doc. 471. The District Court later awarded summary judgment in favor of all Defendants on Debra Johnson's claims, and the Court of Appeals affirmed. (Docs. 488 and 525).

with prejudice be accepted by the Court.[3]  Doc. 535.  The Court is deferring its ruling on that recommendation pending further proceedings and recommendations on certain other matters such as the Hagens Berman Motions to Withdraw and, now, the allegations of professional misconduct that are before me.

In February 2018, Ms. Sampson changed her position, moving to dismiss all her claims against all Defendants, instead of GSK alone.  Doc. 597.  But then, in May 2018, she requested that her motion be withdrawn (Letter to Special Discovery Master, Doc. 635), and Judge Diamond granted that request.  Doc. 636.

More recently, in July 2018, Ms. Sampson sent me (and the Court docketed) a rather detailed letter in which, among other things, Ms. Sampson reviewed her personal investigation into the litigation and went on to accuse both Hagens Berman and its one-time co-counsel, Ms. Reeves,[4] of dishonest conduct.  Doc. 640.  Ms. Sampson has also entered a formal *pro se* appearance.[5]  Doc. 643.

Still more recently, Ms. Sampson has sent the emails and letter mentioned above. Together, Ms. Sampson's communications require that several matters be addressed:

---

[3] Consideration of the motions for sanctions had gone forward in the interim, solely with regard to Grünenthal's claim.  I recommended sanctions and the Court had accepted that recommendation.  *Johnson v. SmithKline Beecham Corp.*, 2015 WL 1004308 (E.D. Pa. Mar. 9, 2015), *approving and adopting* 2014 WL 6851277 (E.D. Pa. Dec. 4, 2014).  GSK's sanctions claim remains suspended pending the court's ruling on the proposed GSK dismissals.

[4] Ms. Reeves had withdrawn from the consolidated cases in July 2013.  Doc. 78.

[5] Ms. Sampson informs me that she has been unable to find new counsel to represent her in this litigation.  My own efforts to identify counsel in Greater Minneapolis/St. Paul willing to advise her *pro bono* on preliminary matters have also been unavailing.

**B.     Issues Raised by Ms. Sampson**

**1.    Supplementing Ms. Sampson's Opposition to Defendants' Motion for Summary Judgment**

Ms. Sampson asks whether, when and how she may make additional arguments and submit additional evidence in opposition to Defendants' Motion for Summary Judgment against her. The short answer is that her request is moot, because the Summary Judgment Motion against her is one of ten summary judgment motions that were denied without prejudice by Judge Diamond in early 2015 pending my investigation, discussed earlier, into the proposed GSK dismissals.[6]  Thus, there is presently no motion for her to oppose, but it is extremely likely that there will be such a motion in the future, and she will be entitled to respond to it fully.

And the likelihood of such motion practice gives relevance to Ms. Sampson's belief that important evidence was lost, ignored or mishandled by her former attorneys.  Some of the important evidence, as I understand it, is in Ms. Sampson's possession or Hagens Berman's, and she thinks Hagens Berman erred in not introducing it in opposition to summary judgment.  She contends, further, that Ms. Reeves "lost or absconded with" other important evidence entrusted to her by Ms. Sampson.  I believe Ms. Sampson is also faulting Hagens Berman for allegedly failing to secure this evidence when Ms. Reeves withdrew from the litigation in 2013.  Finally, Ms. Sampson suggests that Ms. Reeves misled her regarding the difficulty of her case or perhaps the difficulty of bringing it to closure.   I will address these concerns in Section I.B.4.

---

[6] The briefing on the now-dismissed Sampson motion is at Docs. 291, 330 and 336.

### 2. Nullifying Ms. Sampson's Rule 41(a) Stipulation to Dismiss Her GSK Claims with Prejudice

Ms. Sampson repents of her agreement to dismiss her claims against the GSK Defendants, pointing to evidence that, she says, was not adequately explained to her by her then attorneys, or that she learned independently. I think she should be permitted to do that in the absence of unfair prejudice to any other party, and I see none here.

