**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GLENDA JOHNSON ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:11-cv-05782-PD and all related cases |
| SMITHKLINE BEECHAM CORPORATION ET AL., | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM
OF THE SPECIAL DISCOVERY MASTER**

## I.    Introduction

On Tuesday, May 18, 2021, the Special Discovery Master entered an Order, ECF 742, as follows:

1.    Hagens Berman Sobel Shapiro LLP ("Hagens Berman") has waived attorney work product protection by giving its proposed testifying expert witness access to facts and data – the transcripts of proceedings and exhibits received partly *in camera* by the Special Discovery Master (the "Hearing Materials") – that might otherwise have remained protected.  Fed. R. Civ. P. 26(a)(2)(B).

2.    The proposed testifying expert has acknowledged in his report (the "Expert Report") that he considered the Hearing Materials in forming his opinion and preparing the Expert Report.

3.    The attorney-client privileges of individual past or present clients of Hagens Berman or the firm's former co-counsel, Kay Gunderson Reeves, were not waived or lost by the attorneys' self-serving disclosure of privileged

communications to the proposed testifying expert witness because the disclosures were not authorized and were not in Hagens Berman's clients' interests.  *See* Restatement (Third) of the Law Governing Lawyers § 79 and Comment c.

a.      I am filing with the Clerk's office a partially-redacted copy of the Expert Report (the "Redacted Expert Report") for docketing and service.  For the avoidance of any doubt, the Redacted Expert Report shall be delivered to the following making use of the Courts ECF docketing and service system or, if necessary, other means:

i.      The testifying expert witness;

ii.     All Defendants;

iii.    The Plaintiffs and former Plaintiffs participating or entitled to participate in this hearing, *i.e.,* Richard Anderson, Terrie Bolton, Diana Cabcabin, John Marshall, Jose Navamuel, Carolyn Sampson and Mary Sells;

iv.     Kay Gunderson Reeves;

v.      Tyler Weaver; and

vi.     Hon. Paul Diamond, U.S.D.J.

4.     Upon careful review of the Hearing Materials and the Expert Report over a period of several months, the only redactions to be made from the Expert Report presented to the Special Master on April 15, 2020, are:

a.      *Page 8, last ¶, a sentence beginning "Although some of the plaintiffs."* That sentence contains an assertion of fact that can only have come from

an attorney-client communication uttered in the course of obtaining legal services.

a. *Page 9, first full ¶, a sentence beginning "The same."* It presents a close question as to the states of mind of the Plaintiffs with respect to the involvement of Thalidomide in their injuries.

b. *Page 9, first full ¶, a sentence beginning "There was no internet."* The sentence contains a phrase beginning "no indication that these . . . ." That phrase, running to the end of the sentence, could rest on either speculation on the expert's part or actual attorney-client communications. I will redact it, at least for the time being, out of an abundance of concern for the attorney-client privilege.

c. *Page 10, second full ¶, a sentence beginning "Hagens Attorney."* The sentence contains a nine-word phrase beginning "at least." That sentence may or may not be attorney-client communication-dependent, and I will redact it out of the same abundance of caution.

5. I will file of record but under seal an unredacted copy of the Expert Report.

\* \* \*

The partially-redacted version of the Expert Report (*see* no. 4 above) was filed on the public docket. ECF 743. An unredacted copy of the Expert Report (*see* no. 5 above) was filed under seal. ECF 744. This Memorandum explains my reasoning:

The immediate issue is whether a law firm that has engaged an attorney-expert witness to report and testify regarding the law firm's conduct may withhold the expert witness's report, in whole or in part, from parties to the litigation in which the testimony is offered. Larger questions that must be addressed in the process are whether the law firm waived its attorney work product

- 3 -

protection and its clients' attorney-client privilege by giving the proposed testifying expert access to transcripts of testimony and exhibits that were received *in camera* for the express purpose of preserving those protections.[1]

Hagens Berman, a law firm, has filed contested motions for leave to withdraw from its representation of several of its client Plaintiffs while continuing to pursue other Plaintiffs' claims in these consolidated products liability actions.

The firm has engaged an attorney expert to offer opinion testimony respecting the firm's conduct, specifically, "the propriety of the filing of, continued prosecution of, and withdrawal from the thalidomide cases." ECF 707-1, Email, Douglas E. Roberts to Special Discovery Master (Mar. 13, 2020).

After entertaining briefing by interested participants, I Ordered as quoted above (ECF 742).

## II.   <u>Basic Principles</u>

### A.   **Attorney-client privilege**

The attorney-client privilege protects communications between attorney and client, given with an expectation of confidentiality for the purpose of obtaining or providing legal, not business, advice. "[D]isclosure to a third party waives the attorney-client privilege unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance." *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011) (quoting *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991)).

---

[1] I refer throughout to "participants" rather than "parties" because several nonparties – Hagens Berman itself, one former Plaintiff, and two lawyers who no longer represent any parties and have withdrawn their appearances – are actively participating in their own interests, as discussed elsewhere in this Memorandum. *See* discussions *infra* at § 3(B)-(F).

### B.    Work product protection

The work product doctrine "promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. . . . [It] promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Chevron*, 633 F.3d at 164 (quoting *Westinghouse*, 951 F.2d at 1428). Accordingly, "it is only in cases in which the material is disclosed in a manner inconsistent with keeping it from an adversary that the work-product doctrine is waived." *Id.* at 165 (quoting *Westinghouse*, 951 F.2d at 1428).

### C.    Disclosure regarding testifying expert witnesses

Pursuant to Fed. R. Civ. P. 26(a)(2)(A) and (B), a party must identify a proposed testifying expert witness and submit a report that includes, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," and "the facts or data considered by the witness in forming them." I have concluded that a non-party with an interest in the proceeding, including a movant such as Hagens Berman in this instance, has the identical obligation.

## III.    <u>Background Facts</u>

The participants are familiar with the serpentine history of what started out as a large group of Pennsylvania state court products liability cases brought in 2011 and 2012, was removed to this Court, and (after remand motion practice and appeals) was consolidated here before Judge Diamond. I will nevertheless discuss the background in some detail for the benefit of any reviewing court.

### A.    The Thalidomide suits

Each of the 52 original Plaintiffs asserted a separate claim that her or his expectant mother had ingested Thalidomide, a teratogen, in the late 1950s or early 1960s, causing *in utero*

injuries to each Plaintiff. Coming fifty years and more after the alleged tortious conduct, the new lawsuits were obvious targets for dispositive time-bar motions, but the Complaints survived the initial dispositive motions with assertions that the Defendant pharmaceutical companies had fraudulently concealed material information and, additionally, that the maturing diagnostic science had only recently linked certain prenatal injuries to Thalidomide exposure. *See* ECF 92, Order Denying Motions to Dismiss.

### B. The early losses, the sanctions motions, the Plaintiff-side review, and the contested motions to withdraw

I fast-forward to the summer and autumn of 2014. By then, those Plaintiffs whose individual claims had come to the Court's attention had not fared well at all.[2] As discovery crept forward, Defendants were filing motion after dispositive motion asserting that a given Plaintiff's actual medical history, notice, or state of mind was materially different from what was alleged in a Complaint that had been expressly sworn to by the Plaintiff's attorneys in the state court. The Court's concerns about the possibility of bad-faith litigation and evasive discovery tactics is evident from the Court's Order proposing my appointment as Special Discovery Master. ECF 239 (June 17, 2014).

