**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GLENDA JOHNSON ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 2:11-cv-05782-PD |
| v. ) | and all related cases |
| ) | |
| SMITHKLINE BEECHAM ) | |
| CORPORATION ) | |
| ET AL., ) | |
| ) | |
| Defendants. ) | |

**REPORT AND RECOMMENDATIONS**
**OF THE SPECIAL DISCOVERY MASTER**

# REPORT AND RECOMMENDATIONS
# <u>OF THE SPECIAL DISCOVERY MASTER</u>

## CONTENTS

I.  Introduction ............................................................................................................ 1

II.  Summary of Recommendations .......................................................................... 2

    A.  Sanctions ........................................................................................................ 2

        1.  Steve Berman, Tyler Weaver and Hagens Berman ............................ 2

        2.  Other Attorneys and Firms ................................................................. 4

    B.  The Motions to Withdraw .............................................................................. 4

III.  Scope, Limitations, and Materials Considered: ................................................. 5

    A.  Metes and Bounds of the Special Master's Authority ................................... 6

    B.  Evidence Considered ...................................................................................... 8

    C.  Consideration of Earlier Rulings ................................................................... 9

        1.  Privilege and work product protection ................................................ 9

        2.  The earlier sanctions motions and award .......................................... 10

        3.  Hagens Berman's settlements with some plaintiffs: an open question of confidentiality .............................................................................. 12

IV.  History of the Cases ......................................................................................... 13

    A.  Jurisdictional and Rule 12 matters ............................................................. 13

    B.  Truth in Pleading: Rules 11 and 1023.1 ...................................................... 14

    C.  Counsel's Appearances and the Complaints They Filed ............................. 20

        1.  The first two cases:  Kay Reeves, Gordon & Reeves, the Lanier Firm .... 20

        2.  Hagens Berman in, Lanier out ........................................................... 27

        3.  The *Yeatts* complaint ....................................................................... 28

        4.  Ms. Reeves's long goodbye ............................................................... 43

        *5.*  Reeves out, Peter Gordon in ............................................................. 44

        6.  The *Spence* complaint ...................................................................... 47

    D.  A Missed Chance to Catch Up ..................................................................... 48

    E.  Discovery Abuse .......................................................................................... 51

    F.  The Early Losses and Sanctions .................................................................. 52

        1.  Plaintiffs Morgan, Barbara Murray and Williams ........................... 53

        2.  Defendants propose a plaintiff-side case-by-case review ................. 61

|       | 3. | Plaintiffs Merica, Boiardi, Garza and Andre ........................................... 62 |
|       | 4. | The Initial Sanctions ................................................................... 66 |
| G. | The Plaintiff-Side Review, the Voluntary Dismissals and the Contested Motions to Withdraw ........................................................................ 67 | |
| H. | The GSK Agreement .......................................................................... 68 | |
|       | 1. | The Agreement Terms and the Court's Concern ..................................... 68 |
|       | 2. | Resistance to the interviews, followed by unprofessional conduct in client-plaintiffs' presence ................................................................... 70 |
|       | 3. | The Master's recommendation on the GSK dismissals, and circumstances that have changed since its issuance ................................................ 72 |
| I. | Carelessness and worse ...................................................................... 74 | |

V.    The 2017 and 2019 Hearings and Events in Between .................................. 84

| A. | September 2017 ............................................................................... 85 | |
| B. | Post-2017 Hearing ........................................................................... 87 | |
| C. | May 2019 ....................................................................................... 88 | |
| D. | Post-2019 Hearing ........................................................................... 89 | |

VI.   Hagens Berman's Treatment of Terrie Bolton and Diana Cabcabin ............ 90

| A. | Tyler Weaver's False Evidence Regarding Plaintiff Bolton ........................ 92 | |
|       | 1. | Weaver's Document Tampering in 2014 .............................................. 93 |
|       | 2. | False Evidence in 2017 ................................................................. 95 |
|       | 3. | Hagens Berman's longstanding problems with Ms. Bolton's case ........... 98 |
|       | 4. | Dr. Stephens's methodology ........................................................... 104 |
|       | 5. | The *pro bono* lawyers do their job .................................................... 106 |
|       | 6. | The Bolton falsification:  Why it mattered and why I could not accept Weaver's trivialization ................................................................ 107 |
| B. | Falsifying Dr. Stephens's Report on Diana Cabcabin ............................. 112 | |
| C. | More False Testimony in 2019 ........................................................... 114 | |

VII.  Hagens Berman's Expert Witness and the Waiver of Work Product Protection ............ 122

VIII. The Motions to Withdraw: Summaries and Recommendations .................... 124

| A. | Motions that should be Denied as Moot: Bolton and Navamuel ................. 124 | |
|       | 1. | Terrie Bolton ............................................................................ 124 |
|       | 2. | Jose Navamuel .......................................................................... 125 |
| B. | A Motion that should be Denied Without Prejudice: Richard Anderson .......... 132 | |
| C. | A Motion that should be Granted: John Marshall .................................. 135 | |
| D. | A Motion that Should be Denied:  Mary Sells ...................................... 137 | |

IX.   Recommendations on Sanctions ................................................................. 144

    A.    Authority for Sanctions ................................................................. 144

        1.    Rules 1023.1 and 11 .......................................................... 145

    B.    Sanctions Recommendations ........................................................ 147

        1.    Steve Berman ..................................................................... 147

        2.    Tyler Weaver ...................................................................... 149

        3.    Hagens Berman ................................................................... 151

    C.    Ms. Sampson's Claims Against the Attorneys ................................. 153

    D.    Ongoing Proceedings .................................................................. 153

I.    <u>**Introduction**</u>

These are product liability actions[1] brought against pharmaceutical companies[2] between 2011 and 2014, some 50 years after the tortious conduct and injury are claimed to have occurred. They have been consolidated before District Judge Paul Diamond. Each of the 52 original plaintiffs, born in the late 1950s or early '60s, alleged that she was injured *in utero* as a result of her mother's ingestion of the teratogenic compound thalidomide.[3]

---

[1] The cases, with dates of removal to or initial filing in this Court, are:

*Murray v. SmithKline Beecham Corp.*, 11-cv-03510 (May 31, 2011) (2 plaintiffs);
*Glenda Johnson v. SmithKline Beecham Corp.*, 11-cv-5782 (Sept. 14, 2011) (2 plaintiffs);
*Yeatts v. SmithKline Beecham Corp.*, 11-cv-06711 (Oct. 27, 2011) (13 plaintiffs);
*Spence v. Avantor Perform. Mat'ls*, 12-cv-4542 (Aug. 9, 2012) (11 plaintiffs);
*Debra Johnson v. GlaxoSmithKline, LLC*, 12-cv-05455 (Sept. 24, 2012) (1 plaintiff);
*Gunn v. Avantor Perform. Mat'ls*, 12-cv-06431 (Nov. 13, 2012) (6 plaintiffs);
*Charelston v. Avantor Perform. Mat'ls*, 12-cv-06657 (Nov. 28, 2012) (4 plaintiffs);
*Gosser v. Avantor Perform. Mat'ls*, 12-cv-07125 (Dec. 20, 2012) (2 plaintiffs);
*Brust v. Avantor Perform. Mat'ls*, 13-cv-0758 (Feb. 11, 2013) (3 plaintiffs);
*Alexander v. Avantor Perform. Mat'ls*, 13-cv-4591 (Aug. 7, 2013) (5 plaintiffs);
*Griggs v. GlaxoSmithKline, LLC*, 14-cv-02186 (Apr. 15, 2014) (3 plaintiffs).

Although, as discussed throughout, many plaintiffs' claims have now been dismissed with prejudice, all but one of the original 11 actions are still pending on behalf of one or more plaintiffs. *See* Fed. R. Civ. P. 54(b). Only the single-plaintiff suit, *Debra Johnson,* has been finally resolved (*Johnson v. GlaxoSmithKline, LLC*, 636 F. App'x 87 (3d Cir. 2016) (non-precedential), *aff'g Johnson*, Doc. 487, 488, 95 F. Supp. 3d 819 (2015) (Glenda Johnson) (summary judgment for defendant).

[2] SmithKline Beecham Corp d/b/a/ GlaxoSmithKline; GlaxoSmithKline, LLC; and GlaxoSmithKline Holdings, Inc. (collectively, "GSK"); Sanofi-Aventis, U.S., LLC and Avantor Performance Materials (collectively, "Sanofi"); Grünenthal GMBH and Grünenthal U.S.A. (collectively, Grünenthal). Not all companies are named defendants in all the actions.

[3] A teratogen can be broadly defined as any substance that can cause abnormalities when a fetus is exposed to it.

Pursuant to Federal Rule of Civil Procedure 53, the Court has instructed me to report and recommend disposition of several motions filed by Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), a Seattle law firm appearing in this Court *pro hac vice,* to withdraw from its representation of several individual plaintiffs ("the Five Plaintiffs") while continuing to represent most of the remaining plaintiffs.

With the consent of all parties, I have also been instructed to investigate and make recommendations on matters of ethics and professional responsibility. In addition to issues of professional responsibility that surfaced during the District Judge's past consideration of dispositive motions and discovery matters, some extraordinary events occurred or came to light in the course of the hearings before me. This Report and Recommendations will address those subjects as well.

## II. <u>Summary of Recommendations</u>

### A. Sanctions

#### 1. Steve Berman, Tyler Weaver and Hagens Berman

I recommend the imposition of sanctions on Hagens Berman itself, its Managing Partner, Steve Berman, and a one-time partner, Tyler Weaver.

Mr. Weaver falsified documents, attempted to use them to hoodwink two of his clients, later gave false testimony under oath, and put one of the tainted documents in evidence. And, as discussed in § VI.A, that was not the end of his mendacity.

Mr. Berman's misconduct was less dramatic, but more pervasive and corrosive to our system of civil justice. Trusting clients were encouraged to bring and pursue claims that should never have been brought, and became (however belatedly) convinced that identifiable wrongdoers were responsible for their injuries and lifelong sorrows, and could be called to account half a century after the fact. Mr. Berman, who never met any of these 52 clients, drove the enterprise within Hagens Berman. He personally authored – and swore under penalty of perjury to the accuracy of – false factual representations in pleadings that were filed in the state court and prosecuted in this Court. He led a Hagens Berman effort that did a lot of damage, wasted a lot of human, business and Court resources, and broke a lot of hearts along the way without (at least so far) fielding a single claim that would stand up under scrutiny. Time and again, Mr. Berman personally swore to the veracity of things he did not know and should have known, and that were actually and demonstrably false.[4] More broadly (to paraphrase Fed. R. Civ. P. 11(b) and Pa. R. Civ. P. 1023.1(c)(applicable here, as discussed in §

---

[4] At the threshold, I acknowledge the death of attorney Nick Styant-Browne, who was Of Counsel at Hagens Berman. Mr. Styant-Browne had a very active role in these cases and testified extensively before me. I have the awkward obligation, in this Report, to discuss quite a bit of Mr. Styant-Browne's conduct in some detail because it sheds light on the conduct of several other attorneys whose conduct must be considered, and because his principal, Hagens Berman, is sanctionable for it under Fed. R. Civ. P. 11, Pa. R. Civ. P. 1023.1-1023.4, and the Court's inherent powers. I regret the necessary indelicacy.

IV.B, *infra*), he signed, filed, submitted, or later advocated pleadings and papers whose falsity was readily discernible, without having made the requisite "inquiry reasonable under the circumstances."

### 2.    Other Attorneys and Firms

As discussed in § IX.D, this Report should not be read as suggesting that Hagens Berman and Messrs. Berman and Weaver are the only firm and lawyers that should be sanctioned.  The record in these consolidated cases is far from complete; 36 of the original 52 plaintiffs' claims remain pending.  As the hearings before me unfolded, the cast of characters grew and questions of ethics and professional responsibility proliferated.  I heard testimony about the conduct of attorneys and law firms – in the United States and elsewhere – that were not on my screen at all when the withdrawal motions and professional responsibility issues were first assigned to me.  As a result, my inquiry into some of the conduct discussed in this Report has been less orderly and far less complete than, in retrospect, the Court might have wished.  *See infra* § V.  I believe the Court may be in a better position, down the line, to form judgments as to whether sanctions proceedings are called for with respect to several attorneys and firms whose conduct is discussed throughout this Report.

### B.    The Motions to Withdraw

The Five Plaintiffs' individual situations are discussed in §§ VI and VII of this Report.[5]  Briefly, I recommend that the Court

**GRANT** the Motion to Withdraw from the representation of Plaintiff John Marshall (Doc. 207), **DENY** the Motion to Withdraw from the representation of Mary Sells (Doc. 382), **DENY WITHOUT PREJUDICE** the Motion to Withdraw from the representation of Plaintiff Richard Anderson (Doc. 375) pending further attempts by Hagens Berman to locate its client, and **DENY AS MOOT** the Motions to Withdraw from the representation of Plaintiffs Terrie Bolton (Doc. 342) and Jose Navamuel (Doc. 301), who have fired Hagens Berman and are proceeding *pro se.*

Requiring Hagens Berman to continue representing Plaintiff Sells (and, for the moment, Plaintiff Anderson) is a far from satisfactory disposition of these motions, but granting those withdrawal motions would be worse.

### III.  <u>Scope, Limitations, and Materials Considered:</u>

A question of sanctions "demands a review of the entire record."  *Wise v. Washington Cnty.*, No. CIV. A. 10-1677, 2015 WL 1757730, at *1 (W.D. Pa. Apr. 17, 2015), citing *Baker Indus., Inc. v. Cerberus Ltd*., 764 F.2d 204, 209 (3d Cir.

---

[5] A sixth motion (Doc. 343), not discussed further herein, sought to withdraw from representing Plaintiff John Skelton, who died during the motion's pendency.  I have recommended that the motion be dismissed as moot.  Doc. 563.  *See* Fed. R. Civ. P. 25(a); *Giles v. Campbell*, 698 F.3d 153, 158 (3d Cir. 2012).

1985).  That is particularly appropriate here because the attorney conduct in question covers a number of years and different phases of the litigation.  I will therefore review these consolidated cases in some detail, even though the Court and I have previously addressed some of these events in published orders, opinions and reports.

### A.    Metes and Bounds of the Special Master's Authority

As suggested by my title, I was initially appointed to oversee discovery.  But even that limited appointment had its roots in concerns of professional conduct. The Court made its appointment as a final alternative to dismissing these cases as a discovery sanction.  *See* Doc. 239 at 3 ("Although I am not yet prepared to dismiss, I am greatly concerned that Plaintiffs have not honored their discovery obligations . . . .").  My brief has been expanded, pursuant to Federal Rule of Civil Procedure 53, to include additional advisory responsibilities, including the two discussed here. *See* Docs. 316, 420, 472, 532.  My advisory responsibility respecting sanctions matters, consented to by all parties, extends to

> all requests for the imposition of sanctions stemming
> from the Thalidomide discovery issue, including but not
> limited to: the Parties' compliance with their discovery
> obligations, counsel's failure to conduct pre-suit
> investigations, whether discovery misconduct caused any
> unreasonable delays in litigation, and any other sanctions
> pursuant to Rule 11, 28 U.S.C. § 1927, or the Court's
> inherent authority that are substantially related to the
> Special Master's duties under the Appointment Order.

Doc. 316 at 1.

Just as important, the District Court has not requested my recommendation as to the *merits* of any plaintiff's claim. This limitation will require turning some square corners, because this Report necessarily contains fairly extensive discussions of the hurdles a plaintiff, *pro se* or not, must overcome on dispositive motion or trial in tort actions brought half a century after the harms alleged. It would be impossible to advise the Court on the withdrawal motions without looking at some of the Five Plaintiffs' claims, their alleged birth injuries, the procedural issues their claims face, the attorneys' investigations or failures to investigate, and material facts the attorneys considered or failed to consider at key points on the timeline. Obviously, too, the reasoning of judges in these cases themselves – decisions such as the Third Circuit's nonprecedential opinion affirming summary judgment against Plaintiff Debra Johnson,[6] or Judge Diamond's own reasoning in granting judgment and dismissing Plaintiff Edmund Andre's claims[7]– may cast both light and shadow on cases as yet undecided. And, as the District Court has instructed me (Doc. 532), the state of the attorney's knowledge of a problem when he takes up a client's cause – and the decision to

---

[6] *Johnson v. GlaxoSmithKline*, 636 F. App'x 87 (3d Cir. 2016), a*ff'd Johnson*, 95 F. Supp. 3d 603 (E.D. Pa. 2015) (Debra Johnson).

[7] *Johnson*, Doc. 371, 55 F. Supp. 3d 603 (E.D. Pa. 2014) (Andre).

commit that client to the life-changing ordeal of a lawsuit – may shed light on the reasonableness of the attorney's later decision to turn his back on that client in the midst of a lawsuit.

### B.    Evidence Considered

In formulating my Recommendations, I have considered documents received in evidence, documents produced by Hagens Berman and its former co-counsel, Kay Gunderson Reeves, of the Texas bar, and sworn testimony taken telephonically, by video, in the courtroom, and in combination.  I have also had recourse to the parties' depositions and other discovery.  I interviewed 31 Hagens Berman client-plaintiffs, who testified by telephone.  These under-oath interviews related to the "GSK Agreement" (discussed in § IV.H, *infra*), in which Hagens Berman, on behalf of the great majority of plaintiffs, proposes to release Defendant GSK from all claims in exchange for GSK's withdrawal of the sanctions claims it has brought against Hagens Berman, as well as any further such claims arising out of this litigation.

Of course, I have also heard testimony on the withdrawal motions, and on the conduct of these lawyers and firms.  Those hearings were held partially *in camera*, although most of the content is now public, as discussed in § VII, *infra*.

All told, I have heard testimony from 37 past or present plaintiffs in the consolidated cases, from several present and former attorneys for the plaintiffs,

from an anatomist/embryologist engaged to evaluate and testify regarding at least

some plaintiffs' physical conditions, from a practicing attorney offering expert

testimony for Hagens Berman on professional responsibility issues, and from

another practicing attorney, who had a brief but well remembered encounter with

Ms. Reeves several years ago, shortly before she filed the last of the three

complaints on which she is listed as counsel.  Of course, I have also looked to the

District Court and Court of Appeals rulings and opinions on matters in which I was

not involved, and to the evidence submitted by parties in motion practice and (to a

limited extent) discovery both before and after my appointment.

### C.    Consideration of Earlier Rulings

#### 1.    Privilege and work product protection

Hagens Berman has waived its previously available work product protection

with respect to the evidence considered by its expert witness, including the

transcripts and exhibits from the *in camera* hearings.  Doc. 742, *Johnson*, 2021 WL

2010353 (SDM Findings & Order); Doc. 746 (SDM Mem.); Doc. 749 (District

Court overruling objections to Findings & Order).  With one exception, however,

the attorney-client privileges of all past and present plaintiffs (including the Five

Plaintiffs and former Plaintiff Diana Cabcabin) remain intact.[8]  Doc. 746 at 32-34

---

[8] The single exception is Plaintiff Carolyn Sampson, who has expressly waived privilege. *See infra* § V.C.

(SDM Mem.).  As a practical matter, however, the record, even *in camera,* does

not contain much in the way of attorney-client privileged material.  Needless to

say, the Court is free to consider even the attorney-client privileged information in

considering my recommendations; that is what *in camera* proceedings are for.  But

I will avoid quoting privileged information in this public Report and

Recommendation.

### 2.    The earlier sanctions motions and award

In March 2015, the Court approved and adopted my Report and

Recommendation that sanctions be imposed on Hagens Berman (alone) in favor of

Defendant Grünenthal (alone) on Grünenthal's motions regarding the law firm's

unwarranted prosecution of claims on behalf of three former plaintiffs.[9]  Doc. 483,

*Johnson,* 2015 WL 1004308, *approving and adopting* Doc. 414, *Johnson,* 2014

WL 6851277 (SDM).  Those sanctions are of little limiting force, if any, with

respect to the present inquiry and remedies, for a number of reasons:

- The earlier sanctions were sought and imposed pursuant only to 28

  U.S.C. § 1927 and the Court's inherent authority, and not under the

  different terms of Federal Rule of Civil Procedure 11; the attorneys'

---

[9] A similar award is available to Grünenthal's co-defendant GSK, based on the identical facts and conclusions of law, depending on the disposition of other matters pending before the District Court.  *See infra* § IV.H.  Defendant Sanofi did not seek sanctions in those specific instances, *id.,* but has sought them with respect to other motions.  *See, e.g.,* Doc. 456, Motion for Summary Judgment against Plaintiff Robert Murray.

compliance with their presuit investigatory obligations was not at
issue.

- The earlier sanctions, as recommended by me and awarded by the
  District Court, were awarded only to Defendant Grünenthal, and were
  calculated to reimburse only Grünenthal's litigation expenses directly
  attributable to its defense against those three plaintiffs' claims and a
  3/49 fraction of its general expenses.

  - Even that narrowed range of sanctions was based – at
    Grünenthal's behest – on sanctionable Hagens Berman conduct
    occurring in a six-month window, April-September 2014.

Doc. 414, *Johnson*, 2014 WL 6851277 at *4, *18 (SDM); *see* §§ IV.F.3-4.  I
therefore conclude that the Court's discretion to impose sanctions under the aegis
of Federal Rule of Civil Procedure 11, Pennsylvania Rule of Civil Procedure
1023.1 (*see infra* § IV.B), 28 U.S.C § 1927 and the Court's inherent powers is,
essentially, not limited by the prior order.

Nor should the Court's initial June 17, 2014 Order (Doc. 239), in which
Judge Diamond first proposed to appoint me as Special Discovery Master, be
viewed as limiting the Court's power to impose discovery sanctions under Fed. R.
Civ. P. 26(g) or 37.  The proposed and later Final Order (Doc. 256) were, as
explained by the Court, entered in response to a defense letter motion praying for

sanctions and other relief arising out of a lengthy pattern of discovery abuses, but the Court declined to impose any sanctions and, instead, the Court's Order contemplates that the Special Discovery Master will recommend any such remedies if and as appropriate.

### 3. Hagens Berman's settlements with some plaintiffs: an open question of confidentiality

Several unhappy past or present clients in these cases have sued or brought dispute resolution proceedings against Hagens Berman and have now settled those claims.[10]  Two of them (Terrie Bolton and John Marshall) are among the Five Plaintiffs.  Another (former Plaintiff Diana Cabcabin) was a victim of the document-tampering that is discussed *infra*, § VI, as was Ms. Bolton.  And four of the counsel-suing plaintiffs (Bolton, Marshall, Cabcabin and Sampson) have testified in these proceedings.

The Court and I have received copies of the various settlement agreements, but have not docketed or otherwise published them.  I have solicited the views of the participants on whether these documents are entitled to remain shielded from

---

[10] Plaintiff Terrie Bolton and Former Plaintiff Diana Cabcabin mediated or arbitrated their disputes.  In *Sampson v. Hagens Berman Sobel Shapiro LLP*, 20-cv-2232 (E.D. Pa.**),** Plaintiff Carolyn Sampson sued Hagens Berman and attorneys Kay Gunderson Reeves and Steve Berman.  In *Harrellson v. Hagens Berman Sobel Shapiro LLP***,** 21-cv-5211 (E.D. Pa.), Plaintiffs Mark Harrelson, Carolyn Jean Grover, Yvonne English, Darren Griggs and John Marshall sued the firm and Mr. Berman.  All the cases were settled.  If other past or present *Johnson* plaintiffs have proceeded against the attorneys, there is no evidence of it in the instant record.

scrutiny by the public (or by, *e.g.,* more limited populations such as other past or

present plaintiffs) but have not received any responses I found particularly

edifying.  Since no one has, to this point, actually asked for the documents or

asserted their relevance to these consolidated cases, I have not reflected their

substance in this Report.

## IV.    <u>History of the Cases</u>

### A.    **Jurisdictional and Rule 12 matters**

The eleven lawsuits were filed between May 2011 and April 2014.  All but

the last of them, *Griggs,* were initially filed in the Philadelphia Court of Common

Pleas, timely removed, and randomly assigned to judges of this Court.

Removal jurisdiction hinged on the citizenship of the GSK Defendants for

28 U.S.C. § 1332 diversity of citizenship purposes, but the decisions in the Eastern

District of Pennsylvania were already in disagreement on that precise question.[11]

In the present cases, Judge Diamond stood alone in holding that GSK is a citizen of

Delaware and removal was proper, and refusing to remand to the state court.  His

analysis was affirmed on appeal, *Johnson v. SmithKline Beecham Corp.*, 724 F.3d

337 (3d Cir. 2013), *aff'g* Doc. 62, *Johnson*, 853 F. Supp. 2d 487 (E.D. Pa. 2012).

---

[11]  **Holding:  GSK is a Delaware citizen:**  *White v. SmithKline Beecham Corp.*, No. 10–2141, 2010 WL 3119926 (E.D. Pa. Aug. 6, 2010), retaining federal court jurisdiction.

**Holding:  GSK is a Pennsylvania citizen:**  *Brewer v. SmithKline Beecham Corp.*, 774 F. Supp. 2d 720 (E.D. Pa. 2011), and *Monroe v. SmithKline Beecham Corp.*, No. 10–2140, 2010 WL 2606682 (E.D. Pa. June 25, 2010), remanding to the state court.

All this took time.  It was not until mid-2013 – more than two years after two plaintiffs had brought the first thalidomide complaint, *Murray* – that stays were lifted and defendants were in a position to answer or move pursuant to Federal Rule of Civil Procedure 12.  The cases were consolidated and assigned to Judge Diamond.  Doc. 81.

And as everyone surely expected would come next (wherever the cases finally landed), defendants moved to dismiss them as time barred (Docs. 74, 86). Judge Diamond denied those motions in September 2013 because "I cannot determine, at this early stage in the litigation, the viability of Plaintiffs' equitable tolling arguments."  Doc. 92 at 2, ¶ 4.  Defendants answered the complaints.

Finally it was discovery time, and the District Court set a case management schedule, which Judge Diamond later extended a bit, so that "requests for, and responses to, discovery will be noticed, served, and completed" on or before November 30, 2014.  Docs. 103, 270.

## B.    Truth in Pleading: Rules 11 and 1023.1

Before further discussing post-consolidation events, it is important to identify the law firms and lawyers that have come and gone as plaintiffs' counsel in these cases, and the roles they played in constructing the eleven complaints. And even before *that*, I think it is useful to address the professional standards

lawyers follow, and the particular standards these lawyers embraced when they asked permission to practice in this Court and in this Commonwealth.

Lawyers who file pleadings and papers with a Pennsylvania court, federal or state, cannot just make things up. When filing a complaint, the responsible attorneys promise the court that their "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3); Pa. R. Civ. P. 1023.1(c)(3); *cf.,* Pa. R. Prof. Conduct 3.1, 3.3. We trial lawyers have a duty to investigate before pulling the lawsuit trigger, and we must not misstate the facts we learn from our clients in our eagerness to craft a complaint that "gets to the jury." As a precondition to each and every one of these 52 separate cases, the law demanded "an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b); Pa. R. Civ. P. 1023.1(c). That inquiry "must precede presentation to the court." *See* Gregory P. Joseph, Sanctions, the Federal Law of Litigation Abuse ("Joseph, Sanctions"), 1 Sanc. Fed. Law of Lit. Abuse § 7(B), TIMING OF INVESTIGATION:

> One of the cardinal principles of Rule 11 practice is that a party must reasonably determine the bona fides of his or her position before asserting it. Neither a claim nor an affirmative defense nor any other position may be presented in the mere hope that subsequent discovery or later legal research will sustain it.

Those are the commandments.  They inform every aspect of the discussion that follows.

