**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GLENDA JOHNSON, et al. | Civ. No. 11-5782 |
| v. | and all related cases |
| SMITHKLINE BEECHAM COPORATION, et al. | |

**HAGENS BERMAN SOBOL SHAPIRO LLP AND STEVE BERMAN'S
OBJECTIONS TO THE SPECIAL DISCOVERY MASTER'S REPORT AND
RECOMMENDATIONS DATED OCTOBER 12, 2023
<u>AND RESPONSE TO THE OSC ENTERED OCTOBER 13, 2023</u>**

.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

I.  SDM HANGLEY IMPERMISSIBLY EXCEEDED HIS AUTHORITY. ..........................5

    A.  Overseeing Certain Discovery Issues ..........................................6

    B.  Certain Requests for Sanctions ....................................................7

    C.  Voluntariness of Certain Consents to Dismissal...........................8

    D.  Motions to Withdraw ...................................................................9

II.  THE R&R'S RECOMMENDATIONS REGARDING THE WITHDRAWAL
MOTIONS SHOULD BE ACCEPTED IN PART AND REJECTED IN PART..............10

    A.  Recap of Amendment to Appointment Order...............................10

    B.  Recommendations That Should Be Accepted: Marshall, Bolton, Navamuel. ............11

    C.  Recommendations That Should Be Rejected: Sells, Anderson. ...................12

        1.  Mary Sells ...............................................................12

        2.  Richard Anderson ....................................................13

III.  THE R&R SHOULD BE PLACED UNDER SEAL AND BOTH SDM
HANGLEY'S *SUA SPONTE* SANCTIONS RECOMMENDATIONS AND THE
OSC NOTICE SHOULD BE STRICKEN........................................................15

    A.  SDM Hangley Exceeded His Authority......................................15

        1.  Recap of Appointment Order.....................................15

        2.  The R&R Goes Far Beyond SDM Hangley's Authority. ...................16

    B.  The R&R and the OSC Violate Respondents' Due Process Rights...........................18

        1.  Respondents Were Entitled to Particularized Notice and an Opportunity to
Be Heard. ...................................................................18

        2.  Respondents Did Not Receive Particularized (or Any) Notice............................22

            a.  The R&R's Conclusion That Sanctions are Warranted ......................23

            b.  The R&R's Lack of Particularized Notice.........................24

                1.  *Ex Parte* Communications and Other Investigation ...................27

      c.  The OSC's Lack of Particularized Notice ........................................................ 30

C.  There is No Remedy for the Damages Respondents Have Already Suffered but Placing the R&R Under Seal and Striking Its Sanctions Recommendations and the OSC Notice Mitigates Ongoing and Future Damages. ..........................................31

IV.  IF THE R&R'S SANCTIONS DISCUSSION AND RECOMMENDATIONS ARE NOT STRICKEN, THEY SHOULD BE REJECTED IN THEIR ENTIRETY. ...............32

A.  Rule 11 and PA Rule 1023.1 Sanctions are Unavailable Because Respondents Conducted a Reasonable Inquiry Before Filing the Complaints. ..................................32

B.  Section 1927 and Inherent Power Sanctions are Unavailable for the Additional Reason that Respondents Did Not Act in Bad Faith..................................................38

V.  SDM HANGLEY'S SERVICE IS COMPLETE AND HIS ENGAGEMENT SHOULD END.....................................................................................................................43

VI.  The Facts Set Out Below Demonstrate that Sanctions May Not Be Imposed Here............45

A.  Hagens Berman is a Highly Regarded Firm With a Strong Culture............................45

B.  The Firm's Introduction to Potential Thalidomide Claims and Peter Gordon............50

C.  The Lanier Law Firm and Gordon & Reeves File Thalidomide Complaints .............52

D.  In October 2011, Hagens Berman Begins Filing Claims.............................................53

E.  The Firm Conducted an Appropriate Factual and Legal Inquiry Before Filing Its First Complaint in October 2011 ...........................................................................54

    1.  The Firm Extensively Researched and Developed its Statute of Limitations Arguments Before Filing the *Yeatts* Complaint .......................................................56

    2.  Theory No. 1: The March of Science Theory .......................................................58

    3.  Theory No. 2: Discovery Rule Exception ............................................................65

    4.  Theory No. 3: Fraudulent Concealment.................................................................72

    5.  The Firm and Ms. Reeves Conduct a Thorough Factual Investigation into Their Clients' Claims ................................................................................................76

    6.  The Firm Obtained Medical Records from Existing and Potential Clients ...........77

    7.  The Firm Conducted Plaintiff-Specific Investigations .........................................78

    8.  The Firm and Ms. Reeves Filed and Successfully Prosecuted a FOIA Lawsuit to Obtain and Review Voluminous FDA Records ...................................79

    9.  Other Document Review Projects and Witness Interviews ...................................81

    10. Steve Berman Was Actively Involved in the Factual and Legal Investigation..............................................................................................................84

F.   The Firm Met and Consulted with Numerous Experts to Develop Its Theories .........87

    1.   Dr. David Kessler (Former FDA Commissioner)....................................................87

    2.   **Professor** ████████████ ..............................................89

    3.   ███████████████████, and Others ................................89

G.   In October 2013, the Firm Proposed a Bellwether Approach of Six "Test Cases" to Efficiently Manage the Cases and Conserve Resources ...........................................91

H.   The Firm Retained and Relied on Professor Stephens as a Causation Expert............92

I.   Dr. Stephens Presented Challenges as the Litigation Proceeded................................93

J.   After SDM Hangley Ordered the Firm to Review Its Existing Cases, the Firm Conducted a Further Investigation...............................................................................95

K.   The Firm Seeks a Stay Until Pending Motions are Resolved.....................................96

L.   GSK Agreement ........................................................................................................97

    1.   After Conducting Discovery, the Firm Proposes Dismissing GSK .....................97

    2.   The GSK Agreement is Sloppily Described to the Court .....................................98

    3.   The Firm Raises Concerns that the Proposed Inquiry Would Vitiate the Attorney-Client Privilege, Distress Its Clients, and Exceed the Court and SDM's Authority...............................................................................................100

    4.   The Firm Did Not "Bully" SDM Hangley or Act Unprofessionally During the GSK Inquiry .................................................................................................102

    5.   In 2016, SDM Hangley Recommends that the Dismissals be Ordered, Finding that Plaintiffs Knowingly and Voluntarily Agreed to Dismiss Their Claims Against GSK ...................................................................................110

M.   Specific Plaintiffs Mentioned in the October 12, 2023 R&R ...................................111

    1.   Michael Morgan and Barbara Murray ..............................................................111

    2.   Roel Garza, Jack Merica, and Lawrence Boiardi...............................................112

        a.   Roel Garza .................................................................................... 112

        b.   Jack Merica ................................................................................... 114

        c.   Lawrence Boiardi........................................................................... 115

        d.   Ed Andre ....................................................................................... 115

        e.   Terrie Bolton ................................................................................. 117

        f.   Jose Navamuel .............................................................................. 120

g.  Richard Anderson ............................................................................ 124

h.  Mary Sells ....................................................................................... 126

N.  Steve Berman Objects to the Following Statements in the R&R Directed to Him ................................................................................................................127

O.  There is not an "Open Question" as to the Confidentiality of the Confidential Settlement Agreements. ................................................................................129

VII. CONCLUSION ........................................................................................131

## INTRODUCTION

Hagens Berman Sobol Shapiro, LLP ("Hagens Berman" or "the Firm") and Steve Berman ("Mr. Berman") (collectively "Respondents") hereby submit their Objections to the Report and Recommendations ("R&R") issued October 12, 2023 by Special Discovery Master William T. Hangley ("SDM Hangley") (Doc. 767). This filing also constitutes their response to the Order to Show Cause issued by this Court on October 13, 2023 (Doc. 768) (the "OSC Notice") (collectively, the "Objections and Response").

During the course of these consolidated cases, SDM Hangley was assigned four tasks: (1) to oversee certain discovery issues; (2) to consider and make recommendations regarding any requests for sanctions the parties might make arising out of a particular issue (what the Court called the "Thalidomide discovery issue"); (3) to consider and make recommendations regarding whether 28 plaintiffs knowingly consented to dismissal of their claims against Defendant GlaxoSmithKline ("GSK") and whether four plaintiffs knowingly consented to dismissal of their claims against all defendants; and (4) to consider and make recommendations regarding whether Hagens Berman's motions to withdraw from the representation of six plaintiffs should be granted. As of the October 12, 2023 issuance of the R&R, there were no discovery issues or requests for sanctions pending before the Court or SDM Hangley. In 2016, SDM Hangley completed his work related to whether certain plaintiffs knowingly consented to dismissal of their claims. Therefore, the only task remaining before SDM Hangley was to consider and make recommendations regarding Hagens Berman's pending motions to withdraw.

Nonetheless, only 21 of the R&R's 154 pages directly address Hagens Berman's motions to withdraw. The remainder of the far-ranging R&R comprises a discursive discussion of SDM Hangley's viewpoints on a wide range of subjects, focusing mainly on how these multiple cases

have been handled over the course of 12 years by a variety of lawyers representing all 52 plaintiffs. In the end, the R&R relies on that discussion as support for SDM Hangley's *sua sponte* recommendations that this Court sanction the Firm and Mr. Berman.

The R&R should not have been issued in this form. Clearly its main purpose is to publicly excoriate the lawyers who have represented the plaintiffs and to recommend sanctions against those lawyers even though no requests for sanctions are pending. It far exceeds SDM Hangley's authority. Moreover, the R&R violates the due process rights of Hagens Berman and Mr. Berman, including because Respondents did not have adequate notice before SDM Hangley conducted his investigation, performed his analysis, and issued the R&R that he would exceed his authority in this fashion and because SDM Hangley's *sua sponte* sanctions recommendations still fail to provide Respondents with particularized notice and an opportunity to be heard in response to such notice. The one-page OSC Notice issued by the Court on October 13, 2023, which states that it "constitutes notice to show cause under Rule 11(c). Fed. R. Civ. P. 11(c)(3), (c)(5)," does not cure the notice problem. Respondents are entitled to far more particularized notice before sanctions may be entertained or imposed and therefore object to the OSC Notice, as well.

Respondents seek the following relief.

First, Respondents ask that the R&R be placed under seal so that its inflammatory rhetoric and *ultra vires* sanctions recommendations are no longer publicly available. Almost from start to finish, the R&R seeks to portray Respondents, who spent decades building sterling reputations for community contributions and extraordinary advocacy on the part of those who need it most, as avaricious and thoughtless practitioners. In addition to being baseless and well beyond SDM Hangley's authority, these assertions and their accompanying sanctions recommendations violate

2

Respondents' due process rights. Their public availability will cause (indeed, have already caused) Respondents serious professional harm.

Second, Respondents ask that this Court (i) adopt SDM's Hangley's recommendations regarding Hagens Berman's motions to withdraw from the representation of plaintiffs Bolton and Navamuel (motions are moot) and plaintiff Marshall (motion should be granted), and (ii) reject SDM Hangley's recommendations that the Firm's motions to withdraw from the representation of plaintiffs Sells and Anderson be denied; those motions should be granted.

Third, Respondents ask that all portions of the R&R not addressing Hagens Berman's pending motions to withdraw be stricken and that the OSC Notice be stricken, as well.

Fourth, in the event the Court declines to strike but instead considers SDM Hangley's *sua sponte* sanctions recommendations, Respondents request that those recommendations be rejected in their entirety and that no sanctions be levied. There has been no violation of Rule 11 because the claims asserted were not presented for any improper purpose, were warranted by existing law or by a nonfrivolous argument for extending or modifying existing law or for establishing new law, and Respondents believe, after conducting a reasonable inquiry, that the factual contentions in the complaints they filed had evidentiary support or would have such support after further investigation and discovery. Sanctions are unavailable for the additional reason that Respondents did not act with bad faith—much less the requisite willful bad faith—in bringing these claims.

Before agreeing to substitute as counsel for certain plaintiffs and filing lawsuits on behalf of other plaintiffs, the Firm spent months researching and developing legal theories and arguments and finding and assessing relevant facts as to which potential plaintiffs could have viable claims. The Firm relied on advice from scientists that the established medical orthodoxy—which was beginning to change only around the time the Firm first became involved—previously precluded

thalidomide survivors with certain injuries from finding any expert who would have opined that her birth defects were thalidomide related. This March of Science theory has been borne out since these cases were first filed. Under Pennsylvania's discovery rule exception, the thalidomide victims could not reasonably have known about the causal connection between their injuries and thalidomide, even if they may have suspected that there was a connection. In addition, the Firm reasonably believed that the fraudulent concealment doctrine would prevent defendants from invoking the statute of limitations because they had deliberately concealed the extent of their involvement in distributing and marketing thalidomide in the United States.

The Firm filed its first lawsuit in October 2011 and its last in April 2014. During this period, the Firm proceeded diligently, seeking discovery in and out of court, working with experts, and working up the claims of its individual clients. The Firm also sought to minimize the expense of litigation for all participants by, *inter alia,* proposing bellwether trials and seeking stays where appropriate. When the Firm determined that certain claims were not viable, it declined to prosecute them and responsibly sought their termination.

All told, from April 2011 through 2015, the Firm expended approximately 20,000 hours of lawyer and paralegal time—an investment of about $9.1 million in fees—and paid in excess of $850,000 in hard costs, all with a clear understanding that the Firm would not recoup a cent unless it prevailed on behalf of its clients. In short, the Firm conducted a reasonable inquiry before filing the lawsuits and did not violate Rule 11. Respondents did not act with willful bad faith or bad faith of any kind, so sanctions are not appropriate under 28 U.S.C. § 1927 or the Court's inherent authority.

Fifth, now that SDM Hangley has completed all tasks assigned to him, Respondents request that he be discharged in accordance with the original order of appointment.

Respondents' Objections and Response is accompanied by a number of exhibits, and an index of those exhibits is attached as <u>Exhibit A</u>. The Objections and Response, and the accompanying exhibits, contain and/or reference attorney-client privileged communications, attorney opinion work-product, documents marked "Confidential" pursuant to the Protective Order entered in this matter, and materials previously sealed by order of this Court. Consequently, the Objections and Response, and the exhibits thereto, are being filed under seal and served on Special Discovery Master Hangley in accordance with this Court's Order dated December 12, 2023 (Doc. 787.) A redacted version is also being filed and served in accordance with that Order. Respondents do not intend to waive any applicable privilege in this matter.

## I. SDM HANGLEY IMPERMISSIBLY EXCEEDED HIS AUTHORITY.

A special master's authority is constrained by Rule 53 and the orders of appointment. Rule 53 states:

> Unless a statute provides otherwise, a court may appoint a master only to:
>
> (A) perform duties consented to by the parties;
>
> (B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by:
>
>> (i) some exceptional condition; or
>> (ii) the need to perform an accounting or resolve a difficult computation of damages; or
>
> (C) address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.

Fed. R. Civ. P. 53(a)(1).

Subsection (b)(2) of the Rule provides that "[t]he appointing order must . . . state [] the master's duties, including any investigation or enforcement duties." The Comments explain:

> The order appointing a pretrial master is vitally important in informing the master and the parties about the nature and extent of the master's duties and authority. Care must be taken to make the order as precise as possible.

The Comments further stress:

> Rule 53(b)(2) requires precise designation of the master's duties and authority. Clear identification of any investigating or enforcement duties is particularly important. Clear delineation of topics for any reports or recommendations is also an important part of this process.

"Although subdivision (c) of the rule provides masters with the broad and flexible authority necessary to discharge their responsibilities, the appointing order is the most important delineation of a master's authority and duties." 9C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil § 6202.2 (3d ed. 2023); *see also Agric. Servs. Ass'n, Inc. v. Ferry-Morse Seed Co.*, 551 F.2d 1057, 1071 (6th Cir. 1977) (a special master's authority "is dependent upon the District Court's order of reference") (citing Fed. R. Civ. P. 53(c).

This Court appointed Mr. Hangley as a Special Discovery Master and, as required by Rule 53, expressly delineated his authority in a series of orders. Specifically, SDM Hangley was assigned four tasks. Each is discussed below.

### A.    Overseeing Certain Discovery Issues

SDM Hangley was appointed to serve as the Special Discovery Master on June 27, 2014. (Doc. 256) (the "Appointment Order"). In making the appointment, the Court cited Rule 53(a)(1)(C). Relevant paragraphs of the Appointment Order provide:

> 4.    The duties of the Special Master shall include:
>
> a.  Investigating and supervising all discovery respecting the Thalidomide discovery issue.
>
> b. Monitoring and reporting on Plaintiffs' compliance with their discovery and disclosure obligations respecting the Thalidomide discovery issue, and taking such actions as necessary to ensure Plaintiffs' compliance with such discovery and disclosure obligations.
>
> c. Facilitating the Parties' resolution of any discovery disputes concerning the Thalidomide discovery issue.

      d. The Special Master may, if necessary, reopen depositions, order production of documents, propound interrogatories or requests for admissions, and employ any other procedures contemplated by Rule 53 and the Federal Rules.

     5.     The Special Master shall report to the Court and the Parties concerning the status of discovery compliance. The Special Master shall issue a report once every 30 days until the completion of his review, if his review lasts longer than 30 days. At the conclusion of his review, the Special Master shall issue a final report in which he addresses, *inter alia*, whether any Party has failed to comply with his or her discovery obligations.

In a previous order proposing the appointment of SDM Hangley, this Court defined the phrase "Thalidomide discovery issue" as follows: "When each Plaintiff learned that his or her injuries might have been caused by Thalidomide (the 'Thalidomide discovery issue'). . . ." (Doc. 239 at 1.)

     As of SDM Hangley's issuance of the R&R, there were no pending discovery issues, whether related to the "Thalidomide discovery issue" or otherwise.

## B.    Certain Requests for Sanctions

     The initial authority to oversee certain discovery issues was shortly thereafter expanded to include consideration of "*requests* for the imposition of sanctions stemming from the Thalidomide discovery issue." (Doc. 316) (emphasis added).

     The Special Master, William T. Hangley, Esq. shall have the authority to consider all *requests* for the imposition of sanctions stemming from the Thalidomide discovery issue, including but not limited to: the Parties' compliance with their discovery obligations, counsel's failure to conduct pre-suit investigations, whether discovery misconduct caused any unreasonable delays in litigation, and any other sanctions pursuant to Rule 11, 28 U.S.C. § 1927, or the Court's inherent authority that are substantially related to the Special Master's duties under the Appointment Order.

     The Special Master's authority shall extend to all forthcoming and pending *requests*.

     The Special Master shall issue a Report and Recommendation on any *request* for the imposition of sanctions in accordance with Rule 53(e).

(Doc. 316) (emphasis added).

Although certain Defendants reserved their right to seek sanctions in connection with certain motions that may be filed or re-filed in the future, no requests for sanctions (whether related to the Thalidomide discovery issue or otherwise) have been pending before SDM Hangley since 2014, when SDM Hangley recommended (Doc. 414) an award of sanctions in favor of Defendant Grunenthal[1] with respect to the claims of Plaintiffs Boiardi, Garza and Merica, a recommendation promptly adopted by this Court (Doc. 482).[2]

### C.    Voluntariness of Certain Consents to Dismissal

On December 8, 2014, over the objection of Hagens Berman (Doc. 400), SDM Hangley was directed to consider whether each of the 28 Plaintiffs referenced in the November 14, 2014 Motion for Voluntary Dismissal (Doc. 409) "knowingly, voluntarily and intelligently consented" to dismiss their claims against Defendant GSK.  (Doc. 420.)

In February and March 2015, over the objection of Hagens Berman (Docs. 451, 480), SDM Hangley was further authorized to issue a recommendation as to whether Plaintiffs Annette Manning, Sharon Anderson, Ted Mann, and Rebecca Alexander "knowingly, voluntarily, and intelligently" consented to dismiss their claims against all defendants.[3] (Docs. 472, 485.) (Plaintiff

---

[1] Defendants in these actions included: SmithKline Beecham Corp. d/b/a GlaxoSmithKline; GlaxoSmithKline, LLC; and GlaxoSmithKline Holdings, Inc. (collectively, "GSK"); Sanofi-Aventis, U.S., LLC and Avantor Performance Materials (collectively, "Sanofi"); Grunenthal GMBH and Grunenthal U.S.A. (collectively, "Grunenthal).  They are referred to collectively as the "Thalidomide Defendants."

[2] GSK's motion for sanctions as to Boiardi and its request for sanctions in the motions for summary judgment filed as to Garza and Merica were withdrawn as part of the GSK settlement reached with multiple plaintiffs in October 2014 (Doc. 394) ("GSK, in turn, agrees to withdraw its pending sanctions motions . . ."). Approval of the GSK dismissal agreement was recommended by SDM Hangley in 2016 (Doc. 535) but the Court has not yet acted on that recommendation. GSK recently confirmed its willingness to abide by that 2014 agreement, (Doc. 778), and Hagens Berman also believes that the GSK agreement, approved by SDM Hangley, should be approved by this Court.

[3] On April 16, 2018, SDM Hangley was authorized to issue a recommendation as to whether Plaintiff Carolyn Sampson knowingly consented to dismissing her claims against all defendants.

Alexander was also one of the 28 plaintiffs covered by the original order but then consented to dismissal of her claims against all defendants, not just GSK.)

On August 10, 2016, following interviews and investigation, SDM Hangley recommended that all of the Rule 41 voluntary dismissals be allowed. (Doc. 535.) The Court has not yet acted on those recommendations, which no party opposed.

### D.    Motions to Withdraw

On March 14, 2016, the Appointment Order was amended to permit SDM Hangley to issue a recommendation with respect to motions filed in 2014 by Hagens Berman (the "Withdrawal Motions") by which it sought to withdraw from its representation of six plaintiffs (the "Withdrawal Plaintiffs"):[4]

> Mr. Hangley shall issue a Report and Recommendation as to whether Hagens Berman's Motions to Withdraw should be granted. Mr. Hangley must evaluate, *inter alia,* when Hagens Berman first learned that the firm's continuing prosecution of these cases [Marshall, Navamuel, Bolton, Skelton, R. Anderson and Sells] would purportedly be untenable under Rule 1.16(a)(1) of the Pennsylvania Rules of Professional Conduct. *See Chester v. May Dep't Store Co.,* No. CIV. A. 98-5824, 2000 WL 12896, at *1 (E.D. Pa. Jan. 7, 2000) (significant consideration in deciding withdrawal motion is whether "[t]here [was] no suggestion that counsel was unaware of his client's history and propensities when he accepted the representation and proceeded to litigate this matter.").

(Doc. 532.)

Accordingly, by October 12, 2023, the date SDM Hangley issued the R&R, his authority extended only to making a report and recommendations related to the Withdrawal Motions. The

---

(Doc. 611.) Shortly thereafter, Plaintiff Sampson withdrew her request, thereby mooting this additional authorization.

[4] The Firm moved to withdraw from its representation of six plaintiffs, one of whom (John Skelton) thereafter passed away; hence, the term "Withdrawal Plaintiffs" refers to Plaintiffs Richard Anderson, Terrie Bolton, John Marshall, Jose Navamuel and Mary Sells.

R&R provides that discussion and makes those recommendations at pages 5 and 124-144. For the reasons noted below, those recommendations should be accepted in part and rejected in part.

The remainder of the R&R, including SDM Hangley's *sua sponte* sanctions recommendations (at 144-154), exceeds SDM Hangley's authority. SDM Hangley was authorized to consider "requests" for sanctions stemming from the "Thalidomide discovery issue." There are no such requests before the Court, and have not been for many years.[5] For the reasons noted below, the R&R should be placed under seal. Regardless of whether the R&R is placed under seal, its sanctions recommendations should be stricken, and the OSC Notice should be stricken. If the Court declines to order these strikes and instead considers SDM Hangley's *sua sponte* sanctions recommendations, those recommendations should be rejected in their entirety.

## II.    THE R&R'S RECOMMENDATIONS REGARDING THE WITHDRAWAL MOTIONS SHOULD BE ACCEPTED IN PART AND REJECTED IN PART.

### A.    Recap of Amendment to Appointment Order

As discussed above, Plaintiffs Terrie Bolton, Jose Navamuel, Richard Anderson, John Marshall, and Mary Sells were subjects of the Firm's motions to withdraw for "professional considerations." In assigning SDM Hangley the task of making recommendations on how the Withdrawal Motions should be decided, the Court stated that SDM Hangley should determine when the Firm first learned that its continuing prosecution of those cases would purportedly be untenable under Rule 1.16(a)(1) of the Pennsylvania Rules of Professional Conduct. [Doc. 532 at 3, citing *Chester v. May Dep't Store Co.*, No. CIV. A. 98-5824, 2000 WL 12896, at *1 (E.D. Pa. Jan. 7, 2000) (significant consideration in deciding withdrawal motion is whether "[t]here [was] no suggestion that counsel was unaware of his client's history and propensities when he accepted

---

[5] In 2014, Defendant GSK reserved its right to seek sanctions against Hagens Berman as to the Withdrawal Plaintiffs. (Doc. 344.)

the representation and proceeded to litigate this matter.")).] But SDM Hangley later explained that he would be inquiring into whether Hagens Berman "was aware of the problem [necessitating withdrawal] when it filed" the complaints for these five clients; "how the [F]irm learned of the problem"; and why the Firm "fail[ed] to know about it sooner." [Doc. 539 at 2.] In the R&R, SDM Hangley continues to apply the incorrect standard for withdrawal. [*See, e.g.*, Doc. 767 at 36.]

The Firm objects that the proper inquiry for withdrawal is instead "whether the law firm's presence in the case no longer serves any 'meaningful purpose.'" *Ohntrup v. Makina Ve Kimya Endustrisi Kurumu*, 760 F.3d 290, 294-95 (3d Cir. 2014); *see also,* Pa. R.P.C. 1.6 cmt. 3. But no matter what the proper standard for evaluating the withdrawal motions, SDM Hangley was not authorized to consider and ultimately recommend sanctions *sua sponte* as part of that exercise.

### B.    Recommendations That Should Be Accepted: Marshall, Bolton, Navamuel.

The R&R recommends that the Court grant the Marshall Withdrawal Motion, given Mr. Marshall's dishonesty with the Firm during the intake process, and deny the Bolton and Navamuel Withdrawal Motions as moot, given their respective decisions to proceed *pro se*. (Doc. 767 at 147.)

As a preliminary matter, the Firm objects to any suggestion that it did not conduct a sufficient pre-suit investigation with respect to the Withdrawal Plaintiffs, or that it did not have a good faith basis for bringing claims on their behalf. (*See, e.g.*, *id.* at 124, 129, 141.) That said, the Firm agrees with the R&R's ultimate recommendations as to Mr. Navamuel and Ms. Bolton (that the Withdrawal Motions be denied as moot), as well as with respect to Mr. Marshall (that the Withdrawal Motion be granted).

However, for the reasons set forth below, the R&R's recommendations as to Ms. Sell and Mr. Anderson should be rejected, and withdrawal should be granted.

