**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| GLENDA JOHNSON, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:11-cv-05782-PD |
| v. | ) | and all related cases |
| | ) | |
| SMITHKLINE BEECHAM CORPORATION, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FURTHER REPORT AND AMENDED RECOMMENDATIONS
OF THE SPECIAL DISCOVERY MASTER RE:  PROPOSED REDACTIONS FROM
2017 AND 2019 HEARING TRANSCRIPTS**

## I.     Introduction

### A.     Purpose of This Report

I have carefully considered Hagens Berman[1] and Steve Berman's Response (Doc. 825) to my Report and Recommendation, (the "November '24 R&R"), Doc. 824, *Johnson v. SmithKline Beecham Corp.*, 2024 WL 5185344 (E.D. Pa. Nov. 20, 2024), regarding Hagens Berman's proposed redactions from the transcripts of the 2017 and 2019 hearing sessions.  Hagens Berman has accepted many of the November '24 R&R's recommendations and modified some of its remaining proposed redactions and I, in turn, now modify my own recommendations in certain respects, as discussed below.  I have also attached a Revised Table A showing all my final recommended redactions.  I have put those recommendations that have changed from the initial Table A in bold italics for the convenience of the Court.

---

[1] The short-form references utilized in the November '24 R&R are carried over.

To begin with, however, I address at some length, in Sections II and III.A, two of Hagens Berman and Steve Berman's broad contentions.

## II.    The Expert's Report and Testimony Were Adverse to the Five Plaintiffs *and* the Defendants.

Hagens Berman and Mr. Berman appear to be fighting a battle they already lost, *i.e.,* the Court's finding that they waived work product protection.  They argue that their expert witness, Abraham Reich, was not taking a position adverse to the defendants when he expressly offered two opinions on material issues, positions with which defendants have persistently disagreed in these consolidated cases, *i.e., his assertions* that "Hagens Berman had a good faith basis to bring lawsuits on behalf of its clients starting in 2011 for injuries allegedly suffered as a result of exposure to Thalidomide, [and] to continue to prosecute them [into 2014]. . . ."  Opinion of Abraham Reich (Doc. 744, "Expert Op.") at 13.

First, I remind Hagens Berman that the correctness or error of my understanding does not have any bearing on the Court's conclusion that Hagens Berman waived work product protection

> not when it 'retained' Mr. Reich, but when it disclosed to him otherwise privileged materials.  Whether or not Defendants are 'adversaries' or 'participants' in the proceedings before Mr. Hangley is thus quite beside the point.

Doc. 749 at 2 (citations omitted).  Since Hagens Berman appears to have forgotten that ruling, however, it is worth pointing out the obvious, that the expert opinion was a direct attack on defendants' substantive and procedural defenses, and a direct defense against defendants' substantive, procedural and ethics-based attacks on Hagens Berman's conduct of these cases.  Mr. Reich's purpose in opining was to persuade the Special Master and the Court that these Five Plaintiffs had what would reasonably appear to a conscientious attorney – that is, an attorney who had done the presuit investigations required by the rules – to have actual evidentiary support, and that these five cases were responsibly pursued over the years until, for each, some

occurrence turned an apparently good case into a case that could not be won. That the lawyers shouldn't have been expected to see the bad end coming! That they had done all the homework that might reasonably have been expected of them before bringing the suits! In putting that expert testimony before the Special Master, Mr. Berman and his colleagues plainly hoped I would propose such findings to the District Judge, and that I would do that without the defendants' knowing exactly what the expert had said, or his evidentiary bases for saying it.

Allowing the expert, an outsider, to see all the work product that the participants were working so hard to protect was just one in a series of questionable strategic decisions by Hagens Berman here. It was Hagens Berman's decision, in the first instance, to engage and offer expert testimony on what I see as questions of law for a Master and a District Judge who, with all due respect for Mr. Reich, really did not require his help on those questions. Then there was the expert's decision to opine not just on Berman's and Hagens Berman's compliance *vel non* with Pennsylvania Rule of Professional Conduct 3.1, but also their compliance with Fed. R. Civ. P. 11(b)(3)[2] and 28 U.S.C. § 1927 in pleading and pursuing the Five Plaintiffs' cases. Doc. 744, Expert Op. at 9-10.

---

[2] Thus, the expert asserted that, in each of the five cases, Hagens Berman and its lawyers had made "inquiry reasonable under the circumstances" before filing the complaint, and reasonably believed that

> the factual contentions have evidentiary support or, *if specifically*
> *so identified,* will likely have evidentiary support after a reasonable
> opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b)(3) (emphasis added). The expert did not mention Pa. R. Civ. P. 1023.1(c)(3), which governed the initial filing of these cases in the state court. No matter, that rule contains the identical language quoted above. *See* discussion in Doc. 767, the Special Master's October 2023 Report and Recommendation (the "October 2023 R&R"), at 18-24, *Johnson*, 2023 WL 8367748, at *7-*9.

In their December 13, 2023 Objections (Doc. 794) to the October '23 R&R, Hagens Berman and Mr. Berman complain that they were unfairly surprised by the Master's recommendation that the Court consider sanctions.  And in the current filing, they take pains to point out that "no requests for sanctions were pending as to any Plaintiff when Mr. Reich issued his report in 2020 or when he testified in 2021," and that the several sanctions motions dismissed without prejudice in 2014[3] have not been renewed at this point.  Doc. 825 at 3. Is the Court to understand that sanctions were *not* Hagens Berman's concern in those years?  Why, then,  the expert testimony?  If ethics and compliance with the Federal Rules' practice demands were a non-issue, why go out and engage a bar association luminary and adjunct professor of ethics to opine on those subjects?

They did engage an expert, and the parties – defendants and spurned clients alike – surely had every right to know what Mr. Reich was going to say, on what subjects, and what evidence he had to support his opinions.  In Plaintiff Jose Navamuel's case, for example, Mr. Reich was explicitly opining (and asking me to find) that Hagens Berman had – not that it was likely to discover, but that it *already had, before suing* – the required "evidentiary support" that there was thalidomide in Havana in 1960, that these defendants were responsible for its presence, that Mr. Navamuel's mother had ingested it, and so on.  Certainly the Special Master, much less the District Judge, could not be expected to read, hear and be guided by this testimony without giving the defendants a chance to look past Mr. Reich's *curriculum vitae* and ask what actual evidence he had to support these assertions.  That is why we have Fed. R. Civ. P. 26(a)(2).  It is about fairness.

---

[3] As Hagens Berman correctly notes, the Special Master was mistaken in thinking a sanctions motion regarding Plaintiff Mary Sells's claim was in suspense, when it had also been denied without prejudice.  Doc. 522.  I apologize for the error.

Of course, it was not only defendants who were threatened by the expert's opinions. For his third expert conclusion, Mr. Reich swiveled his turret and asserted, as to each of the Five Plaintiffs his client was forsaking, that "it was appropriate for Hagens Berman to seek leave to withdraw from representing plaintiffs when it did due to information obtained during discovery." Doc. 744, Expert Op. at 13.[4] Certainly the Five Plaintiffs would not want the Master to hear the details of those burning-bush revelations outside their hearing and without an opportunity to question Mr. Reich. And even in the absence of such confrontational content in the expert's testimony, each of the Five was now entitled to examine the transcripts and exhibits to see, *e.g.,* whether any of the previously protected work product information having to do with the other four plaintiffs might be helpful to this plaintiff in opposing withdrawal or making her case against defendants.

---

[4] The details pertinent to each of the Five are at pages 11-12 of the Expert Report. When he speaks of "information obtained in discovery," I take Mr. Reich to be referring to information in the hands of defendants and others that was unavailable to plaintiffs without resort to litigation and formal discovery practice, and that he is not suggesting that "discovery" includes a long-term failure to find hoped-for evidence of something that had no evidentiary support in the first instance, or that "information obtained during discovery" would include a tardy look at or appreciation of evidence that was available to counsel before suing, a client's medical history, for example. *See* Gregory P. Joseph, Sanctions, the Federal Law of Litigation Abuse, § 7(B) at 142-43, "TIMING OF INVESTIGATION."

