## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GLENDA JOHNSON**, *et al.*, | : | |
| | : | |
| v. | : | **Civ. No. 11-5782** |
| | : | **and all related cases** |
| **SMITHKLINE BEECHAM** | : | |
| **CORPORATION**, *et al*. | : | |

---

**Diamond, J.**                                                    **August 5, 2025**

### MEMORANDUM OPINION

Beginning in 2011, fifty-two Plaintiffs brought products liability actions against the manufacturers of the morning sickness drug thalidomide, which Plaintiffs alleged their expectant mothers had ingested in the early 1960s, causing Plaintiffs to sustain horrible birth injuries. In 2014, after Plaintiffs repeatedly obstructed Defendants' efforts to discover whether these actions were time-barred, I appointed William T. Hangley to serve as Special Discovery Master. Having conducted a painstaking inquiry against often fierce and unprincipled resistance, Mr. Hangley has issued a Report and Recommendation in which he finds that Plaintiffs' counsel—the law firm of Hagens Berman Sobol and Shapiro, its Managing Partner Steve Berman, and former partner Tyler Weaver—had: conducted grossly inadequate presuit investigations; obstructed discovery; recklessly (or, perhaps, intentionally) made false and baseless allegations intended to toll the limitations clock; doctored evidence; and—when their misconduct came to light—sought to abandon Plaintiffs and evade Defendants' sanctions requests. I will here address the Objections to the R&R that the Firm, Mr. Berman, and Mr. Weaver have raised.

Having reviewed all Mr. Hangley's findings and conclusions de novo, I will adopt Mr. Hangley's Recommendations respecting Hagens Berman's Motions to Withdraw from representing a number of Plaintiffs. I will not adopt the Special Master's Recommendation to

deny without prejudice Hagens Berman's Motion to Withdraw from the representation of a Plaintiff who has abandoned his claims.

I will not adopt Mr. Hangley's Recommendation to impose sanctions on Hagens Berman, Mr. Berman, and Mr. Weaver.  Rather, as I stated in my prior Order, I will treat the R&R as notice to the Firm and Messrs. Berman and Weaver.  (Doc. No. 768.)  I will require: Hagens Berman to show cause why sanctions should not be imposed pursuant to Fed. R. Civ. P. 26(g), and 37; Hagens Berman and Mr. Berman to show cause why sanctions should not be imposed under Pa. R. Civ. P. 1023.1(d), Fed. R. Civ. P. 11(c), and 28 U.S.C. § 1927; and Hagens Berman, Mr. Berman, and Mr. Weaver to show cause why sanctions should not be imposed under the inherent power of the Court, Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991).

The Parties have not objected to the great majority of Mr. Hangley's factual findings, which, in any event, I have reviewed de novo and adopt.  I will thus rely on those undisputed facts throughout this Memorandum.

## I.  BACKGROUND

From 2011 to 2014, Hagens Berman prosecuted eleven products liability actions on behalf of fifty-two individual Plaintiffs against pharmaceutical companies GlaxoSmithKline, Grünenthal, Sanofi, and Avantor.  Each Plaintiff alleged that in the early 1960s, thalidomide—a maternity drug manufactured by the Defendants or their legal predecessors—had caused severe birth defects. Each Complaint save one was initially filed in state court and removed to this Court.  See Johnson v. SmithKline Beecham Corp., 724 F.3d 337, 360 (3d Cir. 2013).  The Parties did not dispute that there was complete diversity between Plaintiffs and all Defendants except GSK.  The Third Circuit accepted the question I had certified for interlocutory review: whether there was diversity jurisdiction over GSK.  Id. at 340-41.  Ruling that there was diversity jurisdiction, the Court

remanded.  Id. at 360.  Chief Judge Tucker then consolidated all eleven Hagens Berman actions before me.  (Doc. Nos. 81, 88, 94, 181.)

Defendants vigorously argued that I should dismiss all claims as barred by Pennsylvania's two-year limitations clock governing tort actions.  See 42 Pa. Cons. Stat. § 5524.  Plaintiffs variously pled: that Defendants' fraudulent concealment had tolled the running of the limitations clock; or, due to advances in medical science, Plaintiffs could not reasonably have discovered until very recently that thalidomide had caused their birth injuries.  (Doc. No. 76.)  I was obligated at the Rule 12(b)(6) stage to accept these allegations.  Accordingly, I denied Defendants' Motions to Dismiss.  (Doc. No. 92); see also Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 498 (3d Cir. 1985) ("Since the applicability of the statute of limitations usually involves questions of fact for the jury, defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred.").

Given that Plaintiffs had sustained their injuries some 50 years before they filed suit, and given Plaintiffs' tolling allegations, Defendants sought to learn in discovery if the suits were time-barred: i.e., when each Plaintiff knew or should have known that thalidomide may have caused his or her injuries.  (See Doc. No. 95.)   As I have previously described in detail, Hagens Berman repeatedly failed to provide this potentially dispositive information.  (See, e.g., Doc. Nos. 147, 154, 166, 206, 222.)  On March 26, 2014, GSK wrote to Hagens Berman that it was "obvious that in all or most of [the cases] no reasonable pre-suit investigation was conducted," asked the Firm "to undertake a careful review of the claims made in all these cases," and offered that "in any such case dismissed by April 11," GSK would not seek sanctions.  (See Doc. No. 310-5 at 2 of 27.)  No cases were dismissed by that deadline.  (See Docket.)

