## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GLENDA JOHNSON, et al.

v.

SMITHKLINE BEECHAM COPORATION, et al.

Civ. No. 11-5782
and all related cases

**HAGENS BERMAN SOBOL SHAPIRO LLP AND STEVE BERMAN'S RESPONSE TO AUGUST 5, 2025, ORDER TO SHOW CAUSE (DOC. 835) WHY SANCTIONS SHOULD NOT BE IMPOSED IN ACCORDANCE WITH THE REPORT AND <u>RECOMMENDATION OF THE SPECIAL DISCOVERY MASTER (DOC. 767)</u>**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

I.  OVERVIEW OF THE OSC AND MEMORANDUM OPINION ....................... 4

    A.  Pre-suit investigation ................................................................................ 4

        1.  Previous suits involving three Plaintiffs ................................... 5

        2.  Plaintiffs' medical records ........................................................ 5

        3.  Fraudulent concealment ............................................................ 5

        4.  Scientific developments ............................................................ 6

    B.  Mr. Berman's role in drafting the eleven Complaints ................................ 7

    C.  Obstruction of discovery ............................................................................ 7

    D.  Unprofessional treatment ........................................................................... 7

II.  THE COURT SHOULD NOT IMPOSE SANCTIONS BECAUSE SANCTIONS
    ARE NOT WARRANTED UNDER APPLICABLE LAW or these facts. .......................... 8

    A.  Rule 11 and PA Rule 1023.1 Sanctions are Unavailable ................................ 8

        1.  The Rule 11 Standard and limits on its applicability .............................. 8

        2.  Respondents' investigation of the law and facts was reasonable......................... 11

    B.  Section 1927 and Inherent Power Sanctions are Unavailable for the Additional
        Reason that Respondents Did Not Act in Bad Faith................................ 17

        1.  Legal Standard for Section 1927 Sanctions. ................................ 17

        2.  Legal Standard for Inherent Authority Sanctions. ................................ 18

        3.  Bad Faith Requirement. ................................ 19

        4.  Respondents Did Not Act in Bad Faith................................ 21

    C.  Discovery Sanctions Under Rules 26(g) and 37 Were Not Recommended by
        SDM Hangley and would be Inappropriate in Any Event................................ 27

III.  THE    COURT    SHOULD    NOT    IMPOSE    SANCTIONS    BECAUSE
    RESPONDENTS HAVE NOT RECEIVED DUE PROCESS. ................................ 29

    A.  Due Process Requires Particularized Notice and an Opportunity to be Heard
        before the Imposition of Sanctions. ................................ 30

B. Respondents Have Not Received Particularized Notice. ..............................................32

    1. Prior to the R&R, Respondents received neither adequate notice of broad-reaching *sua sponte* sanctions nor an opportunity to respond. ............................32

    2. The R&R Does Not Provide Particularized Notice. ...............................................35

    3. The 2023 OSC, 2025 Memorandum Opinion, and 2025 OSC Do Not Provide Particularized Notice. ...................................................................................39

C. Because of the Deficient Notice, Respondents Have Not Received a Constitutionally Adequate Opportunity to be Heard. ..................................................40

D. *Ex Parte* Communications and Extrajudicial Investigations Exacerbate the Due Process Failings. .............................................................................................................41

E. Respondents Have Been Harmed by the R&R and Irreparably Prejudiced by the Lack of Timely Notice and Opportunity to be Heard. ..............................................42

IV. SDM HANGLEY IMPERMISSIBLY EXCEEDED HIS AUTHORITY. ........................44

A. Rule 53 Governs a Special Master's Authority. ..........................................................45

B. SDM Hangley Was Assigned Specific Tasks. ..............................................................47

    1. Overseeing Certain Discovery Issues ....................................................................47

        a. The Appointment ...........................................................................................47

        b. 2014: SDM Hangley's Work Under the Discovery Appointment...................50

    2. Voluntariness of Certain Consents to Dismissal....................................................50

        a. The Appointment ...........................................................................................50

        b. 2014-2016: SDM Hangley's Work Under the Consents Appointment ...........51

    3. Motions to Withdraw .............................................................................................52

        a. The Appointment ...........................................................................................52

        b. 2016-2023: SDM Hangley's Work Under the Withdrawal Appointment: ......52

C. SDM Hangley's Sanctions Recommendations Exceed His Assignments. ...................53

    1. Express Authority ..................................................................................................53

    2. Implied or Inherent Authority................................................................................54

V. The Facts Set Out Below Demonstrate that Sanctions May Not Be Imposed Here............57

A. Hagens Berman is a Highly Regarded Firm With a Strong Culture............................57

B. The Firm's Introduction to Potential Thalidomide Claims and Peter Gordon............62

C.    The Lanier Law Firm and Gordon & Reeves File Thalidomide Complaints. .............65

D.    In October 2011, Hagens Berman Begins Filing Claims.............................................65

E.    The Firm Conducted an Appropriate Factual and Legal Inquiry Before Filing Its First Complaint in October 2011. ................................................................................67

　　1.    The Firm Extensively Researched and Developed its Statute of Limitations Arguments Before Filing the *Yeatts* Complaint.......................................69

　　2.    Theory No. 1: The March of Science Theory. .......................................73

　　3.    Theory No. 2: Discovery Rule Exception. ............................................80

　　4.    Theory No. 3: Fraudulent Concealment.................................................87

　　5.    The Firm and Ms. Reeves Conduct a Thorough Factual Investigation into Their Clients' Claims. .............................................................91

　　6.    The Firm Obtained Medical Records from Existing and Potential Clients. ..........92

　　7.    The Firm Conducted Plaintiff-Specific Investigations. .........................................93

　　8.    The Firm and Ms. Reeves Filed and Successfully Prosecuted a FOIA Lawsuit to Obtain and Review Voluminous FDA Records. ................................94

　　9.    Other Document Review Projects and Witness Interviews. .................................96

　　10.   Steve Berman Was Actively Involved in the Factual and Legal Investigation. .......................................................................................99

F.    The Firm Met and Consulted with Numerous Experts to Develop Its Theories. ......102

　　1.    Dr. David Kessler (Former FDA Commissioner)..............................................102

　　2.    Professor ███████████ ...............................................................103

　　3.    ███████████████ and Others .............................................104

G.    In October 2013, the Firm Proposed a Bellwether Approach of Six "Test Cases" to Efficiently Manage the Cases and Conserve Resources.......................................106

H.    The Firm Retained and Relied on Professor Stephens as a Causation Expert..........107

I.    Dr. Stephens Presented Challenges as the Litigation Proceeded..............................108

J.    After SDM Hangley Ordered the Firm to Review Its Existing Cases, the Firm Conducted a Further Investigation................................................................................110

K.    The Firm Seeks a Stay Until Pending Motions are Resolved....................................111

L.    GSK Agreement...........................................................................................................112

　　1.    After Conducting Discovery, the Firm Proposes Dismissing GSK ....................112

2.  The GSK Agreement is Sloppily Described to the Court. .................................113

3.  The Firm Raised Concerns that the Proposed Inquiry Would Vitiate the Attorney-Client Privilege and Distress Its Clients. ................................115

4.  The Firm Did Not "Bully" SDM Hangley or Act Unprofessionally During the GSK Inquiry. .................................................................................117

5.  In 2016, SDM Hangley Recommends that the Dismissals be Allowed Finding that Plaintiffs Knowingly and Voluntarily Agreed to Dismiss Their Claims Against GSK. ..............................................................................125

M.  Specific Plaintiffs Mentioned in the R&R. ..............................................125

1.  Michael Morgan and Barbara Murray ...................................................126

2.  Roel Garza, Jack Merica, and Lawrence Boiardi.................................127

a.  Roel Garza ...............................................................................127

b.  Jack Merica ..............................................................................128

c.  Lawrence Boiardi......................................................................129

3.  Ed Andre .................................................................................................130

4.  Terrie Bolton ..........................................................................................132

5.  Jose Navamuel ........................................................................................134

6.  Richard Anderson ...................................................................................138

7.  Mary Sells ...............................................................................................140

8.  Tawana Williams .....................................................................................142

N.  Steve Berman Objects to the Following Statements in the R&R Directed to Him. ..........................................................................................................143

O.  There is not an "Open Question" as to the Confidentiality of the Confidential Settlement Agreements. ...............................................................................146

VI. CONCLUSION ................................................................................................148

## INTRODUCTION

Hagens Berman Sobol Shapiro, LLP ("Hagens Berman" or "the Firm") and Steve Berman (collectively "Respondents") hereby submit their Response ("Response") to the August 5, 2025 Order to Show Cause (Doc. 835) ("the 2025 OSC") and the related Memorandum Opinion (Doc. 834) (the "Memorandum Opinion").

The 2025 OSC directs Respondents to show cause as to why sanctions recommended by Special Discovery Master William T. Hangley ("SDM Hangley") in his Report and Recommendations issued October 12, 2023 (Doc. 767) (the "R&R") should not be imposed. Respondents filed Objections to the R&R on December 13, 2023 (Doc. 791) (the "Objections").[1] The 2025 OSC and the Memorandum Opinion overruled the Firm's objection to the R&R's recommended denial of its motion to withdraw as to Plaintiff Mary Sells and its objection to SDM Hangley's continued service. Accordingly, the Firm does not reiterate those arguments here.

Section I of this Response provides an overview of the OSC and Memorandum Opinion. On page 23 of the Memorandum Opinion, the Court summarizes SDM Hangley's sanctions recommendations. That summary description is set forth on pages 4-8 below, with citation to the pages herein where the issues identified in the Court's summary are addressed.

Section II addresses the legal authorities underpinning the R&R's sanctions recommendations, explaining why sanctions would be inappropriate under Rule 11, its Pennsylvania analog, and the Court's inherent authority. The R&R does not expressly recommend sanctions based on 28 U.S.C. § 1927 ("Section 1927") or Rule 26(g) or Rule 37 of the Federal Rules of Civil Procedure, but Respondents nonetheless explain why sanctions would be

---

[1] To correct a filing error, Hagens Berman re-filed the publicly available, redacted version of the Objections on May 23, 2024 (Doc. 807). *See* Doc. 808 (Notice of Filing).

impermissible under those authorities. Moreover, Respondents explain that they did not act with bad faith, further undercutting the propriety of sanctions. From April 2011 through 2015, Hagens Berman expended approximately 20,000 hours of time on these cases and paid approximately $850,000 in hard costs, understanding there would be no recovery if the cases were not successful. Respondents believed in their clients' claims and brought them with the best of intentions.

Section III facially challenges this Honorable Court's Memorandum Opinion and 2025 OSC on the ground that neither provides adequate due process. Respondents respectfully submit that the R&R, the Memorandum Opinion, and the 2025 OSC do not provide clear and adequate notice of the specific acts or omissions for which Respondents might be sanctioned or, *for each such act or omission*, (i) the case in which it occurred (there are 11 Complaints involving 52 Plaintiffs), (ii) the authority under which sanctions might be levied, and (iii) the form those sanctions might take if levied. Different legal standards apply depending on the authority that constitutes the basis for the sanction, and sanctions can take a multitude of forms. Respondents do not know precisely what types of sanction the Court is contemplating, the specific conduct it believes warrants imposition of that sanction, and the legal authority for imposing that sanction. These failings are particularly consequential given the conclusory assertion that Respondents engaged in "misconduct bordering on the criminal." (*See* Doc. 834 at 24.)

Section IV of the Response respectfully seeks reconsideration of this Honorable Court's determination that SDM Hangley's recommendations were within his express and implied authority, particularly given the language in the Court's appointment order limiting his authority to consideration of "requests for sanctions." SDM Hangley was appointed to perform three discrete tasks: (1) overseeing discovery issues (and considering any requests for sanctions that might be made related to those discovery issues), (2) determining the voluntariness of certain consents to

dismissal, and (3) considering whether certain withdrawal motions should be granted. Those tasks defined SDM Hangley's authority, and the sweeping recommendations in the R&R go far beyond his assignments.

Section V describes the Firm's work relevant to the sanctions issues. This section is comprised of separately numbered paragraphs stating relevant facts ("Statement of Facts" or "SOF"). The Firm spent many months conducting research, developing legal theories, and investigating the facts before substituting as counsel in two Complaints and later filing nine others, along with co-counsel. Among several theories, the Firm researched and developed the "March of Science" theory, which posited that the established medical orthodoxy previously precluded certain thalidomide survivors from finding any expert to opine that their birth defects were thalidomide related. This gave Plaintiffs a legitimate basis to address formidable statute of limitations issues. Because the Firm knew that its claims were novel and the statute of limitations presented a hurdle, it sought to minimize the expense of litigation for all participants by, *inter alia,* proposing early bellwether trials and seeking stays where appropriate. And when the Firm determined that certain claims were not viable, it declined to prosecute them and responsibly sought their termination.

Relatedly, Respondents respectfully but strenuously object to the Memorandum Opinion's conclusion that they never "objected to the great majority of Mr. Hangley's factual findings" in the R&R. (Doc. 834 at 2.) To the contrary, Respondents' December 2023 Objections contained a lengthy Statement of Facts and contested "the great majority of" factual assertions found in the 154-page R&R germane to the sanctions recommendation. (*See* Doc. 791 at 45-127.) Moreover, the R&R is non-traditional in that it does not expressly distinguish or designate "findings of fact" to which the parties could readily or effectively object. Instead, SDM Hangley's disposition about

what various lawyers did, wrote and said—and his *ad hominem* views about why things were done, written and said—are interspersed throughout the lengthy R&R.

This Response is supported by exhibits numbered 1-135, an index of which is found in Exhibit A hereto. The Response and accompanying exhibits contain attorney-client privileged communications, attorney opinion work-product, documents marked "Confidential" pursuant to the Protective Order entered in this matter, and materials previously sealed by order of this Court. Thus, the Response and exhibits are being filed under seal, with a redacted version filed on the public docket, in accordance with the Court's October 1, 2025 Order. (Doc. 850).

## I.    OVERVIEW OF THE OSC AND MEMORANDUM OPINION

The OSC directs Respondents to show cause "why the sanctions recommended by Mr. Hangley should not be imposed." (Doc. 835 at 1.) The Memorandum Opinion (at 23) states that "Mr. Hangley has recommended that I impose sanctions on the following grounds" and describes those grounds as (A) the adequacy of the Firm's pre-suit investigation, (B) Mr. Berman's role in drafting the purportedly baseless Complaints, (C) obstruction of discovery, and (D) bullying of SDM Hangley during the GSK hearings in 2015. (*See* Doc. 834 at 23.) Respondents set forth below, *in italics,* these four categories (along with the subcategories regarding pre-suit investigation) and note where in this Response each set of issues is addressed.

### A.    Pre-suit investigation

The adequacy of Hagens Berman's pre-suit investigation is addressed *infra* at pages 21-22 and ¶¶ 12-117, 122-129, 172, 176-177, 179-184, 186-188, 194-196, 209, 217-218, 224, 230 and 234. The Court, summarizing SDM Hangley's assertions, identified four specific items under the umbrella of pre-suit investigation issues:

### 1.  Previous suits involving three Plaintiffs

*"[A] number of Plaintiffs had previously brought suit against thalidomide manufacturers, (Doc. 767 at 53-60)."*

Only three of the 52 Plaintiffs—Tawana Williams, Michael Morgan, and Barbara Murray—had previously brought suit, and their circumstances are addressed *infra* at SOF ¶¶ 172-174 (Morgan and Murray), ¶¶ 224-226 (Williams), *infra*.

### 2.  Plaintiffs' medical records

*"[T]he medical records of other Plaintiffs demonstrated their birth injuries could not have been caused by thalidomide, (see, e.g. id. at 100-102, 128, 138).*

The cited pages from the R&R discuss only three of the 52 Plaintiffs: Terrie Bolton, Jose Navamuel, and Mary Sells. The Firm's withdrawal from Ms. Bolton's and Mr. Navamuel's cases had nothing to do with revelations in their medical records. Discussion of their specific cases can be found at SOF ¶¶ 186-193 (Bolton) and ¶¶ 194-208 (Navamuel), *infra*. A related discussion of the "discovery rule exception" and "fraudulent concealment" theories can be found at SOF ¶¶ 61-82. Similarly, the Firm's attempted withdrawal from Ms. Sells' case was not based on her medical records. A discussion of Ms. Sells' case can be found at SOF ¶¶ 217-223.

### 3.  Fraudulent concealment

*"Defendants never concealed their distribution of thalidomide, (id. at 24-25, 52, 148)."*

Pages 24-25 of the R&R conclude that the Firm's allegations of fraudulent concealment in the *Murray* and *Johnson* Complaints had no factual support because neither Complaint identifies: (i) any specific misinformation received by the four Plaintiffs or their families; or (ii) any reliance or forbearance by any of the Plaintiffs based on receipt of such information. The Firm's response to these assertions is available at SOF ¶¶ 28-30 and at pp. 61-82 (discussing fraudulent concealment and discovery rule exception theories). The *Murray* and *Johnson* cases were filed by

other well-regarded law firms and the Firm entered appearances in those two cases only after doing its own independent research beginning in April 2011.

Pages 51-52 of the R&R criticize the Firm's legal theories with respect to Plaintiffs Tawana Williams, Michael Morgan, and Barbara Murray. Although not specifically cited in the OSC, the R&R also cites Plaintiffs Jack Merica, Lawrence Boiardi, and Raul Garza as examples of how the "fraudulent concealment" allegations in the Complaints belied the evidence unearthed in discovery. The Firm objects that the R&R ignores key elements of its extensively developed legal theories, discussed at SOF ¶¶ 43-82. The Firm addresses all the foregoing Plaintiffs' cases *infra* at SOF ¶¶ 224-226 (Williams), ¶¶ 172-174 (Morgan and Murray), ¶ 179 (Merica), ¶ 180 (Boiardi), and ¶¶ 176-178 (Garza). The R&R's conclusion that the Firm was evasive during discovery is addressed *infra* in Section II(C).

Page 148 of the R&R does not actually concern fraudulent concealment; rather, SDM Hangley states that the Firm and Mr. Berman brought claims irresponsibly and understaffed and under-investigated the cases. As support, the R&R notes that the March of Science and fraudulent concealment theories "trumpeted" in the Complaints were not successful in "any of the cases that have been the subject of dispositive motions." This statement ignores that "[a] district court examining the sufficiency of an investigation for Rule 11 purposes is expected to avoid the wisdom of hindsight and should test the signer's conduct by asking what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *Hunt v. Valley Forge Mil. Acad. & Coll.*, No. 2:25-CV-01323, 2025 WL 2524222, at *5 (E.D. Pa. Sept. 2, 2025) (cleaned up).

### 4.    Scientific developments

"[T]here were no recent scientific developments that made it possible for some *Plaintiffs to discover for the first time that thalidomide caused their birth injuries, or made it likely that they could prove such causation with competent evidence, (id. at 24, 38-39, 74, 148)."*

The recent scientific developments giving Respondents a good faith basis for filing the thalidomide litigation notwithstanding the statute of limitations are addressed *infra* at Section II(B)(4) and SOF ¶¶ 43-60, 113-116, 122-129 and 234.

### B.    Mr. Berman's role in drafting the eleven Complaints

*"Mr. Berman's leading role in drafting and verifying the eleven Complaints, which include numerous false, misleading, or baseless allegations. (Id. at 3-4, 17, 29, 31, 74, 86, 147-149.)"*

Mr. Berman's role in preparing the nine (not eleven) Complaints filed by Hagens Berman is addressed *infra* at SOF ¶¶ 63, 102-106. The extensively researched legal theories that the Firm developed before filing the Complaints are addressed at SOF ¶¶ 43-82. And the specific factual circumstances surrounding each of the Plaintiffs mentioned in the R&R are addressed at SOF ¶¶ 172-226. Mr. Berman's responses to specific allegations levied against him are set out at SOF ¶¶ 227-234.

### C.    Obstruction of discovery

*"Hagens Berman's obstruction of discovery to prevent Defendants from learning information critical to the tolling of the limitations clock. (Id. at 51-52, 147.)"*

Hagens Berman's discussion regarding purported obstruction of discovery is addressed *infra* at Section II(C). Notably, SDM Hangley, while referencing the availability of discovery sanctions, did not actually recommend discovery sanctions.

### D.    Unprofessional treatment

*"Hagens Berman's unprofessional treatment of the Special Master, including attempts to 'bully the Special Master, demonize the Court in the eyes of the plaintiff-witnesses, and intimidate the court reporter.' (Id. at 152; see also id. at 71-72.)"*

Hagens Berman's response to SDM Hangley's statement that its lawyers acted unprofessionally toward him during the GSK hearings can be found *infra* at SOF ¶¶ 152-168.

## II.     THE COURT SHOULD NOT IMPOSE SANCTIONS BECAUSE SANCTIONS ARE NOT WARRANTED UNDER APPLICABLE LAW OR THESE FACTS.

### A.     Rule 11 and PA Rule 1023.1 Sanctions are Unavailable

### 1.     The Rule 11 Standard and limits on its applicability

Both Rule 11 and its "virtually identical" Pennsylvania analog[2] require that an attorney who signs a paper "make a reasonable inquiry into the factual and legal legitimacy of the pleading." *Simmerman v. Corino,* 27 F.3d 58, 62 (3d Cir. 1994); *see also* Pa. R. Civ. P. 1023.1(c). The attorney "must conduct a reasonable investigation of the facts and a normally competent level of legal research to support the presentation," a standard that is assessed based on "what was objectively reasonable under the circumstances." *Simmerman,* 27 F.3d at 62 (citation modified). In evaluating the reasonableness of the investigation, the court may consider, among other things, the amount of time available to investigate, the complexity of the legal and factual issues in question, the extent to which facts were in the possession of defendants or otherwise not readily available to the plaintiff, whether the case was accepted from another attorney, and the extent to which counsel relied upon their client for the relevant facts. Gregory P. Joseph, *Sanctions, The Federal Law of Litigation Abuse,* § 8(A) (6th ed. 2020); *see also Wolfington v. Reconstructive Orthopaedic Assocs. II PC,* 935 F.3d 187, 207 (3d Cir. 2019); *accord* Pa. R. Civ. P. 1023.1, cmt. (2003).

The 1993 revisions to Rule 11 "made it clear that the main purpose of [the Rule] is to deter improper behavior, not to compensate the victims of it or punish the offender." Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1336.3 (4th ed. 2025). Sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others

---

[2] *Contreras Madrid v. Wal-Mart Stores, L.P.*, No. CV 24-5229, 2025 WL 1698701, at *3 n. 1 (E.D. Pa. June 17, 2025) ("Pennsylvania's counterpart to Rule 11 is virtually identical to Rule 11.").

similarly situated" and can include "nonmonetary directives; an order to pay a penalty into court; or, *if imposed on motion and warranted for effective deterrence*, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4) (emphasis added); Pa. R. Civ. P. 1234.4(a)(2)(iii). In other words, "where sanctions are imposed under Rule 11 by a district court on its own initiative, the award of attorneys' fees does not constitute a valid sanction." *Marlin v. Moody Nat. Bank, N.A.*, 533 F.3d 374, 379 (5th Cir. 2008) (citation modified). Instead, "a monetary sanction imposed after a court-initiated show cause order [must] be limited to a penalty payable to the court." *Id.* (quoting 1993 Amendments); *accord Lowe v. Lowe,* 2015 PA Super 35, 110 A.3d 211, 215 (2015) (trial court could not *sua sponte* award attorneys' fees to litigant under Rule 1023.4). Here, because there are no active sanctions motions pending (as discussed *infra* in Sections II(C) and IV(B)(1)), the Court cannot impose an award of attorneys' fees under Rule 11 or Rule 1023.4.

Moreover, a court may not *sua sponte* impose *any* monetary sanction against an attorney unless its show-cause order was entered "before voluntary dismissal or settlement of the claims" at issue. Fed. R. Civ. P. 11(c)(5)(B); Pa. R. Civ. P. 1023.4(b)(2); *Wolfington*, 935 F.3d at 208 (specific claim could not serve as a basis for *sua sponte* monetary sanctions under Rule 11 because it "was withdrawn before the District Court ordered counsel to show cause[.]"); *accord Lowe*, 110 A.3d at 215. There are presently no active motions for sanctions pending, and thus any monetary sanction imposed by the Court would be *sua sponte*.

It bears noting that the 2025 OSC was issued *ten years* after nine Plaintiffs voluntarily dismissed their claims with prejudice as to all Defendants and final judgment was entered. (Doc. 373) (entering final judgment as to Plaintiffs Terry Christianson, William Gosser Jr, Michael Morgan, Barbara Murray, Kevin Randall, Valerie Spence, Tawana Williams, Diana Cabcabin and

Rachel Anne Wicker). It also comes more than a decade after 28 other Plaintiffs voluntarily moved to dismiss with prejudice their claims against GSK after reaching a settlement. (Doc. 409.) The dismissal of those claims was not immediate due to the referral to SDM Hangley (Doc. 420), but in *August 2016,* SDM Hangley recommended that the Court approve dismissal of those claims.[3] (Doc. 535.) The Court has yet to rule on that recommendation.

Issuing monetary sanctions under Rule 11 with respect to already-dismissed claims (or claims that Plaintiffs sought to dismiss years ago) would not serve the remedial purpose of Rule 11 sanctions and would deprive the Firm of the safe harbor provision. *See, e.g., Hunter v. Earthgrains Co. Bakery,* 281 F.3d 144, 151 (4th Cir. 2002) (*sua sponte* show cause orders deprive responding lawyers of Rule 11's "safe harbor" provision and courts "should use extra care in imposing sanctions" in such situations); *Wharton v. Superintendent Graterford* SCI, 95 F.4th 140, 148 (3d Cir. 2024) (same); *Food Sciences Corp. v. Nagler*, No. CIV. 09-1798 JBS/KMW, 2011 WL 2174377, at *2 (D.N.J. June 2, 2011) (declining to award attorneys' fees where Plaintiff moved to voluntarily dismiss the case "before this Court ordered Plaintiff to show cause, and before Defendant moved for sanctions.").

Moreover, Rule 11 "[s]anctions are to be applied only 'in the exceptional circumstances where a claim or motion is patently unmeritorious or frivolous." *Ario v. Underwriting Members of Syndicate 53 at Lloyds*, 618 F.3d 277, 297 (3d Cir. 2010) (quoting *Doering v. Union Cnty. Bd. Of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988)). This stringent standard exists "because sanctions '1) are in derogation of the general American policy of encouraging resort to the courts for peaceful resolution of disputes, 2) tend to spawn satellite litigation counter-productive to

---

[3] One Plaintiff at issue in the GSK Agreement, Rebecca Alexander, stipulated to dismiss her claims with prejudice against *all* Defendants. (Doc. 468).

efficient disposition of cases, and 3) increase tensions among the . . . bench and the bar.'" *Moeck v. Pleasant Valley Sch. Dist.*, 844 F.3d 387, 391 n.7 (3d Cir. 2016 (quoting *Doering*, 857 F.2d 191, 194). And, of course, "[a]ny sanction imposed should be calibrated to the least severe level necessary to serve the deterrent purpose of the Rule." *Zuk v. E. Penn. Psychiatric Inst.*, 103 F.3d 294, 301 (3d Cir. 1996) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1336 (2d ed. Supp. 1996)).

Whether on summary judgment or in response to *Lone Pine* orders, courts routinely reject novel theories of claim or find expert testimony inadequate without imposing sanctions, particularly in cases involving medical, scientific or technical issues. *See, e.g., In re Lipitor Antitrust Litig.*, No. 3:12-CV-2389 (PGS/JBD), 2024 WL 2866654, at *21, 23 (D.N.J. June 6, 2024) (granting summary judgment motion where Plaintiffs' causation argument was speculative, "uncompelling" and had "little evidence to support it") (internal citations and quotations omitted); *In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 711 F. Supp.3d 317, 320 (E.D. Pa. 2022), *aff'd*, No. 23-1032, 2024 WL 3423709. *5 (3d Cir. July 16, 2024) (affirming dismissal as "the appropriate and effective sanction" for failing to satisfy the district court's *Lone Pine* order); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs, Inc*., 485 F.3d 880, 890 (6th Cir. 2007) (affirming summary judgment where plaintiffs' expert failed to establish causation).

### 2.    Respondents' investigation of the law and facts was reasonable

In the instant cases, the Firm began investigating the prospect of bringing claims for thalidomide victims in April 2011, filed its first Complaint in October 2011, and filed its last Complaint in April 2014. During that three-year period, the Firm's investigation of the facts and development of its legal theories was, under any fair evaluation, reasonable. Details relating to the Firm's investigation of the thalidomide claims are set forth in SOF ¶¶ 28-131 and exhibits thereto. The high points, however, are summarized below.

<u>First</u>, because the statute of limitations posed an obvious challenge, the Firm extensively researched and developed three statute of limitations legal arguments—the "March of Science" theory, the fraudulent concealment theory, and the delayed discovery theory (discussed at SOF ¶¶ 43-82). The Firm also spent significant time researching causation and negligence legal theories and supporting facts. Among other things:

- From April 18, 2011 (when the Firm first started billing its time) until October 27, 2011 (one day before the Firm's first Complaint was filed), Firm staff and attorneys billed over 713 hours to factual investigation, legal research into the statute of limitations and causes of action under Pennsylvania law, and extensive discussions with Peter Gordon and Kay Reeves. Over this six-month period, over 170 hours of time included research specifically related to the statute of limitations. [SOF ¶ 34; Ex. 14 (Hagens Berman Fees).] This research continued as the case proceeded. [*See, e.g.*, Ex. 29 (05/06/2011 email attaching statute of limitations memorandum); Ex. 31 (60-page memorandum from April 2014 analyzing ████████████ ██████████████████████████████████]

- The Firm's lawyers flagged noteworthy cases, ████████████████████ ████████████████████████ which was relevant to claims for negligence. [*See, e.g.*, SOF ¶¶ 82, 107; *see also* Ex. 42]

The Firm's efforts at developing legal theories to help victims obtain redress for their lifelong injuries far exceeds the "normally competent level of legal research" required to pass Rule 11 muster. That those theories ultimately have not convinced this Court (or SDM Hangley) on the merits is irrelevant to assessing the Firm's compliance with Rule 11. *See* Fed. R. Civ. P. 11 advisory comm. Note on the 1983 amendments (the "court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted.") "[A]dvocating new or novel legal theories" does not violate Rule 11. *Gaiardo v Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir. 1987); *see also Morley v. Ciba–Geigy Corp.,* 66 F.3d 21, 25 (2d Cir. 1995) (legal position is frivolous under Rule 11 only where "it is clear . . . that there is *no chance of success and no reasonable argument*

*to extend, modify, or reverse the law as it stands*") (emphasis added). The Third Circuit has made clear that Rule 11 should not be used to "inhibit imaginative legal or factual approaches to applicable law or to unduly harness good faith calls for reconsideration of settled doctrine." *Id.*; *see also* Pa. R.C.P. No. 1023.1 Explanatory Comment ("this rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories").

