IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GLENDA JOHNSON, et al. | Civ. No. 2:11-cv-05782-PD |
| v. | AND ALL RELATED CASES |
| SMITHKLINE BEECHAM CORPORATION, et al. | |

## HAGENS BERMAN SOBOL SHAPIRO LLP AND STEVE BERMAN'S BRIEF IN SUPPORT OF MOTION FOR RECUSAL

Hagens Berman Sobol Shapiro, LLP ("Hagens Berman" or "the Firm") and Steve Berman (collectively, "Respondents") respectfully submit this brief in support of Respondents' Motion for Recusal ("Recusal Motion").

In the Recusal Motion and this accompanying brief, Respondents raise an issue of first impression in the Third Circuit, namely: When do *ex parte* communications between a special master and a district judge, about matters for which the judge must later undertake an impartial, de novo review, create the appearance of bias requiring the judge to recuse? Although any motion for disqualification of the presiding judicial officer must be undertaken with great care and caution, Respondents respectfully submit the Court's recusal is necessary based upon the number, timing, and circumstances of *ex parte* communications between the Court and Special Discovery Master Hangley ("SDM Hangley").

## I.    BACKGROUND

Between 2011 and 2014, Respondents and co-counsel filed 11 lawsuits against manufacturers and distributors of the drug thalidomide on behalf of 52 clients. The cases were removed and then consolidated in this Court. On June 27, 2014, this Court entered an Order, pursuant to Fed. R. Civ. P. 53, appointing SDM Hangley. (Doc. 256) In the initial appointment Order (the "Appointment Order"), the Court identified various duties for SDM Hangley. The Appointment

Order also addressed the possibility of *ex parte* communications during SDM Hangley's appointment, stating in pertinent part:

> The Special Master may communicate *ex parte* with the Court without notice to the Parties concerning procedural matters, to assist the Court's understanding of complex discovery matters, or for any other reason reasonably necessary to fulfillment of his duties.

(*Id*. at 3.)

On August 11, 2014, December 8, 2014, February 24, 2015, March 11, 2015, and March 14, 2016, the Court amended the Appointment Order to expand SDM Hangley's authority. (Docs. 316, 420, 472, 485, 532) None of these amendments revised the above-quoted provision identifying three categories of permissible *ex parte* communications between the Court and SDM Hangley. Pursuant to the Appointment Order and its five modifications, SDM Hangley completed various tasks over the course of several years. A brief review of the timing and chronology of certain of those tasks is relevant and material to Respondents' arguments herein.

First, on December 4, 2014, SDM Hangley issued a Report and Recommendation recommending that sanctions be imposed against the Firm in favor of Defendant Grunenthal with respect to claims of three Plaintiffs. (Doc. 414) ("the Discovery Sanctions R&R"). On March 9, 2015, the Court approved and adopted the Discovery Sanctions R&R (Doc. 483) and by August 28, 2015, the Court had imposed those sanctions and entered judgment against those three Plaintiffs (Doc. 514). Thus, as of December 4, 2014, SDM Hangley had no remaining complex discovery issues. Additional tasks assigned in the December 8, 2014 Order (voluntary dismissal issue), the February 24, 2015 Order (voluntary dismissal issue), and the March 11, 2015 Order (voluntary dismissal issue) were still pending. On August 10, 2016, following interviews and investigation, SDM Hangley recommended that the Rule 41 voluntary dismissals be approved. ("Dismissal R&R") (Doc. 535) Thus, as of August 10, 2016, SDM Hangley had no outstanding issues relating to

voluntary dismissals. Only the final task set forth in the March 14, 2016 Order remained—the Firm's motions to withdraw as counsel for five plaintiffs.[1]

During the period of May 24–26, 2021, SDM Hangley presided over hearings related to the motion to withdraw as counsel. Following the May 2021 hearings, SDM Hangley engaged in no further fact-finding on the record. More than two years later, on October 12, 2023, SDM Hangley issued his 154-page far-ranging R&R, *sua sponte* recommending that the Court sanction the Firm and Mr. Berman ("Final R&R"). (Doc. 767) On December 13, 2023, Respondents filed their comprehensive response thereto, under seal. (*See* Hagens Berman Sobol Shapiro LLP and Steve Berman's Objections to the Special Discovery Master's Report and Recommendations Dated October 12, 2023, and Response to the OSC Entered on October 13, 2023 ("Respondents' Objections")). On August 5, 2025, the Court issued the Memorandum Opinion, in which it adopted *all* SDM Hangley's factual findings, erroneously stating:

> The Parties have not objected to the great majority of Mr. Hangley's factual findings….

(Doc. 834 at 2). *See also* discussion *infra* at 17-18.

Throughout his appointment, SDM Hangley engaged in *ex parte* communications with the Court at least 146 times. *See* Summary Table, Exhibit A to Declaration of Keith Beauchamp in Support of Hagens Berman and Steve Berman's Motion for Recusal ("Beauchamp Declaration"), attached as <u>Exhibit 1</u> hereto. For many of these *ex parte* communications, it is not possible to discern whether they fell within the three categories of *ex parte* communications contemplated in the Appointment Order. The time entries are too curt or vague to determine anything other than the fact

---

[1] SDM Hangley later made recommendations as to the Firm's proposed redactions of the exhibits and transcripts of the 2017 and 2019 hearings and also as to redactions in the Objections made by the Firm to his October 2023 Final R&R. (*see* Docs. 805, 829, 836, 861)

that *ex parte* communications took place. However, given the circumstances and timing of *ex parte* communications in the period June 2021 through October 2023, described in Section IIA.2, Respondents have a good faith basis to believe that those *ex parte* communications related directly to the substance of SDM Hangley's Final R&R, thereby impermissibly affecting the Court's ability to conduct a *de novo* review of Respondents' Objections to the Final R&R, or at the very least, creating an appearance of bias requiring this Court's disqualification and recusal.

