| | |
|---|---|
| **From:** | Yvonne English <bonnib2007@yahoo.com> |
| **Sent:** | Tuesday, July 7, 2026 4:21 PM |
| **To:** | Chambers of Judge Paul S Diamond |
| **Subject:** | Case 2:11-cv-05782-PD |
| **Attachments:** | Letter to the Court Regarding Injuries Caused by Thalidomide.docx; English - 01-01-15.pdf; Pics of Disability.pdf; MyChartLitigation.pdf |

**CAUTION - EXTERNAL:**

Dear Honorable Judge Diamond,
I am sending the information and required attachments requested by the defendants and written within the court order.

Best Regards,
Yvonne English

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**GLEND JOHNSON**
**VS**
**SMITHKLINE BEECHAM CORPORATION, ET AL.**
**CIV. NO. 11-5782 AND ALL RELATED CASES**

**Case 2: -cv -05782 -PD**

Date: June 28, 2026

**Letter to the Court Regarding Injuries Caused by Thalidomide**

Dear Honorable Judge,

My name is Yvonne English. I reside at 15965 Dobson Ave., South Holland, IL 60473. My phone number is (334) 549-8968, and my email address is bonnib2007@yahoo.com.

I respectfully submit this letter to describe the lifelong injuries, medical conditions, and personal hardships I was born with as a result of thalidomide exposure. I understand that the Court must consider many facts, and I am grateful for the opportunity to explain, in my own words, how these injuries have affected my body, my health, my independence, and my daily life.

I was born with significant deformities of my arms and hands. I have no wrists or thumbs, and I have four fingers. My left arm is shortened and clubbed. These congenital limb differences have affected nearly every part of my life. Basic tasks that many people perform without thinking—such as grasping, lifting, writing, dressing, preparing food, personal care, household tasks, and other daily activities—require extra effort, adaptation, and physical strain.

In addition to the visible limb injuries, I also live with serious internal medical conditions. My medical history includes hypertension, hyperlipidemia, pulmonary arterial hypertension, atrial septal defect, a very large secundum atrial septal defect measuring approximately 4.20 cm, embolic myocardial infarction, myocardial injury due to demand ischemia, a massively dilated atrium, severe tricuspid valve disease with severe right ventricular regurgitation, mitral valve prolapse, atrial flutter and Congestive Heart Failure (CHF).

These conditions are lifelong, complex, and serious. They require ongoing medical monitoring, treatment, and care. They also create fear and uncertainty because they affect my heart, circulation, breathing, stamina, and overall health. The combination of external

limb deformities and internal cardiovascular injuries has made my life physically difficult, medically complicated, and emotionally exhausting.

I have lived every day with limitations that began before I ever had a choice or a voice. I have had to adapt my body, my routines, and my expectations around injuries that were present from birth. The physical challenges are constant, and so is the emotional weight of knowing that these injuries have shaped my entire life.

As I have gotten older, even the tasks I once managed through adaptation have become more difficult with each passing day. For years, I relied heavily on the one hand that allowed me to maintain some independence, but that hand is now breaking down from overuse and strain. My daughter had to move in with me because I can no longer safely manage many daily activities on my own. Simple household tasks, such as sweeping the floor, have become extremely difficult, and getting in and out of the bathtub is becoming nearly impossible. These changes have taken away more of my independence and have made me more dependent on the help and care of my family.

From kindergarten through high school, I endured cruelty from other children because of my physical differences. I was laughed at, mocked, and called terrible names. I was chased home from school, had rocks thrown at me, and on many occasions, I was subjected to physical abuse. These were not isolated childhood incidents. They were repeated experiences that made school a place of fear, humiliation, and pain. At an age when children should feel safe, accepted, and able to learn, I was forced to protect myself from ridicule and harm because of injuries I was born with and could not change. The emotional effects of those years have stayed with me and became another lasting consequence of thalidomide exposure.

Those experiences did not end when I left school. They affected the way I saw myself, the way I trusted others, and the way I moved through the world as an adult. I have had to work harder to maintain my confidence, independence, and dignity while living with visible differences that often caused people to stare, judge, or underestimate me. These lifelong injuries have affected my relationships, my ability to participate fully in ordinary activities, and my sense of security in public places. They have also created emotional wounds that cannot be seen on the outside but have been just as real and lasting as the physical injuries.

