**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GLENDA JOHNSON ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>SMITHKLINE BEECHAM CORPORATION ET AL.,<br>Defendants. | Case No. 2:11-cv-005782<br><br>This Document Relates to:<br><br>*Yeatts, et al. v. SmithKline Beecham Corp., et al.*, No. 11-cv-06711 |

**DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**
**<u>AS TO PLAINTIFF CAROLYN SAMPSON</u>**

Pursuant to Federal Rule of Civil Procedure 56, for the reasons set forth in the accompanying Memorandum of Law in Support of this Motion, Defendants respectfully move for summary judgment as to Plaintiff Carolyn Sampson, as her action is time-barred under the applicable statute of limitations and she has no admissible evidence that her mother took thalidomide.

Dated: September 8, 2026

Respectfully submitted,

*<u>/s/ Daniel A. Spira</u>*

Michelle A. Ramirez (*admitted pro hac vice*)
michelle.ramirez@sidley.com
Daniel A. Spira (*admitted pro hac vice*)
dspira@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: 312-853-7000
Facsimile: 312-853-7036

Eliezer Granek
egranek@eckertseamans.com
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania 19102
Telephone: 215-851-8400
Facsimile: 215-851-8383

Eugene A. Schoon (*admitted pro hac vice*)
CROKE, FAIRCHILD, DUARTE & BERES, LLC
180 N. LaSalle Street, Suite 3400
Chicago, Illinois 60601
Telephone: (772) 517-2740

*Attorneys for Grünenthal GmbH*

*<u>/s/ Sonja S. Weissman</u>*

Michael T. Scott
MIKE SCOTT LAW LLC
mike@mikescottlaw.com
1116 Red Rose Lane
Villanova, PA 19085
Telephone: (215) 518-8695

Sonja S. Weissman (*admitted pro hac vice*)
REED SMITH LLP
sweissman@reedsmith.com
101 Second Street, Suite 1800
San Francisco, California 94105
Telephone: (415) 543-8700

*Counsel for GlaxoSmithKline LLC, and GlaxoSmithKline Holdings (Americas) Inc.*

*<u>/s/ Daniel S. Pariser</u>*

Daniel S. Pariser (*admitted pro hac vice*)
daniel.pariser@arnoldporter.com
Paige H. Sharpe (*admitted pro hac vice*)
paige.sharpe@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 W. Massachusetts Avenue, N.W.
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Anand Agneshwar (*admitted pro hac vice*)
anand.agneshwar@arnoldporter.com
Carmela T. Romeo
Pennsylvania Bar No. 313042
Email: carmela.romeo@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Sanofi-Aventis U.S. LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that a true and correct copy of the foregoing document is being served this day on all counsel of record via the Court's electronic filing system, and by electronic mail on Plaintiff Carolyn Sampson, cafsampson@gmail.com.

*/s/ Daniel A. Spira*

Daniel A. Spira

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GLENDA JOHNSON ET AL., | ) | Case No. 2:11-cv-005782 |
| Plaintiffs, | ) | This Document Relates to: |
| v. | ) | |
| SMITHKLINE BEECHAM CORPORATION ET AL., | ) | *Yeatts, et al. v. SmithKline Beecham Corp., et al.*, No. 11-cv-06711 |
| Defendants. | ) | |

**ORDER**

Upon consideration of Defendants' Renewed Motion for Summary Judgment as to Plaintiff Carolyn Sampson and the accompanying Memorandum of Law in Support thereof, and any response thereto, it is hereby **ORDERED** that Defendants' Motion is **GRANTED** and the action of Plaintiff Carolyn Sampson is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** this ___ day of __________, 2026.

BY THE COURT:

______________________________
Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GLENDA JOHNSON ET AL., | ) | |
| | ) | Case No. 2:11-cv-005782 |
| Plaintiffs, | ) | |
| | ) | This Document Relates to: |
| v. | ) | |
| | ) | *Yeatts, et al. v. SmithKline Beecham Corp., et al.*, No. 11-cv-06711 |
| SMITHKLINE BEECHAM CORPORATION ET AL., | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF RENEWED MOTION**
**<u>FOR SUMMARY JUDGMENT AS TO PLAINTIFF CAROLYN SAMPSON</u>**

Eliezer Granek
egranek@eckertseamans.com
ECKERT SEAMANS CHERIN & MELLOTT LLC
Two Liberty Place 22nd Floor
50 South 16th Street
Philadelphia, PA 19102
Telephone: (215) 851-8400
Facsimile: (215) 851-8412

Michelle A. Ramirez (*admitted pro hac vice*)
michelle.ramirez@sidley.com
Daniel A. Spira (*admitted pro hac vice*)
dspira@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Eugene A. Schoon (*admitted pro hac vice*)
eschoon@crokefairchild.com
CROKE FAIRCHILD DUARTE & BERES LLC
180 N. LaSalle Street, Suite 3400
Chicago, Illinois 60601
Telephone: (773) 517-2740

*Counsel for Grünenthal GmbH*
*(additional counsel on signature page)*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

UNDISPUTED FACTS ........ 3

A. Plaintiff's Longstanding Belief That Thalidomide Caused Her Injuries ........ 3

B. Publicity and Lawsuits Concerning Thalidomide in the United States ........ 6

C. Prior Motion for Summary Judgment, *Lone Pine* Order, and Plaintiff's Submissions ........ 9

SUMMARY JUDGMENT STANDARD ........ 10

ARGUMENT ........ 10

I. Plaintiff's Claims Are Time-Barred as a Matter of Law. ........ 11

A. Plaintiff's Claims Are Time-Barred Because She Has Believed for Decades That Thalidomide May Have Caused Her Birth Defects. ........ 12

B. Plaintiff's Claims Were Not Tolled by the Discovery Rule or Fraudulent Concealment. ........ 14

C. Plaintiff's Putative Experts' Submissions Confirm Her Claims Are Time-Barred. ........ 20

II. Plaintiff's Claims Fail as a Matter of Law Because She Has No Admissible Evidence That She Was Exposed to Thalidomide. ........ 24

CONCLUSION ........ 29

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adams v. Zimmer US, Inc.*,
943 F.3d 159 (3d Cir. 2019)....................12

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................10

*Apgar v. Lederle Labs.*,
588 A.2d 380 (N.J. 1991)....................20

*Bickford v. Joson*,
533 A.2d 1029 (Pa. Super. Ct. 1987)....................16

*Blanyar v. Genova Prods. Inc.*,
861 F.3d 426 (3d Cir. 2017)....................14

*Bradford v. City of Phila.*,
No. 06-CV-5121, 2007 WL 2345278 (E.D. Pa. Aug. 16, 2007)....................13, 14, 15

*Brawner v. Educ. Mgmt. Corp.*,
513 F. App'x 148 (3d Cir. 2013)....................17

*C.J.M. v. Archdiocese of Phila.*,
67 Pa. D. & C.4th 474 (Pa. Ct. Com. Pl. 2004)....................18

*Canada v. Samuel Grossi & Sons, Inc.*,
49 F.4th 340 (3d Cir. 2022)....................10

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................10, 11

*Childers v. Joseph*,
842 F.2d 689 (3d Cir. 1988)....................10

*Ciccarelli v. Carey Canadian Mines, Ltd.*,
757 F.2d 548 (3d Cir. 1985)....................18

*Danysh v. Eli Lilly & Co.*,
No. 1:10-cv-2116, 2011 WL 4344601 (M.D. Pa. July 13, 2011)....................12, 23, 24

*DeMartino v. Albert Einstein Med. Ctr.*,
460 A.2d 295 (Pa. Super. Ct. 1983)....................13

*DeMayo v. Schmitt*,
20 Phila. Co. Rptr. 269 (Pa. Ct. Com. Pl. 1990)....................25

*Diamond v. Richardson-Merrell, Inc.*,
No. CV 62-0032132 (E.D. Pa. 1962) ........................................................................8

*Dick v. Am. Home Prods. Corp.*,
No. 1:05-cv-22384, 2009 WL 1542773 (M.D. Pa. June 2, 2009) ....................................25, 26

*Eagle Nationwide Mortg. v. Plaza Home Mortg., Inc.*,
No. 07-3868, 2008 WL 555338 (E.D. Pa. Feb. 28, 2008) (Diamond, J.) ...............................10

*Eckenrod v. GAF Corp.*,
544 A.2d 50 (Pa. Super. Ct. 1988)...........................................................................................25

*Feit v. Great W. Life & Annuity Ins. Co.*,
271 F. App'x 246 (3d Cir. 2008) .............................................................................................29

*Fine v. Checcio*,
870 A.2d 850 (Pa. 2005) ..........................................................................................................14

*In re Ford Motor Co. Bronco II Prods. Liab. Litig.*,
982 F. Supp. 388 (E.D. La. 1997).............................................................................................20

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*,
No. 11-3045, 2012 WL 1118780 (D.N.J. Apr. 3, 2012)...........................................................25

*Frankentek Residential Sys., LLC v. Buerger*,
15 F. Supp. 3d 574 (E.D. Pa. 2014) ..........................................................................................11

*Gordner v. Dynetics Corp.*,
862 F. Supp. 1303 (M.D. Pa. 1994)...........................................................................................27

*Green v. Auerbach Chevrolet Corp.*,
606 A.2d 1093 (N.J. 1992)........................................................................................................20

*Harris v. Philadelphia Protectory for Boys*,
No. CV 17-2874, 2018 WL 1123766 (E.D. Pa. Mar. 1, 2018)................................................12

*Henry v. Richardson-Merrell, Inc.*,
508 F.2d 28 (3d Cir. 1975)..........................................................................................................9

*Heraeus Med. GmbH v. Esschem, Inc.*,
927 F.3d 727 (3d Cir. 2019).......................................................................................................17

*Hoefling v. U.S. Smokeless Tobacco Co., LLC*,
576 F. Supp. 3d 262 (E.D. Pa. 2021) ........................................................................................29

*Huber v. McElwee-Courbis Const. Co.*,
392 F. Supp. 1379 (E.D. Pa. 1974) ...........................................................................................16

*Ingenito v. AC & S, Inc.*,
633 A.2d 1172 (Pa. Super. 1993)....................16

