**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GLENDA JOHNSON, et al.,<br>Plaintiffs,<br><br>v.<br><br>SMITHKLINE BEECHAM CORPORATION, et al.,<br>Defendants. | Case No. 2:11-cv-05782-PD<br>AND ALL RELATED CASES<br><br>This Document Relates to:<br>Yeatts, et al. v. SmithKline Beecham Corp., et al.,<br>No. 11-cv-06711 |

**PLAINTIFF CAROLYN SAMPSON'S RESPONSE IN OPPOSITION TO**

**DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT (DOC. 940)**

**Table of Contents**

**INTRODUCTION** ........ 3

**MATERIAL FACTS SUPPORTED BY THE PRESENT RECORD** ........ 4

**ARGUMENT** ........ 8

**I. Professor Vargesson's signed declaration directly answers Defendants' stated expert objections.** ........ 8

**II. Dr. Hopper's absence from selected lists cannot establish non-exposure because the FDA records do not describe a closed distribution system.** ........ 9

**III. The same incomplete record prevents conclusive attribution or exclusion by manufacturer.** ........ 11

**IV. Plaintiff's FOIA history demonstrates diligence and the incompleteness of the accessible record.** ........ 13

**V. The contemporaneous timing and individualized expert evidence reinforce each other.** ........ 15

**VI. The declaration and Plaintiff's record search create a genuine dispute concerning reasonable diligence.** ........ 15

**VII. General publicity did not supply the nonpublic facts now before the Court.** 16

**VIII. The record presents genuine disputes for the factfinder.** ........ 17

**CONCLUSION** ........ 17

**CERTIFICATE OF SERVICE** ........ 19

Plaintiff Carolyn Sampson, proceeding pro se, respectfully opposes Defendants' renewed motion for summary judgment at Document 940. Plaintiff presents the FDA records, contemporaneous family records, Dr. Trent Stephens's previously produced declaration, Professor Neil Vargesson's August 19, 2026 report, and Professor Vargesson's signed September 18, 2026 Supplemental Declaration as evidence now. Plaintiff addresses Document 938 separately.

## INTRODUCTION

Defendants contend that Plaintiff's earlier suspicion triggered limitations, that Dr. John B. Hopper's absence from selected investigator lists eliminates exposure, and that Plaintiff lacks qualified expert evidence connecting thalidomide to her injuries. The present record creates genuine disputes on each issue.

Marilyn Farmer, later known as Marilyn Martin, testified that Dr. Hopper gave her unidentified pills in an unmarked envelope during the pregnancy that resulted in Plaintiff. (Martin Dep. 32-37, 53-57, Defs.' Ex. E.) Contemporaneous records place Farmer in Dr. Hopper's care on August 7, 1961, approximately seven weeks into the pregnancy. (Pl.'s Ex. 1, Appointment Card; Pl.'s Ex. 2, Check Register.) Those records do not identify the pills, but they corroborate the treatment relationship and timing.

Professor Neil Vargesson has supplied the declaration Defendants claimed was absent. He is Chair in Developmental Biology at the University of Aberdeen and has researched thalidomide's mechanisms of embryonic damage for more than twenty years. (Pl.’s Ex. 3 Vargesson Supp. Decl. ¶¶ 1, 5-10.) After reviewing Plaintiff's medical records, childhood photographs, adult imaging, 177-gene limb-malformation panel, family-history information, and the depositions of Plaintiff and Martin, he opines to a reasonable degree of scientific certainty that Plaintiff was exposed to thalidomide in utero and that the exposure caused her bilateral

thumb absence, bilateral radial abnormalities, and reproductive-tract abnormalities. (Id. ¶¶ 11-27.)

FDA records independently show why absence from a surviving list cannot function as conclusive negative proof. National Drug Company did not know of a complete investigator list as late as April 1962; some doctors received the drug from other physicians; and approximately forty doctors appeared in company files outside submitted NDA supplements. (Pl.'s Ex. 4 at 2-6, FDA 1573-1577.) Other records show pharmacy stocks (Pl's Ex. 5 FDA0462), family transfers (Pl's Ex. 6 FDA081, FDA0102), changing distributor information (Pl's Ex. 7 FDA1708-1709; Pl's Ex. 15, FDA0121-0129), unreported supplies (Pl's Ex. 8 FDA 0459), disputed tablet inventories (Pl's Ex 9 FDA0353), and incomplete physician and patient contact (Pl's Ex. 16, FDA0206-0208; Pl's Ex. 12 FDA0365-0366).

