**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GLENDA JOHNSON ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>SMITHKLINE BEECHAM CORPORATION ET AL.,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:11-cv-005782<br><br>This Document Relates to:<br><br>*Yeatts, et al. v. SmithKline Beecham Corp., et al.*, No. 11-cv-06711 |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF CAROLYN SAMPSON**

Pursuant to the Court's Judicial Practice and Procedure Instructions, Section VI.C, Defendants respectfully submit this Statement of Undisputed Material Facts in support of their Renewed Motion for Summary Judgment as to Plaintiff Carolyn Sampson [D.E. 940]. The following constitute material facts as to which there is no genuine issue to be tried:

## I. Plaintiff's Longstanding Belief That Thalidomide Caused Her Injuries

1. Plaintiff was born on March 28, 1962 in Morristown, New Jersey. Compl. ¶ 60.

2. Plaintiff was born with deformities immediately identifiable at birth, including a malformed left arm, a left hand with only three fingers and no thumb, and a right arm with an enlarged radial head. *Id*.

3. In or around 1979, when Plaintiff was 17 years old, a stranger on a bus asked her, "Are you a thalidomide baby?" Sampson Dep. (Ex. A) at 39.[1]

4. The same day in or around 1979, Plaintiff asked her mother if Plaintiff is a "thalidomide baby," and her mother responded, "Well, we're really not sure. . . . You know, yes, I did take some medication. But I don't know. . . . I don't know what it is that I took." *Id.* at 40, 42; *see also id.* at 95.

5. Ever since approximately 1979, Plaintiff has "always believed that it somehow could have been thalidomide" that caused her birth injuries. *Id.* at 46.

6. Since she was 17 years old, Plaintiff has "always thought that [her] mother took thalidomide," but is "not sure." *Id.* at 119.

7. Since 1979, whenever anyone has asked Plaintiff what caused her birth defects, she has answered, "I think my mother took thalidomide," *id*. at 86, or "I don't know. It's possible that mother took thalidomide because I've known that since I was 17." *Id*. at 64.

---

[1] Exhibits referenced herein were filed with Defendants' Renewed Motion for Summary Judgment as to Plaintiff Carolyn Sampson [D.E. 940-1 through 940-29].

8. If asked by doctors, Plaintiff "may have" responded that thalidomide caused her birth defects, because she "always believed that it was possible." *Id*. at 64.

9. In 1982, Plaintiff contacted a lawyer, who she told: "I believe my mother took thalidomide and I would like to look into this further and see if there's anything that can be done." *Id*. at 51.

10. The attorney who Plaintiff contacted in 1982 told Plaintiff that "the statute of limitations in New Jersey is 21," which Plaintiff understood meant she had to file suit by March 28, 1983, when she would reach age 21. *Id*. at 53, 58-59.

11. Plaintiff did not sue within the period the attorney described. *Id.* at 58-59

12. When Plaintiff told her mother that she was seeing a lawyer, her mother told her that she "still had the pills" that her doctor, Dr. Hopper, allegedly gave her while she was pregnant with Plaintiff. *Id*. at 51-52.

13. Plaintiff took the pills that her mother still had, and provided them to the attorney with whom Plaintiff had discussed filing a lawsuit. *Id*. at 51-52.

14. According to Plaintiff, the attorney sent the pills to "a lab to get [them] tested," but the lab reportedly told him that "the pill was too old to determine conclusively what it was." *Id*. at 52-53.

15. Plaintiff did not get the pills back and does not know what happened to them. *Id*. at 57-58.

16. Plaintiff does not recall the name of the attorney who allegedly sent Plaintiff's mother's pills to a lab. *Id*. at 51.

17. Dr. Hopper is not among the doctors in Defendants' lists of thalidomide clinical investigators. Exs. F-G.

18. The attorney with whom Plaintiff spoke in 1982 allegedly called Dr. Hopper to request her mother's medical records, but the doctor reportedly told the lawyer that "those are lost." Sampson Dep. (Ex. A) at 53, 90-91.

