**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GLENDA JOHNSON ET AL., | |
| | Case No. 2:11-cv-05782-PD |
| Plaintiffs, | |
| | This Document Relates to: |
| v. | |
| | *Gunn, et al. v. SmithKline Beecham Corp., et al.*, No. 2:12-cv-06431 |
| SMITHKLINE BEECHAM CORPORATION ET AL., | |
| Defendants. | |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**AS TO PLAINTIFF YVONNE ENGLISH-MONROE**

Pursuant to the Court's Judicial Practice and Procedure Instructions, Section VI.C, Defendants respectfully submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment as to Plaintiff Yvonne English-Monroe. The following constitute material facts as to which there is no genuine issue to be tried:

## I. Plaintiff's Lack of Investigation into the Cause of Her Injuries

1. Plaintiff was born on February 25, 1962, in Chicago, Illinois, where her mother lived while pregnant with her. Compl. ¶ 27; Ex. A (Dep. of Bobbie English, July 31, 2014 ("English Dep.")), at 43.

2. Plaintiff was born with deformities immediately identifiable at birth, including "club hands, with four fingers on each hand and no thumbs," and a left arm "much shorter than her right." Compl. ¶ 28.

3. As Plaintiff grew up, her parents, family, and church told her that her deformities were "an act of God." Ex. B (Dep. of Yvonne English-Monroe, July 31, 2014 ("Pl. Dep.")) at 32.

4. When other children asked Plaintiff about her deformities, she told them that they were "God's will." *Id.* at 32.

5. "About 20 years ago," Plaintiff's mother told her that she had taken a pill during pregnancy for morning sickness. Ex. C (Pl.'s Supp. Resp. to Sanofi-

Aventis U.S. LLC's First Set of Reqs. for Admis., Nos. 6–7); Ex. F (Pl.'s Supp. Resp. to GlaxoSmithKline LLC's First Set of Interrogs., No. 4).

6. But Plaintiff never asked a doctor about the cause of her disabilities. Ex. B (Pl. Dep.) at 73.

7. Plaintiff never attempted to obtain her mother's prenatal medical records or any records from her own birth. *Id.* at 68–69.

8. Plaintiff never reviewed any medical records associated with her mother's pregnancy or her own deformities. *Id.* at 68–69.

9. Plaintiff has never communicated with any of the Defendants. Ex. D (Pl.'s Second Suppl. Resp. to Sanofi-Aventis U.S. LLC's Fourth Interrog.).

10. In early 2011, Plaintiff's friend Ramon Rayford told Plaintiff that his niece had suggested that Plaintiff's deformities might be related to thalidomide. Ex. E (Dep. of Ramon Rayford, Oct. 22, 2014 ("Rayford Dep.")) at 21–22.

11. Mr. Rayford then conducted an internet search about thalidomide and became convinced that his niece might be correct. *Id*. at 35–38.

12. Mr. Rayford called Plaintiff to discuss what he had learned. *Id*. at 35–38.

13. During that call, Plaintiff visited a website that Mr. Rayford suggested and saw images of individuals with limb deformities that she believed "looked like" her own. Ex. B (Pl. Dep.) at 32–33.

14. That website, together with Plaintiff's subsequent internet research, led her to an article on thalidomide and convinced her to e-mail lawyers about a potential lawsuit. *Id.* at 39–40.

15. Plaintiff filed her lawsuit on November 13, 2012. Compl., *Gunn, et al. v. SmithKline Beecham Corp.*, et al., No. 2:12-cv-06431 (Doc. No. 1).

**II. Plaintiff's Lack of Proof of Expose to Thalidomide**

16. Plaintiff's mother, Bobbie English, had morning sickness while she was pregnant with Plaintiff, which was "bad around two months" into the pregnancy. Ex. A (English Dep.) at 48.

17. Plaintiff's mother saw a doctor for the morning sickness and was "given tablets to take." *Id*. at 49.

18. The doctor gave Plaintiff's mother "a 30-day supply" of white tablets to take, "one each morning." *Id*. at 49.

19. Plaintiff's mother "did not know what the pill was." Ex. F (Pl.'s Supp. Resp. to GlaxoSmithKline LLC's First Set of Interrogs., No. 4).

20. Plaintiff's mother did not recall whether they were scored or had any writing on them. *Id*. at 49–50.

21. Plaintiff's mother received the tablets in a paper bag container that had no writing on it. *Id*. at 51.

22. The doctor gave Plaintiff's mother no written instructions about the tablets and did not tell her a "name of the pills." *Id*. at 51.

23. Nor did Plaintiff's mother's doctor say anything about "the company who made the pills" or "where the pills came from." *Id*. at 51–52.

