**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GLENDA JOHNSON, et al.,

Plaintiffs,

v.

SMITHKLINE BEECHAM CORPORATION, et al.,

Defendants.

Case No. 2:11-cv-05782-PD

AND ALL RELATED CASES

*This Document Relates to:*

*Yeatts, et al. v. SmithKline Beecham Corp., et al.*, No. 11-cv-06711

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF JOHN MARSHALL

Michael T. Scott
MIKE SCOTT LAW LLC
1116 Red Rose Lane
Villanova, PA 19085
Telephone: (215) 518-8695

Sonja S. Weissman (*admitted pro hac vice*)
REED SMITH LLP
101 Second Street, Ste. 1800
San Francisco, CA 94105
Telephone: (415) 543-8700

*Counsel for GlaxoSmithKline LLC, and GlaxoSmithKline Holdings (Americas) Inc.*

[additional counsel listed on signature page]

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

UNDISPUTED FACTS ..... 2

I. Thalidomide, Publicity, and Previous Litigation ..... 2

II. Plaintiff's Birth, His Mother's Unidentified Pills, and Plaintiff's Failure to Investigate ..... 6

III. The *Lone Pine* Order and Plaintiff's Response ..... 8

ARGUMENT ..... 9

I. Plaintiff's Claims Are Time-Barred ..... 9

A. The Discovery Rule Does Not Toll Plaintiff's Claims ..... 11

1. Plaintiff Had Constructive Notice of His Claims ..... 12

2. Plaintiff Had Actual Notice of His Claims ..... 14

3. Plaintiff Did Not Reasonably Investigate His Claims ..... 16

B. Fraudulent Concealment Does Not Toll Plaintiff's Claims ..... 18

II. There Is No Evidence Plaintiff Was Exposed to Thalidomide ..... 20

CONCLUSION ..... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdulaziz v. City of Phila.*,
No. 00-5672, 2001 WL 1257441 (E.D. Pa. Oct. 18, 2001) *aff'd*, 47 F. App'x 131 (3d Cir. 2002) ....13

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
MDL No. 1871, 2012 WL 3205620 (E.D. Pa. Aug. 7, 2012) ....13

*Baily v. Lewis*,
763 F. Supp. 802 (E.D. Pa. 1991) ....12

*Baselice v. Franciscan Friars Assumption BVM Province, Inc.*,
879 A.2d 270 (Pa. Super. Ct. 2005) ....19

*Blanyar v. Genova Prods., Inc.*,
861 F.3d 426 (3d Cir. 2017) ....11

*Bradford v. City of Phila.*,
No. 06-CV-5121, 2007 WL 2345278 (E.D. Pa. Aug. 16, 2007) ....12, 13, 14

*Burton v. Richardson-Merrell, Inc.*,
No. 77-738-028-NM (Mich. Cir. Ct. Dec. 1, 1977) ....5

*C.J.M. v. Archdiocese of Phila.*,
67 Pa. D. & C.4th 474 (Pa. Ct. Com. Pl. 2004) ....19

*Ciccarelli v. Carey Canadian Mines, Ltd.*,
757 F.2d 548 (3d Cir. 1985) ....19

*Cochran v. GAF Corp.*,
666 A.2d 245 (Pa. 1995) ....16

*Danysh v. Eli Lilly & Co.*,
No. 1:10-cv-2116, 2011 WL 4344601 (M.D. Pa. July 13, 2011) ....14

*DeMayo v. Schmitt*,
20 Phila. Co. Rptr. 269 (Pa. Ct. Com. Pl. 1990) ....20, 21

*Dick v. Am. Home Prods. Corp.*,
No. 1:05-cv-22384, 2009 WL 1542773 (M.D. Pa. June 2, 2009)......................21

*Fine v. Checcio*,
870 A.2d 850 (Pa. 2005)................................................................11, 12, 14, 20

*In re Ford Motor Co. Bronco II Prods. Liab. Litig.*,
982 F. Supp. 388 (E.D. La. 1997)...................................................................14

*Frankentek Residential Sys., LLC v. Buerger*,
15 F. Supp. 3d 574 (E.D. Pa. 2014)................................................................10

*Gleason v. Borough of Moosic*,
15 A.3d 479 (Pa. 2011)....................................................................................11

*Henry v. Richardson-Merrell, Inc.*,
508 F.2d 28 (3d Cir. 1975) ...............................................................................5

*Huber v. McElwee-Courbis Constr. Co.*,
392 F. Supp. 1379 (E.D. Pa. 1974)..................................................................14

*Ingenito v. AC & S, Inc.*,
633 A.2d 1172 (Pa. Super. Ct. 1993)..............................................................18

*Johnson v. GlaxoSmithKline LLC*,
636 F. App'x 87 (3d Cir. 2016) ...........................................................1, 17, 20

*Johnson v. SmithKline Beecham Corp.*,
55 F. Supp. 3d 603 (E.D. Pa. 2014).........................................................*passim*

*Johnson v. SmithKline Beecham Corp.*,
95 F. Supp. 3d 819 (E.D. Pa. 2015)................................................................17

*Johnson v. SmithKline Beecham Corp.*,
No. 11-5782, 2014 WL 7087959 (E.D. Pa. July 14, 2014)...............................11

*Martin v. Dalkon Shield Claimants Trust*,
Civ. A. No. 93-2652, 1994 WL 649248 (E.D. Pa. Nov. 16, 1994)....................16

*McCarrick v. Richardson-Merrell, Inc.*,
No. 882426, 1971 WL 39622 (Cal. Super. Ct. 1971)..........................................5

*Mest v. Cabot Corp.*,
449 F.3d 502 (3d Cir. 2006) ....................16

*PPG Architectural Finishes, Inc. v. Lowery*,
909 So. 2d 47 (Miss. 2005) ....................10

*Rice v. Diocese of Altoona-Johnstown*,
255 A.3d 237 (Pa. 2021) ....................11

