# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GLENDA JOHNSON, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>SMITHKLINE BEECHAM CORPORATION, *et al.*,<br><br>Defendants. | Case No. 2:11-cv-005782<br><br>AND ALL RELATED CASES |

**PLAINTIFF TERRIE BOLTON'S SUPPLEMENTAL RESPONSES TO DEFENDANT SANOFI-AVENTIS U.S. LLC'S FIRST SET OF REQUESTS FOR ADMISSION, FIRST SET OF INTERROGATORIES, AND FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

Under Rules 33, 34, and 36 of the Federal Rules of Civil Procedure, Plaintiff Terrie Bolton provides the following supplemental responses to defendant Sanofi-Aventis U.S. LLC's first set of requests for admission, first set of interrogatories, and first set of requests for production of documents.

The discovery deadline in this litigation is October 15, 2014. If Plaintiff learns of additional responsive information during the course of the continuing discovery in this case or otherwise, Plaintiff will provide further supplemental responses to these discovery requests under Fed. R. Civ. P. 26(e).

**REQUESTS FOR ADMISSION AND RESPONSES**

**REQUEST FOR ADMISSION NO. 1:**

Admit that You have no Contemporaneous Medical Record that documents Your mother being dispensed or having ingested thalidomide while pregnant with You.

**SUPPLEMENTAL RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 2:**

Apart from Your response to Sanofi-Aventis U.S. LLC's Request for Admission No. 1, admit that You have no other documentary evidence of Your mother being dispensed or having ingested thalidomide while pregnant with You.

**SUPPLEMENTAL RESPONSE:**

Denied.

**REQUEST FOR ADMISSION NO. 3:**

Admit that You do not know the identity of the doctor who allegedly dispensed thalidomide to Your mother.

**SUPPLEMENTAL RESPONSE:**

Admitted.

**REQUEST FOR ADMISSION NO. 4:**

Admit that You have no documentary evidence that the doctor who allegedly gave thalidomide to Your mother was a clinical investigator for Merrell or otherwise involved in Merrell's clinical trial of thalidomide.

**SUPPLEMENTAL RESPONSE:**

Admitted that Plaintiff has no documentary evidence that the doctor who gave thalidomide to Plaintiff's mother is one of the doctors identified by defendant Sanofi as Merrell's so-called "clinical investigators." Denied as to whether Plaintiff has documentary evidence that the doctor who gave thalidomide to Plaintiff's mother was "otherwise involved in" Merrell's so-called "clinical trial of thalidomide."

**REQUEST FOR ADMISSION NO. 5:**

Admit that You have no documentary evidence that the doctor who allegedly gave thalidomide to Your mother was a clinical investigator for SKF or otherwise involved in SKF's clinical trial of thalidomide.

**SUPPLEMENTAL RESPONSE:**

Admitted that Plaintiff has no documentary evidence that the doctor who gave thalidomide to Plaintiff's mother is one of the doctors identified by defendant GSK as SKF's so-called "clinical investigators." Denied as to whether Plaintiff has documentary evidence that the doctor who gave thalidomide to Plaintiff's mother was "otherwise involved in" SKF's so-called "clinical trial of thalidomide."

**REQUEST FOR ADMISSION NO. 6:**

Admit that Your mother did not ingest thalidomide provided by Merrell or any of its agents.

**SUPPLEMENTAL RESPONSE:**

Denied.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Your mother did not ingest thalidomide provided by SKF or any of its agents.

**SUPPLEMENTAL RESPONSE:**

Denied.

## INTERROGATORIES AND SUPPLEMENTAL RESPONSES

**INTERROGATORY NO. 1:**

If Your response to any of Sanofi-Aventis U.S. LLC's Request for Admission Nos. 1-8 is anything but an unqualified admission, identify the specific Request for Admission to which You

are responding; state all facts that relate to, support, or contradict Your response; and identify all witnesses and documents that evidence, support, or contradict Your answer.

