# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GLENDA JOHNSON, et al., | ) | |
| Plaintiff, | ) | |
| vs. | ) | CIVIL ACTION NO. 2:11-cv-05782 |
| SMITHKLINE BEECHAM CORPORATION, et al., | ) | (AND ALL RELATED ACTIONS) |
| Defendant. | ) | |

**DECLARATION OF TERRIE BOLTON**
**PURSUANT TO THE COURT'S MAY 27, 2026 ORDER**

Pursuant to the Court's May 27, 2026 Order, Plaintiff Terrie Bolton declares as follows:

1. My name is Terrie Bolton, a plaintiff in the above-referenced action, and I am currently representing myself *pro se*.

2. I was born on September 22, 1964 with the following birth injuries:

- Left proximal femoral focal deficiency;
- Flexion, abduction contractures of the right hip and flexion, adduction contractures of the left hip;
- Hypoplastic left iliac wing;
- Flexion contracture of the left knee;
- Bilateral aplasia/hypoplasia of the fibulae;
- Bilateral valgus deformity of the feet;
- Two lateral rays missing in the left foot and one lateral ray missing in the right foot;
- Left above-elbow congenital amputation;
- Congenital absence of one or two ulnar rays of the right hand; and

- Moderate scoliosis documented as of October 26, 1964.

3. In 1965, I underwent surgery to remove the right fibular anlagen. My left lower limb is considerably shorter than the right (8 1/2'" by 1973). There was no fibular anlagen on the left. I also had the peroneal tendons lengthened bilaterally. Photos of my birth injuries are collectively attached as Ex. A.

4. I have a good faith basis to believe, in accordance with Rule 11, Federal Rule of Civil Procedure, that I was exposed *in utero* to thalidomide.

5. My parents never told me thalidomide caused my birth injuries. I did not know I was a thalidomide survivor until Trent D. Stephens, Ph.D., an expert retained to opine in this litigation, confirmed I was after he examined me in August 2014. Dr. Stephens received his Ph.D. from the University of Pennsylvania in Anatomy and did his postdoctoral work in Human Embryology and Teratology at the University of Washington, Seattle. He is currently an Emeritus Professor of Anatomy and Embryology in the Department of Biological Sciences at Idaho State University. Dr. Stephens' research interests include limb field induction, size and location of the limb field, comparative and evolutionary morphogenesis, limb defects, teratology and the action of thalidomide.

6. The first time I heard the word "thalidomide" was in 2003. Prior to that time, doctors, attorneys and all information I could gather told me thalidomide could not have caused my injuries because: the drug was never distributed in the United States; my mother had never been to Europe; and my September 22, 1964 birthdate was too late for thalidomide to have caused my injuries given the purported "successful" recall of the drug in 1962. This is precisely the type of fraudulent concealment the drug companies engaged in to mislead the public about the distribution and subsequent recall of thalidomide in the United States. *See, e.g.*. Complaint, ¶¶

196-197, 205-208, 343. When I heard about this lawsuit in approximately 2011, I thought I would not be accepted as a plaintiff for all of these reasons.

7. However, after Dr. Stephens examined me in person in August 2014, I asked him if he thought I was a thalidomide victim and he confirmed I was. Since that time, I have learned:

a. Eighty-two doctors in Chicago, Illinois – where my mother received prenatal care – distributed thalidomide to 127 women of child-bearing age.

b. Thalidomide was often unlabeled and given to women in envelopes bearing only instructions for use. I have five siblings, four of which are older than me. None of my brothers and sisters have birth injuries, but even if the recall had been successful, my mother could have taken a pill prescribed to her for a prior pregnancy.

c. In 2018, I learned that a high school classmate of mine that I did not previously know, Anthony LaValle, was also a thalidomide survivor having been born with phocomelia. Mr. LaValle was born on July 29, 1964 (just two months before me) and lived within 10 miles of my house.

8. In addition, on June 14, 2018, Dr. Stephens signed a Declaration under penalty of perjury stating: "It is, therefore, to a reasonable degree of scientific certainty that Ms. Bolton's spectrum of defects were caused by thalidomide other than by some other, random event." *See* June 14, 2018 Declaration of Trent D. Stephens, Ph.D., attached as Ex. B. Dr. Stephens confirmed under oath that "[t]he probability of [my] defects occurring together by chance in the same person is $1:1.5 \times 10^{16}$ births." I researched that equations and learned that Dr. Stephens believes that the chances of me being born with my constellation of birth injuries is 1 in 10 quadrillion.

