# EXHIBIT E

**DECLARATION OF TRENT D. STEPHENS, PH.D.**

I, Trent D. Stephens, Ph.D., declare under penalty of perjury that the following is true and correct:

1. In approximately mid-2014, Hagens asked me to begin work related on United States thalidomide litigation. More particularly, Hagens asked me to review medical records and, if desired, examine plaintiffs to determine whether it was more likely than not that each plaintiff's birth injuries resulted from thalidomide exposure *in utero*. Hagens told me on several cases that I needed to complete my work on an expedited basis.

2. Although I told Hagens that it was my practice to prepare detailed reports and findings for each plaintiff, Hagens told me not to conduct that detailed work. Rather, Hagens directed me on many cases to prepare brief, cursory memoranda and provide it to them as soon as possible after each examination.

3. As a result, I began preparation of a draft report for each plaintiff based on my review of their medical records. I then supplemented those draft reports following each examination and provided the brief, draft report to Hagens as directed.

4. I then anticipated preparing formal reports setting forth my opinions to the standard customarily used by medical professionals.

5. Because I have been an expert in multiple jurisdictions, I understand that jurisdictions vary in the language used to meet the legal standard for establishing causation. The most common standard used by jurisdictions is "more likely than not." I always rely on the attorneys that retain me to instruct me as to the standard in a particular jurisdiction, and to let me know whether the jurisdiction deviated from the common "more likely than not" standard.

6. In the summer of 2014, as I began drafting my reports, and later my declarations, it was my understanding Pennsylvania law required my opinions to be "more likely than not." I was never told during any conversation with Hagens' attorneys in the summer of 2014 the standard in Pennsylvania was any different.

7. I prepared my reports and initial declarations with that phraseology throughout the summer of 2014. Hagens assisted in the review, finalization and filing of several of these declarations.

8. In fall of 2014, Hagens told me for the first time that the standard in Pennsylvania was "to a reasonable degree of medical certainty." Hagens asked me to prepare supplemental affidavits in some of the cases and use that specific phraseology when setting forth my opinions.

9. I prepared these affidavits as requested. (*e.g. Declaration regarding Carolyn Sampson, October 20, 2014, attached hereto*).

10. Even though I used a different phraseology as requested by Hagens, my opinions remain unchanged from the original reports and declarations as to whether these plaintiffs were exposed to thalidomide.

11. I evaluated Terrie Bolton on August 20, 2014 at my home in Pocatello, Idaho.

12. After the examination, I informed Hagens of my oral conclusions regarding Ms. Bolton and subsequently authored a very preliminary report that did not express any final opinion. I understand that Hagens has taken the position in an upcoming mediation with Ms. Bolton that I "explained to Mr. Weaver that [I] could not opine to a reasonable degree of scientific certainty that [Ms. Bolton's] birth-related injuries resulted from thalidomide exposure." That is inaccurate. Mr. Weaver never asked me whether I could opine to a "reasonable degree of scientific certainty" whether Ms. Bolton's injuries were related to

thalidomide exposure because I did not know that this was the applicable standard until months later. To my recollection, we never discussed this issue and I would have never told Mr. Weaver that I could not provide a causation opinion with respect to Ms. Bolton.

13. Any final thalidomide reports that I prepared for the Hagens firm contained a conclusion section which extrapolated the chances of a plaintiff's physical deformities occurring in a typical pregnancy, followed by my medical judgment regarding whether the plaintiff was exposed to Thalidomide. I was never asked to prepare a final report on Ms. Bolton. In fact, after I provided my August 22, 2014 preliminary draft opinion regarding Ms. Bolton, Hagens never asked me to perform any additional work with respect to Ms. Bolton's case.

14. If I had been asked to prepare a final report on Ms. Bolton, the conclusions contained in paragraph 15-17 would have been included.

15. The probability of transverse upper limb defects in the general population is about 1:15,000 births (Birch-Jensen Thesis, 1949, *Congenital Deformities of the Upper Extremities*, Andelsdogtrykkeriet I Odense and Det danske Forlag; she does not distinguish unilateral vs bilateral). Hypothenar hypoplasia/aplasia is extremely rare, with a very low probability of occurrence (about 1:640,000 for distal lateral defects; Birch-Jensen Thesis, 1949, *Congenital Deformities of the Upper Extremities*, Andelsdogtrykkeriet I Odense and Det danske Forlag). Approximately 50% of palatine tori have a genetic basis (Gorsky et al, Am J Med Genet, 75:138-140). There is no evidence in this case for this being familial. The incidence of a large palatine torus is approximately 1:30 births.

16. The null hypothesis in this case states that there is no relationship between lower limb PFFD (1:52,000 births), bilateral lower limb fibular ray loss (combined with PFFD), left

upper limb transverse loss (1:15,000 births), right upper limb postaxial loss (a separate condition from the left limb transverse defect, 1:640,000 births), and palatine torus (1:30 births). The probability of these defects occurring together by chance in the same person is 1:1.5 x $10^{16}$ births. The proposed incidences of these events occurring together by chance suggests that these defects did not occur by random events but, therefore, may be linked by some common etiology.

17. Two common factors that have been identified for these types of defects are an abnormal, deficient blood supply, and thalidomide exposure. Furthermore, thalidomide has been demonstrated to be antiangiogenic (D'Amato et al., *Proc Natl Acad Sci U S A* 91: 4082-4085, 1994; Therapontos et al, *Proc Natl Acad Sci* 106:8573-8, 2009). Birth defects that originate from natural blood vessel compromise are exceedingly rare. It is, therefore, to a reasonable degree of scientific certainty that Ms. Bolton's spectrum of defects were caused by thalidomide other than by some other, random event.

EXECUTED this 14th day of June 2018.

Trent D. Stephens, Ph.D.

6662901