I do not, of course, intend these Recommendations to be taken as a comment on the relevance or value of the evidence she discusses, or on the wisdom of her decision.

### 3. Claiming against Hagens Berman for Sampson's "Research and Administrative Expenditures"

Ms. Sampson says she does not want to miss the opportunity to seek recovery of her expenses from Hagens Berman. I interpret this as a request for advice on a potential motion for sanctions or, perhaps, a malpractice claim. I cannot address this issue.

### 4. Examining the Attorneys' Conduct and Reviewing Documents

Ms. Sampson's disclosures suggest that she (and perhaps other Plaintiffs) were misled by their attorneys in respects other than by Tyler Weaver's alleged conduct, discussed below. In my earlier interviews of 31 Plaintiffs (Doc. 536) regarding their proposed partial or total dismissals, I took pains to avoid violating the individuals' attorney-client privilege or the Hagens Berman attorneys' work product privilege. Thus, I did not ask questions about conversations with or statements by the attorneys. Now, however, Ms. Sampson has voluntarily put the attorneys' statements and advice squarely at issue and, as discussed elsewhere in this Report, the crime-fraud exception to privilege has come into play. Accordingly, I will pursue that investigation with Ms. Sampson, Ms. Reeves, and Hagens Berman, and they should all be prepared to give evidence at the next hearings in this matter.

I will order Ms. Sampson to produce for my inspection the documents and emails in her possession that relate to her dealings with Hagens Berman and her other past attorneys in this litigation, and her documents and emails with any of her present or past co-Plaintiffs that relate to these actions.[7] These documents may be relevant to my own pending inquiry into the conduct of the attorneys who represented Ms. Sampson and others during the course of these cases. The documentation to be produced includes but is not limited to Ms. Sampson's past correspondence with Hagens Berman and/or Ms. Reeves. I also will order her to identify, in as much detail as possible, the particular documents or other evidence thought to have been taken and kept or lost by Ms. Reeves.

For the moment, I will receive and consider these documents *in camera,* that is, **Ms. Sampson is not obligated to (and should not) distribute them to the other parties or attorneys** while I am considering whether they are privileged against disclosure.

Similarly, I will order Ms. Reeves to produce all documents in her possession or control relating to her involvement in these cases.[8] These, too, will be received *in camera* for the present. *See* discussion, below.

I will also order Hagens Berman to produce – once again, for *in camera* inspection – all documents in its possession or control dealing with Ms. Sampson or her representation.

---

[7] My paralegal assistant, Ms. Ferrari, will contact Ms. Sampson to discuss a means for producing these documents at the least practicable expense and inconvenience to Ms. Sampson.

[8] By appearing *pro hac vice*, Ms. Reeves "conferred disciplinary jurisdiction upon this court for any alleged *misconduct . . . in the course of or in the preparation for such proceeding*." Local Rule 83.6.VIII (E.D. Pa.) (emphasis added).

## II. HAGEN'S BERMAN'S WITHDRAWAL OF A MOTION TO WITHDRAW

Hagens Berman has informed the Court (Doc. 637) that it no longer seeks to withdraw from its representation of Plaintiff Terrie Bolton.  This surprising development comes in the wake of, among other things, Ms. Bolton's simultaneous vocal opposition to the firm's withdrawal and castigation of the firm's conduct, and the firm's later assertion that the Hagens Berman lawyer who dealt with Ms. Bolton, Tyler Weaver, had tampered with an expert consultant's evaluation of Ms. Bolton's physical condition, had palmed it off to the client as the real thing, had placed it in evidence before me, and had lied on the witness stand.

This change of heart on Hagens Berman's part certainly presents Ms. Bolton with some interesting decisions to make.  And Hagens Berman has not explained what led to its change of position, saying only that the firm "anticipates providing evidence as to the reasons supporting this notice at a future hearing concerning the firm's motion to withdraw." (*Id.*, n.1).