With several cases already lost, massive discovery pushing up against a looming discovery deadline, three fully-briefed sanctions motions ripe for decision and more such motions threatened, Hagens Berman and Defendants' counsel stipulated to an Order (ECF 268) requiring the firm to conduct an internal investigation of its clients' claims. Hagens Berman would "investigate each of the remaining active cases in these consolidated actions with a view to making a decision whether it should continue to be prosecuted or dismissed with prejudice by

---

[2] *See* ECF 183 (voluntary dismissals with prejudice of three Plaintiffs' claims) (Apr. 14, 2014); ECF 265 (summary judgment against Plaintiff Jack Merica) (July 14, 2014).

consent."  ECF 268 at 1.  During the summer and fall of 2014, several of Hagens Berman's clients did voluntarily dismiss their claims.  One such Plaintiff was Diana Cabcabin, whose claims were dismissed in October 2014.  ECF 373.

But Hagens Berman and its Plaintiff clients did not, it seems, always see eye-to-eye, and Hagens Berman wound up filing contested motions for leave to withdraw from its representation of six Plaintiffs.[3]  In each case, Hagens Berman cited "professional considerations" as the basis for its motion, without going into detail.  I was ordered to address the withdrawal motions and report and recommend to the District Court.  ECF 532.

### C.       The *in camera* hearing arrangements

The original uncontroversial decision to hear the withdrawal motions *in camera*, excluding Defendants from participating, was bottomed in obvious concerns – preserving the five[4] Plaintiffs' attorney-client privileges with respect to their conversations with the attorneys who were now turning their backs, and protecting Hagens Berman's privileged work product from disclosure to Defendants.[5]  Importantly, *in camera* treatment was not based on the Plaintiffs' personal or medical privacy considerations; they had given up those claims to privacy

---

[3] *See* ECF 207 (John Marshall), 301 (Jose Navamuel), 342 (Terrie Bolton), 343 (John Skelton, III), 375 (Richard Anderson), 382 (Mary Sells).  Of the six Plaintiffs who opposed Hagens Berman's motions to withdraw:  One, Mr. Skelton, has passed away, ending his case and mooting Hagens Berman's motion.  Another, Mr. Anderson, cannot be located; mailed notices addressed to his last known address are being returned by the postal authorities.  A third, Ms. Bolton, has decided to pursue her case *pro se.*  A fourth, Mr. Marshall, has also entered his appearance *pro se*, but continues to oppose the withdrawal, as do Plaintiffs Navamuel and Sells.

[4] References to the "five Plaintiffs" are to the Plaintiffs who opposed Hagens Berman's motions to withdraw minus Plaintiff Skelton, who (as noted above) passed away during the pendency of this action (ECF 551, 563).

[5] Any decision to proceed *in camera* must be weighed against important private and public interests.  *See, e.g.*, *United States v. Simone*, 14 F.3d 833 (3d Cir. 1994).  Mine was facilitated by Defendants' agreement not to participate (ECF 546).

by bringing lawsuits putting their physical conditions, medical histories, and personal family

dynamics and histories at issue.[6]

### D.    What, when, and why-so-late questions

In this Court, a relevant consideration in a contested withdrawal motion is whether the

disaffected attorney knew or should have known, before accepting the engagement, of the

conditions or events he is now proffering as grounds for abandoning ship.  In amending the

scope of my appointment to include these withdrawal motions, Judge Diamond ordered that

> Mr. Hangley must evaluate, *inter alia*, when Hagens Berman first
> learned that the firm's continuing prosecution of these cases would
> purportedly be untenable under Rule 1.16(a)(1) of the
> Pennsylvania Rules of Professional Conduct.  See *Chester v. May
> Dep't Store Co.*, No. CIV. A. 98-5824, 2000 WL 12896, at *1
> (E.D. Pa. Jan. 7, 2000) (significant consideration in deciding
> withdrawal motion is whether "[t]here [was] no suggestion that
> counsel was unaware of his client's history and propensities when
> he accepted the representation and proceeded to litigate this
> matter.").

ECF 532 at 3.  The "professional considerations" supporting the withdrawal motion in the

*Chester* case cited by the Court had involved a client's mercurial temperament and a professed

attorney-client incompatibility.  In the present personal injury cases, I thought Hagens Berman's

"professional considerations" would likely be bottomed on difficulties of proof similar to those

that had already led to so many dismissals, and that the what, when, why questions would have

to be asked.  In my own follow-up order, I stressed that the Hagens Berman attorneys would

have "an opportunity (i) to flesh out . . . the assertion that 'professional considerations require

that Plaintiffs' counsel withdraw . . .'; (ii) to establish that the firm was unaware of the problem

---

[6] This point is addressed in greater detail in, *e.g.*, ECF 644, Report and Recommendation (Dec. 21, 2018) at 10-11 (citing *Williams v. Rene,* 72 F.3d 1096, 1103 (3d Cir. 1995); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 256 F.R.D. 151, 155 (E.D. Pa. 2009)) (other citations omitted).

when it filed its clients' Complaints; (iii) to explain how the firm learned of the problem; and (iv) to explain the failure to know about it earlier."  ECF 539 at 2.

### E.    The first hearing days and their aftermath

The first three days of the hearing, conducted entirely *in camera* in September 2017, led to a significant expansion in the scope of my inquiries.

First, much of Hagens Berman's evidence adduced during the September 2017 hearing sessions was very general, and dealt with the entire group of 52 claims that were brought, along with an unspecified number that were considered and not brought.  But even as a high-level review, the testimony was not terribly informative on the what, when, why-so-late questions mentioned above.

Second, the testimony established that Hagens Berman stepped into an ongoing process in which a non-Hagens Texas attorney, Kay Gunderson Reeves (then of the law firm of Gordon & Reeves), had already done a good deal of the initial investigation of potential claims and claimants on which the Hagens Berman lawyers would rely in drafting complaints and verifying allegations under penalty of perjury when filing suits in the Philadelphia Court of Common Pleas.  Ms. Reeves stayed on as Hagens Berman's co-counsel for a period of time, but had long since withdrawn from all the cases.  It became apparent that, in addition to Hagens Berman attorneys' diligence and fealty to the rules, I would also have to inquire into Ms. Reeves' pre-suit investigations and related matters, and that I would have to review files in her custody in pursuing my "what, when, and why" questions.

Those first three hearing days also begat discovery demands by Plaintiffs Bolton and Sells,[7] and Hagens Berman's undertaking to produce relevant documents. And that development, in turn, would open yet another area of inquiry.