The Pennsylvania Rules of Civil Procedure governed the first ten of these actions initially.  And they continue, in this Court, to be the measuring stick for the attorneys' and parties' pre-removal conduct – their presuit investigation and the content of the ten complaints filed in state court.[12]  The pleading standards under the state and federal regimes are virtually identical for purposes of this discussion. *Compare* Fed. R. Civ. P. 11 *with* Pa. R. Civ. P. 1023.1-1023.4.  As it happens, though, Pennsylvania's rules are more granular than the Federal Rules in illuminating the meaning of this "inquiry reasonable under the circumstances" required by courts, and are a useful guide to the steps conscientious counsel should take, in either regime, before accusing another of actionable transgression.  In addition to the signature of counsel, Pennsylvania Rule 1023.1(c) requires the party herself – or her informed proxy – to expressly *verify* to the court under penalty of perjury that the pleaded facts are, in fact, *facts*!  That Rule also says who can sign

---

[12] A district court cannot impose Federal Rule 11 sanctions based on pre-removal filings, but can impose them under state rules, such as Pennsylvania Rule 1023.1-1023.4.  *See* Joseph, Sanctions, 1 Sanc. Fed. Law of Lit. Abuse, § 5(A)(2) at 85-88.  Otherwise, sanction-worthy pre-removal conduct would be entirely insulated from remedy since the state court is forbidden to act in a removed matter.  *See* discussion and cases collected in *Griffen v. Okla. City*, 3 F.3d 336, 341 (10th Cir. 1993).  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) is not implicated because there is no federal law that applies to a complaint filed in a state court.  *Schmitz v. Campbell–Mithun, Inc*., 124 F.R.D. 189, 192 (N.D. Ill. 1989).

such a "verification," in what circumstances he can sign, and what that signature

means.  In most instances, the Rule calls for a *party* to do the verifying:

> The verification shall be made by one or more of the
> parties filing the pleading unless all the parties (1) lack
> sufficient knowledge or information, or (2) are outside
> the jurisdiction of the court and the verification of none
> of them can be obtained within the time allowed for
> filing the pleading.

Pa. R. Civ. P. 1024(c).

But not one of the 49 plaintiffs who initiated these cases in the Philadelphia

Court of Common Pleas verified a single word of a single complaint.  Instead, the

attorneys – Steve Berman or the late Nick Styant-Browne, once Hagens Berman

came into the litigation – did all the swearing on behalf of everybody.[13]  That in

itself is not prohibited; a non-party – including an attorney, but not necessarily an

attorney – may supply the verification *if* he complies with the Rule's requirements.

And the Rule places quite a heavy burden on the substitute verifier, particularly in

a case where more than one plaintiff and more than one story are involved:

> In such cases, the verification may be made by any
> person having sufficient knowledge or information and
> belief and shall set forth the source of the person's
> information as to matters not stated upon his or her own

---

[13]  Mr. Berman verified the *Debra Johnson, Gunn, Charelston, Gosser, Brust,* and *Alexander* complaints (21 plaintiffs); Mr. Styant-Browne, the *Yeatts* and *Spence* complaints (24 plaintiffs).  A New York-based lawyer licensed in this Commonwealth, Richard Meadow, verified the first two complaints, *Murray* and *Johnson,* which predated Hagens Berman's involvement in these cases.

> knowledge and the reason why the verification is not
> made by a party.

*Id.* Observe the Pennsylvania Rule's careful drill-down into the verifying declarant's state of mind and knowledge base. The verifier doesn't have to have first-hand "knowledge" of every single fact. His "belief" will suffice, but only if it is based on sufficient "information" to support a good-faith, informed "belief." (Note the conjunctive "information *and* belief".) An attorney in a tort case will almost never have "knowledge" – percipient knowledge – of things that happened before he was engaged: He will not have seen the color of the traffic light or seen the crash. And no attorney in these cases could know, for each of these 52 clients, how and when she or her parents first came to suspect that her birth defects might be related to a substance called thalidomide. If the attorney is going to sign the verification, he will necessarily be relying on information told to him by his client or others in the course of the lawyer's "reasonable in the circumstances" inquiry required by Pa. R. Civ. P. 1023.1. Note, further, that the Pennsylvania rule requires a couple of further steps. The lawyer must also explain, in that verification, *why* the individual party has not made the verification herself, and he must tell the court the source of his *information* as to matters not stated upon his actual *knowledge, i.e.*, the information that supports his reasonable *belief.*

None of the verifying lawyers in these cases did that or anything like that. Indeed, the available evidence suggests that the Hagens Berman attorneys – Steve

Berman and Nick Styant-Browne – did not pay much attention either to the

Pennsylvania rule or to the content of their respective verifications.  Here, as an

example, is Mr. Styant-Browne's verification in the eleven-plaintiff *Spence*

complaint:

> Nick Styant-Browne hereby states that he is counsel for
> plaintiffs Valerie Spence, Kim Branscum, Jack Merica,
> Mark Harrelson, Jose Navamuel, Tawanna Williams
> [**sic**], Terrie Bolton, Michael Morgan, Barbara Murray,
> Yolanda Perez, and Kevin Randall in this action and
> verifies that the statements made in the foregoing
> Plaintiffs' Complaint are true and correct to the best of
> his knowledge, information and belief.  The undersigned
> understands that the statements therein [**sic**] are made
> subject to the penalties of 18 Pa.C.C. [**sic**] Section 4904
> relating to unsworn falsification to authorities.

Verification to *Spence* Compl.  That Hagens Berman misspelled the name of its

client Tawana Williams throughout the *Spence* complaint and in Mr. Styant-

Browne's verification, and that no one apparently noticed, raises obvious concerns

about the process by which the lawyers reviewed consequential draft documents

with their 52 clients in these cases.  Notably, too, every single one of the nine

complaint oaths taken by Mr. Berman or Mr. Styant-Browne over the course of

three years miscites the Pennsylvania "false swearing" statute, 18 Pa. C.S. § 4904.

Standing alone, these sorts of errors might be ascribed to careless

proofreading rather than a disregard for the policies that undergird procedure.

Here, they were unfortunate harbingers of the lick-and-a-promise lawyering that is

characteristic of these cases to this point.  The fact is that Berman and Styant-

Browne did not do their homework, and that neither Hagens Berman nor its

predecessor (later co-counsel and, still later, consultant).  Kay Reeves, ever

developed the crucial information they required as a predicate to one lawsuit, much

less 52 lawsuits.

### C.     Counsel's Appearances and the Complaints They Filed

With respect to those of the 52 cases the Court has already dismissed, and at

least some of these Five Plaintiffs' cases, the lawyers have disserved their clients

badly by falling far short of the standards of practice demanded by this Court.  But

the comings and goings of counsel for plaintiffs from case to case must be taken

into account in deciding which lawyers have what responsibility for which false

representation or other misstep.

### 1.     The first two cases:  Kay Reeves, Gordon & Reeves, the Lanier Firm

According to the testimony, bringing these cases in an American court after

all these years was the brainchild of an Australian attorney, Peter Gordon.  Briefly,

there was testimony that Mr. Gordon, back in Australia, had persuaded the

successors to the one-time Australian distributors of thalidomide to put new money

into a privately funded victim compensation fund in that country, and that he had

also made a persuasive case, in Australia, for expanding the range of birth defects

that might be causally linked to thalidomide by applicants for benefits from that

fund.  According to Ms. Reeves and Messrs. Berman and Styant-Browne,[14] the

international publicity from those events, commencing in late 2010, led a number

of quadragenarian or quinquagenarian American residents with birth injuries to

contact Mr. Gordon with respect to their own possible thalidomide claims, and he

saw an opportunity for United States litigation.  *See* 5/10/2019 Tr. at 787:8-793:2

(Reeves); 9/26/2017 General Tr. at 22:3-9 (Berman); 9/26/2017 Bolton Tr. at

103:15-104:10 (Styant-Browne).

At some point in 2010, Kay Reeves testified, Mr. Gordon joined forces with

two American businessmen-attorneys, Reagan Silber and Elliott Karathanasis.  *Id.*

Mr. Silber, in turn, recruited Ms. Reeves to work for the new LLC.  A new

American law firm, Gordon & Reeves, was formed as a limited liability

company.[15]  Although Ms. Reeves lent her name to the venture and seems to have

done almost all of its work for a period of at least a year, she was actually more a

---

[14]  *See* 5/09/2019 Tr. at 748:21-751:19; 9/27/2017 Sells Tr. at 107:7-108:13 (Styant-Browne).  My reference to the September 2017 transcripts by plaintiff name is explained in Note 19, *infra*.

[15]  5/10/2019 Tr. at 792:17-793.5.  The gist of Ms. Reeves' testimony is that Messrs. Gordon, Karathanasis and Silber were the principals of the new firm, but the precise roles Karathanasis and Silber played in that enterprise and their roles, if any, in the continuing post-Gordon & Reeves litigation are not clear.  From publicly available *curricula vitae* of Karathanasis and Silber, it appears that both had successful careers as attorneys but then turned their talents to the world of business and finance. *See Our Team*, https://www.tregan.com/our-team) ; *Reagan W. Silber c.v.*, https://utlsf.org/trustee/reagan-silber/ ("Silber c.v.").  The Silber c.v. discloses that, among his entrepreneurial accomplishments, Mr. Silber "partnered with Peter Gordon" beginning in 2010 and built "one of Australia's preeminent litigation funding firms." *N.B.:*  All websites cited in this Report were most recently visited just before its filing.

contract lawyer than an equity member: "I was being paid on a monthly basis and had sort of a quite modest equity interest on any settlement." 5/10/19 Tr. at 811:3-5 (Reeves).

It was never expected that Gordon & Reeves and Ms. Reeves would be the actual lead trial counsel in these cases. 5/9/2019 Tr. at 695:16-21, 697:2-8. The multi-plaintiff operation contemplated by Gordon and others would require an experienced plaintiffs' catastrophic injury firm with a sizable stable of skilled trial attorneys for discovery and trial. Asked if she herself was a trial lawyer, Ms. Reeves said:

> I don't speak to the jury. I take depositions, I write briefs,
> I do intake, I do kind of all the casework workup, and I
> argue to the court during trials, but I do not put on
> witnesses and I do not conduct jury selection.

5/9/2019 Tr. at 696:11-16.

After considering several candidate firms (including Hagens Berman), Gordon & Reeves selected the Lanier Law Firm to "partner" in the preparation and prosecution of thalidomide cases that Gordon & Reeves identified. Thus was the venture launched.

In addition to those potential plaintiffs who had reached out to Mr. Gordon, others learned about the effort through web solicitations generated by the United States lawyers. 5/10/2019 Tr. at 793:6-794:3 (Reeves). The vetting of potential plaintiffs, such as it was, included questionnaires posted on the web by Gordon &

Reeves (and, later, by Hagens Berman).  *See, e.g.,* Bolton Ex. 5 (responses on

Gordon & Reeves form); Sells Ex. 7 (on Hagens Berman form).

From late 2010 to late 2011, Ms. Reeves was a one-woman band.  Mr.

Karathanasis helped out in interviewing some potential plaintiffs, she said,

(5/9/2019 Tr. at 696:2-7), but Reeves got little or no help from anyone at the

Lanier Firm while putting the cases together – interviewing potential plaintiffs

from across the country (usually face-to-face, she testified); traveling as far as

Australia to learn about new possible theories for linking birth injuries to

thalidomide; researching FDA records at the Library of Congress; reading

scholarly and popular publications on thalidomide; and drafting a master

complaint.

> I spent many, many hours conducting legal research,
> factual research; going to archives; translating and
> getting documents translated from German; meeting with
> experts here and in Australia to educate myself about the
> facts, the science that would be at issue in this case as
> well as, you know, the legal rules in Pennsylvania, the
> law with respect to statute of limitations in particular here
> and in other jurisdictions where the cases might be filed
> or where another state's law might be applied in a
> Pennsylvania-filed case.

5/10/2019 Tr. at 781:3-16.  But although Ms. Reeves talked about educating

herself on "the science," she was careful to point out that Peter Gordon took the

lead in developing the *scientific* knowledge and theories that might support what I

will call a "New Science" argument, the contention that a particular plaintiff's birth

injuries would not have been recognized as thalidomide-related in 1962 or 1964, but would be so recognized today because of very recent advances in diagnostics. 5/9/2019 Tr. at 748:21-749:24 (Reeves).

Ms. Reeves's and Peter Gordon's investigative efforts during the short life of Gordon & Reeves, LLC do not seem to have yielded any eye-opening revelations about causation or New Science. Only two complaints (*Murray* and *Johnson*, four plaintiffs in all), were filed by the Gordon & Reeves/Lanier team. Those two complaints each run to more than 125 pages and 340 paragraphs, but do not contain a whisper about any New Science. Instead, those complaints – initially filed in a "fact-pleading" state court (*see* Pa. R. Civ. P. 1019; *McShea v. City of Phila.*, 995 A.2d 334, 339-40 (Pa. 2010)) – are all about fraudulent concealment, alleging a massive 60-year cover-up. *See, e.g., Murray* Complaint Introduction; *Johnson* Complaint Introduction:

> Today, for the first time, evidence gathered from around the world – newly released information, recently-accessible foreign documents, previously unseen internal corporate materials, and previously undiscovered and unavailable government documents – makes it clear that these people have not only been the victims of a medical tragedy, they have been duped by a cover-up that stretches back 60 years.

However, these two complaints never identify any specific misinformation any of the four plaintiffs or their respective families received, or any reliance or forbearance by any of them based on their receipt of any part of the universe of

misinformation of which the defendants are accused.  For the most part, these two complaints, generously peppered with information-and-beliefs, contain page after page of accusations of deceitful or simply immoral behavior on the part of the defendants but never talk about how the mother or child was misled, or when each plaintiff or her parents first suspected she was a thalidomide victim, or how she now knows she is one, or why she can start a lawsuit fifty years after the injury.

That last problem, the time bar, is huge, particularly in light of the widespread publicity given to the stunning early-'60s revelation that well-meaning physicians had been handing out a medication that caused grievous harm to the unborn.  Younger Americans in today's media-soaked society might not fully appreciate the impact a *Life Magazine* story and photo spread had on a 1962 national consciousness.  Thalidomide was big news in the '60s and for a long time thereafter, and it is hard to imagine Americans born with birth injuries in the late '50s or early '60s – or, more pertinent, the parents of Americans born in that period – being oblivious to the worldwide thalidomide phenomenon.

Asked about that last omission from the *Murray* and *Johnson* complaints, Ms. Reeves stated that "[a]s a general proposition, I didn't draft complaints to plead around statute of limitations, because it isn't required."  5/9/2019 Tr. at 748:4-7.  That familiar response may work for Rule 12(b)(6) purposes (as, indeed, it did in these cases), but not for sanctions purposes if the pleader does not have a non-

frivolous basis for avoiding the time bar.  *See* discussion in Joseph, Sanctions, 1 Sanc. Fed. Law of Lit. Abuse §§ 14(C)(2) & 14(C)(3).[16]  And any wisp of a hope that these defendants, in these cases, would waive their statute of limitations defense would disappear completely once defendants raised it in a pleading or motion.  *See Ford v. Temple Hosp.*, 790 F.2d 342, 350 (3d Cir. 1986) (Section 1927 sanctions not available until defendants pled the time bar); *but see Brubaker v. City of Richmond*, 943 F.2d 1363, 1384 (4th Cir. 1991) ("Where an attorney knows that a claim is time-barred . . . he makes a claim groundless in law and is subject to Rule 11 sanctions").

Ms. Reeves certainly appreciated at all times that the time bar was *the* front-end issue in all the cases; much of her work product during her two years in these cases centered on avoiding time bars.[17]  It could hardly have come as a surprise that when it came time to plead or move in response to the *Murray* and *Johnson* complaints, defendants would likely focus on that inconvenient temporal gap between the alleged injuries and the lawsuits.[18]

---

[16] Mr. Joseph notes that "[s]urprisingly, although the language of Rule 11 derives from the American Bar Association's Code of Professional Responsibility, in this respect the Rule imposes a higher standard than the ethics provision."  *Id.*, § 14(C)(2) at p. 257.

[17] *E.g.,* Reeves00006778, 000029908, 000029913, 000030567, 000030714.  ("Reeves0" references are to Ms. Reeves notes, produced *in camera*.)

[18] Pennsylvania's limitations period is two years (42 Pa. C.S.A. § 5524), but if the tort cause of action accrues in another state, and applying that state's law will *shorten* the limitations period, the shorter period governs.  42 Pa. C.S.A. § 5521(b).

Ms. Reeves's pleading approach regarding the statute of limitations would change – not for the better – when she found herself collaborating with Steve Berman, Nick Styant-Browne and Hagens Berman in composing and filing the third complaint, *Yeatts,* and in shaping future complaints.

### 2.    Hagens Berman in, Lanier out

From early on in the Gordon & Reeves/Lanier Firm relationship, Ms. Reeves and others had been disappointed with the performance of the Lanier firm. 5/10/2019 Tr. at 808:18-809:11 (Reeves). The "partnership" lasted just "a few months." *Id.*  In the Summer of 2011, Reeves was instructed to terminate Lanier's participation.  She did so, and the search for a catastrophic injury firm to try the cases started all over again. *Id.* at 809:13-810:1.

But around Labor Day 2011, Ms. Reeves, too, was shown the door.  In a telephone conversation, Peter Gordon told her that Hagens Berman was going to become lead counsel, and that Gordon & Reeves would leave the case.  She was told she would be paid by Gordon & Reeves for two months, then Hagens Berman would keep her on for six months to aid in the transition. *Id.* at 810:18-811:14. Peter Gordon also told her that he and his Australian firm, Gordon Legal, would participate in the litigation and the expected fees (as Reeves would not). *Id.* at 812:16-24; 813:14-20.  She did continue working with Hagens Berman until May 2012 (5/7/2019 Tr. at 113:17-114:1(Styant-Browne)), and was discussing

particular potential plaintiffs with Steve Berman (and being criticized by him for her pessimistic assessment of some potential plaintiffs' cases) as late as August 2012. *See* Reeves000029895. She would testify that she continued to do wind-down activities as late as the fourth quarter of 2012, although the clients had formally consented to her replacement in the cases in mid-2012. 5/10/2019 Tr. at 1046:14-1047:23.

The Lanier firm was obviously still in the picture as late as August 26, 2011, when Richard Meadow (a Lanier lawyer licensed in Pennsylvania) appeared as co-counsel with Reeves on the two-plaintiff *Johnson* complaint in the Court of Common Pleas. Meadow withdrew in mid-October, and several Hagens Berman lawyers entered their appearances in *Murray* and *Johnson*.

### 3.    The *Yeatts* complaint

On October 27, 2011, the *Yeatts* complaint was filed; it was co-authored by Steve Berman, Nick Styant-Browne, *and* Kay Reeves. It was filed on behalf of thirteen plaintiffs and ran to 448 paragraphs (153 pages).

From the cold record, it appears that the newly minted lead counsel moved quickly – much too quickly, as we shall discuss – to vet and file claims in far greater volume than Reeves and Lanier had managed to do. Although Hagens Berman's witnesses never explained how the thirteen *Yeatts* plaintiffs came to be plaintiffs in the first place, *i.e.,* how they were identified and recruited, Ms. Reeves

stated that she had personally interviewed some if not all of the *Yeatts* plaintiffs (including Carolyn Sampson and Diana Cabcabin, whose cases are discussed *infra* in §§ V and VI, respectively). Her notes bear this out.

At the hearing on these Withdrawal Motions, Steve Berman took credit for writing the portions of the complaints post-*Murray* and *Johnson* that were not plaintiff-specific:

> [O]nce we decided to go forward, I was involved in drafting what I would call the factual sections of the complaint, mainly the non-Plaintiff sections, the sections involving the role of drug companies, the role of thalidomide distribution in the United States.

9/26/2017 General Tr. at 18:12-16.[19] He never spoke to any of the plaintiffs, although he testified that he reviewed and approved every plaintiff-specific

---

[19] *An explanatory note regarding citation to transcripts*: The defendants were excluded from the September 2017 hearing sessions on the withdrawal motions. But for each of the Five Plaintiffs involved in those sessions, some evidence had to be kept secret from the other plaintiffs in addition to the defendants and the public. These were hearings on five different withdrawal motions, involving five unique cases, all of which also encompassed a relatively small hearing segment that was pertinent to all five withdrawal motions. Accordingly, the printed transcripts had to be organized so as to keep one plaintiff from inadvertently receiving another plaintiff's privileged *in camera* evidence and Hagens Berman's work product attributable to the latter plaintiff's case. Transcripts were organized by plaintiff, and not just by date. Thus, a citation to "9/26/2017 Bolton Tr. at 14:25-16:6 (Weaver)" is to Mr. Weaver's *in camera* testimony in the hearing session devoted to the Hagens Berman motion to withdraw from Ms. Bolton's case. The "General Tr." reference in text refers to that single segment of the September 2017 hearing that was open to all of the Five Plaintiffs and involved information common to all their situations.

Much of that evidence is now publicly available for two reasons: First, much of it relates to the evidence falsification and false testimony discussed in § IV; second, Hagens Berman has waived work-product protection. *See* § VII. However, the Five Plaintiffs' privileged attorney-client communications remain protectable and protected. *See id.*; Doc. 742, *Johnson,* 2021 WL 2010353 (SDM Findings and Order) and Doc. 746 (SDM Opinion), *objections overruled,* Doc.

segment of every complaint before it was filed.  Berman referred me to his of-

counsel colleague Mr. Styant-Browne for information regarding the New Science

bases for particular plaintiffs' claims (*See id.* at 18:12-19:18, 43:13-24), but Mr.

Styant-Browne was singularly uninformed on that subject.  *See* 9/26/2017 Bolton

Tr. at 137:22-140:12 (Styant-Browne).  He did acknowledge drafting the

paragraphs of *Yeatts* and Hagens Berman's later complaints that related to

particular plaintiffs and said that either he or Ms. Reeves spoke personally to each

plaintiff before filing her complaint.  5/7/2019 Tr. at 128:16-131:12.  Until she left

the enterprise in May 2012, Ms. Reeves was involved in developing both the

general information and the client-specific information and apparently drafting,

editing or critiquing proposed language for Hagens Berman's complaints.  *Id.*; *see*

*also* Reeves000002847-2975.  But a lot of the information she shared with Hagens

Berman – highly relevant to the time bar issue or the elements of proof of the

alleged torts (or both) – was either ignored or actually contradicted in several of

the cases mentioned in this Report.  *See* Reeves000026795, Reeves000026866,

Reeves000030567, Reeves000030838, Reeves000030991, Reeves000036289,

Reeves000036302.  And from episodic information, it certainly appears that Steve

Berman was the most aggressive member of the team in evaluating claims.

---

749.  All other hearing testimony cited in this Report is identified solely by hearing date, page, line, and testifying witness, as is typical.

The Berman/Styant-Browne/Reeves approach to claim-vetting and complaint-drafting described above seems, in retrospect, almost certainly doomed to failure. The "fact-specific" information apparently focused on by Mr. Berman seems to have been mostly about the perceived wrongdoings and bad character of people who were associated with thalidomide in the 1950s and 1960s and earlier. But what a 2011-2014 plaintiff really needed for *her* claim in *her* case was evidence that *her* mother had actually ingested thalidomide and that *her* harm – this plaintiff's birth injury, that is – was caused by that ingestion. More, even before any of that evidence (if she found it) could be of any use to her, she would have to persuade a court to consider it; she would have to convince a judge bound by Pennsylvania's two-years-or-less time bar either that a responsible defendant kept her from finding out about her injury or the defendant's responsibility, or that the scientists had – just recently – finally wised up to a causal connection between injuries like hers and thalidomide. *That* was the "factual" information (to use Steve Berman's term) each of these plaintiffs required. Without it, their cases would end in disappointment.

With particular reference to those cases that have already been lost or voluntarily dismissed with prejudice, the deficiencies of counsel's approach are readily apparent. These were 52 unique cases alleging one-on-one torts committed in different places at different times with different actors and victims. These were

not securities claims where, *e.g.*, every plaintiff could claim reliance on a single material nondisclosure in a prospectus or proxy statement. Each plaintiff had to have her own unique, competent evidence of maternal thalidomide ingestion, thalidomide-caused injury, and either a particular deception or cover-up or a recent New Science discovery linking her particular birth injury to thalidomide.

Respecting the withdrawal motions, Judge Diamond's instruction to me, it will be remembered, was to determine whether Hagens Berman knew or should have known of the facts underlying its "professional considerations" when it accepted the representation of each of the Five Plaintiffs and sued on her behalf. Hagens Berman had the burden on its withdrawal motions and, surprisingly, addressed only one of the two benchmarks identified in Judge Diamond's question. I heard evidence about counsel's reasons for not having confidence in a plaintiff's claims, but (except perhaps with respect to Plaintiff John Marshall) I heard no evidence that critical facts were not known or reasonably knowable by Hagens Berman in the presuit examination demanded by Federal Rule 11 and Pennsylvania Rule 1023.1.[20]

---

[20] As discussed in § IV.F.1, *infra*, there is evidence suggesting that another plaintiff, Tawana Williams, may have been less than forthright in describing her health history to Ms. Reeves, but Ms. Williams's claims were withdrawn in 2014, and she is not one of The Five Plaintiffs.

Mr. Styant-Browne's explanations for the firm's failure to investigate further before filing 48 new plaintiffs' lawsuits were singularly unpersuasive.  Asked what investigation the firm had made into "the medical records of the physicians who have treated the plaintiff over the years" before suing, Styant-Browne said "[o]nly if they were provided by the client."  9/27/2017 Sells Tr. at 136:2-15(Styant-Browne).  His first explanation was that "it was not possible to obtain any *birth-related* records, so we knew that we would not be able to do that."  *Id.* at 136:22-23 (emphasis added).

But even the strangeness of that non-response – which did not talk about the 50-year postnatal histories of 52 seriously disabled and healthcare-needy clients – paled in comparison to Hagens Berman's second excuse for the firm's failure to obtain and review the medical records before deciding whether someone was or was not a "thalidomider" and starting a lawsuit:

> At the time that we took over these cases there was as I've said considerable publicity which had preceded them, about the second wave of thalidomide litigation, which had occurred in Australia and the United States, and that publicity started in late 2010, concerning the Australian proceedings.  We were aware that SOL issues were very sensitive in these cases, and *we did not want to take the risk of increasing the possible SOL  problems in each case by long delays in obtaining, reviewing, and investigating the medical records of these plaintiffs*, and we felt that it was incumbent upon us to file their proceedings in as timely a way as possible regardless of their particular circumstances concerning the statute but in light of the fact that certainly defendants could show

that there was quite extensive publicity of the second
wave of thalidomide litigation, which had occurred
starting in late 2010.

Q     [Mr. Hangley:]  So then under the pressure of time
to beat the statute you made it a practice of not reviewing
medical records that might inform the decision, whether
to take a case or not?

A     [Mr. Styant-Browne:]  I wouldn't accept that
characterization that it was under the pressure of time to
beat the statute.

*Id.* at 136:23-137:17 (emphasis added).

The argument reeks of makeweight, of rewrite.  First, it is at odds with the

facts:  Hagens Berman brought almost a quarter of its 48 cases in 2013 and 2014

(*see* Note 1), more than two years after the late-2010 "publicity" date Mr. Styant-

Browne mentions.  In a state with a two-year-or-less time bar, that is hardly

reflective of the diligence that was due.  Second, the argument just does not

resonate with a trial lawyer; it does not correspond with the strategy decisions that

real-world trial lawyers make.  In saying what he said, Mr. Styant-Browne was not

conjuring up a zombie statute-of-limitations grace period that rose from the dead

for a second two-year life.  He was not suggesting that the plaintiffs would have

gotten a new temporal "window" in which to bring suit simply because someone

else had brought suits or settled them in a foreign land with foreign laws; that

would make no sense.  His point, I think, was that evidence of a continuing failure

to sue – even after that Australian news reached our shores – would reinforce

defendants' argument that plaintiffs just were not duly diligent people. But it is hard to imagine a seasoned defense lawyer (and there are plenty of them in these cases) deciding to share with a jury the otherwise inadmissible news of multimillion dollar lawsuits and recoveries by scores of innocent Australian citizens whose mothers supposedly were poisoned around the same time by the same drug that has allegedly cursed these plaintiffs. More plausibly, the sophisticated mass tort litigators at Hagens Berman might have worried (they needn't have) that other catastrophic injury lawyers would sweep in, signing clients up and filing suits ahead of Hagens Berman, but that, too, would not have excused flouting Rule 1023.1 and (in *Griggs*) Rule 11 as Hagens Berman did.