### C.    Recommendations That Should Be Rejected: Sells, Anderson.

#### 1.    Mary Sells

The R&R criticizes the Firm for not obtaining a fulsome set of Ms. Sells' medical records before filing suit on her behalf, which purportedly resulted in the Firm being unaware until 2014 that Ms. Sells' medical condition may have been genetic, rather than thalidomide related. (Doc. 767 at 144-147.) SDM Hangley acknowledges (at 147) that the Firm no longer has confidence in Ms. Sells' case; indeed, he never disputes that the Firm no longer has a good faith basis to proceed with her claim, or that doing so could run afoul of the Firm's ethical and professional obligations. Instead, he recommends that Ms. Sells' motion to withdraw be denied because she is "simply not suited to go up against defendants' able counsel." [*Id*. at 147.]

But Ms. Sells' suitability to litigate against Defendants does not bear on the Firm's professional obligations, which demand that a lawyer "*shall* withdraw from the representation of a client if . . . the representation will result in violation of the Rules of Professional conduct or other law[.]" Pa. R. Prof. Conduct, Rule 1.16(a)(1) (emphasis added). As explained in ¶¶ 213-215 of the statements of fact ("SOF") set out in Section VI hereto, ███████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████. Continued representation under these circumstances is untenable, and Respondents are not aware of any authority that would allow it.

Where remaining in the case would likely require an attorney to violate Rule 11, the court must honor the attorney's request to withdraw:

> The decision to grant a motion to withdraw rests within the court's discretion. *Ohntrup v. Firearms Center, Inc*., 802 F.2d 676, 679 (3d Cir.1986). In exercising our discretion, we first recognize Rule 1.16(a)(1) of Pennsylvania's Rules of Professional Conduct, which states that "a lawyer . . . shall withdraw from the representation of a client if . . . the representation will result in violation of the rules of professional conduct or other law." Moreover, as we noted above, Fed. R. Civ. P. 11 generally precludes an attorney from submitting a pleading in which he or she argues a position at odds with existing law. *We therefore conclude that since an order compelling Mr. Noonan to remain in the case and oppose SEPTA's motion would likely result in his violating Rule 11, we must honor his request to withdraw.*

*Bayges v. Se. Pennsylvania Transp. Auth.*, 887 F. Supp. 108, 110 (E.D. Pa. 1995) (emphasis added). Indeed, *not* honoring a request to withdraw can constitute an abuse of discretion. *See Buschmeier v. G&G Invs., Inc.*, 222 F. App'x 160, 164 (3d Cir. 2007) ("Applying *Ohntrup* in this manner, it appears that the District Court abused its discretion by refusing to permit Buchanan Ingersoll to withdraw.").

Further, the Firm's continued representation of Ms. Sells would serve "no meaningful purpose." *Ohntrup*, 802 F.2d at 680. As the R&R acknowledges, Ms. Sells still "believes fervently that she is a thalidomide victim." [Doc. 767 at 141.] ███████████████████████ ███████████████████████████████████████████████████████████ The Sells Withdrawal Motion should be granted.

### 2.    Richard Anderson

The R&R recommends that the Anderson Withdrawal Motion be denied without prejudice given that the Firm has "lost track" of him. [*Id.* at 136.] The R&R acknowledges that Plaintiff Anderson has been unresponsive to contact attempts since 2017, and that the Firm is not "necessarily blameworthy" for this. [*Id.* at 138.] But it nonetheless contends that the Firm failed to satisfy Rule 1.4 of the Rules of Professional Conduct by not keeping Mr. Anderson informed of case developments, and that it would be "premature" to "opine . . . on the appropriateness of Hagens Berman's conduct in accepting the Anderson claim in the first place, pursuing it as long as the [F]irm did, or even seeking to withdraw on the basis of some hearsay-riddled testimony on Mr. Styant-Browne's part." [*Id.*]

The Firm once again objects to any suggestion that it failed to satisfy its professional obligations with respect to Mr. Anderson; as noted above and in SOF ¶¶ 201-208, ████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

██████████████ Mr. Anderson never responded, nor did he attend the hearing. Since that time, the Firm has not heard from him.

Contrary to SDM Hangley's assertion, permitting the Firm to withdraw from representing Mr. Anderson would not be "premature" because "[f]orcing counsel to attempt to communicate with a client who will likely ignore contact is not a meaningful purpose." *EQT Prod. Co. v. Aspen Flow Control, LLC*, No. 2:20-CV-295-NR, 2022 WL 1997208, at *2 (W.D. Pa. June 2, 2022) (permitting counsel to withdraw from representation) (cleaned up). A lawyer has no continuing obligation to represent a client who simply disappears. *Enno v. VBit Techs. Corp.*, No. CV 22-4006, 2023 WL 2589213, at *1-2 (E.D. Pa. Mar. 21, 2023) (good cause existed to withdraw under Rule 1.16(b) where counsel made over a dozen unsuccessful attempts to contact the client's CEO, who was the only client representative with access to the information necessary to represent the client); *Lawson v. Resources for Human Development, Inc.*, No. CV 21-2394, 2021 WL 5639759, at *1 (E.D. Pa. Nov. 30, 2021) (noting clients' duty to stay involved and that "a client's repeatedly failing to respond to counsel who need the client's input . . . can count as good cause" for withdrawal as long as "the client's silence . . . actually impede[s] the case to the point that the lawyer cannot do his job."); *Ludwig v. Speedway LLC*, 2021 WL 2223833, at *2-3 (E.D. Pa. June 2, 2021) (good cause existed for withdrawal where clients were unresponsive and permitted withdrawal would avoid further delays due to clients' inaction); *Lurwick v. Lehigh Valley Health Network, Inc.*, 2019 WL 2060070, at *2 n.1 (E.D. Pa. May 9, 2019) (proper basis for withdrawal under Rule 1.16 where client "had failed to respond to numerous attempts made in an effort to contact him, and had failed to cooperate in the litigation of this matter."); *Wenneker Distilleries v. Olifant USA, Inc.*, No. 1:11-CV-01010, 2013 WL 1337338, at *1 (M.D. Pa. Apr. 1, 2013) (finding "good cause" requirement in Rule 1.16(B)(6) satisfied where litigant "'effectively abandoned its counsel's representation' by repeatedly failing to respond to counsel's communications, including warnings that counsel would withdraw").

Here, Mr. Anderson has been out of touch with the Firm for over six years, despite being provided with ample notice of withdrawal proceedings and other case developments. [SOF ¶¶ 202,

203, 207, 208] No meaningful purpose would be served by continuing to represent him, and thus the Anderson Withdrawal Motion should be granted.

### III.   THE R&R SHOULD BE PLACED UNDER SEAL AND BOTH SDM HANGLEY'S *SUA SPONTE* SANCTIONS RECOMMENDATIONS AND THE OSC NOTICE SHOULD BE STRICKEN.

#### A.    SDM Hangley Exceeded His Authority.

##### 1.    Recap of Appointment Order

As set forth above, on August 11, 2014, the Court amended the original Appointment Order and granted SDM Hangley "the authority to consider all requests for the imposition of sanctions stemming from the Thalidomide discovery issue." (Doc. 316.) The Court's amendment went on to provide examples of subjects that could be addressed in such requests, including "sanctions pursuant to Rule 11, 28 U.S.C. § 1927, or the Court's inherent authority that are substantially related to the Special Master's duties under the Appointment Order." So while the authority granted SDM Hangley in the context of a *request* for sanctions arising out of the Thalidomide discovery issue was broad, the amendment to the Appointment Order was crystal clear that such authority related only to such *requests*. Indeed, after defining the universe of SDM Hangley's authority as encompassing "*requests* for the imposition of sanctions stemming from the Thalidomide discovery issue," the Appointment Order specifies that his "authority shall extend to all forthcoming and pending *requests*," and that he "shall issue a Report and Recommendation on any *request* for the imposition of sanctions. . . ." (emphasis added).

The Appointment Order was never modified to authorize SDM Hangley to consider and make recommendations about sanctions outside the context of "requests for the imposition of sanctions stemming from the Thalidomide discovery issue." The Court's March 2016 order (Doc. 532) authorized SDM Hangley to consider and make recommendations concerning Hagens Berman's Withdrawal Motions, and directed SDM Hangley, in the context of making those

recommendations, to consider when Hagens Berman first learned that the cases at issue (Plaintiffs Marshall, Bolton, Navamuel, Anderson, and Sells) were "untenable" under the Pennsylvania Rules of Professional Conduct. SDM Hangley bases his recommendations on other factors, namely that the Sells Withdrawal Motion be denied because Plaintiff Sells is "not suited to go up against the defendants' able counsel" (Doc. 767 at 147), and the Anderson Withdrawal Motion be denied because the Firm "has lost track of" Plaintiff Anderson (*id.* at 136). In any event, under no circumstance can the March 2016 order be interpreted as expanding SDM Hangley's authority to make sanctions recommendations in the absence of a *request* for sanctions, whether in the context of the Withdrawal Motions relating to the five Withdrawal Plaintiffs or otherwise.[6]

## 2.    The R&R Goes Far Beyond SDM Hangley's Authority.

SDM Hangley confirms his understanding of the limit of his authority with respect to sanctions. In a section of the R&R entitled "Metes and Bounds of the Special Master's Authority," he quotes the amendment to the Appointment Order and its specification that his authority extends only to "all *requests* for the imposition of sanctions stemming from the Thalidomide discovery issue . . . ." (Doc. 767 at 106) (emphasis added).

SDM Hangley then implicitly proceeds to delete the word "requests" and the words "stemming from the Thalidomide discovery issue" from the amendment to the Appointment Order (even though the limitation to "requests" for sanctions is stated three times), grant himself seemingly unlimited authority to review everything that has happened in these consolidated cases, and make *sua sponte* sanctions recommendations about a wide variety of issues, all entirely in the

---

[6] On May 8, 2018, the Court confirmed that "[t]he scope of Mr. Hangley's inquiry has not broadened in over two years," and "[t]here has been no expansion of Mr. Hangley's inquiry since my March 2016 order [authorizing SDM Hangley to consider the Withdrawal Motions]." (Doc. 624.)

absence of any requests for such sanctions. Indeed, he makes his intentions known from the very outset: "A question of sanctions 'demands a review of the entire record.'" (*Id.* at 5.) [7]

There are no requests for sanctions pending before this Court related to the Thalidomide discovery issue. In fact, there have been no requests for sanctions pending before this Court since 2014. Therefore, there is no "question of sanctions" before SDM Hangley. There was no need for him to review "the entire record." He has no authority whatsoever to analyze and make *sue sponte* sanctions recommendations.

In addition to the R&R being sealed for the reasons set forth below, the R&R's sanctions discussion and recommendations should be stricken because they venture far beyond the powers authorized by the appointing orders and thus contravene Rule 53 and those orders. *See, e.g., Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 399 (5th Cir. 2004) (reversing portion of judgment because district court improperly adopted special master's report with respect to claims that were not referred to the special master); *Datapoint Corp. v. Standard Microsystems Corp.*, 31 Fed. App'x. 685, 695 (Fed. Cir. 2002) (finding district court had properly disclaimed portions of special master's report dealing with infringement as that topic was beyond the scope of the reference); *Boudreaux v. Axiall Corp.*, Civ. Action No. 18-0956, 2022 WL 1720380, at *3 (W.D. La. March 31, 2022) (declining to adopt recommendations of special master that "fall outside the scope of the

---

[7] SDM Hangley also writes that the initial Appointment Order (Doc. 256) does not limit the Court's "power to impose discovery sanctions under Fed. R. Civ. P. 26(g) or 37." (Doc. 767 at 15.) Of course, that is correct. But the R&R goes on to say that the initial Appointment Order "contemplates that the Special Discovery Master will recommend any such remedies if and as appropriate." (*Id.* at 16.) That is incorrect. The initial Appointment Order did not authorize SDM Hangley to make recommendations about discovery sanctions; had it done so, there would not have been any reason to later amend the order to authorize SDM Hangley to consider "requests for the imposition of sanctions stemming from the Thalidomide discovery issue, including . . . the Parties' compliance with their discovery obligations . . . ." (Doc. 316.) In any event, the R&R does not recommend "discovery sanctions" under the Federal Rules of Civil Procedure.

Special Master's appointment"); *Cremin v. Merrill Lynch, Pierce, Fenner & Smith*, 328 F. Supp. 2d 865, 868-869 (N. D. Ill. 2004) (reversing decision of special master where the special master exceeded the authority granted).

### B.    The R&R and the OSC Violate Respondents' Due Process Rights.

The R&R's *sua sponte* sanctions recommendations not only patently exceed SDM Hangley's authority, but also violate Respondents' due process rights. Respondents should have received particularized notice and an opportunity to be heard before SDM Hangley conducted his investigation, performed his analysis, and issued sweeping public proclamations painting Respondents as greedy, unethical lawyers and recommending that broad, unspecified sanctions be levied against them in unspecified cases. The OSC Notice, which purports to constitute "notice" of possible Rule 11 violations against Respondents based on the R&R's analysis and recommendations, is derivatively inadequate and thus violative of Respondents' rights.

### 1.    Respondents Were Entitled to Particularized Notice and an Opportunity to Be Heard.

Sanctions can imperil lawyers' ability to earn a living. The Third Circuit, like all federal circuits, requires that an attorney facing the possibility of sanctions be provided with fulsome notice and a chance to respond before any sanction is levied. Because sanctions "may have [a] tangible effect upon [an] attorney's career" that could deprive an attorney of a property interest, "procedural due process requires notice and an opportunity to be heard." *Simmerman v. Corino*, 27 F.3d 58, 64 (3d Cir. 1994) (quoting *Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 570 (3d Cir. 1985)); *see also Martin v. Brown*, 63 F.3d 1252, 1262 (3d Cir. 1995) ("The Due Process Clause of the Fifth Amendment requires a federal court to provide notice and an opportunity to be heard before sanctions are imposed on a litigant or attorney."); *In re Prudential Ins. Co. Am.*, 278 F.3d 175, 191 (3d Cir. 2002) ("[a]n opportunity to be heard is 'especially important' where a lawyer or

firm's 'reputation is at stake,' because sanctions 'act as a symbolic statement about the quality and integrity of an attorney's work—a statement which may have a tangible effect upon the attorney's career.'") (quoting *Felheimer, Eichen & Braverman, P.C. v. Charter Techs, Inc.*, 57 F.3d 1215, 1227 (3d Cir. 1995)).

> For example, when sanctions are being considered under Rule 11,
>
> [t]he party sought to be sanctioned is entitled to *particularized* notice including, *at a minimum*, 1) the fact that Rule 11 sanctions are under consideration, 2) the reasons why sanctions are under consideration, and 3*) the form of sanctions* under consideration.

*Simmerman,* 27 F.3d at 64 (emphasis added); *OR v. Hutner*, 515 Fed. App'x. 85, 88–89 (3d Cir. 2013) (same); *see also In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 379 (3d Cir. 1997) (notice must be given not only "as to the legal rule upon which sanctions were based, particularized notice must also be given as to the form of the contemplated sanction . . .") (citing *Gagliardi v. McWilliams*, 834 F.2d 81 (3d Cir. 1987) (per curiam)). As the court in *Simmerman* held, "[o]nly with this information can a party respond to the court's concerns in an intelligent manner." *Simmerman*, 27 F.3d at 64 (emphasis added).

As reflected in the above interpreting authority, Rule 11 itself codifies an attorney's right to "notice and a reasonable opportunity to respond." Fed. R. Civ. P. 11(c)(1). Moreover, Rule 11 notes that in the case of proposed *sua sponte* sanctions, the court must first "order an attorney, law firm, or party to show cause why conduct *specifically described in the order* has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3) (emphasis added). Rule 11's emphasis on the importance of particularized prior notice in the context of *sua sponte* sanctions reflects the common sense difference between the task of responding to a request for sanctions made by a party, which presumably will be set forth in a motion and with particularity, and the task of responding to the

possibility of *sua sponte* sanctions, where the Court's order takes the place of a party's motion and thus must provide the required particularity.

Sanctions can take various forms. Here, SDM Hangley's *sua sponte* recommendations include sanctions under Rule 11, Section 1927, and the Court's inherent power, although he never recommends any particular sanction under any particular authority. Sanctions might include a fine, an award of attorneys' fees, or non-monetary sanctions under Rule 11 or the Court's inherent power.[8] Such sanctions can be compensatory or punitive in nature. Even compensatory sanctions, depending on their size, may be punitive. Where the sanctions are punitive, enhanced criminal due process protections are owed to the attorneys. *See, e.g.*, *Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 129 (2d Cir. 1998) (attorney sanctioned $10,000 for litigation misconduct was entitled to enhanced procedural protections because, under the facts, the sanction was punitive rather than coercive or compensatory). These heightened protections are owed because courts are concerned that "unfairness and abuse are possible, especially if courts were to operate without any framework of rules or cap on their power to punish." *Id.* at 130.

Lawyers who might be subject to sanctions are entitled to know not only the specific conduct in question (and, in consolidated litigation such as this, the particular case in which such conduct is alleged to have occurred) and the specific authority under which that conduct might be sanctioned, but also the proposed sanction. As the Third Circuit noted in *In re Tutu Wells Contamination Litig.*, "[d]ramatic differences in the relief being considered by the district court may lead to substantially different (e.g., more detailed, differently directed) responses by the alleged offender." 120 F.3d at 379 (quoting Gregory P. Joseph, *Sanctions: The Federal Law of*

---

[8] Sanctions imposed under Section 1927 can only award costs and expenses that result from the particular alleged misconduct. *Martin,* 63 F.3d at 1264-65. Moreover, these costs and expenses are limited to those that could be taxed under 28 U.S.C. § 1920. *Id.*

*Litigation Abuse* § 17(D)(1)(d), at 343 (2d ed.1994) (discussing Rule 11 sanctions in particular));
*Prosser v. Prosser*, 186 F.3d 403, 406 (3d Cir. 1999) ("Due process requires that the parties have
sufficient notice of the *form* of the sanctions being considered by the court because the issues that
must be addressed may differ depending on the form.") (emphasis in original).

In *Tutu Wells*, attorneys who engaged in discovery abuse were suspended by the district
court from practicing law in the district under the court's inherent power. As the Third Circuit,
explained, however, none of the attorneys "received particularized notice that the court was
contemplating" that particular sanction. *Tutu Wells*, 120 F.3d at 380. "Although the [lower] court
made clear the legal rules on which it would base sanctions and the reasons for the sanctions, the
court limited its discussion of the form of the possible sanctions to monetary sanctions and
dismissal of claims*." Id.* That the litigants should have been aware of the full array of sanctions
available to the court, including the ability to suspend an attorney, was insufficient to salvage the
defective notice. The Third Circuit stated that "we cannot expect a party to defend against each
and every one of these possible sanctions simply because a court signals its intention to rely on
such powers. Rather, more particularized notice is required." *Id.* at 381 (emphasis added). After
all, had the attorneys known "that they faced possible suspension as well as possible monetary
sanctions," the attorneys may have offered different or additional evidence to the Court, including:

> … evidence concerning their professional careers, their contributions to the legal
> profession and the community, their character, and the like. The proceedings would
> have followed a different path as the alleged offenders led the court to consider a
> wider array of information.

*Id.* at 381. Without such particularized notice and the ability to craft a response tailored to the
sanctions being considered, "the attorneys' opportunity to be heard was less than meaningful." *Id.*

*Tutu* is not an outlier. In *Prudential*, the Third Circuit affirmed the district's court's finding
of vexatious and bad faith conduct under Section 1927, but held the lower court committed

reversible error when it failed to provide the attorney with "particularized" notice spelling out that the court was considering non-monetary sanctions, including that the attorney attach a copy of the report and recommendation to any pro hac vice application filed in the district. *In re Prudential*, 278 F.3d at 193. Similarly, in *Gagliardi v. McWilliams*, the Third Circuit found that the sanctioned litigant did not receive particularized prior notice of the eventual non-monetary sanction that precluded him from filing complaints without court permission. 834 F.2d 81, 83 (3d Cir. 1987). Although the defendant's motion for sanctions expressly sought fees and "other appropriate relief," the possibility of "other" relief did not provide the litigant with the required notice that the Court could restrict plaintiff's access to courts. *Id.*; *see also Prosser*, 186 F.3d at 406-07 (although court had authority to impose sanction in nature of a fine payable to the court, neither of the sanctioned attorneys had notice that the court was considering this type of sanction).

### 2.      Respondents Did Not Receive Particularized (or Any) Notice.

Respondents were entitled to advance notice consisting, at a minimum, of identification of each act or omission for which they might be sanctioned, and, *for each such act or omission*, (i) the case in which it occurred (there are 11 complaints involving 52 plaintiffs, each with its set of circumstances), (ii) the authority under which sanctions might be levied, and (iii) the form those sanctions might take if levied. Such notice would have given Respondents an opportunity to formulate specifically tailored responses.

There are three failures to provide such prior notice: (i) the R&R's discussion of whether Respondents should be sanctioned and conclusion that sanctions are warranted, publicly stated without prior notice or substantive input from Respondents, (ii) the R&R's general discussion of which sanctions might be available, which discussion does not fix the notice problem, and (iii) the OSC (same).

### a.    The R&R's Conclusion That Sanctions are Warranted

Respondents had no notice that SDM Hangley was going to exceed his authority by addressing their alleged conduct outside the context of the pending Withdrawal Motions and by making *sua sponte* sanctions recommendations in the absence of any pending requests for sanctions by any party. They had no opportunity to be heard in advance of those recommendations.

That Respondents were blindsided by the R&R is reflected in the last substantive filing the Firm made over two and one-half years ago in which it stated (correctly) that "the only matter before the Special Master is the Court's directive that the Special Master issue a report and recommendation concerning Hagens Berman's Motions to Withdraw. . . ." Notice Regarding Transcripts, Agreements Produced as Ordered by Special Master Hangley, and Post-Hearing Briefing (filed June 9, 2021) (Doc. 750 at 20) (requesting "the opportunity to present Post-Hearing Briefs regarding those Motions to Withdraw as Counsel, under seal, within 30 days.").

Leaving aside the fact that SDM Hangley clearly exceeded his authority by issuing *sua sponte* sanctions recommendations, Respondents were denied the opportunity to be heard before SDM Hangley *decided* that Respondents should, in fact, be sanctioned. Respondents should have had the opportunity to be heard during SDM Hangley's deliberations and before he issued a public report concluding (incorrectly) that Respondents engaged in unethical and near-criminal conduct. The R&R not only publicly charges Respondents with violating Rule 11 and Section 1927, but also wrongly accuses them, among other things, of having a "disregard for truth" (at 78), "flout[ing]" their ethical obligations (at 39), acting with "mendacity" (at 59), lacking "skills, loyalty and professionalism" (at 92), and acting to "extort[]" the defendants (at 153). The R&R concludes by falsely describing the conduct of the Firm's lawyers as "products of an overall [firm] culture of avarice in the raiment of messianic zeal" (Doc. 767 at 156.)

SDM Hangley's conclusion is not just far outside his authority. It is also unsupported by any evidence about the Firm's culture or whether Respondents were motivated by "avarice," and is made in the face of abundant evidence that Respondents tackled difficult cases against formidable adversaries knowing that they would not receive any compensation unless their clients prevailed. SDM Hangley's decision to make his damaging findings in a public document was irresponsible and highly offensive to Mr. Berman and others who have devoted their careers to creating a culture of professionalism and meaningful work on behalf of clients who otherwise would have no voice in this country's legal system. Due process (and Rule 53) dictate that Respondents should have been given notice and the opportunity to respond before a federal judicial officer conducted an investigation and published his conclusions in the form of such *ad hominem* accusations.

### b.    The R&R's Lack of Particularized Notice

The R&R's deficiencies go beyond the *ultra vires* nature of the sanctions recommendations and the fact that SDM Hangley reached his conclusion that sanctions are warranted without first seeking and considering Respondents' viewpoints on the subject. The R&R also fails to provide Respondents with the requisite particularized notice regarding what conduct in what case is at issue, what specific authority applies in each instance, and what specific sanctions are under consideration.

First, the R&R cites a wide range of conduct in various cases before generally concluding that the Court can impose sanctions pursuant to Fed. R. Civ. P. 11 (and its Pennsylvania corollary), 28 U.S.C. § 1927, and the Court's inherent authority. (Doc. 767 at 148-51.) But as set forth in more detail below, each of these sources of sanctioning authority has different elements, applies to different types of conduct in particular cases, and has unique defenses and limitations. There

are important distinctions between and among these authorities, and it is incorrect to suggest that each of them is available for most or all of the alleged acts discussed in the R&R.

Second, the R&R does not specify what alleged conduct is at issue in which case or cases. For example, the R&R asserts that "Mr. Berman's oath is everywhere in the record and the things he wrote and swore to were – in numerous plaintiffs' cases – largely false and even more largely based on guesswork," and that "Mr. Berman was quite aggressive in deciding that a particular potential plaintiff should be encouraged to sue, despite obvious warning signals in the intake process." (Doc. 767 at 152.) The R&R, however, is silent about which of the "numerous plaintiffs' cases" are under discussion, and whether the alleged "aggression" related to a signed writing that falls under Rule 11 or, in SDM Hangley's view, otherwise constitutes "bad faith" and multiplied the proceedings in an unreasonable and vexatious manner as required by Section 1927 and the inherent power authority. Each case must be considered in the context of its unique facts and issues. Settlement, disposition of a claim, or entry of a Rule 54(b) order may limit the availability of sanctions. *See, e.g.,* Rule 11(c)(5)(B) (a court may not *sua sponte* impose a monetary sanction "unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by . . . the party that is, or whose attorneys are, to be sanctioned.")[9] Some defendants have already agreed to be responsible for their attorneys' fees with respect to dismissal of several of the plaintiffs' claims. It is inappropriate to now address sanctions and fee-shifting issues for matters settled by the parties. *See, e.g., Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 145 (3d Cir. 2009) (refusing to remand for court to conduct individualized sanctions

---

[9] Most of the plaintiffs discussed in the R&R have settled, dismissed their claims, and/or had judgment entered, including plaintiffs Andre, Boiardi, Cabcabin, Garza, D. Johnson, Merica, Morgan, B. Murray, Randall, Spence, and Williams. (*See* Docs 182, 265, 284, 302, 305, 319, 321, 325, 326, 328, 332, 360, 362, 365, 368, 372, 373, 374, 468, 513, 514.)

analysis: "Where the parties have settled the matter of attorneys' fees, there is no reason to remand."). Nonetheless, the R&R wholly fails to distinguish one case from another in concluding that sanctions should be imposed.

Third, the R&R provides no notice as to the "form of sanctions" under consideration, a fatal defect. "Due process requires that the parties have sufficient notice of the *form* of the sanctions being considered by the court because the issues that must be addressed may differ depending on the form." *Prosser*, 186 F.3d at 406 (reversing sanctions awarded pursuant to court's inherent authority) (emphasis in original). One reason for this requirement is that the defenses and arguments available to counsel vary depending on whether a sanction is compensatory or punitive. If the award is compensatory, the Court is limited to finding a sanction that redresses a specific harm. *See e.g.*, *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017) ("[T]he [compensatory] fee award may go no further than to redress the wronged party for 'losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior.") (quoting *Mine Workers v. Bagwell*, 512 U.S. 821, 829 (1994)). If the sanction is punitive, the sanctioned party is entitled to criminal procedural protections, including a "beyond a reasonable doubt" standard of proof. *Id.* The R&R is impermissibly silent as to the form or forms of sanctions being considered.