III.    **Hagens Berman's Objections to Specific Redaction Recommendations**

A.    **Mary Sells' genetic information: September 27, 2017 Tr. at 12:23-14:6; 14:12-13; 14:18-15:11; 38:25-39:22; 40:1-40:8; and 41:8-42:11[5]**

Hagens Berman's proposal to redact several tranches of the testimony regarding Plaintiff Mary Sells rests on a theory that an Illinois statute, the Genetic Information Privacy Act., 410 Ill. C.S.A. § 513 ("GIPA"), governs this procedural evidentiary issue in this Court, and requires that the results of genetic tests performed in Illinois not be disclosed to the public or the defendants in this litigation. It is not surprising that the argument fails, but it is remarkable that it fails for so many different reasons, and that all of them seem to have escaped Hagens Berman's notice. The most obvious of these reasons is that Hagens Berman's own evidence – the business records on which Hagens Berman's witness relied at hearing – shows that the genetic testing occurred in Wisconsin, not Illinois, but that is just the beginning:

1.    **Facts**

Ms. Sells is an Ohio resident, born there. Since childhood, some treating physicians have diagnosed her complex of serious birth injuries as ectrodactyly-ectodermal dysplasia ("EEC"), a disorder often (not always) associated with a mutation of the TP63 gene, and not associated with thalidomide exposure. That diagnosis escaped Hagens Berman's attention until Ms. Sells was confronted with her own medical records at her deposition on July 2, 2014. Hagens Berman's testifying expert, Dr. Stephens, then reviewed the medical records (for the first time, and he has never examined Ms. Sells), and recommended that she undergo genetic testing. Sells Ex. 3.

---

[5] Hagens Berman has amended the list of proposed redactions that it bases on the Illinois statute discussed in this section, and I have added, here and in Revised Table A, a segment of the Sells transcript – 41:8-42:11 – that was redacted in Hagens Berman's July 31, 2024 submission, but overlooked in my November 2024 R&R. Hagens Berman's proposed redaction of that segment is based on the same Illinois statute, and is rejected for the identical reasons, as the other Illinois statute-based proposed redactions discussed in this § III.A.

It seems to be generally agreed that there are genetic tests that can sometimes conclusively identify a subject's EEC condition as genetically-caused, although those tests cannot under any circumstances establish that the EEC was *not* genetically caused.  *See* Sells Ex. 5 at 3-4 (Shashanna Ndong, M.D.); *id.* at 5 (Nicole Hook); *id.* at 9 (Bruce R. Krawisz, M.D., *Supplemental Information: TP63-Related Disorders via TP63 Gene Sequencing)*.

Sells Exhibit 5 is a package of discrete documents created over the course of a month or so by different specialists in different subdisciplines of genetics, operating in two different jurisdictions, in the attempt to ascertain whether Ms. Sells's birth injuries were genetic or teratogenic in origin.  The two primary actors (with coincidentally similar names) were a *clinical* geneticist, Shashanna Ndong, MD, who *physically* examined and counseled Ms. Sells in Evanston, Illinois before any genetic testing was done, and a *clinical molecular* geneticist, Juan Dong, PhD, who conducted Ms. Sells's actual genetic testing at Dr. Dong's place of work in Marshfield, Wisconsin.[6]

The first witness in support of the motion to cease representing Mary Sells was Barbara Mahoney, the Hagens Berman partner who had been caught unawares by the EEC evidence at Ms. Sells's July 3, 2014 deposition.  She was also, on October 16, 2014, the recipient of a fax, Sells Ex. 5, containing reports from both Dr. Ndong and Dr. Dong.  The exhibit was received in evidence without objection and Ms. Mahoney testified from it.

Unfortunately, though, Ms. Mahoney's testimony at the 2017 hearing was at odds with the business-record events about which she was testifying.  On two occasions she placed genetic testing in the wrong jurisdiction (Illinois rather than Wisconsin), and attributed it to an Illinois

---

[6] Because the privilege/discovery issue raised by Hagens Berman is ultimately for the District Judge, I will not here disclose the outcome of the genetic testing.

geneticist who, with all respect, may not have been qualified to perform or evaluate genetic

testing, and whose only connection to the "molecular" phase of the process was in ordering a

blood sample to be taken and sent to a Wisconsin laboratory, there to be tested by three qualified

molecular geneticists.

We require a somewhat detailed examination of Sells Ex. 5 and the story it tells.  It is a

12-page packet consisting of four separate reports under cover of a fax transmission sheet.  In

chronological order (not the order in which they appear in Sells Ex. 5), they are:

- **September 15, 2014:** Notes authored by Dr. Shashanna Ndong, an Illinois internist, pediatrician and clinical geneticist, regarding her "*Medical Genetics Consultation*" with Ms. Sells in Evanston, Illinois (id. at 2-4), cosigned by her colleague Nicole Hook, a genetics counselor, and showing, among other things, that "a blood sample was obtained and sent to Prevention Genetics," a Marshfield, Wisconsin laboratory;[7]

- **September 29, 2014:** A report by Juan Dong, PhD, a Wisconsin clinical molecular geneticist, dated and co-signed by her colleague, molecular geneticist Khemissa Bejaoui, PhD, of the first of two Wisconsin genetic tests, *"Molecular Genetics Report: TP63-Related Disorders Testing via TP63 Gene Sequencing,"* id. at 7-9;

- **October 5, 2014:** Dr. Dong's report, co-signed by her colleague, molecular geneticist Jie Liu, PhD, of the second Wisconsin genetic test**,** *"Microarray Report: Deletion/Duplication Analysis of the TP63 Gene via aCGH,"* id. at 10-12;

- **October 15, 2014:** Ms. Hook's memorandum of her October 9 *"Telephone Encounter"* with Ms. Sells, *id.* at 5; and

- **October 16, 2014:** A fax cover sheet reflecting Ms. Hook's transmittal of the four documents to Ms. Mahoney. *Id.* at 1.

These business records, introduced by Hagens Berman and admitted without objection,

are evidence that:  On September 15, 2014, Ms. Sells was seen by Dr. Ndong at the Center for

---

[7] The exhibit also contains, at 6, a handwritten, undated sketch that appears to be a family tree of sorts (and about which there was no testimony at hearing).

Medical Genetics at Evanston Hospital in Illinois for a "Medical Genetics Consultation." *Id.* at 2-4. Dr. Dong interviewed and physically examined Mary Sells and took Ms. Sells's history over the course of an 80-minute in-person visit, "of which over 50% of the time was spent in counseling and coordination of care." *Id.* at 4. It does not appear that Dr. Ndong ever saw or spoke with Ms. Sells after that day.

Like Dr. Stephens before her, Dr. Ndong recommended genetic testing, and Ms. Sells agreed. Based on her physical examination, Dr. Ndong also recommended that an extensive battery of x-rays be taken. But neither she nor anyone in Illinois conducted any genetic testing (or, for that matter, radiologic imaging) of Ms. Sells. A blood sample was drawn and sent out of state to Dr. Dong's Wisconsin establishment for two genetic evaluations, "TP63 gene sequencing" and "deletion/duplication testing." *Id.* at 4. These are the tests that might prove but cannot disprove genetic origin of EEC.

The actual genetic tests were conducted in Wisconsin by Dr. Dong and her two colleagues, Khemissa Bejaoui, PhD, and Jie Liu, PhD., all three of whom are *molecular* geneticists.[8] Drs. Dong and Bejaoui wrote up their report of the first completed test, the

---

[8] A current search reflects that the lead Wisconsin geneticist, Dr. Dong, was in 2014 and continues to be certified by the American Board of Medical Genetics and Genomics with a specialty in Clinical Molecular Genetics. Since, she has also been certified in Laboratory Genetics and Genomics, and Clinical Molecular Genetics and Genomics, *see* https://www.certificationmatters.org/practitioner/?pid=974256&ped=UkxpdVI2Q2FSeVZpVTJI d2NDVSs4RXVwTUhMZG02eXg3SG90VVVsVzQ2az0&qs=ZHNlYXJjaD0xJmxuYW1lPWR vbmcmZm5hbWU9anVhbiZzdGF0ZT0mc3BlY2lhbHR5PQ= (last accessed Apr. 14, 2025). Drs. Bejouaia and Liu are identified in Sells Ex. 5 as "Human Molecular Geneticists." According to Sells Ex. 5 at 8, their laboratory, PreventionGenetics, is "certified under the Clinical Laboratory Improvement Amendments of 1988 (CLIA) as qualified to perform high complexity clinical laboratory testing."