On June 12, 2014, Defendants asked me to dismiss all eleven Complaints with prejudice

on discovery abuse grounds.  (Doc. No. 232.)  Although I denied the request, I noted that I was "greatly concerned that Plaintiffs ha[d] not honored their discovery obligations with respect to [the] critical issue" of Plaintiffs' knowledge of their birth injuries.  (Doc. No. 239 at 3.) Accordingly, on June 27, 2014, with the consent of all Parties, I appointed Mr. Hangley as Special Discovery Master to "investigat[e] and supervis[e] all discovery respecting the Thalidomide discovery issue," "[m]onitor[] and report[] on Plaintiffs' compliance with their discovery and disclosure obligations respecting the Thalidomide discovery issue," and "ensure Plaintiffs' compliance with [those] obligations."  (Doc. No. 256 at 1-2); see also Fed. R. Civ. P. 53(b)(1). This Order also included the common provision that the Special Master could "communicate ex parte with the Court . . . for any . . . reason reasonably necessary to the fulfillment of his duties." (Doc. No. 256 at 3); see also, e.g., Arneault v. O'Toole, No. 11-95, 2016 WL 7029620, at *4 (W.D. Pa. Dec. 2, 2016) ("[T]he Special Master may communicate with the Court ex parte on all matters as to which the Special Master has been empowered to act."), aff'd, 718 F. App'x 148 (3d Cir. 2017); In re Flint Water Cases, No. 16-10444, 2018 WL 11290659, at *2 (E.D. Mich. July 31, 2018) ("Pursuant to Rule 53(b)(2)(B), the Special Master may communicate ex parte with the Court at any time."); Moussouris v. Microsoft Corp., No. C15-1483, 2017 WL 1652910, at *1 (W.D. Wash. May 2, 2017) ("Pursuant to Rule 53(b)(2)(B), the Special Master may communicate ex parte with the court without restriction.").  I also ordered that the Special Master's fees and costs would be paid equally: half by Plaintiffs, and half by Defendants.  (Doc. No. 256 at 3.)

Defendants initially sought summary judgment on June 20, 2014.  (Doc. Nos. 245, 246.) With Mr. Hangley's appointment, discovery proceeded apace, and three weeks later, Hagens Berman conceded that summary judgment should be entered against Plaintiff Jack Merica.  (Doc. Nos. 263, 265.)  Counsel subsequently informed Mr. Hangley that the Parties had reached an

agreement similar to that GSK had unsuccessfully proposed in March. (<u>See</u> Doc. No. 268 ¶ 1.) With the Parties' consent, the Special Master ordered Hagens Berman to "investigate each of the remaining active cases" and "decid[e] [by September 16, 2014] whether it should continue to be prosecuted or dismissed with prejudice by consent." (<u>Id.</u>) On August 6, 2014, GSK and Grünenthal moved for sanctions against Hagens Berman both for bad faith prosecution of the Merica case and for "either fail[ing] to investigate or even misstat[ing] the facts of each case" in which GSK and Grünenthal had sought summary judgment. (Doc. No. 310 at 2; <u>see also</u> Doc. No. 258 at 17-18 of 22; Doc. No. 281 at 28-30.) On August 11, 2014, I referred these sanctions requests to Mr. Hangley, again without objection. (Doc. No. 316.) I instructed the Special Master to "consider all requests for the imposition of sanctions stemming from the Thalidomide discovery issue, including but not limited to . . . any . . . sanctions pursuant to Rule 11, 28 U.S.C. § 1927, or the Court's inherent authority that are substantially related to the Special Master's duties under the Appointment Order." (<u>Id.</u> at 1.)

Between May and October 2014—while the Summary Judgment and Sanctions Motions were being filed—Hagens Berman moved to withdraw from representing six Plaintiffs: John Marshall, Jose Navamuel, Terrie Bolton, Richard Anderson, Mary Sells, and John Skelton III (now deceased). (Doc. Nos. 207, 301, 342, 343, 375, 382.) Some three months after it had initially moved for sanctions, however, GSK reported that it had reached an agreement with Hagens Berman: GSK would withdraw its Sanctions Motions, and twenty-eight of the twenty-nine thalidomide Plaintiffs still represented by the Firm (not including the previously mentioned six) would dismiss their claims against GSK with prejudice. (Doc. Nos. 394, 397.) Accordingly, on November 14, 2014, Hagens Berman moved for voluntary dismissal of those twenty-eight actions as to GSK. (Doc. No. 409.) That Motion is still pending.

On March 9, 2015, adopting Mr. Hangley's Recommendation, I granted Grünenthal's Sanctions Motions, but I stayed decision on GSK's Sanctions Motions as to former Plaintiffs Jack Merica, Lawrence Boiardi, and Roel Garza pending inquiry into the propriety of the GSK agreement with Hagens Berman and my decision on the Plaintiffs' Motion for Voluntary Dismissal. (Doc. Nos. 414, 482, 483.) As I explained, the professional and ethical implications were troubling: the "agreement" appeared to benefit both GSK (which would eliminate twenty-eight actions against it) and Hagens Berman (which would avoid sanctions), but it would not benefit the twenty-eight Plaintiffs, who would give up their claims for nothing. (Doc. No. 414 at 6.) Accordingly, I ordered Mr. Hangley to determine whether these Plaintiffs had knowingly, voluntarily, and intelligently agreed to dismiss their claims against GSK. (Doc. No. 420); see also Green v. Nevers, 111 F.3d 1295, 1301 (6th Cir. 1997); United States v. Mercedes-Benz of N. Am., Inc., 547 F. Supp. 399, 400 (N.D. Cal. 1982) (the court may "look behind" a stipulation of dismissal "to determine whether there is collusion or other improper conduct giving rise to the dismissal").

Although it had assented to my previous Orders, Hagens Berman now strenuously objected, and unsuccessfully asked the Third Circuit to issue a writ of mandamus and prohibit Mr. Hangley's inquiry. See In re Alexander, No. 15-2245, 2015 WL 3479384, at *1 (3d Cir. May 29, 2015). Although Mr. Hangley noted after conducting his inquiry that Hagens Berman had sought to obstruct his efforts, on August 10, 2016, he recommended that I allow the dismissals sought by GSK and the Firm. (Doc. No. 535 at 4, 35.) I have not yet ruled on this Recommendation. (See Doc. No. 409.)