Second, in addition to researching and developing its legal theories, the Firm conducted a factual investigation of the claims. (SOF ¶¶ 83-104 and ¶¶ 172-226 (addressing particular plaintiffs).) The R&R states that the Firm violated Rule 11's pre-suit investigation requirement because it did not obtain the medical records of all Plaintiffs before filing suit. (Doc. 767 at 33.) As a threshold matter, the Firm ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████

More to the point, obtaining medical records pre-suit is not a prerequisite for compliance with the Rule. *Richardson v. Actavis Totowa*, LLC, No. CIV.A. 2-09-CV-00441, 2010 WL 1490583, at *4 (S.D.W. Va. Apr. 13, 2010) (rejecting defendants' argument that plaintiff violated Rule 11 by filing a drug injury case despite not possessing any of plaintiff's medical or pharmacy records, and noting that "imposing a bright line, prefiling standard requiring evidence of causation in defense of a Rule 11 motion would in effect require counsel to secure the type of proof necessary to withstand a motion for summary judgment. Such a purpose was not contemplated by Rule 11."); *Bixby v. KBR, Inc.*, 282 F.R.D. 521, 531 n.4 (D. Or. 2011) ("Plaintiffs' conceded failure to obtain and review the entire universe of potentially material medical records prior to initiating suit does not imply that plaintiffs failed to comply with their Rule 11(b)(3) obligation.").

These cases (collectively, the "Thalidomide Litigation") were unique in that Plaintiffs were unable to rely on direct evidence of exposure (such as prescriptions) because the Defendants or their agents distributed thalidomide as an experimental drug, without a prescription and without even identifying it as thalidomide. (SOF ¶ 84.) Moreover, the Defendants sought to cover up their misconduct and failed to maintain adequate records as to distribution of the pills. Thus, the Firm worked to obtain indirect exposure evidence before filing the claims—for example, ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ (*Id.*) This was in addition to the legal research the Firm had done regarding thalidomide distribution, as set forth above.

Respondents and their co-counsel Ms. Reeves took numerous unusual steps to research and analyze the viability of their clients' claims:

- ████████████████████████████████████
  ████████████ [*Id.* ¶¶ 62, 95]

- ████████████████████████████████████
  ████████████ [*Id.*, Ex. 44]

- ████████████████████████████████████
  ████████████████ [*See, e.g., id.*, Ex. 21 (10/13/2011 email), Ex. 24 (9/27/2013 email); Ex. 84 (02/24/2012 email)]

- ████████████████████████████████████
  ████████████████████ [*Id.*, Ex. 22 (11/8/2011 email)]

- Filed and successfully prosecuted a FOIA lawsuit, in November 2011, to obtain previously unobtainable public records relating to thalidomide. The resulting FDA document productions revealed:

  ████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████████████████



[*Id.* ¶¶ 90-93]

[*Id.* ¶ 94]

[*Id.* ¶¶ 110-111]

[*Id.* ¶ 112]

[*Id.* ¶¶ 113-115]

[*Id.* ¶ 116]

- Retained and utilized Dr. Trent Stephens, a leading thalidomide scholar and one of several experts used in the Australian claims settlement process, to evaluate thalidomide victims. Respondents' conversations with Dr. Stephens from 2012 until July 2014 suggested that he could provide testimony on causation and exposure based on the "constellation of injuries" present for certain Plaintiffs based on medical records, x-rays, and photos. [*Id.* ¶¶ 126-131]

- Located and interviewed former clinical investigators at SKF to get more information about the drug's distribution patterns and obtain testimony about how the thalidomide pills were used and controlled, as well as what became of any unused pills. [*Id.* ¶ 95] GSK's document production had suggested that GSK had provided a certain hospital, Northville State, with over 300,000 thalidomide tablets. However, one of the former clinical investigators at Northville State, Dr. Gordon Forrer, told the Firm that this number was greatly inflated, and that the hospital's clinical trial was limited to no more than 20 patients. He further contended that clinical report bearing his signature had been falsified, and that there had been "a large scale and meticulous fraud perpetrated using his name to account for a

massive number of missing pills." Dr. Forrer's interview and subsequent
deposition testimony supported the Firm's theory that GSK had affirmatively
covered up the true distribution of thalidomide. [*Id.* ¶¶ 98-101]

Third, the Firm expended significant resources on its research and factual development.
The first Complaint was filed by the Firm on October 25, 2011; the last was filed on April 15,
2014. Before the first Complaint was filed, Mr. Styant-Browne alone spent over 300 hours on
document review and factual investigation, including reviewing Plaintiff-specific allegations; over
the next year, he billed nearly 240 additional hours for various factual inquiries, including a review
of medical records and other individual client issues. (*Id.* ¶ 88.) Of course, Mr. Styant-Browne was
not working alone. In total, nearly 20,000 hours of Hagens Berman lawyer and paralegal time was
expended in the period 2011 to 2015.[4] This equates to an investment of over $9.1 million in
attorneys' fees, in addition to paying out-of-pocket costs in excess of $850,000 for experts,
deposition costs, genetic testing of clients, and so on, none of which the Firm, working on a
contingent fee basis, could recover unless it was successful at trial. These figures do not include
the substantial work done by Kay Reeves (and The Lanier Law Firm).

On this record, the Respondents' investigation was more than adequate. *See, e.g., Smith v.
Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 446-47 (5th Cir. 1992) (reversing award of Rule
11 sanctions because, among other things, an "attorney receiving a case from another attorney is
entitled to place some reliance upon that attorney's investigation," "virtually all of the factual
materials relevant to proving the RICO case were beyond [plaintiff's] reach, in the hands of the
defendants," and records show firm "devoted over two hundred hours to research of the law and
facts of the case"); *Greenberg v. Sala*, 822 F.2d 882, 887 (9th Cir. 1987) (complaint, which

---

[4] The Firm continued to work on the thalidomide cases after 2015, of course, but the cases largely
ground to a halt. Subsequent time was generally expended on the proceedings before SDM
Hangley rather than the underlying litigation. Accordingly, the 2011 to 2015 period is most
relevant here.

contained factual errors, was not frivolous where counsel "spent approximately 100 hours interviewing his clients, reviewing the records, and researching the law" and "enlisted experienced counsel to conduct further interviews and to review the complaint").

Because the Firm and its attorneys conducted a reasonable investigation as to the law and the facts prior to advancing their clients' claims and did not file their claims for any improper purpose, Respondents may not be sanctioned under Rule 11 or its Pennsylvania analog.

**B.**    **Section 1927 and Inherent Power Sanctions are Unavailable for the Additional Reason that Respondents Did Not Act in Bad Faith.**

**1.**    **Legal Standard for Section 1927 Sanctions.**

Section 1927 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Such sanctions are intended to deter an attorney from intentionally and unnecessarily delaying judicial proceedings, and they are limited to the costs that result from such delay." *In re Prosser*, 777 F.3d 154, 161 (3d Cir. 2015) (internal quotations omitted). Courts should only exercise this sanctioning power "in instances of a serious and studied disregard for the orderly process of justice." *Id.* To impose Section 1927 sanctions, a court must "find an attorney has (1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct." *Id.* (citing *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002).

17

Critically, a court imposing Section 1927 sanctions must find bad faith, either explicitly or implicitly. *Id.*[5]

### 2.    Legal Standard for Inherent Authority Sanctions.

A district court also has inherent authority to impose sanctions against those who abuse the judicial process, but these powers are potent and "must be exercised with restraint and discretion." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 (3d Cir. 1994) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). "Thus, a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified." *Id.* at 74. This first requires a court to analyze the conduct at issue and explain why it warrants a sanction, taking into account the severity of the wrongdoing, whether a "pattern of wrongdoing" is present, whether the wrongdoing "actually prejudices the wrongdoer's opponent," and whether "there may be mitigating factors that must be accounted for in shaping the court's response." *Id.* Then the court must "specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate. Although the court need not exhaust all other sanctioning mechanisms prior to resorting to its inherent power, [it] must explain

---

[5] The circuits are split as to whether Section 1927 permits sanctions to be imposed against law firms. *Compare Vaughan v. Lewisville Indep. Sch. Dist.,* 62 F.4th 199, 208 (5th Cir. 2023) (confirming that Section 1927 "does not allow a district court to award attorney's fees against law firms.") *with Avirgan v. Hull,* 932 F.2d 1572, 1582 (11th Cir.1991) (declaring that courts may assess attorney's fees against "litigants, counsel, and law Firms who willfully abuse judicial process by conduct tantamount to bad faith"). A Third Circuit case from decades ago affirmed the imposition of fees and costs under Section 1927 to a law firm. *See Baker Indus., Inc. v. Cerberus Ltd.*, 764 F.2d 204 (3d Cir. 1985). The Firm respectfully submits that *Baker* was largely devoid of analysis on this issue and notes that more recent district court decisions within this Circuit have concluded the opposite. *Trauma Serv. Grp., P.C. v. Hunter, MacLean, Exley & Dunn, P.C.*, No. CIV. A. 99-CV-5979, 2000 WL 764911, at *3 (E.D. Pa. June 12, 2000) (noting that "section 1927 imposes liability directly upon counsel and not counsel's law Firm"). The Firm maintains that imposing sanctions on Hagens Berman for the conduct of any of its individual attorneys is impermissible under the plain language of Section 1927 and the cases cited above.

why it has chosen any particular sanction from the range of alternatives it has identified." *Id.* (cleaned up).

As with Section 1927 sanctions, a finding of willful bad faith is required before sanctions may be imposed. *Chambers*, 501 U.S. at 45-46 (court may assess attorneys' fees pursuant to its inherent authority "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons") (cleaned up); *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1227 (3d Cir. 1995) ("[A] finding of bad faith is required to support a court's employment of its inherent sanction power.").

### 3.    Bad Faith Requirement.

Bad faith is required before sanctions may be imposed pursuant to Section 1927 or the Court's inherent authority. This requirement exists "to avoid chilling an attorney's legitimate ethical obligation to represent his client zealously[.]"). *Baker Indus. Inc. v. Cerberus, Ltd.*, 764 F.2d 204, 208 (3d Cir. 1985); *see also LaSalle Nat. Bank v. First Connecticut Holding Grp., LLC*, 287 F.3d 279, 289 (3d Cir. 2002) ("[S]anctions may not be imposed under [Section] 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal.").

Allowing counsel to proceed without fear of sanctions is particularly important in cases involving novel or untested causation theories. In *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 795 (3d Cir. 1999), for example, the Third Circuit affirmed the district court's denial of Section 1927 and inherent authority sanctions for plaintiff's advancement of a novel fraud-on-the-market causation theory. The defendants characterized this as needlessly multiplying the proceedings and "so lacking in merit that it should never have been advanced." *Id.* at 796. But as the Third Circuit observed:

> Regardless of whether plaintiffs' theory of causation is ultimately accepted by transferor courts, we cannot say the plaintiffs acted in bad faith in raising it. The Supreme Court has specifically instructed that courts should be wary of chilling legitimate advocacy by imposing fees too hastily: "[I]t is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims . . . ." Restraint is particularly important where, as here, the case presents complex factual and legal issues.

*Id.* (internal citations omitted); *see also DiBartolo v. City of Philadelphia*, No. CIV.A. 99-1734, 2002 WL 32364545, at *2 (E.D. Pa. Jan. 22, 2002) (declining to enter sanctions for asserting a unique theory because "a theory which fails is not necessarily one which was unreasonable or without foundation . . . [and] fees should not be imposed in a way that chills legitimate advocacy."); *Harrison v. Delguerico's Wrecking & Salvage, Inc.*, No. CV 13-5353, 2016 WL 1720354, at *5 (E.D. Pa. Apr. 29, 2016) (declining to sanction plaintiff's counsel under Section 1927 for not withdrawing the plaintiff from a case even after deposition testimony made clear the plaintiff had no viable claim, given that the defendants did not contend plaintiff's counsel was acting with an ulterior motive and defendants did not prove their Section 1927 argument with clear and convincing evidence); *Maule v. Philadelphia Media Holdings, LLC*, No. CIV.A. 08-3357, 2009 WL 129759, at *3 (E.D. Pa. Jan. 16, 2009) (declining to impose sanctions under Section 1927 where attorney and party "advanced reasonable underlying explanations for each of the challenged actions. While their positions may not ultimately prevail, we cannot say that their actions have been completely unreasonable or vexatious.").

Willful bad faith may be found when counsel knew or should have known that the claims being asserted were meritless "and that the motive for filing the suit was for an improper purpose, such as harassment." *In re Prudential*, 278 F.3d at 188 (quoting *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1375 (6th Cir. 1987)); *see also In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.,* 469 F. Supp. 3d 357, 363-65 (E.D. Pa. 2020) (declining to issue sanctions

where defendant did not offer "clear and convincing evidence" of bad faith; "the standard for sanctions is a demanding one.").

*In re Avandia Mktg.* is instructive. There, defendant GSK sought sanctions for plaintiff's counsel's purported failure to conduct an adequate pre-suit investigation and for unreasonably prolonging the litigation for several years without evidence to support the claims. With respect to the pre-suit investigation allegations, the court observed that the lawyers' efforts to investigate their case before filing suit were not "so inadequate that they amount to bad faith, justifying sanctions." *Id.* at 364. While "more should be expected," the experienced plaintiffs' attorneys nonetheless "conducted *some* investigation into the claims" and verified a factual basis for the theory of liability upon which they primarily relied. *Id.* at 365. The court similarly rejected GSK's argument that counsel unreasonably prolonged the litigation, noting that plaintiff eventually produced evidence arguably in support of its claims, even though its initial document production was incomplete and even though it only produced a full set of material after GSK moved for sanctions. *Id.* at 365-366.

*Avandia* and *In re Orthopedic* illustrate the proper reluctance of courts in this Circuit to impose sanctions, even upon a defendant's request, if there is no clear and convincing evidence of bad faith or abuse. This reasoning applies even more forcefully where, as here, *no sanctions requests are pending* and the Court would be acting of its own accord.

### 4.    Respondents Did Not Act in Bad Faith.

Respondents cannot squarely address whatever concerns the Court may have that they acted in bad faith and vexatiously without knowing the precise conduct that is the basis for the sanction. However, by any reasonable measure, Respondents did not act in bad faith or vexatiously for at least the following reasons.

First, Respondents relied in part on experienced and competent co-counsel and predecessor counsel in evaluating and bringing these claims. *See* SOF ¶¶ 19, 28, 30, 34 and Ex. 2 at ¶ 17 (Berman Decl.). Respondents also relied on receiving accurate and complete information from their clients (which generally occurred but did not with respect to a handful of claims). "[B]ecause bad faith is required, reliance on co-counsel or a client may negate a finding of bad faith." Joseph, *supra*, § 27(A)(3), at 574 (citation omitted); *see also Our Lady of the Lake Hosp.,* 960 F.2d at 446-47; *Greenberg*, 822 F.2d at 887.

Second, Hagens Berman conducted an extensive investigation of its own before substituting as counsel of record in two cases and filing nine other Complaints, as discussed above. Moreover, Respondents were discriminating in their review of potential clients and rejected individuals who did not meet their criteria for filing claims. *See* SOF ¶¶ 106, 230.

Third, Respondents relied on the expert testimony it expected to obtain—and later did obtain—from Dr. Trent Stephens and others. Dr. Stephens opined that "no expert, including myself," would have opined before October 2009 that certain defects (unilateral, postaxial, and/or transverse) exhibited by Plaintiffs were caused by thalidomide and that up to 2011, "no one in the US had the clinical expertise and experience with thalidomide defects necessary to discuss the range of defects seen in victims." *See, e.g.,* Doc. 428-2 at 13, ¶ 19 (12/18/14 Decl. of Dr. Stephens i/s/o Opposition to MSJ re Tammy Jackson.) Dr. Stephens also testified that "to a reasonable degree of medical and scientific certainty," certain Plaintiffs' constellation of injuries was so improbable that, given an assumption of thalidomide exposure, their "defects resulted from thalidomide exposure." (*E.g., id*. at ¶ 18.) Dr. Stephens' opinions were never the subject of a *Daubert* motion, nor have the Defendants offered any controverting expert testimony or a rebuttal report.

Dr. Stephens' opinions were deemed unpersuasive here, but expert testimony on medical or scientific causal factors is often found inadequate with no imposition of sanctions. *See, e.g., In re Zoloft (Sertralinehydrochloride) Prods. Liab. Litig.*, 176 F. Supp. 3d 483, 501 (E.D. Pa. 2016) (granting summary judgment where expert analysis was insufficient to establish causation). In cases where plaintiffs cannot meet their burden to make a prima facie showing of exposure and causation under a *Lone Pine* order, dismissal appears to be the only sanction imposed. *See, e.g., In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 711 F. Supp. 3d 317 (E.D. Pa. 2022), aff'd, No. 23-1032, 2024 WL 3423709 (3d Cir. July 16, 2024) (where plaintiffs had produced no expert report or published literature to support their causation theory and the cases were "severely prejudicial" to defendant and burdensome to the court, "[t]here is no effective sanction other than dismissal."); *In re Vioxx Prods. Liab. Litig.*, 388 F. App'x 391, 393 (5th Cir. 2010) (expressing skepticism about the merits of plaintiffs' claims and lack of evidence in a products liability case, yet never discussing sanctions); *Arias v. Dyncorp*, 752 F.3d 1011, 1013 (D.C. Cir. 2014) (dismissing plaintiffs' claims for lack expert testimony "to determine whether the specific herbicide at issue was capable of causing the specific kinds of injuries complained of" but not discussing or imposing sanctions). In this case, Respondents acted in good faith in relying upon expert opinions in filing and prosecuting these claims.

Indeed, the "March of Science" has continued onward since this series of cases was filed beginning in 2011. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████



Fourth, Respondents (and their co-counsel) had no motive to file baseless claims. To the contrary, because the Firm was advancing costs for its clients and was retained pursuant to a contingent-fee arrangement, it had no motive to bring unmeritorious claims against well-financed Defendants. Although the R&R opines that Respondents rushed to file cases in order to beat other

firms to the courthouse, and that they sought to "extort" the Defendants (Doc. 767 at 39, 153), those speculative assertions are false and have no support whatsoever in the record. (Ex. 2 at ¶ 16.) There is no evidence that Respondents' motivation in filing these claims was for an improper purpose such as harassment, and abundant evidence (and common sense) supports the contrary conclusion.

<u>Fifth</u>, once the litigation was underway, Respondents took steps to minimize the expense and burden of litigation. For example, in October 2013, Respondents suggested that bellwether trials be used to minimize litigation expense, resolve the statute of limitations defenses and provide direction to the parties with respect to the remaining claims. (Doc. 96 and SOF ¶¶ 118-121.) The "common, across-the-board issues" that Respondents sought to develop with the bellwether approach included the testing and distribution process of thalidomide by each defendant; the marketing of thalidomide to doctors; verifying each defendant's role in thalidomide distribution in the United States; and establishing the state of scientific knowledge as to how thalidomide causes injury and what injuries were known to be caused by thalidomide, then and now. (Doc. 96 at 4.) The Firm's request was opposed by the Defendants—who wished to proceed with full-scale discovery with respect to all the claims—and was denied by the Court. (Docs. 102 & 103.)

Similarly, in late October 2014, the Firm requested a stay until the then-pending summary judgment and sanctions motions were resolved to avoid unnecessary discovery and briefing. (Doc. 388.) The stay request was denied that same day without explanation. (Doc. 389.)

In December 2014, the Firm reiterated its stay request following the close of discovery. As the Firm explained:

> [T]he Special Master has made evident that he believes that Plaintiff's counsel are extending this litigation in bad faith. While Plaintiffs disagree . . . Plaintiffs' counsel take those findings extremely seriously and do not want to extend or multiply this litigation unnecessarily. Plaintiffs therefore ask the court to not require the parties

to unnecessarily brief summary judgment, and potentially exacerbate the costs accrued by any party, or cause unnecessary work for the Court.

(Doc. 423 at 2.) This request was denied the same day. (Doc. 424.)

Sixth, once Respondents concluded that claims against GSK were not viable after obtaining information that could not be obtained without the discovery process, it contacted GSK to discuss dismissal of those claims (resulting ultimately in the GSK settlement agreement). Similarly, it sought to dismiss the claims of various Plaintiffs in 2014 upon concluding that those individuals did not have meritorious claims. A withdrawal of claims in these circumstances

> does not negate the reasonableness of the inferences existing at the time the complaint was prepared. Indeed, *abandoning a claim that appears unlikely to succeed is responsible advocacy to be commended*—not an abuse of process to be deterred.

*Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir. 1988) (emphasis added).

Creativity in seeking legal redress for those claiming severe injuries should not be quashed by the threat of sanctions, particularly in a complex legal matter involving issues of first impression. *See In re Kunstler,* 914 F.2d 505, 524 (4th Cir. 1990) (sanctioning powers should be exercised with restraint to avoid chilling "novel factual or legal theories"); *Barney v. Holzer Clinic, Ltd.,* 110 F.3d 1207, 1213 (6th Cir. 1997) (award of fees under Section 1927 was not warranted where the "central issue was one of first impression"); *U.S. v. Alexander,* 981 F.2d 250, 253-54 (5th Cir. 1993) (vacating an assessment of sanctions because of "the absence of authority in this Circuit combined with the complexity of the issue").

In *Hackman v. Valley Fair*, 932 F.2d 239 (3d Cir. 1991), the district court awarded sanctions against plaintiff's counsel pursuant to Section 1927 when plaintiff's refusal to dismiss the Complaint on statute of limitations grounds "forc[ed] defendants to file the summary judgment motions," thereby unreasonably multiplying the litigation. *Id.* at 241-42. The Third Circuit, however, overturned the award of sanctions as clearly erroneous, explaining that the plaintiff had

"an arguable, albeit very weak, position" regarding the start of the limitations period. *Id.* at 243.

Consequently, plaintiff's "arguments were not so lacking in merit that opposition to the summary

judgment motion could be considered harassment." *Id.* Here, the claims and statute of limitations

defenses advanced by the Firm and its co-counsel were the product of extensive research of both

facts and law and were not asserted for purposes of harassment.

In sum, because Respondents did not act with willful bad faith or seek to vexatiously

multiply the proceedings, they may not be sanctioned pursuant to Section 1927 or the Court's

inherent authority.

### C.    Discovery Sanctions Under Rules 26(g) and 37 Were Not Recommended by SDM Hangley and would be Inappropriate in Any Event.

The Memorandum Opinion (Doc. 834) states that SDM Hangley has recommended that

the Court impose sanctions on the Firm for its "obstruction of discovery to prevent Defendants

from learning information critical to the tolling of the limitations clock," citing pages 51-52 and

147 of the R&R in support. [Doc. 834 at 23.] We respectfully disagree. The R&R never

recommends—on these pages or any other—that discovery sanctions be imposed.[6]

The R&R references discovery misconduct only tangentially, on pages 51-52, under the

heading "Discovery Abuse." In that section, the R&R references the Court's June 17, 2014 Order

proposing the appointment of SDM Hangley. (Doc. 767 at 51-52 (citing Doc. 239).)[7] In the

June 17, 2014 Order, the Court expressed concern that Plaintiffs had not honored their discovery

---

[6] The R&R observes generally (at 147) that Rule 26(g) and 37 authorize sanctions, but does not identify any discovery-related conduct that would warrant sanctions.

[7] The "Discovery Abuse" section of the R&R also cites the October 16, 2014 Order granting summary judgment on plaintiff Edmund Andre's claim (Doc. 371). This was a summary judgment ruling, not a discovery order, and discovery sanctions were not requested. The October 2014 Order is presumably cited because it contains the same (inaccurate) characterization of Doc. 232. *See* Doc. 371 at 6 ("Defendants urged that this misconduct warranted *dismissal of all Complaints* with prejudice. (Doc. No. 232.)" (emphasis added).

obligations, citing a June 12, 2014 discovery motion from Defendants. This June 12, 2014 motion has been repeatedly misapprehended by the Court and SDM Hangley as one in which Defendants sought dismissal of *all* the pending thalidomide cases as a discovery sanction. *See, e.g.*, Doc. 239 at 3 ("Defendants argue that Plaintiffs' misconduct warrants dismissal of the Complaints with prejudice") (citing Doc. 232); Doc. 767 at 56 ("Defendants contended that Hagens Berman's discovery avoidance had been so persistent and so baseless that they, defendants, *were entitled to dismissal of all the cases as a sanction*") (emphasis added); Doc. 834 at 3-4 (Defendants requested that the Court "dismiss *all eleven* Complaints with prejudice on discovery abuse grounds.") (emphasis added). Respectfully, that is incorrect.

Defendants did *not* request dismissal of all 52 Plaintiffs' claims as a sanction in their June 12, 2014 motion. (Doc. 232.) The June 12, 2014 motion concerned only *nine* Plaintiffs, and Defendants requested dismissal as a sanction as to only *four* of those Plaintiffs, as follows:

> In the cases of the four plaintiffs who provided no response at all to the Court's order [compelling certain discovery], Defendants specifically request that the Court require Mssrs. Christiansen, Marshall and Navamuel to do what has been ordered for Mr. Anderson: comply with outstanding discovery by a date certain or else appear and show cause why their case should not be dismissed for failure to prosecute.

(Doc. 232 at 4.)

The Firm responded on June 16, 2014 (Doc. 238), noting that the dispute as to those four individuals was moot or soon would be, either because the documents at issue had been produced (Navamuel), were being produced (Christiansen[8] and Anderson[9]) or because the Firm had moved

---

[8] On August 4, 2014, Mr. Christiansen voluntarily dismissed his claims with prejudice, with each party to bear its own fees and costs.  [Doc. 302.]

[9] The June 20 date set out for Mr. Anderson to respond to outstanding discovery had not yet come, and he did in fact respond.  See Ex. 130 (June 20, 2014 discovery responses and production, combined).

to withdraw (Marshall). *Id.* at 4-5. The Firm also responded with respect to the five other Plaintiffs whose production was at issue but for whom dismissal was not sought as a sanction. *See* Doc. 238.

By the time of SDM Hangley's appointment in June 2014, the Firm either had confirmed that there were no additional responsive documents to produce on behalf of several Plaintiffs (Johnson, Lucier, and Sampson), provided the responses of others by the promised deadline (Navamuel, Anderson, Grover, and Norcross), had moved to withdraw from representing others (Marshall), or would soon voluntarily dismiss claims (Christiansen). Thus, there is no basis for any discovery-related sanctions with respect to any of the nine Plaintiffs whose production was at issue in the June 12, 2014 motion, let alone *sua sponte* sanctions for the remaining scores of Plaintiffs who were involved in the litigation but whose production was not challenged in the June 12, 2014 motion.[10] Defendants have not made any discovery-related sanctions requests since SDM Hangley was appointed.

In sum, discovery-related sanctions against Respondents have not been recommended and are not warranted.

## III.  THE COURT SHOULD NOT IMPOSE SANCTIONS BECAUSE RESPONDENTS HAVE NOT RECEIVED DUE PROCESS.

The R&R's *sua sponte* sanctions recommendations fail to provide the particularized notice that due process requires before sanctions may be imposed. Respondents' due process rights entitle them to notice consisting of, at a minimum, identification of each act or omission for which they might be sanctioned, and, *for each such act or omission*, (i) the case in which it occurred (there are 11 Complaints involving 52 Plaintiffs, each with its own set of circumstances), (ii) the authority

---

[10] From late 2013 to 2014, Defendants filed—and Judge Diamond ruled upon—various motions to compel arguing that the Firm's discovery responses on behalf of various Plaintiffs were improper. Those discovery-related motions were adjudicated and resolved prior to SDM Hangley's appointment in June 2014.

under which sanctions might be levied, and (iii) the form those sanctions might take if levied. Such particularized notice is necessary to give Respondents a meaningful opportunity to formulate tailored responses. At no time before the R&R was publicly filed did Respondents receive such notice, and neither the R&R nor the Court's subsequent Memorandum Opinion and orders to show cause have provided the particularized notice and opportunity to be heard that due process requires. Yet Respondents have already suffered substantial harm to their reputation and incurred significant financial and personal expense as a result of the R&R's sanctions recommendations. The Court should not impose sanctions in further violation of Respondents' due process rights.

### A. Due Process Requires Particularized Notice and an Opportunity to be Heard before the Imposition of Sanctions.

As the Third Circuit has acknowledged, "sanctions may impose significant burdens on the reputation and career opportunities of the sanctioned attorney." *Martin v. Brown*, 63 F.3d 1252, 1262 (3d Cir. 1995). Because sanctions can imperil attorneys' ability to earn a living and deprive them of a property interest, the Third Circuit, like all federal circuits, mandates that "the fundamental requirements of due process—notice and an opportunity to respond—must be afforded before any sanction is imposed." *In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 379 (3d Cir. 1997) (quoting *Martin*, 63 F.3d at 1261), overruled on other grounds by *Comuso v. Nat'l R.R. Passenger Corp.*, 267 F.3d 331, 338-39 (3d Cir. 2001). "An opportunity to be heard is 'especially important' where a lawyer or firm's 'reputation is at stake,'" as is the case here, "because sanctions 'act as a symbolic statement about the quality and integrity of an attorney's work—a statement which may have a tangible effect upon the attorney's career.'" *In re Prudential*, 278 F.3d at 191 (quoting *Felheimer, Eichen & Braverman, P.C. v. Charter Techs, Inc.*, 57 F.3d 1215, 1227 (3d Cir. 1995)).

Accordingly, Rule 11 requires "*particularized* notice including, *at a minimum*, 1) the fact that Rule 11 sanctions are under consideration, 2) the reasons why sanctions are under consideration, and 3*) the form of sanctions* under consideration." *Simmerman,* 27 F.3d at 64 (emphases added); *OR v. Hutner*, 515 Fed. App'x. 85, 88–89 (3d Cir. 2013) (same); *see also In re Tutu Wells Contamination Litig.*, 120 F.3d at 379 (requiring notice not only "as to the legal rule upon which sanctions were based," but also "particularized notice . . . as to the form of the contemplated sanction") (citing *Gagliardi v. McWilliams*, 834 F.2d 81 (3d Cir. 1987) (per curiam)). "Only with this information can a party respond to the court's concerns in an intelligent manner." *Simmerman*, 27 F.3d at 64.

Moreover, in the case of *sua sponte* sanctions, the court must first "order an attorney, law firm, or party to show cause why conduct *specifically described in the order* has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3) (emphasis added). Rule 11's emphasis on particularized notice in the context of *sua sponte* sanctions stems from the critical difference between the task of responding to a request for sanctions made by a party, which much set forth with particularity the allegedly sanctionable conduct and the specific sanctions the party seeks, and the task of responding to the possibility of *sua sponte* sanctions, where the Court's order takes the place of a party's motion and thus must provide the required particularity. Pennsylvania's analog to Rule 11, Pennsylvania Rule of Civil Procedure 1023.1, imposes similar requirements. *See* Pa.R.C.P. 1023.2 (requiring a party filing a sanctions motion to provide "notice and a demand, which shall identify with specificity each portion of the document which is believed to violate the provisions of this rule, [and] set forth the basis for that belief with specificity"); Pa.R.C.P. 1023.3 (requiring a court to "enter an order describing the specific conduct that appears to violate Rule 1023.1(c) and directing an attorney, law firm or party to show cause why it has not violated" the rule).