## II.    ARGUMENT

**A.    THE COURT'S ABILITY TO CONDUCT AN INDEPENDENT *DE NOVO* REVIEW WAS IRREPARABLY IMPAIRED BY THE EXTENT AND PRESUMED CONTENT OF *EX PARTE* COMMUNICATIONS AND THE APPEARANCE OF BIAS REQUIRES THE COURT'S DISQUALIFICATION AND RECUSAL.**

This is a case of first impression. Despite exhaustive research, Respondents have not located any case law delineating the scope of permissible, **substantive** *ex parte* communications between an Article III judge and his or her special master, when the matters to which the special master are assigned must be reviewed *de novo* pursuant to Fed. R. Civ. P. 53(f)(3)-(4). Respondents respectfully posit that **any** *ex parte* communication between a special master and an Article III judge, which logically appears to concern the substance of a matter under consideration by the special master, fatally compromises the ability of the district judge to conduct the *de novo* review mandated by Rule 53. In the instant matter, this Court's ability to conduct an independent *de novo* review appears to be irreparably impaired by the extent and presumed content of *ex parte* communications with SDM Hangley, and, because of the appearance of bias, the presiding judge must be disqualified and should recuse itself from the instant matter.

Judges and judicial officers may be disqualified from a matter pursuant to 28 U.S.C. § 455. Section 455(a) of the statute governs the appearance of bias. It provides, "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his

impartiality might reasonably be questioned." 28 U.S.C. § 455(a); *see also Liteky v. United States,* 510 U.S. 540, 548 (1994).

The appearance of bias is determined through the lens of a "reasonable person" standard. *In re Kensington Int'l, Ltd.*, 368 F.3d 289, 296 (3rd Cir. 2004) "[T]he test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." *Id*. at 301 (internal citation omitted). "A party moving for disqualification under § 455(a) need not show actual bias because § 455(a) concerns not only fairness to individual litigants, but, equally important, it concerns the public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who ***appears*** to be tainted." *Id.* at 302 (internal quotation and citations omitted) (emphasis added). Because the aim of the disqualification statute is to protect public confidence, "the appearance of impropriety must be viewed from the perspective of the objective, reasonable layperson." *Id*. at 303. It need not be shown that the judge had knowledge of the disqualifying facts—disqualification under 28 U.S.C. § 455(a) is still required if the judge's impartiality could "reasonably be questioned"—i.e., if a reasonable person knowing the disqualifying facts would expect the judge also to be aware of such facts, creating an appearance of partiality. *Liljeberg v. Health Services Acquisition Corp*., 486 U.S. 847, 860 (1988).

"Impartiality and the appearance of impartiality in a judicial officer are the *sine qua non* of the American Legal System." *Haines v. Liggett Group Inc*., 975 F.2d 81, 98 (3d Cir. 1992) (internal citation omitted.) To avoid both bias *and* the *appearance* of bias, appellate courts have the supervisory authority, through a writ of mandamus, to order the reassignment of cases, where it is necessary to "preserve not only the reality but also the appearance of the proper functioning of the judiciary as a neutral, impartial administrator of justice." *Id*. (internal citations omitted).

In addition to the disqualification statute, 28 U.S.C. § 455, the Judicial Conference of the United States imposes further ethical constraints through the Code of Conduct for U.S. Judges. Canon 2 of the Code of Conduct states,

> **Canon 2: A Judge Should Avoid Impropriety and the Appearance of Impropriety in all Activities**
> (A) *Respect for Law*. A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Like 28 U.S.C. § 455(a), the commentary to Canon 2(A) reveals that the "reasonable person" standard applies in the context of appearances of impropriety, instructing,

> An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges, including harassment and other inappropriate workplace behavior. A judge must avoid all impropriety and appearance of impropriety. This prohibition applies to both professional and personal conduct. A judge must expect to be the subject of constant public scrutiny and accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen. Because it is not practicable to list all prohibited acts, the prohibition is necessarily cast in general terms that extend to conduct by judges that is harmful although not specifically mentioned in the Code. Actual improprieties under this standard include violations of law, court rules, or other specific provisions of this Code.

Code of Conduct for U.S. Judges commentary to Canon 2A.

Canon 3 of the Code of Conduct identifies the circumstances under which a judge shall disqualify himself in a proceeding,

> (C) *Disqualification*.
>
> (1) A judge **shall** disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:
> (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . .

Code of Conduct for U.S. Judges Canon 3(C). Canon 3 makes clear that the relevant inquiry is again one of reasonableness – a judge is required to disqualify himself if his impartiality might reasonably be questioned.

The Court's *ex parte* communications with SDM Hangley, especially when considered with other unusual circumstances in this case, create an appearance of bias against Respondents. The volume of *ex parte* communications between the Court and SDM Hangley was excessive; the Court failed to uphold its gatekeeping function with respect to those *ex parte* communications; and the timing of certain *ex parte* communications in the 28-month period between conclusion of the 2021 withdrawal hearings and issuance of the October 2023 *sua sponte* sanctions recommendation compels the conclusion, or at the very least, raises the appearance that these communications involved the actual substance of SDM Hangley's Final R&R.

1.  **Federal Rule of Civil Procedure 53 and the Code of Conduct for U.S. Judges Provide Guideposts for a Judge's Engagement in *Ex Parte* Communications.**

The Court's *ex parte* communications with SDM Hangley in this matter fall outside the guideposts prescribed by Rule 53 of the Federal Rules of Civil Procedure and the Code of Conduct for United States Judges.