In summary, the injuries caused by thalidomide have affected every stage of my life. I was born with severe physical deformities, I live with serious internal and cardiovascular medical conditions, and I have endured emotional harm, social cruelty, and lasting limitations because of these injuries. The consequences have shaped my childhood, my

adulthood, my health, my independence, and my dignity. This is not a temporary hardship, but a lifelong burden that continues to affect me every day.

I respectfully ask the Court to consider the full extent of these injuries and their lifelong consequences, including both the visible deformities and the serious internal medical conditions. The impact of thalidomide has not been limited to one injury, one diagnosis, or one period of my life. It has affected my body, my health, my independence, my emotional well-being, and my quality of life from birth, and it continues to affect me today.

I will also attach medical statements, medical reports, and pictures for the Court's review and consideration.

Thank you for taking the time to consider my statement.

Respectfully submitted,

Signature: Yvonne English
Yvonne English
15965 Dobson Ave.
South Holland, IL 60473
Phone: (334) 549-8968
Email: bonnib2007@yahoo.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
GLENDA JOHNSON, et al.,
Plaintiffs,
SMITHKLINE BEECHAM
Case No.: 2:11-cv-05782-PD
AND ALL RELATED CASES
This Document Relates to:
Yeatts, et al. v. SmithKline Beecham
Corp., et al., No. 11-cv-06711
Defendants.

DECLARATION OF TRENT STEPHENS, PH.D. REGARDING YVONNE ENGLISH

I, Trent D. Stephens, declare:                                    1 January 2015

I. QUALIFICATIONS

1. My name is Trent Dee Stephens, PhD.  I am Emeritus Professor of Anatomy and Embryology in the Department of Biological Sciences at Idaho State University. Since my retirement in 2011, I work from my home at 4441 N. Williamsburg Lane, Pocatello, Idaho, USA. My areas of research include normal and abnormal limb development, human limb defects, and the action of thalidomide in causing birth defects. My credentials are as follows (for more details see my Curriculum Vitae, which is attached to this declaration): As an undergraduate at Brigham Young University my focus was on genetics, including formal course work in Human Genetics, Population Genetics, epidemiology, and statistics. While a full-time student at Brigham Young University I worked for three years in the Genetics Research Laboratory of Dr. Duane Jeffery at that university and in the Human Cytogenetics Laboratory of Dr. Nicholas Wise at the University of Utah and the Utah State Training School, for severely mentally handicapped people, for the same period of time (1970-1973).  As an undergraduate and during my Masters Degree work I taught Developmental Biology Laboratories for two years under the direction of Dr. Robert Seegmiller. My Masters Degree research focused on Teratology and genetic limb defects in

2. My PhD is in Anatomy from the University of Pennsylvania, under the direction of Dr. James Lash. My research emphasis at the University of Pennsylvania was in Developmental Biology (1974-1977). My specific research concerned limb initiation in chick embryos.  My research and course work there was under a National Institutes of Health Fellowship.  My Post-doctoral research and teaching were in the Department of Pediatrics at the University of Washington under the direction of Dr. Thomas Shepard. During my time there (1977-1981), I was in charge of maintaining the large fetus collection, including performing autopsies on 10-12 fetuses per

week. While at the University of Washington, I also interacted on a regular basis with some of the greatest luminaries of the time in field of Human Birth Defects. These included Drs. Thomas Shepard, David Smith, Ronald Lemire, Mont Juchau, Irvin Emanuel, Michael Cohen, and for a couple of months each year Joseph Warkany. Among the post-doctoral students, who would become part of the next generation of luminaries were Drs. Alen Fantel, John Graham, Koha Shiota, Philip Mirkes, Joseph Siebert, and Margot Van Allen. Furthermore, I taught three years there as director of the undergraduate Anatomy course. I also helped teach in the Head and Neck Anatomy course for dental students and the Gross Anatomy course for medical students. While at the University of Washington, I published ten peer reviewed papers on various human birth defects, including one paper on radial aplasia and one on Robert syndrome with phocomelia; and I authored the book, Atlas of Human Embryology,