*Johnson v. SmithKline Beecham Corp.*,
55 F. Supp. 3d 603 (E.D. Pa. 2014).................... *passim*

*Johnson v. SmithKline Beecham Corp.*,
95 F. Supp. 3d 819 (E.D. Pa. 2015)....................2, 16, 28

*Johnson v. Smithkline Beechmam Corp.*,
No. 11-cv-05782, 2014 WL 7087959 (E.D. Pa. July 14, 2014).................... *passim*

*Kennedy v. Ethicon, Inc.*,
No. 5:20-cv-00185, 2020 WL 4050459 (E.D. Pa. July 20, 2020)....................16

*Martinez v. Cooper Hosp.-Univ. Med. Ctr.*,
747 A.2d 266 (N.J. 2000)....................20

*McCarrick v. Richardson-Merrell, Inc.*,
No. 882426, 1971 WL 39622 (Cal. Super. Ct. 1971)....................8, 9

*McKenna v. Ortho Pharm. Corp.*,
622 F.2d 657 (3d Cir. 1980)....................11

*Mest v. Cabot Corp.*,
449 F.3d 502 (3d Cir. 2006)....................18

*Nicolaou v. Martin*,
649 Pa. 227 (2018)....................23

*Orozco v. Children's Hosp. of Phila.*,
638 F. Supp. 280 (E.D. Pa. 1986)....................12

*Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*,
828 F. Supp. 287 (D.N.J. 1993)....................20

*Rice v. Diocese of Altoona-Johnstown*,
667 Pa. 92 (2021)....................14

*Riggs v. AHP Settlement Trust*,
421 F. App'x 136 (3d Cir. 2011)....................18

*Robertson v. Allied Signal, Inc.*,
914 F.2d 360 (3d Cir. 1990)....................25

*Ross v. Johns-Manville Corp.*,
766 F.2d 823 (3d Cir. 1985)....................11

*Sherk v. Daisy-Heddon*,
450 A.2d 615 (Pa. 1982) ....................25

*Smeal v. Clark Equip. Co.*,
No. CV 19-5853, 2022 WL 1265532 (E.D. Pa. Apr. 28, 2022) ....................25

*Speicher v. Dalkon Shield Claimants Trust*,
943 F. Supp. 554 (E.D. Pa. 1996) ....................18

*Thomas v. Smith Kline Beecham Corp.*,
No. J-A15019-13, slip op. 10 (Pa. Super. Ct. Nov. 27, 2013) ....................18

*Thomas v. TEKsystems, Inc.*,
No. 2:21-cv-460, 2026 WL 381239 (W.D. Pa. Feb. 11, 2026)....................10, 11, 18

*Urland v. Merrell Dow Pharms., Inc.*,
822 F.2d 1268 (3d Cir. 1987)....................12, 19

*In re Vioxx Prods. Liab. Litig.*,
522 F. Supp. 2d 799 (E.D. La. 2007) ....................20

*Whelan v. Armstrong Int'l Inc.*,
242 N.J. 311 (2020) ....................24

*In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*,
579 F. Supp. 3d 675 (E.D. Pa. 2021) ....................29

**Statutes**

28 U.S.C. § 1746....................9, 21

42 Pa. Cons. Stat. § 5521(b) ....................11

42 Pa. Cons. Stat. § 5524(2) ....................12

42 Pa. Cons. Stat. § 5524(7) ....................12

42 Pa. Cons. Stat. § 5533(b)(1)(i) ....................12

N.J. Stat. § 2A:14-2(a) ....................20

N.J. Stat. § 2A:14-21....................20

**Rules**

Fed. R. Civ. P. 56(a) ....................10

## INTRODUCTION

As set forth in Defendants' original Motion for Summary Judgment pertaining to Carolyn Sampson, (i) her claims are time-barred, and (ii) she lacks admissible evidence that she was exposed to thalidomide. [D.E. 291, 330, 336]. Nothing in the intervening years, including Plaintiff's submission in response to the Court's May 27, 2026 Order ("*Lone Pine* Order") [D.E. 911], alters these grounds on which summary judgment should be granted.

Indeed, for her entire adult life, Plaintiff has believed that thalidomide her mother allegedly took during pregnancy likely caused her birth defects. Since 1979, whenever anyone has asked Plaintiff what caused her birth defects, she has answered, "I think my mother took thalidomide." Deposition of Carolyn Sampson ("Sampson Dep.") (Ex. A) at 86. In 1982, she even contacted a lawyer about filing a lawsuit related to thalidomide, and was told she needed to file any lawsuit within one year or else the statute of limitations would expire. *Id*. at 53. One of Plaintiff's medical records, dated April 20, 2006, reports: "She has congenital hypoplasia of the arms, fingers that were not developed, with an appearance that is typical of a thalidomide effect." SAMPSON 260109:002, 0154-0156 (Ex. B). Yet Plaintiff did not file this suit until October 2011.

Consistent with this Court's and the Third Circuit's prior holdings in this litigation, and in light of the dispositive and undisputed fact that Plaintiff believed for decades before filing suit that thalidomide may have caused her birth defects, her claims are time-barred. *See Johnson v. Smithkline Beecham Corp.*, No. 11-cv-05782, 2014 WL 7087959, at *2 (E.D. Pa. July 14, 2014) (granting summary judgment because of "Plaintiff's decades-long knowledge that his birth defects were caused by thalidomide," such that he "knew of his injuries substantially more than two years before he filed suit in 2012"); *Johnson v. SmithKline Beecham Corp.*, 55 F. Supp. 3d 603, 611 (E.D. Pa. 2014) (granting summary judgment in Plaintiff Andre's case because "for the

last 40 years, Plaintiff's 'best knowledge' was that thalidomide caused his injuries"); *Johnson v. SmithKline Beecham Corp.*, 95 F. Supp. 3d 819, 827 (E.D. Pa. 2015) (granting summary judgment in Plaintiff Debra Johnson's case, where plaintiff's mother "has long believed that the German morning sickness drug she took while pregnant with Plaintiff caused Plaintiff's birth defects"), *aff'd Johnson v. GlaxoSmithKline, LLC, et al.*, 636 F. App'x 87 (3d Cir. 2016).

Nothing in Plaintiff's two expert submissions in response to the Court's *Lone Pine* Order alters this result. In fact, those submissions *confirm* that Plaintiff has "***the most common defect seen in thalidomide embryopathy***," undermining any argument that Plaintiff could not have discovered the alleged cause of her injuries earlier. Declaration of Trent Stephens, Ph.D (Ex. C) ¶ 15 (emphasis added); *see also* Letter of Prof. Neil Vargesson (Ex. D) at 2, 5 (referring to "old human studies from the 1960s" to support the purported scope of thalidomide-related injuries).

In addition, while the statute of limitations commenced decades ago because Plaintiff subjectively believed she was exposed to thalidomide, summary judgment is independently warranted because Plaintiff lacks admissible evidence of actual exposure to thalidomide. Plaintiff's mother testified that she has "no way of knowing" whether the pills her doctor allegedly gave her were thalidomide. Deposition of Marilyn A. Martin ("Martin Dep.") (Ex. E) at 53. That doctor is now deceased, and Plaintiff long ago lost the pills themselves. *See Johnson*, 55 F. Supp. 3d at 617 (declining to address exposure, but recognizing that "Defendants argue persuasively that Plaintiff has produced no admissible evidence showing that his mother ingested thalidomide at any point during her pregnancy"); *Johnson*, 95 F. Supp. 3d at 832 (similar). Plaintiffs' expert submissions likewise cannot overcome the lack of admissible evidence that Plaintiff was exposed to thalidomide. *See, e.g.,* Stephens Decl. (Ex. C) ¶ 16 (explicitly ***assuming***, rather than establishing, thalidomide exposure); *Johnson v. SmithKline Beecham Corp.*, 55 F. at

612 ("Dr. Stephens's assumption is not evidence that Plaintiff's mother took thalidomide early in her pregnancy.").

Defendants are thus entitled to summary judgment both on statute of limitations grounds and based on the absence of any evidence proving Plaintiff was exposed to thalidomide.

## UNDISPUTED FACTS

### A. Plaintiff's Longstanding Belief That Thalidomide Caused Her Injuries

Plaintiff was born on March 28, 1962 in Morristown, New Jersey. Compl. [D.E. 1 in 11-cv-06711] ¶ 60. She was born with deformities immediately identifiable at birth, including a malformed left arm, a left hand with only three fingers and no thumb, and a right arm with an enlarged radial head. *Id*.

Since she was a teenager, Plaintiff has believed that her birth defects may be the result of thalidomide exposure. In or around 1979, when Plaintiff was 17 years old, a stranger on a bus asked her, "Are you a thalidomide baby?" Sampson Dep. (Ex. A) at 39. That same day, Plaintiff repeated this question to her mother and was told, "Well, we're really not sure. . . . You know, yes, I did take some medication. But I don't know. . . . I don't know what it is that I took." *Id.* at 40, 42; *see also id.* at 95 (similar testimony). Ever since, Plaintiff has "always believed that it somehow could have been thalidomide." *Id.* at 46; *see also id.* at 119 ("I've always thought that my mother took thalidomide since I was told this when I was 17, but I'm not sure.").

Whenever anyone asked Plaintiff about the cause of her birth defects, she "would say: I don't know. It's possible that mother took thalidomide because I've known that since I was 17." *Id*. at 64; *see also id*. at 86 ("[W]henever I was asked if I knew, I would say: I think my mother took thalidomide."). When asked whether she had told her doctors that thalidomide was the cause of her birth defects, Plaintiff testified: "I don't know if I did or not. Like I said, I always believed that it was possible. So I may have said that. If asked by a doctor, I may have said that."

*Id*. at 64. In fact, one of Plaintiff's medical records dated April 20, 2006, reports: "She has congenital hypoplasia of the arms, fingers that were not developed, with an appearance that is typical of a thalidomide effect. She comments that it is possible her mother took a drug that had a small amount of either thalidomide or thalidomide-like additive to it in her pregnancy for treatment of headaches or muscle pain, but she has never been able to determine that conclusively." SAMPSON 260109:002 0154-0156 (Ex. B).