Plaintiff's pre-suit record search illustrates both the breadth and incompleteness of the surviving evidence. After an initial FDA response described Richardson-Merrell application contents as proprietary, Plaintiff submitted a formal FOIA request. (Pl.'s Ex. 10 at 1-3.) FDA ultimately supplied substantial physician-list materials relating to National Drug Company, Richardson-Merrell, and Vick, but did not supply the requested Smith, Kline & French list. (Id at 4-84) Plaintiff followed up about that omission. (Id. at 85) FDA then reported that an approximately eighty-volume search of the SKF Administrative File did not locate a doctor list. (Id at 86.) Defendants later produced and now rely on SKF investigator materials. (Spira Decl. ¶ 7; Defs.' Ex. F.)

## MATERIAL FACTS SUPPORTED BY THE PRESENT RECORD

**A. Contemporaneous records corroborate treatment during the relevant pregnancy.** Martin testified that Dr. Hopper supplied unnamed pills in an unmarked envelope. The appointment card

and Leonard Farmer check register independently document the August 7, 1961 visit. (Martin Dep. 32-37, 53-57; Pl.'s Exs. 1,2.)

**B. Professor Vargesson is qualified by specialized knowledge, research, and experience.** Professor Vargesson is Chair in Developmental Biology at the University of Aberdeen, has studied thalidomide's embryonic mechanisms for more than twenty years, has published extensively, participated in a World Health Organization-sponsored expert meeting, and serves on the Canadian Thalidomide Survivors Support Program Multi-Disciplinary Committee. (Vargesson Supp. Decl. ¶¶ 1, 5-10.)

**C. Professor Vargesson reviewed the individualized evidentiary record.** He reviewed medical records from childhood through adulthood, childhood photographs, adult radiographs and imaging, the Invitae Limb Malformation Panel, family-history information, the reported circumstances of the unmarked pills, and the June 5, 2014 depositions of Plaintiff and Martin. (Id. ¶¶ 11-14.) He expressly considered limitations in present recollection and evaluated the testimony together with objective clinical findings. (Id. ¶ 14.)

**D. Plaintiff's congenital pattern is scientifically consistent with recognized thalidomide effects.** The record documents bilateral thumb absence; three digits and other abnormalities of the left hand and arm; bilateral elbow abnormalities; radial abnormalities; a shortened left arm; a unicornuate uterus; and absence of the left ovary. (Id. ¶¶ 15-19.) Professor Vargesson explains the recognized thumb-and-radius developmental pattern and the scientific consistency of the reproductive-tract abnormalities. (Id. ¶¶ 17-19.)

**E. Professor Vargesson considered alternative genetic explanations.** The 177-gene panel identified no pathogenic variant explaining the limb abnormalities. The heterozygous CEP290 variant indicates carrier status and does not explain Plaintiff's pattern. He acknowledges and accounts for the limits of negative testing. (Id., Alternative Explanations and Genetic Testing, ¶¶ 18-22.)

**F. Professor Vargesson gives express exposure and specific-causation opinions.** To a reasonable degree of scientific certainty, he opines that Plaintiff was exposed to thalidomide in utero and that the exposure caused bilateral thumb absence, radial abnormalities involving both arms, and reproductive-tract abnormalities including a unicornuate uterus and absent left ovary. (Id. ¶¶ 23-24.)

**G. His methodology rests on the totality of the evidence.** No single feature is the sole basis for his opinions. He relies on the reported pills together with the objective congenital pattern, imaging, medical documentation, genetic testing, family history, and specialized scientific knowledge. He states that the absence of a surviving prescription, original medication, or contemporaneous identification result does not alter his scientific assessment. (Id. ¶¶ 25-27.)

**H. Recent scientific developments bear on discoverability.** Professor Vargesson states that much current understanding of thalidomide's mechanisms and effects on the developing embryo was discovered during the last twenty years. In his scientific opinion, Plaintiff's damage pattern was unlikely to have been appreciated until recently in light of historical and continuing limits in relevant United States expertise and recent scientific discoveries. (Id. ¶ 28.)