19. Plaintiff "always thought that was suspect" when Dr. Hopper told the lawyer that her mother's records were lost, but she took no further action until 2011. *Id.* at 91.

20. After the lawyer told Plaintiff there were no medical records and the pill was inconclusive, "[she] thought that was the end of it and [she] went on with [her] life." *Id.* at 53-54.

21. One of Plaintiff's medical records, dated April 20, 2006, reports: "She has congenital hypoplasia of the arms, fingers that were not developed, with an appearance that is typical of a thalidomide effect. She comments that it is possible her mother took a drug that had a small amount of either thalidomide or thalidomide-like additive to it in her pregnancy for treatment of headaches or muscle pain, but she has never been able to determine that conclusively." SAMPSON 260109:002 0154-0156 (Ex. B).

22. In 2006, Plaintiff "did an Internet search . . . to find thalidomide." *Id*. at 45. At that time, Plaintiff thought "Maybe this is the answer. Maybe [her mother] was given something that had thalidomide in it. She got it somewhere." *Id*. at 46; *see also id.* at 47 ("I only remember that I found this little tiny bit of information and I thought: Well, maybe that's the answer.").

23. Plaintiff filed her lawsuit in 2011. Compl.

**II. Plaintiff's Lack of Proof of Exposure to Thalidomide**

24. By 2011, Plaintiff's mother's doctor, Dr. Hopper, had died. Sampson Dep. (Ex. A) at 91.

25. Plaintiff "was never able to prove" that her mother took thalidomide, Sampson Dep. (Ex. A) at 46, and she never has found such proof. *See id*. at 105.

26. Plaintiff's mother "ha[s] no proof" and "ha[s] no way of knowing" whether the drug she allegedly took while pregnant with Plaintiff was thalidomide. Martin Dep. (Ex. E) at 53. Her mother doesn't know what she had taken. *Id.* at 54.

27. Prior to filing her lawsuit, Plaintiff had never communicated with any of the Defendants. Carolyn Sampson's Second Supp. Resp. to Sanofi-Aventis U.S. LLC's Fourth Interrog. (Ex. H).

**III. Publicity and Lawsuits Concerning Thalidomide in the United States**

28. Books, national newspapers, magazine articles, and other media have discussed thalidomide's presence in the United States and its link to birth defects since the early 1960s. Ex. I (partial bibliography).

29. In August 1962, President John F. Kennedy gave a press conference addressing thalidomide and cautioned that "[e]very citizen . . . should be aware of the hazards [of thalidomide], and I am sure they are." Ex. J (Official White House Tr.) at 3.

30. During his August 1962 address, President Kennedy stated that "[e]very woman in this country . . . must be aware that it is most important that they check their medicine cabinet, that they do not take this drug [thalidomide], that they turn it in." *Id*.

31. In August 1962, the U.S. Senate held public hearings that identified Grünenthal as the inventor and licensor of thalidomide. U.S. Senate Hr'g (Aug. 1 and 9, 1962) (Ex. K) at 30, 81-83, 115-118.

32. The public record from the 1962 U.S. Senate hearings included the fact that Smith Kline & French ("SKF") ran a U.S. clinical trial involving thalidomide from November 1956 until December 1957, involving 67 U.S. doctors. Aug. 27, 1962 SKF letter to Sen. Hubert H. Humphrey (Ex. L) (noting that "[i]nvestigations in patients were begun in November 1956").

33. In August 1962, the FDA issued a press release stating that a U.S. clinical trial pertaining to thalidomide conducted by Merrell involved 1,267 doctors, more than 2,500,000 pills, and 19,822 patients, "3,670 [of whom] were women of child-bearing age, [of] whom 624 were reported as pregnant." August 23, 1962 FDA Press Release (Ex. M).

34. On September 9, 1962, the Washington Post ran a front-page story reporting FDA's press release numbers concerning Merrell's trial, and stating that SKF's trial resulted in the distribution of 344,270 thalidomide tablets to 67 doctors. Ex. N (Morton Minz, Drug Firm Said to Lag on Warning, Washington Post Times Herald, Sept. 9, 1962, at A1).