24. The doctor did not tell Plaintiff's mother that the tablets were experimental or a trial drug. *Id*. at 52.

25. Plaintiff's mother cannot recall the name of the doctor who gave her the tablets, or the names of any of the other doctors who treated her during her pregnancy with Plaintiff. *Id*. at 45–47.

26. Plaintiff's mother does not know what happened to the paper bag the tablets came in, but believes it "probably got thrown away at some point." *Id*. at 54.

27. Plaintiff's mother had never heard of thalidomide before learning of Plaintiff's lawsuit and does not know whether the tablets she took contained thalidomide. *Id*. at 15, 16, 58–59.

28. At the time Plaintiff was born, her mother did not have any conversation with a doctor or nurse about why Plaintiff's hands and arms were the way they were. *Id*. at 58.

29. Plaintiff's mother's own belief, at the time, was that Plaintiff's deformities were the result of "God's will." *Id*. at 58.

30. Before Plaintiff brought this lawsuit, Plaintiff's mother was "not sure" whether the pills she took while pregnant caused Plaintiff's birth defects. *Id*. at 58–59.

31. Plaintiff's mother never discussed the possible cause of Plaintiff's birth defects with any of Plaintiff's doctors, or with her husband, while Plaintiff was growing up. *Id*. at 59.

32. Plaintiff's mother has never told her that she took thalidomide. Ex. B (Pl. Dep.) at 48.

33. Plaintiff has no contemporaneous medical record establishing that her mother was dispensed or ingested thalidomide. Ex. C (Pl.'s Supp. Resp. to Sanofi-Aventis U.S. LLC's First Set of Reqs. for Admis., No. 1).

34. Plaintiff has no documentary evidence that the physician who allegedly gave her mother the tablets was a clinical investigator for Merrell's or SKF's respective clinical trials of thalidomide. *Id*. Nos. 3–5.

**III. Thalidomide, Surrounding Publicity, and Related Litigation in the United States**

35. In the 1950s, Grünenthal GmbH, a German company, developed thalidomide. Compl. ¶¶ 53, 56.

36. Beginning in October 1957, thalidomide was available "over the counter" in Germany. *Id.* ¶ 57.

37. Grünenthal entered into a preliminary licensing agreement with Smith Kline & French ("SKF") that led to SKF conducting animal tests, then a limited U.S. clinical trial including 875 patients. *Id.* ¶¶ 42-43, 83, 96-97, 100, 102.

38. In 1957, SKF decided not to market the drug and never sought FDA approval to do so. *Id.* ¶ 111. In October 1958, Grünenthal entered into an agreement with Richardson-Merrell, Inc. and its subsidiaries William S. Merrell Company and National Drug Company (collectively, "Merrell"). *Id.* ¶ 47.

39. Merrell conducted a U.S. trial of thalidomide and, in 1960, filed new drug applications ("NDAs") with the U.S. Food and Drug Administration ("FDA"). *See id.* ¶¶ 58, 64-65.

40. In 1961, news linking thalidomide and birth defects surfaced in England, Germany, and Australia. *Id.* ¶ 2.

41. The drug was soon withdrawn from markets worldwide, and Merrell halted its clinical trial and withdrew its still-pending NDAs. *See id.* ¶¶ 2, 70.

42. The Complaint itself alleges that "[a]dministering thalidomide to pregnant women has been called one of the biggest disasters in modern medicine." *Id.* ¶ 50.

43. Books, national newspapers, magazine articles, and other media have discussed thalidomide's presence in the United States and its link to birth defects since the early 1960s. Ex. G (partial bibliography).

44. In August 1962, President John F. Kennedy gave a press conference addressing thalidomide and cautioned that "[e]very citizen . . . should be aware of the hazards [of thalidomide], and I am sure they are." Ex. H (Official White House Tr.) at 3.

45. During his August 1962 address, President Kennedy stated that "[e]very woman in this country . . . must be aware that it is most important that they check their medicine cabinet, that they do not take this drug [thalidomide], that they turn it in." *Id*.

46. In August 1962, the U.S. Senate held public hearings that identified Grünenthal as the inventor and licensor of thalidomide. Ex. J (U.S. Senate Hr'g (Aug. 1 and 9, 1962)) at 30, 81-83, 115-118.

47. The public record from the 1962 U.S. Senate hearings included the fact that Smith Kline & French ("SKF") ran a U.S. clinical trial involving thalidomide from November 1956 until December 1957, involving 67 U.S. doctors. Ex. J (Aug. 27, 1962 SKF letter to Sen. Hubert H. Humphrey) (noting that "[i]nvestigations in patients were begun in November 1956").