*Robinson v. Singing River Hosp. Sys.*,
732 So. 2d 204 (Miss. 1999) ....................10

*Smeal v. Clark Equip. Co.*,
No. CV 19-5853, 2022 WL 1265532 (E.D. Pa. Apr. 28, 2022) ....................20

*Spade v. Star Bank*,
Civ. A. No. 01-3349, 2002 WL 31492258 (E.D. Pa. Nov. 6, 2002) ....................11, 12

*Speicher v. Dalkon Shield Claimants Trust*,
943 F. Supp. 554 (E.D. Pa. 1996) ....................19

*State Indus. Prods. Corp. v. Beta Tech., Inc.*,
575 F.3d 450 (5th Cir. 2009) ....................10

*Stephens v. Equitable Life Assurance Soc'y of U.S.*,
850 So. 2d 78 (Miss. 2003) ....................10

*Thomas v. SmithKline Beecham Corp.*,
No. J-A15019-13, slip op. (Pa. Super. Ct. Nov. 27, 2013) ....................19

*In re Trasylol Prods. Liab. Litig.*,
No. 08-MD-01928, 2010 WL 6098571 (S.D. Fla. Mar. 16, 2010) ....................14

*Urland v. Merrell Dow Pharms., Inc.*,
822 F.2d 1268 (3d Cir. 1987) ....................10, 20

*In re Vioxx Prods. Liab. Litig.*,
522 F. Supp. 2d 799 (E.D. La. 2007) ....................13, 16

*Wilson v. El-Daief*,
964 A.2d 354 (Pa. 2009) ....................10

**Statutes**

42 Pa. Cons. Stat. § 5521(b) ....................9

42 Pa. Cons. Stat. §§ 5524(2), (7)....................9

Miss. Code Ann. § 15-1-49(1) ....................10

Miss. Code Ann. § 15-1-49(2) ....................10

Miss. Code Ann. §§ 15-1-59, 1-3-27 ....................10

Miss. Code Ann. § 722 (1942)....................10

## INTRODUCTION

Plaintiff John Marshall brought his claims more than fifty years after he was born with the birth defects at issue, despite "overwhelming record evidence that the American public has known since the early 1960s that thalidomide causes serious birth defects," putting Plaintiff on constructive notice of his claims. *Johnson v. SmithKline Beecham Corp.*, 55 F. Supp. 3d 603, 613 (E.D. Pa. 2014) ("*Andre* Mem."). Indeed, thalidomide's risks were featured in countless prominent news articles and books, addressed in highly publicized Congressional hearings in the early 1960s, and the subject of dozens of lawsuits around the country through the 1990s—more than enough to awaken inquiry. Yet Plaintiff did nothing to investigate the cause of his birth defects until 2010. Because he did not exercise reasonable diligence, "the statute of limitations ran ***long*** before [he] instituted the instant action." *Johnson v. GlaxoSmithKline LLC*, 636 F. App'x 87, 89 (3d Cir. 2016) (emphasis in original).

Despite his lack of diligence, Plaintiff also had actual notice of his claims decades ago. In 1999, he told a disability examiner that a pill his mother took during pregnancy caused his injuries, and in April 2008 another examiner recorded that his condition was related to "some sort of Thalidomide ingestion." Therefore, the statute of limitations bars his claims.

Summary judgment also should be granted because Plaintiff has no evidence his mother took thalidomide. His mother recalls only that her doctor gave her unidentified pills; she cannot recall their color, shape, markings, or packaging, and she had never heard of thalidomide before this lawsuit. And although the Court's May 27, 2026, Order (ECF No. 911) ("*Lone Pine* Order") directed Plaintiff to serve an expert declaration on exposure and causation, he served none. That omission is especially glaring because Plaintiff, his daughter, and his two grandchildren share the same birth defects; despite the family history, however, Plaintiff has not undergone genetic testing.

Accordingly, Defendants GlaxoSmithKline LLC and GlaxoSmithKline Holdings (Americas) Inc. (together, "GSK"), Sanofi-Aventis U.S. LLC, and Grünenthal GmbH (collectively, "Defendants") are entitled to summary judgment.

## UNDISPUTED FACTS

### I. Thalidomide, Publicity, and Previous Litigation

In the 1950s, Grünenthal GmbH, a German company, developed thalidomide, which became available without a prescription in Germany in October 1957. Compl. ¶¶ 97-98; Defs.' Statement of Undisputed Material Facts ("SUMF") ¶ 1. Under a preliminary licensing agreement with Grünenthal, Smith Kline & French ("SKF") conducted animal tests and a limited U.S. clinical trial, but in 1957 decided not to market the drug and never sought FDA approval. Compl. ¶¶ 100, 124, 138-139,

379; SUMF ¶ 2. In October 1958, Grünenthal entered into an agreement with Richardson-Merrell, Inc. and its subsidiaries (collectively, "Merrell"); Merrell conducted a U.S. trial of thalidomide and, in 1960, filed new drug applications ("NDAs") with the U.S. Food and Drug Administration ("FDA"). Compl. ¶¶ 100, 106-107, 167-171; SUMF ¶ 3.

In 1961, reports linking thalidomide to birth defects surfaced in Germany and Australia, and Grünenthal withdrew the drug in November 1961; Merrell withdrew its U.S. application on March 8, 1962. Compl. ¶¶ 2, 210, 215, 316, 327; SUMF ¶ 4. The Complaint alleges that administering thalidomide to pregnant women "has been called one of the biggest disasters in modern medicine." Compl. ¶ 92; SUMF ¶ 5.