**SUPPLEMENTAL RESPONSE:**

**Request for Admission No. 2:**

The following documents are evidence that Plaintiff's mother was dispensed and ingested thalidomide while pregnant with Plaintiff: (1) Plaintiff's medical records that have been produced already (and that will be produced by third parties) in this litigation; (2) photographs of Plaintiff that have been produced in this litigation; and (3) the documents listed and discussed in the supplemental interrogatory answers, below, to Requests for Admission Nos. 6 and 7.

**Request for Admission No. 4:**

The physician who gave thalidomide to Plaintiff's mother was "otherwise involved in" either Merrell's or SKF's so-called "clinical investigations," because Merrell and SKF were the only authorized distributors of thalidomide in the 1950s and early 1960s, which means that the thalidomide given to Plaintiff's mother was distributed either by Merrell or SKF. *See* supplemental interrogatory responses to Request for Admission No. 2, above, and Nos. 6 and 7, below.

**Request for Admission No. 5:**

The physician who gave thalidomide to Plaintiff's mother was "otherwise involved in" either Merrell's or SKF's so-called "clinical investigations," because Merrell and SKF were the only authorized distributors of thalidomide in the 1950s and early 1960s, which means that the thalidomide given to Plaintiff's mother was distributed either by Merrell or SKF. *See* supplemental interrogatory responses to Request for Admission No. 2, above, and Nos. 6 and 7, below.

**<u>Request for Admission No. 6</u>:**

First, Plaintiff's mother ingested thalidomide. *See* supplemental interrogatory response, above, relating to Request For Admission No. 2. Moreover, when Plaintiff was in her early 20s, her mother told her that she had taken a pill for morning sickness during her pregnancy. *See* response to Interrogatory No. 4 in GSK LLC's 1st Set of Interrogatories to All Plaintiffs.

Second, during the late 1950s and early 1960s, the only entities authorized to distribute thalidomide in the United States (and, to Plaintiff's knowledge, the only entities that in fact distributed thalidomide in the United States) were SKF and Merrell. Therefore, the thalidomide ingested by Plaintiff's mother had to have been distributed by either SKF or Merrell. And Merrell did not sufficiently monitor the distribution of thalidomide, which had two effects: (1) thalidomide was distributed by physicians and entities other than Merrell's so-called "investigators"; and (2) Merrell did not take adequate steps to ensure that all unused thalidomide pills were destroyed or returned to it once its "investigation" was finished. Merrell's failure to track and account for its own thalidomide, and to make its "investigators" accountable for the thalidomide they received, does not relieve Sanofi of liability for injuries suffered by children of women who took thalidomide distributed by Merrell but provided by physicians or entities other than the "investigators" identified by Sanofi.

Numerous documents demonstrate that Merrell neither sufficiently monitored the distribution of thalidomide nor accounted for the use of the thalidomide that it distributed:

- PLTF000481-82 (FDA letter and attached letter of FDA Cincinnati District of the same date; FDA wonders if Merrell had early notice of birth defects caused by thalidomide or whether the drug was left over from the GSK trial).

- PLTF000767 (8-1-62 FDA memo re investigation in Los Angeles District; hospital did not keep records of administration of thalidomide, promised to review hospital records to see if there were any deformed babies born in the last 2 years and if there were any records of thalidomide in any of the patients' history).
- PLTF001366 (11-6-62 FDA memo, Baltimore District re thalidomide incidence re National Drug Co.; doctor first denied giving thalidomide to any female patients but after reviewing the case history acknowledged giving a small bottle to the mother, but showed records that she had given birth to a healthy baby).
- GSK_LOC00000481-83 (8-6-62 FDA memo re Dr. Northrup, pediatrician, reporting deformed baby, whose mother received thalidomide from a relative from Pittsburgh; in her letter to Dr. Northrup, Dr. Kelsey states that the FDA has found numerous deficiencies in the distribution of thalidomide by American drug companies).
- PLTF001026 (10-29-62 Merrell letter stating that 36 year-old nurse, three months pregnant, took thalidomide during her pregnancy; Merrell presumes she obtained them from a doctor, who had previously reported that he had destroyed his entire stock).
- PLTF000764-65 (8-2-62 FDA memo re investigation in Seattle District; investigators decide not to contact patients who received thalidomide because the drug was given in small quantities (6-24 tablets) 6-9 months before and so it was assumed that the tablets no longer existed, also some of the patients were charity and would be difficult to trace).