9. There has been testimony with respect to Dr. Stephens' calculations. On May 8,

2019, my former lawyer, Tyler Weaver, testified about his conversations with Dr. Stephens as follows:

> Q: …. [W]ould you please characterize the extent to which **Dr. Stephens could reach a conclusion of affirmative causation simply based on probabilities as opposed to circumstances in which he needed affirmative evidence as documentary evidence of actual ingestion during pregnancy**?
>
> A: It varied depending on the circumstances. Like I said, there were three different types of conclusions he reached and there was – and it's kind of a spectrum, but they all fell into one of these categories. One was – uhm, in a few cases he concluded that it was not Thalidomide based on what he had seen. There were other cases where he concluded that it was consistent or could be consistent with Thalidomide, but he would have to assume ingestion. Then there were a few cases where he concluded that based on the **cluster of defects alone**, you know, a large number of defects, especially rare defects that were all associated with Thalidomide and that the chances of them appearing – occurring in the general population in that form **were so small that he concludes strictly on the basis of those injuries that it was – it was – his opinion was that those – those injuries were caused by Thalidomide**.
>
> Q: Are you aware of whether he applied what I will call the "probability threshold" which he required before he would reach such an inference?
>
> A: I don't know if there was a magic number. I – it was somewhere in the high billions, one in so many billions. I know we had one case where one in three billion he still had to assume exposure. And I know we had another case where it was **one in 300 billion** where he didn't have to assume exposure.

*See* Transcript of May 8, 2019 Hearing at 234:18-236:12 (emphasis added).

10. Dr. Stephens' conclusion that the chances of my constellation of birth defects occurring in one person was 1 in 10 quadrillion means that no external evidence of ingestion is required to prove that my birth injuries were caused by thalidomide exposure.

11. I have reviewed this Court's summary judgment decisions in connection with former plaintiffs Jack Merica (Doc. No. 265) and Edmund Andre (Doc. No. 371), and the Third Circuit's decision in Case No. 15-2086, Doc. 003112170691. The Court also ordered that we review Doc. No. 265, an Order appointing William Hangley as discovery master. I have read Doc.

No. 265, but do not understand how it impacts the merits of my claims against the Defendants. In light of those decisions (discussed below), I have a good faith basis, in accordance with Rule 11, to assert my claims are not barred by the statute of limitations.

12. On July 14, 2014, this Court granted summary judgment against Jack Merica finding that his claims were barred by the two-year statute of limitations because Mr. Merica knew well before 2010 (two years before he filed suit in 2012) that his birth injuries were caused by thalidomide. More specifically, Mr. Merica's mother told him in the late 1960s that thalidomide caused his injuries, in the 1970s, Mr. Merica asked his mother why she had not filed a lawsuit against the drug manufacturers, in 1983, Mr. Merica filed a social security disability application seeking benefits for thalidomide injuries, in 1990 or 1991, Mr. Merica's mother gave him a bottle of thalidomide pills and, in 1992, Mr. Merica told his now-wife that thalidomide caused his birth defects.

13. On October 16, 2014, this Court granted summary judgment against Edmund Andre finding that his claims were time-barred because in approximately 1967-1969, Mr. Andre's father told him that his birth injuries were caused by thalidomide. In the 1980s, Mr. Andre's father attempted to sue the doctor that prescribed thalidomide but could not locate him. Also in the 1980s, Mr. Andre told a lawyer representing him in an unrelated personal injury matter that his injuries were the "result of thalidomide," but never asked that lawyer to investigate thalidomide claims. For 35-40 years, Mr. Andre told his doctors that his injuries were caused by thalidomide and, in 2005, identified "thalidomide" as an illness from which he was suffering.

14. On January 5, 2016, the Third Circuit Court of Appeals affirmed the district court's summary judgment award against Debra Johnson, a woman born in 1959. The Court held that Louisiana's one-year statute of limitations barred Ms. Johnson's claim because her mother, Doris

Williams, either had knowledge or should have had knowledge of the source of her daughter's birth injuries. The Court further found that, because Pennsylvania's Minor Tolling Statute was not enacted until 1984, Ms. Williams' knowledge was required to be imputed to Ms. Johnson.

15. My case is not like Messrs. Merica's or Mr. Andre's. Unlike Messrs. Merica and Andre, I did not know until August 2014 that my birth injuries were caused by thalidomide despite years of diligence where I attempted to learn the truth and was repeatedly told by doctors and lawyers that my birth injuries could not have been caused by thalidomide.

16. My case is also not like Ms. Johnson's. Pennsylvania's Minor Tolling Statute was enacted on May 30, 1984 and eliminated the concept that the parents' knowledge could be imputed to the child and bar a child's personal injury/product liability claim before he or she turned 18 years old. The Minor Tolling Statute instead tolls a child's claim during the period of his or her minority, and allows the child to bring a personal injury/products liability claim two years after he or she turns 18 years old (i.e., when the child turns 20 years old) and discovers what and who caused his or her injury. Ms. Johnson was 25 years old as of the May 30, 1984 enactment of the Minor Tolling Statute such that her claim had already been barred as of the date of the statute's passing. But unlike Ms. Johnson, I was only 19 years old when the statute was enacted. While I believe for many reasons my parents (now deceased) had no knowledge that thalidomide caused my birth injuries, my parents' knowledge is not relevant to my case because the Minor Tolling Statute governs my claim. The relevant inquiry is therefore when I knew or should have known I was a thalidomide survivor.

17. As discussed above, despite years of investigation, I did not know and could not have known I was a thalidomide survivor until August 2014. The conclusion of every investigation I undertook prior to August 2014 was that my birth injuries could not be caused by thalidomide

because the drug was not distributed in the United States, my mother never went to Europe, and my birth date was too late for thalidomide to have been the cause.

I declare under penalty of perjury that the foregoing is true and correct.

Terrie Bolton