Respectfully, I do not think that is the fairest approach to Ms. Bolton or her *pro bono* counsel, Ms. Albracht-Crogan, and it is certainly not the most convenient for the Court or me.  Instead, I will order Hagens Berman to brief me and Ms. Bolton on the facts that led to the sudden change of heart, and any legal points it considers pertinent to the Court's consideration or Ms. Bolton's.  It is very likely, I think, that this disclosure will entail discussions of Hagens Berman's thinking – its opinion work product – regarding its continuing strategy for going forward with one or more of its clients' claims.  For the present, therefore, I will receive the briefing *in camera* – to be seen only by Hagens Berman and its counsel, Ms. Bolton and her *pro bono* counsel, the Court, and me – subject to future disclosure if that proves to be appropriate.

### III.   MS. CABCABIN'S REQUESTS FOR SEALING AND ACCESS

Diana Cabcabin has moved to place under seal two documents pertaining to her physical condition.  These documents were initially filed under seal and then removed and made publicly accessible on my recommendation.  *See* Docs. 588, 594.  Now Ms. Cabcabin asks the Court to reseal them, at least temporarily, while the proceedings before me go forward.

Ms. Cabcabin is quite correct in pointing out that all this sealing and unsealing took place without her knowledge or participation of any kind, because she had voluntarily dismissed her claims against all Defendants back in August 2014.  Once again, some background will be helpful.

#### A.   Background

Ms. Cabcabin became a Plaintiff in the same 2011 *Yeatts* Complaint as Ms. Sampson.  Her allegedly thalidomide-based injuries, like Ms. Sampson's, are explicitly described in that Complaint.  By mid-2014, Ms. Cabcabin had answered interrogatories and document requests seeking further information on her injuries.

During this same 2014 period, as mentioned earlier, Hagens Berman was facing dispositive motions regarding some Plaintiffs, and sanctions motions as well.  In July 2014, Hagens Berman agreed to carefully review its still-pending cases, and Defendants agreed that, if Hagens Berman voluntarily dismissed those cases that it concluded could not reach trial, Defendants would not seek sanctions with respect to their time and effort in defending against those particular cases.  I entered an Order articulating the protocol.  Doc. 268.  Over time, I was advised that all then-pending claims had been investigated; and a number of them were dismissed with prejudice voluntarily.

Apparently, some of Hagens Berman's investigations included physical examinations of Plaintiffs by Hagens Berman's testifying expert, anatomist Trent Stephens, Ph.D., who then

prepared reports discussing individual Plaintiffs' conditions and the statistical likelihood of their injuries' being thalidomide-based.  I understand that Ms. Cabcabin was examined and interviewed by Dr. Stephens, presumably as part of the investigation mentioned above, and that he gave Hagens Berman a written report.

The problem is that there are two different embodiments of the same report. Hagens Berman has told us that one of its partners, Mr. Weaver, received the genuine report and altered it by deleting some of Dr. Stephens' text.  And the altered version would leave one with a more pessimistic view of Ms. Cabcabin's prospects for successfully proving injury causation than the original.

The record suggests but does not establish that Ms. Cabcabin was persuaded to drop her case by Hagens Berman attorneys.  It also suggests but does not establish that it was Tyler Weaver who altered the Stephens document, but Mr. Weaver is entitled to be heard on that issue.  And I do not yet know what was done with either of the two iterations of the report, *e.g.,* whether either was ever seen by or discussed with Ms. Cabcabin, or whether either actual or bogus content played a part in Hagens Berman's  advice or Ms. Cabcabin's acceptance of it.