### F.    False documents and false testimony

Plaintiffs Bolton's and Sells' mid-hearing discovery yielded stunning evidence: A Hagens Berman attorney had forged documents, lied to his client about one of them, given false testimony in my hearing three years later, and placed one of the false documents in evidence, passing it off as the McCoy. Here is what happened:

The goal of Hagens Berman's case-by-case review process discussed above was, obviously, to cull the cases that seemed weakest and avoid further sanctions litigation. In at least some instances, Hagens Berman would ask a Plaintiff to submit to a physical examination by Hagens Berman's testifying expert anatomist-embryologist, Trent Stephens, PhD, who would then informally opine to Hagens Berman as to the likelihood that the particular Plaintiff's prenatal injuries were Thalidomide-related.[8] But a Hagens Berman partner, Tyler Weaver, had falsified Dr. Stephens' expert evidence. After examining Plaintiff Bolton and, separately, then-

---

[7] The five Plaintiffs were scattered across the country and, in the context of the withdrawal motions, were effectively appearing *pro se.* Accordingly, I offered to attempt to recruit *pro bono* home-state counsel for those of them who desired it. Phoenix attorney Cindy Albracht-Crogan and Cleveland attorney David Weiner have generously and ably represented Plaintiffs Bolton and Sells, respectively, as *pro bono* counsel on the withdrawal motions. They have not undertaken to succeed Hagens Berman in the underlying Thalidomide litigation.

[8] Dr. Stephens is an Emeritus Professor of Anatomy and Embryology in the Department of Biological Sciences at Idaho State University. He is a classic two-hat expert for Hagens Berman, advising the firm in its evaluation of cases and submitting expert reports and testifying in opposition to Defendants' dispositive motions. *See, e.g.*, ECF 262-7 (Declaration of Dr. Stephens in support of Plaintiff Andre's opposition to summary judgment); ECF 330-2 (Declaration of Dr. Stephens in support of Plaintiff Sampson's opposition to summary judgment).

- 10 -

Plaintiff Cabcabin, Dr. Stephens had emailed reports on his examinations and analyses to Mr. Weaver. The reports were written and emailed as Microsoft Word documents.

After receiving these two reports, Mr. Weaver secretly tampered with the manuscripts, deleting parts of Dr. Stephens's report in a manner that certainly made Dr. Stephens appear more pessimistic about the prospects for successful claims.

The evidence at the hearing would establish – and Mr. Weaver would ultimately testify – that Mr. Weaver used the fiddled Stephens-Bolton document in his unsuccessful campaign to persuade Ms. Bolton to drop her case. Mr. Weaver also changed former Plaintiff Cabcabin's examination report, but she appears to have agreed to drop her case without ever seeing the forged document. Ms. Cabcabin became involved in my inquiries only as a result of the revelation of Mr. Weaver's document-tampering.

Three years later, testifying before me in support of his firm's motion to withdraw from Ms. Bolton's representation, Mr. Weaver placed the same doctored exhibit in evidence[9] and swore to its bona fides.

My inquiries into Mr. Weaver's conduct were obviously connected to the motions to withdraw but, just as obviously, Mr. Weaver and Hagens Berman were not entitled to invoke privilege with respect to his conduct,[10] which meant that the remaining hearing sessions had to

---

[9] Formally, it was Hagens Berman that offered Mr. Weaver, then a member of the firm, as a witness, and put the bogus document in evidence. But the evidence does not suggest anyone at the firm other than Mr. Weaver was aware of its falsity, or that the firm knew of his conduct.

[10] I based this decision on the crime-fraud exception to the attorney-client privilege, but noted that "[a]nother way of arriving at the same end result is by simply concluding that an attorney who is misleading his client does not even have an attorney-client relationship, so there is no privilege to be waived." ECF 644 at 14; *Johnson v. SmithKline Beecham Corp.*, No. CV 11-5782, 2019 WL 4233629, at *8 (E.D. Pa.) (Special Discovery Master's Dec. 21, 2018 Rep. & Rec.), *approved and adopted*, *id.* at *1 (Feb. 14, 2019)).

be held at least partially in open court and were likely to have implications far beyond the narrow

context of Hagens Berman's motion to cut Ms. Bolton loose.

### G.     Another unhappy plaintiff and an explicit waiver of privilege

During this same interim period, another Plaintiff, Carolyn Sampson, began publicly

accusing Hagens Berman and Ms. Reeves of misleading her about the litigation and its prospects

(she later sued them), and explicitly waived her attorney-client privilege.  Her testimony, also

relevant to the withdrawal motions, had to be received in open court.

### H.     The return of Defendants

In a simpler time, Defendants had agreed to waive access to the *in camera* proceedings.

Now they moved for access to "all prior transcripts and filings, with redactions for privilege as

necessary, and access to and involvement in the proceedings going forward."  ECF 602.  They

were granted only partial relief; they were given leave to participate in some of the future

proceedings, but they have not been given access to any part of the 2017 hearing materials.  *See*

ECF 644 at 16 (Dec. 21, 2018 Report & Recommendation); ECF 662 (Feb. 14, 2019 Order

approving and adopting Report & Recommendation); *Johnson*, 2019 WL 4233629 at *1, *8-*9.

Making those Recommendations, I considered and discussed the possibility that the five

Plaintiffs' attorney-client privilege (or at least Ms. Bolton's and Ms. Cabcabin's) had been lost as

a result of Weaver's conduct, and my desire to avoid that result to the greatest possible extent:

> [T]he present cases demonstrate the potential unfairness of
> completely obliterating the innocent client's privilege simply
> because her attorney chose to snooker her.  Here, eradicating the
> privilege in its entirety would create an informational windfall for
> the Defendants, solely because of the suspected self-serving
> conduct of the attorneys at the expense of their clients.
>
> *      *      *
>
> In the context of these proceedings, then, evidence tending to show
> fraudulent behavior on the part of the attorneys – Hagens Berman

- 12 -

> or Ms. Reeves – should be made available to Defendants and the public, while evidence that would typically be considered privileged – the communications between attorney and client, and the attorney's work product – should remain protected if they are not pertinent to the alleged criminal, fraudulent or unethical conduct of the attorneys.  I will review all documents produced in advance with a view to this distinction before releasing them to anyone other than the affected Plaintiff and her counsel.  And each of the Plaintiffs and their counsel (if any), as well as Hagens Berman, Ms. Reeves, and, I think, Mr. Weaver, will . . . "be afforded an opportunity to raise pertinent privilege challenges and to have them resolved pursuant to established procedures."

ECF 644 at 14-16 (quoting *In re Impounded Case (Law Firm)*, 879 F.2d 1211, 1213-15 (3d Cir. 1989)).

All these events assured that the second set of hearings would have to be choreographed even more closely than the first.  The proceedings of May 7-10, 2019, were conducted partly *in camera* and partly open to the public, and featured on-the-spot courtroom evacuations as the evidence veered from a Hagens Berman withdrawal motion to Mr. Weaver's digital tampering, to Hagens Berman's dealings with its anatomist, to attorney Reeves and client Sampson's widely divergent characterizations of their conversations and interactions in the early days of the litigation and thereafter.  Attorneys and witnesses were ushered out of the courtroom or asked to leave their hard-won internet connections, and then rounded up to return only to be shooed out again as the proceedings moved from witness to witness or from topic to topic.

A continued session of the hearing was scheduled and repeatedly rescheduled during the ongoing pandemic, and is now scheduled to go forward on May 24, 2021.

## I.    The long redaction road

If managing the 2019 hearing sessions was somewhat complicated, the process of reviewing, sorting, redacting, and distributing the transcripts and exhibits from those sessions

(the "2019 Hearing Materials"), so that everyone got to read only what she was entitled to read, was absolutely Rubikian.