Furthermore, even if the argument *had* justified a rushed commencement of 49 lawsuits, it would still not have excused the lawyers' failure to do the required investigations *after* filing them and, worse, a rather stupefying refusal to process the information they did find when deciding to file or pursue many of their clients' claims. Deciding early rather than late that a given plaintiff's case lacked merit and should be withdrawn (or not filed in the first place) would have been a kindness to that plaintiff, without even considering the waste of effort and treasure that could have been avoided for all concerned. That is why Rule 11 (like 28 U.S.C. § 1927) extends to papers filed and pursued *after* filing suit.

Not surprisingly, the collective claim-vetting effort in *Yeatts* failed spectacularly. Consider: Of the thirteen *Yeatts* plaintiffs, Hagens Berman has obviously now decided – based on its own belated investigation or rethinking – that more than half of them do not have claims the firm is interested in pursuing. Two *Yeatts* plaintiffs – Richard Anderson and John Marshall – are targets of Hagens Berman's present withdrawal motions based on "professional considerations." Before that, Hagens Berman had already thrown in the towel for five other *Yeatts* plaintiffs, asking the Court to dismiss their claims with prejudice.[21] Even that is not the end of it; defendants have already won summary judgment against an eighth *Yeatts* plaintiff, Edmund Andre, over Hagens Berman's opposition. Doc. 371, *Johnson*, 55 F. Supp. 3d 603 (Andre).[22] And one of those remaining five, Carolyn Sampson, has fired, sued and settled with Hagens Berman. Like Ms. Bolton, she continues pressing her claims against defendants.

---

[21] Plaintiff Diana Cabcabin's claims were voluntarily dismissed with prejudice (Doc. 309). *See infra* § VI. Plaintiffs Sharon Anderson, Ted Mann and Annette Manning (Doc. 440), along with Rachael Anne Wicker (successor to deceased Plaintiff Larry Wicker) (Doc. 321) have asked (and I have recommended) that their claims be dismissed with prejudice. *See infra* §IV.H.3; Doc. 535.

[22] Defendants also moved for summary judgment against four of the remaining five *Yeatts* plaintiffs: Carolyn Sampson (Doc. 291), Tammy Jackson (Doc. 415), Philip Yeatts (Doc. 416), and Mary McPartlan-Hurson (Doc. 469). As a housekeeping matter, the District Court summarily denied those motions (and others) without prejudice to their being refiled once the Discovery Master had submitted a report and recommendation with respect to the proposed consensual dismissal of claims against GSK. Almost all the dismissed-without-prejudice dispositive motions also sought sanctions against plaintiffs' attorneys; none sought sanctions against a plaintiff.

At hearing, Ms. Reeves was asked about another pleading *leitmotif* first seen in the *Yeatts* complaint, the aforementioned "New Science" theory:

> . [The] Thalidomide Syndrome has only been defined in a piecemeal fashion from fragmentary reports in the medical literature synthesized to produce a range of classical injuries that suit a preconceived theory of the mechanism of the drug. *Until recently, a universe of thalidomide related injuries has been thereby excluded from diagnosis, including [Plaintiff n's] injuries.* Only recently available studies published in medical and scientific journals reveal the flaws in the orthodox medical opinion. Armed with this knowledge, [Plaintiff n] can now allege that his injuries were caused by thalidomide.[23]

Ms. Reeves denied writing that particular language. 5/9/2019 Tr. at 747:14-748:2. Plainly, though, she collaborated extensively with Messrs. Berman and Styant-Browne in drafting complaint paragraphs involving this New Science issue and other limitations-related subjects. *See id.* at 741:15-742:22; Reeves000002847-2875. In light of the Court's express instruction that the withdrawal motion proceeding explore not only Hagens Berman's present knowledge, but also its relevant knowledge when launching each of the Five Plaintiffs' cases, it is remarkable that Ms. Reeves – who was testifying only at the behest of the Special Master after hearing Berman's and Styant-Browne's evidence

---

[23] *Yeatts* Complaint, Doc. 1 ¶¶ 14 (Yeatts), 25 (Manning), 32 (McPartlan-Hurson), 43 (Grover), 47 (Sharon Anderson), 52 (Cabcabin), 59 (Jackson), 70 (Mann), 76 (Richard Anderson) (emphasis added).

about their reliance on her and Peter Gordon's work product and knowledge – was the only witness who talked about counsel's knowledge at the times of filing a complaint on behalf of any of the Five Plaintiffs.  Regarding the New Science claims, Ms. Reeves did testify – at length but vaguely – about the numerous scientists or physicians with whom "we" (presumably Ms. Reeves, Peter Gordon, Steve Berman and others) consulted about an expanding appreciation of the range of injuries that might not be excluded from characterization as thalidomide injuries.  Note, here, that Ms. Reeves spoke only of injuries that might be *consistent with* thalidomide exposure, manifestations or expressions that would not *rule out* the possibility of thalidomide as their cause, or even emerge as the most likely.[24]  On direct examination, she stressed "late onset" conditions that might evidence themselves many years after birth, but that might nevertheless be argued to have been causally related to thalidomide exposure *in utero.*  Her example was peripheral neuropathy (damage to nerves outside the brain and spinal cord), but that is a relatively common condition, particularly in aging populations,[25] which

---

[24] This is no small distinction in my view.

[25] According to a Cleveland Clinic consumer website: "Peripheral neuropathy is common, partly because this term refers to so many conditions.  About 2.4% of people globally have a form of peripheral neuropathy.  Among people 45 and older, that percentage rises to between 5% and 7%."  *Peripheral Neuropathy*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/14737-peripheral-neuropathy.

seems to be attributed to myriad possible non-thalidomide "culprits."[26]  None of

the witnesses had anything more specific to offer regarding peer reviewed studies,

much less the "recently available" peer reviewed studies touted in the Hagens

Berman complaints.

For his part, Steve Berman testified that Hagens Berman still plans to adduce

significant expert evidence of such diagnostic advances as surviving cases go

forward, referring to panels of experts who have yet to surface here.  But he was, if

anything, even less specific than Ms. Reeves on the subject of who those experts

might be, or what they had concluded regarding the specific etiology of birth

injuries and thalidomide.  *See* 5/10/2019 Tr. at 946:10-950:11 (Berman).[27]

---

[26] Among them, per the Mayo Clinic, alcohol abuse, autoimmune diseases, bone marrow disorders, chemical toxins, chemotherapy medications, diabetes, infections, heredity, kidney diseases, liver disease, trauma, tumors (malignant and noncancerous), underactive thyroid, and vitamin deficiencies.  *Peripheral Neuropathy*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061.

[27] Interestingly, Mr. Styant-Browne's testimony might suggest that these experts-in-waiting are less qualified than their predecessor, Dr. Stephens, to testify on these subjects.  *See* 9/27/2017 Sells Tr. at 126:14-23 (Styant-Browne):

> I discussed at length with Gordon and Reeves the issue of
> thalidomide experts . . . and they were of the view that the only
> United States based expert who was qualified to opine on
> thalidomide related injuries was Dr. Trent Stevens [SIC], and they
> in fact retained Dr. Stevens in the Australian litigation for the
> purpose of providing expert opinions relating to the class of
> representatives and members of that litigation.

In her testimony, Ms. Reeves mentioned her meeting in October 2011 with Stephen Raynes, a well known Philadelphia catastrophic injury lawyer, who heads a respected plaintiff's personal injury firm.  In the natural order of things, one might expect that Mr. Raynes, Ms. Reeves and Mr. Gordon would all be natural allies.  According to the testimony, Raynes and Gordon were both deeply involved in campaigns to increase the governmental or private-party funding available to confirmed thalidomide victims – Raynes in Canada, Gordon in Australia.  And Raynes, just like Mr. Gordon and Ms. Reeves, is enthusiastically supportive of efforts to have the definition of "thalidomide anomalies" be "as expansive as possible," "as expansive as it could be."  5/25/2021 Tr. at 202:15-203:7 (Raynes).

It did not turn out that way.  Without being asked, Ms. Reeves testified that "I did have a meeting with Stephen Raynes" (5/10/19 Tr. at 914:5-6 (Reeves)) for the purposes of "[s]eeing if they still had any of the liability evidence from [a thalidomide case tried by Stephen Raynes's father, Arthur Raynes] in the 1970s and would be willing to share it."  *Id.* at 916:4-7.  She testified that it did not go well.  *Id.* at 916:8-917:8.  Raynes agreed, stating that he asked her to leave his office.  5/25/2021 Tr. at 200:12-13 (Raynes).

Shortly thereafter, Ms. Reeves filed *Yeatts.*

In these proceedings, Ms. Reeves took one position – a highly significant one – that I had not seen evidenced anywhere in her notes or correspondence, or

heard about from any plaintiff or Hagens Berman witness in the 2017 sessions.  In

advance of her testimony scheduled for the May 2019 hearing, her attorney

articulated (unsolicited) his client's position:

> It is clear that Ms. Reeves had always believed that the
> cases would not be viable in federal court and, it is her
> position that she prepared all plaintiffs with whom she
> dealt for the possibility that if the jurisdictional battles
> did not go their way and they found themselves stuck in a
> federal court, they would have a discussion at which Ms.
> Reeves would recommend a voluntary dismissal.

Letter at 2, Arthur Thomas Donato, Jr. to William T. Hangley, Mar. 22, 2019.  In

the courtroom, Ms. Reeves confirmed that strong conviction – that the *Johnson*

cases had absolutely no chance of succeeding if they remained in the federal court:

> There had been some federal court litigation in the '70s
> that had reached some conclusions about, I think, *forum
> non conveniens*, with respect to forum plaintiffs, and
> some statute of limitation kinds of holdings that would
> have bound the federal courts here.  And I believe that
> the cases were not – as hard as they were for state court, *I
> believe that the cases would not be viable in federal
> court.*

5/9/19 Tr. at 710:9-18 (emphasis added).[28]  Although Ms. Reeves was clear in her

written communications to the then plaintiffs that Gordon & Reeves was seeking

---

[28] The following day, Ms. Reeves's attorney reminded her of this testimony and asked whether she *really* meant to say (as he himself had said in his letter) that she believed the cases would not be viable in a federal court.  If her wandering, jello-to-the-wall response was an effort to walk the earlier testimony back, it did not walk it very far.  *See* 5/10/2019 Tr. at 891:11-893:14 (Reeves).

remand of the cases, I have found nothing in the record to document any

communication to the plaintiffs that the remand question might be a life-or-death

one for their cases, or why.  There is no statement to support Mr. Donato's own

understanding that Ms. Reeves

> prepared all plaintiffs with whom she dealt for the
> possibility that if the jurisdictional battles did not go their
> way and they found themselves stuck in a federal court,
> they would have a discussion at which Ms. Reeves would
> recommend a voluntary dismissal.

Donato Letter at 2.  That is troubling.  Wasn't Ms. Reeves certain when she signed

on to the whole Gordon-Silber-Karathanasis enterprise, back in 2010, that

defendants would seek to remove the cases from a heavy-traffic urban state court

to the federal court?[29]  Did she not recognize that the question of GSK's alleged

Pennsylvania citizenship was at least open to disputation and, indeed, that remands

to the state court would be a toss-up at best?  The United States Supreme Court's

seminal "nerve center" decision in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010), had

been the law of the land for a year by the time she filed any of these cases.

Already, decisions in this Court *on the precise question of GSK's citizenship in the*

*removal context* were squarely at odds with one another and had been for many

---

[29] Fairly or not, the Philadelphia Court of Common Pleas has been reviled by a defense-oriented group, the American Tort Reform Foundation, as a "judicial hellhole."  *See 2022-2023 Executive Summary*, https://www.judicialhellholes.org/reports/2022-2023/2022-2023-executive-summary/.

months before she sued anybody in Pennsylvania.  Both Ms. Reeves's first two

actions in the state court, *Murray* and *Johnson*, had been quickly removed to this

Court, and their respective assigned district judges were entertaining remand

motions.  Judging by the docket entries (and remembering that the Lanier firm was

doing little if any work), Ms. Reeves was awash in remand-related work from the

moment *Murray* was removed.[30]

### 4.    Ms. Reeves's long goodbye

Ms. Reeves testified that around October 31 or November 1, 2011 *i.e.,*

almost immediately after filing *Yeatts,* she had physically delivered *and*

electronically uploaded her files to Hagens Berman.  5/10/2019 Tr. at 815:9-15,

816:6-817:3.  In September and October, she had met with Steve Berman, Peter

Gordon, Nick Styant-Browne and others to discuss the litigation program and

potential plaintiffs' situations in detail.  *Id.* at 815:16-816-5.  She continued

assisting Steve Berman and Nick Styant-Browne for another five months or so –

indeed, she was consulting directly with Steve Berman as late as August 2012 – as

additional plaintiffs' claims were evaluated, prepared, and filed.

In the present proceedings, Ms. Reeves produced *in camera* the documents

that remained in her possession or accessible by her several years after her

---

[30] *See Murray* Docs. 4, 9, 11, 13-14, 17-26, 30-39, 41, 72-80, 87, 89; *Johnson* Docs. 16-18, 24, 34-37, 39, 45-48, 50, 55-59, 62-65; and the later-filed *Yeatts* Docs. 3, 28-31, 38-56, 58).

departure from the team.  I was unable to find anything in the written trail of her communications with plaintiffs and potential plaintiffs that warns them of her belief that the cases would not be "viable" in this Court; even as the removal/remand battles raged, she continued to work with Hagens Berman, lining up additional plaintiffs and drafting individual allegations for future complaints that would be filed without her record participation.  This continued until "[s]ometime late in 2012, . . . maybe end of third quarter, beginning of the fourth quarter." *Id.* at 1046:24-1047:3 (Reeves).  Ms. Reeves formal withdrawals from the as yet unconsolidated *Murray, Johnson* and *Yeatts* cases were not filed until July 2013, but I accept her testimony that she submitted her withdrawal to Hagens Berman in the fall of 2012 (when, as I understand it, she was no longer on the payroll). *Id.* at 1048:18-1049:1.  At that point, the jurisdiction question was still pending in the Third Circuit and the cases were stayed in the District Court. *Id.*

 But, again, it is troubling that during her time as lead counsel, at least, there is no documentation to suggest that clients and potential clients were warned that their cases would viable only if they wound up in the state court.

### 5. Reeves out, Peter Gordon in

The fourth complaint, *Spence,* was filed in August 2012, a few months after Ms. Reeves cut her ties to the enterprise; it brought another eleven plaintiffs into

the consolidated litigation.[31]  Like every other state-filed case, *Spence* was

immediately removed to this Court.  Also as with every other state-filed case, the

individual lawyers named on the complaint took on their special responsibilities

discussed *supra* § IV.B as to their "signing, filing, submitting, or later advocating"

its contents.  The signers of the *Spence* complaint were Mr. Berman, his partner

Craig R. Spiegel, Mr. Styant-Browne, Local Counsel Jeffrey Kodroff, and a new

signer, Peter Gordon:

> Of Counsel:
>
> GORDON LEGAL
> Peter Gordon
> (*Pro Hac Vice* Application to be filed)
> 360 Collins Street
> Melbourne, Victoria  3000
>
> *Attorneys for Plaintiffs*

The new lineup – with Mr. Gordon and his Australian firm identifying

themselves as plaintiffs' co-counsel in pleadings, motion papers, briefs and

discovery documents, continued until at least February 2015 (Doc. 465, Plaintiff

Robert Murray's Brief in Opposition to Defendants' Motion for Summary

Judgment and Sanctions), at which point he seems to have dropped out of the suit

papers as informally as he dropped in; his name just isn't there anymore.  During

that more-than-two-year period, and both before and after the Third Circuit's

---

[31] With the appellate stay in place, Ms. Reeves and Gordon & Reeves continued to be listed as counsel in the still unconsolidated *Murray, Johnson and Yeatts* cases in this Court until July 2013 (by which time, there were 10 cases (not consolidated) and 49 plaintiffs.  *See* Note 1.

jurisdiction decision and the consolidation of these cases, Mr. Gordon signed on to filings in all eleven actions, from the first filed, pre-Hagens Berman *Murray* (*see Johnson* Doc. 465) to the last-filed *Griggs* (*see Griggs* Doc. 1).  In every instance, Mr. Gordon repeated his promise of a "*Pro Hac Vice* Application to be filed."  But unless I am misreading the record, he never did file one, and his name was never added to the extensive electronic or manual service list of counsel on the dockets.

I recommend that Mr. Gordon be asked (ordered if necessary) to submit his promised application, assisted in doing so by his co-counsel as necessary.  Berman, Styant-Browne and Reeves have all testified (9/26/2017 General Tr. at 27:4-12, 46:10-20 (Berman); 5/10/2019 Tr. at 945:8-20, 946:18-947:1 (Berman); 5/7/2019 Tr. at 118:21-119:20 (Styant-Browne); 5/10/2019 Tr. at 929:1-3(Reeves)) to Mr. Gordon's role in identifying potential plaintiffs and providing a rationale for linking a plaintiff's case to thalidomide and defeating time bars.  Ms. Reeves counseled with and reported to him and his partner, Reagan Silber, regarding both the time bar issues and the merits.  *See, e.g.,* Reeves000006778-6792; Reeves000026795.  The record is incomplete respecting the extent of Mr. Gordon's involvement in recruiting later plaintiffs, evaluating the timeliness and merits of their claims, and doing the other things required by the Pennsylvania and federal rules when bringing and prosecuting a lawsuit.  We do not know how much involvement he had, after Ms. Reeves's departure from the venture, in

investigating and documenting potential plaintiffs' life and healthcare histories,

connecting their injuries to thalidomide, and suing in their names. At this point,

we do know that he and his firm put his probity behind papers filed and discovery

served beginning in August 2012. Peter Gordon should not remain an empty chair,

waiting to be blamed for Hagens Berman's travails.

### 6.    The *Spence* complaint

As an exercise in finessing time bars, the *Spence* complaint was hardly an

improvement on the *Yeatts* complaint. In addition (or as alternatives) to the two

theories we have already mentioned (Fraudulent Concealment and New Science),

*Spence* and the later-filed complaints sometimes assert that a birth-injured plaintiff

did hear the word "thalidomide" but had no idea what it meant (and apparently did

not investigate because she had no practical way of finding anything out) (*see*

*Spence* Compl. ¶¶ 22 (Merica), 25 (Harrelson)), or that a plaintiff knew she was a

"thalidomider" but did not know who was responsible (and, again, apparently did

not investigate because she had no practical way of finding anything out) (*see id.*

¶¶ 28 (Navamuel), 31 (Williams), 37 (Morgan), 40 (Barbara Murray), 43 (Perez),

46 (Randall). In the dispositive motions decided by the District Court and Third

Circuit so far, none of these theories has been successful.

Whatever the theories pled, the fates of the *Spence* plaintiffs in the litigation,

like the *Yeatts* plaintiffs before them, bespeak the inadequacy of counsel's

diligence and scholarship and demonstrate, again, the importance of presuit investigation and adherence to the oath.  The results to this point have been pretty comparable to *Yeatts*:  In its withdrawal motions, Hagens Berman turns its back on two of *Spence's* eleven plaintiffs, Terrie Bolton and Jose Navamuel.  But, reminiscent of *Yeatts,* that doesn't mean there are still nine *Spence* plaintiffs whose claims Hagens Berman believes to be (in Ms. Reeves's term) "viable."  Far from it, the firm has already thrown down its hand on five other *Spence* plaintiffs' claims – Valerie Spence, Tawana Williams, Michael Morgan, Barbara Murray, and Kevin Randall.  Doc. 373.  That would leave just four *Spence* plaintiffs, except that Hagens Berman and its *Spence* client Jack Merica also experienced a humiliating public airing of the profound disconnect between his complaint's *allegata* and his deposition's *probata,* which led to the very first summary judgment in these cases (Doc. 265, *Johnson*, 2014 WL 7087959), not to mention the first sanctions award against Hagens Berman.  *See infra* §§ IV.F.3, IV.F.4.[32]

### D.    A Missed Chance to Catch Up

A trial or appellate court's decision on a jurisdictional remand motion has nothing to do with the merits; remanded or not, the lawsuit will go forward in the

---

[32] Defendants moved for summary judgment against two of the three remaining *Spence* plaintiffs, Mark Harrelson (Doc. 259) and Yolanda Perez (Doc. 274).  As discussed in § IV.C.3, *supra*, Judge Diamond denied several dispositive summarily and without prejudice, pending my reports and recommendations on certain matters.  Doc. 474.  These were among them.

trial court that winds up with jurisdiction.  In the two years between *Murray*'s

filing and the Third Circuit's confirmation of this Court's jurisdiction, formal

discovery could not proceed.  But that did not mean that the plaintiffs' attorneys

had to remain idle during the appellate hiatus; with a growing roster of plaintiffs

and potential plaintiffs on hand,[33] there was homework aplenty to be done, and

Hagens Berman should have been utilizing the appeal hiatus to give its clients'

cases that careful vetting that, as discussed earlier, it was supposed to have done

*before* suing.  There is nothing to stop lawyers on both sides of the v from

investigating and validating their own clients' cases.  To all intents and purposes,

Hagens Berman was teeing up 52 distinct individual product liability cases, each

alleging a separate catastrophic personal injury.  Fifty-two times over, Hagens

Berman knew, it would encounter vigorous defenses mounted by well-funded

defendants represented by armies of capable attorneys.  Fifty-two times over, the

attorneys knew, they would have to be ready to prove that a plaintiff's mother had

actually ingested thalidomide early in her pregnancy, that a certain defendant had

made that thalidomide available to someone who had passed it on to the mother-to-

be, and that today's quadragenarian or quinquagenarian plaintiff had been

---

[33] By the time the Court of Appeals ruled on the jurisdiction appeal, Hagens Berman had brought 16 new plaintiffs into the litigation via the *Debra Johnson, Gunn, Charelston, Gosser* and *Brust* complaints.  After that, eight more plaintiffs would enter via the *Alexander* and *Griggs* actions.

grievously injured *in utero* as a result.  For each of these plaintiffs, medical, governmental and family records accreted over half a century would have to be sought, located, validated, examined and followed up on.  In 52 separate investigations, long-ago physicians, pharmacists, teachers, neighbors would have to be identified and, if they were still around, questioned, along with surviving relatives, if any there were.  And to each of 52 clients, knowing whether she had a provable case – one that could overcome all of those obstacles – was a matter of the highest personal urgency.  *See, e.g.,* Tyler Weaver's statement (§ VI.A.3, *infra*) that Ms. Bolton's claim was "the one hope she's had in the world for almost three years . . . ."

And, again, the need for these 52 separate inquiries was not at all dependent on the question whether Judge Diamond had it right when he kept the *Johnson* case in this Court.  There was no reason for counsel to coast while the Court of Appeals had the case.  This was work the lawyers should have done before suing anybody, and that they were going to have to do regardless of whether the cases ultimately went forward in the state court at Broad and Market or the federal court at 6th and Market.

Particularly for the period beginning with Ms. Reeves's departure, and particularly with reference to the Court's inquiries about Hagens Berman's presuit knowledge or efforts to learn about the client-specific issues (discussed in §§ VI

and VIII) that the firm relied upon in its withdrawal motions, I heard . . . nothing. As I shall discuss, the proofs adduced by Hagens Berman in support of the five withdrawal motions began and ended in 2014; years after the Rule 11 and Rule 1023.1 presuit spadework should have been completed; in particular, I heard no testimony and saw no evidence about Hagens Berman investigation during the crucial year that began with Reeves's departure and ended with the Circuit Court's affirmance of Judge Diamond's decision on the remand issue. Hagens Berman and its co-counsel, the Gordon Law Firm, did obviously spend time recruiting new plaintiffs and drafting new complaints, but that just made the evidentiary hurdles taller and more numerous. When the spadework discussed in the testimony was finally done, it was too late to avoid the enormous waste of time and resources and the heartbreaking ordeal of presumably blameless clients that have bedeviled this litigation.

### E.    Discovery Abuse

Plaintiffs' fraudulent concealment claims created issues of fact that would have to be addressed case by case, plaintiff by plaintiff, witness by witness. As Judge Diamond observed in his Order of June 17, 2014, that was why he had refused to dismiss all the complaints as time-barred the year before:

> I denied Defendants' [Rule 12(b)(6)] Motion, concluding
> that I could not evaluate Plaintiffs' fraudulent
> concealment allegations until discovery had taken place.
> (Doc. No. 92.)  When each Plaintiff learned that his or

> her injuries might have been caused by Thalidomide (the
> "Thalidomide discovery issue") is thus critical in this
> case. Disturbingly, Plaintiffs have repeatedly sought to
> evade the issue.

Doc. 239 at 1.  In that Memorandum and Doc. 371, *Johnson*, 55 F. Supp. 3d 603

(Andre), the Court chronicled a series of attempts by Hagens Berman to avoid

telling defendants what defendants were entitled to learn:  What inaccurate or

misleading statements or omissions were received and relied upon by each plaintiff

to that plaintiff's detriment.  Defendants contended that Hagens Berman's

discovery avoidance had been so persistent and so baseless that they, defendants,

were entitled to dismissal of all the cases as a sanction.  Instead, the Court

proposed the appointment of a special discovery master, which was agreed to by

all parties.

As discovery limped toward the onrushing November 2014 deadline, my

mission was expanded to include advisory responsibility regarding sanctions

issues, proposed voluntary dismissals of claims and parties, and these contested

withdrawal motions.  Docs 316, 420, 476

## F.    The Early Losses and Sanctions

Defendants had been filing motion after dispositive motion asserting that a

given plaintiff's actual medical history, notice, or state of mind was materially

different from what was alleged in the state court complaints sworn to by Mr.

Berman or Mr. Styant-Browne.  Defendants were not just arguing that no

reasonable juror could deny that some plaintiffs' claims were time-barred, but that counsel had crossed an ethical divide in writing and filing these particular complaints in the first place.  And the earliest dispositions certainly supported those arguments.

### 1.     Plaintiffs Morgan, Barbara Murray and Williams

Begin with Hagens Berman's first capitulations: *Spence* Plaintiffs Tawana Williams, Michael Morgan, and Barbara Murray had been quite sure, for a long time, that they were thalidomide victims.  We know that because they (their parents) had actually brought thalidomide cases against one of the defendants, decades before *Spence.*

Paragraphs 11 and 12 of the *Spence* Complaint, speaking on behalf of all eleven *Spence* plaintiffs, was plainly false.  It asserted that each of the eleven had a New Science excuse for a half-century tolling of the statute of limitations under the discovery exception to the applicable statute of limitations, *and* that each of them was late in learning that thalidomide caused her injury because the defendants fraudulently concealed the truth:

**New Science:**

> 11.     Plaintiffs in this action have lived for decades with injuries they recently learned by advances in medical science to be caused by their mother's use of thalidomide. Now armed with the truth for the first time, they seek damages . . . .

> 12.    Plaintiffs bring this action now because they could not have reasonably known until recently, due to advances in science, that their injuries were caused by thalidomide . . . .

**Fraudulent Concealment:**

> 11.  . . .  Now armed with the truth for the first time, they seek damages resulting from Defendants' negligence, fraud, negligent misrepresentation, negligent hiring, conspiracy and alter ego . . . .

> 12.    Plaintiffs bring this action now because . . . defendants concealed their role in the thalidomide tragedy and the truth in that regard was recently uncovered due to extraordinary investigative activities.

*Spence* Compl., ¶¶ 11-12.