In short, the R&R fails to tie specific alleged misconduct to specific authority or any particular sanction in any particular case. Instead, the R&R sets out a wide range of purported issues spanning a multi-year period and ranging from the significant (Mr. Weaver's alteration of an expert report) to the petty (misspelled statutory references) to the objectionably personal (that Mr. Berman supposedly created a firm motivated by "avarice"). After drafting an R&R that bears only a brief relationship to his final remaining task of evaluating the Withdrawal Motions, SDM

Hangley lumps all purported misdeeds together and notes that sanctioning authority can generally arise from Rule 11, Section 1927, or the Court's inherent power. But merely listing the wide range of penalties generally available to courts along with a grab bag of alleged sanctionable behavior, has "not given [Hagens Berman] the appropriate opportunity to present relevant defenses to the penalties" because it does not know what penalties—based on any particular alleged misconduct in any particular case or cases—the Court may consider imposing. *See In re Tutu Wells*, 120 F.3d at 381; *In re Prudential*, 278 F.3d at 191 ("Particularized notice" generally requires "notice of the precise sanctioning tool that the court intends to employ") (internal quotations and citations omitted). Inviting the Court to draw on three sources of sanctioning authority to impose some unspecified penalties in some unspecified cases based on one or more of the disparate range of items listed in the 154-page R&R does not satisfy due process, nor does it comport with Rule 11(c).

### 1. *Ex Parte* Communications and Other Investigation

The R&R's lack of particularized notice is exacerbated by SDM Hangley's *ex parte* communications and extra-judicial investigation. Respondents do not know what information SDM Hangley acquired as a result of those communications and investigation or how that information might have influenced SDM Hangley's sanctions recommendations, and therefore cannot respond in any way to that information, much less in an effective, informed manner.

Rule 53 requires the appointing order to identify "the circumstances, if any, in which the master may communicate ex parte with the court or a party." Fed. R. Civ. P. 53(b)(2)(B). The Advisory Committee Notes state the obvious: "Ex parte communications between a master and the court present troubling questions," just as those between a master and a party present "difficult questions." Fed. R. Civ. P. 53 Advisory Comm. Note to Subdivision (b).

Here, the Appointment Order permits *ex parte* communications between SDM Hangley and the Court in three areas: (i) "procedural matters," (ii) "assist[ing] the Court's understanding of complex discovery matters," [iii] "or for any other reason reasonably necessary to the fulfillment of [the SDM's] duties." (Doc. 256 ¶ 8.) It permits *ex parte* communications with parties, but only those that "pertain[] to discovery compliance or *in camera* review of documents as necessary." (Doc. 256 ¶ 8.)

SDM Hangley's time records reflect that he communicated *ex parte* with the Court at least 146 times from the time of his appointment through October 2023.[10] (*See* Ex. 124 (summary) and Ex. 122 (invoices upon which the summary is based). A small number of those communications are not objectionable, as the descriptive time entries reflect that they relate to procedural matters. And it is certainly possible that some of the communications in 2014 were to "assist the Court's understanding of complex discovery matters," but since 2014 there have been no discovery matters under consideration. The third exception for *ex parte* communications—any other reason reasonably necessary to the fulfillment of the SDM's duties—is broad, but that exception should not devour the general rule that *ex parte* communications are to be limited in nature.

Many of SDM Hangley's *ex parte* communications occurred after the last hearings he held in May 2021, a post-hearings period during which presumably he was preparing the R&R. Because the R&R is devoted mainly to SDM Hangley's opinions about Respondents' conduct and his *sua sponte* sanctions recommendations, it is reasonable to assume that his *ex parte* communications while the R&R was under preparation were related, at least in part, to those sanctions

---

[10] Exhibit 124 is a table listing SDM Hangley's *ex parte* communications with the Court, counsel, and parties as reflected in his monthly invoices to the parties. Those invoices also contain generic time entries that merely say "telephone" or "correspondence," with no indication of the identity of the person with whom SDM Hangley was communicating or subject matter.

recommendations. It is also reasonable to assume that SDM Hangley's *ex parte* communications during the hearings he conducted were related, at least in part, to his eventual sanctions recommendations. Of course, Respondents do not know, which is the point.

There are also approximately 13 entries relating to *ex parte* communications with parties or counsel that seemingly do not "pertain[] to discovery compliance or in camera review of documents," as permitted by the Appointment Order. (Doc. 256 at ¶ 8.) *See* Ex. 123 (summary of SDM Hangley time entries). Approximately 32 entries simply read "telephone" or "correspondence," with no identification of the person with whom SDM Hangley was speaking or what they were speaking about. (This figure of 32 does not include entries where there is a corresponding time entry by others at SDM Hangley's law firm reflecting that there was an intra-firm communication.) Because SDM Hangley has engaged in block billing of his time, it is not possible to tell, for example, in an entry that reads "Drafting and correspondence with the court" how much of the 4.2 hours was spent on correspondence with the Court and how much was spent on drafting the R&R.

Finally, there are approximately a half-dozen time entries reflecting that SDM Hangley or his staff investigated matters outside of the record, such as "fact investigation," "public records investigation," or "conduct research regarding related proceedings in which Hagens Berman is a party." *See, e.g.*, Ex. 124 at pp. 8, 12-13. Again, there is no record as to what information was sought or obtained. Again, Respondents have no way of knowing how the information received may have shaped the recommendations found in the R&R. As the D.C. Circuit explained when disqualifying a special master and vacating his report, "our concern is with information that 'leaves no trace in the record'[]—such as [the special master's] *ex parte* contacts....—that may reasonably

be expected to color the way in which he approaches his task, and ultimately his reports and recommendations to the district court . . . ." *In re Brooks*, 383 F.3d 1036, 1046 (D.C. Cir. 2004).

The problems created by *ex parte* contacts and extra-judicial investigation are particularly acute when they occur in the course of what eventually becomes a *sua sponte* sanctions proceeding conducted without prior notice. As the Seventh Circuit explained when reversing and remanding a district court's *sua sponte* imposition of Rule 11 sanctions:

> [A]lthough not all ex parte contacts by the district court are prohibited, if they render it impossible for the district court to fairly consider a plaintiff's arguments, *or are not made a matter of record in the case and do not provide an opportunity for a plaintiff to respond to them*, those contacts threaten that plaintiff's due process rights. . . .
>
> Rule 11 and our case law also mandate that this evidence must be stated with some specificity in the record, and the offending party must be given a full and fair opportunity to respond to the charges. Here, there is evidence suggesting that the district court, in considering information regarding Mr. Selden and Mr. Rosenthal's reputation or past conduct, utilized sources not disclosed to the attorneys or presented in the record. Use of such information to fashion a Rule 11 sanction would be inappropriate.

*Vollmer v. Publishers Clearing House*, 248 F.3d 698, 710 (7th Cir. 2001) (emphasis added) (cited in G. Joseph, *Sanctions: The Federal Law of Litigation Abuse,* § 17(D)(2)(f) at 415 (6th ed. 2020) (noting that *ex parte* investigation by a court "may violate due process unless it is made a matter of record, including identification of the sources consulted by the judge, so that the offender has a meaningful opportunity to respond")).

### c.    The OSC's Lack of Particularized Notice

One day after the 154-page R&R was filed, this Court issued the one-page OSC Notice, which, after setting out the date by which interested parties must file their objections to the R&R, states that it "constitutes notice to show cause under Rule 11(c). Fed. R. Civ. P. 11(c)(3), 11(c)(5)." (Doc. 768.) The OSC Notice provided no additional information. Cleary it relied on the R&R to provide Respondents with the required notice, but the R&R is manifestly deficient for the reasons

identified above. The OSC Notice is thus deficient, as well. *See, e.g.*, *Martin*, 63 F.3d at 1264 (show cause order must "direct the person it seeks to sanction to show cause *why particular sanctions should not be imposed*") (emphasis added); *In re Prudential*, 278 F.3d at 191 ("Generally speaking, particularized notice will usually require notice of the precise sanctioning tool that the court intends to employ.") (quoting *Fellheimer*, 57 F.3d at 1227).

### C.    There is No Remedy for the Damages Respondents Have Already Suffered but Placing the R&R Under Seal and Striking Its Sanctions Recommendations and the OSC Notice Mitigates Ongoing and Future Damages.

Not surprisingly, SDM Hangley's *sua sponte* sanctions recommendations have found an audience outside the parties involved in this proceeding. Within a week of the R&R being filed, defendants' counsel in an unrelated matter filed a copy of the R&R as "supplemental authority" for the Eastern District of Michigan to consider in evaluating the merits of claims filed by the Firm on behalf of citizens injured in car fires. This assuredly will not be the last prejudicial misuse of the R&R. And given that the Firm frequently seeks court approval under Fed. R. Civ. P. 23 for appointment as class counsel, the public nature of the findings reached and recommendations made without the Firm's input and in violation of its due process rights is especially harmful.

Accordingly, Respondents request that the R&R be sealed and that its discussion and recommendations regarding sanctions be stricken. Similarly, the OSC Notice should be stricken or withdrawn because of its reliance on the R&R and its failure to provide particularized notice, both of which render it deficient, as well.

IV.    **IF THE R&R'S SANCTIONS DISCUSSION AND RECOMMENDATIONS ARE NOT STRICKEN, THEY SHOULD BE REJECTED IN THEIR ENTIRETY.**

A.    **Rule 11 and PA Rule 1023.1 Sanctions are Unavailable Because Respondents Conducted a Reasonable Inquiry Before Filing the Complaints.**

Rule 11 requires that an attorney who signs a paper "make a reasonable inquiry into the factual and legal legitimacy of the pleading." *Simmerman,* 27 F.3d at 62. To comply, that attorney "must conduct a reasonable investigation of the facts and a normally competent level of legal research to support the presentation," a standard that is assessed based on "what was objectively reasonable at the time." *Id.* (internal quotations and citations omitted). In evaluating the reasonableness of the investigation, the court can consider, among other things, the amount of time available to investigate, the complexity of the legal and factual issues in question, the extent to which facts were in the possession of defendants or otherwise not readily available to the plaintiff, whether the case was accepted from another attorney, and the extent to which counsel relied upon their client for the relevant facts. Joseph, *supra*, § 8(A).

Rule 11 "[s]anctions are to be applied only 'in the exceptional circumstances where a claim or motion is patently unmeritorious or frivolous." *Ario v. Underwriting Members of Syndicate 53 at Lloyds*, 618 F.3d 277, 297 (3d Cir. 2010) (quoting *Doering v. Union Cnty. Bd. Of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988)). This stringent standard exists "because sanctions '1) are in derogation of the general American policy of encouraging resort to the courts for peaceful resolution of disputes, 2) tend to spawn satellite litigation counter-productive to efficient disposition of cases, and 3) increase tensions among the . . . bench and the bar.'" *Moeck v. Pleasant Valley Sch. Dist.*, 844 F.3d 387, 391 n.7 (3d Cir. 2016 (quoting *Doering*, 857 F.2d 191, 194). And, of course, "[a]ny sanction imposed should be calibrated to the least severe level necessary to serve the deterrent purpose of the Rule." *Zuk v. E. Penn. Psychiatric Inst.*, 103 F.3d 294, 301 (3d Cir.

1996) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1336 (2d ed. Supp. 1996)).

Here, the Firm began investigating the prospect of bringing claims for thalidomide victims in April 2011, filed its first complaint in October 2011 and filed its last complaint in April 2014. During that time period, the Firm's investigation of the facts and development of its legal theories was, under any fair evaluation, objectively reasonable. Details relating to the Firm's investigation of the thalidomide claims are set out at SOF paragraphs 27 to 128 and exhibits thereto. The high points, however, are set out below.

<u>First</u>, because the statute of limitations posed an obvious challenge, the Firm spent extensive time (and incurred significant expense) developing and refining ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████ (discussed at SOF ¶¶ 40-79). The Firm also spent significant time researching ████████████████████████ and supporting facts. Among other things:

- From April 18, 2011 (when the Firm first started billing its time) until October 27, 2011 (one day before the Firm's first complaint was filed), Firm staff and attorneys billed over 713 hours ██████████████████████████████████████████ ████████████████████ Time entries from this period include: ████████ ███████████████████████████████████████████████████████ ████████████ Over this six-month period, over 170 hours' worth of time entries included research specifically related to the statute of limitations. [SOF ¶ 33; Ex. 14 (Hagens Berman Fees).] This research continued as the case proceeded. [*See, e.g.*, Ex. 29 (05/06/2011 email attaching statute of limitations memorandum); Ex. 31 (60-page memorandum from April 2014 analyzing ████████████████████████ ████████████████████████████)]

- ██████████████████████████████████████████████████████████████ ████████████████████████ which was relevant to claims for negligence. [*See, e.g.*, SOF ¶¶ 79, 104; *see also* Ex. 42]

The Firm's efforts at developing legal theories to help long suffering victims obtain redress for their lifelong injuries far exceeds the "normally competent level of legal research" required to pass Rule 11 muster. That those theories ultimately did not convince this Court (or SDM Hangley) is irrelevant to assessing the Firm's compliance with Rule 11. Fed. R. Civ. P. 11 advisory comm. Note on the 1983 amendments (the "court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted.") Just as with evaluating the Firm's purported bad faith, "advocating new or novel legal theories" does not violate Rule 11. *Gaiardo*, 835 F.2d at 483; *see also Morley v. Ciba–Geigy Corp.,* 66 F.3d 21, 25 (2d Cir. 1995) (legal position frivolous under Rule 11 only where "it is clear . . . that there is *no chance of success* and no reasonable argument to extend, modify, or reverse the law as it stands") (emphasis added). To the contrary, the Third Circuit has made clear that the Rule should not be used to "inhibit imaginative legal or factual approaches to applicable law or to unduly harness good faith calls for reconsideration of settled doctrine." *Id.*; *see also* Pa. R.C.P. No. 1023.1 Explanatory Comment ("this rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories").

Second, in addition to researching and developing its legal theories, the Firm conducted a obtained relevant factual information factual investigation of all elements of the claims. (*Id.* ¶¶ 80-90.) The Thalidomide Litigation was unique in that plaintiffs were unable to rely on direct evidence of exposure (such as prescriptions) because the defendants or their agents distributed thalidomide as an experimental drug, without a prescription and without even identifying it as thalidomide. (*Id.* ¶ 81.) Moreover, the defendants sought to cover up their misconduct and failed to maintain adequate records as to distribution of the pills. Thus, the Firm worked to obtain indirect exposure evidence before filing the claims—for example, ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ [*Id.*] This was in addition to the legal research the Firm had done regarding thalidomide distribution, as set forth above.

Among other things, Respondents and their co-counsel Ms. Reeves:

- ████████████████████████████████████████
  ████████. [*Id.* ¶¶ 47, 59]

- ████████████████████████████████████████
  ████████████████████████████████████████.
  [*Id.*, Ex. 44]

- ████████████████████████████. [*See, e.g.*, *id.*, Ex. 21 (10/13/2011 email), Ex. 24 (9/27/2013 email); Ex. 84 (02/24/2012 email)]

- ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████. [*Id.*, Ex. 22 (11/8/2011 email)]

- Filed and successfully prosecuted a FOIA lawsuit, in November 2011, to obtain previously unobtainable public records relating to thalidomide. The resulting FDA document productions revealed:
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████. [*Id.* ¶¶ 87-90]

- ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████. [*Id.* ¶ 91]

- ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████. [*Id.* ¶¶ 107-08]



- █████████████████████████████████████████████████████████. [*Id.* ¶ 109]

- █████████████████████████████████████████████████████████ █████████████████████████. [*Id.* ¶¶ 110-112]

- █████████████████████████████████████████████████████████████). [*Id.* ¶ 113]

- Retained and utilized Dr. Trent Stephens, a leading thalidomide scholar and one of several experts used in the Australian claims settlement process, to evaluate thalidomide victims. Respondents' conversations with Dr. Stephens from 2012 until July 2014 suggested that he could provide testimony on causation and exposure based on the "constellation of injuries" present for certain plaintiffs based on medical records, x-rays, and photos. [*Id.* ¶¶ 123-127]

- Located and interviewed former clinical investigators at SKF to get more information about the drug's distribution patterns and obtain testimony about how the thalidomide pills were used and controlled, as well as what became of any unused pills. [*Id.* ¶ 95] GSK's document production had suggested that GSK had provided a certain hospital, Northville State, with over 300,000 thalidomide tablets. However, one of the former clinical investigators at Northville State, Dr. Gordon Forrer, told the Firm that this number was greatly inflated, and that the hospital's clinical trial was limited to no more than 20 patients. He further contended that clinical report bearing his signature had been falsified, and that there had been "a large scale and meticulous fraud perpetrated using his name to account for a massive number of missing pills." Dr. Forrer's interview and subsequent deposition testimony supported the Firm's theory that GSK had affirmatively covered up the true distribution of thalidomide. [*Id.* ¶¶ 95-98]

Third, Respondents spent significant resources on its research and factual development.

The first complaint was filed by the Firm on October 25, 2011; the last was filed on April 15, 2014.

Before the first complaint was filed, Mr. Styant-Browne alone spent over 300 hours ████████████

█████████████████████████████████████████████████████████; over the next

year, he billed nearly 240 additional hours to ████████████████████████████████

██████████████████████████. (*Id.* ¶ 14.) Of course, Mr. Styant-Browne was

not working alone. In total, nearly 20,000 hours of Hagens Berman lawyer and paralegal time was expended in the period 2011 to 2015.[11] This equates to an investment of over $ 9.1 million in attorneys' fees, in addition to paying out-of-pocket costs in excess of $850,000 for experts, deposition costs, genetic testing of clients, and so on, none of which the Firm, working on a contingent fee basis, could recover unless it was successful at trial. All of this in addition to the work done by Kay Reeves (and The Lanier Law Firm).

Given these facts, the Respondents' investigation was more than adequate. *See, e.g., Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 446-47 (5th Cir. 1992) (reversing award of Rule 11 sanctions because, among other things, an "attorney receiving a case from another attorney is entitled to place some reliance upon that attorney's investigation," "virtually all of the factual materials relevant to proving the RICO case were beyond [plaintiff's] reach, in the hands of the defendants," and records shows firm "devoted over two hundred hours to research of the law and facts of the case"); *Greenberg v. Sala*, 822 F.2d 882, 887 (9th Cir. 1987) (complaint, which contained factual errors, was not frivolous where counsel "spent approximately 100 hours interviewing his clients, reviewing the records, and researching the law" and "enlisted experienced counsel to conduct further interviews and to review the complaint").

Because the Firm and its attorneys conducted a reasonable investigation as to the law and the facts prior to advancing their clients' claims, Respondents may not be sanctioned under Rule 11.

---

[11] The Firm continued to work on the thalidomide cases after 2015, of course, but the cases largely ground to a halt after that and time was generally expended on the proceedings before SDM Hangley rather than the underlying litigation. Accordingly, the 2011 to 2015 period is used here.

**B.      Section 1927 and Inherent Power Sanctions are Unavailable for the Additional Reason that Respondents Did Not Act in Bad Faith.**

Similarly, because Respondents had a reasonable basis to file and prosecute the claims, they may not be sanctioned pursuant to 28 U.S.C. § 1927 or the Court's inherent authority any more than they could be pursuant to Rule 11.

In addition, a finding of willful bad faith is required before sanctions may be imposed pursuant to 28 U.S.C. § 1927 or the Court's inherent authority. *See In re Prudential*, 278 F.3d at 188 ("Before a court can order the imposition of attorneys' fees under § 1927, it must find willful bad faith on the part of the offending attorney.") (quoting *Zuk*, 103 F.3d at 297); *Chambers*, 501 U.S. at 45-46 (court may assess attorneys' fees pursuant to its inherent authority "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'") (quoting *Alyeska*, 421 U.S. at 258-59)); *Fellheimer,* 57 F.3d at 1227 ("[A] finding of bad faith is required to support a court's employment of its inherent sanction power.").

Bad faith is a statutory requirement that exists "to avoid chilling an attorney's legitimate ethical obligation to represent his client zealously[.]"). *Baker Indus. Inc. v. Cerberus, Ltd*., 764 F.2d 204, 208 (3d Cir. 1985); *see also LaSalle*, 287 F.3d at 289 ("[S]anctions may not be imposed under § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal.").

Willful bad faith can be found when counsel knew (or should have known) that the claims being asserted were meritless "and that the motive for filing the suit was for an improper purpose, such as harassment." *In re Prudential*, 278 F.3d at 188 (quoting *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1375 (6th Cir. 1987). For the reasons noted above, Respondents cannot squarely address whatever concerns the Court may have that it acted in bad faith and vexatiously without knowing the precise conduct that is the basis for the sanction. However, by any measure, Respondents did not act in bad faith or vexatiously for at least the following reasons.

<u>First</u>, Respondents relied in part on experienced and competent co-counsel and predecessor counsel in evaluating and bringing these claims. *See* SOF ¶¶ 18, 29 and Ex. 2 at ¶ 17 (Berman

Decl.). ████████████████████████████████████████████

████████████████████████████████████████████ "[B]ecause bad faith

is required, reliance on co-counsel or a client may negate a finding of bad faith." Joseph, *supra*,

§ 27(A)(3), at 574 (citation omitted).

Second, Respondents conducted an extensive investigation of its own before substituting

in as counsel in two complaints and filing nine other complaints, as discussed above. Moreover,

Respondents were discriminating in accepting clients and rejected many individuals who did not

meet their criteria for filing claims. *See* SOF ¶¶ 103, 219.

Third, Respondents relied on the expert testimony it expected to obtain—and later did

obtain—from Dr. Trent Stephens and others. Dr. Stephens opined that "no expert, including

myself" would have opined before October 2009 that certain defects (unilateral, postaxial, and/or

transverse) exhibited by plaintiffs were caused by thalidomide and that up to 2011, "no one in the

US had the clinical expertise and experience with thalidomide defects necessary to discuss the

range of defects seen in victims." *See, e.g.,* Doc. 428-2 at 13, ¶ 19 (12/18/14 Decl. of Dr. Stephens

i/s/o Opposition to MSJ re Tammy Jackson.)  Dr. Stephens also testified that "to a reasonable

degree of medical and scientific certainty" certain Plaintiffs' constellation of injuries was so

improbable that, given an assumption of thalidomide exposure, their "defects resulted from

thalidomide exposure." (*E.g., id*. at ¶ 18.) Dr. Stephens' opinions were never the subject of a

*Daubert* motion, nor have the defendants offered any controverting expert testimony or a rebuttal

report. Although this Court has found Dr. Stephens' opinions unpersuasive, Respondents acted in

good faith in relying upon those opinions in filing and prosecuting these claims.

The "March of Science," on its cusp in 2011, continued onward while these cases have

been pending. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

7. 

9.

10.

11.

13.

Fourth, Respondents (and their co-counsel) had no motive to file baseless claims. To the contrary, because the Firm was advancing costs for its clients and was retained pursuant to a contingent-fee arrangement, it had no motive to bring unmeritorious claims against well-financed defendants. Although the R&R implies that Respondents rushed to file cases in order to beat other

firms to the courthouse and that it sought to "extort" the defendants (Doc. 767 at 39, 153), those speculative assertions are false. (Ex. 2 at ¶ 16.) (Berman Decl.) There is no evidence whatever that Respondents' motivation in filing these claims was for an improper purpose, such as harassment.

Fifth, once the litigation was underway, Respondents took steps to minimize the expense and burden of litigation. For example, in October 2013, Respondents suggested that bellwether trials be used to minimize litigation expense, resolve the statute of limitations defenses and provide direction to the parties with respect to the remaining claims. (Doc. 96 and SOF ¶¶ 115-118.) The "common, across-the-board issues" that Respondents sought to develop with the bellwether approach included the testing and distribution process of thalidomide by each defendant; the marketing of thalidomide to doctors; verifying each defendant's role in thalidomide distribution in the United States; and establishing the state of scientific knowledge as to how thalidomide causes injury and what injuries were known to be caused by thalidomide and when. (Doc. 96 at 4.) The Firm's request was opposed by the defendants—who wished to proceed with full-scale discovery with respect to all of the claims—and was denied by the Court. (Docs. 102 & 103.)

Similarly, in late October 2014, Respondents requested a stay until the then-pending summary judgment and sanctions motions were resolved so as to avoid unnecessary discovery and briefing. (Doc. 388.) The stay request was denied that same day without explanation. (Doc. 389.)

In December, the Firm reiterated its stay request following the close of discovery. As the Firm explained:

> [T]he Special Master has made evident that he believes that Plaintiff's counsel are extending this litigation in bad faith. While Plaintiffs disagree . . . Plaintiffs counsel take those finding extremely seriously and do not want to extend or multiply this litigation unnecessarily.  Plaintiffs therefore ask the court to not require the parties to unnecessarily brief summary judgment, and potentially exacerbate the costs accrued by any party, or cause unnecessary work for the Court.

(Doc. 423 at 2.) This request was denied the same day. (Doc. 424.)

Sixth, once Respondents concluded that claims against GSK were not viable after obtaining information that could not be obtained without the discovery process, it contacted GSK to discuss

dismissal of those claims (resulting ultimately in the GSK settlement agreement). Similarly, it sought to dismiss the claims of various plaintiffs (including the Withdrawal Plaintiffs) in 2014 upon concluding that those individuals did not have meritorious claims. A withdrawal of claims in these circumstances

> does not negate the reasonableness of the inferences existing at the time the complaint was prepared. Indeed, *abandoning a claim that appears unlikely to succeed is responsible advocacy to be commended*—not an abuse of process to be deterred.

*Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir. 1988) (emphasis added).

Creativity in seeking legal redress for those claiming severe injuries caused by thalidomide is to be celebrated, not quashed by the threat of sanctions, particularly in a complex legal matter involving issues of first impression. *See In re Kunstler,* 914 F.2d 505, 524 (4th Cir. 1990) (sanctioning powers should be exercised with restraint to avoid chilling "novel factual or legal theories"); *Barney v. Holzer Clinic, Ltd.,* 110 F.3d 1207, 1213 (6th Cir. 1997) (award of fees under Section 1927 was not warranted where the "central issue was one of first impression"); *U.S. v. Alexander,* 981 F.2d 250, 253-54 (5th Cir. 1993) (vacating an assessment of sanctions because of "the absence of authority in this Circuit combined with the complexity of the issue").

The Third Circuit's decision in *Hackman v. Valley Fair*, 932 F.2d 239 (3d Cir. 1991), is instructive. There, the district court awarded sanctions against plaintiff's counsel pursuant to Section 1927 where plaintiff's refusal to dismiss the complaint on statute of limitations grounds "forc[ed] defendants to file the summary judgment motions," thereby unreasonably multiplying the litigation. *Id.* at 241-42. The Third Circuit, however, overturned the award of sanctions as clearly erroneous, explaining that the plaintiff had "an arguable, albeit very weak, position" regarding the start of the limitations period. *Id.* at 243. Consequently, plaintiff's "arguments were not so lacking in merit that opposition to the summary judgment motion could be considered harassment." *Id.* So too here. The claims and statute of limitations defenses advanced by the Firm and its co-counsel were the product of extensive research of facts and law and were not asserted for purposes of harassment.

Seventh, the expert opinion of Abraham C. Reich, contained in his expert report dated April 15, 2020, confirms Respondents' position that it filed these claims in good faith. (Doc. 743 (redacted).) Mr. Abraham's report concludes that "Hagens Berman had a good faith basis to bring lawsuits on behalf of [the five Withdrawal Plaintiffs] starting in 2011 for injuries allegedly suffered as a result of exposure to Thalidomide, to continue to prosecute them for as long as it did, and that it was appropriate for Hagens Berman to seek leave to withdraw from representing these plaintiffs when it did due to information obtained in discovery." (Doc. 743 at 13.)