Dr. Ndong, the Illinois physician, has certifications from the appropriate boards in the specialties of Internal Medicine, Pediatrics, and Clinical Genetics and Genomics, *see* https://www.certificationmatters.org/practitioner/?pid=984981&ped=ODNIVklPbERnV3ppWlM xVTdjOStkeGo2aFVSQ1pubjAydHdvNEJNanl1dz0&qs=ZHNlYXJjaD0xJmxuYW1lPW5kb25

*Molecular Genetics Report: TP63-Related Disorders Testing via TP63 Gene Sequencing, on* September 29, and faxed it the next day to Dr. Ndong and her colleague Ms. Hook (*Id.* at 7-9)[9]; on October 5 and 6, Drs. Dong and Liu signed off on *Microarray Report: Deletion/Duplication Analysis of the TP63 via aCGH*, and faxed it to Ndong and Hook.  *Id.* at 10-12.  Ms. Hook (presumably in Illinois) and Ms. Sells (presumably back home in Ohio) had a telephone conversation on October 9, 2014, and Hook memorialized the call in a memorandum that was reviewed by Dr. Ndong on October 15.  *Id.* at 5.  On October 16, Ms. Hook faxed the whole package to Ms. Mahoney at Hagens Berman's Seattle office.

Hagens Berman argues that the GIPA statute precludes discussion of "Ms. Sells' genetic consultations at the Center for Medical Genetics at Evanston Hospital in Illinois in September and October 2014."  Doc. 825 at 5.  That is wrong.  What the cited statute purports to quash (unsuccessfully, as we shall see) is the discovery or forensic use of genetic tests themselves or their results, a far narrower category.  If the statute had any application here (as it does not), that application would be limited to the test reports themselves (Sells Ex. 5 at 7-12) and, arguably, snippets of Ms. Hook's cross-border telephone conversation with Ms. Sells after the completion of the genetic testing.  Remarkably, though, almost none of the testimony Hagens Berman seeks to redact is about those parts of the exhibit or Mahoney's understanding of them.  In fact, the

---

nJmZuYW1lPXNoYXNoYW5uYSZzdGF0ZT0mc3BlY2lhbHR5PQ= (last accessed Apr. 14, 2025).

[9] Ms. Hooks's certification  is from the American Board of Genetic Counseling, which states that "[t]he primary qualification to sit for the examination is a master's degree in genetic counseling from a program accredited by the Accreditation Council for Genetic Counseling (ACGC)."  https://www.abgc.net/Certify/About-the-CGC-Credential (last accessed Apr. 14, 2025).

only parts of Mahoney's testimony that talk about the genetic testing process are the parts she got wrong.

### 2. There Was No Illinois Genetic Testing, and Ms. Mahoney Misstated the Facts.

I must begin by pointing to Hagens Berman's attempted use (not its redaction) of overt material misstatements in the testimony of  Hagens Berman's Barbara Mahoney, testimony that Hagens Berman and Mr. Berman initially sought to redact, but now want to publish.  First, Ms. Mahoney stated that "we arranged to send Ms. Sells to a geneticist, and she received counseling from the geneticist *and was tested there.*" Sells Tr. (Mahoney) at 12:6-8 (emphasis added).  So, according to Mahoney, we have Ms. Sells going on a one-stop genomic shopping trip to Illinois, where she sees a single doctor, gets counseled, gets her genome tested, and goes home.  That was false.

Immediately after that testimony, counsel had Ms. Mahoney read into the record Dr. Ndong's "Impressions" of Ms. Sells's condition, which were based on the doctor's interview and *physical* examination  (in Illinois).  *Id.* at 12:22-14:6, reading Sells Ex. 5 at 3-4 into the record. To this point, the narrative hasn't touched on actual genomic tests or results of genomic testing. But counsel stopped Ms. Mahoney's recitation there, a paragraph away from Dr. Ndong's statement that a blood sample had been sent to a different set of professionals for the actual genetic testing.  Sells Ex. 5 at 4.  Ms. Mahoney then testified as follows:

> Q      Those paragraphs that I read -- that you just read into the record, do you understand that those were the geneticist's impressions of a physical examination of Ms. Sells?
>
> A      Yes.
>
> Q And then it says that Mary agreed to the genetic testing?
>
> A      Yes.

> Q     *And did the geneticist actually perform genetic testing to your knowledge?*
>
> A     *Yes, she did.*

Sells Tr. at 14:7-16 (emphasis added).  So once again it's one-stop shopping according to Ms. Mahoney:  Ms. Sells goes to Dr. Ndong's establishment, gets a physical, gets her genome tested, gets counseled and gets out.  All true, except for the part about the genomic testing.  The testimony never did reach the part about shipping the blood samples to the Wisconsin molecular geneticists and asking them to do what they were qualified to do.

I suppose it is possible that, back in 2017, Ms. Mahoney and her able counsel never read far enough into the exhibit she was testifying about to figure out that her testimony about the genetic testing was off target by 365 miles, four geneticists and a state line.  And I suppose it is further possible that Hagens Berman, Mr. Berman, and the able attorneys from the two fine law firms that presently represent them relied on Ms. Mahoney's inaccurate rendition of the contents of a business record, and never actually read Sells Ex. 5 before making their present GIPA argument.  That is hardly reassuring, but it is far less troubling than the only available alternative conclusions.

> **3.     EEC appears to be a disease, which makes GIPA's confidentiality provision inapplicable on its face.**

Hagens Berman and Mr. Berman have shown us only part of the statute they rely on. They quote the broad prohibition found in subsection (a) of GIPA § 513/15, to the effect that "genetic tests and test results are confidential and privileged," and "shall not be admissible as evidence, nor discoverable in any action of any kind in any court . . . ."  That is strong language. Curiously, though, Mr. Berman and his firm fail to take us a couple of subsections further down the page:

> (d)  Results of genetic testing that indicate that the individual tested is at the time of the test *afflicted with a disease*, whether or not currently symptomatic, are not subject to the confidentiality requirements of this Act.

GIPA § 513/15(d) (Emphasis added).  Assuming *arguendo* that GIPA could have any application to the handling of evidence from Wisconsin, Subsection (d) would be a game-changer.  If EEC is a disease (a term not defined in GIPA), the statute would have no application even if Illinois had the predominant interest (discussed below) and Illinois Supreme Court Rule 215 (also discussed below) did not exist.   And, not surprisingly, EEC *is* a "disease" in the eyes of the National Institutes of Health:  NIH's Genetic and Rare Diseases Information Center ("GARD") unequivocally identifies EEC and other expressions of ectrodactyly as "genetic and rare diseases" within GARD's purview.  *See*

https://rarediseases.info.nih.gov/diseases/2068/ectrodactyly-polydactyly-syndrome, and

https://rarediseases.info.nih.gov/diseases/6319/split-hand-foot-malformation.

This "disease clause" and its centrality to any discussion of GIPA's relevance were as plain as the nose on Pinocchio's face.  They could not be ignored, but ignored they were.

> **4.    There is no conflict of laws because Illinois, just like Pennsylvania, would require disclosure of the genetic testing information if it was relevant.**

Hypothetically, what if the genetic testing had been done in Illinois, and EEC was not a disease?  Could it really be that a personal injury plaintiff suing in an Illinois trial court could keep her relevant medical history and records from the knowledge of the defendant and the triers of fact, as Hagens Berman contends?  Of course not, and it is disappointing that Steve Berman and his Hagens Berman colleagues – lawyers who trumpet their nationwide experience and expertise in mass tort litigation (*see* Doc. 767, Objections to October '23 R&R, at 45-50) – clap onto such a counterintuitive assertion without doing their homework in Illinois jurisprudence.

Starting with the nuts and bolts:  We know the law generally demands that a plaintiff who places her physical or mental condition in controversy be prepared to disclose her relevant medical information to those she would hold accountable for her misfortune, and also be prepared to undergo physical examination if that is called for.  The Pennsylvania Supreme Court quotes Wigmore:  "The duty to bear witness to the truth, by whatever mode of expression may be appropriate, includes necessarily the duty to exhibit the physical body, so far as the ascertainment of the truth requires it." *Myers v. Travelers Ins. Co.*, 46 A.2d 224, 226 (Pa. 1946). And just as the federal courts have Fed. R. Civ. P. 34 and 35 and the Pennsylvania courts have Pa. R. Civ. P. 4009.1 and 4010, Illinois has Supreme Court Rules 214 and 215.  Rule 215 provides as follows:

> . . .  In any action in which the physical or mental condition of a party or of a person in the party's custody or legal control is in controversy, the court, upon notice and on motion made within a reasonable time before the trial, may order such party to submit to a physical or mental examination by a licensed professional in a discipline related to the physical or mental condition which is involved. . . .