Still undecided were the Firm's Motions to Withdraw from representing the five Plaintiffs (with Mr. Skelton's death) who had refused to dismiss their claims. Once again, Hagens Berman

had stated that it could not, consistent with its professional obligations, continue to represent these Plaintiffs. (Doc. Nos. 207, 301, 342, 343, 375, 382.) This begged the question of why Hagens Berman had agreed to represent these Plaintiffs in the first place. See Chester v. May Dep't Store Co., No. 98-cv-5824, 2000 WL 12896, at *1 (E.D. Pa. Jan. 7, 2000) (withdrawal denied where there was "no suggestion that counsel was unaware of his client's history and propensities when he accepted the representation and proceeded to litigate this matter"). Accordingly, on March 14, 2016—once again, without Objection—I ordered Mr. Hangley to advise me respecting those Motions to Withdraw. (Doc. No. 532.) To protect Plaintiffs' and the Firm's attorney-client and work-product privileges, Mr. Hangley proposed proceeding in camera, excluding Defendants, and Defendants agreed. (See Doc. Nos. 539, 546.) On September 26, 27, and 28, 2017, the Special Master conducted hearings to determine, inter alia, when and why Hagens Berman believed that the five actions were baseless and so required the Firm to withdraw. (See Doc. Nos. 570-72.)

It became apparent that further hearings were necessary. Moreover, various counsel and Mr. Hangley had to go through the complex process of reviewing and redacting the hearing transcripts without abrogating evidentiary privileges.

In late 2017, Hagens Berman informed Mr. Hangley that Tyler Weaver, one of the Firm's partners, had in August 2014 altered reports authored by expert Dr. Trent Stephens in an apparent effort to persuade two Plaintiffs to withdraw their thalidomide claims. (See Doc. No. 588 at 7.)

The Special Master thus held additional hearings on May 7, 8, 9, and 10, 2019. (See Doc. Nos. 694-97.) Mr. Weaver testified regarding his admitted document tampering and why he failed to mention it when he testified about the Stephens Report during the 2017 withdrawal hearings. (See Doc. Nos. 694-97.)

The 2019 hearings were conducted partly in camera, once again to preserve work product

and attorney-client privileges.  (Doc. No. 704 at 1.)  Mr. Hangley sought to redact the hearing transcripts and exhibits before they were made available to certain past or present Plaintiffs for review, and then to Defendants, before finally being placed in the record.  (Id.)  While Mr. Hangley, Hagens Berman, and other counsel worked on those redactions, Hagens Berman informed Mr. Hangley that it intended to present an opinion from attorney ethics expert Abraham C. Reich that the Firm had acted properly both in agreeing to represent and then moving to withdraw from representing the remaining five Plaintiffs: John Marshall, Mary Sells, Richard Anderson, Terrie Bolton, and Jose Navamuel.  (Doc. No. 707.)  Ordered to submit a report as required by Rule 26, Mr. Reich disclosed that Hagens Berman had given him unredacted copies of the 2017 and 2019 hearing transcripts and exhibits for his review, thus abrogating the work product privilege respecting those transcripts.  Fed. R. Civ. P. 26(a)(2)(B); (Doc. Nos. 742, 746, 749).  With this new complication in mind, Mr. Hangley prepared a Report and Recommendation on proposed hearing transcript redactions.  (Doc. No. 824.)  I have not yet ruled on that R&R.

Delayed by COVID-related shutdowns, on October 12, 2023, Mr. Hangley submitted the instant Report and Recommendation, addressing: Hagens Berman's outstanding Motions to Withdraw from representing the five Plaintiffs; and the imposition of sanctions on the Firm, Mr. Berman, and Mr. Weaver.  (Doc. No. 767.)  Hagens Berman and Mr. Berman have together submitted Objections.  (Doc. No. 794.)  Mr. Weaver, who is no longer employed by Hagens Berman, has submitted his own Objections.  (Doc. No. 795.)  The conduct of other attorneys who had represented Plaintiffs—Kay Gunderson Reeves and Peter Gordon—was criticized in the October 2023 R&R, although Mr. Hangley does not recommend that either be sanctioned.  (See e.g., Doc. No. 767 at 43-44.)  Ms. Reeves has nonetheless submitted Objections.  (Doc. No. 812.)

## II. STANDARDS OF REVIEW

I must review de novo all Objections to Mr. Hangley's conclusions of law and factual findings, unless the Parties stipulate otherwise.  Fed. R. Civ. P. 53(f)(3), (4).  There are no such stipulations here.

I may review the Special Master's findings and conclusions to which no Objections have been made under a clear error standard.  Multiple Energy Techs., LLC v. Under Armour, Inc., No. 20-664-NR, 2024 WL 4784112, at *3 n.1 (W.D. Pa. Nov. 14, 2024) ("[F]ederal district courts routinely review objected-to portions of a special master's report and recommendation de novo and unobjected to portions for clear error, and the Court will do so here."); see also Fed. R. Civ. P. 53 advisory committee's notes to  2003 amendment (for both findings of fact and conclusions of law, the court "must" review objections de novo, but where there are no objections, the court "may" review de novo).  Courts in this Circuit have repeatedly held that Rule 53 does not require the reviewing court to conduct a new hearing:

> The court reviews a special master's R&R de novo, pursuant to Federal Rule of Civil Procedure 53.  The plain language of Rule 53 requires the court to make a de novo determination, but not to always conduct a de novo hearing.  Net2Phone, Inc. v. Ebay, Inc., No. 06-2469, 2008 WL 8183817, at *3 (D.N.J. June 26, 2008).  The parties have had a full and fair opportunity to be heard via the filing of their objections.  Federal Rule of Civil Procedure 53 Advisory Committee Notes to 2003 Amendments ("The requirement that the court must afford an opportunity to be heard can be satisfied by taking written submissions when the court acts on the report without taking live testimony.");  Commissariat à l'Energie Atomique v. Samsung Elecs. Co., 245 F.R.D. 177, 179 (D. Del. 2007) ("The plain language of Rule 53 shows that the review of a Special Master's decision requires the court to make a de novo determination, not conduct a de novo hearing.").