These due process protections apply equally to sanctions under Rules 26(g) and 37, Section 1927, and the Court's inherent power. For example, in vacating discovery sanctions under Rule 37, the Third Circuit explained that "before being sanctioned, a party is entitled to notice of the reasons for possible sanctions, the rule on which they might be based, and their potential form." *Am. Bd. of Surgery, Inc. v. Lasko*, 611 F. App'x 69, 72 (3d Cir. 2015). Similarly, the Third Circuit has held that "the mere existence of Rule 11 or [Section] 1927 does not constitute sufficient notice," but rather "particularized notice is required to comport with due process," including notice of the form of sanctions under consideration. *Jones v. Pittsburgh Nat. Corp.*, 899 F.2d 1350, 1357 (3d Cir. 1990). And adequate notice is particularly critical "in connection with inherent power sanctions since, unlike Rule 11 and Section 1927, they derive from a common law tradition and are not based upon a statute or rule setting forth the standard of conduct expected of counsel and litigants." Joseph, *supra*, § 29(A), at 610 (collecting cases). "[A] court's inherent powers put at its disposal a wide range of possible sanctions." *In re Tutu Wells Contamination Litig.*, 120 F.3d at 381. Therefore, a court "cannot expect a party to defend against each and every one of these possible sanctions simply because [it] signals its intention to rely on such powers. Rather, more particularized notice is required." *Id.*

**B.    Respondents Have Not Received Particularized Notice.**

**1.    Prior to the R&R, Respondents received neither adequate notice of broad-reaching *sua sponte* sanctions nor an opportunity to respond.**

As an initial matter, prior to the R&R, Respondents had no notice that SDM Hangley was contemplating broad-reaching *sua sponte* sanctions recommendations in the absence of any pending request for sanctions by any party. As detailed in Section IV below, although SDM Hangley's initial authority to oversee certain discovery issues was expanded to include consideration of "*requests* for the imposition of sanctions stemming from the Thalidomide

discovery issue" (Doc. 316) (emphasis added), none of the appointment orders mention or otherwise provide particularized (or any) notice of even the possibility of *sua sponte* sanctions. Apart from a brief, generalized reference to potential sanctions based on Mr. Weaver's conduct with respect to Dr. Stephens' report—for which Respondents took corrective action promptly upon discovering the issue—none of the orders SDM Hangley issued prior to the R&R gives notice of potential sanctions.

The Court's 2025 Memorandum Opinion (Doc. 834), at 15, states that SDM Hangley's February 26, 2018 Order (Doc. 588) should have put the parties "on notice." But the relevant language from the 2018 Order references only that SDM Hangley might recommend sanctions based on Mr. Weaver's conduct. Specifically, the 2018 Order states:

> I believe that Weaver's conduct obliges the Court to examine closely the events that transpired, and to impose sanctions if and as warranted, and that the Court expects me to report and recommend on those subjects as well as on the grant or denial of the Motions to Withdraw.

Doc. 588 at 18. The 2018 Order makes no reference to any other allegedly sanctionable conduct and could not have provided any notice, much less constitutionally adequate notice, of the broad range of sanctions ultimately recommended by SDM Hangley in his 2023 R&R. Even as to potential sanctions for Mr. Weaver's conduct with respect to the Stephens report, nothing in the 2018 Order (or the R&R or any subsequent order from SDM Hangley or the Court) specifies the form of sanctions being considered or otherwise provides the particularized notice required to comport with due process.

The Memorandum Opinion also references Respondents' notice objections as "insincere, at best," implying that Hagens Berman must have known it was facing sanctions because it hired an ethics expert, Abraham C. Reich, "to opine that the Firm's conduct—which was explored at the hearings and which now forms the basis of the Mr. Hangley's Sanctions Recommendation—

comported with the procedural and ethics rules and the law." (Doc. 834 at 15). However, Hagens Berman retained Mr. Reich to provide an expert opinion in support of the Firm's Motions to Withdraw, which were properly before SDM Hangley and which were the actual subject of the hearings at the time. Potential sanctions were not the subject of any hearings or briefing before SDM Hangley.

Moreover, Mr. Reich's report itself expressly limits his opinion "to assessing the conduct of the Hagens Berman attorneys in the five cases identified in [the] opinion"—specifically, the five cases that were the subject of the pending Motions to Withdraw. (Doc. 743 at 1) Mr. Reich was asked to address three specific issues: (1) whether Hagens Berman had a good faith basis to bring those cases starting in 2011; (2) whether Hagens Berman's continued prosecution of those cases up until it sought to withdraw was appropriate; and (3) whether it was appropriate for Hagens Berman to seek to withdraw when it did due to information obtained during discovery. (*Id.*) Hagens Berman retained Mr. Reich to opine on those issues because they were relevant under the legal standard SDM Hangley applied to the Motions to Withdraw—*not* because Respondents had any indication SDM Hangley was actively considering broad-reaching *sua sponte* sanctions as to those five Plaintiffs' cases, much less as to all 52 Plaintiffs' cases.

That Respondents were blindsided by the R&R is reflected in the last substantive filing the Firm made prior to the R&R, in which it stated (correctly) that "the only matter before the Special Master is the Court's directive that the Special Master issue a report and recommendation concerning Hagens Berman's Motions to Withdraw. . . ." Notice Regarding Transcripts, Agreements Produced as Ordered by Special Master Hangley, and Post-Hearing Briefing (filed June 9, 2021) (Doc. 750 at 20) (requesting "the opportunity to present Post-Hearing Briefs regarding those Motions to Withdraw as Counsel, under seal, within 30 days."). At no point during

SDM Hangley's deliberations and before he issued a public report concluding (we respectfully submit incorrectly) that Respondents engaged in litigation that bordered on "extortion" did Respondents receive adequate notice or an opportunity to be heard. Contrary to the Memorandum Opinion's finding, Respondents' notice objection was, and continues to be, sincere and made in good faith.

### 2.    The R&R Does Not Provide Particularized Notice.

The R&R (Doc. 767) finds a broad range of misconduct spanning over a decade-long period, publicly charges Respondents with violating Rule 11 and Section 1927, and recommends sanctions under those provisions as well as the Court's inherent authority. The R&R, however, fails to provide Respondents with the requisite particularized notice.

First, the R&R does not specify what alleged conduct is at issue in which case or cases. For example, the R&R states that "Mr. Berman's oath is everywhere in the record and the things he wrote and swore to were – in numerous Plaintiffs' cases – largely false and even more largely based on guesswork," and that "Mr. Berman was quite aggressive in deciding that a particular potential Plaintiff should be encouraged to sue, despite obvious warning signals in the intake process." (Doc. 767 at 152.) The R&R, however, is silent about which of the "numerous plaintiffs' cases" are under discussion, and whether the alleged "aggression" related to a signed writing that falls under Rule 11 or, in SDM Hangley's view, otherwise constitutes "bad faith" and multiplied the proceedings in an unreasonable and vexatious manner as required by Section 1927 and the inherent power authority. Each case must be considered in the context of its unique facts and issues. For example, settlement, disposition of a claim, or entry of a Rule 54(b) order may limit the availability of sanctions. *See, e.g.,* Rule 11(c)(5)(B) (prohibiting *sua sponte* monetary sanction "unless [the court] issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or

settlement of the claims made by . . . the party that is, or whose attorneys are, to be sanctioned").[11] Certain Defendants have already agreed to bear their attorneys' fees with respect to dismissal of several Plaintiffs' claims. It would be unreasonable to now address sanctions and fee-shifting for matters settled by the parties. *See, e.g., Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 145 (3d Cir. 2009) ("Where the parties have settled the matter of attorneys' fees, there is no reason to remand [for individualized sanctions analysis].").  Nonetheless, the R&R wholly fails to distinguish one case from another in concluding that sanctions should be imposed.

Second, the R&R fails to tie alleged acts to a specific source of sanctioning authority. The R&R cites a wide range of conduct in various cases before generally concluding that the Court can impose sanctions pursuant to Fed. R. Civ. P. 11 (and its Pennsylvania corollary), Section 1927, and the Court's inherent authority. (Doc. 767 at 148-51.) But as set forth in more detail in Section II above, each of these sources of sanctioning authority has different elements, applies to different types of conduct in particular cases, and has unique defenses and limitations. There are important distinctions between these authorities, and blanket assertions that sanctions under each are available for most or all the alleged acts discussed in the R&R do not comport with due process. SDM Hangley's discussion of legal standards is not tied to any particular conduct although his recitation of that conduct spans over 100 pages. *See, e.g.*, *Martin*, 63 F.3d at 1265 (requiring the district court to "do more than state generally the various grounds authorizing" sanctions and to instead "relate each sanction to some aspect of [the party's] conduct and explain how that conduct comes within the authority it relies on to impose it").

---

[11] Most of the Plaintiffs discussed in the R&R have settled, dismissed their claims, and/or had judgment entered, including Plaintiffs Andre, Boiardi, Cabcabin, Garza, D. Johnson, Merica, Morgan, B. Murray, Randall, Spence, and Williams. (*See* Docs 182, 265, 284, 302, 305, 319, 321, 325, 326, 328, 332, 360, 362, 365, 368, 372, 373, 374, 468, 513, 514.)

Third, the R&R provides no notice as to the "form of sanctions" under consideration. Sanctions can take a multitude of forms, including a fine, an award of attorneys' fees, or non-monetary sanctions such as a reprimand, suspension, or disbarment (not all of which are available when a court issues an order to show cause, as explained above). "Due process requires that the parties have sufficient notice of the *form* of the sanctions being considered by the court because the issues that must be addressed may differ depending on the form." *Prosser v. Prosser*, 186 F.3d 403, 406 (3d Cir. 1999) (reversing sanctions awarded under the court's inherent authority) (emphasis in original). As the Third Circuit explained in *In re Tutu Wells*, "[d]ramatic differences in the relief being considered by the district court may lead to substantially different (e.g., more detailed, differently directed) responses by the alleged offender." 120 F.3d at 379 (quoting Joseph, *supra*, § 17(D)(1)(d), at 343). For example, the defenses and arguments available to counsel vary depending on whether a sanction is compensatory or punitive. If the award is compensatory, the Court is limited to imposing a sanction that redresses a specific harm. *See e.g.*, *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017) ("[T]he [compensatory] fee award may go no further than to redress the wronged party for 'losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior.") (quoting *Mine Workers v. Bagwell*, 512 U.S. 821, 829 (1994)). If the sanction is punitive, the sanctioned party is entitled to criminal procedural protections, including a "beyond a reasonable doubt" standard of proof. *See, e.g.*, *id.; Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 128-129 (2d Cir. 1998).[12]

---

[12] Factors to consider in assessing whether the sanction is punitive or compensatory depend on the character of the sanction and include: (i) size of the sanction, (ii) whether the Court labeled the sanction as punitive, (iii) whether the sanction involved past wrongful conduct or was imposed to coerce future compliance; (iv) whether the sanction was payable to the court, rather than to the injured party, and (v) whether an opportunity to purge was provided that would permit the sanctioned party to rid himself of the sanction. *Mackler*, 146 F. 3d at 130.

Among other defects in notice, the fact that Respondents still do not know what form of sanctions they face is constitutionally fatal. *In re Tutu Wells* is instructive. There, attorneys who engaged in discovery abuse were suspended from practicing law in the district under the court's inherent power. None of the attorneys, however, "received particularized notice that the court was contemplating" that particular sanction. *In re Tutu Wells Litig.*, 120 F.3d at 380. "Although the [lower] court made clear the legal rules on which it would base sanctions and the reasons for the sanctions*,*" the Third Circuit reversed the suspension sanction because the lower court "limited its discussion of the form of the possible sanctions to monetary sanctions and dismissal of claims*.*" *Id.* That the attorneys should have been aware of the full array of sanctions available to the court, including the ability to suspend an attorney, was insufficient to salvage the defective notice. As explained further in Respondents' 2023 Objections (Doc. 791 at 21-22), the outcome in *In re Tutu* is not an outlier; the Third Circuit has repeatedly found reversible error when a lower court fails to provide particularized notice of the specific form of sanction being considered. *See In re Prudential*, 278 F.3d at 193; *Gagliardi v. McWilliams*, 834 F.2d 81, 83 (3d Cir. 1987); *Prosser*, 186 F.3d at 406-07.

In short, the R&R fails to tie specific alleged misconduct in a specified case or cases to specific authority or any particular form of sanction. In an R&R that bears only a brief relationship to his final remaining task of evaluating the Withdrawal Motions, SDM Hangley improperly lumps all reported misdeeds together and states that sanctioning authority can generally arise from Rule 11, Pa. R. Civ. P. 1023.1, Section 1927, or the Court's inherent power. But merely listing the wide range of penalties generally available to courts, along with sundry misconduct findings, does not give Respondents "the appropriate opportunity to present relevant defenses to the penalties" because Respondents do not know what penalties the Court may consider imposing for what

specific acts of alleged misconduct in which particular case or cases. *See In re Tutu Wells*, 120 F.3d at 381. Inviting the Court to draw on multiple sources of sanctioning authority to impose unspecified penalties in unspecified cases based on one or more actions taken (or not taken) in the wide range of conduct set out in the 154-page R&R does not satisfy due process. Indeed, even without finding a due process violation, the Third Circuit has vacated sanctions orders where such a "lack of specificity is a pervasive characteristic of [the] opinion." *Grider.*, 580 F.3d at 144 ("[W]e cannot affirm the order because of the vague use of the terms 'defendants' without describing individual sanctionable conduct and the general lack of factual specificity [in] discussing sanctions under [Section] 1927 and Local Rule 83.6.1.").

### 3. The 2023 OSC, 2025 Memorandum Opinion, and 2025 OSC Do Not Provide Particularized Notice.

One day after SDM Hangley's R&R was filed, this Court issued an Order on October 13, 2023 ("2023 OSC") setting the deadline for objections to the R&R and stating that it "constitutes notice to show cause under Rule 11(c). Fed. R. Civ. P. 11(c)(3), 11(c)(5)." (Doc. 768.) The 2023 OSC provides no additional information and thus does not provide Respondents particularized notice to satisfy due process, just as the R&R itself does not provide sufficient notice. *See, e.g.*, *Martin*, 63 F.3d at 1264 (show cause order must "direct the person it seeks to sanction to show cause *why particular sanctions should not be imposed*") (emphasis added); *In re Prudential*, 278 F.3d at 191 ("Generally speaking, particularized notice will usually require notice of the precise sanctioning tool that the court intends to employ.") (quoting *Fellheimer*, 57 F.3d at 1227).

Respondents filed Objections, arguing, among other things, that the R&R and the 2023 OSC did not provide adequate notice of the specific acts or omissions for which the Firm and/or Mr. Berman might be sanctioned and, for each act or omission, did not specify (i) the authority (Rule 11, 28 U.S.C. Section 1927, etc.) under which sanctions might be levied and (ii) the form of

the proposed sanction (such as a reprimand, fee shifting, punitive fine, etc.) based on that conduct. (Doc. 791 at 18-29, 30-31.) In its Memorandum Opinion, the Court rejects those arguments but provides this additional opportunity for Respondents to show cause why the sanctions recommended by SDM Hangley should not be imposed. (Doc. 834 at 14-16, 23-24.) The same day, the Court issued an Order stating only the following as to sanctions:

> The Court will not address Mr. Hangley's recommended imposition of sanctions until after Hagens Berman, Steve Berman, Tyler Weaver SHOW CAUSE . . . as to why the sanctions recommended by Mr. Hangley should not be imposed.

(Doc. 835.) But, like the Court's 2023 OSC, neither the Memorandum Opinion nor the 2025 OSC remedy the significant due process shortcomings of the R&R and 2023 OSC by identifying the specific acts or omissions for which the Firm and Mr. Berman may be sanctioned, tying the specifics acts to specific authority for sanctions, or specifying the proposed form of sanctions being considered for each specific act or omission.

## C.    Because of the Deficient Notice, Respondents Have Not Received a Constitutionally Adequate Opportunity to be Heard.

Respondents respectfully and fully acknowledge the opportunity the Court has provided to file objections and to respond to SDM Hangley's sanctions recommendation (and have attempted to respond as best they can under the circumstances), but the fact that Respondents have not received particularized notice regarding the sanctions under consideration renders this opportunity to respond constitutionally inadequate. As explained above, sanctions can take a multitude of forms, and different legal standards and forms of sanctions apply under different authorities. Therefore, the Third Circuit has made clear that particularized notice is critical because a court "cannot expect a party to defend against each and every one of these possible sanctions simply because a court signals its intention to rely on such powers. Rather, more particularized notice is required." *In re Tutu Wells Litig.*, 120 F.3d at 381 (emphasis added). After all, had the attorneys

known "that they faced possible suspension as well as possible monetary sanctions," the attorneys may have offered different or additional evidence to the Court, including:

> … evidence concerning their professional careers, their contributions to the legal profession and the community, their character, and the like. The proceedings would have followed a different path as the alleged offenders led the court to consider a wider array of information.

*Id.* at 381. Without such particularized notice and the ability to craft a response tailored to the sanctions being considered, Respondents are essentially taking a shot in the dark in guessing which specific sanctions may be at issue in which specific case, and for what conduct. Their "opportunity to be heard [is] less than meaningful" and constitutionally inadequate. *Id.*

### D. *Ex Parte* Communications and Extrajudicial Investigations Exacerbate the Due Process Failings.

In their December 2023 Objections, Respondents argued that the foregoing due process violations are exacerbated by SDM Hangley's *ex parte* communications and extra-judicial investigation, which prevent them from responding to SDM Hangley or the Court in an effective or informed manner. (Doc. 818 at 27-30.)[13] Respondents acknowledge that the Court's recent Memorandum Opinion rejected this argument, *see* Doc. 834 at 16-19, and thus merely incorporate by reference the prior argument to avoid waiver. (*See* Doc. 818 at 27-30.) Respondents respectfully and briefly make two additional points.

First, the Court's Memorandum Opinion states that Respondents' "decision to complain for the first time only *after* Mr. Hangley issued his R&R belies the Objection itself." (Doc. 834 at 18) (citations omitted). We respectfully disagree. To the contrary, it was the broad and unexpected sweep of the R&R's sanctions recommendations that first gave rise to concerns about the scope and nature of SDM Hangley's *ex parte* communications and extrajudicial investigation.

---

[13] Respondents' December 2023 Objections were originally filed as Doc. 794, but later re-filed in June 2024 as Doc. 818. Doc. 818 is the operative version of the December 2023 Objections.

Respondents promptly raised these concerns in their 2023 Objections, which are relevant to their due process right arguments.

<u>Second</u>, SDM Hangley appears to have conducted extrajudicial inquiries and had more than 130 *ex parte* contacts with the Court between 2014 and 2023, and while considering broad-reaching *sua sponte* sanctions. *See* Exhibits 122-124 and Doc. 791 at 27-30. Respondents have not received any invoices since the filing of their December 2023 Objections, and are thus in the dark about any further extrajudicial inquiries or *ex parte* contacts. Respondents in no way seek to impugn the integrity of the Court or SDM Hangley, but they simply do not know what information was acquired or discussed as a result of those communications and investigation, or how, if at all, that information may have influenced SDM Hangley's sanctions recommendations or the Court's *de novo* review of those recommendations. This lack of information compounds the due process concerns raised here.

### E.    Respondents Have Been Harmed by the R&R and Irreparably Prejudiced by the Lack of Timely Notice and Opportunity to be Heard.

Though Respondents have yet to receive the due process to which they are entitled, the R&R has already caused substantial and palpable harm to Respondents' reputations. In the publicly filed R&R, SDM Hangley finds Respondents guilty of far-reaching ethical violations, portraying them as greedy, unethical lawyers deserving of significant, though unspecified, sanctions. The R&R wrongly characterizes them as, among other things, having a "disregard for truth" (at 78), "flout[ing]" their ethical obligations (at 39), acting with "mendacity" (at 59), lacking "skills, loyalty and professionalism" (at 92), and acting to "extort[]" the Defendants (at 153). The R&R concludes with a scathing description of the conduct of the Firm's lawyers as "products of an overall [firm] culture of avarice in the raiment of messianic zeal" (Doc. 767 at 156.) Respondents' right to due process is of critical importance when, like here, there are charges of "misconduct

bordering on the criminal" (*see* Doc. 834 at 24) and "a lawyer's or firm's reputation is at stake." *In re Prudential Ins. Co. Am.*, 278 F.3d at 191.

Although the R&R deems Respondents responsible for a wide range of purported misconduct spanning over a decade-long period—ranging from the significant (Mr. Weaver's alteration of an expert report) to the petty (misspelled statutory references) to the objectionably personal (that Mr. Berman supposedly created a firm motivated by "avarice")—it makes little if any effort to tie specific alleged misconduct in specific cases to specific authority or any particular form of sanction for the conduct at issue. Contrary to the Third Circuit's admonition that a court "cannot expect a party to defend against each and every one of the[] possible sanctions simply because [it] signals its intention to rely on [sanctions] powers," *In re Tutu Wells*, 120 F.3d at 381, that is exactly what Respondents have been compelled to do. Respondents have already expended an enormous amount of time and resources and incurred hundreds of thousands of dollars in attorneys' fees (in 2023 and now again in 2025) to defend themselves and their reputations generally against each and every one of the wide array of alleged misconduct under each and every one of the multiple sources of potential sanctioning authority referenced.

This process, "essentially an accumulation of all perceived misconduct, from filing" to date, is an "obvious defect" and "flies in the face of the primary purpose of sanctions, which is to deter subsequent abuses." *See Matter of Yagman*, 796 F.2d 1165, 1183 (9th Cir. 1986) (reversing district court's sanctions based on Rule 11, section 1927, and local rule), *amended on denial of reh'g sub nom. In re Yagman*, 803 F.2d 1085 (9th Cir. 1986); *see also In re Sanford L. Firm*, 106 F.4th 706, 719 (8th Cir. 2024) (reversing Rule 11 sanctions for failure to provide adequate notice of specific conduct and potential sanctions and where targets of sanction "have 'already suffered inevitable financial and personal costs' as a result of the [underlying proceedings]").

The due process failings here have also prejudiced Respondents' ability to adequately defend themselves. Courts have recognized that, "[w]ith few exceptions, sanctions should be imposed 'within a time frame that has a nexus to the behavior sought to be deterred." *Sec. Nat'l Bank of Sioux City, IA v. Jones Day*, 800 F.3d 936, 943 (8th Cir. 2015) (quoting *Thomas v. Capital Sec. Servs., Inc.,* 836 F.2d 866, 881 (5th Cir.1988)). But in this case, multiple years—and in some instances, over a decade—separate the alleged misconduct and any notice that severe *sua sponte* sanctions were being considered. Indeed, as acknowledged in the R&R, Nick Styant-Browne, who was Of Counsel at Hagens Berman, "had a very active role in these cases and testified extensively," has died. (Doc. 767 at 3, note 4.) As Mr. Berman notes in his Declaration, "Mr. Styant-Browne managed the day-to-day litigation from 2011 until his untimely passing in 2022." Ex. 2, ¶ 22. Thus, while Respondents have yet to receive constitutionally adequate particularized notice, their ability to respond to the R&R has been irreparably prejudiced by the passing of a critical witness with extensive knowledge about the cases and conduct at issue. The long delay and denial of due process leave Respondents with impeded access to potentially critical evidence, witnesses, and memory needed to provide the best possible defense to the allegations against them. These failings are particularly consequential here, where Respondents face sweeping charges of "misconduct bordering on the criminal," despite not receiving the requisite due process to date. (*See* Doc. 834 at 24.)

## IV.    SDM HANGLEY IMPERMISSIBLY EXCEEDED HIS AUTHORITY.

In its Memorandum Opinion, the Court rejects Respondents' argument that SDM Hangley impermissibly exceeded his authority by making sweeping sanctions recommendations. The Court finds that SDM Hangley had both express and implied or inherent authority to make his

recommendations. (Doc. 834 at 10-12) Respondents continue to disagree and respectfully ask the Court to reconsider its findings, as they constitute clear error.[14]

At the outset of the R&R, SDM Hangley states the two subjects he intends to address: (1) motions filed by Hagens Berman to withdraw from its representation of five Plaintiffs, and (2) "matters of ethics and professional responsibility." (Doc. 767 at 2.) SDM Hangley correctly identified the former subject; that task was assigned to him in March 2016 (Doc. 532), and issuance of the R&R completed his work on that assignment. However, SDM Hangley incorrectly conferred on himself broad, case-wide authority to address "matters of ethics and professional responsibility." The orders of appointment cannot reasonably be read to provide express authority for sanctions recommendations other than in the context of requests for certain discovery sanctions from the Defendants. While a special master has implied or inherent authority to take such acts as may be necessary to perform the master's duties fairly and efficiently, SDM Hangley's recommendations are almost entirely unrelated to the duties that were assigned to him.

## A.    Rule 53 Governs a Special Master's Authority.

Discussion of a special master's authority begins and ends with Rule 53 and the instructions provided in the orders of appointment. Rule 53(a)(1) defines the permissible scope of an appointment. As relevant here, it permits a court to appoint a special master to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C).

Rule 53(b)(2) governs the contents of the appointing order and provides that "[t]he appointing order must . . . state [ ] the master's duties, including any investigative or enforcement

---

[14] A party seeking reconsideration must show "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted [the applicable] motion . . . ; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

duties . . . ." The Comments emphasize the vital importance of the appointing order. For example, the Comments state:

> The order appointing a pretrial master is vitally important in informing the master and the parties about the nature and extent of the master's duties and authority. Care must be taken to make the order as precise as possible.
> . . .
> Rule 53(b)(2) requires precise designation of the master's duties and authority. Clear identification of any investigating or enforcement duties is particularly important. Clear delineation of topics for any reports or recommendations is also an important part of the process.

Rule 53(c) addresses the special master's authority and, as relevant here, permits the master to "take all appropriate measures *to perform the assigned duties fairly and efficiently*." Fed. R. Civ. P. 53(c)(1)(B) (emphasis added).

Taken together, these three subparts of Rule 53 (i) permit the appointment of a special master to perform tasks that cannot be effectively addressed by the appointing court, (ii) require the appointing order to precisely designate the master's duties and authority so the parties will know what the master will (and will not) be doing, and (iii) provide the master with implied or inherent authority to take other measures "to perform the assigned duties fairly and efficiently." A special master has no other authority, and the master's authority, including implied or inherent authority, is derived from the appointing order. "Although subdivision (c) of the rule provides masters with the broad and flexible authority necessary to discharge their responsibilities, the appointing order is the most important delineation of a master's authority and duties." 9C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil § 6202.2 (3d ed. 2023); *see also United States v. Clifford Matley Fam. Tr.*, 354 F.3d 1154, 1159 (9th Cir. 2004) ("An order referring a case to a special master is therefore the source and the limit of the master's duties and powers.").

**B.      SDM Hangley Was Assigned Specific Tasks.**

Here, the Court issued a series of appointing orders authorizing SDM Hangley to perform specific tasks. He performed them over the course of the next decade.

### 1.      Overseeing Certain Discovery Issues

#### a.      The Appointment

In 2014, the Court appointed SDM Hangley to serve as the Special Discovery Master. The Court's initial appointment comprised two separate orders setting forth discrete tasks.

First, on June 27, 2014, the Court appointed SDM Hangley to oversee all <u>discovery</u> related to "the Thalidomide discovery issue." (Doc 256 (the "Discovery Appointment").) A previous order defined the term "Thalidomide discovery issue" as follows: "When each Plaintiff learned that his or her injuries might have been caused by Thalidomide (the 'Thalidomide discovery issue'). . . ." (Doc. 239 at 1.)

Second, on August 11, 2014, the Court amended the Discovery Appointment to provide SDM Hangley with authority to consider any requests for sanctions that might arise out of the Thalidomide discovery issue. (Doc 316.) The amendment states:

> The Special Master, William T. Hangley, Esq. shall have the authority to consider all ***requests*** for the imposition of sanctions stemming from the Thalidomide discovery issue, including but not limited to: the Parties' compliance with their discovery obligations, counsel's failure to conduct pre-suit investigations, whether discovery misconduct caused any unreasonable delays in litigation, and any other sanctions pursuant to Rule 11, [Section] 1927, or the Court's inherent authority that are substantially related to the Special Master's duties under the Appointment Order.

> The Special Master's authority shall extend to all forthcoming and pending ***requests***.

> The Special Master shall issue a Report and Recommendation on any ***request*** for the imposition of sanctions in accordance with Rule 53(e).

(Doc 316 at 1-2 (emphasis added.))

Accordingly, the Discovery Appointment granted SDM Hangley authority to oversee a specific subset of discovery issues, to consider any requests for sanctions that any party might make related to those discovery issues, and to issue recommendations regarding any such request.

Both SDM Hangley (Doc. 767 at 6) and the Court (Doc. 834 at 12) have determined that the Court's August 11, 2014 amendment of the Discovery Appointment conferred on SDM Hangley express authority to make *sua sponte* sanctions recommendations regardless of whether any party requested such sanctions, whether such recommendations concern the discovery issues assigned to SDM Hangley, and regardless of when such recommendations might be issued. SDM Hangley cites the August amendment as the source of his sanctions-related authority (Doc. 767 at 6), and the Court agrees, asserting that the amendment "gave Mr. Hangley broad authority to consider recommending sanctions," "does not limit the Special Master to considering only sanctions requests," and directed SDM Hangley to recommend "any other sanctions . . . that are substantially related to the Special Master's duties under the Appointment Order." (*Id.* (quoting Doc. 316 at 1). But the August 11, 2014 amendment gave SDM Hangley specific authority to "consider all *requests* for sanctions stemming from the Thalidomide discovery issue, including but not limited to . . . any other sanctions . . . that are substantially related to the Special Master's duties under the Appointment Order." (Doc. 316 at 1 (emphasis added.) The direction to consider "any other sanctions" was expressly defined as a catch-all subcategory within the universe of "requests" that SDM Hangley could consider. For good measure, the amendment went on to clarify that the "[t]he Special Master's authority shall extend to all forthcoming and pending *requests*,"

and that "[t]he Special Master shall issue a Report and Recommendation on any ***request*** for the imposition of sanctions. . . ." (*Id.* at 1-2 (emphasis added.)).[15]

The Court's Memorandum Opinion also holds that, in addition to express authority, SDM Hangley had implied or inherent authority under the Discovery Appointment to recommend sanctions in the absence of any requests for such sanctions. (Doc. 834 10-12) However, SDM Hangley's duties were delimited by the specific terms of the Discovery Appointment, as amended, and that order expressly addressed SDM Hangley's sanctions-related authority. There is no reason to search for an order's implied or inherent authority when the order expressly addresses and defines the authority in question.

Moreover, a special master's inherent authority is limited. It does not, as the Court states, extend to advising the appointing court "as to all the rules, statutes, and case law governing civil litigation." (Doc. 834 at 10.) It does not, as the Court states, confer on the special master each and every sort of authority possessed by the appointing court. (*Id.*) The Court quotes *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 (1991), for the legal principle that a special master's inherent authority is coequal to that of the appointing court and "is 'an implied power squeezed from the need to make the court function.'" (*Id.*) But *Chambers* does not address special masters or their authority, and the quotation provided by the Court in its Memorandum Opinion is the Supreme Court quoting the Fifth Circuit Court of Appeals, which in turn cautions that a district court's own inherent powers are limited: "Although observing that the inherent power 'is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the

---

[15] The Court states that "[i]n addition to Mr. Hangley's inherent authority, I repeatedly instructed him to consider whether specific attorney misconduct alleged could warrant the imposition of sanctions." (Doc. 834 at 11.) But the August 11, 2014 amendment of the Discovery Appointment is the only order of appointment expressly instructing SDM Hangley to consider sanctions.

need to make the court function,' the [Fifth Circuit] also concluded that the District Court did not abuse its discretion. . . ." *Chambers*, 501 U.S. at 42.