Rule 53 sets forth limits on the scope of a master's appointment, identifies certain requirements for the appointment order, and delineates the master's authority to undertake specific tasks. *See* Fed. R. Civ. P. 53(a)(1) and 53(c). In addition, Rule 53(e) specifically states: "A master must report to the court as required by the appointing order." After the master's report has been filed, the district court is mandated by the Rule to **"decide de novo all objections to findings of fact**

**made or recommended by a master,"** unless the parties stipulate otherwise.[2] Fed. R. Civ. P. 53(f)(3). The Rule also mandates that the Court must **"decide de novo all objections to conclusions of law made or recommended by a master."** Fed. R. Civ. P. 53(f)(4). Unlike objections to findings of fact, this provision is not subject to stipulation by the parties, and *de novo* review as to questions of law is mandated by the rule. *Id*.

With respect to *ex parte* communications, Rule 53(b)(2)(B) dictates that an order appointing a special master must state "the circumstances, if any, in which the master may communicate *ex parte* with the court or a party." The Notes to the 2003 amendments to Rule 53 underscore the caution that must be employed by special masters and courts to avoid unauthorized *ex parte* communications. The Note advises,

> Ex parte communications between a master and the court present troubling questions. Ordinarily the order should prohibit such communications, assuring that the parties know where authority is lodged at each step of the proceedings. Prohibiting ex parte communications between master and court also can enhance the role of a settlement master by assuring the parties that settlement can be fostered by confidential revelations that will not be shared with the court. Yet there may be circumstances in which the master's role is enhanced by the opportunity for ex parte communications with the court. A master assigned to help coordinate multiple proceedings, for example, may benefit from off-the-record exchanges with the court about logistical matters. The rule does not directly regulate these matters. It requires only that the court exercise its discretion and address the topic in the order of appointment.

Fed. R. Civ. P. 53 Advisory Committee Note (emphasis added). The Advisory Committee Note makes clear that *ex parte* communications between the special master and the court are disfavored, given the "troubling questions" they present. Although disfavored, the Note also recognizes that certain types of *ex parte* communications may be necessary to the accomplishment of the special

---

[2] In the instant case, the parties did not stipulate otherwise. (*See* Doc. 834 at 9) Thus, the Court is required to undertake a *de novo* review of all objections to the findings of fact in SDM Hangley's R&Rs.

master's duties. The Note acknowledges that Rule 53 does not address with specificity the types of *ex parte* communications that are permissible, but the Note instructs that Rule 53 requires the **court** to act with discretion and to address the topic of *ex parte* communications in its appointment order.[3]

Federal district court judges are also bound by their own Code of Conduct with respect to *ex parte* communications. The Code of Conduct for U.S. Judges provides,

> **Canon 3: A Judge Should Perform the Duties of the Office Fairly, Impartially and Diligently**
>
> The duties of judicial office take precedence over all other activities. The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased. The judge should adhere to the following standards:
> (A) *Adjudicative Responsibilities.*
> . . .
>
> (4) A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. ***Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested. A judge may:***
>
> ***(a) initiate, permit, or consider ex parte communications as authorized by law;***
>
> ***(b) when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication;***

---

[3] That the Rule attempts to balance the need to assiduously avoid *ex parte* communications about matters that must be reviewed *de novo* and the court's interest in enhancing the utility of a special master is obvious. But the exception does not swallow the rule, and the scope of permissible *ex parte* contact simply does not include discussions of the factual and legal findings to be reviewed *de novo,* and must be clearly articulated in the appointment order. To hold otherwise will lead inexorably to *ex parte* communications between master and judge on various factual findings or legal conclusions eviscerating the entire concept of *de novo* review as well as the parties' ability to discern the authority at each step of the proceedings.

Code of Conduct for U.S. Judges, Canon 3(A)(4) (emphasis added).

The above-quoted language is entirely consistent with the policy underlying Rule 53(b)(2)(B) which requires the presiding judge to expressly state in the order of appointment "the circumstances, *if any*, in which the master may communicate *ex parte* with the court…." (Fed. R. Civ. P. 53(b)(2)(B) (emphasis added). Obviously, both the Code of Conduct and Rule 53 recognize that without appropriate restrictions, *ex parte* communications can literally destroy the appearance of impartial justice. To protect the integrity of judicial decision-making, especially *de novo* review, judges and masters must avoid *ex parte* communications on any factual or legal issue that will be the subject of judicial review. Independent decision-making without influence or bias is the cornerstone of our American civil justice system.

Consistent with Rule 53(b)(2)(B), the Appointment Order does address, albeit broadly, the circumstances under which SDM Hangley could permissibly communicate *ex parte* with the Court in this matter. As set forth above, the Appointment Order delineated three categories of permissible *ex parte* communications between SDM Hangley and the Court: (1) communications concerning procedural matters; (2) communications to assist the Court's understanding of complex discovery matters; and (3) communications for any other reason reasonably necessary to the fulfillment of SDM Hangley's duties. (Doc. 256 at 3)

**2.    The Volume of *Ex Parte* Communications between the Court and SDM Hangley Was Excessive and There Was No Gatekeeping Mechanism to Prevent those Communications from Exceeding the Authority Set Forth in the Appointment Order.**

Throughout his appointment, SDM Hangley engaged in *ex parte* communications with the Court at least 146 times. *See* Ex. A to Beauchamp Declaration, attached as <u>Exhibit 1</u>. Exhibit A is a summary table created from SDM Hangley's monthly time and billing entries submitted to the Firm

through October 2023.[4] The billing table reveals the alarming[5] extent of *ex parte* communications between SDM Hangley and the Court, particularly during the critical 28-month period leading up to the Final R&R, which contains the *sua sponte* recommendation of sanctions. *See* Ex. A and B to Beauchamp Declaration.