3. From 1981 until my retirement in 2011, I conducted research in Developmental Biology, including the mechanism of action of thalidomide, and taught numerous Anatomy and Developmental Biology courses at Idaho State University. My formal teaching at Idaho State University included thirty years teaching Human Gross Anatomy, Head Neck Anatomy, and Oral Histology and Embryology for dental students. I also taught Neurobiology as well as other anatomy and histology courses many times for specific Health Professional programs such as Pharmacy, Physician Assistant, Dental Hygiene, Physical Therapy, and Radiobiology. While at Idaho State University, I published numerous books and papers, including five peer reviewed papers dealing specifically with thalidomide. I co-authored, with Rock Brynner, the book, Dark Remedy: The Impact of Thalidomide and it Revival as a Vital Medicine, Perseus (2001). I also authored an encyclopedia entry "Thalidomide" in the McGraw-Hill Yearbook of Science and

4. While at the University of Washington and after coming to Idaho State University I have consulted and/or testified numerous times as an expert witness in Human Teratology cases involving drug exposure during pregnancy for both plaintiffs and defendants.

5. All of the opinions set forth below are based on techniques and theory that have been generally accepted in the scientific community, and are the product of reliable principles and methods that I reliably apply to the facts of this case.

II. MS ENGLISH'S DEFECTS ARE CONSISTENT WITH THOSE SEEN IN THALIDOMIDE

6. I have been asked by Hagens Berman Sobol Shapiro LLP to review the congenital malformations exhibited by Ms Yvonne English to determine if her defects are consistent with those seen in thalidomide embryopathy. I also have been asked to assume that Ms English was exposed to thalidomide during the critical period in utero.

7. I have obtained information from the medical records, photographs, and x-rays provided me by Hagens Berman Sobol Shapiro LLP.  I have also personally examined Ms English and interviewed her.

8. Yvonne English was born 25 February 1962 in Chicago, Ill. Her father died in 2006 of congestive heart failure, which he had suffered for about 15 years. He had no other health problems. Her mother (age 75) is in "perfect" health. Yvonne had a sister who died at 17 months of pneumonia. Her nine other siblings are in good health. She also has three children in good health.

9. Ms English has a high arched palate. She also has congenital heart disease – a heart murmur from a valve defect. A genetic screen has eliminated a *TBX5* mutation and Holt-Oram syndrome.

10. Her shoulders and pectoral muscles appear to be even and normal. She stated that her right breast is smaller than the left. The right side of her back is slightly smaller than the left. The range of motion is greater in the right shoulder than the left. Her arms are about equal in length but the left is slightly smaller in diameter. Her right forearm appears to be fairly normal. Elbow flexion and extension appear to be normal but supination is quite limited.

11. Her right wrist is fairly stiff. She has movement in all directions but limited. Her right hand has four digits and no thumb (digit 1). The remaining digits all appear to be fingers. The first of those four (digit 2) has an extra knob on the radial side with a small nail. There is very little movement in digit 2 Digits 3-5 can flex and extend. The left hand exhibits phocomelia. The forearm is about 3 inches long. There is no thumb. The four fingers exhibit some flexion and extension. Ms English, therefore, exhibits bilateral thenar aplasia with left forearm hypoplasia.

12. I have been asked by Hagens Berman Sobol Shapiro LLP to assume that Ms English was exposed to thalidomide during the critical period in utero. It is estimated that 50-100% of all embryos exposed to thalidomide during the critical period of development has malformations (Lenz, Amer J Dis Child 112, 99-106, 1966). By contrast, Thenar hypoplasia/aplasia is a common defect seen with thalidomide exposure (Lenz and Knapp, *German Medical Monthly* 7, 253-258, 1962) but is rare in the general population (about 1:300,000 births; Birch-Jensen Thesis, 1949, *Congenital Deformities of the Upper Extremities*, Andelsdogtrykkeriet I Odense and Det danske Forlag). The defects probably result from a decreased blood supply to and/or oxidative damage in the affected area (van Allen et al., *Am. J. Med Gen*. 44: 598-604, 1992; Therapontos et al, *Proc Natl Acad Sci* 106:8573-8, 2009; Parman et al., *Nat Med*. 5:582-585, 1999; Wells et al, *Toxicol Appl Pharmacol*. 207:354-66, 2005). Because preaxial (radial) regions of the limb are more sensitive to thalidomide damage than postaxial (ulnar) regions, losses tend to be more common in the distal – preaxial areas, i.e. in the thenar region.