In approximately 1982, Plaintiff contacted an attorney about possibly filing a lawsuit related to thalidomide. Sampson Dep. (Ex. A) at 48-50. During an initial phone call, Plaintiff told the attorney, "I believe my mother took thalidomide and I would like to look into this further and see if there's anything that can be done." *Id*. at 51. The attorney told Plaintiff that "the statute of limitations in New Jersey is 21. And I was 20. And so, you know, he said: If you're going to do something, you have to do it before you turn 21"—i.e., by March 28, 1983. *Id*. at 53. But after receiving this advice, Plaintiff chose not to sue. *See id*. at 58-59 ("Q. So the lawyer left you with the impression that if you wanted to sue, you had a year or so until you reached age 21; is that correct? A. Yes. I know it was less than a year. Q. And you—that year or whatever period it was went by and you didn't sue? A. Right."). Instead, she waited almost three decades before filing this case.

Notably, when Plaintiff told her mother that she was seeing a lawyer, her mother told her that she "still had the pills" that her doctor, Dr. Hopper, allegedly gave her while she was pregnant with Plaintiff, and Plaintiff "took them to the attorney." *Id*. at 51-52. According to Plaintiff, the attorney sent the pills to "a lab to get [them] tested," but the lab reportedly told him that "the pill was too old to determine conclusively what it was." *Id*. at 52-53. Plaintiff did not get the pills back and does not know what happened to them. *Id*. at 57-58. Nor does she recall the

name of the attorney who supposedly sent the pills to a lab. *Id*. at 51 ("Q. You don't remember the name of the attorney? A. I don't."). Dr. Hopper is not among the doctors in Defendants' lists of thalidomide clinical investigators. Ex. F (list of clinical investigators for Smith Kline & French); Ex. G (lists of clinical investigators for Richardson-Merrell, Inc. and its affiliates).

Plaintiff also testified that the attorney called Dr. Hopper to request her mother's medical records. According to Plaintiff, after learning whose records were being requested, the doctor reportedly told the lawyer that "those are lost." Sampson Dep. (Ex. A) at 53; *see also id*. at 90-91 (similar testimony). Plaintiff testified that she "always thought that was suspect." *Id*. at 91. But she took no further action until 2011, and by that time Dr. Hopper had died. *Id*. Instead, Plaintiff testified that "at that point when [the lawyer] said there are no medical records, the pill is inconclusive, you know, I thought that was the end of it and I went on with my life." *Id*. at 53-54; *see also id*. at 53 ("And that's the last I heard of it."). She decided not to bring a lawsuit.

Almost twenty-five years later, in 2006, Plaintiff "did an Internet search . . . to find thalidomide." *Id*. at 45. At that time, she supposedly learned that thalidomide has been used as "an ingredient in other medications," and she thought: "Maybe this is the answer. Maybe [her mother] was given something that had thalidomide in it. She got it somewhere." *Id*. at 46; *see also id*. at 47 ("I only remember that I found this little tiny bit of information and I thought: Well, maybe that's the answer."). Even then, Plaintiff still did not file suit until five years later.

Discovery in this case refutes any argument that Defendants somehow prevented Plaintiff from filing suit earlier. She has admitted that she has never communicated with any of the Defendants. Carolyn Sampson's Second Supp. Resp. to Sanofi-Aventis U.S. LLC's Fourth Interrog. (Ex. H). She instead testified that she "was never able to prove" that her mother took thalidomide, Sampson Dep. (Ex. A) at 46, and she never has found such proof. *See id*. at 105

("Q. So your state of mind at this point, September 21, 2011, was that you suspected your mother received [thalidomide]; correct? A. Uh-hum. I've always suspected that. Q. Your answer is yes? A. Yes, correct. Yes. Q. But you wanted to find proof; right? A. Yes. Q. Did you ever find any? A. No."). Plaintiff's mother likewise testified that she "ha[s] no proof" and "ha[s] no way of knowing" whether the drug she allegedly took while pregnant with Plaintiff was thalidomide. Martin Dep. (Ex. E) at 53; *accord id*. at 54 ("I don't know what it was I had taken."). In fact, there is less proof today than there was decades ago, given the death of the doctor who allegedly gave Plaintiff's mother the pills, and Plaintiff's loss of the pills themselves. But even without that proof, Plaintiff nonetheless filed this lawsuit in October 2011.

**B. Publicity and Lawsuits Concerning Thalidomide in the United States**

In addition to Plaintiff's own personal belief about the source of her birth defects, countless books, national newspapers, and magazine articles and other media have discussed thalidomide's presence in the United States and its link to birth defects since the early 1960s. Ex. I (partial bibliography). In August 1962, President John F. Kennedy gave a press conference addressing thalidomide and cautioned that "[e]very citizen . . . should be aware of the hazards [of thalidomide], and I am sure they are." Ex. J (Official White House Tr.) at 3. He urged American women immediately to get rid of the drug: "Every woman in this country . . . must be aware that it is most important that they check their medicine cabinet, that they do not take this drug, that they turn it in." *Id*.

That same month, the U.S. Senate held public hearings that identified Grünenthal as the inventor and licensor of thalidomide. U.S. Senate Hr'g (Aug. 1 and 9, 1962) (Ex. K) at 30, 81-83, 115-118. The public record from those hearings included the fact that Smith Kline & French ("SKF") ran a U.S. clinical trial involving thalidomide from November 1956 until December 1957, involving 67 U.S. doctors. Aug. 27, 1962 SKF letter to Sen. Hubert H. Humphrey (Ex. L)

(noting that "[i]nvestigations in patients were begun in November 1956."). And the FDA issued a press release stating that a later U.S. clinical trial conducted by Merrell involved 1,267 doctors, more than 2,500,000 pills, and 19,822 patients, "3,670 [of whom] were women of child-bearing age, [of] whom 624 were reported as pregnant." August 23, 1962 FDA Press Release (Ex. M).

Hundreds of other public sources have long disclosed Grünenthal's invention and licensing of thalidomide, as well as SKF's and Merrell's respective U.S. clinical trials. For example, on September 9, 1962, the Washington Post ran a front-page story reporting FDA's press release numbers concerning Merrell's trial, and that SKF's trial resulted in the distribution of 344,270 thalidomide tablets to 67 doctors. Ex. N (Morton Minz, Drug Firm Said to Lag on Warning, Washington Post Times Herald, Sept. 9, 1962, at A1). Numerous other news stories reported the same information. *See, e.g.,* Ex. O (Aug. 10, 1962 Life Magazine cover story on thalidomide referencing German and U.S. manufacturers, including a picture of Grünenthal's manufacturing plant and a statement by Merrell's director of medical research); Ex. P (Sept. 1, 1962 Saturday Review article outlining the chronology of Merrell's NDA); Ex. Q (Oct. 6, 1962 Saturday Review article reporting that the public record of U.S. Senate hearings "shows that in 1956 and 1957 Smith, Kline and French gave thalidomide to sixty-seven doctors, who gave it to 875 patients in an experiment encompassing eleven states"); Ex. R (Mar. 28, 1963 Reporter article reporting that SKF "tested thalidomide in 1956-57" and that Merrell "distributed 2.5 million thalidomide tablets to 1,267 physicians for 'experimental' use").

In the 1970s and later, full-length books were published about thalidomide. In 1972, Henning Sjöström & Robert Nilsson published *Thalidomide and the Power of the Drug Companies*, which discussed SKF's animal and clinical trials (pp. 50, 189, and 191) and Grünenthal, including its relationship to SKF. *See, e.g., id.* at pp. 37, 38, 44, 186-87, and 191

(attached as Ex. S). In 1979, the London *Sunday Times* published *Suffer the Children*, which discussed Grünenthal's invention of thalidomide, SKF's testing of the drug, and Merrell's clinical trial in the United States. Phillip Knightley, et al., The Sunday Times Insight Team, *Suffer the Children: The Story of Thalidomide* (1979) (Ex. T) at pp. 14, 18-19, and 64. In 2001, *Dark Remedy* also discussed Grünenthal, SKF, and Merrell with respect to thalidomide. Trent Stephens & Rock Brynner, *Dark Remedy: The Impact of Thalidomide and its Revival as a Vital Medicine* (2001). In fact, Plaintiff's allegations have largely been cribbed from these published books. *See* Comparison of Complaint to Publicly-Available References (Ex. U).

With this massive publicity, dozens of suits were filed in U.S. courts against Grünenthal, Merrell, and SKF in the decades after thalidomide's link to birth defects was discovered. Between 1962 and 1992, over thirty lawsuits claiming thalidomide injuries were filed across the United States, including in this Court. *See, e.g., Diamond v. Richardson-Merrell, Inc.*, No. CV 62-0032132 (E.D. Pa. 1962) (settled pre-verdict); Ex. V (list of prior U.S. thalidomide litigation). These lawsuits included claims against all three of the Defendants in this case. For example, in 1977, Rose Ann Burton sued SKF, Richardson-Merrell, Grünenthal, and others in Michigan state court. Ex. W (*Burton* complaint).

In 1971, a thalidomide case resulted in a $2.75 million verdict for the plaintiff—a newsworthy amount in those days. *See McCarrick v. Richardson-Merrell, Inc.*, No. 882426, 1971 WL 39622 (Cal. Super. Ct. 1971); Veronica Geng, Thalidomide: The American Experience, N.Y. Times, Apr. 29, 1973 (Ex. X) (reporting on thirteen U.S. lawsuits, including *McCarrick*); Lynn Lilliston, Decade Later, Peggy Yearns 'to Be Tall', L.A. Times, June 22, 1972 (Ex. Y) (discussing *McCarrick* and potential statute of limitations problems for other thalidomide plaintiffs). In 1975—decades before Plaintiff filed suit—the Third Circuit affirmed

the dismissal of a thalidomide case based on the statute of limitations. *Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28 (3d Cir. 1975).

### C. Prior Motion for Summary Judgment, *Lone Pine* Order, and Plaintiff's Submissions

On July 31, 2014, Defendants moved for summary judgment as to Plaintiff's claims, asserting that (i) Plaintiff's claims are time-barred, and (ii) she lacks admissible evidence of exposure to thalidomide. The motion was fully briefed [D.E. 291, 330, 336], but denied without prejudice pending the special master's investigations. Feb. 27, 2015 Order [D.E. 474].