**I. The August 19, 2026 report remains operative.** Professor Vargesson incorporates his August 19 report and states that it remains accurate subject to the declaration's clarifications. (Id. ¶¶ 2-3, 29.)

**J. Formal distribution records were incomplete.** National Drug Company lacked a complete investigator list, identified recipients who obtained drug from other physicians, and had approximately forty doctors in company files outside NDA supplements. (Pl.'s Ex. 4 at 2-6, FDA 1573-1577.)

**K. FDA records document informal routes and accounting failures.** The records include physician-to-physician and family-member transfers (Pl.'s Ex. 6, FDA0081, FDA0102), pharmacy stocks (Pl.'s Ex. 5, FDA0462), changing counts and distributor information and

conflicts between physician accounts and company records (Pl.'s Ex. 7, FDA1708-1709), unreported supplies (Pl.'s Ex. 8, FDA0459), and tablets whose disposition could not be reconstructed (Pl.'s Ex. 9, FDA0353). FDA physician-interview reports further record that some recipients understood Kevadon to have been thoroughly tested and safe, to be approaching general marketing, or to have been supplied as physicians' samples or starter supplies rather than for controlled safety-or-effectiveness testing. (Pl.'s Ex. 14, FDA0394-0396, 0405-0410.) An inspection report states that records were 'essentially useless' in accounting for receipts, disbursements, and returns. (Pl.'s Ex. 11.)

**L. FDA and AMA records document concern about patient notification.** Agency records show continuing concern over whether physicians contacted patients and whether patients still possessed the drug. (Pl.'s Ex. 12.) Plaintiff does not attribute another physician's conduct to Dr. Hopper; the evidence rebuts any assumption that every exposed patient necessarily was identified and notified.

**M. FDA produced substantial physician-list materials, but did not produce the requested SKF list.** Before suit, Plaintiff asked FDA for Richardson-Merrell physician records. FDA initially stated that the application contents were proprietary and releasable only by the sponsor, which did not appear to be a current United States business with available contact information. (Pl.'s Ex. 10 at 1.) Plaintiff then submitted a formal FOIA request for Richardson-Merrell and Smith, Kline & French physician-list records. (Pl.'s Ex. 10 at 2.) FDA ultimately supplied extensive physician-list materials associated with National Drug Company, Richardson-Merrell, and Vick, including typed and handwritten lists of hundreds of doctors. (Pl.'s Ex. 10 at 3-84.) Those materials did not include the requested SKF physician list.

**N. Plaintiff followed up specifically about the missing SKF list.** After recognizing that the SKF list was absent, Plaintiff again contacted FDA. (Pl. Ex. 10 at 85). Only after that follow-up did FDA report that a search of approximately eighty volumes in the SKF Administrative File

did not locate a physician list and that FDA therefore did not have the requested SKF list to provide. FDA further advised that "[c]ertain material has been deleted from the records furnished to you…" further indicating that some records were unavailable to Plaintiff decades after the events at issue. (Pl.'s Ex. 10 at 86.) Defendants subsequently produced and now rely on SKF investigator materials. (Spira Decl. ¶ 7; Defs.' Ex. F.) Plaintiff does not contend that FDA withheld all physician materials. The relevant point is that extensive materials for other distribution systems did not include the SKF list later produced by Defendants.

## ARGUMENT

### I. Professor Vargesson's signed declaration directly answers Defendants' stated expert objections.

Document 940 criticized the August letter as not compliant with 28 U.S.C. section 1746, asserted that Professor Vargesson had not reviewed key depositions, questioned whether he considered alternatives, and argued that he did not explain the basis for progressing from consistency to exposure and causation. The signed September 18 declaration addresses each point. It is executed under penalty of perjury under United States law; identifies the materials reviewed, including both June 5, 2014 depositions; addresses the genetic evidence and its limits; identifies the objective pattern; explains the totality-of-evidence basis; and gives express exposure and causation opinions to a reasonable degree of scientific certainty. (Vargesson Supp. Decl. ¶¶ 1-29.)