35. On August 10, 1962, a Life Magazine cover story on thalidomide referenced German and U.S. manufacturers, including a picture of Grünenthal's manufacturing plant and a statement by Merrell's director of medical research. Ex. O.

36. On September 1, 1962, a Saturday Review article outlined the chronology of Merrell's NDA for thalidomide. Ex. P.

37. On October 6, 1962, a Saturday Review article reported that the public record of U.S. Senate hearings "shows that in 1956 and 1957 Smith, Kline and French gave thalidomide to sixty-seven doctors, who gave it to 875 patients in an experiment encompassing eleven states." Ex. Q.

38. On March 28, 1963, a Reporter article stated that SKF "tested thalidomide in 1956-57" and that Merrell "distributed 2.5 million thalidomide tablets to 1,267 physicians for 'experimental' use." Ex. R.

39. In 1972, Henning Sjöström & Robert Nilsson published *Thalidomide and the Power of the Drug Companies*, which discussed SKF's animal and clinical trials, Ex. S at 50, 189,

and 191, and Grünenthal, including its relationship to SKF. *See, e.g., id*. at pp. 37, 38, 44, 186-87, and 191.

40. In 1979, the London *Sunday Times* published *Suffer the Children*, which discussed Grünenthal's invention of thalidomide, SKF's testing of the drug, and Merrell's clinical trial in the United States. Phillip Knightley, et al., The Sunday Times Insight Team, *Suffer the Children: The Story of Thalidomide* (1979) (Ex. T) at pp. 14, 18-19, and 64.

41. In 2001, the book *Dark Remedy* also discussed Grünenthal, SKF, and Merrell with respect to thalidomide. Trent Stephens & Rock Brynner, *Dark Remedy: The Impact of Thalidomide and its Revival as a Vital Medicine* (2001).

42. Allegations in Plaintiff's Complaint were copied from the books referenced above. *See* Comparison of Complaint to Publicly-Available References (Ex. U).

43. Between 1962 and 1992, over thirty lawsuits claiming thalidomide injuries were filed in the United States, including in this Court. *See, e.g., Diamond v. Richardson-Merrell, Inc.*, No. CV 62-0032132 (E.D. Pa. 1962) (settled pre-verdict); Ex. V (list of prior U.S. thalidomide litigation). These lawsuits included claims against all three of the Defendants in this case. *E.g.,* Ex. W (Burton complaint).

44. For example, in 1977, Rose Ann Burton sued SKF, Richardson-Merrell, Grünenthal, and others in Michigan state court. Ex. W (Burton complaint).

45. In 1971, a thalidomide case resulted in a $2.75 million verdict for the plaintiff. *See McCarrick v. Richardson-Merrell, Inc.*, No. 882426, 1971 WL 39622 (Cal. Super. Ct. 1971); Veronica Geng, Thalidomide: The American Experience, N.Y. Times, Apr. 29, 1973 (Ex. X) (reporting on thirteen U.S. lawsuits, including *McCarrick*); Lynn Lilliston, Decade Later, Peggy

Yearns 'to Be Tall', L.A. Times, June 22, 1972 (Ex. Y) (discussing *McCarrick* and potential statute of limitations problems for other thalidomide plaintiffs).

46. In 1975, the Third Circuit affirmed the dismissal of a thalidomide case based on the statute of limitations. *Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28 (3d Cir. 1975).

### IV. Prior Motion for Summary Judgment, *Lone Pine* Order, and Plaintiffs' Expert Submissions

47. On July 31, 2014, Defendants moved for summary judgment as to Plaintiff's claims, asserting that (i) her claims are time-barred and (ii) she lacks admissible evidence of exposure to thalidomide. The motion was fully briefed [D.E. 291, 330, 336], but was denied without prejudice pending the special masters' investigations. Feb. 27, 2015 Order [D.E. 474].