48. In August 1962, the FDA issued a press release stating that a U.S. clinical trial pertaining to thalidomide conducted by Merrell involved 1,267 doctors, more than 2,500,000 pills, and 19,822 patients, "3,670 [of whom] were women of

child-bearing age, [of] whom 624 were reported as pregnant." Ex. K (August 23, 1962 FDA Press Release).

49. On September 9, 1962, the Washington Post ran a front-page story reporting FDA's press release numbers concerning Merrell's trial, and stating that SKF's trial resulted in the distribution of 344,270 thalidomide tablets to 67 doctors. Ex. L (Morton Minz, Drug Firm Said to Lag on Warning, Washington Post Times Herald, Sept. 9, 1962) at A1.

50. On August 10, 1962, a Life Magazine cover story on thalidomide referenced German and U.S. manufacturers, including a picture of Grünenthal's manufacturing plant and a statement by Merrell's director of medical research. Ex. M (Life Magazine cover).

51. On September 1, 1962, a Saturday Review article outlined the chronology of Merrell's NDA for thalidomide. Ex. N (Saturday Review article).

52. On October 6, 1962, a Saturday Review article reported that the public record of U.S. Senate hearings "shows that in 1956 and 1957 Smith, Kline and French gave thalidomide to sixty-seven doctors, who gave it to 875 patients in an experiment encompassing eleven states." Ex. O.

53. On March 28, 1963, a Reporter article stated that SKF "tested thalidomide in 1956-57" and that Merrell "distributed 2.5 million thalidomide tablets to 1,267 physicians for 'experimental' use." Ex. P (Reporter article).

54. In 1972, Henning Sjöström & Robert Nilsson published *Thalidomide and the Power of the Drug Companies*, which discussed SKF's animal and clinical trials, Ex. Q at 50, 189, and 191, and Grünenthal, including its relationship to SKF. *See, e.g., id*. at pp. 37, 38, 44, 186-87, and 191.

55. In 1979, the London *Sunday Times* published *Suffer the Children*, which discussed Grünenthal's invention of thalidomide, SKF's testing of the drug, and Merrell's clinical trial in the United States. Ex R (Phillip Knightley, et al., The Sunday Times Insight Team, *Suffer the Children: The Story of Thalidomide* (1979)) at pp. 14, 18-19, and 64.

56. In 2001, the book *Dark Remedy* also discussed Grünenthal, SKF, and Merrell with respect to thalidomide. Trent Stephens & Rock Brynner, *Dark Remedy: The Impact of Thalidomide and its Revival as a Vital Medicine* (2001).

57. Allegations in Plaintiff's Complaint were copied from the books referenced above. *See* Ex. S (Comparison of Complaint to Publicly-Available References).

58. Between 1962 and 1992, over thirty lawsuits claiming thalidomide injuries were filed in the United States, including in this Court. *See, e.g., Diamond v. Richardson-Merrell, Inc.*, No. CV 62-0032132 (E.D. Pa. 1962) (settled pre-verdict); Ex. T (list of prior U.S. thalidomide litigation). These lawsuits included

claims against all three of the Defendants in this case. *E.g.,* Ex. U (Burton complaint).

59. For example, in 1977, Rose Ann Burton sued SKF, Richardson-Merrell, Grünenthal, and others in Michigan state court. Ex. U (*Burton* complaint).

60. In 1971, a thalidomide case resulted in a $2.75 million verdict for the plaintiff. *See McCarrick v. Richardson-Merrell, Inc.*, No. 882426, 1971 WL 39622 (Cal. Super. Ct. 1971); Ex. V (Veronica Geng, Thalidomide: The American Experience, N.Y. Times, Apr. 29, 1973) (reporting on thirteen U.S. lawsuits, including *McCarrick*); Ex. W (Lynn Lilliston, Decade Later, Peggy Yearns 'to Be Tall', L.A. Times, June 22, 1972 ) (discussing *McCarrick* and potential statute of limitations problems for other thalidomide plaintiffs).

61. In 1975, the Third Circuit affirmed the dismissal of a thalidomide case based on the statute of limitations. *Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28 (3d Cir. 1975).

## IV. The Court's *Lone Pine* Order and Plaintiff's Expert Submissions

62. On May 27, 2026, the Court issued an Order requiring Plaintiffs in this coordinated litigation to serve declarations from themselves and one or more experts meeting the requirements of 28 U.S.C. § 1746 and containing specified information to support their assertions that (i) their claims are not time-barred, and (ii) they were

exposed to thalidomide in utero, which caused their identified injuries. *Lone Pine* Order, ECF No. 911, at 3-5.