As this Court has recognized, there is "overwhelming record evidence that the American public has known since the early 1960s that thalidomide caused serious birth defects." *Andre* Mem., 55 F. Supp. 3d at 613. Books, national newspapers, and magazines have covered thalidomide's link to birth defects and its presence in the United States ever since. Ex. A (partial bibliography); SUMF ¶ 6. In August 1962, President Kennedy cautioned that "[e]very citizen . . . should be aware of the hazards [of thalidomide], and I am sure they are," and urged that "[e]very woman in this country . . . check their medicine cabinet, that they do not take this drug, that they turn it in." Ex. B (Official White House Tr. at 3, Aug. 1, 1962); SUMF ¶ 7. That same month, Senate hearings identified Grünenthal as the inventor and licensor

of thalidomide and disclosed that SKF ran a U.S. clinical trial from November 1956 to December 1957 involving sixty-seven doctors. Ex. C (U.S. Senate Hr'g, Aug. 1 and 9, 1962, at 30, 81-83, 115-118); Ex. D (Aug. 27, 1962 SKF Letter to Sen. Hubert H. Humphrey, at 275-76); SUMF ¶¶ 8. The FDA announced that Merrell's trial had involved 1,267 doctors, more than 2,500,000 pills, and 19,822 patients, including 3,670 women of child-bearing age, of whom 624 were reported as pregnant. Ex. C (Hr'g Cover Page and Stmnt. of Sen. Hubert Humphrey); Ex. E (FDA Press Release at 3, Aug. 23, 1962); SUMF ¶¶ 9. Hundreds of public sources—including the national press—reported Grünenthal's role and SKF's and Merrell's U.S. trials. *See, e.g.*, Ex. F (Morton Mintz, *Drug Firm Said to Lag on Warning*, Wash. Post Times Herald, Sept. 9, 1962, at A1) (front-page story reporting the FDA's figures and SKF's distribution of 344,270 thalidomide tablets to sixty-seven doctors); Ex. G (*The Full Story of the Drug Thalidomide*, *Life*, Aug. 10, 1962) (cover story picturing Grünenthal's plant and quoting Merrell's director of medical research); Ex. H (*Saturday Review*, Sept. 1, 1962, at 36-37) (outlining the chronology of Merrell's NDA); Ex. I (*Saturday Review*, Oct. 6, 1962, at 57) (SKF "gave thalidomide to sixty-seven doctors, who gave it to 875 patients in an experiment encompassing eleven states"); Ex. J (*The Reporter*, Mar. 28, 1963, at 47) (Merrell "distributed 2.5 million thalidomide tablets to 1,267 physicians for 'experimental' use"); SUMF ¶ 10.

Thalidomide litigation against Defendants "has been ongoing for over 50 years." *Andre* Mem., 55 F. Supp. 3d at 614. Between 1962 and 1992, more than fifty thalidomide suits were filed and litigated in U.S. courts, including in this Court, and in 1977 a plaintiff sued Merrell, Grünenthal, and SKF together. *See, e.g.*, Ex. K (list of prior U.S. thalidomide litigation); Ex. L (Compl., *Burton v. Richardson-Merrell, Inc.*, No. 77-738-028-NM (Mich. Cir. Ct. Dec. 1, 1977)); SUMF ¶ 11. In 1971, a thalidomide case resulted in a verdict just under $3 million for the plaintiff—a newsworthy amount in those days. *See McCarrick v. Richardson-Merrell, Inc.*, No. 882426, 1971 WL 39622 (Cal. Super. Ct. 1971); Ex. M (Veronica Geng, *Thalidomide: The American Experience*, N.Y. Times, Apr. 29, 1973, at 3) (reporting on thirteen U.S. lawsuits, including *McCarrick*); Ex. N (Lynn Lilliston, *Decade Later, Peggy Yearns 'to Be Tall'*, L.A. Times, June 22, 1972) (discussing *McCarrick* and potential statute of limitations problems for other thalidomide plaintiffs); SUMF ¶¶ 12. And "***in 1975***—the Third Circuit ruled that a thalidomide personal injury case against Defendants 'will be dismissed as time-barred.'" *Andre* Mem., 55 F. Supp. 3d at 614 (quoting *Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28, 31 (3d Cir. 1975)).

Plaintiff's Complaint itself draws, often verbatim and without citation, from three books published decades before he sued: *Thalidomide and the Power of the Drug Companies* (1972), *Suffer the Children: The Story of Thalidomide* (1979), and

*Dark Remedy* (2001). *See* Exs. O to Q (comparisons); SUMF ¶ 13. Those books identified each Defendant sued here; *Thalidomide and the Power of the Drug Companies*, for example, discussed SKF's animal and clinical trials and Grünenthal's relationship to SKF, and *Suffer the Children* described Grünenthal's clinical trials, SKF's 1956 animal and human tests, and Merrell's human testing beginning "February 11, 1959." Ex. O (*Thalidomide and the Power of the Drug Companies* at 37, 38, 44, 50, 186-87, 189, 191); Ex. P (*Suffer the Children* at 18, 25, 69); SUMF ¶¶ 14.

## II. Plaintiff's Birth, His Mother's Unidentified Pills, and Plaintiff's Failure to Investigate

Plaintiff was born in Jackson, Mississippi, in 1959, with injuries that were obvious at birth. *See* Compl. ¶ 37; SUMF ¶ 15. His mother, Thelma Louise King, lived in Jackson during the pregnancy but does not remember where she received care or the name of her doctor. Ex. R (November 4, 2014 Deposition of Thelma Louise King ("King Dep.") at 35:15-21, 44:23-25, 45:3-7); SUMF ¶ 16. She testified that, a few weeks into the pregnancy, she was sick to her stomach and "just didn't feel right," so the doctor gave her samples of pills to "get rid of what was ailing [her]." Ex. R (King Dep. at 36:25-37:25); SUMF ¶ 17. She could not remember anything about the pills—not the packaging, how many she received, whether they were tablets or capsules, any writing on the package, or their color, shape, or markings. Ex. R (King Dep. at 41:14-42:14); SUMF ¶ 18. She received

"samples" over multiple visits but could not remember whether the doctor told her anything about them, or whether they were even the same kind of pill. Ex. R (King Dep. at 44:4-8, 45:12-46:8); SUMF ¶ 19. She had never heard of thalidomide until Plaintiff brought this lawsuit. Ex. R (King Dep. at 113:20-114:16); SUMF ¶ 20. And Plaintiff testified that his mother never told him the name of the pills or described their appearance, or used the word thalidomide. Ex. S (Pl. Dep. at 88:23-89:3); SUMF ¶ 21.