- PLTF001578-84 (7-24-62 FDA Establishment of Inspection Report re Vick Chemical Company & memo. FDA memo calls into question Vick's records of disbursement, stating that the forms clearly "did not represent a complete picture of the disposition of" thalidomide, and that the forms used were "totally inadequate and useless as a control record." *Id*. at 1582 (emphasis omitted). The FDA noted that while Vick made monthly inventories of its stores on hand, it was "completely meaningless since discrepancies were not questioned or corrected." The records indicated that the drugs were disbursed to investigators but also Vick's employees (3 bottles/50 tablets) and the President of Walker Laboratories (1 bottle/50 tablets). The FDA also noted that "Vick cannot account for the bulk of the 3 kilos of Thalidomide received over the past few years.").
- PLTF000493 (8-20-62 FDA memo re investigation of phocomelic; one of the physicians involved, Dr. Joseph A. Mellow, stated that he had the drug but discarded it when received; FDA wonders if he could have given it away to another physician or hospital).
- PLTF000736 (8-9-62 FDA memo demonstrating that Merrell did not keep accurate records of the distribution of its drugs because its records were not consistent with the doctors' recollection and the hospital records).
- THAL_SAN_39631-34 (8-23-62 Dept. of Health press release, notifying the public that they may still have thalidomide tablets in their medicine cabinets; over 400 of the investigators the FDA interviewed made no efforts to contact the patients to whom they had given the drug; total number of pills distributed [by Merrell entities only] 2,548,212; FDA recovered 25,096 pills still in possession of

doctors; investigators gave the drug to other physicians, patients and other people).

- PLTF000683-84 (8-30-62 FDA memo re distribution to indigent patients at Raleigh hospital; no pharmacy records kept because the drug was dispensed but not billed; FDA balked at reviewing all of the individual patient records in order to verify use).
- PLTF000508-09 (9-14-62 FDA report of deformed baby in Baltimore area; psychiatrist gave thalidomide to elderly patient who gave the drug to her pregnant daughter).
- PLTF000463-65 (8-31-62 Telegram from Pharmacy Association, responding to FDA comments that it did not know how many pharmacies had been given thalidomide to dispense).
- Dkt. No. 74-2 (8-31-62 New York Times, “U.S. Finds Stores Got Thalidomide: Says Barred Drug Reached Many Pharmacy Shelves”).
- PLTF000365-66 (10-19-62 FDA memo, noting that the lack of responsiveness of investigational doctors to contact their patients is a grave concern; one doctor prescribed it until March 1962 and delivered a malformed baby; another doctor reported to the FDA that he had only dispensed the drug to women past child-bearing years, but the records showed that he had dispensed it to a 26-year-old pregnant woman; phocomelic birth of another child traced back to the grand-mother sharing her drugs with her daughter).
- PLFT000475-76 ( 9-20-62 FDA document, noting that some doctors could not recall which patients had been given thalidomide).

- THAL_SAN_13995-1401 (National Drug Co. waited until May 1962 to send its 15 "inactive investigators" a letter asking them to stop using thalidomide and to request that they retrieve any remaining supplies their patients might have).
- THAL_SAN_10511-13 (FDA memo re Kevadon drug recall; Dr. Kelsey notes that Merrell originally only advised the FDA of 37 investigators; the FDA asked for the complete list of investigators in April 1961, but Merrell initially only provided a partial list of those who had engaged in clinical trials for more than 3 months (2-28-1961); when the FDA reiterated its request, Merrell provided a list of over 1,000 doctors (4-25-1961); FDA notes that the letter of 12-4-1961 that purportedly warned investigators greatly underestimated the association of thalidomide and birth defects, and even its March 1962 letter underestimates that association, despite reports establishing a strong correlation from Lenz, reported to Lancet in January and February 1962).
- PLTF000774 (August 1962 FDA memo re investigation of carton of thalidomide bottles at pharmacy, left by a resident; pharmacy claims the stock was destroyed, investigators wanted to determine whether any investigator was associated with this stock).
- PLTF001196-97 (September 1962 FDA memo re Nulsen; FDA states that Merrell refused to provide information they developed about him in connection with their investigation).
- PLTF000816-17 (1-18-63 FDA memo stating that during the thalidomide investigation, it was doctors' "first line of defense" to claim that they did not use thalidomide).