### B.     Resealing the Stephens Reports

Ms. Cabcabin argues that, because she is no longer asserting a claim based on her medical condition, her privacy rights must be restored to their pre-litigation condition.  I am sympathetic to her privacy concerns, but she is not entitled to the protection she seeks.  By publicly putting her allegedly thalidomide-based injuries at issue in the *Yeatts* Complaint, Ms. Cabcabin waived her general right of privacy on – at least – health and medical matters closely related to the injuries she alleged.  *See Williams v. Rene*, 72 F.3d 1096, 1103 (3d Cir. 1995); *In re Asbestos Prod. Liab. Litig. (No. VI),* 256 F.R.D. 151, 155 (E.D. Pa. 2009). Pleadings in law suits are public documents.  *See, e.g., Nixon v. Warner Communications, Inc.*,

435 U.S. 589, 597 (1978). Indeed, facts stated in a Pennsylvania state court complaint are sworn judicial admissions, binding on the party who stated them. (S*ee* Pa. R. Civ. P. 1024; *Rizzo v. Haines,* 555 A.2d 58, 69 (Pa. 1989); *Wills v. Kane*, 2 Grant 60, 63 (Pa. 1853)). Ms. Cabcabin also overstates her argument that the United States Constitution compels a narrow construction of the waiver she made. To be sure, there is law to the effect that one type of medical evidence – psychiatric evidence (and only psychiatric evidence, so far as I can tell) – may be protected from disclosure by a constitutional right of privacy (*see In re B,* 482 Pa. 471 (1978)), but there is nothing in the two Stephens reports, or in her complaint, that addresses Ms. Cabcabin's psychiatric condition or discloses her innermost thoughts. In a case cited by Ms. Cabcabin, the state court drew the distinction neatly:

> In summation, the interest of privacy engendered by the psychotherapist-patient relationship precludes the examination of the treatment records of such [non-party] patients in the context of a criminal investigation of the service provider. The privacy interest in records from the weight loss clinic is, however, much lower both because confidentiality is not essential to the outcome and because of the reduced likelihood that any communication between therapist and patient arose in the context of a confidential relationship. As to these records, the state's interest in preventing fraud on the part of the health care provider is sufficiently compelling as to require their disclosure.

*In re Search of Offices of Action Mental Health, Inc*., 32 Pa. D. & C.3d 612, 622 (Pa. Com. Pl. 1983).

Two additional points are pertinent here: First, it should be remembered that the Defendants are already in possession of significant medical evidence concerning Ms. Cabcabin; she has answered interrogatories and document requests. Second, it will be recalled that any documents I have received from Hagens Berman relating to Ms. Cabcabin – other than the two Stephens' documents – have been received *in camera,* and will remain under seal except insofar as they implicate the crime-fraud exception. *See* discussion in Section IV.

### C.     Access to Transcripts and Exhibits

Ms. Cabcabin has also moved for access to transcripts and documents placed in evidence in the three days of hearings on Hagens Berman's motions to withdraw from its representations of Richard Anderson, Terrie Bolton, John Marshall, Jose Navamuel and Mary Sells. I will recommend granting that motion only insofar as it relates to the first morning of the hearing, which was open to all five of those Plaintiffs. Hagens Berman's premise in suggesting that the first session be open to all five Plaintiffs was that none of the evidence given that morning would be privileged in favor of one Plaintiff as against another Plaintiff, and that redundant testimony could be avoided. Hagens Berman's mission was to disclose its "all clients" work product at that morning session. Ms. Cabcabin having been one of those clients, she may have access to that morning's record even though Defendants may not. But the later sessions of the hearings each involved privileged information and work product unique to the case of a single Plaintiff, and Ms. Cabcabin will not be given access to that evidence without the informed consent of the concerned Plaintiff.

## IV.   DEFENDANTS' MOTION FOR LEAVE TO PARTICIPATE

When I was instructed to investigate the "professional considerations" that underlay Hagens Berman's motions to withdraw, it was obvious that I would have to inquire regarding privileged communications and opinion work product. That is why the proceedings were held *in camera.* To give Plaintiffs further comfort, I asked Defendants to waive any right to access to those proceedings or their fruits and, without hesitation, Defendants all "waive[d] participation in and discovery into the in camera review and proceedings" regarding the Motions to Withdraw. (Doc. 546)

Now learning about the alleged evidence tampering, Defendants have moved for leave to participate in the continuing hearings. In one respect, at least, Defendants' arguments in favor of