In retrospect, distributing materials from the first hearing session in September 2017 (the "2017 Hearing Materials") was relatively straightforward:  At Hagens Berman's counsel's suggestion, we had arranged for an initial session involving the presentation and transcription of evidence that was not privileged, or that Hagens Berman considered likely to be privileged in favor of all the participating Plaintiffs but not in favor of any one of them against any other, followed by the separate hearing and transcription of evidence containing matter that might be privileged in favor of one Plaintiff as against the world, including the other Plaintiffs.

The transcripts were distributed accordingly, and Defendants did not get to see any of the 2017 Hearing Materials.

Managing the 2019 Hearing Materials was another thing entirely.  Now we had to simultaneously honor the citizenry's interest in the business of its courts; protect so much of the confidential work product of the Plaintiffs' past and present attorneys as remained protection-worthy, and publish that which was not; and also preserve the distinct, separate privilege interests of six past or present Plaintiffs – all the while taking into account Plaintiff Sampson's express waiver of attorney-client privilege and Mr. Weaver's (and hence his former principal Hagens Berman's) forfeiture of work product protection to an extent that had not yet been precisely defined.  As at the hearing itself, we were bound to juggle the sometimes competing privacy and access interests of as many as fourteen participants (seven past or present client-Plaintiffs, two law firms, a former Hagens Berman partner, a former co-counsel, and three Defendants, along with the public's right of access, as we redacted and distributed seven nonidentical iterations of the 2019 Hearing Materials.

- 14 -

Here is the process (*see* ECF 704):

1. Initially, in May 2019, only Judge Diamond, myself, Hagens Berman, Mr. Weaver, and Ms. Reeves were given access to the initial unredacted 2019 Hearing Materials; neither the Plaintiffs nor the Defendants were given access.

2. As a first step, my colleagues and I reviewed the 2019 Hearing Materials, line by line, for work product and attorney-client privilege. Of course, even this first step was complicated by Ms. Sampson's waiver of privilege and Weaver's forfeiture of work product protection.

3. We then forwarded markups to counsel for Hagens Berman, Mr. Weaver, and Ms. Reeves for their review, comment, and further suggested redactions.

4. Next, we reviewed and accepted or rejected those participants' suggestions, and re-redacted the 2019 Hearing Materials accordingly.

5. Now it was time for the preparation of non-identically redacted copies of the 2019 Hearing Materials. A unique set was sent to each of the five Plaintiffs, "custom-redacted" to make all evidence affected by that recipient's privilege visible to her alone and shield other Plaintiffs' privileged evidence from her eyes.

6. Each of these recipients was given an opportunity to propose additional redactions and other edits.

7. We reviewed, and I accepted or rejected these submissions.

8. It was not until May 27, 2020 that "final" edited copies of the 2019 Hearing Materials – redacting all information that I considered privileged in favor of any of the Plaintiffs, and all protectable Hagens Berman or Reeves work product that remained protection-worthy after Mr. Weaver's conduct and Ms. Sampson's

waiver – were distributed to all participants, including Defendants.[11]  In all, the review and privilege-protection process had taken a full year.  By this time, we had made several attempts to schedule a further hearing session for March, April, or later 2020 dates as the current pandemic arrived and lingered.

But while this redaction/distribution process had been going forward, it seems that Hagens Berman and its counsel were simultaneously treating the privilege-marbled hearing materials on a completely separate track and in a wholly-inconsistent manner, with unfortunate consequences.

**J.      Hagens Berman and the testifying expert**

On March 13, 2020, Hagens Berman's counsel informed me by email that the firm anticipated calling a distinguished Philadelphia attorney, Abraham Reich, as "an expert witness on the propriety of the filing of, continued prosecution of, and withdrawal from the thalidomide cases at issue."  ECF 707-1.

This was a strange communication in several respects.  It was sent the day after my Order (ECF 706) rescheduling the next proposed hearing sessions for the week of April 27, 2020, six weeks hence.[12]  It was not accompanied by the expert report mandated by Federal Rule of Civil Procedure 26(a)(2)(B), or even a promise to provide one.  And it was sent only to me and counsel for the two non-party lawyers whose conduct was under scrutiny, Ms. Reeves and Mr. Weaver; not one Plaintiff or Defendant was given the notice, expressly required by Rule

---

[11] I had thought Defendants might challenge some of the redactions.  Mercifully, that did not happen.

[12] As an aside, March 13, 2020 is generally thought of as the day Pennsylvania shut down for what we hoped would be a brief tussle with the virus.  That hearing, once rescheduled to resume on April 27, 2020, is now rescheduled to resume on May 24, 2021, thirteen months later.

26(a)(2)(A), that Hagens Berman intended to put Mr. Reich on the stand as an expert witness a few weeks later.  Accordingly, I ordered Hagens Berman to "serve on the participants in these proceedings, as well as the Special Discovery Master, a report in compliance with Rule 26(a)(2)(B), Fed. R. Civ. P."  ECF 707.

A year later, Hagens Berman has yet to comply fully with that Order.

In partial response, Mr. Reich did prepare a report (the "Expert Report") that seems to satisfy the formal requirements of Rule 26(a)(2)(B).  But instead of complying with Rule 26(a)(2)(A) or with my Order to serve the Expert Report "on all participants in these proceedings," counsel served complete copies of the Expert Report on only me and counsel for those same two non-Hagens lawyers, Mr. Weaver and Ms. Reeves.  Remarkably, not a single *party* has yet received a report that complies with Rule 26(a)(2)(B) or my Order.  Defendants were not given any copies at all!  The copies that counsel served on former and current Plaintiffs Anderson, Bolton, Marshall, Navamuel, Cabcabin, and Sells had been nonidentically and substantially redacted.

### K.    What Hagens Berman gave the expert

The Expert Report makes clear that Hagens Berman (presumably during the same period when the participants, including Hagens Berman and its counsel, were painstakingly separating the privileged from the unprivileged) gave its expert access to everything – attorney-client privileged evidence, privileged work product, everything:

> In reaching the opinions contained herein, I considered the transcripts of testimony from the hearings that took place on September 26 – 28, 2017 and May 7 – 10, 2019, the exhibits entered into evidence at those hearings, and any relevant opinions or orders issued by the Court and the Discovery Master.

Expert Report at 3.

In transmitting the Expert Report to the Special Master (and wholly or partially withholding it from others), Hagens Berman's counsel gave its reasons for its creative distribution. The Plaintiffs' respective copies of the Expert Report were said to be redacted "[c]onsistent with your prior rulings on privilege." As for Defendants:

> We have not provided copies to the pharmaceutical defendants because the report: (1) does not concern the portions of the hearings to which they have been granted access; (2) is based on testimony from which they were excluded due to privilege concerns, and (3) reveals core work product and attorney-client privileged communications.

April 15, 2020 Email from D. Roberts to Special Discovery Master (attached hereto as **Ex. 1**).

I solicited (ECF 713) and have considered extensive briefing on the questions raised by Hagens Berman's disclosure of the previously-protected materials, and what should now be done.