Starting with Plaintiff Tawana Williams's claims:  The two paragraphs that address Ms. Williams's history describe birth injuries that would seem fairly typical of a thalidomide victim, "bilateral phocomelia, no hands, bilateral shortened femur, and shortened right leg", *id.* ¶ 30, and explain that "Tawanna [sic] was aware she may have been a thalidomide baby, but only recently learned of the role of GSK, Grünenthal and the other Defendants in the thalidomide tragedy and could not have reasonably discovered their role." *Id.* ¶ 31..  Putting aside the adequacy of allegations like this against a time bar attack, and taking this assertion at face value, I suppose it is possible that Hagens Berman somehow failed to learn, before suing Defendant Sanofi and the other defendants on Ms. Williams's behalf, that she and her mother had already sued Sanofi's predecessor,

Richardson-Merrell, thirty years in the past, alleging thalidomide injuries, or that she had published a book, *Unarmed but Dangerous,* in which (in her own words under oath) she "identifie[d] herself as a thalidomide baby, but Plaintiff does not know and could not know what drug had been given to her mother." Doc 168.8, Williams Interrog. Resp. No. 4.

A failure to know such things about one's client's case would hardly demonstrate the "inquiry reasonable under the circumstances" required by both Federal Rule 11 and Pennsylvania Rule 1023.1, and it would certainly be impossible to square those facts with the *Spence* complaint's sweeping assertions that all eleven *Spence* plaintiffs were the victims of thalidomide injuries that could not have been diagnosed in years past, *and* that they were also the victims of conscious fraudulent concealment. A lawyer whose presuit investigation, manages to overlook a thalidomide lawsuit, its settlement and the authorship of a book by their "thalidomide baby" client has not, to say the least, satisfied his duties to the client or the system. The only thing that would make it worse would be if the lawyer *knew* about the prior events, and tried to finesse them. That would turn incompetency into mendacity.

And that is precisely what happened with the Michael Morgan and Barbara Murray claims leveled in the *Spence* complaint.

Until she left the scene around May 2012, Ms. Reeves was putting together notes, memos and proposed complaint language – for her own use and that of her Gordon & Reeves bosses and, later, for her Hagens Berman bosses – regarding many of the individuals who had not yet filed suits, including plaintiffs-to-be Williams, Morgan and Barbara Murray.  As I understand Ms. Reeves's testimony, *all* her notes and records were physically sent or electronically uploaded to Hagens Berman by Ms. Reeves around November 1, 2011 (right after *Yeatts* was filed, but months before Ms. Murray and Mr. Morgan were included in the *Spence* complaint), and she continued working actively with Hagens Berman lawyers, including Mr. Styant-Browne, right up until her departure.  Mr. Styant-Browne testified that, for some of the *Spence* complaint plaintiffs, "Ms. Reeves had already prepared the particulars to be inserted into complaints involving those particular plaintiffs and had checked the facts with them and confirmed that those clients agreed to those facts in those instances."  5/7/2019 Tr. at 129:10-15.  She even consulted with Steve Berman on questions he had – and braved his criticism for her decision to reject at least one potential claimant – as late as August 2012, when she presumably was no longer on the payroll.  *See* Reeves000029895.

Reeves's materials disclose that Plaintiff Michael Morgan and his family sued and settled with Sanofi's Richardson-Merrell predecessor back in the 1970s, and that he was still collecting settlement checks.  *See* Reeves000026879-81;

Reeves000030568; Reeves000030991.  Similarly, Hagens Berman was informed that Barbara Murray – conceived, carried, and born in Germany – had taken action against Grünenthal (also in Germany) and settled, and was also receiving continuing payments.  *See* Reeves000003567; Reeves000030991.

Nick Styant-Browne testified that he relied on Ms. Reeves's notes or writings respecting each of the *Spence* plaintiffs, and that he himself reviewed the facts with every plaintiff beginning with the *Yeatts* plaintiffs (including Williams, Barbara Murray and Morgan).  5/7/2019 Tr. at 129:9-133:13.  Mr. Berman testified that he reviewed each potential plaintiff's situation and pleading with Styant-Browne.; and there is more than one example of his skepticism concerning a recommendation by his Hagens Berman colleagues or Ms. Reeves that a case be dropped (Weaver Ex. 10) or not brought in the first place (Reeves000002989).

Reading the *Spence* complaint with knowledge of Morgan and Barbara Murray's history, the document seems calculated to mislead, even though the deception seems peculiarly inept.  The first 87 pages (315 paragraphs) of the *Spence* complaint contain no hint that Michael Morgan's position *vis a vis* Richardson-Merrell, or Barbara Murray's position *vis a vis* Grünenthal, is any different from any other *Spence* plaintiff's.  Indeed, the two paragraphs of that complaint that address Morgan's or Murray's time bar issues profess those two

plaintiffs' pre-2010 ignorance of *any* defendant's association with thalidomide.[34]

Only toward the end of this exhausting read, in the *ad damnum* paragraphs of the

*Spence* complaint, does a discernable difference emerge; beginning at page 88, the

"*Causes of Action*," the *Spence* complaint continues to lob factual accusations at all

the defendants, but carves Mr. Morgan out of the its prayers for relief against

Sanofi, and carves Ms. Murray out of its prayers for relief against Grünenthal.  *See*

*Spence* Compl., ¶¶ 317, 341, 374, 382, 391, 403.  The reader is not told why.  In

other words, Murray and Morgan accuse all the defendants of wrongdoing to the

identical extent that their co-plaintiffs do so.  Paragraph 37 of the complaint is

surely calculated to leave the reader understanding that Mr. Morgan did not know

and could not reasonably have learned of Merrell's role in the spread of

thalidomide, even though he had sued Merrell and was still collecting.  Paragraph

40 is similarly calculated to leave the reader understanding that Ms. Murray did not

know of and could not reasonably have discovered Grünenthal's involvement, even

though she and her parents sued Grünenthal and were also still collecting.  That

was not accidental.

---

[34]  Mr. Morgan, "only learned in late 2010 of defendants GSK, Grunenthal's *and the other Defendants'* role in the thalidomide tragedy and could not have reasonably discovered their roles prior to that time." *Spence* Compl. ¶ 37 (emphasis added).  Ms. Murray "only learned in late 2010 of *Defendants'* role in the thalidomide tragedy and could not have reasonably discovered their roles prior to that time." *Id.* ¶ 40 (emphasis added).

To worry this bone a bit further:  I am at a loss to determine just what good-faith basis Barbara Murray or her attorneys might have thought they had, under any theory, to sue the two defendants she did sue, GSK and Sanofi.  To whatever extent those two companies had any involvement with thalidomide, it was in the United States, not Ms. Murray and her mother's Germany.  There has been no suggestion that the predecessor companies, SmithKline and Merrell, distributed thalidomide in Germany, where Murray's mother was.  *See* Reeves000030991.

Mr. Berman, at hearing, seemed to be suggesting that a Barbara Murray could accuse Grünenthal as a conspirator without suing Grünenthal, but that still did not get her around the fact that she (or her parents) *knew* about Grünenthal's manufacture and distribution of thalidomide, and *knew* the mother had ingested thalidomide made available by Grünenthal.  In other words, the allegations of *Spence* complaint Paragraph 37 are flatly false with regard to Grünenthal whether Ms. Murray sought relief from Grünenthal or not, and the smart and articulate architects of the *Spence* complaint – Berman, Styant-Browne, Reeves and perhaps Peter Gordon – knew that.[35]  Even if I credit Mr. Berman's hearing testimony that

---

[35] I do not know the extent, if any, to which the two other attorneys whose names appear in the *Spence* complaint signature block along with Berman and Styant-Browne's – Craig Spiegel and Peter Gordon – participated in crafting these or other unsupportable allegations but, quite literally, they put their names on the line in making them, and Rules 11 and 1023.1 cast a wide net.

the intention was to make clear that they were conspirators who were not sued, I do not get it.

As mentioned earlier, Ms. Reeves had elected, in the two pre-Hagens Berman complaints she filed, to sidestep the colossally consequential limitations question; not so here.  And in addressing the time-bar question, counsel had to honor the commandments:  Tell the truth and refrain from misstating the facts. Instead, as we would soon see in Mr. Merica's claim (in the same *Spence* complaint), the attorneys put overt falsehoods in their clients' mouths.  The occurrence of the earlier Williams, Morgan and Barbara Murray claims and settlements made it impossible to argue with a straight face that the statute of limitations was tolled as to any of those plaintiffs by reason of Fraudulent Concealment, the New Science, or a somehow justifiable failure to find out what thalidomide was or who had put it into the stream of commerce.  It is simply impossible to imagine Michael Morgan's parents pursuing their successful thalidomide claim against Richardson-Merrell back in the '60s while somehow sidestepping knowledge of the existence of a company called Grünenthal along the way.

Caught out, Hagens Berman quickly agreed to withdraw the Williams,

Barbara Murray and Morgan claims with prejudice.[36]

### 2.    Defendants propose a plaintiff-side case-by-case review

In the early spring of 2014 – by which time defendants had already filed

several dispositive motions based on the discovery they were finally beginning to

obtain – GSK's counsel wrote to Hagens Berman, pressing the position that

Hagens Berman's pre-suit investigation had been inadequate, and asking Hagens

Berman to review the outstanding cases before the parties spent more time and

money on continuing written and oral discovery regarding claimants whose cases,

counsel said, must ultimately fail:

> It is obvious that in all or most of [the 52 claims] no
> reasonable pre-suit investigation was conducted. I would
> hope that plaintiffs' counsel would promptly proceed
> now, before additional expense is incurred, to undertake
> a careful review of the claims made in all these cases. If
> there are others that you decide to dismiss, GSK will
> agree in any such case dismissed by April 11 to again
> bear its own costs. However, for any cases which remain
> pending after that date, GSK will not agree to bear its

---

[36] More accurately, the promise was quick; its performance, not so quick. So far as I can tell, the Hagens Berman attorneys had nothing to gain by dragging their feet on the withdrawal of the Williams, Morgan and Barbara Murray claims and forcing defendants to bring their conduct to the Court's attention, but that is what they did. When defendants learned the facts in discovery, they demanded dismissal of the three plaintiffs' claims in early December 2013, and Hagens Berman agreed to withdraw them, but it took four months, a lot of correspondence and, finally a motion (Doc. 168) before Hagens Berman formally stipulated to the dismissals. Doc. 182. Once again the details suggest that Hagens Berman's understaffing and under-preparation imposed needless burden and expense on defendants and prolonged its own clients' agony.

> own costs and is reserving its right to seek both costs and
> attorneys fees under all applicable rules and statutes.

Doc. 310, Defendants' Motion for Sanctions as to Plaintiff Jack Merica, Ex. 10

(email of Mar. 26, 2014).  As of the date of that email, only a handful of

depositions had been taken.

The April 11 deadline came and went.  No cases were dismissed.  Massive

deposition discovery went forward.  According to counsel for both sides, some 130

depositions were taken between late March and late September (*see* Doc. 364, Oct.

1, 2014 Hr'g Tr. at 65:11-66:7, 134:17-19), and more depositions were taken after

that.

### 3.    Plaintiffs Merica, Boiardi, Garza and Andre

The Morgan, Barbara Murray and Williams dismissals had been attained

only after the lengthy disputation over written discovery that preceded my

appointment.  *See supra* § IV.E.  In the cases of Plaintiffs Jack Merica, Lawrence

Boiardi and Roel Garza, defendants had to go further and conduct depositions

before Hagens Berman raised the white flag.

From the *Spence* complaint's three paragraphs addressing Jack Merica's

history and condition, his claim could obviously not be based on the New Science

theory:  Merica's birth injuries as described in the *Spence* complaint were textbook

thalidomide: "bilateral phocomelia, bilateral malformation of hands and arms, and

scoliosis", *id.* ¶ 20, and the complaint acknowledged that Merica "was told his

mother took thalidomide for morning sickness during her pregnancy with Jack."

*Id.* ¶ 21. Merica's claim, instead, was that he had gone through life not knowing

what that information meant or how to act on it:

> Neither Jack nor his family knew the names of any
> companies responsible for the distribution of thalidomide
> in the USA. With no clues to follow, Jack was left with
> no understanding of what it meant to be a thalidomider
> and no idea who was responsible for developing and
> distributing the drug, and the exact role of each
> Defendant was not reasonably ascertainable in part due to
> acts of concealment set forth below.

*Id.* ¶ 22. The evidence disclosed in discovery, as summarized by Judge Diamond,

told a dramatically different story:

> It is undisputed that: (1) Plaintiff's mother told him in in
> the 1960s that thalidomide caused his injuries . . .; (2)
> Plaintiff's mother told Plaintiff's doctors in the 1960s that
> thalidomide caused his injuries . . .; (3) in the 1970s,
> Plaintiff asked his mother why she had not sued the
> doctor who prescribed thalidomide or the drug's
> manufacturer . . .; (4) in 1983, Plaintiff filed a Social
> Security Disability application seeking benefits for
> thalidomide-caused injuries. . . ; (5) in 1990 or 1991,
> Plaintiff's mother gave him the bottle of thalidomide pills
> that she had taken while she was pregnant with him . . .;
> (6) in 1992—"thirty seconds" into their first date—
> Plaintiff told his now-wife that thalidomide caused his
> birth defects . . .; and (7) in 2000, Plaintiff gave an
> interview to *WeMedia Magazine* during which he stated
> that he had injuries caused by thalidomide . . . .

Doc. 265, *Johnson* (Merica Summary Judgment), 2014 WL 7087959, at *1

(internal citations omitted).  The Court's explanation for its summary judgment

was pithy:

> Because Plaintiff knew of his injuries substantially more
> than two years before he filed suit in 2012, his claims are
> time barred under both the laws of Pennsylvania (where
> Plaintiff brought suit) and Virginia (where Plaintiff's
> mother was prescribed the thalidomide).

*Id.*

Around the same time, all three Defendants obtained "surrenders" from two

more Plaintiffs, Lawrence Boiardi and Roel Garza (Docs. 277, 318), but only after

depositions and motions for summary judgments documenting the significant

differences between the allegations in the *Spence* Complaint and Boiardi and

Garza's actual experiences.  *See* Docs. 258, 281.

GSK and Grünenthal now moved for sanctions against Hagens Berman (but

not its clients) with respect to Hagens Berman's conduct in pursuing the Merica,

Boiardi and Garza claims.  With the consent of all parties, Judge Diamond

assigned the sanctions motions to me for a report and recommendations. Docs.

297, 318.  I entertained briefing, heard oral argument on October 1, 2014, and

submitted my Report and Recommendation on December 4.  Doc. 414, *Johnson*,

2014 WL 6851277 (SDM), *approved and adopted*, Docs. 482, 483, 2015 WL

1004308.

During that interim, Judge Diamond finally had occasion to consider a summary judgment motion that Hagens Berman actually opposed. The Court's Opinion (Doc. 372, *Johnson*, 55 F. Supp. 3d 603 (Andre)), discussed, again, the major discrepancies between the facts gleaned in discovery and the factual assertions in Plaintiff Ed Andre's Complaint. The Judge mentioned the process by which Mr. Andre and his mother's response to a newspaper advertisement eventuated in the filing of a verified *Yeatts* complaint in Andre's name:

> When Plaintiff's mother called the number, she "learned that there was possibly some action that the family could take to participate in getting more information and possibly uncovering specifics and doing something about it." A short time later, Plaintiff called the number and spoke with "attorneys," whose names he could not recall at deposition. Plaintiff testified that he decided to bring this case after receiving an "education about thalidomide." When questioned about this "education," he was instructed not to answer on the grounds of attorney-client privilege. This discussion was the only contact Plaintiff had with his lawyers before filing the instant Complaint.

*Id.* at 609-10 (internal citations omitted). And that, apparently, was the sum and substance of Hagens Berman's pre-verification investigation of Mr. Andre's claim.[37]

---

[37] In the Special Master's hearing, Mr. Styant-Browne would later testify that he personally spoke with every single plaintiff before filing a complaint on her behalf. But Ms. Reeves's notes, produced from her files and Hagens Berman's, make clear that she spoke directly with Mr. Andre. If so, Andre's and Styant-Browne's recollections are in conflict.

Judge Diamond's *Andre* Opinion also addressed an attempt by Hagens Berman to fend summary judgment off with a "New Science" argument – asserting that Plaintiff Andre's injuries could not have been diagnosed as thalidomide-related until very recently.  Judge Diamond rejected Hagens Berman's last-minute expert testimony on that theory for a number of reasons, including (i) that the "New Science" theory was inconsistent with what Andre actually pled in his complaint, and (ii) that the expert's own evidence demonstrated that the "new" scholarly theory the expert was trumpeting had been in the public theater for generations:  "It . . . appears that Dr. Stephens himself acknowledges that any 'sea change' in medical thought on thalidomide occurred some 45 years before the date Dr. Stephens came to appreciate its significance."  Doc. 372, *Johnson*, 55 F. Supp. 3d at 613-14 (internal citations and quotations omitted).

### 4.    The Initial Sanctions

On December 4, 2014, after oral argument on the three initial sanctions motions (*Merica, Garza* and *Boiardi*), I submitted a Report and Recommendation (Doc. 414, *Johnson*, 2014 WL 6851277 (SDM) (the "Sanctions R&R"), which Judge Diamond approved and adopted.  Doc. 482, *Johnson*, 2015 WL 1004308. The facts, to the extent not already discussed in this Report, are fully discussed in the Sanctions R&R and the Court's Opinion.  Notably, I concluded that, just as in its opposition to the earlier Andre summary judgment, Hagens Berman had "made

it worse" by "mischaracterize[ing] the District Court's summary judgment opinion, . . . the law, and even . . . the Complaint Hagens Berman had written on Mr. Merica's behalf." Doc. 414, *Johnson*, 2014 WL 6851277, at *6 (SDM). The District Judge agreed. Doc. 482, *Johnson*, 2015 WL 1004308, at *10.

Importantly, sanctions were awarded only to Defendant Grünenthal, and not to its co-movant GSK because, in the interim, GSK and Hagens Berman had entered into the "GSK Agreement" discussed in § IV.H, *infra*. Depending on the Court's and the parties' decisions regarding the GSK Agreement, GSK may be entitled to a remedy calculated in the same manner as Grünenthal's.

### G. The Plaintiff-Side Review, the Voluntary Dismissals and the Contested Motions to Withdraw

Rewinding the narrative to the beginning of my tour as Discovery Master: After a July 15, 2014 introductory conference with counsel, I entered an Order (Doc. 268) setting certain "nuts & bolts" procedures and protocols going forward. It was at this conference that Hagens Berman – with dispositive motions and sanctions motions raining down – finally agreed to conduct the plaintiff-by-plaintiff review of its thalidomide cases that GSK had requested back in March. The parties stipulated to an Order requiring Hagens Berman to "investigate each of the remaining active cases in these consolidated actions with a view to making a decision whether it should continue to be prosecuted or dismissed with prejudice by consent." Doc. 268 ¶ 1. With the October discovery deadline looming, we set

September 14, 2015 as the agreed deadline for Hagens Berman's completing that process.

During the late summer and fall of 2014, several of Hagens Berman's clients did voluntarily dismiss their claims, although I am sure defendants had been hoping for more such voluntary dismissals. The flow of motions for summary judgment and sanctions continued. One plaintiff whose claims were voluntarily dismissed was Diana Cabcabin. Doc. 373.

Of course, Hagens Berman and its plaintiff clients did not always see eye-to-eye on voluntary dismissals; that is why we are dealing with contested withdrawal motions. Sadly, too, Hagens Berman's case-by-case review would be the occasion for stunning errors of professional judgment and ethics by a Hagens Berman partner, Tyler Weaver, in the firm's treatment of Plaintiffs Diana Cabcabin and Terrie Bolton, as discussed in § VI, *infra*.

### H.    The GSK Agreement

#### 1.    The Agreement Terms and the Court's Concern

My Report and Recommendation of August 10, 2016, Doc. 535, *Johnson*, 2016 WL 4426164 (SDM), is in the public record and will not be repeated in detail here. However, the passage of time, the development of new information, the changing attitudes of some parties, and the instant Report's focus on professional responsibility concerns all require that the events be revisited to some extent.

Defendant GSK was an important target in these cases.  It was one of the two United States pharmaceutical companies that ever did any investigative work with thalidomide in the period before the compound's perils came to public light worldwide.  On October 28, scarcely a month before the adjusted date by which all fact discovery had to be completed and amidst a blizzard of dispositive motions and threats of sanctions, GSK announced to the Court

- that all but one of plaintiffs (Debra Johnson) had agreed to dismiss their claims against GSK with prejudice,

- that the dismissing plaintiffs would take nothing, but

- that GSK would not pursue any pending or future sanctions claims against plaintiffs' attorneys (including the already-argued Merica, Boiardi and Garza motions), but not including the excepted *Debra Johnson* matter.[38]

As if to emphasize the lopsidedness of an arrangement that benefitted a defendant and the plaintiffs' attorneys – but not the plaintiffs themselves – GSK's counsel admonished that "[t]his agreement shall not be characterized as a settlement of plaintiffs' claims; no payments are being made by GSK."  Doc. 394.

---

[38] Doc. 394, Michael T. Scott Letter to Hon. Paul S. Diamond, dated Oct. 28, 2014. Debra Johnson, the plaintiff who was expressly excepted from the surrender described in Mr. Scott's letter, would later suffer summary judgment. *Johnson*, Docs. 487, 488, 95 F. Supp. 3d 819, *aff'd, Johnson v. GlaxoSmithKline*, 636 F. App'x 87 (3d Cir. 2016).

The notice to the Court seemed a bit thrown together. There was no formal Rule 41 stipulation, and the releases and dismissals, if accurately described, seemed to bind Plaintiffs Anderson, Bolton, Marshall, Navamuel and Sells, all of whom were resisting Hagens Berman's attempts to stop being their lawyers.

Although the GSK Agreement was, on its face, strangely asymmetrical – relieving GSK of the burden and risk of defending the cases, depriving the plaintiffs of a source of recovery and giving them nothing in return, I was never asked to look into the wisdom or fairness of the GSK Agreement from the individual clients' standpoint. My only assigned task was to try to satisfy the Court that each of these 27 releasing plaintiffs had made an informed and voluntary decision to accept the arrangements. A tide of dispositive and sanctions motions like these could be expected to put a law firm's relationships with its client plaintiffs under stress, and the Court needed comfort that the firm's desire to dodge sanction bullets did not overmaster its loyalty to these plaintiffs. The assigned task was to seek assurance that the dismissing plaintiffs understood what they were giving up and that they consciously decided to do that, and that assignment had to be accomplished without trespassing on the plaintiffs' attorney-client privilege or Hagens Berman's work product protection.

>    **2.    Resistance to the interviews, followed by unprofessional conduct in client-plaintiffs' presence**

The extended run-up to the limited interviews was noteworthy. Hagens Berman strove mightily to keep the interviews from happening or, if they could not manage that, to cabin them even more tightly than I did. The 27 plaintiffs (*i.e.,* Hagens Berman) made numerous filings in this Court and, ultimately, filed an unsuccessful petition for mandamus in the Court of Appeals.[39] The attorneys' rancor at having their clients interviewed, and the obvious effect that rancor had on the conduct of the interviews and, I think, on the mindset of several of the plaintiffs, was deeply troubling.[40] Over the course of the 31 interviews, and in the presence of his clients, Hagens Berman attorney Ari Brown accused me, the Court, or both, of "deliberate attempts that the attorney/client and work product privileges are being [sic] violated" (Doc. 536-7, Sampson Tr. at 10:3-9); that the inquiries

---

[39]Hagens Berman was afforded multiple opportunities to support its arguments (i) that the Court (and therefore the Special Master) did not have the power to look into the voluntariness or informedness of the GSK Agreement and (ii) that any inquiry by the Special Master as to whether a releasing plaintiff actually intended to enter into the GSK Agreement, or as to her understanding of its consequences, would manifestly violate attorney-client privilege and Hagens Berman's work product protection. Hagens Berman asserted variously that the Court *could* not act at all (Doc. 400 at 3-5), that the Court *need* not act because "[w]e can assure you that Plaintiffs' counsel would never have sought to dismiss anyone's claim if counsel did not know that the Plaintiffs had consented willingly after being fully informed." (Doc. 425 at 2), that instead of the interviews, I should accept form declarations from the plaintiffs (Doc. 453 at 10-11) and, finally, that I should be limited to asking a package of questions written by Hagens Berman (Doc. 502 at 25-26). As threatened, Hagens Berman did seek a writ of mandamus, unsuccessfully. Addressing these redundant objections and proposed fixes consumed seven months of counsels', the parties', the Court's and my time.

[40] The transcripts of the interviews, all conducted between June 8 and June 28, 2016, are filed at Doc. 536. Examples of testifying plaintiffs who seemed primed to be antagonistic to the interview process are at Doc. 536-2, Alexander Tr. at 28:13-29:7; Doc. 536-3, Andre Tr. at 15:3-17; Doc. 536-4, McPartlan-Hurson Tr. *passim*; Doc. 536-7, Sampson Tr. at 17:2-21:1.

were "pretextual at best," and were actually "an effort to punish or perhaps embarrass plaintiffs and their counsel" (*id.* at Doc 536-10, Simeone Tr. at 8:14-15); insinuated that the District Judge and the Special Master were in league with "the defendants" or "someone else," questioned whether "the defendants are driving this," and questioned the very legitimacy of the tribunal. *See* Doc. 535 at 29-35, *Johnson*, 2016 WL 4426164, at \*14-18 (SDM). In other interviews and immediately thereafter, Mr. Styant-Browne, Brown's colleague, was accusing me of a "sham inquiry," insinuating that the Master and court reporter might be tampering with the transcript, and warning that Hagens Berman would be investigating our conduct. *Id.* at 31; *Johnson*, 2016 WL 4426164, at \*15-16.

### 3. The Master's recommendation on the GSK dismissals, and circumstances that have changed since its issuance

I stand by my recommendation that these partial and total dismissals go forward as agreed by the parties, but there are exceptions, questions, and some post-Report developments that will merit the District Court's attention:

- One plaintiff, Carolyn Sampson, has expressly withdrawn her request for dismissal of claims against GSK, and will go forward with them. *See* Doc. 644.[41]

---

[41] Ms. Sampson has had an interesting journey in this litigation. After being vocally resentful of being interviewed, and vocally supportive of Hagens Berman and its conduct (*see* preceding Note), she has variously announced the dismissal of her claims against all defendants, withdrawn that dismissal, fired Hagens Berman, testified in these hearings respecting the conduct, primarily, of Kay Reeves, sued Hagens Berman, Steve Berman and Kay Reeves, and

- Another plaintiff, Mark Harrelson, has also terminated Hagens
  Berman and announced his intention to proceed *pro se* (Doc. 763), but
  has not stated whether he still approves the dismissal of claims against
  GSK, as he did when he was interviewed (Doc. 536-21).

- Mr. Harrelson, joined by Plaintiffs Yvonne English, Carolyn Jean
  Grover and Darren Griggs (who had also confirmed their informed
  acceptance of the GSK Agreement in their respective interviews,
  Docs. 536-1, 536-6, 536-27) sued Hagens Berman.  More specifically,
  their complaint in the now-settled *Harrellson v. Hagens Berman*, 21-
  cv-05211, Doc. 1 ¶¶ 31-36, accused Hagens Berman of chicanery in
  eliciting their acquiescence in the GSK Agreement.

Having leveled those accusations and settled their case against Mr. Berman and his

firm, do Harrelson, English, Grover and Griggs still wish to dismiss their claims

against GSK?  And what of the claims of the Five, Plaintiffs Anderson, Bolton,

Marshall, Navamuel and Sells, who were not parties or purported parties to the

GSK Agreement?[42]  What do they wish to do about GSK as a defendant?  And, of

---

settled with them.  *See* Doc. 644.  She is now proceeding *pro se* in these cases, although she had
able counsel in the present hearings before me and her separate lawsuit against the lawyers.