In sum, because Respondents did not act with willful bad faith or seek to vexatiously multiply the proceedings, they may not be sanctioned pursuant to 28 U.S.C. § 1927 or the Court's inherent authority.

## V.    SDM HANGLEY'S SERVICE IS COMPLETE AND HIS ENGAGEMENT SHOULD END.

There are no matters pending before SDM Hangley. He has made a recommendation with respect to all of the various Withdrawal Motions assigned to him, and there are no pending discovery disputes or pending requests for sanctions. Accordingly, Hagens Berman requests that the Court discharge him from service.

"There is no more effective way of putting a case to sleep for an indefinite period than to permit it to go to reference with a busy lawyer as a referee." 9C *Wright & Miller*, *supra*, § 2603 (quotation and citation omitted). Thus, Rule 53(a)(3) mandates that a court "must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay" before appointing a special master. "[T]he judicial power to refer matters to a master is to be exercised sparingly." 9C *Wright & Miller*, *supra*, § 2603.

The initial Appointment Order, issued on June 27, 2014, stated that SDM Hangley "shall incur only fees and expenses as are reasonably necessary to fulfill his duties." (Doc. 256 at ¶ 9.) Since his appointment, SDM Hangley has billed the parties more than $2,600,000 for his services.

The Appointment Order also "direct[ed] the special master to proceed with all reasonable diligence" (*id.* at ¶ 11). SDM Hangley has now been engaged at the parties' expense for over nine years and five months, and his final task of making recommendations about the Withdrawal Motions was assigned to him by the Court in March 2016, seven years and nine months ago.

In the Appointment Order, the Court stated that it had "taken steps to protect against unreasonable expense or delay" (*id.* at ¶ 9). Unfortunately, the expenses the parties have incurred and the delays the parties have endured have not been reasonable. All parties have been harmed by the expenses, and Respondents in particular have been harmed by the delays, not only facing *sua sponte* sanctions recommendations arising out of alleged conduct dating back to 2011 but doing so without access to certain professionals who have since departed the Firm and without the ability to consult with Nick Styant-Browne, the Firm lawyer most heavily involved throughout the Firm's handling of the consolidated cases who passed away in 2022.

The 154-page R&R demonstrates that much of the expense and delay of the last few years can be attributed to SDM Hangley's decision to investigate and assess "the entire record," as he put it (Doc 767 at 9), in service of making *sua sponte* sanctions recommendations that are far beyond his authority. SDM Hangley has performed the tasks assigned to him and much more. Respondents ask that his engagement end, effective immediately.[12]

---

[12] The Firm also advises that in 2023 it became adverse to SDM Hangley's law firm in an unrelated matter in which Hagens Berman unsuccessfully asked that a portion of any settlement or judgment paid to Retailer Plaintiffs represented by SDM Hangley's firm be "set aside" to account for the common benefit they received from the Firm from its work representing End-Payor Plaintiffs of HIV drugs in an antitrust suit. *See In Re HIV Antitrust Litigation*, Case No. 3:19-cv-02573-EMC (N.D. Cal. 2019). *See also* Doc. 250 (SDM Hangley's Rule 53(b)(3)(A) disclosure, noting that his firm represents retail pharmacy chains that opt out of antitrust class actions brought by Hagens Berman). Respondents make no suggestion that this fees dispute in the unrelated matter influenced SDM Hangley's sanctions recommendations, but merely note it in the context of the Court's decision about ending SDM Hangley's engagement in these cases.

## VI. THE FACTS SET OUT BELOW DEMONSTRATE THAT SANCTIONS MAY NOT BE IMPOSED HERE

The R&R does not recommend specific sanctions based on specific conduct, but instead broadly "recommend[s] that the firm be sanctioned for the conduct of Mr. Berman and, further, for the conduct of the late Mr. Styant-Browne and other lawyers mentioned here." [Doc. 767 at 156.] The statement of facts set out below, and accompanying exhibits, along with the testimony submitted and various filings in this matter, demonstrate that sanctions are not appropriate here. As a prefatory note, evidence submitted in support of the Objections and Response need not meet the standards of admissibility at trial, but merely have some indicia of reliability. *See* Gregory P. Joseph, *Sanctions, The Federal Law of Litigation Abuse*, § 17(A)(19) (6th ed. 2020); s*ee also* [Ex. 1 (Declaration of Keith Beauchamp) (providing foundation and other information as to certain exhibits).]

### A. Hagens Berman is a Highly Regarded Firm With a Strong Culture

1.    Hagens Berman is a litigation firm headquartered in Seattle, Washington. The Firm was founded in 1993 with the goal of fighting for the rights of plaintiffs, including consumers, whistleblowers, employees, investors, and others. The Firm's success can be attributed, in large part, to its lawyers' willingness to think creatively and assert novel legal theories where traditional claims may fail—but only after careful consideration. Steve Berman is the Managing Partner of the Firm. [Ex. 2 (Declaration of Steve Berman) ("Berman Decl.") ¶¶ 4, 5.]

2.    This philosophy has enabled the Firm to achieve remarkable results for its clients. For example, in the late nineties, Hagens Berman was one of a few private law firms that helped bring state attorneys general government tobacco law enforcement and medical cost recovery actions against a well-funded tobacco industry. During the state tobacco litigation, the Firm made innovative legal and strategic decisions that paved the way for success, including asserting state

law enforcement claims, rather than traditional tort claims, against the tobacco companies. Indeed, the claims were so novel that only two law firms in the State of Washington responded to the Attorney General's RFP for the case. When Mr. Berman was in his third month of trial for the State of Washington, the case (along with other cases on behalf of attorneys general) settled for $206 billion—the largest civil settlement in history. [Ex. 2 (Berman Decl.) ¶ 6.]

3.    In 2018, Mr. Berman and co-lead counsel Jeffrey Kessler of Winston & Strawn conducted a 10-day bench trial on behalf of a nationwide class of college athletes challenging NCAA-imposed caps on college athlete scholarships. The district court issued a permanent injunction enjoining the NCAA limits on education-related benefits as unreasonable restraints of trade. The district court's injunction was affirmed by both the Ninth Circuit and, later, by the United States Supreme Court in a 9-0 ruling. *See NCAA v. Alston*, 141 S. Ct. 2141 (2021). The Court concluded that the "judgment does not float on a sea of doubt but stands on firm ground— an exhaustive factual record, a thoughtful legal analysis consistent with established antitrust principles, and a healthy dose of judicial humility." *Id*. at 2166.

4.    The Firm usually seeks monetary awards on behalf of its clients, but also aims to create tangible change and obtain justice for individuals who have limited access to the courts. The Firm's litigation efforts have also brought about new education programs, testing and research, and have achieved major victories benefiting the environment and sustaining human rights. [Ex. 2 (Berman Decl.) ¶ 7.] Indeed, the Firm regularly takes on "cause cases"—matters that will not be revenue generators, but are nonetheless viewed as worthwhile investments because they seek to remedy systemic injustices. For example:

- Rio Tinto/Bougainville Litigation. In November 2000, the Firm represented a proposed class of citizens of the Island of Bougainville against the operator of the world's largest

copper mine, which it alleged had violated international law by dumping billions of tons of mine waste on the island, thereby polluting the land, injuring the people, and inciting violence. [Ex. 2 (Berman Decl. ¶ 7.] Despite difficult and complex legal hurdles under the Alien Tort Statute, the Firm zealously litigated the case for more than a decade, resulting in a favorable en banc decision in the Ninth Circuit. *See Sarei v. Rio Tinto, PLC*, 671 F.3d 736 (9th Cir. 2011) (later vacated by the Supreme Court in light of *Kiobel v. Royal Dutch Petroleum Co*., 569 U.S. 108 (2013); *see also Sarei v. Rio Tinto, PLC*, 722 F.3d 1109 (9th Cir. 2013)).

- FIFA & U.S. Soccer Concussions. On behalf of several soccer players, the Firm filed a class action against U.S. Soccer's governing bodies, which led to life-changing safety measures brought to millions of youth soccer players. Players represented by Hagens Berman alleged these groups failed to adopt effective policies to evaluate and manage concussions, leaving millions of players vulnerable to long-lasting brain injury. The settlement against six of the largest youth soccer organizations greatly diminished risks of concussions and traumatic head injuries. The settlement resulted in new return-to-play guidelines, benchmarks for concussion measurement, and new safety guidelines. At the time the Firm took the case it understood that there would be no common fund from which it could obtain fees and the fees it was paid were modest. [Ex. 2 (Berman Decl. ¶ 7).]

- NCAA Concussion Litigation. Hagens Berman sued the NCAA for failing to prevent concussions and protect student-athletes who suffered concussions. Mr. Berman served as lead counsel in multi-district litigation and led the Firm to a settlement that brought sweeping changes to the NCAA's approach to concussion treatment and prevention.

The settlement's 50-year medical monitoring program is overseen by a medical science committee appointed by the court that screens and tracks concussions. Examinations include neurological and neurocognitive assessments to evaluate potential injuries. Each player now receives a seasonal baseline test to better assess concussions sustained during the season and all athletes who sustain a concussion must now be cleared before returning to play. [Ex. 2 (Berman Decl. ¶ 7).]

5.      The Firm's commitment to social change is a fundamental part of its culture. As its website acknowledges, it seeks and attracts young attorneys who want to "change the future through innovative applications of the law" and "focus on litigation that has big impact both in making plaintiffs whole and shaping the future." [*See* https://www.hbsslaw.com/about/working-at-hagens-berman; *see also* Ex. 2 (Berman Decl.) ¶ 9.]

6.      The Firm and Mr. Berman have received countless accolades from the legal community. The Firm has been named to the National Law Journal's Plaintiffs' Hot List eight times. And Mr. Berman has, among other things, been named as a Titan of the Plaintiffs' Bar by Law360 (2018, 2020, 2022); a Plaintiffs' Attorneys Trailblazer by the National Law Journal (2017, 2022); a Finalist for Trial Lawyer of the Year by Public Justice (2014); and one of the 100 most influential attorneys in America by the National Law Journal (2013). [Ex. 2 (Berman Decl.) ¶10.]

7.      Federal judges regularly rely on both the Firm and Mr. Berman for insight into complex commercial cases; Mr. Berman has been appointed as lead counsel in multiple multi-district litigation matters. [Ex. 2 (Berman Decl.) ¶ 12.] In one of those cases, the judge commented on his fellow district court judges' "high praise" for Mr. Berman's skills and further noted: "[T]he track record of Hagens Berman and its lead partner Steve Berman is . . . impressive . . . *In re Stericycle, Inc*., No. 13 C 5795, 2013 WL 5609328 (N.D. Ill. Oct. 11, 2013) (order appointing

interim class counsel). In that case, the Firm eventually served as lead counsel and secured a settlement of over $250 million for class members. [Ex. 2 (Berman Decl.) ¶ 12.] In an order granting class counsel's motion for attorney's fees and costs, the judge noted that "the efforts of Class Counsel showed significant skill and dedication on behalf of the Class, and . . . Class Counsel achieved excellent results . . . ." *See In re Stericycle, Inc*., No. 13 C 5795, Doc. 382 (N.D. Ill. March 8, 2018).

8.     In 2010, a federal judge in California appointed the Firm as co-lead counsel to represent 20 million class members against Toyota for its sudden unintended acceleration defect and subsequent economic loss to vehicle owners. [Ex. 2 (Berman Decl.) ¶ 12.] The judge praised the Firm and other class counsel for having "consistently demonstrated extraordinary skill and effort." *In re Toyota Motor Corp. Unintended Acceleration Mktg. Sales Practices, & Prods. Liab. Litig*., Case No. CV 10-ML-2151 (C.D. Cal.), Dkt. No. 3933 at 12. The same year, a judge in the Northern District of California appointed the Firm as the "clear choice" to represent the interests of plaintiffs as interim class counsel in an antitrust case; the case resulted in settlements totaling $180 million. *See In re: Optical Disk Drive Prod. Antitrust Litig*., No. M:10-2143 VRW, 2010 WL 11428028, at *2 (N.D. Cal. June 4, 2010).

9.     In 2016, the Firm was appointed to the plaintiffs' steering committee in the nationwide class action lawsuit against Volkswagen on behalf of franchise dealers regarding its "defeat device" emissions software. The Firm's efforts, along with other firms, resulted in $1.67 billion in benefits to Volkswagen dealers. [Ex. 2 (Berman Decl.) ¶ 12.] Additional comments from judges about the Firm and its co-counsel are highlighted in Exhibit 3.

10.     In November 2023, a federal judge in California granted class certification to three classes of athletes, represented by Mr. Berman and another lawyer, who are challenging NCAA

restrictions on their name, image, and likeness rights. Law360 described the decision as a "huge procedural victory" for Mr. Berman's clients. [Ex. 2 (Berman Decl.) ¶ 13).]

**B.    The Firm's Introduction to Potential Thalidomide Claims and Peter Gordon**

11.    In April 2011, Hagens Berman lawyer Nick Styant-Browne was approached by Peter Gordon, one of Australia's most prominent plaintiff lawyers, about potentially joining forces to represent thalidomide victims in the United States. Mr. Styant-Browne had practiced in Australia and was familiar with Mr. Gordon.  [Ex. 2 (Berman Decl.) ¶ 14.]

12.    Mr. Gordon is a highly respected and decorated Australian lawyer who has spent his career representing those who lack access to the legal system, including sexual abuse victims and those injured by defective products. His work has also created important legal precedent, including the right of Australian workers to claim punitive damages from their employer, and the direct tort liability of parent companies whose guiding hand put the employees of their subsidiary companies in harm's way. [Ex. 4 (07/1/14 Alumni Profile of Peter Gordon from Melbourne Law School); Ex. 5 (biography from Gordon Legal)][13]

13.    In 2010, Mr. Gordon formed Gordon Legal to bring claims on behalf of Australian and New Zealand ("AZN") thalidomide survivors as a result of his friendship with a thalidomider and his pro bono work assisting in the creation of an agreement to benefit AZN thalidomiders. That agreement, reached in 2010, resulted in Diageo plc (successor to the AZN distributor of thalidomide, The Distillers Company, plc) paying additional compensation to the 46 Australia and New Zealand thalidomide survivors who had originally received compensation from Distillers in

---

[13] *Available at* https://gordonlegal.com.au/people/peter-gordon/ (Gordon Legal Biography) and https://law.unimelb.edu.au/alumni/alumni-profiles-and-accomplishments/alumni-profiles/gordon-peter (Melbourne Law School Alumni Profile) (last accessed December 10, 2023).

the 1960s and 1970s. [*See* Ex. 6 (P. Gordon Submission to Australian Parliament (January 29, 2019))[14].]

14.     As a result of his work for Australian thalidomide survivors, Mr. Gordon was invited as a special guest to Australia's Parliament House in November 2023 as the Australian Prime Minister delivered a national apology to thalidomide survivors; he later spoke at the unveiling of the dedication site for Australia's thalidomide community in Canberra.[15] He previously had delivered remarks to Australia's Parliament House in January 2019.[16]

15.     Mr. Gordon also brought class action suits against Grunenthal, the German inventor and manufacturer of thalidomide, and the UK Distillers companies, which distributed the drug in Australia. The cases tripled the number of Australians and New Zealanders recognized as thalidomiders and were eventually settled for approximately $100,000,000. [Ex. 6 (P. Gordon Submission to Australian Parliament (January 29, 2019)).]

16.     In 2011, Mr. Gordon informed Hagens Berman that ███████████████████ ████████████████████████████████████████████████. Toward that end, he

---

[14] *See* Support for Australia's thalidomide survivors, Submission 66, "Submission of Peter Gordon re Thalidomide Inquiry," *available at*:
https://www.aph.gov.au/DocumentStore.ashx?id=6a67df4b-f5e3-4b9b-a3b1-a6b10a73cf3a&subId=666381 (last accessed Dec. 8, 2023).

[15] Dedication Ceremony, National Site of Recognition for Thalidomide Survivors and their Families, November 30, 2023, *remarks available at* *https://www.health.gov.au/sites/default/files/2023-11/dedication-ceremony-for-the-national-site-of-recognition-for-thalidomide-and-their-families-program-booklet.pdf* (last accessed Dec. 4, 2023).

[16] *See* Official Committee Hansard, Senate – Community Affairs References Committee: Support for Australia's thalidomide survivors, January 31, 2019, pp. 28-35, *available at* *https://parlinfo.aph.gov.au/parlInfo/download/committees/commsen/e43c91ee-7831-4098-b22f-adb6c8eca2e3/toc_pdf/Community%20Affairs%20References%20Committee_2019_01_31_6877_Official.pdf;fileType=application%2Fpdf* (last accessed Dec. 4, 2023).

had formed the law firm of Gordon & Reeves LLP with Texas attorney Kay Reeves. [Ex. 2 (Berman Decl.) ¶¶ 14, 15.]

17.    After its investigation of the law and facts, Hagens Berman was interested in bringing the claims along with Gordon & Reeves.  But Gordon & Reeves initially elected to join forces with The Lanier Law Firm, which was also headquartered in Texas. [Ex. 2 (Berman Decl.) ¶¶ 15.]

### C.    The Lanier Law Firm and Gordon & Reeves File Thalidomide Complaints

18.    The Lanier Law Firm is one of the preeminent plaintiff-side law firms in the United States, obtaining more than $1 billion in verdicts and settlements.[17] Its founder, Mark Lanier, has been recognized as one of the top civil trial lawyers in America on multiple occasions.[18]

19.    The Lanier Law Firm and Gordon & Reeves filed the first thalidomide complaint ("*Murray*") in Pennsylvania state court on May 26, 2011 on behalf of Robert Murray and Diane Kessler. [*See Murray et al v. Smithkline Beecham Corporation et al,* 2:11-cv-03510-CDJ.] The Lanier Law Firm and Gordon & Reeves also filed a second case on behalf of Glenda Johnson and Steven Lucier ("*Johnson*"). [*See Johnson et al v Smithkline Beecham Corporation et al,* 2:11-cv-05782-PD.] Both cases were removed to federal court and *Johnson* was assigned to Judge Diamond. [Doc. 1]

20.    Hagens Berman replaced Lanier as counsel in those two cases in October 2011. [Doc. 28 (10/27/2011 Order Granting The Lanier Law Firm PLLC's Motion to Withdraw as Counsel.)]

---

[17] *See* https://www.lanierlawfirm.com/case-results/ (last accessed December 10, 2023).

[18] *See* https://www.lanierlawfirm.com/attorneys/w-mark-lanier (last accessed December 10, 2023).

**D.    In October 2011, Hagens Berman Begins Filing Claims**

21.    On October 25, 2011, Hagens Berman and Gordon & Reeves jointly filed a case in state court on behalf of 13 plaintiffs (*Philip Yeatts, et al. v. SmithKline Beecham Corp. d/b/a GlaxoSmithKline, et al.*) ("*Yeatts*"). *Yeatts* was also promptly removed to federal court. [*See Yeatts et al v. Smithkline Beecham Corporation et al*, 2:11-cv-06711-JHS, Doc. 1.] *Murray, Johnson,* and *Yeatts* were assigned to three different judges in this District.

22.    On March 29, 2012, the Firm's request to remand *Murray* and *Yeatts* to Pennsylvania state court was granted. [*Yeatts*, Doc. 58, *Murray*, Doc. 89.] However, Judge Diamond denied the Firm's remand motion in *Johnson* and stayed the case while Hagens Berman took an interlocutory appeal to the Third Circuit on the remand issue. [Docs. 63-64.]

23.    While waiting for the Third Circuit to rule on the remand issue, the Firm continued to interview potential clients. [Ex. 8 (03/01/2012 email from Mr. Styant-Browne to team).]

██████████████████████████████████████████████████████

██████████████████████████████████  [*Id.*]

24.    The Firm eventually filed six additional cases while the remand issue was pending (*Spence* on 8/9/12; *Johnson* on 9/24/12; *Gunn* on 11/12/12; *Charleston* on 11/27/12; *Gosser* on 12/20/12; *Brust* on 2/11/13), all which were promptly removed. [*See Spence, et al v. Avantor Performance Materials et al*, 5:12-cv-04542-CDJ, Doc. 1; *Johnson v, Glaxosmithkline, LLC et al*, 2:12-cv-05455-WY, Doc. 1; *Gunn et al v. Avantor Performance Materials et al*, 5:12-cv-06431-CDJ, Doc. 1; *Charleston et al v. Avantor Performance Materials, et al*, 2:12-cb-06657-CDJ, Doc 1; *Brust et al v. Avantor Performance Materials et al*, 2:13-cv-00758-CDJ, Doc. 1] It later filed two more cases (*Alexander* on 8/7/13; *Griggs* on 4/15/14), bringing the total number of filed cases to 11 and the total number of plaintiffs to 52. [*See Alexander et al v. Avantor*

*Performance Materials et al*, 2:13-cv-04591-CDJ, Doc. 1 and *Griggs et al v Glaxosmithkline LLC et al, 2:14-cv-02186-PD*, Doc. 1.]

25.    As discussed below, the Firm ████████████████████████

████████████████████████████████████████████████████████

███████████████    [Ex. 9 (10/18/2012 letter to Ms. Sells from Mr. Styant-Browne and 03/19/13 letter to Mr. Boiardi from Mr. Styant-Browne); Ex. 10 (Attorney Employment Agreement between the Firm and Roel Garza, making clear that the Firm "has made no promises about the outcome" and that "any opinion offered by [the Firm] in the future will not constitute a guarantee and/or warranty regarding the success of the case.").]

26.    In June 2013, over a year after the Firm filed the appeal, the Third Circuit ruled in *Johnson* that removal was proper. [*Johnson*, Doc. 75.] The Thalidomide Defendants then successfully moved to consolidate the federal cases before Judge Diamond. [*Johnson*, Doc. 94.]

   **E.    The Firm Conducted an Appropriate Factual and Legal Inquiry Before Filing Its First Complaint in October 2011**

27.    Gordon & Reeves had begun an intensive factual and legal inquiry into the validity of potential thalidomide claims in the United States by early 2011. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████.  [*See, e.g.*, Ex. 11 (04/13/2011 email from Mr. Gordon to Mr. Styant-Browne with an attachment re Challenging the Thalidomide Dogma); Ex. 12 (Reeves' research and investigation); Ex. 13 (04/18/2011 email from Mr. Gordon to Mr. Styant-Browne, attaching a ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████).]

28.    In April 2011, the Firm began billing time to the matter. [Ex. 14 (Compilation of Hagens Berman Fees (2011-2015)).]

29.    In August 2011, Mr. Gordon approached the Firm about replacing The Lanier Law Firm. Hagens Berman agreed; ████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████. [Ex. 2 (Berman Decl.) ¶¶ 15, 17.] The Firm subsequently entered appearances in the *Murray* and *Johnson* cases. [(*Murray, 11-CV-03510*  (Doc. 61 (Order Granting Lanier Law Firm's Motion to Withdraw as Counsel and Substitute Counsel), Doc. 68 (Notice of Appearance by Steve Berman), Doc. 69 (Notice of Appearance by Craig Spiegel), Doc. 70 (Notice of Appearance by Nick Styant-Browne); (*Johnson, 11-CV-05782,* Doc. 25 (Notice of Appearance by Steve Berman), Doc. 26 (Notice of Appearance by Craig Spiegel), Doc. 27 (Notice of Appearance by Nick Styant-Browne, Doc. 28 (Order Granting Lanier Law Firm's Motion to Withdraw as Counsel and Substitute Counsel).]

30.    The R&R states at various places (and somewhat inconsistently) that Ms. Reeves was essentially fired in September 2011 and that she stopped working on the thalidomide cases in May 2012. [*Compare* Doc. 767 at 79-80 (claiming that Peter Gordon gave Ms. Reeves "the sack" and that her work with the Firm ended in May 2012); *with id.* at 27-28 (stating that Ms. Reeves was working as late as August 2012); *see also id.* at 79 (claiming that Ms. Reeves was "shown the door" around Labor Day 2011).] The Firm objects to the assertion that Ms. Reeves' work with the Firm ended in May 2012; on the contrary, she was involved as late as the end of 2012. [Ex. 34

(July 2012 email exchange between Mr. Berman and Ms. Reeves, discussing substantive matters, including GSK's response to the statute of limitations theory); Ex. 78 (08/20/2012 email from Ms. Reeves to Mr. Styant-Browne noting that █████████████████████████████ █████████████████████████████████████████████████████████████████████████ ███████████████████"); Ex. 71 (October 2012 email exchange between Mr. Berman and Ms. Reeves regarding ███████████).] Nor was she "given the sack" by Peter Gordon or "shown the door." [Doc. 767 at 31, 79] The record reflects that her decision to withdraw from the Thalidomide Litigation was voluntary. [*See, e.g.,* Ex 7 (07/23/2012 (Email to Ms. Reeves from Mr. Styant-Browne).]

31.    The R&R asserts that "a lot of the information [Ms. Reeves] shared with Hagens Berman . . . was either ignored or actually contradicted in several of the cases mentioned in this Report. *See* Reeves000026795, Reeves000026866, Reeves000030567, Reeves000030838, Reeves000030991, Reeves000036289, Reeves000036302." But the R&R does not identify what "information" in Ms. Reeves' documents was purportedly "ignored or . . . contradicted" in "several of the cases mentioned" in the R&R. Moreover, some of these documents cited contain information about multiple plaintiffs. [*See* Reeves030991 (spreadsheet with information about 18 plaintiffs) and Reeves30567-69 (notes regarding 17 actual or prospective plaintiffs).] Accordingly, without more specific information, the Firm cannot meaningfully respond to this assertion.

        1.    **The Firm Extensively Researched and Developed its Statute of Limitations Arguments Before Filing the *Yeatts* Complaint**

32.    The R&R asserts that "[f]rom May 2012 to October 2013 – a time in which a lot of important events occurred – the plaintiffs' team in the growing list of cases seems to have had plenty of generals (Berman, Gordon, Spiegel, Styant-Browne) and no visible foot soldiers, none of the less senior lawyers who, along with their paralegal colleagues and investigators, typically

gather and evaluate encyclopedic knowledge of, here, 52 clients' separate cases, with their 52 discrete histories, casts of characters, and issues." [Doc. 767 at 80.] The Firm objects to the assertion that it did not adequately staff its cases, that it did no meaningful work during the May 2012 to October 2013 period, and that Mr. Styant-Browne, Mr. Speigel and Mr. Berman were "generals." As discussed below, the Firm staffed the cases with numerous lawyers, performed significant work during that period, and Mr. Styant-Browne, Mr. Speigel and Mr. Berman were heavily involved in the case—not only at the strategic level, but also with respect to the Firm's investigation and prosecution of the claims.

33.     From April 18, 2011 (when the Firm first started billing its time) until October 27, 2011 (one day before *Yeatts* was filed), Firm staff and attorneys billed over 713 hours to factual investigation, legal research into the statute of limitations and causes of action under Pennsylvania law, and extensive discussions with Peter Gordon and Kay Reeves. Time entries from this period include: "Legal research re ███████████████████████████████████ ████████████████████████████████"; "Further research re statute of limitations; begin drafting memorandum re same;" "Case investigation;" and "Review docs." Over this six-month period, over 170 hours' worth of time entries included research specifically related to the statute of limitations. [Ex. 14 (Hagens Berman Fees).]