Ill. Sup. Ct. R. 215(a).  GIPA has been on the Illinois books for more than a quarter century.  If it blocked Illinois Rule 214 discovery of genetic test results or Rule 215 physical examination of genetic information in civil lawsuits as robustly and categorically as Hagens Berman and Steve Berman insist it does, one would expect at least an occasional reported discovery spat about, *e.g.,* what constitutes "genetic testing," or "information derived from genetic testing" under GIPA. No trace have I found, and Hagens Berman's pregnant reticence suggests that its lawyers haven't found anything either.

However, I *have* found case after Illinois state court case in which personal injury plaintiffs have been ordered – usually *after* producing their relevant medical records  – to submit to genetics-oriented testing.  That there are no such cases involving GIPA and its sweeping

- 14 -

assertions of confidentiality and privilege is, I submit, because the pertinent issue – *the primacy of the Illinois Supreme Court's discovery rules over legislative pronouncements of procedural law* – was well settled long before the enactment of GIPA in 1998.  Here is what the Appellate Court of Illinois had to say on the subject in 1976:

> [I]nsofar as the Blood Test Act infringes on the power of the court to order blood tests for discovery purposes, it is an invalid exercise of the legislative power. Where a statute conflicts with a supreme court rule on a matter of procedure, the supreme court rule controls.

*Zavaleta v. Zavaleta*, 358 N.E.2d 13, 16 (Ill. App. Ct. 1976) (citations omitted) (upholding contempt order upon failure to submit to a court-ordered blood test).  For a post-GIPA decision, *see Kallal v. Lyons*, 189 N.E.3d 916 (Ill. App. Ct. 2021) (remand to determine if parents ordered to take genetic tests were "parties" for purposes of Illinois Rule 215; GIPA is never even mentioned in the appellate court opinion.).  *See also People ex rel. Yarn v. Yarn*, 392 N.E.2d 606, 607–08 (Ill. App. Ct. 1979) ("[E]ven assuming that under the Blood Test Act defendant could not be compelled to submit to a second test, the discovery provisions of Supreme Court Rule 215 would still be available to plaintiff. . . .  [T]he trial court believed that Rule 215 was inapplicable to the present proceedings and therefore did not exercise its discretion thereunder. On this basis alone, we must reverse the order dismissing the complaint."); *People ex rel. DeVos v. Laurin*, 391 N.E.2d 164 (Ill. App. Ct. 1979); *People ex rel. Coleman v. Ely*, 390 N.E.2d 140 (Ill. App. Ct. 1979).

In *People v. Jackson*, 371 N.E.2d 602 (Ill. 1977), a criminal appeal, the Illinois Supreme Court voided a statute that purported to give counsel the right to question jurors in *voir dire,* because a Supreme Court rule made the allowance of such questioning discretionary.  The court quoted Dean Pound:

> [T]he common-law courts have governed procedure by general rules from the middle ages to the present, and the first public action of the Supreme Court of the United States was to make a rule adopting the practice of the Court of King's bench as the practice of that tribunal.
>
> * * *
>
> Hence, if anything was received from England as a part of our institutions, it was that the making of these general rules of practice was a judicial function.

*Jackson*, 371 N.E.2d at 604, *quoting* Pound, The Rule-Making Power of the Courts, 12 A.B.A.J. 599, 601 (1926); *see also, e.g., People ex rel. Stamos v. Jones*, 237 N.E.2d 495 (Ill. 1968) (invalidating statute forbidding bail in certain appeals).

There is, of course, no conflict on this point of law because Pennsylvania law is in complete agreement. *See, e.g., Payne v. Commonwealth Dep't of Corr.*, 871 A.2d 795 (Pa. 2005) (striking down Prison Litigation Reform Act provisions for automatic dissolution of preliminary injunctions and imposition of certain costs in *in forma pauperis* proceedings as encroaching on the exclusive responsibilities of the Supreme Court in matters of procedure).

The answer, then, is that Pennsylvania and Illinois agree; there is no conflict. The genetic information is not privileged against discovery and disclosure in a civil action in either jurisdiction.

### 5. Pennsylvania is the Predominantly Concerned Jurisdiction.

But suppose there were a conflict, and this Court had to decide which was the predominantly concerned jurisdiction. What then? Hagens Berman cites *Samuelson v. Susen,* 576 F.2d 546 (3d Cir. 1978), for its argument – based on Ms. Sells' 80-minute visit and physical examination by an Illinois physician – that Illinois law controls this question. The *Samuelson* Court, applying Pennsylvania conflicts law, employed a "predominantly concerned jurisdiction" test in a diversity case where an Ohio physician was suing two Pittsburgh physicians, saying

their allegedly defamatory statements cost him privileges at a number of Ohio hospitals.  *Id.* at 551.  Ohio physicians and hospital administrators resisted discovery into the proceedings of Ohio hospital review committees, which were privileged under Ohio statute.  The Third Circuit found that Ohio was the predominantly concerned jurisdiction, and applied Ohio law to conclude that the witnesses need not testify:

> Here the review committee proceedings were held in **Ohio**. The participants were **Ohio** residents. The proceedings were those of an **Ohio** body seeking to effectuate policies respecting an **Ohio** physician's use of **Ohio** medical facilities. Presumably, the proceedings were for the protection of **Ohio** residents. Under all these circumstances, it seems clear that the district court was justified in concluding that **Ohio** had the more "significant relationship" to the dispute.

*Id.* (emphases added).  That is a pretty compelling argument for applying Ohio law.  But let us test the analogy here; let us try to plug our *Mary Sells* facts into the *Samuelson* framework, to see how that works:

> Here the [*genetic testing and sequencing*] were held in [***Wisconsin***.]  The participants were [*three **Wisconsin** molecular geneticists, analyzing blood extracted from an **Ohio** citizen in **Illinois** and overnighted to **Wisconsin**.*]  The proceedings were those of [*a **Wisconsin**-licensed  laboratory, presumably seeking to comply with policies and procedures created primarily*] for the protection of  [***Wisconsin***] residents, [*and intended to inform an **Ohio** resident and an **Illinois** clinical geneticist whose services had been engaged at the behest of **Washington** attorneys and/or their **Idaho** testifying expert in a **Pennsylvania** lawsuit.*]

So much for the *Samuelson* simile.  In the other case cited by Hagens Berman, *Harrisburg Auth. v. CIT Cap. USA, Inc.*, 716 F. Supp. 2d 380 (M.D. Pa. 2010), the court applied New York's law of attorney-client privilege instead of Pennsylvania's where the discovery dispute "involves a

New York litigant seeking to protect primarily New York-based communications" with New York counsel.[10]  *Id.* at 391.

Looking to the assumed policy interests of the various jurisdictions, it seems obvious that Pennsylvania has a plenary interest in assuring that proceedings in its courts are fair to all parties; that its courts' procedural regimens are as transparent, predictable, and intellectually consistent as reasonably possible; that relevant evidence is not excluded unless there is a clear basis for excluding it; and that the parties and the public have fair access to the court's proceedings.  Ohio and Wisconsin have strong and obvious interests, but no one has suggested that their relevant laws differ from Pennsylvania's in any respect.  Illinois, as reflected in GIPA, has an interest in protecting Illinoisans and, I suppose, non-Illinoisans availing themselves of genetic testing processes within its borders from commercial trafficking in genetic information.  Here, though, Ms. Sells does not fall in either of those two categories; she is not from Illinois, she was not tested in Illinois, and she was probably back home in Ohio when Ms. Hooks called to talk to her after the genetic test reports came in.

Importantly, nothing in GIPA speaks in any way to the pre-genetic testing events Hagens Berman wants to hide from defendants and the public, the testimony about Ms. Sells's physical examination, the anatomy-related questions that apparently have still not been addressed, or Dr. Ndong's non-genetic clinical observations.  In the single page of Sells Ex. 5 that was generated in Illinois – summarizing the cross-border phone conversation – there is just a single sentence that mentions (in GIPA's words) "information derived from genetic testing" that was (again) *Wisconsin* genetic testing.

---

[10]  New York privilege extended to attorney-to-client communications and, at the time, Pennsylvania law did not.  *See id.* at 388-89.