Arconic Inc. v. Novelis Inc., No. 17-1434, 2021 WL 37615, at *2 (W.D. Pa. Jan. 5, 2021).

## III. OBJECTIONS

Hagens Berman, Mr. Berman, Mr. Weaver, and Ms. Reeves have submitted Objections to the Special Master's R&R.  (Doc. Nos. 794, 795, 812.) Because Hagens Berman and Mr. Berman

submitted their Objections jointly, I will collectively refer to them as Hagens Berman or the Firm.

I will overrule the Objections of Ms. Reeves.  (Doc. No. 812.)  I agree with the Special Master that imposing sanctions on her is not warranted based on the present record.  Moreover, as I discuss below, the R&R is not itself a form of sanction.  Accordingly, Ms. Reeves has no standing to object.  See In re T.G. Morgan, Inc., 343 F. App'x 171, 172 (8th Cir. 2009) (certain parties "lacked standing to object to the report" of a Chapter 7 trustee because they had no allowed claims in the case.  If required, I would accept Mr. Hangley's conclusions (which I have reviewed de novo) and overrule virtually all Ms. Reeves' Objections for the reasons stated in the R&R.  Finally, I accept Mr. Hangley's Recommendation that I redact snippets of Ms. Reeves' testimony and related exhibits on privilege grounds.

### A. Mr. Hangley's Authority to Recommend Sanctions

I will overrule the Objections of Hagens Berman and Mr. Weaver that the Special Master was without authority to recommend sanctions.  (Doc. No. 794 at 5-10, 15-18; Doc. No. 795 at 7-8.)  That is simply not the law.  A special master is a judicial officer, a surrogate of the appointing court.  He has not just the inherent authority but the duty to advise the Court as to all the rules, statutes, and case law governing civil litigation.  That authority is "an implied power squeezed from the need to make the court function."  Chambers, 501 U.S. at 42.  Indeed, the special master is the only court officer who can address those issues of professional conduct that first arise in the proceedings over which he presides.  It thus makes little sense to suggest that Mr. Hangley exceeded his authority by advising me about allegedly grievous misconduct.  See In re Intel Corp. Microprocessor Antitrust Litig., 562 F. Supp. 2d 606 (D. Del. 2008) (upholding special master's recommendation to impose sanctions on non-parties even though his appointment order made no mention of sanctions with respect to non-parties).

In addition to Mr. Hangley's inherent authority, I repeatedly instructed him to consider whether specific attorney misconduct alleged could warrant the imposition of sanctions. The Order appointing a special master "must direct the master to proceed with all reasonable diligence and must state . . . the master's duties, including any investigation or enforcement duties, and any limits on the master's authority under Rule 53(c)." Fed. R. Civ. P. 53(b)(2)(A). My Orders of June 27, 2014 and August 11, 2014, gave rise to the Special Master's Recommendations. (Doc. Nos. 256, 316.)

I contemplated sanctions when I first appointed Mr. Hangley. In my June 17, 2014 Order, I emphasized that a Special Discovery Master was needed to address Hagens Bermans' "disturbing" attempts to "evade" providing critical discovery, and that I was thus considering imposing sanctions on the Firm, including dismissing all eleven Complaints with prejudice. (Doc. No. 239 at 1, 3.) This was a "drastic sanction," however, to be "reserved for those cases where there is a clear record of delay or contumacious conduct by the plaintiff." Donnelly v. Johns-Manville Sales Corp., 677 F.2d 339, 342 (3d Cir. 1982). Because "it is necessary for the district court to consider whether lesser sanctions would better serve the interests of justice," I ordered the Special Master to consider such lesser sanctions. Id.; (Doc. No. 316 at 1.) Mr. Hangley understood that the June 27 Order "contemplates that the Special Discovery Master will recommend" sanctions "if and as appropriate." (Doc. No. 767 at 12.)

Hagens Berman urges that if the June 27 Order authorized the Special Master to recommend sanctions, then "there would not have been any reason to later amend the order to authorize [him] to consider 'requests for the imposition of sanctions.'" (Doc. No. 794 at 17 n.7.) The Firm here conflates Mr. Hangley's authority to consider sanctions with my instructions that he consider whether particular conduct warranted the imposition of sanctions. For instance, by

July 1, 2014, the Defendants began to file new requests for sanctions based on Hagens Berman's alleged discovery and pleading misconduct. (Doc. No. 258 at 8-9; <u>see also</u> Doc. No. 293.) Indeed, when I first proposed amending the June 27, 2014 Order, I explicitly did so "upon consideration" of these new requests. (Doc. No. 297.) That my August 11, 2014 Order allowed Mr. Hangley to consider Defendants' newly-filed sanctions requests does not impugn the authority I conferred on the Special Master in the June 27 Order to recommend whether sanctions should be imposed.

Moreover, my August 11, 2014 Order explicitly gave Mr. Hangley broad authority to consider recommending sanctions:

> The Special Master, William T. Hangley, Esq. shall have the authority to consider all requests for the imposition of sanctions stemming from the Thalidomide discovery issue, **including but not limited to**: the Parties' compliance with their discovery obligations, counsel's failure to conduct pre-suit investigations, whether discovery misconduct caused any unreasonable delays in litigation, **and any other sanctions** pursuant to Rule 11, 28 U.S.C. § 1927, or the Court's inherent authority **that are substantially related to the Special Master's duties under the Appointment Order**. The Special Master's authority shall extend to all forthcoming and pending requests. The Special Master shall issue a Report and Recommendation on any request for the imposition of sanctions in accordance with Rule 53(e).