A district court's inherent powers are broad but do have limitations. And a special master's inherent powers are more limited as defined and constrained by Rule 53: a special master may take such acts as may reasonably be in service of performing the master's "assigned duties fairly and efficiently." Fed. R. Civ. P. 53(c)(1)(B).

### b.    2014: SDM Hangley's Work Under the Discovery Appointment

Pursuant to the Discovery Appointment, the Court assigned SDM Hangley responsibility for motions seeking sanctions filed by Defendants GSK and Grünenthal against Hagens Berman. On December 4, 2014, after briefing and oral argument, SDM Hangley recommended that sanctions be awarded to Defendant Grünenthal and that GSK's sanctions request be held in abeyance. (Doc. 414.) The Court adopted SDM Hangley's recommendations. (Docs. 482, 483.) On August 28, 2015, judgment for sanctions in the amount of $145,000 was entered in favor of Grünenthal.

Fact discovery closed on November 30, 2014. (Doc. 270.) No requests for sanctions of any sort, whether related to the Thalidomide discovery issue or otherwise, have been pending before SDM Hangley since December 2014. No discovery has occurred, and there have been no material issues for SDM Hangley to consider under the Discovery Appointment, including any requests for sanctions, since that date.

### 2.    Voluntariness of Certain Consents to Dismissal

### a.    The Appointment

On November 14, 2014, Hagens Berman filed a Motion for Voluntary Dismissal on behalf of 28 Plaintiffs with respect to those Plaintiffs' claims against Defendant GSK. (Doc. 409.) On December 8, 2014, four days after SDM Hangley issued his recommendations on the sanctions

motions assigned to him, and over the objection of Hagens Berman (Doc. 400), the Court directed SDM Hangley to consider whether each of the 28 Plaintiffs "knowingly and intelligently consented" to dismiss their claims against GSK. (Doc. 420 (the "Consents Appointment").)

In February and March 2015, and over the objection of Hagens Berman (Docs. 451, 480), the Court expanded the Consents Appointment and directed SDM Hangley to also consider whether four Plaintiffs had knowingly and intelligently consented to dismiss their claims against all Defendants. (Docs. 472, 485.) Finally, on April 16, 2018, the Court further expanded the Consents Appointment and directed SDM Hangley to consider whether Plaintiff Carolyn Sampson had knowingly consented to dismiss her claims against all Defendants. (Doc. 611.) On May 29, 2018, in response to a letter it received from Ms. Sampson asking that her claims not be dismissed (Doc. 635), the Court withdrew its expansion of SDM Hangley's duties under the Consents Appointment to include Ms. Sampson. (Doc. 636.)

### b.    2014-2016: SDM Hangley's Work Under the Consents Appointment

From December 2014 through August 2016, SDM Hangley performed substantial work under the Consents Appointment. On August 10, 2016, SDM Hangley issued a report finding that all the Plaintiffs assigned to him for review had knowingly and voluntarily provided the consents at issue. He recommended that the dismissals be ordered. (Doc. 535.) SDM Hangley thus completed his work under the Consents Appointment in August 2016.[16]

---

[16] In July 2018, Ms. Sampson sent SDM Hangley a letter accusing Hagens Berman and Kay Reeves of misconduct. (Doc. 640.) Although the Court had withdrawn SDM Hangley's authority regarding Ms. Sampson, SDM Hangley decided to explore the relationship between Ms. Sampson and her counsel. (Doc. 644 at 6.) SDM Hangley ultimately determined that Ms. Sampson did not prove her allegations and declined to recommend sanctions related to the Firm's representation of Ms. Sampson. (Doc. 767 at 153.)

### 3.    Motions to Withdraw

#### a.    The Appointment

On March 14, 2016, the Court directed SDM Hangley to consider whether motions filed by Hagens Berman in 2014 (the "Withdrawal Motions") seeking to withdraw from its representation of six Plaintiffs should be granted. (Doc. 532 (the "Withdrawal Appointment").) The six Plaintiffs were Richard Anderson, Terrie Bolton, John Marshall, Jose Navamuel, Mary Sells, and John Skelton (the "Withdrawal Plaintiffs").[17]

> The Withdrawal Appointment states:
>
> Mr. Hangley shall issue a Report and Recommendation as to whether Hagens Berman's Motions to Withdraw should be granted. Mr. Hangley must evaluate, *inter alia*, when Hagens Berman first learned that the firm's continuing prosecution of these cases [the cases brought by the Withdrawal Plaintiffs] would purportedly be untenable under Rule 1.16(a)(1) of the Pennsylvania Rules of Professional Conduct. *See Chester v. May Dep't Store Co.*, No. CIV. A. 98-5824, 2000 WL 12896, at *1 (E.D. Pa. Jan. 7, 2000) (significant consideration in deciding withdrawal motion is whether "[there [was] no suggestion that counsel was unaware of his client's history and propensities when he accepted the representation and proceeded to litigate this matter.").

Doc. 532.)

#### b.    2016-2023: SDM Hangley's Work Under the Withdrawal Appointment:

On November 17, 2016, SDM Hangley issued a memorandum outlining the process he would use to evaluate the motions to withdraw that had been assigned to him in the Withdrawal Appointment. (Doc. 539.) On June 23, 2017, the Court approved SDM Hangley's proposed process. (Doc. 561.) In September 2017, SDM Hangley held hearings on the pending motions to withdraw involving the five Plaintiffs. On March 14, 2018, the Court approved SDM Hangley's recommendation that his charter be expanded to consider the conduct of Firm attorney Tyler

---

[17] Mr. Skelton thereafter passed away, leaving five Plaintiffs for SDM Hangley's consideration.

Weaver. (Doc. 593.) In May 2019, SDM Hangley held hearings related to Mr. Weaver's conduct. In May 2021, SDM Hangley held additional hearings related to the motions to withdraw and the issues concerning Carolyn Sampson. Little of substantive note occurred between the May 2021 hearings and the issuance of SDM Hangley's R&R in October 2023.

### C.    SDM Hangley's Sanctions Recommendations Exceed His Assignments.

SDM Hangley issued the R&R on October 12, 2023. (Doc. 767.) By that date, SDM Hangley's only remaining duty under the orders of appointment was to provide a report and recommendations under the Withdrawal Appointment regarding Hagens Berman's motions to withdraw from its representation of five Plaintiffs. The R&R does indeed address the five motions to withdraw assigned to SDM Hangley, recommending that three of those motions be granted and that two be denied. (*Id.* at 5, 124-144.)

However, the R&R goes far beyond issues related to the Withdrawal Appointment. It is a lengthy and almost wholly pejorative depiction of decisions made and actions taken by the Plaintiffs' lawyers from 2011 forward. It generally addresses the filing and prosecution of all 11 Complaints on behalf of all 52 Plaintiffs and bases its recommendation that various undefined sanctions be levied (*id.* at 147-152) on that lengthy recitation. SDM Hangley exceeded his authority in making those recommendations.

### 1.    Express Authority

SDM Hangley's express authority to consider and make recommendations related to sanctions was set forth in the Discovery Appointment and was limited to consideration of requests for sanctions. SDM Hangley discharged this duty in December 2014. <u>No additional requests for sanctions were made or referred to him.</u>

### 2.    Implied or Inherent Authority

SDM Hangley had implied or inherent authority to consider and make recommendations related to sanctions if doing so was in service of performing his "assigned duties fairly and efficiently." Fed. R. Civ. P. 53(c)(1)(B). Through this lens, the following addresses the Court's summary of SDM Hangley's factual bases for recommending unspecified sanctions.

a.    <u>Discovery obstruction</u>: The Court's Memorandum Opinion states that in the R&R, SDM Hangley recommended that sanctions be assessed against Hagens Berman for its alleged discovery-related "obstruction." (Doc. 834 at 23.) As discussed above, the R&R does not recommend that the Firm be sanctioned for discovery-related misconduct; rather, it discusses generally the discovery rules governing sanctions and then expressly notes that Mr. Berman should not be sanctioned individually for any discovery abuses. (Doc. 767 at 147-49.)

Even if the R&R contained recommendations that the Firm be sanctioned for alleged discovery obstruction, such recommendations would have been outside of SDM Hangley's authority. As noted above, SDM Hangley exercised his express authority to recommend discovery sanctions in December 2014. If, despite the clear limitations set forth in the Discovery Appointment, SDM Hangley also had implied or inherent authority to recommend discovery sanctions that were not requested by any party, he should have exercised such authority in 2014, when his work under the Discovery Appointment ended. Any recommendation nine years later that discovery sanctions be imposed would not be in service of completing his assigned duties "fairly and efficiently," and therefore would exceed whatever implied or inherent authority he may have had.

b.    <u>Unprofessional treatment</u>: SDM Hangley recommends that Hagens Berman be sanctioned because its lawyers allegedly attempted to "bully the Special Master, demonize the Court in the eyes of the plaintiff-witnesses, and intimidate the court reporter." (Doc. 767 at 152.)

SDM Hangley's allegations arise from the witness interviews he conducted with certain Plaintiffs in June 2015 while working under the Consents Appointment to determine whether those Plaintiffs knowingly consented to the dismissal of their claims. Hagens Berman agrees that SDM Hangley had inherent authority to recommend sanctions arising out of those witness interviews (although Hagens Berman disagrees that sanctions would be warranted, *see* SOF ¶¶ 152-168, *infra*). However, SDM Hangley should have exercised that authority in timely fashion, namely on or not long after August 10, 2016, when he found that all the consents were voluntarily given and recommended that the dismissals be granted. Those August 2016 recommendations constituted the completion of SDM Hangley's work under the Consents Appointment. His recommendation that sanctions be imposed more than seven years after the alleged conduct occurred, and his work on that task was completed, cannot be characterized as fulfilling his obligation to complete his assigned duties "fairly and efficiently." Therefore, they exceed his implied or inherent authority.

        c.      <u>Inadequate pre-suit investigation and irresponsible verifying of Complaints</u>: Finally, SDM Hangley goes back to the fall of 2011 and Hagens Berman's original involvement in these cases, finds fault with Hagens Berman's factual investigation and legal theories, castigates Steve Berman for drafting and signing Complaints from 2011 to 2014, and recommends that sanctions be awarded against both Hagens Berman and Mr. Berman. (Doc. 767 at 20-151.) Obviously, these recommendations do not arise from the Discovery Appointment (they do not concern discovery) or the Consents Appointment (they do not concern whether those Plaintiffs knowingly consented to the dismissal of their claims). Rather, they were issued in connection with the Withdrawal Appointment, specifically SDM Hangley's charge to consider whether Hagens Berman should be allowed to withdraw from its representation of five Plaintiffs: Richard

Anderson, Terrie Bolton, John Marshall, Jose Navamuel, and Mary Sells. Indeed, SDM Hangley agrees:

> Respecting the withdrawal motions, Judge Diamond's instruction to me, it will be remembered, was to determine whether Hagens Berman knew or should have known of the facts underlying its "professional considerations" ***when it accepted the representation of each of the Five Plaintiffs and sued on her behalf***.

(Doc. 767 at 32 (emphasis added).)

SDM Hangley had implied or inherent authority under Rule 53(a)(1)(C) to recommend sanctions if doing so was in fulfillment of the fair and efficient discharge of his duties under the Withdrawal Appointment. This means that, at most, SDM Hangley had authority to recommend sanctions in connection with Respondents' representation of Plaintiffs Anderson, Bolton, Marshall, Navamuel, and Sells. SDM Hangley does find fault with the Firm's pre-suit investigation and subsequent decision to bring claims on behalf of Plaintiffs Bolton (Doc. 767 at 100-102, 124-125), Navamuel (*id.* at 125-132), and Sells (*id.* at 137-144); to the extent his sanctions recommendations can be said to pertain to Respondents' representation of those three Plaintiffs, such recommendations would not exceed his implied or inherent authority.[18]

However, SDM Hangley had no authority to make broader sanctions recommendations. Paradoxically, SDM Hangley repeatedly finds fault with Hagens Berman for painting with a broad brush in filing these lawsuits and not, according to SDM Hangley, appreciating the need for "52 separate inquiries." (*Id.* at 50.) SDM Hangley then broadly recommends sanctions arising out of Hagens Berman's pre-suit investigation and

---

[18] Respondents continue to contend that what Respondents knew or should have known before filing Complaints on behalf of these three Plaintiffs is not the correct test for whether the motions to withdraw should be granted. Further, Respondents continue to contend that any sanctions imposed are not warranted on the merits and would violate their due process rights.

subsequent filing of claims with respect to all 52 Plaintiffs even though SDM Hangley was assigned to investigate such issues with respect to only five of those Plaintiffs. SDM Hangley had no conceivable implied or inherent authority to review "the entire record" and make his sweeping recommendations.

For these reasons, Respondents ask that all of SDM Hangley's pending sanctions recommendations be rejected for lack of authority save for those recommendations that may be said to apply to Plaintiffs Bolton, Navamuel, and Sells; any such recommendations should be rejected on other grounds, as set forth above.

## V.    THE FACTS SET OUT BELOW DEMONSTRATE THAT SANCTIONS MAY NOT BE IMPOSED HERE.

The R&R does not recommend specific sanctions based on specific conduct, but instead broadly "recommend[s] that the firm be sanctioned for the conduct of Mr. Berman and, further, for the conduct of the late Mr. Styant-Browne and other lawyers mentioned here." [Doc. 767 at 156.] The statement of facts set out below, and accompanying exhibits, along with the testimony submitted and various filings in this matter, demonstrate that sanctions are not appropriate here. As a prefatory note, evidence submitted in support of this Response need not meet the standards of admissibility at trial, but merely have some indicia of reliability. *See* Joseph, *supra*, § 17(A)(19); s*ee also* [Ex. 1 (Declaration of Keith Beauchamp) (providing foundation and other information as to certain exhibits).]

### A.    Hagens Berman is a Highly Regarded Firm With a Strong Culture.

1.    Hagens Berman is a litigation firm headquartered in Seattle, Washington. The Firm was founded in 1993 with the goal of fighting for the rights of plaintiffs, including consumers, whistleblowers, employees, investors, and others. The Firm's success can be attributed, in large part, to its lawyers' willingness to think creatively and assert novel legal theories where traditional

claims may fail—but only after careful consideration. Steve Berman is the Managing Partner of the Firm. [Ex. 2 (Declaration of Steve Berman) ("Berman Decl.") ¶¶ 4, 5.]

2.     This philosophy has enabled the Firm to achieve remarkable results for its clients. For example, in the late nineties, Hagens Berman was one of the few private law firms that helped bring state attorneys general government tobacco law enforcement and medical cost recovery actions against a well-funded tobacco industry. During the state tobacco litigation, the Firm made innovative legal and strategic decisions that paved the way for success, including asserting state law enforcement claims, rather than traditional tort claims, against the tobacco companies. Indeed, the claims were so novel that only two law firms in the State of Washington responded to the Attorney General's RFP for the case. When Mr. Berman was in his third month of trial for the State of Washington, the case (along with other cases on behalf of attorneys general) settled for $206 billion—the largest civil settlement in history. [Ex. 2 (Berman Decl.) ¶ 6.]

3.     In 2018, Mr. Berman and co-lead counsel Jeffrey Kessler of Winston & Strawn conducted a 10-day bench trial on behalf of a nationwide class of college athletes challenging NCAA-imposed caps on college athlete scholarships. The district court issued a permanent injunction enjoining the NCAA limits on education-related benefits as unreasonable restraints of trade. The district court's injunction was affirmed by both the Ninth Circuit and, later, by the United States Supreme Court in a 9-0 ruling. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021). The Court concluded that the "judgment does not float on a sea of doubt but stands on firm ground—an exhaustive factual record, a thoughtful legal analysis consistent with established antitrust principles, and a healthy dose of judicial humility." *Id*. at 2166. In June 2025, the district court granted final approval to a historic settlement that ensures that college athletes will be fairly compensated for the benefits they have provided for decades to the NCAA and its

members. [Ex. 135 (Supplemental Declaration of Steve Berman) ¶ 10] This includes, among other things, a requirement that NCAA member institutions share a portion of athletic revenue with their athletes, and that the NCAA eliminate rules limiting the number of scholarships each institution can award its athletes. [*Id.* ¶ 8]

4.      Recently, Mr. Berman and his co-lead counsel also obtained a complex nationwide settlement with the National Association of Realtors which eliminated a mechanism that kept realtor commission rates artificially high, thereby ensuring that homebuyers have access to the full range of homes on the market without hidden economic biases. [*Id.* ¶ 13] This represented one of the most significant successes in modern antitrust litigation, delivering meaningful relief to consumers and reforming a dominant industry practice that had persisted for decades. [*Id.*]

5.      The Firm usually seeks monetary awards on behalf of its clients but also aims to create tangible change and obtain justice for individuals who have limited access to the courts. The Firm's litigation efforts have brought about new education programs, testing and research, and have achieved major victories benefiting the environment and sustaining human rights. [Ex. 2 (Berman Decl.) ¶ 7.] Indeed, the Firm regularly takes on "cause cases"—matters that will not be revenue generators but are nonetheless viewed as worthwhile investments because they seek to remedy systemic injustices. For example:

- Rio Tinto/Bougainville Litigation. In November 2000, the Firm represented a proposed class of citizens of the Island of Bougainville against the operator of the world's largest copper mine, which it alleged had violated international law by dumping billions of tons of mine waste on the island. [Ex. 2 (Berman Decl. ¶ 7.] Despite difficult and complex legal hurdles under the Alien Tort Statute, the Firm litigated the case for more than a decade, resulting in a favorable Ninth Circuit decision. *See Sarei v. Rio Tinto,*

*PLC*, 671 F.3d 736 (9th Cir. 2011) (later vacated in light of *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013); *see also Sarei v. Rio Tinto, PLC*, 722 F.3d 1109 (9th Cir. 2013)).

- FIFA & U.S. Soccer Concussions. On behalf of several soccer players, the Firm filed a class action against U.S. Soccer's governing bodies, which led to life-changing safety measures for millions of youth soccer players. Players represented by Hagens Berman alleged these groups failed to adopt effective policies to evaluate and manage concussions, leaving millions of players vulnerable to long-lasting brain injury. The settlement against six of the largest youth soccer organizations greatly diminished risks of concussions and traumatic head injuries and resulted in new return-to-play guidelines and benchmarks for concussion measurement. When the Firm took the case it understood that there would be no common fund from which it could obtain fees and the fees it ultimately received were modest. [Ex. 2 (Berman Decl. ¶ 7).]

- NCAA Concussion Litigation. Hagens Berman sued the NCAA for failing to prevent concussions and protect student-athletes who suffered concussions. Mr. Berman served as lead counsel and the resulting settlement brought sweeping changes to the NCAA's approach to concussion treatment and prevention. [Ex. 2 (Berman Decl. ¶ 7).]

6.      The Firm's commitment to social change is a fundamental part of its culture. As its website acknowledges, it seeks and attracts young attorneys who want to "change the future through innovative applications of the law" and "focus on litigation that has big impact both in making plaintiffs whole and shaping the future." [*See* https://www.hbsslaw.com/about/working-at-hagens-berman; *see also* Ex. 2 (Berman Decl.) ¶ 9.]

7.      The Firm and Mr. Berman have received countless accolades from the legal community. The Firm has been named to the National Law Journal's Plaintiffs' Hot List eight times. And Mr. Berman has, among other things, been named as a Titan of the Plaintiffs' Bar by Law360 (2018, 2020, 2022); a Plaintiffs' Attorneys Trailblazer by the National Law Journal (2017, 2022); a Finalist for Trial Lawyer of the Year by Public Justice (2014); and one of the 100 most influential attorneys in America by the National Law Journal (2013). [Ex. 2 (Berman Decl.) ¶10.]

8.      Federal judges regularly rely on both the Firm and Mr. Berman for insight into complex commercial cases; Mr. Berman has been appointed as lead counsel in multiple multi-district litigation matters. [Ex. 2 (Berman Decl.) ¶ 12.] In one of those cases, the judge commented on his fellow district court judges' "high praise" for Mr. Berman's skills and track record. *In re Stericycle, Inc.*, No. 13 C 5795, 2013 WL 5609328 (N.D. Ill. Oct. 11, 2013) (order appointing interim class counsel). [Ex. 2 (Berman Decl.) ¶ 12.] In an order granting class counsel's motion for attorney's fees and costs, the judge noted that "the efforts of Class Counsel showed significant skill and dedication on behalf of the Class, and . . . Class Counsel achieved excellent results . . . ." *See In re Stericycle, Inc.*, No. 13 C 5795, Doc. 382 (N.D. Ill. March 8, 2018).

9.      In 2010, a federal judge in California appointed the Firm as co-lead counsel to represent 20 million class members against Toyota for its sudden unintended acceleration defect and subsequent economic loss to vehicle owners. [Ex. 2 (Berman Decl.) ¶ 12.] The judge praised the Firm and other class counsel for having "consistently demonstrated extraordinary skill and effort." *In re Toyota Motor Corp. Unintended Acceleration Mktg. Sales Practices, & Prods. Liab. Litig.*, Case No. CV 10-ML-2151 (C.D. Cal.), Dkt. No. 3933 at 12. The same year, a judge in the Northern District of California appointed the Firm as the "clear choice" to represent the interests of plaintiffs as interim class counsel in an antitrust case; the case resulted in settlements totaling

$180 million. *See In re: Optical Disk Drive Prod. Antitrust Litig.*, No. M:10-2143 VRW, 2010 WL 11428028, at *2 (N.D. Cal. June 4, 2010).

10.     In 2016, the Firm was appointed to the plaintiffs' steering committee in the nationwide class action lawsuit against Volkswagen on behalf of franchise dealers regarding its "defeat device" emissions software. The Firm's efforts, along with other firms, resulted in $1.67 billion in benefits to Volkswagen dealers. [Ex. 2 (Berman Decl.) ¶ 12.] Additional comments from judges about the Firm and its co-counsel are highlighted in Exhibit 3.

11.     In November 2023, a federal judge in California granted class certification to three classes of athletes, represented by Mr. Berman and another lawyer, who are challenging NCAA restrictions on their name, image, and likeness rights. Law360 described the decision as a "huge procedural victory" for Mr. Berman's clients. [Ex. 2 (Berman Decl.) ¶ 13.)]

   **B.     The Firm's Introduction to Potential Thalidomide Claims and Peter Gordon.**

12.     In April 2011, Hagens Berman lawyer Nick Styant-Browne was approached by Peter Gordon, one of Australia's most prominent plaintiff-side lawyers, about potentially joining forces to represent thalidomide victims in the United States. Mr. Styant-Browne had practiced in Australia and was familiar with Mr. Gordon. [Ex. 2 (Berman Decl.) ¶ 14.]

13.     Mr. Gordon is a highly respected and decorated Australian lawyer who has spent his career representing those who lack access to the legal system, including sexual abuse victims and those injured by defective products. His work has also created important legal precedent, including the right of Australian workers to claim punitive damages from their employer, and the direct tort liability of parent companies whose guiding hand put the employees of their subsidiary

companies in harm's way. [Ex. 4 (07/1/14 Alumni Profile of Peter Gordon from Melbourne Law School); Ex. 5 (biography from Gordon Legal)][19]

14.    In 2010, Mr. Gordon formed Gordon Legal to bring claims on behalf of Australian and New Zealand ("AZN") thalidomide survivors as a result of his friendship with a one such survivor and his pro bono work assisting in the creation of an agreement to benefit AZN survivors. That agreement, reached in 2010, resulted in Diageo plc (successor to the AZN distributor of thalidomide, The Distillers Company, plc) paying additional compensation to the 46 Australia and New Zealand thalidomide survivors who had originally received compensation from Distillers in the 1960s and 1970s. [*See* Ex. 6 (P. Gordon Submission to Australian Parliament (January 29, 2019))[20].]

15.    As a result of his work for Australian thalidomide survivors, Mr. Gordon was invited as a special guest to Australia's Parliament House in November 2023 as the Australian Prime Minister delivered a national apology to thalidomide survivors; he later spoke at the

---

[19] *Available at* https://gordonlegal.com.au/people/peter-gordon/ (Gordon Legal Biography) and https://law.unimelb.edu.au/alumni/alumni-profiles-and-accomplishments/alumni-profiles/gordon-peter (Melbourne Law School Alumni Profile) (last accessed Sept. 30, 2025).
[20] *See* Support for Australia's thalidomide survivors, Submission 66, "Submission of Peter Gordon re Thalidomide Inquiry," *available at*:
https://www.aph.gov.au/DocumentStore.ashx?id=6a67df4b-f5e3-4b9b-a3b1-a6b10a73cf3a&subId=666381 (last accessed Sept. 30, 2025).

unveiling of the dedication site for Australia's thalidomide community in Canberra.[21] He previously had delivered remarks to Australia's Parliament House in January 2019.[22]

16.    Mr. Gordon also brought class action suits against Grünenthal, the German inventor and manufacturer of thalidomide, and the UK Distillers companies, which distributed the drug in Australia. The cases tripled the number of Australians and New Zealanders recognized as thalidomide survivors and were eventually settled for approximately $100,000,000. [Ex. 6 (P. Gordon Submission to Australian Parliament (January 29, 2019)).]

17.    In 2011, Mr. Gordon informed Hagens Berman that he was considering bringing claims on behalf of thalidomide victims in the United States and in Canada. To that end, he had formed the law firm of Gordon & Reeves LLP with Texas attorney Kay Reeves. [Ex. 2 (Berman Decl.) ¶¶ 14, 15.]

18.    After its investigation of the law and facts, Hagens Berman was interested in bringing the claims along with Gordon & Reeves. But Gordon & Reeves initially elected to join forces with The Lanier Law Firm, which was also headquartered in Texas. [Ex. 2 (Berman Decl.) ¶¶ 15.]

---

[21] Dedication Ceremony, National Site of Recognition for Thalidomide Survivors and their Families, November 30, 2023, *remarks available at https://www.health.gov.au/sites/default/files/2023-11/dedication-ceremony-for-the-national-site-of-recognition-for-thalidomide-and-their-families-program-booklet.pdf* (last accessed Sept. 30, 2025).

[22] *See* Official Committee Hansard, Senate – Community Affairs References Committee: Support for Australia's thalidomide survivors, January 31, 2019, pp. 28-35, *available at https://parlinfo.aph.gov.au/parlInfo/download/committees/commsen/e43c91ee-7831-4098-b22f-adb6c8eca2e3/toc_pdf/Community%20Affairs%20References%20Committee_2019_01_31_6877_Official.pdf;fileType=application%2Fpdf* (last accessed Sept. 30, 2025).

**C.**     **The Lanier Law Firm and Gordon & Reeves File Thalidomide Complaints.**

19.     The Lanier Law Firm is one of the preeminent plaintiff-side law firms in the United States, obtaining more than $1 billion in verdicts and settlements.[23] Its founder, Mark Lanier, has been recognized as one of the top civil trial lawyers in America on multiple occasions.[24]

20.     The Lanier Law Firm and Gordon & Reeves filed the first thalidomide Complaint ("*Murray*") in Pennsylvania state court on May 26, 2011 on behalf of Robert Murray and Diane Kessler. [*See Murray et al v. SmithKline Beecham Corporation et al,* 2:11-cv-03510-CDJ.] The Lanier Law Firm and Gordon & Reeves also filed a second case on behalf of Glenda Johnson and Steven Lucier ("*Johnson*"). [*See Johnson et al v SmithKline Beecham Corporation et al,* 2:11-cv-05782-PD.] Both cases were removed to federal court and *Johnson* was assigned to Judge Diamond. [Doc. 1]

21.     Hagens Berman replaced Lanier as counsel in those two cases in October 2011. [Doc. 28 (10/27/2011 Order Granting The Lanier Law Firm PLLC's Motion to Withdraw as Counsel.)]

**D.**     **In October 2011, Hagens Berman Begins Filing Claims.**

22.     On October 25, 2011, Hagens Berman and Gordon & Reeves jointly filed a case in state court on behalf of 13 Plaintiffs (*Philip Yeatts, et al. v. SmithKline Beecham Corp. d/b/a GlaxoSmithKline, et al.*) ("*Yeatts*"). *Yeatts* was also promptly removed to federal court. [*See Yeatts et al v. SmithKline Beecham Corporation et al*, 2:11-cv-06711-JHS, Doc. 1.] *Murray*,

---

[23] *See* https://www.lanierlawfirm.com/case-results/ (last accessed Sept. 30, 2025).

[24] *See* https://www.lanierlawfirm.com/attorneys/w-mark-lanier (last accessed Sept. 30, 2025).

*Johnson,* and *Yeatts* were assigned to three different judges in the Eastern District of Pennsylvania.

23.    On March 29, 2012, the Firm's request to remand *Murray* and *Yeatts* to Pennsylvania state court was granted. [*Yeatts*, Doc. 58, *Murray*, Doc. 89.] However, Judge Diamond denied the Firm's remand motion in *Johnson* and stayed the case while Hagens Berman took an interlocutory appeal to the Third Circuit on the remand issue. [Docs. 63-64.]

24.    While waiting for the Third Circuit to rule on the remand issue, the Firm continued to interview potential clients. [Ex. 8 (03/01/2012 email from Mr. Styant-Browne to team).]

████████████████████████████████████████████████████

███████████████████████████████ [*Id.*]

25.    The Firm eventually filed six additional cases while the remand issue was pending (*Spence* on 8/9/12; *Johnson* on 9/24/12; *Gunn* on 11/12/12; *Charleston* on 11/27/12; *Gosser* on 12/20/12; *Brust* on 2/11/13), all which were promptly removed. [*See Spence, et al v. Avantor Performance Materials et al*, 5:12-cv-04542-CDJ, Doc. 1; *Johnson v, GlaxoSmithKline, LLC et al*, 2:12-cv-05455-WY, Doc. 1; *Gunn et al v. Avantor Performance Materials et al*, 5:12-cv-06431-CDJ, Doc. 1; *Charleston et al v. Avantor Performance Materials, et al*, 2:12-cb-06657-CDJ, Doc 1; *Brust et al v. Avantor Performance Materials et al*, 2:13-cv-00758-CDJ, Doc. 1] It later filed two more cases (*Alexander* on 8/7/13; *Griggs* on 4/15/14), bringing the total number of filed cases to 11 and the total number of Plaintiffs to 52. [*See Alexander et al v. Avantor Performance Materials et al*, 2:13-cv-04591-CDJ, Doc. 1 and *Griggs et al v GlaxoSmithKline LLC et al, 2:14-cv-02186-PD*, Doc. 1.]

26.    As discussed below, the Firm ████████████████████████████

████████████████████████████████████████████████████

██████████████████████  [Ex. 9 (10/18/2012 letter to Ms. Sells from Mr. Styant-Browne and 03/19/13 letter to Mr. Boiardi from Mr. Styant-Browne); Ex. 10 (Attorney Employment Agreement between the Firm and Roel Garza, making clear that the Firm "has made no promises about the outcome" and that "any opinion offered by [the Firm] in the future will not constitute a guarantee and/or warranty regarding the success of the case.").]

27.    In June 2013, over a year after the Firm filed the appeal, the Third Circuit ruled in *Johnson* that removal was proper. [*Johnson*, Doc. 75.] The Defendants in the 11 cases (the "Thalidomide Defendants") then successfully moved to consolidate the cases before Judge Diamond. [*Johnson*, Doc. 94.] (The 11 cases, separately and as consolidated, are "the Thalidomide Litigation").