It is not merely the volume of *ex parte* communications that is concerning, but also the vague and ambiguous memorialization of these communications. Most of SDM Hangley's time entries referencing communications with the Court are so non-descript that it is impossible to ascertain the topics discussed. Respondents, therefore, have no way to determine into which category of approved *ex parte* communications, if any, the conversations fall. Only a handful are descriptive enough to determine that the communications fall squarely into the permissible categories of communications concerning procedural matters or communications to assist the Court's understanding of complex discovery matters. For example, a time entry on September 5, 2017, reflects, "Discuss hearing logistics with the Court and Staff (.40)." *See* Ex. A to Beauchamp Declaration. As another example, a time entry on July 17, 2014, reflects, "Review discovery order with Judge Diamond. File. (3.60)." *See id*. These obviously, are unobjectionable.

---

[4] The Firm has not received billing records from SDM Hangley since filing its December 2023 Objections, and thus is unaware as to what, if any, communications occurred between SDM Hangley and the Court in the period November 2023 through issuance of the August 2025 Memorandum Opinion. *See* Exhibit 2, Declaration of Craig Spiegel.

[5] In the Memorandum Opinion, the Court calculates the frequency of SDM Hangley's *ex parte* communications to be "approximately one per month" and characterizes that frequency as "hardly surprising" given the length and complexity of the litigation. What the Court fails to address or even acknowledge is the frequency of communications in proximity to specific events, such as the multiple, and sometimes lengthy, *ex parte* communications that occurred prior to SDM Hangley's release of the Final R&R—when he was not engaged in any activity other than drafting the Final R&R. The Memorandum Opinion summarily dismisses Respondents' objections as untimely and without legal support. Respondents' legal support is detailed herein and offered in good faith on a matter of first impression in the Third Circuit. The issue of timeliness is also addressed herein in Section II B *infra*.

But most of SDM Hangley's time entries are far less specific. The descriptions are general, short references, revealing only that an *ex parte* communication with the Court occurred. Creating more ambiguity, many of the entries fall within block entries that identify tasks in addition to communications with the Court, making it impossible to determine how much of the recorded time involved communications with the Court versus other tasks such as conducting research or drafting reports. For example, an entry from February 14, 2018, reflects, "Report and Recommendation. Telephone with chambers. Research." *See* Ex. A to Beauchamp Declaration. SDM Hangley devoted eight hours to this block of tasks. *Id*. The time and billing records made it impossible to determine whether he spent seven hours and 59 minutes conducting research/writing reports and only one minute communicating with the Court or if he spent seven hours and 59 minutes communicating with the Court and only one minute conducting research/writing. The latter would be extremely troubling. The fact that Respondents do not know the answer is even more troubling.

The ambiguity and vagueness of these time entries is especially disconcerting given the importance of the Appointment Order in regulating the use of *ex parte* communications. As Rule 53 makes clear, the Appointment Order is the vehicle for avoiding the "troubling questions" that *ex parte* communications present. *See* Fed. R. Civ. P. 53 Advisory Committee's Note. Without specificity in the billing records, there is no way for Respondents to determine whether the *ex parte* communications fell within one of the three categories of permissible *ex parte* communications delineated in the Appointment Order. As the Advisory Committee's Note to Rule 53 suggests, the Court is the gatekeeper, exercising its discretion to ensure that *ex parte* communications do not exceed the scope agreed to by the parties. *See* Fed. R. Civ. P. 53 Advisory Committee Note. The Code of Conduct serves as the guidepost, making it the obligation of the Court to ensure that *ex parte* communications do not impermissibly bear upon matters of substance. *See* Code of Conduct

for U.S. Judges, Canon 3(A)(4). Here, it appears that the Court failed to perform its gatekeeping function and its obligation to protect matters of substance from the reach of impermissible *ex parte* communications.

**3.    The Volume of *Ex Parte* Communications Preceding Issuance of the Final R&R Logically Implies that SDM Hangley and the Court Discussed Factual Findings or Legal Conclusions Thereby Jeopardizing the Court's Ability to Conduct an Independent, *De Novo* Review of Respondents' Objections to the Final R&R.**

The length and timing of certain *ex parte* communications between the Court and SDM Hangley provide Respondents with a good faith basis to believe that the Court and SDM Hangley discussed substantive issues material to the drafting of SDM Hangley's Final R&R. As set forth above, the Appointment Order permitted *ex parte* communications related to procedural matters, to assist the Court's understanding of complex discovery matters, or for any other reason reasonably necessary to fulfillment of SDM Hangley's duties. When placed in context—in the procedural chronology of the case—*ex parte* communications in the period June 2021 through October 2023 cannot be explained as involving procedural issues, complex discovery matters, or in any way necessary to the fulfillment of SDM Hangley's duties.

The first category of permissible *ex parte* communications in the Appointment Order permits communications relating to procedural matters. Given the express authorization in the Appointment Order, it is reasonable to assume that SDM Hangley would be careful to specifically designate all *ex parte* communications on procedural matters in his time entries. In fact, as set forth above, in certain time entries, he did just that. The natural conclusion, therefore, is that if a time entry does not reflect that it specifically related to procedural matters, it did not.

The second category of permissible *ex parte* communication in the Appointment Order was communications related to complex discovery issues. As set forth above, the complex discovery issues were largely resolved by December 4, 2014, because SDM Hangley issued his Discovery

13

Sanctions R&R on that day. (Doc. 414) Thereafter, a few minor issues arose and were addressed, the latest in May 2015. (Doc. 508) Any *ex parte* communications between the Court and SDM Hangley after May 2015 could not have been related to complex discovery matters.

For a multitude of reasons, the last, catch-all category of permissible *ex parte* communications, those "reasonably necessary" to the fulfillment of SDM Hangley's duties, cannot justify or explain all remaining *ex parte* communications between SDM Hangley and the Court. First and foremost, acceptance of this justification would effectively extinguish Rule 53's mandate that an appointment order clearly state the circumstances under which *ex parte* communications are allowed. The Rule requires specificity of circumstances. *See* Fed. R. Civ. P. 53(b)(2)(B). To rely on the catch-all provision in the Appointment Order as authority, thereby permitting all the remaining hours of *ex parte* communications between SDM Hangley and the Court is in direct conflict with Rule 53's mandate of specificity.