13. Cardiac and palate defects were also among the first defects identified as being associated with thalidomide embryopathy (Lenz and Knapp, *German Medical Monthly* 7, 253-258, 1962). These defects, therefore, are consistent with thalidomide exposure. The incidence of congenital heart disease in the general population is about 1:170 births (Hoffman and Kaplan, *J Am Coll Cardiol*. 39:1890-1900, 2002). A high arched palate occurs in about 1:5000 births (Collier et al, Oxford Handbook of Clinical Specialties, 9th ed, Oxford, 2013).

14. The null hypothesis in this case would state that there is no relationship between these defects: bilateral thenar aplasia with left forearm hypoplasia, congenital heart disease, and high arched palate. The probability, therefore, of these defects occurring by chance in the same person is about $1:3 \times 10^{11}$. It is, therefore, obvious that these defects are not occurring together at random, but rather have some common cause. All of these defects can result from vascular disruption and have been associated with thalidomide exposure (Smithells and Newman, *J Med Genet* 29:716-23, 1992). It has been demonstrated that thalidomide has antiangiogenic action (D'Amato et al., *Proc Natl Acad Sci U S A* 91: 4082-4085, 1994; Therapontos et al, *Proc Natl Acad Sci* 106:8573-8, 2009). These calculations do not include the apparent head tilt and lung congestion.

15. Further, I have been asked by Hagens Berman Sobol Shapiro LLP to address the question: Before October 2009, is it likely that Ms English would have been able to find an expert on thalidomide embryopathy who would opine that it is more likely than not that her defects, being unilateral, postaxial, and/or teransverse, were caused by thalidomide? It is my opinion that no expert, including myself, would have given such an opinion before October 2009. My opinion is based on several issues:

  a. Smithells and Newman (J Med Genet 29:716-23, 1992) stated, "…the number of doctors with wide experience of this problem [thalidomide defects] is small (possibly only three in the UK) and will become smaller with the passage of time…" (Smithells has since died). This reflects the concept of a very limited number of experts capable of addressing issues of thalidomide embryopathy.

  b. Dr Lewis Holmes, at Massachusetts General Hospital, one of the world's leading experts on birth defects, has stated that, "…the relative paucity of thalidomide births in the United States means that few researchers there can speak with authority on the drug's effects. None of us ever saw thalidomide-damaged children…" (Wadman, Nature, 8 November 2011, published online; doi:10.1038/479161a). Dr Holmes statement that, "… few researchers… [in the US] can speak with authority on the drug's effects," because, "None of us ever saw thalidomide-damaged children…" indicates his opinion, with which I agree, that up to the time of that statement (2011) no one in the US had the

clinical expertise and experience with thalidomide defects necessary to discuss the range of defects seen in victims.

c. I have spoken to a person here in the US who believed her unilateral defects were caused by thalidomide and made a heroic effort to find an expert with whom she could discuss her defects. She informed me that she first contacted the NIH. Whoever she talked to there referred her to the Teratology Society. The person she spoke to there referred her to Dr. Lewis Holmes. She said that he told her she would have to go to Europe to find an expert on thalidomide defects. I include here a portion of the e-mail sent by Lewis B. Holmes, MD to Maureen Hurson, September 29, 2010 (MCPM000066-67): "I have not seen in the U.S. any individuals with limb malformations attributed to thalidomide." "…the consensus has developed that the thalidomide effect is a symmetrical and bilateral (both arms affected) deformity." "…I could suggest some genetic centers in the U.K. where you could go for an evaluation."

d. The UK Thalidomide Trust and the World Health Organization jointly sponsored a meeting 24-25 February 2014 in Geneva, Switzerland to address the issue of the range of thalidomide defects and invited those who they apparently consider to be the twenty five world's experts on the subject to attend. I was the only attendee from the United States. My singular invitation by the WHO suggests that in their minds I am the only thalidomide expert in the US. The purpose of that meeting was to establish criteria for determining the spectrum of thalidomide defects.