On May 27, 2026, the Court issued an Order requiring plaintiffs in this coordinated litigation to serve declarations from themselves and one or more experts meeting the requirements of 28 U.S.C. § 1746 and containing specified information to support their assertions that (i) their claims are not time-barred, and (ii) they were exposed to thalidomide in utero, which caused Plaintiff's identified injuries. *Lone Pine* Order [D.E. 911] at 3-5.

On June 27, 2026, Plaintiff served a Declaration from herself, along with a 2014 Declaration from Dr. Trent Stephens, originally submitted in opposition to Defendants' original motion for summary judgment [D.E. 330-2] and addressed in Defendants' reply in support of that summary judgment motion [D.E. 336]. On August 20, 2026, Plaintiff served a Letter from Professor Neil Vargesson, which does not meet the requirements of 28 U.S.C. § 1746, but which Plaintiff nevertheless seeks to rely on to support her claims.

Both putative experts—neither of which is a medical doctor—assert that certain of Plaintiff's birth defects are (or are more likely than not) caused by thalidomide, and that she could not have previously located an expert to testify that her injuries are consistent with or caused by exposure to thalidomide, notwithstanding their recognition that she has "the most common defect seen in thalidomide embryopathy," Stephens Decl. (Ex. C) ¶ 15; their citations to

scientific literature published decades before Plaintiff's suit that purportedly connects her injuries to thalidomide exposure, *e.g.,* Vargesson Letter (Ex. D) at 4; and Plaintiff's own 2006 medical record in which her doctor states that she has injuries "typical of a thalidomide effect." SAMPSON 260109:002 0154-0156 (Ex. B).

## SUMMARY JUDGMENT STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Eagle Nationwide Mortg. v. Plaza Home Mortg., Inc.*, No. 07-3868, 2008 WL 555338, at *1 (E.D. Pa. Feb. 28, 2008) (Diamond, J.). A factual dispute is material if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 345 (3d Cir. 2022) (quoting *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir.), *amended*, 979 F.3d 192 (3d Cir. 2020)).

The moving party has the initial burden of identifying evidence that shows an absence of a genuine issue of material fact. *Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir. 1988); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted); *see also Thomas v. TEKsystems, Inc.*, No. 2:21-cv-460, 2026 WL 381239, at *4 (W.D. Pa. Feb. 11, 2026). Once the moving party has shown an absence of evidence to support the nonmoving party's claims, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324; *see also Thomas*, 2026 WL 381239, at *4.

## ARGUMENT

Defendants are entitled to summary judgment for two reasons. First, Plaintiff's claims are time-barred as a matter of law because it is undisputed that Plaintiff has believed since 1979 that

her injuries might have been the result of thalidomide exposure. Second, Plaintiff cannot carry her burden of proving an essential element of her case: that her mother actually took thalidomide during pregnancy and thus that thalidomide caused Plaintiff's birth defects.

**I. Plaintiff's Claims Are Time-Barred as a Matter of Law.**

For claims like Plaintiff's that arose outside of Pennsylvania, the applicable time for filing suit "shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim." 42 Pa. Cons. Stat. § 5521(b); *see also Frankentek Residential Sys., LLC v. Buerger*, 15 F. Supp. 3d 574, 581 (E.D. Pa. 2014) ("Pennsylvania's limitations period applies to the claim unless the foreign jurisdiction's laws, including laws on tolling and the date of accrual, bar the claim first."); *Ross v. Johns-Manville Corp*., 766 F.2d 823, 827 (3d Cir. 1985) ("Both the statutory scheme and the case law in this area suggest that the limitations period for a foreign cause of action brought in Pennsylvania courts should never be construed to be longer than would be the case if the same events had occurred in Pennsylvania to a Pennsylvania plaintiff."). This inquiry "requires [courts] to look to the law of the state where the cause of action arose to determine not only the prescribed period of limitations, but also the point at which the statute begins to run." *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 660 (3d Cir. 1980). Pennsylvania federal courts sitting in diversity must apply Pennsylvania's borrowing statute. *Id*. at 659-60.

Here, Plaintiff's mother allegedly ingested thalidomide in New Jersey, and Plaintiff was born in New Jersey with the injuries that are the subject of this lawsuit. Thus, Plaintiff's claims accrued in New Jersey and, under the borrowing statute, the Court must apply the statute of limitations—Pennsylvania's or New Jersey's—that results in the earliest bar to Plaintiff's claims. Regardless of which state's law is applied, Plaintiff's claims have long been time-barred, and nothing tolled the statute of limitations.

Under Pennsylvania law, Plaintiff's personal injury claims are subject to a two-year statute of limitations. 42 Pa. Cons. Stat. § 5524(2), (7); *see also Adams v. Zimmer US, Inc.*, 943 F.3d 159, 163 (3d Cir. 2019). The statute "begins to run once the plaintiff is on 'inquiry notice'—that is, actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Danysh v. Eli Lilly & Co.*, No. 1:10-cv-2116, 2011 WL 4344601, at *7 (M.D. Pa. July 13, 2011) (internal quotation marks omitted); *see also Adams*, 943 F.3d at 163.[1]

### A. Plaintiff's Claims Are Time-Barred Because She Has Believed for Decades That Thalidomide May Have Caused Her Birth Defects.

The massive publicity surrounding thalidomide alone would be enough to establish that Plaintiff was on inquiry notice of her claims decades ago. *See Bradford v. City of Phila.*, No. 06-CV-5121, 2007 WL 2345278, at *2 (E.D. Pa. Aug. 16, 2007) (describing the discovery rule's reasonable person standard).

[1] Pennsylvania's minor tolling statute, 42 Pa. Cons. Stat. § 5533(b)(1)(i), does not apply, because the statute was not enacted until 1984 and does not retroactively revive claims that already were time-barred at the time of enactment. *Urland v. Merrell Dow Pharms., Inc.*, 822 F.2d 1268, 1275 (3d Cir. 1987) (collecting cases). Where, as here, the minor tolling statute does not apply, a parent's knowledge is imputed to his or her child for purposes of the discovery rule. *See Orozco v. Children's Hosp. of Phila.*, 638 F. Supp. 280, 283 n.1 (E.D. Pa. 1986) (statute of limitations expired where child's parents knew of a potential claim, imputing knowledge to "all plaintiffs"), *aff'd* 813 F.2d 29 (3d Cir. 1987). In this case, Plaintiff's mother has always believed that thalidomide may have caused Plaintiff's birth defects, and Plaintiff has shared this belief since at least 1979 when her mother told her so. Plaintiff's claims thus are time-barred regardless of whether the Court focuses on Plaintiff's knowledge or that of her parents. *See Harris v. Philadelphia Protectory for Boys*, No. CV 17-2874, 2018 WL 1123766, at *2 (E.D. Pa. Mar. 1, 2018) (claim was time barred, despite § 5533(b), where "even under that expansion, Plaintiff's claim would already have expired by the time that amendment to the statute took effect."). *cf. Johnson*, 636 F. App'x at 89 (affirming trial court's ruling that "because Louisiana law does not permit retroactive application of its minor tolling statute, her mother's knowledge would be imputed to [plaintiff]").

But this case is even clearer because Plaintiff's actual knowledge plainly bars her claims. *E.g., Johnson*, 2015 WL 7087959, at *1 ("Because Plaintiff [Jack Merica] knew of his injuries substantially more than two years before he filed suit in 2012, his claims are time barred . . . ."); *Johnson*, 55 F. Supp. 3d at 611 (granting summary judgment because "for the last 40 years, Plaintiff's 'best knowledge' was that thalidomide caused his injuries"). It is undisputed that:

(1) when Plaintiff was 17 years old, her mother told her that a medication she took while pregnant may have caused Plaintiff's birth defects, Sampson Dep. (Ex. A) at 40-43;

(2) ever since—i.e., for more than three decades before filing suit—Plaintiff has believed that thalidomide may have caused her birth defects, *id*. at 46, 64, 86, 119;

(3) whenever anyone, including her doctors, has asked Plaintiff about the cause of her birth defects, she has said that thalidomide may have caused them, *id*.;

(4) in approximately 1982, Plaintiff contacted a lawyer about bringing a lawsuit related to thalidomide, but she chose not to sue even though the lawyer told her that the statute of limitations would expire in one year, *id*. at 48-59; and

(5) one of Plaintiff's medical records from 2006 states that Plaintiff has "an appearance that is typical of a thalidomide defect" and that Plaintiff commented that her mother may have taken thalidomide while pregnant with Plaintiff, SAMPSON 260109:002 0154-0156 (Ex. B).

Yet Plaintiff did not file suit until 2011. The long and unjustifiable delay, as key witnesses died and Plaintiff lost key evidence, mandates dismissal of her claims with prejudice as time-barred. *See, e.g., DeMartino v. Albert Einstein Med. Ctr.*, 460 A.2d 295, 299 (Pa. Super. Ct. 1983) ("The statute of limitations has as its policies and purposes the stimulation of the prompt pursuit of legal rights and the avoidance of the inconvenience and prejudice resulting from deciding stale cases on stale evidence."); *cf. Johnson*, 636 F. App'x at 89 (finding "the District Court's analysis to be correct in all respects" and "affirm[ing] its grant of GSK's motion for summary judgment").

### B. Plaintiff's Claims Were Not Tolled by the Discovery Rule or Fraudulent Concealment.

Additionally, nothing tolled Plaintiff's claims for the roughly 32-year gap during which she declined to file suit.

***First***, the discovery rule does not toll Plaintiff's claims. Pennsylvania's discovery rule tolls the statute of limitations only until the plaintiff "was able, in the exercise of reasonable diligence, to know of [1] his injury and [2] its cause." *Fine v. Checcio*, 870 A.2d 850, 858-59 (Pa. 2005); *see also Rice v. Diocese of Altoona-Johnstown*, 667 Pa. 92, 109 (2021) ("The plaintiff's inability to know of the injury must be 'despite the exercise of reasonable diligence'") (quoting *Fine*, 870 A.2d at 858); *Bradford*, 2007 WL 2345278, at *2 (discovery rule tolls limitations period only until "the plaintiff knew or using reasonable diligence should have known of the claim") (citations and internal quotation marks omitted); *accord Johnson*, 2015 WL 7087959, at *1 ("Pennsylvania statute of limitations begins to run when plaintiff discovers or reasonably should discover injuries, and that another has caused the injuries") (citing *Fine*, 870 A.2d at 859).