The declaration does not merely state that Plaintiff's presentation is consistent with thalidomide embryopathy. It provides separate opinions that Plaintiff was exposed in utero and that the exposure caused specified congenital injuries. (Id. ¶¶ 23-24.) It also explains that no single feature or the pill history alone controls the analysis. (Id. ¶¶ 25-27.) Defendants may dispute weight, but the declaration supplies evidence creating a triable dispute.

**II. Dr. Hopper's absence from selected lists cannot establish non-exposure because the FDA records do not describe a closed distribution system.**

Defendants' inference from the absence of Dr. Hopper's name depends on the premise that surviving investigator lists identify every physician who obtained, possessed, handled, transferred, or dispensed thalidomide. Contemporaneous FDA records contradict that premise.

The September 26, 1962 National Drug Company report states that, even as late as April 1962, the company did not know of a list of all investigators and that warnings concerning neurological effects and congenital deformities had not been sent to a complete investigator list. (Pl.'s Ex. 4 at 5-6, FDA 1576-1577.) The same report identifies four doctors who received the drug from other physicians and approximately forty doctors who appeared in company files although their reports had not been submitted as NDA supplements. (Id. at 2-3, FDA 1573-1574.) The company's own files therefore contained recipients outside formal submissions, and the company recognized recipients who obtained the drug through other physicians.

Other FDA records document additional breaks between formal records and ultimate possession: physician-to-physician transfers, family-member transfers to pregnant women, pharmacy supplies (Pl’s Ex. 5 FDA0462), discrepancies between company records and physician accounts, unreported supplies, changing investigator counts, corrected distributor information (Pl. Ex. 13, FDA0185) and tablets whose disposition could not be reconstructed. (Pl’s Ex 9 FDA0353). These records show that the person named in a manufacturer record was not necessarily the person who ultimately possessed or ingested the drug.

FDA physician-interview reports further show that at least some recipients did not understand themselves to be conducting controlled investigations of Kevadon’s safety or effectiveness. One physician reported being told that Kevadon had been thoroughly tested, was safe, and would shortly be released for general prescription use; the physician understood that controlled experimentation was not required and characterized the arrangement as essentially a

"pre-market" promotion. (Pl.'s Ex. 14, FDA0394-0396.) Other physicians described receiving Kevadon as physicians' samples or starter supplies, reported assurances that the drug was safe or thoroughly tested, and stated that they did not understand formal experimentation or reporting to be required. (Pl.'s Ex. 14, FDA0405-0410.) Their recollection is supported by the instructions to detail men in Merrell's "Kevadon Clinical Hospital Program" Manual, which is included in contemporaneous FDA documents. (Pl.'s Ex. 21.) The unredacted substance of the interviews undermines any assumption that every physician who received or dispensed Kevadon understood the distribution as participation in a formal investigation that necessarily would be completely reflected in investigator records.

That distinction is material here. Martin did not testify that she received a labeled bottle bearing a manufacturer name. She testified that Dr. Hopper gave her unidentified pills in an unmarked envelope. (Martin Dep. 32-37, 53-57.) The appointment card and check register independently place her in his care on August 7, 1961. (Pl.'s. Exs. 1, 2). In this setting, Dr. Hopper's absence from a direct-recipient list does not answer whether he could have obtained tablets or capsules through a secondary channel documented by FDA.

Plaintiff does not contend that these records identify Dr. Hopper's source or that another physician's conduct proves what he did. The narrower point is that Defendants cannot establish non-access as a matter of law from records that did not capture all recipients, transfers, inventories, or returns. Dr. Hopper's absence may be weighed by the factfinder together with the evidence explaining why list silence did not necessarily equal lack of access.

Professor Vargesson considered the pill testimony together with medical records, photographs, imaging, genetic testing, family history, and the objective congenital pattern. (Vargesson Supp. Decl. ¶¶ 11-27.) Based on that totality, he opines to a reasonable degree of scientific certainty that Plaintiff was exposed in utero. (Id. ¶ 23.) He states that the absence of a surviving prescription, original medication, or contemporaneous identification result does not

alter his scientific assessment. (Id. ¶ 27.) His opinion does not identify the distributor, but it supplies individualized scientific evidence to be weighed with the historical evidence explaining why the commercial route cannot now be completely reconstructed.