48. On May 27, 2026, the Court issued an Order requiring plaintiffs in this coordinated litigation to serve declarations from themselves and one or more experts meeting the requirements of 28 U.S.C. § 1746 and containing specified information to support their assertions that (i) their claims are not time-barred, and (ii) they were exposed to thalidomide in utero, which caused their identified injuries. Lone Pine Order [D.E. 911] at 3-5.

49. On June 27, 2026, Plaintiff served a Declaration from herself, along with a 2014 Declaration from Dr. Trent Stephens, originally submitted in opposition to Defendants' original motion for summary judgment [D.E. 330-2] and addressed in Defendants' reply in support of that summary judgment motion [D.E. 336].

50. On August 20, 2026, Plaintiff served a Letter from Professor Neil Vargesson. Vargesson Letter (Ex. D).

51. Neither Dr. Stephens nor Professor Vargesson is a medical doctor.

52. Dr. Stephens states that Plaintiff has "the most common defect seen in thalidomide embryopathy." Stephens Decl. (Ex. C) ¶ 15.

53. Dr. Stephens "assume[s] thalidomide exposure in this case," rather than offering opinions on whether Plaintiff was exposed to thalidomide. *Id.*

54. More than two years before Plaintiff filed her lawsuit, Dr. Stephens "probably" would have "given the opinion that her birth defects were more likely than not caused by thalidomide." *Id.* ¶ 17.

55. Professor Vargesson describes Plaintiff's birth injuries as "characteristic features of Thalidomide Embryopathy," based on studies from the 1960s and 1990s. Vargesson Letter (Ex. D) at 2, 4, 5.

56. Professor Vargesson states that "3% of all babies born each year have significant birth differences, the majority of which have unknown causes. Some mothers will have given birth to babies with congenital differences that may share characteristics with those seen in Thalidomide Embryopathy, but were unrelated to Thalidomide exposure, even during the period when it was readily available." *Id*. at 4.

57. Professor Vargesson has not ruled out that Plaintiff's birth differences result from unknown causes unrelated to Thalidomide exposure. *Id*.

Dated: September 30, 2026

Respectfully submitted,

*/s/ Daniel A. Spira*
Michelle A. Ramirez (*admitted pro hac vice*)
Email: michelle.ramirez@sidley.com
Daniel A. Spira (*admitted pro hac vice*)
Email: dspira@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603

Telephone: 312-853-7000
Facsimile: 312-853-7036

Eliezer Granek
Email: egranek@eckertseamans.com
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania 19102
Telephone: 215-851-8400
Facsimile: 215-851-8383

Eugene A. Schoon (*admitted pro hac vice*)
CROKE, FAIRCHILD, DUARTE & BERES, LLC
180 N. LaSalle Street, Suite 3400
Chicago, Illinois 60601
Telephone: (772) 517-2740

*Attorneys for Grünenthal GmbH*

Michael T. Scott
MIKE SCOTT LAW LLC
Email: mike@mikescottlaw.com
1116 Red Rose Lane
Villanova, PA 19085
Telephone: (215) 518-8695

Sonja S. Weissman (*admitted pro hac vice*)
REED SMITH LLP
Email: sweissman@reedsmith.com
101 Second Street, Suite 1800
San Francisco, California 94105
Telephone: (415) 543-8700

*Counsel for GlaxoSmithKline LLC, and*
*GlaxoSmithKline Holdings (Americas) Inc.*

Daniel S. Pariser (*admitted pro hac vice*)
Email: daniel.pariser@arnoldporter.com
Paige H. Sharpe (*admitted pro hac vice*)
Email: paige.sharpe@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 W. Massachusetts Avenue, N.W.
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Anand Agneshwar (*admitted pro hac vice*)
Email: anand.agneshwar@arnoldporter.com
Carmela T. Romeo
Pennsylvania Bar No. 313042
Email: carmela.romeo@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Sanofi-Aventis U.S. LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that a true and correct copy of the foregoing document is being served this day on all counsel of record via the Court's electronic filing system.

*/s/ Daniel A. Spira*
Daniel A. Spira