63. On July 7, 2026, Plaintiff served a letter to the Court regarding her injuries, Ex. Y (Pl. Letter), together with a declaration from Trent Stephens, Ph.D. executed in 2014, Ex. Y (Stephens Decl.).

64. Dr. Stephens is not a medical doctor. *Id.* ¶ 1.

65. Dr. Stephens states that he was asked by Plaintiff's former counsel "to assume" that Plaintiff "was exposed to thalidomide during the critical period in utero" rather than offering opinions on whether Plaintiff was exposed to thalidomide. *Id*. ¶¶ 6, 12.

66. Dr. Stephens's opinion that Plaintiff's defects are consistent with thalidomide exposure relies on medical literature published in 1962, 1966, and 1992. *Id* ¶¶ 12–14.

67. On August 21, 2026, Plaintiff served another declaration, from Robert Jeffrey Snell, M.D. Ex. X (Snell Decl.).

68. Dr. Snell identifies himself as Plaintiff's "treating physician / primary care provider." *Id* ¶ 1.

69. Dr. Snell opines that Plaintiff's "severe, complex structural heart defects and upper extremity deformities perfectly align with the textbook clinical

presentation of thalidomide embryopathy documented in her permanent medical record." *Id* ¶ 6.

70. Dr. Snell's opinion that Plaintiff was exposed to thalidomide in utero rests on his review of her "verified historical medical records," which purportedly "document an established medical history of intrauterine thalidomide exposure." *Id.* ¶ 3.

71. The only record Dr. Snell explicitly identifies by reference in his opinion is a December 5, 2017 office note from Rush University Medical Center. Ex. Y (Pl.'s Dec. 5, 2017 Office Visit, Rush Univ. Med. Ctr.).

72. That office note was created more than fifty years after Plaintiff's birth in 1962. *Id.*

73. That office note was also created approximately five years after Plaintiff filed her case in 2012. *Id.*; Compl.

74. The office note contains only a brief notation that Plaintiff has a "past medical history significant for intrauterine thalidomide exposure," with no attribution or explanation. Ex. Y (Pl.'s Dec. 15, 2017 Office Visit, Rush Univ. Med. Ctr.) at 1, 4.

75. Dr. Snell does not identify by name any medical record created at or near the time of Plaintiff's birth, or at any point before this litigation began,

documenting that Plaintiff's mother was dispensed or ingested thalidomide. *See generally* Ex X, Snell Decl.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Daniel S. Pariser*
Daniel S. Pariser (admitted *pro hac vice*)
daniel.pariser@arnoldporter.com
Paige H. Sharpe (admitted *pro hac vice*)
paige.sharpe@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)

Anand Agneshwar (admitted *pro hac vice*)
anand.agneshwar@arnoldporter.com
Carmela T. Romeo
carmela.romeo@arnoldporter.com
Pennsylvania Bar No. 313042
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(212) 836-8689 (fax)

*Counsel for Sanofi-Aventis U.S. LLC*

*/s/ Michelle A. Ramirez*
Michelle A. Ramirez (*admitted pro hac vice*)
michelle.ramirez@sidley.com
Daniel A. Spira (*admitted pro hac vice*)
dspira@sidley.com
SIDLEY AUSTIN LLP

One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
(312) 853-7036 (fax)

Eliezer Granek
egranek@eckertseamans.com
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
(215) 851-8400
(215) 851-8383 (fax)

Eugene A. Schoon (*admitted pro hac vice*)
CROKE, FAIRCHILD, DUARTE & BERES, LLC
180 N. LaSalle Street, Suite 3400
Chicago, IL 60601
Telephone: (772) 517-2740

*Counsel for Grünenthal GmbH*

*<u>/s/ Michael T. Scott</u>*
Michael T. Scott
MIKE SCOTT LAW LLC
Email: mike@mikescottlaw.com
1116 Red Rose Lane
Villanova, PA 19085
(215) 518-8695

Sonja S. Weissman (*admitted pro hac vice*)
REED SMITH LLP
Email: sweissman@reedsmith.com
101 Second Street, Suite 1800
San Francisco, CA 94105
(415) 543-8700

*Counsel for GlaxoSmithKline LLC, and GlaxoSmithKline Holdings (Americas) Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2026, I electronically filed the foregoing Defendants' Statement of Undisputed Material Facts in Support of Motion for Summary Judgement to Plaintiff Yvonne English-Monroe with the Clerk of the Court using CM/ECF. I also certify that true and correct copies of the foregoing documents are being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Daniel S. Pariser*
Daniel S. Pariser