Plaintiff admits that his birth defects have always been obvious, and, as an adult, he obtained Social Security disability benefits because of them. Ex. S (Pl. Dep. at 47:7-49:14, 65:1-68:14, 71:19-73:10, 73:23-75:18, 168:1-169:5); SUMF ¶ 22. Disability records from June 1999 state that "[h]is mother took medication during pregnancy for nausea which caused [his] deformities," and records from April 2008—still more than two years before Plaintiff filed suit—state that "it appears that [his injuries] [are] related to some sort of Thalidomide ingestion that his mother took before he was born." Ex. T (Social Security Disability Records of John Marshall, MARJ000202); Ex. U (Barnes Gulf Coast Orthopedics Records of John Marshall, MARJ000152); SUMF ¶ 23. The physicians who wrote these notes testified that the information came from Plaintiff himself. *See* Ex. V (December 15, 2014 Deposition of Kimberley Warren-Ellis, M.D. ("Warren-Ellis Dep.") at 17:9-18:2); Ex. W

(November 25, 2014 Deposition of Charlton Barnes, M.D. ("Barnes Dep.") at 23:7-25:5); SUMF ¶ 25.

Plaintiff knew his disability file would likely address the cause of his birth defects, but did not obtain it until filing this lawsuit. Ex. S (Pl. Dep. at 49:24-50:9, 53:22-55:25, 81:2-82:6, 183:24-184:21); SUMF ¶ 25. He contends his first investigation into the cause of his injuries was an online search in 2010, and that, once he searched, it was "very easy" to find information about thalidomide that had been public for decades. Ex. S (Pl. Dep. at 135:15-24, 168:10-169:5, 249:7-17, 250:22-251:14); SUMF ¶ 26.

Notably, Plaintiff's daughter has birth defects that are a "[m]irror image of [his]," and her two children have "[e]xactly the same birth defects." Ex. S (Pl. Dep. at 26:15-27:11, 65:9-18); SUMF ¶ 27. However, Plaintiff has never undergone genetic testing. Ex. S (Pl. Dep. at 78:3-11, 94:24-95:10, 270:16-23); SUMF ¶ 28.

## III. The *Lone Pine* Order and Plaintiff's Response

The *Lone Pine* Order directed Plaintiff, within ninety days, to serve (i) a declaration under 28 U.S.C. § 1746 setting out a good-faith basis to assert *in utero* exposure and that his claims are timely, and (ii) expert declarations stating, to a reasonable degree of medical certainty, that he was exposed to thalidomide and that it caused his injuries. ECF No. 911 ¶¶ A.1–A.2 & App. A. Plaintiff's only submission consists of a certificate of service, a one-page list of conditions titled

"Thalidomide Birth Defects," and medical records. ECF No. 924. It contains no declaration by Plaintiff and no declaration from any expert. *See generally id.*

## ARGUMENT

Defendants are entitled to summary judgment for two reasons.[1] ***First***, Plaintiff's claims are time-barred because he had both constructive and actual notice of his claims decades before he filed suit. ***Second***, Plaintiff has no evidence that his mother took thalidomide.

### I. Plaintiff's Claims Are Time-Barred

For claims like Plaintiff's arising outside Pennsylvania, the applicable time for filing suit "shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim." 42 Pa. Cons. Stat. § 5521(b). Here, Plaintiff's mother allegedly ingested thalidomide in Mississippi, and Plaintiff was born with birth defects in that state. *See* Ex. R (King Dep. at 44:23-45:2); Compl. ¶ 37; SUMF ¶ 29. Thus, Plaintiff's claims accrued in Mississippi, and, under the Pennsylvania borrowing statute, the Court must apply the statute of limitations—that of Mississippi or Pennsylvania—that results in the earliest bar to Plaintiff's claims. *See Andre* Mem., 55 F. Supp. 3d at 610-11 (explaining borrowing statute).

---

[1] The Court explained the standard for granting summary judgment in *Andr*e Mem., 55 F. Supp. 3d at 610. Accordingly, Defendants will not restate that standard here.

Pennsylvania applies a two-year statute of limitations, while Mississippi applies a six-year catchall limitations period. 42 Pa. Cons. Stat. §§ 5524(2), (7); Miss. Code Ann. § 722 (1942) (codified as amended at Miss. Code Ann. § 15-1-49(1)); *State Indus. Prods. Corp. v. Beta Tech., Inc.*, 575 F.3d 450, 454 (5th Cir. 2009).[2] Therefore, Pennsylvania law bars Plaintiff's claims first, so Pennsylvania law applies. *Andre* Mem., 55 F. Supp. 3d at 611 ("Pennsylvania's limitations period applies . . . unless the foreign jurisdiction's laws, including laws on tolling and the date of accrual, bar the claim first") (quoting *Frankentek Residential Sys., LLC v. Buerger*, 15 F. Supp. 3d 574, 581 (E.D. Pa. 2014)).