- PLTF001145 (March 1963 FDA memo re investigation of shipment of thalidomide samples to a charity organization abroad; FDA concerned that other charities may have received samples and not been aware of the drug's danger).
- PLTF001261-62 (5-22-64 FDA letter to US Attorney, stating that the FDA had difficulties inspecting Merrell because its attorneys restricted access to information).
- PLTF000766 (August 1962 FDA memo re investigation of ob/gyn in the Atlanta District; nurse was interviewed and was fairly certain that Merrell had provided supplies).
- PLTF001095-96 (September 1962 FDA memo re discussion with AMA; FDA stated that if the investigators stated that they had contacted their patients or would do so; this statement was accepted on face value and no efforts were made to confirm this; the FDA was only concerned with taking steps when doctors refused to contact their patients and ask them to return or destroy any remaining supplies; AMA expressed surprise that some investigators could no longer recall the patients to whom had administered the drug).
- PLTF000353 (October 1962 FDA memo; doctor turned over two 100-count pill bottles to Connecticut authorities but had not accounted for other two 100-count bottles Merrell had provided him in 1960).
- PLTF001042 (November 1962 FDA memo, Chicago District; FDA asked to investigate why attending doctor did not take epileptic mother off Kevadon until March 1962, when Merrell sent him a warning letter in December 1961).

- Sanofi Response to Plaintiffs' Interrogatory No. 1 ("Since the persons to whom this drug was distributed were independent clinical investigators, this Defendant could not require but did request that they file reports covering the matters referred to.").
- PLTF001123-30 (10-17-62 FDA Establishment of Inspection Report re Vick Chemical Company & memo; FDA concludes that Vick operates independently of Richardson Merrell as a research and product development area and does not exercise control over the inventory of its thalidomide supplies, and does not account accurately or correctly the amount and to whom the clinical materials are disbursed; FDA also doubted Vick's statement that they notified investigators of the discontinuance of the thalidomide program and requested that the remaining stock be destroyed or returned because no form letter was used, no material returned and Vick has no record of information about how much material was destroyed, if any, or who destroyed it; FDA identifies eight Vick clinical investigators).
- PLTF000343-47 (10-6-62 FDA memo re investigation to determine if Merrell broke the law by distributing an investigational drug for marketing purposes; FDA planned to interview 30 doctors who received the largest amounts of the drug, all lived in cities of at least 100,000 and were ob/gyn or internal medicine doctors; FDA noted that several of the doctors they selected had not provided any assurances that they would contact their patients and advise them to destroy any remaining thalidomide).

- PLTF000405-10 (October 1962 FDA confidential memo re investigation of an ob/gyn, whose name and other identifying information is redacted, noting that a Merrell detail man who approached the doctor for the purpose of promoting Kevadon when he was still a resident; the detail man emphasized the safety of the drug, and was led to believe that Kevadon was not an investigational drug that would have required clearance from supervising doctors; he also was led to believe that the supplies he received were advance samples, and that the drugs would be available to be dispensed from pharmacies in a matter of days; he said it was possible that the drug was given to some women in the first trimester of pregnancy but he would have no way of knowing it; the report also refers to a letter from Merrell, dated 8-21-61, stating that Dr. Nulsen had administered thalidomide to pregnant women with sleeping problems “without effect on the newborn infants”).
- PLTF000462 (9-23-62 letter from FDA to Pharmacy Association, noting that 200 pharmacies were involved in giving out drugs, the drugs were placed there by investigators to dispense them).
- PLTF001399-1411 (9-26-62 FDA investigation of National Drug Co.; ninety investigators specific to National Drug Co., false claims to investigators of “unsurpassed safety,” brochures not marked “for investigational use only”; in some cases the doctors received “an enormous amount” of the drug, including one doctor who received 160 bottles even though he had no institutional patients and was merely using them in his private practice; FDA thought that the number and quality of the reports received from the investigator reports were not commen-

surate with the amounts of drugs distributed; "It almost seems as if the drugs were being detailed for general use and loaded up on the doctors' shelves instead of being given to him with a careful eye on its evaluation as a drug."; the records of drug distribution were not consistent with National's original representation to the FDA in 4-62 that each doctor received 24 bottles).