- 12 -

access actually counsel against it.  They argue that the testimony of Dr. Stephens "potentially bears on the merits of Plaintiffs' claims."  Doc. 602 at 3.  But the period for merits discovery – discovery into the question whether Plaintiff *P* was injured by thalidomide made or distributed by Defendant *D* and ingested by *P*'s mother – ended years ago.  Once we get back to the merits, these cases will proceed to trial or dispositive motion, not further discovery.  Furthermore, I presume that all participants in the hearings, the Plaintiffs, as well as movant Hagens Berman, relied on Defendants' promises in giving their *in camera* evidence.  With respect to the testimony and evidence from the past hearings, then, I will not relieve Defendants of their promises.

Things are more complicated as to future events before me.  To the extent the proceedings still center on Hagens Berman's Motions to Withdraw, Defendants remain bound by their aforementioned undertaking to the extent those motions are the subject of evidence offered and taken.  But the scope of the proceedings has certainly broadened with the disclosure of the conduct attributed to Mr. Weaver, and broadened even more with Ms. Sampson's assertions concerning both Hagens Berman and Ms. Reeves.  Continued inquiry into the alleged evidence tampering, perjury, and other abuses of the attorney-client and attorney-court compacts are not protected from the eyes of Defendants or, indeed, the eyes of the world.  Once again, however, Defendants still face some 30 Plaintiffs' "live" claims of wrongdoing, and discovery on those claims has closed.  They are not entitled to reopen merits discovery under the cloak of an inquiry into possible attorney misconduct.

Almost 30 years ago, Judge Seitz marked off some important Third Circuit boundaries relating to the crime-fraud exception to the attorney-client and work product privileges.  First, the Court held that the crime-fraud exception applies even in circumstances where, as here, the

only evidence is that it was the attorney, and not the client, who authored a crime or fraud, and that the client was wholly unaware of it. *In re Impounded Case (Law Firm),* 879 F.2d 1211, 1213–15 (3d Cir. 1989). Of course, the present scenario is one step past that in *Impounded Case*. In *Impounded Case,* there was nothing to suggest that the client was the actual or intended victim or target of the attorney's abuse or chicanery; presumably, the suspected criminal or fraudulent conduct occurred in the course of an attempt to advance the client's interest. In the topsy-turvy circumstances of this case, the alleged conduct – at least, the conduct attributed to Mr. Weaver – looks to have been intended to trick clients by making their claims seem less powerful than a fair presentation might have shown. But the focus of the crime-fraud exception is on the conduct of the wrongdoer – client or attorney – as Judge Seitz made clear in *Impounded Case:*

> It is not apparent to us what interest is truly served by permitting an attorney to prevent this type of investigation of his own alleged criminal conduct by asserting an innocent client's privilege with respect to documents tending to show criminal activity by the lawyer. On the contrary, the values implicated, particularly the search for the truth, weigh heavily in favor of denying the privilege in these circumstances. . . . We recognize some resulting erosion of the attorney-client privilege but we think societal interests outweigh that protection here.

*Id.* at 1213-14. Another way of arriving at the same end result is by simply concluding that an attorney who is misleading his client does not even have an attorney-client relationship, so there is no privilege to be waived.

But the present cases demonstrate the potential unfairness of completely obliterating the innocent client's privilege simply because her attorney chose to snooker her. Here, eradicating the privilege in its entirety would create an informational windfall for the Defendants, solely because of the suspected self-serving conduct of the attorneys at the expense of their clients.

In *Impounded Case,* which involved a criminal investigation into a law firm's conduct, the government had made a showing of probable cause sufficient to justify the seizure of the firm's files under the rubric of the crime-fraud exception. The district court ruled that (with limited exceptions not pertinent to this discussion) the establishment of probable cause made all the documents unprivileged. The Circuit Court reversed that determination:

> The government and the district court appear to believe that the probable cause showing to obtain the search warrant triggered the application of the crime-fraud exception without more, except in the very narrow circumstance noted. We think the district court's expansive reading of the crime-fraud exception here takes too narrow a view of a client's privilege. We believe that if the client is not implicated in criminal conduct the privilege obtains unless a document is pertinent to the accusation of criminal activity by the attorney alone. Our conclusion is consistent with the proper scope of the privilege and its limitations.
>
> We conclude that on remand the law firm must be afforded an opportunity to raise pertinent privilege challenges and to have them resolved pursuant to established procedures.