Hagens Berman argues that the expert has reported, and offers to testify, only on those topics that were addressed *in camera.* ECF 718. Former and current Plaintiffs have argued, variously, that all of the report remains protected (ECF 719, 727), and, by contrast, that there has been a broad subject-matter waiver of any work product protection for Hagens Berman (ECF 716). Defendants have straddled the fence, asserting that "with the understanding that the expert report will be considered solely in relation to the motions to withdraw, Defendants take no position on whether Hagens Berman has waived privilege with respect to the report or portions thereof," but that

> If the expert report were subsequently to be offered or used for any other purpose, such as the merits of these cases or requests for sanctions or costs, then Defendants must be afforded access to the full report and an opportunity for cross-examination. If that were to become necessary, Defendants would (among other things) be prepared to address a number of factual and legal errors that are apparent from the unredacted portions of that report.

ECF 725 at 1-2 and n. 1.  We will address this reasoning elsewhere in this Memorandum.

## IV.    Discussion

### A.    Three layers of lawyers

As a threshold observation, I am troubled by Hagens Berman's apparent understanding that the procedural rules governing expert discovery and waiver of privilege operate to protect Hagens Berman's work product in the Thalidomide cases or the firm's efforts to withdraw from some of those cases.  They do not; to a limited extent they protect the work product of Hagens Berman's *attorneys*, the Pietragallo firm.  They are no antidote to Hagens Berman's waiver.

In counsel's initial April 15, 2020 email transmitting the Expert Report to the Special Master, one of the reasons given for disregarding (or, perhaps, rewriting) my Order to distribute a Rule 26(a)(2) report to "all participants" was that the Expert Report "reveals core work product and attorney-client privileged communications."  **Ex. 1.**  If counsel was referring to *Hagens Berman's* work product, as I think he was, we have some threshold-level confusion that requires discussion:

It is easy, I think, to become confused about the expert discovery/disclosure rules and privileges in the relatively uncommon situation where all actors in the expert witness engagement happen to be lawyers.  Instead of a situation where, say, the client is a manufacturer whose lawyer engages an expert accountant to testify about lost business revenues, here we have lawyers thick on the ground.  Trial lawyers (the Pietragallo firm) representing other trial lawyers (Hagens Berman) have engaged an unrelated trial lawyer (Mr. Reich) to consider and opine upon the trial lawyer clients' trial-lawyering.  It is easy to get the hats mixed up, and it is worth taking a moment to consider how Federal Rules of Civil Procedure 26(a)(2) and 26(b)(3) and (4) work with respect to attorney work product in *all* situations, whether or not the client or the expert is a lawyer.

- 19 -

### 1.    The testifying expert

To start with, it is worth reiterating that the activities and mental processes of a testifying expert witness are about as unprivate as anything in the federal litigation firmament.  That has been so as far back, at least, as the 1993 amendments to Rule 26.  The general proposition is that every relevant opinion the expert holds, all his reasoning, and every fact or document he has considered in getting to his conclusions must be identified, in writing, in his report.  The Federal Rules of Civil Procedure's requirements regarding proposed testifying experts are detailed and demanding.  Hagens Berman was obligated to inform the parties of its intention to call Mr. Reich (Fed. R. Civ. P. 26(a)(2)(A)), and accompany that notice with a written report, signed by the expert, that included

> (i) a complete statement of all opinions the witness will express
> and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications
> authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years,
> the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and
> testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).  The attorney-expert has no work product protection with respect to his investigation or his analysis.  The limited work product protection provided by Rule 26(b)(4), discussed below, "does not extend to the expert's own development of the opinions to be presented; those are subject to probing in deposition or at trial."  Committee Notes on Rules – 2010 Amendment; quoted in, *e.g., Picken v. Louisville Ladder Inc.,* No. 11-13044, 2013 WL

- 20 -

12182395, at *3 (E.D. Mich. Sept. 26, 2013); *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 293 F.R.D. 568, 577 (S.D.N.Y. 2013).

### 2. The client on whose behalf the expert would testify

In arguing that it was entitled to withhold or selectively redact the Expert Opinion, Hagens Berman points to the selective inclusion and exclusion process that happened in the hearing itself, and the selective redaction and distribution of the 2019 Hearing Materials. That is an unfortunate comparison, because the purpose of the excluding Defendants from the 2017 and portions of the 2019 session, and excluding Plaintiffs from one another's portions of that session, was to preserve work product and attorney-client protection, and the problem here is that Hagens Berman undermined all that hard work when it handed the unedited hearing materials to the expert. As a general proposition, the disclosure of privileged material to a testifying expert waives privilege. *Chevron*, 633 F.3d at 165 (court-appointed expert witness); *United States v. Veolia Environnement N. Am. Operations, Inc.*, No. CV 13-MC-03-LPS, 2013 WL 5779653, at *7 (D. Del. Oct. 25, 2013); *Fialkowski v. Perry*, No. CIV.A. 11-5139, 2012 WL 2527020, at *4 (E.D. Pa. June 29, 2012); *Kontonotas v. Hygrosol Pharm. Corp.,* No. CIV.A. 07-4989, 2009 WL 3719470, at *1-5 (E.D. Pa. Nov. 4, 2009); *Quinn Constr., Inc. v. Skanska USA Bldg., Inc.*, 263 F.R.D. 190, 197 (E.D. Pa. 2009); *Bio-Tech Corp. v. Thermax, Inc.*, 2008 WL 356928, at *2 (E.D. Pa. Feb. 7, 2008); *Synthes Spine Co. v. Walden,* 232 F.R.D. 460, 463 (E.D. Pa. 2005) (collecting cases).

I note that Hagens Berman's waiver problem is not with the fact that Mr. Reich wrote a report, or that he wrote that report under compulsion of an Order from the Special Master. The waiver problem lies in the fact that the firm consciously placed all privileges in harm's way by giving the previously protected information to the expert, and that the expert, in the words of Rule 26(a)(2)(B), "considered" that information in reaching his opinions. And, of course, all of

this must have happened before Hagens Berman told me the expert was going to testify or what he was going to testify about. Thus, if Hagens Berman waived any protection, it did so some time before being ordered to produce and distribute an expert report.

And, like it or not, no waiver bell can be unrung. In *CP Kelco U.S. Inc. v. Pharmacia Corp.*, 213 F.R.D. 176 (D. Del. 2003), the defendant disclosed privileged information to a testifying expert, and later tried to take a Mulligan. After being caught out at the expert's deposition, defendant decided to re-designate the expert as a non-testifying consultant, who would not have to disclose his information. *See* Fed. R. Civ. P. 26(b)(4)(D). District Judge (now Circuit Judge) Jordan, remarking that "a right that is waived is not available to be picked up again as if it were a handy tool," had no difficulty rejecting the attempt:

> It would be manifestly unfair to allow a party to use the privilege to shield information which it had deliberately chosen to use offensively, as Pharmacia did in this instance when it used the allegedly privileged documents to arm its expert for testimony. Hence the truism that a privilege cannot be used as both a shield and a sword. The non-legal equivalent of that truism is equally to the point: "You can't have it both ways." Having chosen to use the information offensively, any privilege Pharmacia might have claimed to defend the information from disclosure is, and remains, waived.