[42] To complicate matters, Plaintiff Marshall, as one of the Five, was not privy to the GSK
Agreement as clarified by Hagens Berman and GSK's attorneys, but was a suing and settling
plaintiff in *Harrellson.*

course, we do not know whether GSK and Hagens Berman themselves still want to embrace a GSK Agreement that binds some but not all plaintiffs, or whether any party would be entitled to withdraw from or abrogate the GSK agreement in these changed circumstances. These questions should be sorted out as the Court considers my earlier recommendation.

## I.    Carelessness and worse

If good luck is the residue of preparation, the misfortunes suffered by so many trusting plaintiffs in these actions surely can be linked to counsel's dismissive attitude toward its investigative responsibilities and its oath. Ms. Reeves's notes, while voluminous, certainly do not bespeak the skepticism that a conscientious attorney should bring to bear in counseling a prospective client about the possible consequences of a 50-year delay in bringing a personal injury action, nor do they reflect any new scientific discoveries (as distinguished from, say, interesting and early speculations) regarding the etiology of birth injuries or the mechanism of teratogens. At hearing, Mr. Berman acknowledged his partial authorship and overall supervision of pleadings that bespeak either a woeful lack of preparation or, worse, a disregard for truth. And as quick as he was to lay off on Nick Styant-Browne the responsibility within Hagens Berman for the New Science theory in particular clients' cases (9/26/2017 General Tr. at 43:13-44:1) so too was Mr. Styant-Browne ready to make clear that he really did not know much about

thalidomide and causation, and had learned what he did know from reading

consultant Trent Stephens's 2001 book, *Dark Remedy* and from "the work that we

did with Gordon and Reeves and the Lanier Law Firm prior to and at the time that

we took over these cases." 9/26/2017 Sells Tr. at 128:4-14 (Styant-Browne). And

Kay Reeves, when asked about the "recently-available studies" so frequently

mentioned in the Hagens Berman complaints, pointed out that "Peter Gordon's

office really took the lead on this portion of the case . . .." 5/9/19 Tr. at 748:21-

749:24. Other than more junior lawyers who learned the particulars of their

clients' conditions and backgrounds far too late in the game – Barbara Mahoney

with Mary Sells, Shelby Smith with John Marshall and, of course, Tyler Weaver

with Terrie Bolton and Diana Cabcabin – nobody from Hagens Berman was in a

position to testify about the particulars of any of the clients' cases. Hagens

Berman was in the cases beginning in early autumn 2011 but, as we have seen, the

hard plaintiff-by-plaintiff, physician-by-physician, family-by-family investigation

was generally left up to a single outside individual, Ms. Reeves, during the eight or

nine months between September 2011, when Peter Gordon gave her the sack, and

May 2012, when her work with Hagens Berman ended. If she had been equal to

that task in the early days, she was certainly overmatched by the sheer numbers by

the time she left the cases. By May 2012, there were 17 plaintiffs in these cases,

and Reeves's notes also reflect her involvement with others of the 35 additional

plaintiffs whose complaints would be filed after her departure, including the eleven *Spence* plaintiffs.  After that, it is not clear who did what with respect to investigation of possible claims.  Mr. Styant-Browne offered no evidence about who (if anyone) succeeded to Reeves's plainly unfinished business.  From May 2012 to October 2013 – a time in which a lot of important events occurred – the plaintiffs' team in the growing list of cases seems to have had plenty of generals (Berman, Gordon, Spiegel, Styant-Browne) and no visible foot soldiers, none of the less senior lawyers who, along with their paralegal colleagues and investigators, typically gather and evaluate encyclopedic knowledge of, here, 52 clients' separate cases, with their 52 discrete histories, casts of characters, and issues.

In October 2013 – some time after the Third Circuit's affirmance of Judge Diamond's jurisdictional decision and the consolidation of these cases before him, and around the time of the Court's initial case management order (Doc. 103) – Hagens Berman began assigning junior partners and associates to track down and assess (after the fact) the huge body of information required to support Steve Berman and Nick Styant-Browne's sworn representations to the Court.  Here in particular, with scores of tales to be told in detail, on-the-ground lawyers and other professionals were needed to talk to clients, to identify witnesses, to ferret out any medical, educational and other ancient evidence that might still exist and,

basically, to learn each of the 52 stand-alone cases inside-out so that the Bermans, Spiegels and Styant-Brownes could knowledgeably and conscientiously counsel and represent those clients in their unique personal injury cases.  Hagens Berman's conscious decision to sue first and investigate later was showing its inevitable consequences.

In October 2013, Barbara Mahoney, a young partner, and Shelby Smith, an associate, were added to the team.[43]  More than a year had gone by since Ms. Reeves left the team.  Mses. Mahoney and Smith knew nothing about the cases. *See* 9/27/2017 Sells Tr. (Mahoney) at 4:19-5:13; 9/28/2017 Marshall Tr. (Smith) at 5:21-6:19.  Scores of plaintiffs had to respond to interrogatories in disparate cases with disparate facts.  For example, Shelby Smith was responsible for working with Plaintiff John Marshall to respond to discovery:

> . . .  We had been served with interrogatories, and Mr. Marshall's case was one of the cases that I was assigned to help prepare responses.

* * *

> . . . I read the interrogatories, and reached out to Mr. Marshall, so that we could respond to them together.

---

[43] Mses. Mahoney and Smith's *pro hac* appearances do not appear on the record until the following summer (Docs. 280, 296), but I accept their testimony that they were on the cases before that.  Another Hagens Berman associate, Ashley Bede, also appeared *pro hac* in July 2014 (Doc. 295), and I assume she worked on the cases, too.  Her LinkedIn entry (*sub. nom.* Ashley Locke) states that she left Hagens Berman in 2017.

9/28/2017 Marshall Tr. (Smith) at 6:10-16.  Ms. Smith's unhappy experience with Plaintiff Marshall's discovery is discussed in § VIII.C, *infra*.  In § VIII.D, I discuss Ms. Mahoney's woeful unpreparedness for Plaintiff Mary Sells's deposition.

The acceptance and filing of new cases went forward, with 24 plaintiffs filing suit after *Spence*.

As the depth of the hole Hagens Berman had dug itself by filing lawsuits without appropriate presuit investigation and passing up the opportunity to investigate the cases over the next three years became increasingly apparent, two more Hagens Berman lawyers, Tyler Weaver and Ari Brown, were pressed into service.  That was in June 2014.  9/26/2017 Bolton Tr. at 12:4-6 (Weaver); Docs. 228, 229.

Later in this report, I recommend sanctions against Mr. Weaver, and I have already remarked on the off-the-rails behavior of Mr. Brown in the interviews on the GSK Agreement.  But I must observe that their Hagens Berman superiors thrust both Weaver and Brown into a terribly difficult situation.  To be sure, Weaver's and Brown's responses to the challenge could hardly have been worse, but this remains a top-down calamity.  Weaver was plainly overwhelmed by the sheer volume and complexity of the investigation and validation work left undone by his colleagues over the preceding three years; the seeds of his ethical undoing had, at least in part, been planted by the attorneys who preceded him on the case.

By the time of Weaver and Brown's *pro hac* appearances on June 11, 2014 (just

four months before the scheduled close of fact discovery),[44] the Court had already

concluded that Hagens Berman was thumbing its nose at its discovery obligations

and required more hands-on monitoring than a busy Article III court could indulge.

An avalanche was coming: Within days of their appearances, Weaver,

Brown and the rest of the team would be greeted by defendants' motions for

summary judgment against Plaintiffs Jack Merica (Doc. 245, June 20), Edmund

Andre (Doc. 246, June 20), Lawrence Boiardi (Doc. 258, July 1), Mark Harrelson

(Doc. 259, July 1), and Debra Johnson (Doc. 260, July 3).  And the defendants

would be seeking sanctions against the lawyers, too.  Also shortly after these

attorneys' arrival on the scene, Hagens Berman finally agreed to conduct the case-

by-case internal review discussed in § IV.F.2, *supra*, with a September 14

deadline.  And now, three years into the saga of these cases, Hagens Berman would

be asking its sole testifying scientific expert to consider individual plaintiffs' birth

injuries – and the causes of those injuries – in depth.  As Tyler Weaver would

testify:

> . . .  [In July 2014] I was spending pretty much 90
> percent of my time reviewing all the cases pursuant to an
> order from The Court that we decide what cases we could

---

[44] Judge Diamond would later extend the fact discovery deadline to November 30, 2014
(Doc. 270).

in good faith go forward on.  That's a pretty unusual
situation.

Uhm, I think we had three sanctions motions
pending, multiple summary judgment motions pending,
and there was a lot going on.

5/8/2019 Tr. (Weaver) at 284:11-20.

Less than a month into his *Johnson* tour, Weaver knew the cases were in a

shambles.  On July 1, 2014, he met with the expert, Dr. Stephens, to discuss the

conditions of several plaintiffs, including Plaintiff Lawrence Boiardi.

Coincidentally while at that meeting, Weaver received an email from GSK's

counsel discussing that same plaintiff, Mr. Boiardi.  GSK gave Hagens Berman the

requisite 21-day advance conditional notice of a to-be-filed motion for sanctions

under Fed. R. Civ. P. 11 with respect to Boiardi's case.[45]  Still in the meeting,

Weaver forwarded that email to a Hagens Berman confidant, Jennifer Connolly,

who was not part of the thalidomide team.  Here is the meat of their email

exchange:

> **Connolly to Weaver (after receiving the email and
> draft Rule 11 motion from Weaver):**  Oh man. Figured
> that had to be coming after the way the MSJ was written.
>
> **Weaver:**  Yup. And based on this meeting I'm sitting in
> with the expert it is WELL DESERVED.

---

[45] In the event, GSK and Grünenthal sought sanctions only under 28 U.S.C. § 1927 and
the Court's inherent authority, and not Rule 11, and only for conduct during the period
commencing April 12, 2014.

> **Connolly:**  Who screened these plaintiffs??
>
> **Weaver:**  Some of it was us some another firm. Expert has no way to establish exposure. Or causation. Finding out today.

*See* SDM Ex. 6, HBSS-001261 (7/1/2014 email chain; emphasis by Weaver);

5/8/2019 Tr. (Weaver) at 363:23-364:23;.

It is not at all surprising that the expert had these difficulties; it *is* surprising that Hagens Berman brought Boiardi's suit in the first place.  On the question of exposure, Mr. Boiardi's *Alexander* complaint claim (sworn to by Steve Berman) says only that Mr. Boiardi "believes his mother was given thalidomide by her doctor for morning sickness."  *Alexander* Compl. ¶ 19.  For starters, that is incompetent pleading, both in the state court where it was filed and in the federal court where it landed; it does not even give lip service to (much less particularize) the "information" that supports Mr. Boiardi's "belief."  It was also, apparently, a groundless belief.  The reality was that Mr. Boiardi, adopted as an infant, never knew his mother or knew who she was, and had no "information" to underpin his (and Steve Berman's) professed "belief."  Where did that belief come from, and what was it?  The lawyers did not tell us because there was nothing to tell.  Boiardi believed it and that was that!

Going further in the *Alexander* complaint sworn to by Steve Berman, Mr. Boiardi was born, it said, with a constellation of birth injuries that had historically

been viewed as "non-thalidomide" and, without a scrap of medical support, he and someone from Hagens Berman (presumably Berman or Styant-Browne; Ms. Reeves had left the enterprise) decided he could consciably assert that they were thalidomide-caused. That supposition, in turn, required an entire chain of additional suppositions: Since you cannot sustain thalidomide injuries *in utero* unless your mother ingests thalidomide, they supposed further that Boiardi's unknown mother must have ingested thalidomide. But where would she get thalidomide? Well, probably from some unknown doctor. But why give her thalidomide? Most likely, he was treating her for the morning sickness. Did she have morning sickness? She must have; otherwise, she wouldn't have gotten the thalidomide. Everything was speculation.

And, of course, Steve Berman then put his credibility stamp on the entire house of cards by swearing to the veracity of the *Alexander* complaint and each and every one of these explicit and implicit guesses. In that same *Alexander* complaint, Mr. Berman also swore to the truth of similar speculations on behalf of three of the four other *Alexander* plaintiffs, *i.e.,* that "[Plaintiff *n*] "believes [*n*'s] mother was given thalidomide by her doctor for morning sickness." *Id.* ¶¶ 16 (Rebecca Alexander), 22 (Roel Garza), 25 (David Hobbs).[46]

---

[46] Ms. Alexander has asked (Doc. 468) and I have recommended (Doc. 535, *Johnson,* 2016 WL 4426164) that the Court dismiss all her claims with prejudice. Co-plaintiffs Garza and Hobbs have already dismissed their claims with prejudice. Docs. 317, 368.

Focusing on just this one of the eleven complaints, *Alexander,* and assuming as I must that the fifth *Alexander* plaintiff, Gearold Ledsome, presents triable issues of fact, there is no question that the entire process has uselessly and carelessly imposed on the time and resources of the Court, the defendants, and an overburdened system of civil justice. Worst of all, to my mind, it has been a crushing experience for the Alexanders, Boiardis, Garzas and Hobbses that the lawyers were supposed to be helping. If you tell a long-suffering victim of an unexplained injury that you have identified the cause and the pecunious culprits, he is likely to be very receptive to that good news, loathe to let it go. Lawrence Boiardi was a case in point.

It fell to Weaver to persuade Mr. Boiardi to drop his case. In a July 24, 2014 email to his friend Ms. Connolly, he reported on his most recent conversation with Plaintiff Boiardi:

> . . . There was lots of yelling and ultimately resignation and crying after about 30 minutes. Nick [Styant-Browne] was on the call from the airport. I thought we were going to lose him and never get authority again, and get Rule 11 sanctions, etc., but eventually we tag teamed it home. We might still be paying fees and costs but at least Rule 11 seems to be unlikely. The guy literally doesn't have a single f***ing argument, we did all we could, and this is the right thing to do, but it's hard. 2 years ago he had never given a thought to thalidomide, didn't even know it was possible, and now he is convinced he was injured by

> it despite all the evidence to the contrary.  We did him a
> disservice.

SDM Ex. 7, HBSS-001265 at 1265; 5/8/2019 Tr. at 368:11-369:18 (Weaver);.[47]

That disservice – inducing the client to think he had a meritorious case when he

absolutely did not – is the antithesis of what lawyers are supposed to do, of who we

are supposed to be.  A client who has, over the long years, borne up under the

random cruelty of his birth injuries is suddenly told that someone is to blame, and

that despite the client's half-century delay in investigating the question, some

measure of relief might be obtained.  In reality, though, the client "doesn't have a

single f***ing argument."

It was also in the eleventh-hour crush of evaluating the various plaintiffs'

claims and encouraging some plaintiffs to surrender their claims that, as we would

learn a few years later, Mr. Weaver slipped his ethical moorings.  He tampered

with post-examination reports of Hagens Berman's testifying expert, analyzing the

conditions of Plaintiff Terrie Bolton and then-Plaintiff Diana Cabcabin, as

discussed in § VI.

## V.    The 2017 and 2019 Hearings and Events in Between

---

[47]    SDM Exhibit 7 is an email chain produced by Hagens Berman *in camera,* at a time when the firm was presumptively entitled to work product protection.  That protection has now been waived by Hagens Berman (*see infra* § VII), but Mr. Boiardi, a former client, has not lost his attorney-client privilege.  Accordingly, I have not quoted excerpts or summaries of attorney-client conversations found in email chains.  They are, of course, available for the Court's full consideration.

It was probably inevitable that some of the plaintiffs, once persuaded that they had viable tort claims against giant pharmaceutical companies, would not react well to their lawyers' reversal of that position.  Hagens Berman wound up filing contested motions for leave to withdraw from its representation of six Plaintiffs.  In each case, Hagens Berman cited "professional considerations," as the basis for its motion, without going into detail.  *See* Docs. 207 (Marshall), 301 (Navamuel), 342 (Bolton), 343 (Skelton), 375 (Anderson), 382 (Sells).  I was ordered to address the withdrawal motions and report and recommend to the District Court.  Doc. 532.

## A.    September 2017

The withdrawal motions hearing would be Hagens Berman's opportunity to identify the "professional considerations" that compelled the firm's consequential decisions to leave its clients alone and unprotected on the battlefield, and to explain why the firm had no reason to anticipate, before it filed suit, that those "considerations" would likely come to pass.  Plainly, they (and perhaps the resisting plaintiffs) would have to testify about all manner of privileged or confidential attorney-client matter.  Defendants all consented (Doc. 546) to my holding the proceedings without them, *in camera*.[48]

---

[48]Any decision to proceed *in camera*, even with the consent of the excluded parties, must be weighed against important private and public interests.  *See, e.g., United States v. Simone*, 14 F.3d 833, 845-46 (3d Cir. 1994).  Importantly, *in camera* treatment was not based on sensitivity to the Five Plaintiffs' privacy-based concerns regarding their physical conditions; they had given

The initial September 2017 proceedings consisted of a single session open to all five respondent plaintiffs, followed by individual sessions from which the other four of the Five and their attorneys, if any, were excluded.[49]

In the 2017 sessions, the Hagens Berman attorneys provided a general history of the cases and (as discussed in §§ VI and VIII, *infra*) the events leading up to the motion respecting each of the clients. This is where I first learned about the involvement of attorneys who had not previously been on my screen at all – particularly Peter Gordon and Kay Gunderson Reeves.

More detailed discussion of the evidence regarding each of the motions is found in § VIII, where I make my recommendations, but a few points should be mentioned here: First, the primary Hagens Berman witnesses, Messrs. Berman and Styant-Browne, acknowledged their leading roles in writing the complaints, beginning with the *Yeatts* complaint. But both witnesses were eager to point to non-Hagens Berman lawyers, Peter Gordon of Melbourne, Australia, and Kay

---

those up by bringing lawsuits calling their physical conditions, medical histories, and relevant family dynamics into question. *See, e.g., Williams v. Rene*, 72 F.3d 1096, 1103 (3d Cir. 1995); *In re Asbestos Prods. Liab. Litig. (No. VI)*, 256 F.R.D. 151, 155 (E.D. Pa. 2009).

[49] Given the regrettable one-sidedness of proceedings in which an attorney is litigating against his client, I offered to attempt to identify *pro bono* counsel to represent those of the Five who so desired, solely with respect to the withdrawal motions. Plaintiffs Bolton and Sells accepted the offer and I was able to identify professional colleagues in those plaintiffs' home states to represent them on the motions. Ironically, the presence of the volunteer attorneys had an enormous impact on the proceedings, and underscored the gravity of a midstream withdrawal motion.

Gunderson Reeves of Texas, as the sources of the actual information regarding the 52 plaintiffs, actual knowledge of the etiology of birth injury, and the entire process by which the lawyers concluded that Plaintiff X had injury Y because Doctor Z had given thalidomide to X's mother.  Also, as discussed in § VI, *infra*, it was at this hearing that Tyler Weaver gave his initial false evidence regarding Plaintiff Terrie Bolton and Hagens Berman's expert witness, Dr. Stephens.

### B.    Post-2017 Hearing

A year and a half would pass before the next hearing sessions as we dealt with a series of wholly unexpected events.  The *pro bono* attorneys representing Plaintiffs Bolton and Sells asked for and were granted discovery and – characteristic of this case – counsel came back to the Special Master with discovery disputes and accusations that we were able to resolve.  That production, in turn, led to the revelation of Tyler Weaver's document tampering, false testimony and a falsified exhibit in the 2017 hearing, and the injection into the proceedings of matter that could not be afforded *in camera* treatment.  On the heels of its disclosure that Weaver had tampered with not just Ms. Bolton's information but also former Plaintiff Cabcabin's, Hagens Berman voluntarily undertook to pay the attorneys' fees and expenses of that second Weaver victim and she engaged counsel.  Hagens Berman did not do that in Ms. Bolton's instance.

I was, in this time frame, also pursuing further information, documents, and cooperation from Ms. Reeves and arranging for her testimony (and Ms. Cabcabin's) in the proceedings assigned to me. During this same period one plaintiff, Carolyn Sampson (who is not one of the Five), leveled particularized accusations at Ms. Reeves that led to yet additional evidence-gathering from Ms. Reeves, Hagens Berman and Ms. Sampson herself.

In retrospect, managing the distribution of the transcripts of the 2017 proceedings was child's play. Hagens Berman received all the transcripts; defendants received none. Each of the Five received the testimony and exhibits regarding her situation, and the transcript of the initial general testimony. All of the *in camera* transcription was protected.

### C.    May 2019

Managing the May 2019 in-court proceedings would be a different story. Much of the evidence was necessarily public, while other evidence was plainly protected by work product and attorney-client privileges. One witness, Ms. Sampson, had expressly waived the attorney-client privilege, and would be testifying quite publicly. Similarly, the revelations concerning Mr. Weaver's conduct, and the unanticipated evidence about Ms. Reeves' alleged centrality to the events of 2010-2012 made it necessary to obtain and review additional documents, and to arrange for and receive the testimony of Mr. Weaver, Ms. Reeves, Plaintiff

Sampson, and Dr. Stephens at the next hearing, in addition to having more

testimony from Messrs. Berman and Styant-Browne.  This required a good deal of

stage management, with defendants and their attorneys permitted to hear all or part

of one witness's testimony but not another's, and the Five Plaintiffs themselves (as

well as former Plaintiff Cabcabin) also being excluded from large segments of the

hearing.  Because several participants – including unrepresented participants –

were attending by telephone or video, there was a lot of hand-signaling and

emailing involved.

### D.    Post-2019 Hearing

Receiving the evidence was not the end of it.  A year-long process of

selectively circulating, redacting and recirculating transcripts, so as to protect work

product and privilege for the attorneys and each of now-six past or present clients

came on the heels of the hearing.  That long march is described in Doc. 746 at 14-

16 (SDM).  The final hearing sessions – delayed by Covid – were held in May

2021.

As discussed in § VII, *infra*, the careful transcript editing and masking of the

pre-2021 transcripts would ultimately prove to have been done in vain (worse,

*mostly* in vain) because, in advance of the last hearing, Hagens Berman waived

work product protection (but not attorney-client privilege protection) of the hearing

transcripts and exhibits.  *See* Doc. 746 (SDM), *approved and adopted, objections*

*overruled*, Doc. 749.  However, the plaintiffs' and past plaintiffs' attorney-client

privileges have not been waived by that conduct.  *See* Doc. 746 at 34.[50]

## VI.    <u>Hagens Berman's Treatment of Terrie Bolton and Diana Cabcabin</u>

A contested motion to withdraw is a calamity for the client; her champion

and protector has turned into her adversary.  The situation is particularly painful in

these cases because, apparently, no American lawyer can be found, anywhere, who

is willing to take these representations on, more than 50 years after the alleged

tortious conduct.  Plaintiff Terrie Bolton described her efforts to find replacement

counsel:

> After Tyler, Mr. Weaver said he was going to put
> in that request to withdraw from my case he said I can go
> *pro se*, I didn't know what that meant, but I looked it up
> on Google, or I can try to find replacement counsel.  I
> started searching through Google, through the American
> Bar Association, to anyone.  I searched the personal
> injury attorneys, pharmaceutical attorneys, mass tort
> attorneys, civil action case attorneys, and I sought, and I
> looked.  I looked everywhere but Alaska and Hawaii.
>
> And . . . they all said unfortunately they couldn't
> help me, some didn't even know what thalidomide was.
> But if they did know what they were, they said Hagens
> and Berman was the only attorney left, and they was

---

[50] The Court and I are free to consider all information, confidential or not, in addressing
the matters involved in the hearing.  However, this Report is (and should be) a public document,
and I have attempted to avoid quoting portions of the record that might implicate any Plaintiff's
attorney-client privilege or non-Hagens Berman lawyers' work product privileges to the extent
those privileges were not themselves mooted by their disclosure on the record and Hagens
Berman's subsequent conduct.

handling this case, and I should seek help from them.  I
said that's ironic, they won't help me.

       And then I accidently contacted one of the
Defendants' attorneys, I didn't know he was corporate, I
know nothing about being a lawyer, and then I looked at
the complaint, and I looked, and I said "Oh my G-d," and
I just disconnected the call, because that's the
Defendants' attorney.  I didn't know nothing, who was
who in the legal world.  I was just trying to do whatever I
could to get replacement, because I know I can't do it
alone.

9/28/2017 Tr. at 12:20-13:19 (Bolton).

    In these particular cases, the potentially *pro se* plaintiffs' difficulties are

aggravated by the very physical problems they have endured throughout their lives.

Ms. Bolton again:

       Q. [Ms. Crogan:] . . . [W]hat would happen to your case
if Hagens and Berman were permitted to withdraw?

       A    It'll prejudice my case.  I don't have the education.
I have very limited education.  I don't even have the
funds barely to feed myself, let alone take care of just my
day-to-day.  The cost of depositions, arguments, motions,
traveling from east coast, west coast, that it's deadlines
that have to be made, things have to be typed up.  I only
have three fingers and an elbow.

       . . . I needed someone to travel with me.  The
weather's not like it is in Arizona.  We're coming into
wintertime.  I don't know, I can't even—it's hard for me
to get in and out of cabs.  It's hard for me just to put on
clothes to function.  I don't have the knowledge.  I don't
have the knowledge.  I don't have the funds.  I have
nothing.  I literally have nothing.

*Id.* at 13:23-14:16.  The essential problem with this withdrawal motion is that there is no good outcome from the standpoint of these clients, only a search for the less bad outcome.  If Hagens Berman leaves her, the client will be forced to litigate *pro se,* at her direct and immediate expense, in a venue where none of the Five Plaintiffs lives or works.  If Hagens Berman stays, she is in a broken attorney-client relationship, relying on the skills, loyalty and professionalism of attorneys who have shown a conspicuous lack of those qualities in the eyes of the Court and the Special Master.

Although her opposition to Hagens Berman's withdrawal is no longer before the Court, the story of the firm's treatment of Ms. Bolton and its similar treatment of Bolton's former co-plaintiff Diana Cabcabin is fundamental to the sanctions issues, and will be discussed in some detail.

### A.    Tyler Weaver's False Evidence Regarding Plaintiff Bolton

Hagens Berman's past pursuit of its motion to cease representing Ms. Bolton was the setting for Mr. Weaver's false testimony, for the discovery of his document-tampering and misrepresentations to a client and, finally, for his later explanatory testimony, which I find no more reliable than the earlier testimony.

Facts are facts.  Lawyers, honest lawyers, may change their arguments to accommodate the facts, but they do not change the facts to accommodate the arguments, and that is what Weaver tried to do.  An honest lawyer does not read an

independent expert's report, decide there are parts that make the lawyer's argument more difficult, and erase those parts without the expert's knowledge, but that is what Weaver did. And an honest lawyer certainly does not lie to his client about what an expert witness thinks of her case, and back the lie up with a correspondingly bogus piece of paper. Weaver did that, too.

### 1.    Weaver's Document Tampering in 2014

First, the facts that are now uncontested: In August 2014, two Hagens Berman client-plaintiffs, Terrie Bolton and Diana Cabcabin, traveled separately from their homes in Arizona and California to Pocatello, Idaho, there to be examined by Hagens Berman's testifying expert, Dr. Trent Stephens, a non-physician anatomist/embryologist and retired college professor, at his home. These examinations were done in connection with Hagens Berman's internal evaluation of its cases and in advance of scheduled depositions. Ms. Bolton's was a last-minute thing, to be done just a few days before her scheduled deposition. At the time, Weaver was talking with both clients about the unhappy likelihood that Hagens Berman would recommend that they withdraw their cases with prejudice, depending on the outcome of the Stephens examinations.

But Hagens Berman had other reasons for wanting Ms. Bolton to withdraw her case; there were two additional facts that bode ill for Ms. Bolton's cause: First, Ms. Bolton was born in 1964, two years after the thalidomide scandal had

exploded across our national consciousness.  Second, both her parents were

deceased, so she faced huge difficulties in proving that her mother had been

exposed to thalidomide.