34.     Hagens Berman spent significant time and resources on the Thalidomide Litigation and staffed the cases with a large number of attorneys and paralegals. In the period April 2011 through December 2015, Firm Professionals recorded nearly 20,000 hours of work on the cases (equating to $9,130,775 in attorneys' fees); the Firm has paid over $850,000 in hard costs. [Ex. 2 (Berman Decl.) ¶ 21]; Ex. 14 (Hagens Berman Fees); Ex. 15 (Compilation of Hagens Berman Expenses (2011-2015)).]

35.    In communicating with its clients, before and after filing suit, ███████████████

██████████████████████████████████████████████████████. The

Firm's standard representation agreement noted:



[Ex. 9 (10/18/2012 letter to Ms. Sells)]

36.    The Gordon & Reeves' initial client communication included ████████████████

█████ [*See* Ex. 16 (11/11/10 Gordon & Reeves letter.]

37.    Both Gordon & Reeves and the Firm requested that clients ████████████████

████████████████████████████████████████████. [*See id.*;

*see also* Ex. 17 (09/17/12 Letter to Ms. Sells)]

38.    The Firm also kept clients ████████████████████████████. [Ex. 18,

(09/14/2012 exemplar Letter to Mr. Yeatts).]

39.    By the time the Firm filed the *Yeatts* complaint, it had concluded that the

Thalidomide Plaintiffs had viable claims, notwithstanding the statute of limitations, for several

reasons. Those reasons are discussed below.

### 2.    Theory No. 1: The March of Science Theory

40.    The first theory was that the Thalidomide Plaintiffs' claims were not barred by

the statute of limitations because the medical community in the United States had only recently

begun to realize that thalidomide-related birth defects were far more varied and wide-ranging than originally thought. Shortly after the height of the thalidomide crisis in the United States, the medical consensus was that the drug caused a narrow set of defects—namely, bilateral and symmetrical deformities in those exposed to the drug before birth. [*See*, *e.g.*, Doc. 262-7 (Declaration of Dr. Trent Stephens i/s/o Andre Opp. to MSJ), ¶18); *see also* 05/10/2019 Tr. at 922:7-19 (Reeves' testimony discussing the March of Science theory and orthodox medical consensus); *see also* ██████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

41.    ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

42.    ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████

43.    ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████.” [Ex. 20 (10/18/2011 email

exchange between Mr. Gordon and the Firm) at 1-2.] ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████. [Ex. 21 (10/13/2011 email

exchange between Ms. Reeves, Mr. Gordon and Mr. Styant-Browne).] Additionally, subsequent

research on different issues entirely (such as the therapeutic use of thalidomide to treat leprosy

and Crohn's disease) identified, as a secondary finding, "additional information about the

mechanisms by which thalidomide operated in the body." [(05/09/2019 Tr. at 743) (Reeves

testimony).]

44.    When deciding the summary judgment motions before the Court in 2014, Judge

Diamond found that the existence and availability of this decades-old data necessarily

undermined the March of Science theory. [*See, e.g.*, Doc. 372, *Johnson*, 55 F. Supp. 3d at 613-

14; *see also* Doc. 767 at 70 (noting that "the 'new' scholarly theory [that Dr. Stephens] was

trumpeting [in summary judgment briefing] had been in the public theater for generations.").]

Similarly, in the R&R, SDM Hangley stated that "Ms. Reeves and Peter Gordon's investigative

efforts during the short life of Gordon & Reeves, LLC do not seem to have yielded any eye-

opening revelations about causation or New Science." [Doc. 767 at 28.]

45.    The Firm objects to the assertion that the existence and availability of decades-

old data undermined the March of Science theory and the Firm's statute of limitations argument.

As Dr. Stephens explained in a December 2014 declaration:

> I understand that my opinion on the availability of experts has been questioned.
> Those questions appear to be based on the assumption that because data have been
> available for some time, those data can easily become the basis of expert opinion.
> That assumption ignores the powerful force of paradigm in science. The history of
> genetics is a perfect example of this condition in science. Gregor Mendel published
> his discovery that inherited traits are passed on to descendants in discrete packages,
> which we now call genes, in 1866. Experts in the field rejected Mendel's work
> because they adhered to the paradigm of "blended inheritance," which proposed

that all characteristics of an individual were passed on in various proportions to the offspring. In the spring of 1900, two researchers, Hugo de Vries and Carl Correns, independently discovered the same patterns of inheritance as had Mendel and only then discovered that Mendel had already published on the same concept. For the intervening 34 years, it is a well-established fact in science history that no one referred to Mendel's work in a positive light. Therefore, even though the data existed, no experts could have been found during those years who would testify that a given human defect had a Mendelian inheritance pattern, largely because Mendel's work, although published, was lost to the scientific community and had to be "rediscovered" in 1900. Even over the next 20 years, the importance of Mendel's work was hotly debated in the scientific community.

[Doc. 428-2 at 13, ¶ 20 (12/18/14 Decl. of Dr. Stephens i/s/o Opposition to MSJ re Tammy Jackson).]

46.    In other words, the fact that scientific data was available in the past did not mean that it had gained acceptance in the scientific community, or that expert witnesses would have been willing or able to testify about it. [*See id.* at 14, ¶ 21 ("[I]t is highly unlikely that [plaintiff] Jackson would have found any expert before October 2009 who would have given the opinion that her birth defects were more likely than not caused by thalidomide.").]

47.    Early criticisms of the Orthodox Criteria never gained prominence in the scientific or medical community, because by the time those criticisms were published, the expanded range of birth defects caused by thalidomide was not "a research question anyone was interested in." [05/09/2019 Tr. at 744.] Indeed, thalidomide ████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████.

[*See, e.g.*, Doc. 465 at 27 (discussing Dr. Stephens' view that thalidomide disabilities were a foreign problem and that "American cases were extremely limited and already identified."); Ex. 22 (11/08/11 email from Ms. Reeves to HB team discussing ████████████████ ████████████████████████████████████████████████████

███████████████.] As recently as 2006, ████████████████████████

████████████████████████████████████████████. [Ex. 23 (03/2014

email from Mr. Berman to team, citing ████████████████████████

████████████████████.]

    48.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████.]

    49.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

    50.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████; *see also* Ex. 24 (09/26/2013 email exchange between Mr. Berman and Dr. Stephens

with attached memorandum re March of Science).] Examples of this medical literature are found

in Exhibit 1 to the Declaration of ███████████████ attached as Exhibit 19.

    51.    Dr. Stephens emphasized the foregoing points at a January 2014 meeting with the

Firm, noting ████████████████████████████████████████████

████████████████████████████████[Ex. 25 (01/16/2014 Meeting Minutes for Meeting

with Professor Stephens) at 3.] He further noted that ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ [*See id.* at 3, 4.]

52.     Based on the foregoing, the Firm believed it had a good faith basis for arguing that only shortly before filing suit would Plaintiffs have been able to find an expert witness to testify as to causation, even if they suspected much earlier that thalidomide had caused their unconventional injuries. [*See, e.g*., Johnson Appellant's Opening Brief, 2015 WL 4055098, June 29, 2015, at *24-37; *see also* Doc. 283-20 (Stephens Decl.) ¶16; Doc. 428-2 (Stephens Decl.) ¶ 21.]

53.     In February 2011, Ms. Reeves met with experts in Australia and developed the March of Science theory. [05/10/2019 Tr. at 921:10-15.] She also ████████████████ in a January 2011 memo to Mr. Gordon ("Reeves Memo"), which Mr. Gordon later forwarded to Mr. Styant-Browne. [Ex. 26 (08/24/11 email to Mr. Styant-Brown from Ms. Presnell attaching Ms. Reeves 1/28/2011 memo).] The Reeves Memo ████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████. [*Id.* at 2.]

54.     This was significant given ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████ [*Id.*] The Reeves Memo ██████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████. [*Id.* at 6.]

55.     After reviewing Gordon & Reeves' ████████████████████████████

████████████████████████████, the Firm believed it had a strong argument that the

limitations period should be tolled for plaintiffs with unilateral injuries (and other unconventional

injuries previously not associated with thalidomide). In April 2011, the Firm set up a new client

matter for the GSK Thalidomide Litigation, describing it as ████████████████████

███████████████████████████████████████████████ [Ex. 27

(04/22/2011 email to Hagens from Ms. Carroll).]

56.     In April and May 2011, the Firm billed over 30 hours to researching statute of

limitations issues, including with respect to the March of Science theory. [Ex. 14 (Fees

Spreadsheet).] On May 3, 2011, Hagens Berman partner Craig Spiegel circulated an internal

memorandum addressing ████████████████████████████████████████

███████████████████████████████████████████████ [Ex. 28

(05/03/2011 memo to Thalidomide file from Mr. Spiegel at 1.] The memorandum cited ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████. [*Id.* at 6.] ████████████████████████████████

███████████████████████████████████████████████████████████

64

███████████████████████████████████████ [*Id.* at 7.] The memorandum

concluded that ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████ [*Id.* at 8.]

57.    On May 6, 2011, Mr. Spiegel updated the memorandum to discuss ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ [Ex. 29 (05/06/2011 email from Mr. Spiegel attaching updated memo).] Mr. Spiegel

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████. [*See, e.g.*, Ex. 30 (09/20/2011 email updating Ms. Reeves'

███████████████████████████████████████████████████████

███████████████████████████████████████████████████). Ex. 31

(April 2014 Spiegel Memo); Ex. 32 (05/06/2014 email and attached memorandum from

Mr. Spiegel to team regarding ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████.]

### 3.    Theory No. 2: Discovery Rule Exception

58.    The second theory, under Pennsylvania's discovery rule exception to the statute

of limitations, was that the Thalidomide Plaintiffs could not reasonably have known about the

causal connection between their injuries and thalidomide, even if they may have suspected that there was a connection. *See Fine v. Checcio*, 582 Pa. 253, 269, 870 A.2d 850, 859 (2005) (providing that the statute of limitations was tolled "in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises.") (emphasis added); *see also* Doc. 427 at 16 ("Plaintiffs' good-faith argument is that the discovery rule does not apply to individuals who merely suspect that their injuries were caused by a particular medication."). The "salient point" for application of the discovery rule is "the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause." *Checcio*, 582 Pa. at 267. The "reasonable diligence" standard is not "absolute," but instead is "what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised . . . [while there are very] few facts which diligence cannot discover . . . there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful." *Id*. Put another way, the "reasonable diligence" standard would only preclude a claim if the claimant had access to information sufficient to awaken an inquiry in the first place. ████████████████████████

████████████████████████████████████████████████████

███████. [*See, e.g.*, Ex. 26 (01/28/2011 memo from Reeves) at 4; Ex. 31 (April 2014 Spiegel Memo) at 22).] Here, the Firm believed that the publicity generated by the thalidomide crisis would not have put a Thalidomide Plaintiff exercising reasonable diligence on notice of her claim for several reasons.

59.    *First*, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████." [Ex. 33 (12/23/2011 email to Mr. Styant-

Browne from Ms. Reeves); *see also* Ex. 32 (05/06/2014 Spiegel Memo noting that ████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████).]

     60.    Further, ██████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████:



[Ex. 34 (07/30/2012 email to Mr. Berman and others from Ms. Reeves)]. The Firm subsequently

███████████████████████████████████████████████████████████

████████████████████████████. [Ex. 35 (06/01/2014 retainer agreement

between Mr. Howell and Hagens Berman).]

    61.   ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. [Ex. 26 (01/28/2011 Reeves

Memo at 7) ████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████]

    62.   Moreover, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████:





[Ex. 36 (10/15/2011 email to Mr. Berman & others from Ms. Reeves).] When Mr. Berman responded by ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ [*Id.* (████████████████████).]

63.    Defendant-specific media coverage was also buried in obscure places (such as exhibits to congressional records), or couched in language that did not suggest that the Defendants may have distributed the drug to primary care physicians around the country during the applicable time period (i.e., newspaper articles stating that SmithKlineFrench ("SKF")—the precursor company to Defendant GSK— had tested the drug on mice or distributed it in an experimental program). [*See, e.g.*, Doc. 262 (Opposition to Motion for Summary Judgment re Plaintiff Andre) at 24-26.] Thus, the Firm concluded that it could argue in good faith that neither the Thalidomide Plaintiffs nor their families—even if exercising due diligence—would have realistically been able to access this information. ████████████████████████████████

████████████████████████████████████████████████████████████

████. [Ex. 37 (09/29/2011 email between Ms. Reeves and Mr. Styant-Browne).]

64.    *Second*, as discussed above, ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████ .

[*See, e.g.*, Ex. 25 (01/16/2014 Minutes of Stephens Meeting) at 4.]

    65.   *Third* ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███ :

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████

[Ex. 33 (12/23/2011 email to Mr. Styant-Browne from Ms. Reeves).]

    66.   *Fourth*, the ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ . [Ex. 38 (11/09/11 Email from K. Reeves to S. Berman et al.]  ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[*See, e.g.*, *Spence* Complaint at ¶¶ 203-206; *see also* Ex. 25 (01/16/2014 meeting minutes with Dr. Stephens mentioning that ███████████████████████████.]

      67.    This conclusion—████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████. [Ex. 39

(12/08/2014 Ari Brown Memo discussing (at 2) ████████████████████████

████████████████████████████████████████████████████

████████████████████████"); [Doc. 367 at 7-15] (Plaintiffs' Notice of Supplemental Evidence summarizing deposition testimony from a doctor involved in the SKF clinical trials, which suggested that "over 90% of the pills that SKF distributed are completely unaccounted for" and that "SKF lied to the FDA about how many pills [the doctor] received and distributed, in a blatant attempt to cover up the fact that it had distributed hundreds of thousands of pills but had no idea where they had gone.").] In an "Elements of the Claims" outline dated February 28, 2014, ██████████████████████████████████:



Ex. 40 (Ms. Mahoney's Elements of the Claims) at 5.]

68.    *Fifth*, █████████████████████████████████████████████

████████████████████████████████████████████████████████

██████. [*See, e.g.*, *Yeatts* complaint ¶118; *see also* [(09/26/2017 Tr. (re Bolton) at 127 (Styant-

Browne  testimony)  (██████████████████████████████████████████

█████████████████████).]

69.    *Sixth* ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████    [*See, e.g.*,

Ex 26 (01/28/2011 Reeves Memorandum  at 1.] ████████████████████████

████████████████████████████████. [06/29/2015 Appellant's Opening Brief

in *Johnson v.* GSK, 2015 WL 4055098 at *6 (June 29, 2015); *see also* Ex. 31 (April 2014 Spiegel

Memo)  (citing  Pennsylvania  case  law  ██████████████████████████████

████████████████████) at 23.]

### 4.    Theory No. 3: Fraudulent Concealment

70.    The third theory was that the Thalidomide Plaintiffs' claims were not barred by

the statute of limitations under the fraudulent concealment doctrine, an estoppel-based theory

providing  that  a  defendant  "may  not  invoke  the  statute  of  limitations,  if  through  fraud  or

concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into

the facts." *Checcio*, 582 Pa. at 271. The limitations period only begins to run "when the injured

party knows or reasonably should know of his injury and its cause." [*Id*. at 272.]

71.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████. Eventually, Grunenthal's co-defendants also learned that the drug was unsafe, but "everyone kept quiet." [05/10/19 Tr. at 941 (Berman testimony); *see also* Ex. 33 (12/23/2011 email from Ms. Reeves to Mr. Styant-Browne and others discussing ████████████████████████████████████████

███████████████████████); Ex. 41 (10/02/2013 discovery requests from Plaintiff to Defendants, RFP No. 26 (requesting all licensing agreements between Defendants and Grunenthal), RFP No. 28 (requesting "all communications between or among any Defendants regarding thalidomide.")).]

72.    The Firm and Ms. Reeves carefully considered this theory throughout 2011 and exchanged memos and research emails on this subject and others. [*See, e.g.*, Ex. 42 (September 2011 Email from Reeves to Mr. Styant-Browne); Ex. 22 (11/08/11 Email from Reeves to Berman, NSB, Spiegel and Gordon discussing ████████████████████████████

███).] ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ [*See, e.g.*, Ex. 43 (08/25/2011 Email from Reeves to Berman).]

73.    Reeves' ██████████████████████████—shared with the Firm throughout 2011—also suggested that ██████████████████████████

████████████████████████████████████████████

█████████████████████████████ [Ex. 38 (11/09/2011 email to

Mr. Berman & others from Ms. Reeves).] It also suggested that ████████████████

████████████████████████████. [*Id*.; *see also* Ex. 42

(09/09/2011 Email to Mr. Styant-Browne from Ms. Reeves attaching memo) (discussing ████

███████████████████████.]

74.     Similarly, Reeves' research suggested that, ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

[Ex. 44 (10/25/2011 email exchange); Ex. 45 (10/21/2011 email to Mr. Styant-Browne from

Ms. Reeves).]   But   Reeves ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████ [Ex. 45 10/21/2011 email to

Mr. Styant-Browne from Ms. Reeves).] Thus, hundreds of women in the United States may have

taken the drug even though it was never approved for use. [Ex. 46 (11/17/2011 Press Release).]

75.     ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████.[19] Indeed, in 1962, President Kennedy awarded Dr. Kelsey with

---

[19] *See, e.g.*, https://content.time.com/time/subscriber/article/0,33009,873697,00.html.

the President's Award for Distinguished Federal Civilian Service for <u>preventing</u> "a major tragedy of birth deformities in the United States."[20]

76.     Based on the foregoing, the Firm had a good faith basis for arguing that the thalidomide crisis in the United States was far more widespread than originally thought, and that the Thalidomide Plaintiffs—including those with atypical injuries that medical science had not yet recognized as thalidomide related—had no way of knowing that thalidomide was the cause of their injuries.

77.     The Firm's research also suggested that  [*See, e.g.*, Doc. 262 at 40; *see also* Ex. 31 (April 2014 memorandum by Mr. Spiegel                                                    ) at 28; *see also* 10/01/2014 Tr. of GSK Sanctions Hearing at 73-77.]

78.     The foregoing legal theories were researched extensively before the Firm first filed suit on behalf of Plaintiffs, and were the subject of careful consideration and discussion amongst the Firm and its attorneys. [*See, e.g.*, Ex. 2 (Berman Decl.) ¶ 18.]

79.     The Firm also conducted legal research into other aspects of the cases, including with respect to negligence, causation, and exposure. [*See, e.g.*, *id*. ¶ 17; *see also* Ex. 47 (09/23/2011 email exchange between Ms. Reeves, Mr. Berman, Mr. Spiegel & Mr. Styant-Browne).] This included

---

[20] https://cfmedicine.nlm.nih.gov/physicians/biography_182.html.

███████████████████████████████████████████████████████████████

████████████████████████████████████ [*See, e.g.*, Ex. 48 (09/27/2011 email to

Mr. Berman and others from Ms. Reeves).] Mr. Spiegel later updated the team ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ [Ex. 49

(05/05/2014 email to Team from Mr. Spiegel).]

### 5. The Firm and Ms. Reeves Conduct a Thorough Factual Investigation into Their Clients' Claims

80.     In addition to its legal research, the Firm and Ms. Reeves also conducted an

appropriate factual investigation into their clients' claims. As early as October 2011, an internal

Firm memo noted ████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████ [Ex. 50 (Thalidomide Case Background Questions).] In the

same briefing, the Firm noted ████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ [*Id.* at 5.]

Although the Firm relied on Gordon & Reeves initial work, it also took a proactive and hands-

on approach to the litigation from the start. [*See* Ex. 44 (10/24/11 email from Ms. Reeves, ████

███████████████████████████████████████████████████████████████

████████████ ]

81. The Thalidomide Litigation was difficult in that plaintiffs were unable to rely on direct evidence of exposure (such as prescription records). Because the Thalidomide Defendants had distributed thalidomide as an experimental drug within the United States—without a prescription and without even identifying it as thalidomide—there was little evidence of direct exposure. [*See, e.g.*, Doc. 341 (Opp. To Sanctions Motion in Garza) at 4.] Although Hagens Berman also worked hard ███████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████. [Ex. 2 (Berman Decl.) ¶ 19.] That said, the Firm worked diligently to ensure it had indirect evidence of exposure before filing the claims—for example, the fact that certain claimants came from families with no congenital abnormalities, and/or that certain claimants were born during a time period in which thalidomide was plainly in the United States and distribution of the drug was uncontrolled. [*See, e.g.*, Doc. 341 at 4-5.]

### 6. The Firm Obtained Medical Records from Existing and Potential Clients

82. At the outset, the Firm attempted to ████████████████████████████ ███████████████████. [*See also* Ex. 51 (03/22/2012 client email telling clients ████████ ████████████████████████████████████████████████████); Ex. 52 (08/23/2012 email to potential client from Ms. Barnes ████████████████████ ████████████████████████████████████████████████]

83. But clients often did not have older medical records—particularly their birth-related records, which were "almost impossible" to obtain. [(09/27/2017 Tr. at 10:38 a.m. at 136:11-137:12 (re Sells).] That said, to the extent clients were able to provide such records, the Firm collected and reviewed them. [*Id*. at 140:1-4).] It also ████████████████████████████

██████████████. [*See, e.g.*, Ex. 53 (08/27/2012 email) (█████████████

████████████████████).] Time records show that Firm attorneys and staff billed 950

hours and spent $213,000 to tasks that included investigating, collecting, and reviewing medical

records from 2011-2014.

### 7.    The Firm Conducted Plaintiff-Specific Investigations

84.    The R&R asserts that the "hard plaintiff-by-plaintiff, physician-by-physician,

family-by-family investigation was generally left up to a single outside individual, Ms. Reeves."

[Doc. 767 at 79.] The Firm objects to this assertion. The investigation was a group effort that

involved several Firm attorneys, in particular Mr. Styant-Browne, who testified that he or another

Hagens Berman lawyer spoke with Ms. Reeves about each plaintiff for whom a complaint was

filed; he reviewed the intake documents, notes, and available medical records; and he personally

spoke to each of the Plaintiffs regarding, █████████████████████████

███████████ [*See e.g.*, 09/28/2017 Tr. at 9:00 a.m. at 58:2-9, 66:2-11 (re Marshall); 9/28/2017

at 11:3-24 (re Anderson); 9/28/2017 at 9:00 a.m. at 27-30 (re Navamuel); 5/7/2019 Tr. at 118-

120, 130-133.]

85.    Before the Yeatts complaint was filed in October 2011, Mr. Styant Browne spent

over 300 hours on document review and factual investigation, including reviewing plaintiff-

specific allegations with an eye toward the statute of limitations. [Ex. 14 (Fees Spreadsheet)

(Styant-Brown time entries from September and October 2011 re "work on . . . SOL facts each

plaintiff;" and "Review docs").] In November 2011, he billed roughly 140 hours to further factual

investigation, including a review of client medical records. [*Id.* at 6-7.] In July 2012, prior to

filing the *Spence* complaint, he billed nearly 100 hours to, among other things, an analysis of

"individual client issues." [*Id.* at 13-14.]

86.     The R&R states [Doc. 767 at 69, n. 37] that although Mr. Styant-Brown testified that he "personally spoke with every single plaintiff before filing a complaint on her behalf," Ms. Reeves's notes "make clear that she spoke directly with Mr. Andre. If so, Andre's and Styant-Browne's recollections are in conflict." But Mr. Andre's and Styant-Browne's recollections are not in conflict, and the Firm objects to the extent this statement suggests Mr. Styant-Browne's testimony was inaccurate. Ms. Reeves' typed case notes [Ex. 126 (Reeves000036418-19)], ███████████████████████████ whether Mr. Styant-Browne or anyone else was on her call(s) with Mr. Andre is not reflected in her case notes. That Ms. Reeves spoke with Mr. Andre is not inconsistent with Mr. Styant-Browne's testimony that he spoke with Mr. Andre (and with other Plaintiffs). Mr. Andre testified that his mother gave him a number which he then called and spoke to "[m]y attorneys." [Ex. 125 (Andre depo.) at 26:2-10.] Mr. Andre did not recall which attorney(s) he spoke to. [*Id*. at 28:14-22.] Thus, Mr. Andre's deposition testimony that he spoke to "my attorneys" before the complaint was filed is consistent with Mr. Styant-Browne's testimony.

### 8.     The Firm and Ms. Reeves Filed and Successfully Prosecuted a FOIA Lawsuit to Obtain and Review Voluminous FDA Records

87.     In November 2011, Ms. Reeves, with support from the Firm, filed a FOIA lawsuit against the FDA to obtain previously unavailable public records relating to thalidomide. [Ex. 46 (11/17/2011 Firm Press Release).] As a result, they eventually obtained a voluminous set of documents related to the use and distribution of thalidomide. Beginning in 2012, they extensively reviewed these documents to help build various aspects of the cases.

88.     On May 4, 2012, Ms. Reeves summarized more than 50 pages of notes from the latest FDA production. [Ex. 54 (05/04/2012, email to Mr. Styant-Browne & Mr. Berman from Ms. Reeves).] The production supported the Firm's fraudulent concealment theory by ███████

██████████████████████████████████████████████████████

████████████████████████████████████████████. [*See id.*]

A few days later, Ms. Reeves followed up with another email ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████    [Ex. 55 (05/06/2012 Email to Mr. Gordon, Mr. Berman, Mr. Styant-Browne, and

others from Ms. Reeves); *see also* Ex. 56 (08/17/2012 email to Mr. Styant-Browne and Ms.

Barnes from Mr. Berman) (██████████████████████████████).]

Subsequent FDA productions appeared to suggest, among other things, ████████████

██████████████████████████████████████████████████████

████████████████" [Ex. 57 (08/10/2012 email to Mr. Berman, Mr. Gordon and Mr. Styant-

Browne from Ms. Reeves).]

    89.    The FDA materials also made clear ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████ For this reason, the Firm sought information about ████████████████████████████. [Ex. 60 (12/05/2012 email from Mr. Spiegel to Mr. Styant-Browne attaching ██████████████████████████████ ████████████████████████.]

90.     Other FDA documents also supported the Firm's theories as to negligence, exposure, and causation. For example, ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████ [Ex. 61 (08/16/2012 email to Team from Mr. Berman).] The next day, he emailed the team ███████████ ████████████████████████████████████████ [Ex. 62 (08/17/2012 email to Ms. Reeves, Ms. Barnes and Mr. Styant-Browne from Mr. Berman); *see also* Ex. 63 (08/17/2012 email from Mr. Berman attaching ███████████████ ████████████████████████████████] The same day, Mr. Berman sent an email quoting from ████████████████████ ████████████████████████████████████████ ██████████████████████████ [Ex. 56, (08/17/2012 email to Mr. Styant-Browne and Ms. Barnes from Mr. Berman).]

### 9.     Other Document Review Projects and Witness Interviews

91.     The Firm, with the assistance of Ms. Reeves and Mr. Gordon, also ████████ ████████████████████████████████████████ ████████████████████████████ [*See*, *e.g.*, Ex. 64 (11/14/2011 email from Ms. Reeves summarizing ongoing research and investigative efforts, ████████████████████████████████████████ ██████████████████████); Ex. 44 (10/24/2011 email from Reeves to Styant-Browne,

Peter Gordon, and others.] This ongoing investigation ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ [Ex. 20

(10/18/2011 email exchange between Mr. Gordon and the Firm).]