In considering the relatively incidental role of the Illinois geneticists (with respect to *molecular* genetics) it may be useful to look at the relatively small amount of molecular genetic information that has found its way to Illinois.  To begin with, the *TP62 Gene Sequencing* looks at a limited, microscopically limited, area:  "Only the indicated axons and roughly 20 bp of flanking non-coding sequence on each side were analyzed. Test reports contain *no information about other portions of the gene*, including many regulatory regions."  Sells Ex. 5 at 8 (emphasis added).  The later *MicroArray Report: Deletion/Duplication Analysis of the TP63 Gene via aCGH,* also had a tiny focus: "Only the Indicated gene or genes were analyzed.  Test reports contain no information about other regions of the genome . . . ." *Id.* at 11.  We assume, however, that these two tests yielded a massive amount of data – one imagines pages of zeros and ones – that a molecular geneticist can comprehend and a special master cannot.  Still, the only information that traveled to Illinois was the answers to the question whether Ms. Sells' blood sample had tested positive or negative for (a) "sequence variants" (*id.* at 7), and (b) "deletions and duplications within the genomic region encompassing the *TP63* (NM_003722.4) gene." (*Id.* at 10).  The actual data is not in Illinois:  "Prevention Genetics recommends that DNA sequences from this test be stored in the patient's electronic medical record.  This will permit automatic reinterpretation of the sequences in the future, and will best benefit the patient and family members.  Upon request, we will be pleased to transfer the Patient's sequences."  There was no evidence that such a transfer was requested or completed.  Illinois does not seem to have much genetic information to hide.

### 6.    If Illinois law applies, Hagens Berman misapplies it.

GIPA speaks only to "genetic testing and information derived from genetic testing." Emphatically, the statute does not define or concern itself with pre-test consultations or

counseling, physical examinations, or anything in the range of sophisticated invasive and non-invasive probes, tools, machines, scans, devices and what-have-you, whether mechanical, electrical, chemical, nuclear, hydraulic, ultrasonic or you-name-it, that poke, prod, sniff, peek at or listen in on any and all aspects of our bodies and minds and their workings *other than* the secrets of the double helix.  A physical examination is not genetic testing, nor is radiology. Taking a patient's history, drawing blood and sending it to a laboratory, discussing the utility of x-rays or, even, persuading a patient to participate in genetic testing: None of those is genetic testing.

The Illinois statute is a red herring.  It has nothing to do with the parties' and public's entitlement to the evidence in this case.

### 7.     The record does not show that Ms. Sells has been asked.

But if the Court disagreed with every aspect of the Special Master's GIPA discussion, an issue would remain: It would still appear distressingly arguable that Hagens Berman was employing a privilege-creating statute to take away its client's rights instead of protecting them.

The obvious interest of the Illinois legislature in enacting GIPA was the privacy of the person whose genetic information was collected.  That person, the privilege holder, can publish it as freely as she chooses.  GIPA §§ 513/15(a), 513/30(a)(2).

In most litigation contexts, we expect a privilege holder's attorney to interpose privilege whenever the issue comes up, without even having to check first with the client.  We tacitly presume that preserving the privilege is a good thing for the client because it usually is, and we lawyers know the perils of a failure to invoke it now, not later!

But these withdrawal motions complicate the analysis.  Here, what is good for the client may not be so good for Hagens Berman, and *vice versa*.  If, for example, the Wisconsin genetic tests disclosed that Ms. Sells's EEC was genetic and not teratogenic in origin, that would help

Hagens Berman in its withdrawal case because, of course,  the firm and Ms. Sells would be left with precious little chance of winning the underlying personal injury case.  But if the results were inconclusive, and would not help Hagens Berman walk away from the representation, the firm would be much less incented to publish them, just as Ms. Sells would be more incented to keep on fighting.  More basically, the black-letter assertion of GIPA is that genetic testing information cannot be used in any litigation, including merits litigation, without the test-taker's consent.  If asked, would Ms. Sells agree not to try to use her Wisconsin genomic test results in her case against the defendants?  Conversely, would it be fair to prevent the defendants from obtaining them and, if they helped their case, seeking to employ them in their defense cases?

To whatever extent, if any, GIPA affords a privilege in this litigation, that privilege belongs to Mary Sells, not her estranged attorneys, and I worry that those attorneys may not have done enough to make sure Ms. Sells is making her own decision on an informed basis. Throughout these withdrawal motion proceedings, the Court and the Special Master have taken steps to assure that the Five Plaintiffs physically receive the various motions, briefs, orders and other things that come to attorneys of record through the magic of ECF, but we cannot know what happens once the Five Plaintiffs receive their copies *sans* any explanation or guidance from a lawyer, and I have been troubled by the information and skills imbalances between these lay parties and their used-to-be champions.[11]  I respectfully suggest that, if the Court were to reject all my above-stated reasons for rejecting the GIPA-based redactions sought by Mr. Berman and Hagens Berman, the Court could instruct me to expressly inquire of Ms. Sells whether she agrees

---

[11] In Ms. Sells's case (and only in her case), I have recommended that Hagens Berman be ordered to continue representing Ms. Sells in the absence of qualified independent counsel, because there are so many functions counsel can handle – to the benefit of Ms. Sells and the civil justice system itself – without violating its spoken or unspoken convictions regarding the merit or provability of the client's claim.

with the redaction from the public record of the genetic test evidence (testimonial and documentary) Mr. Berman and his firm seek to redact, so that she can make an informed decision on those questions.  Nothing in this recommendation should be taken as a finding or proposed finding on the Special Master's part regarding the admissibility or import of any such evidence.

### B.    Hagens Berman and Mr. Berman's Other Proposed Redactions

#### 1.    Sells Tr. 81:17-21 and 82:2-7

The Special Master recommended redacting only parts of Barbara Mahoney's testimony called out by Hagens Berman at these pages.  Hagens Berman, in turn, has narrowed its redaction proposal to encompass only the above-identified segments beyond those I had recommended.  I now recommend accepting that compromise solution.

#### 2.    Sells Tr. 111:24-25

Hagens Berman accepts my redactions, except it asks that my partial redaction of line 24 be extended to a complete redaction of lines 24 and 25.  I recommend accepting that request.

#### 3.    September 28, 2017 Marshall Tr. 58:10-59:10

Hagens Berman's insistence on this redaction is based on a mistaken perception that it involves Mr. Styant-Browne's conversations with the client, John Marshall.  In fact, the entire page of testimony was about Styant-Browne's conversation with Marshall's estranged mother, a witness and not a client.  I reject the redaction.

#### 4.    May 8, 2019 Tr. 294:24-295:2

It is hard to find bright-line consistency in the case law pertinent to this question – the extent to which the attorney-client privilege reaches beyond attorney-client conversations to cover lawyer-to-lawyer in-house discussions of clients' beliefs or positions when work product protection is unavailable.  I recommend accepting Hagens Berman's proposed redaction.

### 5.    May 10, 2019 Tr. 880:3-8

This is a shot not worth the powder, and I recommend accepting Hagens Berman's current proposed redaction rather than wasting any more time on it.  By way of explanation: Hagens Berman  argues that the Special Master's refusal to redact testimony about a passage from a Hagens Berman letter to its client plaintiffs is inconsistent with an earlier recommendation to permit a different redaction of testimony about the same letter.  (May 10, 2019 Tr. 877:23-878:15) The difference is that the "page 880" information communicated by Hagens Berman told the clients of an event that was either about to be public or already public (the firm's entry into the litigation), while the "page 878" information was about the attorneys' strategy and case preparation.  But the very fact that the page 880 information is already public suggests that no harm to the justice process will be done if it is left out of this particular transcript.  The defendants and the public do not really need it because they already have it.

### 6.    May 10, 2019 Tr. 1029:23-1033:9

I recommend denying the suggested redaction except to the limited extent previously stated.  This plaintiff, Michael Morgan, was obviously an adult – a middle-aged adult – by the time Ms. Reeves had the conversations reflected in the notes she discusses.  Mr. Morgan's attorney-client communications have already been redacted, and there is no basis in the attorney-client privilege for redacting his parents' communications.  I find nothing in the cases cited by Hagens Berman that changes my view:  An adult client's parents are not themselves clients by reason of that relationship.

## IV.    **Conclusion**

This completes my Review and Recommendations concerning the 2017 and 2019 transcripts, subject only to my suggestion, in § III.A.7, regarding the possibility of making inquiries regarding Mary Sells's interest in redacting or disclosing certain information.