(Doc. No. 316 at 1-2 (emphasis added).) The Order does not limit the Special Master to considering only sanctions requests. His duties under that Order are broad, "including but not limited to" recommending "any other sanctions . . . that are substantially related to the Special Master's duties under the Appointment Order." (<u>Id.</u> at 1.) The Order was thus an extension to the Special Master of the Court's inherent authority to impose sanctions on the lawyers who practice before it. <u>Chambers</u>, 501 U.S. at 42 n.8; <u>LaSalle Nat. Bank v. First Connecticut Holding Grp., LLC.</u>, 287 F.3d 279, 286 (3d Cir. 2002).

**B. The Special Master Applied the Correct Standard Regarding the Motions to Withdraw**

An attorney may withdraw from a matter in this District only by leave of Court, unless substitute counsel has entered an appearance.  Local R. Civ. P. 5.1.  Leave to withdraw is left to the Court's discretion.  Compare Wolgin v. Smith, No. 94-7471, 1996 WL 482943, at *2 (E.D. Pa. Aug. 21, 1996) (withdrawal criteria), with Ohntrup v. Makina Ve Kimya Endustrisi Kurumu, 760 F.3d 290, 295 (3d Cir. 2014) ("Ohntrup III") ("[T]here is no multi-factor test that a district court must apply to decide a motion for attorney withdrawal.").  In each of its Motions to Withdraw, Hagens Berman states only that it bases its Motion on Pennsylvania Rule of Professional Conduct 1.16(a)(1), which requires a lawyer to withdraw from representation if "professional considerations require termination."  (Doc. Nos. 207, 301, 342, 375, 382.)

Accordingly, in my March 14, 2016 Order, I directed the Special Master to "evaluate, inter alia, when Hagens Berman first learned that the firm's continuing prosecution of these cases would purportedly be untenable under Rule 1.16(a)(1)."  (Doc. No. 532 at 3.)  This is the Order cited by Mr. Hangley throughout his R&R.  (See, e.g., Doc. Nos. 767 at 32, 37-38, 90.)

The Firm objects that the Special Master exceeded his authority in his November 17, 2016 Memorandum, when he "afford[ed] the firm and its affected lawyers an opportunity" to "establish that the firm was unaware of the problem when it filed its clients' Complaints"; "explain how the firm learned of the problem"; and "explain the failure to know about it earlier."  (Doc. No. 794 at 11; see also Doc. No. 539 at 2.)  These are all obviously parts of the question I ordered Mr. Hangley to address "inter alia."  (Doc. No. 532 at 3.)  It is thus difficult to accept that this Objection is made in good faith.

Hagens Berman next objects to the withdrawal standard that I applied in my March 14, 2016 Order.  The Firm asserts that the "proper inquiry for withdrawal" is whether the Firm's

presence in the case no longer serves any "meaningful purpose." (Doc. No. 794 at 11.) Once again, the Firm misstates the law. The Third Circuit explained the withdrawal standard in <u>Ohntrup v. Firearms Ctr., Inc.</u>, 802 F.2d 676 (3d Cir. 1986) ("<u>Ohntrup II</u>"). There, a law firm sought to withdraw because: continued representation of its client placed the firm "in an unacceptable ethical position"; and, its client would no longer communicate with the firm. <u>Id.</u> at 679. Regarding the second ground, the Third Circuit refused withdrawal as there was still a "meaningful purpose" in continuing the representation, including preserving at least the possibility of "communications between the litigants and the court." <u>Id.</u> As to the first ground, the Court did not allow withdrawal because the firm was "not in an unacceptable ethical position" under the applicable Rules of Conduct—without any inquiry into "meaningful purpose." <u>Id.</u>

When the <u>Ohntrup</u> litigation returned to the Third Circuit some twenty-six years later, the Court confirmed that a district court need not always employ the "meaningful purpose" test. "The point at which the law firm no longer serves a meaningful purpose in the case marks the outer boundary of the District Court's discretion," but "the local rules commit the decision on attorney withdrawal to the discretion of the district court. And that discretion is not governed by any 'meaningful purpose' test." <u>Ohntrup III</u>, 760 F.3d at 295.

### C. Although the Parties Received Adequate Notice Respecting Sanctions, I Will Provide Additional Notice

Hagens Berman and Mr. Weaver next argue that I should reject the Special Master's sanctions Recommendations because they were given inadequate notice and no opportunity to be heard. (Doc. No. 794 at 18-31; Doc. No. 795 at 8-9.) I do not agree.

In 2018, after learning that Dr. Stephens' report had been altered, Mr. Hangley informed the Parties that he would consider recommending the imposition of sanctions on those responsible:

> I hope Hagens Berman appreciates the enormity of the insult to the civil justice system, the courts, and office of attorney that apparently has occurred. I believe that Weaver's conduct obliges the Court to examine closely the events that transpired, and to impose sanctions if and as warranted, and that the Court expects me to report and recommend on those subjects as well as on the grant or denial of the Motions to Withdraw.

(Doc. No. 588 at 13.) No Party objected to this statement or to Mr. Hangley's decision to conduct hearings on the Weaver alterations. To the contrary, as I have described, Hagens Berman hired an ethics expert to opine that the Firm's conduct—which was explored at the hearings and which now forms the basis of Mr. Hangley's Sanctions Recommendation—comported with the procedural and ethics rules and the law. It was only *after* Mr. Hangley rejected Mr. Reich's opinion and *after* Mr. Hangley recommended imposing sanctions that the Firm first expressed "surprise." Plainly, the 2023 notice Objection is insincere, at best.

In an abundance of caution, I will nonetheless order the Parties to show cause before I consider imposing sanctions. That is all the law requires. See Simmerman v. Corino, 27 F.3d 58, 64 (3d Cir. 1994) (party is entitled to notice of the legal rule on which sanction would be based; the reason for sanction; and the form of sanction); In re Tutu Wells Contamination Litig., 120 F.3d 368, 381 (3d Cir. 1997).