**E.    The Firm Conducted an Appropriate Factual and Legal Inquiry Before Filing Its First Complaint in October 2011.**

28.    Gordon & Reeves had begun an intensive factual and legal inquiry into the validity of potential thalidomide claims in the United States by early 2011. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████  [*See, e.g.*, Ex. 11 (04/13/2011 email from Mr. Gordon to Mr. Styant-Browne with an attachment re Challenging the Thalidomide Dogma); Ex. 12 (Reeves' research and investigation); Ex. 13 (04/18/2011 email from Mr. Gordon to Mr. Styant-Browne, attaching

a ███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

29.    In April 2011, the Firm began billing time to the matter. [Ex. 14 (Compilation of Hagens Berman Fees (2011-2015)).]

30.    In August 2011, Mr. Gordon approached the Firm about replacing The Lanier Law Firm. Hagens Berman agreed; ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ [Ex. 2 (Berman Decl.) ¶¶ 15, 17.] The Firm subsequently entered appearances in the *Murray* and *Johnson* cases and thereafter co-counseled on the thalidomide cases with highly respected Philadelphia attorney Jeffrey Kodroff (as well the Gordon & Reeves firm). [(*Murray, 11-CV-03510* (Doc. 61 (Order Granting Lanier Law Firm's Motion to Withdraw as Counsel and Substitute Counsel), Doc. 68 (Notice of Appearance by Steve Berman), Doc. 69 (Notice of Appearance by Craig Spiegel), Doc. 70 (Notice of Appearance by Nick Styant-Browne); (*Johnson, 11-CV-05782,* Doc. 25 (Notice of Appearance by Steve Berman), Doc. 26 (Notice of Appearance by Craig Spiegel), Doc. 27 (Notice of Appearance by Nick Styant-Browne, Doc. 28 (Order Granting Lanier Law Firm's Motion to Withdraw as Counsel and Substitute Counsel).]

31.    The R&R states at various places (and somewhat inconsistently) that Ms. Reeves was essentially fired in September 2011 and that she stopped working on the thalidomide cases in May 2012. [*Compare* Doc. 767 at 79-80 (claiming that Peter Gordon gave Ms. Reeves "the sack" and that her work with the Firm ended in May 2012); *with id.* at 27-28 (stating that Ms. Reeves was working as late as August 2012); *see also id.* at 79 (claiming that Ms. Reeves was "shown the door" around Labor Day 2011).] The Firm objects to the finding that Ms. Reeves' work with the Firm ended in May 2012; on the contrary, she was involved as late as the end of 2012. [Ex. 34 (July 2012 email exchange between Mr. Berman and Ms. Reeves, discussing substantive matters,

including GSK's response to the statute of limitations theory); Ex. 78 (08/20/2012 email from Ms. Reeves to Mr. Styant-Browne noting that ███████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ Ex. 71 (October 2012 email exchange between Mr. Berman and Ms. Reeves regarding ████████████] Nor was she "given the sack" by Peter Gordon or "shown the door." [Doc. 767 at 31, 79] The record reflects that her decision to withdraw from the Thalidomide Litigation was voluntary. [*See, e.g.,* Ex 7 (07/23/2012 (Email to Ms. Reeves from Mr. Styant-Browne).]

32.    The R&R states that "a lot of the information [Ms. Reeves] shared with Hagens Berman . . . was either ignored or actually contradicted in several of the cases mentioned in this Report. *See* Reeves000026795, Reeves000026866, Reeves000030567, Reeves000030838, Reeves000030991, Reeves000036289, Reeves000036302." But the R&R does not identify what "information" in Ms. Reeves' documents was purportedly "ignored or . . . contradicted" in "several of the cases mentioned" in the R&R. Moreover, some of these documents cited contain information about multiple Plaintiffs. [*See* Reeves030991 (spreadsheet with information about 18 Plaintiffs) and Reeves30567-69 (notes regarding 17 actual or prospective Plaintiffs).] Accordingly, without more specific information, the Firm cannot meaningfully respond to this statement..

       **1.**      **The Firm Extensively Researched and Developed its Statute of Limitations Arguments Before Filing the *Yeatts* Complaint.**

33.    The R&R states that "[f]rom May 2012 to October 2013 – a time in which a lot of important events occurred – the Plaintiffs' team in the growing list of cases seems to have had plenty of generals (Berman, Gordon, Spiegel, Styant-Browne) and no visible foot soldiers, none of the less senior lawyers who, along with their paralegal colleagues and investigators, typically gather and evaluate encyclopedic knowledge of, here, 52 clients' separate cases, with their 52

discrete histories, casts of characters, and issues." [Doc. 767 at 80.] The Firm objects to the statement that it did not adequately staff its cases, that it did no meaningful work during the May 2012 to October 2013 period, and that Mr. Styant-Browne, Mr. Speigel and Mr. Berman were "generals." As discussed below, the Firm staffed the cases with numerous lawyers, performed significant work during that period, and Mr. Styant-Browne, Mr. Speigel and Mr. Berman were heavily involved in the case—not only at the strategic level, but also with respect to the Firm's investigation and prosecution of the claims.

34.    From April 18, 2011 (when the Firm first started billing its time) until October 27, 2011 (one day before *Yeatts* was filed), Firm staff and attorneys billed over 713 hours to factual investigation, legal research into the statute of limitations and causes of action under Pennsylvania law, and extensive discussions with Peter Gordon and Kay Reeves. Time entries from this period include: "Legal research re ███████████████████████████████████████ ███████████████████████████████████ "Further research re statute of limitations; begin drafting memorandum re same;" "Case investigation;" and "Review docs." Over this six-month period, over 170 hours' worth of time entries included research specifically related to the statute of limitations. [Ex. 14 (Hagens Berman Fees).]

35.    Hagens Berman expended significant time and substantial resources on the Thalidomide Litigation and staffed the cases with a large number of attorneys and paralegals. In the period April 2011 through December 2015, Firm Professionals recorded nearly 20,000 hours of work on the cases (equating to $9,130,775 in attorneys' fees); the Firm has paid over $850,000 in hard costs. [Ex. 2 (Berman Decl.) ¶ 21]; Ex. 14 (Hagens Berman Fees); Ex. 15 (Compilation of Hagens Berman Expenses (2011-2015)).]

36.    In communicating with its clients, before and after filing suit,  The

Firm's standard representation agreement noted:



[Ex. 9 (10/18/2012 letter to Ms. Sells)]

37.    The Gordon & Reeves' initial client communication included

[*See* Ex. 16 (11/11/10 Gordon & Reeves letter.]

38.    Both Gordon & Reeves and the Firm requested that clients

[*See id.*;

*see also* Ex. 17 (09/17/12 Letter to Ms. Sells)]

39.    The Firm also kept clients                                    [Ex. 18,

(09/14/2012 exemplar Letter to Mr. Yeatts).]

40.    By the time the Firm filed the *Yeatts* Complaint, it had concluded that the Thalidomide Plaintiffs had viable claims, notwithstanding the statute of limitations, for several reasons. The Firm's three primary theories of relief—the "March of Science" theory, the "discovery rule exception" theory, and the "fraudulent concealment" theory, are discussed in detail below.

71

41.     As a threshold matter, however, the R&R incorrectly concludes that the Firm failed to differentiate between various Plaintiffs in applying the foregoing theories. For example, the R&R characterizes paragraphs 11 and 12 of the *Spence* Complaint as "plainly false" because they supposedly "asserted that each of the eleven [Plaintiffs] had a [March of Science] excuse for a half-century tolling of the statute of limitations under the discovery exception to the applicable statute of limitations, and that each of them was late in learning that thalidomide caused her injury because the defendants fraudulently concealed the truth[.]" Doc. 767 at 53. It then states that the March of Science theory could not possibly apply to Plaintiff Tawana Williams' case given her "fairly typical" thalidomide injuries. *Id.* at 54. *But paragraph 12 of the Spence Complaint specified that the various theories were asserted in the alternative:* "Plaintiffs bring this action now because they could not have reasonably known until recently, due to advances in science, that their injuries were caused by thalidomide **or** because defendants concealed their role in the thalidomide tragedy and the truth in that regard was recently uncovered due to extraordinary activities." Spence Compl. ¶ 12 (emphasis added).

42.     The Firm brought Ms. Williams' claims based on the fraudulent concealment and discovery rule exception theories, <u>not</u> the March of Science theory. *See id.* ¶ 31 ("Tawanna was aware she may have been a thalidomide baby, but *only recently learned of the role of [the specific Defendants] in the thalidomide tragedy and could not have reasonably discovered their role [previously].*") (emphasis added).[25] Similarly, while the R&R states that Jack Merica's claims in the *Spence* Complaint "could obviously not be based on the [March of Science] theory" given that his birth injuries were "textbook thalidomide," a careful review of the *Spence* Complaint makes clear that Mr. Merica's claims were also based on the fraudulent concealment theory.

_____

[25] The Firm addresses its basis for bringing Ms. Williams' claims at SOF ¶¶ 224-226, *infra*.

Spence Compl. ¶ 22 ("Neither Jack nor his family knew the names of any companies responsible for the distribution of thalidomide in the USA. With no clues to follow, Jack was left with no understanding of what it meant to be a thalidomider and no idea who was responsible for developing and distributing the drug, and the exact role of each Defendant was not reasonably ascertainable in part due to acts of concealment set forth below."). These are just a few examples of the R&R mischaracterizing or ignoring crucial details to support its conclusion that the Firm acted in bad faith.

### 2. Theory No. 1: The March of Science Theory.

43. The first theory was that the Thalidomide Plaintiffs' claims were not barred by the statute of limitations because the medical community in the United States had only recently begun to realize that thalidomide-related birth defects were far more varied and wide-ranging than originally thought. Shortly after the height of the thalidomide crisis in the United States, the medical consensus was that the drug caused a narrow set of defects—namely, bilateral and symmetrical deformities in those exposed to the drug before birth. [*See*, *e.g.*, Doc. 262-7 (Declaration of Dr. Trent Stephens i/s/o Andre Opp. to MSJ), ¶18); *see also* 05/10/2019 Tr. at 922:7-19 (Reeves' testimony discussing the March of Science theory and orthodox medical consensus); *see also* ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

44. The Orthodox Criteria was quickly published in British and European medical journals after the height of the crisis in Europe, based mainly on severe damage patterns seen in children whose mothers had known exposure to thalidomide. ███████████████████████

45. The Orthodox Criteria was highly influential—so much so that major scientific studies of Thalidomide of the 1960s and 1970s excluded whole classes of injuries or children

because their injuries did not fall within the accepted framework. For example, some of the studies pre-selected children with severe damage for assessment yet ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████

46.    In the years that followed, there were limited criticisms of the Orthodox Criteria within certain corners of the medical and scientific community. A 1976 paper, for example, noted that the commonly accepted constellation of defects associated with thalidomide constituted "only part of the total spectrum of thalidomide embryopathy." [Ex. 20 (10/18/2011 email exchange between Mr. Gordon and the Firm) at 1-2.] Another paper from 1963 implicitly acknowledged that limb malformations were not always bilateral, and noted that information was still inadequate on clinical manifestations of thalidomide syndrome. [Ex. 21 (10/13/2011 email exchange between Ms. Reeves, Mr. Gordon and Mr. Styant-Browne).] Additionally, subsequent research on different issues entirely (such as the therapeutic use of thalidomide to treat leprosy and Crohn's disease) identified, as a secondary finding, "additional information about the mechanisms by which thalidomide operated in the body." [(05/09/2019 Tr. at 743) (Reeves testimony).]

47.    When deciding the summary judgment motions before the Court in 2014, Judge Diamond found that the existence and availability of this decades-old data necessarily undermined the March of Science theory. [*See, e.g.*, Doc. 372, *Johnson*, 55 F. Supp. 3d at 613-14; *see also* Doc. 767 at 70 (noting that "the 'new' scholarly theory [that Dr. Stephens] was trumpeting [in summary judgment briefing] had been in the public theater for generations.").] Similarly, in the R&R, SDM Hangley stated that "Ms. Reeves and Peter Gordon's investigative

efforts during the short life of Gordon & Reeves, LLC do not seem to have yielded any eye-opening revelations about causation or New Science." [Doc. 767 at 28.]

48.    The Firm objects to the determination that the existence and availability of decades-old data undermined the March of Science theory and the Firm's statute of limitations argument. As Dr. Stephens explained in a December 2014 declaration:

> I understand that my opinion on the availability of experts has been questioned. Those questions appear to be based on the assumption that because data have been available for some time, those data can easily become the basis of expert opinion. That assumption ignores the powerful force of paradigm in science. The history of genetics is a perfect example of this condition in science. Gregor Mendel published his discovery that inherited traits are passed on to descendants in discrete packages, which we now call genes, in 1866. Experts in the field rejected Mendel's work because they adhered to the paradigm of "blended inheritance," which proposed that all characteristics of an individual were passed on in various proportions to the offspring. In the spring of 1900, two researchers, Hugo de Vries and Carl Correns, independently discovered the same patterns of inheritance as had Mendel and only then discovered that Mendel had already published on the same concept. For the intervening 34 years, it is a well-established fact in science history that no one referred to Mendel's work in a positive light. Therefore, even though the data existed, no experts could have been found during those years who would testify that a given human defect had a Mendelian inheritance pattern, largely because Mendel's work, although published, was lost to the scientific community and had to be "rediscovered" in 1900. Even over the next 20 years, the importance of Mendel's work was hotly debated in the scientific community.

[Doc. 428-2 at 13, ¶ 20 (12/18/14 Decl. of Dr. Stephens i/s/o Opposition to MSJ re Tammy Jackson).]

49.    In other words, the fact that scientific data was available in the past did not mean that it had gained acceptance in the scientific community, or that expert witnesses would have been willing or able to testify about it. [*See id.* at 14, ¶ 21 ("[I]t is highly unlikely that [plaintiff] Jackson would have found any expert before October 2009 who would have given the opinion that her birth defects were more likely than not caused by thalidomide.").]

50.    Early criticisms of the Orthodox Criteria never gained prominence in the scientific or medical community, because by the time those criticisms were published, the expanded range

of birth defects caused by thalidomide was not "a research question anyone was interested in." [05/09/2019 Tr. at 744.] Indeed, thalidomide was viewed as a foreign problem that the United States had largely evaded due to the work of Dr. Frances Kelsey, an FDA medical reviewer who had rejected a New Drug Application for thalidomide for lacking sufficient evidence of safety. [*See, e.g.*, Doc. 465 at 27 (discussing Dr. Stephens' view that thalidomide disabilities were a foreign problem and that "American cases were extremely limited and already identified."); Ex. 22 (11/08/11 email from Ms. Reeves to HB team discussing ███████████████

████████████████████████████████████████████████

█████████████████ As recently as 2006, ███████████████████████

████████████████████████████████████████ [Ex. 23 (03/2014

email from Mr. Berman to team, citing ███████████████████████████

████████████████

51.    As a result, a large number of people born in areas where thalidomide was distributed—including the United States—were not considered thalidomide survivors because their injuries did not fall within the specific set of attributes traditionally and stereotypically associated with thalidomide exposure. ████████████████████████

52.    Even decades later, thalidomide's mechanism of action within the embryo is not fully understood. ████████████████████ But the ambit of malformation considered capable of being caused by thalidomide has generally expanded since 2009, as has scientific understanding of biological mechanisms for thalidomide's actions. [*Id.*] Given these recent advances, as well as the ability for genetic testing, there has been a sea change in views on what damage thalidomide causes to embryos. [*Id.* ¶ 15.]

53.    There is now a growing scientific consensus that thalidomide exposure is associated with less obvious damage patterns, including unilateral defects and damage to internal organs (the latter which may only manifest or cause problems later in life). ▮▮▮▮▮▮ ▮▮▮▮; *see also* Ex. 24 (09/26/2013 email exchange between Mr. Berman and Dr. Stephens with attached memorandum re March of Science).] Examples of this medical literature are found in Exhibit 1 to the Declaration of ▮▮▮▮▮▮, attached as Exhibit 19.[26]

54.    Dr. Stephens emphasized the foregoing points at a January 2014 meeting with the Firm, noting that an upcoming conference in Geneva would be "the first time that it is presented that there are a range of thalidomide defects." [Ex. 25 (01/16/2014 Meeting Minutes for Meeting with Professor Stephens) at 3.] He further noted that (i) as late as the 1990s, it was still believed that thalidomide could not cause unilateral injuries; (ii) medical literature showing that thalidomide could cause unilateral defects was largely ignored by experts; (iii) even as of 2014, there were still people who claimed that thalidomide could not cause unilateral defects; and (iv) in the United States, many people with unorthodox defects (i.e., non-limb defects) would still probably never be connected with thalidomide by their doctors. [*See id.* at 3, 4.]

55.    Based on the foregoing, the Firm believed it had a good faith basis for arguing that only shortly before filing suit would Plaintiffs have been able to find an expert witness to testify as to causation, even if they suspected much earlier that thalidomide had caused their unconventional injuries. [*See, e.g.*, Johnson Appellant's Opening Brief, 2015 WL 4055098, June

---

[26] The R&R makes much of the fact that attorney Stephen Raynes—a proponent of expanding the definition of thalidomide anomalies—did not get along with Ms. Reeves, suggesting that this somehow undermines the credibility of the March of Science theory. *See* R&R at 40. But at the 2021 hearings, Mr. Raynes conceded that (i) what is and is not considered a thalidomide injury has been a "moving target" for many years; (ii) as a catastrophic injury attorney he has accepted cases, and *won* cases, that other attorneys have declined because they viewed the cases as non-meritorious. *See* 5/25/21 Tr. at 200, 217-218.

29, 2015, at *24-37; *see also* Doc. 283-20 (Stephens Decl.) ¶16; Doc. 428-2 (Stephens Decl.) ¶ 21.]

56.     In February 2011, Ms. Reeves met with experts in Australia and developed the March of Science theory. [05/10/2019 Tr. at 921:10-15.] She also ████████████████ in a January 2011 memo to Mr. Gordon ("Reeves Memo"), which Mr. Gordon later forwarded to Mr. Styant-Browne. [Ex. 26 (08/24/11 email to Mr. Styant-Brown from Ms. Presnell attaching Ms. Reeves 1/28/2011 memo).] The Reeves Memo ██████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ [*Id.* at 2.]

57.     This was significant given recent Pennsylvania case law holding "that the state of the medical literature is relevant to the statute of limitations analysis . . . [under this case law] if the literature would not have linked an 'atypical' injury (like a limb deficiency on only one side of the body) as thalidomide-related, the jury would be entitled to conclude that the cause of such an 'atypical' injury was not knowable. Thus, persons . . . with 'atypical' injuries have a better statute of limitations case than those with typical injuries." [*Id.*] The Reeves Memo also cited Pennsylvania case law supporting the proposition that—where there is no reason for a lay plaintiff to suspect the link between the drug and her injury—the question of whether the cause of action has accrued should go to the jury. [*Id.* at 6.]

58.     After reviewing Gordon & Reeves' research on the March of Science theory and conducting extensive research of its own, the Firm believed it had a strong argument that the limitations period should be tolled for Plaintiffs with unilateral injuries (and other unconventional injuries previously not associated with thalidomide). In April 2011, the Firm set up a new client matter for the GSK Thalidomide Litigation, describing it as "P.I. cases v. GSK and others for

those with unilateral deformities that science now shows are caused by thalidomide." [Ex. 27 (04/22/2011 email to Hagens from Ms. Carroll).]

59.    In April and May 2011, the Firm billed over 30 hours to researching statute of limitations issues, including with respect to the March of Science theory. [Ex. 14 (Fees Spreadsheet).] On May 3, 2011, Hagens Berman partner Craig Spiegel circulated an internal memorandum addressing ███████████████████████████████████████████ ████████████████████████████████████████████████████ [Ex. 28 (05/03/2011 memo to Thalidomide file from Mr. Spiegel at 1).] The memorandum ████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████ [*Id.* at 6.] ██████████████████████████████████████████████████████ ████████████████████████████████████████████ [*Id.* at 7.] The memorandum concluded that ████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████ [*Id.* at 8.]

60.    On May 6, 2011, Mr. Spiegel updated the memorandum to discuss ████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

███████ [Ex. 29 (05/06/2011 email from Mr. Spiegel attaching updated memo).] Mr. Spiegel

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████ [*See, e.g.*, Ex. 30 (09/20/2011 email updating Ms. Reeves'

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Ex. 31

(April 2014 Spiegel Memo); Ex. 32 (05/06/2014 email and attached memorandum from

Mr. Spiegel to team regarding ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████.]

### 3.  Theory No. 2: Discovery Rule Exception.

61.    The second theory, under Pennsylvania's discovery rule exception to the statute

of limitations, was that the Thalidomide Plaintiffs could not reasonably have known about the

causal connection between their injuries and thalidomide, even if they may have suspected that

there was a connection. *See Fine v. Checcio*, 582 Pa. 253, 269, 870 A.2d 850, 859 (2005)

(providing that the statute of limitations was tolled "in any case where a party neither knows nor

reasonably should have known of his injury *and its cause* at the time his right to institute suit

arises.") (emphasis added); *see also* Doc. 427 at 16 ("Plaintiffs' good-faith argument is that the

discovery rule does not apply to individuals who merely suspect that their injuries were caused

by a particular medication."). The "salient point" for application of the discovery rule is "the

inability of the injured, despite the exercise of reasonable diligence, to know that he is injured

and by what cause." *Checcio*, 582 Pa. at 267. The "reasonable diligence" standard is not

"absolute," but instead is "what is expected from a party who has been given reason to inform

himself of the facts upon which his right to recovery is premised . . . [while there are very] few facts which diligence cannot discover . . . there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful." *Id*. Put another way, the "reasonable diligence" standard would only preclude a claim if the claimant had access to information sufficient to awaken an inquiry in the first place. █████████████████████████████

████████████████████████████████████████████████████████████████

████████ [*See, e.g.*, Ex. 26 (01/28/2011 memo from Reeves) at 4; Ex. 31 (April 2014 Spiegel Memo) at 22).] Here, the Firm believed that the publicity generated by the thalidomide crisis would not have put a Thalidomide Plaintiff exercising reasonable diligence on notice of her claim for several reasons.

62.    *First*, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ [Ex. 33 (12/23/2011 email to Mr. Styant-Browne from Ms. Reeves); *see also* Ex. 32 (05/06/2014 Spiegel Memo noting that ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ ]

63.    Further, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████



[Ex. 34 (07/30/2012 email to Mr. Berman and others from Ms. Reeves)]. The Firm subsequently

███████████████████████████████████████████████████

████████████████████████████████████ [Ex. 35 (06/01/2014 retainer agreement

between Mr. Howell and Hagens Berman).]

64.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

65.    Moreover, ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████



[Ex. 36 (10/15/2011 email to Mr. Berman & others from Ms. Reeves).] When Mr. Berman

responded by ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ [*Id.* ███████████████████████████]

66.     Defendant-specific media coverage was also buried in obscure places (such as exhibits to congressional records), or couched in language that did not suggest that the Defendants may have distributed the drug to primary care physicians around the country during the applicable time period (i.e., newspaper articles stating that SmithKlineFrench ("SKF")—the precursor company to Defendant GSK— had tested the drug on mice or distributed it in an experimental program). [*See, e.g.*, Doc. 262 (Opposition to Motion for Summary Judgment re Plaintiff Andre) at 24-26.] Thus, the Firm concluded that it could argue in good faith that neither the Thalidomide Plaintiffs nor their families—even if exercising due diligence—would have realistically been able to access this information. ███████████████████████████

████████████████████████████████████████████████████

████ [Ex. 37 (09/29/2011 email between Ms. Reeves and Mr. Styant-Browne).]

67.     *Second*, as discussed above, ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[*See, e.g.*, Ex. 25 (01/16/2014 Minutes of Stephens Meeting) at 4.]

68.     *Third*, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



[Ex. 33 (12/23/2011 email to Mr. Styant-Browne from Ms. Reeves).]

69.   *Fourth,*

[Ex. 38 (11/09/11 Email from K. Reeves to S. Berman et al.]

[*See, e.g., Spence* Complaint at ¶¶ 203-206; *see also* Ex. 25 (01/16/2014 meeting minutes with Dr. Stephens mentioning that                                    .]

70.   This conclusion—

[Ex. 39 (12/08/2014 Ari Brown Memo discussing (at 2)  ███████

████████████████████████████████████████████████████

███████████████████████████ [Doc. 367 at 7-15] (Plaintiffs' Notice of

Supplemental Evidence summarizing deposition testimony from a doctor involved in the SKF

clinical trials, which suggested that "over 90% of the pills that SKF distributed are completely

unaccounted for" and that "SKF lied to the FDA about how many pills [the doctor] received and

distributed, in a blatant attempt to cover up the fact that it had distributed hundreds of thousands

of pills but had no idea where they had gone.").] An internal "Elements of the Claims" outline

dated February 28, 2014 ███████████████████



Ex. 40 (Ms. Mahoney's Elements of the Claims) at 5.]

 71. *Fifth*, the drug was distributed in the United States in a wide variety of forms and

with different product names. This made it difficult for mothers to know whether they ingested

the drug. [*See, e.g.*, *Yeatts* Complaint ¶118; *see* also [(09/26/2017 Tr. (re Bolton) at 127 (Styant-

Browne testimony) (noting that one of the Defendants distributed a drug that was not readily

identifiable by its brand name).]

 72. *Sixth*, several of the Thalidomide Plaintiffs identified by Ms. Reeves only learned

that their mothers believed they may have ingested the drug shortly before filing suit. Their

doctors never told them that their injuries were caused by thalidomide; instead, they were told that their physical problems were merely "acts of God," or the result of "bad luck," rather than manifestations of injuries suffered as a result of something other than natural causes. [*See, e.g.*, Ex 26 (01/28/2011 Reeves Memorandum at 1.] This provided an additional avenue for tolling the statute of limitations under the laws of various states. [06/29/2015 Appellant's Opening Brief in *Johnson v.* GSK, 2015 WL 4055098 at *6 (June 29, 2015); *see also* Ex. 31 (April 2014 Spiegel Memo) (citing Pennsylvania case law ████████████████████████████████ ████████████████████████ at 23.]

### 4. Theory No. 3: Fraudulent Concealment.

73.    The third theory was that the Thalidomide Plaintiffs' claims were not barred by the statute of limitations under the fraudulent concealment doctrine, an estoppel-based theory providing that a defendant "may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Checcio*, 582 Pa. at 271. The limitations period only begins to run "when the injured party knows or reasonably should know of his injury and its cause." [*Id*. at 272.]

74.    Here, the Firm believed that the Thalidomide Defendants had deliberately concealed the extent of their involvement in distributing and marketing thalidomide in the United States. Under this theory, Defendant Grunenthal knew that the drug was dangerous, yet misrepresented the hazards of the drug, and also provided marketing brochures and scientific studies to the other Defendants—SKF and Richardson Merrell—with whom it had licensing agreements to distribute the drug within the United States. Eventually, Grunenthal's co-defendants also learned that the drug was unsafe, but "everyone kept quiet." [05/10/19 Tr. at 941 (Berman testimony); *see also* Ex. 33 (12/23/2011 email from Ms. Reeves to Mr. Styant-Browne and others discussing ███████████████████████████████████████████████████

████████████████████████████████████ Ex. 41 (10/02/2013 discovery requests from Plaintiff to Defendants, RFP No. 26 (requesting all licensing agreements between Defendants and Grunenthal), RFP No. 28 (requesting "all communications between or among any Defendants regarding thalidomide.")).]

75.    The Firm and Ms. Reeves carefully considered this theory throughout 2011 and exchanged memos and research emails on this subject and others. [*See, e.g.*, Ex. 42 (September 2011 Email from Reeves to Mr. Styant-Browne); Ex. 22 (11/08/11 Email from Reeves to Berman, NSB, Spiegel and Gordon discussing ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ [*See, e.g.*, Ex. 43 (08/25/2011 Email from Reeves to Berman).]

76.    Reeves' ████████████████████████—shared with the Firm throughout 2011—also suggested that ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ [Ex. 38 (11/09/2011 email to Mr. Berman & others from Ms. Reeves).] It also suggested that ████████████████

████████████████████████████████████ [*Id.*; *see also* Ex. 42 (09/09/2011 Email to Mr. Styant-Browne from Ms. Reeves attaching memo) (discussing SKF's liability for fraud under Restatement of Torts § 533).]

77.    Similarly, Reeves' research suggested that, ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

[Ex. 44 (10/25/2011 email exchange); Ex. 45 (10/21/2011 email to Mr. Styant-Browne from Ms. Reeves).]   But   Reeves ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ [Ex. 45 10/21/2011 email to Mr. Styant-Browne from Ms. Reeves).] Thus, hundreds of women in the United States may have taken the drug even though it was never approved for use. [Ex. 46 (11/17/2011 Press Release).]

78.   ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████[27] Indeed, in 1962, President Kennedy awarded Dr. Kelsey with the President's Award for Distinguished Federal Civilian Service for preventing "a major tragedy of birth deformities in the United States."[28]

79.    Based on the foregoing, the Firm had a good faith basis for arguing that the thalidomide crisis in the United States was far more widespread than originally thought, and that the Thalidomide Plaintiffs—including those with atypical injuries that medical science had not

---

[27] *See, e.g.*, https://content.time.com/time/subscriber/article/0,33009,873697,00.html.

[28] https://cfmedicine.nlm.nih.gov/physicians/biography_182.html.

yet recognized as thalidomide related—had no way of knowing that thalidomide was the cause of their injuries.

80.     The Firm's research also suggested that 

[*See, e.g.*, Doc. 262 at 40; *see also* Ex. 31 (April 2014 memorandum by Mr. Spiegel ███████████████████████ ) at 28; *see also* 10/01/2014 Tr. of GSK Sanctions Hearing at 73-77.]

81.     The foregoing legal theories were researched extensively before the Firm first filed suit on behalf of Plaintiffs and were the subject of careful consideration and discussion amongst the Firm and its attorneys. [*See, e.g.*, Ex. 2 (Berman Decl.) ¶ 18.]

82.     The Firm also conducted legal research into other aspects of the cases, including with respect to negligence, causation, and exposure. [*See, e.g.*, *id.* ¶ 17; *see also* Ex. 47 (09/23/2011 email exchange between Ms. Reeves, Mr. Berman, Mr. Spiegel & Mr. Styant-Browne).] This included ████████████████████████████████ [*See, e.g.*, Ex. 48 (09/27/2011 email to Mr. Berman and others from Ms. Reeves).] Mr. Spiegel later updated the team ████████ [Ex. 49 (05/05/2014 email to Team from Mr. Spiegel).]

5.    **The Firm and Ms. Reeves Conduct a Thorough Factual Investigation into Their Clients' Claims.**

83.    In addition to its legal research, the Firm and Ms. Reeves also conducted an appropriate factual investigation into their clients' claims. As early as October 2011, an internal Firm memo noted ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ [Ex. 50 (Thalidomide Case Background Questions).] In the same briefing, the Firm noted ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ [*Id.* at 5.] Although the Firm relied on Gordon & Reeves' initial work, it also took a proactive and hands-on approach to the litigation from the start. [*See* Ex. 44 (10/24/11 email from Ms. Reeves, ██████ ████████████████████████████████████████████████████████████ █████████████ ]

84.    The Thalidomide Litigation was difficult in that Plaintiffs were unable to rely on direct evidence of exposure (such as prescription records). Because the Thalidomide Defendants had distributed thalidomide as an experimental drug within the United States—without a prescription and without even identifying it as thalidomide—there was little evidence of direct exposure. [*See, e.g.*, Doc. 341 (Opp. To Sanctions Motion in Garza) at 4.] Although Hagens Berman also worked hard ████████████████████████████████████████████ ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ [Ex. 2 (Berman

Decl.) ¶ 19.] That said, the Firm worked diligently to ensure it had indirect evidence of exposure

before filing the claims—for example, the fact that certain claimants came from families with no

congenital abnormalities, and/or that certain claimants were born during a time period in which

thalidomide was unquestionably present in the United States and distribution of the drug was

uncontrolled. [*See, e.g.*, Doc. 341 at 4-5.]