The specificity requirement of Rule 53 relating to *ex parte* communications is critical given the *de novo* review that Rule 53 also demands. A blanket approval of all *ex parte* communications reasonably necessary for the fulfillment of a special master's duties flouts the protections necessary for the *de novo* review requirements of Rule 53.

SDM Hangley's fact-finding duties concluded in May 2021 with the last series of hearings related to the motions to withdraw as counsel for five Plaintiffs. Between the close of those hearings in May 2021 and issuance of the Final R&R in October 2023, there was virtually nothing that SDM Hangley and the Court could have discussed other than his work on the Final R&R, as no other matters were pending. But SDM Hangley's *ex parte* communications with the Court continued even while he drafted the Final R&R, notwithstanding that the Court was obligated to conduct a *de novo* review of whatever SDM Hangley recommended.

The extensive communications between SDM Hangley and the Court (and with others whose identity was not identified, *i.e.*, entries for "telephone") are set out in Ex. A to the Beauchamp Declaration attached as <u>Exhibit 1</u>. In 2021, for example, SDM Hangley's time entries reflect that he spent 29.3 hours on tasks that included communicating with the Court and other unknown persons (i.e., "telephone"). Seven of these entries unequivocally cite communications with the Court:

| 05/27/21 | William T. Hangley | **Telephone with the court. Arrangements to begin post-hearings review and drafting.** | 0.90 |
|---|---|---|---|
| 06/09/21 | William T. Hangley | **Lengthy calls with team and with the court. Continuing research and request for research assistance.** *Correspondence with counsel*. | 4.00 |
| 07/06/21 | William T. Hangley | **Telephone with the court.** | 0.60 |
| 08/24/21 | William T. Hangley | **Research and drafting. Question for the court.** | 4.40 |
| 08/30/21 | William T. Hangley | *Telephone* and review recent cases. | 2.30 |
| 09/23/21 | William T. Hangley | **Telephone with the court and review testimony.** | 1.90 |
| 10/04/21 | William T. Hangley | **Telephone with the court.** | 0.60 |
| 11/02/21 | William T. Hangley | *Telephone*. | 0.60 |
| 12/10/21 | William T. Hangley | **Transcript review and research; correspondence with the court.** | 4.40 |
| 12/14/21 | William T. Hangley | Drafting and research. *Telephone*. | 3.60 |
| 12/15/21 | William T. Hangley | Drafting and research. *Telephone*. | 6.00 |

Ex. A to Beauchamp Decl.

The extensive *ex parte* communications continued into calendar year 2022, when SDM Hangley recorded 48.60 hours of time communicating with the Court and/or with third parties (*i.e.*, "telephone"). Of those 48.60 hours, time entries totaling 32.90 hours explicitly reference communications with the Court, notwithstanding that the only task being undertaken by SDM Hangley during this time period was the drafting of his Final R&R:

| Date | Timekeeper | Description | Hours |
|---|---|---|---|
| 01/06/22 | William T. Hangley | **Telephone with the Court.** | 0.40 |
| 03/08/22 | William T. Hangley | *Fact investigation* and research. | 0.90 |
| 03/17/22 | William T. Hangley | **Follow up with court re recent dismissal of related litigation.** *Review that docket* . | 0.70 |
| 05/06/22 | William T. Hangley | **Telephone with the court.** | 0.40 |
| 06/13/22 | William T. Hangley | *Telephone* and research. | 1.30 |
| 06/15/22 | William T. Hangley | Drafting and research. *Telephone* . | 4.50 |
| 06/23/22 | William T. Hangley | **Correspondence with the court and with counsel (re Harrellson settlement).** Continued review and drafting. | 5.00 |
| 06/28/22 | William T. Hangley | Record review and drafting. *Telephone* . | 5.00 |
| 09/19/22 | William T. Hangley | **Telephone with the Court.** Drafting R&R. | 7.00 |
| 11/21/22 | William T. Hangley | Draft report. **Correspondence with the court.** | 4.00 |
| 11/28/22 | William T. Hangley | *Telephone* and record review. | 4.00 |
| 12/21/22 | William T. Hangley | **Research and telephone with the court.** | 3.60 |
| 12/22/22 | William T. Hangley | **Research and discussion with Judge Diamond.** | 7.00 |
| 12/23/22 | William T. Hangley | Research and drafting. **Telephone with the court.** | 4.80 |

*Id.*

SDM Hangley and the Court continued communicating in 2023 prior to issuance of the Final R&R in October of that year. That year, SDM Hangley's time entries reflect eight communications with the Court and an additional "telephone" communication with persons unknown. And on July 10, 2023—approximately 90 days before issuance of the Final R&R—SDM Hangley had a full hour of *ex parte* communication with the Court:

| Date | Timekeeper | Description | Hours |
|---|---|---|---|
| 02/28/23 | William T. Hangley | Drafting and **telephone with the court.** | 3.00 |
| 03/10/23 | William T. Hangley | J. Summers re staffing arrangements and coverage. **Telephone with the Court.** | 0.90 |
| 05/03/23 | William T. Hangley | *Telephone* . Review transcripts and citations. | 5.30 |
| 06/02/23 | William T. Hangley | **Discuss case questions with the court.** Review testimony. | 0.90 |
| 07/07/23 | William T. Hangley | **Telephone with the court.** | 0.30 |
| 07/10/23 | William T. Hangley | **Telephone with the court.** | 1.00 |
| 08/04/23 | William T. Hangley | Drafting and **correspondence with the court.** | 4.20 |
| 08/10/23 | William T. Hangley | Research and record check. *Telephone* . | 4.40 |

*Id*.