16. I understand that my opinion on the availability of experts has been questioned. Those questions appear to be based on the assumption that because data have been available for some time, those data can easily become the basis of expert opinion. That assumption ignores the powerful force of paradigm in science. The history of genetics is a perfect example of this condition in science. Gregor Mendel published his discovery that inherited traits are passed on to descendants in discrete packages, which we now call genes, in 1866. Experts in the field rejected Mendel's work because they adhered to the paradigm of "blended inheritance," which proposed that all characteristics of an individual were passed on in various proportions to the offspring. In the spring of 1900, two researchers, Hugo de Vries and Carl Correns, independently discovered the same patterns of inheritance as had Mendel and only then discovered that Mendel had already published on the same concept. For the intervening 34 years, it is a well-established fact in science history that no one referred to Mendel's work in a positive light. Therefore, even though the data existed, no experts could have been found during those years who would testify that a given human defect had a Mendelian inheritance pattern, largely because Mendel's work, although published, was lost to the scientific community and had to be "rediscovered" in 1900. Even over the next 20 years, the importance of Mendel's work was hotly debated in the scientific

17. In my opinion, therefore, it is highly unlikely that Ms English would have found any expert before October 2009 who would have given the opinion that her birth defects were more likely than not caused by thalidomide.  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on 18 December 2014, in Pocatello, Idaho.


Trent D. Stephens, PhD



ENGB000002



ENGB000003



ENGB000004





ENGB000005





ENGB000006



ENGB000007





ENGB000008

Name: Yvonne Learnell English | DOB: 2/25/1962 | MRN: 7475638 | PCP: Tabassum Aziz Faruqi, MD | Legal Name: Yvonne Learnell English

## Office Visit – Dec 05, 2017
with Vishali Shah, PA-C at Rush Cardiology - Chicago

## Notes from Care Team

**Progress Notes by Vishali S at 12/5/2017 11:00 AM**

**RUSH UNIVERSITY MEDICAL CENTER**
**University Cardiologists**
**APP Return Office Visit**

**CHIEF COMPLAINT:**
Chief Complaint
Patient presents with
- Hospital F/U
    *s/p ASD repair*

**HISTORY OF PRESENT ILLNESS:**
Yvonne English is a 55 year old female with a past medical history significant for intrauterine thalidomide exposure, HTN, HLD, tobacco use, PAH, ASD and recent MI 2/2 embolus (9/2017 at OSH) who presents for hospital follow-up. Patient was admitted from 10/15-11/10 with chest pain d/t demand ischemia and was subsequently followed for repair of her very large, 4.20 cm secundum ASD.

*Per discharge summary:*
*She denied any knowledge of congenital cardiac condition prior to September 2017 when seen at Swedish Covenant Hospital for STEMI, presumed to be d/t paradoxical coronary embolus as cath at that time did not show any evidence of CAD. Additional workup revealed a very large ASD and was discharged on apixaban, aspirin, and ticagrelor which she self discontinued 3 weeks later. She then presented to Rush on 10/15th with type II NSTEMI likely d/t volume overload and admitted to CICU. Pulmonology was consulted and underwent RHC with iNO shunt challenge on 10/18 ; she was started on sildenafil 20 TID and able to maintain SpO2 > 90% on room air. CT Congenital surgery was consulted and performed fenestrated ASD repair on 10/26 after which patient was transferred to CVTICU. Heparin gtt was started due to previous embolic myocardial infarction in September. On POD2, she was started on Amio gtt per protocol for A fib with RVR, bolused with 1.5L crystalloid total and started on Epi gtt due to hypotension accompanied with a rise in lactic acid. She was also started on intermittent BiPAP due to hypercarbia/ respiratory acidosis. On POD3, diuresis was initiated with lasix IV and continued throughout the rest of her hospital stay. Mediastinal/Pleural chest tubes and pacing wires were removed on POD8 with heparin gtt paused. Due to transaminitis, her amiodarone was discontinued on POD8 and abdominal ultrasound was obtained which showed pulsatile flow in the portal vein but no other abnormalities. On POD9, her transaminitis was noted to be improving and a TTE was obtained which showed moderate tricuspid regurgitation, LVEF 55%, and normal RV size and function. She was weaned from supplemental oxygen on POD9 but continued to use it overnight for the remainder of her hospital course. On POD10, C diff obtained due to continued leukocytosis and frequent loose stools- it was noted to be positive and she was started on PO vancomycin for a ten day course. Additionally, she was noted to be in atrial flutter for which EP was consulted and on POD11, she had a TEE with cardioversion. She was discharged with 5 days of sildenafil while awaiting the pre-authorization for her sildenafil Rx. Pulmonology team to follow up with sildenafil needs upon discharge. She was scheduled for follow up with cardiac surgery team, cardiology, and pulmonology upon discharge.*