"Pennsylvania's formulation of the discovery rule reflects a narrow approach 'to determining accrual for limitations purposes' and places a greater burden upon Pennsylvania plaintiffs vis-á-vis the discovery rule than most other jurisdictions." *Blanyar v. Genova Prods. Inc.*, 861 F.3d 426, 432 (3d Cir. 2017) (quoting *Gleason v. Borough of Moosic*, 609 Pa. 353, 362 (2011)). Courts employ an objective standard to determine whether a plaintiff can sustain this burden:

> The standard of reasonable diligence is an objective or external one that is the same for all individuals. It is not a subjective standard. The fact that this individual plaintiff may have lacked knowledge of his or her injury is irrelevant, the statute is tolled only if a reasonable person in the plaintiff's position would have been unaware of the salient facts.

*Bradford*, 2007 WL 2345278, at *2 (citations and internal quotation marks omitted). Thus, while a plaintiff's actual knowledge alone suffices to raise a time bar, even in the absence of actual knowledge, the objective reasonable diligence standard provides an independent and alternative ground for barring the claim. *See id*. Where "undisputed facts lead unerringly to the conclusion that the time it took to discover an injury [or its cause] was unreasonable as a matter of law," dismissal is required. *Id*.

*Bradford* is instructive. There, the plaintiff alleged he was injured as a result of improper medical tests performed on him while he was imprisoned at Holmesburg Correctional Facility in Philadelphia in 1957. *Id*. at *1. He did not file suit until some 50 years later, claiming he did not learn of the dangers of the medical testing for decades. *Id*. This Court concluded that the plaintiff could not invoke the discovery rule to toll the statute of limitations in light of the extensive public record surrounding the Holmesburg medical testing, which consisted of articles in the media, public hearings before Congress, and six lawsuits by other prisoners. *Id*. at *3 n.2. As the Court put it: "[G]iven 'the extraordinary media attention paid to the medical experiments conducted on prisoners at Holmesburg, as well as the six other lawsuits filed by former Holmesburg prisoners, a reasonable person in the plaintiff's position would have been aware of the salient facts years before the current action was filed.'" *Id*. (citation omitted).

Here, the undisputed evidence makes the time bar even clearer. There was far more publicity about thalidomide and more lawsuits than in *Bradford*, so the publicity and lawsuits here put any reasonable person on notice of any potential thalidomide claim decades ago. Furthermore, the undisputed facts demonstrate not only that Plaintiff should have known that her birth defects may have been the result of thalidomide, but also that she actually has believed there was a possible link since at least 1979, going so far as to contact a lawyer in 1982 who told

her that she was required to file a thalidomide-related lawsuit within a year.[2] Where, as here, the plaintiff actually believes a particular drug caused her alleged injuries, the discovery rule does not toll the statute of limitations. Pennsylvania courts routinely dismiss actions as untimely when plaintiffs believe they know the cause of their injuries, but fail to act in a timely fashion. *See, e.g., Johnson*, 2015 WL 7087959, at *1; *Johnson*, 55 F. Supp. 3d 603; *Johnson*, 95 F. Supp. 3d at 819; *Kennedy v. Ethicon, Inc.*, No. 5:20-CV-00185, 2020 WL 4050459, at *19 (E.D. Pa. July 20, 2020) (recognizing that claims are time-barred based on "first-hand knowledge," even where plaintiff's "doctor may have been telling her that her pain, fatigue, and other symptoms were *not* caused by" defendant's product) (citation omitted); *Huber v. McElwee-Courbis Const. Co.*, 392 F. Supp. 1379, 1383-84 (E.D. Pa. 1974) (when "the plaintiff knew of the cause of his injuries . . . [t]he requirements of the statute were met and the statute began to run" regardless of whether the plaintiff knew who was responsible); *Ingenito v. AC & S, Inc.*, 633 A.2d 1172, 1175 (Pa. Super. 1993) (affirming time-bar of plaintiff's claims where he was diagnosed with lung cancer, but failed to exercise reasonable diligence to investigate potential claims); *Bickford v. Joson*, 533 A.2d 1029, 1031 (Pa. Super. Ct. 1987) (affirming the dismissal of plaintiff's claims based on the statute of limitations where it was "clear that the injury—failure to alleviate or reverse a paralysis—was obvious to [plaintiff] who had knowledge of the continued gravity of his paralysis with only slight improvement from the time he left the hospital").

Nor does Plaintiff's uncertainty as to whether she could prove exposure to thalidomide in court somehow toll the limitations period. "[K]nowledge of every fact necessary to prevail on the

---

[2] Defendants do not concede that Plaintiff's injuries were caused by thalidomide. For purposes of this argument, however, Plaintiff's belief triggered the commencement and expiration of the limitations period, as did the constructive knowledge imputed to her from the information publicly available about thalidomide.

claim is not required to . . . trigger the accrual period." *Brawner v. Educ. Mgmt. Corp.*, 513 F. App'x 148, 149-150 (3d Cir. 2013); *see also Heraeus Med. GmbH v. Esschem, Inc.*, 927 F.3d 727, 734 (3d Cir. 2019) ("Rather, for the statute of limitations to run, a plaintiff need not know the exact nature of his injury, as long as it objectively appears that the plaintiff is reasonably charged with the knowledge that he has an injury caused by another.") (citation modified). Indeed, at this late date, the doctor who allegedly dispensed the drug is no longer living and the pills are lost. If limitations are to have any meaning, Plaintiff cannot have waited decades to sue until key evidence is no longer extant. The discovery rule therefore does not apply here.

***Second***, Plaintiff's claims are not saved by the doctrine of fraudulent concealment. As this Court has noted in this litigation, allegations of general concealment are insufficient and a plaintiff must show an affirmative misstatement by a defendant to the plaintiff that induces actual and justifiable reliance. Specifically, this Court stated:

> In opposing Defendants' [interrogatory] request, Plaintiffs state that "[t]hey do not allege each individual Plaintiff heard or saw each individual communication. They rather rely on the cumulative effect of the communications which caused Plaintiffs to refrain from investigating their claim." (Feb. 20, 2014 Letter.) Plaintiffs cite no supporting authority for this suggestion and I am aware of none. Accordingly, each Plaintiff must provide a verified response to Interrogatory 4 detailing which communications she relied upon that misled her into refraining from investigating her claim or otherwise proceeding against Defendants.

Feb. 24, 2014 Order [D.E. 166] at 2; *see also Johnson*, 2015 WL 7087959, at *1 ("in Pennsylvania, fraudulent concealment requires affirmative act of concealment upon which Plaintiff justifiably relied") (citing *Riggs v. AHP Settlement Trust*, 421 F. App'x 136, 139 (3d Cir. 2011)); *C.J.M. v. Archdiocese of Phila.*, 67 Pa. D. & C.4th 474, 490-91 (Pa. Ct. Com. Pl. 2004) (finding no fraudulent concealment where plaintiff claimed reliance on "systematic" acts or "general statements" instead of an "independent act of concealment . . . applicable to an individual plaintiff"); *Riggs*, 421 F. App'x at 139 ("[I]n order for fraudulent concealment to toll

the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiff [ ] justifiably relied.") (internal quotation marks omitted); *Speicher v. Dalkon Shield Claimants Trust*, 943 F. Supp. 554, 558-59 (E.D. Pa. 1996) ("hid[ing] information from the public [is not sufficient] to support a claim of fraud that would cause plaintiff to deviate from her duty to inquire" under Pennsylvania law).

Indeed, the Pennsylvania Superior Court confirmed that a "fraud on the public" does not constitute fraudulent concealment, and that an affirmative act directed at the plaintiff instead is required to toll the statute of limitations. *Thomas v. Smith Kline Beecham Corp.*, No. J-A15019-13, slip op. 10 (Pa. Super. Ct. Nov. 27, 2013) (Ex. Z) (upholding summary judgment on limitations grounds because "general systemic public conduct . . . is not an affirmative act directed at this specific plaintiff")).[3] Without proof that the alleged concealment thwarted the plaintiff's inquiries, there is accordingly no justifiable reliance and no tolling. *See Johnson*, 636 F. App'x at 89 ("The District Court properly rejected Johnson's other arguments, namely . . . that her inaction was caused by GSK's fraudulent concealment.").

Here, Plaintiff concedes in her discovery responses that she has had no contact with any of the Defendants, which refutes any notion that the Defendants made misrepresentations to her. Carolyn Sampson's Second Supp. Resp. to Sanofi-Aventis U.S. LLC's Fourth Interrog. (Ex. H).

[3] In *Thomas*, the Pennsylvania Superior Court cited multiple decisions of the Third Circuit and the Eastern District of Pennsylvania, all of which further support the rejection of Plaintiff's claim of fraudulent concealment here. *See Mest v. Cabot Corp.*, 449 F.3d 502, 517 (3d Cir. 2006) (finding no fraudulent concealment in the absence of communications between defendant and plaintiff); *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 557 (3d Cir. 1985) (holding allegations of decades-long fraud on the public regarding asbestos "insufficient to create an issue of fraud under Pennsylvania law"); *Speicher*, 943 F. Supp. at 558-59 (finding no fraudulent concealment because "Plaintiff has not alleged facts which would enable us to conclude that there was any specific conduct directed towards her by defendant that would cause her to deviate from her right of inquiry").

And her "public misimpression" theory not only contravenes this Court's previous orders, but also is at odds with other averments in her Complaint and the public record. Defendants' respective connections to thalidomide have been known in the public domain for over fifty years and formed the basis of other U.S. lawsuits filed and resolved many years ago. Plaintiff's former counsel cribbed from books published decades ago to draft the Complaint. There is no evidence that Defendants directed any alleged acts of concealment toward Plaintiff or that she relied on anything Defendants said or did not say. Plaintiff's admission that no Defendant communicated with her rules out application of the fraudulent concealment doctrine.