**III. The same incomplete record prevents conclusive attribution or exclusion by manufacturer.**

The surviving materials do not establish a closed chain connecting every thalidomide tablet or capsule to its originating company, intermediary recipients, and ultimate user. The record concerns multiple companies, separate applications, different trade names, dosage forms, and direct and indirect distribution systems. (Pl.'s Exs. 4-9, 11-13.) FDA records show movement through physician-to-physician transfers, family-member transfers, pharmacies, and other channels that did not necessarily preserve the original manufacturer identity through to the ultimate recipient.

The product-identification problem is compounded by the historical use of separate regulatory applications and different product names for thalidomide. FDA records identify The Wm. S. Merrell Company as the applicant for Kevadon Tablets under NDA 12,611 and describe Kevadon as Merrell's brand of thalidomide. (Pl.'s Ex. 22 at 1-2, 4.) Merrell also authorized National Drug Company to refer to Merrell's NDA in connection with National Drug's application for a similar product. (Id. at 3.) A separate FDA chronology identifies National Drug Company's application for Contergan as NDA 12,711, expressly describes Contergan as thalidomide, and states that the Contergan application relied in large measure on Merrell's application for the "Kevadon" brand of thalidomide. (Pl.'s Ex. 23 at 1-3, 5.) Contemporaneous records thus identify two applications, two applicants, and two product names for the same drug: Merrell's Kevadon application and National Drug Company's Contergan application. The historical record further reports that even a physician identified as a Contergan investigator did

not learn until later that Contergan was thalidomide. (Pl.'s Ex. 4 at 6, FDA1577.) If a physician participating in the distribution system did not contemporaneously understand that relationship, a patient receiving unidentified pills in an unmarked envelope could not reasonably be expected to know whether the pills were called thalidomide, Kevadon, or Contergan, or which company had manufactured or distributed them. Martin's inability to identify a product or company therefore must be considered in light of the documented product-name and source-identification problem, rather than treated as affirmative proof that the pills were not thalidomide or that a particular distribution route was impossible.

The source-identification problem is inherent here. Martin received unidentified pills in an unmarked envelope. Plaintiff's attempt to identify a surviving pill was reportedly inconclusive because of its age, and Dr. Hopper's records were reportedly lost. (Martin Dep. 32-37, 53-57; Sampson Dep. 48-59, 90-91, 104-05.) Plaintiff therefore cannot determine from the pills' appearance or packaging which company originally manufactured or distributed them.

But the resulting uncertainty cannot operate only against Plaintiff. Defendants likewise cannot establish that their respective products could not have reached Dr. Hopper or Martin when FDA records document incomplete recipient lists, transfers outside direct manufacturer-investigator relationships, disputed inventories, missing supplies, corrected distributor information, and unsuccessful recovery efforts. The same gaps that prevent Plaintiff from tracing an unlabeled pill backward through a decades-old network also prevent Defendants from proving that every one of their products was confined to surviving lists and recovered from every downstream recipient.

FDA materials reflect thalidomide-related distribution, investigation, possession, or transfer from at least 1958 through 1969. (Pl.'s Ex. 17, FDA0400; Pl.'s Ex. 18.) Plaintiff does not contend that those endpoints establish patient distribution throughout the period. The later record concerns controlled laboratory possession, not proof of patient exposure. The endpoints bear on

whether categorical assumptions about when distribution began, when possession ended, complete recovery, and definitive product attribution are reliable.

Accordingly, a Defendant's assertion that its documented direct distribution occurred principally during a particular period does not establish that every associated tablet or capsule was recovered, that none passed into secondary channels, or that surviving records identify every ultimate recipient. Nor does Dr. Hopper's absence from one company's list establish that another company supplied the unidentified pills. The historical evidence does not permit that degree of manufacturer-specific certainty.

Plaintiff does not ask the Court to infer that every Defendant's product reached her mother. She asks the Court not to draw the opposite inference as a matter of law from demonstrably incomplete records. On this record, attribution among the companies and the weight of each company's list evidence remain factual questions. No Defendant should be dismissed solely because its surviving direct-distribution records omit Dr. Hopper or because the precise manufacturer of pills dispensed without labeling cannot now be determined.