Pennsylvania's two-year period "starts to run when 'an injury is inflicted,'" *Andre* Mem., 55 F. Supp. 3d at 611 (quoting *Wilson v. El-Daief*, 964 A.2d 354, 361 (Pa. 2009)), here at Plaintiff's birth in 1959. The claims are thus barred "unless

---

[2] This catchall statute was amended in 1989 to reduce the limitations period to three years. *See* Miss. Code Ann. § 15-1-49(1). But the Mississippi Supreme Court held that the former six-year limitations period continues to apply to claims that accrued before the 1989 amendment. *See Stephens v. Equitable Life Assurance Soc'y of U.S.*, 850 So. 2d 78, 83 (Miss. 2003). Additionally, Mississippi's discovery rule applies only to "latent injury or disease." Miss. Code Ann. § 15-1-49(2); *PPG Architectural Finishes, Inc. v. Lowery*, 909 So. 2d 47, 50 (Miss. 2005) ("if a latent injury is *not* present the discovery rule would *not* apply"); *Robinson v. Singing River Hosp. Sys.*, 732 So. 2d 204, 207-08 (Miss. 1999). Plaintiff's injuries were obvious at birth, so the period began when he turned 21 in 1980 and expired in 1986. *See* Miss. Code Ann. §§ 15-1-59, 1-3-27.

Plaintiff can equitably toll the limitations clock until at least . . . two years before [he] initiated this action [in October 2011]." *Id*. The facts foreclose tolling.[3]

### A. The Discovery Rule Does Not Toll Plaintiff's Claims

Pennsylvania's discovery rule "reflects a narrow approach 'to determining accrual for limitations purposes' and places a greater burden upon Pennsylvania plaintiffs vis-à-vis the discovery rule than most other jurisdictions." *Blanyar v. Genova Prods., Inc.*, 861 F.3d 426, 432 (3d Cir. 2017) (quoting *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011)); *see also Spade v. Star Bank*, Civ. A. No. 01-3349, 2002 WL 31492258, at *8 (E.D. Pa. Nov. 6, 2002) ("[Pennsylvania's] discovery rule is a narrow exception and should be applied in only the most limited circumstances.") (internal quotation marks omitted).

The rule tolls the statute of limitations only until the plaintiff "was able, in the exercise of reasonable diligence, to know of [1] his injury and [2] its cause." *Fine v. Checcio*, 870 A.2d 850, 851, 858 (Pa. 2005); *see also Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 247 (Pa. 2021) ("The plaintiff's inability to know of the

---

[3] As this Court has recognized, "Pennsylvania's minor tolling statute, which tolls the statute of limitations clock until an individual reaches 18, does not apply retroactively to claims barred at the time of its enactment in 1984." *Andre* Mem., 55 F. Supp. 3d at 611 (citing *Urland v. Merrell Dow Pharms., Inc.*, 822 F.2d 1268, 1276 (3d Cir. 1987)). Because Plaintiff's claims were time-barred as of 1984, the minor tolling statute does not apply here. Even if the minor tolling statute applied—and it does not—Plaintiff's claims still would be time-barred because the information necessary to bring suit has been readily available to him for more than three decades of adulthood.

injury must be 'despite the exercise of reasonable diligence[.]'") (alteration in original); *accord Andre* Mem., 55 F. Supp. 3d at 614; *Johnson v. SmithKline Beecham Corp.*, No. 11-5782, 2014 WL 7087959, at *1 (E.D. Pa. July 14, 2014) ("Pennsylvania statute of limitations begins to run when plaintiff discovers or reasonably should discover injuries, and that another has caused the injuries" (citing *Fine*, 870 A.2d at 859)). Indeed:

> The standard of reasonable diligence is an objective or external one that is the same for all individuals. It is not a subjective standard. The fact that this individual plaintiff may have lacked knowledge of his or her injury is irrelevant, the statute is tolled only if a reasonable person in the plaintiff's position would have been unaware of the salient facts.

*Bradford v. City of Phila.*, No. 06-CV-5121, 2007 WL 2345278, at *2 (E.D. Pa. Aug. 16, 2007) (quoting *Baily v. Lewis,* 763 F. Supp. 802, 806-07 (E.D. Pa. 1991)) (internal quotation marks omitted). "[T]here are very few facts which cannot be discovered through the exercise" of such reasonable diligence, *Spade*, 2002 WL 31492258, at *9, and here the "undisputed facts lead unerringly to the conclusion that the time it took to discover an injury was unreasonable as a matter of law." *Bradford*, 2007 WL 2345278, at *2.

### 1. Plaintiff Had Constructive Notice of His Claims

The extensive publicity concerning thalidomide and its role in causing birth defects triggered the running of the limitations period despite Plaintiff's claimed lack of knowledge.

In *Bradford*, for example, the plaintiff alleged injury from improper medical tests performed on him at Holmesburg Correctional Facility in 1957 but did not sue until some fifty years later. *Id*. at *1. The court held the discovery rule unavailable because of the extensive public record—media articles, Congressional hearings, and six other prisoners' lawsuits—reasoning that "a reasonable person in the plaintiff[']s position would have been aware of the salient facts years before the current action was filed." *Id*. at *3 n.2 (quoting *Abdulaziz v. City of Phila.*, No. 00-5672, 2001 WL 1257441, at *8 (E.D. Pa. Oct. 18, 2001)), *aff'd*, 47 F. App'x 131, 132 (3d Cir. 2002) (finding it "simply not reasonable" to believe plaintiffs lacked the facts necessary to sue because the Holmesburg "experimentation programs were widely publicized").

Here, the undisputed evidence forecloses the discovery rule even more clearly than in the Holmesburg cases. For decades, there has been significant publicly available information and discussion of thalidomide in the media, books, and public government records—starting in the early 1960s and continuing through the 2000s. *See Andre* Mem., 55 F. Supp. 3d at 613 (noting the "overwhelming record evidence that the American public has known since the early 1960s that thalidomide causes serious birth defects."); SUMF ¶¶ 4-10. Public knowledge of thalidomide's presence in the United States has even led to the filing of dozens of lawsuits from the 1960s to the 1990s—including by several former plaintiffs in this current litigation. *See* SUMF ¶ 11-12.