Finally, Merrell has not established the earliest date of distribution of thalidomide in the United States. In fact, in a prior lawsuit, Merrell incorrectly informed the court that "plaintiff's counsel well knows that Thalidomide could not be manufactured – for sale – or distributed by Richardson Merrell." GSK_BUR00000395-404, at GSK_BUR00000402.

**Request for Admission No. 7**:

First, Plaintiff's mother ingested thalidomide. *See* supplemental interrogatory response, above, relating to Request For Admission No. 2. Moreover, when Plaintiff was in her early 20s, her mother told her that she had taken a pill for morning sickness during her pregnancy. *See* response to Interrogatory No. 4 in GSK LLC's 1st Set of Interrogatories to All Plaintiffs.

Second, during the late 1950s and early 1960s, the only entities authorized to distribute thalidomide in the United States (and, to Plaintiff's knowledge, the only entities that in fact distributed thalidomide in the United States) were SKF and Merrell. Therefore, the thalidomide ingested by Plaintiff's mother had to have been distributed by either SKF or Merrell. And SKF did not sufficiently monitor the distribution of thalidomide, which had two effects: (1) thalidomide was distributed by physicians and entities other than the so-called "clinical investigators" identified by GSK; and (2) SKF did not take adequate steps to ensure that all unused thalidomide pills were destroyed or returned to it once its "investigation" was finished. SKF's failure to track and account for its own thalidomide, and to make its "investigators" accountable for the thalido-

mide they received, does not relieve GSK of liability for injuries suffered by children of women who took thalidomide distributed by SKF but provided by physicians or entities other than the "investigators" identified by GSK.

There is ample documentary evidence of SKF's failure to control the distribution of thalidomide. In its supplemental response to Plaintiffs' Interrogatory No. 9 in this litigation, GSK states:

> At the time SKF discontinued its investigation of thalidomide in December 1957 based on its conclusion that the drug was not very effective, the disposition of remaining supplies of the drug, if any, was left to the discretion of the individual physician investigator. At that time, the drug appeared to be extremely safe. After the potential danger of thalidomide became known to SKF, SKF contacted each of its investigators in 1962, by telephone, to advise them to destroy any remaining supplies.

That response does not remotely establish that SKF controlled the distribution of thalidomide or accounted for the use of all thalidomide that it had distributed. Numerous other documents demonstrate that SKF neither controlled the distribution of thalidomide nor accounted for the use of all thalidomide that it had distributed:

- GSK00000995-1001; GSK 2159-65 (summary of GSK distribution from 11-17-1956 through 5-15-1956: many GSK investigators in private practice, like Carabello, Grahn, Kolton, Kriebel and Souder, receive disproportionately large volumes of thalidomide; Dr. Forrer receives hundreds of thousands of capsules).
- GSK00002511 (7-11-57 letter to Dr. Leinbach; GSK acknowledges that it did not provide a brochure on thalidomide when it distributed the drug: "However please use the supplies in any way you desire and don't worry about giving me a report. We are summarizing our data now and will not require any additional information.").