*Id.* at 1214.

In the context of these proceedings, then, evidence tending to show fraudulent behavior on the part of the attorneys – Hagens Berman or Ms. Reeves – should be made available to Defendants and the public, while evidence that would typically be considered privileged – the communications between attorney and client, and the attorney's work product – should remain protected if they are not pertinent to the alleged criminal, fraudulent or unethical conduct of the attorneys.[9] I will review all documents produced in advance with a view to this distinction before releasing them to anyone other than the affected Plaintiff and her counsel. And each of the Plaintiffs and their counsel (if any), as well as Hagens Berman, Ms. Reeves, and, I think,

---

[9] Obviously, the Stephens reports regarding Misses Cabcabin and Bolton easily fall on the crime-fraud side of the divide.

Mr. Weaver, will, to quote *Impounded Case,* "be afforded an opportunity to raise pertinent privilege challenges and to have them resolved pursuant to established procedures."

If the Court accepts my recommendations, Defendants and their counsel will be allowed but not required to attend and participate in the next hearings. They will be permitted to hear and elicit testimony and have access to exhibits only when such testimony or exhibits are pertinent to the crime-fraud exception. They will not be permitted to make general discovery, or to seek information on matter that remains privileged as described above.

## V. SCHEDULING

I had hoped to convene the next hearings in this matter some time ago but, as suggested by the foregoing, additional facts and issues have come to the fore. Rule 53 affords interested persons an opportunity to object to any portion of this Report and Recommendations, and to seek review by the District Court. Fed. R. Civ. P. 53(f).

I instruct the parties and the attorneys to inform me, through my paralegal assistant, Ms. Ferrari, of their availability during February and March 2019 for an estimated three days of hearings. Plaintiffs and Ms. Cabcabin, and their counsel, may participate by telephone or video conference facility at their option. All other witnesses and counsel shall be prepared to appear in person absent a further ruling.

I understand that these indications of availability will be without prejudice to any respondent's position that the demand for her participation is beyond the power of the Court or the Discovery Master, or that participation would cause undue hardship.

## VI. SUMMARY OF RECOMMENDATIONS

I recommend that the Court order the following:

A.  That Plaintiff Carolyn Sampson's request to withdraw her proposed voluntary dismissal of her claims against Defendants GlaxoSmithKline LLC and GlaxoSmithKline Holdings (Americas) Inc. be granted.

B. With respect to Diana Cabcabin's Motion to File Documents Under Seal and Allow Counsel Access to Previously Sealed Materials (Doc. 603), that the Court

1. DENY the request to place documents under seal;

2. GRANT Ms. Cabcabin's counsel access to the transcript of and exhibits introduced at the session of the Special Discovery Master's hearing in this matter, held in the morning of September 26, 2017;

3. DENY Ms. Cabcabin's counsel access to any transcripts or exhibits from later sessions of the Special Discovery Master's September 2017 hearing.

C. With Respect to Defendants' Motion For Leave To Participate In Proceedings Regarding Hagens Berman Sobel Shapiro LLC's Motions To Withdraw As Counsel, that the Court

1. DENY access to transcripts or evidence from the September 2017 hearing, and

2. GRANT access to participate in continuing proceedings, and have access to additional evidence, only to the extent that such testimony or documents implicate the crime-fraud exception to the attorney-client or work product privilege.

A separate order of the Special Discovery Master follows.

December 21, 2018                               /s/ William T. Hangley
                                                WILLIAM T. HANGLEY
                                                SPECIAL DISCOVERY MASTER