*CP Kelco,* 213 F.R.D. at 179 (citing *United States v. Krasnov*, 143 F. Supp. 184, 191 (E. D. Pa. 1956), *aff'd sub nom. Oppenheimer v. United States*, 355 U.S. 5 (1957)) (other internal citations omitted).

### 3. The trial lawyers who engaged the expert to testify on behalf of the client

Now we come to the only attorneys who have any work product protection under the expert discovery rules, and that protection is narrow and, in the present case, useless to Hagens Berman.

Between 1993 and 2010, a trial lawyer's dealings with the expert she had engaged were no more protected than her client's. In that time there grew up a practice that was both despised and assiduously practiced by all facets of the practicing bar – discovery into trial counsel's *communications* with the expert, and discovery of the drafting and review process that led to the final expert report. Courts had held that even the core work product of the attorney who engaged the expert fell within the definition of "data or other information" that must be disclosed under the then-operative version of Rule 26(a)(2). *See, e.g., Bro-Tech Corp. v. Thermax, Inc.*, No. CIV. 05-CV-2330, 2008 WL 724627 (E.D. Pa. Mar. 17, 2008).

Effective in 2010, Rule 26(b) was amended to provide that *some* communications between trial counsel and the expert were protected from discovery. First, the "data or other information" language in Rule 26(a)(2)(B) gave way to "facts or data considered by the witness in forming" his expert opinion. Second, Rule 26(b)(4) now provides a safe haven for *some* of these trial attorney-expert communications, but it is a very limited one:

> (B) *Trial-Preparation Protection for Draft Reports or Disclosures.* Rules 26(b)(3)(A) and (B) protect drafts of any report or disclosure required under Rule 26(a)(2), regardless of the form in which the draft is recorded.
>
> (C) *Trial-Preparation Protection for Communications Between a Party's Attorney and Expert Witnesses.* Rules 26(b)(3)(A) and (B) protect communications between the party's attorney and [a testifying expert], regardless of the form of the communications, *except to the extent that the communications*:
>
>> (i) relate to compensation for the expert's study or testimony;
>>
>> (ii) *identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed*; or
>>
>> (iii) identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed.

Fed. R. Civ. P. 26(b)(4)(B)-(C) (emphasis added.)  First, the new provision deals only with "communications between the party's attorney [the Pietragallo lawyers] and the expert.  It doesn't pretend to address the voluminous transcripts and exhibits Mr. Reich says he considered, nor does it speak to communications (if any) between Hagens Berman and the expert.  The Comments to the 2010 Amendment make that clear:  "The protection [of work product] is limited to communications between an expert witness required to provide a report under Rule 26(a)(2)(B) [*e.g.,* Mr. Reich] and the attorney [the Pietragallo firm] for the party on whose behalf the witness will be testifying [Hagens Berman] . . . ."  Committee Notes on Rules – 2010 Amendment.[13]

One of the seminal decisions interpreting the 2010 Amendment, Judge DuBois's opinion in *Fialkowski v. Perry*, 2012 WL 2527020, also involved a lawyer-client.  A lawyer, Ms. Fialkowski, accused her former partners of cheating her and pushing her out of their firm, so she hired a lawyer and sued them.  Her lawyer then engaged an expert – an accountant – to testify on his lawyer-client's behalf.  At deposition, the expert disclosed that he had been given documents prepared by Ms. Fialkowski – "spreadsheets and document analysis [that] Plaintiff [prepared] from QuickBooks records, tax returns, and [d]iscovery produced by Defendant," notably, "a thirty-nine-page document that contains plaintiff's own 'explanation and assessment of . . . discovery documents and how they relate to the claims [she has] asserted and the various

---

[13] I suppose it might be argued that Hagens Berman is not technically "a party," although it is the movant on the withdrawal motions, and certainly has an interest, to say the least, in the outcome of the accusations made by Ms. Sampson and the confessed conduct of its member Mr. Weaver.  In any event, a conclusion that Rule 26(b)(4) did not apply to participant Hagens Berman would simply remove whatever limited protection the rule might otherwise afford the Pietragallo firm's work product.  Either way, the information would be unprotected under Rule 26.  *See, e.g., Galambus v. Consol. Freightways Corp.,* 64 F.R.D. 468, 473 (N.D. Ind. 1974); 8 Wright, Miller & Marcus, *Federal Prac. and Proc.: Civil 2d* § 2024 at 354.

defenses raised by defendants." *Id.* at \*1.  Obviously, these lawyer-prepared documents bristled with lawyerly theories and mental impressions, and would surely have been afforded work product treatment outside the expert discovery context.[14]  But they were the theories and impressions of the *client-lawyer*, not the *trial lawyer* and, critically, they had been considered by the expert.  As Judge DuBois stressed:

> The requested materials contain "factual ingredients" and disclosure does not implicate "theories or mental impressions of counsel" *because plaintiff, not plaintiff's attorney, prepared them.* Thus, the 2010 Amendments provide no basis for prohibiting discovery of the requested materials.

*Fialkowski*, 2012 WL 2527020, at \*4 (emphasis added).  *Accord, e.g., Ansell Healthcare Prod. LLC v. Reckitt Benckiser LLC,* No. 15-CV-915-RGA, 2017 WL 6328149, at \*5 (D. Del. Dec. 11, 2017) (damages analysis prepared for counsel must be produced); *Veolia Environnement*, 2013 WL 5779653, at \*7 ("[T]here is no reason that communications from someone **other than** the party's attorney that likewise identify such 'facts or data' should be protected from disclosure.") (emphasis in original).

I am unaware of anything in the Expert Opinion, or even in the materials Mr. Reich says he considered or relied upon, that touches on the confidential litigation strategy or mental impressions of the Pietragallo firm lawyers in pursuing Hagens Berman's withdrawal motions, and the Expert Report certainly does not refer to any direct communications with the Pietragallo firm lawyers that Mr. Reich considered in forming his opinion.

---

[14] *Cf.*, *e.g.*, *Flynn v. Mfrs. & Traders Tr. Co.,* No. 17-CV-04806-WB, 2019 WL 414912, at \*2, \*5 (E.D. Pa. Jan. 31, 2019) (lay "process improvement manager's" computations were attorney work product)

**B.**      **The unworkability of an *in camera* expert investigation, report, discovery, and testimony in this matter**

As mentioned earlier, Hagens Berman has argued that its selective distribution of the Expert Report (and, by inference, its wholesale disclosure of privileged information to the expert) was based on an assumption that the would allow the expert to testify only in the presence of certain people, and that different audiences would see and hear different parts (or no part at all) of his expert opinion.