When, hours apart on August 22,  Weaver received Stephens's two post-

examination memoranda (in Microsoft Word), he altered them.  Without talking to

Dr. Stephens, Weaver deleted significant language from both reports.[51]  He

emailed the falsified Stephens/Bolton report to Ms. Bolton, saying "Terrie, here is

Dr. Stephens' report after seeing you," as if it were the genuine article.  9/26/2017

Bolton Tr. at 17:7-17 (Weaver) and Weaver Ex. 2, HBSS-000392-96.  That Ms.

Cabcabin did not also physically receive a falsified report seems to have been

fortuitous.  Weaver gave the tainted document to his Hagens Berman paralegal,

expecting her to forward it to Ms. Cabcabin (as the client had requested).  Instead,

the paralegal questioned him, saying "Should I send this to Cabcabin?  I'm a bit

concerned she will come back with questions since there isn't an obvious

conclusion at the end of the report."  Weaver Ex. 18, HBSS-001237.  There is no

record of a response from Weaver, or of how he described the Stephens report in

his conversations with Ms. Cabcabin.

---

[51] The specific deletions are set out and analyzed in § VI.A.6, *infra.*

We do know, of course, that Ms. Cabcabin accepted Weaver's advice and withdrew her claims with prejudice.  Doc. 319.  Bolton did not, and Hagens Berman moved to withdraw.

### 2.    False Evidence in 2017

None of this tampering was known of when Weaver took the stand in September 2017 to testify in support of the proposed Bolton withdrawal.  In that hearing, he unequivocally identified the jiggered Stephens/Bolton report as authentic, and I received it in evidence.

Remarkably enough, Weaver then proceeded to give false testimony regarding the already falsified document:

> Q    And did Dr. Stevens[sic] reach an opinion with respect to Ms. Bolton?
>
> A    He did.
>
> Q    Okay.  And what was his opinion with respect to Ms. Bolton?
>
> A    His opinion was that he could not opine to a reasonable degree of medical and scientific certainty that her injuries were caused by thalidomide.
>
> *    *    *
>
> Q [after introducing the exhibit:]  Okay.  And what was Dr. Stevens' [sic] conclusion in this report?
>
> A    His conclusion in this report was that Ms. Bolton had a case of PFFD, Proximal Femoral Focal Deficiency. And essentially he concluded that he could not opine that with that defect in particular, without other defects, he

could not rule out causes other than thalidomide, at least
to a reasonable degree of medical and scientific certainty.

Q     Did he conclude that Ms. Bolton's injuries were
consistent with thalidomide exposure?

A     He found that they could be consistent but that he
could not opine to a reasonable degree of medical and
scientific certainty that they had been caused by
thalidomide.

9/26/2017 Bolton Tr. at 16:24-18:14 (Weaver).

Perhaps I was expected to accept this testimony without looking at the

document, because Weaver's testimony was actually a remarkably compound

misrepresentation, a falsehood on a falsehood, a misleading description of the

content of an already falsified document.  When I pressed him for help in finding

the "conclusion in this report," he was unable to find one,[52] nor was there (and this

is important) any reference to that "reasonable degree of medical and scientific

certainty" standard Weaver had just finished mouthing several times.  (*Id.* at 18:12-

19:7).  At that point, Weaver's attorney stepped in, resuming his direct, and

Weaver quickly changed his story, with another falsehood:

Q     [Mr. Alfano]  Mr. Weaver, after you received Dr.
Stevens' report, did you contact Dr. Stevens to discuss it?

---

[52] Tellingly, the closest Weaver could come was Stephens's statement that "[t]hese
results suggest that Ms. Bolton's defects would fall into the non-thalidomide group," a phrase
that we will see in its actual pre-tampering setting (with its pre-tampering meaning) in § VI.A.6,
*infra.*

> A    I did.  I talked to him.
>
> Q    Okay.  And what did you and he discuss about Ms. Bolton?
>
> A    We discussed what I was talking about earlier, about whether he would be able to give us an opinion that Ms. Bolton's injuries were caused by thalidomide to a reasonable degree of certainty, and he indicated that he wouldn't be able to.  He could not rule out other causes of her injuries to a certain degree of certainty.

*Id.* at 19:15-24.  That, too, was false; there was no such Weaver-Stephens conversation before the document-tampering, as Weaver would later have to admit.

Furthermore, it is flatly impossible to credit any testimony that – at any time before moving to jettison Ms. Bolton and her case on August 29, 2014 (Doc. 342) – Weaver and Stephens talked in terms of "reasonable medical or scientific certainty" as Weaver claimed they did.  Once again, Hagens Berman and Weaver trip over their own footprints.

Remarkably enough, Hagens Berman seems to have litigated in these cases for three years and more without knowing Pennsylvania's standards for expert opinion testimony.  Pennsylvania courts require (as does this Court in these cases) that a plaintiff's expert opinions on causation be given to a "reasonable scientific certainty."  *See, e.g., McMahon v. Young*, 276 A.2d 534 (Pa. 1971).  But until October 2014 – a couple of months *after* the August motion to cut Ms. Bolton loose – every single one of Dr. Stephens' expert reports pursuant to Fed. R. Civ. P. 26(a)(2)(B) *and* all Hagens Berman's arguments to the District Court consistently

articulated an inapposite "more likely than not" standard.[53]  Weaver's document-tampering and Hagens Berman's withdrawal motion occurred (and the apocryphal Weaver-Stephens "reasonable medical or scientific certainty" conversation would have had to occur but didn't) months before that.  Judge Diamond, in awarding summary judgment against Mr. Andre on *October 16, 2014*, cited as one ground the Court's inability to consider a "more likely than not" expert conclusion. *Johnson*, 55 F. Supp. 3d at 612-13 and cases cited therein.  Four days after *Andre*, in a painfully obvious "whoops" moment, Mr. Berman filed a flurry of "Supplemental Declaration[s] of Trent Stephens, Ph.D." in opposition to summary judgment motions, mouthing the proper standard for the first time.  Docs. 376-81. Once again, Mr. Weaver's 2017 testimony was not truthful.

### 3. Hagens Berman's longstanding problems with Ms. Bolton's case.

As mentioned earlier, Hagens Berman had concerns with Ms. Bolton's case long before – and unrelated to – her journey to Pocatello and her particular prenatal injury, concerns that were obvious as soon as she became a potential plaintiff:

Every one of these 52 cases was sure to present daunting problems of proof, and that would have been so even in a hypothetical world that had no statutes of

---

[53] *See, e.g.,* Doc. 262 at pp. 2, 35 (Hagens Berman espousing "more likely than not" standard in Plaintiff Ed Andre's case; Doc. 262-7, ¶ 23 (Stephens Decl., July 10, 2014):  "If I assume that Mr. Andre's mother took thalidomide early in pregnancy . . . it is more likely than not that Mr. Andre's defects were caused by thalidomide." *Id.* ¶ 23.

limitations.  Element by element, witness by witness, time wears a cause of action away.  How does a plaintiff show that her mother was given thalidomide tablets by her treating physician if neither the patient nor the doctor is available to testify?  How does a defendant rebut such a statement, once placed in evidence?  When she first came into contact with Gordon & Reeves, Terrie Bolton made clear that this would be a problem in her case; her intake document, a Gordon & Reeves "Thalidomide Client Questionnaire" (Weaver Ex. 5, HBSS-006367-68), spelled out that her parents were deceased, and that Ms. Bolton did not know the name of her mother's treating doctor during the pregnancy.  Indeed, in his initial testimony in 2017, Tyler Weaver listed that deficiency as Hagens Berman's first ground for withdrawing from Ms. Bolton's case:

> Q    And what were the facts that you knew at the point at which you submitted your declaration, that supported the firm's request to withdraw?
>
> A    The main things that we were taking into consideration were the lack of witnesses who could testify regarding what happened at the time of her conception and during her mother's pregnancy, especially regarding thalidomide; the date of her birth; and also the expert review that had been done by Dr. Trent Stevens in August of 2014.

9/26/2017 Bolton Tr. at 14:25-15:5 (Weaver).  On this issue, then, Hagens Berman's withdrawal motion failed the only test Judge Diamond had expressly articulated, *i.e.,* that in considering a withdrawal motion, I should consider whether

the grounds relied upon to justify withdrawal were known or unknown to the

attorney when he decided to take the case in the first place.

Of course, Ms. Bolton's questionnaire also disclosed her birthdate, which

provided Hagens Berman's second ground for withdrawing identified by Weaver

when he testified in 2017:

> She was born in 1964. There was – there was significant
> publicity in 1962 regarding thalidomide and what it could
> do to infants. And it would have meant that her mother
> had had to take the drug after distribution had ceased
> within the United States, and that publicity had occurred.

*Id.* at 16:2-6 (Weaver). Remarkably enough, it appears that the Hagens Berman

team had paid little or no attention to the 1964 birthdate problem until the day

before Ms. Bolton's meeting with Dr. Stephens. On August 19, acknowledging

that he didn't know much about "the background facts of the case," Weaver asked

his colleagues on the thalidomide team:

> [W]hat sort of argument can we really make about a
> person actually getting this drug in early 1964? It would
> have taken (1) the drug sitting around somewhere for
> nearly two years before the doctor handed it over, and (2)
> a doctor who was completely unaware of the massive
> publicity that came out with the President and Life
> magazine in 1962 and subsequent coverage, including
> several scientific publications our own expert cites. I get
> why some plaintiffs or their mothers might have missed.
> that publicity but a doctor who treated pregnant women?
> At a minimum, we would have a serious empty-chair
> problem.

> . . . [D]o we have any evidence it was still being given to
> patients in 1964?  If not, do we have a basis for
> proceeding on Bolton?

Weaver Ex. 4, HBSS-001238-41 at 1240, email chain (Weaver, Spiegel, Styant-

Browne, Mahoney, Brown, Bede, Smith), dated Aug. 19, 2014; *see also* 5/8/19 Tr.

at 251:3-254:23 (Weaver).  A senior member of the team, Craig Spiegel,

responded:

> This case would really be pushing it. Not only would the
> drug still have to be out there, but some idiot MD would
> have to dispense it long after the dangers became clear.
> And if the MD didn't know what the drug is, would
> he/she dispense it?

Weaver Ex. 4, at HBSS-001238 (Spiegel).  What I find particularly distressing

about this latter observation is that – as will be recalled – this same Craig Spiegel

was one of the three Hagens Berman attorneys (Berman and Styant-Browne were

the others) who authored Ms. Bolton's *Spence* complaint in the first place.  Why,

when he put his name on Ms. Bolton's *Spence* complaint in August 2012 and

overtly stated that Ms. Bolton was born in September 1964 (*Spence* Compl. ¶ 32),

was Mr. Spiegel not concerned about this "idiot MD" issue?  How did he square

that with his Pennsylvania Rule 1023.1 obligations?  It is not my place to decide or

advise on whether Ms. Bolton's claim must fail, but if either the unavailability of

"exposure" evidence or the 1964 birthdate is a factor counseling withdrawal today,

why was it not a concern urgent enough to be addressed directly in 2011 or 2012,

when Terrie Bolton first presented her situation to the attorneys?  The client did

her job.  Forthrightly, she answered the questions her attorneys had asked.  My

answer to the Court's question (Doc. 532, p. 3 ¶ 1) is, therefore, that Hagens

Berman knew, from the moment it accepted Terrie Bolton's engagement, the facts

it relied upon in its Bolton withdrawal motion.

Whatever else has come of this litigation, it has been torture for Terrie

Bolton.  After a life of continuing pain, she was offered hope.  And then, three

years later, her supposed champions turned their backs on her.  Weaver himself

was all too aware of the toll that emotional roller coaster was taking on Ms. Bolton.

In another email to his colleague, Ms. Connolly, he said:

> This woman brought me to tears yesterday.  This case
> had been the one hope she's had in the world for almost
> three years, and she feels like without it she's going to die
> penniless in a nursing home.
>
> *   *   *
>
> I'm actually worried this may be more than this client can
> handle, but we have no choice because we have no case.

5/8/2019 Tr. at 286:3-18 (Weaver); Weaver Ex. 9, HBSS-001282-84 at 1282.

Once again we see the wages of inadequate pre-suit investigation.  Hagens

Berman's failure to do its homework back in 2011 and 2012 was coming back to

haunt the firm in 2014.  Weaver pointed this out (with a dollop of self-pity) in

another August 22 email that went to Ms. Connolly and two other Hagens Berman

colleagues:

> This is the woman I spent 45 minutes with before lunch
> yesterday.  Forget about the firm, the number one reason
> to vet cases like this is to protect the clients from this sort
> of situation.  I can't believe I am the one having to deal
> with this, I basically have to hear her out but also
> persuade and explain why her case never should have
> been brought in the first case.

Weaver Ex. 9, HBSS-001282-84 at 1282.  The timing of this Weaver-Connolly

email is telling in the context of the overall paper trail of that date, August 22,

2014.

- At 5:01 a.m. PDT, Stephens's email, transmitting the genuine

  Stephens/Bolton report, lands in Weaver's mailbox.

- At 10:21 a.m., Weaver sends his email to Connolly.

- At 10:35 a.m., less than fifteen minutes later, Weaver closes the document

  on his computer.  The falsification is complete.[54]

- Two minutes after that, at 10:37 a.m., he emails the phony report to Terrie

  Bolton, lying about its authenticity.

I do not know whether Weaver rewrote Stephens's work before or after bemoaning

his lot in life to Ms. Connolly.  I do know that Hagens Berman and Berman's

thalidomide team were awash in crises as of August 22, 2014:  The firm was

---

[54] The date/time information for the emails to Ms. Connolly and Plaintiff Bolton appear
on the faces of the documents.  The remaining date/time information comes from the
Investigative Report of Jeff Whitney, Certified Computer Examiner, received in evidence by
stipulation of the parties as Ex. 9 to testimony of Nick Styant-Browne.  5/7/2019 Tr. at 99:2-14.

obligated to complete its plaintiff-side case evaluation process by mid-September. The extended discovery deadline was ten weeks away, and scores of depositions were yet to be conducted.  It is also fair to observe that the firm's credibility score with the Court was dangerously low; Judge Diamond had recently issued his blistering *Merica* opinion, Hagens Berman had just given up the ghost on Messrs. Boiardi and Garza's cases, the Merica, Boiardi and Garza sanctions motions were soon to be argued before me, and new demands for summary judgment and sanctions were thick on the ground.

Hagens Berman really wanted Ms. Bolton to drop her case.

### 4.    Dr. Stephens's methodology

Dr. Stephens's approach to his evaluations of the many plaintiffs' injuries, as understood and explained by Mr. Weaver in his testimony, figures into my evaluation of Weaver's conduct.  In his analysis, Stephens begins by identifying the various defects or birth injuries experienced by the individual and the frequency with which (based on generally scant empirical data, I think) such injuries have historically been associated with thalidomide.  Simultaneously, he considers the frequency with which each of those conditions is found in the general population.  Stephens multiplies the various incidences against one another to arrive at a likelihood of all the conditions' occurring without thalidomide poisoning.  The rarer the coincidence of the conditions in the general population,

the greater the likelihood that Stephens will blame them on thalidomide.

According to Weaver, Dr. Stephens's practice in assessing the likelihood of a

given plaintiff's injury's being thalidomide-related was as follows:

> . . . [T]here were three different types of conclusions he
> reached and there was -- and it's kind of a spectrum, but
> they all fell into one of these categories.
>
> . . . [I]n a few cases he concluded that it was not
> Thalidomide based on what he had seen.  There were
> other cases where he concluded that it was consistent or
> could be consistent with Thalidomide, but he would have
> to assume ingestion.  Then there were a few cases where
> he concluded that based on the cluster of defects alone, . .
> . that those – those injuries were caused by Thalidomide.

5/8/2019 Tr. at 235:4-24 (Weaver).  What Weaver is describing is a bell-shaped

curve with "a few cases" at each extreme – situations in which Stephens felt

comfortable, just considering the constellation of birth defects, in opining that the

individual definitely was or definitely was not a "thalidomider."  But these were

the extremes.  For most of the cases – the middle body of the bell-shaped curve –

he would have to assume a long-ago mother-to-be had been exposed to

thalidomide in order to feel comfortable in opining that the long-ago child was a

thalidomider.

Turning to Ms. Bolton's birth injuries:  It bears mention, first, that the

Stephens report regarding Ms. Bolton was not a Fed. R. Civ. P. 26(a)(2)(B) report.

From Dr. Stephens's perspective, it was simply a tool to inform Weaver and

Hagens Berman, in confidence, of the expert's present diagnostic thinking.  For

Weaver, though, it was a stage prop; he hoped to use it to persuade Ms. Bolton to

get out of the case, to take her 1964 birth date and her lack of admissible exposure

evidence and leave before Hagens Berman was hit with another sanctions motion.

And Weaver's report-fudging – while it did *not* persuade Ms. Bolton to go away –

was obviously aimed at that outcome.  If Ms. Bolton had decided she didn't have a

thalidomide injury and dropped her case, Hagens Berman's years-long failure to

address the birth date and exposure issues would not be issues.

### 5.    The *pro bono* lawyers do their job

On the withdrawal motions (but not on the underlying claims against the

defendants), Ms. Bolton and another of the Five, Mary Sells, were represented *pro

bono* by Arizona lawyer Cindy Crogan (for Bolton) and Cleveland lawyer David

Weiner (for Sells), respectively.  Crogan and Weiner were very new to the

engagements, of course.  Hearing the testimony of Hagens Berman witnesses Steve

Berman, Nick Styant-Browne, Tyler Weaver and Barbara Mahoney at the

September 2017 hearing, both *pro bono* attorneys pressed for discovery relevant to

the respective motions, and I allowed it.

With Bolton's *pro bono* lawyer pressing for document discovery, it was

Weaver himself who disclosed to his colleagues and outside counsel that he had

"discovered" the existence of the inconsistent versions of the Stephens/Bolton

report and, later the same day, that he had "discovered" that it was he himself who had tampered with it, although (he said) he couldn't remember doing that. Days later, he acknowledged the same facts and alleged the same failures of memory regarding the Stephens/Cabcabin report.

I believe Weaver's conduct would have gone undetected and unrevealed if not for the energetic and resourceful conduct of the two *pro bono* attorneys, particularly Ms. Crogan. We are in their debt.

### 6. The Bolton falsification: Why it mattered and why I could not accept Weaver's trivialization

I find that Weaver lied in his 2017 testimony. In his 2019 testimony, discussed in § VII.C, *infra*, Weaver would characterize his tampering as a benign thing, nothing more than a copy editor's clean-up of clumsy prose, and his false 2017 testimony as mere forgetfulness of a trivial long-ago moment. In reality, the document was altered in a manner calculated to mislead a client and bend her conduct to Hagens Berman's (and Weaver's) will.

As mentioned earlier, Ms. Bolton's birth injuries include something called proximal femoral focal deficiency, or PFFD, defined on the Children's Hospital of Philadelphia website as a "complex birth defect in which the upper part of the femur bone (in the thigh) is either malformed or missing . . . ."[55] Here are the last

---

[55] *Proximal Femoral Focal Deficiency*, Children's Hosp. of Phila. (CHOP), available at https://www.chop.edu/conditions-diseases/proximal-femoral-focal-deficiency#:~:text=femoral%20focal%20deficiency%3F-

two paragraphs of Stephens's report as he emailed it to Weaver on August 22,

2014.  The only differences are that I have bold-typed the portion of Stephens's

presentation that Weaver then chose to hide from his client, and I have also

italicized Dr. Stephens's conclusion:

> The incidence of proximal femoral focal deficiency in the general population is 1:52,000 births (Rogala et al., *J. Med. Genet.*, 11:221-233, 1974). Hamanishi (*J. Bone Joint Surg.*, 62B:307-320, 1980) examined seventy patients with proximal femoral focal deficiency and other limb defects, fourteen of whom had known thalidomide exposure. … He found no difference in the femoral defects but found differences in the other limb defects. The thalidomide group showed femur-tibia-radial defects, whereas the non-thalidomide group showed femur-fibular-ulna defects. … These results suggest that Ms Bolton's defects would fall into the non-thalidomide group.
>
> **However, Hamanishi's (*J. Bone Joint Surg.*, 62B:307-320, 1980) Materials and Methods section indicates that all the cases he examined, from the Princess Margaret Rose Orthopedic Hospital, Edinburgh, had been pre-screened as thalidomide vs non-thalidomide cases and does not make it clear that the pre-screening was not biased as to assignment of thalidomide exposure vs non-exposure.  I have seen evidence from early papers suggesting that the type of limb defect itself was used as a determining factor for listing limb defects as thalidomide vs non-thalidomide.  *Therefore, if clear thalidomide exposure is established in the present case, it is my opinion that***

---

,What%20is%20proximal%20femoral%20focal%20deficiency%3F,be%20shorter%20than%20th
e%20other.

> ***Ms Bolton's defects, which are femoral-fibular-ulnar,
> are still consistent with thalidomide exposure.***
>
> The cholesytectomy is also of interest. Although stated
> in a June 5 2003 report as past surgery, I saw no medical
> record describing the procedure itself. If the gallbladder
> had some congenital deformity, necessitating its removal,
> that might add weight to the side of this being a
> thalidomide case. Absent or deformed gallbladder has
> been associated with thalidomide exposure. However,
> according to Ms Bolton, the gallbladder was removed
> because of numerous gallstones and apparently no
> information concerning any specific gallbladder defect
> was conveyed to her.

*Compare* Doc. 588-1 *with* Doc. 588-2, Exs. A and B respectively to SDM Report

and Recommendation, Doc. 588 (emphases added).[56]

Weaver's "revisions" give us one hand clapping: The non-bold type portion

of the "revised" paragraph tells the reader about only one "not thalidomide" study

result, a 34-year old report by C. Hamanishi that, Dr. Stephens says, "suggest[s]

that Ms Bolton's defects would fall into the non-thalidomide group." Doc. 588-2,

Ex. B. But then, in the next two sentences (they start with a red-flag "however"),

Stephens kicks dirt on Hamanishi's analysis, explaining why he doesn't trust

Hamanishi's conclusions: "I have seen evidence from early papers suggesting that

the type of limb defect itself was used as a determining factor for listing limb

---

[56] *See also* Doc. 593, removing these documents from under-seal status.

defects as thalidomide vs non-thalidomide." *Id.* If so, the rabbit was in Hamanishi's hat.

With a flick of the mouse, Weaver erased Stephens's "however" and the rest of the paragraph from the Word document. It was that easy. One side of a scholarly rumination simply disappeared. With these "revisions," Weaver moved Ms. Bolton to the extreme edge – the "a few cases" segment – of that bell-shaped curve when Stephens had actually placed her in the middle, with the other subjects whose diagnosis would depend on the proof or disproof of "thalidomide exposure."[57]

Weaver did not talk to Stephens before tampering with his work; he just did it. (Had he asked, it seems that Stephens would have turned him down.)[58] Then Weaver sent the falsified document to his client, Terrie Bolton.

Whoever decided to call Ms. Bolton Terrie was prophetic. She is a terrier. Smart, energetic, curious and indefatigable, she does not let go easily. Faced with Hagens Berman's withdrawal motion she has, she tells the Court, contacted law firms across the land, looking for a new attorney without success, and has finally

---

[57] I stress once more that I voice no opinion on the competence or persuasiveness of Dr. Stephens' analytic approach, only that it was far more plaintiff-friendly before Weaver's tampering than after.

[58] Asked about the last deleted sentence, Dr. Stephens testified that he considered it important, 5/8/2019 Tr. 387:13-23, that he did not authorize Weaver to delete it, and "I don't know why I would have done that." *Id.* at 390:9-21.

decided to go it alone without a lawyer.  She has brought, prosecuted and settled

ADR proceedings against Hagens Berman.[59]  She has testified eloquently in these

proceedings, and she is continuing to press her claims against the present

defendants, *pro se* but relentlessly.  She viewed the outcome of her campaign

against the defendants as, basically, a matter of personal survival as well as a

confrontation of good against evil.  *See* Weaver Ex. 10, HBSS-001285-87 at 86,

8/22/2014 email from Ms. Bolton to Steve Berman, begging him to undo the

decision to drop her representation.

What would be the effect of showing Ms. Bolton the actual unadulterated

Stephens report, instead of the tainted version she saw?  Surely she would have

been unimpressed with Hamanishi's suspect conclusions, as deconstructed by Dr.

Stephens, on the relationship between thalidomide and the diagnosis of PFFD.

Very likely she would have pressed Weaver and his firm to do their job, to dig

deeper on the alleged presence of thalidomide in the Chicago area where her

mother had lived while with child and where (her mother reportedly said) she had

been given "a pill" for her morning sickness, and where another child born in 1964

had supposedly been diagnosed with thalidomide injury.  She may also have

pressed Hagens Berman to have another expert (a physician?) probe further into

---

[59] She was able to find counsel for that suit.

the "cholesytectomy [that was] also of interest" but left unexplored.  Bolton would

be unlikely to go quietly, and Hagens Berman really needed her to go quietly.

Had she done so, we would never have learned of Weaver's chicanery.

### B.    Falsifying Dr. Stephens's Report on Diana Cabcabin

Within a few hours of his Bolton switch,[60] Weaver altered another Stephens

report; this one related to Ms. Cabcabin.

Based on my limited contact with Ms. Cabcabin she appears, like Ms.

Bolton, smart and curious; a reader and a thinker who, judging by the record,

considers it important that decisions be informed decisions, approached with care.

Weaver had been pressing Ms. Cabcabin to dismiss her claim with prejudice and,

earlier in August, she had agreed.  But she wanted to read Dr. Stephens's August

14 post-examination report to Mr. Weaver.

Ms. Cabcabin's most visible condition is a "distal truncation" or "distal

transverse defect" of the foot.  In his report to Weaver (Doc. 588-3, Ex. C), Dr.

Stephens says that "[d]istal truncation of the foot occurs about 1:120,000 births" in

the general population.

Stephens then discusses two other conditions reported in Ms. Cabcabin's

medical records, but which he was unable to identify as prenatal injuries:

> Scoliosis was among the first defects identified as being
> associated with thalidomide embryopathy (Lenz and

---

[60] *See* Whitney Investigation Report (HBSS Ex. 9), §§ 7, 9 and Ex. 2.

Knapp, *German Medical Monthly* 7, 253-258, 1962).  It is also fairly common in the general population (about 2.3%).  Uterine defects, which are associated with thalidomide exposure, are also fairly common in the general population, occurring at a rate of about 1/10 births each (Saravelos and Cocksedge, *Hum. Repro. Update* 14, 415-429, 2008).  **If either of these defects is congenital in this case, the probability of seeing either of them together with distal truncation of the foot becomes about 1:1,200,000 births.**

*Id.*[61]  As with Ms. Bolton, I have bold-typed the language that Weaver took it upon himself to delete from the Stephens report without asking Dr. Stephens for permission.  *Compare* Doc. 588-3 (Ex. C) *with* Doc. 588-4 (Ex. D).[62]

At the May 2019 hearing, Weaver (who had left Hagens Berman after his document-tampering came to light and was not practicing law at the time) seemed to dwell on Dr. Stephens's perceived lack of writing skills[63] as a relevant consideration in judging Weaver's own behavior.  I do not really understand that reasoning and, in any event, Stephens's point in each of the passages that were deep-sixed by Weaver was discernible if not pellucid.  In Bolton's case, Stephens

---

[61] "Congenital" means "present at birth," whether of genetic or other origin.  Thalidomide injuries are not natural, but *are* congenital.  Curiously, Dr. Stephens did not offer a probability calculation that assumed that both the uterine defect *and* the scoliosis were birth injuries along with the distal truncation.

[62] These documents, too, were released from seal by Judge Diamond.  Doc. 593.