92.     In December 2011, Hagens Berman attorney Lauren Barnes accompanied

Ms. Reeves to ████████████████████████████████████

████████████████████████████████ [Ex. 65 (12/22/2011 email from

Ms. Barnes); *see also* Ex. 33 (12/23/2011 email from Kay Reeves ████████████

████████████████] Later, the Firm created ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.

[Ex. 66 (████████████████████████████.]

93.     Firm attorneys also reviewed documents produced by the Thalidomide

Defendants and identified hot documents. [*See* 05/07/2019 Tr. at 173-174 (noting that "[W]e had

a team devoted to going through [Defendants'] records to ascertain the extent of the distribution

of the drug by Defendants, the extent to which the drug was distributed or may have been

distributed without any record being generated . . . .").]

94.     On January 10, 2014, for example, Firm attorney Barbara Mahoney ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ [Ex. 67 (01/10/2014 email to Team from Ms. Mahoney).] The Firm also

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████. [Ex. 68 (08/14/2014 email to Mr. Spiegel

from Ms. Bede).]

95.    The Firm also ████████████████████████████████████

██████████████████████████████████ In June 2014, GSK had filed summary

judgment motions stating that its distribution of thalidomide in the United States consisted of

344,270 tablets distributed to 67 doctors and given to approximately 875 patients. ████████

████████████████████████████████████████████████

████████████████████████████████████████ [Ex. 39 (12/08/2014

memo to File from Mr. Brown).]. ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ [See id.]

96.    In early August 2014, ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ [Ex. 69 (08/04/2014 email to Mr. Berman and Mr. Styant-Browne from

Mr. Brown).] Mr. Berman forwarded the email to local counsel, █████████████████

██████████████ [Ex. 128 (08/04/2014 Email to Mr. Kodroff from Mr. Berman ).]

97.    On August 11, 2014, Plaintiffs issued a subpoena to Dr. Forrer and two other doctors whom the Firm identified as having played significant roles in supplying or conducting the Northville clinical trials. [*See* Ex. 39 (12/08/14 Memo to File from Ari Brown).]

98.    Dr. Forrer was eventually deposed on October 1, 2014. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ [Ex. 70 (10/08/14 Memo to File from Ms. Bede and Mr. Brown).] ██████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

[*See* Ex. 39 (12/08/14 Memo to File from Ari Brown) at 2.] As a Firm attorney noted in a follow up memorandum: "This testimony substantiated allegations in multiple complaints that GSK had affirmatively covered up its true distribution of thalidomide." [*See id.*]

### 10.    Steve Berman Was Actively Involved in the Factual and Legal Investigation

99.    Although Mr. Styant-Browne managed the day-to-day of the litigation, Mr. Berman was actively involved from the outset. [*See, e.g.*, (05/10/19 Tr.) at 933-934 (describing role in the cases); Ex. 2 (Berman Decl.) ¶¶ 22, 23.] He provided direction, strategic guidance, and general oversight to the team. [*See, e.g.*, Ex. 2 (Berman Decl.) ¶ 22, 23; Ex. 71 (October 2012 email authorizing Ms. Reeves ████████████████); Ex. 38 (11/09/2011 email from Mr. Berman to Ms. Reeves and Mr. Styant-Browne asking ████████████ ████████████████████) *see also* Ex. 72 (01/17/2014 email from Mr. Berman to team with ████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████]

100.    He was also involved in developing the Firm's legal theories with respect to the statute of limitations theories, negligence, and other issues. [Ex. 73 (08/06/2012 email from Mr. Berman discussing the March of Science and discovery rule theories).] ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ [Ex. 42 (09/09/2011 (email to Mr. Styant-Browne from Ms. Reeves).] ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████ [*See* Ex. 36 (10/15/2011 email exchange between Mr. Berman and Ms. Reeves).] After Ms. Reeves provided a detailed response, he responded with an additional follow-up question. [*See id.*]

101.    Mr. Berman spent significant time personally reviewing key documents, including FDA materials, ████████████████████████ [Berman Decl. ¶ 23.] In August 2012, he emailed the team to note that ████████████████████████ █████████████████████████████████████ [Ex. 61 (08/16/2012 email to Team from Mr. Berman).] The next day, he ███████████████████████ ████████████████████████████████ [Ex. 62 (08/17/2012 email to Ms. Reeves, Ms. Barnes and Mr. Styant-Browne from Mr. Berman).] He also pointed the team to ████████████████████████████████████████ ████████ [Ex. 76 (08/17/2012 email from Mr. Berman to team ████████████

██████████████████████████████████████████████████████

██████████████████████);*see also* Ex. 75 (07/30/2012 email exchange from Mr. Berman discussing ████████████████████████████████████).]

102.    Mr. Berman also corresponded and met with experts and potential experts (a further discussion of the Firm's work with these experts is discussed *infra* at ¶¶ 104-113). [Berman Decl. ¶¶ 23-30; *see also* Ex. 77 (08/30/12 email from Mr. Berman noting that he was

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████]; Ex. 48 (06/19/2012 email from Mr. Berman to team, noting ██████████████████████ ███████████████); Ex. 78 (08/20/2012 email from Ms. Reeves to Mr. Styant-Browne noting that Mr. Berman ██████████████████████████████████████ ████████████████████████████████████████████████████);

Ex. 24 (09/26/2013 email and attached essay from Dr. Stephens to Mr. Berman regarding ██ ██████████████████████); Ex. 79 (02/02/2014 email re Mr. Berman's meeting with █████████████████████████); Ex. 80 (08/30/2013 email from Mr. Berman

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████); Ex. 81 (04/03/2014 Email from Mr. Berman █████████████████ ████████████████████████.]

103.    Mr. Berman was also discriminating in accepting new clients, regularly rejecting those he believed would not have viable cases. In a March 2012 email, Firm attorney Lauren Barnes ███████████████████████████████████████ [Ex. 82 (March 2012 email exchange between Ms. Barnes, Mr. Styant-Browne, Ms. Reeves and Mr. Berman) at 2-3.] After reviewing the email, Mr. Berman responded that ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

[*Id*. at 1.]

### F.    The Firm Met and Consulted with Numerous Experts to Develop Its Theories

104.    From the outset, the Firm knew that expert testimony would be crucial, including to establish causation. As early as September 2011—before ever filing its first case—the Firm was researching and analyzing ████████████████████████████████

███████. [*See, e.g.*, Ex. 47 (09/23/2011 email from Ms. Reeves to team ████████

████████████████████████████████████████████████).] This work continued throughout 2012. [*See, e.g.*, Ex. 48 (06/19/2012 email from Mr. Berman to team, noting ████████████████████████████████████.]

105.    As discovery progressed, the Firm formally and informally relied upon several highly credentialed consulting experts to help develop its factual and legal theories, including as to negligence and causation.

### 1.    Dr. David Kessler (Former FDA Commissioner)

106.    In January 2012, a few months after the *Spence* complaint was filed, attorneys for GSK provided the Firm with a set of documents which they claimed debunked Plaintiffs' theories of liability. The Firm (including Mr. Berman) carefully reviewed the documents provided by GSK, but did not agree that the documents gutted Plaintiffs' claims—████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████ [Ex. 83 (03/02/2012 memo from Reeves to Berman noting ██████████

███████████████████████████); Ex. 74 (February and April 2012 emails from

Ms. Reeves noting, among other things, that ████████████████████████

████████████████████████████████████.]

107.    After reviewing GSK's documents, the Firm, assisted by Ms. Reeves, retained

former FDA commissioner Dr. David Kessler as a consulting expert to opine on standard of care

issues with respect to the Thalidomide Defendants, with the intent of calling him as a testifying

expert at trial. [(05/10/19 Testimony by S. Berman before SDM Hangley at 948); Berman Decl. ¶

24; Ex. 84 (02/24/12 email from Reeves to Berman re ██████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████);

Ex. 85 (03/04/2012 email from Reeves to team re ██████████████████████

███████████████); Ex. 74 (04/13/2012 email exchange discussing █████████████

██████████████████████████████.]

108.    Ms. Reeves' █████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ [Ex. 85 (email to Team from Ms. Reeves).]

**2.** **Professor** ███████████

109. The Firm also retained ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████ [*See, e.g.*, Ex. 86

(05/19/2014 email ████████████████████████████

████████████████████████████████████████████

██████████); *see also* Ex. 2 (Berman Decl. ¶ 26).] In October 2014, ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ [Ex. 87 (10/11/2014 ███████████████████.]

**3.** ████████████████████████**, and Others**

110. The Firm also discussed retaining two highly credentialed experts, ████

████████████████████████████████████████████

---

21 *See, e.g.*, https://1boringgoldman.com/images/rothman-report-1-20.pdf.

███████████████████████████████████████████████████████

███████████████████████████████████████ [Berman Decl. ¶ 25; *see also*

Ex. 88 (01/29/2014 email exchange between Mr. Berman and Mr. Savarirayan).] ██████████

███████████████████████████████████████████████████████

███████████████ [Ex.89 (11/14/2012 email to Mr. Berman from Mr. Gordon).]

111.    On November 14, 2012, Mr. Gordon emailed Mr. Berman to note, ████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ [*Id.*] ████████

███████████████████████████████████████████████████████

███████████████ [Ex. 90 (08/30/2013 email to Mr. Berman from Mr. Gordon).]

112.    In February 2014, Mr. Berman met with ███████████████████████

███████████████████████████████████████ [*See, e.g.*, Ex. 88 (01/29/2014

email exchange between Mr. Berman and Mr. Savarirayan); Ex. 79 (02/02/2014 Email to Mr.

Berman from Mr. Savarirayan).]

113.    Over the next few months, the Firm reached out to experts regarding standard of

care issues. [Ex. 91 (05/06/2014 email to Mr. Berman from ██████████████████████).] It

also contacted several experts to discuss ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

[Ex. 35 (06/01/2014 Retainer agreement between Hagens Berman ██████████████); *see also*

Ex. 92 (05/02/14 email from A. Bede to Mr. Berman noting that a potential expert's ██████████

███████████████████████████████████████████████████████



114.    In an April 2014 email to a potential expert witness, a Firm attorney noted:



[Ex.93 (04/19/2014 email exchange between Ms. Bede ▮▮▮▮▮▮▮▮▮▮▮); *see also* Ex. 94
(05/28/14 email to Mr. Berman re ▮▮▮▮▮▮▮▮▮▮▮▮▮▮).]

### G.    In October 2013, the Firm Proposed a Bellwether Approach of Six "Test Cases" to Efficiently Manage the Cases and Conserve Resources

115.    Once the remand issue had been decided by the Third Circuit and the cases were consolidated before Judge Diamond, the Firm filed a proposed Case Management Order suggesting that the litigation be limited to six test cases in order to identify "common, across-the-board issues affecting all Plaintiffs" before embarking on extensive, case-specific depositions and discovery. [*See* Doc. 96 at 2-3.] Defendants, on the other hand, sought to proceed with discovery for all 49 plaintiffs. [*Id.* at 1.]

116.    The Firm proposed this "bellwether" approach to avoid unnecessary expense for all parties. This would allow discovery to be obtained from the Thalidomide Defendants relating to the Firm's tolling and fraudulent concealment theories; and permit a ruling on the threshold legal issues, like statute of limitations. The "common, across-the-board issues" that the Firm sought to develop with the bellwether approach included the testing and distribution process of thalidomide by each defendant; the marketing of thalidomide to doctors; verifying each Defendant's role in

thalidomide distribution in the United States; and establishing the state of scientific knowledge as to how thalidomide causes injury and what injuries were known to be caused by thalidomide and when. [*Id.* at 4.]

117.    At bottom, although the Firm had extensively researched statute of limitations issues and was confident in its theories, bellwether test cases would provide both sides with an understanding of how those theories would be resolved by the Court (and jury), while also avoiding unnecessary expense to the parties and distress for its clients. As Hagens Berman explained to the Court:

> As another example, suppose Defendants move for summary judgment, arguing that the way they tested and distributed thalidomide was proper under then-existing medical standards and prevailed on that motion. Under those circumstances, it is difficult to see how other Plaintiffs could continue with their cases . . . [t]hus, test cases are a better alternative than Defendants' proposal that all 49 cases (and other cases that may be filed) be subject to full discovery. The Defendants' blunderbuss approach would stir up painful memories for Plaintiffs and family members that might be unnecessary based on the results in test cases.")

*Id.*

118.    On October 4, 2013, the Court, without explanation, denied the Firm's request for the bellwether approach and ordered that discovery proceed with respect to all plaintiffs. [Docs. 102, 103.]

**H.    The Firm Retained and Relied on Professor Stephens as a Causation Expert**

119.    Dr. Trent Stephens was one of several experts used in the Australian claims settlement process to evaluate thalidomide victims. [*See, e.g.*, Ex. 90 (08/30/13 email from Peter Gordon noting that ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████.]

120.    To help build its causation case, Hagens Berman retained Dr. Stephens as its consulting expert given that he was one of the leading scholars regarding thalidomide mechanisms. Dr. Stephens had authored several peer reviewed papers dealing specifically with thalidomide, and was one of the experts used in the Australian claims settlement process to evaluate whether claimants were thalidomide victims. ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ [Ex. 2 (Berman Decl.) ¶ 28.]

121.    In June of 2012 Mr. Berman and Mr. Styant-Browne travelled to Idaho and met with Dr. Stephens. [*Id.*] After this meeting, Mr. Berman wrote: ██████████████

██████████████████ [Ex. 95 (06/16/12 email to Gordon from Berman); *see also* Ex. 89 (11/14/12 email from Peter Gordon to Steve Berman re ████████████████

█████████████████████████████████████]

122.    In February 2013, Mr. Berman again met with Mr. Stephens in Idaho. [Ex. 2 (Berman Decl.) at ¶ 29.]

**I.    Dr. Stephens Presented Challenges as the Litigation Proceeded**

123.    Before filing its first complaint, Hagens Berman understood that ████████

████████████████████████████████████████████

███████████████. [*See* Ex. 96 (08/16/2012 email from Mr. Gordon to Mr. Berman confirming that ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████] Mr. Berman then wrote to his team:



[Ex. 97 (08/16/2012 email from Berman to team)]

124.    In  September  2013,  Dr.  Stephens  emailed  Mr.  Berman ██████████████

██████████████████████ [Ex.  24.] ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████ [*Id.* at 6.]

125.    On  November  22,  2013,  Hagens  Berman  emailed ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████. [Ex. 99 (11/22/2013 email from Lisa Hasselman to Dr. Stephens).]

126.    Dr. Stephens met with ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████ [Ex. 2 (Berman Decl.) at ¶¶ 31-32; *see also* Ex. 25

(01/16/2014 ██████████████████████ ) (" ████████████████████████████████

█████████████████████████████████████.").]

127.    In April 2014, the Firm forwarded ███████████ Dr. Stephens ██████████

████████████████████████████████████████████████████. [Ex.  100

(04/30/2012 email exchange between Dr. Stephens and Ms. Grueneich).] On May 16, 2014,

Dr. Stephens ████████████████████████████████████████████. [Ex. 101

(05/16/2014 email exchange between Stephens and Ms. Grueneich).]

128.    In July 2014, Dr. Stephens ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████    As Mr. Spiegel noted: █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████    [Ex. 98 (07/02/2014 email exchange).]

**J.    After SDM Hangley Ordered the Firm to Review Its Existing Cases, the Firm Conducted a Further Investigation**

129.    On July 17, 2014, Special Discovery Master Hangley ("SDM Hangley") directed Plaintiffs' counsel to investigate each active case with a view to deciding whether it should continue to be prosecuted. [Doc 268.] Investigations were to be completed by September 16, 2014. [*Id.*]

130.    Hagens Berman subsequently ████████████████████████    During or after the examination period that was ordered by SDM Hangley, Hagens Berman filed nine stipulations for voluntary dismissal with prejudice with the consent of Plaintiffs, and filed motions to withdraw from representing six others. The Firm made these decisions ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████    [Ex. 2 (Berman Decl.) at ¶33.]

131.    Hagens Berman objects to the pejorative phrasing and substance of the R&R's assertion that the Firm "turn[ed] its back on" or "[threw] down its hand on" plaintiffs Terrie Bolton, Jose Navamuel, Valerie Spence, Tawana Williams, Michael Morgan, Barbara Murray, and Kevin Randall. [Doc. 767 at 51-52.] The Firm responsibly sought to withdraw from representing certain clients when professional responsibility dictated that it do so.

132.    Even though the Firm decided to dismiss several cases, it sought to proceed with as many cases as it had a good faith basis to proceed with. Thus, it continued to expend resources to obtain genetic testing for some plaintiffs and sent other plaintiffs for further medical evaluations. [*See, e.g.*, Ex. 102 (09/16/2014 email from Mr. Styant-Browne to SDM Hangley with a status update that notes that certain Plaintiffs "are awaiting the results of genetic testing . . .").]

### K.    The Firm Seeks a Stay Until Pending Motions are Resolved

133.    In late October 2014, with several of Defendants' summary judgment and sanctions motions still pending, the Firm requested a stay of all related actions until the pending summary judgment and sanctions motions were resolved. [Doc. 388.] As Defendants recognized at a prior hearing, the Court's rulings on the pending motions would "provide real and substantial guidance on every related case." [*Id.* at 4.] Thus, the Firm sought a stay to avoid further extensive discovery and briefing:

> The stay Plaintiffs propose in this motion would give the parties 21 days after the Court's ruling on the last of the currently pending summary judgment motions to assess how the Court's ruling affects the remaining cases, and whether it would be judicially efficient to continue to proceed on discovery and motion practice in the remaining cases. For example, if the Court granted some motions but denied others, Plaintiffs would expect that it would be relatively clear which cases should proceed through discovery and motion practice in this Court, and which should be stayed pending appeal of certain orders. Or if the Court were to grant all of the pending motions, Plaintiffs expect that it would make sense from the standpoint of judicial efficiency to extend the stay pending resolution of an appeal of the Court's rulings. More particularly, Plaintiffs would be able to determine whether to dismiss some

or all of the remaining cases if the Third Circuit were to affirm any summary judgment rulings in favor of Defendants. As a result, the proposed stay would avoid most, or perhaps all, of the costs of discovery in the coming weeks, as well as the cost of further dispositive motions.

[*Id.* at 5]. The Court denied the stay request, without explanation, the same day. [Doc. 389.]

### L.    GSK Agreement

#### 1.    After Conducting Discovery, the Firm Proposes Dismissing GSK

134.    By October 2014, fact discovery was drawing to a close. The discovery process had given the Firm a better sense of the respective strengths and weaknesses of its claims against each Defendant. [Doc. 453 at 10.] For example, it had revealed significant variations in the timing and nature of distribution of thalidomide by GSK and Sanofi; it became clear that GSK had stopped distributing thalidomide within the United States before several Plaintiffs were conceived. [*See, e.g.*, (Doc. 536-10 at 27-28 (Simeone testimony); Doc. 536-11 at 19-20 (Ledsome testimony); 536-12 at 15 (Horridge testimony).] Discovery had also revealed varied evidence against each Defendant with respect to the statute of limitations and exposure issues. [Doc. 453 at 10.]

135.    The Firm concluded, based on the discovery it had received—and its continuing search for evidence that could only be obtained through discovery—that the Plaintiffs' cases against GSK should be dismissed. The Firm and GSK reached an agreement providing that the Firm would dismiss claims against GSK by individuals represented by Hagens Berman for whom the Firm had not filed a motion to withdraw as counsel.[22] [*See* Doc. 425 at 1-2.] The Firm conditioned the finality of any agreement on the approval of the individual clients following consultation with the Firm. [*Id.*]

---

[22] The sole exception was Plaintiff Debra Johnson (who planned to continue opposing GSK's outstanding motion for summary judgment—a motion which was later granted and affirmed on appeal, *see* Doc. 535 at 15.)

136.    After the parameters of the GSK Agreement had been set, the Firm held a group meeting of staff and attorneys working on these cases to discuss the process for communicating with each individual Plaintiff about the proposal. [Doc. 425 at 1-2.] The goal of that meeting was to ensure that counsel explained all of the terms of the proposal to each Plaintiff, and that the Plaintiffs understood the proposal and what would happen with their claims against GSK. [*Id.*] The Firm also wanted to be sure that each attorney who communicated with a Plaintiff knew all of the information necessary to answer any questions a Plaintiff might have. [*Id.*]

137.    During the meeting, the Firm decided which attorney would speak to each individual Plaintiff. In every case, the attorney who had the closest relationship with a particular client was assigned to discuss the proposal with that client. On the same day, counsel provided an explanatory letter to each of the Plaintiffs and encouraged each Plaintiff to discuss the situation with counsel. Attorneys at the Firm subsequently answered any questions the Plaintiffs had about the proposal. All of the Plaintiffs agreed to the proposal at the conclusion of this process, and the Firm did not move to dismiss their cases before obtaining the full and informed consent of each Plaintiff. [*Id.*] Counsel for GSK reported this agreement to the Court on October 28, 2014. [Doc. 394.]

138.    Notably, even after the Firm entered into the GSK Agreement, all the Plaintiffs encompassed by the Agreement still had claims against Grunenthal, and nearly all also had claims against Sanofi. [Doc. 453 at 10-11.] As the Firm noted in subsequent filings, it had every intention of continuing to litigate against the other Thalidomide Defendants despite recent rulings by the Court indicating skepticism about Plaintiffs' claims. [*Id.*]

## 2.    The GSK Agreement is Sloppily Described to the Court

139.    In its initial correspondence to Judge Diamond, GSK's counsel described the GSK Agreement as: "All plaintiffs currently represented by [the Firm]—with the sole exception of

Debra Johnson—will dismiss with prejudice all claims against the GSK Defendants." [Doc. 400 at 1.] But this was inaccurate. The GSK Agreement only encompassed Plaintiffs who were both (a) represented by the Firm, and (b) were also *not* subject to a pending Motion to Withdraw. [Doc. 400 at 2.]

140.    After Judge Diamond learned of the GSK Agreement, he further expanded SDM Hangley's charter to include an investigation of whether the Thalidomide Plaintiffs implicated in the GSK Agreement had "knowingly, intelligently and voluntarily consented to dismissing with prejudice his or her claims against the GSK Defendants – or any other Defendants." [Doc. 396.]

141.    The parties promptly sought to clarify the record. GSK's counsel informed Judge Diamond that the GSK Agreement did not encompass the Motion to Withdraw Plaintiffs. [Doc. 397.] The Firm filed written objections in November 2014 that reiterated that Judge Diamond had misunderstood the scope of the GSK Agreement and which Thalidomide Plaintiffs were actually implicated by it. [Doc. 400.] The Firm further highlighted that the Plaintiffs actually encompassed by the GSK Agreement had agreed to dismiss their claims as to GSK only, and that their claims against the other Defendants were not being dismissed. The Firm also made several legal arguments, including that (i) the Court had no power to approve or disapprove the terms of the GSK Agreement/Voluntary Dismissals, and (ii) SDM Hangley's investigation into the GSK Agreement could violate the attorney-client privilege. [*Id*.]

142.    In December 2014, Judge Diamond rejected these arguments and ordered SDM Hangley to proceed with his inquiry into the GSK Agreement. [Doc. 420.] SDM Hangley later stated that the "dominant consideration" for Judge Diamond in expanding his charter was that he had "lost confidence in the Hagens Berman lawyers' ability and willingness to tell the truth about critical facts when addressing the Court" in light of the "antipodal difference between 'facts' pled

or asserted by the Hagens Berman lawyers and the actual facts stated under oath by their client Plaintiffs." [Doc. 535 at 3.]

143.    SDM Hangley's proposed inquiry would focus on: i) Plaintiffs' understanding of their claims, (ii) Plaintiffs' understanding of the consequences of dropping their claims against GSK, and (iii) the facts and circumstances that Plaintiffs took into account in deciding to drop their claims against GSK. [Doc. 501.]

### 3.    The Firm Raises Concerns that the Proposed Inquiry Would Vitiate the Attorney-Client Privilege, Distress Its Clients, and Exceed the Court and SDM's Authority

144.    In late December 2014, the Court requested that the parties brief the following issues: (i) whether the Firm had a Rule 1.7(a)(2) conflict with respect to the GSK Agreement; (ii) the steps that SDM Hangley should take to ensure that each of the Plaintiffs made a voluntary and informed decision to dismiss their claims against GSK; and (iii) the extent to whether the attorney client privilege or Rule 1.6 precluded SDM Hangley from inquiring into the Firm's communications with the Plaintiffs encompassed by the GSK Agreement. [Doc. 430 at 7.]

145.    In January 2015, the Firm filed its response. [Doc. 453.] First, it noted that no Rule 1.7(a)(2) conflict existed with respect to the GSK Agreement, which was executed based on the Firm's honest appraisal of Plaintiffs' cases against GSK, rather than any motivation to avoid sanctions (indeed, the Firm either already faced, or risked facing, sanctions requests from the other Thalidomide Defendants). [*See id.* at 5-15.] Second, it argued that Rule 41 did not contemplate or allow for the Court to investigate the terms or fairness of private agreements between the parties, especially given the fact that no party had objected or complained that the dismissals may prejudice them. [*Id.* at 5-6.] Third, it claimed that both the attorney client privilege and Rule 1.6 precluded SDM Hangley from inquiring into the Firm's communications with the Plaintiffs encompassed by the GSK Agreement. [*Id.* at 17-21.] Indeed, the Firm warned that such an inquiry would be stressful

100

for the its disabled clients. [*Id.* at 16; *see also* Doc. 502 at 32 ("Hagens Berman is not aware of a single case in which a court has sua sponte ordered a party to testify in any capacity, or answer written questions, about whether she consented knowingly and voluntarily to either a conflict of a dismissal of a claim. Ordering such a requirement would be truly extraordinary given that . . . the issues the Special Master apparently wants to ask the clients about are communications that are not only privileged, but are some of the most sensitive and confidential conversations an attorney can have with her clients.").]

146.    The Firm further explained these positions in its several objections before SDM Hangley and the Court, as well as in its Petition for Writ of Mandamus. [Docs. 400, 451, 480, 499, 502.] With respect to the privilege issue, it noted:

> There is no way to divorce the Petitioners' understanding of their claims, their understanding of the consequences of the dismissal, or the facts and circumstances they considered in consenting to the dismissals from the conversations they have had with counsel. What they know about the legal and factual basis for their claims, the likelihood of success, the terms of any possible agreement, and the consequences of dismissing all have one common source: what their attorneys have told them. The Special Master cannot engage in an interrogation about these topics without asking the Petitioners, directly or indirectly, what their attorneys have told them about these various topics. The Special Master apparently believes that by couching the questions as seeking their "understanding" of various points, he can seek the nonprivileged testimony of the Petitioners, but those "understandings" have their direct roots in the extensive communications they have had with their counsel on those topics.

[*See* Hagens Berman's May 19, 2015 Petition for Writ of Mandamus to the Third Circuit, Case No. 15-2245, at 33-34.]