In my R&R of May 18, 2021, Doc. 742, I undertook to "review the Hearing Materials (*i.e.* the transcripts of testimony from 2017 and 2019 and the related exhibits) anew in light of Hagens Berman's waiver."  Instead of waiting for the District Court's ruling on the proposed transcript redactions, I intend to review the exhibits now and begin the R&R-Response-Court Action process pursuant to Fed. R. Civ. P. 59.  I recognize, of course, that the Court's rulings on transcript redactions may require revisiting the related exhibit redactions.

April 15, 2025                              /s/ *William T. Hangley*
                                            WILLIAM T. HANGLEY
                                            SPECIAL DISCOVERY MASTER

# Table A, Revised

### Recommended Redactions ("R"), Partial Redactions ("RP") and Denials of Redactions ("D")

| SEPTEMBER 26, 2017 BOLTON TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Tyler Weaver Testimony** | | |
| 20:14-20 | R | Discloses privileged attorney-client communication entitled to redaction ("ACC") |
| 20:24 | D | Does not disclose a privileged attorney-client communication ("NACC").  Identifying the occurrence of an attorney-client communication and its general subject matter ("GSM") sufficiently to "enable other parties to assess the claim" of privilege is not a disclosure of its privileged content.  *Cf.* Fed. R. Civ. P. 26(b)(5)(A)(ii). |
| 20:25-21:4 | D | NACC |
| 21:8-21:13 | Redact portions ("RP") | R21:9-21:13 |
| 21:18-21:19 | R | |
| 22:16-22:17 | R | |
| 22:22-22:25 | D | NACC |
| 23:8-23:14 | D | NACC: The stipulations on the record were to unprivileged facts – a plaintiff's date of birth and the death of her parents. |
| 24:14-24:17 | D | NACC, GSM |
| 24:19-20 | D | NACC, GSM |
| 24:22-25:2 | D | NACC, GSM |
| 26:7-26:20 | Redact portions ("RP") | R26:14 (after "conversations")-26:16 (before "And"). The rest is GSM. |
| 27:4 | R | |
| 27:8-27:15 | D | NACC:  A lawyer-witness's denial that a communication occurred, or denial of knowledge whether it occurred, is not evidence ("NE") that it did occur, or of the hypothetical content of the hypothetical communication.  Of course, the questions themselves are not evidence. |
| 28:18-28:25 | R | Discloses content of a client questionnaire ("CQ content") |
| 29:4-29:10 | RP | R29:4-29:8, CQ content. |
| 29:15-29:17 | D | NACC |

| *SEPTEMBER 26, 2017 BOLTON TRANSCRIPT* | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Tyler Weaver Testimony** | | |
| 29:25-30:2 | RP | R29:25-30:1. The communication of CQ content is ACC, but the denial that the information was reviewed by counsel is not. |
| 34:15-34:17 | D | NACC. The question is not evidence. |
| 36:16-36:18 | D | NACC |
| 37:2-37:4 | D | NACC |
| 40:14-40:15 | D | NACC |
| 44:1-44:3 | D | NACC |
| 46:20-46:21 | D | NACC |
| 48:24-48:25 | D | NACC, GSM |
| 49:4-49:5 | D | NACC, GSM |
| 49:16-49:17 | D | NACC. *Note*: The testimony, which was false, was corrected by the witness after discovery, but that is not a basis for redacting it from the public record. |
| 49:23-50:22 | RP | R50:5-50:9. Balance is NACC, NE. |
| 51:6-51:7 | D | NACC, NE |
| 51:10-51:22 | D | NACC, NE |
| 52:15-52:17 | R | *Note*: I recommend expanding the redaction to mask the word "that" in 52:15. As submitted by Hagens Berman, the proposed redaction would have changed the meaning of the published testimony. |
| 53:7-8 | D | NACC |
| 54:3-54:5 | D | NACC, NE |
| 65:21-65:23 | D | NACC, NE |
| 66:3-66:6 | R | |
| 66:10-66:18 | RP | R66:10-66:11 (before "If I"). Balance is NACC, NE. |
| 68:2-68:3 | R | |
| 90:15-91:18 | R | CQ content |
| 92:23-93:16 | RP | R92:23-93:13 (before "Do you know") (CQ content). Balance is NACC, NE. |
| 97:13 | R | |
| 101:19-101:25 | D | NACC, NE |

| SEPTEMBER 26, 2017 BOLTON TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Nicholas Styant-Browne Testimony** | | |
| 108:17-109:6 | RP | R108:17-108:22 (before "And it was"). Balance is NACC |
| 109:10-109:15 | D | If the questionnaire's questions are not ACC but work product, as stated in *Gates*, the more ministerial content written by counsel – the identity and address of the law firm that wrote it – are plainly not ACC. |
| 110:1-112:24 | R | |
| 114:11-114:17 | D | NACC, NE. This was, as the witness said, "merely an administrative inquiry." |
| 114:21 | D | NACC, NE |
| 115:12-115:14 | R | |
| 115:15-115:20 | RPN | R 115:18 (after "I knew that")-115:20. Balance is NACC. |
| 121:15-121:16 | D | NACC |
| 124:2-124:6 | R | |
| 124:10-124:21 | R | |
| 125:8-126:7 | RP | R125:8-125:18; R125:23 (before "that the drug;" R126:1 (after "existed")-126:2 (before "that the drug"). The balance is NACC. |
| 127:17-130:11 | RP | R127:17-128:8 |
| | | R128:22-130:8. Balance is NACC |
| 135:2-135:20 | D | NACC |
| 136:1-136:7 | D | NACC |

| SEPTEMBER 27, 2017 SELLS TRANSCRIPT | | |
|---|---|---|
| Pg/Ln HB Proposed Redactions | Special Master's Recommendation | Comments |
| Barbara Mahoney Testimony | | |
| 8:19-8:24 | D | NACC |
| 9:6-9:8 | D | NACC |
| 9:13-9:19 | RP | R9:15 (after "to them)-9:19. Balance is NACC |
| 10:5-10:20 | R | |
| 11:21-12:3 | D | NACC |
| 12:6-12:8 | RP | R12:6 (before "we arranged") |
| 12:23-14:6 | D | *See discussion in text, § III.A, supra.* |
| *14:12-13* | *D* | *See discussion in text, § III.A, supra* |
| *14:18-15:11* | *D* | *See discussion in text, § III.A, supra* |
| 15:16-15:19 | RP | R15:16 (after "Sells").  The balance is NACC |
| 15:21-15:24 | D | NACC |
| 16:9-16 | R | |
| 19:21-20:1 | D | *See* discussion in text, § III.A, *supra* |
| 24:10-24:14 | D | NACC, GSM |
| 29:2-29:3 | D | NACC |
| 30:20-31:4 | D | NACC |
| 31:15-31:18 | D | NACC |
| 31:22-31:23 | D | NACC |
| 32:1-32:2 | D | NACC |
| 32:6-32:12 | D | NACC |
| 32:19-32:22 | D | NACC |
| 32:24-33:4 | D | NACC |
| 33:10-12 | RP | R33:11 (after "little hair")-33:12(before "in her") |
| 33:17-18 | RP | R33:17 (after "teeth, but")-33:18 (before "that was") |
| 33:20-34:9 | D | NACC |
| 34:22-34:23 | D | NACC, NEP |
| 34:25-35:3 | D | NACC and no disclosure of CQ content |
| 35:6-14 | RP | CQ: R35:6 (after "hearing")-35:7 (before "I did") |
| 35:17-35:19 | D | NACC (and no disclosure of CQ content) |
| 36:2-36:4 | D | NACC |
| 36:6-36:9 | D | NACC |
| 36:11-36:12 | D | NACC |
| 36:15-36:17 | D | NACC |
| 36:19-37:6 | D | NACC |
| 37:8-37:9 | D | NACC |
| 37:22-38:1 | D | NACC |
| 38:3 | D | NACC |
| 38:5-38:8 | D | NACC |
| 38:9-38:15 | D | NACC |
| 38:25-39:22 | D | *See discussion in text, § III.A, supra* |