Hagens Berman and Mr. Weaver apparently believe that the R&R is itself a sanction warranting notice to the Firm before it was "imposed." (See Doc. No. 794 at 22-24.) As I have discussed, Mr. Hangley stated explicitly some seven years ago that he would consider recommending sanctions. (Doc. No. 588 at 13.) All Parties were thus "on notice." In any event, Mr. Hangley's Recommendation of sanctions is not itself a sanction. See Converse Const. Co. v. Converse Steel Fabricators & Erectors, Inc., 181 F.3d 79 (Table) (1st Cir. 1998) (A district court's referral of an attorney to the Bar was "not itself a sanction," but was "merely the first step in a process to investigate the misconduct for the purpose of determining 'what sanctions, if any' ought

to be imposed."); <u>Landscape Props., Inc. v. Whisenhunt</u>, 127 F.3d 678, 685 (8th Cir. 1997) (referral of Rule 11 violation to other judges in the district to determine whether any disciplinary actions should be taken against counsel "was not itself a sanction"). For that same reason, I will also reject the Firm's request to place the R&R under seal. (Doc. No. 794 at 31.) Once again, I will treat Mr. Hangley's Recommendation as a suggestion that I order Hagens Berman, Steve Berman, and Tyler Weaver to show cause why the Court should not impose sanctions for the conduct the Special Master has discussed.

### D. Mr. Hangley's Actions and Continued Service

In appointing Mr. Hangley, I ordered half his fees and costs would be paid by Hagens Berman and half by Defendants. (Doc. No. 256 at 3.) In addition, the Order provides:

> The Special Master may communicate ex parte with counsel insofar as it pertains to discovery compliance or in camera review of documents as necessary. The Special Master may communicate ex parte with the Court without notice to the Parties concerning procedural matters, to assist the Court's understanding of complex discovery matters, or for any other reason reasonably necessary to the fulfillment of his duties.

(<u>Id.</u>) Once again, there was no Objection to this Order. (Doc. No. 255.) Having reviewed and paid Mr. Hangley's bills for some ten years, Hagens Berman (joined by Mr. Weaver) for the first time objects to two actions described in those bills: an "extra-judicial investigation," and ex parte communications with the Court. (Doc. No. 794 at 27.) Both Objections are frivolous.

The Firm challenges Mr. Hangley's time entries for "fact investigations," "public records investigation," and "conduct research regarding related proceedings in which Hagens Berman is a party." (<u>Id.</u> at 29.) Yet, Hagens Berman did not challenge Mr. Hangley's bills, which include these and similar time entries. (<u>See</u> Doc. No. 791-4 at *511-523.) The decision to object only *after* the issuance of the Special Master's highly critical R&R suggests strongly that the Objection is not made in good faith. <u>Baker Indus., Inc. v. Cerberus Ltd.</u>, 764 F.2d 204, 207, 209 (3d Cir.

1985) (After the defendant stipulated to finality of special master's report, but filed forty pages of objections when the report was "unfavorable," court found "bad faith" attempt to "completely distort the nature of the stipulation reached"); see also Fajardo Shopping Ctr., S.E. v. Sun All. Ins. Co. of Puerto Rico, 167 F.3d 1, 15 (1st Cir. 1999) (Defendant corporation sanctioned as "obstinate" for accusing a special master of "lack of objectivity, neutrality and clear bias in favor of the plaintiff" after he issued unfavorable reports); Hernendez v. Lynch, No. 16-620, 2019 WL 13014631, at *4-5 (C.D. Cal. May 10, 2019) (Defendants' objection to special master's order compelling production after close of discovery "has a whiff of bad faith about it" where the defendants had previously "improperly continued to serve Plaintiffs with motions to compel well after the close of discovery").

In any event, the Firm and Mr. Weaver offer no legal support for their Objections. Mr. Hangley's bills indicate only that he had reviewed the record and judicially-noticeable facts. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007) ("[J]udicial proceedings constitute public records" and "courts may take judicial notice of another court's opinions"). The authority Hagens Berman offers is inapposite. (See Doc. No. 794 at 30 (first citing In re Brooks, 383 F.3d 1036, 1044-46 (D.C. Cir. 2004) (disqualifying a special master when he solicited facts from "moles" and "unnamed DOI employees"); and then citing Vollmer v. Publishers Clearing House, 248 F.3d 698, 710 (7th Cir. 2001) (vacating Rule 11 sanctions where the court appeared to investigate facts outside the record)).

The Firm also argues that communications between Mr. Hangley and the Court—which includes law clerks and support staff—were excessive:

> [The Special Master's] time records reflect that he communicated ex parte with the Court at least 146 times from the time of his appointment through October 2023. . . . A small number of those communications are not objectionable . . . . [but] the general rule [is] that ex parte communications are to be limited in nature.

(Doc. No. 794 at 28.)  Once again, since 2014, the Firm has paid without complaint Mr. Hangley's bills, many of which included charges for communications with the Court.  (See Doc. No. 791-4 at *511-523.)  Given this matter's procedural and substantive complexity and ten-year history, 146 discussions—averaging approximately one per month—is hardly surprising.  Once again, the Firm's decision to complain for the first time only *after* Mr. Hangley issued his R&R belies the Objection itself.  Baker Indus., Inc., 764 F.2d at 209; see also Fajardo, 167 F.3d at 15; Hernendez, 2019 WL 13014631, at *4-5.

Again, the Firm and Mr. Weaver offer no legal support for their Objections.  They acknowledge that "the Appointment Order permits ex parte communications between [the Special Master] and the Court . . . 'for any . . .  reason reasonably necessary to the fulfillment of [the Special Master's] duties.'"  (Doc. No. 794 at 28 (citing Doc. No. 256 at 3).)  Once again, the Firm bases its Objection on inapposite authority concerning ex parte communications with third parties—not between a special master and the Court.  (See Doc. No. 794 at 30 (first citing In re Brooks, 383 F.3d at 1046 (disqualification of a special master who communicated ex parte with third parties); and then citing Vollmer, 248 F.3d at 710 (voiding sanctions where the court communicated ex parte with third parties)).