6.    **The Firm Obtained Medical Records from Existing and Potential Clients.**

85.    At the outset, the Firm attempted to ████████████████████


███████████████ [*See also* Ex. 51 (03/22/2012 client email telling clients ████████████

███████████████████████████████████████████████ Ex.

52 (08/23/2012 email to potential client from Ms. Barnes ████████████████████

██████████████████████████████████████ ]

86.    But clients often did not have older medical records—particularly their birth-

related records, which were "almost impossible" to obtain. [(09/27/2017 Tr. at 10:38 a.m. at

136:11-137:12 (re Sells).] That said, to the extent clients were able to provide such records, the

Firm collected and reviewed them. [*Id.* at 140:1-4).] It also ██████████████████████

███████████████ [*See, e.g.*, Ex. 53 (08/27/2012 email) (██████████████████

████████████████ ] *Time records show that Firm attorneys and staff billed 950*

*hours and spent $213,000 for tasks that included investigating, collecting, and reviewing medical*

*records from 2011-2014.* [*See* Ex. 14 (Hagens Berman Fees); Ex. 15 (Compilation of Hagens

Berman Expenses (2011-2015)).]

### 7. The Firm Conducted Plaintiff-Specific Investigations.

87. The R&R states that the "hard plaintiff-by-plaintiff, physician-by-physician, family-by-family investigation was generally left up to a single outside individual, Ms. Reeves." [Doc. 767 at 79.] The Firm objects to this finding. The investigation was a group effort that involved several Firm attorneys, in particular Mr. Styant-Browne, who testified that he or another Hagens Berman lawyer spoke with Ms. Reeves about each Plaintiff for whom a complaint was filed; he reviewed the intake documents, notes, and available medical records; and he personally spoke to each of the Plaintiffs regarding, ███████████████████████████

████████ [*See e.g.*, 09/28/2017 Tr. at 9:00 a.m. at 58:2-9, 66:2-11 (re Marshall); 9/28/2017 at 11:3-24 (re Anderson); 9/28/2017 at 9:00 a.m. at 27-30 (re Navamuel); 5/7/2019 Tr. at 118-120, 130-133.]

88. Before the Yeatts Complaint was filed in October 2011, Mr. Styant Browne spent over 300 hours on document review and factual investigation, including reviewing Plaintiff-specific allegations with an eye toward the statute of limitations. [Ex. 14 (Fees Spreadsheet) (Styant-Brown time entries from September and October 2011 re "work on . . . SOL facts each plaintiff;" and "Review docs").] In November 2011, he billed roughly 140 hours to further factual investigation, including a review of client medical records. [*Id.* at 6-7.] In July 2012, prior to filing the *Spence* Complaint, he billed nearly 100 hours to, among other things, an analysis of "individual client issues." [*Id.* at 13-14.]

89. The R&R states [Doc. 767 at 69, n. 37] that although Mr. Styant-Brown testified that he "personally spoke with every single plaintiff before filing a Complaint on her behalf," Ms. Reeves's notes "make clear that she spoke directly with Mr. Andre. If so, Andre's and Styant-Browne's recollections are in conflict." But Mr. Andre's and Styant-Browne's recollections are not in conflict, and the Firm objects to the extent this statement suggests Mr.

Styant-Browne's testimony was inaccurate. Ms. Reeves' typed case notes [Ex. 126 (Reeves000036418-19)], indicate that she spoke directly with Mr. Andre; whether Mr. Styant-Browne or anyone else was on her call(s) with Mr. Andre is not reflected in her case notes. That Ms. Reeves spoke with Mr. Andre is not inconsistent with Mr. Styant-Browne's testimony that he spoke with Mr. Andre (and with other Plaintiffs). Mr. Andre testified that his mother gave him a number which he then called and spoke to "[m]y attorneys." [Ex. 125 (Andre depo.) at 26:2-10.] Mr. Andre did not recall which attorney(s) he spoke to. [*Id*. at 28:14-22.] Thus, Mr. Andre's deposition testimony that he spoke to "my attorneys" before the Complaint was filed is consistent with Mr. Styant-Browne's testimony.

### 8.    The Firm and Ms. Reeves Filed and Successfully Prosecuted a FOIA Lawsuit to Obtain and Review Voluminous FDA Records.

90.    In November 2011, Ms. Reeves, with support from the Firm, filed a FOIA lawsuit against the FDA to obtain previously unavailable public records relating to thalidomide. [Ex. 46 (11/17/2011 Firm Press Release).] As a result, they eventually obtained a voluminous set of documents related to the use and distribution of thalidomide. Beginning in 2012, they extensively reviewed these documents to help build various aspects of the cases.

91.    On May 4, 2012, Ms. Reeves summarized more than 50 pages of notes from the latest FDA production. [Ex. 54 (05/04/2012, email to Mr. Styant-Browne & Mr. Berman from Ms. Reeves).] The production supported the Firm's fraudulent concealment theory by █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████    [*See id*.]

A few days later, Ms. Reeves followed up with another email ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████ [Ex. 55 (05/06/2012 Email to Mr. Gordon, Mr. Berman, Mr. Styant-Browne, and others from Ms. Reeves); *see also* Ex. 56 (08/17/2012 email to Mr. Styant-Browne and Ms. Barnes from Mr. Berman) ██████████████████████████████████████ ]

Subsequent FDA productions appeared to suggest, among other things, ██████████████ ███████████████████████████████████████████████

█████████████ [Ex. 57 (08/10/2012 email to Mr. Berman, Mr. Gordon and Mr. Styant-Browne from Ms. Reeves).]

    92.    The FDA materials also made clear ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ For this reason, the Firm sought information about █████████████████████████████ [Ex. 60 (12/05/2012 email from Mr. Spiegel to Mr. Styant-Browne attaching ██████████████████████████

████████████████████████ ]

93.    Other FDA documents also supported the Firm's theories as to negligence, exposure, and causation. For example, ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ [Ex. 61 (08/16/2012 email to Team from Mr. Berman).] The next day, he emailed the team ████████████ ███████████████████████████████████████████████████████████ [Ex. 62 (08/17/2012 email to Ms. Reeves, Ms. Barnes and Mr. Styant-Browne from Mr. Berman); *see also* Ex. 63 (08/17/2012 email from Mr. Berman attaching █████████████████ ███████████████████████████████████████████] The same day, Mr. Berman sent an email quoting from ████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████ [Ex. 56, (08/17/2012 email to Mr. Styant-Browne and Ms. Barnes from Mr. Berman).]

**9.    Other Document Review Projects and Witness Interviews.**

94.    The Firm, with the assistance of Ms. Reeves and Mr. Gordon, also ███████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████ [*See*, *e.g.*, Ex. 64 (11/14/2011 email from Ms. Reeves summarizing ongoing research and investigative efforts, ████████████████████████████████████████████████████████████████ ███████████████████████████ Ex. 44 (10/24/2011 email from Reeves to Styant-Browne, Peter Gordon, and others.] This ongoing investigation ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ [Ex. 20

(10/18/2011 email exchange between Mr. Gordon and the Firm).]

95.     In December 2011, Hagens Berman attorney Lauren Barnes accompanied

Ms. Reeves to ████████████████████████████████████████

████████████████████████████████ [Ex. 65 (12/22/2011 email from

Ms. Barnes); *see also* Ex. 33 (12/23/2011 email from Kay Reeves

██████████████] Later, the Firm created █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ ]

96.     Firm attorneys also reviewed documents produced by the Thalidomide

Defendants and identified "hot documents." [*See* 05/07/2019 Tr. at 173-174 (noting that "[W]e

had a team devoted to going through [Defendants'] records to ascertain the extent of the

distribution of the drug by Defendants, the extent to which the drug was distributed or may have

been distributed without any record being generated . . . .").]

97.     On January 10, 2014, for example, Firm attorney Barbara Mahoney ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ [Ex. 67 (01/10/2014 email to Team from Ms. Mahoney).] The Firm also

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ [Ex. 68 (08/14/2014 email to Mr. Spiegel

from Ms. Bede).]

    98.    The Firm ██████████████████████████████████

████████████████████████████████ In June 2014, GSK had filed summary

judgment motions stating that its distribution of thalidomide in the United States consisted of

344,270 tablets distributed to 67 doctors and given to approximately 875 patients. ███████████

████████████████████████████████████████████████

████████████████████████████ [Ex. 39 (12/08/2014

memo to File from Mr. Brown).]. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ [*See id.*]

    99.    In early August 2014, ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ [Ex. 69 (08/04/2014 email to Mr. Berman and Mr. Styant-Browne from

Mr. Brown).] Mr. Berman forwarded the email to local counsel, ████████████████████████

████████████████ [Ex. 128 (08/04/2014 Email to Mr. Kodroff from Mr. Berman ).]

    100.    On August 11, 2014, Plaintiffs issued a subpoena to Dr. Forrer and two other

doctors whom the Firm identified as having played significant roles in supplying or conducting

the Northville clinical trials. [*See* Ex. 39 (12/08/14 Memo to File from Ari Brown).]

    101.    Dr. Forrer was eventually deposed on October 1, 2014. Firm attorney Ashley Bede

subsequently drafted a detailed memo about all the ways in which GSK's factual representations

to the Court were "undercut" by Dr. Forrer's deposition testimony. [Ex. 70 (10/08/14 Memo to File from Ms. Bede and Mr. Brown).] Among other things, Dr. Forrer testified that GSK did not in fact provide Northville State with over 300,000 tablets, but that there was only a single small clinical trial limited to no more than 20 patients, that his staff was never nearly the size that GSK's documents claimed, and that a clinical report bearing his signature had been falsified. [*See* Ex. 39 (12/08/14 Memo to File from Ari Brown) at 2.] As a Firm attorney noted in a follow up memorandum: "This testimony substantiated allegations in multiple Complaints that GSK had affirmatively covered up its true distribution of thalidomide." [*See id.*]

### 10. Steve Berman Was Actively Involved in the Factual and Legal Investigation.

102.    Although Mr. Styant-Browne managed the day-to-day of the litigation, Mr. Berman was actively involved from the outset. [*See, e.g.*, (05/10/19 Tr.) at 933-934 (describing role in the cases); Ex. 2 (Berman Decl.) ¶¶ 22, 23.] He provided direction, strategic guidance, and general oversight to the team. [*See, e.g.*, Ex. 2 (Berman Decl.) ¶ 22, 23; Ex. 71 (October 2012 email authorizing Ms. Reeves ███████████████████ Ex. 38 (11/09/2011 email from Mr. Berman to Ms. Reeves and Mr. Styant-Browne asking ██████████ ███████████████████) *see also* Ex. 72 (01/17/2014 email from Mr. Berman to team with ███████████████████████ ████████████████████████████████ ████████ ]

103.    He was also involved in developing the Firm's legal theories with respect to the statute of limitations theories, negligence, and other issues. [Ex. 73 (08/06/2012 email from Mr. Berman discussing the March of Science and discovery rule theories).] ███████████ ████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████ [Ex. 42

(09/09/2011 (email to Mr. Styant-Browne from Ms. Reeves).] ███████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ [*See* Ex. 36 (10/15/2011

email exchange between Mr. Berman and Ms. Reeves).] After Ms. Reeves provided a detailed

response, he responded with an additional follow-up question. [*See id.*]

104.    Mr. Berman spent significant time personally reviewing key documents,

including FDA materials, ██████████████████████████ [Berman Decl. ¶ 23.]

In August 2012, he emailed the team to note that █████████████████████████

██████████████████████████████████ [Ex. 61 (08/16/2012 email to

Team from Mr. Berman).] The next day, he █████████████████████████████

███████████████████████████████████████ [Ex. 62 (08/17/2012

email to Ms. Reeves, Ms. Barnes and Mr. Styant-Browne from Mr. Berman).] He also pointed

the team to ███████████████████████████████████████████

██████ [Ex. 76 (08/17/2012 email from Mr. Berman to team ███████████████████

██████████████████████████████████████████████████████

████████████ );*see also* Ex. 75 (07/30/2012 email exchange from Mr. Berman

discussing ██████████████████████████████████ ]

105.    Mr. Berman also corresponded and met with experts and potential experts (a

further discussion of the Firm's work with these experts is discussed *infra* at ¶¶ 104-113).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████ Ex. 48

(06/19/2012 email from Mr. Berman to team, noting ████████████████

████████████████ Ex. 78 (08/20/2012 email from Ms. Reeves to Mr. Styant-Browne

noting that Mr. Berman ███████████████████████████████████

████████████████████████████████████████████████████

Ex. 24 (09/26/2013 email and attached essay from Dr. Stephens to Mr. Berman regarding ██

████████████████████ Ex. 79 (02/02/2014 email re Mr. Berman's meeting with

██████████████████████ Ex. 80 (08/30/2013 email from Mr. Berman

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ ██ Ex. 81 (04/03/2014 Email from Mr. Berman ██████████████████

██████████████████████████████ ]

106.    Mr. Berman was also discriminating in accepting new clients, regularly rejecting

those he believed would not have viable cases. In a March 2012 email, Firm attorney Lauren

Barnes ████████████████████████████████████████ [Ex. 82 (March

2012 email exchange between Ms. Barnes, Mr. Styant-Browne, Ms. Reeves and Mr. Berman) at

2-3.] After reviewing the email, Mr. Berman responded that ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

[*Id.* at 1.]

### F.    The Firm Met and Consulted with Numerous Experts to Develop Its Theories.

107.    From the outset, the Firm knew that expert testimony would be crucial, including to establish causation. As early as September 2011—before ever filing its first case—the Firm was researching and analyzing ████████████████████████████████████ ████████ [*See, e.g.*, Ex. 47 (09/23/2011 email from Ms. Reeves to team ██████████ ████████████████████████████████████████████████████] This work continued throughout 2012. [*See, e.g.*, Ex. 48 (06/19/2012 email from Mr. Berman to team, noting that ████████████████████████████████████████████]

108.    As discovery progressed, the Firm formally and informally relied upon several highly credentialed consulting experts to help develop its factual and legal theories, including as to negligence and causation.

### 1.    Dr. David Kessler (Former FDA Commissioner)

109.    In January 2012, a few months after the *Spence* Complaint was filed, attorneys for GSK provided the Firm with a set of documents which they claimed debunked Plaintiffs' theories of liability. The Firm (including Mr. Berman) carefully reviewed the documents provided by GSK, but did not agree that the documents gutted Plaintiffs' claims—███████████



████████████████████████████████ [Ex. 83 (03/02/2012 memo from Reeves to Berman noting

████████████████████████████████ Ex. 74 (February and

April 2012 emails from Ms. Reeves noting, among other things, that ███████████████

████████████████████████████████████████████████ ]

110.    After reviewing GSK's documents, the Firm, assisted by Ms. Reeves, retained

former FDA commissioner Dr. David Kessler as a consulting expert to opine on standard of care

issues with respect to the Thalidomide Defendants, with the intent of calling him as a testifying

expert at trial. [(05/10/19 Testimony by S. Berman before SDM Hangley at 948); Berman Decl. ¶

24; Ex. 84 (02/24/12 email from Reeves to Berman re ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Ex. 85 (03/04/2012 email from Reeves to team re ████████████████████

████████████████    Ex. 74 (04/13/2012 email exchange discussing ████████████

██████████████████████████████ ]

111.    Ms. Reeves' ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ [Ex. 85 (email to Team from Ms. Reeves).]

2.    **Professor** ████████████████

112.    The Firm also retained ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ ██████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ [*See, e.g.*, Ex. 86

(05/19/2014 email ████████████████████████████████

████████████████████████████████████████████████

██████████ *see also* Ex. 2 (Berman Decl. ¶ 26).] In October 2014, █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ [Ex. 87 (10/11/2014 ██████████████████]

**3.**    ███████████████████████████ **and Others**

113.    The Firm also discussed retaining two highly credentialed experts, ████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████ [Berman Decl. ¶ 25; *see also*

Ex. 88 (01/29/2014 email exchange between Mr. Berman and ████████████ ] ████████████

████████████████████████████████████████████████

███████████████████ [Ex.89 (11/14/2012 email to Mr. Berman from Mr. Gordon).]

---

29 ███████████████████████████████████████████

114.    On November 14, 2012, Mr. Gordon emailed Mr. Berman to note, ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ [*Id.*] █████

████████████████████████████████████████████████████████████

██████████████████ [Ex. 90 (08/30/2013 email to Mr. Berman from Mr. Gordon).]

115.    In February 2014, Mr. Berman met with ████████████████████

████████████████████████████████████ [*See, e.g.*, Ex. 88 (01/29/2014

email exchange between Mr. Berman and Mr. ████████); Ex. 79 (02/02/2014 Email to Mr.

Berman from Mr. █████████).]

116.    Over the next few months, the Firm reached out to experts regarding standard of

care issues. [Ex. 91 (05/06/2014 email to Mr. Berman from ██████████████████] It

also contacted several experts to discuss ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[Ex. 35 (06/01/2014 Retainer agreement between Hagens Berman █████████████); *see also*

Ex. 92 (05/02/14 email from A. Bede to Mr. Berman noting that a potential expert's █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ ]

117.    In an April 2014 email to a potential expert witness, a Firm attorney noted:

████████████████████████████████████████████████████████████



[Ex.93 (04/19/2014 email exchange between Ms. Bede ▇▇▇▇▇▇▇); *see also* Ex. 94

(05/28/14 email to Mr. Berman re ▇▇▇▇▇▇▇▇▇▇▇▇▇▇]

### G.    In October 2013, the Firm Proposed a Bellwether Approach of Six "Test Cases" to Efficiently Manage the Cases and Conserve Resources.

118.    Once the remand issue had been decided by the Third Circuit and the cases were consolidated before Judge Diamond, the Firm filed a proposed Case Management Order suggesting that the litigation be limited to six test cases in order to identify "common, across-the-board issues affecting all Plaintiffs" before embarking on extensive, case-specific depositions and discovery. [*See* Doc. 96 at 2-3.] Defendants, on the other hand, sought to proceed with discovery for all 49 Plaintiffs. [*Id.* at 1.]

119.    The Firm proposed this "bellwether" approach to avoid unnecessary expense for all parties. This would allow discovery to be obtained from the Thalidomide Defendants relating to the Firm's tolling and fraudulent concealment theories; and permit a ruling on the threshold legal issues, like statute of limitations. The "common, across-the-board issues" that the Firm sought to develop with the bellwether approach included the testing and distribution process of thalidomide by each defendant; the marketing of thalidomide to doctors; verifying each Defendant's role in thalidomide distribution in the United States; and establishing the state of scientific knowledge as to how thalidomide causes injury and what injuries were known to be caused by thalidomide and when. [*Id.* at 4.]

120.    At bottom, although the Firm had extensively researched statute of limitations issues and was confident in its theories, bellwether test cases would provide both sides with an

understanding of how those theories would be resolved by the Court (and jury), while also avoiding unnecessary expense to the parties and distress for its clients. As Hagens Berman explained to the Court:

> As another example, suppose Defendants move for summary judgment, arguing that the way they tested and distributed thalidomide was proper under then-existing medical standards and prevailed on that motion. Under those circumstances, it is difficult to see how other Plaintiffs could continue with their cases . . . [t]hus, test cases are a better alternative than Defendants' proposal that all 49 cases (and other cases that may be filed) be subject to full discovery. The Defendants' blunderbuss approach would stir up painful memories for Plaintiffs and family members that might be unnecessary based on the results in test cases.")

*Id.*

121.    On October 4, 2013, the Court, without explanation, denied the Firm's request for the bellwether approach and ordered that discovery proceed with respect to all Plaintiffs. [Docs. 102, 103.]

### H.    The Firm Retained and Relied on Professor Stephens as a Causation Expert.

122.    Dr. Trent Stephens was one of several experts used in the Australian claims settlement process to evaluate thalidomide victims. [*See, e.g.*, Ex. 90 (08/30/13 email from Peter Gordon noting ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████ ]

123.    To help build its causation case, Hagens Berman retained Dr. Stephens as its consulting expert given that he was one of the leading scholars regarding thalidomide mechanisms. Dr. Stephens had authored several peer reviewed papers dealing specifically with thalidomide and was one of the experts used in the Australian claims settlement process to evaluate whether claimants were thalidomide victims. ██████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ [Ex. 2 (Berman Decl.) ¶ 28.]

124.    In June of 2012 Mr. Berman and Mr. Styant-Browne travelled to Idaho and met

with Dr. Stephens. [*Id.*] After this meeting, Mr. Berman wrote: ██████████████████

████████████████████████ [Ex. 95 (06/16/12 email to Gordon from Berman); *see also*

Ex. 89 (11/14/12 email from Peter Gordon to Steve Berman re ██████████████████

███████████████████████████████████████████ ]

125.    In February 2013, Mr. Berman again met with Mr. Stephens in Idaho. [Ex. 2

(Berman Decl.) at ¶ 29.]

**I.    Dr. Stephens Presented Challenges as the Litigation Proceeded.**

126.    Before filing its first Complaint, Hagens Berman understood that ████████

████████████████████████████████████████████████████

████████████████ [*See* Ex. 96 (08/16/2012 email from Mr. Gordon to Mr. Berman confirming

that ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ ] Mr. Berman then wrote to his team:

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[Ex. 97 (08/16/2012 email from Berman to team)]

127.    In September 2013, Dr. Stephens emailed Mr. Berman ██████████████████

████████████████████████ [Ex. 24.] ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ [*Id.* at 6.]

128.    On November 22, 2013, Hagens Berman emailed ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ [Ex. 99 (11/22/2013 email from Lisa Hasselman to Dr. Stephens).]

129.    Dr. Stephens met with ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ [Ex. 2 (Berman Decl.) at ¶¶ 31-32; *see also* Ex. 25

(01/16/2014████████████████████) ████████████████████

████████████████████████████████ ]

130.    In April 2014, the Firm forwarded ████████████ Dr. Stephens ████████████

████████████████████████████████████████████ [Ex. 100

(04/30/2012 email exchange between Dr. Stephens and Ms. Grueneich).] On May 16, 2014,

Dr. Stephens ████████████████████████████████████ [Ex. 101

(05/16/2014 email exchange between Stephens and Ms. Grueneich).]

131.    In July 2014, Dr. Stephens ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ As Mr. Spiegel noted: ██████████████████████

109

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ [Ex. 98 (07/02/2014 email exchange).]

**J.      After SDM Hangley Ordered the Firm to Review Its Existing Cases, the Firm Conducted a Further Investigation.**

132.    On July 17, 2014, Special Discovery Master Hangley ("SDM Hangley") directed Plaintiffs' counsel to investigate each active case with a view to deciding whether it should continue to be prosecuted. [Doc 268.] Investigations were to be completed by September 16, 2014. [*Id.*]

133.    Hagens Berman subsequently ███████████████████████ During or after the examination period that was ordered by SDM Hangley, Hagens Berman filed nine stipulations for voluntary dismissal with prejudice with the consent of Plaintiffs, and filed motions to withdraw from representing six others. ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ [Ex. 2 (Berman Decl.) at ¶33.]

134.    Hagens Berman objects to the pejorative phrasing and substance of the R&R's finding that the Firm "turn[ed] its back on" or "[threw] down its hand on" Plaintiffs Terrie Bolton, Jose Navamuel, Valerie Spence, Tawana Williams, Michael Morgan, Barbara Murray, and Kevin Randall. [Doc. 767 at 51-52.] The Firm responsibly sought to withdraw from representing certain clients when professional responsibility dictated that it do so.

135.    Even though the Firm decided to dismiss several cases, it sought to proceed with as many cases as it had a good faith basis to proceed with. Thus, it continued to expend resources to obtain genetic testing for some Plaintiffs and sent other Plaintiffs for further medical evaluations. [*See, e.g.*, Ex. 102 (09/16/2014 email from Mr. Styant-Browne to SDM Hangley with a status update that notes that certain Plaintiffs "are awaiting the results of genetic testing . . .").]

**K.    The Firm Seeks a Stay Until Pending Motions are Resolved.**

136.    In late October 2014, with several Defendants' summary judgment and sanctions motions still pending, the Firm requested a stay of all related actions until the pending summary judgment and sanctions motions were resolved. [Doc. 388.] As Defendants recognized at a prior hearing, the Court's rulings on the pending motions would "provide real and substantial guidance on every related case." [*Id.* at 4.] Thus, the Firm sought a stay to avoid further extensive discovery and briefing:

> The stay Plaintiffs propose in this motion would give the parties 21 days after the Court's ruling on the last of the currently pending summary judgment motions to assess how the Court's ruling affects the remaining cases, and whether it would be judicially efficient to continue to proceed on discovery and motion practice in the remaining cases. For example, if the Court granted some motions but denied others, Plaintiffs would expect that it would be relatively clear which cases should proceed through discovery and motion practice in this Court, and which should be stayed pending appeal of certain orders. Or if the Court were to grant all of the pending motions, Plaintiffs expect that it would make sense from the standpoint of judicial efficiency to extend the stay pending resolution of an appeal of the Court's rulings. More particularly, Plaintiffs would be able to determine whether to dismiss some or all of the remaining cases if the Third Circuit were to affirm any summary judgment rulings in favor of Defendants. As a result, the proposed stay would avoid most, or perhaps all, of the costs of discovery in the coming weeks, as well as the cost of further dispositive motions.

[*Id.* at 5]. The Court denied the stay request, without explanation, the same day. [Doc. 389.]

L.    **GSK Agreement.**

1.    After Conducting Discovery, the Firm Proposes Dismissing GSK

137.    By October 2014, fact discovery was drawing to a close. The discovery process had given the Firm a better sense of the respective strengths and weaknesses of its claims against each Defendant. [Doc. 453 at 10.] For example, it had revealed significant variations in the timing and nature of distribution of thalidomide by GSK and Sanofi; it became clear that GSK had stopped distributing thalidomide within the United States before several Plaintiffs were conceived. [*See, e.g.*, (Doc. 536-10 at 27-28 (Simeone testimony); Doc. 536-11 at 19-20 (Ledsome testimony); 536-12 at 15 (Horridge testimony).] Discovery had also revealed varied evidence against each Defendant with respect to the statute of limitations and exposure issues. [Doc. 453 at 10.]

138.    The Firm concluded, based on the discovery it had received—and its continuing search for evidence that could only be obtained through discovery—that the Plaintiffs' cases against GSK should be dismissed. The Firm and GSK reached an agreement providing that the Firm would dismiss claims against GSK by individuals represented by Hagens Berman for whom the Firm had not filed a motion to withdraw as counsel.[30] [*See* Doc. 425 at 1-2.] The Firm conditioned the finality of any agreement on the approval of the individual clients following consultation with the Firm. [*Id.*]

139.    After the parameters of the GSK Agreement had been set, the Firm held a group meeting of staff and attorneys working on these cases to discuss the process for communicating with each individual Plaintiff about the proposal. [Doc. 425 at 1-2.] The goal of that meeting was to ensure that counsel explained all of the terms of the proposal to each Plaintiff, and that the

---

[30] The sole exception was Plaintiff Debra Johnson (who planned to continue opposing GSK's outstanding motion for summary judgment—a motion which was later granted and affirmed on appeal, *see* Doc. 535 at 15.)

Plaintiffs understood the proposal and what would happen with their claims against GSK. [*Id.*] The Firm also wanted to be sure that each attorney who communicated with a Plaintiff knew all of the information necessary to answer any questions a Plaintiff might have. [*Id.*]

140.    During the meeting, the Firm decided which attorney would speak to each individual Plaintiff. In every case, the attorney who had the closest relationship with a particular client was assigned to discuss the proposal with that client. On the same day, counsel provided an explanatory letter to each of the Plaintiffs and encouraged each Plaintiff to discuss the situation with counsel. Attorneys at the Firm subsequently answered any questions the Plaintiffs had about the proposal. All of the Plaintiffs agreed to the proposal at the conclusion of this process, and the Firm did not move to dismiss their cases before obtaining the full and informed consent of each Plaintiff. [*Id.*] Counsel for GSK reported this agreement to the Court on October 28, 2014. [Doc. 394.]

141.    Notably, even after the Firm entered into the GSK Agreement, all the Plaintiffs encompassed by the Agreement still had claims against Grunenthal, and nearly all also had claims against Sanofi. [Doc. 453 at 10-11.] As the Firm noted in subsequent filings, it had every intention of continuing to litigate against the other Thalidomide Defendants despite recent rulings by the Court indicating skepticism about Plaintiffs' claims. [*Id.*]

## 2.    The GSK Agreement is Sloppily Described to the Court.

142.    In its initial correspondence to Judge Diamond, GSK's counsel described the GSK Agreement as: "All plaintiffs currently represented by [the Firm]—with the sole exception of Debra Johnson—will dismiss with prejudice all claims against the GSK Defendants." [Doc. 400 at 1.] But this was inaccurate. The GSK Agreement only encompassed Plaintiffs who were both (a) represented by the Firm, and (b) were also *not* subject to a pending Motion to Withdraw. [Doc. 400 at 2.]

143.    After Judge Diamond learned of the GSK Agreement, his Honor expanded SDM Hangley's authority to include an investigation of whether the Thalidomide Plaintiffs implicated in the GSK Agreement had "knowingly, intelligently and voluntarily consented to dismissing with prejudice his or her claims against the GSK Defendants – or any other Defendants." [Doc. 396.]

144.    The parties promptly sought to clarify the record. GSK's counsel informed Judge Diamond that the GSK Agreement did not encompass the Motion to Withdraw Plaintiffs. [Doc. 397.] The Firm filed written objections in November 2014 that reiterated that Judge Diamond had misapprehended the scope of the GSK Agreement and which Thalidomide Plaintiffs were implicated by it. [Doc. 400.] The Firm further highlighted that the Plaintiffs actually encompassed by the GSK Agreement had agreed to dismiss their claims as to GSK only, and that their claims against the other Defendants were not being dismissed. The Firm also made several legal arguments, including that (i) the Court lacked the power to approve or disapprove the terms of the GSK Agreement/Voluntary Dismissals, and (ii) SDM Hangley's investigation into the GSK Agreement would likely invade matters governed by the attorney-client privilege. [*Id.*]

145.    In December 2014, Judge Diamond rejected these arguments and ordered SDM Hangley to proceed with his inquiry into the GSK Agreement. [Doc. 420.] SDM Hangley later stated that the "dominant consideration" for Judge Diamond in expanding his charter was that he had "lost confidence in the Hagens Berman lawyers' ability and willingness to tell the truth about critical facts when addressing the Court" in light of the "antipodal difference between 'facts' pled or asserted by the Hagens Berman lawyers and the actual facts stated under oath by their client Plaintiffs." [Doc. 535 at 3.]