All told, SDM Hangley and the Court engaged, at a minimum, in 22 communications during the time SDM Hangley was preparing the Final R&R (seven communications in 2021, nine in 2022, and six in 2023). This volume of *ex parte* communications during the drafting of the Final R&R, which would ultimately excoriate Respondents and *sua sponte* recommend sanctions against them, creates a good faith basis for Respondents to conclude that the Court's ability to conduct an independent, impartial *de novo* review of the Respondents' Objections to the Final R&R has been impaired.

### 4. The Court's Summary Adoption of the Factual Findings in the Final R&R Ignored Respondents' Substantial Objections, Suggesting a *De Novo* Review Did Not Occur.

Certain highly unusual aspects of the Court's Memorandum Opinion (Doc. 834) provide additional support for the Respondents' Recusal Motion. Indeed, as set forth in Section II.B., the Memorandum Opinion is relevant and material to the timing of the instant motion. Despite Respondents' lengthy and detailed Objections to the Final R&R (Doc. 818), comprising 133 pages plus another 1064 pages of exhibits, the Court summarily adopted all SDM Hangley's factual findings. (*See* Doc. 834 at 2 (quoted below)). The Court's Memorandum Opinion is a mere 24 pages long, exceptionally brief for *de novo* review of a 154-page R&R and 133 pages of objections and responses thereto.

Even more unsettling is the Court's declaration that the Respondents' failed to object to the "great majority" of SDM Hangley's factual findings. To place this precisely in context with the attendant ramifications to the Court's final conclusions, we quote the entirety of the fourth paragraph of the Memorandum Opinion:

> The Parties have not objected to the great majority of Mr. Hangley's factual findings, which, in any event, I have reviewed de novo and adopt. I will thus rely on those undisputed facts throughout this Memorandum.

(Doc. 834 at 2) Respondents are perplexed as to how the Court arrived at the conclusion that Respondents did not object to the "great majority" of the factual findings in the Final R&R. Respondents' 133 pages of objections were replete with very specific objections to and refutations of SDM Hangley's factual findings. A *de novo* review of Respondents' Objections certainly should have acknowledged the extent to which Respondents disagreed with the factual findings in SDM Hangley's Final R&R. Yet, tellingly, the Court "rel[ied] on those **'undisputed facts'** throughout [its] Memorandum." (*See* Doc. 834 at 2) (emphasis added.) The Court's failure to acknowledge let alone address disputed factual issues seriously calls into question the independence and impartiality of the Court's *de novo* review.

Equally problematic are statements that are *not* found in the Court's Memorandum Opinion. Respondents' discomfort regarding the extent and timing of the *ex parte* communications between the Court and SDM Hangley were explicitly stated in Respondents' December 2023 Objections. (*See* Respondents' Objections at 27-30) Hence, the Court was fully aware of Respondents' concern that the Court's *ex parte* communications may have involved discussions about the substance of SDM Hangley's Final R&R, thereby affecting the Court's ability to conduct an impartial *de novo* review. *See id*. However, the Court's Memorandum Opinion does not address the critical question of the content of its communications with SDM Hangley, not even to provide assurances that there was no discussion of the factual issues and legal conclusions in the Final R&R. Although the Court dismisses Respondents' arguments as "without legal support" and untimely, the Court does not engage the ultimate issue of whether the *ex parte* communications involved discussions of the substance of SDM Hangley's Final R&R, in particular his decision to *sua sponte* recommend

sweeping sanctions against Respondents. Instead of affirmatively stating that the *ex parte* communications did *not* involve discussions of substance, the Court resorted to faulting Respondents for failing to object to SDM Hangley's bills, stating, "Having reviewed and paid Mr. Hangley's bills for some ten years, Hagens Berman (joined by Mr. Weaver) for the first time objects to two actions described in those bills: an 'extra-judicial investigation,' and ex parte communications with the Court. Both objections are frivolous." (Doc. 834 at 16) The Court's failure to engage on the merits of Respondents' specific concerns about the nature of the *ex parte* communications, coupled with its statement that the Firm did not object to the great majority of SDM Hangley's factual findings and the Court's cursory adoption of those findings, lends further support for the instant motion to recuse.[6]

### 5.    The Appearance of Bias Requires the Court's Disqualification and Immediate Recusal.

The Advisory Committee for the 2003 amendments to Rule 53 anticipated the potential pitfalls of *ex parte* communications between special masters and the courts. The Committee recognized that *ex parte* communications between a special master and the court present troubling questions and went so far to caution that "ordinarily the [appointing] order should ***prohibit*** such communications, assuring that the parties know where authority is lodged at each step of the

---

[6] In addition to failing to address the true nature of its *ex parte* communications with SDM Hangley, the Court also failed to address its reasons for not ruling on Respondents' Motion to Dismiss. The Court specifically acknowledged that the motion was outstanding, stating, "Accordingly, on November 14, 2014, Hagens Berman moved for voluntary dismissal of those twenty-eight actions as to GSK. (Doc. No. 409) That Motion is still pending." (Doc. 834 at 5) The Court's failures to address the Dismissal R&R and to rule on Plaintiffs' Motion to Dismiss are troubling, depriving four Plaintiffs of the finality of case resolution notwithstanding that the parties stipulated to dismissal of their claims nearly 11 years ago and causing the claims of 27 other Plaintiffs to remain pending against Defendant GSK notwithstanding agreement of the parties that GSK should be dismissed.

proceedings." Fed. R. Civ. P. 53 Advisory Committee's Note. The Committee's concerns are well-founded here. The Code of Judicial Conduct, likewise, voices strong caution with respect to *ex parte* communications. Code of Conduct for U.S. Judges Canon 3(A)(4). A Judge who receives an unauthorized *ex parte* communication bearing on the ***substance of a matter***, is instructed to promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested. *Id*.