Today in clinic the patient reports feeling increased incisional pain and has been out of tramadol for 2 weeks; seen by CT NP - CXR WNL. She admits to only taking sildenafil daily instead of TID. The patient denies any chest pain suggestive of angina. Patient also denies any SOB, edema, PND, or orthopnea. No palpitations, LH, fatigue, presyncope or syncope noted. Patient does not describe any lower extremity discomfort suspicious for intermittent claudication or symptoms concerning for sleep apnea. Adheres to a low sodium/fluid restricted diet and reports compliance with medication regimen. Patient is able to carryout ADLs without any difficulty. Patient does not regularly exercise.

**REVIEW OF SYSTEMS:**
12 systems were reviewed including depression screening. Pertinent positives are discussed in HPI.

**CURRENT MEDICATIONS:**

Current Outpatient Prescriptions:
- IBUprofen (MOTRIN) 600 mg PO tablet, take 1 Tablet by mouth every 6 hours as needed for Pain for up to 10 days. Best if taken with food., Disp: 40 Tablet, Rfl: 1
- traMADol (ULTRAM) 50 mg PO tablet, take 1 Tablet by mouth every 6 hours as needed for Pain., Disp: 50 Tablet, Rfl: 0
- warfarin (COUMADIN) 5 mg PO tablet, take 1 Tablet by mouth one time at 5pm. Tablet size may not reflect current daily dose., Disp: 30 Tablet, Rfl: 0
- furosemide (LASIX) 40 mg PO tablet, take 1 Tablet by mouth daily., Disp: 30 Tablet, Rfl: 0
- pantoprazole (PROTONIX) 40 mg PO delayed release tablet, take 1 Tablet by mouth every morning. Swallow whole., Disp: 30 Tablet, Rfl: 0
- sildenafil (REVATIO) 20 mg PO tablet, take 1 Tablet by mouth three times daily., Disp: 90 Tablet, Rfl: 0
- aspirin (EC) 81 mg PO TbEC enteric coated tablet, take 81 mg by mouth daily. Best if taken with food., Disp: , Rfl:

**ALLERGIES:**
Patient has no known allergies.

**PAST MEDICAL, SOCIAL AND FAMILY HISTORY:**
Past Medical History:
Past Medical History:

Diagnosis
- Cardiac abnormality
- Cardiac arrest
- Hypertension

Date

Past Surgical History:  No past surgical history on file.
Family History:  No family history on file.
Social History:
**Tobacco History**
History
Smoking Status
- Former Smoker
- *Packs/day:*                           *0.25*
- Quit date:                             7/1/2017
Smokeless Tobacco
- Former User
**Alcohol History**
**Drug History**
**Marital Status**
**Social History - Occupational and Educational History**
**Social History - Living Arrangement**
Living Arrangement: With Family

**PHYSICAL EXAM**:
BP 123/65  | Pulse 95  | Resp 16  | Ht 170.2 cm (5' 7")  | Wt 47.2 kg (104 lb)  | BMI 16.29 kg/m²

CONSTITUTIONAL:  awake, alert, cooperative, no apparent distress.
NECK:  No JVD in the upright position, no carotid bruits bilaterally.
LUNGS:  No increased work of breathing, CTA bilaterally, no crackles, rhonchi or wheezing.
CARDIOVASCULAR: RRR, normal S1, S2, no S3, no S4, no murmur noted. No lower extremity edema, bilateral. Pulses 2 + all extremities.
ABDOMEN:  Normal bowel sounds, soft, non-distended, non-tender.
MUSCULOSKELETAL:  There is no redness, warmth, or swelling of the joints.
NEUROLOGIC:  Awake, alert, oriented to name, place and time.  Sensory is intact.
SKIN:  No bruising or bleeding, normal skin color, texture, turgor and nails normal without discoloration or clubbing. Sternal incision healing well without dehiscence or bleeding.