Moreover, even if Plaintiff's allegations of fraud on the public were somehow sufficient to toll the statute of limitations—which they are not—Plaintiff's actual belief outside the statutory period that her birth defects may have been caused by thalidomide precludes her from invoking fraudulent concealment for the same reasons that it prevents application of the discovery rule. This is because the Pennsylvania Supreme Court "views tolling of the statute of limitations in terms of the same 'knew or should have known' standard whether the statute is tolled because of the discovery rule or because of fraudulent concealment." *Urland*, 822 F.2d at 1273. As this Court has recognized, "Plaintiff's decades-long knowledge that his birth defects were caused by thalidomide" conclusively refutes any allegation of fraudulent concealment. *Johnson*, 2015 WL 7087959, at *2.

The massive publicity surrounding thalidomide for five decades, including the references to Defendants, reinforces this conclusion. *See supra* at 6-9. The relationship between thalidomide and birth defects was so highly publicized that even the slightest diligence would have awoken inquiry in a reasonable person decades ago. *See In re Vioxx Prods. Liab. Litig.*, 522 F. Supp. 2d 799, 808 (E.D. La. 2007) ("Both the national and local media coverage of the withdrawal of

Vioxx from the market were sufficient to put the plaintiffs on notice of a potential link between their alleged injuries and the use of Vioxx.") (citation omitted); *In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 982 F. Supp. 388, 396 (E.D. La. 1997) (rejecting plaintiffs' "bald[] assert[ion] that even in the face of . . . extensive media attention in widely circulated publications . . . their ignorance" of the alleged defect was reasonable).

Accordingly, Plaintiff's claims have not been tolled, and they are barred by the statute of limitations.[4]

### C. Plaintiff's Putative Experts' Submissions Confirm Her Claims Are Time-Barred.

In response to this Court's *Lone Pine* Order, Plaintiff re-submitted a Declaration from Dr. Trent Stephens, as well as a Letter from Professor Neil Vargesson. Both supposed experts purport to assert that (i) Plaintiff's injuries were (or may have been) caused by thalidomide,

[4] While Pennsylvania law bars Plaintiff's claims, for the sake of completeness Defendants note that New Jersey law also bars the claims. New Jersey has a two-year statute of limitations for every action for personal injuries, whatever the theory. N.J. Stat. § 2A:14-2(a). When a cause of action accrues while the plaintiff is a minor, the statute of limitations is tolled until the minor reaches the age of twenty-one. N.J. Stat. § 2A:14-21; *see also Green v. Auerbach Chevrolet Corp.*, 606 A.2d 1093, 1096 (N.J. 1992) (explaining that the minor tolling statute was amended in 1973 to change the age of majority to eighteen, but that this amendment does not apply to a person, such as Plaintiff, who was "under 21 years of age on January 1, 1973") (emphasis omitted). As in Pennsylvania, New Jersey's discovery rule tolls the statute of limitations only until the plaintiff "knew or should have known" that "[1] he or she was injured [2] due to the fault of another." *Martinez v. Cooper Hosp.-Univ. Med. Ctr.*, 747 A.2d 266, 270 (N.J. 2000); *accord id*. ("Critical to the running of the statute is the injured party's awareness of the injury and the fault of another."); *see also Apgar v. Lederle Labs.*, 588 A.2d 380, 382 (N.J. 1991) (granting summary judgment and dismissing claim as time-barred where plaintiff believed by the time she was 21 years old that the medication she took as a child caused her tooth discoloration). Also like the Pennsylvania rule, the New Jersey statute of limitations may be tolled based on alleged fraudulent concealment only if the plaintiff presents "proof of an intent to deceive and reliance upon the misrepresentations." *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 828 F. Supp. 287, 301 (D.N.J. 1993). And fraudulent concealment tolls the running of the statute only "until plaintiff discovers the cause of action or discovers facts that reasonably put him on notice of it." *Id*. at 300 (citation and internal quotation marks omitted). Plaintiff's claims thus are time-barred under New Jersey law for the same reasons they are barred under Pennsylvania law.

Stephens Decl. (Ex. C) ¶ 16 ("given the assumption of thalidomide exposure in this case, it is more likely than not that these defects were caused by that exposure"); Vargesson Letter (Ex. D) at 6 (opining that Ms. Sampson was exposed to thalidomide in utero and that it caused her injuries), and (ii) until recently Plaintiff could not have identified an expert in the United States to support her claims. Stephens Decl. (Ex. C) ¶ 17; Vargesson Letter (Ex. D) at 6.[5] Plaintiff's experts only further confirm that her claims are time-barred:

***First***, the experts themselves directly contradict their own theory that no expert could have previously supported Plaintiff's claims. Dr. Stephens acknowledges that Plaintiff has "***the most common defect seen in thalidomide embryopathy***" and other defects "also associated with thalidomide exposure," Stephens Decl. (Ex. C) ¶ 15, undermining any suggestion that Plaintiff could not have discovered an alleged link to thalidomide earlier. Professor Vargesson seemingly agrees, describing the "characteristic features of Thalidomide Embryopathy" as including bilateral limb differences and damage to other tissues/organs—injuries that Plaintiff exhibits—and citing studies from as early as the 1960s as support. Vargesson Letter (Ex. D) at 4; *see also id*. at 2 (basing opinions about injuries associated with thalidomide, at least in part, on "reviewing old human studies from the 1960s"); *id*. at 5 (citing 1962 and 1992 publications as support that Plaintiff's injuries have been linked to thalidomide).[6]

---

[5] Professor Vargesson's Letter is not in accordance with 28 U.S.C. § 1746, as required under the Court's *Lone Pine* Order [D.E. 911] at 4.

[6] *See also Johnson*, 55 F. Supp. 3d at 613 (recognizing that Dr. Stephens cites 1964 and 1969 studies to assert that thalidomide causes plaintiff's injuries, and "[i]t thus appears that Dr. Stephens himself acknowledges that any 'sea change' in medical thought on thalidomide occurred some 45 years before the date Dr. Stephens came to 'appreciate[]' its significance"); *Johnson*, 95 F. Supp. at 829–30 ("Although Dr. Stephens opines that expert testimony would not have been available to Plaintiff before September 2011, he also avers that medical science has for decades associated Plaintiff's [injuries] with thalidomide exposure.").

In fact, more than two years before this lawsuit was filed, Dr. Stephens *himself* would have "given the opinion that her birth defects were more likely than not caused by thalidomide." Stephens Decl. (Ex. C) ¶ 17. While Dr. Stephens speculates that "it is highly unlikely that [Plaintiff] would have asked my opinion on the matter, because before 2012, I remained mainly in the background of the clinical side of thalidomide," *id.*, during the time that Dr. Stephens supposedly was in the "background" of thalidomide research, he authored at least five peer-reviewed publications, three papers, one book, two letters, one encyclopedia entry, five abstracts, and gave six speeches, all of which contain "thalidomide" in the title. *Id.*, Curriculum Vitae of Dr. Trent Stephens. *See also* Vargesson Letter (Ex. D) at 1 (asserting that he has "studied and researched the mechanism of action by which Thalidomide caused damage to embryos for over 20 years").

***Second***, Plaintiff's experts' assertion that she could not find a qualified expert to make the causal link between her injuries and thalidomide is further unsupported by the record. As stated above, one of Plaintiff's medical records from 2006 states that she has "an appearance that is typical of a thalidomide defect." Ex. B (SAMPSON 260109:002 0154-0156) (emphasis added). Both experts ignore this medical record and thus make no attempt to reconcile it with their theory that no one in the United States could make such a claim until at least 2009. Additionally, Dr. Stephens's grandiose conclusion that he is "the only thalidomide expert in the US" (Stephens Decl. (Ex. C) ¶ 17) is pure speculation that is not a proper subject for expert evidence:

- Dr. Stephens's statement that his invitation by the World Health Organization to a single meeting in 2014 "suggests that in their mind I am the only thalidomide expert in the US" is baseless. *Id.* Even assuming WHO's endorsement were the *sine qua non* of expert qualification, there could be any number of reasons behind WHO's invitation list besides the view that no one else in this nation is qualified.

- Dr. Stephens's unstated assumption that prior hands-on clinical experience with thalidomide victims is a prerequisite to rendering an expert opinion on causation is also without foundation. Dr. Stephens—who is not even a medical doctor—does not explain why this should be a necessary criterion for expertise.

- Dr. Stephens avoids addressing the availability of experts outside the United States. So too does Professor Vargesson. Vargesson Letter (Ex. D) at 6. And Plaintiffs' experts do not explain why that geographic boundary is dispositive when Dr. Stephens acknowledges that there is an international scientific dialogue and a robust body of expertise abroad. Indeed, international publications have been broadly available in the U.S., and Professor Vargesson himself is outside the United States but evidently available to offer expert opinions in this litigation. *Id.* at 1.

- Dr. Stephens's expert declaration in another case directly undermines the experts' opinions here, by repeatedly referring to "experts in the field" other than himself. *See* Stephens Decl. [D.E. 262-7] ¶ 18 ("[H]istorically, it has been the belief of experts in the field that . . . ."); *id.* ¶¶ 19-20 (discussing a "majority" and "minority" opinion among "many experts"); *id.* ¶ 21 (discussing the supposed failures of "early experts"). That declaration even refers to another American expert by name—Dr. Marilyn Miller of the University of Illinois. *Id.* ¶ 20.

***Third***, a speculated lack of access to experts does not toll the statute of limitations as a matter of law. A plaintiff "need not have had 'specific medical evidence supporting a cause of action' for the limitations period to begin to run." *Danysh v. Eli Lilly & Co.*, No. 10-2116, 2011 WL 4344601, at *10 (M.D. Pa. July 13, 2011) (citing *Wilson v. El-Daief*, 964 A.2d 354, 369 (Pa. 2009)); *Nicolaou v. Martin*, 649 Pa. 227, 248 n.14 (2018). In *Danysh*, the plaintiff believed that Prozac was the cause of his criminal acts, but he could not find an expert or other causation evidence to support his suspicion. 2011 WL 4344601, at *1-3. After accepting a plea bargain on his criminal charges, the plaintiff obtained new evidence, including a letter from a medical expert opining that Prozac in fact may have contributed to cause his behavior. *Id*. at *3. Accordingly, the plaintiff brought product liability claims against the drug's manufacturer, and argued that "although he ***suspected*** early on that his anger and violent behavior were related to Prozac, he lacked knowledge of a sufficient causal connection to support a . . . viable civil action," because

"his suspicions were dismissed by experts . . . ." *Id*. at *8 (emphasis in original). The court rejected this argument:

> [P]laintiff was aware of his injury and suspected its cause only shortly after it occurred. Awareness of injury and suspicion of its cause are enough to begin the running of the statute of limitations period. A plaintiff's evidence of an injury . . . is irrelevant to when the cause of action accrues. Pennsylvania law has been consistent and settled on this point since the early twentieth century. [Plaintiff] need not have had "specific medical evidence supporting a cause of action" for the limitations period to run.