**IV. Plaintiff's FOIA history demonstrates diligence and the incompleteness of the accessible record.**

Plaintiff's investigation did not end with an initial request. She first asked FDA for Richardson-Merrell physician records and was told that application contents were proprietary and releasable only by a sponsor that did not appear to remain available. (Pl.'s Ex. 10 at 1.) She then submitted a formal FOIA request and obtained extensive physician-list materials relating to National Drug Company, Richardson-Merrell, and Vick. (Pl.'s Ex. 10 at 1-84.) Those records showed the breadth and complexity of distribution but did not include the requested SKF list.

Plaintiff recognized the missing category and followed up. Only after that additional inquiry did FDA report that an approximately eighty-volume search of the SKF Administrative

File did not locate a doctor list and that FDA did not have the requested list to provide. (Pl.'s Ex. 10 at 85.) Defendants subsequently produced SKF investigator materials and now rely on those materials to challenge exposure. (Spira Decl. ¶ 7; Defs.' Ex. F.)

This sequence supports diligence rather than delay. Plaintiff identified the relevant federal repository, made an initial inquiry, filed a formal FOIA request, reviewed a substantial production, recognized that a requested category was missing, and followed up concerning that omission. FDA nevertheless did not provide the SKF list later produced by Defendants. A reasonable factfinder could conclude that Plaintiff acted diligently but lacked access to material manufacturer-specific records. FDA's inability to locate the requested SKF physician list, despite searching approximately eighty volumes of the SKF Administrative File, coupled with Defendants' later production of SKF materials not previously provided to Plaintiff, further demonstrates that Plaintiff could not obtain all relevant records through FDA requests before filing suit. (Pl.'s Ex. 10 at 85-86; Spira Decl. ¶ 7; Defs.' Ex. F.)

The sequence also demonstrates why possession of hundreds of physician names did not resolve Plaintiff's inquiry. The production did not identify Dr. Hopper, identify Martin's pills, establish which company made them, or include the absent SKF materials. Receiving voluminous but incomplete records is not equivalent to discovering the facts necessary to establish product identity and a supportable exposure route.

The SKF history supplies a concrete warning against treating record silence as proof of nonexistence. Materials absent from FDA's production and not located in its extensive administrative-file search nevertheless existed and were later produced by a Defendant. This does not establish that Dr. Hopper appears in SKF materials or that SKF supplied him. It establishes that absence from FDA's production or search result did not prove that relevant manufacturer records never existed.

**V. The contemporaneous timing and individualized expert evidence reinforce each other.**

The appointment card and check register establish the August 7, 1961 treatment date; Martin's testimony supplies the reported dispensing event; and Professor Vargesson explains that the thumb is particularly sensitive, followed by the radius and other upper-limb structures, with presentation varying according to timing and extent of exposure. (Vargesson Supp. Decl., Carolyn Sampson's Congenital Conditions, ¶¶ 17-18.) The declaration does not expressly calculate gestational age from the appointment date, so Plaintiff does not attribute that calculation to him. The date, pregnancy chronology, testimony, objective medical pattern, and expert opinions are separate components of the circumstantial record.

**VI. The declaration and Plaintiff’s record search create a genuine dispute concerning reasonable diligence.**

Defendants equate earlier suspicion and older literature with discovery of a supportable claim. Professor Vargesson offers a different scientific proposition: much current understanding of thalidomide's mechanisms and embryonic effects arose during the last twenty years, and Plaintiff's pattern was unlikely to have been appreciated until recently given historical and continuing limits in relevant expertise and recent scientific discoveries. (Id. ¶ 28.)

That opinion must be considered with Plaintiff's actual investigation: the reportedly inconclusive pill test, reportedly lost Hopper records, initial proprietary-record response, extensive but incomplete FOIA production, Plaintiff's follow-up about missing SKF materials, FDA's unsuccessful eighty-volume search for the requested list, and Defendants' later production of SKF materials. A jury could distinguish general suspicion from access to the product, distribution, manufacturer, and scientific facts needed to support the claim.

**VII. General publicity did not supply the nonpublic facts now before the Court.**

General publicity that thalidomide caused birth defects did not disclose the incomplete lists, secondary transfers, pharmacy stocks, missing supplies, notification failures, product-name confusion, or individualized scientific assessment now documented. (Pl.'s Exs. 4-9.) Nor did publicity provide Professor Vargesson's synthesis of Plaintiff's full medical record, imaging, genetic testing, family history, and depositions. (Vargesson Supp. Decl. ¶¶ 11-28.)