This is more than enough to put any reasonable person in Plaintiff's or his mother's position on notice of a potential thalidomide claim decades ago. *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 1871, 2012 WL 3205620, at *4 (E.D. Pa. Aug. 7, 2012) ("extensive media reports" sufficient to put a reasonable person on notice); *In re Vioxx Prods. Liab. Litig.*, 522 F. Supp. 2d 799, 808 (E.D. La. 2007) (under Pennsylvania law, national and local media coverage "sufficient to put the plaintiffs on notice of a potential link between their alleged injuries and the use of Vioxx"); *In re Ford Motor Co. Bronco II Prods. Liab. Litig.*, 982 F. Supp. 388, 396 (E.D. La. 1997) (rejecting claimed ignorance "in the face of . . . extensive media attention in widely circulated publications"); *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 6098571, at *12 (S.D. Fla. Mar. 16, 2010) (plaintiffs on notice "*at the latest*" when a *New England Journal of Medicine* article on the drug's risks was published and "discussed in national and local newspapers") (emphasis in original).

**2. Plaintiff Had Actual Notice of His Claims**

Constructive notice aside, the record independently shows that, as early as 1999, Plaintiff believed that his birth defects were caused by a medication his mother took while pregnant with him. A plaintiff's actual knowledge of his injury and its cause alone suffices to start the limitations clock. *See Fine*, 870 A.2d at 858–59; *Bradford*, 2007 WL 2345278, at *2. He need not know the name of the drug or the

identity of its manufacturer; once a plaintiff knows the cause of his injury, the "burden has been and should remain on the injured party . . . to determine within the statutory period whose negligence or breach of duty, if any, was behind the cause." *Huber v. McElwee-Courbis Constr. Co.*, 392 F. Supp. 1379, 1383–84 (E.D. Pa. 1974). Nor must he have medical evidence confirming his suspicion. *Danysh v. Eli Lilly & Co.*, No. 1:10-cv-2116, 2011 WL 4344601, at *8–10 (M.D. Pa. July 13, 2011) ("Awareness of injury and suspicion of its cause are enough to begin the running of the statute of limitations period.").

Plaintiff's disability records establish that knowledge. A June 1999 disability evaluation by Dr. Kimberley Warren-Ellis recorded that Plaintiff was born with deformities of his feet and hands and that his mother took medication during pregnancy for nausea which caused these deformities. Ex. V (Warren-Ellis Dep. at 16:1-22, 17:24-18:2, 18:13-19:5 ("I would think it's just something he said")); SUMF ¶ 30. Dr. Warren-Ellis testified that Plaintiff told her that information. Ex. V (Warren-Ellis Dep. at 17:9-18:2); SUMF ¶ 31.

And, in April 2008, orthopedist Dr. Charlton Barnes recorded during a disability evaluation that "it appears that [Plaintiff's condition] is related to some sort of Thalidomide ingestion that his mother took before he was born." Ex. T (Social Security Disability Records of John Marshall, MARJ000202); Ex. U (Barnes Gulf Coast Orthopedics Records of John Marshall, MARJ000152); SUMF ¶ 32. Dr.

Barnes testified that the history came from Plaintiff—"I wouldn't have known that otherwise"—who "related the morning sickness pills right away as the reason he had the problem." Ex. T (Barnes Dep. at 23:18-24:6, 37:16-38:16); SUMF ¶ 33. Dr. Barnes "probably asked him if it was thalidomide," the word was likely mentioned more than once, and Plaintiff left understanding that the medicine was a possible cause of his birth defects, with nothing said to dissuade him. *Id.* at 25:12-26:14, 34:15-35:2, 36:18-37:3, 45:14-46:4; SUMF ¶ 34.

Even measured from April 2008, Pennsylvania's two-year period expired in April 2010—eighteen months before Plaintiff sued. Measured from 1999, it expired nearly a decade earlier. Either way, Plaintiff's actual knowledge bars his claims. *See In re Vioxx Prods. Liab. Litig.*, 522 F. Supp. 2d at 808 (finding claims time-barred where plaintiffs were on notice of potential link more than two years before filing suit).

### 3. Plaintiff Did Not Reasonably Investigate His Claims

Plaintiff also cannot invoke the discovery rule because he failed to investigate his claims with reasonable diligence. He was "obligated to exercise 'reasonable diligence in ascertaining the existence of [his] injury and its cause,'" *Andre* Mem., 55 F. Supp. 3d at 614 (quoting *Mest v. Cabot Corp.*, 449 F.3d 502, 511 (3d Cir. 2006)) (alteration in original), yet did not timely do so. *See id.* ("[A] diligent investigation may require one to seek further medical examination") (quoting

*Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995)); *Martin v. Dalkon Shield Claimants Trust*, Civ. A. No. 93-2652, 1994 WL 649248, at *4 (E.D. Pa. Nov. 16, 1994) ("The due diligence requirement necessitates that a plaintiff question a doctor as to the cause of an injury").

In affirming *Johnson v. SmithKline Beecham Corp.*, 95 F. Supp. 3d 819 (E.D. Pa. 2015), the Third Circuit confirmed that failure to inquire alone suffices: even without imputing her mother's knowledge, "Johnson never investigated the cause of her injuries, and 'even a cursory inquiry would have provided Plaintiff with abundant information concerning the connection between thalidomide and her birth defects.'" *Johnson*, 636 F. App'x at 89. It is undisputed that Plaintiff likewise conducted no investigation for decades, *see* SUMF ¶ 26, so "the statute of limitations ran long before [he] instituted the instant action." *Id.*; *see also Andre* Mem., 55 F. Supp. 3d at 614 ("This is no diligence at all, especially compared with that demonstrated by the numerous plaintiffs who brought thalidomide personal injury actions against Defendants decades before.").

Plaintiff made only a very minimal effort to learn the cause of his birth defects: at 18, he asked one doctor what caused them, and, when a nurse reacted angrily and he was told to leave, he left. Ex. S (Pl. Dep. at 127:10-129:3, 133:14-20); SUMF ¶ 35. Thereafter, he never asked another doctor—including the many who evaluated him for disability over the next three decades—why he was born with his defects.