- GSK00001038 (1-14-58 Records show that Dr. Forrer received 110,00 capsules in less than 3 months, 10-23-57 through 1-14-58).
- GSK00002413 (June 8, 1962 letter from Hahnemann medical college (re Dr. Moyer), stating that there are no supplies of thalidomide and nothing in the minutes reflects that the hospital was ever involved in clinical studies of the drug; thus, GSK cannot account for drugs sent to one of its investigators).
- GSK00001044 (2-11-58 records of thalidomide distribution; includes shipment of 16,000 capsules to Dr. Forrer (one month after he declined further shipments) and incorrectly listed on GSK's shipment summary document as 800 capsules).
- GSK00003761 (11-2-56 letter from Dr. Norman David, professor at U. of Oregon med school (Portland), who agrees to begin research on thalidomide, but the study will be undertaken by his residents).
- GSK00003872-73 (12-24-56 letter of Dr. Forrer, director of state mental hospital in Michigan, who agrees to thalidomide study, which will be carried out by his staff).
- GSK00004076-78 (May 1962 GSK memo re retrieving the drug from its investigators, memo summarizing responses of doctors re remaining supplies; GSK acknowledges that the doctors did not know the drug they tested was thalidomide; only 43 of the 67 doctors are accounted for; GSK acknowledges that most of the investigators did not know that they were distributing thalidomide).
- GSK00001000, GSK00001016, GSK00001017 (5-15-58 list of distributions to GSK investigators on summary sheet, i.e., 5 months after the study purportedly finished and GSK did not renew its license).

- GSK00001028 (late May 1958 additional post-trial shipment of thalidomide).
- GSK00001020 (June 1958 additional post-trial shipment of thalidomide, this time to part-time GSK employee, Dr. Farquhar).
- GSK00001037 (July 1958 additional post-trial distribution of thalidomide, this time 100 capsules to Dr. Bard, GSK employee).
- GSK00003227, GSK00002457, GSK00003225 (GSK correspondence dated December 1957 (when its trials were purportedly coming to an end) re Professor Barnes's unsolicited proposed lab test; notes that he has an "unsavory reputation", although GSK still provides the 10 gm drug supply to him).
- GSK00001981 (1-20-58 letter showing that by January 1958 when GSK purportedly stops the study Dr. Forrer had received 304,400 capsules).
- GSK00002420; GSK00001395 (August 24, 1961, almost four years after the conclusion of GSK's trials GSK learned that Northville State was using supplies of GSK thalidomide provided to former Northville physician Dr. Forrer).
- GSK00002419 (on August 25, 1961, Northville State confirms that it was using thalidomide on its patients even though Dr. Forrer was gone and the study had not been in effect for years but agrees to destroy remaining supplies).
- PLTF000767 (8-1-62 FDA memo re investigation in Los Angeles District; hospital did not keep records of administration of thalidomide, promised to review hospital records to see if there were any deformed babies born in the last 2 years and if there were any records of thalidomide in any of the patients' history).
- GSK_LOC00000481-83 (8-6-62 FDA memo re Dr. Northrup, pediatrician, reporting deformed baby, whose mother received thalidomide from a relative

from Pittsburgh; in her letter to Dr. Northrup, Dr. Kelsey states that the FDA has found numerous deficiencies in the distribution of thalidomide by American drug companies).

- GSK00002105-06 (4-8-57 GSK exchange with Dr. Marrazzi, who tells GSK that the thalidomide trial is being conducted by Dr. Rodriguez; GSK indicates that it needs to know what doctors are involved; there is a mention of another drug being used in the wards at the VA hospital not at GSK's direction).
- GSK00004233 (4-23-57 GSK memo re clinical results of Dr. Chao, who entrusted the work to a resident).
- GSK00002555 (6-7-57 letter to Dr. Friend: "Do you think you can farm out SKF #5627 (the non-barbiturate sedative) to your Attleboro hospital for trial or possibly even to the Roxbury Veterans Administration Hospital? We are having a rather difficult time getting data on this compound by July 1.").
- GSK00004236 (6-13-57 GSK memo; notes that Dr. Keitel is leaving for California and will instruct his staff to use thalidomide in his absence, "and hopes to have 6-10 patients to report on when by his return").
- GSK00003804-08 (6-26-57 notes re Dr. Forrer's study, states that 20 staff MDs were involved).
- PLTF000493 (8-20-62 FDA memo re investigation of phocomelic; one of the physicians involved, Dr. Joseph A. Mellow, stated that he had the drug but discarded it when received; FDA wonders if he could have given it away to another physician or hospital).