Back in the period before complications like evidence-tampering forced their way onto the menu, I certainly did intend that the five withdrawal motions would be treated as five separate hearings.  I attempted to make it clear that the inquiry would not focus on the generalities, *e.g.,* the investigation and reasoning supporting a theory that 50-year-old personal injury claims could be conscionably pursued on behalf of some 52 plaintiffs, and rather that I needed to know what Hagens Berman had learned about these individual Plaintiffs' etiologies.  I had to know what they had learned, when they had learned it, and why it had taken 50 years or more to learn it:

> With respect to each of the five Motions, I will expect the Hagens Berman attorney who prepared and executed the Verification to the pertinent Complaint to attend in person.  Similarly, the Hagens Berman attorney or attorneys who are directly knowledgeable respecting the particular Plaintiff's situation – the preparation and prosecution of her claims, the pertinent discovery, the decision by Hagens Berman to seek to withdraw and the reasons for that decision, as well as any discussions between Hagens Berman and the particular Plaintiff with respect to the proposed withdrawal – should attend.
>
> With respect to each Motion, I request that the Plaintiff who is named in the Motion also attend, either telephonically, by video, or in person.  *To be clear: This will not be a single hearing on all five Motions, but five separate hearings, each of which will delve into the facts and professional considerations surrounding a particular Hagens Berman Motion.*  To preserve privilege, no Plaintiff will be permitted to hear another Plaintiff's *in camera* evidence, nor will

> any Plaintiff be entitled to hear Hagens Berman's *in camera*
> evidence regarding any of the Motions other than the one to which
> she is Respondent.

ECF 562 at 2-3 (emphasis added). At the actual hearing, Hagens Berman requested and I agreed to a modified first step in the hearing, in which information considered pertinent to all five Plaintiffs was presented in their presence. But that evidence, as it turned out, was significantly different from the "what, when, and why so late" information for which I had been hoping. On the one hand, there was precious little information about the failure to learn – before suing or during the two or three-year post-complaint period before moving – the information that was now triggering "professional considerations." On the other hand (as discussed above), the early testimony was not just about facts pertinent to one or all of these five Plaintiffs but, instead, about the manner in which Hagens Berman and its predecessor counsel educated themselves and went forward with litigation on behalf of all 52 of its initial Plaintiffs. It was (and the Expert Report is) about counsel's conscious decision to commence lawsuits without first ferreting out medical records, and about late-in-the-game scientific examination into the Plaintiffs' specific prenatal injuries.

In the Expert Report, Mr. Reich states three propositions, and I presume that Hagens Berman intends that I will be persuaded to find (or recommend that the Court find): First, that Hagens Berman had a good faith basis for bringing these consolidated cases on behalf of "its clients starting in 2011"; second, that it had such a good faith basis "to continue to prosecute them as long as it did"; and finally, "that it was appropriate for Hagens Berman to seek leave to withdraw from representing these plaintiffs when it did due to information obtained during

- 27 -

discovery." Expert Report at 13.[15]  At least the first two of these topics as discussed by Mr. Reich, and probably the third, have obvious relevance to topics brought into the hearing before me as a result of the evidence-tampering:  Plaintiff Sampson's allegations of misconduct by Hagens Berman and Ms. Reeves; and, indeed, the very broad sweep of Hagens Berman's case-in-chief and the expert's opining regarding the total roster of these consolidated claims and their handling by Hagens Berman.  If – as I understand Hagens Berman to be proposing – I were to accept (or recommend that the District Court accept) the expert witness's conclusion that "Hagens Berman had a good faith basis to bring lawsuits on behalf of its clients starting in 2011" (Expert Report at 13), and also had a good faith basis "to continue prosecuting them as long as it did," without having afforded Defendants an opportunity to cross-examine Mr. Reich on those topics, wouldn't that be unfair?  It is difficult to speculate about how that finding would affect, *e.g.*, a Defendant's motion for sanctions regarding the prosecution of these or other Plaintiffs' claims, or a Plaintiff's claim (like Ms. Sampson's) that she was lured into bringing a case that has been the bane of her existence for the past several years.  The fact is that most of Mr. Reich's discussion of the history of the litigation is, like the testimony at the hearing, quite general.  He discusses, for the most part, the entire body of Plaintiffs' cases (Expert Report at 3-5), and the general range of activities by a group of lawyers, not just Hagens Berman.  When it comes to these five Plaintiffs (*id.* at 11-12), he provides precious little information to demonstrate that bringing these cases was justified in the first place, and no information to explain why learning the facts about a Plaintiff's condition depended upon opponent-driven "discovery" and was not the product of the firm's own pre-complaint or early investigation.

---

[15] It is difficult to identify a single non-Hagens Berman participant (other than, perhaps, Ms. Reeves) who would not take strenuous issue with one aspect or the other of that opinion.

Hagens Berman's decision to put on a case that focused – and more particularly, to put on an *expert* case that focused – so heavily on its entire body of claims and clients, created a situation in which it would be unfair to exclude Defendants from the courtroom if and when Mr. Reich testifies, or to preclude their deposing Mr. Reich if they so choose.

## C.    Selective waiver

We have spoken throughout of Hagens Berman's attempted selective distribution of the Expert Report.  What should be clear from this is that Hagens Berman also hopes to effect something that is forbidden in this Circuit, a selective waiver of privilege.

In this Circuit, it was early decided that holders of privileges would not be permitted to waive them selectively, withholding information from one audience on grounds of privilege after disclosing it to another.  In *Westinghouse*, the Court held that Westinghouse's voluntary disclosure of privileged documents to the Department of Justice and the Securities and Exchange Commission waived privilege for all purposes with respect to those documents, even though Westinghouse reasonably expected that those agencies would keep the information confidential:

> Even though the DOJ apparently agreed not to disclose the information, under traditional waiver doctrine a voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else.  See, for example, [*United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir. 1990)] ("The attorney-client privilege does not apply to communications that are intended to be disclosed to third parties *or that in fact are so disclosed*.") (emphasis added).  See also 8 Wigmore, *Evidence*, § 2327 at 636; Note, 36 Stan. L. Rev. at 792.  We also note that the agreement between Westinghouse and the DOJ preserved Westinghouse's right to invoke the attorney-client privilege only as to the DOJ – and does not appear in any way to have purported to preserve Westinghouse's right to invoke the privilege against a different entity in an unrelated civil proceeding such as the instant case.

951 F.2d at 1427.  Presumably, Hagens Berman expected that the expert would not republish the information he was given, except as directed by Hagens Berman.  Such direction is contrary to the policies behind the two privileges.  *See Chevron*, 633 F.3d at 164-65.

### D.      Attorney-client and work product:  The differing waiver tests

The tests for waiver of work product protection and waiver of the attorney-client privilege are not the same:

> [T]he courts recognize that because the attorney-client privilege serves to protect the confidentiality of communications between clients and their attorneys, "disclosure to a third party waives the attorney-client privilege unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance."
>
> On the other hand, the work-product doctrine protects an attorney's work from falling into the hands of an adversary, and so "disclosure to a third party does not necessarily waive the protection of the work-product doctrine."  Rather, the purpose behind the work-product doctrine "requires [a court] to distinguish between disclosures to adversaries and disclosures to non-adversaries[,]" and it is only in cases in which the material is disclosed in a manner inconsistent with keeping it from an adversary that the work-product doctrine is waived.

*Id.* at 165 (quoting *Westinghouse,* 951 F.2d at 1428).

It should be noted, at the threshold, that the test of work product waiver is not an entirely subjective one; the disclosing party need not *intend* to forfeit work product protection.  We assume that the parties and attorneys who disclosed work product documents in the many cases we have cited[16] thought they could still withhold them from their adversaries; they just lost that argument when the time came.