[63] "[H]e's not a good writer, he's a terrible writer, and, uhm, without conversations with him I could not fully understand what he was saying."  5/8/2019 Tr. at 242:11-14; "I don't think he's always been consistent in positions he's taken, and I -- you know, and I think I said before, he can't write his way out of a paper bag."  *Id.* at 367:16-20.

was saying that the reader should be wary of Hamanishi's conclusions because Hamanishi's methodology and data were suspect. In Cabcabin's, Stephens was saying that the at-birth presence of either of two conditions (along with the truncated foot) would diminish tenfold the likelihood that Ms. Cabcabin's birth injuries "just happened."

And, as with Ms. Bolton, the question here was not whether a trier of fact would conclude that Ms. Cabcabin's condition was thalidomide-related, or even whether a court, applying the Rule 56 standard, would allow that question to be considered by a jury. The question is and was whether Ms. Cabcabin, being pressed to drop her claim, would have attached importance to that potential tenfold increase in the likelihood that her injury was not just natural. Putting it another way, the question is whether deleting *Dr. Stephens's* language from *Dr. Stephens's* expert reports made the documents more, less, or equally suggestive of the proposition that Bolton or Cabcabin did not have a claim worth pursuing and should drop it.

And the larger question, for purposes of this Report and Recommendation, is whether doing what Weaver did is ever justifiable. That answer, too, seems obvious.

### C.    More False Testimony in 2019

In 2019, Weaver testified regarding the August 2014 document tamperings and his 2017 testimony.  As suggested above, I disbelieved Weaver's testimony on critical points.  It was not credible. For the second time in three years, he failed to tell the truth under oath.

Of course, he did admit the undeniable – the two falsifications and his representation to Ms. Bolton that the faked-up Stephen/Bolton report was the McCoy.  But he went on to say that he completely forgot, while authenticating and testifying about a document in 2017, that he had falsified the document three years earlier, forgot that he had knowingly lied about it to a trusting client, and forgot that he had misrepresented his own expert's objective analysis to his client.  I simply could not believe that anybody – let alone an experienced attorney, readying himself to fly cross-country and testify in court – could have totally forgotten about all this forging and lying.  I could not ignore the fact that Weaver's mid-hearing "discovery" of the damning documents came at a time when the Plaintiffs Bolton and Sells's newfound *pro bono* counsel were pushing hard for discovery of the identical documents, with their incriminating metadata.

I understand, of course, that the Court will makes its own determination whether to accept my finding that Mr. Weaver lied under oath in his 2017 testimony.  But even if the Court rejected that finding, the uncontested facts – the deliberate document tamperings and conscious mendacity *to a client* – are ample

support for the award of sanctions I recommend.  By Weaver's self-description, he is an attorney capable of forging the Stephens-Bolton report, passing it off as genuine to the client, and then forging the Stephens-Cabcabin report and attempting to pass that one off as well – all this in the space of a few hours – and then having the whole thing slip his mind when preparing to testify under oath. That would suggest that employing corrupted evidence is not a particularly memorable or extraordinary event for this particular officer of the court.  What client would trust her fiduciary's advice if she could not be absolutely sure he would tell her the truth?  Who would negotiate with such a person?  What tribunal would believe anything he had to say?

Weaver's 2019 testimony regarding his motivation for falsifying the documents also did his cause more harm than good, in my view.  When asked why he did it, Weaver could do no better than to say that he just wanted to protect his client from confusing language:

> I was concerned that the writing -- uhm, what Dr.
> Stephens had wrote there was going to be very confusing
> to Ms. Bolton and that it didn't accurately convey his
> opinion or at least didn't – it didn't make much sense. It
> was circular, confusing, and I took it out to try to make
> this as clear as I could.

5/8/2019 Tr. at 289:1-8 (Weaver).  As demonstrated earlier, that is nonsense, an insult to the client's formidable intelligence.  The deleted language in the Stephens/Bolton report made sense and was anything but circular.  The deletion,

on the other hand, changed the scientist's message without the scientist's consent. Certainly a recipient as smart as Ms. Bolton would not have been confused by those particular sentences, left in place. Even if we were to ignore content and look only to syntax, the evidence gives the lie to Weaver's position. Throughout Dr. Stephens's Bolton and Cabcabin reports, one encounters jawbreaking prose and technical terms that cry out for translation to everyday English. Similarly dense prose is encountered throughout Stephens's seventeen formal Fed. R. Civ. P. 26(a) expert reports, which Weaver or other Hagens Berman attorneys reviewed, approved and filed in opposition to defendants' dispositive motions between July 10, 2014 and February 26, 2015.[64] As to the substance of Weaver's tampering, it changed Dr. Stephens's conclusion without the scientist's consent. Stephens's bottom line in the "clean" report was that he could not state whether Ms. Bolton's birth injuries were or were not caused by thalidomide unless he knew Bolton's mother had taken thalidomide. Take away the deleted materials, and the report says they were definitely not thalidomide-related.

---

[64] Doc. 262-7 (Edmund Andre); Doc. 279-10 (Mark Harrelson); Doc. 283-20 (Debra Johnson); Doc. 303-5 (Steven Lucier); Doc. 313-2 (Yolanda Perez); Doc. 330-2 (Carolyn Sampson); Doc. 337-6 (Alan Horridge); Doc. 376 (Debra Johnson); Doc. 377 (Harrelson); Doc. 378, (Lucier); Doc. 379 (Perez); Doc. 380 (Sampson); Doc. 381 (Horridge); Doc. 428-2 (Jackson); Doc. 429-2 (Philip Yeatts); Doc. 465-2 (Robert Murray); Doc. 473-2 (Doris Brust). The "supplemental" Stephens declarations on behalf of Plaintiffs Debra Johnson, Harrelson, Lucier, Perez, Sampson and Horridge results from Hagens Berman's and Stephens's belated realization that Pennsylvania law requires a "reasonable medical or scientific certainty" in a plaintiff's expert's opinion, as discussed earlier.

But was Weaver not correct in stating that Stephens's as-written language was "circular"?  To say "I know her birth injuries were caused by thalidomide if her mother took thalidomide" sounds rather like saying "the DNA evidence proves he committed the crime if we have an eyewitness," doesn't it?

If that is Weaver's reasoning, though, he and Hagens Berman should have dropped many more clients' claims than they did, because they have relied on the identical Stephens reasoning time and time again in these cases.  As explained by Weaver himself (Tr. 5/10/2019 at 235:4-24), quoted in § VI.A.4, *supra*) they are the middle ground in the range of Stephens opinions.  And a plaintiff-by-plaintiff examination of the seventeen Rule 26(a)(2) reports filed by Hagens Berman on the public docket in these cases damns Weaver's "circular" argument.  In *every single one of those seventeen Stephens declarations, he expressly makes the same assertion* – that thalidomide caused the injury *if* the mother-to-be was given thalidomide.[65]  In some cases Stephens also opines (rather tepidly, I think) that it "appears" that thalidomide was the culprit even in the absence of exposure

---

[65] Doc. 262-7 ¶ 23 ("[I]f I assume that Mr. Andre's mother took thalidomide early in pregnancy, during the time that the embryo was most sensitive to thalidomide, it is more likely than not that Mr. Andre's defects were caused by thalidomide."); Doc. 279-10 ¶ 20 (Mark Harrelson); Doc. 283-20 ¶ 14 (Debra Johnson); Doc. 303-5 ¶ 15 (Steven Lucier); Doc. 313-2 ¶ 14 (Yolanda Perez); Doc. 330-2 ¶ 16 (Carolyn Sampson); Doc. 337-6 ¶ 12 (Alan Horridge); Doc. 376 ¶ 2, Oct. 20, 2014 (Debra Johnson); Doc. 377 ¶ 2 (Harrelson); Doc. 378, ¶ 2, (Lucier); Doc. 379 ¶ 2 (Perez); Doc. 380 ¶ 2 (Sampson); Doc. 381, ¶ 2 (Horridge); Doc. 428-2 ¶ 18 (Tammy Jackson); Doc. 429-2 ¶ 14 (Philip Yeatts); Doc. 465-2 ¶ 17 (Robert Murray); Doc. 473-2 ¶ 14 (Doris Brust).

evidence; in others (just as with Ms. Bolton), he does not.  If Hagens Berman, on

Weaver's recommendation, was going to abandon Ms. Bolton "because no such

exposure had been established," one would have expected the dismissals without a

fight in every case where Stephens's causation opinion depended on an assumption

of thalidomide exposure.  That certainly did not happen.  *See, e.g.*, Doc. 262 at 35-

39 (Plaintiff Andre's Brief in Opposition to Summary Judgment, asserting that

Andre could get to the jury in a case where the closest thing to exposure evidence

was his testimony that his now-deceased mother had blamed his birth defects on

"some damn pill," some "new type of pill" that her doctor had given her).

In concluding as I have that Weaver's testimony in both 2017 and 2019 was

false, I have given careful consideration to all the evidence from the proceedings.  I

have also carefully considered a document found on the internet without the

participants' assistance, the stipulated settlement of Weaver's disciplinary

proceedings before the Office of Disciplinary Counsel of the Washington State Bar

Association (the "Wash. Stip."),[66] in which Weaver acknowledged that:

> 44. By altering the expert's report and sending the altered
> version to TB [Ms. Bolton] while falsely describing it to
> her as genuine, Respondent [Weaver] violated RPC
> [Washington Rule of Professional Conduct] 8.4(c).
>
> 45. By testifying that the altered version of the expert's
> report was the one that the firm had received from the

---

[66] The stipulation was not introduced by any participant, but is publicly available at
https://www.mywsba.org/WebFiles/CusDocs/000000029413-0/002.pdf (Sept. 9, 2020).

expert when such was not the case, Respondent violated
RPC 8.4(c).


Unlike the Special Master, the ODC accepted Weaver's protestation that he

tampered with the Stephens-Bolton report because it was "poorly worded and

would confuse" Bolton.  Wash. Stip.  In dealing with the ODC, Weaver was more

specific about his professed "confusion" worry than he had been in his 2019

testimony:

> . . .  In particular, he was concerned that the last sentence
> [of the Stephens deletion] which began with the phrase,
> 'if clear thalidomide exposure is established in the
> present case,' was particularly confusing *because no such
> exposure had been established.*

Wash. Stip. ¶ 16 (emphasis added).  As we have seen, however, the absence of

exposure evidence has not been an impediment to Hagens Berman's reliance on

such "if thalidomide, then thalidomide injury" reasoning, at least in the seventeen

other cases mentioned above.  Weaver was intimately familiar with Stephens's

approach; he described the two men's working relationship in his stipulation:

> 5. . . . Respondent was directed [by Hagens
> Berman] to work with the firm's expert to determine
> which cases could move forward and to communicate
> with the clients.
>
> 6. The general procedure was that Respondent sent
> medical records to the expert for the expert's review,
> spoke with the expert after the expert reviewed the
> records and examined the plaintiff, and reviewed any
> reports from the expert. Based on the expert's opinion as

> to whether or to what extent causation for the injuries
> could be proven to be based on Thalidomide exposure,
> Respondent made a recommendation to the firm as to
> whether it should go forward with that plaintiff's case,
> dismiss it, or withdraw as counsel.

*Id.*[67]  The stipulation gives no inkling – and the Washington authorities presumably

had none – that Stephens's Bolton report was no different from other Stephens

reports in conditioning a finding of thalidomide harm on the hope that Hagens

Berman would ferret out evidence of thalidomide exposure.[68]  Weaver's Paragraph

16 "confusion" argument was untenable to anyone familiar with the totality of the

Hagens Berman-Stephens effort in these cases, as Weaver undeniably was.

Indeed, it is worse than that:  It turns out that Stephens was doing all this

thalidomide assuming *because Hagens Berman told him to*:

> I have been asked to review the congenital
> malformations exhibited by Mr. Edmund Andre to
> determine if his defects are consistent with those seen in
> thalidomide embryopathy.  *I also have been asked to
> assume that Mr. Andre was exposed to thalidomide
> during the critical period in utero.*

Doc. 262-7 ¶ 6, Stephens Decl. (Andre).  It is flatly impossible for an informed

audience to believe that that Weaver tampered with the Stephens/Bolton report

---

[67] It appears that, during the July-August crunch in 2014, Weaver reported to Hagens Berman regarding as many as 25 different plaintiffs.  *See* Whitney Investigation Report (HBSS Ex. 9) at Ex. 2.  I do not know how many of those reports were vetted by Mr. Weaver.

[68] This is not intended as a criticism of the Washington Office of Disciplinary Counsel; the very purpose of stipulated sanctions arrangements is to *avoid* the necessity of in-depth investigations and protracted proceedings.  *Cf.* Wash. Stip. ¶¶ 59-61.

because it was "confusing" or "circular."  It was a deliberate, calculated attempt to mislead his client.

I believe that acceptance of Weaver's argument on the "confusion" point made it easier for the ODC to go along with his equally critical assertion that his document–tampering and lying to a client somehow slipped his mind when he gave his sworn testimony in 2017.[69]  Having heard the testimony and explored the evidence, and with fullest respect for the Washington state authorities and their processes, I cannot accept their stipulated conclusion on this point.  Weaver testified falsely in 2017 *and* 2019.

## VII.  Hagens Berman's Expert Witness and the Waiver of Work Product Protection

As everywhere, the Covid 19 pandemic was a scheduler's nightmare, and a last hearing initially expected to be held in early 2020 was repeatedly rescheduled and ultimately held in May 2021.

But in March 2020, about a month before the then-scheduled hearing date, I received an email from one of Hagens Berman's counsel, telling me the firm

---

[69] Counsel herself plainly had her own misgivings about buying into this assertion, *see id.* ¶ 33:

> At the time Respondent gave his [2017] testimony, he states that he did not recall that he had altered the report three years prior, and that he mistakenly identified the altered report as the one he had received.  ODC believes it cannot prove that Respondent knew he was testifying falsely.

intended to present the expert testimony of a respected Philadelphia attorney,

Abraham C. Reich, who would opine

1. that Hagens Berman acted properly in bringing its cases on behalf of
   the Five Plaintiffs,

2. that Hagens Berman acted properly in prosecuting the cases as long as
   it had and, finally,

3. that Hagens Berman acted properly in moving to withdraw from
   representing the Five Plaintiffs.

Surprisingly, there was no written report as required by Fed. R. Civ. P. 26(a)(2)(B),

and I ordered Hagens Berman to serve one on all participants and to otherwise

comply with Rule 26(a)(2).  Doc. 707.

That report, when it arrived, disclosed that Hagens Berman had turned over

to Mr. Reich the entire unredacted record of the earlier hearing sessions.

After extensive briefing and opportunity to be heard, I concluded that

Hagens Berman had waived work product protection by doing that.  *See* Doc. 742,

*Johnson*, 2021 WL 2010353 (SDM Order), Doc. 746 (SDM Mem.).  The District

Court overruled all objections to the ruling.  Doc. 749.  I also ruled that the Five

Plaintiffs' attorney-client privileges were preserved, even if disclosed in the

materials turned over to the expert, because Hagens Berman was not acting as their

agent in doing so.  *Id.*

Mr. Reich testified in open court in May 2021.  5/24/2021 Tr. at 28-137. With all respect for Mr. Reich, who is certainly qualified to opine on matters of professional responsibility under Pennsylvania law, I disagree with most of his conclusions.  My own conclusions are set out in greater detail in the discussions of the respective withdrawal motions and the Five Plaintiffs' circumstances, § VIII, *supra*.

## VIII.  <u>The Motions to Withdraw: Summaries and Recommendations</u>

### A.    **Motions that should be Denied as Moot: Bolton and Navamuel**

#### 1.    **Terrie Bolton**

As mentioned earlier, Hagens Berman's motion to withdraw from the representation of Plaintiff Terrie Bolton is now moot:  After fighting gamely against the firm's withdrawal, she finally decided to fire Hagens Berman and sue the firm instead.[70]

I would have recommended denying this withdrawal motion had it required a recommendation, even if Mr. Weaver's treachery had not outed.  The record evidence discussed in § VI.A.3, *supra*, makes clear that – regardless of the merits

---

[70] In an *opera buffa* episode in July 2018, Hagens Berman suddenly *withdrew* its motion to *withdraw* from Bolton's representation and Ms. Bolton – she who had so vigorously opposed the firm's withdrawal, and searched so exhaustively for replacement counsel to no avail – *opposed* the firm's *withdrawal* from the *withdrawal*!  *See* Docs. 637, 638, 639.  The attorney-client bond is that badly fractured.

of Ms. Bolton's case – Hagens Berman had no more basis for seeking to withdraw on August 29, 2014 than it had two years earlier when it filed *Spence* in the Court of Common Pleas.  And Bolton's testimony on the bonding between attorney and client, and the cruelty of a withdrawal (9/28/2017 Tr. at 8:21-15:23 (Bolton)) should be required reading for beginning lawyers.

### 2.    Jose Navamuel

Just recently, in June 2023, Mr. Navamuel also voluntarily terminated his association with Hagens Berman.  As with Ms. Bolton, though, his story has bearing on the professional responsibility conversation.

Had Mr. Navamuel not chosen to proceed *pro se,* I would have recommended denying Hagens Berman's attempted withdrawal because, once again, Hagens Berman failed to meet the standard enunciated by the Court and required by the Rules.  Although it is not my place to speak to the merits of Mr. Navamuel's claim, I certainly do not believe Hagens Berman had the degree of nonspeculative knowledge, when it sued on Mr. Navamuel's behalf in the *Spence* complaint in August 2012, that is a required predicate to the lawyer's sworn assurance that his "factual allegations have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."  Pa. R. Civ. P. 1023.1(c)(3); Fed. R. Civ. P. 11(b)(3).

A threshold obstacle to Mr. Navamuel's claim (time bars aside) is the lack of evidence that thalidomide was ever present in Cuba at all. The sole support Hagens Berman offers for its assertion that it had a good-faith basis for claiming such a presence is so weak that it almost forces the listener to a conclusion of bad faith. Accordingly, I reject Mr. Reich's testimony (Doc. 743, Reich Report at 13) that:

> Hagens Berman had a good faith basis to bring lawsuits on behalf of [Mr. Navamuel] … for injuries allegedly suffered as a result of exposure to Thalidomide, to continue to prosecute [it] as long as it did and, finally, that it was appropriate for Hagens Berman to seek leave to withdraw from representing [Navamuel] when it did….

The *Spence* complaint is lamentably sketchy in explaining the 50-year lag between Mr. Navamuel's injured birth and his lawsuit:

> 26.  Plaintiff Jose Navamuel was born in Habana, Cuba on January 16, 1961. He is a resident of Hollywood, Florida.
>
> 27.  He was born with serious birth defects, including bilateral shortened arms and only three fingers on each hand.
>
> 28.  Jose was aware he may have been a thalidomide baby, but only learned in late 2010 of defendants GSK and Grünenthal's role in the thalidomide tragedy and could not have reasonably discovered their roles.

*Spence* Compl. ¶¶26-28.

In the entire 133-page, 422-paragraph *Spence* Complaint, those are the only mentions of Mr. Navamuel or Cuba. The complaint – supposedly compliant with Pennsylvania's fact-pleading rules – does not say which of the defendants allegedly manufactured or distributed thalidomide in or to Cuba, or how the drug supposedly made its way to Mr. Navamuel's mother. The truth is that Hagens Berman and Mr. Navamuel had no idea about those things. And, of course everyone knew what they did not know. Testifying at hearing, Mr. Navamuel said as much: Given an opportunity to cross-examine Hagens Berman partner Barbara Mahoney, he did what *pro se* litigants so frequently seem to do instead – talk about their cases:

> . . . Basically, my only question about the whole situation was from the very beginning, you know, I disclosed I was born in Cuba, and I kept asking that question from the very beginning, all along. And then it becomes an obstacle to the whole situation. … That was my main concern, and my question, that I am born in Cuba, I know this was an American lawsuit, and they took a f***ing year before they even, you know, before this issue was even brought up. And I was mentioning, I was talking about this issue from the very beginning.

9/28/2017 Tr. at 17:22-18:8 (Navamuel, in unsworn colloquy during Mahoney testimony), and

> [T]his was my concern from the very beginning. Which is why I asked that question a million times. And they never said yes, they never said no, they just continue with the case.

> And then all of a sudden this became an issue, which I
> can't afford lawyers, and I can't, you know, I really—
> there's nothing I can really do except just see what the
> outcome of this is, but I felt that I was led on from the
> very beginning . . .

*Id.* at 37:6-12 (Navamuel under oath).

There is really no functional difference between the states of Hagens

Berman's knowledge when it filed its *Spence* Complaint on Mr. Navamuel's behalf

in October 2011 and when it told him of its decision to withdraw in 2014.  Taking

Mr. Navamuel's "questionnaire" responses (*Id.*, Navamuel Ex. 8) as true, his

mother had received a "sample from doctor" in tablet form, but he did not know

who the doctor was, what the tablet was, or how many tablets the doctor gave his

mother.  At hearing on its withdrawal motion, Hagens Berman offered no evidence

regarding any attempts to find answers to these issues.  Neither Hagens Berman

nor Mr. Navamuel himself had any evidence that thalidomide was ever tested,

marketed or distributed in Cuba, where Mrs. Navamuel was treated and gave birth.

Plainly the authors of the *Spence* Complaint, Messrs. Berman and Styant-Browne

(and Spiegel and Gordon), fail the Court's test with regard to Mr. Navamuel's

claim:  They knew the same things in 2011 as Hagens Berman argues in support of

the Withdrawal Motion, and they had no likelihood of building a competent case.

At the hearing, Mr. Styant-Browne found comfort in what he identified as an

article (more accurately, a 107-word "filler" in the newspaper/magazine argot of

the '60s) published in the *Ocala* [Florida] *Star-Banner* of August 2, 1962.  Mr.

Styant-Browne could not tell me when Hagens Berman learned of the existence of

the piece – whether it was before or after suing – but I don't really think that

matters because his reading of the *Star Banner* piece simply made no sense.

On direct examination, Mr. Styant-Browne claimed the *Star-Banner* piece

"stated that the thalidomide which had been distributed in Cuba had been supplied

from the United States."  9/28/2017 Tr.  at 29:25-30:3 (Styant-Browne).  That was

just false; the *Star-Banner* said no such thing, and Mr. Styant-Browne had it almost

precisely backwards!  Here, in its entirety, is the little AP piece as published in the

*Star Banner*:

### Cubans Are Told Drug Thalidomide is Made in the United States

KEY WEST (AP) – Cubans are being told that the drug Thalidomide is a U.S. product.  Havana Radio, in discussing the preparation which is suspected of deforming unborn babies, referred to it as "a tranquilizer of Yankee manufacture."  The broadcast said expectant mothers in Europe had not been warned of its possible dangers but that those in the United States had been advised.

The drug actually was developed in Germany.  It was prevented from getting a license for commercial distribution in the United States through the vigilance of a woman doctor with the Food and Drug Administration.

*Id.*, Navamuel Ex. 9.  The obvious "gist" of the AP story – published the year after the Bay of Pigs and two months before the Cuban Missile Crisis – was that Havana Radio was disinforming its audience about where thalidomide came from.  That listen-up word "actually" (not unlike Dr. Stephens's "however," *see* § VI.A.6, *supra*) tells the reader: "Here's the truth, the product is *actually* of German manufacture, *not* American!"  The AP piece can logically be understood only as a contradiction of Radio Havana's "Yankee manufacture" assertion, going on to state as fact that the United States had done a good job of keeping the compound out of this country, and tacitly suggesting that Havana Radio was lying again!

In all this, neither the *Ocala Star Banner*/AP nor, apparently, Havana Radio, had said anything about how, *or whether,* thalidomide had found its way across the waters to Cuba.  Styant-Browne had made that claim in his testimony, but acknowledged his error when I walked him through the text of the AP squib.  *See* 9/28/2017 Tr.  at 31:17-33:17.

In his expert report, however, Mr. Reich carried the inaccuracy a step further:  According to Mr. Reich, the AP squib "said that Thalidomide had been supplied from the United States and distributed in Cuba."  Both assertions are simply mistaken; not only does the blurb say nothing about U.S. sources supplying

thalidomide to Cuba, it certainly doesn't say the thing Mr. Navamuel is presumably going to have to prove, that thalidomide ever *was* distributed in Cuba.

In reality, just one potentially relevant mote of information can be inferred from the AP squib, and it is not a helpful one for Mr. Navamuel's case or Hagens Berman's. That Havana Radio was even talking about thalidomide suggests that the thalidomide scandal was news in Havana as it was news in the United States, that Cuban audiences – physicians, mothers-to-be, lawyers – would likely have been exposed not to thalidomide, but to news *about* thalidomide by the August 2, 1962 date of the AP squib.[71] Otherwise, Havana Radio would not have been talking about a chemical compound called thalidomide at all, and a local Florida newspaper would not have given the AP squib its inches of space on the page.

And Hagens Berman's knowledge on the critical question – whether it would even have been possible for Mr. Navamuel's mother to stumble onto thalidomide in Havana, and ingest it, in the spring of 1960 – is exactly the same now as it was when Steve Berman swore to the accuracy of the *Spence* complaint. He and Hagens Berman knew and still know nothing.

---

[71] For context, Merrell had withdrawn its FDA application in 1961. President Kennedy had held a press conference lauding Dr. Frances Kelsey (the "vigilan[t] . . . woman doctor with the Food and Drug Administration" who had "prevented [Merrell] from getting a license for commercial distribution in the United States" and calling for beefed up FDA drug clearance protocols on August 1, 1962, and the *Life* article was published on August 10, 1962.

Recognizing the difficult position of an attorney who does not believe in his client's cause, I nevertheless concluded that Hagens Berman should not be permitted to abandon Mr. Navamuel *if* he remained willing to have the firm continue representing him. The consequences to the client of being forced to litigate this complicated matter *pro se* are worse, in my judgment, than the consequences to Hagens Berman of its conscientious and energetic representation of Mr. Navamuel.

### B.    A Motion that should be Denied Without Prejudice: Richard Anderson

Hagens Berman has lost track of Plaintiff Richard Anderson. He did not attend the September 2017 hearing in person or remotely. The record (9/28/2017 Anderson Tr., *passim*) shows that the firm was in contact with him in 2014, and that he cooperated in its efforts (pursuant to the aforementioned Stipulation and Order, Doc. 268) to evaluate his case's staying power. After that, he stopped communicating with Hagens Berman.

A defense motion to dismiss Anderson's claims based on his failure to respond to discovery has remained pending while these withdrawal motions are under consideration. The Court Clerk's mailings to Mr. Anderson, and mailings from my own office, have been returned when the postal authorities were unable to locate him.

Hagens Berman has supported its assertion of "professional considerations" justifying withdrawal with cognizable supporting evidence, and Mr. Anderson has not responded. The problem, of course, is that I cannot tell whether Plaintiff Anderson has ever seen Hagens Berman's motion to withdraw, or the firm's later submissions. In the absence of such evidence, I recommend that Hagens Berman's motion be denied without prejudice to its renewal at such time as the firm succeeds in finding him and, if Mr. Anderson is still alive, he has been given an opportunity to at least explain the absence of a response on his part.

Under Rule 1.4 of the Pennsylvania Rules of Professional Conduct, a lawyer has a continuing duty to

> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;
>
> (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
>
> (3) keep the client reasonably informed about the status of the matter; [and]
>
> (4) promptly comply with reasonable requests for information . . . .

*Id.* Although the Rules do not say it explicitly, it is beyond obvious that a lawyer cannot satisfy these obligations – not to mention the obligation to court and parties to cooperate in the orderly preparation and prosecution of the case – unless he is in touch with his client.

Here, Hagens Berman did keep in contact with Mr. Anderson, sporadically at least, up to and including the time when it moved to withdraw. But it is fair to say that the Rule 1.4 obligation to keep the client informed is particularly strong when, as here, the client's goals and those of his lawyers – the only lawyers he has in the case – are at odds. Hagens Berman did not satisfy that obligation.