147.    The Firm also noted that the proposed client interviews would necessarily delve into counsel's protected work product, and raised concerns that SDM Hangley intended to act as judge, jury, and executioner:

> The Special Master will address objections on the basis of privilege primarily by ruling on the objections himself and, in limited cases, by seeking a ruling from the District Court. Yet there is absolutely no protection of the privilege if the Special

Master makes a Plaintiff answer a question over an objection based on work product or privilege, with an apparent threat of contempt if the Plaintiff does not answer his question over the objection of his counsel . . . Nor is the privilege adequately protected if the Special Master refers the matter to the District Court for a ruling. The District Court Is the sole investigator, and the Special Master acts as the District Court's agent and at the District Court's discretion. Yet the Special Master's alternative process would refer matters of privilege to the District Court in its own investigation.

[*Id.* at 29-30.]

148.    The Firm proposed two compromises that would make clear that its clients were aware of the terms of the GSK Agreement, but would also avoid unnecessary interrogations that would infringe on opinion work product and attorney-client privileged communications: (a) that plaintiffs be permitted to file sworn declarations making clear that they understood the terms of the GSK Agreement [Doc. 453 at 14-15], or (b) that SDM Hangley limit himself to a narrower scope of questioning that would not risk the disclosure of protected information [Doc. 499.] After SDM Hangley refused these requests, the Firm reiterated them to the Court. [Docs 501, 502 at 32.] In the alternative, it requested a stay of the upcoming interviews pending resolution of these issues via a mandamus petition. [Docs 502, 504.] After the Court never responded to that request or ruled on the Firm's objections, the Firm filed a Petition for Writ of Mandamus, which was subsequently denied.

### 4.    The Firm Did Not "Bully" SDM Hangley or Act Unprofessionally During the GSK Inquiry

149.    In 2015, SDM Hangley began conducting interviews with the plaintiffs encompassed by the GSK Agreement.

150.    The R&R accuses Mr. Styant-Brown and Hagens Berman lawyer Ari Brown of attempting "to bully the Special Master, demonize the Court in the eyes of the plaintiff-witnesses, and intimidate the court reporter." [Doc. 767 at 156; *cf* at 75-76]. Hagens Berman objects to these characterizations.

151.    The Firm was justifiably concerned that the process SDM Hangley intended to employ for these under-oath would violate the attorney-client and work-product privileges and Rule 1.6 by requiring disclosure of the Firm's communications with Plaintiffs. [*See* Doc. 501.]

152.    SDM Hangley's examination of Plaintiffs confirmed the Firm's concerns. [*See generally* Docs. 536-1 through 536-32.] He asked questions that the Firm and its clients believed encroached on privilege and work product—and then, in his dual role as examiner and judge, ruled on the Firm's objections. [*See* Doc. 536-1-536-2.] While the Firm objected to SDM Hangley's questioning of its client's at times, it did not "bully" SDM Hangley or act unprofessionally. Indeed, a dispassionate review of the interview transcripts, of which there are examples below, reflects that SDM Hangley was bullying the Plaintiffs.

153.    Before each interview, SDM Hangley summarized the concept of the attorney-client privilege to Plaintiffs and warned them to "look hard at any question" before answering, so that they could assess whether it sought privileged information; he warned Plaintiffs to be "very, very careful" about inadvertently or mistakenly waiving the privilege. [*See, e.g.*, Doc. 536-1 at 15-18 (Carolyn Grover interview).] He acknowledged that it would likely be difficult for Plaintiffs to determine what information was privileged, but emphasized that they were required to do so anyway, regardless of their attorneys' objections:

> BY SPECIAL MASTER HANGLEY:
>
> Q. And the next thing I want to say, I want to go back to this attorney/client privilege. You can waive the attorney/client privilege if you want to. I'm not entitled to hear about your conversations with your attorneys or your written communications with your attorneys unless you decide that you want to disclose them, but I want to make very clear to you that nobody in this conversation is pressing you to waive the attorney/client privilege . . . .
>
> On the other hand . . . you must understand, and this is kind of a subtle distinction, . . . that facts that you know or facts that you believe are proper subjects of my interrogation, so that I will ask you questions about things, and if it happens that you learn them from your attorney or if it happens that they are facts that you communicated to your attorney, that doesn't stop me from asking you about the facts and about your

knowledge. It does prevent inquiry into your communications. And that's going to be a hard line to draw in some circumstances . . . Your attorney may assert that I have crossed the line and that I am asking you about what they said to you. I will rule on those objections and decide. And if I tell you to answer it, you will, you will answer. If you have a worry about it, once again, do not hesitate to tell me that, but you will ultimately have to honor my instructions. Okay?

[Doc. 536-15 at 15:21-17:12 (June 16, 2015 Interview Transcript of Colleen Van Vleet).]

154.    When SDM Hangley asked Plaintiffs why they decided to drop their claims against GSK, attorneys for the Firm objected, arguing that its clients could not answer that question without divulging privileged information:

SPECIAL MASTER HANGLEY. Okay. Why did you decide to drop your claims against GlaxoSmithKline and to continue your claims against the others?

MR. WEAVER: Objection. It seeks attorney/client privileged information as well as opinion work product.

SPECIAL MASTER HANGLEY: You may answer, Mr. Murray.

MR. WEAVER: Is that objection overruled?

SPECIAL MASTER HANGLEY: Oh, I'm sorry. Yes, it is.

THE WITNESS: I have been advised not to give up my – they advised me they didn't have enough information and enough evidence to continue with–

SPECIAL MASTER HANGLEY: Stop. Stop. Stop. I don't want you to tell me what they said. I want you to tell me what you believe.

MR. WEAVER: Mr. Hangley, I think what you're getting at is exactly the problem with these questions, is that–– and this is Mr. Weaver–– the clients' understanding of privileged information can't be divorced given the conversations. Our objection stands. I'm sure it's going to be overruled, but to the extent that he can answer, I guess we'll let him, but, you know, his understanding is inextricably tied up with what we had talked about with him.

SPECIAL MASTER HANGLEY: Understood and overruled.

[Doc. 536-5 at 15:17-17:7.]

155.    Several Plaintiffs expressed confusion about how they could answer SDM Hangley's question—why they decided to drop their claims against GSK—without waiving the privilege. The following exchange between SDM Hangley and Plaintiff Mary McPartlan-Hurson is illustrative:

Q.    Do you intend to continue pursuing your claims against those three defendant groups?

A.    Well, I think the entire point that we are, uhm, meeting over is about dropping our claims against GSK.

Q.    Okay. And do you intend to continue pursuing your claims against Grunenthal and Sanofi?

A.    Yes.

Q.    What is the basis for the distinction between your treatment of the two?

MS. MAHONEY. Mr. Hangley, this is Barbara Mahoney on behalf of plaintiffs. We object to this because we think it will reveal attorney/client privilege or work product privilege.

SPECIAL MASTER HANGLEY: Overruled. And when I say "overruled," that means that you answer.

THE WITNESS: Can you repeat the question, please?

SPECIAL MASTER HANGLEY: Sure.

.  .  .

THE WITNESS: Well, according to the information that we got, it wasn't worthwhile proceeding with GSK.

BY SPECIAL MASTER HANGLEY:

Q.    Okay. Why?

A.    Well, based on the information and based on, uhm, the research and based on all of my discussions with attorneys, uhm, we came to the conclusion that it wasn't worth pursuing GSK.

Q.    Okay. Now, I don't want to know what your attorneys told you about their research. I don't want to know what they said to you. I do want to know–-

MS. MAHONEY: Mr. Hangley–-

SPECIAL MASTER HANGLEY: Let me finish the question, please.

BY SPECIAL MASTER HANGLEY:

Q.    I do want to know what the information is that you referred to twice in that last answer. What's the difference?

MS. MAHONEY: This is Barbara Mahoney on behalf of plaintiffs. I didn't get chance to interject the objection. Again, objection on work product and attorney/client.

SPECIAL MASTER HANGLEY: Overruled. You may answer.

THE WITNESS: You know, I don't understand what it is that you're asking me.

BY SPECIAL MASTER HANGLEY:

Q.      I'm asking you what the information is; not the fact that there is information, but I'm asking you what the information is that persuaded you that it was a good idea to drop your claims against GSK while continuing to pursue them against Grunenthal and Sanofi.

MS. MAHONEY: Same objection.

SPECIAL MASTER HANGLEY: Overruled.

THE WITNESS: Well, you know, I know I–- I have discussed, uhm, these, uhm–- this case, this lawsuit with my attorneys on numerous times. Any time I have ever had a question they answered my question. I know all about the sanctions. I know all about what's going on in the courts. I read all the opinions. And I think that, uhm, I was well aware of all facts all the time all the way through this lawsuit. And, uhm, all the research and all of the information was available to me. Every question I had was answered we–- by–- by my attorneys. Uhm, I am in touch with them all the time on the phone and through e-mail, so I understand exactly what was going on and why we decided to drop the claims against GSK. So any further than that, I would be cautious to give you any other information that–- because I'm not waiving my attorney/client privilege.

SPECIAL MASTER HANGLEY: Nor do I want you to.

THE WITNESS: And as I understand it, what you said in your speech when you began this conversation, uhm, I just want that understood.

SPECIAL MASTER HANGLEY: It is–- it is absolutely understood, and not only is it understand, you and I agree on it a hundred percent.

THE WITNESS: Oh good.

SPECIAL MASTER HANGLEY: And I am not asking you to tell me about your conversations with Hagens Berman. I'm asking you to tell me what it is that makes the case against SmithKline, in your view, sufficiently worse than the claim against the other two companies that you want to drop that claim.

MS. MAHONEY: Mr. Hangley, just before she answers, we have the ongoing objection that we disagree with your characterization of attorney/client privilege and work product privilege.

SPECIAL MASTER HANGLEY: Overruled. Answer the question, please.

THE WITNESS: I don't understand how I can answer that question and separate information that I know through the research that I–- uhm, that, you know, was given through my attorneys, information that I researched and found and gave to my attorneys. It's impossible. Are you–- you know, if – I have a question for you. May I ask a question of you?

SPECIAL MASTER HANGLEY: No. You may answer my questions.

THE WITNESS: Oh, I see.

SPECIAL MASTER HANGLEY: And that's how it works.

BY SPECIAL MASTER HANGLEY:

Q.      The question that I have is a question that doesn't depend on where you got your information, whether you looked it up yourself, whether your attorneys told it to you, whether or not it was written on the side of a passing bus. I don't care. I want to know what the information is that makes your case against GlaxoSmithKline worse than your case against Grunenthal and Sanofi. I don't want conclusions. I want facts.

MS. MAHONEY: Mr. Hangley, this is privileged. And also objection, asked and answered.

SPECIAL MASTER HANGLEY: I have your objection. It's overruled. Answer the question, please.

THE WITNESS: I did answer the question.

BY SPECIAL MASTER HANGLEY:

Q.      What was that answer?

A.      I told you after long discussions with my attorneys based on all the information and the research that they obtained, that it wasn't worth pursuing the claim against GSK.

Q.      That's a conclusion. I'm looking for the facts that led to the conclusion. I don't want to know the conversations and, Ms. Mahoney, you don't need to object to that because I'm not asking about conversations. I'm asking to the facts that led to this conclusion.

A.      Well, you know, in order to make a decision one has to have facts. We learn those facts through conversations. So you're asking me to parse the facts and the conversations in order to give you an answer and that's impossible without—

Q.      No. No, it's not.

A.      -- raising -- well --

Q.      It's impossible, ma'am, because you are conflating-- no, I'm speaking.

MR. BROWN: Would you – can you let her finish her answer?

SPECIAL MASTER HANGLEY: Actually, no. If I speak, other people become silent and wait until I finish. That's another one of the rules. All right? And, actually, ma'am, you are conflating conversations with conclusions. I'm not asking you for either. I'm asking you for the facts, the understandings that led to the conclusions.

BY SPECIAL MASTER HANGLEY:

Q.      Now, don't tell me, please, don't insult my intelligence by telling me that you can't discuss facts without discussing the conversations that led to the facts because you can. People do it in courtrooms all the time. And I am asking you to do it now.

MS. MAHONEY: Same objections.

SPECIAL MASTER HANGLEY:

Overruled.

. . .

Q.      Is it your–- and I will rephrase the question.

Is it your understanding that based on your own understanding, not what your attorneys told you, but is it your understanding that the evidence against GlaxoSmithKline with respect to distributing Thalidomide, making it available at the time of your mother's pregnancy, is insufficiently strong to go forward with a claim against GlaxoSmithKline?

MS. MAHONEY: Objection. Mr. Hangley, this is a strategic decision. It invades the work product and attorney/client privilege.

SPECIAL MASTER HANGLEY: Overruled. You may answer the question.

THE WITNESS: We made the decision, and I was fully informed of the decision and the process and, you know, uhm, I know everything that's going on. I'm informed by my attorneys. I am in touch with them all the time. Whenever I have questions, I ask them. I know all about the sanctions. I know all about the cases. I know all about the judge's rulings. I know exactly who you are. I don't understand why you're even going forward with this.

[*See* Doc. 536-4 June 9, 2015 Tr. of Interview with Mary Mcpartlan-Hurson at 15:9-16:9, 17:1-24:13, 31:16-32:33.]

156.    Plaintiffs in other interviews experienced similar distress and confusion during the examination by SDM Hangley. *See, e.g.*, Doc. 536-2 at 27:9-15 (June 8, 2015 Interview with Plaintiff Rebecca Alexander) ("My attorney and I had many conversations about this particular thing, and so it is so hard for me to answer this without sharing information that I shouldn't share. I'm not exactly sure how to proceed, Mr. Hangley."); Doc. 536-11 at 16:22-17:1 (June 12, 2015 interview with Plaintiff Gerald Ledsome) ("I'm conflicted because many parts of the answer would get into things that I have discussed with my attorneys . . ."); Doc. 536-14 at 15:5-9 (June 15, 2015 interview with Plaintiff William Tyler, III) ("I cannot answer that question without mentioning my conversation with the attorneys because we came to that conclusion together.").]

157.    During his questioning of Plaintiffs, SDM Hangley was highly critical of the GSK Agreement and speculated negatively about the Firm when examining its clients. [*See, e.g.*, Doc. 536-10 at 24, June 12, 2015 interview with Plaintiff Chris Simeone (noting that "from all that

appears in the record, Hagens Berman obtained a benefit, i.e., being relieved of the threat of sanctions by [GSK] while the plaintiffs will not receive any benefit from their dismissal."); Doc. 536-23 at 25:9-13 (June 24, 2015 Interview with Plaintiff Carmella Norcross) ("[I]f I said to you that Hagens Berman was under a threat, a worry, about whether it would have to pay money to [GSK] as a sanction in this litigation, did you know that?").

158.    Several Plaintiffs expressed concern at what they viewed as an undermining of their own agency and decision-making authority:

> THE WITNESS:  Uhm, may I say something?
>
> SPECIAL MASTER HANGLEY:  Sure.
>
> THE WITNESS:  Uhm, this gets to the point of–- I mean, this is my personal opinion, uhm, this what I have just had to do.  And, uhm, the court's opinion that we–- I'm just going to stick to myself, not the other plaintiffs, that I knowingly and with an intelligent decision dismissed this case, uhm, is somewhat– I'm trying to think of the word– uhm, insulting.
>
> I have birth defects, yes, several.  Uhm, I'm handicapped by some people's standards and I am disabled, but I do have a good mind and a conscience without the court making sure that I am not stupid. And that's -- that's really all I have to say.

[Doc. 536-11 at 32:17-33:14 (June 12, 2015 interview with Plaintiff Gearold Ledsome).]

159.    During the interviews, the Plaintiffs confirmed that they understood the key terms of the GSK Agreement and had voluntarily entered into it.  [*See, e.g.*, Doc. 536-2 at 23:6-13 (June 8, 2015 interview with Plaintiff Rebecca Alexander) ("I absolutely made [the decision to dismiss GSK] voluntarily . . . I am an intelligent person and I weighed the information that I had, and I made this decision, uhm, per discussions with my attorney, but it is definitely my own decision.").] Others emphasized their gratitude for the Firm and its work. [*See, e.g.*, Doc. 536-23 at 26:15-21 (June 24, 2015 interview with Plaintiff Carmela Norcross) ("I think my attorneys are doing a really good job. They have kept me up-to-date on everything they have done. I have no qualms with them whatsoever. They spend a lot of time and energy on this . . . ."); Doc. 536-18 at 19:22-24 (June 18,

2015 interview with Plaintiff Doris Brust) (". . . I have been very happy with the work that Hagens Berman has done and they have been fabulous to work with.").]

160.    The R&R also asserts [Doc. 767 at 75-76] that Mr. Styant-Browne acted unprofessionally by "insinuating that the Master and the court reporter might be tampering with the transcript and warning that Hagens Berman would be investigating our conduct." But Mr. Styant-Browne was merely concerned that SDM Hangley was submitting transcript errata requests for the interviews at which Plaintiffs testified without copying counsel on those requests. His correspondence to the SDM and court reporter, attached as Exhibit 129, was professional and not something for which he or the Firm should be sanctioned.

### 5.    In 2016, SDM Hangley Recommends that the Dismissals be Ordered, Finding that Plaintiffs Knowingly and Voluntarily Agreed to Dismiss Their Claims Against GSK

161.    On August 10, 2016 issued an R&R concluding that the Plaintiffs encompassed by the GSK Agreement had indeed knowingly and voluntarily agreed to dismiss their claims, and thus recommended that the dismissals be ordered. [Doc. 535.] He noted that Plaintiffs "articulated a cogent rationale for a decision to dismiss their claims against GSK[.] [*Id.* at 27-28.] But his recommendation notwithstanding, he then stated: "[i]t is easy to wonder whether, in presenting the lopsided GSK deal to its clients, Hagens Berman painted a picture of a judiciary so hostile, so malevolent, that the plaintiffs were incapable of making a reasonably informed decision." [*Id.* at 36.]

162.    As of December 2023, SDM Hangley's R&R remains pending, and the Court has not issued an order regarding whether to adopt the R&R. But the Firm continues to be criticized in the R&R and elsewhere [*E.g.,* Doc. 749 at 2.] with respect to the propriety of the GSK Agreement despite SDM Hangley's prior recommendation that it be approved and the testimony of more than two dozen Plaintiffs that they were fully aware of its consequences.

**M.    Specific Plaintiffs Mentioned in the October 12, 2023 R&R**

Facts relevant to SDM Hangley's discussion of specific Plaintiffs in his October 12, 2023 Report & Recommendation are discussed below.

163.    The R&R [Doc. 767 at 57-65] discusses the *Spence* complaint at length. Hagens Berman objects that testimony taken by SDM Hangley regarding the *Spence* complaint is not relevant to the Withdrawal Motions and SDM Hangley's narrow charge with respect to the Withdrawal Motions. Further, Hagens Berman objects to SDM Hangley's implicit statement that the Firm misled anyone with respect to Plaintiffs Morgan and Murray. As counsel testified, and the *Spence* complaint bears out, neither Mr. Morgan nor Ms. Murray sought damages from the entities with whom they had previously settled. [*See e.g.*, 5/10/2019 Tr. at 953-955.]

**1.    Michael Morgan and Barbara Murray**

164.    Michael Morgan and Barbara Murray were plaintiffs in the *Spence* complaint filed in August 2012. [Doc. 1.] The Firm knew at the outset that Mr. Morgan and Ms. Murray had existing settlements with one or another of the Thalidomide Defendants—Mr. Morgan with Sanofi predecessor Merrell (from whom he was receiving monthly compensation), and Ms. Murray with Grunenthal. As a result, when filing the *Spence* complaint, the Firm carved Mr. Morgan out of its request for relief as to Sanofi, and did the same with Ms. Murray with respect to Grunenthal. [*See, e.g.*, *Spence* Compl. ¶¶ 317, 341, 374, 382, 391, 403; *see also* 05/07/19 Tr. at 157-60 (Styant-Browne testimony).] However, under the fraudulent concealment and civil conspiracy theories described above, the Firm still believed it had a good faith basis for bringing claims on behalf of Mr. Morgan and Ms. Murray with respect to the Thalidomide Defendants with whom they did *not* have existing settlements. [*See, e.g.*, 05/10/19 Tr. at 941 (Berman testimony) (describing conspiracy claim wherein the Thalidomide Defendants all "kept quiet" about the dangers of thalidomide).]

165.    In December 2013, counsel for Defendants sent the Firm a letter requesting dismissal of the Morgan and Murray claims, among others. In February 2014, the Court issued a ruling on a motion to compel expressing skepticism of plaintiffs' fraudulent concealment theory (that it was not necessary for the Thalidomide Defendants to have directly communicated with the plaintiffs for the doctrine to apply, and that plaintiffs could rely on the cumulative effect of communications instead). [*See* Doc. 166 at 1.]

166.    In April 2014, the Firm filed Stipulations of Voluntary Dismissal with Prejudice with respect to Morgan, Murray, and Tawana Williams. [Doc. 182.]

### 2.    Roel Garza, Jack Merica, and Lawrence Boiardi

167.    In the summer of 2014, when the Thalidomide Defendants filed several motions for summary judgment with respect to Plaintiffs Jack Merica, Lawrence Boiardi, and Roel Garza, the Firm stipulated to entry of the requested summary judgments for several reasons.  To the extent the R&R implies that sanctions (in addition to those already awarded) may be imposed on Respondents, they object and incorporate by reference their prior objections.  [*See* Doc. 427.]

### a.    Roel Garza

168.    With respect to Mr. Garza, discovery had not unearthed the hoped-for materials establishing that his injuries were the result of thalidomide exposure. Because the Thalidomide Defendants had distributed thalidomide as an experimental drug within the United States— without a prescription and without even identifying it as thalidomide—the Firm knew from the outset that there would be little proof of direct exposure with several Plaintiffs' claims.  [*See, e.g.,* Doc. 341 (Opp. to Sanctions Motion in Garza) at 4.] Instead, it brought claims based on indirect proof—which, in Mr. Garza's case, included that he: (i) had injuries that were consistent with thalidomide exposure; (ii) had a large and extended family with no congenital abnormalities; (iii) was born during a time period in which the drug was clearly in the United States and

distribution was uncontrolled; and (iv) had been told by at least one physician, less than two years before his complaint was filed, that his injuries were caused by thalidomide. [Doc. 341 at 4-5; *see also* Doc. 318 at 3 n.6.]

169. ███████████████████████████████████████████████████████
████████████████████████████████. For example, as noted above, the Firm's extensive pre-suit investigation had revealed ████████████████████████████████
████████████████████████████████████████████████████████████
███████ [Ex. 39 (12/8/14 Ari Brown Memo).] Thus, the Firm believed that discovery would yield
████████████████████████████████████████████████████████████
████████████████████████████████████████ For this reason, its initial discovery requests sought to determine where within the United States the Thalidomide Defendants had distributed or caused thalidomide to be distributed between 1950 and 1962. [*See, e.g.*, Ex. 41 (10/02/2013 First Set of RFPs from Plaintiffs to Defendants, RFP No. 4 (requesting "[a]ll documents identifying any doctors, hospitals, or facilities that received thalidomide in the United States from [Defendants], including documents with the address of the doctor, hospital, or facility."); RFP No. 5 ("All documents RELATING TO how [Defendants] selected doctors to whom thalidomide was provided."); RFP No. 9 ("All documents that reveal the identity and last known address of any person or entity (whether a doctor, hospital, or plaintiff) receiving thalidomide in the United States."); RFP No. 23 (documents reflecting number of thalidomide tablets distributed and other tracing information).]

170. Unfortunately, by time the Defendants filed their summary judgment motion, discovery had failed to produce much evidence supporting the Firm's exposure theory as to Mr. Garza. The Firm thus concluded that it was unlikely that Mr. Garza would prevail on

exposure at summary judgment or at trial, and chose not to oppose the entry of summary judgment to avoid needlessly prolonging the litigation. [*See* Doc. 341 at 5.]

### b.    Jack Merica

171.    With respect to Mr. Merica, the Firm had asserted that he could not have obtained sufficient knowledge as to whether thalidomide actually caused his injuries (as opposed to his subjective belief that thalidomide caused his injuries) given, among other things, the state of the medical science. [Doc. 427 at 27 (citing *Spence* Complaint at ¶ 11).] But in their summary judgment motion as to Mr. Merica, the Thalidomide Defendants invoked Virginia law for the first time—without notice—to argue that Mr. Merica's claims were time-barred because he had subjectively believed for many years before filing his case that his birth defects were the result of thalidomide exposure. [*See, e.g.*, Docs. 338 at 17, 338-1, 427.] But as described above, the Firm still believed—and had cited case law supporting the proposition—that Mr. Merica's claims could survive under Pennsylvania's discovery rule, notwithstanding his subjective belief. [*See, e.g.*, Doc. 338 at 21-25 (discussing *Coleman* case).] The Firm did *not* believe it could make the same arguments under Virginia law, including because Virginia did not provide for a discovery rule with respect to statutes of limitation. [*See* Doc. 338-1 ¶¶ 1-6 (Spiegel Decl.).] For this reason, the Firm did not oppose Defendants' motion for summary judgment as to Mr. Merica. [*See id.*] Moreover, by this time, Judge Diamond had already ruled—in deciding a discovery motion— that the fraudulent concealment theory required direct communication between the defendant and plaintiff, rather than fraud on the public (something the Firm viewed as an open legal question when initially filing the complaint). [10/01/2014 Tr. of Sanctions Hearing, at 73-74; *see also* Doc. 166 (order granting Defendants' motion to compel).]

### c.    Lawrence Boiardi

172.    With respect to Plaintiff Lawrence Boiardi, the Firm ████████████

████████████████████████████████████████████████████████

████████████████████████████████████. [*Alexander* Complaint

¶ 21 (noting that "the predominant medical view has for decades held that thalidomide did not

cause the types of unilateral and asymmetrical limb reduction from which Lawrence suffers.").]

Mr. Boiardi was adopted and never knew his birth mother; although the Firm was able to find his

original birth certificate before filing, it could not locate his mother. [Doc. 427-1 ¶ 3.] Defendants

eventually located her during the discovery process and provided her contact details to the Firm.

[*Id.* ¶ 4.] When the Firm contacted her, she claimed that she did not even remember giving birth

to her son—something she later admitted was a fabrication. [*Id.* ¶¶ 4, 6.] After Defendants

contacted her, she changed her story, claiming that she did remember birthing her son, but did

not believe she had taken thalidomide. [*Id.* ¶ 5.] This was the first time she had unequivocally

taken the position that she had given birth to Mr. Boiardi, but did not believe she had taken

thalidomide. [Doc. 427 at 55.] In response to this—and in light of the fact that exposure evidence

as to Mr. Boiardi was weak—the Firm decided it could no longer continue to represent him in

good faith. [*See id.*]

### d.    Ed Andre

173.    The *Yeatts* complaint alleges that: (i) Mr. Andre was born with severe birth

defects, including unilateral injuries (¶ 15); (ii) while Mr. Andre and his family knew that his

mother had taken thalidomide while pregnant, they could never obtain confirmation from doctors

given the lack of recordkeeping at the time (¶¶ 17-18); (iii) Mr. Andre and his family did not

know the names of the specific companies responsible for distribution of thalidomide within the

United States, nor could they find a doctor who did know (¶ 18);  (iv) the publicly available

information about the drug's distribution in the United States did not suggest it was available during his mother's pregnancy in 1956, in part because of Defendants' representations (¶18); and (v) only in the spring of 2011 did Mr. Andre's mother learn for the first time about the companies responsible for thalidomide distribution, and about the fact that the drug was available during her pregnancy (¶19). [*See Yeatts et al v. Smithkline Beecham Corporation et al*, 2:11-cv-06711-JHS, Doc. 1.]