| | SEPTEMBER 27, 2017 SELLS TRANSCRIPT | |
|---|---|---|
| Pg/Ln HB Proposed Redactions | Special Master's Recommendation | Comments |
| 40:1-40:8 | D | ***See discussion in text, § III.A, supra*** |
| **41:8-42:11** | ***D*** | ***See discussion in text, § III.A, supra*** |
| 44:4-44:16 | D | NACC; NE; |
| 59:21-60:3 | D | NACC |
| 61:13-61:21 | D | NACC; NE: Denials and inability to recall whether a question was asked are not evidence that it was; hence no communication. |
| 68:8-68:9 | D | NACC |
| 71:7-71:9 | R | |
| 71:12-71:19 | R | |
| 72:7-73:16 | R | |
| 74:9-74:25 | RP | R74:9 (after "time that")-74:10 (before "that she") |
| | | R74:14 (after "deposition")-74:15 (before "it was that") |
| | | R74:24-74:25.  The remainder is unprivileged as NEP. The testimony that tells what was said in the client's deposition is plainly unprivileged. I may actually have been overly solicitous of the conversants in redacting snippets that might not necessarily relate to attorney-client communications outside the deposition context. |
| 75:2-75:6 | R | |
| 75:9-75:11 | D | NACC |
| 77:18-78:6 | R | |
| 78:8-78:9 | R | |
| 80:6-81:3 | R | |
| 81:17-82:15 | RP | *R81:17 (after "but")-**81:21*** <br> ***R82:2-7*** <br> R82:11 (after "understood")-82-12 (before "that her"). The balance is NACC. |
| | **Tyler Weaver Testimony** | |
| 85:21-86:4 | D | NACC |
| 86:7-86:13 | D | NACC |
| 101:12-101:13 | D | NACC |
| 101:20-101:22 | R | |

| Nicholas Styant-Browne Testimony | | |
|---|---|---|
| 109:22-112:4 | RP | CQ Content R109:22-110:15 |
| | | CQ content  R110:19-111:21 |
| | | ***CQ content  R111:24-25*** |
| | | CQ content  R112:3 (after "injuries" and before "being" |
| 113:9-113:19 | D | NEP: Testimony is about the content of the complaint.  No ACC is disclosed. |
| 114:17-115:2 | RP | R114:17 (CQ content).  The balance is NACC |
| 115:5-115:15 | RP | R115:5-115:7. Balance is NACC, NE |
| 124:13-124:15 | R | |
| 130:22-130:24 | R | |
| 132:8-132:12 | R | |
| 139:5-139:8 | RP | R139:6 (before "were consistent").  Only the client communication is privileged.  The attorney's knowledge or belief is not, in the absence of work product protection. |
| 140:17-141:12 | RP | R140:17-141:10 |
| 141:15-18 | D | NACC |
| 142:2-142:21 | RP | R142:2-142:3 (before "I'm not").  Balance is NACC. |
| 143:1-143:9 | D | NACC |
| 143:16-144:3 | R | |
| 144:19-145:2 | RP | R144:20 (before "I don't"); R144:24 (after "doctors") |
| 147:20-147:23 | D | NACC ; NEP |
| Mary Sells Testimony | | |
| 157:2-157:9 | R | |
| 158:4-158:15 | R | |
| 158:16-158:17 | RP | R158:17 (after "they" and before "filed") |
| 161:5-161:7 | R | |
| 161:13-162:12 | D | NACC |
| 163:18-163:21 | R | |

| SEPTEMBER 28, 2017 ANDERSON TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Nicholas Styant-Browne Testimony** | | |
| 5:2-5:4 | D | NACC.  Conversations between the attorneys and the testifying expert are not attorney-client privileged, and work product protection has been waived. |
| 6:5-6:7 | D | NACC |
| 6:12-7:4 | D | NACC |
| 7:8-7:10 | D | NACC |
| 8:10-13 | D | NACC |
| 8:20-9:17 | D | NACC |
| 9:22-10:2 | D | NACC |
| 10:15-11:2 | RP | R10:15-10:24.  Balance is an unanswered question. |
| 12:5-12:20 | RP | R12:5-12:14.  Balance is NACC |
| 14:25-18:8 | D | NACC |
| 18:25-19:1 | D | NACC, GSM |
| 19:7-21:2 (HB typo corrected) | RP | R19:8-19:10 (before "Is that"); R19:23-19:24; R20:8-20:12.  Balance is NACC. |
| 21:18-22:1 | RP | R21:18-21:20.  Balance is NACC. |

| SEPTEMBER 28, 2017 BOLTON TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Terrie Bolton Testimony** | | |
| 4:22-5:21 | R | |
| 8:23-8:25 | D | NACC when the event is an attorney's voicemail asking the client to call back, and without substantive content. |
| 9:3-9:24 | R | |
| 10:6-10:19 | R | |
| 10:22-11:2 | RP | R10:22-10:23 (before "and then") |
| | | R10:24 (after "email")-10:25 ("before "He wanted").  Balance is NACC.  In particular, the portion of the testimony beginning at 10:25 ("He wanted") does not comport with accepted notions of attorney-client communications; Hagens Berman was attempting to negotiate with Ms. Bolton in its own interests. |
| 11:4-11:8 | RP | R11:5 (after "email" and before "when."  Balance is NACC |

| SEPTEMBER 28, 2017 BOLTON TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Terrie Bolton Testimony** | | |
| 11:10-11:11 | D | NACC |
| 11:15-12:5 | R | |
| 12:13 | R | |
| 12:20-12:23 | R | |

| SEPTEMBER 28, 2017 MARSHALL TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Shelby Smith Testimony** | | |
| 9:3 | | Information provided for interrogatory responses is given with no expectation of privacy ("NEP"), and is not privileged. |
| 9:18-9:21 | D | NEP; Crime-fraud exception ("CFX") |
| 10:16-10:20 | RP | R10:16-10:18 |
| 11:3-12:4 | D | CFX |
| 14:5-14:7 | R | |
| 14:11-14:23 | D | NACC, NEP, CFX |
| 15:5-15:13 | D | NACC |
| 15:22 | D | NACC (no content disclosed) |
| 16:6-17:6 | R | |
| 23:1-23:5 | RP | R23:2 (after "emails,")-23:5 |
| 23:11-23:18 | R | |
| 24:1-24:4 | R | |
| 24:14-24:17 | RP | R24:14 (after "also,")-24:15 (before "I was") |
| 24:22-24:24 | R | |
| 25:1-26:17 | RP | R25:8-25:9 |
| | | R25:13 (after "Marshall")-25:17 |
| | | R25:20 (after "photograph:)-25:22 (before "and from my") |
| | | R26:3 (after "really")-26:4 |
| | | R26:7 (after "able to")-26:8 (before "confirm") |
| | | R26:8 (after "confirm" and before "that the feet:) |
| | | R26:14-26:17 |
| 26:24 | R | |
| 27:8-27:16 | D | NACC |
| 27:22-28:5 | RP | R27:23 (after "understood "and before "as"); |
| | | R27:25 (after "understand")-28:1 (before "and that's") |
| 29:2-14 | R | |
| 29:19-29:25 | D | NACC |

| SEPTEMBER 28, 2017 MARSHALL TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| Shelby Smith Testimony | | |
| 30:4-5 | D | NACC |
| 31:25-32:12 | RP | R31:25 (after "true that")-R32:1. Remainder is NEP, discussion of Ms. Smith's practice when gathering information and preparing discovery responses with a client. |
| 32:22-33:9 | D | NEP. And, in any event, the *pro se* party's questions are not actually testimony or evidence. |
| 33:22-34:4 | R | |
| Nicholas Styant-Browne Testimony | | |
| 44:14-45:5 (HB typo corrected) | RP | R44:14-44:24 |
| | | R45:2 (after "issue,")-45:3 (before "And Dr.") |
| 45:11-13 | R | |
| 45:19-23 | R | |
| 46:17 | D | NACC |
| 46:21-25 | D | NACC |
| 47:17-48:7 | RP | R47:17-47:18 (before "I had no") |
| | | R47:25 (after "related")-48:7. The balance of this passage is unprotected work product and stops short of disclosing any actual ACC. |
| 48:11-48:12 | D | NACC |
| 48:22-48:24 | RP | R48:24 (after "1998 paper") |
| 49:4-49:13 | RP | R49:4-49:7 |
| 49:21-49:23 | D | NACC |
| 52:18-53:1 | D | NACC. The client's communications with the expert are not ACC-privileged, nor are Mr. Styant-Browne's dealings with the expert. |
| 53:9-53:18 | D | NACC. The lawyer's reason for communicating a fact to a client is not ACC but work product, here unprotected. |
| 55:9-55:14 | R | CQ content |
| 55:22-57:3 | R | CQ content |
| 57:13-57:24 | R | Note that the ACC here was between Mr. Marshall and attorneys who never undertook to represent him. It is protected, nevertheless. |
| 58:10-59:10 | D | NACC |
| 60:16-60:17 | D | NACC |
| 61:1-61:3 | D | NACC |
| 65:2-65:24 | D | NACC; CFX |
| 66:2-66:4 | R | |