Finally, the Firm asks me to discharge Mr. Hangley "effective immediately," because he "has performed the tasks assigned to him and much more."  (Doc. No. 794 at 44.)  Since the Firm filed its Objections, however, Mr. Hangley has issued four additional R&Rs concerning: privilege redactions in the Parties' Objections to the instant R&R; additional privilege redactions to the 2017 and 2019 hearing transcripts; a response to the Parties' Objections to the hearing transcripts R&R; and further transcript redactions.  (Doc. Nos. 805, 824, 829, 832.)  In this sprawling, decade-long litigation, Mr. Hangley continues to be an invaluable aid to the Court.  Accordingly, I will overrule

18

Hagens Berman's belated Objection to his continuing service.

## IV.     THE MOTIONS TO WITHDRAW

There are no Objections to the Special Master's Recommendations to approve the Motion to Withdraw from the representation of John Marshall, or to deny as moot the Motions to Withdraw from representation of Terrie Bolton and Jose Navamuel.     Having reviewed these Recommendations de novo, I will adopt them.

Hagens Berman objects to the Special Master's Recommendation to deny the Motion to Withdraw from the representation of Mary Sells, and to deny without prejudice the Motion to Withdraw from the representation of Richard Anderson.  (Id. at 12.)   I will adopt the Special Master's Recommendation as to Ms. Sells (which I have reviewed de novo), but reject his Recommendation as to Mr. Anderson.

### A.  Mary Sells

As I have discussed, whether to grant leave to withdraw is left to my discretion.  If the "meaningful purpose" standard is not implicated, I may consider several factors.  TotalFacility, Inc. v. Dabek, No. 14-5324, 2016 WL 7450465, at *2 (E.D. Pa. Dec. 28, 2016).  In my March 14, 2016 Order, I indicated that I would consider "when Hagens Berman first learned that the firm's continuing prosecution of these cases would purportedly be untenable."  (Doc. No. 532 at 3 (citing Chester, 2000 WL 12896, at *1)).  This factor confirms that Hagens Berman's representation of Ms. Sells was deficient.

Mr. Hangley details how, when signing up new thalidomide clients (including Ms. Sells) Hagens Berman reviewed only those documents in the putative Plaintiff's possession.  (Doc. No. 767 at 141.)  Mr. Berman—who verified Ms. Sells' Complaint—never spoke with or even met Ms. Sells or any other Plaintiffs.  (Id. at 29); Complaint, Gunn v. Avantor Perform. Mat'ls, No.

19

12-6431 (E.D. Pa. Nov. 13, 2012), Doc. No. 1-1.  The Firm also knew nothing of Ms. Sells' voluminous medical records dating back to her childhood, which provide that her birth injuries are genetic in nature.  (Doc. No. 767 at 138.)   Indeed, her Hagens Berman lawyer first learned that these records existed when *Defendants* introduced them during Ms. Sells' deposition.  (Id. at 140.) That same Hagens Berman lawyer testified that even if she had seen the records before the deposition, she would not have "understood the[ir] ramifications" given her lack of medical knowledge.  (Id. at 141.)  The Firm does not dispute these facts.  (See Doc. No. 794 at 12-13, 126-27.)  Accordingly, the Firm and Mr. Berman were plainly unaware of Ms. Sells' medical history when they accepted her case because they failed to conduct an adequate presuit investigation.

In its Motion to Withdraw, the Firm mentions only unspecified "professional considerations" under Pa. R. P. C. 1.16(a)(1).  (Doc. No. 382-1 at 1-2.)  That Rule requires that a lawyer "shall withdraw from the representation of a client" if "the representation will result in violation of the Rules of Professional Conduct or other law."  In its Objection, the Firm states that it "no longer believes that it has a good faith basis to prosecute Ms. Sells' claims," and so it cannot "continue representing Ms. Sells without violating Rule 11."  (Doc. No. 794 at 12.)

Hagens Berman apparently does not understand its obligations under Rule 11, which bars a lawyer from filing a pleading he knows to be false.  See Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 289 (3d Cir. 1991).  "The mere failure of a complaint to withstand a motion for summary judgment or a motion to dismiss should not be thought to establish a Rule 11 violation."  Simmerman, 27 F.3d at 62.  That Hagens Berman is dissatisfied with the strength of Ms. Sells' case does not mean that the Firm would act improperly by continuing to represent her.

To the extent that the "meaningful purpose" test is applicable here, there is such a purpose in requiring Hagens Berman to continue to represent Ms. Sells.  The R&R indicates that she "has

undergone testing procedures that might have confirmed a genetic source for her birth injuries; the results were inconclusive, so it is still not certain whether her injuries were teratogenic or genetic in their origin." (Doc. No. 767 at 143.) Hagens Berman also acknowledges that Ms. Sells underwent genetic testing and does not dispute that the results were inconclusive. (Doc. No. 794 at 127.)

Although it is unclear today if Ms. Sells seeks to go forward with her case, her earlier pro se filings indicate that she may. In 2015, she stated that she will "never stop fighting for what I bel[ie]ve is true. [U]ntil I win my case. [O]r I die." (Doc. No. 520; see also Doc. Nos. 523, 533, 558.) It appears that Ms. Sells is unable to find new counsel. Given the late stage of this litigation and Ms. Sells' inability to find replacement counsel, I will not compel her to proceed pro se.

**B. Richard Anderson**

Mr. Anderson has been absent from this case for over seven years. Both the Special Master and Hagens Berman agree that the Firm communicated with Mr. Anderson until around 2017; after that, neither the Firm nor Mr. Hangley has been able to contact him. (Doc. No. 767 at 132, 134; Doc. No. 794 at 13-14, 124-25.) The Special Master nevertheless recommends that I deny Hagens Berman's Motion to Withdraw without prejudice, because he "cannot tell whether Plaintiff Anderson has ever seen Hagens Berman's Motion to Withdraw, or the firm's later submissions." (Doc. No. 767 at 133.) Mr. Hangley also emphasizes the "need for fairness to all the litigants and the system." (Id. at 135.) I will sustain Hagens Berman's Objection and grant its Motion to Withdraw.