146.    SDM Hangley's proposed inquiry would focus on: i) Plaintiffs' understanding of their claims, (ii) Plaintiffs' understanding of the consequences of dropping their claims against

114

GSK, and (iii) the facts and circumstances that Plaintiffs considered in deciding to drop their claims against GSK. [Doc. 501.]

### 3. The Firm Raised Concerns that the Proposed Inquiry Would Vitiate the Attorney-Client Privilege and Distress Its Clients.

147.    In late December 2014, the Court requested that the parties brief the following issues: (i) whether the Firm had a Rule 1.7(a)(2) conflict with respect to the GSK Agreement; (ii) the steps that SDM Hangley should take to ensure that each of the Plaintiffs made a voluntary and informed decision to dismiss their claims against GSK; and (iii) the extent to whether the attorney client privilege or Rule 1.6 precluded SDM Hangley from inquiring into the Firm's communications with the Plaintiffs encompassed by the GSK Agreement. [Doc. 430 at 7.]

148.    In January 2015, the Firm filed its response. [Doc. 453.] First, it noted that no Rule 1.7(a)(2) conflict existed with respect to the GSK Agreement, which was executed based on the Firm's honest appraisal of Plaintiffs' cases against GSK, rather than any motivation to avoid sanctions (indeed, the Firm either already faced, or risked facing, sanctions requests from the other Thalidomide Defendants). [*See id.* at 5-15.] Second, it argued that Rule 41 did not contemplate or provide the Court with authority to investigate the terms or fairness of private agreements between the parties, especially given the fact that no party had objected or complained that the dismissals may prejudice them. [*Id.* at 5-6.] Third, it claimed that both the attorney client privilege and Rule 1.6 precluded SDM Hangley from inquiring into the Firm's communications with the Plaintiffs encompassed by the GSK Agreement. [*Id.* at 17-21.] Indeed, the Firm cautioned that such an inquiry would be stressful for its disabled clients. [*Id.* at 16; *see also* Doc. 502 at 32 ("Hagens Berman is not aware of a single case in which a court has sua sponte ordered a party to testify in any capacity, or answer written questions, about whether she consented knowingly and voluntarily to either a conflict of a dismissal of a claim. Ordering such a requirement would be truly

extraordinary given that . . . the issues the Special Master apparently wants to ask the clients about are communications that are not only privileged, but are some of the most sensitive and confidential conversations an attorney can have with her clients.").]

149.     The Firm further explained these positions in its several objections before SDM Hangley and the Court, as well as in its Petition for Writ of Mandamus. [Docs. 400, 451, 480, 499, 502.] With respect to the privilege issue, it noted:

> There is no way to divorce the Petitioners' understanding of their claims, their understanding of the consequences of the dismissal, or the facts and circumstances they considered in consenting to the dismissals from the conversations they have had with counsel. What they know about the legal and factual basis for their claims, the likelihood of success, the terms of any possible agreement, and the consequences of dismissing all have one common source: what their attorneys have told them. The Special Master cannot engage in an interrogation about these topics without asking the Petitioners, directly or indirectly, what their attorneys have told them about these various topics. The Special Master apparently believes that by couching the questions as seeking their "understanding" of various points, he can seek the nonprivileged testimony of the Petitioners, but those "understandings" have their direct roots in the extensive communications they have had with their counsel on those topics.

[*See* Hagens Berman's May 19, 2015 Petition for Writ of Mandamus to the Third Circuit, Case No. 15-2245, at 33-34.]

150.     The Firm also noted that the proposed client interviews would necessarily delve into counsel's protected work product, and raised concerns that SDM Hangley intended to act as judge, jury, and executioner:

> The Special Master will address objections on the basis of privilege primarily by ruling on the objections himself and, in limited cases, by seeking a ruling from the District Court. Yet there is absolutely no protection of the privilege if the Special Master makes a Plaintiff answer a question over an objection based on work product or privilege, with an apparent threat of contempt if the Plaintiff does not answer his question over the objection of his counsel . . . Nor is the privilege adequately protected if the Special Master refers the matter to the District Court for a ruling. The District Court Is the sole investigator, and the Special Master acts as the District Court's agent and at the District Court's discretion. Yet the Special Master's alternative process would refer matters of privilege to the District Court in its own investigation.

[*Id.* at 29-30.]

151.    The Firm proposed two compromises that would make clear that its clients were aware of the terms of the GSK Agreement, but would also avoid unnecessary interrogations that would infringe on opinion work product and attorney-client privileged communications: (a) that Plaintiffs be permitted to file sworn declarations making clear that they understood the terms of the GSK Agreement [Doc. 453 at 14-15], or (b) that SDM Hangley limit himself to a narrower scope of questioning that would not risk the disclosure of protected information [Doc. 499.] After SDM Hangley rejected these requests, the Firm reiterated them to the Court. [Docs 501, 502 at 32.] In the alternative, it requested a stay of the upcoming interviews pending resolution of these issues via a mandamus petition. [Docs 502, 504.] Lacking a ruling on the Firm's objections, the Firm filed a Petition for Writ of Mandamus, which was subsequently denied.

### 4.    The Firm Did Not "Bully" SDM Hangley or Act Unprofessionally During the GSK Inquiry.

152.    In 2015, SDM Hangley began conducting interviews with the Plaintiffs encompassed by the GSK Agreement.

153.    The R&R states that Mr. Styant-Brown and former Hagens Berman lawyer Ari Brown attempted "to bully the Special Master, demonize the Court in the eyes of the plaintiff-witnesses, and intimidate the court reporter." [Doc. 767 at 156; *cf* at 75-76]. Hagens Berman objects to these findings, and to any suggestion that Mr. Styant-Browne's or Mr. Brown's conduct was sanctionable under Rule 11 or Section 1927.

154.    Here, the Firm was concerned that the process SDM Hangley intended to employ would violate the attorney-client and work-product privileges and Rule 1.6 by requiring disclosure of the Firm's communications with Plaintiffs. [*See* Doc. 501.]

155.    The nature of SDM Hangley's examination of Plaintiffs confirmed the Firm's concerns. [*See generally* Docs. 536-1 through 536-32.] He asked questions that the Firm and its clients believed encroached on privilege and work product—and then, in his dual role as examiner and judge, overruled the Firm's objections and the clients' concerns. [*See* Doc. 536-1-536-2.] While the Firm objected to SDM Hangley's questioning of its clients at times, it did not "bully" SDM Hangley.

156.    Before each interview SDM Hangley summarized the concept of the attorney-client privilege, advised that he did not seek privileged information, acknowledged that it would be difficult for Plaintiffs to determine what information was privileged, but emphasized that they were required to do so anyway, regardless of their attorneys' objections:

> BY SPECIAL MASTER HANGLEY:
>
> Q. And the next thing I want to say, I want to go back to this attorney/client privilege. You can waive the attorney/client privilege if you want to. I'm not entitled to hear about your conversations with your attorneys or your written communications with your attorneys unless you decide that you want to disclose them, but I want to make very clear to you that nobody in this conversation is pressing you to waive the attorney/client privilege . . . .
>
> On the other hand . . . you must understand, and this is kind of a subtle distinction, . . . that facts that you know or facts that you believe are proper subjects of my interrogation, so that I will ask you questions about things, and if it happens that you learn them from your attorney or if it happens that they are facts that you communicated to your attorney, that doesn't stop me from asking you about the facts and about your knowledge. It does prevent inquiry into your communications. And that's going to be a hard line to draw in some circumstances . . . Your attorney may assert that I have crossed the line and that I am asking you about what they said to you. I will rule on those objections and decide. And if I tell you to answer it, you will, you will answer. If you have a worry about it, once again, do not hesitate to tell me that, but you will ultimately have to honor my instructions. Okay?

[Doc. 536-15 at 15:21-17:12 (June 16, 2015 Interview Transcript of Colleen Van Vleet).]

157.    When SDM Hangley asked Plaintiffs why they decided to drop their claims against GSK, attorneys for the Firm objected, arguing that its clients could not answer that question without divulging privileged information:

SPECIAL MASTER HANGLEY. Okay. Why did you decide to drop your claims against GlaxoSmithKline and to continue your claims against the others?

MR. WEAVER: Objection. It seeks attorney/client privileged information as well as opinion work product.

SPECIAL MASTER HANGLEY: You may answer, Mr. Murray.

MR. WEAVER: Is that objection overruled?

SPECIAL MASTER HANGLEY: Oh, I'm sorry. Yes, it is.

THE WITNESS: I have been advised not to give up my – they advised me they didn't have enough information and enough evidence to continue with–

SPECIAL MASTER HANGLEY: Stop. Stop. Stop. I don't want you to tell me what they said. I want you to tell me what you believe.

MR. WEAVER: Mr. Hangley, I think what you're getting at is exactly the problem with these questions, is that–- and this is Mr. Weaver–- the clients' understanding of privileged information can't be divorced given the conversations. Our objection stands. I'm sure it's going to be overruled, but to the extent that he can answer, I guess we'll let him, but, you know, his understanding is inextricably tied up with what we had talked about with him.

SPECIAL MASTER HANGLEY: Understood and overruled.

[Doc. 536-5 at 15:17-17:7.]

158.    Many Plaintiffs expressed confusion about how they could answer SDM Hangley's

question—why they decided to drop their claims against GSK—without waiving the privilege.

This exchange between SDM Hangley and Plaintiff Mary McPartlan-Hurson is illustrative:

Q.    The question that I have is a question that doesn't depend on where you got your information, whether you looked it up yourself, whether your attorneys told it to you, whether or not it was written on the side of a passing bus. I don't care. I want to know what the information is that makes your case against GlaxoSmithKline worse than your case against Grunenthal and Sanofi. I don't want conclusions. I want facts.

MS. MAHONEY: Mr. Hangley, this is privileged. And also objection, asked and answered.

SPECIAL MASTER HANGLEY: I have your objection. It's overruled. Answer the question, please.

THE WITNESS: I did answer the question.

BY SPECIAL MASTER HANGLEY:

Q.    What was that answer?

A.      I told you after long discussions with my attorneys based on all the information and the research that they obtained, that it wasn't worth pursuing the claim against GSK.

Q.      That's a conclusion. I'm looking for the facts that led to the conclusion. I don't want to know the conversations and, Ms. Mahoney, you don't need to object to that because I'm not asking about conversations. I'm asking to the facts that led to this conclusion.

A.      Well, you know, in order to make a decision one has to have facts. We learn those facts through conversations. So you're asking me to parse the facts and the conversations in order to give you an answer and that's impossible without–

Q.      No. No, it's not.

A.      -- raising -- well --

Q.      It's impossible, ma'am, because you are conflating– no, I'm speaking.

       MR. BROWN: Would you – can you let her finish her answer?

       SPECIAL MASTER HANGLEY: Actually, no. If I speak, other people become silent and wait until I finish. That's another one of the rules. All right? And, actually, ma'am, you are conflating conversations with conclusions. I'm not asking you for either. I'm asking you for the facts, the understandings that led to the conclusions.

BY SPECIAL MASTER HANGLEY:

Q.      Now, don't tell me, please, don't insult my intelligence by telling me that you can't discuss facts without discussing the conversations that led to the facts because you can. People do it in courtrooms all the time. And I am asking you to do it now.

       MS. MAHONEY: Same objections.

       SPECIAL MASTER HANGLEY:

       Overruled.

       . . .

Q.      Is it your– and I will rephrase the question.

       Is it your understanding that based on your own understanding, not what your attorneys told you, but is it your understanding that the evidence against GlaxoSmithKline with respect to distributing Thalidomide, making it available at the time of your mother's pregnancy, is insufficiently strong to go forward with a claim against GlaxoSmithKline?

       MS. MAHONEY: Objection. Mr. Hangley, this is a strategic decision. It invades the work product and attorney/client privilege.

       SPECIAL MASTER HANGLEY: Overruled. You may answer the question.

       THE WITNESS: We made the decision, and I was fully informed of the decision and the process and, you know, uhm, I know everything that's going on. I'm informed by my attorneys. I am in touch with them all the time. Whenever I have questions, I ask them. I know all about the sanctions. I know all about the cases. I know

all about the judge's rulings. I know exactly who you are. I don't understand why you're even going forward with this.

[*See* Doc. 536-4 June 9, 2015 Tr. of Interview with Mary Mcpartlan-Hurson at 15:9-16:9, 17:1-24:13, 31:16-32:33.]

159.    Plaintiffs in other interviews experienced similar distress and confusion. *See, e.g.*, Doc. 536-2 at 27:9-15 (June 8, 2015 Interview with Plaintiff Rebecca Alexander) ("My attorney and I had many conversations about this particular thing, and so it is so hard for me to answer this without sharing information that I shouldn't share. I'm not exactly sure how to proceed, Mr. Hangley."); Doc. 536-11 at 16:22-17:1 (June 12, 2015 interview with Plaintiff Gerald Ledsome) ("I'm conflicted because many parts of the answer would get into things that I have discussed with my attorneys . . ."); Doc. 536-14 at 15:5-9 (June 15, 2015 interview with Plaintiff William Tyler, III) ("I cannot answer that question without mentioning my conversation with the attorneys because we came to that conclusion together.").]

160.    During his questioning of Plaintiffs, SDM Hangley was highly critical of the GSK Agreement and speculated negatively about the Firm when examining its clients. [*See, e.g.*, Doc. 536-10 at 24, June 12, 2015 interview with Plaintiff Chris Simeone (noting that "from all that appears in the record, Hagens Berman obtained a benefit, i.e., being relieved of the threat of sanctions by [GSK] while the plaintiffs will not receive any benefit from their dismissal."); Doc. 536-23 at 25:9-13 (June 24, 2015 Interview with Plaintiff Carmella Norcross) ("[I]f I said to you that Hagens Berman was under a threat, a worry, about whether it would have to pay money to [GSK] as a sanction in this litigation, did you know that?").

161.    Several Plaintiffs expressed concern at what they viewed as an undermining of their own agency and decision-making authority. Plaintiff Ledsome put it this way:

THE WITNESS: . . .the court's opinion that we–- I'm just going to stick to myself, not the other plaintiffs, that I knowingly and with an intelligent decision dismissed this case, uhm, is somewhat– I'm trying to think of the word– uhm, insulting.

I have birth defects, yes, several. Uhm, I'm handicapped by some people's standards and I am disabled, but I do have a good mind and a conscience without the court making sure that I am not stupid. And that's -- that's really all I have to say.

[Doc. 536-11 at 32:17-33:14 (June 12, 2015 interview with Plaintiff Gearold Ledsome).]

162.    During the interviews, the Plaintiffs confirmed that they understood the key terms of the GSK Agreement and had voluntarily entered into it. [*See, e.g.*, Doc. 536-2 at 23:6-13 (June 8, 2015 interview with Plaintiff Rebecca Alexander) ("I absolutely made [the decision to dismiss GSK] voluntarily . . . I am an intelligent person and I weighed the information that I had, and I made this decision, uhm, per discussions with my attorney, but it is definitely my own decision.").] Others emphasized their gratitude for the Firm and its work. [*See, e.g.*, Doc. 536-23 at 26:15-21 (June 24, 2015 interview with Plaintiff Carmela Norcross) ("I think my attorneys are doing a really good job. They have kept me up-to-date on everything they have done. I have no qualms with them whatsoever. They spend a lot of time and energy on this . . . ."); Doc. 536-18 at 19:22-24 (June 18, 2015 interview with Plaintiff Doris Brust) (". . . I have been very happy with the work that Hagens Berman has done and they have been fabulous to work with.").]

163.    SDM Hangley states that the Firm "primed" the GSK Agreement Plaintiffs to be "antagonistic" to the interview process. [Doc. 767 at 71 n. 40.] But as noted above, Plaintiffs' frustration was triggered by their belief that they had indeed dismissed their claims voluntarily (a conclusion that SDM Hangley eventually agreed with)[31] and that the hearings were stripping them of their autonomy.

---

[31] Doc. 535 ("[A]fter interviewing all 31 of these Plaintiffs under oath with an eye to the two-element standard – voluntariness and informedness – I recommend that the complete or partial dismissals with prejudice they seek be permitted.").

164.    For example, the R&R cites Mr. Andre's testimony as an example of Plaintiff's supposed "antagonism" to the withdrawal hearings. [Doc. 767 at 71 n.40.] Mr. Andre was forced to testify at the 2015 GSK dismissal hearings despite the fact that months earlier, in October 2014, judgment had been entered against him. [Doc. 372.] Mr. Andre found the inquiry "offensive and cumbersome… regarding something that is already past history . . . it's already dismissed. So why . . . are we talking about it?" [Doc. 536-3 at 15.] It's hardly surprising that a litigant whose claims were lost months earlier was unhappy being forced to testify about whether he had knowingly, voluntarily and intelligently consented to give up his right to an appeal.

165.    As support for its determination that the Firm was attempting to "bully the Special Master" and "demonize the Court in the eyes of the plaintiff-witnesses," the R&R also (at 71-72) refers to certain statements made by Firm attorneys Ari Brown and Nick Styant-Browne. This reference includes statements that SDM Hangley was conducting a "sham inquiry" and Mr. Brown's frustration that there appeared to be "deliberate attempts" to violate the attorney/client and work product privileges by conducting the interviews in front of defense counsel, that "any claim that this is done for the protection of [the plaintiffs] is pretextual at best" and that he thought the interviews were "a deliberate effort to get behind the attorney/client privilege in an effort to punish or perhaps embarrass plaintiffs and their counsel."

166.    The Firm fully acknowledges that Mr. Styant-Browne and Mr. Brown made the foregoing statements, but emphasizes that they were made: (i) during only three of the 34 witness interviews[32], (ii) only after several Plaintiffs had already expressed distress and confusion over

---

[32] In the other 31 interviews, Firm lawyers respectfully read a pre-prepared preliminary statement into the record that made clear Plaintiffs' objections to the interviews, reserved their rights to argue the process was impermissible and violated the privilege, and asserted that Plaintiffs believed there was a "grave risk" the privilege would be violated given the interviews were conducted in the presence of defense counsel. *See, e.g.*, Doc. 536-2 at 9-10.

SDM Hangley's line of questioning; and (iii) in the context of Mr. Styant-Browne and Mr. Brown's attempts to preserve the attorney client privilege, widely recognized as the "bedrock principle of American jurisprudence," was at stake. *Stout v. Leadec Indus. Servs.*, No. 321CV00171CHBCHL, 2022 WL 2532458, at *3 (W.D. Ky. July 7, 2022) (citing 8 J. Wigmore, Evidence § 2290); *see also Osborn v. Griffin*, No. 2:11-CV-89-WOB-REW, 2014 WL 12647942, at *5 (E.D. Ky. July 7, 2014) (denying discovery sanctions as unjust in "a hotly contested case with sophisticated lawyers on all sides . . . the Court would expect zealous advocacy in the highly sensitive, complicated area of attorney-client privilege."). While those statements were ill-advised, in the context of the month-long proceedings they were isolated incidents, reflecting the hearing room's palpable tension given the highly sensitive nature of SDM Hangley's inquiries, and did not prejudice any party to the case. *See Republic of Philippines*, 43 F.3d at 74.

167.    The R&R also states [Doc. 767 at 75-76] that Mr. Styant-Browne acted unprofessionally by "insinuating that the Master and the court reporter might be tampering with the transcript and warning that Hagens Berman would be investigating our conduct." But Mr. Styant-Browne was merely concerned that SDM Hangley was submitting transcript errata requests for the interviews at which Plaintiffs testified without copying counsel on those requests. His correspondence to the SDM and court reporter, attached as Exhibit 129, was professional and not something for which he or the Firm should be sanctioned.

168.    Finally, and critically, none of the allegedly disrespectful or "bullying" statements that SDM Hangley identifies was made by Mr. Berman himself, who was not present at the 2015 hearings. *Martin v*, 63 F.3d at 1265 (sanctions may be imposed against attorney "solely because of [his] own improper conduct without considering the conduct of the parties or any other attorney."). And, apropos of its due process and delay arguments made in Section III above, Mr.

Brown is no longer with the Firm to assist with defense of his statements made 10 years ago. Nor should the Firm be sanctioned for the conduct of Mr. Styant-Browne, who passed away in 2022 and cannot speak to the conduct now at issue because of sua sponte findings.

> **5.     In 2016, SDM Hangley Recommends that the Dismissals be Allowed Finding that Plaintiffs Knowingly and Voluntarily Agreed to Dismiss Their Claims Against GSK.**

169.     On August 10, 2016, SDM Hangley issued an R&R concluding that the Plaintiffs encompassed by the GSK Agreement had indeed knowingly and voluntarily agreed to dismiss their claims, and thus recommended that the dismissals be ordered. [Doc. 535.] He noted that Plaintiffs "articulated a cogent rationale for a decision to dismiss their claims against GSK[.] [*Id.* at 27-28.] But his recommendation notwithstanding, he then stated: "[i]t is easy to wonder whether, in presenting the lopsided GSK deal to its clients, Hagens Berman painted a picture of a judiciary so hostile, so malevolent, that the plaintiffs were incapable of making a reasonably informed decision." [*Id.* at 36.]

170.     SDM Hangley's 2016 R&R has not yet been acted upon by the Court. Yet the Firm continues to be criticized in the 2023 R&R and elsewhere [*e.g.,* Doc. 749 at 2.] with respect to the propriety of the GSK Agreement despite SDM Hangley's recommendation that it be approved and the testimony of the affected Plaintiffs that they were fully aware of its consequences.

**M.     Specific Plaintiffs Mentioned in the R&R.**

Facts regarding SDM Hangley's discussion of specific Plaintiffs in the R&R not already addressed are discussed below.

171.     The R&R [Doc. 767 at 57-65] discusses the *Spence* Complaint at length. Hagens Berman objects that testimony taken by SDM Hangley regarding the *Spence* Complaint is not relevant to the Withdrawal Motions and SDM Hangley's narrow charge with respect to the Withdrawal Motions. Further, Hagens Berman objects to SDM Hangley's implicit statement that

the Firm misled anyone with respect to Plaintiffs Morgan and Murray. As counsel testified, and the *Spence* Complaint bears out, neither Mr. Morgan nor Ms. Murray sought damages from the entities with whom they had previously settled. [*See e.g.*, 5/10/2019 Tr. at 953-955.]

### 1. Michael Morgan and Barbara Murray

172.    Michael Morgan and Barbara Murray were plaintiffs in the *Spence* Complaint filed in August 2012. [Doc. 1.] The Firm knew at the outset that Mr. Morgan and Ms. Murray had existing settlements with one or another of the Thalidomide Defendants—Mr. Morgan with Sanofi predecessor Merrell (from whom he was receiving monthly compensation), and Ms. Murray with Grunenthal. As a result, when filing the *Spence* Complaint, the Firm carved Mr. Morgan out of its request for relief as to Sanofi, and did the same with Ms. Murray with respect to Grunenthal. [*See, e.g.*, *Spence* Compl. ¶¶ 317, 341, 374, 382, 391, 403; *see also* 05/07/19 Tr. at 157-60 (Styant-Browne testimony).] However, under the fraudulent concealment and civil conspiracy theories described above, the Firm still believed it had a good faith basis for bringing claims on behalf of Mr. Morgan and Ms. Murray with respect to the Thalidomide Defendants with whom they did *not* have existing settlements. [*See, e.g.*, 05/10/19 Tr. at 941 (Berman testimony) (describing conspiracy claim wherein the Thalidomide Defendants all "kept quiet" about the dangers of thalidomide).]

173.    In December 2013, counsel for Defendants sent the Firm a letter requesting dismissal of the Morgan and Murray claims, among others. In February 2014, the Court issued a ruling on a motion to compel expressing skepticism of Plaintiffs' fraudulent concealment theory (that it was not necessary for the Thalidomide Defendants to have directly communicated with Plaintiffs for the doctrine to apply, and that Plaintiffs could rely on the cumulative effect of communications instead). [*See* Doc. 166 at 1.]

174.     In April 2014, the Firm filed Stipulations of Voluntary Dismissal with Prejudice with respect to Morgan, Murray, and Tawana Williams. [Doc. 182.]

### 2.     Roel Garza, Jack Merica, and Lawrence Boiardi

175.     In the summer of 2014, when the Thalidomide Defendants filed several motions for summary judgment with respect to Plaintiffs Jack Merica, Lawrence Boiardi, and Roel Garza, the Firm stipulated to entry of the requested summary judgments for several reasons. To the extent the R&R implies that sanctions (in addition to those already awarded) may be imposed on Respondents, they object and incorporate by reference their prior objections. [*See* Doc. 427.]

### a.     Roel Garza

176.     With respect to Mr. Garza, discovery had not unearthed the hoped-for materials establishing that his injuries were the result of thalidomide exposure. Because the Thalidomide Defendants had distributed thalidomide as an experimental drug within the United States— without a prescription and without even identifying it as thalidomide—the Firm knew from the outset that there would be little proof of direct exposure with several Plaintiffs' claims. [*See, e.g.,* Doc. 341 (Opp. to Sanctions Motion in Garza) at 4.] Instead, it brought claims based on indirect proof—which, in Mr. Garza's case, included that he: (i) had injuries that were consistent with thalidomide exposure; (ii) had a large and extended family with no congenital abnormalities; (iii) was born during a time period in which the drug was clearly in the United States and distribution was uncontrolled; and (iv) had been told by at least one physician, less than two years before his Complaint was filed, that his injuries were caused by thalidomide. [Doc. 341 at 4-5; *see also* Doc. 318 at 3 n.6.]

177.     When it filed Mr. Garza's case, the Firm believed in good faith that discovery would reveal additional facts as to exposure. For example, as noted above, the Firm's extensive pre-suit investigation had revealed that thalidomide may have been distributed far more widely

than Defendants had originally led the public and government to believe, and for a longer time period. [Ex. 39 (12/8/14 Ari Brown Memo).] Thus, the Firm believed that discovery would yield additional exposure evidence, including Defendants' distribution to physicians in Plaintiffs' applicable geographical area during their mothers' pregnancies. For this reason, its initial discovery requests sought to determine where within the United States the Thalidomide Defendants had distributed or caused thalidomide to be distributed between 1950 and 1962. [*See, e.g.*, Ex. 41 (10/02/2013 First Set of RFPs from Plaintiffs to Defendants, RFP No. 4 (requesting "[a]ll documents identifying any doctors, hospitals, or facilities that received thalidomide in the United States from [Defendants], including documents with the address of the doctor, hospital, or facility."); RFP No. 5 ("All documents RELATING TO how [Defendants] selected doctors to whom thalidomide was provided."); RFP No. 9 ("All documents that reveal the identity and last known address of any person or entity (whether a doctor, hospital, or plaintiff) receiving thalidomide in the United States."); RFP No. 23 (documents reflecting number of thalidomide tablets distributed and other tracing information).]

178.    Unfortunately, by time the Defendants filed their summary judgment motion, discovery had failed to produce much evidence supporting the Firm's exposure theory as to Mr. Garza. The Firm thus concluded that it was unlikely that Mr. Garza would prevail on exposure at summary judgment or at trial, and chose not to oppose the entry of summary judgment to avoid needlessly prolonging the litigation. [*See* Doc. 341 at 5.]

### b.    Jack Merica

179.    With respect to Mr. Merica, the Firm had asserted that he could not have obtained sufficient knowledge as to whether thalidomide actually caused his injuries (as opposed to his subjective belief that thalidomide caused his injuries) given, among other things, the state of the medical science. [Doc. 427 at 27 (citing *Spence* Complaint at ¶ 11).] But in their summary

judgment motion as to Mr. Merica, the Thalidomide Defendants invoked Virginia law for the first time—without notice—to argue that Mr. Merica's claims were time-barred because he had subjectively believed for many years before filing his case that his birth defects were the result of thalidomide exposure. [*See, e.g.*, Docs. 338 at 17, 338-1, 427.] But as described above, the Firm still believed—and had cited case law supporting the proposition—that Mr. Merica's claims could survive under Pennsylvania's discovery rule, notwithstanding his subjective belief. [*See, e.g.*, Doc. 338 at 21-25 (discussing *Coleman* case).] The Firm did *not* believe it could make the same arguments under Virginia law, including because Virginia did not provide for a discovery rule with respect to statutes of limitation. [*See* Doc. 338-1 ¶¶ 1-6 (Spiegel Decl.).] For this reason, the Firm did not oppose Defendants' motion for summary judgment as to Mr. Merica. [*See id.*] Moreover, by this time, Judge Diamond had already ruled—in deciding a discovery motion— that the fraudulent concealment theory required direct communication between the defendant and plaintiff, rather than fraud on the public (something the Firm viewed as an open legal question when initially filing the Complaint). [10/01/2014 Tr. of Sanctions Hearing, at 73-74; *see also* Doc. 166 (order granting Defendants' motion to compel).]

### c. Lawrence Boiardi

180.    With respect to Plaintiff Lawrence Boiardi, the Firm believed it had a good faith basis to bring his claims in part because he had unilateral injuries that would allow the Firm to argue that the March of Science theory tolled the statute of limitations. [*Alexander* Complaint ¶ 21 (noting that "the predominant medical view has for decades held that thalidomide did not cause the types of unilateral and asymmetrical limb reduction from which Lawrence suffers.").] Mr. Boiardi was adopted and never knew his birth mother; although the Firm was able to find his original birth certificate before filing, it could not locate his mother. [Doc. 427-1 ¶ 3.] Defendants eventually located her during the discovery process and provided her contact details to the Firm.

[*Id.* ¶ 4.] When the Firm contacted her, she claimed that she did not even remember giving birth to her son—something she later admitted was a fabrication. [*Id.* ¶¶ 4, 6.] After Defendants contacted her, she changed her story, claiming that she did remember birthing her son, but did not believe she had taken thalidomide. [*Id.* ¶ 5.] This was the first time she had unequivocally taken the position that she had given birth to Mr. Boiardi, but did not believe she had taken thalidomide. [Doc. 427 at 55.] In response to this—and in light of the fact that exposure evidence as to Mr. Boiardi was weak—the Firm decided it could no longer continue to represent him in good faith. [*See id.*]

### 3.    Ed Andre

181.    The *Yeatts* Complaint alleges that: (i) Mr. Andre was born with severe birth defects, including unilateral injuries (¶ 15); (ii) while Mr. Andre and his family knew that his mother had taken thalidomide while pregnant, they could never obtain confirmation from doctors given the lack of recordkeeping at the time (¶¶ 17-18); (iii) Mr. Andre and his family did not know the names of the specific companies responsible for distribution of thalidomide within the United States, nor could they find a doctor who did know (¶ 18); (iv) the publicly available information about the drug's distribution in the United States did not suggest it was available during his mother's pregnancy in 1956, in part because of Defendants' representations (¶18); and (v) only in the spring of 2011 did Mr. Andre's mother learn for the first time about the companies responsible for thalidomide distribution, and about the fact that the drug was available during her pregnancy (¶19). [*See Yeatts et al v. Smithkline Beecham Corporation et al*, 2:11-cv-06711-JHS, Doc. 1.]

182.    The Firm believed it had a good faith basis for bringing claims on behalf of Mr. Andre for several reasons. First, Mr. Andre's unilateral birth defects supported application of the March of Science theory; in other words, medical expert testimony only recently would

have supported any claim that thalidomide caused his particular injuries. [Doc. 262 at 9, 13.] Although the Yeatts Complaint did not explicitly allege unilateral injuries with respect to Mr. Andre, Dr. Stephens' opinion attached to the motion for summary judgment briefing confirmed that his injuries were unilateral. [*See* Doc. 262-7 at ¶ 17.]