In this matter, the Court gave the parties no such notice. *Ex parte* communications relating to the substance of SDM Hangley's Final R&R do not fall within the range of permissible *ex parte* communications set forth in the Appointment Order because substantive communications regarding SDM Hangley's opinions and conclusions would have born heavily upon this Court's ability to conduct an independent, impartial *de novo* review of Respondents' objections to the R&R. Rule 53 mandates such *de novo* review, and Respondents were entitled to a *de novo* review free of the influence of SDM Hangley's opinions, conclusions, and excessively negative characterization of Respondents and their case.

The "reasonably necessary" language in the catch-all provision of the Appointment Order cannot logically be read to mean that Respondents authorized the Court to engage in *ex parte* communications regarding the substantive findings, conclusions, and opinions in SDM Hangley's Final R&R. To draw that conclusion would necessarily mean that Respondents agreed to waive the Court's independent and impartial *de novo* review of the Respondent's Objections to the Final R&R. The Respondents did not. The volume and timing of *ex parte* communications between SDM Hangley and the Court during the pendency of this case—especially during periods of time when no discovery and/or procedural issues would have been pending—plainly creates an appearance of bias.

The appearance of bias detailed in this memorandum requires the Court's disqualification and immediate recusal from this case. Respondents respectfully submit that a reasonable person, with knowledge of all the facts, would conclude that the Court's impartiality might reasonably be questioned in this matter, and disqualification is mandated by 28 U.S.C. § 455(a).

In *Kensington*, the Third Circuit found an appearance of bias based on extensive *ex parte* communications. 368 F.3d at 312. During the litigation in *Kensington*, the judge had appointed five advisors to assist with asbestos litigation. *Id*. at 297. Two of the advisors were plaintiffs' counsel in unrelated asbestos litigation. *Id*. Over the course of two years, the judge met *ex parte* repeatedly with the parties and their attorneys and with the group of appointed advisors. *Id*. The Third Circuit found that the extensive *ex parte* communications supported disqualification of the judge in the matter. *Id*. at 309. The Court noted the problem with *ex parte* communications: "[E]x parte communications run contrary to our adversarial trial system. The adversary process plays an indispensable role in our system of justice because a debate between adversaries is often essential to the truth-seeking function of trials." *Id*. at 310 (internal citation omitted). The Court acknowledged that *ex parte* communications may be permissible if all parties consent to such communications: "It should be understood that we do not hold that a judge may not or should not have *ex parte* meetings or communications with the parties or their counsel appearing before him. However, the hallmark of such meetings or communications requires the consent of the parties." *Id*. at 311. In the *Kensington* case, the Third Circuit concluded that the parties had not consented to the *ex parte* communications engaged in by the court. *Id*.

The Third Circuit in *Kensington* made clear that the *ex parte* communications alone did not require the judge's recusal. *Id*. at 305. ("We do not hold that *ex parte* communications alone-in the absence of any conflict of interest-require recusal.") To be sure, the conflict of interest was of great

concern to the Court. *Id*. However, the Court also recognized, under the reasonable person standard, that the number of *ex parte* communications was troubling. *Id*. at 312.

Here, like in *Kensington*, the number of *ex parte* communications between SDM Hangley and the Court is troubling. Although Respondents did not object to the *ex parte* provisions in the Appointment Order, there is no support for the contention that the Respondents consented to the extensive and pervasive ex *parte* communications that occurred throughout SDM Hangley's appointment in this matter. Nor is there any support for the suggestion that Respondents waived these concerns by timely paying SDM Hangley's invoices. It is hardly controversial to acknowledge the disparity in authority at issue in the case at bar. Respondents were faced with the ultimate Catch 22: seek additional clarity of various time entries at the very real risk of disturbing the individual charged with making a decision on the merits of its case or say nothing and await the results knowing that there are unexplained *ex parte* communications. The Memorandum Opinion states "the Firm's decision to complain for the first time only *after* Mr. Hangley issued his R&R belies the Objection itself." (Doc. 834 at 18) Respectfully, this statement ignores the ethical obligations of the Court as set forth in Section II A *supra*. It is incumbent upon the Court and SDM Hangley, not Respondents, to monitor the content of their communications. Moreover, Respondents could not have known until after SDM Hangley issued the Final R&R that he would exceed his authority in dramatic fashion, which underscores the import of these troubling *ex parte* communications.

The Respondents submit that here, all permissible bounds of Rule 53, the Code of Conduct, and the Appointment Order were exceeded. The *ex parte* communications provision in the Appointment Order cannot possibly be construed in such a manner as to permit the extensive *ex parte* communications in this case, especially during the period that SDM Hangley was solely focused on drafting the Final R&R.

Although this case differs from *Kensington* in that Respondents do not allege an actual conflict of interest, the volume and extent of the *ex parte* communications, along with other troubling circumstances—*i.e.*, the Court's failure to acknowledge Respondents' Objections to the Final R&R and failure to provide any assurances that it did not engage in substantive discussions with SDM Hangley on factual findings or legal conclusions— make this case analogous to *Kensington*. It is the totality of the circumstances here, and not just the *ex parte* communications alone, that would lead a reasonable person to conclude that the Court's impartiality is fatally impaired. The Court, therefore, should be disqualified and should rescue itself from continuing to preside over this matter.

**B.    THE RESPONDENTS' MOTION FOR RECUSAL DOES NOT FLOW FROM MERE DISAGREEMENT WITH THE COURT'S DECISIONS AND IT IS TIMELY FILED.**

Title 28, United States Code, Section 455 does not contain an express timeliness requirement. *See Kensington*, 368 F.3d at 312. A party must raise its claim of a district court's disqualification at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim. *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987). The Third Circuit has concluded that "when a party's attorney is aware of the grounds supporting recusal, but fails to act until the judge issues an adverse ruling, the recusal motion is not timely." *Kensington, 368 F.3d at* 314-15 (internal citation omitted).