**DATA**:

**Labs:**

CBC:
**Lab Results**

| Component | Value | Date |
|---|---|---|
| WBC | 13.14 | 11/10/2017 |
| RBC | 2.93 | 11/10/2017 |
| HGB | 9.0 | 11/10/2017 |
| HCT | 28.3 | 11/10/2017 |
| MCV | 96.6 | 11/10/2017 |
| RDW | 14.2 | 11/10/2017 |
| PLT | 521 | 11/10/2017 |

CMP:
**Lab Results**

| Component | Value | Date |
|---|---|---|
| NA | 131 | 11/10/2017 |
| K | 4.4 | 11/10/2017 |
| CL | 95 | 11/10/2017 |
| CO2 | 28 | 11/10/2017 |
| BUN | 17 | 11/10/2017 |
| CREAT | 0.83 | 11/10/2017 |
| IBEGFR | >=60 | 11/10/2017 |
| IINBEGFR | >=60 | 11/10/2017 |
| GLU | 97 | 11/10/2017 |
| PROT | 8.1 | 11/10/2017 |
| ALB | 2.3 | 11/10/2017 |
| CA | 9.2 | 11/10/2017 |
| TBIL | 0.7 | 11/10/2017 |
| AP | 111 | 11/10/2017 |
| SGOT | 24 | 11/10/2017 |
| SGPT | 34 | 11/10/2017 |

BNP:  No results found for: BNP
FLP (Lipid Profile):  No results found for: CHOL, TRIG, HDL, LDLCALCU, CHOLHDLR
Hemoglobin A1C:  No results found for: HGBA1C
Last 3 Troponin:
**Lab Results**

| Component | Value | Date |
|---|---|---|

TROP        0.32                          10/16/2017

*Diagnostic studies/procedures reviewed:*

**CT Angio Chest (10/15/2017)**
IMPRESSION:
1. Negative for pulmonary embolism down to the level of the opacified segmental pulmonary arteries. Limited evaluation of the left segmental and subsegmental pulmonary arteries secondary to mixing artifact.
2. Marked cardiomegaly without a visible atrial septum consist with patient's known history of atrial septal defect.
3. Centrilobular emphysema.

**Congenital TTE (10/16/17):**
1. Atrial septum: There is a very large, 4.20 cm secundum atrial septal defect.
2. Right atrium: The atrium is massively dilated. Estimated volume 166 ml/m2
3. Tricuspid valve: There is moderate-severe regurgitation. 32 mmHg.
4. Right ventricle: The cavity size is moderately increased. Wall thickness is normal. Systolic function is fair.
5. Left ventricle: The cavity size is normal. Wall thickness is normal. Systolic function is normal.

**Cardiac cath (10/19/2017)**
SUMMARY:

1. Hemodynamics: Cardiac output is at the upper limits of normal. Mean pressure in the pulmonary artery is moderately elevated (mean of 40 mm Hg). Pressure in the right atrium is elevated (mean of 25 mm Hg). Pressure in the pulmonary capillary wedge is markedly elevated (mean of 30 mm Hg). The pulmonary vascular resistance (PVR) is normal (1.5 Wood units)
2. Impressions: Bidirectional shunt is present with no response to iNO vasoreactivity testing, however her right to left component decreased with iNO suggesting some benefit with pulmonary vasodilators. Qp/Qs ratio: 1.61.

**OR Procedure (10/27/2017)**
On cardiopulmonary bypass, fenestrated (2.5mm) pericardial patch closure of secundum atrial septal defect

**Abdominal U/S (11/3/2017)**
IMPRESSION:
1. Unremarkable grayscale appearance of the liver.
2. Patent hepatic vasculature.
3. Pulsatile flow with the main portal vein, which can be seen with right heart dysfunction/tricuspid regurgitation.
4. Small right pleural effusion.

**TEE without evidence of left atrial appendage thrombus (11/6/2017)**
1. Successful synchronized cardioversion of atypical Atrial Flutter to ectopic atrial rhythm with competing junctional rhythm with 200 Joules x 1 attempt.