*Id*. at *8-10 (citations and internal quotation marks omitted). As in *Danysh*, Plaintiff indisputably has been "aware of [her] injury and suspected its cause" for decades.[7] Her purported inability to obtain an expert—or prove causation—is irrelevant, and her claims are time-barred.

## II. Plaintiff's Claims Fail as a Matter of Law Because She Has No Admissible Evidence That She Was Exposed to Thalidomide.

Plaintiff's claims fail for the additional reason that she cannot establish actual exposure to thalidomide, much less exposure to thalidomide distributed by one of the Defendants.

To recover for injuries allegedly caused by a defendant's product, a plaintiff must have evidence that she was exposed to that defendant's product. This is true under either New Jersey or Pennsylvania law. *See, e.g., Whelan v. Armstrong Int'l Inc.*, 242 N.J. 311, 333 (2020), as revised (June 4, 2020) ("[T]he plaintiff must show that the injury was proximately caused by exposure to defendant's [ ] product.") (citation modified); *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, No. 11-3045, 2012 WL 1118780 (D.N.J. Apr. 3, 2012) (plaintiff must prove "exposure to the drug"); *Smeal v. Clark Equip. Co.*, No. CV 19-5853, 2022 WL 1265532, at *5 (E.D. Pa. Apr. 28, 2022) ("Before imposing liability on a defendant in a product liability action, Pennsylvania law requires a plaintiff to show not only that the plaintiff was

---

[7] Plaintiff's argument that her claims are timely are even weaker than in *Danysh*, where Plaintiff's "suspicions were dismissed by experts." *Id*. at *8. Plaintiff can make no such claim in this case, where a doctor even noted in 2006 that her injuries appeared typical of thalidomide.

exposed to a defective product manufactured or sold by the defendant, but that the plaintiff's exposure was a substantial factor in causing the plaintiff's injury.") (citation omitted); *Dick v. Am. Home Prods. Corp.*, No. 1:05-cv-22384, 2009 WL 1542773, at *3 (M.D. Pa. June 2, 2009); *Sherk v. Daisy-Heddon*, 450 A.2d 615, 617 (Pa. 1982); *Eckenrod v. GAF Corp.*, 544 A.2d 50, 52 (Pa. Super. Ct. 1988); *see also Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 366 (3d Cir. 1990) ("Under Pennsylvania law, the plaintiff in a products liability action bears the burden of demonstrating that a specific defendant is responsible for the harm alleged.").

*DeMayo v. Schmitt*, 20 Phila. Co. Rptr. 269 (Pa. Ct. Com. Pl. 1990), is instructive. There, the plaintiff sued to recover for injuries allegedly caused by the plaintiff's grandmother's ingestion of DES while pregnant. *Id.* The plaintiff had no physician or pharmacist records confirming exposure, and the grandmother who allegedly had ingested DES was deceased. *Id.* at 279-80. Plaintiff's only evidence of exposure was physician testimony that her injuries were "*consistent* with DES exposure," medical records in which the grandmother "*said* she ingested DES while pregnant," and plaintiff's testimony that her grandmother had told her she ingested DES. *Id.* at 272, 280. The court found "no competent evidence of ingestion of DES," and dismissed plaintiffs' claims because she failed to establish exposure (among other reasons). *Id.* at 272.

Likewise, in *Dick*, the plaintiff claimed that he suffered injuries after ingesting capsules from a later-recalled lot of a drug that was contaminated with acebutolol. 2009 WL 1542773, at *2. The court found "no evidence to support Plaintiff's claim that Mr. Dick actually received or ingested any capsules that may have come from [the recalled] lot," and "[e]ven more fundamentally, there is no evidence to show that any etodolac capsules Mr. Dick did ingest – whether from [the recalled lot] or otherwise – actually contained any acebutolol, much less a

quantity of acebutolol sufficient to cause him to suffer adverse health effects or cause his death." *Id.* at *3. "Although the Court is sensitive to the difficulty that Plaintiff may have had to prove through direct evidence that her husband's medication was filled from the contaminated lot, the Court cannot ignore the fundamental requirement that Plaintiff produce at least sufficient circumstantial evidence in order to prove product identification." *Id.* at *4.

Here, Plaintiff's mother testified only that Dr. Hopper gave her "some pills" to take for headaches during her pregnancy with Plaintiff. Martin Dep. (Ex. E) at 32-33. Plaintiff's mother does not know whether the pills she took were thalidomide. When asked whether she has "any personal belief as to whether the pills Dr. Hopper gave [her] were thalidomide," Plaintiff's mother answered: "*I have no way of knowing* that because there was no name on the envelope. There was no prescription. So it's always in the back of mind could it have been, but *I have no proof*." *Id.* at 53 (emphases added); *see also id.* at 54-55 ("I don't know what it was I had taken. I thought it possibly could have been [thalidomide] because of the timeframe when I took the pills and later found out the timeframe when these things occurred."). She testified that Dr. Hopper did not say "anything about the name of the pills," *id.* at 33, and that he never "use[d] the word thalidomide," *id.* at 37. Dr. Hopper did not tell Plaintiff's mother where he had gotten the pills, and he did not say "anything about whether the drug was [an] investigational drug." *Id.* at 57. And more than 50 years later, Dr. Hopper is now deceased. Sampson Dep. (Ex. A) at 88. So there is no testimonial evidence that, even if admissible, could establish that Plaintiff's mother took thalidomide as opposed to any other of the countless medications available to treat headaches.

Nor is there any documentary or physical evidence that the pills were thalidomide. There are no medical records available from Plaintiff's mother's pregnancy. Plaintiff testified that Dr.

Hopper told the unidentified lawyer whom she consulted in 1982 that those records are "lost." *Id.* at 53. And Plaintiff herself long ago lost the pills that Dr. Hopper allegedly gave her mother. She testified that in 1982 she gave them to a lawyer to send to a lab for testing and never got them back. *Id.* at 57-58. *Cf. Gordner v. Dynetics Corp.*, 862 F. Supp. 1303, 1307 (M.D. Pa. 1994) ("In products liability cases, both Pennsylvania and federal courts applying Pennsylvania law have held consistently that a plaintiff who destroys the allegedly defective product will be precluded from proving the defect, which in turn leads to summary judgment against the plaintiff."). Nor is Dr. Hopper among the doctors in Defendants' lists of thalidomide clinical investigators. Exs. F, G. Under these circumstances, even Plaintiff herself agreed that she still has no proof that the pills her mother allegedly took were thalidomide. Sampson Dep. (Ex. A) at 59 ("Q. What have you learned since [1982] about whether or not . . . those pills that your mother took were thalidomide. A. Well, I still don't know if they were or not."); *id.* at 105 ("Q. So your state of mind at this point, September 21, 2011, was that you suspected your mother had received [thalidomide]; correct? A. Uh-hum. I've always suspected that. Q. Your answer is yes? A. Yes, correct. Yes. Q. But you wanted to find proof; right? A. Yes. Q. Did you ever find any? A. No.").

Finally, Plaintiff's expert submissions do not provide adequate proof that she was exposed to thalidomide. As an initial matter, the Court has already recognized that Dr. Stephens' causation opinions are inadmissible, including because they are not offered to a reasonable degree of medical certainty. *Johnson*, 55 F. Supp. 3d at 613 ("Dr. Stephens's opinion on the cause of Plaintiff's defects would not be admitted at trial unless it was to 'a reasonable degree of medical certainty.' Because Dr. Stephens avers that his opinion on causation is 'more likely than not,' his declaration would not be admissible at trial," and "cannot defeat summary judgment") (citations omitted); *Johnson*, 95 F. Supp. 3d at 829 ("I have previously ruled that even if Dr.

Stephens's opinion passed muster under *Daubert* (which it may well not), it is nevertheless inadmissible, contradictory, and otherwise incompetent."). *Johnson*, 636 F. App'x at 89 (finding that the Court properly refused to credit Dr. Stephens in the *Debra Johnson* case).

Additionally, Dr. Stephens did not opine on exposure at all, but rather was "asked by Hagens Berman Sobol Shapiro LLP to ***assume thalidomide exposure in this case*** and then to address the question: Is it more likely than not that these defects were caused by thalidomide?" Stephens Decl. (Ex. C) ¶ 15 (emphasis added). Dr. Stephens thus opined only that "given ***the assumption of thalidomide exposure in this case***, it is more likely than not that these defects were caused by that exposure." *Id.* (emphasis added). As the Court has already held, Dr. Stephens's ***assumption*** that Plaintiff was exposed to thalidomide is not ***evidence*** that Plaintiff was exposed to thalidomide. *Johnson*, 55 F. Supp. 3d at 612 ("Dr. Stephens's assumption is not evidence that Plaintiff's mother took thalidomide early in her pregnancy.").

Professor Vargesson's Letter fares no better. He asserts that Plaintiff's "birth differences . . . are ***consistent with*** Thalidomide Embryopathy," and "scientifically ***in keeping with*** damage caused by in utero exposure to thalidomide." Vargesson Letter (Ex. D) at 3, 5 (emphasis added). Professor Vargesson does not explain how he then makes the leap to his final conclusion that Plaintiff "was exposed to Thalidomide in utero, which caused her to suffer" certain injuries, *id*. at 6, particularly in light of the glaring lack of exposure evidence discussed *supra*, and the fact that Professor Vargesson evidently has not reviewed key deposition testimony showing a lack of exposure evidence. In fact, Professor Vargesson acknowledges that:

> [I]t is important to consider that 3% of all babies born each year have significant birth differences, the majority of which have unknown causes. Some mothers will have given birth to babies with congenital differences that may share characteristics with those seen in Thalidomide Embryopathy, but were unrelated to Thalidomide exposure, even during the period when it was readily available.