Nor did the availability of hundreds of physician names make the complete distribution record publicly accessible. Plaintiff obtained substantial lists associated with some distributors, but the requested SKF list was absent. When she followed up, FDA reported that an approximately eighty-volume search had not located it. Defendants later produced SKF materials in litigation. The difference between the partial FDA production and manufacturer records later produced by Defendants is evidence that an injured person could diligently search the federal archive and still lack material information concerning a relevant distribution system.

Contemporaneous records further show that important information concerning thalidomide was not necessarily made publicly available even when it was known to FDA and the companies involved. In 1961, after an FDA letter concerning the Merrell application, Dr. John Murray of William S. Merrell described the letter as “somewhat libelous” and asked whether it was subject to reconsideration; the FDA representative responded that the letter could be reconsidered if Murray supplied sufficient reason. (Pl.’s Ex. 19, FDA1261.) In 1964, Professor Widukind Lenz asked FDA what warnings Merrell had received from Chemie Grünenthal and whether FDA considered the information supplied to Merrell sufficient. Dr. Frances Kelsey’s internal response stated that she was uncertain how much of the information was public or could be made public. Although her memorandum discussed the substance of Lenz’s questions and concluded that Grünenthal had ample knowledge of serious peripheral-neuritis reports and awareness of reports associating thalidomide with congenital malformations,

FDA's response directed Lenz to obtain the requested information from Merrell. (Pl.'s Ex. 20, FDA1423-1425, FDA1427-1429.) These records reinforce the distinction between the existence of information within company and agency files and its availability to an injured person attempting to investigate a claim. Dr. Lenz's correspondence is particularly significant because he directed his concerns to the companies involved and later reported that Chemie Grünenthal's attorney threatened slander litigation after he criticized the company's response to thalidomide warnings. (Pl.'s Ex. 20, FDA1423-1425, FDA1427-1429.)

**VIII. The record presents genuine disputes for the factfinder.**

The complete record includes Martin's testimony; the August 7 appointment and check records; Dr. Stephens's declaration; Professor Vargesson's report and signed Supplemental Declaration; objective medical records, photographs, imaging, and genetic testing; incomplete investigator records; informal transfers; disputed supplies; deficient notification; Plaintiff's extensive but incomplete FDA production; her follow-up concerning the missing SKF list; FDA's eighty-volume search; and Defendants' later production of SKF materials. Professor Vargesson's express opinions remove the premise that Plaintiff offers only phenotype consistency or unsupported personal suspicion.

Plaintiff does not contend that any single document identifies the pills or manufacturer. She contends that the evidence, viewed collectively and in her favor, permits a reasonable factfinder to find exposure and causation and prevents Defendants from using demonstrably incomplete historical records as conclusive exclusionary proof.

## CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' renewed motion for summary judgment at Document 940. Professor Vargesson's signed Supplemental Declaration supplies opinions to a reasonable degree of scientific certainty that Plaintiff was exposed to

thalidomide in utero and that the exposure caused specified congenital injuries. (Vargesson Supp. Decl. ¶¶ 23-24.) It identifies his qualifications, record review, consideration of genetic alternatives, totality-of-evidence methodology, and scientific basis for delayed appreciation of Plaintiff's pattern. (Id. ¶¶ 5-29.)

Plaintiff's record-seeking history further supports genuine disputes concerning diligence and accessibility. FDA supplied substantial physician-list materials associated with National Drug Company, Richardson-Merrell, and Vick, but did not provide the requested SKF list. Plaintiff followed up, and FDA reported that an approximately eighty-volume search did not locate it. Defendants later produced and now rely on SKF materials. That sequence demonstrates both Plaintiff's persistence and the incompleteness of the records available to her.

Together with the contemporaneous treatment records, deposition testimony, Dr. Stephens's declaration, FDA distribution and notification records, and Plaintiff's diligence evidence, the record creates genuine disputes concerning exposure, causation, notice, accrual, reasonable diligence, public accessibility, and manufacturer attribution. No Defendant should be dismissed merely because its surviving list omits Dr. Hopper or because incomplete records no longer permit Plaintiff to identify the manufacturer of pills dispensed without labeling.