Ex. S (Pl. Dep. at 125:16-126:19, 131:14-20, 133:21-134:9, 155:14-156:3); SUMF ¶ 36. But Plaintiff's birth defects were obvious, and he sought disability benefits for them. Ex. S (Pl. Dep. at 47:7-17); SUMF ¶ 37. He knew his disability file likely referred to "what [his] mom might have taken," yet he did not obtain it until after he sued. Ex. S (Pl. Dep. at 81:2-82:6, 183:24-184:21); SUMF ¶ 38. Plaintiff's lack of diligence is further demonstrated by the ease with which he discovered his possible claim when he first researched it on the internet in 2010. Ex. S (Pl. Dep. at 135:15-24, 164:18-165:1, 249:7-17, 250:22-251:14); SUMF ¶ 39. "[W]here the undisputed facts lead unerringly to the conclusion that the time it took to discover an injury or its cause was unreasonable as a matter of law, summary judgment may be entered by the court." *Ingenito v. AC & S, Inc.*, 633 A.2d 1172, 1175 (Pa. Super. Ct. 1993). That is exactly the situation here.

### B. Fraudulent Concealment Does Not Toll Plaintiff's Claims

Plaintiff's claims are likewise not saved by the doctrine of fraudulent concealment because there is no evidence that Plaintiff directly or indirectly relied on any alleged concealment.

Plaintiff cannot prove ***direct*** fraudulent concealment because he never had contact with any Defendant, never read anything about thalidomide before 2010, agreed that no one told him anything before 2010 that he later learned was untrue, and was never under a misimpression that kept him from suing. Ex. S (Pl. Dep. at

161:7-162:1, 166:22-167:10, 284:10-15); Ex. X (Pl.'s Second Suppl. Resp. to Sanofi-Aventis U.S. LLC's Fourth Interrog.); SUMF ¶ 40.

Nor is there any evidence that Plaintiff ***indirectly*** relied on any of Defendants' alleged representations to the general public, assuming *arguendo* such an "indirect reliance" theory is valid.[4] As in *Andre*, "Defendants' alleged misrepresentations never lulled Plaintiff into an incorrect understanding that [he] had no reason to proceed against Defendants." *Andre* Mem., 55 F. Supp. 3d at 616; *see also id.* at

[4] While this Court "ha[s] never ruled on whether [an] 'act of concealment' must be communicated ***directly*** to the plaintiff," the Court has recognized that this proposition has ample support in case law. *Andre* Mem., 55 F. Supp. 3d at 616 (collecting federal and state cases) (emphasis in original). Defendants maintain that a "fraud on the public" does not constitute fraudulent concealment, and that an affirmative act directed at the plaintiff instead is required to toll the statute of limitations. Ex. AA (*Thomas v. SmithKline Beecham Corp.*, No. J-A15019-13, slip op. at 10 (Pa. Super. Ct. Nov. 27, 2013) (upholding summary judgment on limitations grounds because "general systematic public conduct . . . is not an affirmative act directed at this specific plaintiff")); *See also Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 557 (3d Cir. 1985) (holding allegations of decades-long fraud on the public regarding asbestos "insufficient to create an issue of fraud under Pennsylvania law."); *Speicher v. Dalkon Shield Claimants Trust*, 943 F. Supp. 554, 559 (E.D. Pa. 1996) (finding no fraudulent concealment because "Plaintiff has not alleged facts which would enable us to conclude that there was any specific conduct directed towards her by defendant that would cause her to deviate from her right of inquiry"); *Baselice v. Franciscan Friars Assumption BVM Province, Inc.*, 879 A.2d 270, 278 (Pa. Super. Ct. 2005) ("general and systematic conduct" is not fraudulent concealment; "affirmative independent" statements directed to the plaintiff are required); *C.J.M. v. Archdiocese of Phila.*, 67 Pa. D. & C.4th 474, 490-91 (Pa. Ct. Com. Pl. 2004) (finding no fraudulent concealment where plaintiff claimed reliance on "systematic" acts or "general statements" instead of an "independent act of concealment . . . applicable to an individual plaintiff").

615 ("Plaintiff has not, in his Complaint or deposition, identified a single misrepresentation on which ***he*** relied to ***his*** detriment.") (emphasis in original).

Fraudulent concealment is also at odds with five decades of massive publicity. Pennsylvania applies "the same 'knew or should have known' standard whether the statute is tolled because of the discovery rule or because of fraudulent concealment," *Urland*, 822 F.2d at 1273 (quoted in *Andre* Mem., 55 F. Supp. 3d at 617), so the doctrine tolls the statute only until the "injured party knows or reasonably should know of his injury and its cause." *Andre* Mem., 55 F. Supp. 3d at 617 (quoting *Fine*, 870 A.2d at 861). As the Third Circuit recognized, Plaintiff's failure to investigate and half a century of public knowledge foreclose the doctrine. *See Johnson*, 636 F. App'x at 89. So, too, does Plaintiff's actual knowledge. *See supra* Section I.A.2.

## II. There Is No Evidence Plaintiff Was Exposed to Thalidomide

Plaintiff's claims fail for the independent reason that he cannot establish exposure to thalidomide.

To recover for injuries allegedly caused by a defendant's product, a plaintiff must have evidence that he was exposed to that defendant's product. *Smeal v. Clark Equip. Co.*, No. CV 19-5853, 2022 WL 1265532, at *5 (E.D. Pa. Apr. 28, 2022) ("Before imposing liability on a defendant in a product liability action, Pennsylvania law requires a plaintiff to show not only that the plaintiff was exposed to a defective

product manufactured or sold by the defendant, but that the plaintiff's exposure was a substantial factor in causing the plaintiff's injury.") (citation omitted).