- THAL_SAN_39631-34 (8-23-62 Dept. of Health press release, notifying the public that they may still have thalidomide tablets in their medicine cabinets; over 400 of the investigators the FDA interviewed made no efforts to contact the patients to whom they had given the drug; total number of pills distributed [by Merrell entities only] 2,548,212; FDA recovered 25,096 pills still in possession of doctors; investigators gave the drug to other physicians, patients to other people).
- PLTF000683-84 (8-30-62 FDA memo re distribution to indigent patients at Raleigh hospital; no pharmacy records kept because the drug was dispensed but not billed. FDA balked at reviewing all of the individual patient records in order to verify use).
- PLTF000508-09 (9-14-62 FDA report of deformed baby in Baltimore area; psychiatrist gave thalidomide to elderly patient who gave the drug to her pregnant daughter).
- PLTF000463-65 (8-31-62 Telegram from Pharmacy Association, responding to FDA comments that it did not know how many pharmacies had been given thalidomide to dispense).
- Dkt. No. 74-2 (8-31-62 New York Times, "U.S. Finds Stores Got Thalidomide: Says Barred Drug Reached Many Pharmacy Shelves").
- PLTF000365-66 (10-19-62 FDA memo, noting the lack of responsiveness of investigational doctors to contact their patients is a grave concern; one doctor prescribed it until March 1962 and delivered a malformed baby; another doctor reported to the FDA that he had only dispensed the drug to women past child-bearing years, but the records showed that he had dispensed it to a 26 year-old

pregnant woman, phocomelic birth of another child traced back to the grand-mother sharing her drugs with her daughter).

- PLFT0000475-76 ( 9-20-62 FDA letter or memo, noting that some doctors could not recall which patients had been given thalidomide).
- GSK00004064-71; GSK00004085-86; GSK00004082-83; GSK00002169-70 (documents regarding GSK's efforts to contact doctors for recall; GSK refers to thalidomide as the drug that "caused all the fuss about deformed babies"; most doctors say that they used all their supplies rather than that they destroyed them at the close of the study, supporting the inference that the drugs were in circulation for an indeterminate amount of time).
- PLTF000774 (August 1962 FDA memo re investigation of carton of thalidomide bottles at pharmacy, left by a resident).
- GSK00002172 (August 1962 GSK memo re contacting investigators to find out whether they had destroyed any remaining supplies; GSK notes that many doctors had forgotten which patients they had given it to and planned to use their "discretion in handling any questions" from the FDA).
- GSK00004073 (August 1962 GSK memo re telephone conversation to be held with all 67 investigators re FDA contacting them; GSK advises investigators that it will not reveal the patients who received the drug to the FDA and the doctors could use their discretion in responding to direct inquiries from the FDA).
- PLTF000816-17 (1-18-63 FDA memo stating that during the thalidomide investi-gation, it was doctors' "first line of defense" to claim that they did not use thalidomide).

- PLTF001145 (March 1963 FDA memo re investigation of shipment of thalidomide samples to a charity organization abroad; FDA concerned that other charities may have received samples and not been aware of the drug's danger).
- GSK00002178; GSK00004087 (May 1962 GSK records of contacting nine investigators, to see if they have any thalidomide supplies left; most had used them, one still had some and a couple were not sure).
- PLTF001095-96 (September 1962 FDA memo re discussion with AMA; FDA stated that if the investigators stated that they had contacted their patients or would do so; this statement was accepted on face value and no efforts were made to confirm this; the FDA was only concerned with taking steps when doctors refused to contact their patients and ask them to return or destroy any remaining supplies; AMA expressed surprise that some investigators could no longer recall the patients to whom had administered the drug).
- GSK00002093 (letter from GSK, acknowledging that investigator Dr. Marrazzi (VA research lab, Pittsburgh) returned 20 gms of thalidomide, SKF 5627, left over from the GSK study).
- PLTF001313 (October 1962 FDA memo of telephone conversation with Philadelphia District asking them to investigate GSK's hawk program because it sounded like commercialization of a NDA, noting that in Dr. Kelsey's interview with Dr. Gates, he stated that he had been told that the drug was perfectly safe, and that he said he had no special expertise in testing and that he understood that he was given the drug to test patient acceptance).