---

[16] *See, e.g.*, *Chevron*, 633 F.3d at 165; *Veolia Environnement*, 2013 WL 5779653, at *7; *Fialkowski*, 2012 WL 2527020, at *4; *Kontonotas*, 2009 WL 3719470, at *1-5; *Quinn Constr.*, 263 F.R.D. at 197; *Bio-Tech Corp.*, 2008 WL 356928, at *2; *Synthes*, 232 F.R.D. at 463 (collecting cases); *CP Kelco*, 213 F.R.D. 176.

Here, Hagens Berman and its counsel gave the entirety of a much-protected cache of facts and data – hearing testimony and associated exhibits – to an independent non-participant, an expert, in the hope of deploying that information to persuade him that Hagens Berman had behaved and was behaving appropriately under prevailing standards of practice and (I presume) that Hagens Berman should be permitted to withdraw its appearances with respect to the five Plaintiffs.  Hagens Berman and its counsel are charged with knowledge of the rules:  An expert has to prepare a report.  The report has to be disclosed to all the parties, some of whom are, in the nature of things, adverse to Hagens Berman.  The disclosed report must identify, *inter alia,* all facts or data the expert has considered.  And those facts and data are readily discoverable.

The Third Circuit's decision in *Chevron* had much in common with the present case, although that decision involved a court-appointed rather than a party-engaged expert.  In environmental tort litigation in Ecuador, the Ecuadorian court had appointed an environmental engineer and geologist, one Cabrera, to serve as a court-appointed damages expert.  From time to time, Cabrera requested documents relevant to the dispute; defendant Chevron did not supply documents, but plaintiff Ecuadorian citizens did.

In related 28 U.S.C. § 1782 discovery proceedings in the District of New Jersey, the issue was whether the plaintiffs' disclosure of the documents to Cabrera waived work product protection, so that Chevron could discover the documents from their authors, plaintiffs' New Jersey environmental consultants, and from plaintiffs themselves.  The Third Circuit had no difficulty affirming the district court's decision that work product protection had been waived:

> [W]e can discern no reason for appellants' submission of the
> documents to Cabrera other than for him to consider those
> documents to advance appellants' hope that Cabrera's final global
> damages assessment report would reflect the materials and
> conclusions in the documents.  Indeed, it is quite clear that
> appellants intended that by submitting the documents to Cabrera

> they would place him in a position to serve as a conduit to transmit the documents to Chevron *because they hoped that Cabrera would agree with the documents' assessment of damages and thus would incorporate the documents, or at least the conclusions in them, into his report.* Consequently, we are satisfied that the documents were submitted to Cabrera in a manner inconsistent with keeping them from Chevron, and therefore the work-product doctrine and the attorney-client privilege were waived as to the documents submitted to Cabrera.

*Chevron*, 633 F.3d at 165 (emphasis added). In the present case, of course, it is the Special Master or the District Judge that Hagens Berman hoped to persuade through the intercession of the expert.

Like the *Chevron* and *CP Kelco* courts, I conclude that Hagens Berman's work product protection has been waived by its disclosure to the expert.

### E.    Waiver of attorney-client privilege

As a general rule, the disclosure of a privileged attorney-client communication to a testifying expert waives the privilege. Any disclosure does that "unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance." *Chevron*, 633 F.3d at 165 (citation omitted). Although I see little in the Expert Report itself that necessarily reflects actual attorney-client communications between Plaintiffs and Hagens Berman lawyers (as distinguished from facts that would generally be discoverable), there are a handful of such statements, and I have personal knowledge that the hearing materials do contain testimony regarding conversations between attorney and client made with the expectation of confidentiality and seeking or giving legal advice. The case law tells us that Rule 26(a)(2)(B) – specifically, its requirement that facts and data considered by the expert be disclosed – "trumps" the attorney-client privilege. *Fialkowski*, 2012 WL 2527020, at *4; *Bio-Tech*, 2008 WL 356928 at *2; *Synthes*, 232 F.R.D. at 463; *Veolia Environnement*, 2013 WL 5779653, at *7. I nevertheless conclude that the Plaintiffs' attorney-client privileges have not been vitiated by

Hagens Berman's disclosures to the expert, because the disclosures were not authorized by the client Plaintiffs.  This conclusion turns on homely common law concepts of agency, authorization, and apparent authority.

Usually, a lawyer's disclosure of an attorney-client privileged communication is the death knell of the privilege.  But not always, as explained by the American Law Institute:

> **§ 79 Subsequent Disclosure:**  The attorney-client privilege is waived if the client, the client's lawyer, or another authorized agent of the client voluntarily discloses the communication in a nonprivileged communication.

Restatement (Third) of the Law Governing Lawyers.  The Comments to § 79 speak volumes:

> c. <u>Authorized disclosure by a lawyer or other agent</u>.  The privilege is waived if the client's lawyer or another authorized agent of the client discloses the communication acting under actual or apparent authority.  *A lawyer generally has implied authority to disclose confidential client communications in the course of representing a client . . .*
>
> *Unauthorized disclosure by a lawyer not in pursuit of the client's interests does not constitute waiver under this Section.*  For example, disclosure of a client's confidential information to prevent a threat to the life or safety of another or to prevent a client crime or fraud does not constitute waiver within the meaning of this Section . . . ."

*Id.,* Comment c (emphasis added).  From the comment, we observe that for a lawyer's disclosure *not* to constitute a waiver, the disclosure must (i) be unauthorized (*i.e.*, not pursuant to actual authority, including express or implied authority, or apparent authority); and (ii) not be in pursuit of the client's interests.  There is no indication Hagens Berman was acting pursuant to actual or apparent authority from its clients, and it clearly was not pursuing their interests, when it handed the hearing materials over to the expert – rather, it was trying to *offload* five clients.

Equally instructive is the ALI's position that a disclosure of a client's privileged information without her consent can sometimes be appropriate and justified, even necessary,

*while still being unauthorized.* The cases seem to agree. *See Purcell v. Dist. Att'y*, 676 N.E.2d 436 (Mass. 1997) (an attorney who reported his client's threat to commit arson could not be made to testify at the criminal trial because the disclosure had been proper but unauthorized). *Compare In re Original Grand Jury Investigation,* No. L-98-1146, 1999 WL 518837, at \*2 (Ohio Ct. App. July 23, 1999), *aff'd,* 733 N.E.2d 1135 (Ohio 2000) (acknowledging *Purcell* but requiring the attorney to comply with a grand jury subpoena where the evidence sought was physical, and not the product of an attorney-client communication).

Mary Sells, John Marshall, and the other Plaintiffs were entitled to rely on the sanctity of their conversations with their lawyers. Their attorney-client privilege survives.

## V.    Conclusion

Hagens Berman's work product protection has been waived by the disclosure of the Hearing Materials to the testifying expert, but the five Plaintiffs' attorney-client privilege was not. By my Order of May 18, 2021 (ECF 742), I redacted from the Expert Report the handful of passages that disclose, or likely disclose, privileged attorney-client communications – the disclosure of which in the *in camera* hearing, whether proper or not, was unauthorized by Hagens Berman's clients and not in pursuit of their interests (ECF 743) – and have distributed the redacted Expert Report to the parties and other participants.

May 20, 2021                                   /s/ William T. Hangley
                                               WILLIAM T. HANGLEY
                                               SPECIAL DISCOVERY MASTER