I am not suggesting that Hagens Berman's conduct in this situation was necessarily blameworthy; it may be that Mr. Anderson simply decided to ghost his lawyers and his lawsuit, to walk away from the litigation without ceremony or common courtesy. By the same token, I believe that it would be premature to opine, as Mr. Reich has opined, on the appropriateness of Hagens Berman's conduct in accepting the Anderson claim in the first place, pursuing it as long as the firm did, or even in seeking to withdraw on the basis of some hearsay-riddled testimony on Mr. Styant-Browne's part.[72]

Emphatically, too, I am not suggesting that the defendants should have to hold back on pursuing their remedies for Mr. Anderson's failure to respond to discovery. In concluding that Hagens Berman should not be permitted to withdraw while its client is missing, I do not intend to penalize the other parties for

---

[72] Asked by his attorney to summarize Dr. Stephens's report, Mr. Styant-Browne spoke at length about things that were not in the report at all, based on alleged conversations between the declarant and Stephens. The actual Stephens/Anderson report stated only that "it is my opinion that unilateral hemimelia is within the range of defects caused by thalidomide." Anderson Ex. 2 at 2.

Anderson's and Hagens Berman's apparent inability to communicate with one

another, and Anderson's failure to meet his discovery obligations.  Indeed, my

recommendation against granting Hagens Berman's Anderson motion is rooted in

part in the need for fairness to all the litigants and the system.  The Court and the

parties should be in a position to deal with Mr. Anderson and his claims just as

they deal with the other parties, by communicating with Anderson's lawyers.  *See*

*Ohntrup v. Firearms Ctr., Inc.*, 802 F.2d 676, 679-80 (3d Cir. 1986) (requiring a

law firm – fired by the client – to continue as record counsel in the hope that this

would facilitate the administration and resolution of case against client, a Turkish

government-related arms manufacturer); *Ohntrup v. Makina Ve Kimya Endustrisi*

*Kurumu*, 760 F.3d 290, 294 (3d Cir. 2014) (finally permitting the withdrawal 28

years later, and discussing the Court's reasoning in the earlier opinion); *In re DVI,*

*Inc. Sec. Litig.*, No. CIV. A. 03-5336, 2014 WL 5430998 (E.D. Pa. Oct. 24, 2014)

(denying withdrawal in light of the complexity of the litigation and the needs and

convenience of the other parties and the court).[73]

### C.    A Motion that should be Granted: John Marshall

---

[73] A report and recommendation addressing Hagens Berman's earlier objections to the
Special Master's protocols in addressing these withdrawal motions contains a more fulsome
discussion of these authorities, and of the range of a district court's discretion in entertaining
motions to withdraw.  Doc. 552, *Johnson*, 2017 WL 2729272 (SDM), *approved and adopted*,
Doc. 561, *Johnson*, 2017 WL 2720183.

I note at the threshold that Mr. Marshall may not still be interested in resisting Hagens Berman's Withdrawal Motion. He is one of the clients who sued Hagens Berman and settled the case. That has not led to any change in Marshall's record opposition to the firm's withdrawal, but I will not be surprised if that situation changes while my Recommendation is before the District Court.

Attorney-client candor is a two-way street. Mr. Marshall deliberately withheld material information when he and Hagens Berman were forming their client-attorney relationship. *See* 9/28/2017 Marshall Tr. at 8:23-14:7 (Smith).

Without reaching any conclusions as to whether Mr. Marshall is a thalidomide victim, it is fair to observe that the prevailing wisdom is that thalidomide injury is not heritable; hence, evidence that a particular birth defect turned up in successive generations is thought to contraindicate thalidomide causation. Whether that proposition is correct or not, it is certainly the view of Hagens Berman and its only expert witness and consultant, Dr. Stephens. *Id.* at 15:5-19.

Mr. Marshall has a daughter and two grandchildren who were born with conditions similar to his own birth injuries. For reasons of his own, Mr. Marshall withheld this information – indeed, he hid his daughter and grandchildren's very existence – from Hagens Berman.

This is not to say that Hagens Berman and its co-counsel, Ms. Reeves, are blameless here; Marshall's *Yeatts* complaint was filed in October 2011, and the firm had ample time to do the same investigation that defendants did, only earlier. But in this particular instance there is a straight-line relationship between Marshall's dissembling and Hagens Berman's agreement to take his case:  Upon learning of the generationally recurring birth injuries – bilateral injuries that might otherwise seem quite compatible with thalidomide poisoning to a non-scientist – Hagens Berman and its consultant immediately concluded that Marshall did not have a provable case; to a moral certainly, Marshall would not have *been* a Hagens Berman client if he had told the truth from the outset.[74]  The firm should be permitted to withdraw from its representation of Mr. Marshall.

### D.    A Motion that Should be Denied:  Mary Sells

Plaintiff Mary Sells believes fervently that she is a thalidomide victim, although her November 2012 complaint (*Gunn* Doc. 1-1), crafted by Hagens Berman's Steve Berman and Nick Styant-Browne, says that she "had no understanding of what it meant to be a thalidomider" (a phrase that appears over and over again in the nine complaints written by Messrs. Berman and Styant-Browne) until Grünenthal apologized publicly a couple of months before the *Gunn*

---

[74] This recommendation, if accepted, will moot Hagens Berman's concern (*see* Doc. 532) that Mr. Marshall was already proceeding *pro se* before the withdrawal motions were assigned for my consideration.

complaint was filed.  *Id.* ¶ 23.  Responding to Hagens Berman's "Thalidomide

Client Questionnaire" from Hagens Berman, Ms. Sells had provided a relatively

detailed list of her birth injuries (Sells Ex 7),[75] and a rather extensive list of

medical caregivers and institutions going back over the years**.**  *Id.*

At Ms. Sells's deposition in July 2014, defendants confronted Ms. Sells with

voluminous medical records going back to her childhood, and diagnostically

attributing her birth injuries to a genetically transmitted condition called

ectrodactyly-ectodermal dysplasia-cleft syndrome ("EEC" or, unkindly, "lobster

claw syndrome").  Ms. Sells, at birth or early in life, apparently showed several

(not all) of the physical anomalies that may be associated with EEC.[76]

It is not a discovery master's place to predict the outcome of Ms. Sells' still-

pending claim against the defendants.  Plainly, however, it was Hagens Berman's

---

[75] "Missing fingers on both hands.  Feet were like a big toe.  Webbed feet.  Doctors did surgery at a young, young age and took both feet off . . . .  Very thin hair, never grew thick. Only 3 teeth . . . ." (punctuation and similar edits omitted.)

[76] **Ectrodactyly**:  According to the National Organization for Rare Diseases ("NORD"), https://rarediseases.org/rare-diseases/split-handsplit-foot-malformation/, "[s]plit hand/foot malformation (SHFM) is a limb abnormality that is present at birth. It is characterized by absence of certain fingers and toes (ectrodactyly) that suggest a claw-like appearance and webbing of fingers and toes may also be present."  NORD describes **ectodermal dysplasias** as "a heterogeneous group of nearly 100 inherited disorders characterized by anomalies in at least two of the structures derived from the embryonic ectoderm, with at least one involving the skin appendages (hair, nails, sweat glands) or teeth. Other tissues derived from the primitive ectoderm that can be involved in EDs include the mammary glands, adrenal medulla, central nervous system, inner ear, retina, optic lens, pigment cells, and branchial arch cartilages." https://rarediseases.org/rare-diseases/ectodermal-dysplasias/.

responsibility – for itself, its client, and every other person or institution touched by this litigation – to understand and appreciate the challenges Ms. Sells would face in pursuing that claim, and to be prepared to address those challenges both as an advocate and as a counselor.

That is why I found the testimony of Hagens Berman partner Barbara Mahoney so disheartening. Recall that Ms. Mahoney had no role in reviewing Ms. Sells' intake questionnaire, interviewing her, gathering medical or other records, or drafting the *Gunn* complaint (9/27/2017 Sells Tr. at 5:8-13 (Mahoney)); that was Berman's and Styant-Browne's job. As mentioned earlier, Ms. Mahoney was pressed into service in late 2013 to prepare certain plaintiffs' cases for discovery, including Ms. Sells's. *Id.* at 4:23-5:4. And she knew these cases, many of them, would focus intensively on diagnostic science; after all, Berman and Styant-Browne had sworn, time and again, that "Plaintiffs in this action have lived for decades with injuries they recently have learned, by advances in medical science, to be caused by their mother's use of thalidomide" (*e.g., Gunn* Compl. ¶ 10); "due to advances in science, [plaintiffs now know] that their injuries were caused by thalidomide" (*id.* ¶ 15); and so on.

On direct examination by Hagens Berman's attorney at hearing on the withdrawal motion, Ms. Mahoney testified as follows:

Q      And did you learn anything *during Ms. Sells'
deposition* that you felt was potentially relevant to the
viability of her claim?

A      The Defendants introduced a medical record,
which indicated that a doctor had examined Ms. Sells.  I
think she was about 14-years-old, and the doctor
concluded that it's -- that she had EEC -- sorry, EEC
syndrome, and EE -- and that part of her -- part of the
description of her injuries included ectodermal dysplasia,
which accounted for the sparse hair and the few teeth.

Q      Okay.  And what in your mind was the
significance of that information?

A      *I wasn't sure at the time what the significance was*.
However, from the line of questioning from the
Defendants, *it was clear from their position that a
genetic cause was suspected*.

9/27/2017 Sells Tr. at 6:1-13 (emphasis added).[77]  In other words, Ms. Mahoney

put her client on the witness stand in a lawsuit claiming a teratogenic injury

without having knowledge and appreciation of available, client-specific medical

evidence supporting a contrary conclusion.  I find that shocking.

Ms. Mahoney did not know whether Hagens Berman had ever even obtained

the records of, say, Children's Hospital of Akron, Ohio before that deposition:

[Ms. Mahoney]      . . .  I don't know for certain whether I
had seen that document in my review.  I don't think I
understood the ramifications of that document before the

---

[77] Counsel chose not to place those medical records in evidence at the hearing, but
Defendants had placed the entire Sells deposition, with Exhibits, on the record in their February
2015 Motion for Summary Judgment, Doc. 459.  *See,* in particular, Doc. 459-1 at 9-10
(Memorandum in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment as
to Plaintiff Mary Sells and for Sanctions Pursuant to 28 U.S.C. § 1927).

deposition.  In many cases, and I cannot specifically say whether it was in the context of Ms. Sells' records, but in reviewing medical records, some terminology is purely descriptive, and is merely an indicator of in Latin terms the more precise description of her injuries that would not have necessarily come to -- would not have necessarily stood out for me in terms of preparing her for her deposition.

Q [the Special Master] And so far as you knew had anyone ever reviewed – anyone with the technical competence that you've said you don't have, had anyone ever reviewed that document during the intake process?

A      I don't believe that would have been the case.  To my knowledge that document was produced in 2014, which would have been after the intake.

Q      Okay.  Is -- I take it then that it is not part of the intake process to examine the medical scientific basis or indicator of the validity of the claim or the counter-indicators of the validity of the claim insofar as you know?

*   *   *

A      I have no personal knowledge as to the framework.  . . . I have no personal knowledge to be able to respond to that.

*Id.* at 79:2-20, 80:1-5.  Mr. Styant-Browne answered that question, sort of.  As

discussed in § IV.C.3, *supra*, he testified that, in the intake process, the only

medical documents obtained by Hagens Berman were those that were in the

possession of a putative plaintiff.  That is not likely to be a lot.  Ms. Mahoney was

vague about any medical history investigation done before the depositions of Ms.

Sells or her family.  *Id.* at 35:4-22 (Mahoney).[78]  It may be that Ms. Sells's records were collected by Hagens Berman before her deposition, but that was a useless gesture if, as appears to be the case, Ms. Mahoney lacked both the skillset and the inclination to understand their import.  Mahoney seems to have skipped over the scientific terms because they were scientific!

In these 52 separate cases, the question whether genetics, thalidomide, or some other cause was to blame for a plaintiff's lifelong suffering is of crucial importance.  Carelessly bringing an unexamined case, and then running away from it when it is thought less attractive to the lawyer, is an unacceptably callous course of professional conduct.  Filing ten or 50 cases in the hope that one of them may make it to the jury – turtle hatchlings on a beach – is an abuse of the system and (more important in my view) the credulous clients.  It is simply incomprehensible to me that a Hagens Berman lawyer escorted Ms. Sells into a deposition not knowing what the medical records said or what they portended for Ms. Sells's case.

At Ms. Sells's insistence, she has undergone testing procedures that might have confirmed a genetic source for her birth injuries; the results were inconclusive, so it is still not certain whether her injuries were teratogenic or

---

[78] I believe Mr. Weiner's and the witness's reference to an "intake form" relates to the Hagens Berman questionnaire completed by Ms. Sells in response to Hagens Berman's online solicitations.

genetic in their origin.  Hagens Berman has concluded that it cannot find expert testimony to support a thalidomide claim.

Returning to the standard noted by the Court for measuring Hagens Berman's "professional considerations" argument, it seems highly likely that Hagens Berman did not know, when it agreed to sue and sued on Ms. Sells' behalf, of the medical facts that would persuade the firm to renege on that agreement a year later.  But it is absolutely clear that Hagens Berman had a duty to be fully conversant with those facts and their implications before bringing a suit on Ms. Sells' behalf.

Coming up with a sensible recommendation for the Court's consideration on this particular Withdrawal Motion is not easy; there just are not any *good* choices. We know Hagens Berman does not have confidence in Ms. Sells' claim.  Ms. Sells herself cannot be happy about depending on lawyers whom she may fairly view as both inconstant and inept, but she has had no success in finding another lawyer, and I agree with her view that she is simply not suited to go up against defendants' able counsel, even though I am certain they will give Ms. Sells all those courtesies that officers of the court owe to the unrepresented.

I also have to consider the interests of the civil justice system and the other parties.  Having a *pro se* party in court in a multi-party proceeding creates all manner of obstacles and interruptions.  The experience with another of the Five,

John Marshall, in these proceedings was instructive on this subject. I am not sure Mr. Marshall ever received all the materials he ought to have received (and that represented parties' attorneys received), and neither was he. I am not sure that he knew exactly what those materials were, and I am absolutely certain that he did not understand some of the legal jargon or appreciate the details of the procedural puzzle that all of us were working our way through. And that makes things *very* hard for the Court and the represented participants, because they must be careful not only to be *perceived* as being fair, but to actually *be* fair, both to the lay participant and to everybody else! I am confident that Hagens Berman will be doubly attentive to its duties of loyalty and completeness if Ms. Sells chooses to keep them on as counsel.

I reject Mr. Reich's opinion that, to this point, Hagens Berman's has satisfied the requisite standards of professionalism. Without opining on the question whether Ms. Sells's condition is or is not thalidomide-related, it seems obvious that the lawyers started a lawsuit on Ms. Sells's behalf without knowing what they were getting her into. Worse, they then let two years go by without obtaining the necessary medical records or, if they did obtain them, without having a useful understanding of what they might portend for Ms. Sells's case.

## IX.    <u>Recommendations on Sanctions</u>

### A.    **Authority for Sanctions**

### 1. Rules 1023.1 and 11

As discussed in § IV.B, *supra*, the Pennsylvania Rule is the appropriate authority under which any sanctions may be imposed on the attorneys or law firms based on the preparation, submission and content of the complaints in any of the first ten of these consolidated actions. Rule 11 is the vehicle for impositions based on such conduct in *Griggs*, *and* as to post-removal "signing, filing, submitting, or later advocating" a written submission in any of the cases.

A statute, 28 U.S.C. § 1927, does not depend on the existence of written submissions as such. Before sanctions can be assessed against an attorney under Section 1927, the court must find that the attorney has "(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings," and that the attorney "d[id] so in bad faith or by intentional misconduct." *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002).

To impose sanctions pursuant to the court's inherent power, the court must likewise make a finding of bad faith. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (explaining that a court may assess attorneys' fees pursuant to its inherent authority "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'"); see also *Prudential Ins. Co.*, 278 F.3d at 181. Courts have a bit more flexibility when assessing sanctions pursuant to their inherent

power. *See, e.g., Ferguson v. Valero Energy Corp.*, 454 F. App'x 109, 114 (3d Cir. 2011) (when conduct is egregious and statutory remedies would not adequately compensate the party moving for sanctions, courts are not bound by the statutory limitations imposed on fees awarded under § 1927). Similarly, a court may exercise its inherent authority to hold a law firm vicariously responsible for the bad faith misconduct of one it its attorneys, even when the applicable statute or rule, *e.g.,* Section 1927 or Fed. R. Civ. P. 26(g), standing alone, would not permit such an assessment. *Chambers,* 501 U.S. at 32; *see* Joseph, Sanctions, 1 Sanc. Fed. Law of Lit. Abuse §§ 26(A), 28(B)(2).

Bad faith can be inferred when the claims pursued are clearly frivolous. *See Prudential Ins. Co.*, 278 F.3d at 188 ("[F]indings that the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment" have been recognized as "[i]ndications of this bad faith."); see also *Loftus v. S.E. Pa. Transp. Auth.*, 8 F. Supp. 2d 458, 461 (E.D. Pa. 1998), *aff'd*, 187 F.3d 626 (3d Cir. 1999) ("When a claim is advocated despite the fact that it is patently frivolous or where a litigant continues to pursue a claim in the face of an irrebuttable defense, bad faith can be implied."). Thus, for example, in *Matthews v. Freedman*, 128 F.R.D. 194, 206-07 (E.D. Pa. 1989), *aff'd*, 919 F.2d 135 (3d Cir. 1990), the court found that plaintiff's counsel acted in bad faith when he continued to pursue claims after

being notified by defendants in a letter that the claims were barred by the statute of limitations.  See also *Alphonso v. Pitney Bowes, Inc*., 356 F. Supp. 2d 442, 454 (D.N.J. 2005) ("relentless pursuit of [inflated claims for lost earnings] after the evidence demonstrated, at most, a comparatively trivial amount of loss shows bad faith.")

The discovery rules also provide for sanctions.  While Rule 11 is expressly inapplicable to "disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37," Rules 26(g) and 37 cover that area.  Indeed, Rule 26(g) was a companion piece – centered on discovery papers and their preparation, signing, and handling – to the particularly hardnosed iteration of Rule 11 that was in effect from 1983 to 1993 and, curiously enough, has never been amended in a manner that matches the moderative spirit of the 1993 amendments to Rule 11.  Sanctions for Rule 26(g) violations are still mandatory (*Compare* Rule 11(c)(1) *with* Rule 26(g)(3), and there is no "warning shot" or delayed filing protocol comparable to that of Rule 11(c)(2).

### B.    Sanctions Recommendations

Without hesitation, I recommend the imposition of sanctions on Steve Berman and Tyler Weaver, and on Hagens Berman vicariously by reason of the conduct of Berman, Styant-Browne, and others of its agents.

### 1.    Steve Berman

Mr. Berman is not merely the captain of the Hagens Berman ship and the *Johnson* ship. He was, by his own testimony, the hands-on author and architect of all but the first four plaintiffs' claims. His oath is everywhere in the record and the things he wrote and swore to were – in numerous plaintiffs' cases – largely false and even more largely based on guesswork. It is also apparent – particularly from my review of documents produced *in camera* by Hagens Berman and Kay Reeves – that Mr. Berman was quite aggressive in deciding that a particular potential plaintiff should be encouraged to sue, despite obvious warning signals in the intake process. A Reeves recommendation that a candidate not be accepted as a plaintiff would come under Berman's basilisk gaze. *See* Reeves000029895 (Berman-Reeves email exchange).

Berman and his team disserved their clients and the Court by bringing claims irresponsibly and – so far as I have been able to determine from the present record – by understaffing, under-investigating, and underpreparing the cases at times when pain to the clients, unjustified expense to the defendants and untoward burden on the Court could have been avoided or at least lessened. The New Science trumpeted in the complaints has not found an application in any of the cases that have been the subject of dispositive motions; the same is true of the broadbased fraudulent concealment claims. And the developments in discovery – the Merica, Boiardi, Marshall, Navamuel, and Sells debacles prominent among

them – speak volumes about the willingness of Mr. Berman and his cohort to blur the fundamental distinction between *bona fide* litigation and something closer to extortion. It is remarkable to me that the 52-plaintiff enterprise was permitted to bumble along for several years without anyone's paying any attention to Pennsylvania's "reasonable scientific certainty" requirement for expert testimony in a case in chief. *Compare, e.g., McCandless v. Great Atl. & Pac. Tea Co.*, 529 F. Supp. 476, 478 (N.D. Ill. 1982), *aff'd*, 697 F.2d 198 (7th Cir. 1983) (sanctions because "[t]his lawsuit could have been avoided had [plaintiff's] counsel done the minimum amount of research required of a responsible member of the bar.")

Formally, sanctions imposed on Mr. Berman should be rooted in Rule 11 and its Pennsylvania counterpart, Rule 1023.1, on Section 1927 and the Court's inherent power. In the hearings and elsewhere, I did not encounter evidence directly tying Mr. Berman to Hagens Berman's discovery abuses, and I do not recommend basing sanctions under Rule 26(g) or 37 against him as an individual.

### 2. Tyler Weaver

Interestingly, Rules 1023.1, 11 and 26(g) and 37 do not lend themselves conveniently to a sanctions analysis as to Mr. Weaver's behavior; nor can I say that Weaver was attempting to "multiply the proceedings" in these cases within the meaning of Section 1927; although his conduct certainly *has* multiplied the proceedings, I think he was seeking just the opposite result – a quick end to the

Bolton and Cabcabin claims – when he did the things he wrongfully did.  Thus, we must look to the inherent power of this Court to police its own proceedings in recommending that sanctions commensurate with the gravity of his wrongdoing – his document tampering and misrepresentations in 2014 and his false testimony in both 2017 and 2019 – be imposed.

A casual glance at the docket entries in this litigation underscores the extent to which this Court, like any court, relies on the sworn and unsworn representations of officers of the court, that same fundamental commandment – tell the truth – we spoke of earlier.  Weaver himself submitted numerous affidavits or declarations in these cases, rightly expecting that, whether or not the Court accepted his arguments, the Court would accept his statements of fact as true because he swore they were true.  *See* Docs. 279-1, 283-1, 342-2, 427-3, 592.  In Weaver's case (and maybe for Hagens Berman lawyers other than Weaver) that acceptance will be harder to come by in the future.

In considering sanctions, remorse is relevant, and recognition of the wrong one has done is important.  Mr. Weaver seemed neither repentant nor, really, willing to even recognize that he done a wrong thing.  He admitted the undeniable, but I cannot say that he recognized the fundamental immorality, the profound *counter-professionalism*, of what he did behind his clients' backs.  I pressed him, in open court, to acknowledge that tampering with the document was wrong.  He

could not bring himself to do even that, insisting that it was merely "ill-advised." *See* 5/8/2019 Tr. at 356:14-358:3.  That smacks of strategy rather than morality; it is perilously close to "I'm sorry because I'm caught" or "I'm sorry because everybody's making such a fuss about it."  Even on direct examination, Weaver seemed incapable of apologizing without first exonerating himself and talking about how hard things have been for *him* since the truth came out:

> I regret the whole thing. I was trying to be clear and honest with the clients in a way that was not well thought out, and I ended up with multiplying this already extremely difficult set of proceedings with me having to be up here testifying against my clients again has resulted in three bar complaints against me.  And I regret the stress and anxiety that it has caused both Ms. Bolton and Ms. Cabcabin, my family, and the firm.

*Id.* at 329:13-24.  Asked whether it is ever permissible for an attorney to alter a report or document of an independent expert without permission, and present it to the client as the unaltered report, he hemmed and hawed and finally said he did not know.  *Id.* at 358:4-14.  That is not the right answer.

I respectfully suggest that, to be faithful to the standards of truthfulness and integrity demanded by the Federal Rules (and our profession), a substantial and public sanction is in order.

### 3.    Hagens Berman

"Absent exceptional circumstances, a law firm must be held jointly responsible for a violation [of Fed. R. Civ. P. 11 or Pa. R. Civ. P. 1023.1]

committed by its partner, associate, or employee." Fed. R. Civ. P. 11(c)(1). Holding the firm liable under the Court's inherent powers is, of course, discretionary with the Court.

I think Mr. Weaver's conduct constituted exceptional circumstances, and I do not recommend that Hagens Berman be held jointly liable for sanctions earned by Mr. Weaver. As discussed earlier, I am sure Weaver acted under the pressure of a crushing workload and timeline imposed from higher in the firm, but his response to that pressure was a choice he made. The fact that his superiors put him on the stand to testify under oath and place documents in evidence is eloquent testimony to their unawareness that a document was bogus and the testimony would be false.

But I do recommend that the firm be sanctioned for the conduct of Mr. Berman and, further, for the conduct of the late Mr. Styant-Browne and other lawyers mentioned here. It is impossible to read the record of the various Hagens Berman attorneys' performance in these cases – not only Messrs. Berman and Styant-Browne's disdain for their professional obligations, but also Messrs. Brown's and Styant-Browne's attempts to bully the Special Master, demonize the Court in the eyes of the plaintiff-witnesses, and intimidate the court reporter, and (of course) the loss of Mr. Weaver's moral compass – as products of an overall culture of avarice in the raiment of messianic zeal.

### C.    Ms. Sampson's Claims Against the Attorneys

Plaintiff Carolyn Sampson made specific allegations of deceptive and misleading conduct on Ms. Reeves's part in recruiting Sampson and others, which Ms. Reeves denied.  I heard testimony from both Sampson and Reeves, and examined a paper record from Ms. Sampson's intake process and ongoing dealings with Ms. Reeves, documents larded with caveats and cautions that are generally inconsistent with Ms. Sampson's recall of oral statements she attributes to Ms. Reeves.  Without questioning the sincerity of Ms. Sampson's contentions, she has not proven them in the proceedings before me, and I do not recommend sanctions based on those allegations.[79]  The evidence was inconclusive.

### D.    Ongoing Proceedings

Several attorneys other than Berman and the late Mr. Styant-Browne were signers of papers within the meaning of Rules 11 and 1023.1 – Kay Reeves, Peter Gordon, Craig Spiegel – and still others figure in the narrative.  As mentioned earlier, I do not intend this Report to be read as a conclusion that none of them deserves to be sanctioned or, indeed, that once-sanctioned lawyers and firms will not be shown to have engaged in misconduct in cases that are still before the Court. As just one example, defendants had moved for summary judgment against

---

[79] I am mindful that Ms. Sampson sued Ms. Reeves in a separate action, and apparently has obtained satisfaction and dismissed the case.  *See* Note 10, *supra.*

Plaintiff Steven Lucier (Doc. 272), Glenda Johnson's co-plaintiff in a pre-Hagens

Berman complaint authored by Ms. Reeves and Mr. Gordon, but pursued by

Hagens Berman.  I cannot speculate on whether that motion will be renewed or, if

it is, what lawyers, firms and conduct it will involve.

　　　As a separate matter, I recommend that the Court invite or (if necessary)

order Peter Gordon to complete the process of seeking admission in these cases *pro*

*hac vice,* as he has repeatedly undertaken to do.[80]  The testimony and Ms. Reeves's

notes bespeak Mr. Gordon's active involvement in attracting and vetting the

plaintiffs and, apparently, in reviewing draft complaint language.  In addition, he

has a contingent fee participation in the cases, according to Ms. Reeves.  The

present situation, in which Mr. Gordon is neither in nor out of these cases, should

not be tolerated.

October 12, 2023　　　　　　　　　/s/ William T. Hangley
　　　　　　　　　　　　　　　　WILLIAM T. HANGLEY
　　　　　　　　　　　　　　　　SPECIAL DISCOVERY MASTER

---

[80] It is not obvious that Mr. Gordon, who does not appear to be a member of any United States bar, *can* be admitted *pro hac vice,* but the better reasoning seems to be that a district court has the power to do so unless its own local rules expressly forbid it.  *See United States v. CLGE, Inc.*, No. 14-CV-6792, 2015 WL 2124792, at *2 (E.D.N.Y. May 6, 2015) (collecting cases).  Plainly, Mr. Gordon and Hagens Berman have concluded that he can be admitted.