174.    The Firm believed it had a good faith basis for bringing claims on behalf of Mr. Andre for several reasons. First, Mr. Andre's unilateral birth defects supported application of the March of Science theory; in other words, medical expert testimony only recently would have supported any claim that thalidomide caused his particular injuries. [Doc. 262 at 9, 13.] Although the Yeatts Complaint did not explicitly allege unilateral injuries with respect to Mr. Andre, Dr. Stephens' opinion attached to the motion for summary judgment briefing confirmed that his injuries were unilateral. [*See* Doc. 262-7 at ¶ 17.]

175.    Second, under the discovery rule exception, Mr. Andre, exercising reasonable diligence, would not have known about the causal connection between his injury and thalidomide, even if he suspected there was a connection. For example, although his doctors acknowledged to him that his injuries appeared to be thalidomide-related, no medical records were available to confirm that theory, and the publicly available information about thalidomide's distribution in the United States did not support the conclusion that thalidomide was obtainable in the United States during the time Mr. Andre's mother was pregnant. [*Yeatts* ¶ 18] Additionally, although Mr. Andre's father had told him that he had spoken to a lawyer about his defects, the lawyer told his father that absolutely nothing could be done about it—so Mr. Andre believed he had no claim against the Thalidomide Defendants. [Doc. 262 at 10.]

176.    Third, based on its research, the Firm reasonably concluded that the Thalidomide Defendants concealed the fact that thalidomide was obtainable in the United States far earlier than their statements to the public suggested, including during the time of Mr. Andre's mother's pregnancy. [*Yeatts* ¶ 18.] Because the Firm's research revealed that Pennsylvania law did not necessarily require the Thalidomide Defendants to have directly communicated with each Plaintiff in order for liability to attach, the fact that Mr. Andre and his family suspected that thalidomide was the cause of his injuries did not bar his claim, given that they did not know the names of the specific companies responsible for distribution of thalidomide within the United States (nor could they find a doctor who did know). [*See id.*] It was only in Spring 2011 that Mr. Andre's mother learned, for the first time, that thalidomide had indeed been available in the United States during her pregnancy, and about the specific companies responsible for distribution of thalidomide within the United States. [*Id.* ¶ 19.]

177.    In October 2014, the Court granted summary judgment in favor of Defendants, holding that Pennsylvania's two-year statute of limitations barred Mr. Andre's claims. [Doc. 371.] To the extent the R&R implies that sanction may be imposed in connection with Mr. Andre's claim, Respondents incorporate by reference the argument and evidence found in Mr. Andres' Opposition to Defendants Motion for Summary Judgment.  [*See* Doc. 262.]

### e.    Terrie Bolton

178.    Ms. Bolton was born with severe birth defects in 1964. ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ As Mr. Styant-Browne testified:

> Here is what I recollect about Chicago. I was concerned about her date of birth. I recollect raising the issue with Ms. Reeves and I believe that she gave an account as to the possibility, according to Ms. Bolton's statements, that the drug had been -- had been distributed to Chicago. I can't remember any more details than that, but I do remember being satisfied by Ms. Reeves that the possibility existed on the basis of Ms. Bolton's statements that the drug had been distributed after 1962 to where her mother had her pregnancy . . . I recollect that we had gathered together a great deal of information that suggested two things. First of all, that the distribution of the drug was much more widespread than had previously been understood. And, in particular, hundreds of thousands of tablets had been distributed across the United States, contrary to what the previous understanding as to these very limited so-called clinical trials had been. We also knew that the record keeping of the distribution of the drugs was grossly inefficient and at times non-existent. So we had evidence that various sales persons from the U.S. manufacturers would simply go around to doctors they knew and hand out samples of the drug to those doctors, without specifically recording the distribution of the drug . . . we didn't have any specific evidence after 1962, but we did . . . know that the record keeping of the distribution of the drug was entirely inadequate. We also knew that when the drug was distributed by SKF it was not identified by any, if I can call, it[s] brand name . . . [a]nd so doctors could not readily ascertain what the drug was or what the active ingredient in the drug was by reference to its name. So I knew that much and my recollection is that Ms. Reeves stated that Ms. Bolton made statements, making it plausible that the drug may have been distributed to her mother when she was in Chicago.

[09/26/2017 Tr. at 11:32 a.m. at 125-27 (re Bolton).]

179.    Indeed, documents collected from ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████. [Ex. 66 (Table with ████████████████████).]

180.    Further, because the "public narrative" was that the drug was no longer accessible by the summer of 1962, the relatively late date of birth would assist with application of the discovery rule to toll the statute of limitations. [09/26/2017 Tr. at 11:32 a.m. at 134 (re Bolton) (Styant-Browne testimony noting that "the public narrative . . . was the drug was removed from

anywhere in the world in the summer of 1962 . . . [Ms. Bolton] may have come up against that wall, which would have stopped her from making any further inquiry.").]

181.    However, by 2014 the Firm . Thus, the Firm determined that it could not proceed with Ms. Bolton's claim. [Ex. 104 (08/25/2014 email from Ms. Bolton).]

182.    Ms. Bolton ███████████████████████. [*Id.*] Accordingly, the Firm filed a motion to withdraw (the "Bolton Motion to Withdraw") on August 29, 2014. [*See, e.g.*, Doc. 342 (08/29/2014 Motion to Withdraw as Counsel for Plaintiff Terrie Bolton).]

183.    In December 2017, upon learning that Tyler Weaver had altered Dr. Stephens' report before sending it to Ms. Bolton, the Firm promptly disclosed the alterations to counsel for Ms. Bolton and SDM Hangley and then moved to reopen and correct the record with respect to its motion to withdraw as Ms. Bolton's counsel. [Doc. 583.]

184.    In July 2018, the Firm withdrew its motion to withdraw as Ms. Bolton's counsel ████████████████████████████████. [*See* Doc. 637.] The ███████████████████████████████████████████ ███████████████████████. [*See* Ex. 105 (01/22/2019 Hagens Berman Disclosure to the Court, attaching 2018 Stephens Declaration).]

185.    Because the Firm had initially sought withdrawal as Ms. Bolton's counsel based ████████████████████████████████████████ ██████████████████████████████. [*See id.* at 2-3.] For this reason, the Firm filed a Notice of Withdrawal of its motion to withdraw. [*See id.* at 3; *see also* Doc. 637.] The Notice of Withdrawal did not discuss the ████████████████

████████████████████████████████████████, but the Firm later made a confidential disclosure to SDM Hangley, with the permission of counsel for Ms. Bolton, explaining the issue. [*See* Ex. 105; *see also* Doc. 639.]

**f.    Jose Navamuel**

186.    Mr. Navamuel's thalidomide claim was asserted in the *Spence* complaint filed on August 9, 2012. [Doc. 1.] Mr. Navamuel was born in Cuba; during his initial interview, he ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████. [Ex. 106 (Reeves' Attorney's Notes at 1); Ex. 107 (Questionnaire) at 2.]

187.    In his discussions with the Firm, Mr. Navamuel also ████████████████ ██████████████████████████████████. [09/28/2017 Tr. (re: Navamuel) at 18-19 (Mahoney's testimony); *see also id.* at 30 (Styant-Browne's testimony).] The Firm did not have documentation that thalidomide had been distributed in Cuba specifically, but did have research suggesting that the drug had left the United States and entered into other countries. [*Id.* at 6-7 (noting records "that showed that the drug did leave the United States, and enter into other countries, for example, there were donations made by doctors who received the drugs from the Merrell companies, who donated them to missionaries, and they appeared outside the United States . . . there were also documents that showed that the researchers themselves undertook it to take the drug outside the United States. In one instance I can recall . . . the drug was distributed to pregnant women in the Middle East.").]

188.    This, combined with ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████. On January 19, 2012, for

example, Ms. Reeves emailed Mr. Styant-Browne regarding ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ [Ex. 108 (01/19/2012 email to Mr.

Styant-Browne from Ms. Reeves)).]

189.    Additionally, the Firm later discovered an August 2, 1962 Associated Press article,

republished in a Florida newspaper, with the headline "Cubans Are Told Drug Thalidomide is

Made in the United States." [09/28/2017 Tr. (Mr. Styant-Browne's testimony) at 33.] The Firm

believed that the article supported its theory that the drug had been distributed in Cuba. [*Id.* at 33-

35.]

190.    In the R&R [Doc. 767 at 132-35], SDM Hangley construes the article to cut against

Hagens Berman's inference that thalidomide may have been distributed in Cuba.

> That Havana Radio was even talking about thalidomide suggests that the
> thalidomide scandal was news in Havana as it was news in the United States, that
> Cuban audiences – physicians, mothers-to-be, lawyers – would likely have been
> exposed not to thalidomide, but to news *about* thalidomide by the August 2, 1962
> date of the AP squib. Otherwise, Havana Radio would not have been talking about
> a chemical compound called thalidomide at all, and a local Florida newspaper
> would not have given the AP squib its inches of space on the page.

191.    SDM Hangley's conclusion that the "gist" of the article was "obvious" is

inaccurate. A fair reading, and the one espoused by Mr. Styant-Browne, [9/28/17 Tr. (Navamuel)

at 33-35], was that Havana Radio was providing misinformation to its audience about the

provenance of a drug being distributed in Cuba. SDM Hangley may disagree, and he certainly

offers his own personal opinion as to the "obvious" import of a four-sentence article about a

statement made by Havana Radio, but reasonable minds can differ.

192.    The R&R also states [Doc. 767 at 135]:

Hagens Berman's knowledge on the critical question – whether it would even have been possible for Mr. Navamuel's mother to stumble onto thalidomide in Havana, and ingest it, in the spring of 1960 – is exactly the same now as it was when Steve Berman swore to the accuracy of the *Spence* complaint. He and Hagens Berman knew and still know nothing.

193.    This statement that the Firm "knew" nothing and "still[s] knows nothing," or that there was no "functional difference" in its knowledge at the time of filing and the time of withdrawal, is misleading, and not the standard for whether withdrawal should be granted. In 2014, after targeted discovery and conducting additional investigation out of court, ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████ [*See* 09/28/2017 Tr. (Ms. Mahoney's testimony) at 7.]. The fact that the Firm learned ████████████████████████████████████████████████████████ ███████████████████████ does not mean the Firm did not adequately investigate the claim before filing, or that it acted with willful bad faith in doing so.

194.    The Firm recommended to Mr. Navamuel via separate letters on April 1 and April 9, 2014, ████████████████████. [(09/28/2017 Tr. (Ms. Mahoney's testimony) at 10-11).] Mr. Navamuel ████████████████████. *Id*. In a subsequent phone call, Mr. Navamuel stated ████████████████████████████████████████████████████████████████ ████████. *Id*. at 11. The Firm then served targeted discovery on the Defendants regarding distribution of thalidomide to Cuba. *Id*. at 12. After Defendants responded to that discovery stating that they had not distributed thalidomide to Cuba, the Firm sent Mr. Navamuel ████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████ *Id*. at 14. The Firm ████████████████ ████████████████████ *Id*.

195.    On July 18, 2014, the Firm ████████████████████████████████ ███████████. *Id.* at 16. The Firm also advised Mr. Navamuel █████████████████ █████████████████████████████████████████ *Id.*

196.    On August 1, 2014, the Firm filed a Motion to Withdraw as Mr. Navamuel's counsel. [Doc. 301.] Three days later, on August 4, Judge Diamond denied the motion without prejudice, ruling that he would "defer a decision . . . until after the issue of sanctions has been resolved"—although no sanctions have ever been requested with respect to Mr. Navamuel. [*See* Doc. 304.]

197.    On August 18, 2014, Judge Diamond ordered Mr. Navamuel to inform the court in writing by September 18, 2014, whether he had obtained replacement counsel or wished to proceed *pro se*, and further ordered that he would dismiss the action for lack of prosecution absent Mr. Navamuel informing the court about his decision. [Doc. 329.] The Firm personally served a copy of the Court's order and the Firm's Motion to Withdraw on Mr. Navamuel. [Doc. 333.] Mr. Navamuel never filed a notice as ordered by the August 18, 2014 Order regarding his election.

198.    On October 13, 2014, GSK filed a Motion to Dismiss the Navamuel claims. [Doc. 366.] The motion was denied without prejudice on May 29, 2015; no explanation was given for the denial. [Doc. 509.]

199.    In late September 2017, Special Master Hangley held hearings regarding the 2014 motions to withdraw filed by the Firm, including with respect to Mr. Navamuel. [Doc. 573.] The hearing on September 28, 2017 addressed the withdrawal motion for Mr. Navamuel. Lawyers for the Firm testified as to the facts set out above.

200.    On June 24, 2023, Mr. Navamuel filed a notice stating that he no longer wanted to be represented by the Firm and would be proceeding *pro se.* [Doc. 765.]

### g.    Richard Anderson

201.    Plaintiff Richard Anderson was born with serious unilateral and asymmetrical defects, including scoliosis and an abnormally short left arm with a fixed elbow and a malfunctioning shoulder. [*Yeatts* ¶ 72.] Although he had asked doctors about the cause of his injuries, he was never given an answer. Years later, he saw pictures of thalidomide victims in a medical dictionary; a nurse also told him that he may have a thalidomide injury. [*Id.* ¶ 73.] Mr. Anderson told the Firm ███████████████████████████████████████ ███████It was only in July 2011 that a doctor stated, for the first time, that thalidomide had caused the damage to his left hand. [*Id.* ¶ 75.]

202.    Subsequently, Mr. Anderson lost touch with the Firm, ████████████████████ ████████████████████████████████████████████████. [*See, e.g.*, Doc. 220, Ex. B.] Despite numerous attempts, the Firm was unable to establish consistent contact with Mr. Anderson ████████████████████████████████████████████████████████████████████████ ██████████████████████████. [Ex. 109 (12/18/13 letter to Mr. Anderson from Mr. Styant-Browne); Ex. 110 (12/22/13 letter to Hagens Berman from Mr. Anderson); Ex. 111 (11/01/2013 letter to Mr. Anderson from Mr. Styant-Browne).]

203.    In August 2014, Mr. Styant-Browne wrote to Mr. Anderson ████████████████ ██████████████████████████████████ [Ex. 112 (08/05/2014 letter to Mr. Anderson from Mr. Styant-Browne).] ████████████████████████████████████████ ███████████████████████████████████████████████████████ [*See* Ex. 113 (08/28/2014 email exchange).]

204.    Given these logistical hurdles, the Firm arranged for a local orthopedic surgeon to examine Mr. Anderson and provide Dr. Stephens with the results of the examination. [09/28/2017 Tr. (re: Anderson) at 5 (Styant-Browne testimony).]

205.   In light of . [Ex. 115 (Ex. 3 to Anderson portion of 09/28/2017 Hearing (Sept. 17, 2014 Letter)).] ███████████████. On October 17, 2014, the Firm filed a motion to withdraw with respect to Mr. Anderson. [Doc. 375.]

206.   In October 2014, the Court stayed Mr. Anderson's case and ordered him to inform the Court whether he had obtained replacement counsel or wished to proceed pro se. [Doc. 384.] Mr. Anderson never responded.

207.   Over the next few years, both the Firm and the Court made several attempts to reach Mr. Anderson, and serve him copies of various orders, but were unsuccessful.

208.   In early February 2017, [Ex. 116 (02/06/2017 email to SDM Hangley from Mr. Roberts).] This appears to be the last known address on file for Mr. Anderson; communications sent to the Clay Avenue Address in 2019 and thereafter appear to have been returned to the sender. [*See* Doc. 767 at 136.] In September 2017, the Firm sent Mr. Anderson a ███████████████████████████ [Ex. 117 (09/21/17 email to Mr. Anderson from Mr. Alfano).] Hagens Berman's business records do not reflect that the Firm received any correspondence from Mr. Anderson after this date, and Mr. Anderson never attended the September 2017 hearing. Mr. Anderson has also not been responsive to documents sent by SDM Hangley. [Doc. 767 at 136.]

h.    **Mary Sells**

209.    Mary Sells was born in Ohio on February 14, 1962 with serious birth defects, including missing fingers on both hands and webbed feet. [*Gunn* ¶ 22.]

210.    Sells and her family ███████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████. [Ex. 118 (Ms. Sells Questionnaire).] However, ███████ ████████████████████████████. [Ex. 119 (07/03/2014 email to Team from Ms. Mahoney) HBSS-001508).] Ms. Sells first learned about Grunenthal's role in the crisis when she heard about Grunenthal's apology in 2012. [*Gunn* ¶ 23.]

211.    During her deposition, Defendants introduced one of Sells' medical records, which suggested that a doctor had concluded that her defects were genetic. [09/27/2017 Tr. (Sells) at 6:1-13.] Initially, the Firm believed ████████████████████████████████████ ████████████████████████████████████████████████████████. [*See* Ex. 119 (07/03/2014 email from Mahoney to team, noting: ████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████. ███████████████████████████████████████████.]

212.    Further, the Firm reasonably believed ████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

████████████████████████████████████ [*See id.* (07/03/2014 email to Team from Ms. Mahoney).]

213.    In August 2014, Dr. Stephens reviewed Ms. Sells' medical records.

214.    The Firm followed up by arranging for ████████████████████

215.    As a result of ████████████████████████████████████ ████████████████████████████████ After discussing the issue with Ms. Sells, the Firm filed a motion to withdraw. [Doc. 382.] Ms. Sells expressed her wish to continue with the lawsuit. [Doc. 520.]

**N.    Steve Berman Objects to the Following Statements in the R&R Directed to Him**

216.    Mr. Berman objects to the following statements of fact directed specifically at him in the R&R, and incorporates by reference the preceding factual statements of fact and exhibits. Where possible, statements similar in nature are grouped together for the sake of efficiency.

217.    The R&R asserts that Mr. Berman's "oath is everywhere in the record and the things he wrote and swore to were – in numerous plaintiffs' cases – largely false and even more largely based on guesswork." [Doc. 767 at 152.] It further asserts that he "personally authored – and swore under penalty of perjury to the accuracy of – false factual representations in pleadings that were filed in state court and prosecuted in this Court.  [Doc. 767 at 7.]

> Time and again, Mr. Berman personally swore to the veracity of things he did not know and should have known, and that were actually and demonstrably false. More broadly [citing Rule 11 and Pa. R. Civ. P. 1023.1] . . . he signed, filed submitted or later advocated pleadings and papers whose falsity was readily discernible, without having made the requisite 'inquiry reasonable under the circumstances.'

(Doc. 767 at 7.)

218.    Mr. Berman objects that these conclusory assertions are inaccurate. They also do not identify any particular statements that were false or "based on guesswork," and therefore do

not provide adequate notice to permit him to respond.  Nor do they identify with particularity the representations in pleadings he signed or which of the "things he wrote" that were purportedly false or "based on guesswork." Mr. Berman specifically denies making any false statement under oath.

219.    The R&R also asserts:

It is also apparent – particularly from my review of documents produced in camera by Hagens Berman and Kay Reeves – that Mr. Berman was quite aggressive in deciding that a particular potential plaintiff should be encouraged to sue, despite obvious warning signs in the intake process.  A Reeves recommendation that a candidate not be accepted as a plaintiff would come under Berman's basilisk gaze. *See* Reeves000029895 (Berman-Reeves email exchange).

(Doc. 767 at 152.) And also that "there is more than one example of his skepticism concerning a recommendation by his Hagens Berman colleagues or Ms. Reeves that a case be dropped [Weaver Ex. 10] or not brought in the first place (Reeves000002989) [Doc. 767 at 61.] Mr. Berman objects to these statements as inaccurate. Mr. Berman was not overly aggressive during the intake process nor did he ignore "warning signs" in the intake process. As noted in SOF ¶ 103 and the exhibits cited therein, Mr. Berman was discriminating in accepting new clients and regularly rejected those whom he believed would not have viable cases. Moreover, the Reeves0000029895 document cited above does not support the proposition that Mr. Berman ignored Ms. Reeves' concerns about potential clients. In that email exchange, Mr. Berman says ███████████████

████████████████████████████████████

████████████████████████████████████

███████████████████. *See* Ex. 127 (Reeves0000029895). The other document cited in the R&R, Reeves000002989, is a typographical error. And Weaver Ex. 10 is an email that does not mention Mr. Berman, nor is he copied on it.

220.    The R&R also asserts [Doc. 767 at 152-153], as to Mr. Berman:

And the developments in discovery – the Merica, Boiardi, Marshall, Navamuel, and Sells debacles prominent among them – speak volumes about the willingness of Mr. Berman and his cohorts to blur the fundamental distinction between *bona fide* litigation and something closer to extortion.

221.    Mr. Berman objects to the foregoing as not tied to a specific sanctions recommendation. Mr. Berman further objects to the references to Mr. Merica and Mr. Boiardi as unrelated to the recommendations related to the Firm's pending motions to withdraw (the Court years ago adopted SDM Hangley's recommendation that the Firm be sanctioned with respect to Mr. Merica's and Mr. Boiardi's claims, *see* Docs. 414, 482; *see also* Doc. 427 (the Firm's objections to sanctions recommendation)

222.    Mr. Berman further objects to the statement that he blurred "the fundamental distinction between *bona fide* litigation and something closer to extortion." This statement is inflammatory, offensive, injudicious, and entirely baseless. The R&R does not cite any  document or testimony suggesting that Mr. Berman or the Firm ever attempted to "extort" Defendants in any way—on the contrary, their conduct consistently demonstrated a willingness to minimize the impact of the litigation on Defendants (*i.e.,* by seeking to adopt a bellwether approach, later moving for a stay, and seeking to dismiss certain plaintiffs' claims against Defendant GSK once it became clear that discovery would not support those claims).

**O.    There is not an "Open Question" as to the Confidentiality of the Confidential Settlement Agreements.**

223.    The R&R asserts (at 16) that the confidentiality of the Firm's settlements with certain of its former clients—which SDM Hangley inexplicably demanded the parties produce— is "an open question."  Not so. Those settlement agreements contain confidentiality and/or non-disclosure clauses expressly prohibiting disclosure of the terms of the settlement agreements.  The parties agreed to those terms, the confidentiality term is material, and public policy favors enforcement of contracts in general and settlement agreements in particular. *See, e.g.*, Advisory

Committee Notes, Fed. R. Evid. 408 ("As a matter of general agreement, evidence of an offer to compromise a claim is not receivable in evidence as an admission of, as the case may be, the validity or invalidity of the claim . . . [given the] public policy favoring the compromise and settlement of disputes.") Even in the discovery context—where the rules are "meant to be construed quite liberally to as to permit the discovery of any information which is relevant and is reasonably calculated to lead to the discovery of admissible evidence"—courts required the party seeking discovery of settlement agreements to "make a particularized showing that the evidence is likely to lead to the discovery of admissible evidence." *Fid. Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993) ("In keeping with the strong Congressional policy behind Rule 408 as well as the liberal discovery rules, we will follow along the lines of the New York district courts and place the onus on the plaintiffs to show that the documents relating to the settlement negotiations are relevant and likely to lead to the discovery of admissible evidence.") `SDM Hangley has not articulated why he believes the settlement agreements are remotely relevant to the matters before him. SDM Hangley notes (at 17) that he "solicited the views of the participants on whether these documents are entitled to remain shield from scrutiny the public" and says—without explanation—that the responses were not "particularly edifying."  To Respondents' knowledge, every party to those agreements indicated that they should remain confidential, although all responses apparently have not been shared with Respondents.  Moreover, even assuming those agreements were relevant to the withdrawal proceedings (they are not) or the *sua sponte* sanctions proposed in the R&R, the agreements should be kept *in camera* and remain confidential.  To Respondents' knowledge, that is also the view of all other parties to those agreements.  [*See, e.g.*, Doc. 750 at 19 n. 9 (06/09/21 Notice from the Firm stating that other parties were in alignment with its position regarding the confidentiality of settlement agreements)]

224.    In June 2021, the Firm reserved its rights and arguments regarding the agreements remaining under seal as well as the propriety of SDM Hangley demanding them in this proceeding. (Dkt No. 747 at 6). The Firm also requested to brief the issue before any such agreement is made public. [Doc. 750 at 20] The Firm reiterates those requests here, and objects to any assertion that the confidentiality of any of the Firm's settlement agreements is an "open question."

## VII.    CONCLUSION

For the reasons set out herein, Respondents respectfully request that the Court (1) seal the R&R; (2) adopt SDM's Hangley's recommendations regarding Hagens Berman's motions to withdraw from the representation of plaintiffs Bolton, Navamuel and Marshall (3) reject SDM Hangley's recommendations as to plaintiffs Sells and Anderson, (4) grant all of the pending motions to withdraw; (5) issue an order discharging SDM Hangley from his duties; and (6) strike all portions of the R&R not addressing Hagens Berman's pending motions to withdraw. Respondents further respectfully request, in the alternative and without waiving the various objections expressed herein, that the Court deny the recommendation of sanctions, should the Court reach that issue.

DATED:  December 13, 2023              Respectfully submitted,

                                       /s/ Keith Beauchamp

                                       COPPERSMITH BROCKELMAN PLC

                                           Keith Beauchamp (*pro hac vice*)
                                           kbeauchamp@cblawyers.com
                                           Marvin C. Ruth (*pro hac vice*)
                                           mruth@cblawyers.com
                                           Malvika A. Sinha (*pro hac vice*)
                                           msinha@cblawyers.com
                                           2800 North Central Avenue, Suite 1900
                                           Phoenix, AZ  85004
                                           Telephone: (602) 381-5490
                                           Facsimile: (602) 224-6020

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI LLP

Gaetan J. Alfano
Pennsylvania Bar No. 32971
GJA@pietragallo.com

Peter St. Tienne Wolff
Pennsylvania Bar No. 208433
PSW@pietragallo.com
1818 Market Street, Suite 3402
Philadelphia, PA 19102
Telephone: (215) 320-6200
Facsimile: (215) 981-0082

*Attorneys for Hagens Berman Sobol Shapiro LLP,
and Steve Berman*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that December 13, 2023, a true and correct copy of the foregoing Hagens Berman Sobol Shapiro LLP And Steve Berman's Objections To The Special Discovery Master's Report And Recommendations Dated October 12, 2023 And Response To The OSC Entered October 13, 2023 was filed electronically and served on all counsel via the Court's CM/ECF system. A copy is also being served on persons in accordance with the Court's December 12, 2023 Order (Doc. 787).

/s/ Keith Beauchamp

COPPERSMITH BROCKELMAN PLC

Keith Beauchamp (*pro hac vice*)
kbeauchamp@cblawyers.com
Marvin C. Ruth (*pro hac vice*)
mruth@cblawyers.com
Malvika A. Sinha (*pro hac vice*)
msinha@cblawyers.com
2800 North Central Avenue, Suite 1900
Phoenix, AZ 85004
Telephone: (602) 381-5490
Facsimile: (602) 224-6020

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP

Gaetan J. Alfano
Pennsylvania Bar No. 32971
GJA@pietragallo.com

Peter St. Tienne Wolff
Pennsylvania Bar No. 208443
PSW@pietragallo.com
1818 Market Street, Suite 3402
Philadelphia, PA 19102
Telephone: (215) 320-6200
Facsimile: (215) 981-0082

*Attorneys for Hagens Berman Sobol Shapiro LLP, and Steve Berman*

133