- 9 -

| SEPTEMBER 28, 2017 MARSHALL TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Nicholas Styant-Browne Testimony** | | |
| 67:20-67:22 | R | |
| 68:1-68:22 | D | Neither Mr. Marshall's questions nor the witness's lack of recall are evidence or testimony. |
| 70:5-70:18 | R | |
| 72:17 | D | NACC |
| 73:16-73:21 | D | NACC |
| 74:7-74:14 | D | NACC |
| 75:14-75:17 | D | NACC |
| 75:19-75:21 | D | NACC |


| SEPTEMBER 28, 2017 NAVAMUEL TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Barbara Mahoney Testimony** | | |
| 9:13-9:15 | RP | R9:13 (before "about") |
| 9:18-9:22 | R | |
| 10:8-10:11 | R | |
| 10:13-10:14 | R | |
| 10:18-10:22 | RP | R10:21 |
| 11:3-11:10 | RP | R11:3 (after "letter") |
| 11:23-12:10 | R | |
| 13:25-14:18 | R | |
| 14:20 | D | NACC, GSM |
| 16:4-16:5 | D | NEP |
| 16:14-16:23 | RP | R16:14-16:19 (before "we provided." The balance is NACC. |
| 17:22-18:13 | R | |
| 18:19-19:1 | RP | R18:19-18:24. |
| 19:3-19:6 | R | |
| 19:13-19:15 | R | |
| 19:19-20:12 | RP | R19:19-20:8 |
| 24:3-24:7 | D | NACC; NEP |
| 24:23-25:18 | R | |
| **Nicholas Styant-Browne Testimony** | | |
| 28:7-28:25 | R | |
| 29:5-29:19 | RP | R29:17 (after "And in") and before "the complaint" |
| 30:15-30:18 | R | |
| 33:20-34:1 | R | |

- 10 -

| SEPTEMBER 28, 2017 NAVAMUEL TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Jose Navamuel Testimony** | | |
| 36:22-37:9 | RP | R36:22 (after "life")-37:1 (before "I") |
| | | 37:6 (after "beginning")-37:8 (before "they just") |
| 37:12-37:13 | D | NACC |
| 38:11-38:16 | D | NACC |
| 38:19-38:25 | R | |
| 39:3-39:6 | R | |
| 40:7-40:20 | RP | R40:16-40:20 |
| 41:4-41:6 | D | NACC |

| MAY 7, 2019 TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Nicholas Styant-Browne Testimony** | | |
| 118:21-119:9 | D | NACC. Conversations between counsel are not ACC, and work product protection has been waived. |
| 129:13-129:15 | D | NACC, NEP |
| 129:22-130:20 | D | NACC. The memoranda and conversations described might be work product (not protected here) but are not attorney-client communications. |
| 131:8-133:19 | D | NACC, NEP |
| 141:12-141:19 | D | NACC |
| 146:15-147:15 | D | NACC |
| 152:1-6 | D | NEP |
| 168:11-171:8 | RP | R169:1 (after "there")-169:3 |
| | | R169:9 (after "fund")-169:10 |
| | | R169:14-169:20 |
| | | R170:7 (after "was filed")-170:15 |

- 11 -

| MAY 8, 2019 TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| Tyler Weaver Testimony | | |
| 244:21-244:24 | D | NACC |
| 252:1-253:2 | D | NACC |
| 254:3-254:23 | D | NACC |
| 258:2-4 | D | NACC |
| 258:7-9 | D | NACC |
| 264:6 -16 | RP | R264:6 (after "a lot")-264:8 (before "And it")  The balance is NACC. |
| 265:2-266:17 | R | |
| 279:19-21 | R | |
| 282:3-6 | R | |
| 293:5-14 | R | |
| ***294:24-295:2*** | ***R*** | |
| 296:10-15 | R | |
| 302:19-303:4 | RP | R303:2 (after "house")-303-4 (before "and I sent") |
| 303:9-10 | R | |
| 303:19-22 | R | |
| 342:13-346:8 | RP | R343:8-343-10.  Attorney-expert conversations are not ACC.  Testimony that the attorney does not know whether he spoke to client, or that he did not do so, are also not ACC, and testimony that the attorney did not talk to past or present treating physicians is, again, not ACC. |
| 368:2-6 | D | NACC |
| 368:18-369:18 | RP | R368:18-369:4 (before "Nick") |
| 370:19-371:9 | R | |
| 377:8-380:22 | D | NACC |
| 395:1-13 | D | NACC |

| *MAY 9, 2019 TRANSCRIPT* | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Diana Cabcabin Testimony** | | |
| 445:5-452:24 | RP | R447:17 (after "Ms. Reeves")-448:10 |
| | | R448:14-451:17 |
| | | R452:9-452:24 |
| 459:12-460:1 | R | |
| 460:15-461:18 | R | |
| 471:5-472:10 | RP | R471:11-472:10 |
| 475:15-477:10 | D | NACC.  The small part of this testimony that mentions a conversation with one of counsel, Ms. Reeves, does no more than attempt to place it chronologically in reference to other events. |
| 478:4-5 | R | |
| 478:14-15 | R | |
| 479:21-480:14 | RP | R 480:2 (after "remember")-480:14 |
| 480:15-481:8 | R | |
| **Kay Reeves Testimony** | | |
| 731:16 | D | NEP |
| 731:22-732:5 | D | NEP.  This and the preceding segment relate to the process of obtaining the client's confirmation of information to be included in a public document, with no expectation that either the occurrence or the content of the communication would be private. |
| 732:20-22 | D | NACC.  Ms. Reeves's drafting of assertions of fact for a complaint was at most work product, not protected here. |
| 733:22-734:1 | D | NACC |
| 734:13-23 | D | NEP |
| 735:18-736:17 | R | |

| *MAY 10, 2019 TRANSCRIPT* | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Kay Reeves Testimony** | | |
| 817:8-821:12 | RP | R820:22-821:8.  The balance of this testimony is about the witness's general practice. The suggested redaction is of ACCs she says she had with all plaintiffs in *these* cases. |

- 13 -

| MAY 10, 2019 TRANSCRIPT | | |
|---|---|---|
| **Pg/Ln HB Proposed Redactions** | **Special Master's Recommendation** | **Comments** |
| **Kay Reeves Testimony** | | |
| 821:16-822:12 | D | NACC because only the occurrence, not the content, of conversations is testified to. |
| 833:24-834:1 | D | NACC |
| 834:24-835:10 | R | It is difficult to determine whether the witness is describing her general practice, or what she would probably do, or describing actual conversations with clients or potential clients in these actual cases.  I gave the benefit of the doubt, but the privilege is to be applied parsimoniously, and the Court may disagree with my recommendation. |
| 843:14-16 | D | NACC.  After explaining that the PowerPoint exhibit was not used in these cases, and quoting many sentences in it, Hagens Berman redacts (and seems to distinguish) one sentence on a rationale I cannot divine. |
| 843:24-844:14 | D | NACC |
| 845:14-847:18 | D | NACC |
| 851:7-11 | R | |
| 851:18-852:7 | D | NACC.  The statement that a letter was sent, without disclosing its content, does not disclose an ACC. |
| 877:23-878:15 | RP | R878:9 (after "2011")-878:15 |
| *880:3-8* | *R* | |
| **Steve Berman Testimony** | | |
| 964:10-16 | R | |
| **Kay Reeves Testimony Resumes** | | |
| 1022:4-1023:20 | D | NACC |
| 1024:11-1028:23 | RP | R1024:15-1024:17 (before "She is") R1024:23 (after "fund")-1024:23 R1026:7--1026:9 R1028:1(after "Barbara")-1028:4 |
| 1029:23-1033:9 | RP | R1030:15 (after "Richardson-Merrell")-1030:16 (before "Hold").  The balance is NACC. |
| 1047:15-1048:13 | D | NE |
| 1066:23-1067:20 | RP | R1067:8 (after "place")-1067:20 (before "And I said") |

- 14 -