I turn again to Ohntrup's "meaningful purpose" standard respecting whether a firm may withdraw after its client had ceased communications. Ohntrup II, 802 F.2d at 679-80. The Circuit initially decided that there was a meaningful purpose for the subject firm to continue its

representation.  The client, a Turkish company, was the unsuccessful defendant in the underlying action; the plaintiffs were seeking to enforce the judgment they had obtained; and the Circuit sought to preserve the "possibility of effective communication" with the defendant, as well as a "reliable mechanism for responsible supervision of the post-judgment aspects of th[e] litigation." Id. at 676-77, 679-80.  Almost thirty years later, however, when the firm renewed its motion to withdraw, the Third Circuit concluded that there was no meaningful purpose in continuing the representation.  Ohntrup III, 760 F.3d at 294-95.  The Court had found a meaningful purpose to continue the representation in 1986 because it was "uncertain how the . . . post-judgment proceedings would unfold and whether [the defendant] would comply with discovery requests served on the Firm." Id. at 295.  By 2014, however, it had become "clear that the Firm is merely a captive, uncompensated process server," and that the plaintiffs' efforts to communicate with the defendant through the firm had proven to be "futile."  Id.

Although the Special Master's grounds for disallowing Hagens Berman's withdrawal are well-reasoned, they do not make out a "meaningful purpose."  Indeed, the Third Circuit has declined to find a meaningful purpose for parties less delinquent than Mr. Anderson.  See Erie Molded Plastics, Inc. v. Nogah LLC, 520 F. App'x 82, 84-85 (3d Cir. 2013).

Finally, there is one crucial difference between Mr. Anderson's case and that of Ms. Sells: since he first refused the Firm's request to dismiss his case in 2014, Mr. Anderson (unlike Ms. Sells) has indicated scant, if any, interest in the matter.  From 2014 to 2017, he appears to have had no contact with Hagens Berman, despite the Firm's efforts to reach him.  (Doc. No. 794 at 125.)  Although Hagens Berman communicated with him briefly in 2017, he has since ceased all communications.  (Id.)  He did not attend the 2017 withdrawal hearings.  (Id.)  Hagens Berman, the Special Master, and the Clerk of Court have all been unable to contact him.  (Id.; see also Doc.

No. 767 at 132.)  Given Mr. Anderson's evident lack of interest in prosecuting his case, there would be no meaningful purpose in compelling Hagens Berman to continue representing him.

## V.    SANCTIONS

Mr. Hangley has recommended that I impose sanctions on the following grounds:

Hagens Berman's failure to conduct an adequate presuit investigation respecting any of Plaintiffs' products claims, which would have revealed, inter alia, that: a number of Plaintiffs had previously brought suit against thalidomide manufacturers, (Doc. No. 767 at 53-60); the medical records of other Plaintiffs demonstrated their birth injuries could not have been caused by thalidomide, (see, e.g., id. at 100-102, 128, 138); Defendants never concealed their distribution of thalidomide, (id. at 24-25, 52, 148); and there were no recent scientific developments that made it possible for some Plaintiffs to discover for the first time that thalidomide caused their birth injuries, or made it likely that they could prove such causation with competent evidence, (id. at 24, 38-39, 74, 148).

Mr. Berman's leading role in drafting and verifying the eleven Complaints, which include numerous false, misleading, or baseless allegations.  (Id. at 3-4, 17, 29, 31, 74, 86, 147-149.)

Hagens Berman's obstruction of discovery to prevent Defendants from learning information critical to the tolling of the limitations clock.  (Id. at 51-52, 147.)

Hagens Berman's unprofessional treatment of the Special Master, including attempts to "bully the Special Master, demonize the Court in the eyes of the plaintiff-witnesses, and intimidate the court reporter."  (Id. at 152; see also id. at 71-72.)

Tyler Weaver's: doctoring of expert reports to induce two Plaintiffs to agree to the dismissal of their claims; failure to disclose these alterations at a 2017 hearing; and 2019 testimony that he purportedly did not remember altering those reports when he testified at the 2017 hearing.

(Id. at 90-122, 149-151.)

I will require: Hagens Berman to show cause why sanctions should not be imposed pursuant to Fed. R. Civ. P. 26(g) and (37); Hagens Berman and Mr. Berman to show cause why sanctions should not be imposed under Pa. R. Civ. P. 1023.1(d), Fed. R. Civ. P. 11(c), and 28 U.S.C. § 1927; and Hagens Berman, Mr. Berman, and Mr. Weaver to show cause why sanctions should not be imposed under the inherent power of the Court, Chambers, 501 U.S. at 45-46.

## VI.    CONCLUSION

I will adopt Mr. Hangley's Recommendation respecting Hagens Berman's Motions to Withdraw from representing Mr. Marshall, Ms. Bolton, Mr. Navamuel, and Ms. Sells. I will sustain Hagens Berman's Objection to Mr. Hangley's Recommendation respecting the Firm's continuing representation of Mr. Anderson.

More difficult is the Recommendation respecting the imposition of sanctions. Mr. Hangley has found that in performing his duties as Special Discovery Master, he discovered misconduct bordering on the criminal committed by Hagens Berman, its Managing Partner Steve Berman, and its then-partner Tyler Weaver—all apparently intended to prevent the Court from learning that the Firm had prepared, verified, filed, and prosecuted baseless, dishonest claims. I will allow the Firm, Mr. Berman, and Mr. Weaver the opportunity to be heard once more before I address Mr. Hangley's findings and his resulting sanctions Recommendation.

Finally, I reject Hagens Berman's demand that I discharge the Special Master.

An appropriate Order follows.

**AND IT IS SO ORDERED.**

_____

Paul S. Diamond, J.

24