183.    Second, under the discovery rule exception, Mr. Andre, exercising reasonable diligence, would not have known about the causal connection between his injury and thalidomide, even if he suspected there was a connection. For example, although his doctors acknowledged to him that his injuries appeared to be thalidomide-related, no medical records were available to confirm that theory, and the publicly available information about thalidomide's distribution in the United States did not support the conclusion that thalidomide was obtainable in the United States during the time Mr. Andre's mother was pregnant. [*Yeatts* ¶ 18] Additionally, although Mr. Andre's father had told him that he had spoken to a lawyer about his defects, the lawyer told his father that absolutely nothing could be done about it—so Mr. Andre believed he had no claim against the Thalidomide Defendants. [Doc. 262 at 10.]

184.    Third, based on its research, the Firm reasonably concluded that the Thalidomide Defendants concealed the fact that thalidomide was obtainable in the United States far earlier than their statements to the public suggested, including during the time of Mr. Andre's mother's pregnancy. [*Yeatts* ¶ 18.] Because the Firm's research revealed that Pennsylvania law did not necessarily require the Thalidomide Defendants to have directly communicated with each Plaintiff in order for liability to attach, the fact that Mr. Andre and his family suspected that thalidomide was the cause of his injuries did not bar his claim, given that they did not know the names of the specific companies responsible for distribution of thalidomide within the United States (nor could they find a doctor who did know). [*See id.*] It was only in Spring 2011 that

Mr. Andre's mother learned, for the first time, that thalidomide had indeed been available in the United States during her pregnancy, and about the specific companies responsible for distribution of thalidomide within the United States. [*Id.* ¶ 19.]

185.    In October 2014, the Court granted summary judgment in favor of Defendants, holding that Pennsylvania's two-year statute of limitations barred Mr. Andre's claims. [Doc. 371.] To the extent the R&R implies that sanction may be imposed in connection with Mr. Andre's claim, Respondents incorporate by reference the argument and evidence found in Mr. Andres' Opposition to Defendants Motion for Summary Judgment. [*See* Doc. 262.]

### 4.    Terrie Bolton

186.    Ms. Bolton was born with severe birth defects in 1964. █████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████    As Mr. Styant-Browne testified:

> Here is what I recollect about Chicago. I was concerned about her date of birth. I recollect raising the issue with Ms. Reeves and I believe that she gave an account as to the possibility, according to Ms. Bolton's statements, that the drug had been -- had been distributed to Chicago. I can't remember any more details than that, but I do remember being satisfied by Ms. Reeves that the possibility existed on the basis of Ms. Bolton's statements that the drug had been distributed after 1962 to where her mother had her pregnancy . . . I recollect that we had gathered together a great deal of information that suggested two things. First of all, that the distribution of the drug was much more widespread than had previously been understood. And, in particular, hundreds of thousands of tablets had been distributed across the United States, contrary to what the previous understanding as to these very limited so-called clinical trials had been. We also knew that the record keeping of the distribution of the drugs was grossly inefficient and at times non-existent. So we had evidence that various sales persons from the U.S. manufacturers would simply go around to doctors they knew and hand out samples of the drug to those doctors,

without specifically recording the distribution of the drug . . . we didn't have any specific evidence after 1962, but we did . . . know that the record keeping of the distribution of the drug was entirely inadequate. We also knew that when the drug was distributed by SKF it was not identified by any, if I can call, it[s] brand name . . . [a]nd so doctors could not readily ascertain what the drug was or what the active ingredient in the drug was by reference to its name. So I knew that much and my recollection is that Ms. Reeves stated that Ms. Bolton made statements, making it plausible that the drug may have been distributed to her mother when she was in Chicago.

[09/26/2017 Tr. at 11:32 a.m. at 125-27 (re Bolton).]

187.    Indeed, documents collected from



[Ex. 66 (Table with ███████████████████ ]

188.    Further, because the "public narrative" was that the drug was no longer accessible by the summer of 1962, the relatively late date of birth would assist with application of the discovery rule to toll the statute of limitations. [09/26/2017 Tr. at 11:32 a.m. at 134 (re Bolton) (Styant-Browne testimony noting that "the public narrative . . . was the drug was removed from anywhere in the world in the summer of 1962 . . . [Ms. Bolton] may have come up against that wall, which would have stopped her from making any further inquiry.").]

189.    However, by 2014 the Firm still lacked exposure evidence, and Dr. Stephens was apparently unwilling to provide a sufficient causation opinion as to Ms. Bolton. Thus, the Firm determined that it could not proceed with Ms. Bolton's claim. [Ex. 104 (08/25/2014 email from Ms. Bolton).]

190.    Ms. Bolton declined to voluntarily dismiss her claims. [*Id.*] Accordingly, the Firm filed a motion to withdraw (the "Bolton Motion to Withdraw") on August 29, 2014. [*See, e.g.*, Doc. 342 (08/29/2014 Motion to Withdraw as Counsel for Plaintiff Terrie Bolton).]

191.    In December 2017, upon learning that Tyler Weaver had altered Dr. Stephens' report before sending it to Ms. Bolton, the Firm promptly disclosed the alterations to counsel for Ms. Bolton and SDM Hangley and then moved to reopen and correct the record with respect to its motion to withdraw as Ms. Bolton's counsel. [Doc. 583.]

192.    In July 2018, the Firm withdrew its motion to withdraw as Ms. Bolton's counsel upon receiving a new declaration executed by Dr. Stephens on June 14, 2018. [*See* Doc. 637.] The 2018 Stephens Declaration opined that Ms. Bolton's injuries were caused by thalidomide exposure to a reasonable degree of scientific certainty. [*See* Ex. 105 (01/22/2019 Hagens Berman Disclosure to the Court, attaching 2018 Stephens Declaration).]

193.    Because the Firm had initially sought withdrawal as Ms. Bolton's counsel based ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ [*See id.* at 2-3.] For this reason, the Firm filed a Notice of Withdrawal of its motion to withdraw. [*See id.* at 3; *see also* Doc. 637.] The Notice of Withdrawal did not discuss the ██████████████ ███████████████████████████████ but the Firm later made a confidential disclosure to SDM Hangley, with the permission of counsel for Ms. Bolton, explaining the issue. [*See* Ex. 105; *see also* Doc. 639.]

### 5.    Jose Navamuel

194.    Mr. Navamuel's thalidomide claim was asserted in the *Spence* Complaint filed on August 9, 2012. [Doc. 1.] Mr. Navamuel was born in Cuba; during his initial interview, he ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████ [Ex. 106 (Reeves' Attorney's Notes at 1); Ex. 107 (Questionnaire) at 2.]

195.    In his discussions with the Firm, Mr. Navamuel ███████████████ ██████████████████████████████████████████ [09/28/2017 Tr. (re: Navamuel) at 18-19 (Mahoney's testimony); *see also id.* at 30 (Styant-Browne's testimony).] The Firm did not have documentation that thalidomide had been distributed in Cuba specifically, but did have research suggesting that the drug had left the United States and entered into other countries. [*Id.* at 6-7 (noting records "that showed that the drug did leave the United States, and enter into other countries, for example, there were donations made by doctors who received the drugs from the Merrell companies, who donated them to missionaries, and they appeared outside the United States . . . there were also documents that showed that the researchers themselves undertook it to take the drug outside the United States. In one instance I can recall . . . the drug was distributed to pregnant women in the Middle East.").]

196.    This, combined with the knowledge that American companies conducted significant business in Cuba in the early 1960s, gave the Firm a reason to believe it could obtain further information about the drug's distribution in Cuba through discovery. On January 19, 2012, for example, Ms. Reeves emailed Mr. Styant-Browne regarding ███████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████ [Ex. 108 (01/19/2012 email to Mr. Styant-Browne from Ms. Reeves)).]

197.    Additionally, the Firm later discovered an August 2, 1962 Associated Press article, republished in a Florida newspaper, with the headline "Cubans Are Told Drug Thalidomide is Made in the United States." [09/28/2017 Tr. (Mr. Styant-Browne's testimony) at 33.] The Firm

believed that the article supported its theory that the drug had been distributed in Cuba. [*Id.* at 33-35.]

198.    In the R&R [Doc. 767 at 132-35], SDM Hangley construes the article to cut against Hagens Berman's inference that thalidomide may have been distributed in Cuba.

> That Havana Radio was even talking about thalidomide suggests that the thalidomide scandal was news in Havana as it was news in the United States, that Cuban audiences – physicians, mothers-to-be, lawyers – would likely have been exposed not to thalidomide, but to news *about* thalidomide by the August 2, 1962 date of the AP squib. Otherwise, Havana Radio would not have been talking about a chemical compound called thalidomide at all, and a local Florida newspaper would not have given the AP squib its inches of space on the page.

199.    SDM Hangley's conclusion that the "gist" of the article was "obvious" is inaccurate. A fair reading, and the one espoused by Mr. Styant-Browne, [9/28/17 Tr. (Navamuel) at 33-35], was that Havana Radio was providing misinformation to its audience about the provenance of a drug being distributed in Cuba. SDM Hangley may disagree, and he certainly offers his own personal opinion as to the "obvious" import of a four-sentence article about a statement made by Havana Radio, but reasonable minds can differ.

200.    The R&R also states [Doc. 767 at 135]:

> Hagens Berman's knowledge on the critical question – whether it would even have been possible for Mr. Navamuel's mother to stumble onto thalidomide in Havana, and ingest it, in the spring of 1960 – is exactly the same now as it was when Steve Berman swore to the accuracy of the *Spence* Complaint. He and Hagens Berman knew and still know nothing.

201.    This statement that the Firm "knew" nothing and "still[s] knows nothing," or that there was no "functional difference" in its knowledge at the time of filing and the time of withdrawal, is misleading, and not the standard for whether withdrawal should be granted. In 2014, after targeted discovery and conducting additional investigation out of court, the Firm could find no hard evidence in the materials produced by Defendants during discovery, or the documents it obtained from the National Archives and other sources, that any of the Defendants distributed

136

thalidomide in Cuba. [*See* 09/28/2017 Tr. (Ms. Mahoney's testimony) at 7.]. The fact that the Firm learned that its good faith belief that the drug may have been distributed in Cuba was not born out by its post-filing investigation does not mean the Firm did not adequately investigate the claim before filing, or that it acted with willful bad faith in doing so.

202.    The Firm recommended to Mr. Navamuel via separate letters on April 1 and April 9, 2014, ████████████████████ [(09/28/2017 Tr. (Ms. Mahoney's testimony) at 10-11).] Mr. Navamuel ████████████████████r. *Id*. In a subsequent phone call, Mr. Navamuel stated ██████████████████████████████████████████████████████ ██████ *Id*. at 11. The Firm then served targeted discovery on the Defendants regarding distribution of thalidomide to Cuba. *Id*. at 12. After Defendants responded to that discovery stating that they had not distributed thalidomide to Cuba, the Firm sent Mr. Navamuel ████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ *Id*. at 14. ████████████████ ████████████████ *Id*.

203.    On July 18, 2014, the Firm ██████████████████████████████ ██████████ *Id.* at 16. The Firm also advised Mr. Navamuel ██████████████████ ██████████████████████████████ *Id.*

204.    On August 1, 2014, the Firm filed a Motion to Withdraw as Mr. Navamuel's counsel. [Doc. 301.] Three days later, on August 4, Judge Diamond denied the motion without prejudice, ruling that he would "defer a decision . . . until after the issue of sanctions has been resolved"—although no sanctions have ever been requested with respect to Mr. Navamuel. [*See* Doc. 304.]

205. On August 18, 2014, Judge Diamond ordered Mr. Navamuel to inform the court in writing by September 18, 2014, whether he had obtained replacement counsel or wished to proceed *pro se*, and further ordered that he would dismiss the action for lack of prosecution absent a response from Mr. Navamuel. [Doc. 329.] The Firm personally served a copy of the Court's order and the Firm's Motion to Withdraw on Mr. Navamuel. [Doc. 333.] Mr. Navamuel never filed a notice as ordered by the August 18, 2014 Order regarding his election.

206. On October 13, 2014, GSK filed a Motion to Dismiss the Navamuel claims. [Doc. 366.] The motion was denied without prejudice on May 29, 2015; no explanation was given for the denial. [Doc. 509.]

207. In late September 2017, Special Master Hangley held hearings regarding the 2014 motions to withdraw filed by the Firm, including with respect to Mr. Navamuel. [Doc. 573.] The hearing on September 28, 2017 addressed the withdrawal motion for Mr. Navamuel. Lawyers for the Firm testified as to the facts set out above.

208. On June 24, 2023, Mr. Navamuel filed a notice stating that he no longer wanted to be represented by the Firm and would be proceeding *pro se.* [Doc. 765.]

### 6.    Richard Anderson

209. Plaintiff Richard Anderson was born with serious unilateral and asymmetrical defects, including scoliosis and an abnormally short left arm with a fixed elbow and a malfunctioning shoulder. [*Yeatts* ¶ 72.] Although he had asked doctors about the cause of his injuries, he was never given an answer. Years later, he saw pictures of thalidomide victims in a medical dictionary; a nurse also told him that he may have a thalidomide injury. [*Id.* ¶ 73.] Mr. Anderson told the Firm ████████████████████████████████ ███████ It was only in July 2011 that a doctor stated, for the first time, that thalidomide had caused the damage to his left hand. [*Id.* ¶ 75.]

138

210.    Subsequently, Mr. Anderson lost touch with the Firm, ███████████████

███████████████████████████████ [*See, e.g.*, Doc. 220, Ex. B.]

Despite numerous attempts, the Firm was unable to establish consistent contact with Mr. Anderson

██████████████████████████████████████████

███████████████ [Ex. 109 (12/18/13 letter to Mr. Anderson from Mr. Styant-

Browne); Ex. 110 (12/22/13 letter to Hagens Berman from Mr. Anderson); Ex. 111 (11/01/2013

letter to Mr. Anderson from Mr. Styant-Browne).]

211.    In August 2014, Mr. Styant-Browne wrote to Mr. Anderson to inform him that he

needed to be physically examined by Dr. Stephens. [Ex. 112 (08/05/2014 letter to Mr. Anderson

from Mr. Styant-Browne).] The examination was delayed due to Mr. Anderson's failure to

maintain contact and logistical holdups from Mr. Anderson's parole officer. [*See* Ex. 113

(08/28/2014 email exchange).]

212.    Given these logistical hurdles, the Firm arranged for a local orthopedic surgeon to

examine Mr. Anderson and provide Dr. Stephens with the results of the examination. [09/28/2017

Tr. (re: Anderson) at 5 (Styant-Browne testimony).]

213.    In light of Dr. Stephens' opinion, as well as the lack of evidence of Mr. Anderson's

mother's ingestion of thalidomide, the Firm believed his case was no longer tenable and asked Mr.

Anderson for approval to dismiss his case. [Ex. 115 (Ex. 3 to Anderson portion of 09/28/2017

Hearing (Sept. 17, 2014 Letter)).] Mr. Anderson refused. On October 17, 2014, the Firm filed a

motion to withdraw with respect to Mr. Anderson. [Doc. 375.]

214.    In October 2014, the Court stayed Mr. Anderson's case and ordered him to inform

the Court whether he had obtained replacement counsel or wished to proceed pro se. [Doc. 384.]

Mr. Anderson never responded.

215.    Over the next few years, both the Firm and the Court made several attempts to reach Mr. Anderson, and serve him copies of various orders, but were unsuccessful.

216.    In early February 2017, the Firm finally managed to reach Mr. Anderson via phone, received an updated address from him (the "Clay Avenue Address") and provided him with copies of the various documents they had previously sent to other addresses. [Ex. 116 (02/06/2017 email to SDM Hangley from Mr. Roberts).] This appears to be the last known address on file for Mr. Anderson; communications sent to the Clay Avenue Address in 2019 and thereafter appear to have been returned to the sender. [*See* Doc. 767 at 136.] In September 2017, the Firm sent Mr. Anderson a copy of potential exhibits to be introduced at SDM Hangley's hearing regarding the Firm's motion to withdraw as his counsel. [Ex. 117 (09/21/17 email to Mr. Anderson from Mr. Alfano).] Hagens Berman's business records do not reflect that the Firm received any correspondence from Mr. Anderson after this date, and Mr. Anderson never attended the September 2017 hearing. Mr. Anderson has also not been responsive to documents sent by SDM Hangley. [Doc. 767 at 136.]

### 7.    Mary Sells

217.    Mary Sells was born in Ohio on February 14, 1962 with serious birth defects, including missing fingers on both hands and webbed feet. [*Gunn* ¶ 22.]

218.    Sells and her family believed that her injuries were likely caused by thalidomide; as she noted in her questionnaire, her mother was given a tablet from her doctor during her pregnancy to combat pregnancy symptoms. [Ex. 118 (Ms. Sells Questionnaire).] However, doctors insisted that her condition was hereditary. [Ex. 119 (07/03/2014 email to Team from Ms. Mahoney) HBSS-001508).] Ms. Sells first learned about Grunenthal's role in the crisis when she heard about Grunenthal's apology in 2012. [*Gunn* ¶ 23.]

219.    During her deposition, Defendants introduced one of Sells' medical records, which suggested that a doctor had concluded that her defects were genetic. [09/27/2017 Tr. (Sells) at 6:1-13.] Initially, the Firm believed ██████████████████████████████████████████ ████████████████████████████████████████████████████████ [*See* Ex. 119 (07/03/2014 email from Mahoney to team, noting: ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████ ]

220.    Further, the Firm reasonably believed ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ [*See id.* (07/03/2014 email to Team from Ms. Mahoney).]

221.    In August 2014, Dr. Stephens reviewed Ms. Sells' medical records.

222.    The Firm followed up by arranging for Ms. Sells to have genetic testing.

223.    As a result of Dr. Stephens' opinions and genetic testing, the Firm concluded it could no longer proceed in good faith with Ms. Sells' case. After discussing the issue with Ms. Sells, the Firm filed a motion to withdraw. [Doc. 382.] Ms. Sells expressed her wish to continue with the lawsuit. [Doc. 520.]

### 8.    Tawana Williams

224.    The Firm believed the statute of limitations did not bar Tawana Williams' claims under its fraudulent concealment and discovery rule exception theories (SOF ¶¶ 61-82, *supra*) because, although she was aware she was a "thalidomide baby" in general, she was unaware of specific Defendants' roles in the thalidomide crisis. Ex. 131 (Reeves000030714) (███████

████████████████████████████████████████████████████████

██████████████████); Ex. 26 (████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████)

(emphasis added); *see also* Ex. 132 (Williams' 11/5/13 Response to GSK Interrogatory No. 4) (acknowledging that doctors had asked her in the past whether she was a thalidomide baby and noting that she had sued the manufacturers of benedictine and thalidomide, alleging that "one or the other drugs had caused her birth defects," but noting that while "Plaintiff identifies herself as a thalidomide baby, but Plaintiff does not know and could not know what drug had been given to her mother.").

225.    Later, Ms. Williams provided the Firm with court documents showing that she sued both thalidomide and benedictine manufacturers in 1981. At this point, the Firm attorney handling Ms. Williams' █████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. 133 (HBSS-002273). This is consistent with the Firm's fraudulent concealment and discovery rule exception theories, which posited that particular Defendants were not identifiable given Defendants' conduct.

226.    Ultimately, however, the Firm concluded the case would be so difficult that it could not proceed. In January 2014, Ms. Mahoney gave Mr. Berman ████████████████████████

████████████████████████████████████ Mr. Berman responded ████████████████

████████████████████████████████████ Ex. 134 (HBSS-003637).

### N.    Steve Berman Objects to the Following Statements in the R&R Directed to Him.

227.    Sanctions may be imposed against Mr. Berman "solely because of [his] own improper conduct without considering the conduct of the parties or any other attorney." *Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995). Mr. Berman has not engaged in any improper conduct, and objects to the following statements in the R&R directed to him (and incorporates by reference the preceding statements of fact).

228.    The R&R sates that Mr. Berman's "oath is everywhere in the record and the things he wrote and swore to were – in numerous plaintiffs' cases – largely false and even more largely based on guesswork." [Doc. 767 at 152.] It further states that he "personally authored – and swore under penalty of perjury to the accuracy of – false factual representations in pleadings that were filed in state court and prosecuted in this Court. [Doc. 767 at 7.]

> Time and again, Mr. Berman personally swore to the veracity of things he did not know and should have known, and that were actually and demonstrably false. More broadly [citing Rule 11 and Pa. R. Civ. P. 1023.1] . . . he signed, filed submitted or later advocated pleadings and papers whose falsity was readily discernible, without having made the requisite 'inquiry reasonable under the circumstances.'

(Doc. 767 at 7.)

229.    Mr. Berman objects that these conclusory statements are inaccurate. They also do not identify any particular statements that were false or "based on guesswork," and therefore do not provide adequate notice to permit him to respond. Nor do they identify with particularity the representations in pleadings he signed or which of the "things he wrote" that were purportedly false or "based on guesswork." Mr. Berman specifically denies making any false statement under oath.

230.    The R&R also states:

It is also apparent – particularly from my review of documents produced in camera by Hagens Berman and Kay Reeves – that Mr. Berman was quite aggressive in deciding that a particular potential plaintiff should be encouraged to sue, despite obvious warning signs in the intake process. A Reeves recommendation that a candidate not be accepted as a plaintiff would come under Berman's basilisk gaze. *See* Reeves000029895 (Berman-Reeves email exchange).

(Doc. 767 at 152.) And also states that "there is more than one example of his skepticism concerning a recommendation by his Hagens Berman colleagues or Ms. Reeves that a case be dropped [Weaver Ex. 10] or not brought in the first place (Reeves000002989) [Doc. 767 at 61.] Mr. Berman objects to these statements as inaccurate. Mr. Berman was not overly aggressive during the intake process nor did he ignore "warning signs" in the intake process. As noted in SOF ¶ 106 and the exhibits cited therein, Mr. Berman was discriminating in accepting new clients and regularly rejected those whom he believed would not have viable cases. Moreover, the Reeves0000029895 document cited above does not support the proposition that Mr. Berman ignored Ms. Reeves' concerns about potential clients. In that email exchange, Mr. Berman says that he would take the case of prospective plaintiff Nick Flick, and asks to set up a call to go over the list of prospective plaintiffs. Although there is no record of the discussion that took place back in August 2012, the Firm never filed a claim on behalf of Mr. Flick. *See* Ex. 127 (Reeves0000029895). The other document cited in the R&R, Reeves000002989, is a typographical error. And Weaver Ex. 10 is an email that does not mention Mr. Berman, nor is he copied on it.

231.    The R&R further states [Doc. 767 at 152-153], as to Mr. Berman:

And the developments in discovery – the Merica, Boiardi, Marshall, Navamuel, and Sells debacles prominent among them – speak volumes about the willingness of Mr. Berman and his cohorts to blur the fundamental distinction between *bona fide* litigation and something closer to extortion.

232.    Mr. Berman objects to the foregoing as not tied to a specific sanctions recommendation. Mr. Berman further objects to the references to Mr. Merica and Mr. Boiardi as

144

unrelated to the recommendations related to the Firm's pending motions to withdraw (the Court years ago adopted SDM Hangley's recommendation that the Firm be sanctioned with respect to Mr. Merica's and Mr. Boiardi's claims, *see* Docs. 414, 482; *see also* Doc. 427 (the Firm's objections to sanctions recommendation)

233.     Mr. Berman further objects to the statement that he blurred "the fundamental distinction between *bona fide* litigation and something closer to extortion." This statement is inflammatory, offensive, injudicious, and entirely baseless. The R&R does not cite any document or testimony suggesting that Mr. Berman or the Firm ever attempted to "extort" Defendants in any way—on the contrary, their conduct consistently demonstrated a willingness to minimize the impact of the litigation on Defendants (*i.e.,* by seeking to adopt a bellwether approach, later moving for a stay, and seeking to dismiss certain Plaintiffs' claims against Defendant GSK once it became clear that discovery would not support those claims).

234.     Finally, Mr. Berman objects to the accusation that he was "quick . . . to lay off on Nick Styant-Browne the responsibility within Hagens Berman for the [March of Science] theory *in particular clients' cases*." (Doc. 767 at 74 (citing 09/26/2017 General Tr. at 43:13-44:1)) (emphasis added); *see also id.* at 30 ("Berman referred me to his of counsel colleague Mr. Styant-Browne for information regarding the New Science bases *for particular plaintiffs' claims*.") (emphasis added). Respectfully, this mischaracterizes the cited portions of the September 2017 transcript. The purpose of the September 2017 hearings was for SDM Hangley to assess the professional considerations that led the Firm to seek withdrawal from five specific Plaintiffs' cases. The cited transcript sections did not involve questions about the scientific basis for *particular Plaintiffs'* claims, but more general questions about "the *types of injuries* that were not attributable in the past [to thalidomide exposure] but now were[.]" 9/26/17 General Tr. at 43:20-

22. In response, Mr. Berman simply testified that he could not recall the "specific names" of the injuries and referred SDM Hangley to Mr. Styant-Browne for that information. Notably, Mr. Berman went on to testify knowledgably about (i) the literature supporting the theory; (ii) his meeting and conversations with Dr. Trent Stephens; and (iii) the science finally having advanced to a level where experts could testify about thalidomide causing unilateral (as opposed to only bilateral) injuries. (09/26/17 General Tr. at 43:23-45:22.) In short, Mr. Berman was well-versed in the March of Science theory when questioned about it during the ancillary proceedings.

**O.    There is not an "Open Question" as to the Confidentiality of the Confidential Settlement Agreements.**

235.    The R&R states (at 16) that the confidentiality of the Firm's prior settlements with certain of its former clients—which SDM Hangley inexplicably required the parties to produce— is "an open question." Not so. Those settlement agreements contain confidentiality and/or non-disclosure clauses expressly prohibiting disclosure of the terms of the settlement agreements. The parties agreed to those terms, the confidentiality term is material, and public policy favors enforcement of contracts in general and settlement agreements in particular. *See, e.g.*, Advisory Committee Notes, Fed. R. Evid. 408 ("As a matter of general agreement, evidence of an offer to compromise a claim is not receivable in evidence as an admission of, as the case may be, the validity or invalidity of the claim . . . [given the] public policy favoring the compromise and settlement of disputes.") Even in the discovery context—where the rules are "meant to be construed quite liberally to as to permit the discovery of any information which is relevant and is reasonably calculated to lead to the discovery of admissible evidence"—courts required the party seeking discovery of settlement agreements to "make a particularized showing that the evidence is likely to lead to the discovery of admissible evidence." *Fid. Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993) ("In keeping with the strong Congressional policy behind

Rule 408 as well as the liberal discovery rules, we will follow along the lines of the New York district courts and place the onus on the plaintiffs to show that the documents relating to the settlement negotiations are relevant and likely to lead to the discovery of admissible evidence.") SDM Hangley did not articulate why he believed the settlement agreements were relevant to the matters before him. SDM Hangley notes (at 17) that he "solicited the views of the participants on whether these documents are entitled to remain shield from scrutiny the public" and says—without explanation—that the responses were not "particularly edifying." To Respondents' knowledge, every party to those agreements indicated that they should remain confidential, although all responses apparently have not been shared with Respondents. Moreover, even assuming those agreements were relevant to the withdrawal proceedings or the *sua sponte* sanctions proposed in the R&R, the agreements should be kept *in camera* and remain confidential. To Respondents' knowledge, that is also the view of all other parties to those agreements. [*See, e.g.*, Doc. 750 at 19 n. 9 (06/09/21 Notice from the Firm stating that other parties were in alignment with its position regarding the confidentiality of settlement agreements)]

236.    In June 2021, the Firm reserved its rights and arguments regarding the agreements remaining under seal as well as the propriety of SDM Hangley demanding them in this proceeding. (Dkt No. 747 at 6). The Firm also requested to brief the issue before any such agreements are made public. [Doc. 750 at 20] The Firm reiterates those requests here, and objects to any assertion that the confidentiality of any of the Firm's settlement agreements is an "open question."

## VI.    <u>CONCLUSION</u>

Respondents respectfully request that the Court deny the recommendation of sanctions.

DATED:  October 4, 2025            Respectfully submitted,

/s/ Keith Beauchamp

COPPERSMITH BROCKELMAN PLC

Keith Beauchamp (*pro hac vice*)
kbeauchamp@cblawyers.com
Malvika A. Sinha (*pro hac vice*)
msinha@cblawyers.com
2800 North Central Avenue, Suite 1900
Phoenix, AZ  85004
Telephone: (602) 381-5490
Facsimile: (602) 224-6020

**PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP**

/s/ Gaetan J. Alfano (w/permission)

Gaetan J. Alfano
Pennsylvania Bar No. 32971
GJA@pietragallo.com
1818 Market Street, Suite 3402
Philadelphia, PA 19102
Telephone: (215) 320-6200
Facsimile: (215) 981-0082

Peter St. Tienne Wolff
Pennsylvania Bar No. 208433
PSW@pietragallo.com
38th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Telephone: (412) 263-2000
Facsimile: (412) 263-2001

**SAXTON & STUMP, LLC**

/s/ Christopher C. Conner (w/permission)

Christopher C. Conner
Pennsylvania Bar No. 36407
cconner@saxtonstump.com
4250 Crums Mill Road, Suite 201
Harrisburg, PA 17112
Telephone: (717) 216-5522
Facsimile: (717) 547-1900

Timothy M. Stengel
Pennsylvania Bar No. 314573
tstengel@saxtonstump.com
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Telephone: (717) 556-1010
Facsimile: (717) 441-3810

*Attorneys for Hagens Berman Sobol Shapiro LLP,
and Steve Berman*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 4, 2025, a true and correct copy of the

foregoing Hagens Berman Sobol Shapiro LLP And Steve Berman's Response To August 5, 2025

Order To Show Cause (Doc. 835) Why Sanctions Should Not Be Imposed In Accordance With

The Report And Recommendation Of The Special Discovery Master (Doc. 767) was filed

electronically and served on all counsel via the Court's CM/ECF system.

/s/ Keith Beauchamp

COPPERSMITH BROCKELMAN PLC

Keith Beauchamp (*pro hac vice*)
kbeauchamp@cblawyers.com
Malvika A. Sinha (*pro hac vice*)
msinha@cblawyers.com
2800 North Central Avenue, Suite 1900
Phoenix, AZ  85004
Telephone: (602) 381-5490
Facsimile: (602) 224-6020

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI LLP

/s/ Gaetan Alfano (with permission)

Gaetan J. Alfano
Pennsylvania Bar No. 32971
GJA@pietragallo.com

Peter St. Tienne Wolff
Pennsylvania Bar No. 208443
PSW@pietragallo.com
1818 Market Street, Suite 3402
Philadelphia, PA 19102
Telephone: (215) 320-6200
Facsimile: (215) 981-0082

SAXTON & STUMP, LLC

/s/ Christopher C. Conner (w/permission)

Christopher C. Conner
Pennsylvania Bar No. 36407
cconner@saxtonstump.com
4250 Crums Mill Road, Suite 201
Harrisburg, PA 17112
Telephone: (717) 216-5522
Facsimile: (717) 547-1900

Timothy M. Stengel
Pennsylvania Bar No. 314573
tstengel@saxtonstump.com
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Telephone: (717) 556-1010
Facsimile: (717) 441-3810

*Attorneys for Hagens Berman Sobol Shapiro LLP,
and Steve Berman*