The instant motion has not been filed as the result of mere disagreement with the Court's rulings. As set forth at length hereinabove, this motion has been filed after careful review of a series of highly unusual and related conduct on the part of both SDM Hangley and the Court. Although Respondents were on notice that the Court was engaging in *ex parte* communications with SDM Hangley prior to issuance of the Final R&R in light of SDM Hangley's billing records, Respondents could not have known or assessed the true nature and impact of those *ex parte* communications until the Final R&R was issued. When the Firm objected to the level of *ex parte* communications in its

23

December 2023 Objections, it received no meaningful explanation as to the purpose and substance of those communications from the Court's Memorandum Opinion filed August 5, 2025. To be pellucidly clear, it is the cumulative and related conduct of the Court and SDM Hangley that has created the appearance of bias; Respondents also respectfully submit that, taken in the context of surrounding case events detailed in this brief, the Court's Memorandum Opinion reflects actual bias against the Respondents.

Respondents timely objected to SDM Hangley's Final R&R, raising the issue of *ex parte* communications. The Court's failure to address the critical question of whether the *ex parte* communications involved substantive discussions about SDM Hangley's Final R&R raises grave concerns about whether they did. In addition, the Court's puzzling statement that Respondents did not object to the great majority of SDM Hangley's factual findings casts doubt on whether the Court did, in fact, conduct an independent, impartial *de novo* review of Respondents' Objections. Only when the Court issued its Memorandum Opinion, comprising 24 pages to address hundreds of pages of Objections (with exhibits) to the 154-page Final R&R—which accuses the Respondents, in the Court's own words, of "misconduct bordering on the criminal"—could the Respondents have assessed the significance and ramifications of the 22 *ex parte* communications (at a minimum) that occurred in the 28 months prior to issuance of the Final R&R.

As the Supreme Court noted in *Liteky*,

[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

510 U.S. at 554. The Court's Memorandum Opinion revealed the deep-seated antagonism held by the Court against Respondents. It also revealed to Respondents for the first time the impact of an

extrajudicial source—the Court's extensive *ex parte* communications with SDM Hangley who clearly shares that deep-seated antagonism—on Respondents and their case. Prior to the filing of the Court's Memorandum Opinion, Respondents could not have known of these *cumulative* grounds supporting disqualification. Respondents' Recusal Motion, therefore, is timely.

### III.    <u>CONCLUSION</u>

For the reasons set forth above, there is a good faith basis to believe that the appearance of bias created by the *ex parte* communications between SDM Hangley and the Court requires the Court's disqualification and immediate recusal from this matter.

October 23, 2025                               Respectfully submitted,

                                              /s/ Keith Beauchamp
                                              COPPERSMITH BROCKELMAN PLC

                                                   Keith Beauchamp (*pro hac vice*)
                                                   kbeauchamp@cblawyers.com
                                                   Marvin C. Ruth (*pro hac vice*)
                                                   mruth@cblawyers.com
                                                   Malvika A. Sinha (*pro hac vice*)
                                                   msinha@cblawyers.com
                                                   2800 North Central Avenue, Suite 1900
                                                   Phoenix, AZ  85004
                                                   Telephone: (602) 381-5490
                                                   Facsimile: (602) 224-6020

                                              PIETRAGALLO GORDON ALFANO BOSICK &
                                              RASPANTI LLP

                                                   Gaetan J. Alfano
                                                   Pennsylvania Bar No. 32971
                                                   GJA@pietragallo.com

Peter St. Tienne Wolff
Pennsylvania Bar No. 208433
PSW@pietragallo.com
1818 Market Street, Suite 3402
Philadelphia, PA 19102
Telephone: (215) 320-6200
Facsimile: (215) 981-0082

SAXTON & STUMP

Christopher C. Conner
Pennsylvania Bar No. 36407
4250 Crums Mill Road, Suite 201
Harrisburg, PA 17112
cconner@saxtonstump.com
Office: 717-216-5522
Fax:717-547-1900

Timothy M. Stengel
Pennsylvania Bar No. 314573
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
tstengel@saxtonstump.com
Office: 717-556-1010
Fax: 717-441-3810

*Attorneys for Hagens Berman Sobol Shapiro LLP,
and Steve Berman*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 23, 2025, a true and correct copy of the foregoing Hagens Berman Sobol Shapiro LLP and Steve Berman's Brief in Support of Motion for Recusal was filed electronically and served on all counsel via the Court's CM/ECF system.

/s/ Keith Beauchamp

COPPERSMITH BROCKELMAN PLC

Keith Beauchamp (*pro hac vice*)
kbeauchamp@cblawyers.com
Marvin C. Ruth (*pro hac vice*)
mruth@cblawyers.com
Malvika A. Sinha (*pro hac vice*)
msinha@cblawyers.com
2800 North Central Avenue, Suite 1900
Phoenix, AZ 85004
Telephone: (602) 381-5490
Facsimile: (602) 224-6020

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP

Gaetan J. Alfano
Pennsylvania Bar No. 32971
GJA@pietragallo.com

Peter St. Tienne Wolff
Pennsylvania Bar No. 208433
PSW@pietragallo.com
1818 Market Street, Suite 3402
Philadelphia, PA 19102
Telephone: (215) 320-6200
Facsimile: (215) 981-0082

SAXTON & STUMP

Christopher C. Conner
Pennsylvania Bar No. 36407
4250 Crums Mill Road, Suite 201
Harrisburg, PA 17112
cconner@saxtonstump.com

Office: 717-216-5522
Fax:717-547-1900

Timothy M. Stengel
Pennsylvania Bar No. 314573
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
tstengel@saxtonstump.com
Office: 717-556-1010
Fax: 717-441-3810

*Attorneys for Hagens Berman Sobol Shapiro LLP,
and Steve Berman*