**TEE (11/6/2017)**
SUMMARY:

1. Left ventricle: The cavity size is normal. Systolic function is mildly to moderately reduced.
2. Right ventricle: The cavity size is dilated. Systolic function is reduced.
3. Left atrium: The atrium is dilated. No evidence of thrombus in the atrial cavity or appendage. The appendage is dilated. Emptying velocity is reduced.
4. Right atrium: The atrium is dilated. No evidence of thrombus in the atrial cavity or appendage. The appendage is dilated.
5. Atrial septum: Agitated saline contrast study shows a large right-to-left shunt at the level of the inter atrial septum, in the baseline state.
6. Mitral valve: Mild to moderate thickening of the anterior leaflet. Prolapse, involving the A2 and A3 scallops. No evidence of vegetation. There is at least moderate regurgitation, with multiple jets directed eccentrically.
7. Aortic valve: No evidence of vegetation.
8. Tricuspid valve: Moderate diffuse leaflet thickening. There is malcoaptation of the valve leaflets. No evidence of vegetation. There is moderate-severe regurgitation.
9. Pulmonic valve: No evidence of vegetation.
10. Pericardium, extracardiac: A small pericardial effusion is

identified. There is no evidence of hemodynamic compromise.

11. Pulmonary arteries: The pulmonary artery systolic pressure is mildly increased, in the range of 40 mm Hg to 47 mm Hg. The PAP may be under estimated fro

**TTE (11/8/2017)**
1. ASD secundum ,PHTN s/p fenestrated ASD repair R to L shunt.
2. *Right atrium: The atrium is moderately dilated decreased from pre-operative measurement. RA ESV Index (BP) 65 ml/M2*
3. Left atrium: The atrium is dilated.
4. Atrial septum: Atrial septal defect patch is seen with small *residual defect with Rt to left shunt.*
5. Tricuspid valve: Thickening of the tricuspid leaflets with evidenceof mal-coaptation of tricuspid valve leaflets. There is moderate to severe regurgitation.
6. Mitral valve: Mitral valve leaflets are thickened with mitral valve prolapse in A2,A3 scallops. There are 2 separate regurgitation jet with mild to moderate regurgitation.
7. Right ventricle: The cavity size is increased. Wall thickness is normal. Systolic function is mildly reduced. Based on the velocity of the tricuspid regurgitation jet the estimated right ventricular pressure is 38 mm Hg plus the right atrial pressure ( less than half sytemic pressure).
8. Left ventricle: The cavity size is normal. Wall thickness is normal. Systolic function is mildly depressed. The estimated ejection fraction is 50-55%. Probable dyskinesis.
9. Pericardium, extracardiac: No pericardial effusion.

**ASSESSMENT AND PLAN:**
**Yvonne English is a 55 year old female with a past medical history significant for intrauterine thalidomide exposure, HTN, HLD, tobacco use, PAH, ASD and recent MI 2/2 embolus (9/2017 at OSH) who presents for hospital follow-up. Patient was admitted from 10/15-11/10 with chest pain d/t demand ischemia and was subsequently followed for repair of her very large, 4.20 cm secundum ASD.**

**Large ASD s/p repair c/b MI 2/2 embolus (OSH)**
- stable post-op
- has had CT congenital surgery follow-up, cont to f/u with Dr. Kavinksy
- CBC ordered today to follow WBC

**pHTN**
- cont f/u with Dr. Khan
- start taking sildenafil TID (pt is only taking QD)

**Atrial flutter/atrial tachycardia**
- s/p DCCV on 11/6/2017
- Continue anticoagulation with coumadin - INR followed by coumadin clinic
- cont f/u with Dr. Sharma

**Tobacco use**
- *strongly encouraged cessation*

**Meaningful Use:**
Dietary and exercise counseling provided for BMI below normal.
Current medications reviewed

**MISC:**
I discussed smoking cessation where appropriate; alcohol and drug cessation where appropriate; the need to monitor BP, weight, salt and fluid restriction; exercise; need to control diabetes where appropriate; sleep apnea; heart failure therapeutic options, including evidence based medical therapy.

*I spent 45min with the patient, over half of this was spent discussing education, management of multiple co-morbidities and answering questions concerning treatment options.*

Return for follow-up visit with Dr. Sharma and Dr. Kavinsky as scheduled.

**Vishali Chand Shah, PA-C**
**University Cardiologists**
**Pager 1112**

MyChart® licensed from Epic Systems Corporation© 1999 - 2026