*Id*. at 4. Dr. Vargesson does not explain if, or how, he rules out this explanation for Plaintiff's injuries, such that his analysis cannot show that Plaintiff was in fact exposed to thalidomide. *See, e.g., Feit v. Great W. Life & Annuity Ins. Co.*, 271 F. App'x 246, 254 (3d Cir. 2008) (affirming exclusion of causation opinions where expert "failed to rule out the possibility of" another explanation for plaintiff's injuries); *In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 579 F. Supp. 3d 675, 681 (E.D. Pa. 2021) (excluding specific causation opinions of expert who did "not provide[ ] any grounds to rule out . . . an obvious alternative cause"); *Hoefling v. U.S. Smokeless Tobacco Co., LLC*, 576 F. Supp. 3d 262, 284 (E.D. Pa. 2021) (granting summary judgment for defendant where experts did not "rule out plausible alternative causes" for plaintiff's injury); *In re Zostavax*, 579 F. Supp. 3d at 679-85 (similar).

Because Plaintiff lacks any reliable evidence of exposure to thalidomide, summary judgment should be granted.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment should be granted, and Plaintiff's claims should be dismissed with prejudice.

Dated: September 8, 2026

Respectfully submitted,

*/s/ Daniel A. Spira*
Michelle A. Ramirez (*admitted pro hac vice*)
Email: michelle.ramirez@sidley.com
Daniel A. Spira (*admitted pro hac vice*)
Email: dspira@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: 312-853-7000
Facsimile: 312-853-7036

Eliezer Granek
Email: egranek@eckertseamans.com
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania 19102
Telephone: 215-851-8400
Facsimile: 215-851-8383

Eugene A. Schoon (*admitted pro hac vice*)
CROKE, FAIRCHILD, DUARTE & BERES, LLC
180 N. LaSalle Street, Suite 3400
Chicago, Illinois 60601
Telephone: (772) 517-2740

*Attorneys for Grünenthal GmbH*

*/s/ Sonja S. Weissman*
Michael T. Scott
MIKE SCOTT LAW LLC
Email: mike@mikescottlaw.com
1116 Red Rose Lane
Villanova, PA 19085
Telephone: (215) 518-8695

Sonja S. Weissman (*admitted pro hac vice*)
REED SMITH LLP
Email: sweissman@reedsmith.com
101 Second Street, Suite 1800
San Francisco, California 94105
Telephone: (415) 543-8700

*Counsel for GlaxoSmithKline LLC, and GlaxoSmithKline Holdings (Americas) Inc.*

*/s/ Daniel S. Pariser*
Daniel S. Pariser (*admitted pro hac vice*)
daniel.pariser@arnoldporter.com
Paige H. Sharpe (*admitted pro hac vice*)
paige.sharpe@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 W. Massachusetts Avenue, N.W.
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Anand Agneshwar (*admitted pro hac vice*)
anand.agneshwar@arnoldporter.com
Carmela T. Romeo
Pennsylvania Bar No. 313042
carmela.romeo@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Sanofi-Aventis U.S. LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that a true and correct copy of the foregoing document is being served this day on all counsel of record via the Court's electronic filing system, and by electronic mail on Plaintiff Carolyn Sampson, cafsampson@gmail.com.

*/s/ Daniel A. Spira*
Daniel A. Spira

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GLENDA JOHNSON ET AL., Plaintiffs, | ) | Case No. 2:11-cv-005782 |
| v. | ) | This Document Relates to: |
| SMITHKLINE BEECHAM CORPORATION ET AL., Defendants. | ) | *Yeatts, et al. v. SmithKline Beecham Corp., et al.*, No. 11-cv-06711 |

**DECLARATION OF DANIEL A. SPIRA**

I, Daniel A. Spira, here by declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a member of the firm of Sidley Austin, LLP, attorneys for the Defendant Grünenthal GmbH in this matter. As such, I am personally familiar with the matters set forth herein. I submit this Declaration in support of Defendants' Motion for Summary Judgment as to Plaintiff Carolyn Sampson (the "Motion").

2. Attached as Exhibit A to the Motion is a true and correct copy of the transcript of the deposition of Carolyn Sampson, dated June 5, 2014.

3. Attached as Exhibit B to the Motion is a true and correct copy of a medical Record from Park Nicollet Clinic dated April 20, 2006.

4. Attached as Exhibit C to the Motion is a true and correct copy of the Declaration of Trent Stephens, Ph.D., dated August 14, 2014.

5. Attached as Exhibit D to the Motion is a true and correct copy of the Letter of Prof. Neil Vargesson, dated August 19, 2026.

6. Attached as Exhibit E to the Motion is a true and correct copy of the deposition transcript of Marilyn Martin, dated June 5, 2014.

7. Attached as Exhibit F to the Motion are (1) a true and correct copy of the list identified by the GSK Companies in this litigation as the list of clinical investigators for Smith Kline & French in connection with its investigation of thalidomide, which is publicly available and which has been produced in this litigation at GSK_NARA00000167-00000227 and (2) true and correct copies of the lists identified by the GSK Companies in this litigation as the lists of clinical investigators for Smith Kline & French in connection with its investigation of thalidomide, which were produced in this litigation at GSK00000995-000001001 and GSK00002159-2165.

8. Attached as Exhibit G to the Motion are true and correct copies of the lists of clinical investigators for Richardson-Merrell, Inc. and/or its subsidiaries in connection with its investigation of thalidomide identified in Defendant Sanofi-Aventis U.S. LLC's responses to discovery requests in this litigation, and which were produced in this litigation at THAL_SAN_11415-11416, 14014-14017, 14227-14231, 16439-16482, 67502-67613, 67654-67700, and 67614-67653.

9. Attached as Exhibit H to the Motion is a true and correct copy of Plaintiff Carolyn Sampson's Second Supplemental Response to Defendants Sanofi-Aventis U.S. LLC's Fourth Interrogatory.

10. Attached as Exhibit I to the Motion is a bibliography of media coverage regarding thalidomide and birth defects prepared by Defendants' counsel reflecting media sources referring or relating to thalidomide and which are publicly available.

11. Attached as Exhibit J to the Motion is a true and correct copy of Official White House Transcript of the Press Conference held by President John F. Kennedy dated August 1, 1962, which is available within the public record and which was produced in this litigation at THAL_SAN_00016-00018.

12. Attached as Exhibit K to the Motion is a true and correct copy of excerpts from the transcript of the public hearing held in the U.S. Senate August 1 and 9, 1962.

13. Attached as Exhibit L to the Motion is a true and correct copy of the August 27, 1962 SKF letter to Sen. Hubert H. Humphrey.

14. Attached as Exhibit M to the Motion is a true and correct copy of the August 23, 1962 FDA Press Release.

15. Attached as Exhibit N to the Motion is a true and correct copy of Morton Mintz, *Drug Firm Said to Lag on Warning*, The Washington Post Times Herald dated Sept. 9, 1962, which is publicly available and which was produced in this litigation at GSK_MEDIA00000019-00000020.

16. Attached as Exhibit O to the Motion is a true and correct copy of *The Full Story of the Drug Thalidomide*, Life Magazine dated August 10, 1962, which is publicly available.

17. Attached as Exhibit P to the Motion is a true and correct copy of John Lear, *The Unfinished Story of Thalidomide*, Saturday Review dated September 1, 1962, which is publicly available and was produced at THAL_SAN_05723-29.

18. Attached as Exhibit Q to the Motion is a true and correct copy of John Lear, *Human Guinea Pigs and the Law*, Saturday Review dated October 6, 1962, which is publicly available.

19. Attached as Exhibit R to the Motion is a true and correct copy of Morton Mintz, *New Drugs: Is Government Supervision Adequate?*, The Reporter dated March 28, 1963, which is publicly available and which was produced in this litigation at GSK_MEDIA00000008-00000014.

20. Attached as Exhibit S to the Motion is a true and correct copy of excerpts from Henning Sjöström & Robert Nilsson *Thalidomide and the Power of the Drug Companies* (1979).

21. Attached as Exhibit T to the Motion is a true and correct copy of excerpts from *Suffer the Children: The Story of Thalidomide*, Sunday Times (1979), which is publicly available.

22. Attached as Exhibit U to the Motion is a document prepared by Defendants comparing true and correct copies of relevant portions of Plaintiff's Complaint and true and correct copies of relevant portions of (i) *Suffer the Children: The Story of Thalidomide*, Sunday Times (1979), (ii) Trent Stephens & Rock Brynner, *Dark Remedy: The Impact of Thalidomide and its Revival as a Vital Medicine* (2001), and (iii) Henning Sjöström & Robert Nilsson, *Thalidomide and the Power of the Drug Companies* (1979).

23. Attached as Exhibit V to the Motion is an index of known prior thalidomide litigation within the United States prepared by Defendants' counsel.

24. Attached as Exhibit W to the Motion is a true and correct copy of the complaint in *Burton v. Richardson-Merrell*, No. 77-738-028 (Mich. Cir. Ct. Wayne Co.), which is publicly available and which was produced in this litigation at GSK_BUR00000009-00000011.

25. Attached as Exhibit X to the Motion is a true and correct copy of Veronica Geng, *Thalidomide: The American Experience*, New York Times dated April 29, 1973, which is publicly available and which was produced in this litigation at THAL_SAN_16077-16078.

26. Attached as Exhibit Y to the Motion is a true and correct copy of Lynn Lilliston, *Remember The Thalidomide Headlines: Decade Later, Peggy Yearns 'to Be Tall,'* Los Angeles Times dated June 22, 1972, which is publicly available and which was produced in this litigation at THAL_SAN_17140-17144.

27. Attached as Exhibit Z to the Motion is a true and correct copy of *Thomas v. Smith Kline Beecham Corp.*, J-A15019-13, slip op. (Pa. Super. Ct. Nov. 27, 2013).

Dated: September 8, 2026

*/s/ Daniel A. Spira*
Daniel A. Spira