Dated: September 21, 2026

Respectfully submitted,

/s/ Carolyn Sampson
Carolyn Sampson, Plaintiff Pro Se
15353 Greenhaven Ln Apt 101
Burnsville, Minnesota 55306
Telephone: 651-470-3937
Email: cafsampson@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2026, I electronically filed the foregoing document with the Clerk of Court using the Court's CM/ECF system. I further certify that a true and correct copy of the foregoing document is being served on all counsel of record through the Court's CM/ECF system.

/s/ Carolyn Sampson

Carolyn Sampson

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GLENDA JOHNSON, et al.,
Plaintiffs,

v.

SMITHKLINE BEECHAM CORPORATION, et al.,
Defendants.

Case No. 2:11-cv-05782-PD

AND ALL RELATED CASES

This Document Relates to:
Yeatts, et al. v. SmithKline Beecham Corp., et al., No. 11-cv-06711

## [PROPOSED] ORDER

AND NOW, this ______ day of __________________, 2026, upon consideration of Defendants' Renewed Motion for Summary Judgment (Doc. 940), Plaintiff Carolyn Sampson's Response in Opposition, and the record, it is hereby ORDERED that Defendants' Renewed Motion for Summary Judgment (Doc. 940) is DENIED as to Plaintiff Carolyn Sampson.

BY THE COURT:

_________________________________
PAUL S. DIAMOND, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GLENDA JOHNSON, et al.,
Plaintiffs,

v.

SMITHKLINE BEECHAM CORPORATION, et al.,
Defendants.

Case No. 2:11-cv-05782-PD

AND ALL RELATED CASES

This Document Relates to:
Yeatts, et al. v. SmithKline Beecham Corp., et al., No. 11-cv-06711

## PLAINTIFF CAROLYN SAMPSON'S EXHIBIT INDEX IN SUPPORT OF HER RESPONSE IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT (DOC. 940)

| Ex. | Description / Document Title | Date | Pages / Notes |
|---|---|---|---|
| 1 | Appointment Card | Aug. 7, 1961 | |
| 2 | Check Register | Aug. 7, 1961 | |
| 3 | Vargesson Supplemental Declaration | Sept. 18, 2026 | |
| 4 | National Drug Company Report | Sept. 26, 1962 | FDA1572-1584 |
| 5 | Pharmacy Stock Records | Sept. 25, 1962 | FDA0462 |
| 6 | Physician and Family Transfer Records | Aug. 22, 1962 | FDA0081, FDA0102 |
| 7 | Distributor and Physician Account Records | Sept. 20, 1962 | FDA1708-1709 |
| 8 | Unreported Supply Records | Oct. 8, 1962 | FDA0459 |
| 9 | Tablet Inventory Record | Oct. 2, 1962 | FDA0353 |
| 10 | FDA FOIA Correspondence and Physician Lists | Sept. 17, 2011 | Selected correspondence and production |
| 11 | FDA Inspection Report | July 24, 1962 | |
| 12 | FDA and AMA Patient Notification Records | Oct. 19, 1962 | FDA0365-0366 |
| 13 | Corrected Distributor Record | July 25, 1962 | FDA0185 |
| 14 | Physician Interview Reports | Oct. 11, 1962 | FDA0394-0396; FDA0405-0410 |
| 15 | FDA Thalidomide Record | July 27-Aug. 6, 1962 | FDA0121-0129 |
| 16 | FDA Kevadon Recall Record | May 31, 1962 | FDA0206-0208 |
| 17 | FDA Memorandum: Abnormalities Due to Thalidomide | Oct. 12, 1962 | FDA0400 |
| 18 | Letters: Thalidomide for Laboratory Experiments | Aug. 26, 1969 | 1964-1969 records |
| 19 | FDA Memorandum | May 1961 | FDA1261 |
| 20 | Lenz-FDA Correspondence | June 25, 1964 | FDA1423-1429 |
| 21 | Merrell Kevadon Hospital Clinical Program Manual | 1960 | Excerpts |

| | | | |
|---|---|---|---|
| 22 | Merrell Kevadon New Drug Application No. 12,611 | Oct. 25, 1960 | Selected pages |
| 23 | National Drug Contergan New Drug Application No. 12,711 | 1960-1961 | Selected pages |