*DeMayo v. Schmitt*, 20 Phila. Co. Rptr. 269 (Pa. Ct. Com. Pl. 1990), is instructive. There, the plaintiff alleged injuries from her grandmother's ingestion of diethylstilbestrol ("DES") while pregnant, but had no physician or pharmacist records, and the grandmother was deceased. *Id.* at 271, 279–80. Her only evidence was physician testimony that her mother's injuries were "***consistent*** with DES exposure," records in which the grandmother "***said*** she took DES during the pregnancy in question," and her mother's testimony to the same effect. *Id.* at 280, 284 (emphases in original). The court found "no competent evidence of ingestion of DES" and dismissed the claims. *Id.* at 272.

Similarly, in *Dick v. American Home Products Corp.*, the plaintiff claimed her husband was injured by a later-recalled drug lot contaminated with acebutolol, but the court found "no evidence" that Mr. Dick ingested capsules from that lot or that any capsules he took "actually contained any acebutolol." *Dick v. Am. Home Prods. Corp.*, No. 1:05-cv-22384, 2009 WL 1542773, at *2–3 (M.D. Pa. June 2, 2009). Despite "the difficulty that Plaintiff may have had to prove through direct evidence" the source of the medication, the court could not "ignore the fundamental requirement that Plaintiff produce at least sufficient circumstantial evidence in order to prove product identification." *Id.* at *4.

Here, there is no evidence Plaintiff's mother took thalidomide. Most prominently, in response to the *Lone Pine* Order, Plaintiff did not produce an expert declaration; therefore, no expert has opined to a reasonable degree of medical certainty that Plaintiff was exposed to thalidomide. *See generally* ECF No. 924; *see also* SUMF ¶ 41.

That is unsurprising. As noted, Plaintiff's mother could not recall the pills' name, form, color, shape, markings, or packaging; what they were for; how many she took or for how long; or who made them, and the Defendants' names meant nothing to her. Ex. R (King Dep. at 38:14-16, 41:14-44:11, 110:13-15, 113:20-114:19); SUMF ¶ 42. The only description she ever gave Plaintiff was that the pills were "more for depression," Ex. S (Pl. Dep. at 88:14-22), yet she testified she had no depression during the pregnancy: "I always felt good when I was pregnant." Ex. R (King Dep. at 61:4-8); SUMF ¶ 43. Her recollection of unidentified sample pills does not prove she took thalidomide rather than any of the scores of medications then used for nausea, sleeplessness, and nervous conditions. Plaintiff conceded he has no "direct evidence that those pills, in fact, were thalidomide"; the most he could say was: "She was given pills. I was born with birth defects." Ex. S (Pl. Dep. at 170:15-171:11, 178:1-13); SUMF ¶ 44. The only purported "proof" of exposure in Plaintiff's handwritten discovery answers is his 2008 disability records—which

record his own statements—and he knows of no one alive who can say whether his mother took thalidomide. *Id.* at 226:20-228:6, 293:8-11; SUMF ¶ 45.

Nor is there any evidence tying any pill to any Defendant. The physician identified on Plaintiff's birth certificate, Dr. Lloyd Berrong, is deceased, and Plaintiff has no evidence that he had any route to obtain thalidomide, such as serving as, or partnering with, a clinical investigator. Ex. S (Pl. Dep. at 84:6-13, 171:13-17, 175:15-24); SUMF ¶ 46. Plaintiff could not say whether his mother obtained pills from anyone other than Dr. Berrong. Ex. S (Pl. Dep. at 175:8-18, 180:20-22); SUMF ¶ 47.

Plaintiff's discovery responses confirm the gap. He did not deny requests to admit that he has no medical or documentary evidence that his mother was dispensed thalidomide or that her physician was a clinical investigator. Ex. Y (Plaintiff John Marshall's Responses to Sanofi-Aventis U.S. LLC's First Set of Requests for Admission, Nos. 1–6); SUMF ¶ 48. Asked for all documents supporting his belief that his mother took thalidomide, the only records he had were his own medical records. Ex. Z (Plaintiff John Marshall's Responses to GSK's First Set of Requests for Production, No. 2); SUMF ¶ 49. More than a decade later, nothing more has been produced.

## CONCLUSION

Statutes of limitations exist to "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick*, 444 U.S. 111, 117 (1979). This case is a glaring example of why such statutes are needed. Plaintiff's mother cannot remember what pills she took, the physician who allegedly gave them to her is deceased, and no pills, packaging, or records survive. Nor has Plaintiff produced an expert declaration that he was exposed to thalidomide—a gap made more significant by his family history of birth defects. Defendants respectfully request that this Court enter summary judgment in their favor and dismiss each of Plaintiff's claims with prejudice, and enter final judgment in favor of Defendants as to Plaintiff pursuant to Rule 54(b).

Dated: October 16, 2026

Respectfully submitted,

*/s/ Sonja S. Weissman*

Michael T. Scott
Mike Scott Law LLC
1116 Red Rose Lane
Villanova, PA 19085
Telephone: (215) 518-8695

Sonja S. Weissman (*admitted pro hac vice*)
REED SMITH LLP
101 Second Street, Ste. 1800
San Francisco, CA 94105

Telephone: (415) 543-8700

*Counsel for GlaxoSmithKline LLC, and GlaxoSmithKline Holdings (Americas) Inc.*

*/s/ Daniel S. Pariser*
Daniel S. Pariser (*admitted pro hac vice*)
Paige H. Sharpe (*admitted pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

Anand Agneshwar (*admitted pro hac vice*)
Carmela T. Romeo
Pennsylvania Bar No. 313042
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Counsel for Sanofi-Aventis U.S. LLC*

*/s/ Daniel A. Spira*
Michelle A. Ramirez (*admitted pro hac vice*)
Daniel A. Spira (*admitted pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Eugene A. Schoon (*admitted pro hac vice*)

CROKE, FAIRCHILD, DUARTE &
BERES, LLC
180 N. LaSalle St., Suite 3400
Chicago, Illinois 60601
Telephone: (773) 517-2740

*Counsel for Grünenthal GmbH*