- PLTF000462 (9-23-62 letter from FDA to Pharmacy Association, noting that 200 pharmacies were involved in giving out drugs, and that the drugs were placed there by "investigators" to dispense them).

**INTERROGATORY NO. 3:**

Identify and describe all facts supporting the allegation in Your Complaint that Your mother ingested thalidomide while pregnant with You.

**SUPPLEMENTAL RESPONSE:**

*See* all supplemental interrogatory responses to Interrogatory No. 1, above.

**REQUEST FOR PRODUCTION AND SUPPLEMENTAL RESPONSE**

**REQUEST FOR PRODUCTION NO. 1:**

If Your response to any of Sanofi-Aventis U.S. LLC's Request for Admission Nos. 1-8 is anything but an unqualified admission, produce all documents that evidence, support, or contradict Your answer, and identify, for each document produced, the specific Request for Admission to which the document is responsive.

**SUPPLEMENTAL RESPONSE:**

All documents referred to in these responses have already been produced to or by Defendants, and are discussed above with respect to specific Requests for Admission.

DATED: June 9, 2014

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
Steve W. Berman (*Admitted Pro Hac Vice*)
Craig R. Spiegel (*Admitted Pro Hac Vice*)
Nick Styant-Browne (*Admitted Pro Hac Vice*)
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
craig@hbsslaw.com
nick@hbsslaw.com

*Attorneys for Plaintiffs*

SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
Jeffrey L. Kodroff (PA Bar No. 55780)
John Macoretta (PA Bar No. 60094)
Mary Ann Geppert (PA Bar No. 92644)
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
Email: jkodroff@srkw-law.com
jmacoretta@srkw-law.com
mgeppert@srkw-law.com

*Attorneys for Plaintiffs/Local Counsel*

Of Counsel:

GORDON LEGAL
Peter Gordon (*Pro Hac Vice* application to be filed)
360 Collins Street
Melbourne, Victoria, Australia 3000

*Attorneys for Plaintiffs*

**VERIFICATION**

I, Terrie Bolton, declare under penalty of perjury that all of the information provided in my supplemental responses to Defendant Sanofi-Aventis U.S. LLC's First Set of Interrogatories is true and correct to the best of my knowledge.

Executed this __ day of _____________, 2014.

_________________________________
Terrie Bolton

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2014, I caused a copy of the foregoing document to be served on counsel for the Defendants listed below by email.

/s/ Steve W. Berman
Steve W. Berman

Michael T. Scott
Sandra M. Di Iorio
Bailey E. Axe
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
mscott@reedsmith.com
sdiiorio@reedsmith.com
baxe@reedsmith.com

Sonja S. Weissman
**REED SMITH LLP**
101 Second St., Suite 1800
San Francisco, CA 94105
Telephone: (415) 543-8700
Facsimile: (415) 391-8269
sweissman@reedsmith.com

*Counsel for Defendants GlaxoSmithKline LLC and GlaxoSmithKline Holdings (Americas) Inc.*

Kenneth A. Murphy
**DRINKER BIDDLE & REATH LLP**
One Logan Square
Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2837
Facsimile: (215) 988-2757
kenneth.murphy@dbr.com

Anand Agneshwar
Bruce Kelly
**ARNOLD & PORTER LLP**
399 Park Avenue
New York, NY 10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399
anand.agneshwar@aporter.com
bruce_kelly@aporter.com

Albert G. Bixler
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
abixler@eckertseamans.com

Sara J. Gourley
Eugene A. Schoon
Craig A. Knot
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
sgourley@sidley.com
eschoon@sidley.com
cknot@sidley.com

*Counsel for Defendant Grünenthal GmbH*

Daniel S. Pariser
**ARNOLD & PORTER LLP**
555 12th Street NW
Washington, DC 20004
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
daniel_pariser@aporter.com

*Counsel for Defendant*
*Sanofi-Aventis U.S. LLC*